**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO[1]**

| | |
|---|---|
| AMERICAN WILD HORSE CAMPAIGN | ) |
| 338 G Street # B | ) |
| Davis, CA 95616, | ) |
| | ) |
| SKYDOG RANCH & SANCTUARY | ) |
| 23823 Malibu Road, Suite 50, Box 498 | ) |
| Malibu, CA 90265, | ) |
| | ) |
| CLARE STAPLES | ) |
| 23823 Malibu Road, Suite 50, Box 498 | ) |
| Malibu, CA 90265, | ) |
| | ) |
| EVANESCENT MUSTANG RESCUE | ) |
| AND SANCTUARY, INC. | ) |
| 8370 US Hwy 82, | ) |
| Sherman, TX 75090, | ) |
| | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | ) |
| | ) |
| DEBRA HAALAND, Secretary | ) |
| U.S. Department of Interior | ) |
| 1849 C Street N.W. | ) |
| Washington, D.C. 20240 | ) |
| | ) |
| U.S. BUREAU OF LAND MANAGEMENT, | ) |
| 760 Horizon Drive | ) |
| Grand Junction, CO 81506, | ) |
| | ) |
| Respondents. | ) |

## SUPPLEMENTAL PETITION FOR REVIEW

---

[1] Petitioners originally filed this case in the District of Columbia. At Respondents' request, Petitioners stipulated to the transfer of this case to the District of Colorado, where a related case was challenging the same agency action. *See* ECF Nos. 8, 9.

1.      This case challenges the highly controversial Adoption Incentive Program ("AIP" or "the Program") created by the Department of Interior's ("DOI") Bureau of Land Management ("BLM"), under which BLM provides payments of up to $1,000 in federal funds to individuals for each wild horse or burro adopted through the Program, and which BLM created with no public notice, no opportunity for comment, and no environmental analysis—despite the fact that the program would foreseeably lead to wild horses and burros being profoundly mistreated and sold for slaughter in contravention of Congress's intent in enacting the Wild Free-Roaming Horses and Burros Act ("WHA") and subsequent appropriations of agency funding that specifically forbid any expenditure of federal funds for the slaughter of healthy wild horses or burros.

2.      BLM has repeatedly been subject to intense scrutiny and widespread public criticism for allowing wild horses to be sold or adopted in ways that have led to these federally protected animals being treated inhumanely or even sold for slaughter or processing into commercial products. Such scrutiny has included at least one investigation by the Department of Interior's Office of the Inspector General, a federal grand jury investigation, numerous critical articles in major newspapers, and letters from members of Congress expressing concern that such practices violate federal law and the congressional intent to protect these animals. Notably, Congress has repeatedly and explicitly forbidden federal agencies, including BLM, from using any appropriated federal funds for the destruction of wild horses or burros, or for the sale of a wild horse or burro that results in the animal's destruction for processing into a commercial product.

3.      Nevertheless, despite abundant, clear evidence that the public is extremely interested in ensuring that BLM's programs do not result in the slaughter or inhumane treatment

of wild horses or burros, and that neither Congress nor the American public condone federal agencies causing wild horses or burros to be slaughtered or treated inhumanely, BLM provided no public notice or opportunity for public comment when it created the AIP by promulgating an "Instruction Memorandum" ("IM") known as Instruction Memorandum 2019-025 ("IM 2019-025"). Likewise, despite the AIP having significant adverse impacts on wild horses, and despite BLM's own explicit intention for the AIP to free up federal funds for expenditure on agency operations on public lands that also have environmental impacts, BLM created the AIP without first undertaking any analysis of the likely environmental impacts of the Program, as required under the National Environmental Policy Act ("NEPA"). Additionally, BLM failed to adequately analyze the economic impacts of the AIP, as well as how such economic impacts may cause further environmental impacts by altering BLM's other wild horse and burro operations across western public lands.

4.     Since BLM created the AIP, Petitioners—a collection of non-profit organizations and individuals devoted to the welfare of wild horses and burros—have been forced to expend scarce resources investigating the fates of animals adopted through BLM's Program and attempting to prevent dire outcomes for these animals. Petitioners' investigations have revealed that numerous wild horses and burros adopted through the AIP have been subjected to severely inhumane treatment and have been sold at auctions that cater to the horse and burro slaughter industry. Petitioners compiled the results of their investigations into an extensive report that they submitted to DOI and BLM in order to demonstrate to the agencies that the AIP has caused inhumane—and unlawful—outcomes for federally protected animals, including the fact that the animals ended up at auctions that sell horses and burros for slaughter. Likewise, Petitioners submitted a formal petition to DOI and BLM explaining that the creation of the AIP violated

federal law in numerous ways and explicitly requesting that the agencies withdraw the AIP, or at the very least impose a moratorium on the AIP so that the agencies could take the necessary steps to come into compliance with federal law. However, DOI and BLM have not provided any final response to Petitioners' petition.

5.      After this lawsuit was filed, BLM revised the AIP by issuing IM 2022-014, which supersedes IM 2019-025. As detailed below, IM 2022-014 made nominal revisions to the incentive program such as altering the timing of BLM's payments of incentives to adopters. However, under IM 2022-014, BLM will continue to pay members of the public up to $1,000 for each animal adopted and will continue to allow members of the public to adopt animals—and receive federal taxpayer dollars—as swiftly as the WHA allows. Moreover, despite the fact that BLM was aware that the public, including Petitioners, had a high degree of interest in submitting input to promote lawful, transparent, and humane agency management of wild horses and burros—and despite the agency's own press release stating that "[p]ublic input continues to be important to the BLM"—the agency again refused to provide any public notice or opportunity for comment before issuing IM 2022-014. Likewise, despite having received ample notice from Petitioners of the need to consider the foreseeable environmental impacts of the AIP, BLM refused to undertake any NEPA analysis for its revisions to the AIP, instead relying on a categorical exclusion to claim that no NEPA analysis was necessary.

6.      The actions of DOI and BLM associated with the AIP violate federal law. For example, because the AIP meets the definition of a "rule" under the Administrative Procedure Act ("APA"), BLM was obligated to undertake notice-and-comment rulemaking before creating the AIP, yet BLM unlawfully failed to do so. Likewise, because the AIP has substantial adverse impacts on wild horses and burros—which BLM is statutorily tasked to protect—and because

BLM designed the AIP to free up funds for other activities that will cause further environmental and economic impacts to the lands and resources under BLM's management, BLM was obligated to prepare a NEPA analysis regarding the AIP's impacts, yet BLM unlawfully failed to undertake this legally required process as well. Further, because in creating and revising the AIP, BLM significantly deviated from its prior policies, which featured a more rigorous system for ensuring that wild horses and burros would not be sold to those who may send the animals to slaughter, without any recognition or explanation for why it was doing so, BLM violated the APA's mandates for reasoned decision-making. Moreover, by paying individuals to adopt wild horses and burros who then resell the animals for slaughter, the AIP constitutes an unlawful evasion of Congress's prohibition on the expenditure of federal funds for the slaughter of wild horses or burros.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Respondent Bureau of Land Management has headquarters in Colorado. Although this case was originally filed in the District of Columbia (where venue was also proper, as alleged in the original Complaint), Petitioners and Respondents stipulated to transfer this case to the District of Colorado because a related case was already pending in this forum.

## PARTIES

9.      Petitioner American Wild Horse Campaign ("AWHC") is a national 501(c)(3) nonprofit organization that is the nation's leading voice on protecting and preserving wild horses and burros. AWHC's mission is to defend America's wild horses and burros, to protect their freedom, preserve their habitat, and promote humane standards of treatment. AWHC's mission is

endorsed by a broad-based coalition of public interest groups, environmentalists, humane organizations, and historical societies, representing over ten million supporters.

10.     A major focus of AWHC's mission is to ensure that wild horses and burros that are removed from public lands are never sold for slaughter or processed into commercial products. AWHC has been working on this effort for more than a decade. Because preventing the slaughter of wild horses and burros is a key aspect of AWHC's mission, AWHC has engaged in numerous efforts to prevent wild horses or burros that are removed from public lands from being sold for slaughter or processed into commercial products. For example, AWHC has conducted polling showing that 80 percent of Americans oppose the slaughter of federally protected wild horses and burros, and has been successful in convincing Congress to maintain annual appropriations language that prohibits BLM from using any appropriated funds for the slaughter of healthy, unadopted wild horses or burros or the sale of wild horses or burros that results in the animals' destruction for processing into a commercial product. Likewise, after the United States Forest Service decided to sell wild horses "without limitation," which would have effectively approved the sale of such animals for slaughter, AWHC filed suit against the Forest Service and successfully prevented such sales from occurring during the pendency of the lawsuit. At the same time, AWHC also successfully convinced Congress to extend its prohibition on using appropriated funds for the slaughter of wild horses and burros so that the prohibition applies to the United States Department of Agriculture and the Forest Service in addition to the Department of Interior and BLM.

11.     Another key component of AWHC's mission is to promote the humane treatment of wild horses and burros on the range, during roundups and removals, and after the federal government has removed them from the range. AWHC has been actively engaged in this effort

for more than a decade. For example, AWHC has an extensive history of observing and recording BLM's management of wild horse and burro populations to document how the agency's operations have caused inhumane outcomes for wild horses and burros, such as serious injuries and deaths associated with the agency's use of helicopters to round up horses for removal from the range. AWHC has used these observations and recordings to successfully promote more stringent standards for the humane treatment of wild horses during roundups. Likewise, AWHC routinely comments on BLM's wild horse and burro population management actions and advocates for the agency to select means of managing these animals that are more humane. The opportunity to provide input on BLM's management of wild horses and burros is, for this reason, essential to AWHC's mission of promoting more humane treatment of these animals by the federal government. AWHC has also requested information regarding the acquisition and disposition of horses in short-term holding facilities and has used that information to educate the public regarding the significant incidence of deaths that occur in holding pens in the days, weeks, and months after roundup operations. AWHC has also supported efforts to improve conditions at holding facilities by providing shelter from the elements and has facilitated the rescue of dozens of horses and burros from holding facilities.

