# EXHIBIT 1:

**Petitioners' Petition to DOI and BLM,
Petitioners' Report on AIP and Addenda
(Materials filed with Petitioners' Original
Complaint)**

Eubanks & Associates, PLLC
——————————————————————
LAW FOR THE PUBLIC INTEREST

1331 H STREET NW
SUITE 902
WASHINGTON, DC 20005
(202) 556-1243

June 3, 2021

**VIA E-MAIL**

Deb Haaland, Secretary
United States Department of Interior
1849 C Street N.W.
Washington, D.C. 20240
doiexecsec@ios.doi.gov

Nada Culver, Deputy Director
United States Bureau of Land Management
760 Horizon Drive
Grand Junction, CO 81506
Nculver@blm.gov

Re:    **The Bureau of Land Management's Unlawful Adoption Incentive Program**

Dear Secretary Haaland and Deputy Director Culver:

On behalf of our client the American Wild Horse Campaign ("AWHC"), we are writing to inform the United States Department of Interior ("DOI") and the United States Bureau of Land Management ("BLM") of significant violations of federal law associated with BLM's creation and implementation of its wild horse and burro Adoption Incentive Program ("AIP"). This letter also serves as a formal petition, pursuant to 5 U.S.C. § 553(e), to either withdraw the AIP in its entirety or, if the agency insists on retaining the AIP in some form, to impose a moratorium on any further payments under the AIP while the agencies engage in formal notice-and-comment rulemaking to provide interested parties with an opportunity for input and design a program that comports with federal law. **Pursuant to 5 U.S.C. § 555(e), AWHC respectfully requests a timely response to this petition; given the urgency involved, we request an response no later than June 30, 2021.**

As described in AWHC's attached report, the AIP has led to, and if allowed to persist will continue to lead to, extremely bad outcomes for federally protected wild horses that are fundamentally inconsistent with Congress's goals in enacting the Wild Free-Roaming Horses and Burros Act ("WHA"), 16 U.S.C. §§ 1331–1340. Indeed, despite the fact that Congress has repeatedly and specifically forbidden DOI and BLM from expending federal funds for the slaughter of healthy wild horses, the AIP has exactly that effect. Specifically, the AIP provides nominal adopters of wild horses with payments—federal expenditures coming directly from BLM's budget—of up to $1,000 per wild horse; once these nominal adopters receive title to the animal, they are then free to sell it for slaughter. In this manner, the AIP effectuates an ongoing end-run around Congress's prohibition on expending federal funds to slaughter wild horses. The practical outcomes for wild horses are profoundly inhumane and contrary to Congress's goals of

protecting these animals. Additionally, as detailed below, the creation of the AIP violated federal law in several critical ways. Accordingly, we respectfully request, and formally petition, DOI and BLM to end this unlawful program, or at minimum to immediately suspend the AIP until and unless DOI and BLM conduct and complete a lawful decision-making process to authorize the AIP.

## BACKGROUND

## I.    The Wild Free-Roaming Horses and Burros Act

Finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West," and that "they contribute to the diversity of life forms within the Nation and enrich the lives of the American people," Congress enacted the WHA in 1971 to ensure that "wild free-roaming horses and burros shall be protected from capture, branding, harassment, [and] death," and that they are "considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331.

The WHA mandates that the Secretary of the Interior "shall manage wild free-roaming horses and burros as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." *Id.* § 1333(a). To that end, the WHA further directs the Secretary to "maintain a current inventory" of wild horses and burros and to use that inventory to "determine appropriate management levels" in various areas of public lands, and "make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals." *Id.* § 1333(b)(1). The statute defines "excess animals" as those "which have been removed" from public lands or "which must be removed" to preserve and maintain a thriving natural ecological balance. *Id.* § 1332. The WHA further provides discretion for BLM to determine "whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options . . . ." *Id.* § 1333(b)(1).

Where BLM determines both that "an overpopulation exists and that action is necessary to remove excess animals" the WHA provides that the agency "shall immediately remove excess animals from the range so as to achieve appropriate management levels." *Id.* § 1333(b)(2). As the Tenth Circuit Court of Appeals has explained, the plain text of the WHA "quite clearly affords BLM with discretion to decide whether or not to remove excess animals." *Wyoming v. U.S. Dep't of Interior*, 839 F.3d 938, 944 (10th Cir. 2016).

If BLM decides to remove wild horses, the WHA authorizes the BLM to allow the public to adopt wild horses "for private maintenance and care," provided that the agency "determines an adoption demand exists by qualified individuals" and that certain other conditions are met. 16 U.S.C. § 1333(b)(2)(B). In particular, the agency must determine that any adopter "can assure humane treatment and care (including proper transportation, feeding, and handling)." *Id.* Likewise, the statute restricts any individual from adopting more than four animals in a year "unless the Secretary determines in writing that such individual is capable of humanely caring for more than four animals, including the transportation of such animals by the adopting party."

*Id.* In this manner, Congress sought to accommodate the public's interest in adopting wild horses while also ensuring that any horses so adopted would be cared for humanely.

Although the WHA contemplates that unadoptable wild horses may be "destroyed in the most humane and cost efficient manner possible," *id.* § 1333(b)(2)(C), Congress has routinely and specifically forbidden DOI and BLM from using federal funds for the slaughter of healthy, unadopted wild horses. *See*, *e.g.*, *In Defense of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1059 n.3 (9th Cir. 2014) (noting that "Congress has never appropriated funds for extermination, as opposed to ongoing maintenance, of excess horses even if not adopted") (citing Pub.L. 111-88, 123 Stat. 2904, 2907 (2009)). Most recently, the Consolidated Appropriations Act, 2021, specifically provided that federal funds "shall not be available for . . . the destruction of any healthy, unadopted, and wild horse or burro" or "the sale of a wild horse or burro that results in the destruction of the wild horse or burro for processing into a commercial product." Pub. L. 116-260 § 419(e).

## II.     **The National Environmental Policy Act**

Congress enacted the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, to ensure that federal agencies fully consider the environmental impacts of their actions before taking them, consider alternatives to proposed actions that may have less adverse environmental impacts, and make information publicly available with sufficient detail to promote fully informed public participation in agency decision-making.

To meet these objectives, all agencies must prepare an Environmental Impact Statement ("EIS") for any major federal action that may "significantly affect[]" the environment. 42 U.S.C. § 4332(C). The Council on Environmental Quality ("CEQ")—an agency within the Executive Office of the President—has promulgated regulations implementing NEPA that are "binding on all Federal agencies." 40 C.F.R. § 1500.3. These regulations provide that in determining whether an EIS is required with respect to a particular proposed action, an agency must prepare an Environmental Assessment ("EA") that analyzes the environmental impacts of the proposed action as well as alternatives. *Id.* §§ 1501.4(c), 1509.9.[1]

In determining whether an EIS is required, the agency must consider whether the proposed action may have a "significant" effect on the human environment. 40 C.F.R. § 1508.27. The "significance" determination is based on factors such as the degree to which the effects on the environment "are likely to be highly controversial" or "are highly uncertain"; the degree to which the action "may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration," or "may cause loss or destruction of significant scientific, cultural, or historical resources"; and whether the action "threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." *Id.*

---

[1] CEQ amended its regulations in 2020. *See* 85 Fed. Reg. 43,304 (July 16, 2020). However, because BLM created the AIP before that date, the new regulations do not apply here.

A significant effect, requiring an EIS, may exist "even if the Federal agency believes that on balance the effect will be beneficial." 40 C.F.R. § 1508.27(b)(1). The existence of any one of the CEQ significance criteria usually requires the preparation of an EIS.

If an agency decides that an EIS is not required, it issues a Finding of No Significant Impact ("FONSI"), which must present the reasons why the agency has determined its proposed action "will not have a significant impact" on the environment." 40 C.F.R. § 1508.13.

NEPA requires agencies to consider a range of reasonable alternatives to its proposed action. *See* 40 C.F.R. § 1502.14. An agency may not artificially constrain its analysis of reasonable alternatives by framing its purpose and need statement for a proposed action in an excessively narrow manner.

## III.   **The Administrative Procedure Act**

The Administrative Procedure Act ("APA") mandates that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . in excess of statutory jurisdiction, authority or limitations," or adopted "without observance of procedure required by law." 5 U.S.C. § 706(2). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The APA also provides the "basic procedural requirement" that "an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2125 (2016). "Agencies are free to change their existing policies so long as they provide a reasoned explanation for the change." *Id.* In doing so, "the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy." *Id.* at 2126. Likewise, agencies "must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* In such circumstances, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* For these reasons, "an unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Id.*

The APA also mandates that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e). If an agency denies such a petition, "[p]rompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding"; "the notice shall be accompanied by a brief statement of the grounds for denial." *Id.* § 555(e). Courts will "set aside an agency's decision to deny a petition for rulemaking only if it is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 5 (D.C. Cir. 2011). "In other

words, [courts] look to see whether the agency employed reasoned decisionmaking in rejecting the petition." *Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 919 (D.C. Cir. 2008).

## IV.   **The Adoption Incentive Program**

Under the Trump Administration, BLM implemented the AIP in January 2019 through Instruction Memorandum No. 2019-025 ("IM 2019-025").[2] The AIP aims "to increase the number of adoptions of untrained wild horses and burros placed into private care through offering financial incentives." IM 2019-025 at 1. "The AIP offers a financial incentive in the amount of $500 within 60 days from the adoption date [of a wild horse or burro] and an additional $500 within 60 days from the title date . . . ." *Id.* In adopting the AIP, BLM stated that "[i]ncreasing the placement of animals into private care is a critical priority of the [wild horse and burro] program and of utmost interest to the BLM due to the costs associated with caring for unadopted animals in BLM managed or contracted corrals and pastures." *Id.* BLM noted that because the number of wild horses and burros the agency removes from public lands significantly exceeds the rate at which the public adopts wild horses and burros, "the feed and care of the animals removed from the range continue to consume over 50 percent of the WHB program's budget." *Id.* at 3. BLM further explained that "this policy will reduce off-range holding costs and allow those savings to support critical on-range operations," and that "[i]ncreasing adoptions reduces holding costs, creating a cost savings that allows funding to be dedicated to other aspects of managing wild horses and burros." *Id.*

Although the AIP nominally allows "each adopter participating in AIP to adopt and maintain a maximum of four untitled animals annually," the program actually allows individuals to adopt more than four horses in a year so long as they have "up to a maximum of four untitled animals at any one time." *Id.* at 2. As an adopted gains title to an animal, that adopter becomes eligible to adopt another animal through the AIP.

Although the AIP requires adopters to sign an "Adoption Incentive Agreement," *id.* at 1, which requires adopters to "certify that [they] will provide humane care for any animals [they] adopt and will not sell or transfer ownership of them to any person or organization that intends to resell, trade, or give away any such animals for slaughter or processing into commercial products," Form 4710-25, AWHC's attached report documents how BLM has in fact failed to adequately ensure the humane treatment of adopted animals or prevent their sale for slaughter. Moreover, the AIP's plain language contains troubling indications that BLM views any ongoing oversight of adopted horses to be discretionary rather than mandatory. For example, it states that "BLM employees or other BLM approved individuals *should* conduct compliance inspections on adopted animals," and that "BLM *should* remove eligibility to participate in the AIP from any adopter that relinquishes two or more animals within a 12 month period or does not adhere to the terms and conditions of the Adoption Incentive Agreement." *Id.* at 2 (emphases added). Likewise, the AIP's instruction memorandum states that "BLM employees *should* issue an Adoption Incentive Ineligibility Letter . . . to adopters who are no longer eligible to participate in the AIP." *Id.* (emphasis added). By using the discretionary word "should" instead of any mandatory word such as "shall" or "must," BLM fails to provide the public with any guarantee

---

[2] IM 2019-025 is available at https://www.blm.gov/policy/im-2019-025

that the agency will in fact ensure humane outcomes for wild horses. Likewise, the AIP fails to provide any meaningful guidelines for how the agency may attempt to verify the humane treatment of adopted horses; for example, there is no mandatory timeline for "compliance inspections" and no description of how the agency will determine whether an adopter passes or fails a compliance inspection.

