# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-02146-REB

AMERICAN WILD HORSE CAMPAIGN, et al.

       Petitioners,

  v.

DEBRA HAALAND, et al.

       Respondents.

---

## PETITIONERS' OPENING MERITS BRIEF

### *Oral Argument Requested*

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

GLOSSARY .................................................................................................................... vii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

   I.   STATUTORY AND REGULATORY FRAMEWORK ..................................................... 2

     A.  The Administrative Procedure Act .................................................................... 2

     B.  The National Environmental Policy Act .......................................................... 3

     C.  The Wild Free-Roaming Horses and Burros Act ............................................ 4

  II.  FACTUAL BACKGROUND ............................................................................. 6

     A.  BLM's Costly Off-Range Holding of "Excess" Wild Horses and Burros ...................... 6

     B.  BLM's Efforts to Reduce Costs Through Slaughter or Similar Means ......................... 7

     C.  Wild Horses and the Commercial Slaughter Pipeline ..................................... 8

     D.  BLM's Establishment of the AIP ................................................................... 11

     E.  BLM's Modest Revision of the AIP .............................................................. 15

ARGUMENT ................................................................................................................... 18

   I.   PETITIONERS HAVE STANDING .................................................................... 18

  II.  THE AIP REFLECTS FINAL AGENCY ACTION ...................................................... 22

     A.  BLM's IMs Reflect the Consummation of BLM's Decision-Making Process .............. 22

     B.  BLM's IMs Determined Legal Rights and Obligations ................................. 23

III.   BLM VIOLATED THE APA BY ESTABLISHING THE AIP WITHOUT NOTICE-AND-COMMENT RULEMAKING ........................................................ 24

  A.  The AIP Constitutes a Legislative Rule .......................................................... 24

  B.  BLM Failed to Undertake Notice-and-Comment Rulemaking ...................................... 28

IV.   BLM VIOLATED NEPA BY REFUSING TO ANALYZE THE AIP'S IMPACTS ... 29

  A.  BLM's Reliance on a Categorical Exclusion Was Unlawful ........................................ 29

    1.  *The AIP is Not "Purely Administrative"* .................................................. 30

    2.  *BLM Failed to Even Assert that the AIP's Impacts Are Speculative* ........................ 32

    3.  *BLM's Suggestion that Adoptions and Titling Will Receive Later NEPA Analysis Is Meritless* ................................................................................. 33

    4.  *BLM Failed to Adequately Consider Extraordinary Circumstances* ........................ 34

  B.  BLM Violated NEPA by Establishing the AIP Without Preparing an EIS .................. 37

  C.  The AIP Cries Out for Meaningful NEPA Analysis ...................................... 39

V.  THE AIP CONSTITUTES AN ARBITRARY AND CAPRICIOUS DECISION ........... 42

CONCLUSION.............................................................................................. 45

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ariz. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*,
  273 F.3d 1229 (9th Cir. 2001) ....................................................................................3

*Bennett v. Spear*,
  520 U.S. 154 (1997)...............................................................................................22, 23

*Chiang v. Kempthorne*,
  503 F. Supp. 2d 343 (D.D.C. 2007)........................................................................22, 24

*Children's Health Care v. Ctrs. for Medicare & Medicaid Servs.*,
  900 F.3d 1022 (8th Cir. 2018) ..................................................................................26

*Columbia Riverkeeper v. U.S. Coast Guard*,
  761 F.3d 1084 (9th Cir. 2014) ..................................................................................22

*Common Cause of Colo. v. Buescher*,
  750 F. Supp. 2d 1259 (D. Colo. 2010)......................................................................22

*Fund for Animals v. Clark*,
  27 F. Supp. 2d 8 (D.D.C. 1998)................................................................................21

*Getty v. Fed. Sav. & Loan. Ins. Corp.*,
  805 F.2d 1050 (D.C. Cir. 1986)................................................................................35

*Hayes v. Chaparral Energy, LLC*,
  180 F. Supp. 3d 902 (N.D. Okla. 2016)....................................................................30

*In Def. of Animals v. U.S. Dep't of Interior*,
  751 F.3d 1054 (9th Cir. 2014) ....................................................................................6

*Initiative & Reform Inst. v. Walker*,
  450 F.3d 1082 (10th Cir. 2006) ................................................................................18

*Iowa League of Cities v. EPA*,
  711 F.3d 844 (8th Cir. 2013) ....................................................................................24

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)...................................................................................................18

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989).....................................................................................................3

*Mendoza v. Perez,*
    754 F.3d 1002 (D.C. Cir. 2014) ............................................................25, 27, 28

*Middle Rio Grande Conservancy Dist. v. Norton,*
    294 F.3d 1220 (10th Cir. 2002) ......................................................................37

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)..................................................2, 3, 28, 29, 32, 35, 42

*N.H. Hosp. Ass'n v. Azar,*
    887 F.3d 62 (1st Cir. 2018)....................................................................25, 26, 27

*Nat'l Min. Ass'n v. McCarthy,*
    758 F.3d 243 (D.C. Cir. 2014)........................................................................27

*Nat'l Parks Conservation Ass'n v. Semonite,*
    916 F.3d 1075 (D.C. Cir. 2019) .....................................................................39

*NLRB v. Brown,*
    380 U.S. 278 (1965).........................................................................................3

*Olenhouse v. Commodity Credit Corp.,*
    42 F.3d 1560 (10th Cir. 1994) .......................................................................28

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015)............................................................................2, 24, 25

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.,*
    565 F.3d 683 (10th Cir. 2009) ....................................................................3, 39

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989)........................................................................................39

*Shalala v. Guernsey Memorial Hosp.,*
    514 U.S. 87 (1995)..........................................................................................26

*Shearwater v. Ashe,*
    No. 14-cv-02830, 2015 WL 4747881 (N.D. Cal. Aug. 11, 2015) ....................31, 33

*Sierra Club v. U.S. Dep't of Energy,*
    255 F. Supp. 2d 1177 (D. Colo. 2002).............................................................30

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
    282 F. Supp. 3d 91 (D.D.C. 2017) ..................................................................34

*Tenn. Hosp. Ass'n v. Azar,*
    908 F.3d 1029 (6th Cir. 2018) .......................................................................26

*U.S. v. Bailey*,
    444 U.S. 394 (1980) ...................................................................................................45

*W. Watersheds Proj. v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011) ...................................................................................31

*W. Watersheds Proj. v. Zinke*,
    441 F. Supp. 3d 1042 (D. Idaho 2020) .........................................................2, 22, 24

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
    139 S. Ct. 361 (2018) .................................................................................................42

*Wilderness Watch v. Mainella*,
    375 F.3d 1075 (11th Cir. 2004) .................................................................................30

*Wyoming v. U.S. Dep't of Interior*,
    839 F.3d 938 (10th Cir. 2016) .....................................................................................5

**Statutes**

5 U.S.C. § 551 ....................................................................................................................2

5 U.S.C. § 553 .................................................................................................1, 24, 27, 28

5 U.S.C. § 704 ..................................................................................................................22

5 U.S.C. § 706 ....................................................................................................................2

16 U.S.C. § 1331 ......................................................................................................4, 8, 42

16 U.S.C. § 1332 ................................................................................................................6

16 U.S.C. § 1333 .....................................................................................................5, 6, 10, 42

18 U.S.C. § 1001 ..............................................................................................................12

42 U.S.C. § 4332 .........................................................................................................3, 38

**Regulations**

40 C.F.R. § 1501.3 ..............................................................................................................3

40 C.F.R. § 1501.4 .........................................................................................................4, 34

40 C.F.R. § 1501.5 ..............................................................................................................3

40 C.F.R. § 1508.1 ............................................................................................................38

43 C.F.R. § 26.205 .........................................................................................................4, 34

43 C.F.R. § 46.210 ................................................................................................30, 32

43 C.F.R. § 46.215 ...............................................................................4, 34, 35, 36, 37

43 C.F.R. § 4700.0-6 ....................................................................................................25

43 C.F.R. § 4750.4-1 ........................................................................................5, 26, 38

43 C.F.R. § 4750.4-2 ....................................................................................................11

## **GLOSSARY**

| | |
|---|---|
| AIP | Adoption Incentive Program |
| APA | Administrative Procedure Act |
| AWHC | American Wild Horse Campaign |
| BLM | Bureau of Land Management |
| CE | Categorical Exclusion |
| EIS | Environmental Impact Statement |
| FOIA | Freedom of Information Act |
| IM | Instruction Memorandum |
| NEPA | National Environmental Policy Act |
| WHA | Wild Free-Roaming Horses and Burros Act |

## INTRODUCTION

This case challenges the Bureau of Land Management's ("BLM") Adoption Incentive Program ("AIP" or "Program"), in which BLM pays the public to adopt untrained wild horses and burros. BLM established the AIP through an Instruction Memorandum ("IM") in 2019 and revised the AIP through another IM in 2022. Both times, BLM refused to provide any public notice or opportunity for comment, violating the Administrative Procedure Act's ("APA") rulemaking requirements, 5 U.S.C. § 553. Had BLM complied with the APA, Petitioners could have explained that paying the public $1000 for each animal adopted would foreseeably lead to inhumane outcomes, including the sale of federally protected wild horses and burros for slaughter—an outcome Congress expressly prohibits. Instead, when creating and modifying the AIP, BLM failed to engage in informed decision-making, adopting a Program that foreseeably would lead—and has led—to the sale of many wild horses and burros for slaughter.

In creating and revising the AIP, BLM also violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, by refusing to analyze the AIP's environmental impacts or less harmful alternatives. The AIP impacts federally protected wild horses and burros, by resulting in inhumane outcomes and slaughter. Moreover, the AIP's purpose is to free up funds to remove substantially more wild horses from public lands, which impacts rangeland resources throughout the country. BLM was aware that alternative incentives would better protect wild horses and burros. Yet, when creating the AIP, BLM conducted no NEPA analysis whatsoever. And when revising the AIP, BLM excluded the AIP from NEPA review.

BLM's creation and modification of the AIP without public input or NEPA analysis harms Petitioners, who are individuals and organizations working to preserve wild horses and burros, promote their humane treatment, and prevent their slaughter. As part of their mission,

Petitioners rescue wild horses and burros from slaughter by purchasing these animals at auctions before they are sold to buyers who send animals to slaughter. Since BLM established the AIP, wild horses and burros have been auctioned in far greater numbers—including hundreds of animals that BLM paid the public to adopt through the AIP—thereby draining Petitioners' limited resources, forcing Petitioners to counteract BLM's serious legal violations, and frustrating Petitioners' mission of protecting wild horses and burros from inhumane treatment.