12.     The creation and implementation of the AIP has frustrated AWHC's core mission and caused AWHC to divert significant, and scarce, resources to mitigate the harms that the AIP has caused to AWHC's mission and to federally protected wild horses and burros. For example, BLM's creation of the AIP without any public notice or opportunity for comment deprived AWHC of any opportunity to advise BLM prior to the implementation of this Program of the foreseeable adverse consequences for wild horses and burros or to advise the agency of reasonable means of ensuring more humane outcomes for adopted animals. Wrongly deprived of

any opportunity to advise the government of the AIP's shortcomings or more protective and economically prudent alternatives, AWHC was forced instead to divert resources to educating the public about the AIP's foreseeable adverse consequences. For example, shortly after the AIP's creation, AWHC diverted staff resources to issuing a press release to educate the public about how the AIP would prove to be an economic boondoggle and "was a terrible idea from an animal welfare perspective" because "it will result in more federally-protected wild horses and burros entering the slaughter pipeline by incentivizing people without the necessary skills and resources to adopt wild horses."[2] The deprivation of any opportunity for input into BLM's policy-making thus frustrated AWHC's mission of promoting more humane treatment of wild horses and burros by the federal government.

13.     The creation and implementation of the AIP has also harmed AWHC's core mission of promoting the humane treatment of wild horses and burros, and of preventing the slaughter of wild horses and burros, by causing severely inhumane outcomes for wild horses and burros adopted through the Program. To counter the harms to AWHC's mission and to wild horses and burros, AWHC has been forced to divert resources to the investigation of the AIP's adverse outcomes and the subsequent dissemination of the resulting information to Congress, agencies, and others with authority to halt this unlawful Program. In particular, AWHC has been forced to devote significant staff time to the submission of numerous Freedom of Information Act ("FOIA") requests seeking information about animals adopted through the AIP that BLM does not make public. Likewise, AWHC has been forced to devote substantial staff time and resources to the investigation and preparation of reports documenting how wild horses and

---

[2] *See* AWHC, *Feds Give Cash Incentive for Mustang Adoptions – Advocacy Group Calls Foul*, https://americanwildhorsecampaign.org/media/feds-give-cash-incentive-mustang-adoptions-advocacy-group-calls-foul (March 12, 2019).

burros adopted through the AIP have in fact been treated inhumanely and have in numerous instances been sold at auctions that identify themselves as selling horses and burros for slaughter. As AWHC and its partner organizations have documented, wild horses and burros that have been adopted through the AIP have been subjected to a wide range of inhumane treatment, including but not limited to being provided inadequate feed, being housed in dangerously inadequate pens, and not being provided with adequate veterinary care. In at least one instance, a wild horse adopted through the AIP suffered abuse and/or neglect so extreme that the animal sustained a neck injury so severe that the animal was unable to stand and was "put out of her misery." On information and belief, the AIP has resulted in a dramatic expansion of adoption of wild horses and burros, to many individuals who are either unprepared and unequipped to care for these animals, or who have no sincere interest in caring for these animals and are instead motivated principally or exclusively by the cash payments that BLM provides as an adoption incentive through the AIP. The dramatic increase in the number of animals being adopted through the AIP has resulted in a far greater number of instances of inhumane treatment of wild horses and burros than occurred before the AIP was created and implemented. Hence, the AIP has harmed AWHC's ability to accomplish its mission of promoting the humane care and treatment of wild horses and burros and forced AWHC to expend significant resources to counter this harm to its mission.

14.     The creation and implementation of the AIP has also impaired AWHC's ability to accomplish its mission of preventing the slaughter of wild horses and burros. As AWHC and its partner organizations have documented, wild horses adopted through the AIP have frequently been sold at slaughter auctions, which are auction houses that describe themselves as "kill pens"

or that Petitioners know to be frequented by kill buyers.[3] (The term "kill buyer" refers to individuals who purchase horses and burros and sell them to horse slaughter plants in Canada or Mexico.) AWHC has documented nearly 587 instances—which is likely a fraction of the true number of instances—in which wild horses and burros that bear BLM freeze-brands have been sold at slaughter auctions since the creation of the AIP. On information and belief, the AIP has resulted in a dramatic expansion of adoption of wild horses and burros to individuals who have no interest in caring for the animals over the long term, but who instead retain the animals only for sufficient time to obtain payments of federal funds through the AIP and then sell them at slaughter auctions. Accordingly, on information and belief, the AIP has resulted in wild horses and burros being sold for slaughter. In this manner, the AIP has impaired AWHC's mission of preventing the slaughter of wild horses and burros. To counter this injury to its mission and to counteract this unlawful Program, AWHC has been forced to divert significant resources to investigating what has happened to wild horses and burros that are adopted through the AIP, to documenting in extensive reports how the AIP has effectively become a pipeline for wild horses and burros to be sent to slaughter, and to educating the public about the AIP's disastrous impacts for these federally protected animals.

15.     Due to BLM's creation and implementation of the AIP—which has created a serious risk of many horses and burros ending up at slaughter auctions—AWHC has had to divert significant organizational resources and staff time to investigating, disseminating information, and promoting solutions to counteract BLM's unlawful Program, which otherwise

---

[3] *See* https://stroudoklahomakillpen.com/about ("Yes, we are a kill pen"); *see also* https://fabriziuslivestock.com/ ("We are a kill pen that offer [sic] each horse a second chance before shipping to slaughter."); *see also* Exhibit 1, Appendix 1 (containing screenshots of the websites of these kill pens).

would have been spent on AWHC's other organizational priorities, such as PZP administration to wild horses on the range. For example, AWHC has been forced to divert at least $64,000 to rescue wild horses and burros from slaughter auctions, prevent their slaughter, and to obtain the title information for these animals. AWHC has further been forced to divert significant staff resources to submitting dozens of FOIA requests for information regarding the implementation of the AIP and to comparing the information obtained through FOIA to the information on titles of rescued animals to verify that the wild horses and burros that AWHC and its partners have rescued were in fact adopted out through the AIP. Furthermore, AWHC has been forced to divert significant staff resources to the preparation and publication of an extensive report on the AIP's disastrous consequences in order to educate the public and elected officials about this program and to explain to DOI and BLM how the AIP has inhumane and unlawful impacts. By draining AWHC's limited resources and forcing the organization to substantially shift its money and staff time from other priorities, the AIP has significantly impaired AWHC's day-to-day operations and frustrated key aspects of its organizational mission.

16.     Petitioner Skydog Ranch and Sanctuary ("Skydog") is a nonprofit organization that owns a 9,000-acre ranch near Bend, Oregon. Skydog's ranch is home to approximately 175 rescued horses and 50 rescued burros, some of which Skydog rescued at auctions before they could be purchased by kill buyers for slaughter or purchased from kill buyers when they had the animals in their feedlots waiting to ship to slaughter. Skydog's staff—including individual Petitioner Clare Staples—are regularly sent images of horses in need of rescue, often leading to such horses being saved hours or even minutes prior to them being shipped to Mexico or Canada for slaughter. Skydog's ranch provides a permanent home for rescued horses. Skydog's limited funding derives from fundraising events around specific trips to auctions to rescue a particular

horse or group of horses based on the horses' needs for that particular year. Skydog's specific mission is to rescue as many wild horses from slaughter as possible, and to then provide humane, respectful care for the rest of their lives.

17.     Prior to the AIP, Skydog operated in a much smoother fashion, deliberately planning its needs and capacity for horse rescue on an annual basis. For example, Skydog would determine through board meetings whether to target rescues of a particular type of horse (e.g., sale authority mustangs), and then would fundraise to support the execution of that year's rescue plan. After the AIP, and to counteract the significant onslaught of AIP horses showing up at slaughter auctions, a significant portion of Skydog's day-to-day operations and funding had to be diverted to bailing, hauling, and rescue costs associated with saving AIP horses from kill pens. Skydog's staff were forced repeatedly to travel to kill pens and auctions in various states, where they took title to many AIP horses—sometimes as many as twelve at one time. Skydog's staff were also forced to expend significant time, resources, and effort identifying third parties to haul the horses to Skydog's ranch in Oregon or to affiliate partner rescue organizations in the United States or abroad (sometimes with the assistance of TIP trainers). Each AIP horse required Skydog to expend funds on various activities before they could be placed, including veterinarian bills, quarantine expenses (including supplemental feed during quarantine), hauling costs, and trainer costs given that many of the young AIP horses needed gentling. In total, the average cost to Skydog for each AIP horse that it placed outside of Skydog's ranch amounted to roughly $5,000, with some costing more depending on the distance between the kill pen and the receiving horse rescue and whether or not the animal required veterinary care. The medical costs associated with veterinary care could also be considerable; for example, one rescued AIP horse required surgery to remove an eye at Colorado State University—an expenditure that Skydog

would not have incurred but for the AIP. In 2020 and 2021 (to date), the AIP has forced Skydog to permanently take in roughly twice the number of new horses that Skydog had planned and budgeted for in setting its annual priorities for those years, all outside Skydog's targeted in-need groups for those years.

18.     In total, Skydog has itself permanently rescued and relocated to its ranch approximately a dozen AIP horses that it had not planned or budgeted to rescue as part of its normal annual operations. This is a significant diversion of organizational resources that Skydog would not have expended but for the AIP, and which will continue to cost Skydog substantial sums of money throughout the lives of these animals, which could be up to thirty years given the young age of many of them. In addition, Skydog has rescued and helped place nearly 100 AIP horses at affiliate horse rescues all over the United States, as well as Germany, Bulgaria, and other countries (often with the assistance of TIP trainers). Because wild horses—including AIP horses—are not domesticated, Skydog has had to invest significant resources in identifying and hiring trainers to gentle AIP horses before they can be placed with Skydog or affiliate rescues in a manner that will harmonize with other animals on these ranches. Training of AIP horses alone has cost tens of thousands of dollars. Both because the AIP has forced Skydog to expend significant organizational resources rescuing and placing horses and because the AIP forced Skydog to divert those resources from other important organizational priorities, BLM's creation and implementation of the AIP has fundamentally compromised Skydog's day-to-day operations and frustrated its core mission. In addition, because Skydog has not always been successful in rescuing all AIP horses from slaughter, the fact that some horses have likely been slaughtered or placed in severely inhumane situations further undermines Skydog's core mission to rescue all wild horses from horrific fates.

19.     Petitioner Clare Staples is the Founder and President of Petitioner Skydog. She has been working on wild horse protection and rescue issues for more than a decade, and she oversees Skydog's management. Ms. Staples was heavily involved in Skydog's efforts—and will continue to be involved in those efforts—to rescue as many AIP horses as possible from kill pens and auctions before they are sent to Mexico or Canada for slaughter. After the creation of the AIP, Ms. Staples observed a noticeable difference in the people showing up at BLM corrals to adopt horses, many of them taking groups of very young horses. One year later, just after those same adopters would have received title, she received near-constant calls from individuals at kill pens and auctions that recognized wild horses there with BLM's freeze brands, thus requiring her to attempt to rescue these horses from horrific fates. The AIP—and its foreseeable result of AIP horses ending up at kill pens and auctions known to sell to kill buyers—forced Ms. Staples, when possible, to arrange for the rescue and transport of wild horses dozens of times before they were sold to third party kill buyers.