The AIP has roughly doubled the rate at which BLM adopts wild horses. In a press release dated May 14, 2020, the BLM stated that there had been "an increase of 91%" in the number of adoptions "[i]n the first 12 months of the AIP." BLM further noted that in the AIP's first year (2019 to 2020), the agency saw "substantial increases" in the number of first-time adopters, repeat adopters, and "multiple-animal adoptions."[3]

However, as extensively documented in the attached report by AWHC, the AIP has in fact led to profoundly inhumane outcomes that are inconsistent with Congress's objectives in enacting the WHA and its repeated prohibition on using any federal funds directly or indirectly for the slaughter of wild horses and burros. As AWHC's report describes, AWHC and cooperating animal rescue organizations have discovered at least 180 BLM-branded wild horses and burros at livestock auctions that are known to, and in some instances principally aim to, sell horses for slaughter. As the report notes, the horses documented in that report constitute only a subset of all the horses that meet this fate, because AWHC and its partner organizations continue to find wild horses and burros at these auctions. The report further explains that "[m]any of these horses were young, unhandled animals, some with their BLM tags still around their necks more than a year after their adoption from BLM holding corrals, suggesting that adopters simply held the animals for a year without care in order to collect the $1,000 incentive" and then sold the horses at auctions where slaughter is the most common outcome.

Troublingly, BLM has expressed the view, as documented in AWHC's report, that so long as an adopter takes title to a wild horse before selling it for slaughter, no violation of the WHA or the adoption agreement has occurred, and the adopter *would still be eligible to receive AIP funds and continue to adopt wild horses*. AWHC's report also cites a New York Times article that documents BLM telling adopters that once the horses are titled, "there is no limitation — you can do whatever you want with them."[4] Accordingly, BLM has made clear that its priority is simply having members of the public take title to wild horses, without regard to any practical consequences for the wild horses once they are titled. By taking this position, BLM has created a system in which federal expenditures in the form of AIP payments lead to the slaughter of federally protected wild horses—which Congress has specifically forbidden the agency from doing.

Nor is the sale of wild horses for slaughter the only type of inhumane outcome documented in AWHC's report. To the contrary, AWHC's report documented numerous

---

[3] *See* BLM, *Cash Incentives Help Agency Adopt More Wild Horses and Burros*, https://www.blm.gov/press-release/cash-incentives-help-agency-adopt-more-wild-horses-and-burros

[4] *See* https://www.nytimes.com/2021/05/15/us/wild-horses-adoptions-slaughter.html

instances in which BLM's compliance inspections revealed that—far from providing good homes and humane care—adopters were neglecting or abusing the wild horses they had adopted. For example, AWHC's report documents instances in which BLM's inspector "put [a horse] out of her misery" due to "a severe neck injury," as well as instances in which horses were neglected or housed in unsafe or otherwise inadequate facilities.

## DISCUSSION

## I.   BLM Violated Federal Law When Creating the AIP

As discussed below, BLM's creation of the AIP violated federal law in several critical ways, any one of which would be a sufficient basis for a reviewing court to find the program unlawful and set it aside.

### A.   The AIP is final agency action subject to judicial review

As an initial matter, it is beyond any reasonable dispute that IM 2019-025 constitutes "final agency action" within the meaning of the APA and is thus subject to judicial review. The APA authorizes judicial review of "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. Agency action is "final" where: (1) the action "mark[s] the consummation of the agency's decision-making process," and is not "merely tentative or interlocutory [in] nature"; and (2) "the action [is] one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

The AIP "marks the consummation of [BLM's] decision-making process" with regard to the creation of this new program and is not "merely tentative or interlocutory." *Id.* One clear signal of the finality of an agency action is the fact that "immediate compliance with its terms is expected." *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094–95 (9th Cir. 2014). Here, BLM clearly stated that the IM creating the AIP "is effective immediately." IM 2019-025 at 3. The fact that the IM was "effective immediately . . . lets the air out of any argument that [an IM] operates only as provisional guidance," and is instead a powerful indication that the agency action was indeed final. *W. Watersheds Proj. v. Zinke*, 441 F. Supp. 3d 1042, 1062 (D. Idaho 2020). Likewise, IM 2019-025 uses no language that suggests an ongoing deliberative process with regard to the creation of the AIP. Moreover, confirming that the AIP constituted the consummation of BLM's decision-making process, BLM has in fact followed the terms of IM 2019-025 in issuing numerous payments to adopters of wild horses. *See*, *e.g.*, BLM, *Cash Incentives Help Agency Adopt More Wild Horses and Burros*, https://www.blm.gov/press-release/cash-incentives-help-agency-adopt-more-wild-horses-and-burros (noting that BLM had in fact issued numerous payments under the AIP).

Likewise, IM 2019-025 determined "rights or obligations," and "legal consequences" flowed from the IM. IM 2019-025 created a new right for members of the public to obtain up to $1,000 of federal funds in association with the adoption of a wild horse or burro, and conversely imposed an obligation on BLM to confer payment of up to $1,000 in federal funds. By providing a new right for individuals to obtain federal funding associated with the adoption of a wild horse

or burro, IM 2019-025 determined "rights," and by obligating BLM to issue payments of federal funding to adopters of wild horses, the IM created both "obligations" for the agency and determined "legal consequences." Accordingly, there can be no legitimate dispute that IM 2019-025 constitutes final agency action subject to judicial review. *See W. Watersheds Proj.*, 441 F. Supp. 3d at 1060–66 (concluding that another IM issued by BLM constituted final agency action).

**B.**    **BLM failed to undertake required notice-and-comment procedures when creating the AIP**

"As a general matter, the APA requires an agency to use notice-and-comment procedures to make any "rule." *Id.* at 1067. The APA broadly defines a "rule" to mean "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). The definition of a "rule" specifically includes any "approval or prescription for the future of . . . rates . . . financial structures . . . prices . . . services . . . or . . . valuations, costs, or accounting, or practices bearing on" any agency practice. *Id.* "[T]he hallmark of a substantive agency rule is that it carries the force and effect of law via the creation of new rights or duties." *W. Watersheds Proj.*, 441 F. Supp. 3d at 1067.

IM 2019-025 falls squarely within the definition of a "rule" under the APA. As described above, the IM establishes a set of procedures under which BLM must issue payments of federal funds to adopters of wild horses or burros who meet certain criteria. In doing so, the IM both establishes a new right for adopters of wild horses—namely the right to receive up to $1,000 in federal funds per animal adopted—and establishes new obligations for BLM, including the obligation to issue payments to adopters, as well as certain (albeit minimal) obligations associated with oversight of the program. In doing so, the IM "prescribe[s] law or policy" within the definition of a "rule" under the APA.

Nonetheless, when BLM established IM 2019-025, it entirely failed to undertake any notice-and-comment procedures, in clear violation of the requirements of the APA. *See* 5 U.S.C. § 553(b)–(c). The agency's failure to provide any notice or opportunity for comment was not only a flagrant violation of the APA in its own right, but also led the agency to ignore critical input that wild horse advocates such as AWHC would have provided. For example, had the agency followed proper procedures and allowed for public comment, wild horse advocates would have had the opportunity to explain how the AIP is vulnerable to exactly the kind of manipulation that AWHC has now documented in its attached report—namely, the abuse of the system by individuals who have no sincere interest in providing a good home to an adopted animal but are instead interested principally in the receipt of $1,000 per wild horse plus the amount they can obtain by subsequently selling the animal—regardless of the fate it will eventually meet once sold. Likewise, wild horse advocates could have explained that common-sense safeguards could have at least mitigated the disastrous consequences that the AIP has wrought for wild horses, including for example terms restricting the payment of federal funds to any adopter that has previously sold an adopted animal in circumstances that will likely lead to the animal being slaughtered. However, because BLM unlawfully ignored its obligation to

provide the public with any notice or opportunity for comment, the public was deprived of any chance to provide valuable input on this new program.

### C.      BLM failed to consider highly relevant factors when creating the AIP

In part due to BLM's unlawful promulgation of IM 2019-025 without any notice or opportunity for public comment, BLM failed to consider numerous relevant factors when creating the AIP. For example, IM 2019-025 reflects no consideration of the obvious ways in which the system of federal payments that it established is easily prone to abuse—as AWHC has now documented has in fact occurred. Likewise, BLM failed to consider that a system that provides cash payment for those that adopt a wild horse would predictably attract—and has in fact attracted—individuals who are interested principally in a cash payment rather than the welfare of the animal being adopted. Notably, as AWHC's report documents, BLM's own officials raised such concerns after the AIP had been adopted, specifically warning that the program could attract "people only seeing the initial cash payment and not thinking about the lifetime costs associated with owning a horse" or lead to "the adoption of animals to people who have no business owning a horse." However, despite the clear ways in which the AIP's design was prone to abuse, to our knowledge, BLM's sole contemplation of such issues occurred *after* the agency issued IM 2019-025—thus confirming that BLM failed to consider highly relevant issues before taking this action as the APA requires.

Critically, the agency failed to consider how the structure of the AIP creates a *de facto* pipeline that allows wild horses and burros to be sold for slaughter or conversion into commercial products in violation of Congress's explicit and repeated bans on this practice. Although the AIP requires adopters to sign a statement that they "will not sell or transfer ownership" of adopted animals "to any person or organization that intends to resell, trade, or give away such animals for slaughter or processing into commercial products," Form 4710-25, AWHC's report documents how that statement has not served as a practical deterrent to wild horses in fact being sold for slaughter. Moreover, AWHC's report also documents how—as a matter of the AIP's design—the program is highly vulnerable to this practice. Because BLM has taken the position that even where an adopter has in fact sold a wild horse at auctions where the most common outcome is slaughter, no violation of the AIP has occurred so long as the adopter took title to the animal before sale, BLM's own design of the AIP reveals that it is highly vulnerable to abuse by those who merely hold an animal for the required period to obtain title, gain their $1,000 payment, and then turn around to sell the animal for slaughter. Moreover, BLM's position as documented in AWHC's report is that even if BLM knows that an adopter has in fact sold adopted animals for slaughter, that individual remains eligible for future adoptions and future payments of federal funds. Accordingly, the AIP's design serves as a mechanism for BLM to expend federal funds in a way that results in wild horses being sold for slaughter— exactly the practice that Congress has routinely forbidden. BLM's failure to consider or guard against this abuse of federally protected wild horses in any rigorous manner renders BLM's adoption of the AIP arbitrary and capricious.

**D.    The AIP reflects an unexplained reversal of position**

Although IM 2019-025 misleadingly states that "[n]othing in this IM is intended to effect a substantive regulatory change," IM 2019-025 at 1, in fact the IM does exactly that. Prior to the IM's issuance, nothing in BLM's regulations entitled any adopter of a wild horse or burro to the receipt of any federal funds; however, in a "substantive regulatory change," IM 2019-025 for the first time established a program that allows adopters of wild horses to receive up to $1,000 per animal adopted. IM 2019-025 thus created a significant new federal payment that was never before contemplated in BLM's regulations, and which served as a financial incentive to bring new adopters to the agency focused principally (if not exclusively) on obtaining federal funds and then offloading horses to the highest bidder.

Moreover, at the same time that it created a significant new federal benefit, IM 2019-025 also created a far laxer system for oversight of adoptions than the BLM previously applied to the sales of wild horses or burros. Since 2014, the sale of wild horses and burros has been governed by BLM IM 2014-132; under that prior IM, before selling a wild horse or burro BLM was obligated to "look up the purchasers name," "determine if there are any documented notes" about the purchaser in BLM's possession, and "[w]hen there is evidence that may indicate a purchaser does not intend to provide a good home . . . deny the sale and document the reasons for their decision." IM 2014-132, att. 1 at 4. In sharp contrast, IM 2019-025 includes no such requirements. Indeed, as documented in AWHC's report, under IM 2019-025, BLM has taken the position that even where the has actual proof that an adopter under the AIP has failed to provide humane care of an adopted animal or has sold the animal for slaughter, so long as such violations occurred after the adopter took title to the animal BLM believes no violation has occurred and that the adopter will continue to be eligible to adopt horses through the AIP.

BLM's creation of a less stringent program for the payment of adoption incentives than it previously created for the sale of wild horses constitutes an unexplained change in the agency's policy. To pass muster under the APA, an agency that changes its policy "must at least display awareness that it is changing position." *Encino Motorcars*, 136 S.Ct. at 2126. However, IM 2019-025 does not even to acknowledge that BLM previously imposed a more stringent set of requirements on those who purchase wild horses than the agency now provides for those whom it pays to adopt wild horses. By failing to even "display awareness" that it was changing its policy regarding the circumstances under which it would allow individuals to take possession of wild horses, the agency violated the APA in a fundamental way.