## BACKGROUND

## I.   STATUTORY AND REGULATORY FRAMEWORK

### A.   The Administrative Procedure Act

The APA "establishes the procedures federal administrative agencies use for 'rule making,' defined as 'the process of 'formulating, amending, or repealing a rule.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95 (2015) (quoting 5 U.S.C. § 551). "'Rule,' in turn, is defined broadly to include 'statement[s] of general or particular applicability and future effect' that are designed to 'implement, interpret, or prescribe law or policy.'" *Id.* "As a general matter, the APA requires an agency to use notice-and-comment procedures to make any 'rule.'" *W. Watersheds Proj. v. Zinke*, 441 F. Supp. 3d 1042, 1067 (D. Idaho 2020).

A "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An action is "arbitrary and capricious if the agency has relied on factors Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.*

While arbitrary-and-capricious review is deferential, "[j]udicial review is meaningless . . . unless [the court] carefully review[s] the record to 'ensure that agency decisions are founded on a reasoned evaluation of the relevant factors.'" *Ariz. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1236 (9th Cir. 2001) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989)). Thus, courts "must not 'rubber-stamp . . . administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'" *Id.* (quoting *NLRB v. Brown*, 380 U.S. 278, 291–92 (1965).

### B.    The National Environmental Policy Act

Congress enacted NEPA to ensure that agencies fully consider the impacts of their proposed actions, analyze alternatives that may have less adverse impacts, and make information publicly available with sufficient detail to promote informed public participation in agency decision-making. Thus, agencies must prepare an Environmental Impact Statement ("EIS") for any major federal action that may "significantly affect[]" the environment. 42 U.S.C. § 4332(C). NEPA's implementing regulations provide that to determine whether a particular action requires an EIS, an agency may prepare an Environmental Assessment that analyzes the action's impacts and feasible alternatives. 40 C.F.R. §§ 1501.3, 1501.5.

NEPA requires agencies to consider alternatives to a proposed action. *See* 42 U.S.C. § 4332(C)(iii), (E). "Without substantive, comparative environmental impact information regarding other possible courses of action, the ability of [a NEPA analysis] to inform agency deliberation and facilitate public involvement would be greatly degraded." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 708 (10th Cir. 2009).

Under NEPA's regulations, agencies may develop "categorical exclusions" ("CE") to identify "categories of actions that normally do not have a significant effect on the human environment, and therefore do not require preparation of an environmental assessment or [EIS]." 40 C.F.R. § 1501.4(a). To properly rely on a CE to exempt an action from NEPA review, an agency must ensure that the proposal fits within the category of actions subject to the relevant CE. Moreover, as the Department of Interior's regulations specify, "[a]ny action that is normally categorically excluded must be evaluated to determine whether it meets any of the extraordinary circumstances," because "if it does, further analysis and environmental documents must be prepared for the action." 43 C.F.R. § 26.205(c)(1), "Extraordinary circumstances . . . exist" if an action "*may* meet any of the criteria listed" in the regulations. *Id.* § 46.215 (emphasis added).

### C.     The Wild Free-Roaming Horses and Burros Act

Finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West," and "contribute to the diversity of life forms within the Nation and enrich the lives of the American people," Congress enacted the Wild Free-Roaming Horses and Burros Act ("WHA"), 16 U.S.C. §§ 1331–1340, in 1971. It states that "wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death." 16 U.S.C. § 1331.

The Secretary of the Interior "shall manage wild free-roaming horses and burros as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." *Id.* § 1333(a). To that end, the WHA directs the Secretary to "maintain a current inventory" of wild horses and burros and to use that inventory to "determine appropriate management levels" on public lands, and "make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals." *Id.* § 1333(b)(1). The statute defines "excess animals" as those

"which must be removed" from public lands to preserve and maintain a thriving natural ecological balance. *Id.* § 1332. The WHA provides discretion for BLM to determine "whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options . . . ." *Id.* § 1333(b)(1).

Where BLM determines both that "an overpopulation exists and that action is necessary to remove excess animals[,]" the WHA provides that BLM "shall immediately remove excess animals from the range so as to achieve appropriate management levels." *Id.* § 1333(b)(2). The WHA "quite clearly affords BLM with discretion to decide whether or not to remove excess animals." *Wyoming v. U.S. Dep't of Interior*, 839 F.3d 938, 944 (10th Cir. 2016).

If BLM decides to remove wild horses or burros, the WHA allows the public to adopt them "for private maintenance and care," if BLM "determines" there are "qualified individuals" who "can assure humane treatment and care (including proper transportation, feeding, and handling)." 16 U.S.C. § 1333(b)(2)(B). No individual may adopt more than four animals in a year "unless the Secretary determines in writing that such individual is capable of humanely caring for more than four animals . . . ." *Id.* BLM requires adopters of wild horses or burros to "execute a Private Maintenance and Care Agreement and agree to abide by its terms and conditions." 43 C.F.R. § 4750.4-1. "Adopters are financially responsible for the proper care and treatment of all wild horses and burros covered by the agreement." *Id.* § 4750.4-1(e).[1]

Although the WHA states that unadoptable animals may be "destroyed in the most humane and cost efficient manner possible," *id.* § 1333(b)(2)(C), Congress has forbidden BLM's

---

[1] BLM may also sell wild horses or burros that are over 10 years old or have been unsuccessfully offered for adoption at least three times. 16 U.S.C. § 1333(e)(1). While the WHA contemplates sales "without limitation," *id.* § 1333(e)(2), as explained *infra*, Congress does *not* allow the sale of wild horses or burros for slaughter. As such, animals must be sold with limitations on what the buyers may do with the animals after purchase.

use of federal funds for the slaughter of unadopted wild horses, or for their sale for slaughter. *See In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1059 n.3 (9th Cir. 2014) ("Congress has never appropriated funds for extermination, as opposed to ongoing maintenance, of excess horses even if not adopted."). In 2021, Congress provided that federal funds "shall not be available for . . . the destruction of any healthy, unadopted, and wild horse or burro" or "the sale of a wild horse or burro that results in the destruction of the wild horse or burro for processing into a commercial product." Consol. Appropriations Act, 2021, Pub. L. 116-260 § 419(e).

Under the WHA, adopters cannot immediately take title to adopted animals. Instead, Congress authorized BLM to transfer title to adopters only if it "determines that [the adopter] has provided humane conditions, treatment and care for such animal or animals for a period of one year." 16 U.S.C. § 1333(c). At the "end of the one-year period," BLM may transfer title for "not more than four animals" to each adopter. *Id.*

## II.  FACTUAL BACKGROUND

### A.  BLM's Costly Off-Range Holding of "Excess" Wild Horses and Burros

Since Congress enacted the WHA, BLM has managed wild horses principally by removing from public lands animals it deems "excess." 16 U.S.C. §§ 1332(f); 1333(b)(2). Although BLM may allow the adoption and sale of animals it has removed from the range, as a practical matter BLM removes vastly more animals from the range each year than the public adopts or purchases. *See* BLM_002119 ("The number of animals removed from the range is far greater than the number adopted or sold . . . .").

Because BLM removes far more wild horses and burros from the range than the public adopts or purchases, the agency houses many animals in BLM-owned corrals or "contracted private pastures." BLM_002209. BLM's corrals are short-term facilities where animals are held

"until adopted, sold, or transported to off-range pastures." *Id.* Over the long term, BLM sends wild horses to live in off-range pastures on privately owned land in "the more productive pastures of the Midwest," "primarily in Iowa, Kansas, Nebraska, and Oklahoma." *Id.* As of 2018, over 46,000 wild horses lived in holding facilities. *Id.* Recently, in large part due to adoptions pursuant to the AIP, BLM accelerated its removals of wild horses and burros from public lands, causing the off-range population to grow to over 64,000 animals (almost exclusively horses).[2] Very few burros are held in off-range corrals, "[s]ince BLM can more easily place most burros it removes from the range into private care." BLM_003679.

Long-term holding in off-range pastures is expensive. "BLM pays the private contractors that operate the long-term holding facilities a fee per horse per day." BLM_00031. As of 2018, BLM reported that long-term holding costs "nearly $48 million annually, accounting for nearly 60 percent" of BLM's annual budget for its Wild Horse and Burro Program. BLM_002210.

### B.   BLM's Efforts to Reduce Costs Through Slaughter or Similar Means

Because BLM's system of removing wild horses from public lands and shipping them to live in rented pastures is costly, BLM has proposed various ways to more cheaply—but less humanely—manage these animals. For example, in 2018, BLM urged Congress to "reduc[e] off-range holding costs dramatically" through "sale without limitation and euthanasia of unadopted or unsold animals," BLM_002206, which would require Congress to make all "sale-eligible" horses "no longer subject to the protections of the [WHA]" so they could be sold "as soon as is practicable," without *any* restrictions on their ability to be sold for slaughter. BLM_002216.

---

[2] *See* BLM, *Program Data*, Wild Horse and Burro Removals, https://www.blm.gov/programs/wild-horse-and-burro/about-the-program/program-data (listing animals removed annually since 2012 and current numbers in off-range holding).

However, Congress *refused* to amend the WHA in this manner, and instead continued to expressly prohibit the use of any federal funds that would result in wild horse or burro slaughter.

Similarly, frustrated by the "lengthy environmental analysis process to comply with NEPA," which "can take hundreds of hours of staff time as well as periods of public involvement," BLM has attempted to eliminate NEPA review for many wild horse management decisions. BLM_002217. For example, BLM proposed exempting from NEPA review the "[e]uthanasia of healthy excess wild horses for which an adoption or sale demand does not exist" or the "[u]nrestricted sale of excess wild horses and burros for which an adoption demand does not exist." *Id.* However, Congress never authorized any such loopholes to NEPA review.

C.  **Wild Horses and the Commercial Slaughter Pipeline**

The public has long warned BLM that without robust agency oversight of adopters and buyers of wild horses and burros, these animals may be sold for slaughter or otherwise endure inhumane treatment—violating Congress's intent that these animals "shall be protected." 16 U.S.C. § 1331. In 2008, the Government Accountability Office noted that "advocacy groups are concerned that animals removed from the range are too often adopted into abusive homes or are ultimately sold for slaughter." BLM_00032; *see also* BLM_00028 ("[W]ild horse advocates continue to voice concerns about horses being slaughtered.").