20.     The period of time since AIP horses began showing up at slaughter auctions has significantly affected Ms. Staples in many concrete ways. Financially, she has incurred tens of thousands of dollars of personal expenditures for training, hauling, transport, and other associated costs where Skydog had not yet conducted any fundraiser due to the urgent nature of these rescues of AIP horses. She has spent more than a thousand hours attempting to rescue AIP horses from horrific fates, and then planning logistics for quarantine, veterinarians, trainers, and hauling to placement locations—time she would not have spent on these matters but for the AIP. Ms. Staples has also suffered significant mental anguish and emotional distress from having to be repeatedly subjected to observing AIP horses—often in extremely poor health—in kill pens only hours or minutes from shipment to Mexico or Canada for slaughter. In addition, the AIP has

placed tremendous personal and professional pressure on Ms. Staples because if she cannot find a suitable placement at a horse rescue or sanctuary, this failure equates to that horse or group of horses going to slaughter or to an inhumane setting. Due to the immense stress imposed on Ms. Staples by BLM's creation and implementation of the AIP, she is terribly exhausted and emotionally drained because the AIP places her in the position of deciding the fate of AIP horses that BLM, as the agency charged with protecting them, should be safeguarding from slaughter and inhumane conditions. Especially now that Skydog's ranch is nearing capacity much faster than otherwise would have been the case due to taking in so many unexpected AIP horses, the emotional toll of many horses being slaughtered or treated inhumanely as a result of the AIP severely affects Ms. Staples' day-to-day emotional well-being and success both personally and professionally.

21.     Petitioner Evanescent Mustang Rescue and Sanctuary, Inc. ("Evanescent") is a 501(c)(3) nonprofit organization that was created to prevent animal cruelty through educating the public about horse care and safety, and which is dedicated to the rescue and rehabilitation of wild horses and burros. Evanescent partners with known, reliable individuals and organizations that provide foster care for rescued horses and burros. Evanescent's supporters and other mustang advocates attend slaughter auctions on behalf of Evanescent and purchase wild horses and burros before they can be sold to kill buyers. Evanescent and its partnering foster homes provide safe and humane care for rescued wild horses and burros, and work to match rescued animals with good, permanent homes. Evanescent also works to provide training for rescued animals to promote better chances of matching the animals with a good home. To further its mission to rescue wild horses and burros, Evanescent's goal is to acquire additional land for its sanctuary so

that it can rescue as many wild horses and burros from slaughter as possible and provide a safe and caring home for the remainder of the animals' lives.

22.     The AIP has frustrated Evanescent's ability to achieve its mission of rescuing wild horses and burros and has required Evanescent to expend significant additional resources to counteract that harm. For example, since the AIP's creation, Evanescent has witnessed a dramatic expansion in the number of wild horses and burros bearing BLM freeze marks at slaughter auctions. Prior to the AIP's creation, wild horses and burros appeared at auctions relatively infrequently and in small numbers, and were generally trained animals that humans can handle. However, after the AIP's creation, wild horses and burros began appearing at auctions extremely frequently, in large numbers, and in a completely ungentled state that revealed that the animals had not received any meaningful training or care. To prevent this dramatically increased number of wild horses and burros from being sold into slaughter, Evanescent has been forced to rescue wild horses and burros at a far greater rate. Evanescent has thus been forced to expend a significant portion of its scarce resources purchasing as many of these animals as possible, arranging for their safe and humane transportation and care, and working with responsible foster organizations to provide safe homes for these animals. Evanescent has been further forced to divert resources away from other aspects of its mission, such as any expansion to Evanescent's own sanctuary. Before the AIP, Evanescent was able to raise and save funds toward the purchase of additional land for its sanctuary. However, in light of the amounts that Evanescent has been forced to redirect to the rescue and care of numerous wild horses and burros from slaughter auctions, Evanescent no longer believes it will be possible to purchase additional land for its sanctuary in the foreseeable future.

23.     The AIP has also made the logistics of rescuing wild horses and burros from slaughter auctions more difficult. Because wild horses and burros are appearing at auctions with much greater frequency since the AIP's creation, Evanescent has been forced to expend greater resources obtaining wild horses and burros from auctions than it expended prior to the AIP's creation. Further, because it has been forced to expend most of its scarce resources on the animals it has already rescued, Evanescent is dependent on fundraising to rescue additional animals. However, when Evanescent learns that wild horses or burros are for sale at a slaughter auction, Evanescent often has only a matter of hours to try to raise funds to rescue these animals, which it is not always possible to do. Additionally, the animals that Evanescent has been able to rescue have required costly veterinary care.

24.     Likewise, because the wild horses and burros arriving at slaughter auctions since the AIP's creation are often entirely ungentled, Evanescent has been forced to expend significant resources to provide training for these animals that will allow humans to interact with them. The prevalence of such ungentled wild horses and burros at slaughter auctions has also made it significantly more difficult for Evanescent to locate suitable homes for these animals, because caring for and training ungentled animals requires specialized expertise. Because it has already been forced to rescue so many ungentled animals, which are costly to train and difficult to match with good homes, Evanescent does not have the capacity to continue adopting such ungentled animals at the rate the AIP has made necessary, and will not be able to do so unless it is able to identify additional suitable foster homes, which is increasingly difficult. In these ways, the AIP has frustrated and impaired Evanescent's central mission to protect wild horses and burros from slaughter.

25.     Respondent Debra Haaland is the Secretary of the United States Department of the Interior, the parent agency of BLM, and accordingly is ultimately responsible for the actions challenged here.

26.     Respondent United States Bureau of Land Management is an agency within the United States Department of Interior, which created and administers the Adoption Incentive Program and is responsible for the actions challenged here.

## FACTS GIVING RISE TO PETITIONERS' PETITION

## I.     STATUTORY AND REGULATORY FRAMEWORK

### A.   The Wild Free-Roaming Horses and Burros Act

27.     Finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West," and that "they contribute to the diversity of life forms within the Nation and enrich the lives of the American people," Congress enacted the WHA in 1971 to ensure that "wild free-roaming horses and burros shall be protected from capture, branding, harassment, [and] death," and that they are "considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331.

28.     The WHA mandates that the Secretary of the Interior "shall manage wild free-roaming horses and burros as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." *Id*. § 1333(a). To that end, the WHA further directs the Secretary to "maintain a current inventory" of wild horses and burros and to use that inventory to "determine appropriate management levels" in various areas of public lands, and "make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals." *Id*. § 1333(b)(1). The statute defines "excess animals" as those "which have been removed" from

public lands or "which must be removed" to preserve and maintain a thriving natural ecological balance. *Id*. § 1332. The WHA further provides discretion for BLM to determine "whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options . . . ." *Id*. § 1333(b)(1).

29.     Where BLM determines both that "an overpopulation exists and that action is necessary to remove excess animals" the WHA provides that the agency "shall immediately remove excess animals from the range so as to achieve appropriate management levels." *Id*. § 1333(b)(2). As the Tenth Circuit Court of Appeals has explained, the plain text of the WHA "quite clearly affords BLM with discretion to decide whether or not to remove excess animals." *Wyoming v. U.S. Dep't of Interior*, 839 F.3d 938, 944 (10th Cir. 2016).

30.     If BLM decides to remove wild horses, the WHA authorizes the BLM to allow the public to adopt wild horses "for private maintenance and care," provided that the agency "determines an adoption demand exists by qualified individuals" and that certain other conditions are met. 16 U.S.C. § 1333(b)(2)(B). In particular, the agency must determine that any adopter "can assure humane treatment and care (including proper transportation, feeding, and handling)." *Id*. Likewise, the statute restricts any individual from adopting more than four animals in a year "unless the Secretary determines in writing that such individual is capable of humanely caring for more than four animals, including the transportation of such animals by the adopting party." *Id*. In this manner, Congress sought to accommodate the public's interest in adopting wild horses while also ensuring that any horses so adopted would be cared for humanely.

31.     Although the WHA contemplates that unadoptable wild horses may be "destroyed in the most humane and cost efficient manner possible," *id*. § 1333(b)(2)(C), Congress has

routinely and specifically forbidden the Department of Interior and BLM from using federal funds for the slaughter of healthy, unadopted wild horses. *See, e.g., In Defense of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1059 n.3 (9th Cir. 2014) (noting that "Congress has never appropriated funds for extermination, as opposed to ongoing maintenance, of excess horses even if not adopted") (citing Pub.L. 111-88, 123 Stat. 2904, 2907 (2009)). Most recently, the Consolidated Appropriations Act, 2021, specifically provided that federal funds "shall not be available for . . . the destruction of any healthy, unadopted, and wild horse or burro" or "the sale of a wild horse or burro that results in the destruction of the wild horse or burro for processing into a commercial product." Pub. L. 116-260 § 419(e).

32.     BLM's regulations implementing the WHA specify that the agency "shall make available for private maintenance all healthy excess wild horses or burros for which an adoption demand by qualified individuals exists." 43 C.F.R. § 4750.1.

33.     BLM must ensure that any wild horses or burros made available for adoption "shall be individually identified . . . with a permanent freeze mark of alpha numeric symbols on the left side of its neck." These freeze marks "identif[y] the animal as Federal property subject to the protections of the [WHA]." *Id.* § 4750.2-1(c).

34.     BLM's regulations also specify the "[q]ualification standards" for an adopter of a wild horse or burro. For example, an adopter must be 18 years of age or older and have no prior conviction for inhumane treatment of animals or for violation of the WHA or its implementing regulations. *Id.* § 4750.3-2(a). Adopters must also "[h]ave adequate feed, water, and facilities to provide humane care to the number of animals" adopted. *Id.* An adopter's facilities "shall be in safe condition and of sufficient strength and design to contain the animals," and specifically must provide "minimum space of 144 square feet" per animal if exercised daily or otherwise "a

minimum of 400 square feet." *Id.* Until animals are "fence broken," wild horse enclosures must be "at least 6 feet high" and burro enclosures must be "at least 4 ½ feet high," and enclosures must "be protrusion free and shall not include large-mesh woven or barbed wire." *Id.* Shelter must "mitigate the effects of inclement weather and temperature extremes," and "[f]eed and water shall be adequate to meet the nutritional requirements of the animals." *Id.*

35.     BLM's regulations further specify that an adopter must "[h]ave obtained no more than 4 wild horses and burros within the preceding 12-month period, unless specifically authorized in writing" by BLM. *Id.*

36.     Any individual who wishes to adopt more than 4 wild horses or burros within a 12-month period, "or an individual or group of individuals requesting to maintain more than 4 wild horses or burros at a single location," must "provide a written report" prepared by a BLM official, "a local humane official, veterinarian, cooperative extension agent, or similarly qualified person" approved by BLM, "verifying that the applicant's facilities have been inspected, appear adequate to care for the number of animals requested, and satisfy the requirements" in BLM's regulations. *Id.* § 4750.3-3(a). The report must "include a description of the facilities, including corral sizes, pasture size, and shelter, barn, or stall dimensions, and shall note any discrepancies between the facilities inspected and representations made in the application form." *Id.* If any individual "requests 25 or more animals or when 25 or more animals will be maintained at any single location regardless of the number of applicants, the facilities for maintaining the adopted animals shall be inspected by the authorized officer prior to approving the application." *Id.*

37.     BLM must "determine an individual's qualifications" to adopt wild horses and burros based on information provided on a BLM-designed application form and BLM must

maintain "records of any previous private maintenance by the individual under the Act." *Id.* § 4750.3-2(b).