Likewise, BLM also ran afoul of the APA's requirement that an agency changing policy must "show that there are good reasons for the new policy." *Id.* at 2126. Although BLM stressed that increasing adoptions could reduce "costs associated with caring for unadopted animals in BLM managed or contracted corrals and pastures," IM 2019-025 at 1, the agency provided no reason why such cost-savings could not, or should not, be balanced against the need to ensure that adopters actually provide good homes for wild horses rather than merely taking federal payments and then promptly selling the horses for slaughter. Particularly in light of Congress's repeated prohibitions on the use of federal funds for slaughter of healthy wild horses, BLM provided no good reason for the relaxation of its standards for who could be trusted to take

10

possession of a wild horse. In this manner as well, BLM's promulgation of IM 2019-025 was arbitrary and capricious.

### E.       The AIP required NEPA analysis

As described above, NEPA requires the preparation of an EIS for any major federal action with significant environmental effects and, where an agency is uncertain whether an action will have significant effects, requires the preparation of an EA. With particular relevance to BLM's creation of the Adoption Incentive *Program*, NEPA's implementing regulations define "Federal actions" broadly to include the "adoption of *programs*, such as a group of actions to implement a specific policy or plan." 40 C.F.R. § 1508.18(b)(3) (emphasis added).

The need for NEPA analysis of the AIP is clear. To begin with, the AIP itself clearly has environmental impacts because it has effects on wild horses themselves. Indeed, as AWHC's report documents, the impacts to wild horses have proven to be extremely severe. Moreover, BLM explicitly intended the AIP to free up federal funding for activities with environmental impacts. As BLM noted, the AIP's "[c]ost savings may be utilized for other management operations," including "allow[ing] those savings to support critical on-range operations." IM 2019-025 at 1, 3. Because the AIP was intended to allow additional "on-range operations," NEPA obligated BLM to consider the environmental impacts of such operations—as well as alternatives to the AIP that could potentially address the concerns raised by BLM in adopting the AIP without subjecting wild horses and burros to slaughter.

Nevertheless, BLM adopted IM 2019-025 without any environmental analysis whatsoever. Indeed, BLM did not even make any effort to discuss NEPA or even assert that the AIP was somehow exempt from NEPA's requirements (which it is not). The result is that BLM adopted this new program in clear violation of the nation's bedrock environmental law.

## II.       BLM Must End the AIP

For the reasons described above, BLM's creation of the AIP violated federal law in numerous important ways. In such circumstances, a reviewing court "shall hold unlawful and set aside" the AIP, 5 U.S.C. § 706(2), resulting in the vacatur of the program in its entirety. However, in light of the now amply documented ways in which the AIP has resulted in disastrous outcomes for federally protected wild horses that are entirely inconsistent with the congressional intent behind the WHA and behind Congress's routine prohibitions on BLM expending federal funds for the slaughter of healthy wild horses, AWHC hopes that it will not be necessary to have a federal court terminate the AIP. Instead, AWHC hopes that now that it has been confronted with the awful outcomes of the AIP, as well as having been apprised of the numerous ways in which the AIP's creation violated federal law, BLM will itself immediately withdraw IM 2019-025 and end this disastrous program.

III.   **BLM Must Immediately Investigate How the AIP Has Led to the Slaughter and/or Inhumane Treatment of Wild Horses**

As AWHC's report has extensively documented, numerous wild horses and burros adopted through the AIP have encountered inhumane treatment while in the charge of their adopters, and/or have been quickly sold in auctions that cater to slaughter facilities shortly after their adopter taking title to the wild horses. However, to AWHC's knowledge, BLM has not conducted any comprehensive investigation of the outcomes from the AIP. Instead, BLM has touted the AIP's success while apparently turning a blind eye to the extremely dire consequences the AIP has caused for wild horses and burros. Consequently, AWHC has been forced to utilize Freedom of Information Act ("FOIA") requests to obtain information about BLM's administration of the AIP. Although BLM has not complied with FOIA's statutory mandate to promptly release information, the agency has provided some information that has extremely troubling implications for how the AIP is continuing to subject wild horses to inhumane outcomes. For example, AWHC has obtained records through FOIA that show that many individuals are adopting the 4-horse maximum at any given time. Moreover, these records also demonstrate that in many instances, several members of a single family simultaneously each adopt 4 horses at once, resulting in families that adopt 12, 16, or 20 horses at a time to the same location —all without any apparent effort by BLM to ensure that these individuals can care for so many horses and burros at once. AWHC believes that this pattern of behavior—adopting the maximum number of horses at once—constitutes a red flag that suggests that an adopter is more interested in a cash payment than in the welfare of the adopted animal, and that such adopters are highly likely to sell adopted animals as soon as they take title—without regard to whether the animals suffer slaughter as a consequence.

The time has come for BLM itself to meaningfully assess the outcomes from the AIP. To that end, AWHC respectfully requests, and formally petitions pursuant to 5 U.S.C. § 553(e), that BLM immediately undertake a thorough investigation of what fates have befallen wild horses and burros adopted through the AIP. In addition to verifying that adopters provide humane care of wild horses and burros prior to taking title, BLM must investigate what happens to the animals after the adopters take title. Those who have taken title to wild horses or burros through the AIP should prove that the animals have been treated humanely by showing the animals to agency inspectors and demonstrating what kind of care and treatment the adopted animals endure. If an adopter no longer has possession of an animal adopted through the AIP, BLM should make every effort to determine what has happened to that animal—and in particular should conduct a thorough investigation to determine whether these animals have been sold for slaughter or the conversion into commercial products. In that event, BLM should not allow an adopter that has sold an adopted animal in such a manner to adopt (or purchase) a wild horse in the future. Moreover, BLM should make the results of such an investigation open to the public.

Additionally, DOI and BLM should request that the U.S. Department of Justice and the Department of Interior's Office of Inspector General immediately commence investigations into the fates of wild horses adopted through the AIP, and to what extent the creation and implementation of the AIP has involved violations of federal law by the agencies or by adopters. Notably, the AIP is not the first time that DOI and BLM have allowed wild horses to be sent to slaughter, and ample precedent exists for inquiries by the Inspector General and/or the

12

Department of Justice. For example, in 2015, DOI's Office of the Inspector General issued an *Investigative Report of Bureau of Land Management Wild Horse Buyer*, which found that "BLM did not follow current law while managing [wild horses and burros]" and instead sold 1,700 wild horses to a buyer that "wrongfully sent them to slaughter."[5] Although BLM's response to that report was ostensible to "strengthen[] its policies for adoption and sale" of wild horses and to a high-level official's approval for the sale or adoption of more than four wild horses to any individual, the AIP reflects a weakening of exactly this type of restriction, as described above. As another example, in 1997, the Los Angeles Times reported that a federal grand jury investigation showing that BLM "allowed the slaughter of hundreds of wild horses taken from federal lands, falsified records and tried to prevent investigators from uncovering the truth."[6]

These prior instances in which independent federal investigations revealed negligent oversight of the adoption or sale of wild horses, or outright wrongdoing by BLM itself, which led to the slaughter of wild horses in contravention of congressional intent—as is currently occurring under the AIP—reinforces the need for a truly independent investigation into BLM's creation and implementation of the AIP. If DOI and BLM wish to recover the public's trust that the agencies are faithfully protecting wild horses, it is important that the agencies request—and do not obstruct—a truly independent investigation of the AIP. If DOI and BLM do not immediately request that the Department of Justice and DOI's Office of Inspector General commence independent investigations of the AIP, AWHC will have no choice but to explore all options for ensuring that the public receives an accurate and unbiased account of the agencies' creation and implementation of this program, such as requesting that Congress direct that such an independent investigation be conducted and made public.

## IV.   Any Ongoing Implementation of the Adoption Incentive Program Will Require Notice-and-Comment Rulemaking

As described above, because the AIP clearly meets the APA's definition of a "rule," prior to the implementation of any similar action—and prior to any ongoing implementation of the AIP in its current form—BLM must undertake notice-and-comment rulemaking. Accordingly, this letter serves as a formal petition under the APA, 5 U.S.C. § 553(e), for BLM to (1) withdraw IM 2019-025 and permanently end the AIP; and (2) to the extent the agency wishes to provide incentives for the adoption of wild horses in the future, to provide the public with clear notice of what specific incentives the agency intends to provide and allow a meaningful opportunity for public comment.

## CONCLUSION

BLM's creation of the Adoption Incentive Program violated federal law in numerous ways and continues to have extremely negative outcomes for federally protected wild horses. To come into compliance with federal law, BLM must withdraw IM 2019-025 and end the AIP immediately.

---

[5] This report is available at
https://www.doioig.gov/sites/doioig.gov/files/WildHorseBuyer_Public.pdf
[6] *See* Martha Mendoza, Los Angeles Times, March 23, 1997,
https://www.latimes.com/archives/la-xpm-1997-03-23-mn-41176-story.html

13

Although AWHC hopes that it will not be necessary to resort to litigation in order to bring BLM into compliance with its duty to protect wild horses, unless BLM immediately withdraws IM 2019-025 and terminates the AIP, AWHC will have no choice but to contemplate all options to bring the agency into compliance with federal law, including litigation.

**Please provide a response to this letter no later than <u>June 30, 2021</u>**. Thank you for your time and attention to this critically important matter.

Respectfully,

William N. Lawton
Senior Associate

William S. Eubanks II
Owner & Managing Attorney

14

# **<u>Attachments</u>**



May 19, 2021

The Honorable Secretary Deb Haaland
U.S. Department of Interior
Email: doiexecsec@ios.doi.gov

CC: Laura Daniel Davis, Principal Deputy Assistant Secretary
U.S. Department of the Interior
Land and Minerals Management
Email: ldavis@blm.gov

Nada Culver, Acting Director
U.S. Bureau of Land Management
Email: nculver@blm.gov

Dear Secretary Haaland:

This letter and the enclosed report  are sent to you as a follow up to my letter of May 17 regarding the urgent need to suspend and investigate the Bureau of Land Management Adoption Incentive Program.

The report entitled The *BLM's Adoption Incentive Program: Pipeline to Slaughter for Federally-Protected Wild Horses and Burros*, is respectfully submitted on behalf of the American Wild Horse Campaign ("AWHC"), Skydog Sanctuary, Black Hills Wild Horse Sanctuary, and Evanescent Mustang Rescue.

The report adds detail and evidence to the *New York Times* report "Wild horses adopted under a federal program are going to slaughter" May 15, 2021 about the Bureau of Land Management ("BLM") Wild Horse and Burro Program's Adoption Incentive Program ("AIP"). The program pays individuals $1,000 to adopt a wild, untamed horse or burro, and the article detailed numerous instances of adopters collecting the payments, then immediately sending the horses to slaughter auctions.

Our report provides additional evidence of this link to slaughter, as well as documentation indicating an additional problem: the AIP is incentivizing adopters who lack

skills, resources or interest to properly care for and manage wild, unhandled horses or burros, resulting in severe neglect and abuse.

This report and the *New York Times* article provide compelling evidence that the AIP is defrauding the American public and sending federally protected wild horses and burros, resulting in abuse, neglect and  slaughter in contravention of a Congressional ban on the practice. As a result, we respectfully request that the AIP be suspended and an immediate inquiry into the issues raised in this report. Thank you for your consideration, and should you have any questions we can be available by conference call to discuss this matter.

Sincerely,

Suzanne Roy
Executive Director
American Wild Horse Campaign



*BLM's Adoption Incentive Program: Pipeline to Slaughter for Federally-Protected Wild Horses and Burros*

**A Request for Termination & Investigation**

**American Wild Horse Campaign**
**P.O. Box 1733**
**Davis, CA 95617**

&

**Skydog Sanctuary**

**Evanescent Mustang Rescue**

**The Institute of Range and the American Mustang's Black Hills Wild  Horse Sanctuary**

In the last six months, the American Wild Horse Campaign ("AWHC") and several rescue organizations have discovered more than 80 titled Bureau of Land Management ("BLM") wild horses and burros, and over 100 BLM-branded wild horses and burros for whom titles could not be obtained and whose status is unknown, unidentifiable animals, at eight different livestock auctions known to sell horses to kill buyers across five different states. These ungentled, BLM wild horses and burros arrived at those auctions within 1–4 months after their adopters received title, a timeframe that strongly suggested their adopters opted into the agency's Adoption Incentive Program ("AIP") as explained below. Below is a summary of the AIP, followed by a detailed description of each case identified by our coalition.