The slaughter of U.S. horses occurs in Canada and Mexico because Congress places an annual appropriations prohibition on the U.S. Department of Agriculture's use of federal funds to inspect horses at slaughter, effectively prohibiting horse slaughter (wild or otherwise) for human consumption in the United States. However, horses may be purchased at auctions and exported for slaughter to Canada and Mexico. BLM_003917. Horses are sold at auctions held at "kill barns" and are then "taken to slaughter." BLM_002569. Wild horse advocates and the media

refer to the horses' sale at kill barns, their purchase by "kill buyers," and their subsequent transport abroad for slaughter, as "the slaughter pipeline." BLM_003800-03; BLM_003912-17.

The slaughter pipeline—from the sale of horses at kill barns through their transport abroad and ultimately their slaughter—involves profoundly inhumane treatment of animals. BLM's own data reveal that between 2002 and 2008, "about 2,000 wild horses whose legal titles were obtained by private citizens either through adoption or purchase were slaughtered." BLM_00073. "During that same period, another 90 wild horses whose title still belonged to BLM were retrieved from slaughterhouses by BLM and by wild horse groups." *Id.*

Although BLM purports to prevent wild horses from entering the slaughter pipeline, it lacks a rigorous system for ensuring its efforts are effective. For example, BLM previously had "agreements with all three slaughterhouses in the United States" in which they would notify BLM of the arrival of wild horses and would not slaughter animals to which BLM still held title. BLM_00082. However, with horses shipped abroad, the identification of wild horses in the slaughter pipeline is far more difficult. "The Department of Agriculture, which certifies the inspections of horses and other livestock exported to other countries, is not required and does not report how many of the horses exported to other countries were once wild horses." BLM_00083. Indeed, no federal agency monitors how many wild horses are exported for slaughter. *See* BLM_00082-83 (noting that the government was "not able" to determine how many of the "3,000 horses per month [that] were exported for slaughter in 2007 . . . were at one time wild").

BLM has also imposed conditions on sales and adoptions ostensibly to prevent slaughter or inhumane treatment, but again lacks any rigorous system for ensuring these measures are effective. When selling or adopting wild horses, BLM requires buyers to sign a statement that "they do not intend to sell the animals for slaughter" and requires "verification that potential

buyers would provide adequate care for the animals." BLM_00081–82. However, BLM has no system for tracking whether wild horses and burros are later sold into the slaughter pipeline.

BLM also nominally ensures that adopters care for wild horses or burros for a year before receiving title, but its methods lack accountability. *See* 16 U.S.C. § 1333(c) (authorizing title transfer after BLM "determines that such individual has provided humane conditions, treatment and care for such animal or animals for a period of one year"). In the year before titling, BLM must inspect adopted animals and their living conditions. BLM_00080 ("BLM has established policies for inspecting adopted horses or burros in this first year through telephone calls or personal visits."). However, BLM has reported that it lacks sufficient funds or staffing for regular in-person inspections. *See* BLM_002376 ("Mandatory compliance?!! Not possible. With current staffing."); BLM_002447 (noting "challenges" from "a reduction in funding for compliance" monitoring). Moreover, once title passes, the animals no longer receive statutory protection, 16 U.S.C. § 1333(d)(1), and BLM does not track whether the horses remain in humane homes or are sold for slaughter. *See* BLM_001926 ("Once they are off the BLM books they are not BLM property.").

Because it views post-titled animals as "not BLM property," BLM_001926, BLM has no system for verifying, or for making publicly available, information regarding whether its conditions on sales and adoptions actually prevent the inhumane treatment or slaughter of wild horses after they pass into private care. For example, "BLM does not provide information on the results of its adoption inspections to the public." BLM_00081; *see also* BLM_00089 ("[D]espite public concerns about the humane treatment of these animals, BLM has not provided the public with easily accessible information about their treatment."); BLM_0090 (recommending that

BLM "determine what information on the treatment of . . . adopted animals could easily be provided to the public to help inform them about the treatment of wild horses and burros").

### D.   BLM's Establishment of the AIP

BLM established the AIP by issuing IM 2019-025. *See* BLM_003561 ("This [IM] outlines policies and procedures for administering the [AIP] for untrained wild horses and burros."). It required adopters to pay a $25 fee—less than the usual $125 fee. *See* 43 C.F.R. § 4750.4-2(a). Adopters then received "a financial incentive in the amount of $500 within 60 days from the adoption date and an additional $500 within 60 days from the title date," which occurs one year later, thus receiving $1000 for each animal adopted. *Id.* Adopters receive the incentive for adopting "untrained animals . . . regardless of species, age, sex, color, herd management area or the number of times the animal has been offered for adoption." *Id.* Although intended "to defray associated initial costs, such as veterinary care, feed, and training," BLM neither placed any conditions on the use of funds, nor required proof that funds were spent in this manner. *Id.*

The AIP is designed to allow the public to adopt as many animals as possible as quickly as the WHA allows. Each adopter can "adopt and maintain a maximum of four untitled animals annually." BLM_003562. "[H]owever, as each participating animal is titled" after one year, "BLM may allow an adopter to adopt additional animals (up to a maximum of four untitled animals at any one time) through the AIP." *Id.* Additionally, multiple individuals residing at the same location, such as members of a family, may each adopt four animals at a time.

The AIP discourages adopters from returning horses to BLM by specifying that BLM will "remove eligibility to participate in the AIP from any adopter that relinquishes two or more animals within a 12-month period." *Id.*; *see also* BLM_003567 (requiring adopters to certify that

they "understand that I will lose my eligibility to participate in the adoption incentive program in the future if I return two or more animals within any 12-month period").

The AIP requires adopters to complete an application and sign a contract. BLM_003567. That agreement authorizes BLM employees "and other BLM approved individuals" to conduct compliance inspections on animals during the year before titling. *Id.* Adopters must also certify that they "have read and understand the terms of adoption and prohibited acts." *Id.* Adopters must agree to the following statement: "[u]nder penalty of prosecution for violating 18 U.S.C. § 1001, which makes it a Federal crime to make false statements to any agency of the United States, I hereby certify that I will provide humane care for any animals that I adopt and will not sell or transfer ownership of them to any person or organization that intends to resell, trade, or give away such animals for slaughter or processing into commercial products." *Id.*

BLM explicitly intended the AIP to result in "major cost savings." BLM_000262. As IM 2019-025 states, "[i]ncreasing the placement of animals into private care is a critical priority of the [Wild Horse & Burro] program and of utmost interest to the BLM *due to the costs associated with caring for unadopted animals in BLM managed or contracted corrals and pastures*." BLM_003561 (emphasis added). However, the record reflects substantial uncertainty regarding the actual costs of long-term holding; thus, it is unclear how much the agency may potentially save through the AIP. *Compare* BLM_001126 (claiming that it costs "$48,000 to care for an animal over its lifetime if it is not adopted"), *with* BLM_002807 (claiming that the lifetime costs are "on average approximately $12,000–$16,000 for feed and care"). Nevertheless, BLM projects a "cost savings that allows funding to be dedicated to other aspects of managing wild horses and burros." BLM_003563; *see also id.* ("The budget impacts of this policy will reduce off-range holding costs and allow those savings to support critical on-range operations.").

BLM also aimed to save money when implementing the AIP by outsourcing inspections of adopted animals. From the outset, agency officials noted that BLM did not have sufficient staff or funding to inspect the treatment of all adopted animals. *See* BLM_002447 ("The challenges have been a reduction in funding for compliance."); BLM_002376 (providing feedback on the AIP stating "Mandatory compliance?!! Not possible. With current staffing."); BLM_002394 (noting concerns about "having mandatory compliance in this program without funding to accomplish this"). Hence, BLM aimed to "minimize compliance costs by placing more of the burden on the adopter working with his/her veterinarian and less on a traveling BLM inspector." BLM_000466; *see also* BLM_000428 (seeking to "lower the cost of adoption compliance by relying on veterinarians and travel by BLM employees only when nearby the adopted animal's location"); BLM_000526 ("If we make compliance mandatory, we are going to have to pay for it. But wouldn't a signed statement from a veterinarian suffice?").

Agency officials also knew that the AIP would be vulnerable to abuse before BLM issued IM 2019-025. As one official noted, "[t]he easy money aspect may bring out potential for fraud, abuse and neglect," including "potential neglect of the animals." BLM_002376. Another official stated that "[t]he biggest potential problem with the AIP is the reality of adopters returning the horses to the BLM after getting paid and having compliance issues beyond what we are capable of dealing with." *Id.* Just months before the AIP's creation, the Acting Division Chief for BLM's wild horse program wrote about the possibility for "immediate abuses of the program, that is people taking the initial $500 and then abandoning the animal." BLM_003526. Insisting that BLM would "shut [such abuses] down," the Division Chief stated "[t]hat's why the $500 at the end is so critical, along with compliance checks as well, to monitor the program and determine if

there are abuses." *Id.* However, he did not appear to contemplate that adopters could foreseeably abuse the AIP by pocketing *both* payments and then selling wild horses for slaughter.

Agency officials' concerns about fraud, abuse, and neglect were realistic considering BLM's previous experience with earlier smaller-scale, pilot programs that offered similar adoption incentives. For example, from 2009-2011, BLM ran a two-year pilot program that offered financial incentives to adopt older horses, which are less popular, BLM_000204-06, but that pilot program "caused questions on fraud." BLM_002248. Likewise, in 2011, BLM "discontinued" another incentive program that offered horses "at a reduced fee of $25 per head," because it led to "greater numbers of compliance issues with adopters who had selected three or four reduced fee animals." BLM_000531. BLM concluded that "[the incentive] influenced some adopters to adopt more animals than they could financially afford to care for." BLM_00531-32.

BLM also knew that alternatives to purely financial incentives would be less prone to bad outcomes. In 2016, BLM crafted a different "Adoption Assistance Incentive Program" to encourage the adoption and training of older horses by reimbursing the costs of trainers. BLM_001540-41. At that time, BLM explained that "[g]entling and training mustangs and burros adds monetary value to the animals *and reduces the risk that they would be sold for slaughter*." *Id.* (emphasis added); *see also* BLM_001927 ("The animal must be well trained to add value—to reduce the chance of the animal showing up at slaughter."). BLM also found that "a bond between the adopter and animal develops while training the animal and typically leads to the animal remaining in private care." BLM_001132.

Despite internal awareness that the AIP could be prone to abuse and end with slaughter, and despite knowing that alternative incentives could prevent these adverse outcomes, BLM

neither gave the public notice nor any opportunity to comment on the AIP, nor conducted any

NEPA review to consider the Program's likely impacts or more protective alternatives.