38.     After a wild horse or burro is adopted, BLM must retain title to the animal for "at least 1 year," during which time the adopter must abide by a "Private Maintenance and Care Agreement." 43 C.F.R. § 4750.1(a). During this time, the adopter may not transfer the animal to another location or to another individual without BLM's prior approval. *Id.* § 4750.1(b). Adopters must make adopted animals "available for physical inspection within 7 days of a written request" by BLM, *id.* § 4750.1(b), and must notify BLM within 7 days of the death, theft, or escape of an adopted animal, *id.* § 4750.1(c).

39.     An adopter must also "apply for title" to an adopted wild horse or burro. 43 C.F.R. § 4750.5(a). BLM "shall issue a Certificate of Title after 12 months" from the date of adoption only "if the adopter has complied with the terms and conditions of the [adoption] agreement" and BLM "determines, based either on a field inspection or a statement provided by the adopter from a veterinarian, extension agency, local humane official, or other individual acceptable to the [agency], that the animal or animals covered by the [adoption] Agreement have received proper care and humane treatment." *Id.* § 4750.5(b). "An adopter may not obtain title to more than 4 animals per 12-month period of private maintenance." *Id.* § 4750.5(c). Once BLM issues a Certificate of Title to the adopter, "Federal ownership of the wild horse or burro ceases and the animal loses its status as a wild horse or burro and is no longer under the protection of the Act." *Id.* § 4750.5(c).

40.     Through a series of Instruction Memoranda, BLM has also created policies that govern the sale of wild horses and burros. The agency's policies for sales of wild horses and

burros are described in IM 2014-132.[4] That IM's intent "is to provide guidance on selling animals to individuals and organizations that will provide good homes and humane care." To that end, the policy requires BLM to "look up the purchaser's name" in the agency's records "to determine if there are any documented notes" about the purchaser in BLM's possession, and "[w]hen there is evidence that may indicate a purchaser does not intend to provide a good home . . . deny the sale and document the reasons for their decision." In such instances, the policy also requires local BLM officials to "notify the Washington office . . . so that other Facility Managers can be advised of the situation and prevent such buyers from shopping from facility to facility." Additionally, any individual or group wishing to purchase more than four animals within a six-month period must receive approval from a high-level agency official, "the Assistant Director, Resources and Planning," and in order to obtain such approval must "submit a proposal detailing where animals will be kept, plans to provide humane care including adequate forage, water, hoof and veterinary care, fencing, and the intended use for the animals." The sale of the animal is completed with a Bill of Sale that "indicates that the animal has become private property and is no longer under the protection of the [WHA]." Through these provisions, BLM's policies regarding the sale of wild horses and burros attempt to guarantee that the animals may only be sold to individuals or organizations that will provide good homes and humane care, and specifically include mechanisms designed to prevent purchases by individuals who do not actually intend to provide good homes and humane care for these federally protected animals.

---

[4] Although BLM briefly superseded IM 2014-132 by promulgating another such memorandum, IM 2018-066, the agency then issued a third memorandum, IM 2019-026, that superseded IM 2018-066 and reinstated IM 2014-132 as the agency's governing policy. *See* IM 2019-026, https://www.blm.gov/policy/im-2019-026 (directing that BLM will "comply with the policies, procedures, guidance set forth in IM 2014-132").

### B.  <u>The National Environmental Policy Act</u>

41.     Congress enacted the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, to ensure that federal agencies fully consider the environmental impacts of their actions before taking them, consider alternatives to proposed actions that may have less adverse environmental impacts, and make information publicly available with sufficient detail to promote fully informed public participation in agency decision-making.

42.     To meet these objectives, all agencies must prepare an Environmental Impact Statement ("EIS") for any major federal action that may "significantly affect[]" the environment. 42 U.S.C. § 4332(C). The Council on Environmental Quality ("CEQ")—an agency within the Executive Office of the President—has promulgated regulations implementing NEPA that are "binding on all Federal agencies." 40 C.F.R. § 1500.3. These regulations provide that in determining whether an EIS is required with respect to a particular proposed action, an agency must prepare an Environmental Assessment ("EA") that analyzes the environmental impacts of the proposed action as well as alternatives. *Id*. §§ 1501.4(c), 1509.9.

43.     In determining whether an EIS is required, the agency must consider whether the proposed action may have a "significant" effect on the human environment. 40 C.F.R. § 1508.27. The "significance" determination is based on factors such as the degree to which the effects on the environment "are likely to be highly controversial" or "are highly uncertain"; the degree to which the action "may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration," or "may cause loss or destruction of significant scientific, cultural, or historical resources"; and whether the action "threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." *Id*.

44.     A significant effect, requiring an EIS, may exist "even if the Federal agency believes that on balance the effect will be beneficial." 40 C.F.R. § 1508.27(b)(1). The existence of any one of the CEQ significance criteria usually requires the preparation of an EIS.

45.     If an agency decides that an EIS is not required, it issues a Finding of No Significant Impact ("FONSI"), which must present the reasons why the agency has determined its proposed action "will not have a significant impact" on the environment." 40 C.F.R. § 1508.13.

46.     NEPA requires agencies to consider a range of reasonable alternatives to its proposed action. See 40 C.F.R. § 1502.14. An agency may not artificially constrain its analysis of reasonable alternatives by framing its purpose and need statement for a proposed action in an excessively narrow manner.

## C.  The Administrative Procedure Act

47.     The Administrative Procedure Act ("APA") mandates that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . in excess of statutory jurisdiction, authority or limitations," or adopted "without observance of procedure required by law." 5 U.S.C. § 706(2).

48.     Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

49.     The APA also provides the "basic procedural requirement" that "an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2125 (2016). "Agencies are free to change their existing policies so long as they provide a reasoned explanation for the change." *Id*. In doing so, "the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy." *Id*. at 2126. Likewise, agencies "must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id*. In such circumstances, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id*. For these reasons, "an unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Id*.

50.     The APA requires agencies to provide notice and an opportunity for public comment before promulgating any rule. 5 U.S.C. § 553. The APA defines a "rule" as "the whole or part of an agency statement of general applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4). The definition of a "rule" also "includes the approval or prescription for the future of . . . financial structures . . . prices . . . services or allowances . . . or practices bearing on any of the foregoing." *Id.*

## II.     FACTUAL BACKGROUND

### A.     Prior BLM Actions Caused, or Failed to Prevent, Slaughter of Wild Horses and Burros, and BLM Has Repeatedly Asked Congress for the Authority to Conduct Slaughter

51.     BLM has previously endured intense public scrutiny, federal investigations, and congressional inquiries regarding its actions that have caused or failed to prevent wild horses and burros from being slaughtered.

52.     The slaughter of wild horses and burros generally occurs in Canada or Mexico, because no slaughterhouses in the United States are authorized to slaughter horses or burros for human consumption. Accordingly, individuals and organizations that seek to profit from the slaughter of American horses and burros generally purchase these animals at auctions in the United States and then  transport them to Canada or Mexico and sell them to slaughterhouses. This Complaint uses the term "slaughter auction" to refer to auctions in the United States that cater to this industry, meaning auctions at which many or most of the purchasers will eventually resell the animals for slaughter.[5] Many such facilities refer to themselves as "kill pens," state that animals at auction are "in the slaughter pipeline," or acknowledge that horses that are not rescued from the facility will instead be shipped to slaughter.[6]

53.     Although slaughterhouses are a typical final destination for horses and burros purchased at slaughter auctions, BLM has a history of turning a blind eye to the outcomes from slaughter auctions. For example, BLM recently informed Petitioners that it "does not and cannot assume that any or every titled or sold wild horse or burro that arrives at a sale barn is destined for slaughter." The consequences of BLM's unwillingness to meaningfully investigate or oversee slaughter auctions at which wild horses and burros are sold has previously led to instances in which BLM allowed or failed to prevent the slaughter of wild horses and burros.

---

[5] The term "slaughter auction" is not unique to this Complaint. *See*, *e.g.*, Letter from Dianne Feinstein, U.S. Senator to the Honorable Deb Haaland, Secretary of Interior, May 27, 2021, available at https://www.feinstein.senate.gov/public/index.cfm/press-releases?ID=02C96A16-6B68-4039-82BE-73F47AB8B4B0 (objecting to how the AIP has led to the sale of wild horses at "slaughter auctions"); Dave Philipps, *New York Times*, *Wild Horses Adopted Under a Federal Program Are Going to Slaughter*, May 15, 2021, available at https://www.nytimes.com/2021/05/15/us/wild-horses-adoptions-slaughter.html (describing how "instead of going to good homes, truckloads of horses were dumped at slaughter auctions").
[6] *See* Exhibit 1, Appendix 1 and June 16 Addendum.

54.     For example, as documented in an article in the Los Angeles Times, a federal grand jury investigation in 1997 revealed that BLM "allowed the slaughter of hundreds of wild horses taken from federal lands, falsified records and tried to prevent investigators from uncovering the truth."[7]

55.     In 2015, DOI's Office of the Inspector General issued an *Investigative Report of Bureau of Land Management Wild Horse Buyer*, which found that "BLM did not follow current law while managing [wild horses and burros]" and instead sold 1,700 wild horses to a buyer that "wrongfully sent them to slaughter."[8]

56.     Although BLM has put in place policies that nominally aim to prevent wild horses or burros from being slaughtered or sold for processing into commercial products, the agency has also asked Congress to allow it to slaughter wild horses and burros as a population control measure. For example, in a 2018 Report to Congress titled *Management Options for a Sustainable Wild Horse and Burro Program*, BLM stated that "BLM has previously requested authority . . . to sell without limitation [i.e. for slaughter] all excess wild horses and burros and euthanize horses for which an adoption demand does not exist." In that same report, BLM proposed that "[e]uthanasia of healthy excess wild horses for which an adoption demand does not exist" should be "categorically excluded from detailed NEPA analysis," despite the fact that such an action would result in the death of at least 50,000 federally protected animals. Likewise, BLM's fiscal year 2019 budget proposal asked Congress to remove appropriations language prohibiting the use of federal funds for the slaughter of wild horses and burros.