Additional BLM wild horses and burros are continually found at auctions like the ones listed below; as a result, the 79 individual BLM wild horses and one BLM wild burro herein described represent an initial subset of the total cases. Information regarding additional cases can be provided upon request.

1. **Organizations**

 A. **American Wild Horse Campaign**

AWHC is a national nonprofit organization dedicated to preserving the American wild horse in viable, free–roaming herds for generations to come, as part of our national heritage. Our grassroots efforts are supported by a coalition of over 60 historic preservation, conservation, horse advocacy, and animal welfare organizations. AWHC is working with rescue organizations to investigate the BLM's AIP with the goal of bringing an end to government subsidized slaughter of our wild horses and burros.

 B. **Skydog Sanctuary**

Skydog Sanctuary is a forever home for wild mustangs and burros who have ended up in horrible and dangerous situations—in kill pens, at auctions, and in unloving homes where they have often been starved and neglected. As a "boots on the ground" organization, Skydog Sanctuary closely monitors and documents mustangs landing in kill pens and auctions throughout the year, saving many of them and working with other organizations to coordinate rescues. Skydog Sanctuary also educates and raises awareness of these issues, and has worked hard on their "Pass the SAFE Act" initiative to eliminate kill pens once and for all.

Skydog Sanctuary has rescued many of the horses and the burro documented in this report, and provided their titles and other support for this investigation.

### C.   Evanescent Mustang Rescue and Sanctuary

Evanescent Mustang Rescue and Sanctuary was created for the prevention of animal cruelty through educating the public about horse care and safety as well as rescuing equines (specifically mustangs and burros) from slaughter.  Evanescent Mustang Rescue and Sanctuary has rescued many of the horses documented in this report, and provided their titles and other support for this investigation.

### D.   The Institute of Range and American Mustang/ Black Hills Wild Horse Sanctuary

The Institute of Range and American Mustang's (IRAM) Black Hills Wild Horse Sanctuary has been providing a forever home for America's Wild Horses for over 33 years. This 12,000 acres of privately owned non-profit sanctuary is a home to all wildlife and hundreds of wild mustangs. The IRAM/ Black Hills Wild Horse Sanctuary has rescued many of the horses documented in this report, and provided their titles and other support for this investigation.

2. **Background on the BLM's Adoption Incentive Program**

On January 30, 2019, the BLM published Instruction Memorandum ("IM") IM 2019-025, *Adoption Incentive Program for Wild Horses and Burros*. The policy summary stated that the AIP was developed in order to increase the number of adoptions of untrained wild horses and burros by offering financial incentives: two payments of $500. The first incentive payment is made within 60 days from the adoption date and the second $500 payment is made within 60 days from the title date. (Under the Wild Free-Roaming Horses and Burros Act, title transfers from the BLM to qualified adopters one year from the adoption date. 16 U.S.C. § 1333(c)). Compliance inspections are a requirement of the AIP where BLM personnel, or other BLM approved individuals, *should* conduct compliance inspections on adopted animals participating in the AIP. These inspections are completed for title transfer and eligibility. BLM then tracks these inspections in the agency's Wild Horse and Burro Program System, report titled "*Required Inspections for Incentive Animals.*"

Adopters pay a minimum adoption fee of $25 per wild horse. Each adopter is allowed to take a maximum of four wild horses or burros annually, but as each animal is titled the BLM may allow the adopter to adopt additional animals, up to four at one time. An adopter is removed from AIP eligibility if they relinquish two or more animals within a 12-month period or do not adhere to the terms of the Agreement (4710-25).

The purpose of this program was to increase the placement of as many wild horses and burros into private care as possible, a proclaimed critical priority for the agency's Wild Horse and Burro Program because of the long-term costs associated with caring for unadopted animals, but also in order to free up more space for animals to be removed from public lands en masse. It

was presumed (but not required) that the AIP money would be used for training and initial care of these ungentled wild horses and burros.

The program was implemented in March of 2019 and the BLM has sung its praises ever since. As recently as November 19, 2020, the agency touted the success of the AIP: "The BLM continued to offer the [AIP] in Fiscal Year 2020, which is believed to have bolstered performance." In May 2020, the BLM reported that "[i]n the first 12 months of the AIP, the agency adopted out more than 6,000 animals." This represents a more than 100 percent increase over the BLM's 2,900 per year adoption average in the five years preceding the AIP program. According to Paul McGuire, Outreach Specialist, BLM National Wild Horse & Burro Program, "most but not all of the 6,026 animals adopted during the first 12 months of the AIP received or were eligible for the incentive." (personal email communication, December 7, 2020).

Adopters participating in the AIP are required to sign the BLM's adoption and sale forms which require certification that each adopter has "no intent to sell this wild horse or burro for slaughter or bucking stock, or for processing into commercial products, within the meaning of the Wild and Free-Roaming Horse and Burro Act, 16 U.S.C. 1331 et seq., and regulations 43 CFR 4700.0-5(c)." Consistent with Congress' mandate in the Interior Department's annual appropriations bills, BLM may only sell horses "with limitations," thereby requiring *anyone adopting or purchasing* a wild horse to certify at the time of adoption or purchase that they do not intend to kill or sell the horse for commercial slaughter, *nor would they transfer ownership to any person or organization who they knew or had reason to believe would "resell, trade or give away the animal(s) for slaughter or commercial processing."* The appropriations language prohibiting sale for slaughter specifically applies to BLM.

**3.   2020 Influx of Wild Horses in Kill Pens**

March 2020 marked the end of the first year of the AIP, meaning that participants would begin to receive title and subsequently the second $500 incentive payment on all their eligible adopted wild horses and burros. The IM noted that the second payment would be issued within 60 days of titling, meaning that the adopter of a horse or burro adopted through the program on, for example March 30, 2019, would potentially not receive the second incentive payment until May 30, 2020.

By August 2020, rescue groups began to see an increase in BLM branded wild horses and burros at auctions known to sell the animals to kill buyers (individuals who purchase horses and burros and sell them to horse slaughter plants in Canada or Mexico). Titles available from the auctions revealed ungentled wild horses arriving within 1–4 months of their adopters receiving title, a timeframe during which program participants would receive their second AIP payment. Many of these horses were young, unhandled animals, some with their BLM tags still around their necks more than a year after their adoption from BLM holding corrals, suggesting that adopters simply held the animals for a year without care in order to collect the $1,000 incentive. Even more concerning, the titles showed that several families had adopted horses and sent them to kill pens together within 3–4 months of receiving title to the animals. Each individual adopter can adopt up to four horses in a year, meaning a family of four could each take four horses and flip all 16 to a kill pen together.

Rescues worked with AWHC to uncover a total of 80 cases of identified individual horses and burros who arrived in kill pens and were put up for auction in a timeframe that strongly suggested their adopters opted in to the AIP. The following are examples of BLM adoption horses who were "flipped" to kill pens months after adopters received title to the animals:

### A. Peabody Horse Pen

The Peabody Horse Pen in Peabody, Kansas, is run in partnership with a 501c(3) organization that has an agreement with a well-known kill buyer to try to sell horses before the kill buyer ships them to slaughter. (Appendix 1, 1A).

- **Case Number 1**: Thirteen BLM wild horses were titled to a family of four: Lacey Cumin, Nathan Cumin, Cole Cumin, and Jessica Cumin. Each member of the family adopted between 3–4 horses and those horses were later relinquished to the Peabody auction. Of the 13 horses, 10 were titled to the same address. The other three titled under Lacey Cumin listed a different address. The horses were titled to the Cumin family in three batches: three were titled on June 30, 2020, eight were titled on July 7, 2020, and two were titled on July 15, 2020. All 13 horses were sent to Peabody on October 1, 2020, after the 60-day window for receipt of the second $500 AIP payment. All were later rescued with assistance from Skydog Sanctuary from the Peabody Horse Pen in Kansas. Two of these animals were confirmed as being adopted through the AIP by records received through Freedom of Information Act ("FOIA") requests. Compliance inspections on the other horses are pending. See Appendix 2, section 1 A-E for in-depth information on the titles.

  Of note: According to an internal BLM email dated June 14, 2019 and obtained in response to a FOIA request, both Nathan and Lacey Cumin were designated as "no longer eligible for the Adoption Incentive Program due to returning 2 or more animals within a 12 month period." Nevertheless, they received titles for three adopted horses each in June and July 2020 and flipped the horses to the kill pen on October 1, 2020.

- **Case Number 2:** Three BLM wild horses were titled to David A. Wilkie on October 5, 2020. All three horses were posted to Peabody Horse Pen's Facebook page for sale on January 1, 2021, after the 60-day window for receipt of the second AIP installment of $500. It is confirmed that all three of these horses were adopted through the AIP from compliance inspections obtained via FOIA requests. See Appendix 2, section 2 A-C for in depth information on the titles.

- **Case Number 3:** Staci S. Jacques adopted two BLM wild horses who were titled to her on July 15, 2020 and were later rescued from Peabody Horse Pen in September 2020 within the 60-day period when adopters would receive the second AIP installment of $500. See Appendix 2, section 3A and 3B for in depth information on the titles.

- **Case Number 4:** Sandy K. Tiede adopted one BLM horse. The title date was obscured by kill pen officials. The animal was found in the Peabody Horse Pen on April 14, 2021. See Appendix 2, section 4A for in depth information on title.

- **Case Number 5:** Kurt W. Fast adopted one BLM burro who was later found in the Peabody Horse Pen in September 2020. While the title date is unknown, compliance inspections obtained through FOIA requests confirm this burro was adopted through the AIP. The animal was adopted on July 9, 2019 and the compliance inspection was conducted on April 13, 2020. See Appendix 2, section 5A for in depth information on title.

### B. Stroud Oklahoma Kill Pen

Stroud Oklahoma Kill Pen is a livestock auction in Stroud, Oklahoma. It is a self-proclaimed kill pen. At this particular auction, owners selling horses can designate whether or not their horse(s) can be sold to slaughter. None of the horses listed below were designated as NOT to be sold for slaughter. See Appendix 1, 3A and 3B for proof of slaughter auction status.

- **Case Number 1:** John L. Massingale adopted four BLM wild horses, the maximum number of horses allowed under BLM policy. All four were titled to Massingale on September 21, 2020 and were later sent to Stroud Kill Pen in early November, within the 60-day period when adopters were to receive the second AIP installment of $500. All were later rescued from Stroud Kill Pen in Oklahoma. See Appendix 2, section 6A-D for in-depth information on the titles.

- **Case Number 2:** Edward L. Chauncey adopted two BLM wild horses. Both were titled on September 21, 2020 and were sent to Stroud Kill Pen in early November 2020, within the 60-day period when adopters were to receive the second AIP installment of $500. All were later rescued from Stroud Kill Pen in Oklahoma. See Appendix 2, section 7A and 7B for in-depth information on the titles.

- **Case Number 3:** Clint L. Couch adopted one BLM wild horse who was titled to Couch on August 10, 2020 and was later sent to Stroud Kill Pen in early November 2020. The horse was later rescued from Stroud Kill Pen in Oklahoma. The animal was confirmed as being adopted through the AIP by compliance inspection records obtained through FOIA requests. Clint L. Couch was convicted of kidnapping and assault in a horse deal gone wrong. Act See Appendix 2, section 8A and 8B for in-depth information on the title and assault charges

- **Case Number 4:** Kaeli Seay adopted one BLM wild horse who was titled to Seay on August 18, 2020. The horse was sent to Stroud Kill Pen in early November 2020. The horse was later rescued from Stroud Kill Pen in Oklahoma. This animal was confirmed as being adopted through the AIP by compliance inspection records obtained through FOIA requests. See Appendix 2, section 9A for in-depth information on the title.

- **Case Number 5:** Ben A. Baugh received the title of one BLM wild horse on April 22, 2020. The horse was later rescued in early November 2020 by Black Hills Wild Horse Sanctuary and still had a BLM identification tag around her neck. See Appendix 2, section 10A for in-depth information on the title.