    **E.**    **BLM's Modest Revision of the AIP**

Because the AIP incentivizes individuals to maximize profit by adopting a horse or burro,

spending nothing on its care or training, obtaining the title and $1000 of taxpayer funds, and then

selling the animal to the highest bidder at a kill barn, it was inevitable that the Program would

lead to fraud and abuse. Indeed, shortly after the AIP's establishment, Petitioner American Wild

Horse Campaign ("AWHC") advised BLM and the public that the AIP "was a terrible idea from

an animal welfare perspective" because "it will result in more federally-protected wild horses

and burros entering the slaughter pipeline by incentivizing people without the necessary skills

and resources to adopt wild horses." Decl. of Suzanne Roy ("Roy Decl."), Ex. A, ¶18.

As predicted, one year after BLM established the AIP—as adopters received title to the

first AIP animals—wild horses and burros began appearing at slaughter auctions in far greater

numbers. *See* BLM_003917. The types of animals arriving at auctions changed fundamentally.

Before the creation of the AIP, wild horses and burros arrived at slaughter auctions in small

numbers and were generally older, trained animals that had outlived their useful roles as working

animals or were too sick to work. *Id.* In contrast, after BLM enacted the AIP, very young wild

horses and burros began arriving at slaughter auctions in much greater numbers. *Id.* Moreover,

the wild horses and burros arriving at slaughter auctions were often untrained and entirely

ungentled, *id.*; these characteristics are hallmarks of animals adopted through the AIP because

the Program provides incentives only for adoptions of *untrained* animals.

To prevent these animals from being sent to slaughterhouses, Petitioners have devoted

their own scarce resources and enormous amounts of staff time to rescuing many of these young,

untrained AIP-adopted animals arriving at slaughter auctions. *Id.* These efforts are a massive drain on Petitioners' budgets, impair their abilities to conduct their daily operations, and frustrate their core missions. *See, e.g.*, Roy Decl., ¶¶27-34.

Because BLM does not make information publicly available about the outcomes of adoptions—including the ultimate fate of adopted animals—Petitioners also devoted their limited resources to investigating the AIP's outcomes. This included dozens of requests under the Freedom of Information Act ("FOIA") and the expenditure of thousands of staff hours to collect, analyze, and collate this information into a useful format that reveals the true extent of the AIP slaughter pipeline crisis. In this manner, Petitioners have proven that hundreds of AIP-adopted wild animals have entered the slaughter pipeline. *See* BLM_003751-59; BLM_003895-3957. Petitioners put this information before BLM through testimony at BLM's wild horse advisory board meetings, formal investigatory reports, and a rulemaking petition identifying the AIP's bad outcomes and asking BLM to stop the Program and conduct a rigorous investigation.

Petitioners' efforts led to a major *New York Times* expose entitled "Wild Horses Adopted Under a Federal Program Are Going to Slaughter." BLM_003800-03. As that article described, "instead of going to good homes, truckloads of horses were dumped at slaughter auctions as soon as their adopters got the federal money." *Id.* It highlighted instances in which "adopters often took the maximum number of horses [allowed under the WHA] and sent them to auction soon after their final government payments cleared." *Id.* The article even included an interview with an adopter who candidly "acknowledged that [the animals] would probably go to kill buyers." *Id.* He indicated that BLM "told him he wasn't breaking any rules," because "[o]nce you get title, [BLM employees] told me, there is no limitation—you can do whatever you want with them." *Id.*

Soon after, Senator Dianne Feinstein urged BLM to suspend and investigate the AIP, warning that the AIP "has provided federal incentive payments to adopters who abandoned these animals at slaughter auctions," and "[s]ubsidizing the slaughter of wild horses and burros with taxpayer dollars violates Congressional intent" in appropriations bills that "prohibit[] the use of funds for the destruction of wild horses and burros." BLM_003798-99. Likewise, a bipartisan coalition of 31 members of Congress deemed the AIP flawed because "some adopted horses and burros still end up in slaughterhouses." BLM_003890-92. They urged BLM "to immediately suspend the [AIP] to conduct a full and transparent investigation into the prevalence of federally protected wild horses being sent to slaughter once placed into private ownership." *Id.*

BLM never suspended the AIP. Nor is there record evidence that BLM ever investigated how the AIP led to the inhumane treatment of many adopted animals or their sale for slaughter.

In July 2021, the House Committee on Appropriations issued a report accompanying the Appropriations Act for the Department of Interior, explaining that Congress "wants to ensure that [appropriated] resources protect the welfare of the wild horses and burros." BLM_004166. The Committee thus directed that BLM's wild horse management "strategy will not include any sale or actions that result in the destruction of healthy animals, which continues to be prohibited." *Id.* The Committee directed BLM "to protect against any violation of the law" and specifically mandated that BLM must "review its [AIP] . . . and address any weakness in the program that would jeopardize the welfare of these animals." *Id.*

On July 26, 2021, BLM issued a press release "announc[ing] additional protective steps for wild horse and burro adoptions." BLM_004500-01. Although BLM did not identify steps that would be immediately applicable, the agency suggested it would take certain "actions to provide

further oversight and protection of adopted wild horses and burros." *Id.* On January 26, 2022, BLM released IM 2022-014, which revised the AIP. *See* BLM_004919-21.

IM 2022-014 made only minor changes to the AIP. The core of the Program remains intact: it still applies only to untrained animals, and BLM still offers cash incentives of up to $1000 for each animal adopted. *Id.* However, BLM altered the timing of these payments; rather than two payments, BLM now pays one lump sum within 60 days of title transfer. *Id.* Compliance inspections must occur within six months after adoption and a title application must be signed by a veterinarian or BLM-authorized officer. *Id.* BLM restored the minimum adoption fee of $125, as set in the agency's regulations. *Id.*

Neither in IM 2022-014 nor in its press release did BLM explain how these nominal alterations could cure the AIP's well-established problem of using federal funds in a manner that leads to wild horses and burros being illegally sold into the slaughter pipeline. Under IM 2022-014, the AIP continues to establish the same perverse incentive it has since its inception: individuals more interested in money than animal welfare will adopt an untrained animal, spend as little as possible on the animal's care or training for one year, obtain title and $1000 of taxpayer funds, and then sell the animal at a kill barn for further profit.

## **ARGUMENT**

## I.   **PETITIONERS HAVE STANDING**

To demonstrate standing, petitioners must: (1) suffer a concrete and actual or imminent "injury in fact"; (2) that is caused by, or fairly traceable to the conduct complained of; and (3) that is redressable by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). For standing purposes, the court must "assume that on the merits the plaintiffs would be successful in their claims." *Initiative & Reform Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir.

2006). Petitioners submit detailed declarations attesting to the myriad ways their cognizable interests are harmed by the AIP. *See* Roy Decl.; Decl. of Clare Staples ("Staples Decl."), Ex. B; Decl. of Candace Ray ("Ray Decl."), Ex. C. Below is a brief summary of the facts that amply establish Petitioners' standing to challenge the AIP.

Petitioners are non-profit organizations and individuals devoted to the preservation of wild horses and burros, their welfare, and the prevention of their inhumane treatment. A critical aspect of this mission is educating the public and policymakers about how BLM's actions affect the animals Congress tasked the agency to protect. Hence, Petitioners routinely observe, investigate, and document BLM's treatment of these animals, including at roundups, off-range holding facilities, and adoption and sale events. When BLM does not make information about wild horses or burros publicly available, Petitioners request records under FOIA to better understand whether BLM is effectuating Congress's intent to protect these animals. Petitioners use such information to educate the public and policymakers about how BLM's actions often fall short of the protection and humane treatment that Congress mandated, and to petition BLM to better vindicate Congress's intent. Petitioners also routinely participate in BLM's decision-making processes, including by submitting comments on BLM actions from roundups to the formulation of nationwide policies governing the treatment of wild horses and burros.

Another key aspect of Petitioners' mission is preventing wild horses and burros from being slaughtered. For example, AWHC has repeatedly persuaded Congress to maintain annual appropriations language prohibiting BLM from using federal funds in any manner that directly or indirectly results in the slaughter of wild horses or burros. AWHC also successfully sued and prevented the U.S. Forest Service from selling wild horses without limitation (i.e., for slaughter)

19

and then convinced Congress to prohibit the Forest Service from using appropriated funds that would directly or indirectly result in wild horse or burro slaughter. *See* Roy Decl., ¶¶4-5.

Petitioners also work to prevent the slaughter of wild horses and burros by rescuing animals from sale into the slaughter pipeline. Hence, Petitioners monitor auctions at kill barns, and when Petitioners identify wild horses or burros offered for sale—and where Petitioners' limited resources allow—Petitioners purchase these animals to prevent them from being shipped abroad for slaughter. Petitioners then work to find safe, humane homes for the animals, either at Petitioners' sanctuaries or with trusted partner organizations.

Before BLM established the AIP, wild horses and burros arrived at kill barns infrequently, and those that did were usually well-trained animals that were no longer useful working animals due to advanced age or illness. Accordingly, Petitioners were able to rescue most animals without impeding their daily operations or mission activities. Through this experience, Petitioners developed a strong working knowledge of the slaughter pipeline, becoming familiar with particular "kill buyers" who routinely purchase animals for eventual resale to foreign slaughterhouses. *See* Roy Decl., ¶¶8-9; Staples Decl., ¶6; Ray Decl., ¶¶5-6.

Because BLM failed to provide the public with any opportunity to comment on the AIP, Petitioners were deprived of supplying input prior to the AIP's creation. Instead, they had to use their scarce resources to investigate and document the AIP's inhumane outcomes *after* the Program's implementation. Likewise, Petitioners have had to educate the public and policymakers about the fates of AIP-adopted wild horses and burros, rescue numerous such animals from kill barns, and petition BLM to correct the Program's serious problems. These efforts have come at significant expense and have frustrated Petitioners' core missions and ordinary, day-to-day work. *See* Roy Decl., ¶¶27-34; Staples Decl., ¶¶27-36; Ray Decl., ¶¶13-15.

One year after the AIP's creation—as the first AIP adopters received title to adopted animals—Petitioners observed a sudden, sharp increase in the number of wild horses arriving at kill barns. Although older, trained animals occasionally arrived at kill barns prior to BLM's implementation of the AIP, afterwards very young, untrained wild horses began arriving at kill barns in large numbers. Petitioners could easily identify these animals by their distinctive BLM freeze-marks or BLM tags placed on the wild animals before their adoption through the Program. Often, animals arriving at kill barns showed signs of serious neglect, such as malnutrition or preventable disease. These horses also often showed no signs of any training during the year after their adoption. *See, e.g.*, Roy Decl., ¶¶19, 31, 34.