---

[7] *See* Martha Mendoza, Los Angeles Times, March 23, 1997, https://www.latimes.com/archives/la-xpm-1997-03-23-mn-41176-story.html

[8] This report is available at https://www.doioig.gov/sites/doioig.gov/files/WildHorseBuyer_Public.pdf

57.     Despite BLM's repeated requests for authority to slaughter wild horses and burros, Congress does not authorize the use of federal funds for this purpose. Rather, Congress has explicitly and continually prohibited the use of any federal funds for this purpose.

58.     The American public overwhelmingly opposes the slaughter of healthy wild horses and burros.

**B.     The Adoption Incentive Program Created a Genuine Risk that Wild Horses and Burros Will Be Slaughtered**

59.     BLM created the AIP on January 30, 2019 by issuing IM 2019-025, which states that the AIP aims "to increase the number of adoptions of untrained wild horses and burros placed into private care through offering financial incentives."

60.     Under IM 2019-025, an adopter becomes eligible for incentive payments after paying an adoption fee of $25 per animal and completing an Adoption Incentive Agreement and an Adoption Application. At that point, as IM 2019-025 notes, "[t]he AIP offers a financial incentive in the amount of $500 within 60 days from the adoption date [of a wild horse or burro] and an additional $500 within 60 days from the title date," which occurs one year from the date of adoption. Thus, an adopter who houses a wild horse or burro for one year may obtain title to the animal, and a total payment of up to $1,000 for each wild horse or burro adopted through the Program. Once an adopter takes title, ownership of the animal passes to the adopter, and the animal enjoys no further protections under the WHA.

61.     Although it offers direct payments to adopters of wild horses, the overarching purpose of the AIP is to save money for BLM. As BLM explained when creating the AIP, "[i]ncreasing the placement of animals into private care is a critical priority of the [wild horse and burro] program and of utmost interest to the BLM due to the costs associated with caring for unadopted animals in BLM managed or contracted corrals and pastures." BLM noted that

because the number of wild horses and burros the agency removes from public lands significantly exceeds the rate at which the public adopts wild horses and burros, "the feed and care of the animals removed from the range continue to consume over 50 percent of the WHB program's budget." BLM further explained that "this policy will reduce off-range holding costs and allow those savings to support critical on-range operations," and that "[i]ncreasing adoptions reduces holding costs, creating a cost savings that allows funding to be dedicated to other aspects of managing wild horses and burros."

62.    The AIP nominally allows "each adopter participating in AIP to adopt and maintain a maximum of four untitled animals annually," but the Program actually allows individuals to obtain more than four horses in a year so long as they have "up to a maximum of four untitled animals at any one time." As an adopter gains title to an animal, that adopter becomes eligible to adopt another animal through the AIP.

63.    Although IM 2019-025 contains some provisions that address the need for humane care and treatment of adopted animals, these provisions are significantly weaker than in prior BLM policies. BLM's prior policy governing sales of wild horses and burros, IM 2014-132, specifies that "where there is evidence that *may* indicate that a purchaser does not intend to provide a good home," the agency "*will* deny the sale" and inform BLM's Washington Office so that other facilities can also "prevent such buyers from shopping from facility to facility." In this manner, BLM's prior policy was to proactively disqualify purchasers from obtaining any wild horse or burro where any evidence "may" indicate that the purchaser would not provide a good home for the animal. The AIP contains no such proactive disqualification policy and is thus a significant, and unexplained, departure from BLM's prior policy.

64.     Moreover, although the AIP does contain a provision specifying that BLM may eventually disqualify an adopter from further receipt of incentive payments, such disqualification only occurs *after* BLM proves a violation of a Private Maintenance and Care Agreement, an Adoption Incentive Agreement, or the commission of a prohibited act specified in BLM's regulations. This difference is important. For example, under BLM's prior policy governing sales, an individual who sells a horse at a slaughter auction should be disqualified from ever purchasing a wild horse again, because such an action at least "may indicate" that the purchaser "does not intend to provide a good home" for the animal. In sharp contrast, under the AIP BLM has expressed the position that the sale of a wild horse or burro at a slaughter auction does not constitute a violation of the AIP so long as the adopter first received title to the animal. As such, those who receive federal incentives to adopt wild horses or burros, receive title to the animals, then sell those animals at slaughter auctions, will not only be allowed to adopt more animals, but will still be entitled to receive federal taxpayer dollars to do so.

65.     IM 2019-025 also makes agency oversight of adopters discretionary rather than mandatory. For example, IM 2019-025 merely states that BLM "*should* ensure that adopters participating in the AIP adhere to the terms of the Adoption Incentive Agreement," and "*should* ensure that all adopters meet applicable adoption requirements." Likewise, the IM states that BLM "*should* conduct compliance inspections on adopted animals participating in the AIP." Further, the IM states that "BLM *should* remove eligibility to participate in the AIP from any adopter that relinquishes [i.e. returns to BLM] two or more animals within a 12 month period." However, the AIP does not contain any provision specifying that adoptions, or payments of federal funds, *must* be denied based on a history of inhumane treatment of adopted animals, a

history of animal abuse, or even evidence that an adopter actually sent an adopted animal to slaughter.

66.     These discrepancies between the AIP and prior BLM policy, which the agency has never explained, highlight how BLM established more lax standards for individuals whom the agency pays to adopt wild horses or burros than the agency previously established for those who pay to purchase a wild horse or burro.

67.     Because the AIP, under IM 2019-025, "offer[ed] a financial incentive in the amount of $500 within 60 days from the adoption date and an additional $500 within 60 days from the date of title," the AIP constitutes "the approval or prescription for the future of rates . . . prices . . . services or allowances . . or practices bearing on any of the foregoing" within the APA's definition of a "rule." 5 U.S.C. § 551(4).

68.     Because the AIP directs BLM to deliver payments of federal funds to adopters of wild horses or burros, the AIP constitutes a "statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy" within the APA's definition of a "rule." 5 U.S.C. § 551(4).

69.     Before creating the AIP through the issuance of IM 2019-025, BLM did not provide the public with any notice or opportunity for comment.

70.     BLM's creation of the Adoption Incentive *Program* meets the definition of a "Federal action" subject to mandatory NEPA review, which includes the "adoption of *programs*, such as a group of actions to implement a specific policy or plan." 40 C.F.R. § 1508.18(b)(3) (emphasis added).

71.     The AIP has environmental and economic impacts, including impacts on federally protected wild horses and burros that are adopted through the program, as well as impacts

associated with federal on-range management actions for which BLM explicitly intends the AIP to free up federal funds.

72.     Before creating the AIP through the issuance of IM 2019-025, BLM did not conduct any NEPA analysis to consider the Program's impacts.

73.     Before creating the AIP through the issuance of IM 2019-025, BLM did not engage in any public process under NEPA to consider alternatives to the Program. However, BLM was aware that alternative approaches could exist. For example, BLM previously discussed with its Wild Horse and Burro Advisory Board a program under which it would provide financial incentives for the adoption of only older horses and burros, which are less likely to be adopted absent an incentive than young animals, as opposed to providing an incentive for adopting animals of any age as occurs under the AIP. Likewise, BLM previously discussed with its Advisory Board the possibility that adopters could only earn financial incentives if they were able to demonstrate that they had trained adopted animals to a certain level during the year of private care that occurs before titling. BLM also discussed with the Advisory Board various possible levels of incentive payments, including such options as paying up to $10,000 per animal adopted or using a sliding scale to pay higher incentives for the adoption of multiple animals at once. Additionally, BLM and the Advisory Board discussed whether there should be greater clarity regarding what the consequences might be for those who violate the terms of the AIP or violate the WHA itself. Finally, BLM and the Advisory Board discussed the need for adequate procedures to ensure that adopted horses would not be abused or neglected, or sold once the adopter received incentive payments. Accordingly, BLM's history of discussions with its own Advisory Board make clear that the agency was aware that alternative approaches to the AIP could exist and could make the Program more protective of wild horses and burros. Recently, the

Advisory Board also recommended another specific alternative of non-cash incentives that might be put toward veterinary care or training of adopted horses. Nevertheless, despite the clear existence of numerous alternatives to the AIP, BLM failed to examine any alternatives to the Program as part of any NEPA process.

74.      Before creating the AIP through the issuance of IM 2019-025, BLM did not engage in any public process under NEPA or the APA to consider whether the AIP would contravene Congress's intent to forbid the use of appropriated funds in a manner that results in the slaughter of wild horses or burros.

75.      The AIP has roughly doubled the rate of adoption of wild horses and burros. In a press release dated May 14, 2020, the BLM stated that there had been "an increase of 91%" in the number of adoptions "[i]n the first 12 months of the AIP." BLM further noted that in the AIP's first year (2019 to 2020), the agency saw "substantial increases" in the number of first-time adopters, repeat adopters, and "multiple-animal adoptions."[9]

76.      In another press release, BLM stated that "[i]n the first 12 months of the Adoption Incentive Program, the agency adopted out more than 6,000 animals, helping the agency to achieve a 15-year record for total adoptions and sales in Fiscal Year 2019."[10] For Fiscal Year 2021, BLM reported that 51% of adoptions, or 3,742 animals, went through the AIP.[11]

---

[9] *See* BLM, *Cash Incentives Help Agency Adopt More Wild Horses and Burros*, https://www.blm.gov/press-release/cash-incentives-help-agency-adopt-more-wild-horses-and-burros

[10] *See* BLM, *ICYMI: BLM's Adoption Incentive Program A Success At the One Year Mark As Agency Takes Steps to Address Wild Horse and Burro Overpopulation*, https://www.blm.gov/press-release/BLM-Adoption-Incentive-Program-a-Success-at-the-One-Year-Mark-as-Agency-Takes-Steps-to-Address-Wild-Horse-and-Burro-Overpopulation

[11] *See* BLM, *Wild Horse and Burro Program: Highlights from Fiscal Year 2021*, https://www.blm.gov/sites/blm.gov/files/docs/2021-12/FINAL_WHBhighlightsFY2021.pdf

77.     As reflected in records obtained by Petitioners through FOIA, roughly six months after the AIP's creation, a BLM official shared his "thoughts on the Adoption Incentive Program." That official noted that the agency had seen a "pretty good boost in adoption numbers," mostly to "new adopters," but raised significant "concerns focus[ed] on the welfare of the animal after they are adopted." The BLM official further noted that the agency could see "a surge in compliance issues with AIP animals as a result of people only seeing the initial cash payment and not thinking about the lifetime costs associated with owning a horse and the adoption of animals to people who have no business owning a horse!"