- **Case Number 6:** Julie Auld (also listed as Auld Julie in official records) adopted one wild horse on June 11, 2019. She received the title of one BLM wild horse on August 27, 2020. The animal was later found in the Stroud Kill Pen in December 2020 and was rescued by Black Hills Wild Horse Sanctuary. BLM compliance inspections, received through FOIA requests, confirmed this horse was adopted through the AIP. FOIA records also indicate that she adopted an additional wild horse. See Appendix 2, section 11A and 11B for in-depth information on the title.

- **Case Number 7:** The Castagno family, consisting of Tracy Castango, Nicki Castango and Steve Castango, adopted a minimum of 3 wild horses. Compliance inspections obtained through FOIA requests confirm all three animals were adopted through the AIP. The animals were adopted on May 31, 2019 and were titled on or around June 15, 2020. The animals were found in Stroud Kill Pen in September 2020. See Appendix 2 Section 12 A-C for in-depth information on the titles.

- **Case Number 8**: Wayne A. Nicho received the titles to two wild horses on February 9, 2021. Both animals were found in Stroud Kill Pen on April 10, 2021, within the 60-day period when adopters were to receive the second AIP installment of $500. See Appendix 2 section 13A and 13B for in depth information on the titles.

### C.  Cleburne Horse Sale

According to an Animal's Angels undercover investigation, sellers at the Cleburne Horse Sale in Texas *must acknowledge* that their horse may end up sold to a slaughter auction (Appendix 1, 3A). According to that same investigation, well known kill buyer Mike McBarron, who runs the Kaufman Kill Pen (Appendix 1, 3B), often frequents Cleburne Horse Sale (Appendix 1, 3B). This is further supported by a *Weatherford Democrat* article that details the tragic journey of a veterinarian who relinquished horses to the Cleburne Horse Sale and later found them at McBarron's Kaufman Kill Pen (Appendix 1, 3B).

- **Case:** Twenty-one BLM wild horses together arrived at Cleburne Horse Sale on November 11, 2020. All names on the titles were either redacted or there was an attempt to redact the information. Per the auction, these horses were all from the same location. The horses were titled in four batches, the earliest being on September 14, 2020 and the latest on October 5, 2020. The mustangs arrived at the auction house a little over a month after the last batch of titles was awarded, within the 60-day window for receipt of the second $500 AIP installment. Despite attempts to redact information on the titles, three names and addresses were legible. Brenda J. Kidd adopted at least two mustangs titled on September 14, 2020, Gary Kidd adopted at least one mustang titled on September 14, 2020, and Dustin Banks adopted four mustangs titled on October 5, 2020. The address for the Kidd's and Banks's horses were the same, affirming the auction house's claim the horses arrived from the same location. All 21 wild horses were rescued by Evanescent Mustang Rescue and Sanctuary. One of these horses was confirmed to be adopted through the AIP by compliance inspections obtained through FOIA requests. There are pending FOIAs on the other 20 animals. Gary Kidd, was included in the recent *New York Times* exposé, the interview shows Kidd lied about the status of his horses and was

confronted with records that showed all 21 animals went to a kill pen. See Appendix 2, section 14A-D for in-depth information on the titles.

### D.  Fabrizius Livestock Auction

Fabrizius Livestock Auction is a self-proclaimed kill pen (Appendix 1, section 5A) located in Eaton, CO. It is run by Jason Fabrizius, who according to a 2018 article in the Denver Channel, stated that, "I buy them, and I buy them by the truckloads. And we send them to Mexico." In the same article, he claims to regularly send 34 horses a week to Mexico. (Appendix 1, 5B).

- **Case Number 1:** Lonnie D. Krause adopted three BLM wild horses who were sent to the Fabrizius Livestock Auction. The horses were titled on September 14, 2020 and sent to Fabrizius on September 25, 2020, well within the 60-day period when adopters were to receive the second AIP installment of $500. All were  later rescued from the Fabrizius Livestock Auction in Colorado. Lonnie Krause admitted in an interview for the *New York Times* that he and his grandson (Conner Palmer) adopted the maximum number of horses each as a more profitable venture than raising cattle. He saw no issue with this, as BLM officials stated "once you get title, there is no limitation on slaughter." See Appendix 2, section 15A-C for in-depth information on the titles.

- **Case Number 2:** Conner A. Palmer adopted two BLM wild horses and received their titles in his name on September 14, 2020. They were later sent to Fabrizius around September 25, 2020, well within the 60-day period when adopters were to receive the second AIP installment of $500. All were later rescued  from the Fabrizius Livestock Auction in Colorado. See Appendix 2, section 16A and  16B for in-depth information on the titles.

**Special Note:** These horses were flipped to the kill pen quicker than we've seen in the previous cases, but once the BLM conducts their second compliance inspection and issues the title, the owner is under no obligation to keep the horse in their care. The BLM would **not** know if the horse(s) remained with the adopter(s) or not and yet would still issue the second incentive payment of $500 since the title had already been transferred.

### E.  Bowie Auction House

Bowie Auction is a self-proclaimed kill pen (Appendix 1, 5A) located in Bowie, TX.

- **Case:** Dennis M. Schwitzer adopted one BLM wild horse and received the title in August 2020. The horse was later rescued from Bowie Auction House by a private individual on September 9, 2020, arriving at the auction well within the 60-day period when adopters were to receive the second AIP installment of $500.  See Appendix 2, section 17A for in-depth information on the title.

**Special Note:** Compliance Inspection records note that four BLM animals, adopted through the AIP, were flipped to Bowie before titles were transferred to the adopter. The BLM was notified and all four horses were repossessed.  See Appendix 2, section 17B for freeze brand information.

### F.  Kaufman Kill Pen:

Kaufman Kill Pen is a self-proclaimed kill pen (Appendix 1, section 6) located in Forney Texas. According to an Animal's Angels investigation,  this kill pen is owned and operated by Mike McBarron (Appendix 1, 3B).

- **Case Number 1:** Myra N. Sander adopted one BLM wild horse on August 3, 2019. The horse was titled to her on August 8, 2020 and was flipped to Kaufman Kill Pen within the 60–90 day timeframe. This horse was confirmed to be adopted through the AIP by BLM compliance inspection records obtained by FOIA requests. See Appendix 2, 18A for in-depth information on the title.

- **Case Number 2:** Henry D. Jump adopted one wild horse on August 3, 2019. The horse was titled to him in 2020. While the month of titling is obscured, the horse was inspected for title eligibility by BLM officials on January 1, 2020. The date of actual titling is unknown. The horse was found in Kaufman Kill Pen February 1, 2021 and was one of seven BLM horses found in the kill pen on that day. FOIA records confirm this animal was adopted through the AIP. Records also note Henry Jump adopted two horses. See Appendix 2, 19A and 19B for in-depth information on the title and FOIA information.

### G.  North Louisiana Equine Transport and Feedlot

North Louisiana Equine Transport and Feedlot is a feedlot located in Bastrop, LA. According to a 2021 article, this feedlot is run by brothers Gregory and Mitchell Stanley. The Stanley brothers are considered some of the most notorious kill buyers in the country and have been the subjects of multiple investigations including animal cruelty, inauthentic transport paperwork, and assault allegations. See Appendix 1 section 7.1 and 7.2 for more information.

- **Case:** Hugh C. Hession adopted two BLM wild horses. Both were titled on November 18, 2020 and both were found in the North Louisiana kill pen in early February 2021. Appendix 2, sections 20A and 20B for in-depth information on the titles.

### H.  Centennial Livestock Auction:

The Centennial Livestock Auction is a slaughter auction in Fort Collins, Colorado. While not explicitly stated on their website, the weekly market report published on their website clearly shows they sell horses, by the pound, to slaughter. See Appendix 1 section 8 for more information.

- **Case:** Debra J. Harris received title for three wild horses on November 19, 2020. The three horses were found at the Centennial Livestock Auction in early May 2021. See Appendix 2 Section 21 A-C.

  **Special note:** These horses were flipped to the kill pen outside of the typical 60–90 days after titling, but it is highly probable that they are AIP animals as the 60–90 day window for titling and payment is just an estimate.

I. **Miscellaneous**

- **Case Number 1** Tarrah L. Hern adopted one BLM wild horse who was titled to her on March 24, 2020. According to information obtained through FOIA requests, Hern adopted the horse through the AIP. The horse was later rescued from a livestock auction in August 2020. See Appendix 2, section 22A for in-depth information on the title.

- **Case Number 2:** Joni R. Flemming adopted four horses on August 13, 2019. One horse, who was rescued from an undisclosed kill pen by a private individual, was titled October 9, 2020. Compliance inspection records indicate all four animals were adopted through the AIP. The status of the other three animals is unknown. See appendix 2 section 23 A-D for in-depth information on titles.

- **Case Number 3:** Joe A. Anderson adopted three wild horses and received titles for all four on March 31 2021. All four horses were discovered in an undisclosed kill pen in Texas on April 11 2021. See appendix 2 section 24A-C for in-depth information on titles.

- **Case Number 4**: Dymiti Anderson adopted one wild horse and received the title on March 31 2021. The one horse was discovered in an undisclosed kill pen in Texas on April 11 2021. See appendix 2 section 25A for in-depth information on the title.

This information is based on evidence that AWHC has been able to gather working with various rescues such as our partners, Skydog Wild Horse Sanctuary, Black Hills Wild Horse Sanctuary, and Evanescent Mustang Rescue. Some of the individuals named above may have adopted more than the horses listed here, but those potential horses were likely sold to various individuals or, in the worst case, to a kill buyer who shipped them across the border without being detected by rescue groups.

### 4. <u>Compliance Inspections Show AIP Wild Horses and Burros Are Suffering Severe Cruelty After Being "Adopted"</u>

AWHC's concerns about the AIP expand further than federally protected horses and burros being funneled to kill pens. Through the records received on BLM compliance inspections for AIP animals, it is obvious many adopters using this incentive program either have nefarious intent, or lack the basic ability and knowledge to care for unhandled wild animals. AWHC has documented many cases of abuse and neglect of AIP animals. Additionally, in several instances, when the time came for compliance inspections BLM officials were not able to locate or get in contact with numerous adopters in Texas and Oklahoma. Many cases were turned over to law enforcement and the status of those AIP animals is unknown. Examples from the documents are as follows:

**<u>Abuse cases (animal is identified by freeze brand number):</u>**

- **19025517:** "Found 19025517 Sorrel horse upside down with her head folded back with a severe neck injury. The neck injury prevented her from standing and being able to lay upright. We tried to assist her to stand but she was unable to do so. We then called every vet in the valley. None returned our phone calls due to the Veterans Day Holiday. After no calls she was laboring to breath [sic] so I put her out of her misery."

- **16861637:** "We received a complaint about this horse being underweight [sic] and in a dog pen. We contacted the adopter and found that she had moved the horse a second time and she gave the new location to us. Upon arrival at the location we found this horse with a body score of 2 and in a 10x10 area with a peice [sic] of plywood on top standing in 5 inches of mud. We repossessed the animal that day."

**Neglect cases (animal is identified by freeze brand number):**

- **18869274:** "Body Score is a 2.5. Had numerous [sic] sores on body. Sent out a correction letter in regards to the weight of the animal. We are requesting for the vet to come out to make a nutritional plan and to do another inspection in 4 weeks."

- **18869242:** "We arrived at this facility to inspect (b) REDACTED animals that had just moved there and found this yearling. The animal was very thin on rating on the scale at a 2. He was eating moldy hay and the adopter admitted that last week he had eaten a fly trap. The water also had thick algae [sic] in it. The animal was repossessed that day."