BLM's implementation of the AIP—including the modestly revised AIP—have caused, and continue to cause, a major drain on Petitioners' resources to counteract the illegal harms resulting from the AIP, and in turn have substantially impaired Petitioners' daily operations and activities while also frustrating other core aspects of Petitioners' missions. *See* Roy Decl., ¶26; Staples Decl., ¶26; Ray Decl., ¶13. Accordingly, Petitioners have suffered not only procedural harm by being deprived of any opportunity under NEPA and the APA to comment on the AIP, but also organizational injury from the immense drain on resources and the impairment of core aspects of Petitioners' missions due to being forced to shift significant staff time and resources to counteract the AIP's unlawful outcomes. Additionally, Petitioners continue to suffer grave aesthetic injuries from observing first-hand the inhumane treatment these federally protected animals must endure as a direct result of the AIP. *See, e.g.*, Roy Decl., ¶34; Staples Decl., ¶34.

These concrete injuries—which are traceable to BLM's conduct and would be redressed by vacatur and remand of the challenged actions—easily satisfy Article III. *See, e.g.*, *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) (finding "concrete" and "irreparable"

injury from agency action where "seeing or even contemplating the type of treatment of the bison inherent in an organized hunt would cause them to suffer an aesthetic injury that is not compensable in money damages"); *Common Cause of Colo. v. Buescher*, 750 F. Supp. 2d 1259, 1269 (D. Colo. 2010) ("An organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." (quotation marks and citations omitted)).

## II.      THE AIP REFLECTS FINAL AGENCY ACTION

The APA authorizes review of "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. Action is "final" where: (1) it "mark[s] the consummation of the agency's decision-making process," and is not "merely tentative or interlocutory [in] nature"; and (2) "the action [is] one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

### A.      BLM's IMs Reflect the Consummation of BLM's Decision-Making Process

IM 2022-014, which "outlines policies and procedures for administering the [AIP]," BLM_004919, "marks the consummation of [BLM's] decision-making process" with regard to the AIP and is not "merely tentative or interlocutory." *Bennett*, 520 U.S. at 177. One clear signal of the finality of an agency action is that "immediate compliance with its terms is expected." *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094–95 (9th Cir. 2014). Here, BLM stated that the IM creating the AIP "is effective *immediately*" and directed it to "*[a]ll* [BLM] Field Office Officials." BLM_004921 (emphases added). In analogous contexts, courts have found that where an IM is "'effective immediately' . . . 'across the BLM,'" it "lets the air out of any argument that [an IM] operates only as provisional guidance," and reveals that the IM was final agency action. *W. Watersheds Proj.*, 441 F. Supp. 3d at 1062; *see also Chiang v.*

*Kempthorne*, 503 F. Supp. 2d 343, 350 (D.D.C. 2007) (finding that an action "easily satisfy[ied] the first prong of the final action test" because it was "*effective immediately*").

Additionally, IM 2022-014 contains no suggestion of any ongoing deliberative process regarding cash incentives. Instead, it merely suggests that BLM may "continue[] to explore the feasibility of other incentives *in addition to cash payments*." BLM_004919 (emphasis added). The record also confirms BLM's own characterization of the AIP as a *final* policy. For example, after stating BLM's intent to "finalize policy" to "launch [the AIP]," BLM issued IM 2019-025, which it treats as the event triggering the Program's nationwide implementation. BLM_003534; *see also* BLM_002421 (stating, in June 2018, that BLM aimed to "[f]inalize the [AIP] and have it ready for implementation prior to the end of the [Fiscal Year]," which it accomplished through IM 2019-25); BLM_003501 ("We want to make sure *the IM* and supporting documents are all correct *before we begin implementation*." (emphasis added)); BLM_003785 (stating in October 2019 that "implementation of the [AIP]" began in "March" after issuance of IM 2019-025).

### B.   BLM's IMs Determined Legal Rights and Obligations

IM 2022-014 (and IM 2019-025) determined "rights or obligations," and had "legal consequences." *See Bennett*, 520 U.S. at 177–78. By its plain terms, the IMs created a new right for members of the public to obtain up to $1000 of federal funds by adopting an untrained wild horse or burro, and obligated BLM to pay $1000 in federal funds upon the transfer of legal title to each animal adopted. Accordingly, the IM determined "rights" for potential adopters and both imposed "obligations" on BLM and determined "legal consequences."

Additionally, BLM has in fact paid members of the public to adopt thousands of animals pursuant to the AIP policies described in its IMs, expending millions of taxpayer dollars. *See* BLM_003787-88 (noting that BLM has issued many AIP payments). Where, as here, an agency

"is applying [a policy] in a binding fashion," it "constitute[s] a final agency action." *Chiang*, 503 F. Supp. 2d at 350; *see also W. Watersheds Proj.*, 441 F. Supp. 3d at 1062 (concluding that a BLM IM was final agency action in part because "BLM field offices believed compliance with [the IM] was mandatory, and adhered to [the IM]" when implementing its policy).

Finally, the fact that these IMs constitute rules within the meaning of the APA, as discussed below, is an additional indication that IM 2022-014 is a final agency action. "[W]here BLM has adopted de facto substantive new rules in [an IM] without following the requisite notice-and-comment procedures . . . , they represent de facto final agency action." *W. Watersheds Proj.*, 441 F. Supp. 3d at 1065 n.7 (citations omitted).

## III.  BLM VIOLATED THE APA BY ESTABLISHING THE AIP WITHOUT NOTICE-AND-COMMENT RULEMAKING

The APA's rulemaking requirements apply to legislative rules, but not "'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.'" *Perez*, 575 U.S. at 96 (quoting 5 U.S.C. § 553(b)(A)). Interpretative rules "are issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Id.* at 97. "The critical distinction between legislative and interpretative rules is that, whereas interpretative rules simply state what the administrative agency thinks the statute means, and only remind affected parties of existing duties, *a legislative rule imposes new rights or duties*." *Iowa League of Cities v. EPA*, 711 F.3d 844, 873 (8th Cir. 2013) (emphasis added).

### A.    The AIP Constitutes a Legislative Rule

The AIP is a legislative rule because it both creates new rights for members of the public and new duties for BLM. *See W. Watersheds Proj.*, 441 F. Supp. 3d at 1067 (reasoning that "the hallmark of a substantive agency rule is that it carries the force and effect of law via the creation of new rights or duties" and concluding that another BLM IM constituted a rule requiring notice-

and-comment). As explained, BLM's IMs establish a right for adopters of wild horses to receive up to $1000 in federal funds per animal adopted and titled. *See* BLM_004919. Indeed, BLM also provided a guarantee of due process for this new right through the Board of Land Appeals before the agency may render an individual ineligible to participate in the AIP. BLM_004927. Conversely, IM 2022-014 creates a new duty for BLM, categorically obligating BLM to pay $1000 "within 60 days after the adoption title date" if all conditions are met. BLM_004919-21.

Moreover, courts easily identify legislative rules where—as here—an agency creates a policy that lacks a clear statutory basis. Notably, no portion of the WHA authorizes, or even contemplates, payment of federal funds as an incentive to adopt wild horses or burros. Nor do BLM's regulations contemplate this approach; instead, they discuss *the public* paying the agency for adoptions. *See* 43 C.F.R. § 4700.0-6(f) ("Fees shall normally be required from qualified individuals adopting excess wild horses and burros to defray part of the costs of the adoption program."). Such "textual silence" in governing statutes and regulations indicates that "any authority that the Secretary may have to adopt the rule would most likely flow from Congress's delegation of a power to make a decision that Congress chose not to make itself," confirming that the policy is in fact a legislative rule requiring notice-and-comment. *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 71 (1st Cir. 2018); *see also Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014) (describing a binding policy where Congress was silent in a statute as "the clearest possible example of a legislative rule" (quotation marks and citations omitted)).

By the same token, the AIP cannot be characterized an interpretive rule exempt from the APA's notice-and-comment requirements. "[T]he critical feature of interpretive rules is that they are issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez*, 575 U.S. at 96. Here, BLM's IMs do not interpret—or even cite—

any provision of the WHA or BLM's regulations. "Had the Secretary merely been interpreting the governing statute and regulation, then one would expect that the agency's justification for the rule would rely on an interpretive methodology." *N.H. Hosp. Ass'n*, 887 F.3d at 71. In contrast, courts easily discern a legislative rule where, as here, an agency "did not rely on interpretive methodology" and instead "announce[d] a new policy out of whole cloth, rather than engaging in an interpretive exercise." *Children's Health Care v. Ctrs. for Medicare & Medicaid Servs.*, 900 F.3d 1022, 1026 (8th Cir. 2018).

Further proving that the AIP is a legislative rule, BLM's new policy indisputably modifies its regulations. By providing federal funds to "defray the costs of care, such as veterinary care, feed, and training" incurred by adopters, BLM_004919, the AIP alters BLM's regulations, which specify that "*[a]dopters are financially responsible* for the proper care and treatment of all wild horses and burros covered by [a private maintenance and care] agreement," 43 C.F.R. § 4750.4-1(e) (emphasis added). Because the AIP thus alters the existing regulatory framework, it constitutes a legislative rule. *See Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 100 (1995) (noting that "APA rulemaking" is "required" if a policy "adopt[s] a new position inconsistent with any of the Secretary's existing regulations").

In similar circumstances where an agency issued a policy dictating how much federal money could be provided to private parties—there, Medicaid funds for hospitals—four Courts of Appeal uniformly found that the policy constituted a legislative rule requiring notice-and-comment. *See Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042–46 (6th Cir. 2018) (listing cases). For example, the First Circuit held this policy to be a legislative rule based in part on "pragmatic considerations" that are likewise applicable to IM 2019-025 and IM 2022-014, including that the

policy "was a categorical resolution that affects a broad range of payments and scenarios and likely involves large sums of money" in aggregate. *N.H. Hosp. Ass'n*, 887 F.3d at 73.

Nor is the AIP a "general statement of policy" exempt from notice-and-comment requirements. 5 U.S.C. § 553(b)(A). A "general statement of policy" is "[a]n agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014). Again, BLM's IMs do not even cite the WHA or BLM's regulations, much less announce how BLM will "enforce a statute or regulation." *Id.* Moreover, "[w]hen the agency applies a general statement of policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued." *Id.* at 253. Here, in contrast, BLM made clear that it could *not* implement the AIP unless and until it issued these IMs. *See, e.g.*, BLM_003501 (noting the need to "make sure the IM and supporting documents are all correct before we begin implementation").