78.     Because it was entirely foreseeable that offering payments of $1,000 per animal could attract individuals who are more interested in cash payments than the welfare of adopted animals, Petitioners would have raised this concern had BLM provided any opportunity for public input prior to establishing the AIP. Likewise, Petitioners would have raised the concern that BLM was unreasonably departing from its prior policies, without any explanation, by making it easier to get paid to adopt a wild horse or burro than to pay to purchase one. However, BLM's failure to provide any opportunity for public comment deprived Petitioners of any opportunity to raise any such concerns.

**C.     Petitioners' Investigation of the AIP Revealed the Harm BLM Has Caused to Wild Horses and Burros**

79.     Because the AIP was created in January 2019, and because under IM 2019-025 adopters receive $500 upon the date of adoption and another $500 within 60 days of the transfer of title one year later, the first set of final AIP payments was issued in or around March 2020.

80.     Petitioners include equine rescue groups whose missions are to prevent wild horses and burros from being slaughtered or subjected to inhumane treatment. To accomplish that mission, these rescue groups monitor online advertisements by slaughter auctions and attend

auctions at which unhandled horses and burros that have been removed from federal public lands are sold to kill buyers, who are private purchasers who then resell such animals to slaughterhouses in Canada or Mexico (where, unlike in the United States, slaughter of horses and burros for conversion into commercial products is permitted). Some of these slaughter auctions are self-described "kill pens." If possible, Petitioners purchase wild horses and burros at such auctions to prevent them from being slaughtered and instead, at the rescue organizations' expense, house the wild horses and burros humanely on the organizations' lands.

81.     Beginning in the summer of 2020, shortly after individuals who adopted the first wild horses or burros available through the AIP were receiving their second cash payment from BLM, the rescue groups began witnessing an increase in the number of horses and burros bearing BLM freeze marks—i.e., wild horses and burros that had been removed from public lands—at slaughter auctions catering to kill buyers. In total, Petitioners have documented at least 240 instances in which wild horses or burros—i.e., animals bearing BLM freeze-marks—appeared in slaughter auctions' online promotions and/or in the auctions themselves.

82.     To accomplish their mission of preventing wild horses from being slaughtered or subjected to inhumane treatment, which is a common outcome for animals sold at slaughter auctions, Petitioners were forced to investigate the cause of the sudden influx of wild horses and burros at such slaughter auctions. As part of that investigation, and consistent with their missions and to the extent they were able, the Petitioner rescue organizations purchased horses and burros bearing BLM freeze marks to prevent them from being slaughtered and/or treated inhumanely. Such a purchase is the only way to ensure that the animals will not be slaughtered and to obtain the title to the animals, which is essential to verifying whether the animals were adopted through the AIP.  Hence Petitioners were forced to expend substantial resources purchasing wild horses

and burros at auction, which is the only way to obtain the title to the animals, and conducting

further investigations based on the information on the animals' titles and information obtained

through numerous FOIA requests to verify that wild horses and burros arriving at slaughter

auctions were first adopted through the Program. As of the filing of this lawsuit, Petitioners had

successfully rescued 110 wild horses and burros from slaughter auctions, but knew of at least

130 additional wild horses and burros that they were not able to rescue from such slaughter

auctions. The likely fate of those 130 additional wild horses and burros is slaughter.

83.     When the Petitioner rescue organizations purchased horses and burros bearing

BLM freeze marks, they generally received the title to such animals. Those titles revealed that

the animals were in fact sold at auction within 1 to 4 months of their adopters initially receiving

title to the animals, a time frame which is consistent with the timing of AIP participants

receiving their second $500 payment under IM 2019-025. Likewise, the titles revealed that

multiple individuals within families had simultaneously adopted the maximum number of wild

horses or burros and then sent them to a slaughter auction within a few months of receiving title

to those animals, indicating that families were adopting as many wild horses and burros as

possible, pocketing the AIP payments, and then quickly flipping these animals for sale at

slaughter auctions, which netted sale funds in addition to the $1,000 payments supplied by

BLM.[12]

84.     Many of the horses and burros that Petitioners rescued from slaughter auctions

were still ungentled animals with no evidence that they had been handled or trained to any

significant degree by their adopters. In fact, at least five of these animals still bore the tags that

---

[12] One adopter described this process in an interview in the *New York Times* by stating that "it's economics," because "I can make about $800 putting a calf on my land for a year," but "[w]ith the horses, I made $1,000, then turned around and sold them for $500."

BLM had placed around their neck prior to their adoption more than a year previously. These observations indicate that adopters merely held these animals for a year without any serious effort to care for the animals, took payment through the AIP, then sold the animals at auction as quickly as possible.

85.     To confirm that the AIP caused an influx of wild horses and burros at auctions catering to the slaughter industry, Petitioners were forced to expend significant resources to obtain information about BLM's administration of the Program. These expenditures included spending tens of thousands of dollars, either in direct purchases or in grants to rescue groups, to rescue horses and burros from slaughter and obtain their titles to verify whether they went through the AIP, devoting significant staff time to submitting numerous FOIA requests to various BLM offices around the country (many of which BLM has still not fulfilled), reviewing records obtained through FOIA, and comparing them to titles received through rescue, as well as devoting significant staff time to communications with BLM officials in pursuit of information about the administration of the AIP. For example, Petitioners utilized FOIA requests to obtain records of compliance inspections conducted by BLM under the AIP. By comparing information in the AIP compliance inspections obtained through FOIA against the information in titles of horses and burros, Petitioners were able to verify that numerous horses appearing at auctions catering to the slaughter industry were, in fact, wild horses and burros that BLM had removed from the range and then adopted out through the AIP. These included animals being sold at self-described "kill pens."

86.     Petitioners have been forced to continually expend resources seeking further information from BLM about its administration of the AIP in order to document and educate the public regarding how the Program is causing wild horses and burros to be sold at auctions that

regularly lead to slaughter. For example, Petitioner AWHC has submitted at least seventy FOIA

requests for information about BLM's administration of the AIP, many of which remain

unfulfilled as the agency has not yet released all responsive information. Likewise, Petitioner

AWHC has been forced to expend hundreds of hours of staff time reviewing information

obtained through FOIA, following up on overdue FOIA requests, and communicating with BLM

in an effort to obtain information about the administration of the AIP and the fates of the animals

adopted through this Program. Moreover, because BLM has failed to respond to some of

Petitioner AWHC's FOIA requests for over seven months, Petitioner AWHC has also been

forced to divert staff time and resources to filing a FOIA lawsuit in order to compel the agency to

produce information regarding its implementation of the AIP. *See American Wild Horse*

*Campaign v. Bureau of Land Management*, No. 1:21-cv-01746 (D.D.C. filed June 30, 2021).

   87. To counteract the harms from the AIP to their missions of preventing the

slaughter and inhumane treatment of wild horses, Petitioners have been forced to devote

significant resources to the preparation of an investigative report and subsequent addenda to that

report documenting how the AIP has had the practical consequence of leading wild horses and

burros to be sold for slaughter and otherwise treated inhumanely. Petitioners' report is titled

*BLM's Adoption Incentive Program: Pipeline to Slaughter for Federally-Protected Wild Horses*

*and Burros*. Petitioners have used this report and its addenda to further their mission of

preventing the slaughter and/or inhumane treatment of wild horses by delivering proof to BLM

and DOI that the AIP has in numerous instances led to the abuse and/or neglect of wild horses

and burros and has led to these animals being sold at auctions that cater to the slaughter industry.

Likewise, Petitioners have used the report and addenda, and the information contained therein, to

educate the public about the AIP's disastrous outcomes for wild horses and burros, such as

through media outreach and direct engagement with Petitioners' followers, agency staff, and members of Congress. Petitioners' investigative work is ongoing; Petitioners continue to be forced to expend resources rescuing horses, obtaining and reviewing records through FOIA and other avenues, and compiling this evidence in further addenda to their original report.

88.     On May 15, 2021, the *New York Times* published an article, "Wild Horses adopted under a federal program are going to slaughter," which was based in large part on information about the AIP that Petitioners had obtained through the investigations described above, as well as on the *New York Times*' own research. The article documented how the AIP's results were "that instead of going to good homes, truckloads of horses were dumped at slaughter auctions as soon as their adopters got the federal money." The *New York Times*' article includes interviews with an individual who candidly admitted that he and his family adopted wild horses through the AIP in order to accept the payments and then sell the horses despite the fact that "they would probably go to kill buyers." The *New York Times* quoted that individual as describing how BLM officials told him that his conduct was lawful because "Once you get title, they told me, there is no limitation — you can do whatever you want with them."

89.     On May 17, 2021, Petitioner AWHC sent a letter to the Secretary of Interior with an urgent request for the Department of Interior to suspend and investigate the AIP. AWHC has not received any response to this letter.

90.     On May 19, 2021, Petitioner AWHC sent another letter to the Secretary of Interior and the Acting Director of BLM, attaching the report, *BLM's Adoption Incentive Program: Pipeline to Slaughter for Federally-Protected Wild Horses and Burros*, noting that the "report and the *New York Times* article provide compelling evidence that the AIP is defrauding the American public" and "resulting in abuse, neglect and slaughter in contravention of a

Congressional ban on the practice." Petitioner AWHC thus requested "that the AIP be suspended" and requested "an immediate inquiry into the issues raised in [the] report." AWHC has not received any response to this letter.

91.     On May 27, 2021, Senator Dianne Feinstein sent a letter to the Secretary of the Interior asking that the agency "immediately suspend" the AIP because it "has provided federal incentive payments to adopters who abandoned these animals at slaughter auctions." Senator Feinstein further noted that "BLM has failed to use all appropriate tools" to "prevent adopters who previously sold their wild horses to slaughter auctions from adopting again." Noting that BLM "[s]ubsidizing the slaughter of wild horses and burros with taxpayer dollars violates Congressional intent," Senator Feinstein urged BLM to "immediately halt the [AIP] and ensure a proper investigation is conducted to prevent future wild horses and burros from suffering abuse or slaughter."