- **16025230:** "body condition: very poor, score of 2, ribs and spine apparent. Hoof condition: long, overgrown hooves. Comments: horse was obviously malnourished and did not receive [sic] basic care." "with a brief look at facility there was not an adequate shelter with attached safe turn out"

- **17632030 and 17632043:** "On 1/15/2020 received pictures of thin horses and a complaint that they were not being fed [sic]. Called REDACTED at 2:21 pm and left a message [sic]. Called back at 3:08 pm. Mr. Seals was told about a complaint [sic] and the BLM would be there tomorrow. He said that he called and left a message last week about his job and to move the horses. There was not a message sent to my knowledge. He was told that he needed to be there. He was told that he would get a telephone call 30 miles out. 1/16/2020 8:33am Telephone call was made, no answer, left message that the BLM will be there. 9:14 am Dan & I arrived at the REDACTED place and was not home. FM 17632043 & FM 17632030 Body condition was 2 1/2-3. Talked to the next door neighbors  and said that the horses had not been fed [sic] in a couple of days [sic] and that they have been feeding them. Said that their [sic] was another mustang down the road that sold. FM 18632317 was verified and it is a sold animal, but the animal was at 1 1/2 body condition. called back and I told him that I was giving him a warning and that I would check on the animals. Said that he needed to turn the horses back because he needed [sic] to move closer to work.voluntarily relinquished the horses. Horses were picked up."

- **12188414:** "Grant received information from SB FICC Dispatch regarding burros escaping from their adopter. I conducted the compliance inspection on Tuesday, March 3, at 1 PM. The holding pen design described on the application which met the qualifications to adopt was not how the actual pen design was, where the two burros escaped after two days after being brought home. The two burros could have either escaped by climbing over a 10 foot high dirt mound that was in the first pen that was not fenced or over a 2 -4 foot rock/earth barrier next to the shelter in the lower pen. See pictures at: \\blm.doi.net\dfs\ca\ri\pub\Photos\aneiberg\2020 WHB Compliance The pen

design where the burros were kept, did not meet the BLM requirements for adoption. After inspection of the facility, went with Janey to scout the area where reports from the public had either seen them or seen signs [sic] indicating they were in the area. Animals missing in the desert."

These are the most egregious cases, but there are many more instances of negligence by adopters such as falsifying government documents and failing to provide care for these animals.

5. **BLM Washes Hands of Situation Despite Internal Concerns**

At least one BLM employee accurately predicted the outcome of the AIP.   In records received by AWHC under FOIA, Rob Sharp, Supervisory Wild Horse & Burro Specialist for BLM Oregon, stated on June 25, 2019:

[H]here's some thoughts on the Adoption Incentive Program:

Since its inception we've seen a pretty good boost in adoption numbers. Some are repeat adopters but the majority have been new adopters. My concerns focus on the welfare of the animal after they are adopted. For many first time adopters, getting a gentled horse from a TIP trainer or other gentled horse program is a great segway into wild horses. However, since the AIP isn't applicable to gentled animals, this removes that option. Time will tell if we see a surge in compliance issues with AIP animals as a result of people only seeing the initial cash payment and not thinking about the lifetime costs associated with owning a horse and the adoption of animals to people who have no business owning a horse!… And personally I don't agree with the government providing cash incentives to a product (horses) which has an existing private market… I have spoken with… trainers who can offset the cost of care for a year and resell their horses after they are titled and make some money.

Mr. Sharp's concerns have been borne out, however, the agency he works for has turned a blind eye to the fate of the horses and burros adopted under this program. On October 6, 2020, AWHC contacted Acting Off-Range Branch Chief Paul McGuire via email regarding the 13 BLM wild horses sent to Peabody Horse Pen. Mr. McGuire responded that because the adopters of the horses had fulfilled their obligations under the adoption agreement and received title for the horses before sending them to auction, *the BLM had no cause to issue a violation.* Mr. McGuire answered affirmatively when asked if these adopters would still be eligible to participate in adopting horses in the future from BLM. See the email chain here. Mr. McGuire is conveying the BLM apparent policy of taking no responsibility for wild horses and burros once title is transferred (including whether the adopters adhere to the enforceable no-slaughter provision of their adoption contracts).

Additionally, the *NY Times* reported that according to one AIP adopter, the agency tells AIP participants "Once you get a title, they told me, there is no limitation — you can do whatever you want with them." Additionally, the BLM told the *NY Times* that it had no authority to enforce adoption contracts and their anti-slaughter provision that is signed under penalty of perjury.

The actions of the BLM with regard to the AIP are similar to the agency's behavior a decade ago when it sold truckloads of horses to a known kill buyer, turning a blind eye to the implausible explanations about what the buyer intended to do with the horses, such as using truckloads of horses for "use in movies" in Mexico. (The buyer also told the BLM that he didn't care what kind of horses (male/female) he purchased, as long as they were big.)

## 6. __Conclusion: An Immediate Termination  of AIP  and Full Investigation of the Program is Required__

AWHC has submitted several FOIA requests[1] seeking to obtain further evidence of the connection between these incidents and the BLM's AIP, including records related to AIP payments. We also continue to collect data from rescue organizations and sanctuaries in order to document all BLM wild horses and burros adopted via BLM internet adoptions as well as BLM horses and burros being sold at kill pens across the country.

However, the incidents listed above provide compelling evidence that the BLM has created, a government subsidized slaughter pipeline and is defrauding U.S. taxpayers by providing payments of $1,000 per a BLM wild horse or burros adopted through AIP while turning a blind eye when those same animals are immediately flipped to known slaughter auctions after the adopters receive full incentive payments.In light of this report and the *NY Times* expose', the Interior Department and Congress must investigate the extent of the problem, agency complicity in the illegal sale of wild horses and burros at slaughter auction in violation of the spirit and the letter of federal law.

Additionally, the Interior Department must identify all wild horses and burros adopted under the AIP who remain at risk of slaughter and abuse, as well as refer adopters who sold horses to slaughter auctions in violation of their adoption contracts, signed under penalty of perjury,  for criminal prosecution. Due to the length of time it will take to receive responses to AWHC's FOIA requests, and the urgency of the threat that the AIP is driving the sale of BLM wild horses and burros for slaughter in contravention of federal law, we officially request a suspension of the AIP pending an immediate inquiry into the issues raised in this report.

---

[1] AWHC's requests include: DOI-BLM-2021-000789, 2021-000803, 2021-000825, 2021-001001, DOI-BLM-2021-002679, DOI-BLM-2021-002681, DOI-BLM-2021-002683, DOI-BLM-2021-002685, DOI-BLM-2021-003104, DOI-BLM-2021-003106, DOI-BLM-2021-003112, DOI-BLM-2021-003110, DOI-BLM-2021-003107, DOI-BLM-2021-003109, DOI-BLM-2021-003111, DOI-BLM-2021-003175, DOI-BLM-2021-003134, DOI-BLM-2021-003331, 2020-00726, and DOI-BLM-2021-004024 which are still outstanding.

# Appendix 1: Proof of Auction Houses as Kill pens

1. Peabody Horse Pen

    1. Screenshot of Peabody Horse Pen Facebook page



2. Stroud Kill Pen

    1. Screenshot of Stroud Kill Pen's website



2.   Horse marked as a non-slaughter horse



3.   Cleburne Horse Sale



1.

https://myemail.constantcontact.com/Animals--Angels-Investigators-Call-Strike-
Three-on-Trent-Ward-s-Cleburne-Auction-in-Texas.html?soid=1101655399670&
aid=temyncmaGeA

2.  

https://www.weatherforddemocrat.com/news/cutting-horse-vet-s-horses-slated-for

-slaughter/article_70c9b4b2-5675-11e6-9d2b-735fc8e9a5c7.html

4.  Fabrizius Livestock Auction

1.  Screenshot of Fabrizius's website affirming slaughter auction status.



2.  https://www.thedenverchannel.com/news/360/colorado-horses-sold-for-slaughter-

even-when-rescues-want-to-help

5.  Bowie Auction House

1. Screenshot of Bowie Auction House's website



6. Kaufman Kill Pen

1. Screenshot of Kaufman Kill Pen's Facebook page affirming its kill pen status



7. North Louisiana Transport and Feedlot

1. Screengrab from a 2021 article stating the Stanley's own the North Louisiana Transport and Feedlot.



2. Further information on investigations into the Stanley brothers can be found here and here

8. Centennial Livestock Auctions
   1. Screengrab from CLA's website showing the price per pound of horses going through their auction. CWT is the livestock abbreviation of hundredweight, which is the price per 100 lbs of any given animal.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Hors**es | 1 | brwn | mule | 245 | lbs | 385.00 | hd | Eaton |
| | 1 | blm | stud | 735 | lbs | 215.00 | cwt | Rawlins |
| | 1 | bksk | stud | 885 | lbs | 150.00 | cwt | Rawlins |
| | 1 | pnt | stud | 790 | lbs | 115.00 | cwt | Rawlins |
| | 1 | bksk | **hors** | 880 | lbs | 175.00 | cwt | Chugwater |
| | 1 | grey | **hors** | 895 | lbs | 150.00 | cwt | Carbondale |
| | 1 | palo | **hors** | 665 | lbs | 145.00 | cwt | Rawlins |
| | 1 | pnt | **hors** | 1045 | lbs | 120.00 | cwt | Carbondale |
| | 1 | palo | **hors** | 1125 | lbs | 100.00 | cwt | Carbondale |
| | 1 | blm | **hors** | 1100 | lbs | 95.00 | cwt | Rawlins |
| | 1 | palo | **hors** | 1070 | lbs | 92.50 | cwt | Rawlins |
| | 1 | pnt | **hors** | 1035 | lbs | 82.50 | cwt | Carbondale |
| | 1 | palo | **hors** | 1005 | lbs | 80.00 | cwt | Rawlins |
| | 1 | sorr | **hors** | 970 | lbs | 80.00 | cwt | Carbondale |
| | 1 | sorr | **hors** | 910 | lbs | 80.00 | cwt | Carbondale |
| | 1 | grey | **hors** | 745 | lbs | 65.00 | cwt | Rawlins |

**Appendix 2: In-depth information on adopters and BLM wild horses:**

1. Cumin Family: (All horses were later rescued with assistance from Skydog from the Peabody Horse Pen in Kansas.)

   a. Lacey N. Cumin: (Note: Lacey Cumin is banned from adopting any more AIP horses as of June 14, 2019 per compliance inspection FOIA received by AWHC. However, she received three titles in 2020.)

      i. 12978012: Titled on June 30, 2020. Found in Peabody Horse Pen on October 1, 2020.

      ii. 12978020: Titled on June 30, 2020. Found in Peabody Horse Pen on October 1, 2020.

      iii. 14862300: Titled on June 30, 2020. Found in Peabody Horse Pen on October 1, 2020.

   b. Nathan H. Cumin: (Note: Nathan Cumin is banned from adopting any more AIP horses as of June 14, 2019 per compliance inspection FOIA received by AWHC. However, he received three titles in 2020.)

      i. 12978046: Titled on July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

      ii. 13978036: Titled on July 15, 2020. Found in Peabody Horse Pen on October 1, 2020.

      iii. 13978059: Titled on July 15, 2020. Found in Peabody Horse Pen on October 1, 2020.

   c. Cole T. Cumin:

      i. 17632360: Titled July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

    ii.   18631903: Titled July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

    iii.   18632325: Titled July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

d.   Jessica S. Cumin:

    i.   18629609: Titled on July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

    ii.   18631914: Titled on July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

    iii.   18631993: Titled on July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

e.   Unknown member of the Cumin Family:

    i.   18631953: Titled on July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

2.   David A. Wilkie:

a.   17632598: Titled on October 5, 2020. Arrived at auction around January 5, 2021.

b.   17632608: Titled on October 5, 2020. Arrived at auction around January 5, 2021.

c.   16631881: Titled on October 5, 2020. Arrived at auction around January 5, 2021.

3.   Staci S. Jaques: (Both were later rescued from Peabody Horse Pen in September 2020.)

a.   14732785: Titled July 15, 2020. Arrived at Peabody Horse Pen in September, 2020.

b.   17628969: Titled July 15, 2020. Arrived at Peabody Horse Pen in September, 2020.

4.   Sandy K. Tiede:

      a.  14224743: Title date unknown. Arrive at Peabody Horse Pen in April 2021.

5. Kurt W. Fast
   a. 11145215: Title date unknown. Arrived at Peabody horse pen in September 2020. Compliance inspections obtained through AWHC's FOIA requests confirm this burro was adopted through the AIP. The animal was adopted on July 9, 2019 and the compliance inspection was conducted on April 13, 2020.