Finally, the AIP cannot be characterized as a "rule[] of agency organization, procedure, or practice" exempt from notice-and-comment requirements. 5 U.S.C. § 553(b)(A). "Procedural rules, the general label for rules falling under this exemption, are primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights or interest of affected parties." *Mendoza*, 754 F.3d at 1023 (quotation marks and citation omitted). Here, BLM's IMs state that the AIP's scope is not "Administrative," but instead "Mission Related"—i.e., it addresses the essential activities for which BLM was established. BLM_004919. Moreover, where a policy "substantively affect[s] the regulated public," it constitutes a legislative rule rather than a procedural rule. *Mendoza*, 754 F.3d at 1024. For example, a policy that set a minimum wage constituted a legislative rule because it "substantially

27

affect[ed] the rights and interests" of the regulated public. *Id.* So too here: because the AIP sets a rate at which members of the public receive federal funds when certain conditions are met, it substantively affects the rights and interests of the public, and thus constitutes a legislative rule.

### B.      BLM Failed to Undertake Notice-and-Comment Rulemaking

Because the AIP is a legislative rule, BLM was obligated to conduct notice-and-comment rulemaking before issuing it. However, BLM created and amended the AIP without any notice-and-comment procedures, in violation of the APA. *See* 5 U.S.C. § 553(b)–(c). This major error also led the agency to ignore Petitioners' input. Had BLM at the outset sought public comment as the APA requires, Petitioners would have both explained how the AIP is vulnerable to abuse and proposed alternative incentive structures that would better vindicate Congress's intent to protect wild horses and burros. However, because BLM unlawfully ignored its APA obligations, the public was deprived of any chance to provide valuable input on this new program.

Moreover, when BLM revised the AIP, it ignored key information Petitioners had put before BLM prior to the issuance of IM 2022-014. *See, e.g.*, BLM_003751-59; BLM_003895-3957. BLM's refusal to consider—let alone address—relevant input from subject matter experts that could reduce the likelihood of fraud and abuse in BLM's adoption program constitutes a head-in-the-sand approach that the APA does not permit. *See, e.g.*, *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1581 (10th Cir. 1994) (finding APA violation where an agency "fail[ed] to discuss [public's] contentions or make any findings of fact," thus providing "no basis for its conclusion" or any finding that the agency's decision was "the product of reasoned decisionmaking"); *State Farm*, 463 U.S. at 43 (explaining that agency action is "arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem").

BLM's failure to obtain or consider *any* public input when designing or revising the AIP is particularly egregious in light of BLM's knowledge of the need to "[i]ncrease public involvement" in the management of wild horses and burros. BLM_002533. For example, the record shows that the Secretary of Interior's formal initiative specifically "recommend[ed] an explicitly phased approach to public engagement that communicates an ongoing commitment . . . that *BLM will not go it alone.*" *Id.* (emphasis added); *see also* BLM_00561 (National Academy of Sciences recommending that "BLM should develop an iterative process between public deliberation and scientific research and codesign the participatory process with representatives of the public"). Yet, that is precisely what BLM did—it went it alone in designing the ill-fated AIP.

Accordingly, BLM flouted the APA by ignoring its own stated need for increased public participation when it created the AIP—and did so again by disregarding relevant information in BLM's possession when revising the AIP—without soliciting public input in either instance.

## IV.    BLM VIOLATED NEPA BY REFUSING TO ANALYZE THE AIP'S IMPACTS

The AIP indisputably causes environmental impacts. It directly affects wild horses and burros, foreseeably leading federally protected animals to endure inhumane conditions and to be sold for slaughter. The AIP also influences BLM's on-range operations, which directly impact wild horses, burros, and their habitat (and other range resources such as livestock and wildlife). Yet, BLM established the AIP without any NEPA analysis whatsoever. And then, despite Petitioners' repeated calls for rigorous NEPA evaluation, BLM asserted that its revision of the AIP was categorically excluded from NEPA review. This is a textbook violation of NEPA.

### A.    BLM's Reliance on a Categorical Exclusion Was Unlawful

In creating the AIP in 2019, BLM conducted no NEPA review. Despite having the benefit of this lawsuit when BLM revised the AIP in 2022—in which Petitioners alleged that

BLM had illegally circumvented NEPA in 2019—BLM once again sidestepped any NEPA review, this time by categorically excluding it from NEPA analysis as merely "'policies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case.'" BLM_004915-16 (quoting 43 C.F.R. § 46.210(i)). To shoehorn the AIP into this CE, BLM claimed that issuing IM 2022-014 was "a purely administrative function," and that "the contents of the revised IM are of an administrative and procedural nature." *Id.* BLM also suggested that "subsequent adoptions and titling events will later be subject to the NEPA process, either collectively or on a case-by-case basis." *Id.* Finally, BLM asserted that "there are no extraordinary circumstances" that would foreclose the use of a CE. *Id.*

### 1. *The AIP is not "purely administrative"*

For a CE to lawfully apply, it must actually fit the action being excluded from NEPA review. Hence, courts reject agency invocations of CEs that do not apply to an action. *See, e.g.*, *Wilderness Watch v. Mainella*, 375 F.3d 1075, 1095 (11th Cir. 2004) (rejecting use of a CE for "routine and continuing government business" because "[o]btaining a large van to accommodate fifteen tourists hardly appears to be a 'routine and continuing' form of administration"); *Sierra Club v. U.S. Dep't of Energy*, 255 F. Supp. 2d 1177, 1182–83 (D. Colo. 2002) (rejecting use of a CE that applied "only if the use of and impacts to [transferred] property remain unchanged upon the transfer" because in fact "the use of the [] land and the impacts to this parcel will change"); *Hayes v. Chaparral Energy, LLC*, 180 F. Supp. 3d 902, 909–910 (N.D. Okla. 2016) (rejecting the use of a CE "premised on a plainly erroneous legal interpretation" of the CE's terms).

Here, BLM's reliance on a CE for "purely administrative" matters is invalid. BLM's assertion that IM 2022-014 is "of an administrative and procedural nature" contradicts the IM's plain terms. In the IM, BLM definitively answered whether the IM was "Administrative or Mission Related" by concluding that the IM concerned BLM's "Mission." BLM_004919.

Moreover, the AIP's purpose and outcomes are not "purely administrative." The IM's substantive purpose is "to increase the number of adoptions of untrained wild horses and burros," *id.*, thus aiming to significantly increase private ownership of federally protected wildlife, not purely to reduce administrative burdens. Nor can the AIP's outcomes be classified as "administrative." "[O]ver 8,250 animals" were adopted in 2019 and 2020, costing taxpayers over $8 million, BLM_004498, and many federally protected animals have foreseeably been sold at slaughter auctions, *see* BLM_003751-59; BLM_003895-3957. It is also beyond dispute that one purpose of the AIP is to facilitate larger, more frequent wild horse and burro removals from public lands by redirecting AIP savings to "on-range operations," BLM_004921, which greatly impacts these animals, livestock, endangered species, vegetation, and other range resources.

Accordingly, because the AIP aims to alter—and *has* altered—public ownership of federally protected wildlife, which has harmed many animals and facilitated larger and more frequent removals from public lands, it is not "purely administrative." *See W. Watersheds Proj. v. Kraayenbrink*, 632 F.3d 472, 498 (9th Cir. 2011) (finding action "not purely administrative" because it "alter[s] ownership rights to water on public lands" and "will have a substantive effect on special status species"); *Shearwater v. Ashe*, No. 14-cv-02830, 2015 WL 4747881, at *17 (N.D. Cal. Aug. 11, 2015) (rejecting reliance on the same CE because "the primary purpose" of the action "was not to reduce [the agency's] administrative burden," but "to facilitate the responsible development of renewable energy"). This is fatal to BLM's use of this CE.

### 2.   *BLM failed to even assert that the AIP's impacts are speculative*

BLM arbitrarily failed to justify another central premise of this CE. The CE applies to

actions "whose environmental effects *are too broad, speculative, or conjectural to lend*

*themselves to meaningful analysis **and*** will later be subject to the NEPA process, either

collectively or case-by-case." 43 C.F.R. § 46.210(i) (emphasis added). Here, BLM claimed only

that adoptions and titling will later be subject to NEPA, but never even suggested that the AIP's

impacts are "broad, speculative, or conjectural." By ignoring a mandatory element of its cited

CE, BLM "entirely failed to consider an important aspect of the problem" and thus acted

arbitrarily and capriciously. *State Farm*, 463 U.S. at 43.

In any event, the AIP's impacts were foreseeable, not conjectural. Before BLM created

the AIP in 2019, an agency official accurately foresaw that "[t]he easy money aspect may bring

out potential for fraud, abuse and neglect." BLM_002376. Likewise, BLM knew that *untrained*

animals—the only animals eligible for AIP incentives—are more likely to end up in the slaughter

pipeline. *See, e.g.*, BLM_001927 (stressing that animals "must be well trained to add value—to

reduce the chance of the animal showing up at slaughter"); BLM_001540-41 ("Gentling and

training mustangs and burros adds monetary value to the animals and reduces the risk that they

would be sold for slaughter."). Hence, contrary to the notion that the AIP's impacts were

somehow speculative (which BLM did not actually assert in invoking this CE), in fact BLM

knew that the AIP would foreseeably result in some level of inhumane treatment and slaughter.

Moreover, even if BLM could somehow argue that it was unable to foresee wild horses

suffering harsh fates before BLM created the AIP, when BLM modified the AIP there was no

longer any argument that such outcomes were speculative. BLM had received extensive proof—

from Petitioners, the New York Times, and members of Congress—extensively documenting the

AIP's terrible outcomes resulting in hundreds of wild horses and burros ending up in the slaughter pipeline and many having been treated inhumanely. *See supra* at 16-17.

This backdrop makes clear why BLM's CE did not attempt to explain why the AIP's impacts were speculative or conjectural. These outcomes were foreseeable, and in fact have repeatedly occurred since the creation of the AIP. BLM's CE—which did not even acknowledge these foreseeable and grisly impacts, let alone analyze them—fails on this basis alone.