92.     On June 2, 2021, a bipartisan coalition of 31 members of Congress wrote to the Secretary of the Interior to "urge [the AIP's] immediate suspension" until "a full and transparent investigation has been conducted into the fate of the horses and burros that have passed through this program." The members of Congress noted that under the AIP "adopted horses and burros still end up in slaughterhouses" despite the meager protections that BLM included in the AIP to prevent such outcomes. Accordingly, the members of Congress urged the Department of Interior to "immediately suspend the [AIP] to conduct a full and transparent investigation into the prevalence of federally protected wild horses and burros being sent to slaughter once placed in private ownership." Likewise, the members of Congress urged the Department "to strengthen existing protections against slaughter and clarify the Department's authority to enforce violations through penalties and other measures."

93.     On June 3, 2021, counsel for Petitioner AWHC submitted to the Secretary of Interior and the Deputy Director of BLM a formal petition, pursuant to 5 U.S.C. §§ 553(e), 555(e), notifying the agencies of significant violations of federal law associated with BLM's creation and implementation of the AIP and requesting that the agencies either withdraw the AIP in its entirety or, if the agencies insist on retaining the AIP in some form, to impose a moratorium on any further payments under the AIP while the agencies engage in a formal notice-and-comment rulemaking consistent with the APA and other federal laws. Petitioner AWHC's petition included a copy of AWHC's report and addenda on the AIP's terrible outcomes for wild horses and burros. In light of the fact that Petitioners' investigations continue to reveal wild horses and burros arriving at auctions catering to the slaughter industry, Petitioner AWHC's petition noted that the situation required the agencies' urgent attention and respectfully requested a response by June 30, 2021. A copy of AWHC's petition, along with Petitioners' report, an addendum prepared since the petition's submission, and a second report, are attached to this Complaint.

94.     Petitioners' report and addenda document 110 known instances in which wild horses and burros have been rescued from slaughter auctions. Petitioners have separately documented another 130 wild horses and burros that have appeared at slaughter auctions but which Petitioners were not able to rescue.

95.     Petitioners' report also documents how in several instances, members of the same family simultaneously adopted several horses at once and then simultaneously sold them at such auctions. For example, the report documents how a family of four adopted 13 horses, received title to the animals in June and July of 2020, and then delivered the horses to auction in early October 2020—just after the 60-day period for receiving the second AIP payment elapsed. In

total, this family could have received $13,000 in federal taxpayer dollars in addition to whatever proceeds they obtained by selling these federally protected animals at a slaughter auction.

96.     Petitioners' report further documents how individuals who should have been disqualified from owning a wild horse or burro were nonetheless able to receive federal taxpayer dollars to adopt horses through the AIP. For example, the report describes how an individual who was previously arrested for "kidnapping and assault in a horse deal gone wrong" was nonetheless able to receive federal taxpayer dollars to adopt a wild horse, which the individual then sent to auction at a self-described "kill pen." Likewise, the report describes how individuals whom BLM identified as no longer eligible to participate in the AIP due to returning two wild horses to BLM in a single year were nonetheless able to receive title to three wild horses—and thus could potentially receive up to $3,000 in federal taxpayer funds for the adoption of those animals—which they then sent to a slaughter auction.

97.     At the time of the filing of this lawsuit, of the 110 wild horses or burros that Petitioners' initial report documents identifying at auctions catering to the slaughter industry, Petitioners had obtained information through FOIA that proves that 49 animals were adopted through the AIP. Petitioners have numerous FOIA requests still pending for information that will reveal whether the remaining identified animals were adopted through the Program as well. Even if all 110 horses described in the report (and its addenda) were AIP horses, this is likely a fraction of the true number of AIP horses that have been placed for sale at kill pens or otherwise sold for slaughter. For Petitioners to definitively identify horses and burros as having been adopted through the AIP, Petitioners must rescue the animal from an auction, obtain its title, and compare that title against records of the AIP's implementation obtained through FOIA.

98.     Petitioners' report also documents instances in which wild horses and burros adopted through the AIP have suffered extreme neglect and abuse. For example, the report documents a wild mare that sustained a neck injury after adoption that was so severe as to prevent the horse from standing; the report cites a BLM record, obtained through FOIA, that notes that one mare had an injury so severe that she had to be "put [] out of her misery." The report also documents instances in which wild horses or burros were provided with insufficient food, water, or shelter, or which had not received even basic veterinary care, including one horse in poor body condition with numerous sores on its body, and another horse that was reported to be housed in a dog pen.

99.     On June 17, 2021, BLM's Washington Office sent counsel for Petitioners an email in response to AWHC's June 3, 2021 petition. In that response, BLM neither stated that it would undertake any of the actions requested in AWHC's petition nor responded to any of the copious evidence that AWHC had provided regarding the legal violations associated with the creation and implementation of the AIP or regarding the AIP's adverse practical outcomes for wild horses and burros. Instead, BLM disavowed any responsibility for the fates of wild horses and burros once they pass into private ownership. For example, despite clear evidence that wild horses and burros adopted through the AIP were being sold at auctions that cater to the slaughter industry, BLM stated that "BLM does not and cannot assume that any or every titled or sold wild horse or burro that arrives at a sale barn is destined for slaughter." Likewise, disavowing any accountability for the fates of wild horses and burros adopted through the Program, BLM stated that "BLM does not have the means or legal authority to track or direct the disposition of wild horses or burros once they pass into private ownership (i.e. once an animal is sold by BLM or an adopter receives title)."

100.     On June 22, 2021, counsel for Petitioners sent a response to BLM's June 17 email, explaining that AWHC construed BLM's June 17 email as a denial of AWHC's June 3 petition, because BLM and DOI did not agree to take any of the action that AWHC's petition requested. Petitioner AWHC requested a clarification of BLM's position by no later than June 30, 2021.

101.     On June 24, 2021, David Jenkins, BLM's Assistant Director for Resources and Planning, sent counsel for Petitioners an email stating that "BLM's Wild Horse and Burro Program appears to have mistakenly sent you an email on June 17, 2021" in response to AWHC's petition and stating that BLM's "email should not be construed as formal response to [AWHC's] prior correspondence." Mr. Jenkins stated that the Department of Interior and BLM "continue to review" AWHC's petition and "expect to send [] a response in writing soon." Petitioners have not received any such response.

102.     On June 30, 2021, BLM's Deputy Director announced to the agency's Wild Horse and Burro Advisory Board that BLM is conducting an internal investigation into the AIP. Additionally, the Deputy Director suggested that BLM could add measures to better protect wild horses and burros from slaughter. However, the Deputy Director did not indicate that BLM would impose any moratorium on adoptions through the AIP, even to individuals who Petitioners' report proves have sold adopted horses at slaughter auctions. Nor did the Deputy Director provide any timeline for the completion of the agency's investigation or any details about what additional measures, if any, the agency might impose to prevent wild horses and burros from being slaughtered. As such, the Deputy Director's announcement, while perhaps a first step toward better protecting wild horses and burros, does not cure any of the harms to Petitioners' interests from the AIP described in this Complaint.

103.     Since the filing of the original Complaint in this case, Petitioners have continued their efforts to investigate and document the AIP's adverse outcomes and to prevent wild horses and burros from being slaughtered. Petitioners' ongoing investigation has, to date, identified 587 BLM-branded wild horses and burros poised to enter the slaughter pipeline through auctions at self-identified kill pens. Of these, 301 animals were identified by BLM freezebrand number or BLM paperwork. Petitioners' efforts under FOIA have obtained information confirming that 214 of these animals were adopted through the AIP; Petitioners also have pending (in fact overdue) FOIA requests that Petitioners anticipate will confirm that another 87 animals sold at kill barns were also adopted through the AIP. However, kill pens have begun to make Petitioners' investigations more difficult by visually obscuring BLM brands in public postings about the availability of horses or burros at slaughter auctions. Accordingly, although the kill pens have identified the remaining 286 wild horses and burros for sale at slaughter auctions, Petitioners have not been able to confirm whether most of these animals were adopted through the AIP. However, because most of these animals showed no signs of gentling or training—a hallmark of animals adopted through the AIP, which applies only to untrained animals—Petitioners believe that these animals were likely adopted through the AIP. Given the fact that 70% of the animals identified by brand number have so far been confirmed as having been adopted through the AIP, Petitioners expect that the majority of these animals were adopted through the AIP as well. Because the AIP has already caused so many wild horses and burros to need rescue from slaughter auctions, Petitioners have been unable to rescue many of these unidentified wild horses and burros from entering the slaughter pipeline. Accordingly, Petitioners believe that many of these wild horses and burros have been sold into the slaughter pipeline and, very likely, have already been slaughtered.

104.     Since the filing of the original Complaint in this matter, the ongoing need to rescue so many wild horses and burros from slaughter auctions has caused an extreme drain on Petitioners' resources. As alleged above, the expenditures on these rescues are a significant departure from Petitioners' normal operations and have been incurred to counteract the harms to Petitioners' missions caused by the AIP. Unfortunately, the rate at which wild horses and burros are arriving for sale at slaughter auctions now significantly exceeds Petitioners' capacity to rescue these animals. For this reason, Petitioners believe that many wild horses and burros that have been adopted through the AIP are entering the slaughter pipeline and likely being slaughtered.

**D.     BLM's 2022 Revisions to the AIP**

105.     In December 2021, BLM informed Petitioners that the agency would soon revise the AIP. Accordingly, the parties jointly requested that this case be stayed until the agency issued a revised AIP policy and Petitioners had an opportunity to assess the revised policy.

106.     BLM issued its revised AIP policy on January 26, 2022.

107.     The Court granted the parties' requested stay on January 28, 2022, and required the parties to file a status report by February 4, 2022. On February 4, 2022, the parties filed a joint status report advising the Court that Petitioners were continuing to review the new AIP policy and that the parties would provide a further status report by February 25, 2022.

108.     On February 25, 2022, the parties filed a joint status report advising the Court that the parties were negotiating a schedule for the remainder of this litigation, including the filing of this Supplemental Petition.

109.    BLM issued its new AIP policy through another Instruction Memorandum, IM 2022-014. Although IM 2022-014 is dated December 19, 2021, and states that it "is effective immediately," BLM did not publicly issue this IM until January 26, 2022.[13]

110.    Although IM 2022-014 made some nominal changes to the AIP, the Program remains unchanged in its key features. Under IM 2022-014, BLM will continue to pay members of the public up to $1,000 in federal taxpayer funds for each wild horse or burro adopted through the Program. Likewise, the AIP continues to apply only to untrained wild horses or burros. Moreover, although IM 2022-014 purports to aim "to defray the costs of care, such as veterinary services, feed, and training," BLM still imposes no requirement that participants in the Program demonstrate that they have actually spent money on the care, feed, or training of adopted animals, nor is there any requirement that AIP funds be spent in this manner. The AIP still aims to "reduce off-range holding costs and allow those savings to support critical on-range operations." Finally, the AIP continues to allow individuals to adopt wild horses and burros as quickly as the WHA permits, allowing each individual to adopt 4 horses or burros per calendar year and to adopt additional animals as soon as BLM transfers the titles of any previously adopted animals. Additionally, BLM continues to allow multiple family members to adopt the maximum number of animals to the same location.