6. John L. Massingale: (Adopted the following four BLM wild horses who were later rescued from Stroud Kill Pen in Oklahoma.)
   a. 15626752: Titled on September 21, 2020. Found in a slaughter auction early November, 2020
   b. 15730345: Titled on September 21, 2020. Found in a slaughter auction on approximately November 5, 2020.
   c. 15731037: Titled on September 21, 2020. Found in a slaughter auction on approximately November 5, 2020. Adopted from KS Correctional in 2019.
   d. 16626723: Titled on September 21, 2020. Found in a slaughter auction on approximately November 5, 2020.

7. Edward L. Chauncey: (Adopted the following two BLM wild horses which were later rescued from Stroud Kill Pen in Oklahoma.)
   a. 14733288: Titled on September 21, 2020. Found in a slaughter auction early November 2020.
   b. 15861728: Titled on September 21, 2020. Found in a slaughter auction early November, 2020.

8. Clint L. Couch: (Adopted the following one BLM wild horse who was later rescued from Stroud Kill Pen in Oklahoma.)

      a.  12625474: Titled on August 10, 2020. Found in a slaughter auction on

          approximately November 5, 2020.

      b.  [Article detail Clint Couch's arrest](#)

9. Kaeli Seay: (Adopted the following one BLM wild horse who was later rescued from

   Stroud Kill Pen in Oklahoma.)

      a.  16862192: Titled August 18, 2020. Found in a slaughter auction early November,

          2020.

10. Ben A. Baugh: (Adopted the following one BLM wild horse who was later rescued from

   Stroud Kill Pen in Oklahoma.)

      a.  15730993: Titled April 22, 2020. Rescued by Black Hills. Still had a BLM tag

          around her neck.

11. Auld Julie (Adopted the following two BLM wild horses, one of which was later rescued

   from Stroud Kill Pen in Oklahoma.)

      a.  18628990: Adopted on June 11, 2019. Titled on August 27th, 2020. Found in the

          kill pen in December 2020.

      b.  18628955: Adopted on June 11, 2019. Title date and the status date of this horse

          is unknown.

12. The Castango Family (Adopted the following three BLM wild horses, which were later

   rescued from Stroud Kill Pen in Oklahoma.)

      a.  Steve Castango:

          i.  18862753: Adopted on May 31, 2019. Titled on June 15, 2020. The horse

              was found in a kill pen in September 2020.

      b.  Tracy Castango:

         i.    18862329: Adopted on May 31, 2019. Titled on June 15, 2020. The horse was found in a kill pen in September 2020.

  c.  Unknown Castango:

         i.    18862743: Adopted on May 31, 2019. Titled on June 15, 2020. The horse was found in a kill pen in September 2020.

13. Wayne A. Nichol:

  a.  18862430: Titled on February 9, 2021. The horse was found in a kill pen on April 10th, 2021. Status of this horse is unknown.

  b.  18862611: Titled on February 9, 2021. The horse was found in a kill pen on April 10th, 2021. Status of this horse is unknown.

14. The Cleburne 21:

  a.  Titles with names redacted: (All later rescued by Evanescent Mustang Rescue from Cleburne Horse Sale in Texas.)

         i.    13646627: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

         ii.   14623671: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

         iii.  15626070: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

         iv.  15632314: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

         v.   16632238: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

vi.    16632261: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

vii.   16632313: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

viii.  16632483: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.  This BLM wild horse arrived at the auction trained, unlike the others we have seen. However, this trained horse may have still been adopted through AIP as an unhandled BLM wild horse at the time of adoption.

ix.    17632268: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

x.     17632299: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

xi.    17632453: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

xii.   18629272: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

xiii.  18629290: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

xiv.   18633484: Titled on September 29, 2020. Arrived at Cleburne on November 11, 2020.

b.  Brenda J. Kidd: (Adopter's name was legible through attempted redaction. Horses were later rescued from Cleburne Horse Sale in Texas.)

       i.    14629187: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

      ii.    18629053: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

c.    Gary Kidd: (Adopter's name was legible through attempted redaction. Horse was later rescued from Cleburne Horse Sale in Texas.)

       i.    15766749: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

d.    Dustin Banks: (Adopter's name was legible through attempted redaction. Horses were later rescued from Cleburne Horse Sale in Texas.)

       i.    16632343: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

      ii.    18625966: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

     iii.    18628912: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

     iv.    18629276: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

15. Lonnie D. Krause: (All horses were later rescued from Fabrizius Livestock Auction in Colorado.)

a.    12024193: Titled September 14, 2020. Found in Fabrizius Livestock auction around September 25th, 2020.

b.    157334818: Titled September 14, 2020. Found in Fabrizius Livestock auction around September 25th, 2020.

      c.  15862383: Titled September 14, 2020. Found in Fabrizius Livestock Auction. Rescued by a private individual from the auction house on November 3, 2020.

16.  Conner A. Palmer: (All horses were later rescued from Fabrizius Livestock Auction in Colorado.)

      a.  147311725: Titled on September 14, 2020. Found in Fabrizius Livestock Auction on September 25, 2020.

      b.  15733657: Titled on September 14, 2020. Found in Fabrizius Livestock Auction on September 25, 2020.

17. Dennis M. Schwitzer:

      a.  18631933: Titled in August 2020. Rescued from Bowie Auction House on September 9, 2020. Rescued by a private individual.

      b.  Freeze Brands of horses repossessed by the BLM:

          i.   17627871

          ii.   16628049

          iii.   16627991

          iv.   13628044

18. Myra N. Sanders:

      a.  15633342: Adopted on August 3 2019 and titled on August 8 2020. Later found in Kaufman Kill pen.

19. Henry D. Jump

      a.  18629097: Adopted on August 3, 2019 and titled in 2020. Later found in Kaufman Kill Pen.

      b.  18629282: This horse was discovered through a Freedom of Information Act request for BLM Compliance inspection data. Adopted on August 3, 2019 and

was inspected on January 7, 2020 by a BLM employee. The Compliance inspection noted "horse in pasture 240 acers did not see Mr. Jump said horse is doing good comes in about every three days." The status of this horse is unknown.

20.  Hugh C. Hession:

   a.  18627042: Titled on November 18, 2020 and was found in a kill pen in February 2021

   b.  18627153: Titled on November 18, 2020 and was found in a kill pen in February 2021

21. Debra J. Harris:

   a.  18862516: Titled on November 19 2020 and was found in the CLA slaughter auction in early May 2021

   b.  18862473: Titled on November 19 2020 and was found in the CLA slaughter auction in early May 2021

   c.  18862467: Titled on November 19 2020 and was found in the CLA slaughter auction in early May 2021

22. Tarrah L. Hern:

   a.  18025303: Titled on March 24, 2020. Rescued from an auction house in August 2020 by a rescue organization and reported to AWHC by the new owner. Records received from BLM in response to a FOIA request submitted by AWHC for compliance inspection records on all horses that went through Nevada under the AIP, confirmed that this horse was adopted through the AIP.

23.  Joni R. Flemming:

    a.  17632207: Adopted August 13, 2019. Titled October 9, 2020. Was found in a kill pen early 2021. Compliance inspection records indicate that BLM officials completed the compliance inspection on April 24, 2020.

    b.  18628904: Adopted August 13, 2019. The title date is unknown, but compliance inspection records indicate that BLM officials completed the compliance inspection on April 24, 2020.

    c.  18629335: Adopted August 13, 2019. The title date is unknown, but compliance inspection records indicate that BLM officials completed the compliance inspection on April 24, 2020.

    d.  18631927: Adopted August 13, 2019. The title date is unknown, but compliance inspection records indicate that BLM officials completed the compliance inspection on April 24, 2020.

24. Joe A. Anderson:

    a.  13628079: Titled on March 3, 2021. This animal was found in a kill pen April 4, 2021.

    b.  16628229: Titled on March 3, 2021. This animal was found in a kill pen April 4, 2021.

    c.  17628141: Titled on March 3, 2021. This animal was found in a kill pen April 4, 2021.

25. Dymiti Anderson:

    a.  16628531: Titled on March 3, 2021. This animal was found in a kill pen April 4, 2021.



**Addendum to "BLM's Adoption Incentive Program: Pipeline to Slaughter for Federally-Protected Wild Horses and Burros" Report**
**June 2, 2021**

1. **Additional  Confirmed Adoption Incentive Program (AIP) Animals Sold at Kill Pens**

- **Case Number 1:** A minimum of nine BLM Burros were rescued from Cleburne Horse Sale. The animals were titled in two batches, five were titled on June 2, 2020 and four were titled on May 19th, 2020. Records obtained by AWHC's Freedom of Information Act (FOIA) request prove all nine were adopted through the AIP. See Appendix section 1A-1I.

- **Case Number 2:** Chad W. Lessert adopted a minimum of three BLM burros. The animals were titled on the same date, June 17, 2020. The animals were titled in Blackwell OK. The animals were later rescued from an undisclosed kill pen. Records obtained by AWHC's FOIA request prove all three were adopted through the AIP. Further, records noted that cursory compliance inspections were conducted via email and with five photos.

- **Case Number 3:** Sherry Lessert adopted a minimum of one BLM burro, titled in Blackwell OK. The animal was titled in July 2021 and later rescued from an undisclosed kill pen. Records obtained by AWHC's FOIA request prove this animal was adopted through the AIP. Further, records noted that cursory compliance inspections were conducted via email and with five photos.

- **Case Number 4:**  Randy L. Davis adopted a minimum of two BLM burros, both titled in Blanchard OK. One of the animals was titled on July 15 2020. The second animal was titled in 2020, but the date is redacted. Both burros were rescued from an undisclosed kill pen. Records obtained by AWHC's FOIA request prove the two burros were adopted through the AIP.

- **Case Number 5:** An owner of a burro rescued from a kill pen sent AWHC the identifying freeze brand number of the animal. While no title was obtained, the freeze brand matched FOIA records obtained by AWHC confirming this burro was adopted through the AIP. The burro was adopted May 14, 2019 and was inspected by a private vet on April 23, 2020 in Paoli OK.

- **Case number 6**: Frank R. Myers adopted a minimum of two horses who were rescued from Strouds Oklahoma Kill Pen on January 19, 2021. The two horses were titled on the same date, August 24, 2020.  Records obtained by AWHC's FOIA request prove these animals were adopted through the AIP. The horses were adopted on August 3, 2019 and were inspected by a BLM employee on December 3, 2020 in Binger, OK.

2. **Potential Idaho Burro Slaughter Ring**

In a recent Freedom of Information Act Request (FOIA), records from the Bureau of Land Management's Idaho Field office indicate 14 families who have adopted four burros each (the maximum number allowed per adoption).  Of concern:

- Shelly, Rodney, Robert and Leeann Harrop all adopted four burros each

- Heath, Bobbie Jo, Alicia, Marian, and Wendy Marley all adopted four burros each.

- Upon further investigation into the families, it was uncovered that they are connected through marriage. Bobbie Jo's maiden name is Harrop and she is married to Heath Marley.

- Included in this group was Dawn Erickson, a woman from the same town as the Harrop family. Her Facebook account shows she is connected to Rodney Harrop.

- Included in the group are Coti and Cody Weeks. Each of them adopted four burros. Cody Weeks Facebook account shows he is connected to Rodney Harrop as well.

- Included in this group is Floyd Fife. He adopted four BLM burros. Adoption records show he has the same address as Marian Marley.

- This brings the total number of burros adopted to one family to 52 animals, meaning one family received a total of $52,000 taxpayer funds.

- One family member, Heath Marley, either works or worked at Skaar Livestock Auction, a large and controversial livestock auction yard.

The FOIA release also contained photos of burros in a **folder** called "Marley Burros" indicating they were housed at the Marley property. These images showed approximately 40 burros

housed in one pasture together. An immediate investigation is required  to determine whether these individuals are still in possession of these burros.

**3.   Alleged BLM Employee Consigning or Transporting Burros to Slaughter Auction**

- Evanescent Mustang Rescue recently sent AWHC the titles for 16 burros the group rescued from kill pens.

- We also received Coggins paperwork for 9 of the 16 burros. The names of the adopters were redacted on the title paperwork.

- The bloodwork for the Coggins was drawn on 7/1/2020 for the 2 of the 9 burros, and on 7/8/2020 for the remaining 7. The location of the blood draw is recorded as "Cleburne Horse Sale." Each coggins was matched to its corresponding title through the tube number (section 9 on the Coggins), which was also handwritten on the title.