Likewise, BLM's cursory two-page CE is also invalid due to BLM's silence regarding the highly significant impacts to range resources that will flow from the AIP. Despite conceding in IM 2022-014 that the AIP "*will* reduce off-range holding costs and *allow those savings to support critical on-range operations*," BLM_004919 (emphases added), the CE never mentions (let alone examines) the increased frequency and size of wild horse and burro removals that BLM will conduct with funds redirected from AIP cost savings. *See* BLM_004915-16. Yet, BLM touts these cost savings that helped BLM "gather[] more wild horses and burros from overpopulated herds than the previous five years combined," and admits that these increased removals affect "wildlife and habitat health," grazing, and other range resources. BLM_003792. Because the CE fails to account for these foreseeable environmental impacts of the AIP, it must be vacated. *See Shearwater v. Ashe*, 2015 WL 4747881, at *17 (vacating agency's CE invocation where it increased the duration of eagle take permits, because "bald and golden eagles may face greater mortality risks as a result" of an agency action that was intended to "facilitate the funding, construction, and operation of numerous energy generation projects").

### 3. *BLM's suggestion that adoptions and titling will receive later NEPA analysis is meritless*

BLM's suggestion that adoptions and titling of wild horses and burros will be subject to NEPA review "later" is highly misleading. The record does not include a single example where

BLM has ever analyzed under NEPA any adoption or titling event in the 51 years since Congress enacted the WHA (nor are Petitioners aware of any). In any event, BLM's own policies belie its claim that "adoptions and titling events will later be subject to the NEPA process." BLM_004916. BLM maintains that "[a]pproval of the adoption of healthy, excess wild horses and burros" and "[i]ssuance of title to adopted wild horses and burros" are *also* categorically excluded from NEPA review. BLM Handbook H-1790-1, *NEPA*, Appendix 4 §§ D(6), (8), https://on.doi.gov/3BI3KOm; Department of Interior, *NEPA Manual*, 516 DM 11.9(D)(6), (8), https://on.doi.gov/3xIiTht. Hence, the CE's suggestion that BLM will "later" analyze adoptions and titling events defies the record and is inconsistent with BLM's own stated CE policy.

Furthermore, even presuming that BLM were to later analyze specific adoption or titling events (contrary to its own policy), that would not provide any meaningful analysis of the AIP's core feature—cash payments to adopters. While an event-specific NEPA analysis could theoretically consider impacts to a finite number of wild horses or burros involved in that event, it would not revisit the overarching premise for the *already-finalized decision* to pay adopters cash as opposed to alternative incentives with less prospect for fraud, abuse, and inhumane outcomes. This illustrates why BLM's avoidance of NEPA review *now* "is contrary to the purpose of NEPA, which seeks to ensure that the government looks before it leaps." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 106 (D.D.C. 2017).

### 4.    *BLM failed to adequately consider extraordinary circumstances*

When using a CE, agencies must "evaluate the action for extraordinary circumstances in which a normally excluded action may have a significant effect." 40 C.F.R. § 1501.4; *see also* 43 C.F.R. § 26.205(c)(1) ("Any action that is normally categorically excluded must be evaluated to determine whether it meets any of the extraordinary circumstances listed in section 46.215; if it

does, further analysis and environmental documents must be prepared for the action"). As the Department of Interior's regulations specify, "[e]xtraordinary circumstances . . . exist" if an action "may meet any of the criteria listed" in the regulations. 43 C.F.R. § 46.215.

Here, BLM's CE contains no *analysis* of extraordinary circumstances or any fact-specific application of them to the AIP. Instead, the CE makes a conclusory assertion that "[t]he proposed action has been reviewed with the list of extraordinary circumstances" and that "none of these circumstances apply." BLM_004916. "Stating that a factor was considered, however, is not a substitute for considering it." *Getty v. Fed. Sav. & Loan. Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). Instead, courts "must make a 'searching and careful' inquiry to determine if [the agency] actually *did* consider it," and "an agency must provide the court an explanation sufficient to allow [it] to carry out [its] review." *Id.* Here, because BLM never actually *evaluated* whether extraordinary circumstances may apply to the AIP (instead merely stating its unsubstantiated conclusion), the CE "entirely failed to consider an important aspect of the problem" and is arbitrary and capricious. *State Farm*, 463 U.S. at 43.

Indeed, BLM's failure to examine extraordinary circumstances is particularly egregious because several "may" apply to the AIP, and thus trigger NEPA review. 43 C.F.R. § 46.215.

First, the AIP involves "unresolved conflicts concerning alternative uses of resources." *Id.* § 46.215(c). For example, an unresolved conflict exists over the type of adoption incentive that BLM should provide. Before BLM established the AIP, agency staff and its advisory board members warned that cash payments could lead to worse outcomes than alternative incentives because "[t]he easy money aspect may bring out potential for fraud, abuse and neglect." BLM_002376; *see also* BLM_02343 (noting that cash incentives "could bring out the worst in people on the corrupted side of things"). Conversely, "[m]ost staff suggest[ed] that . . . offering

more trained animals will increase private placement," BLM_002549, because training adds value and "reduce[s] the chance of the animal showing up at slaughter." BLM_001927; *see also* BLM_002537 ("[I]ncreasing the number of trained animals is vital to the success of the adoption program."). Likewise, advisory board members suggested that BLM "should prioritize money allocated to programs that are working," such as the "trainer incentive program" that "could have adopted four thousand horses [in 2017] but [] ran out of budget." BLM_003225; *see also* BLM_003226 (suggesting that BLM should incentivize training that is "actually turning these animals into marketable and adoptable critters"). Hence, a conflict existed regarding what alternative incentives BLM should use to increase adoptions while better protecting wild horses and burros from inhumane treatment and the slaughter pipeline. Yet, the record contains no indication that BLM actually considered this conflict, much less resolved it. Accordingly, this is an "unresolved conflict concerning alternative uses of available resources."

Second, a CE is improper because the AIP may "[v]iolate a Federal law . . . or requirement imposed for the protection of the environment." 43 C.F.R. § 46.215(i). Congress has repeatedly barred BLM from using *any* appropriated funds that could lead to the slaughter of wild horses or burros. *See supra* at 5-6. Yet, the AIP's perverse incentive has resulted—and will continue to result—in an influx of wild horses and burros at slaughter auctions. BLM_003895-3957. As Senator Feinstein warned BLM, "[s]ubsidizing the slaughter of wild horses and burros violates [the] Congressional intent" behind these restrictions. BLM_003798-99. Similarly, a House Appropriations Committee recently emphasized that BLM must not take any "actions that result in the destruction of healthy animals, which continues to be prohibited," and "directed [BLM] to protect against any violation of the law" by reviewing the AIP and "address[ing] any weakness in the program that would jeopardize the welfare of these animals." BLM_004166.

Because members of Congress have repeatedly cautioned BLM that its cash incentives likely violate legal restrictions on BLM's use of taxpayer funds, the AIP may "violate a Federal law . . . or requirement imposed for the protection of the environment." 43 C.F.R. § 46.215(i).

Third, the AIP has "highly controversial environmental effects." *Id.* § 46.215(c). Under NEPA, an action is "highly controversial" when there is a "substantial dispute as to the size, nature, or effect of the action." *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1229 (10th Cir. 2002). Here, there is a substantial dispute about the nature and effects of the AIP. Subject matter experts and members of Congress maintain that the AIP is unacceptably leading federally protected animals to sale at slaughter auctions in violation of federal law, and that the Program must be halted and thoroughly investigated. *See* BLM_003895-3957; BLM_003798-99; BLM_003890-92. BLM takes the opposite view; indeed, BLM has neither paused the Program nor provided record evidence of any investigation of its outcomes. Hence, there is a dispute about the AIP's nature (i.e., its compliance with federal law) and the AIP's effects (i.e., the extent of AIP-adopted animals entering the slaughter pipeline). Likewise, there is a dispute over the acceptability of the AIP's effects and the need to halt the AIP until it can be investigated—especially after BLM's top wild horse official previously insisted that BLM would "shut [the AIP] down" if it resulted in precisely these kinds of "abuses of the program." BLM_003526.

Accordingly, extraordinary circumstances "may" (and do) apply to the AIP, which renders BLM's use of a CE unlawful. 43 C.F.R. § 46.215.

**B.**     **BLM Violated NEPA by Establishing the AIP Without Preparing an EIS**

Because BLM's CE cannot withstand scrutiny, the Court need not determine whether the AIP required an EIS. Nonetheless, it is beyond legitimate dispute that that the AIP constitutes a "major federal action" that has significant impacts and thus requires an EIS.

NEPA requires an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). "Major Federal actions tend to fall within" certain "categories," including the "[a]doption of programs." 40 C.F.R. § 1508.1(q)(3)(iii). BLM's creation of the Adoption Incentive *Program* squarely fits within this category.

Another category of major federal actions includes the "[a]doption of official policy" such as through "formal documents establishing an agency's policies which will result in or substantially alter agency programs." *Id.* § 1508.1(q)(i). Here, BLM's IM establishing the AIP is a formal document that "outlines *policies* and procedures for administering the [AIP]." BLM_003561 (emphasis added). Likewise, the AIP substantially altered BLM's regulations, which specify that *adopters* are "financially responsible" for any animals adopted. 43 C.F.R. § 4750.4-1(e). The AIP also aims to substantially alter BLM's entire wild horse program by providing significant additional funds "to support critical on-range operations." BLM_004919.

Finally, another category of major federal actions is the "[a]doption of formal plans . . . which prescribe alternative uses of Federal resources, upon which future agency actions will be based." 40 C.F.R. § 1508.1(q)(3)(ii). The AIP fits this definition because it reflects BLM's plan to use federal taxpayer dollars for cash incentives (as opposed to alternative incentives such as vouchers) to pay adopters (instead of trainers) for adoptions of untrained animals (as opposed to trained animals), thereby obligating BLM to issue such incentive payments moving forward.

Hence, the AIP meets three distinct definitions of a "major federal action." In addition, for many of the same reasons that extraordinary circumstances prevent the invocation of a CE here, *see supra* at 34-37, this action is "significant," as long defined by NEPA's regulations and courts. *See, e.g.*, *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1082-83 (D.C. Cir.

2019). The significance of this major federal action indisputably required an EIS; yet, BLM unlawfully established and revised the AIP without undertaking any NEPA review whatsoever.

    C.    **The AIP Cries Out for Meaningful NEPA Analysis**

NEPA's "action-forcing procedures" serve Congress's "broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348–49 (1989). "Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Id.* at 349. These procedures also serve a crucial "informational role" by giving "the public an assurance that the agency has indeed considered environmental concerns in its decisionmaking process and, perhaps more significantly, provides a springboard for public comment." *Id.* The consideration of alternatives is at the core of NEPA's requirements; "[w]ithout substantive, comparative environmental impact information regarding other possible courses of action, the ability of [the NEPA process] to inform agency deliberation and facilitate public involvement would be greatly degraded." *Richardson*, 565 F.3d at 708.