111.    IM 2022-014 made some minor alterations to the AIP. Whereas incentive payments were previously disbursed in two batches—$500 at the time of adoption and $500 at the time of titling—BLM will now disburse incentive payments in one lump sum of $1000 within 60 days of titling. Additionally, IM 2022-014 restored the adoption fee of $125 per animal

---

[13] As to the period between December 19, 2021 and January 26, 2022, it is not clear whether BLM's policy was reflected in IM 2019-025 or IM 2022-014.

that is the default adoption fee under BLM regulations, 43 C.F.R. § 4750.4-2, which IM 2019-025 had reduced to $25 per animal. IM 2022-014 also states that "BLM authorized officers or other BLM-approved individuals should conduct compliance inspections on adopted animals participating in the AIP within six months after the adoption date," which alters the prior AIP policy only by defining the time period in which these inspections "should" be conducted. Finally, IM 2022-014 requires that a title application must be signed by a veterinarian or a BLM-authorized officer in order for an adopter to be eligible to receive AIP incentives; however, adopters may still obtain title to wild horses or burros (without an incentive payment) if the title application is not signed by a veterinarian or BLM-authorized officer.

112.    BLM did not provide any public notice or opportunity for comment before issuing IM 2022-014.

113.    On January 26, 2022, BLM issued a "Categorical Exclusion for Issuance of Revised Instruction Memorandum for Adoption Incentive Program for Wild Horses and Burros," DOI-BLM-WO-2600-2022-0001-CX. This document claims that the AIP revision "is categorically excluded from further documentation under the National Environmental Policy Act (NEPA) in accordance with 43 C.F.R. § 46.210(i) relating to "policies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case." The Categorical Exclusion claims that "[i]ssuing a revised IM is a purely administrative function and the contents of the revised IM are of an administrative and procedural nature." despite the fact that the IM actually creates new rights and obligations by specifying when

adopters of wild horses are entitled to incentive payments and obligating BLM to issue such payments to members of the public.

114. BLM's Categorical Exclusion for the revised AIP also claims that "subsequent adoptions and titling events will later be subject to the NEPA process, either collectively or on a case-by-case basis." However, Petitioners are not aware of any instance in which BLM has conducted any NEPA review for wild horse adoption or titling events. Instead, BLM's NEPA Handbook claims that "[a]pproval of the adoptions of healthy, excess wild horses and burros" and the "[i]ssuance of title to adopted wild horses and burros" are also categorically excluded from NEPA review. BLM's Categorical Exclusion for IM 2022-014 does not make clear whether its statement that "subsequent adoptions and titling events will later be subject to the NEPA process" merely means that BLM will simply later claim that such events are also categorically excluded from NEPA review.

115. BLM's Categorical Exclusion for the revised AIP also claims that "there are no extraordinary circumstances potentially having effects that may significantly affect the environment." That document also states that the revised AIP "has been reviewed with the list of extraordinary circumstances" found at 43 C.F.R § 46.215 and that "none of these circumstances apply." However, BLM's Categorical Exclusion document merely lists the various "extraordinary circumstances" that appear in BLM's regulations and contains no analysis whatsoever of why these extraordinary circumstances purportedly do not apply. In reality, various extraordinary circumstances do appear to apply to the AIP. For example, one extraordinary circumstance that renders a categorical exclusion inappropriate is when an action involves "unresolved conflicts concerning alternative uses of resources"; this extraordinary circumstance is plainly applicable because BLM has never resolved a conflict—which was raised

both by Petitioners and by BLM's own Wild Horse and Burro Advisory Board—over whether it is appropriate to use federal monetary resources to provide cash payments, as opposed to non-cash incentives, to promote the adoption of wild horses and burros, particularly where those cash payments are likely to lead wild horses and burros to be slaughtered. Likewise, another extraordinary circumstance makes clear that a categorical exclusion is inappropriate when an action may "[v]iolate a Federal law, or a State, local, or tribal law or requirement imposed for the protection of the environment"; as alleged here, BLM's expenditure of federal funds for a Program that has in fact resulted in wild horses and burros entering the slaughter pipeline threatens a violation of Congress's repeated prohibition on the use of federal funds for the slaughter of wild horses and burros. Nonetheless, BLM entirely failed to analyze why these extraordinary circumstances, or any others, purportedly do not apply to the AIP.

116.    Because IM 2022-014 retains the core of the original AIP—namely, the payment of up to $1,000 per animal adopted—the new IM establishes the same perverse incentive as the original AIP. As was the case before, IM 2022-014 still creates an incentive for individuals more motivated by cash payments than by the welfare of adopted animals to adopt as many animals as possible through this Program, house them as cheaply as possible for a year until they can receive title to the animals and $1,000 in federal funds, and then offload the animals at slaughter auctions, where these individuals may earn up to another roughly $500 per animal. Moreover, because BLM has taken the position that individuals selling these animals at auctions after titling are not violating any law or policy, these same individuals may then return and adopt more animals through the AIP and repeat the process, thus enriching themselves at the expense of taxpayers and of the wild horses and burros that Congress sought to protect. In fact, Petitioners have documented multiple instances in which individuals or groups have exhibited exactly this

behavior of selling wild horses and burros at slaughter auctions shortly after receiving title and then adopting more animals through the Program. Because this perverse incentive remains intact under IM 2022-014, the harms documented in this Petition to Petitioners, to wild horses, and to the public fisc will persist under BLM's new IM.

## PETITIONERS' CLAIMS FOR RELIEF

I.    **CLAIMS UNDER THE WHA AND APA**

117.   By issuing IM 2019-025 and IM 2022-014, which are "statement[s] of general or particular applicability and future effect designed to implement, interpret, or prescribe" BLM's policy for administering adoption of wild horses and burros under the WHA and which for that reason constitute a "rule" within the meaning of the APA, without first providing notice or an opportunity for public comment, Respondents acted in a manner that is unlawful, arbitrary and capricious, and without observance of procedure required by law, in violation of the APA.

118.   By issuing IM 2019-025 and IM 2022-014, which reflect "approval or prescription for the future of rates . . . financial structures . . . prices . . . services or allowances" associated with the adoption of wild horses and burros protected under the WHA and which for that reason constitute a "rule" within the meaning of the APA, without first providing public notice or an opportunity for public comment, Respondents acted in a manner that is unlawful, arbitrary and capricious, and without observance of procedure required by law, in violation of the APA.

119.   By issuing IM 2019-025 and IM 2022-014 without considering how the AIP would expend federal funds in a manner that would foreseeably lead to wild horses and burros being sold for slaughter, which is a practice that Congress has explicitly and repeatedly forbidden, Respondents entirely failed to consider an important aspect of the problem before the

agencies and thus acted in a manner that is arbitrary and capricious and unlawful within the meaning of the APA.

120.    By issuing IM 2019-025 and IM 2022-014, which establish significantly laxer requirements for disqualifying individuals whom BLM pays to adopt wild horses and burros than the agency previously established for those who purchase wild horses and burros, without any explanation for the deviation from prior policy or any announcement of any good reasons for the more relaxed and less protective policies in the AIP, Respondents engaged in an unexplained reversal of position that is arbitrary and capricious and unlawful under the APA.

121.    By significantly modifying BLM's adoption policies—and doing so in a manner that is fundamentally worse for wild horses—without acknowledging that change or its legal or practical import (let alone supplying a coherent rationale for it), Respondents acted arbitrary, capriciously, and not in accordance with law under the APA.

122.    By expending federal funds through a Program that would foreseeably result in wild horses being slaughtered in a manner expressly prohibited by Congress, Respondents have circumvented the congressional intent behind the express statutory prohibition against using federal funds in any manner that leads to wild horse slaughter, and thus has violated the WHA, federal appropriations legislation that funds WHA activities, and the APA.

123.    Respondents' actions harm Petitioners in the manner described in ¶¶ 9–24, 79–104, 116 .

## II.    CLAIMS UNDER NEPA

124.    By issuing IM 2019-025 and IM 2022-014 without preparing any analysis of the AIP's environmental or economic impacts, including impacts on wild horses and burros adopted through the Program and impacts associated with on-range agency activities enabled by the cost-

savings that BLM anticipates the AIP will yield, Respondents violated NEPA and its implementing regulations.

125.    By issuing IM-2019-025 and IM 2022-014 without considering viable (and far less damaging) alternatives to the AIP—including, but not limited to, continuing the pre-existing policy of adopting horses without providing any financial incentive, or creating a modified adoption program with far stricter requirements for ensuring the eligibility of adopters and then imposing mandatory oversight and enforcement mechanisms for adopters that violate the terms of the program—BLM acted arbitrary and capriciously, and violated NEPA and its implementing regulations.

126.    By issuing a Categorical Exclusion for IM 2022-014 that relies on a plainly inapplicable categorical exclusion listed in the Department of Interior's regulations, and which includes no analysis or explanation to substantiate its claim that no extraordinary circumstances foreclose reliance on a categorical exclusion, BLM acted arbitrarily and capriciously and violated NEPA and its implementing regulations.

127.    Respondents' actions harm Petitioners in the manner described in ¶¶ 9–24, 79–104, 116.

**WHEREFORE,** Petitioners respectfully request that the Court enter an Order:

1.    Declaring that Respondents' creation and implementation of the AIP through the issuance and implementation of IM 2019-025 is arbitrary and capricious and in ongoing violation of the APA;

2.    Declaring that Respondents' creation and implementation of the AIP through the issuance of IM 2019-025 violated the WHA and NEPA;

3.    Setting aside IM 2019-025;

4.      Enjoining Respondents from taking any further action to implement the AIP;

5.      Enjoining Respondents from transferring wild horses and burros under the AIP to individuals who intend to transfer them to kill pens as explained above;

6.      Awarding Petitioners their reasonable attorneys' fees and costs in this action; and

7.      Providing any other relief that the Court deems proper.

Respectfully submitted,

/s/ William N. Lawton
William N. Lawton
D.C. Bar No. 1046604

/s/ William S. Eubanks
William S. Eubanks II
D.C. Bar No. 987036

Eubanks & Associates, PLLC
1331 H Street NW, Suite 902
Washington, DC 20005
(202) 556-1243
nick@eubankslegal.com
bill@eubankslegal.com

Counsel for Petitioners