- We have confirmed from the brand numbers on the titles that the 9 burros for whom we obtained Coggins paperwork were adopted through the AIP, and all were located in Paoli, OK, which has a population of 691 people.

- The Coggins paperwork records  a "Jimmy Galloway" as the owner of the 9 burros.

- Candace Ray of Evanescent informed AWHC that Jimmy Galloway is an employee of the Bureau of Land Management, specifically at Pauls Valley Off Range Holding Facility, located just 10 minutes away from Paoli, Oklahoma. Candace also told us that Jimmy frequents the Clerburne auction, allegedly to "run brands." Candace believes that individuals who transport horses to kill pens are able to sign as the owner on required paperwork.

- Two NY Times articles (here and here) indicate that a James D. Galloway was an employee of the Texas Bureau of Land Management who investigated in the 1990's for planning to sell wild horses he adopted to slaughter. The article notes "... *Mr. Galloway saying he planned to get horses from the adoption program, fatten them and sell them for slaughter.*" The article also states that Galloway lost his job as a result of the incident.

- Further investigation shows that in 2014, a Jimmy Galloway was part of a BLM crew that moved 1,493 wild horses out of the Teterville Long-Term Holding Facility in Oklahoma after 196 horses perished there.  This may be James D. Galloway, the BLM employee

found to be preparing to send wild horses he adopted to slaughter, or it may be his son.
[A comment left on a 2011](#) Associated Press article indicates that the former Galloway
had a son working at the BLM at the time.

- In either case, it appears that an individual associated with or employed by the BLM is
  signing paperwork for BLM wild horses and burros sent to livestock auctions and an
  immediate investigation into this individual is warranted.  **The titles and coggins can be
  found [in this Dropbox](#).**

**Appendix:**

1. Nine burros were sent to Cleburne Horse Sale by an individual, or individuals, whose
   name(s) are redacted on the titles. All animals were inspected by a private veterinarian.

   a. 07730058: Burro titled on June 3, 2020. The burro was adopted on May 14, 2019
      and was inspected on April 23, 2020 in Paoli, OK.

   b. 11144297: Burro titled on May 19, 2020. The burro was adopted on May 14,
      2019 and was inspected on April 23, 2020 in Paoli, OK.

   c. 14144226: Burro titled on May 19, 2020. The burro was adopted on May 14,
      2019 and was inspected on April 23, 2020 in Paoli, OK.

   d. 14732935: Burro titled on May 19, 2020. The burro was adopted on May 14,
      2019 and was inspected on April 23, 2020 in Paoli OK

   e. 16732988: Burro titled on May 19, 2020. The animal was confirmed to be
      adopted through the AIP by FOIA records obtained by AWHC. The burro was
      adopted on May 14, 2019 and was inspected on April 23, 2020 in Paoli OK

   f. 14733071: Burro titled on June 3, 2020. The burro was adopted on May 14, 2019
      and was inspected on April 23, 2020 in Paoli, OK.

   g. 16144289: Burro titled on June 3, 2020. The burro was adopted on May 14, 2019
      and was inspected on April 23, 2020 in Paoli, OK.

   h. 18646708: Burro titled on June 3, 2020. The burro was adopted on May 14, 2019
      and was inspected on April 23, 2020 in Paoli, OK.

      i.   18646712: Burro titled on June 3, 2020. The burro was adopted on May 14, 2019 and was inspected on April 23, 2020 in Paoli, OK.

2.   Three burros were titled to Chad W. Lessert.

    a.   09145147: Burro titled on June 17, 2019. The burro was adopted on June 11, 2019 and was inspected, virtually, on April 9, 2020. The compliance check records note: "Virtual compliance inspection over email with adopter. Sent 5 pictures. Animal is in excellent condition. BCS 5."

    b.   16144271: Burro titled on June 17, 2019. The burro was adopted on June 11, 2019 and was inspected, virtually, on April 9, 2020. The compliance check records note: "Virtual compliance inspection over email with adopter. Sent 5 pictures. Animal is in excellent condition. BCS 5."

    c.   18646709: Burro titled on June 17, 2019. The burro was adopted on June 11, 2019 and was inspected, virtually, on April 9, 2020. The compliance check records note: "Virtual compliance inspection over email with adopter. Sent 5 pictures. Animal is in excellent condition. BCS 5."

3.   One  burro was titled to Sherry Lessert

    a.   13733107: Burro titled on July 9, 2020. The burro was adopted on July 9, 2019 and was inspected, virtually, on April 9, 2020. The compliance check records note: "Virtual compliance inspection over email with adopter. Sent 5 pictures. Animal is in excellent condition. BCS 5."

4.   Two BLM burros were titled to Randy L. Davis

    a.   12799612: The burro was titled on July 15, 2020.  The burro was adopted on July 9, 2019 and inspected on July 7, 2020 by a BLM employee.
    b.   14145212: The burro was titled in 2020, the exact month not shown. The burro was adopted on July 9, 2019 and inspected on July 7, 2020 by a BLM employee.

5.   One BLM burro titled to an unknown individual

     a.  1614427: TItle date is unknown. The burro was adopted on May 14. 2019 and was inspected on April 23, 2020 by a private vet in PAOLI OK

6.   Two BLM horses were titled to Frank R. Myers
     a.  17629141: The horse titled on August 24, 2020 and rescued from Strouds Ok Kill Pen on January 19, 2021. The horse was adopted on August 3, 2019 and was inspected by a BLM employee on December 3, 2020 in Binger OK.

     b.  17629194: The horse titled on August 24, 2020 and rescued from Strouds Ok Kill Pen on January 19, 2021. The horse was adopted on August 3, 2019 and was inspected by a BLM employee on December 3, 2020 in Binger OK.

7.   Four BLM burros were titled to Marian Marley
     a.  12145104:  The burro was adopted on June 17, 2019 and was titled on July 6, 2020.
     b.  12733168:  The burro was adopted on June 17, 2019 and was titled on July 6, 2020.
     c.  12733267:  The burro was adopted on June 17, 2019 and was titled on July 6, 2020.
     d.  13730738:  The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

8.   Four BLM burros were titled to Alicia Marley:
     a.  08730145: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.
     b.  05185047: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.
     c.  1573134: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.
     d.  16733128: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

9.   Four BLM burros were titled to Wendy Marley
     a.  06733219: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.
     b.  16144361: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

     c.  08184411: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

     d.  08184627: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

10.  Four BLM burros were titled to Heath Marley

     a.  09185075: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

     b.  07184428: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

     c.  09185149: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

     d.  09185471: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

11.  Four BLM burros were titled to Bobbie Jo Marley

     a.  09730256: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

     b.  09733167: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

     c.  09733274: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

     d.  09799424: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

12.  Four BLM burros were titled to Shelly Harrop

     a.  12732966: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

     b.  13732954: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

     c.  13733035: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

     d.  14732930: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

13.  Four BLM burros were titled to Robert Harrop

     a.  10184782: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    b.  10185133: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    c.  10186524: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    d.  10730222: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

14. Four BLM burros were titled to Leeann Harrop

    a.  10733218: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    b.  10733241: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    c.  11185978: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    d.  11733247: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

15. Four BLM burros were titled to Rodney Harrop:

    a.  14732936: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

    b.  15732976: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

    c.  16144366: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

    d.  06730247: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

16. Four BLM burros were titled to Cody D Weeks

    a.  12145204: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

    b.  12186532: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

    c.  12733224: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

    d.  12733236: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

17. Four BLM burros were titled to Coti B Weeks

    a.  05733136: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

     b.  08733135: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

     c.  09733253: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

     d.  107300546: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

18. Four BLM burros were titled to Dawn Erickson

     a.  12143838: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

     b.  09143773: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

     c.  05185617: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

     d.  12733063: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

19. Four BLM burros were titled to Floyd Fife

     a.  13733208: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

     b.  14733187: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

     c.  14773195: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

     d.  15730794: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

20. [Images of the "Marley Burros"](#)



**Addendum to "BLM's Adoption Incentive Program: Pipeline to Slaughter for Federally-Protected Wild Horses and Burros" Report**
**June 16, 2021**

1. **Additional  Confirmed Adoption Incentive Program (AIP) Animals Sold at Kill Pens**

   - **Case Number  1:** The American Wild Horse Campaign (AWHC) in partnership with Evanescent Mustang Rescue (EMRS) rescued a group of 12 branded Bureau of Land Management (BLM) burros out of Stroud Oklahoma Kill Pen. Out of the 12, EMRS was able to obtain 10 titles and the remaining two were untitled. All burros were adopted to the Patterson family. Through FOIA records AWHC obtained, it was confirmed that all 10 were adopted through the Adoption Incentive Program. The  10 burros were titled on March 22, 2021 and were found in the kill pen in May 2021, within the 60-90 day window for the second AIP payment.   See appendix 2.1 for information on adoptions.

     *special note: Out of the group of 12, only 10 were titled. According to EMRS, who has been in contact with the Oklahoma BLM,  two burros were repossessed as they were not titled. The BLM official also stated that the Patterson family had a group of 20-24 burros and the second 12 burros were to be titled in July.

   - **Case Number 2:** AWHC and Montgomery Creek Ranch (MCR) completed a rescue of one BLM branded mare from Lone Star Kill Pen in Justin, Texas (see appendix 1.1 for proof of slaughter status). FOIA records confirm this mare was adopted through the AIP.  She was titled on February 8, 2021 and was found in the kill pen in April, 2021 within the 60-90 day window for the second AIP payment. See appendix 2.2 for information on adoptions.

   - **Case Number 3:** EMRS rescued one BLM branded mare from Stroud Oklahoma Kill Pen. FOIA records confirm the mare was adopted through the AIP. See appendix 2.3 for information on adoptions.

**Appendix One: Proof of kill pen status**

1.  Screenshot of Lone Star Kill Pen's Facebook page affirming their status as a slaughter auction.



**Appendix Two:**

1.  Ten BLM burros were confirmed as adopted through the AIP

    a.  18733938: The BLM burro was adopted on March 10, 2020 and was inspected on March 22, 2021. This burro was rescued from Stroud OK Kill pen in May 2021.

    b.  17145359: The BLM burro was adopted on March 10, 2020 and was inspected on March 22, 2021. This burro was rescued from Stroud OK Kill pen in May 2021.

    c.  15734349:  The BLM burro was adopted on March 10, 2020 and was inspected on March 22, 2021 in Marlow Oklahoma. This burro was rescued from Stroud OK Kill pen in May 2021.

    d.  14734421:  The BLM burro was adopted on March 10, 2020 and was inspected on March 22, 2021 in Marlow Oklahoma. This burro was rescued from Stroud OK Kill pen in May 2021.

    e.  13145574: The BLM burro was adopted on March 10, 2020 and was inspected on March 22, 2021 in Marlow Oklahoma. This burro was rescued from Stroud OK Kill pen in May 2021.

2

f.   10734358: The BLM burro was adopted on March 10, 2020 and was inspected on March 22, 2021 in Marlow Oklahoma. This burro was rescued from Stroud OK Kill pen in May 2021.

g.   06732977: The BLM burro was adopted on March 10, 2020 and was inspected on March 22, 2021 in Marlow Oklahoma and was titled to Lee Patterson. This burro was rescued from Stroud OK Kill pen in May 2021.

h.   09145567: The BLM burro was adopted on March 10, 2020 and was inspected on March 22, 2021 in Marlow Oklahoma and was titled to Lee Patterson. This burro was rescued from Stroud OK Kill pen in May 2021.

i.   15145757: The BLM burro was adopted on March 10, 2020 and was inspected on March 22, 2021 in Marlow Oklahoma and was titled to Lee Patterson. This burro was rescued from Stroud OK Kill pen in May 2021.

j.   09734398: The BLM burro was adopted on March 10, 2020 and was inspected on March 22, 2021 in Marlow Oklahoma and was titled to Terry L Patterson. This burro was rescued from Stroud OK Kill pen in May 2021.

2. One BLM mare was confirmed as adopted through the AIP
   a. 19646741:  The BLM mare was adopted on February 11, 2020. She was inspected on February 8, 2021 and was rescued from the Lone Star Kill Pen on April 7, 2021.

3. One BLM mare was confirmed as adopted through the AIP
   a. 19646726: The BLM mare was adopted on February 11, 2020. She was inspected on February 8, 2021 and was rescued from Stroud OK Kill Pen in June 2021.