Here, BLM's refusal to conduct any analysis for the AIP disregards these fundamental NEPA principles. By the same token, a court order vacating the AIP and remanding to BLM to prepare a rigorous NEPA analysis would vindicate Congress's intent. For example, a court order requiring NEPA compliance would compel BLM to publicly analyze the adverse impacts to wild horses and burros that the agency itself has foreseen but never disclosed, such as how "[t]he easy money aspect may bring out potential for fraud, abuse and neglect," BLM_002376. BLM would also be forced to explain why it has chosen a cash payment system despite this well-established risk. Likewise, it would require BLM to confront the fact that untrained animals are more likely

to be sold at slaughter auctions and to explain its decision to provide cash incentives only for adoptions of untrained animals, despite knowing that training "reduce[s] the chance of the animal showing up at slaughter." BLM_001927. A court-ordered NEPA process would also compel BLM to grapple with calls from Congress and experts for a rigorous investigation into the AIP.

A meaningful NEPA process would also require analysis of reasonable alternatives that could promote adoptions while better protecting wild horses and burros. Importantly, the record proves that BLM has long known that alternative incentive schemes would be more protective, yet the agency has failed to consider them in any public-facing process. For example, a BLM official acknowledged in 2015 that "a multitude of payment/frequency options are available." BLM_001019. One alternative would be a payment "for individuals who can prove that the horse or burro is alive and well 10 years after the initial adoption." BLM_001010; *see also* BLM_001019 (listing four distinct payment incentive options). Unlike the AIP, which pays out after only one year, this alternative would ensure that taxpayer dollars only go to adopters who actually provide good, *long-term* homes for animals. And while it never informed the public of this alternative, BLM internally noted that a payment as high as $10,000 after ten years of ownership was "financially sound," BLM_001019-20, and thus a feasible alternative.

Other alternatives—which BLM knew of but never publicly aired—focus on animals less likely to be adopted. For example, because "adoption demand for younger animals is comparatively strong," a previous BLM pilot program provided "a greater incentive [] for older horses and a lesser incentive for mid-aged horses," with "[n]o incentive [] for younger horses and burros." BLM_003977. Similarly, because BLM is well aware that it "can more easily place most burros it removes from the range into private care," BLM_003679, BLM could consider an alternative that incentivizes the adoption of only wild horses (but not burros).

Still other alternatives could focus on training wild horses. Indeed, BLM's own staff frequently suggested such alternatives. *See* BLM_002549 ("Most staff suggest that . . . offering more trained animals will increase private placement."); *see also id* ("More trained animals means easier adoptions" because "[h]alter-trained and gentled animals are much more appealing to the public/easier to place."). BLM's "Private Care Placement Team" recommended such an alternative featuring a "$1,500 incentive paid to individuals who . . . [a]dopt a 7 year or older [horse] and halter/saddle train" the animal, or an "$800 incentive paid to adopters who . . . [adopt a] 9 years and older burro and halter train." BLM_001933-34. Such training incentives could also "reduce[] the risk that [adopted animals] would be sold for slaughter," by creating a "bond [] between the adopter and the animal . . . that increases the likelihood the animal would be retained by the adopter." BLM_001480. Similarly, another training-based alternative would provide an "incentive for the trainer not the adopter," in which the trainer would work with the adopter for a year to train a horse and then receive a payment from BLM of $1850. BLM_001927.

A meaningful NEPA process would allow the public to explain why BLM should adopt alternative approaches—including those never before contemplated by the agency—that better protect wild horses and burros, while also increasing adoptions into good, permanent homes. For example, in order to ensure that taxpayer dollars BLM intends "to defray associated initial costs [of adoption], such as veterinary care, feed, and training" are actually spent on the care of these animals instead of merely being pocketed, the public would be able to propose alternatives featuring vouchers for such services instead of cash, or reimbursements for adopters who can prove through receipts that they actually spent money caring for adopted animals.

## V.   THE AIP CONSTITUTES AN ARBITRARY AND CAPRICIOUS DECISION

In addition to BLM's failure to observe procedures required by law when it issued and modified the AIP without notice-and-comment or NEPA review, the AIP runs afoul of the APA's requirements for reasoned decision-making in several other ways.

First, the AIP is arbitrary and capricious because in enacting and revising the Program, BLM failed to consider "relevant factors that the statute [being implemented] sets forth to guide the agency in its exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 371 (2018); *see also State Farm*, 463 U.S. at 43 (agency action must be "based on a consideration of the relevant factors").

Whether wild horses and burros will be treated humanely—and specifically whether they may be slaughtered—is unquestionably a relevant factor that BLM is obligated to consider when implementing the WHA. *See* 16 U.S.C. § 1331 ("It is the policy of Congress that wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death."). Indeed, Congress specifically required that BLM ensure humane treatment of adopted animals, allowing adoption only where the agency "determines [the adopter] can assure humane treatment and care (including proper transportation, feeding, and handling)." *Id.* § 1333(b)(2)(B). Moreover, Congress has repeatedly forbidden BLM from expending federal funds in a manner that leads to the slaughter of wild horses or burros. *See*, *e.g.*, Pub. L. 116-260 § 419(e). Accordingly, Congress has unequivocally clarified that when administering the WHA—and specifically when adopting horses to the public—the humane treatment of adopted animals and the possibility of them ending up in slaughterhouses are relevant factors BLM must consider.

Yet, BLM created and revised the AIP in a manner that fundamentally disregards the clear congressional intent that wild horses and burros must be treated humanely and must not be

slaughtered. In critical ways, the incentives that BLM selected for the AIP conflict with Congress's goal of preventing the slaughter of wild horses and burros and ensuring their humane treatment. To begin with, the choice of cash incentives foreseeably led to abuse by those more interested in money than the welfare of adopted animals, which BLM knew was likely to occur. Moreover, by the time BLM revised the AIP, Petitioners had provided the agency with *proof* of many AIP-adopted animals being sold at slaughter auctions. BLM nonetheless chose to continue paying an incentive of $1000 per adopted animal. The choice of $1000 cash incentives when revising the AIP—which BLM knew would lead to the sale of adopted animals at slaughter auctions—is in profound tension with Congress's intent to prevent slaughter of these animals.

Likewise, BLM's choice to provide incentives solely for the adoption of *untrained* animals was foreseeably likely to lead adopted animals to be sold into the slaughter pipeline. Again, BLM knew that "[g]entling and training mustangs and burros adds monetary value to the animals and reduces the risk that they would be sold for slaughter." BLM_001540-41; *see also* BLM_001927. Nonetheless, BLM designed the AIP to provide incentives only for untrained animals. Even after Petitioners provided the agency with proof that untrained animals adopted through the AIP were in fact arriving at slaughter auctions, BLM continued to offer incentives only for untrained animals as part of the minimally revised AIP. *See* BLM_004919-21.

Further, in revising the AIP, BLM retained nominal protections to avoid adopted animals being sold for slaughter *that had proven ineffective in the past*, without any meaningful effort to take BLM's own experience into consideration or improve the rigor of the agency's oversight. Although BLM requires adopters to sign a statement affirming that they do not intend to sell adopted animals for slaughter, this affirmation proved meaningless during the initial rollout of the AIP as dozens of wild horses and burros ended up in the slaughter pipeline. *See*

BLM_003895-3957. This is likely due to the fact that BLM takes the view that "once [wild horses and burros] are off the BLM books they are not BLM property," BLM_001926, meaning that BLM does not rigorously monitor or enforce adopters' statements that they will not sell adopted animals for slaughter. *See* BLM_003800-03 (documenting that BLM employees told adopters under the AIP that "[o]nce you get title [to these animals] . . . there is no limitation— you can do whatever you want with them."). BLM's failure to provide any more rigorous system for preventing the sale of adopted animals for slaughter—despite extensive evidence that essentially the same system had already resulted in many AIP horses and burros entering the slaughter pipeline—reinforces how the AIP is in tension with congressional intent to ensure that BLM's policies *actually* prevent these animals from being slaughtered.

Remarkably, when BLM revised the AIP, the agency actually made it *more difficult* for BLM to take action against adopters who sell animals into the slaughter pipeline. Originally, adopters had to sign a statement that they "will not sell or transfer ownership of [adopted animals] to any person or organization that intends to resell, trade, or give away such animals for slaughter or processing into commercial products." BLM_002284. However, in the revised AIP, BLM quietly altered this statement to state that adopters "will not ***knowingly*** sell or transfer ownership of [adopted animals] to any person or organization that intends to resell, trade, or give away such animals for slaughter or processing into commercial products." BLM_004924 (emphasis added). By adding the word "knowingly," BLM made it more difficult to prosecute fraudulent adopters, because BLM would have to prove not only that the purchaser intended to sell the animals for slaughter, but that the adopter was "aware that the result [wa]s practically certain to follow from his conduct." *U.S. v. Bailey*, 444 U.S. 394, 404 (1980). Hence, by adding

the word "knowingly" to its adoption contracts, BLM further contravened Congress's clear intent to prevent these animals from being slaughtered—yet never publicly analyzed this problem.

Finally, when BLM revised the AIP, it devoted no attention to the extensive proof that Petitioners, the New York Times, and dozens of members of Congress submitted demonstrating how the AIP had led to the sale of many wild horses and burros at slaughter auctions. Rather than halting the AIP as urged by the public or a least explicitly addressing these serious concerns in IM 2022-014, BLM made only minor tweaks to the AIP, leaving intact its core approach of providing $1000 cash incentives exclusively for the adoption of untrained animals—a system that was, and is, foreseeably likely to lead to the sale of wild horses and burros for slaughter.

In sum, BLM's decision to pay cash incentives to adopt untrained wild horses and burros—despite actual proof that the AIP has led to many animals entering the slaughter pipeline—constitutes arbitrary and capricious decision-making and it reflects BLM's failure to consider and vindicate congressional intent to protect these animals from *exactly this outcome*.

## CONCLUSION

For the reasons explained above, this Court should find BLM's establishment and revision of the AIP unlawful and vacate BLM's IMs and CE that govern this Program.

Respectfully submitted

*/s/ William S. Eubanks II*
William S. Eubanks II
bill@eubankslegal.com

Elizabeth L. Lewis
lizzie@eubankslegal.com

EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(970) 703-6060

*Counsel for Petitioners*