MEMORANDUM OF UNDERSTANDING
BETWEEN THE
WYOMING STATE GRAZING BOARD (WSGB)
WYOMING BUREAU OF LAND MANAGEMENT (BLM)
WYOMING DEPARTMENT OF AGRICULTURE (WDA)

Wyoming Wild Horse Pilot Project
(WWHPP)

**1.** **Parties.** This Memorandum of Understanding (hereinafter referred to as "MOU") is made and entered into by and between the Wyoming State Grazing Board (WSGB) whose address is P.O. Box 1202, Lander, Wyoming 82520, the Wyoming Bureau of Land Management (BLM) whose address is P.O. Box 1828, Cheyenne, Wyoming 82003, and the Wyoming Department of Agriculture (WDA) whose address is 2219 Carey Avenue, Cheyenne, Wyoming 82002.

**2.** **Purpose.** The purpose of this MOU is to provide a document that conveys the responsibilities of each of the parties to this MOU to accomplish the common objective of management of wild horses that now occupy public, private, and state rangelands in Wyoming at population levels that protect the health of watersheds. The parties to this MOU agree that if wild horse populations in existing Herd Management Areas (HMA's) are maintained at no more than current Appropriate Management Levels (AML's), this objective will be accomplished. We will work together to try to preclude a situation where large numbers of wild horses might starve when winter habitat is in limited supply. We feel that these objectives compliment and comply with the Congressional mandate that wild horses be managed, "in a manner that is designed to achieve and maintain a thriving ecological balance on the public lands". (Section 3, P.L. 92-195, Wild Horse & Burro Act of 1971). The parties to this MOU agree it is in the best interest of watershed health, wildlife resources, the livestock business, and the economy and custom and culture of Wyoming to achieve the objective of long term management of wild horses at AML's. We agree that all of the resources of Wyoming should contribute to the quality of life we enjoy in this State. Some of these resources should also contribute to the economy of our State, and we believe that wild horses have the potential to provide not only a visual and aesthetic contribution, but that they can also become a tourist attraction that could contribute to our economy. We will work together to provide a humane situation for wild horses in Wyoming, either on the range within their HMA's, or under adoption or sanctuary situations. The parties to this MOU are dedicated to the objective of maintaining a viable wild horse population that will be considered by our residents and visitors as a positive contribution to our State. This MOU is intended to provide means in addition to the BLM's existing wild horse management program for the purpose of management of wild horses under humane conditions and in a thriving ecological balance with other multiple use resources of Federal lands in Wyoming. This MOU will address the responsibilities of each party in four main categories. They are:

a) inventories of existing numbers of wild horses and their current locations
b) removal efforts to reduce existing number to AML's
c) finding homes for Wyoming wild horses deemed in excess of AML's
d) long term maintenance of wild horse numbers at AML's

BLM_000001

**3.** **Term of MOU.** This MOU shall commence upon the day and date last signed and executed by the duly authorized representatives of the parties to this MOU and shall remain in full force and effect until December 31, 2005. This MOU may be terminated, without cause, by either party upon thirty (30) days written notice, which notice shall be delivered by hand or by certified mail.

**4.** **Payment.** No payment shall be made to either party by the other party as a result of this MOU.

**5.** **Responsibilities of the WSGB.**
**A.** In cooperation with the Wyoming Business Council and the Department of Agriculture, cause to be conducted a feasibility study of the potential for private adoption or long term sanctuary, or an appropriate combination of these two, of up to sixty (60) horses per location within Wyoming, for wild horses gathered from Wyoming ranges and deemed "unadoptable" by the Wyoming BLM through their national adoption program. These horses are usually older than five (5) years old. As of the date of signing of this MOU, the feasibility study has been completed.

**B.** In cooperation with the other parties to this MOU, review the results of the feasibility study. If the results of this review conclude that there is sufficient demand within the State of Wyoming for increased adoption or long term sanctuary for older horses that are not adopted by the public, the WSGB will work to find specific locations on which to implement these programs in Wyoming.

**C.** The WSGB will directly encourage ranchers in Wyoming, or anyone else in Wyoming with land and facilities that meet BLM qualifications, to accept at no cost to any of the parties to the MOU, from one (1) to ten (10) horses that are considered by the BLM to be "unadoptable". These parties will be asked to provide a safe and humane pasture or rangeland home for these horses for the remainder of their natural life under the periodic supervision of the BLM or their designee.

**D.** The WSGB will directly participate in a search for locations in Wyoming that have facilities and land that would qualify as pasture locations for wild horses deemed "unadoptable" by the BLM. The owners of these locations will be asked to negotiate an agreement with the parties to this MOU to provide a safe and humane long-term home to up to sixty (60) horses per location. The first ten (10) horses of the up to sixty (60) total, can be chosen by the owner, from the pool of horses available to this program. The remaining fifty (50) horses will be chosen by the BLM from this pool of older horses by gate cut.

**E.** The WSGB will provide information to Wyoming's Congressional delegation regarding the WWHPP in response to the requests by the Congressional delegation regarding funding for this program. This information will include, but not be limited to, the information gained from the feasibility study and from the BLM regarding the anticipated number of wild horses to be eligible for placement in the program. Up to two thousand (2000) horses gathered from Wyoming ranges over the time period of 2001 to 2005 will be available for this program.

MOU Between the WSGB, BLM, and the WDA
Page 2 of 6

BLM_000002

**F.** The WSGB will work to secure funding to support payment of transportation costs of horses from holding facilities to the location of public service program or the pasture program, if funds available from the BLM or other sources are not available for this purpose.

**G.** The WSGB will work with the other parties to this MOU, and other individuals and groups interested in supporting the WWHPP to provide additional educational and recreational opportunities for Wyoming citizens and our visitors to view and learn about will horses in Wyoming. The WSGB has proposed to the other parties to this MOU that a minimum of three (3) public education/wild horse viewing areas be developed near existing tourist travel routes to Yellowstone National Park, one north of Rock Springs, one east of Cody, and one near Lander/Riverton.

**H.** The WSGB agrees that the wild horse situation in Southwest Wyoming deserves a high priority from the WWHPP and agrees that the Rock Springs Grazing Association is a party to an Agreement with the Wyoming BLM on issues involved in managing wild horses in Southwest Wyoming.

**I.** The WSGB will assist with the advertising and promotion of the wild horse adoption program.

**6.** . **Responsibilities of the BLM.**
**A.** The BLM agrees, subject to available appropriations, to commit the resources necessary to reduce wild horse numbers in every HMA in Wyoming to the lower level prescribed in the AML over the next three-year period.

**B.** The Wyoming BLM will keep the other parties to this MOU informed as to the number of horses available for placement under this MOU.

**C.** The Wyoming BLM agrees to develop cost estimates for what Wyoming BLM's share would be from the National BLM's base program in the existing wild horse program, the FY 2002 initiative, and costs estimates for the BLM's responsibilities of their share of the costs of performance of the project over the next three (3) years.

**D.** The Wyoming BLM agrees to ask for a commitment from the National BLM and the Department of the Interior to ensure that the Wyoming BLM will annually receive its proportionate share of the base wild horse budget, and proportionate share of the funds from the FY 2002 initiative, and other sources dedicated to the BLM's wild horse program.

**E.** When offers from private sources to adopt older horses under the regular BLM Adopt a Horse Program or under a public service program for up to ten (10) horses as expressed in the WWHPP, or offers to provide pasture for more than ten (10) horses under the WWHPP are received by the parties to this MOU, applicants will be selected by agreement of the parties to this MOU. The Wyoming BLM will determine whether the application meets the adoption requirements. Successful applicants will enter into a modified adoption agreement with the BLM. The contra ct will be the

BLM_000003

standard "Private Maintenance and Care Agreement" with additional provisions that the fee will be waived and title will not pass. The possibility of titling may be re-evaluated at some later time. Waiver of the adoption fee will require BLM Director approval.

**F.** The BLM will transfer funds under a separate contract to the State Department of Agriculture for those applicants who are selected to adopt more than ten (10) horses under this MOU for the purpose of providing a grant to those successful applicants to help defray the expense of long-term housing of the animals.

**G.** The Wyoming BLM will assure, through its Will Horse & Burro Compliance Program, humane treatment of all horses placed in private facilities under this MOU and that all facilities meet BLM standards. BLM will assume responsibility for humane destruction of any horse in the WWHPP at any point in time when it is determined by a licensed veterinarian that it can not humanely survive on its own in a Wyoming rangeland environment.

**H.** The Wyoming BLM will try to expand the time period for their roundup program into the winter season when weather permits.

**I.** The BLM will cooperate with the other parties to this MOU to develop an appropriate public relations and awareness program for items included in the WWHPP.

**7.** **Responsibilities of the WDA**.
**A.** In cooperation with the WSGB and the Wyoming Business Council, cause to be conducted a feasibility study of whether or not a demand exists in Wyoming for placement of older horses deemed "unadoptable" by the BLM into private, long-term adoption or pasture locations. It is the intent of the WDA and WSGB that this feasibility study be completed by July 1, 2000. As of the date of signing of this MOU, the feasibility study has been completed.

**B.** The WDA agrees to administer any funds dedicated to the performance of this MOU from state or private sources, as well as any federal money available through specific appropriations act language or in accordance with an economy act agreement. Decisions of the expenditure of funds dedicated to the WWHPP will be made by the parties to this MOU, unless otherwise conditioned by the source of the funds. Funds will be transferred to the WDA under a separate agreement.

**C.** The WDA will determine if facilities at the State Fair location in Douglas, Worming, or other locations in Wyoming, would be available to provide temporary housing for horses deemed not adoptable by the BLM until they can be placed into a permanent home. The WDA will notify the other parties as to the cost of such temporary housing.

**D.** The WDA will communicate the objectives of the WWHPP to the office of the Governor of Wyoming and other state agencies that could provide support and assistance to this projects.

**E.** The WDA will assist with the advertising and promotion of the wild horse adoption program.

BLM_000004

8.   **General Provisions**.

**A.   Amendments.**   Either party may request changes in this MOU.   Any changes, modifications, revisions, or amendments to this MOU, which are mutually agreed upon by and between the parties to this MOU, shall be incorporated by written instrument, executed and signed by all parties to this MOU.

**B.   Applicable Law.**   The construction, interpretation and enforcement of this MOU shall be governed by the laws of the State of Wyoming.   Nothing in this MOU is intended to preclude efforts by the BLM to conduct their wild horse management program consistent with the Wild Horse & Burro Act, existing Federal Statutes and other directions from Congress.   This MOU is intended to provide means in addition to the BLM's existing Wild Horse Management Program for the purpose of the management of wild horses under humane conditions and in a thriving ecological balance with the other multiple use of resources of federal lands in Wyoming.

**C.   Entirety of Agreement.**   This MOU, consisting of six (6) pages, represents the entire and integrated agreement between the parties and supersedes all prior negotiations, representations and agreements, whether written or oral.

**D.   Prior Approval.**   This MOU shall not be binding upon either party unless this MOU has been reduced to writing before performance begins as described under the terms of this MOU, and unless this MOU is approved as to form by the Attorney General or his representative.

**E.   Severability.**   Should any portion of this MOU be judicially determined to be illegal or unenforceable, the remainder of the MOU shall continue in full force and effect, and either party may renegotiate the terms affected by the severance.

**F.   Sovereign Immunity.**   The Wyoming State Department of Agriculture (WDA) does not waive their sovereign immunity by entering into this MOU, and fully retains all immunities and defenses provided by law with respect to any action based on or occurring as a result of this MOU.

**G.   Third Party Beneficiary Rights.**   The parties do not intend to create in any other individual or entity the status of third party beneficiary, and this MOU shall not be construed so as to create such status.   The rights, duties and obligations contained in this MOU shall operate only between the parties to this MOU, and shall inure solely to the benefit of the parties to this MOU.   The provisions of this MOU are intended only to assist the parties in determining and performing their obligations under this MOU.   The parties to this MOU intend and expressly agree that only parties signatory to this MOU shall have any legal or equitable right to seek to enforce this MOU, to seek any remedy arising out of a party's performance or failure to perform any term or condition of this MOU, or to bring an action for the breach of this MOU.

**THIS SPACE LEFT INTENTIONALLY BLANK**

BLM_000005

9.   **Signatures.**   In witness whereof, the parties to this MOU through their duly authorized representatives have executed this MOU on the days and dates set out below, and certify that they have read, understood, and agreed to the terms and conditions of this MOU as set forth herein.

The effective date of this MOU is the date of the signature last affixed to this page.

**WYOMING STATE GRAZING BOARD**

_____          _____
Douglas Thompson, Chairman                       Date   12/4/01

**WYOMING BUREAU OF LAND MANAGEMENT**

_____          _____
Al Pierson, Wyoming Director                       Date   12/4/01

**WYOMING DEPARTMENT OF AGRICULTURE**

_____          _____
Ron Micheli, Director                                    Date   12/4/01

**ATTORNEY GENERAL'S OFFICE APPROVAL AS TO FORM**

_____          _____
Mary Loos, Assistant Attorney General           Date   11/30/01

MOU Between the WSGB, BLM, and the WDA
Page 6 of 6

**Form 1511-1**
**(February 1989)**

**United States Department of the Interior**
**Bureau of Land Management**

# ASSISTANCE AGREEMENT

NOTE: By signing this document, the recipient accepts this agreement and agrees to perform in accordance with all the enclosed terms, conditions, and documents attached hereto.

PAGE  1   OF   10  PAGES

**1. AGREEMENT NO.**
KAA020002

**2. TASK ORDER NO.**

**3. TYPE OF AGREEMENT (Check One)**
[ ]  GRANT
[X]  COOPERATIVE AGREEMENT

| | |
|---|---|
| **4. NAME, ADDRESS, AND PHONE NO. OF ASSISTANCE OFFICER**<br>Lou Maestas<br>Bureau of Land Management<br>P.O. Box 1828<br>5353 Yellowstone Road<br>Cheyenne, WY 82003<br>Phone No. (307) 775-6057 | **5. NAME, ADDRESS, AND PHONE NO. OF RECIPIENT**<br>Ron Micheli, Director<br>Wyoming Department of Agriculture<br>2219 Carey Avenue<br>Cheyenne, WY 82002<br>Phone No. (307) 777-7321 |
| **6. NAME, ADDRESS, AND PHONE NO. OF ASSISTANCE REPRESENTATIVE**<br>Don Glenn<br>Bureau of Land Management<br>P.O. Box 1828<br>5353 Yellowstone Road<br>Cheyenne, WY 82003<br>Phone No. (307) 775-6097 | **7. NAME, ADDRESS, AND PHONE NO. OF RECIPIENT'S PROJECT MANAGER**<br>Jim Schwartz<br>Wyoming Department of Agriculture<br>2219 Carey Avenue<br>Cheyenne, WY 82002<br>Phone No. (307) 777-6591 |
| **8. PROGRAM STATUTORY AUTHORITY**<br>*Federal Land Policy and Management Act of 1976* | **9. STARTING DATE**<br>(See Block 17c) |
| **10. EFFECTIVE DATE**<br>(See Block 17c) | **11. COMPLETION DATE**<br>September 30, 2005 |

**12. TYPE OF RECIPIENT (Check Appropriate Box)**
[X]  STATE
[ ]  LOCAL GOVERNMENT
[ ]  INDIAN TRIBAL GOVERNMENT
[ ]  EDUCATIONAL INSTITUTION
[ ]  INDIVIDUAL
[ ]  FOR-PROFIT ORGANIZATION
[ ]  NON-PROFIT ORGANIZATION
[ ]  OTHER (Specify) _____

**13. FUNDING INFORMATION (Insert Appropriate Funding)**

| | Recipient | BLM |
|---|---|---|
| This Obligation | $_____ | $200,000 |
| Previous Obligation | $_____ | $_____ |
| Total Obligation | $_____ | $200,000 |
| Share Ratio | 28 % | 72 % |

**14. ACCOUNTING AND APPROPRIATION DATA**
WY930 1060 HG 25 2F

**15. PROJECT TITLE AND BRIEF SUMMARY OF THE PURPOSE AND OBJECTIVES**
WYOMING WILD HORSE PILOT PROJECT

This cooperative agreement will provide for the cooperative effort between the parties to assist in management of unadoptable wild horses by outlining procedures under which landowners will provide long term pasture care for these wild horses. This agreement will delineate the means for transferring funds which will be used to provide financial assistance to landowners who will provide long term pasture homes for up to 60 wild horses.

| **16a. NAME AND TITLE OF SIGNER (Type or print)** | | **17a. NAME AND TITLE OF ASSISTANCE ORDERING OFFICER (Type or print)** | |
|---|---|---|---|
| **17b. RECIPIENT**<br>(See Approvals)<br>*(Authorized Signature)* | **16c. DATE SIGNED** | **17b. UNITED STATES OF AMERICA**<br>(See Approvals)<br>BY _____<br>*(Signature of Assistance Officer)* | **17c. DATE SIGNED** |

Cooperative Agreement KAA000003                           Page 2 of 10 Pages
Wyoming Wild Horse Pilot Project

I.   STATEMENT OF JOINT OBJECTIVES

   A.   Background:

        1.  Based on current inventories and professional estimates, wild horse
        numbers on BLM, State, and private lands in Wyoming in 2001 are in excess
        of 7000 animals. This number is more than double the appropriate management
        levels, ( AML's ), as provided by Federal Land Use Plan Decisions. BLM
        documents reveal that the numbers will continue to escalate out of control
        unless solution based ideas, money, and manpower in addition to the current
        federal policies are applied to the wild horse program in Wyoming. One of
        the major threats to watershed health is an overabundance of wild horses on
        rangelands.

        2.  During FY 1999, the BLM completed a comprehensive program capability
        and population modeling analysis. This analysis revealed that at current
        funding capability and adoption demand, wild horse populations will
        increase at a rate faster than their ability to remove excess animals. The
        parties to this cooperative agreement agree that innovative ideas need to
        be developed and implemented to accomplish our common objective to manage
        wild horses on Wyoming rangelands at levels that will protect the resource
        and preclude possible massive starvation of wild horses on open range
        during the winter period in Wyoming .

        3.  It is estimated that wild horse populations increase at a rate of about
        18-20% per year.  Failure to control wild horse populations results in
        damage to rangeland resources, declining wildlife species habitat, a loss
        in carrying capacity for wild horses and livestock, and ultimately a
        decline in the health of the wild horses themselves and their ability to
        survive the harsh Wyoming winters.

   B.   Purpose:  This Cooperative Agreement is made and entered into by the U.S.
        Department of the Interior, Bureau of Land Management, Wyoming State Office
        (BLM) and the Wyoming Department of Agriculture (DOA) is to provide a means
        to accomplish the common objective of  This document will provide the means
        of transferring funds to the  DOA) and outlining procedures under which
        private landowners may provide a long term pasture home for up to 60 older
        wild horses per location.

   C.   Objectives:  To ensure proper management of wild horses that now occupy
        public, private, and state rangelands in Wyoming and primarily dealing with
        the older wild horses.  The BLM's wild horse adoption program has not
        provided a satisfactory outlet for the older horses and this agreement will
        assist and provide a sensible approach to deal with the problem of adopting
        these older horses.

   D.   Authority:  This Agreement is issued in accordance with the following:

        1.  Section 307(c) of the Federal Land Policy and Management Act of 1976,
        (Public Law 94-579), as amended.

        2.  Section 6 of the Wild Horse and Burro Act of 1971 (Public Law 92-195)
        as amended.

        3.  The Public Rangeland Improvement Act (Public Law 95-514)

E.  Benefits: According to an economic analysis completed on this project, the
total present value cost per horse on BLM sanctuaries is $4530.  The total
present value cost per horse under this agreement is $1082 including
compliance cost.  Housing older horses under this agreement is more cost-
effective than housing them in BLM sanctuaries, with a dollar difference of
$3,448 per horse ($4530 - $1082).

II.  DEFINITIONS

A.  Agreement means this cooperative agreement.

B.  Assistance Officer (AO) means the BLM's authorized assistance officer
responsible for obligating the BLM's funds and administering this
Cooperative Agreement.

C.  Assistance Representative (AR) means the Bureau of Land Management official
responsible for technical administration responsibilities under this
Cooperative Agreement in accordance with the duties designated by the AO.

D.  BLM means the Bureau of Land Management.

E.  DOA means the Wyoming Department of Agriculture.

F.  CFR means Code of Federal Regulations.

H.  Fiscal Year means the Federal fiscal year which extends from October 1 of
one year through September 30 of the following year.

I.  Not-to-Exceed (NTE) Amount means the maximum Federal funding amount.

J.  OMB Circular means the Office of Management and Budget circulars which are
normally printed in the Federal Register to establish principles and
administrative procedures and requirements.

K.  Statement of Work (SOW) is the part of the Task Order that specifies the
work to be accomplished.

III.  PROJECT MANAGEMENT PLAN

A.  The DOA agrees to:

1.  Upon receipt of a fully executed Private Maintenance and Care Agreement
and a Performance Bond, distribute funds to the landowner(s) whose name(s)
will appear on said agreement.  Bond shall name the DOA as beneficiary, for
the full amount of the Grant for the first year, six hundred dollars
($600.00) per horse for the second year, and two hundred dollars ($200.00)
per horse for the third year.

2.  File a claim with the Bonding Company of the insured, when notified by
the BLM of a default of the Private Maintenance and Care Agreement.  Net
benefits shall be forwarded on to the BLM upon receipt.

3.  Not be responsible for the Private Maintenance and Care Agreement or
its contents if not fully carried out within the specifications of the
Agreement.

    4.  Assist the landowner(s) in obtaining a Performance Bond as outlined in the Private Maintenance and Care Agreement.

B.  The BLM agrees to:

    1.  Provide DOA with a copy of a fully executed Private Maintenance and Care Agreement.

    2.  Be responsible for monitoring the landowner activities in accordance with the Private Maintenance and Care Agreement.

    3.  Provide the necessary documentation to the DOA if a landowner defaults. Using that documentation, the Agency will file a claim with the Bonding Company.

    4.  Provide funds to the State Department of agriculture for those applicants who are selected to adopt over 10 horses in the amount of $1000 per horse for each horse over the first 10 to be placed at the applicant's facility.

C.  Procedures: All parties will cooperatively advertize for applicants to participate in the Wyoming Wild Horse Pilot Project, and will cooperatively select applicants in Fiscal Year 2001 who will adopt from 11 to 60 older (over 5 years of age) wild horses under a modified private maintenance and care agreement (copy attached).  BLM shall have final authority to approve the applicants.  Successful applicants will receive a grant from the DOA in the amount of $1000 per horse for all horses over the first 10 up to 60 head maximum.  The maximum amount of the grant shall be $50,000.  The purpose of the grant shall be to help defray the expense of long term feed and care of the adopted horses.  To protect the public's investment, the successful applicant shall be required to purchase a performance bond for the full amount of the grant ($1,000 per horse) for the first year, for $600 per horse in the 2nd year, and for $200 per horse in the 3rd year. After the 3rd year, the bond will no longer be required.

IV.  TERM OF AGREEMENT

This agreement shall become effective on the date of the last signature  and shall remain in effect through December 31, 2005, unless terminated in accordance with the provisions of 43 CFR, Subpart F, Section 12.961.

V.  TASK ORDER MANAGEMENT

Task Orders may be issued under the terms and conditions of this agreement for specific projects through which planning and implementation of specific cooperative activities or efforts will be conducted.  The BLM AO and the DOA's Authorized Official must approve and sign the task order prior to commitment of funds or initiation of work to be performed.

VI.  FINANCIAL DATA, APPROPRIATIONS, AND PAYMENTS

A.  Financial Support

The BLM agrees to provide funding the the DOA in the amount of (Not-To-

Exceed) $200,000 for which the DOA will monitor to pay successful wild horse pilot program applicants.  The BLM shall not be obligated to pay for nor shall the DOA be obligated to perform any effort that will require the expenditure of federal funding exceeding the above amount.

B.    Payments:

1.    Electronic Funds Transfer Payments:

a.    Payment under this agreement will be made by the Government by electronic funds transfer (through the Treasury Fedline Payment System (FEDLINE) or the Automated Clearing House (ACH)).

b.    After award, but no later than 14 days before an invoice or agreement financing request is submitted, the Recipient shall designate a financial institution for receipt of electronic funds transfer payments (SF-3881), and shall submit this designation to the following address:

Bureau of Land Management
Service Center, SC-616
Denver Federal Center, Bldg. 50
P.O. Box 2047
Denver, CO  80225-0047

c.    If a designation has been submitted to the Bureau of Land Management under a previous agreement it is not necessary to complete another SF-3881 unless you are changing your designation of financial institution.

2.    The DOA shall be entitled to advance payment or reimbursement at least quarterly upon submission of an original Request for Advance or Reimbursement, Standard Form (SF) 270 to the AR, who will after verification of correctness, then forward to the AO.

3.    If advance payments are made the DOA must submit a Federal Cash Transaction Report, SF 272 to the AR 15 working days following the end of each quarter, who will after verification of correctness, then forward to the AO.

4.    Advance payments shall be made only in amounts necessary to meet current disbursement needs and shall be scheduled so that the funds are available only immediately prior to their disbursement.

VII.    PROPERTY MANAGEMENT AND DISPOSITION

Any BLM property used or other property acquired under this agreement, including intangible property such as copyrights and patents shall be governed by the provisions of 43 CFR, Subpart F, Section 12.931 through 12.937.

VIII.   DELIVERABLES AND REPORTS

Submit one copy of an annual performance report to the AR within 90 days after the end of the fiscal year.  The performance report must be prepared in accordance with 43 CFR, Subpart F, Section 12.951 and address items such as a

comparison of actual accomplishments with established goals, reasons why goals may not have been met, cost overruns and any other pertinent information.


IX.   KEY OFFICIALS

A.   Name, Address and Phone No. of BLM Assistance Officer:

Luis Maestas
Bureau of Land Management
5353 Yellowstone Rd.
P.O. Box 1828
Cheyenne, WY 82003
(307) 775-6057

The AO is the only individual authorized to obligate funds, award, modify or terminate the agreement or any task order thereto. The AO is responsible for issuing task orders, monitoring agreement and task and task order compliance, enforcing the agreement provisions, issuing timely performance and payment approvals, terminating the agreement or any task order thereto and closing out the agreement.

B.   Name, Address and Phone No. of BLM Assistance Representative:

Don Glenn
Bureau of Land Management
P.O. Box 1828
5353 Yellowstone Road
Cheyenne, WY 82003
Phone No. (307) 775-6097

The Assistance Representative will be designated for the purpose of administering the technical aspect of the agreement. The AR is authorized to clarify technical requirements, and to review and approve work which is clearly within the scope of the work specified in this agreement. The AR is not authorized to issue changes or in any other way modify this agreement.


C.   Name Address and Phone No. of the DOA's Authorized Official:

Ron Micheli, Director
Wyoming Department of Agriculture
2219 Carey Avenue
Cheyenne, WY 82002
Phone No. (307) 777-7321

D.   Name, Address and Phone No. of the DOA's Project Manager:

Jim Schwartz
Wyoming Department of Agriculture
2219 Carey Avenue
Cheyenne, WY 82002
Phone No. (307) 777-6591

X.   SPECIAL TERMS AND CONDITIONS

A.   <u>Order of Precedence</u>: Any inconsistency in this cooperative agreement shall
be resolved by giving precedence in the following order: (a) Any national
policy requirements or standards; (b) requirements of the applicable OMB
and Treasury Circulars; (c) 43 CFR Part 12; (d) special terms and
conditions; and (e) all Cooperative Agreement sections, documents,
exhibits, and attachments.

B.   <u>Modifications</u>: Modifications or changes to the terms of this agreement
shall be made only upon mutual written agreement by the parties and
approved by the BLM AO and the DOA's Authorized Official. Changes must be
within the original scope of the agreement. Administrative changes (i.e.
assistance officer name change) which do not change the project management
plan, NTE, etc. or otherwise affect the recipient may be signed
unilaterally by the AO.

C.   <u>Applicable Law</u>: The construction, interpretation and enforcement of this
Agreement shall be governed by Federal law and the laws of the State of
Wyoming. Nothing in this Agreement is intended to preclude efforts by the
BLM to conduct their wild horse management program consistent with the Wild
Horse and Burro Act, existing Federal Statutes and other directions from
Congress. This Agreement is intended to provide a means in addition to the
BLM's existing wild horses management program for the purpose of management
of wild horses under humane conditions and in a thriving ecological balance
with the other multiple use resources of Federal lands in Wyoming. The
courts of the State of Wyoming, shall have jurisdiction over any action
arising out of this Agreement and over the parties, and the venue shall be
the First Judicial District, Laramie County, Wyoming.

D.   <u>Availability of Funds</u>: Each payment obligation of either party is
conditioned upon the availability of government funds which are
appropriated or allocated for the payment of this obligation. If funds are
not allocated and available for the continuance of the services performed
by either party, the Agreement may be terminated by either party at the end
of the period for which the funds are available. Each party shall notify
the other party at the earliest possible time of the services which will or
may be affected by a shortage of funds. No penalty shall accrue to either
party in the event this provision is exercised, and neither party shall be
obligated or liable for any future payments due or for any damages as a
result of termination under this section. This provision shall not be
construed to permit either party to terminate this Agreement to acquire
similar services from another party.

E.   <u>Entirety of Agreement</u>: This Agreement, consisting of ten (10) pages,
represents the entire and integrated agreement between the parties and
supersedes all prior negotiations, representations and agreements, whether
written or oral.

F.   <u>Prior Approval</u>: This Agreement shall not be binding upon either party
unless this Agreement has been reduced to writing before performance begins
as described under the terms of this Agreement, and for the State of
Wyoming, unless this Agreement is approved as to form by the Attorney
General or her representative.

G.   <u>Severability</u>: Should any portion of this Agreement be judicially
determined to be illegal or unenforceable, the remainder of the Agreement

Case 1:21-cv-02146-REB   Document 47-2   Filed 10/14/22   USDC Colorado   Page 14 of 162

shall continue in full force and effect, and either party may renegotiate the terms affected by the severability.

H.   Sovereign Immunity:  The parties do not waive sovereign immunity by entering into this Agreement, and fully retain all immunities and defenses provided by law with respect to any action based on or occurring as a result of this Agreement.

I.   Third Party Beneficiary Rights:  The parties do not intend to create in any other individual or entity the status of third party beneficiary, and this Agreement shall not be construed so as to create such status.  The rights, duties and obligations contained in this Agreement shall operate only between the parties to this Agreement, and shall inure solely to the benefit of the parties to this Agreement.  The provisions of this Agreement are intended only to assist the parties in determining and performing their obligations under this Agreement.  The parties to this Agreement intend and expressly agree that only parties signatory to this Agreement shall have any legal or equitable right to seek to enforce this Agreement, to seek any remedy arising out of a party's performance or failure to perform any term or condition of this Agreement, or to bring an action for the breach of this Agreement.

XI.  GENERAL PROVISIONS

A.   Nothing in the Agreement shall be construed as affecting the authorities of the participants or as binding beyond their respective authorities or to require either participant to obligate or expend funds in excess of available appropriations.

B.   National Policy Requirements and Administrative Management Standards:  All applicable national policy requirements and administrative management standards as set forth in the Office of Management and Budget, Financial Management Division, Directory of Policy Requirements and Administrative Standards for Federal Aid Programs are incorporated by reference.

C.   43 CFR Part 12, Administrative and Audit Requirements and Cost Principles for Assistance Programs is incorporated by reference.

D.   Federal Acquisition Regulation (FAR) at 48 CFR Part 31 is incorporated by reference.

E.   43 Code of Federal Regulations (CFR) Part 12, Appendix A to Subpart D, Certification Regarding Debarment, Suspension, and Other Responsibility Matters - Primary Covered Transaction and completed Form DI-1953 are incorporated by reference.

F.   43 CFR Part 12, Appendix C to Subpart D, Certification Regarding Drug-Free Workplace Requirements, Alternate I and completed Form DI-1955 are incorporated by reference.

G.   31 U.S.C. 1352, Certification Regarding Lobbying and completed Form DI-1963 are incorporated by reference.

H.   Pursuant to Sec. 310 of the Department of the Interior and Related Agencies Appropriations Act, 1994, Public Law 103-138, 107 Stat. 1312, please be advised of the following:

In the case of any equipment or product that may be authorized to be purchased with financial assistance provided using funds made available in this Act, it is the sense of the Congress that entities receiving the assistance should, in expending the assistance, purchase only American-made equipment and products.

Recipient agrees to follow the procedures in 43 CFR Part 12, Subpart E - Buy American Requirements for Assistance Programs (See Federal Register, Vol. 59, No. 137, July 19, 1994, Pages 36713 - 36717).

I.  <u>Officials Not to Benefit</u>.  No member of or delegate to Congress, or resident commissioner, shall be admitted to any share of this agreement, or to any benefit arising from it.  However, this clause does not apply to this agreement to the extent that this agreement is made with a corporation for the corporation's general benefit.

J.  <u>Compliance With Buy American Act</u>.  Pursuant to Sec. 307 of the Department of the Interior and Related Agencies Appropriations Act of 2000, Public Law 106-113, be advised of the following:

1.  None of the funds made available in this agreement may be expended by a recipient unless the recipient agrees that in expending the funds the recipient will comply with sections 2 through 4 of the Act of March 3, 1933 (41 U.S.C. 10a-10c; popularly known as the "Buy American Act").

2.  Purchase of American-made equipment and products.  In the case of any equipment or product that may be authorized to be purchased with financial assistance provided using funds made available in this Act, it is the sense of the Congress that entities receiving the assistance should, in expending the assistance, purchase only American-made equipment and products.

3.  Recipient also agrees to follow the procedures in 43 CFR Part 12, Subpart E, Section 12.700 - Buy American Requirements for Assistance Programs.

K.  <u>Opposition to Any Legislation</u>.  Pursuant to Sec. 303 of the Department of the Interior and Related Agencies Appropriations Act of 2000, Public Law 106-113, recipient shall not use any part of the Government's funds for any activity or the publication or distribution of literature that in any way tends to promote public support or opposition to any legislative proposal on which Congressional action is not complete.

L.  <u>Increasing Seat Belt Use in the United States</u>.  Recipients of grants/cooperative agreements and/or sub-awards are encouraged to adopt and enforce on-the-job seat belt use policies and programs for their employees when operating company-owned, rented, or personally owned vehicles.  These measures include, but are not limited to, conducting education, awareness, and other appropriate programs for their employees about the importance of wearing seat belts and the consequences of not wearing them.

Cooperative Agreement KAA000003                    Page 10 of 10 Pages
Wyoming Wild Horse Pilot Project

XII.    APPROVALS

Signatures:  In witness whereof, the parties to this Agreement through their duly
authorized representatives have executed this Agreement on the days and dates set
out below, and certify that they have read, understood, and agreed to the terms
and conditions of this Agreement as set forth herein.

FOR THE WYOMING DEPARTMENT OF AGRICULTURE

_____          12/12/01
Ron Micheli, Director                       Date

By: (Approved as to Form)

_____          12/7/01
State Attorney Representative                Date

FOR THE U.S. DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT

By:
_____          13/8/01
Wyoming State Director                       Date

By:
_____          10.4.01
Assistance Officer, WSO                      Date

Form 1511-2
(February 1989)

United States Department of the Interior
Bureau of Land Management

**AMENDMENT OF REQUEST FOR
APPLICATION/MODIFICATION OF
ASSISTANCE AGREEMENT**

PAGE 1  OF 1  PAGE(S)

1. AMENDMENT/MODIFICATION NO.
003

2. EFFECTIVE DATE
9/26/2003

3. REQUISITION NO.

| 4. ISSUED BY | 5. ADMINISTERED BY *(if other than item 4)* |
|---|---|
| Bureau of Land Management<br>5353 Yellowstone Road<br>P.O. Box 1828<br>Cheyenne, WY 82003 | |

| 6. NAME AND ADDRESS OF RECIPIENT *(No., street, county, state, and ZIP code)* | | |
|---|---|---|
| Wyoming Department of Agriculture<br>2219 Carey Avenue<br>Cheyenne, WY 82002 | (X) | 7A. AMENDMENT OF REQUEST FOR APPLICATION NO. |
| | | 7B. DATED |
| | X | 8A. MODIFICATION OF ASSISTANCE AGREEMENT NO.<br>KAA020002 |
| | | 8B. DATED<br>12/04/01 |

9. THIS ITEM ONLY APPLIES TO AMENDMENTS OF REQUEST FOR APPLICATION

[ ] The above numbered Request is amended as set forth in Item 10. The hour and date specified for receipt of Application [ ] is extended, [ ] is not extended.
Applicants must acknowledge receipt of this amendment prior to the hour and date specified in the Request or as amended by one of the following methods:
a) By completing Items 6 and 13, and returning ___ copies of the amendment; b) By acknowledging receipt of this amendment on each copy of the Application submitted; or c) By
separate letter or telegram which includes a reference to the Request for Application and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE
DESIGNATED FOR THE RECEIPT OF APPLICATIONS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOU APPLICATION. If by virtue of this amendment you
desire to change an application already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the Request for Application and this
amendment, and is received prior to the hour and date specified.

10. DESCRIPTION OF AMENDMENT/MODIFICATION *(Attach additional pages if needed)*

WYOMING WILD HORSE PILOT PROJECT

This unilateral modification is to de-obligate additional funding originally obligated on
Modification 002  Therefore, the total amount of the agreement is changed back to the original
amount of $50.000.00 reflecting a net decrease of $50,000.00.

Except as provided herein, all terms and conditions of the document referenced in Item 7A or 8A above, as heretofore changed, remain unchanged and in full force and effect.

11. ACCOUNTING AND APPROPRIATION DATA *(if required)*

WY930 03 1060HG 25 2F -  **(Decrease of $50,000)**

12. IMPORTANT:  Recipient [X] is not, [ ] is required to sign this document and return ____ copies to the issuing office.

| 13A. NAME AND TITLE OF SIGNER *(Type or print)* | | 14A. NAME AND TITLE OF ASSISTANCE OFFICER *(Type or Print)*<br>Luis Maestas, Assistance Officer | |
|---|---|---|---|
| 13B. RECIPIENT/APPLICANT<br><br>*(Authorized Signature)* | 13C. DATE SIGNED | 14B. UNITED STATES OF AMERICA<br><br>*Signature of Assistance Officer* | 14C. DATE SIGNED<br>9/26/03 |

BLM_000017

**Nathan, Alexi L**

| | |
|---|---|
| **From:** | Steven_Wells@blm.gov |
| **Sent:** | Friday, February 22, 2008 12:34 PM |
| **To:** | Karen_Malloy@es.blm.gov |
| **Subject:** | Fw: Business Plan to meet our goal of 1,500 adopted horses |

we may need to think about this, I will finish my other email to you, we
may need to cogitate over the weekend

thank you, -steve

Deputy State Director,
Natural Resources
Eastern States Office
phone: (703) 440 - 1535
fax: (703) 440 - 1551
cell: (202) 329 - 4551
http://web.es.blm.gov

----- Forwarded by Steven Wells/ESO/ES/BLM/DOI on 02/22/08 12:33 PM -----

Juan
Palma/ESO/ES/BLM/
DOI To
Steven Wells/ESO/ES/BLM/DOI@BLM
02/22/08 12:31 PM cc
Terry Lewis/ESO/ES/BLM/DOI@BLM,
Alan Barron Bail/ESO/ES/BLM/DOI@BLM
Subject
Business Plan to meet our goal of
1,500 adopted horses

Steve, I trust all is well. I reviewed with great interest the notes that
Terry gave me on the discussions from the last few months on the three
incentives: 1) Adopter referral award. 2) Title bonus award pilot
program, and 3) the Feed/Gas Card or Free Delivery. These three ideas
seemed more operational to me, but certainly would be part of a marketing
strategy.

I do not know how you will develop, reach agreement with the principals,
and roll-out a document that will achieve our mission of 1,500 adopted

BLM_000018

horses in FY08. The document should be succinct such as a Business Plan (which marketing should be a part of). Keep me posted as you travel in time with the development of this Business Plan. As soon (sooner rather than later) as you are ready with the Business Plan let's sit down and take action on the items that need to be executed immediately.

/s/ Juan

BLM_000019

| | |
|---|---|
| **From:** | Karen_Malloy@es.blm.gov |
| **To:** | Juan_Palma@blm.gov |
| **Cc:** | Steven_Wells@blm.gov |
| **Bcc:** | blm@bridge1.iggbcloud.local |
| **Subject:** | Re: Lexington, VA adoption Saturday March 29th |
| **Date:** | Monday, February 25, 2008 3:16:05 PM |

We had some issues with the gas cards when we tried to get approval from W.O. last year. I don't remember the exact problem, but I believe it went beyond WHB - into Solictor's Office or Ethics, etc. Anything that involves a cash payback would need to be discussed with W.O. I prefer the Titling Bonus, since they will have to keep and feed the animal for one year first.

Delivery is problematic anywhere except Ewing, and that costs $2.00 per mile from the private hauler. The WHB crew is busy from Thur - Sun at the satellite locations, setting up and running the event. Animals must be removed from the satellite facilities by noon on Sunday, so there is no where to hold the animals once the crew becomes available. Plus the crew is usually working on overtime by the end of the event, due to the travel time required to get to and from the locations. We can try to hire haulers at each location, costs would vary from state to state.

We can talk more about these options at the meeting tomorrow, or meet with Steve anytime you are available.

Karen

Juan
Palma/ESO/ES/BLM/
DOI To
Karen Malloy/ESO/ES/BLM/DOI@BLM
02/25/2008 02:54 cc
PM Steven Wells/ESO/ES/BLM/DOI@BLM,
Karen Roberts/ESO/ES/BLM/DOI@BLM,
Terry Lewis/ESO/ES/BLM/DOI@BLM,
Alan Barron
Bail/ESO/ES/BLM/DOI@BLM, JoAn
Mundt/ESO/ES/BLM/DOI@BLM
Subject
Lexington, VA adoption Saturday
March 29th

Karen, looking forward to joining you at the Lexington, VA adoption on Saturday March 29th. The timing is good for me as the movers will drop all my furniture and clothing on the 24th (I brought only a couple of pairs of shoes and little clothing with me) so I can find a pair of jeans and join you all' at this event. It should be fun.

Why can't we unveil some (or one) of the three suggestions: 1) Adopter referral award, 2) Title bonus award pilot program, and/or 3) Feed/gas card or Free deliver feed/gas card. - what do you think? Shall we do it?

I grew up on a farm all my life (no we did not own the farm we were the help) and spent two years working on a feed-lot feeding 1,000 cows so getting a little (mmm stuff) on me is nothing new and a little sweat under my armpits is fine too. I just want to make sure I help out in any way I can at the adoption.
/s/ Juan

BLM_000021

**United States Government Accountability Office**

# GAO

Report to the Chairman, Committee on Natural Resources, House of Representatives

---

October 2008

# BUREAU OF LAND MANAGEMENT

# Effective Long-Term Options Needed to Manage Unadoptable Wild Horses



**GAO**

Accountability * Integrity * Reliability

---

BLM_000022



Highlights of GAO-09-77, a report to the Chairman, Committee on Natural Resources, House of Representatives

**October 2008**

# BUREAU OF LAND MANAGEMENT

## Effective Long-Term Options Needed to Manage Unadoptable Wild Horses

## Why GAO Did This Study

The Department of the Interior's Bureau of Land Management (BLM) manages about 33,100 wild horses and burros on 199 Herd Management Areas (HMA) in 10 western states. Under the Wild Free-Roaming Horses and Burros Act of 1971, as amended, BLM is to protect wild horses and burros, set appropriate management levels (AML), maintain current inventory counts, and remove excess animals to prevent overpopulation and rangeland damage. Over the years, various stakeholders have raised issues about BLM's management of the animals on and off the range.

GAO examined (1) BLM's progress in setting and meeting AML; (2) BLM's management of animals off the range through adoptions, sales, and holding facilities; (3) BLM's controls to help ensure the humane treatment of animals; and (4) what challenges, if any, BLM faces in managing for the long-term sustainability of the program. GAO surveyed and analyzed documents from 26 of the 44 BLM offices that manage wild horses and burros.

## What GAO Recommends

To improve the program, GAO is recommending, among other things, that BLM establish a formal policy for setting AML, develop alternatives for long-term holding facilities, and initiate a discussion with Congress and other stakeholders on how best to comply with the act, as amended. The Department of the Interior concurred with GAO's findings and recommendations.

To view the full product, including the scope and methodology, click on GAO-09-77. For more information, contact Robin M. Nazzaro at (202) 512-3841 or nazzaror@gao.gov.

## What GAO Found

BLM has made significant progress toward setting and meeting AML (the optimum number of animals which results in a thriving natural ecological balance and avoids range deterioration). BLM has set AML for 197 out of 199 HMAs. Most of the field offices GAO surveyed considered similar factors in determining AML, such as rangeland conditions; however, BLM has not provided specific formal guidance to the field offices on how to set AML. Without clear guidance, BLM cannot ensure that the factors considered in future AML revisions will be consistent across HMAs. At a national level, in 2007, BLM was closer to meeting AML (about 27,200 animals) than in any other year since AMLs were first reported in 1984. The extent to which BLM has actually met AML depends on the accuracy of BLM's population counts. Nineteen of the 26 field officials GAO surveyed used a counting method which, researchers say, consistently undercounts animals and does not provide a statistical range of population estimates. Undercounting can put animals at risk and lead to increased program costs.

The number of animals removed from the range is far greater than the number adopted or sold, which has resulted in the need for increased short-term and long-term holding. Since 2001, over 74,000 animals have been removed from the range, while only about 46,400 have been adopted or sold. Thirty-six percent fewer animals were adopted in 2007 than compared to the average adoption rates in the 1990s. As of June 2008, BLM was holding 30,088 animals in holding facilities, up from 9,807 in 2001. To accommodate the increased removals and declining adoptions and sales, BLM has increased the number of short-term and long-term holding facilities.

BLM has implemented multiple controls to help ensure humane treatment, including random checks on adopted horses and agreements with adopters and buyers to prevent slaughter. Although BLM state offices collect data on the treatment of the animals, BLM does not always compile the information in its central database or report it to the public. Providing additional information to the public on the treatment of these animals could help inform the public about their treatment and improve transparency.

The long-term sustainability of BLM's Wild Horse and Burro Program depends on the resolution of two significant challenges:
- *If not controlled, off-the-range holding costs will continue to overwhelm the program.* The percentage of the program's direct costs for holding animals off the range increased from $7 million in 2000 (46 percent) to $21 million in 2007 (67 percent). In 2008, these costs could account for 74 percent of the program's budget.
- *BLM has limited options for dealing with unadoptable animals.* The act provides that unadopted excess animals shall be humanely destroyed or, under certain circumstances, sold without limitation. However, BLM only manages these animals through sales with limitations. BLM is concerned about the possible reaction to the destruction of healthy animals.

**United States Government Accountability Office**

# Contents

**Letter**                                                                                          1

    Results in Brief                                                            7
    Background                                                                  11
    BLM Has Made Progress in Setting and Meeting AML, but Guidance
        Is Lacking and Meeting AML Has Proven Difficult          23
    Declining Adoptions and Sales Have Increased the Need for Short-
        Term and Long-Term Holding Facilities, and Holding Costs Have
        Increased                                                40
    BLM Has Controls in Place to Help Ensure the Humane Treatment
        of Wild Horses and Burros, but It Could Better Track and Report
        These Data to the Public                                 46
    Challenges to the Long-Term Sustainability of the Program Include
        Growing Holding Costs and Limited Options for Dealing with
        Unadoptable Animals                                      56
    Conclusions                                                                61
    Recommendations for Executive Action                                        63
    Agency Comments and Our Evaluation                                          64

**Appendix I**          **Objectives, Scope, and Methodology**                                      65

**Appendix II**         **Fertility Control and Genetic Variability**                               69

    Fertility Control                                                          69
    Genetic Variability                                                        69

**Appendix III**        **Wild Horse and Burro Survey Results**                                     71

    Section I: Field Office Responses Specific to Selected HMAs                  71
    Section II: Field Offices' Responses to General Questions
        Regarding All of the HMAs They Manage                    77

**Appendix IV**         **Comments from the Department of the Interior**                            80

**Appendix V**          **GAO Contact and Staff Acknowledgments**                                   81

# Tables

Table 1:      Major Legislation Governing BLM's Wild Horse and
              Burro Program                                                    11
Table 2:      Summary Statistics on BLM's Wild Horse and Burro
              Program, by State, February 2008                                15
Table 3:      Years in Which Current AMLs Were Set for BLM's 199
              HMAs                                                             25
Table 4:      Extent to Which BLM Field Office Staff Considered
              Each of the Four Key Factors in Making the Most
              Recent AML Determination for Surveyed Field Offices              26
Table 5:      Factors Considered by BLM Field Office Staff in Making
              the Most Recent AML Determinations for Surveyed
              Field Offices                                                    27
Table 6:      Age of Data Used to Make Current AML Determinations
              for Surveyed Field Offices                                       30
Table 7:      Extent to Which BLM Field Office Staff Considered
              Each of the Five Key Factors in Making Their Most
              Recent Gather Determination                                      36
Table 8:      Factors Considered by Field Offices in Decisions to
              Gather Wild Horses and Burros from the Range                     37
Table 9:      Age of Data Used by Field Offices to Determine the
              Need for Most Recent Gather                                      38
Table 10:      Number of Wild Horses and Burros Sold under the
              December 8, 2004, Sales Directive                               43
Table 11:     Number of Wild Horses in Long-Term Holding, by Year,
              Since 2000                                                       44
Table 12:     BLM Long-Term Holding Facilities, June 2008                      45
Table 13:     Number and Percentage of Wild Horses and Burros
              That Died During Gather Operations, (for 6 of 10
              States) Fiscal Years 2005 through 2007                           49
Table 14:     Results of Random Inspections of Wild Horse and
              Burro Adoptions, 2005 through 2007                               54
Table 15:     BLM Field Offices and HMAs Included in GAO's Survey             66
Table 16:     Number of HMAs Managed at Various AMLs, February
              2008                                                            70
Table 17:     Current and Initial AML and Year of Determination per
              HMA Surveyed                                                     71
Table 18:     Level of Data Sufficiency Used to Determine Current
              AML                                                             72
Table 19:     Respondents' Opinions about Current AML                         73
Table 20:     Population Level in Comparison with AML Range                    73
Table 21:     Primary Challenges in Meeting or Maintaining AML                73

Table 22:  Impact on Rangeland Resources in HMA When Herd
           Populations Exceed the Upper Limit of AML by Less
           Than 25 Percent                                          74
Table 23:  Impact on Rangeland Resources in HMA When Herd
           Populations Exceed the Upper Limit of AML by 25 to 50
           Percent                                                  74
Table 24:  Impact on Rangeland Resources in HMA When Herd
           Populations Exceed the Upper Limit of AML by 51 to
           100 Percent                                              74
Table 25:  Number of Field Offices That Have or Do Not Have
           Procedures in Place to Distinguish Impact of Wild
           Horses and Burros, Cattle, and Wildlife on Rangeland
           Condition                                                75
Table 26:  Actions Taken to Manage HMAs Since 2000                  75
Table 27:  Number of HMAs with a Herd Management Area Plan          75
Table 28:  Primary Physical Method Used in Most Recent
           Census/Inventory                                         75
Table 29:  Primary Statistical Method Used in Most Recent
           Census/Inventory                                         76
Table 30:  Level of Accuracy of Most Recent Census/Inventory        76
Table 31:  Level of Data Sufficiency Used to Support Most Recent
           Gather                                                   76
Table 32:  Timing of Gather in Relation to Scheduled Date of
           Gather                                                   76
Table 33:  Level of AML to Which HMA Is Typically Gathered          77
Table 34:  Actions Taken to Manage HMA's Since 2000                 77
Table 35:  Field Offices Whose HMAs Have Herd Management
           Area Plans                                               77
Table 36:  Field Offices Working to Develop Herd Management
           Area Plans for All of Their HMAs                         77
Table 37:  Actions to Help Field Offices Achieve Healthy Herd
           Populations in Balance with the Range and Other
           Multiple Uses                                            78
Table 38:  Major Challenges Facing Field Offices in Managing
           HMAs to Achieve Healthy Herd Populations That Are in
           Balance with the Range and Other Multiple Uses           78
Table 39:  Major Challenges Facing BLM's Wild Horse and Burro
           Program As a Whole                                       79

BLM_000026

# Figures

| Figure 1: | BLM Herd Areas and HMAs in the Western United States | 14 |
| Figure 2: | Drought Conditions and HMAs, February 2008 | 18 |
| Figure 3: | BLM Management of Wild Horses and Burros on and off of the Range | 20 |
| Figure 4: | BLM's Wild Horse and Burro Program Funding, Fiscal Years 2000 through 2007 | 23 |
| Figure 5: | Estimated Population of Wild Horses and Burros on the Range | 32 |
| Figure 6: | Number of Field Offices Who Reported Negative Impacts When Populations Exceed the Upper Limit of AML | 34 |
| Figure 7: | Comparison of Removed and Adopted Wild Horses and Burros, 1989 through 2007 | 42 |
| Figure 8: | Helicopter Used to Gather Wild Horses Near Ely, Nevada, c. 2006 | 48 |
| Figure 9: | BLM Contractor Trimming Horse Hooves Using a Special Holding Chute at a Contract Short-Term Holding Facility in Fallon, Nevada, October 2007 | 51 |
| Figure 10: | BLM Estimated Wild Horse and Burro Direct Program Costs, Fiscal Years 2000 through 2008 | 57 |

## Abbreviations

| AML | appropriate management level |
| BLM | Bureau of Land Management |
| HMA | Herd Management Area |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States Government Accountability Office**
**Washington, DC 20548**

October 9, 2008

The Honorable Nick J. Rahall, II
Chairman
Committee on Natural Resources
House of Representatives

Dear Mr. Chairman:

Wild horses have long been a symbol of the independence of the American West, but today, the health of their population depends heavily on government management. At their peak, in the mid-1800s, an estimated 2 million wild horses roamed America's rangelands. Populations decreased as development reduced habitat for wild horses and native grazers and as horses and burros were rounded up to make room for livestock and farming operations. By the early 1900s, most wild horses had disappeared from the Great Plains and those that remained were found primarily in the remote mountains, deserts, and badlands of the West. By 1971, only about 9,500 wild horses were thought to live on public rangelands. Public concerns about abuse and wild horse population declines swelled in the 1950s and 1960s. Subsequently, Congress enacted the Wild Free-Roaming Horses and Burros Act of 1971 to protect wild horses and burros from abuse and death and to manage them to achieve and maintain a thriving natural ecological balance on the public lands.[1] The 1971 act declared these wild animals to be "living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene." Since the passage of the act, wild horse and burro populations have increased, but the way they are managed on public lands has been controversial and wild horse advocates continue to voice concerns about horses being slaughtered.

The 1971 act authorized and directed the Secretary of the Interior, on public lands managed by the Bureau of Land Management (BLM), and the Secretary of Agriculture, on public lands managed by the Forest Service, "to protect and manage wild free-roaming horses and burros as

---

[1]Pub. L. No. 92-195, 85 Stat. 649 (1971) (codified as amended at 16 U.S.C. §§ 1331–1340).

GAO-09-77  BLM's Wild Horse and Burro Program

BLM_000028

components of public lands."[2] The act also directed the Secretaries to manage them "to achieve and maintain a thriving natural ecological balance on the public lands." BLM field offices are responsible for determining where the animals are to be managed within areas where they were found as of 1971.[3] In fiscal year 2007, the program was funded at $36.4 million under BLM's Management of Lands and Resources appropriation. Forty-four BLM field units manage approximately 33,100 wild horses and burros on 199 Herd Management Areas (HMA) covering over 34 million acres in 10 western states—Arizona, California, Colorado, Idaho, Montana, New Mexico, Nevada, Oregon, Utah, and Wyoming.[4] BLM's Nevada State Office manages about half of the land and animals in the Wild Horse and Burro Program.

In the mid- to late 1970s, population counts indicated that there was a large increase in wild horses and burros and that they were contributing to overgrazing of the rangeland. Congress amended the 1971 act in 1978 to protect the range from wild horse overpopulation, among other things. The Public Rangelands Improvement Act of 1978 directed the Secretaries of the Interior and Agriculture to determine appropriate management levels (AML), maintain a current inventory of wild horses and burros, and determine whether and where overpopulation exists.[5] AML has been defined as the "optimum number of wild horses which results in a thriving natural ecological balance and avoids deterioration of the range."[6] Each BLM field office is responsible for determining AML for each of the HMAs it manages. The aggregate AML for BLM's 199 HMAs is approximately 27,200. Because wild horse populations can double every 4 years and few

---

[2]This report focuses solely on BLM's Wild Horse and Burro Program. BLM is responsible for managing over 90 percent of the wild horses and burros on public lands. The Forest Service is responsible for managing 2,200 wild horses and about 300 burros in 37 Wild Horse Territories that cover about 2.5 million acres of Forest Service land.

[3]Shortly after the 1971 act, BLM conducted a wild horse and burro population census and estimated the number of wild horses to be about 17,300 and the number of wild burros to be about 8,000.

[4]The 44 BLM field units include 39 field offices, 4 district offices in Oregon, and 1 field station—the Tonopah Field Station in Nevada. We will refer to these 44 BLM field units collectively as field offices. BLM's count of the number of offices that manage HMAs may differ because the 4 district offices in Oregon manage 7 resource area offices.

[5]Pub. L. No. 95-514, § 14, 92 Stat. 1803, 1808 (1978) (amending 16 U.S.C. §§ 1332–1333).

[6]*Animal Protection Institute of America*, 109 IBLA 112, 119 (1989) (internal quotes omitted).

natural predators remain, managing wild horse and burro populations at AML has become a primary objective of the program. To reach and maintain AML, BLM primarily conducts "gathers" to remove excess animals from the range. From 1971 through 2007, over 267,000 wild horses and burros were removed.[7] In 2001, BLM began implementing its most recent management strategy, to reach AML by increasing removals. Since then, about 10,600 animals have been removed, on average, per year.

Maintaining current and accurate inventories of wild horses and burros is a key component of on-the-range management. BLM has traditionally counted animals using the direct-count method, which involves flying over the HMA and reporting on each individual animal they see. BLM generally conducts this type of animal count or "census" every 4 years or so, leading up to a removal of excess animals. To produce annual population estimates between counts, BLM adjusts these census figures for each HMA based on an estimate of the herd's annual population growth. If the census numbers are inaccurate, particularly if they underestimate the actual population, BLM runs the risk that adequate forage or water may not be available for the wild horses and burros or for livestock and wildlife in the area.

After being removed from the range, excess animals are managed in short-term holding facilities, where they are either prepared for adoption or sale, or in long-term holding facilities, where they will live out the remainder of their lives. The preferred outcome for healthy animals removed from the range is that they be adopted through BLM's Adopt-a-Horse-or-Burro Program. As of 2007, approximately 235,700 animals have been adopted by the public since the start of the program in 1971. On average, about 6,300 wild horses and burros have been adopted annually since 2001. Under the act, as amended, BLM is required to assure that adopters can provide humane treatment and care.[8] When adoption demand is not sufficient to absorb all the animals removed, the act, as amended, directs BLM to either destroy the remaining healthy animals in the most humane and cost-efficient manner possible or, under certain circumstances, sell

---

[7]This total does not include the number of burros removed from the range in 1981. BLM was not able to verify older data or estimate the number of burro removals for 1981. The total number of wild horses and burros that BLM could verify were removed from the range between 1971 and 2007 was 249,489. Officials verified that the number of animals removed between 1977 and 1980 was 18,009; however, they were unable to further specify this number by year or by species. When added together, this total equals 267,498.

[8]16 U.S.C. § 1333(b)(2)(B).

BLM_000030

them without limitation.[9] BLM has not destroyed any animals since January 1982, when a former BLM director issued a moratorium to end the destruction of excess unadoptable animals. To manage for the growing number of unadoptable animals, BLM began opening long-term holding facilities. Unlike the rangelands of the West where the animals normally live, the long-term holding facilities use Midwest grasslands that generally provide the animals with abundant forage and decreased stress. This allows most of the animals to live far longer than they would in the wild. BLM pays the private contractors that operate the long-term holding facilities a fee per horse per day. The sales directive, which was enacted on December 8, 2004, directs BLM to sell excess wild horses and burros without limitation if the animal is more than 10 years of age or has been offered unsuccessfully for adoption at least three times.[10]

Since the passage of the 1971 act, there has been controversy over the number of wild horses and burros that BLM manages in the wild and the amount of public land available for their management. There is concern by some, including wild horse and burro advocacy groups, that the number of animals managed in the wild is too low to protect their genetic integrity; that the numbers are based on insufficient rangeland monitoring data; and that BLM gives preference to other users of the range, primarily livestock and wildlife. For instance, groups often point out that BLM permits far more cattle and sheep to graze on BLM managed lands than horses. Specifically, in fiscal year 2007, approximately 567,000 head of cattle or sheep grazed BLM public lands.[11] However, livestock are managed on 160 million acres of BLM lands, compared to the 29 million BLM acres that

---

[9]16 U.S.C. § 1333(b)(2)(C) (destroy excess animals for which an adoption demand does not exist) and 16 U.S.C. § 1333(e) (sell without limitation excess animals under certain circumstances).

[10]Pub. L. No. 108-447, Div. E, Title I, § 142, 118 Stat. 2809, 3070 (2004) (amending 16 U.S.C. § 1333). In 2005, shortly after the 2004 sales directive was enacted, legislation was introduced in the 109th Congress that would have prohibited the sale of wild horses and burros for processing into commercial products (H.R. 297 and S. 576). Neither of these bills were enacted. More recently, in the 110th Congress, H.R. 249 was introduced to prohibit the sale of wild horses and burros for processing into commercial products. The bill was passed by the House of Representatives on April 26, 2007. As of August 31, 2008, the Senate had not acted on the bill.

[11]The number 567,000 represents the cattle yearlong equivalent derived by dividing the actual number of animal unit months billed in fiscal year 2007 by 12 months. An animal unit month refers to the amount of forage needed to sustain an adult cow and her calf or horse for 1 month. In reality, few livestock grazing permits are issued for yearlong grazing.

are available for wild horses and burros.[12] Additionally, advocacy groups are concerned that the animals removed from the range are too often adopted into abusive homes or are ultimately sold for slaughter. Some livestock and wildlife groups argue that the population of wild horses and burros has far exceeded the level that provides ecological balance and equitable forage distribution for competing users, such as cattle and sage grouse.

We first reviewed BLM's Wild Horse and Burro Program in 1990.[13] At that time, regarding on-the-range management activities, we found that BLM's decisions on how many wild horses to remove from federal rangelands were not based on direct evidence that wild horse populations exceeded what the range could support and that removals were often not accompanied by reductions in livestock grazing levels or range management to increase the land's capacity. We recommended that BLM develop carrying capacity and range condition data and, in locations where overgrazing was occurring, that BLM implement range management techniques designed to give vegetation more opportunity to grow and, when necessary, remove wild horses and reduce livestock grazing in proportion to the numbers of each species on the range. Regarding off-the-range management activities, we found that "BLM's wild horse sanctuaries [long-term holding facilities] are likely to be much more expensive than originally envisioned and may represent only a temporary solution to the disposal of unadoptable horses.… If horse removals above levels that can be handled by private adoptions are reinstituted, other disposal options will have to be considered." We recommended that BLM consider a variety of disposal options for unadoptable horses and, as necessary, make recommendations for congressional consideration.

To update our 1990 report, we are reporting on (1) BLM's progress in managing wild horses and burros on the range through setting and meeting AML; (2) BLM's management of wild horses and burros off of the range through adoption, sales, and holding facilities; (3) the controls BLM has in place to help ensure humane treatment of wild horses and burros; and (4) what challenges, if any, BLM faces in managing the long-term sustainability of the Wild Horse and Burro Program. We were also asked to

---

[12]BLM manages wild horses and burros on 199 HMAs that are comprised of 29 million acres of BLM land and an additional 5.35 million acres of non-BLM land.

[13]GAO, *Rangeland Management: Improvements Needed in Federal Wild Horse Program*, GAO/RCED-90-110 (Washington, D.C.: Aug. 20, 1990).

BLM_000032

review how and why the acreage available for wild horses and burros had changed since the 1971 act. We did not examine the acreage issue because BLM is in the process of compiling a history of acreage determinations. BLM officials expect their review to be completed by March 2009.

To examine how BLM manages wild horses and burros on and off of the range and to identify the challenges facing BLM, we reviewed relevant laws, regulations, BLM policies, and strategic plans. We also surveyed, and analyzed documents from, 26 of the 44 BLM field offices that manage wild horses and burros.[14] We collected and reviewed relevant resource management decision documents from the surveyed field offices to help corroborate their responses about specific questions, including those about factors used to make AML determinations and gather decisions. In addition, we also conducted follow-up phone calls to clarify ambiguous or incomplete survey responses. We received usable responses from all field offices that we surveyed—a 100 percent response rate. We surveyed field offices in all 10 western states that have HMAs. The field offices we surveyed represented 82 percent of all BLM acres managed for wild horses and burros, 74 percent of all BLM managed wild horses, and 69 percent of burros on the range at the time of our survey. We interviewed BLM Wild Horse and Burro Program managers at the state and national levels and conducted site visits at two field offices that manage HMAs, two adoption events, three short-term holding facilities, and one long-term holding facility. To examine humane treatment, we collected information from BLM's compliance database and interviewed public citizens, advocacy groups, and BLM officials. A more detailed description of our scope and methodology is presented in appendix I.

We conducted this performance audit from September 2007 to October 2008 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

---

[14]We drew our sample of 26 field units from among the 44 field units that manage HMAs, which include 39 field offices, 4 district offices in Oregon, and 1 field station in Nevada. BLM's count of the number of offices that manage HMAs may differ because the 4 district offices in Oregon manage 7 resource area offices.

BLM_000033

## Results in Brief

BLM has made significant progress in setting and meeting AML for the HMAs. As of February 2008, BLM has set AML for 197 out of 199 HMAs. Most of the field offices we surveyed considered similar factors in determining AML, such as rangeland conditions and climate data; however, BLM has not provided specific formal guidance to the field offices on how to set AML. BLM has been working on revising the program's handbook to provide this guidance since 2006. Without clear guidance, BLM cannot ensure that the factors considered in future AML revisions will be consistent across HMAs, especially since the personnel most familiar with the current, informal practice of determining AML are retiring at an increasing rate. At the national level, BLM was closer to meeting AML in 2007 than in any other year since AMLs were first reported in 1984. Specifically, in February 2007, BLM estimated the population of wild horses and burros to be 28,563, about 1,000 animals over AML. To reach this level, BLM has reduced the nationwide population in the wild by about 40 percent since 2000. Our 1990 report was critical of BLM's decisions on the number of wild horses and burros to remove from the range. At that time we concluded that the decisions were made without adequate information about range carrying capacity or the impact of the animals on range conditions. Since then, in August 2005, BLM updated its formal policy on gathers and removals and specified the key factors that should be considered in the decision making process. The extent to which BLM has actually met AML depends on the accuracy of its population counts. Nineteen of the 26 field officials we surveyed used the direct-count method for their most recent gathers. This method, according to researchers, consistently undercounts animals and does not provide a statistical range of population estimates. Some BLM officials are concerned that other counting methods would require too much additional staff or are too expensive. However, undercounting is also costly since it often leads BLM to remove fewer animals than needed, which leads to overpopulation and costlier gathers in the future. For example, in the summer of 2007, BLM staff on an HMA in Nevada miscalculated the population by approximately 640 wild horses and found that the actual population was about five times greater than what they determined was sustainable. Many of the wild horses subsequently removed from this HMA were in poor condition due to severe drought, and about 150 animals ultimately died from disease in short-term holding as a result.

The number of wild horses and burros removed from the range is far greater than the number adopted or sold, which has resulted in a significant increase in the number of animals in short- and long-term holding and commensurate increases in spending for their care. Since 2001, over 74,000 animals have been removed from the range, while only

**GAO-09-77  BLM's Wild Horse and Burro Program**

BLM_000034

about 46,400 have been adopted or sold. Thirty-six percent fewer wild horses and burros were adopted in 2007, compared to average adoption rates in the 1990s. BLM officials attribute the steady adoption decline in recent years to the decreasing demand for horses in general and increasing hay and fuel costs associated with their care. As of June 2008, BLM was holding 30,088 animals in short- and long-term holding facilities, far more than in 2001 when it held 9,807. From 2001 through June 2008, the number of short-term holding facilities increased from 14 to 24 to accommodate more animals, while the average cost per animal increased from $3.00 per day to $5.08 per day. The total cost for short-term holding increased from $6.4 million in 2000 to $11.2 million in 2001. From 2001 through 2007, the cost remained relatively stable, but for 2008, costs are anticipated to increase to $16.2 million. Similarly, BLM has increased the number of long-term holding facilities from 1 in 1988 to 11 as of June 2008, and the average cost per animal has increased to approximately $1.27 per day. Warnings issued in the 1990s by us and the Department of the Interior's Office of Inspector General about the potential for escalating costs for long-term holding have proven accurate, as spending on long-term holding has increased from about $668,000 in 2000 to more than $9.1 million in 2007. In addition, with the long-term holding facilities at full capacity—they held 22,101 wild horses as of June 2008 and had a capacity of 22,100—more wild horses are spending a longer time in the more expensive short-term holding facilities.

BLM has implemented multiple controls to help ensure the humane treatment of wild horses and burros, including standard operating procedures, random checks on adopted horses, and agreements with buyers to help prevent slaughter. For gathers, it has established standard operating procedures and reporting systems to help ensure humane treatment. According to data from 6 of the 10 states that manage wild horses and burros, 1.2 percent of animals removed from 2005 to 2007 were either euthanized or died accidentally. While BLM state offices sometimes collect data on animals that die during gathers, the information is not compiled by BLM headquarters in its centralized database, nor is it reported to the public. For animals held after removal in short- and long-term holding facilities, staff from BLM and veterinarians from the Department of Agriculture's Animal and Plant Health Inspection Service inspect facilities on a regular basis to help ensure adequate care and treatment are provided. For wild horses and burros that have been adopted, BLM guidance directs field offices to make follow-up phone calls or visits for all adopters during the first year of the adoption, physically inspect a random sample of adopted animals, and conduct inspections of adopted animals whenever complaints are received. According to the

BLM_000035

results of BLM's random adoption inspections, from 2005 through 2007, on average about 9 percent of adopters did not comply with BLM standards of care for adopted wild horses and burros. The most common violations were failing to report changes in the animals' status or location to BLM and failing to provide adequate facilities or care. For animals that are sold, since the spring of 2005, BLM has required buyers to sign a statement that they do not intend to slaughter the animals. Although BLM tracks information about the treatment of animals in short- and long-term holding and after adoption, it does not regularly report this information to the public. Doing so could help inform the public about the treatment of the animals and improve transparency.

The long-term sustainability of BLM's Wild Horse and Burro Program depends on the resolution of two significant challenges:

- *If not controlled, off-the-range holding costs will continue to overwhelm the program.* The Wild Horse and Burro Program's spending for off-the-range holding increased from $7 million in 2000—46 percent of the program's direct costs—to about $21 million in 2007—67 percent of the program's direct costs. In 2008, BLM anticipates that holding costs will account for about 74 percent of the program's direct costs. As holding costs continue to increase, less funding is available for on-the-range management, which could result in sharp increases to the animal population in the wild. To deal with its long-term holding problem, BLM has primarily sought increased funding to open additional holding facilities. However, funding is not likely to increase in the future, and limited funding is forcing BLM to make the difficult choice among managing the animals on the range to prevent overpopulation, destroying excess unadoptable animals, or selling them without limitation. If funding is not increased or if BLM does not dispose of animals in other ways, BLM projects that the number of wild horses on the range would reach about 50,000, or about 80 percent over AML, by 2012.

- *BLM's options are limited for dealing with unadoptable animals.* The Wild Free-Roaming Horses and Burros Act, as amended, requires that excess animals, for which the adoption demand is not sufficient to absorb all the animals removed from the range, be destroyed in the most humane and cost-efficient manner possible or, under certain circumstances, be sold without limitation. From fiscal year 1988 through fiscal year 2004, Congress prohibited BLM from using its Management of Lands and Resources appropriations to destroy excess healthy, unadopted wild horses and burros, despite the amended act's directive to destroy excess animals. However, since the enactment of

BLM_000036

the sales directive in 2004, which provided BLM with another means of disposal for these excess animals, Congress has appropriated funds to BLM without the prohibition. BLM has still chosen not to destroy or sell excess animals without limitation because of concerns about public and congressional reaction to the large-scale slaughter of thousands of healthy horses. However, by not destroying or selling them without limitation, BLM is not in compliance with the requirements of the act. Legislation is pending in the 110th Congress that would repeal the 2004 sales directive but not the requirement to destroy excess horses. As of June 2008, budget constraints have forced BLM to reconsider all of its options, including humane destruction and sales without limitations. BLM has not formally considered other possible solutions to deal with the current number of wild horses in long-term holding other than one pilot project in Wyoming. Some BLM officials suggested that other options are possible, such as placing nonreproducing animals on vacant BLM grazing allotments or on other federal lands, but these actions would require legislative changes.

To improve the management of BLM's Wild Horse and Burro Program, we are recommending that the Secretary of the Interior direct BLM to finalize and issue the new program handbook to ensure that AML determinations are based on consistent factors across HMAs into the future, improve the accuracy of population estimates by continuing to adopt statistically based methods to estimate animal populations, improve public access to data about the welfare of wild horses and burros removed from the range, and develop cost-effective alternatives to caring for wild horses removed from the range in long-term holding facilities. We are also recommending that the Secretary of the Interior direct BLM to initiate discussions with Congress to address BLM's noncompliance with the act. In commenting on a draft of this report, the Department of the Interior concurred with our findings and recommendations and provided several technical clarifications, which we have made as appropriate. Appendix IV presents the Department of the Interior's comment letter.

# Background

During the 20th century, tens of thousands of wild horses were either killed or captured for slaughter on America's western ranges. Documented abuses suffered by wild horses led concerned individuals and national humane organizations to push for federal protections in the 1950s. Subsequently, Congress passed legislation in 1959 prohibiting the use of aircraft or motor vehicles to capture or kill wild horses or burros on public lands and polluting watering holes on public lands to trap, kill, wound, or maim wild horses or burros. Despite the 1959 act, wild horse exploitation continued, and some questioned whether the population would eventually be eradicated. To protect wild horses and burros, Congress passed additional legislation in 1971 to require the protection and management of wild free-roaming horses and burros on public lands. The 1971 act was amended in 1976, 1978, 1996, and 2004 (see table 1). The 2004 amendments directed BLM to sell, without limitation, excess animals more than 10 years of age or that have been offered unsuccessfully for adoption at least three times.

**Table 1: Major Legislation Governing BLM's Wild Horse and Burro Program**

| Legislation | Date | Major relevant provisions |
|---|---|---|
| Public Law 86-234 (Wild Horse Annie Act of 1959)[a] | Sept. 8, 1959 | Establishes criminal penalties for using an aircraft or motor vehicle to hunt wild horses or burros on public lands for capturing or killing and for polluting watering holes on public lands to trap, kill, wound, or maim wild horse or burros. |
| Public Law 92-195 (Wild Free-Roaming Horses and Burros Act of 1971)[b] | Dec. 15, 1971 | Authorizes and directs the Secretaries of the Interior and Agriculture to protect and manage wild horses and burros as components of the public lands to achieve and maintain a thriving natural ecological balance. Authorizes the Secretaries, in areas found to be overpopulated, to order old, sick, or lame animals destroyed in the most humane manner possible and to capture or remove wild horses and burros under humane conditions and care. Authorizes the Secretaries to order wild horses and burros destroyed in the most humane manner possible when such action is deemed necessary to preserve and maintain the habitat in a suitable condition for continued use. The act also establishes criminal penalties for a number of offenses involving wild horses and burros. |
| Federal Land Policy and Management Act of 1976[c] | Oct. 21, 1976 | Directs the Secretary of the Interior to prepare and maintain an inventory of public lands and their resources and other values and to, with public involvement, develop, maintain, and revise land use plans, which provide for the use of public lands. Directs the Secretary to manage the public lands under principles of multiple use and sustained yield. Authorizes the Secretaries of the Interior and Agriculture to contract for the use of helicopters and for using motor vehicles to transport captured animals after a public hearing and in accordance with humane procedures. |

BLM_000038

| Legislation | Date | Major relevant provisions |
|---|---|---|
| Public Rangelands Improvement Act of 1978[d] | Oct. 25, 1978 | Directs the Secretaries of the Interior and Agriculture to maintain a current inventory of wild horses and burros on given areas of public lands to determine whether and where overpopulation exists and whether to remove excess animals, the appropriate management levels, and whether appropriate management levels could be achieved by removal or destruction of excess animals or through other options. Directs the Secretaries, upon finding that an overpopulation exists and that action is necessary to remove excess wild horses and burros, to restore a thriving ecological balance by first destroying old, sick, and lame animals in the most humane manner possible; then humanely capturing and removing wild horses and burros for private maintenance and care for which an adoption demand exists by qualified individuals; and then destroying additional excess wild horses and burros in the most humane and cost-efficient manner possible. Authorizes the Secretaries, upon application, to grant title to excess wild horses and burros for which an individual provided humane conditions, treatment, and care for a period of 1 year. Provides that a wild horse or burro is no longer a wild horse and burro for purposes of the 1971 act once title has passed to an individual or in a number of other circumstances. No wild horse and burro or its remains may be sold or transferred for consideration for processing into a commercial product. |
| Omnibus Parks and Public Lands Management Act of 1996[e] | Nov. 12, 1996 | Attempts to clarify the effect of the 1976 amendment, which authorized the Secretaries of the Interior and Agriculture to use helicopters and motor vehicles in the capture and transportation of animals. |
| Department of the Interior and Related Agencies Appropriations Act, 2005[f] | Dec. 8, 2004 | Directs the sale, without limitation, of excess wild horses and burros, or their remains, if the animals are more than 10 years of age or have been offered unsuccessfully for adoption at least three times, until all excess animals are sold or until appropriate management levels are attained. It also provides that wild horses and burros, or their remains, once sold, are no longer wild horses and burros for the purposes of the 1971 act. Exempts animals sold under these provisions from the general prohibition under the 1971 act of processing the remains of wild horses and burros into commercial products. |

Source: GAO analysis of laws pertinent to BLM's management of the Wild Horse and Burro Program.

[a]Pub. L. No. 86-234, 73 Stat. 470 (1959) (codified as amended at 18 U.S.C. § 47).

[b]Pub. L. No. 92-195, 85 Stat. 649 (1971) (codified as amended at 16 U.S.C. §§ 1331–1340).

[c]Pub. L. No. 94-579, 90 Stat. 2743 (1976). Specifically, section 404 (90 Stat. 2775) amended the 1971 act (codified as amended at 16 U.S.C. § 1338a).

[d]Pub. L. No. 95-514, § 14, 92 Stat. 1803, 1808 (1978) (amending 16 U.S.C. §§ 1332–1333).

[e]Pub. L. No. 104-333, Title VIII, § 803, 110 Stat. 4093, 4186 (1996) (amending 16 U.S.C. § 1338a).

[f]Pub. L. No. 108-447, Div. E, Title I, § 142, 118 Stat. 3039, 3070 (2004) (amending 16 U.S.C. § 1333).

The passage of the 1971 act changed the way BLM managed wild horses and burros on public lands. Rather than considering them as feral species that caused damage to the rangeland, the agencies had to change their mind-set to protect and manage the animals as an integral part of the ecosystem. One of the first tasks in managing the animals was to determine where they lived and their populations. According to the act, BLM is only authorized to manage wild horses and burros in areas where

they were found in 1971.[15] The areas where wild horses and burros were found, largely on public lands managed by the BLM and the Forest Service, as of the date of the act are called herd areas, and they comprise about 53.5 million acres. Once the exact land status and ownership of the herd areas was verified, it was determined that most herd areas were on BLM administered public lands, but some also included private and state-owned in-holdings. The 1971 act states that the Secretaries of the Interior and Agriculture shall arrange for the removal of wild horses and burros that stray onto private land upon notification by the owner.[16]

Next, through its land management planning process, BLM designated HMAs within these herd areas. In making HMA designations, BLM determined whether or not the areas where wild horses and burros were found contained adequate forage and water to sustain the herds. BLM also designated some HMAs in such a way as to avoid conflicts with private landowners. Today, BLM is responsible for managing 199 HMAs covering 34.3 million acres across 10 western states (see fig. 1).[17] BLM is currently compiling a history of how BLM field offices made the determination to manage wild horses and burros on the current 34.3 million acres, compared to the 53.5 million acres where they were originally found in 1971. According to BLM officials, they expect the review to be completed by March 2009.

---

[15]Pub. L. No. 92-196, § 9, 85 Stat. 649, 651 (renumbered as § 10 of the act and codified at 16 U.S.C. § 1339).

[16]Pub. L. No. 92-196, § 4, 85 Stat. 649, 651 (codified at 16 U.S.C. § 1334).

[17]Three of the 199 HMAs are classified as Wild Horse Ranges—the Pryor Mountains Wild Horse Range in Montana, the Little Book Cliffs Wild Horse Range in Colorado, and the Nevada Wild Horse Range of south-central Nevada. One of the HMAs is classified as a Wild Burro Range—the Marietta Wild Burro Range located in Nevada. According to the 1971 act, under certain circumstances, the Secretaries of the Interior and Agriculture may designate and maintain specific ranges on public lands as sanctuaries for the protection and preservation of wild free-roaming horses and burros. 16 U.S.C. § 1333(a). Ranges are to be devoted principally, but not necessarily exclusively, to their welfare in keeping with the multiple-use management concept for the public lands. 16 U.S.C. § 1332(c). BLM can also choose to close appropriate areas of public lands to grazing use by all or a particular kind of livestock, if necessary, to provide habitat for wild horses or burros; to implement herd management actions; or to protect wild horses or burros from disease, harassment, or injury. 43 C.F.R. § 4710.5.

BLM_000040

**Figure 1: BLM Herd Areas and HMAs in the Western United States**



Source: BLM.

The number of HMAs and their acreage has changed over time for many different reasons, including BLM land being redesignated as National Park land and declines in forage or water that make an area unsustainable,

among others. About half the acreage managed under BLM's Wild Horse and Burro Program is located in Nevada (see table 2). While most of BLM's management activities for wild horses and burros occur within HMAs, BLM is responsible for removing populations of animals that stray onto public lands outside of HMAs, as well as those that stray onto private property.

**Table 2: Summary Statistics on BLM's Wild Horse and Burro Program, by State, February 2008**

| State | Number of HMAs | Total AML[a] | Population estimate | HMA acreage | | |
|---|---|---|---|---|---|---|
| | | | | BLM acreage | Other acreage | Total acreage |
| Nevada | 102 | 13,098 | 16,143 | 15,772,485 | 1,695,925 | **17,468,410** |
| Wyoming | 16 | 3,725 | 3,439 | 3,638,330 | 1,137,121 | **4,775,451** |
| Arizona | 7 | 1,676 | 2,173 | 1,756,086 | 1,327,777 | **3,083,863** |
| Oregon | 18 | 2,715 | 2,473 | 2,703,409 | 259,726 | **2,963,135** |
| Utah | 21 | 2,151 | 3,096 | 2,379,850 | 362,817 | **2,742,667** |
| California | 22 | 2,237 | 3,878 | 1,946,590 | 471,855 | **2,418,445** |
| Idaho | 6 | 617 | 703 | 377,907 | 40,287 | **418,194** |
| Colorado | 4 | 812 | 933 | 366,098 | 38,656 | **404,754** |
| Montana | 1 | 105 | 170 | 28,282 | 8,865 | **37,147** |
| New Mexico | 2 | 83 | 97 | 24,505 | 4,107 | **28,612** |
| **Total** | **199** | **27,219** | **33,105** | **28,993,542** | **5,347,136** | **34,340,678** |

Source: BLM.

[a]This column represents the upper limit of AML according to BLM data.

Wild horses and burros are to be managed as self-sustaining populations of healthy animals in balance with other multiple uses and the productive capacity of their habitat. Because wild horses and burros reproduce at an estimated rate of 20 percent annually and no natural predators remain, except for in a very few isolated HMAs, BLM must actively manage the population of the herds. AML has been defined as the "optimum number of wild horses which results in a thriving natural ecological balance and avoids deterioration of the range."[18] AML determinations can be made in a variety of land planning or decision documents, including, but not limited to, resource management plans, Herd Management Area Plans, and multiple use decision documents. The actual number set through an AML determination is predicated, in part, on (1) the number of acres set-aside

---

[18]*Animal Protection Institute of America*, 109 IBLA at 119 (internal quotes omitted).

BLM_000042

for the management of wild horses and burros within a specific resource planning area and (2) the proportion allocation of the available forage allotted for wild horse and burro consumption among other users, such as livestock and wildlife. After these two key multiple use decisions have been made, BLM field offices can then set the actual AML numbers. Available forage is based on range conditions and other data.

BLM's Wild Horse and Burro National Program Office encourages field offices to establish AML as a range with an upper and lower limit.[19] The upper limit of the range equals the maximum number of animals that can be sustained to result in a thriving natural ecological balance and avoid deterioration of the range. The lower limit is generally determined as the number to which a population must be gathered to help ensure the population will not exceed the upper limit of AML within the established gather cycle. For example, if the established gather cycle was 4 years, it would be the number to which a population must be gathered to help ensure the population will not exceed the upper limit of AML within a 4 year time period. BLM strives to maintain a national herd population level that is at the midpoint of AML, where the recently gathered HMAs would be at the lower limit of AML, while those awaiting gathers would be closer to the upper limit of AML. As of February 2008, the upper limit of AML (the cumulative total for each of the 199 HMAs) was approximately 27,219, and the midpoint was about 22,588.[20]

Because AMLs are intended to reflect the population of animals that can be sustainably maintained in an HMA, they are subject to change over time. Changes in AML happen for several reasons, including when acreage is added to or subtracted from an HMA and when changes in rangeland conditions result in improved or reduced forage and water availability sufficient to sustain a certain population level. In the arid ranges where most wild horses and burros are managed, conditions generally do not

---

[19]Some HMAs report AML as a single number rather than as a range; however, they also calculate an upper and lower limit of AML to determine the level within which to manage herds. BLM is drafting guidance to direct all field offices to identify AML as a range.

[20]According to BLM officials, as of February 2008, the upper limit of AML nationally was approximately 27,219 animals, and the lower limit of AML was approximately 17,957. Based on our calculation, the midpoint between the two limits is approximately 22,588. These numbers are considered approximate because not all HMAs report AML as a range. AML for 7 HMAs are reported as the midpoint of AML, while 29 HMAs report AML as the upper limit. Therefore, to account for the 36 HMAs that report a single AML number, BLM may only approximate the true upper, lower, and midpoint of AML on a nationwide basis.

improve rapidly and have been further degraded by drought conditions that have lasted for over a decade (see fig. 2). The effects of climate change are likely to exacerbate the poor conditions that many HMAs are already experiencing.

BLM_000044

**Figure 2: Drought Conditions and HMAs, February 2008**



Source: BLM.

Determining which type of animal is responsible for rangeland damage is important to properly managing an HMA and in determining the number of animals to permit on the range. BLM can control the number of livestock

and wild horses and burros to permit on the range, but BLM is not responsible for managing wildlife numbers on the range. Because BLM is not the lead agency responsible for wildlife on public lands, they are to coordinate with state wildlife officials about the forage allocation for wildlife populations. An increase in allocation of any species may cause increased competition for the remaining users of the range, especially under severe conditions. For example, in severe drought conditions, grazing and browsing is concentrated in limited areas near water sources. This intense competition causes heavy use and perhaps depletion of the resources the animals are dependent upon.

Throughout the life of the program, the population of wild horses and burros on the range has generally far exceeded AML. BLM has used the removal of animals from the range as a primary management tool for managing herd sizes. To gather animals for removal, BLM uses private contractors to herd the animals in an HMA into temporary on-site corrals.[21] The animals are primarily gathered using helicopters. In some cases, when gathering smaller numbers of wild horses and burros, BLM officials or contractors will use other trapping techniques, such as bait trapping, to capture the animals. Once collected into the temporary corrals, BLM officials use a selective removal process to determine which of those gathered animals to remove from the HMA.[22] Animals that are not selected are returned to the wild. When animals are removed from the range, they are taken to short-term holding facilities to receive vaccinations and other treatment prior to either being adopted, sold, or sent to long-term holding. Figure 3 depicts BLM's management of wild horses and burros on and off of the range.

---

[21]BLM has gather contracts with two private companies.

[22]The selective removal policy is used only for wild horses; it is not applicable to wild burros. When gathers are conducted, an emphasis is placed on removing the younger, more adoptable animals from the range. However, the sex ratio and age structure of the herd must also be considered to assure a healthy population.

BLM_000046

**Figure 3: BLM Management of Wild Horses and Burros on and off of the Range**



### 1. On-the-Range Management

On-the-range management of wild horses and burros includes management activities such as range condition monitoring, population counts, and rangeland improvements. As of February 2008, the estimated on the range population was 33,105.

Animals are periodically removed from HMAs to reach a level that is sustainable with other uses of the range. BLM typically uses helicopters to herd animals into temporary corrals. In 2007, BLM removed 7,726 animals from the range.

### 2. Short-Term Holding

Once animals are removed from the range, they enter short-term holding facilities where they receive veterinary care prior to being adopted, sold, or sent to long-term holding facilities. As of June 2008, the number of animals in short-term holding was 7,987.



### 3. Adoption and Sales

BLM offers animals removed from the range for adoption to private citizens. In 2007, 4,772 wild horses and burros were adopted.

Wild horses can be sold if they are offered unsuccessfully for adoption at least three times or are more than 10 years of age.

Wild horses and burros that are adopted or sold are used by some as companions and by others as working animals.

### 4. Long-Term Holding

Animals that are removed from the range and cannot be adopted or sold are placed in long-term holding facilities to live out the rest of their lives. Most of the facilities are located on Midwest grasslands in Kansas and Oklahoma. As of June 2008, the number of horses in long-term holding was 22,101.

Sources: GAO (photos, photo illustration), BLM (photos).

For fiscal year 2001, BLM requested a budget increase for the program as part of a major initiative to reach the upper limit of AML by 2005.[23] Subsequently, program funding allocated from congressional appropriations—what the agency refers to as "enacted funding"— increased from $19.8 million in fiscal year 2000 to $34.4 million in fiscal year 2001, an increase of $14.6 million. In 2002, enacted funding for the program was $29.6 million, about $10 million over the 2000 congressional funding level. After reassessing the initiative in 2004, BLM estimated it needed an additional $10.5 million on top of their enacted funding level of $29.1 million in fiscal year 2004 to meet its revised goal of meeting the midpoint of AML by 2006. In fiscal year 2005, enacted funding was increased about $10 million for a total of $39 million in fiscal year 2005 (see fig. 4). The President's 2008 budget requested $32 million for the program, about $4 million less than enacted funding for fiscal year 2007.

---

[23]U.S. Department of the Interior, BLM, *Living Legends in Balance with the Land, A Strategy to Achieve Healthy Lands and Viable Herds, The Restoration of Threatened Watersheds Initiative* (Washington, D.C., 2000).

BLM_000049



**Figure 4: BLM's Wild Horse and Burro Program Funding, Fiscal Years 2000 through 2007**

Source: BLM.

Note: The enacted funding level, as reported by BLM, is the amount allocated from congressional appropriations minus rescissions for the Wild Horse and Burro Program. Total program funding represents the sum of the enacted funding; reprogrammed funding; and funding from other sources, such as reimbursement for BLM's management of parts of the Forest Service's Wild Horse and Burro Program.

# BLM Has Made Progress in Setting and Meeting AML, but Guidance Is Lacking and Meeting AML Has Proven Difficult

BLM has made significant progress in setting and meeting AML for the HMAs. As of February 2008, BLM has set AML for 197 out of 199 HMAs. Most of the field offices we surveyed considered similar factors in determining AML, such as rangeland conditions and climate data; however, BLM has not provided specific formal guidance to the field offices on how to set AML. BLM has been working on revising the program's handbook to provide such guidance since 2006. With increased retirements, field offices reported losing the experienced personnel most familiar with the informal practice of determining AML. Until BLM finalizes the handbook or issues other guidance, it cannot ensure that the factors considered in future revisions of AML determinations are consistent across HMAs. At the national level, BLM reported that it was closer to meeting AML in 2007 than in any other year since AMLs were documented in 1984. Specifically, as of February 2007, BLM estimated the

population at 28,563, which was about 1,000 animals over AML. To reach this level, BLM has reduced the nationwide population in the wild by about 40 percent since 2000. However, the population estimates are higher for 2008, and BLM has not met its goal of meeting AML for each HMA. The fact that not all HMAs have met AML remains a concern because of the damage excessive populations can cause on the range. Twenty of 26 field officials we surveyed told us that conducting gathers to remove excess animals is among their top challenges to maintaining AML because delayed gathers can cause animal populations to quickly exceed AML. In our 1990 report we concluded that BLM's decisions on the number of wild horses and burros to remove were made without adequate information about range carrying capacity or the impact of the animals on range conditions. In August 2005, BLM updated its formal policy on gathers and removals and specified the key factors that should be considered in the decision making process. The extent to which BLM has actually met AML depends on the accuracy of BLM's wild horse and burro population counts. Nineteen of the 26 field officials we surveyed used a method that consistently undercounts animals and does not provide a statistical range of population estimates. Alternative counting methods may be more expensive, but undercounting a population can lead to overpopulation and costlier gathers in future years.

## BLM Has Set AML for 197 out of 199 HMAs, but No Formal Guidance Exists on How to Establish AML

BLM has made significant progress in setting AML using rangeland monitoring data for the HMAs. As of February 2008, BLM has set AML for 197 out of 199 HMAs, compared to 2002 when about two-thirds of HMAs had set AML.[24] Prior to 1984, many of the initial AMLs were not based on rangeland data but on factors such as initial herd population counts or administrative convenience. For example, the original AML established for Beaty's Butte HMA in Oregon in 1977 was based on the number of horses found in that area on December 15, 1971. In Wyoming, AMLs for about one-third of the HMAs were based on agreements with local grazing interests because they owned private lands that were interspersed with BLM lands where wild horses were found in 1971. Only 10 out of the 26 field offices we surveyed identified the use of rangeland data to determine their initial AMLs. But since 1984, in accordance with the *Dahl v. Clark* decision, BLM officials told us that field managers have generally

---

[24]The number of HMAs managed by BLM has changed over time. In 2002, BLM managed 208 HMAs, 142 of which had set AML, or 68 percent.

BLM_000051

based AML decisions on monitoring data and an in-depth analysis.[25] Most of the current AMLs for the 199 HMAs were set after 1984 (see table 3). Although some current AMLs were set many years ago, they are generally reviewed every 4 years or so as part of the recurring process to gather and remove excess animals. If during this process, and through monitoring, it is determined that an AML is no longer appropriate, field offices will consider changing it. For example, table 17 in appendix III shows how the current AMLs for the 26 HMAs in our sample have been changed, as applicable, since they were initially set.

**Table 3: Years in Which Current AMLs Were Set for BLM's 199 HMAs**

| Years in which current AMLs were set | Number of HMAs |
|---|---:|
| 1975–1979[a] | 2 |
| 1980–1984 | 13 |
| 1985–1989 | 13 |
| 1990–1994 | 45 |
| 1995–1999 | 32 |
| 2000–2004 | 68 |
| 2005–2008 | 24 |
| Not yet set | 2 |
| **Total** | **199** |

Source: GAO analysis of BLM data.

Note: Although an AML may have been set years ago, they are generally reviewed every 4 years or so as part of the reoccurring process to gather and remove excess animals.

[a]AML determinations were first required by the Public Rangelands Improvement Act of 1978.

Most of the field offices we surveyed considered similar factors in determining AML.[26] According to BLM National Program Office officials, field office staff should consider at least four factors in making AML determinations—climatic data, utilization data, actual use data, and trend data. Climate data measures the amount of precipitation within a specific area. In addition, temperature and wind data may be collected to evaluate

---

[25]*Dahl v. Clark*, 600 F. Supp. 585 (Dist. Ct. Nev. 1984).

[26]For this report we reviewed BLM's process for making AML determinations and the factors it considers during that process. We are not expressing a legal opinion as to whether any individual AML established through this process would achieve and maintain a "thriving natural ecological balance," as required by the act. 16 U.S.C. § 1333(a), (b)(2); *see also, Animal Protection Institute of America*, 109 IBLA 112, 115.

BLM_000052

the effect of climate on vegetation; utilization data measures the percent of forage consumed by livestock, wild horses and burros, wildlife, and insects during a specified period; actual use data is the number of grazing animals that used an area within a certain amount of time; and trend data measures the direction of change in ecological status or resource rating observed over time. Our survey results indicate that these four key AML determination factors were considered by some, but not all, of the BLM field offices responsible for setting AML for our sample of 26 HMAs (see table 4).

**Table 4: Extent to Which BLM Field Office Staff Considered Each of the Four Key Factors in Making the Most Recent AML Determination for Surveyed Field Offices**

| Number of the four key factors considered | Number of BLM field offices |
|---|---|
| 4 | 16 |
| 3 | 6 |
| 2 | 2 |
| 1 | 1 |
| 0 | 1 |
| **Total** | **26** |

Source: GAO survey results.

Almost all of the field offices considered trend (25) and utilization (23) data, but only 19 considered climate and actual use data for livestock, while 14 considered actual use data for wildlife (see table 5).

BLM_000053

**Table 5: Factors Considered by BLM Field Office Staff in Making the Most Recent AML Determinations for Surveyed Field Offices**

| Factor | Considered | Not considered | Don't know | Not applicable | Blank |
|---|---|---|---|---|---|
| Factors BLM officials told us should be considered | | | | | |
| Trend | 25 | 1 | 0 | 0 | 0 |
| Utilization | 23 | 2 | 1 | 0 | 0 |
| Climate data | 19 | 3 | 4 | 0 | 0 |
| Actual use: livestock | 19 | 2 | 2 | 3 | 0 |
| Actual use: wildlife | 14 | 5 | 6 | 1 | 0 |
| Other factors considered | | | | | |
| Carrying capacity | 23 | 1 | 2 | 0 | 0 |
| Census/inventory | 22 | 2 | 2 | 0 | 0 |
| Water resources | 21 | 3 | 2 | 0 | 0 |
| Stakeholder influence | 20 | 2 | 4 | 0 | 0 |
| Production | 19 | 2 | 5 | 0 | 0 |
| Herd health | 19 | 4 | 3 | 0 | 0 |
| Genetic viability | 16 | 6 | 3 | 1 | 0 |
| Recreational use | 14 | 6 | 3 | 3 | 0 |
| Cultural resources | 12 | 6 | 5 | 2 | 1 |
| Archeological resources | 12 | 6 | 5 | 2 | 1 |
| Livestock agreements | 11 | 4 | 7 | 4 | 0 |
| Human safety issues | 8 | 8 | 2 | 8 | 0 |
| Community expansion | 4 | 8 | 2 | 12 | 0 |
| Court order | 2 | 5 | 2 | 17 | 0 |
| Mineral extraction | 3 | 10 | 2 | 11 | 0 |
| Other factors | 7 | 1 | 0 | 1 | 17 |

Source: GAO survey results.

In addition to the four factors mentioned by BLM National Program Office officials, field offices considered other factors to help make their AML determinations, including census inventory, water resource availability, herd health, and unique local conditions. For instance, in Arizona, one field office reduced the AML for burros on an HMA because they found

that burros were foraging on the same willows critical to the survival of the endangered Southwestern Willow Flycatcher.[27]

In determining AML, field office staff must also consider rangeland conditions for wild horses and burros in conjunction with other users of the range, including livestock and wildlife. Determining which species is responsible for rangeland damage is an important task to properly managing the HMA and in determining the number of wild horses and burros to permit on the range. For example, if field staff determine that cattle are primarily responsible for damaging an area, they may pursue several management options, including fencing out cattle, reducing the number of cattle, or changing the time of year cattle are allowed to graze in a particular area. BLM lacks similar management techniques to control wild horse and burro use due to their free-roaming nature. BLM's direct management actions are limited to dealing with livestock and wild horses and burros, since individual states are responsible for managing wildlife.

We recognized the difficulty in distinguishing the difference between impacts that wild horses and burros have on the range versus other users in our 1990 report.[28] Some advocacy groups have criticized BLM because they believe that BLM unfairly faults wild horse and burros for damage to the range to justify their removal and reductions in AML. Several BLM officials told us ascribing range impacts can be difficult, but 20 out of the 26 field offices that we surveyed said they had a procedure in place do so. When the damage is caused by all the user groups or when the damage can not be attributed to a specific user group, BLM will generally make across-the-board reductions in the number of animals allowed on the range based on the historic proportion of each user group on the range. For example, if wild horses and burros historically accounted for 10 percent of the forage consumption on the range, then wild horses and burros would bear 10 percent of the necessary reductions.

BLM has also made steady reductions in cattle grazing on BLM land as drought conditions in much of the West have worsened, resulting in the reduction of forage and water availability. For example, in Nevada, the

---

[27]Under Section 7 of the Endangered Species Act, all federal agencies must ensure that any actions they authorize, fund, or carry out are not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of its designated critical habitat.

[28]GAO/RCED-90-110.

BLM_000055

state that manages for the greatest number of wild horses, permitted livestock use was reduced from about 2.5 million animal unit months in 1990 to a little over 2 million in 2006.[29] The actual use during this same period, however, decreased from 1.8 million animal unit months to 1.2 million.

In addition to the factors considered in making AML determinations, the age of the data, or how current it is, can also be important. The meaning of "current" data collection depends on the ecosystem and may vary across HMAs. BLM national program officials explained that data used to support AML decisions should be collected on a frequent basis. In general, they told us climate, utilization, and actual use data should be collected annually and trend data should be analyzed and reviewed within 4 years of setting AML. However, of the respondents who provided the age for data used, fewer than half collected their data for actual use for livestock and wildlife within 1 year of their AML determination; half collected their data for utilization within 1 year of the determination; and more than half collected their data for climate within 1 year of the determination. Fifteen of the 19 respondents who provided the age for data used considered trend data within 4 years of the determination (see table 6).

---

[29]An animal unit month refers to the amount of forage needed to sustain an adult cow and her calf or horse for 1 month.

BLM_000056

**Table 6: Age of Data Used to Make Current AML Determinations for Surveyed Field Offices**

| | Age of the data | | | | | |
|---|---|---|---|---|---|---|
| Factor | 1 year | 2 years | 3 years | 4 years | 5-10 years | 11 years or older |
| Factors BLM officials told us should be considered | | | | | | |
| Trend | 8 | 3 | 1 | 3 | 4 | 0 |
| Utilization | 9 | 2 | 1 | 3 | 3 | 0 |
| Climate data | 9 | 2 | 0 | 2 | 2 | 0 |
| Actual use: livestock | 6 | 3 | 0 | 2 | 3 | 0 |
| Actual use: wildlife | 5 | 1 | 0 | 2 | 2 | 1 |
| Other factors considered | | | | | | |
| Carrying capacity | 7 | 3 | 0 | 2 | 5 | 1 |
| Census inventory | 13 | 1 | 1 | 2 | 1 | 0 |
| Water inventory | 11 | 2 | 0 | 2 | 1 | 0 |
| Production | 6 | 1 | 0 | 2 | 3 | 2 |
| Herd health | 11 | 1 | 0 | 3 | 1 | 0 |
| Genetic viability | 8 | 0 | 0 | 3 | 1 | 0 |

Source: GAO survey results.

Note: Some field offices that considered the factors listed in this table did not provide a year in which the data was collected.

Although field offices use many factors to make their AML determinations, BLM has no guidance or policy about the specific factors they must consider in determining AML. This is in contrast to the BLM policy that exists for a similar type of analysis that is conducted for removals. According to BLM's 2005 gather policy, the determination to remove animals must be supported by the following factors: climatic data, utilization data, actual use data, trend data, and current census data.[30] While 22 out of 26 BLM field offices responded that the data used to make their AML determination were moderate to very sufficient, several BLM officials told us that with increased retirements, field offices are losing the experienced personnel most familiar with the informal practice of determining AML. Therefore, without clear guidance, BLM cannot ensure

---

[30]U.S. Department of the Interior, BLM, *Gather Policy and Selective Removal Criteria*, Instruction Memorandum No. 2005-206 (Washington, D.C., Aug. 10, 2005). Although the instruction memorandum had an expiration date of September 30, 2006, according to BLM officials, it is still considered to be in effect until it is reissued.

BLM_000057

that the factors considered in future revisions of AML determinations will be consistent across HMAs. To make the informal AML determination process official and to help ensure consistency among BLM field offices, BLM officials have been working on drafting a new handbook for the program since 2006, which specifies the factors field offices should use in making AML determinations.[31] Due to higher priorities and limited resources, the handbook is still in draft form and is undergoing final revision. BLM officials told us they expect the handbook to be completed in fall 2008.

## BLM Has Made Significant Progress toward Meeting AML, but Some HMAs Remain Far over AML

Since 2000, BLM has made significant progress toward meeting AML. At the national level, BLM was closer to meeting AML in 2007 than in any other year since 1984 (when AML levels were first reported by BLM), with a population of 28,563, or about 1,000 animals over the upper limit of AML (see fig. 5). Meeting AML has been a challenge for most of the lifetime of the program. In 1985, in reporting on the Department of the Interior and related agencies' appropriations, the Senate Committee on Appropriations recommended more than tripling the program's funding above the original budgeted amounts to, according to the committee, permit BLM to maintain nearly 14,000 animals in corrals through the end of fiscal year 1986 and to remove 17,000 excess animals during fiscal year 1986.[32] The program's funding was tripled in fiscal year 1986, and with the increased funding, BLM removed 18,959 excess animals. In fiscal year 2001, BLM began implementing a 4-year strategy to aggressively remove animals from the range to reach the upper limit of AML by 2005. However, just before initiating the strategy—which relied heavily on specific assumptions about the number of animals removed, adopted, and held in short-term and long-term holding—emergency drought and fire conditions called for the removal of wild horses and burros in numbers far greater than anticipated. These additional removals and decreases in adoption targets changed BLM's assumptions and made it clear the agency would not be able to meet the targets set forth in their plan. In 2004, BLM again revisited targets and management options that would help them to achieve and maintain the midpoint of AML by 2006. Over the past several years, the program is closer to meeting AML as a result of increases in the number of wild

---

[31]According to BLM, the effort to revise the *Wild Horse and Burro Program Handbook* was first initiated in 1997. The effort was restarted most recently in 2006 when the draft handbook was significantly rewritten and expanded.

[32]S. Rpt. 99-141, at 6, 121 (1985).

BLM_000058

horses and burros removed from the range, but it continues to face challenges in maintaining that level. According to BLM data, the population now exceeds the upper limit of AML by an estimated 5,886 animals. BLM attributes most of the increase in population to more accurate population census counts.

**Figure 5: Estimated Population of Wild Horses and Burros on the Range**



Source: BLM.

Note: All population levels are estimated based on aerial surveys that likely undercount the number of animals on the range. In 2000, BLM changed the time frame for its population counts from October 1 through September 30 of every year to March 1 through February 28 or 29 of every year. For AML levels prior to 1984, BLM was unable to provide estimated figures. For AML levels from 1984 through 1999, the figures are estimated and they do not necessarily reflect the upper limit of AML; from 2000 onward, the AML figures represent the upper limit of AML.

While the national statistics appear to indicate that BLM is close to meeting its goal, it is important to note that, under the act, BLM is required to maintain HMAs at a level that is at or below the upper limit of AML. To stay below the upper limit of AML, HMAs should be gathered to the lower limit of AML approximately every 3 to 5 years. However, only 7 of the 26 BLM field offices we surveyed said they were typically able to gather to this low level. When animals are not gathered to the low level of AML, a population can quickly rise well above the upper limit of AML. Fewer than

half (10) of the field offices surveyed said they were usually able to manage the population of wild horses and burros on their HMAs within the limits of AML. Fifteen field offices said they managed populations that were typically above AML.

We are not reporting in detail on the extent to which individual HMAs have met AML because we do not believe that BLM's data are precise enough to accurately make such a determination. BLM's estimates of the number of HMAs that are at or below AML may be overstated because, for reporting purposes, BLM considers the HMAs where the population is not more than 10 percent over the upper limit of the AML to be at AML. BLM officials told us that this is done to account for those HMAs that may slightly exceed AML. For example, in 2008, BLM reported that 61 of the 102 HMAs in Nevada were at or below AML. Without the 10 percent adjustment factor, we calculated that 52 HMAs were at or below AML. Because of this adjustment factor and questions about the accuracy of BLM's animal counting methods, we concluded that the data on whether or not individual HMAs had met AML were not sufficiently reliable to report because an error of plus or minus one or two animals could change the status of an HMA from being under or over AML. Aside from the precise issue of whether or not an HMA is within or over AML, it is clear from the data that some HMAs are significantly over AML. For example, as of February 2008, BLM reported that 87 HMAs were over AML. About half of these HMAs were over AML by 50 percent or less, about a quarter were over AML by between 51 and 100 percent, and about another quarter of the HMAs were over AML by more than 100 percent.

Populations that exceed AML can harm the health of the range. For example, in 2004, the Calico HMA in Nevada exceeded AML by about 200 percent. The herds were found to concentrate in sensitive areas, affecting the threatened Lahontan cutthroat trout and contributing to the nonattainment of grazing allotment objectives and standards for rangeland health.[33] As of February 2008, the wild horse population in this HMA exceeded the upper limit of AML by 160 percent. The excess population

---

[33]Rangeland health standards were developed to be consistent with the fundamentals of rangeland health, including watersheds that are in a properly functioning condition; ecological processes that are maintained in order to support healthy biotic populations and communities; water quality that complies with state water quality standards; and habitats that are being restored or maintained for federal threatened and endangered species, proposed or candidate threatened and endangered species, and other special status species.

levels and continued drought are expected to continue to negatively impact sensitive riparian areas relied upon by the Lahontan cutthroat trout. The overpopulation of wild horses and burros on the range may negatively impact herd health, rangeland health, and livestock and wildlife that depend on the range. An over-obligation of the vegetative resources can result in declines in the healthy vegetative condition that may take years to recover. See figure 6 for our survey results on the possible negative impacts of populations that exceed the upper limits of AML.

**Figure 6: Number of Field Offices Who Reported Negative Impacts When Populations Exceed the Upper Limit of AML**



Source: GAO analysis of survey data.

Note: We asked survey respondents to identify the impact (positive, slightly positive, no impact, slightly negative, and negative) that populations that exceed the upper limit of AML would have on the four factors above. The figure is a graphic depiction of survey respondents who reported negative impacts when populations exceed AML. See appendix III for the number of survey respondents who reported positive, slightly positive, no impact, or slightly negative impacts when the upper limit of AML is exceeded by a certain percentage.

In addition to the effects on the range, overpopulation in HMAs also results in costlier gathers because a greater number of animals would have to be removed to maintain AML in future years.

BLM_000061

Although there has been an increased effort to meet AML, there have been many challenges in meeting and maintaining that level. Twenty of the 26 field officials we surveyed identified limitations to gathers to remove excess animals as one of their top challenges to meeting or maintaining AML. One limitation identified by these respondents included limited funding available to conduct gathers. Another limitation identified by respondents was unplanned gathers that alter the gather schedule as resources are directed to HMAs in critical need. Reasons for unplanned gathers include escalating problems and emergencies. An HMA with an escalating problem is defined as an area where deteriorating rangeland conditions, such as declining availability of forage or water, will negatively affect animal condition and rangeland health. Emergency situations are unexpected situations that threaten the immediate health of wild horses and burros or their habitat, such as fire, disease, or other catastrophic events.

In addition to using gathers and removals to manage the population on the range, BLM may also use fertility treatment to manage the reproductive rates of wild horses. BLM is using this tool on a limited number of HMAs. However, some animal fertility researchers and wild horse advocates believe that this tool should be used more widely. They say that unless the reproductive rate is curtailed, the need to gather a large number of animals from the range will continue. See appendix II for more information about BLM's use of this treatment.

## BLM Has Established a Formal Policy on Gathers and Removals that Specifies the Key Factors that Should Be Considered in the Decision Making Process

Removals are used as a primary method for managing wild horse and burro populations on the range; however, the data used to support these removal decisions have been criticized. Specifically, our 1990 report concluded that BLM's decisions on the number of wild horses and burros to remove were made without adequate information about range carrying capacity or the impact of the animals on range conditions.[34] In August 2005, BLM issued an update to their 2002 policy on gathers that determinations to support gathers and removals must be based on a National Environmental Policy Act analysis and a gather plan that consider five key factors—utilization, trend, actual use, climatic data, and

---

[34]GAO/RCED-90-110.

current census.[35] Eleven of the 26 field offices we surveyed considered all five key factors in their most recent gather plan (see table 7). However, many of these field offices conducted their most recent gathers prior to the issuance of the 2005 policy that specified which factors to consider in their decision making process. Specifically, 11 field offices conducted their most recent gathers between 1990 and 2005. Additionally, some field offices' most recent gathers were conducted as a result of an emergency situation. In those cases, a field office may not have had enough time to consider all five criteria due to the critical time response necessary to remove the animals.[36]

**Table 7: Extent to Which BLM Field Office Staff Considered Each of the Five Key Factors in Making Their Most Recent Gather Determination**

| Number of the five key factors considered | Number of respondents |
| --- | ---: |
| 5 | 11 |
| 4 | 4 |
| 3 | 5 |
| 2 | 1 |
| 1 | 4 |
| 0 | 1 |
| **Total** | **26** |

Source: GAO survey results.

Regardless of when the most recent gathers were conducted, 25 of the 26 field offices we surveyed considered the data used to support their removals for specific HMAs as moderately to very sufficient. See table 8 for the number of field offices that considered each of the factors we asked about in our survey.

---

[35] U.S. Department of the Interior, BLM, *Gather Policy and Selective Removal Criteria*, Instruction Memorandum No. 2005-206 (Washington, D.C., Aug. 10, 2005). The 2005 policy updated BLM Instruction Memorandum No. 2002-095, dated February 13, 2002. The 2002 policy did not explicitly enumerate the key factors that should be considered as part of the gather and removal analysis.

[36] U.S. Department of the Interior, BLM, *Establishment/Adjustment of Appropriate Management Levels, and Managing Planned Escalating Problem and Emergency Gathers*, Instruction Memorandum No. 2004-151 (Washington, D.C., Mar. 16, 2004). When gathers are conducted as a result of an emergency, such as a fire, a National Environmental Policy Act analysis and gather plans are still required prior to the animal removal, if time permits. If immediate action is required, emergency actions should be documented and a report prepared after resolution of the problem.

**Table 8: Factors Considered by Field Offices in Decisions to Gather Wild Horses and Burros from the Range**

| Factor | Considered | Not considered | Don't know | Not applicable | Blank |
|---|---|---|---|---|---|
| Factors that should be considered | | | | | |
| Census/inventory | 24 | 2 | 0 | 0 | 0 |
| Utilization | 21 | 3 | 1 | 0 | 1 |
| Climate data | 19 | 5 | 1 | 0 | 1 |
| Trend | 16 | 6 | 2 | 1 | 1 |
| Actual use: livestock | 11 | 8 | 2 | 4 | 1 |
| Actual use: wildlife | 8 | 10 | 3 | 4 | 1 |
| Other factors considered | | | | | |
| Herd health | 21 | 4 | 1 | 0 | 0 |
| Carrying capacity | 17 | 6 | 2 | 0 | 1 |
| Water resources | 16 | 7 | 1 | 0 | 2 |
| Stakeholder influence | 16 | 3 | 3 | 2 | 2 |
| Production | 12 | 8 | 4 | 1 | 1 |
| Livestock agreements | 12 | 6 | 1 | 5 | 2 |
| Cultural resources | 12 | 7 | 1 | 4 | 2 |
| Archeological resources | 12 | 8 | 1 | 3 | 2 |
| Genetic viability | 11 | 11 | 2 | 1 | 1 |
| Recreational use | 8 | 8 | 1 | 7 | 2 |
| Other factors | 8 | 0 | 1 | 3 | 14 |
| Human safety issues | 7 | 10 | 1 | 6 | 2 |
| Court order | 3 | 5 | 1 | 14 | 3 |
| Mineral extraction | 3 | 9 | 1 | 11 | 2 |
| Community expansion | 1 | 11 | 1 | 11 | 2 |

Source: GAO survey results.

Unlike our previous report, which stated that data to justify removals was outdated, most respondents who provided the year in which their data was collected indicated that their data was current as of the year of their most recent gather or less than 4 years old (see table 9).

BLM_000064

**Table 9: Age of Data Used by Field Offices to Determine the Need for Most Recent Gather**

| Factor | Age of the data | | | | | |
|---|---|---|---|---|---|---|
| | 1 year | 2 years | 3 years | 4 years | 5-10 years | 11 years or older |
| Factors that should be considered | | | | | | |
| Census/inventory | 14 | 2 | 3 | 0 | 0 | 0 |
| Utilization | 13 | 1 | 0 | 1 | 0 | 0 |
| Climate data | 15 | 0 | 0 | 1 | 0 | 0 |
| Trend | 8 | 1 | 1 | 1 | 2 | 0 |
| Actual use: livestock | 10 | 0 | 0 | 0 | 0 | 0 |
| Actual use: wildlife | 7 | 0 | 0 | 0 | 0 | 0 |
| Other factors considered | | | | | | |
| Herd health | 11 | 2 | 1 | 1 | 0 | 0 |
| Carrying capacity | 6 | 1 | 1 | 0 | 1 | 2 |
| Water resources | 8 | 0 | 0 | 1 | 0 | 0 |
| Production | 6 | 1 | 0 | 1 | 0 | 0 |
| Genetic viability | 1 | 1 | 1 | 2 | 1 | 0 |

Source: GAO survey results.

Half of the survey respondents identified impediments to conducting gathers as a major challenge in managing their HMAs to achieve healthy herd populations that are in balance with the range and other multiple uses. Only 7 of the 26 field offices surveyed said that they were able to typically gather to their lower limits of AML. While several BLM officials explained that gathers can be delayed as a result of funding restrictions or emergency gather priorities, only four of the field offices surveyed indicated that their most recent gather was delayed.

## Research and Experience Have Shown That BLM's On-the-Range Population Estimates Are Too Low

Accurate animal population counts are critical to BLM's ability to properly manage wild horse and burro herds and in determining whether AML targets were met. However, many field offices use a population counting method—the direct-count method—that researchers consider inaccurate. This method generally calls for one person to count each animal they spot from an airplane or helicopter. According to researchers, it consistently undercounts animals and does not provide a statistical range of estimates. Nineteen of the 26 field officials we surveyed used the direct-count method for conducting their most recent census.

Regardless of which method is used, counting wild horses and burros can be challenging, particularly when the animals are obscured by trees or when the rangeland is covered with snow. Because counting poses such challenges, researchers are investigating alternative counting methods to assist BLM in collecting accurate population data to form statistically valid population estimates.[37] Each method the researchers are evaluating includes some range of statistical error, whereas direct count only reports the raw number spotted on the ground. Researchers believe that the most effective method will likely be a combination of two or more counting techniques. BLM's population counts of wild horses and burros have long been questioned by managers and advocacy groups alike. By employing alternative methods that account for a range of error, BLM would have a more defensible way of determining population estimates. In the most recent 2008 BLM population estimates, for example, population counts exceeded those in 2007 by approximately 4,500 animals. As a result, on a nationwide level, BLM is once again well over the upper limit of AML, which brings into question earlier population estimates and whether or not those previous years were as close to meeting AML as once thought. BLM is working with the Department of the Interior's U.S. Geological Survey's Fort Collins Science Center and the Colorado State University to develop these methods to achieve greater accuracy in population counts. Some BLM offices have begun to employ some of these methods. For example, in Arizona, managers use the simultaneous double-count method to improve population counts and avoid underestimating burro populations. Some field offices, however, are reluctant to use alternate counting methods because they are concerned that they would require too much

---

[37]The five methods experts are investigating include the following: (1) Photographic mark-resight involves two or more separate counts. First, an aerial count is conducted, and each group of animals photographed. This is followed soon after by additional aerial counts. The photographs from each survey are compared to determine which animals were seen on each pass and which were missed. A statistical technique to estimate the number missed is based on the number missing on each pass. (2) Simultaneous double-count is a form of mark-resight that uses only one count where two observers in an aircraft independently observe and record a direct count of wild horses or burros. Sighting rates are estimated by comparing sighting records of the two observers, and the number of horses that were missed by both individuals can be estimated. (3) Sightability bias correction involves observers that count animals but also records other factors about each sighting, such as if the groups were large or small, terrain type, weather, and other factors that may have prevented some animals from being seen. (4) Distance sampling estimates the number of animals or herds based on the distance and location of the animals that are seen on the ground. The data enables statisticians to predict the number of animals that are not seen because they are too far away. (5) Combined techniques utilize different combinations of the aforementioned four techniques to mitigate known biases associated with each individual method.

BLM_000066

additional staff or would be too expensive. Researchers agree that other methods may be slightly more expensive, given the greater number of staff needed.

When a population is undercounted, BLM is likely to remove fewer animals than is needed to control overpopulation. For example, in 2002, a direct count was used to census the wild horse population located on the Jackson Mountain HMA in northern Nevada, an area that has been affected by severe drought. When a gather was conducted in 2003, staff believed they removed the adequate number of wild horses to reach AML. Funds to conduct their scheduled census in 2006 were not available, and BLM was unable to conduct its population count until the summer of 2007. It was at this point that staff realized that their 2002 census was incorrect and that they miscalculated the population in 2007 by approximately 640 wild horses. They found that the actual population in 2007 was about five times greater than what they determined was sustainable. In the winter of 2007, BLM began to monitor water availability more regularly. The BLM field staff member who managed that HMA told us that although the herd condition was weakened, the horses did not appear to be in extremely poor condition. Nevertheless, more than 150 of the wild horses removed from this HMA died in a short-term holding facility due to disease that was able to overtake the animals in their weakened state.

## Declining Adoptions and Sales Have Increased the Need for Short-Term and Long-Term Holding Facilities, and Holding Costs Have Increased

The number of wild horses and burros removed from the range is far greater than the number adopted or sold. Since 2001, about 74,000 animals have been removed from the range, while only about 46,400 have been adopted or sold. This has resulted in significant spending increases due to a greater number of animals in short- and long-term holding. Thirty-six percent fewer wild horses and burros were adopted in 2007, compared to average adoption rates in the 1990s—a trend BLM officials attribute to the decrease in adoption demand and increasing hay and fuel costs. Since 2004, when BLM was directed to sell excess wild horses and burros without limitation, BLM has sold about 2,700 animals—far fewer than expected, despite the low average selling price of $15. As of June 2008, BLM was holding 30,088 animals in short- and long-term holding facilities, compared with the estimated 9,807 held in 2001. To accommodate the increase in animals removed from the range and the decline in adoptions and sales, BLM has increased the number of short- and long-term holding facilities. This has resulted in an increase in spending for short- and long-term holding facilities.

## Adoption Rates Have Declined Since the 1990s, and the 2004 Sale Directive Generally Has Not Been Used

BLM has historically managed wild horses and burros removed from the range through adoptions to the general public. Adoption has been regarded as the most economical way to provide humane long-term care to animals that have been removed from the range. In the 1990s, the number of animals removed from the range was about equal to the number of animals adopted. The average number of animals adopted each year in the 1990s was about 7,500. Since 2000, the number of animals removed has outpaced the number of animals adopted or sold due to an increase in removals and a steady decline in adoption demand and sales. Since 2001, about 74,000 animals have been removed from the range, compared to about 46,400 adopted or sold. The average number removed annually from 2001 to 2007 was about 10,600, compared to the average adoption rate of about 6,300 annually. According to BLM's 2004 Report to Congress, at least 7,000 adoptions were needed annually to assist in achieving and maintaining AML. However, only about 4,700 animals were adopted in 2007. Although BLM has increased efforts to market adoptions, demand continues to decline for wild horses, even though the price for adopting them has remained at the minimum fee of $125 since 1997.[38] BLM officials attribute the steady wild horse adoption decline in recent years to increases in hay and fuel costs associated with horse care, the large number of domesticated horses that are currently flooding the adoption market,[39] a general urbanization of rural areas, and a shift toward other forms of recreation. For example, according to one official, individuals who once had corrals with two or three horses may now own one horse and four all-terrain vehicles. Figure 7 compares the number of wild horses and burros removed from the range with the number adopted from 1989 through 2007.

---

[38]Demand for burros has stayed relatively stable from an annual average of 1,154 burros adopted from 1990 through 1999 and an annual average of 1,092 burros adopted from 2000 through 2007.

[39]The last horse slaughterhouse in the United States closed in fall 2007. The number of domestic horses killed in slaughterhouses from 2000 to 2005 ranged from about 40,000 to 75,000 annually. Without these outlets, more domestic horses are available to the public, causing direct competition with wild horse adoptions and sales.

**Figure 7: Comparison of Removed and Adopted Wild Horses and Burros, 1989 through 2007**

Number of animals



Year

☐ Total adopted

▨ Total removed

Source: BLM.

One alternative for managing unadoptable excess wild horses and burros, as provided for by the 2004 amendment to the 1971 act, is to sell the animals "without limitation." The act directs BLM to offer excess animals for sale that are more than 10 years old or that have been offered unsuccessfully for adoption at least three times. At the time of the amendment, BLM estimated that approximately 8,400 animals were eligible for sale. To date, BLM has sold only about 2,700 animals—far fewer than originally expected, despite the low average selling price in 2006 of $15 (see table 10).

**Table 10: Number of Wild Horses and Burros Sold under the December 8, 2004, Sales Directive**

| Year | Number sold |
|------|------------:|
| 2005 | 1,468 |
| 2006 | 645 |
| 2007 | 420 |
| 2008[a] | 211 |
| **Total** | **2,744** |

Source: BLM.

[a]As of June 2008.

In 2005, the first sale was made to a wild horse protection group in Wyoming who purchased 200 horses that would otherwise have likely ended up in long-term holding under BLM's care. A few other animals that were sold, however, ultimately ended up in slaughterhouses. To reduce the likelihood that a buyer would purchase these animals and then sell them for slaughter, BLM changed its sales process to require buyers to sign a "statement of intent" that they do not intend to sell the animals for slaughter. This limitation, as well as a decrease in demand, has contributed to the small number of sales.

## BLM Manages 30,088 Animals in an Increasing Number of Short-Term and Long-Term Holding Facilities, and Holding Costs Have Increased

As of June 2008, BLM was holding a combined 30,088 animals in short-term and long-term holding facilities, compared to 9,807 animals in 2001. To accommodate the increase in animals needing care once removed from the range, the number of short-term and long-term holding facilities has increased. Spending on combined short-term and long-term holding has also increased from about $7 million in 2000 to about $20.9 million in 2007. From 2001 through 2008, the number of short-term holding facilities increased from 14 to 24,[40] and the number of animals held in these facilities increased from 6,514 animals to 7,987 by June 2008. These holding facilities provide the animals with vaccinations and other care prior to their being adopted, sold, or sent to long-term holding. The average cost of animals in short-term holding increased from $3.00 per horse per day in 2001 to $5.08 per horse per day in 2008. From 2000 to 2001, the cost for short-term holding increased from $6.4 million to $11.2 million. From

---

[40]Three of these facilities were added to incorporate horse gentling programs to improve the likelihood of adoption.

2001 through 2007, the cost remained relatively stable, but for 2008, costs are anticipated to increase to $16.2 million. According to several BLM officials, the escalating cost for caring for animals in short-term holding is primarily a result of the dramatic increase in hay and fuel prices from 2007 to 2008. For example, hay prices for one short-term holding facility in Nevada increased from about $160 per ton in 2007 to almost $300 per ton in 2008. Decreases in adoption and sales and a lack of capacity in long-term holding has not only increased the number of animals held in short-term holding, but has also increased the time animals are held there. According to one state official, animals in his state spent 45 to 60 days in short-term holding facilities in the late 1990s. Beginning in 2000, this official told us, it was not uncommon to hold animals for more than a year. Nationwide, according to BLM, the average length of stay in short-term holding in 2008 has been 210 days. This is far longer than the 90 days BLM projected animals would spend in short-term holding in their 2001 initiative to meet AML.

Similarly, the number of long-term holding facilities has increased, as has the cost. The number of facilities increased from 1 in 1988 to 11 as of June 2008, and the number of animals cared for increased from 1,500 in 2000 to 22,101 as of June 2008 (see table 11). These long-term holding facilities have reached their capacity—currently 22,100—despite the increase in numbers of facilities. BLM anticipates it will need greater long-term holding capacity and is working to contract for additional facilities.

**Table 11: Number of Wild Horses in Long-Term Holding, by Year, Since 2000**

| Year | Number of facilities | Capacity | Number of horses in long-term holding |
|---|---|---|---|
| 2000 | 1 | 2,000 | 1,500 |
| 2001 | 3 | 6,000 | 3,293 |
| 2002 | 5 | 10,000 | 7,311 |
| 2003 | 7 | 14,000 | 10,122 |
| 2004 | 7 | 14,000 | 13,151 |
| 2005 | 9 | 20,600 | 15,379 |
| 2006 | 8 | 19,700 | 18,198 |
| 2007 | 10 | 21,800 | 19,652 |
| 2008[a] | 11 | 22,100 | 22,101 |

Source: BLM.

[a]As of June 2008.

BLM pays private contractors an average of $1.27 per horse per day to maintain the animals for the remainder of their lifespan, unless removed from long-term holding for adoption or sale. While this fee has increased by only 7 cents since 2000, the number of animals cared for has also increased, resulting in a significant increase in BLM spending on long-term holding.[41] In 2000, BLM spent approximately $668,000 in 2000, compared to more than $9.1 million in 2007 to care for wild horses in long-term holding. The long-term holding facilities are primarily located in Oklahoma and Kansas, where forage is typically more abundant than on HMAs of the West. Table 12 lists the 11 long-term holding facilities.

**Table 12: BLM Long-Term Holding Facilities, June 2008**

| Name of facility | Location | Year(s) animals first held in facility | Capacity | Horses held |
|---|---|---|---|---|
| Bartlesville | Oklahoma | 1989 | 2,300 | 2,066 |
| Catoosa | Oklahoma | 2001 | 2,000 | 2,042 |
| Teterville East | Kansas | 2001 | 2,200 | 1,913 |
| Teterville West | Kansas | 2002 | 2,200 | 2,531 |
| Foraker | Oklahoma | 2003 | 2,500 | 2,507 |
| Pawhuska | Oklahoma | 2003–2004 | 3,400 | 3,646 |
| Grenola | Kansas | 2004 | 2,200 | 2,269 |
| Hulah | Oklahoma | 2004 | 2,200 | 2,203 |
| Herd | Oklahoma | 2007 | 1,000 | 1,042 |
| Whitehorse | South Dakota | 2007 | 1,100 | 1,169 |
| Strohm | Oklahoma | 2008 | 1,000 | 713 |
| **Total** | | | **22,100** | **22,101** |

Source: BLM.

For at least two decades, BLM's primary strategy to manage excess unadoptable wild horses has been to increase long-term holding, despite warnings in our 1990 report that these facilities were likely to be more expensive than envisioned and to be only a temporary solution to the disposal of unadoptable animals.[42] In 1994, the Department of the Interior's Office of Inspector General also issued a report that strongly discouraged

---

[41]Long-term holding costs were, on average, $1.20 in 2000, $1.22 in 2001, and $1.25 per horse per day from 2001 through 2004. In 2005, the cost increased to $1.27 per horse per day through 2007 and will increase to $1.28 per horse per day by the end of 2008.

[42]GAO/RCED-90-110.

long-term holding as a solution to managing horses removed from the range due to the large costs.[43] BLM continues to look for more facilities but faces difficulty attracting new contractors that can sustain a large number of animals and that will accept the fee BLM offers, compared to perhaps more profitable land uses.

## BLM Has Controls in Place to Help Ensure the Humane Treatment of Wild Horses and Burros, but It Could Better Track and Report These Data to the Public

BLM has implemented multiple controls to help ensure the humane treatment of wild horses and burros, including standard operating procedures and agreements with all three slaughterhouses in the United States before they closed in 2007. A variety of controls are used at various stages in the management of wild horses and burros, including for those animals that are gathered, in short-term holding facilities, in long-term holding facilities, adopted, or sold. BLM's controls for gathers include standard operating procedures, inspections, and data collection. While BLM state offices collect detailed data on animals that die during gathers, the information is not compiled by BLM headquarters in its centralized database, nor is it reported to the public. In addition, BLM does not regularly provide the information it tracks on the treatment of animals in short- and long-term holding and adoption inspections to the public. Making more of this data available to the public may help inform them about the treatment of the animals and improve transparency. Beginning in 1998, until the last horse slaughterhouse in the United States shut down in 2007, BLM sought agreements with all three slaughter facilities to alert BLM of wild horses that entered their facilities. According to BLM data, since 2002, about 2,000 wild horses whose legal titles were obtained by private citizens either through adoption or purchase were slaughtered. During that same period, another 90 wild horses whose title still belonged to BLM were retrieved from slaughterhouses by BLM and by wild horse groups. We reviewed the basic controls BLM has in place, but we did not evaluate their effectiveness. While BLM is required to implement controls to help ensure the humane treatment of wild horses and burros, such

---

[43]U.S. Department of the Interior, Office of Inspector General, *Selected Aspects of the Wild Horse and Burro Program* (Washington, D.C., May 1994).

controls cannot provide absolute assurance that all agency objectives will be met.[44]

## BLM Internal Controls Help Ensure Humane Treatment, but BLM Could Improve Data Gathering and Reporting in Some Areas

A variety of controls are used at various stages in the management of wild horses and burros, including for those animals that are gathered, in short-term holding facilities, in long-term holding facilities, adopted, or sold. BLM's controls for gathers include standard operating procedures, inspections, and data collection. Data collected from 6 of the 10 states from fiscal years 2005 through 2007 indicate that mortality as a result of gathers is about 1.2 percent. Similarly, controls for short- and long-term holding include standard operating procedures, inspections, and data collection. BLM did not report any deaths due to neglect or abuse at holding facilities, aside from one animal that was repossessed by BLM after having been abused by an adopter. BLM has controls over the adoption of wild horses and burros, and data indicate that from 2005 to 2007, about 9 percent of adopters were not in compliance with BLM's standards of care. BLM's controls over humane treatment primarily apply to horses and burros before ownership is passed to private individuals, but BLM has also implemented some controls to protect horses and burros once ownership passes, such as when wild horses and burros are sold. For animals that are sold, since spring 2005, BLM has required buyers to sign a statement that they do not intend to slaughter the animals. BLM does not consistently track information on treatment during gather operations through a central database, nor does it report information about the treatment of animals during gathers, holding, or adoption inspections to the public.

### Gathers

BLM has established controls, such as standard operating procedures and tracking systems, to help ensure humane treatment during gather operations. BLM hires contractors to remove wild horses and burros from the range. These contractors generally use helicopters to herd the animals into capture pens on the range (see fig. 8).

---

[44]Standards for internal control in the federal government describe internal controls as "a series of actions and activities that occur throughout an [agency's] operations and on an ongoing basis" used "to regulate and guide [the agency's] operations." See GAO, *Standards for Internal Control in the Federal Government*, GAO/AIMD-00-21.3.1 (Washington, D.C.: November 1999).

BLM_000074

**Figure 8: Helicopter Used to Gather Wild Horses Near Ely, Nevada, c. 2006**



Source: BLM.

Due to the stress caused to wild animals by gathering them into pens, gather operations have the potential to cause harm to wild horses and burros, such as nervous agitation; conflict between captured animals; or more rarely, animal death. Because of the potential for harm and to help ensure the safe and humane handling of all animals captured, BLM has implemented a range of standard operating procedures for its gather contractors. Prior to the start of gather operations, BLM personnel evaluate the site of the gather to determine whether it is suitable based on environmental and safety concerns. They also approve gather facility plans ensuring, among other things, that they do not present puncture or laceration hazards and that they prevent animals from seeing humans, vehicles, and other perceived threats. During the herding of the animals, BLM sets limitations on the distance and speed the animals will travel, depending on the condition of the animals and other factors. As the animals are herded into the gather site, BLM requires contractors to segregate horses by age and sex to reduce the possibility of conflict and to ensure that very young horses and burros are not left behind to fend for themselves on the range. Finally, as the captured animals are transported from the gather site to short-term holding facilities, contractors are required to follow procedures to ensure animal safety, such as using adequately sized motorized equipment that has been inspected for safety. BLM has managed gathers with standard operating procedures since the passage of the act in 1971.

BLM_000075

Although BLM's controls are designed to enhance the safety of wild horses and burros during gather operations, some animals are accidentally killed in the course of gathers or are euthanized because of ill health or prior injury. Six of the 10 BLM state offices reported data about the number of animals that die as a result of their gather operations. Data collected from 6 of the 10 states from fiscal years 2005 through 2007 indicate that, of the 24,855 animals removed from these states during this period, about 1.2 percent were either euthanized or died accidentally (see table 13). Horses and burros sometimes die due to accidents during gather operations on the range or after they are brought to the holding pens. For example, wild horses will sometimes panic and break their necks against capture pens. Animals found with conditions that make it unlikely they will be able to live their life without significant pain, such as lameness or club feet, are euthanized.

**Table 13: Number and Percentage of Wild Horses and Burros That Died During Gather Operations, (for 6 of 10 States) Fiscal Years 2005 through 2007**

| Fiscal year | Number removed | Number of accidental deaths | Percentage | Number euthanized | Percentage |
|---|---|---|---|---|---|
| 2005 | 9,830 | 25 | 0.25% | 46 | 0.47% |
| 2006 | 8,081 | 64 | 0.79 | 79 | 0.98 |
| 2007 | 6,944 | 28 | 0.40 | 60 | 0.86 |
| **Total** | **24,855** | **117** | **0.47%** | **185** | **0.74%** |

Source: GAO analysis of BLM data.

Note: This chart is based on data reported by 6 of 10 states: California, Colorado, Idaho, Nevada, New Mexico, and Wyoming. The data provided could not be verified for its reliability. We requested this information from the other four states (Arizona, Montana, Oregon, and Utah), but the information was not provided.

Although BLM national and state officials told us that they sometimes record data about the animals accidentally killed or euthanized during gathers at the BLM state office level, BLM does not centrally compile or report these data to the public on a regular basis on a national level. A BLM official told us that although their main tracking database has the capability to record the number of animals that are killed or euthanized during gathers, they generally do not use the database to do so because it was originally intended to track adoptions. Moreover, BLM has not regularly reported to the public how many wild horses and burros are killed in the course of gathers, although BLM officials have cited the data during public hearings. Some advocates and members of the public believe that gathers are held in secret and highlight individual cases of apparent mistreatment as evidence that inhumane treatment is widespread.

BLM_000076

However, a BLM official told us that it is BLM's standard practice to allow the public and the media to observe gather operations, and BLM is required to hold public hearings prior to scheduled gathers using helicopters. If BLM does not improve its transparency by presenting reliable data to members of the public, BLM will continue to be vulnerable to accusations that gathers are generally cruel and inhumane.

## Short-Term Holding

BLM has issued standard operating procedures to help ensure that wild horses and burros held in short-term holding facilities are well cared for. They include procedures for minimizing the excitement of the animals to prevent injury; separating horses by age, sex, and size; observation of the animals on a regular basis; and recording information about the animals that BLM later uses for tracking the animals in BLM's database. BLM's short-term holding facilities are mostly maintained and directly managed by BLM, either on government property or on leased property. Several are at state prisons, and a few others are maintained by contractors in privately-owned feedlots or ranches that BLM has leased. According to BLM staff, they regularly inspect the short-term holding facilities and the animals they hold. They inspect to see that the corral equipment is up to code and that animals are treated with appropriate veterinary care. For example, staff check to see that the horses' hooves are regularly trimmed so that they do not become too long and cause injury. At two of the short-term holding facilities we visited, we observed specially constructed chutes that hold and rotate horses in place so that horses' hooves can be trimmed more quickly, easily, and with less risk to the animals and the employee than other methods, such as using tranquilizer darts or roping (see fig. 9).

**Figure 9: BLM Contractor Trimming Horse Hooves Using a Special Holding Chute at a Contract Short-Term Holding Facility in Fallon, Nevada, October 2007**



Source: GAO.

BLM data indicate that the wild horses and burros held in short-term holding facilities from 2003 to 2007 had a mortality rate of about 5 percent. Specifically, for 2007, BLM reported 936 deaths in short-term holding facilities out of a total of 17,363 animals that passed through short-term holding facilities in that year.[45] BLM reported that none of the animals in its care died of neglect or abuse between 2005 and 2007, aside from one case in 2006, where a reclaimed adopted horse died in BLM care due to the effects of abuse suffered while it was in the care of an adopter. BLM data showed that the animals generally died due to sickness, broken limbs, or injuries sustained accidentally during gathers. BLM does not report this information regularly to members of the public who remain concerned that the agency does not adequately care for animals in short-term holding.

**Long-Term Holding**

BLM has similar controls in place for its long-term holding facilities. BLM staff inspect long-term holding facilities annually to count the number of animals held. Staff also monitor pasture conditions, winter feeding, and

---

[45]For 2007, BLM also reported 616 births in short-term holding facilities.

BLM_000078

animal health throughout the year. According to BLM staff, during these visits they ensure the contractors comply with BLM provisions and discuss possible problems that can be corrected. In addition, veterinary staff from the Department of Agriculture's Animal and Plant Health Inspection Service inspect long-term holding facilities annually; these inspections involve a full count of the horses held there, an inspection of the horses' general health, and written reports. Animal and Plant Health Inspection Service reports from 2007 indicate that the horses kept in long-term holding sanctuaries are generally in "good" or "excellent" condition. These reports, however, highlight some areas for possible improvement. At one facility, one area of improvement included the proper disposal of the remains of animals that have died of natural causes. To help ensure the animals are well cared for, a contract veterinarian provides care when needed at BLM direction and expense. In addition to inspecting the facilities for the well being of wild horses in long-term holding, contractors are required to count and report the number of horses held on a weekly basis for billing and payment purposes. In 2007, long-term holding contractors were paid an average fee of $1.27 per horse per day, or about $460 per horse per year. While this contract fee structure is not in itself a control that guarantees humane treatment, it provides a profit incentive for contractors to ensure the continued health of the horses. According to one BLM official, BLM does not regularly document the results of its inspections. This official told us that the agency would take actions and record them if it found problems, but the official generally has not found problems with the contractors that have warranted action beyond informal conversations to address minor issues.

BLM collects data on how wild horses are cared for in long-term holding, including the number of animals that die in long-term holding. The average mortality rate of wild horses in long-term holding from 2003 through 2007 was about 8 percent, but it fluctuated from a low of 5 percent to a high of 14 percent during that time period. Specifically, for 2007, BLM reported 938 deaths in long-term holding facilities.[46] The number of wild horses in long-term holding in 2007 was 19,652. The animals that die in long-term holding are generally found in the pastures, and unless there is evidence of foul play, BLM does not investigate the cause of death. According to BLM, barring any evidence to the contrary, it is assumed that the animals in

---

[46]For 2007, BLM also reported 303 births in long-term holding facilities. Although studs are gelded prior to being sent to long-term holding and the wild horses are separated by sex, pregnant mares may be transferred from short-term holding facilities into long-term holding facilities.

BLM_000079

long-term holding die of old age. Officially, BLM reported about 95 percent of the animal deaths in long-term holding as "undiagnosed." Some of the other causes of deaths reported included old age and respiratory illness. No animals in long-term holding died from neglect or abuse, according to BLM reports. While BLM collects this data, it does not report this data regularly to the public. In the absence of this data, some members of the public who advocate greater protection for wild horses have repeatedly expressed their concern that BLM does not adequately care for animals in long-term holding.

**Adoption**

The act requires BLM to determine that adopters have provided humane conditions, treatment, and care for adopted animals for at least 1 year before BLM transfers ownership to the adopter. To implement the act, BLM has established policies for inspecting adopted horses or burros in this first year through telephone calls or personal visits. BLM inspections focus on the condition of the animal; the condition of the facilities; and whether the adopter has notified BLM if the adopted animal has been moved, was stolen, has escaped, or has died. Prior to taking possession of an adopted animal, BLM requires that adopters describe the facility where they will maintain the adopted animal. This is documented in their application, which confers penalties for providing false information.

According to BLM data, from 2005 through 2007, an average of about 9 percent of adopted wild horses and burros that still belong to the government have not been treated in compliance with BLM standards (see table 14). BLM randomly selects a sample from the universe of approximately 5,000 adopters per year who have not yet received title of their adopted animal for inspection. BLM inspects these adopters in order to generate a statistical sample of the likely percentage of adopted animals kept under conditions that do not comply with BLM's policies and standards. The most common conditions in need of improvement included the failure to report changes in the animal's location or status and substandard facilities, such as inadequate fencing or shelter. Less common conditions included lack of care of the animal, such as inadequate feeding or failure to trim the animal's hooves before they grew too long.

BLM_000080

**Table 14: Results of Random Inspections of Wild Horse and Burro Adoptions, 2005 through 2007**

| Result of random adoption inspections | 2005 | | 2006 | | 2007 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| No violation | 395 | 94% | 614 | 91% | 805 | 89% |
| Failure to notify BLM of change in status | 10 | 2 | 24 | 4 | 36 | 4 |
| Failure to provide adequate facilities/care | 4 | 1 | 3 | 0 | 30 | 3 |
| Failure to produce animal | 5 | 1 | 13 | 2 | 19 | 2 |
| Unauthorized transfer/sale | 0 | 0 | 6 | 1 | 15 | 2 |
| Commercial exploitation | 0 | 0 | 0 | 0 | 4 | 0 |
| Inadequate facility | 4 | 1 | 6 | 1 | 0 | 0 |
| Unauthorized destruction | 0 | 0 | 5 | 1 | 0 | 0 |
| Inhumane treatment | 2 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **420** | **100%** | **671** | **100%** | **909** | **100%** |

Source: GAO analysis of BLM data.

In addition, BLM policy directs that officials or certified volunteers conduct personal inspections of all adopted animals whenever BLM receives complaints about mistreatment or when an individual or organization adopts more than four wild horses or burros at one time.

Similar to the data collected on the animals in short- and long-term holding, BLM does not provide information on the results of its adoption inspections to the public. The information regularly provided to the public on the treatment of these animals is in contrast to the comparatively large amount of information BLM provides on the program's Web site regarding information on AML and population estimates for each HMA.

Sales

In the case of animals that were legally sold, BLM has implemented limitations to prevent these animals from being resold to slaughter facilities. In 2004, the act was changed and directed BLM to sell, "without limitation," excess wild horses and burros more than 10 years of age or that had been offered unsuccessfully for adoption at least three times, until all excess animals for sale are sold or until AML is met in all HMAs. However, shortly after BLM began to sell wild horses and burros without limitation, in early 2005, it was discovered that 41 of these wild horses had been slaughtered. In April 2005, BLM suspended its wild horse sales program and resumed sales in May 2005, after adding controls intended to restrict the sale of animals for the purpose of selling them for slaughter. These controls included BLM's requirement that buyers sign a statement

they do not intend to sell the animals for slaughter and verification that potential buyers would provide adequate care for the animals.

## BLM Implemented Controls to Prevent Slaughter of Wild Horses in the United States

Although BLM is no longer required to protect animals after ownership has passed to adopters or buyers, BLM implemented controls to help prevent their slaughter beginning in 1998. BLM had negotiated agreements with all three U.S. facilities that operated horse slaughterhouses. The slaughterhouses agreed to alert BLM to all wild horses that entered their facilities and refrain from slaughtering those wild horses whose title still belonged to BLM. According to BLM data, which it was able to provide since 2002, about 2,000 wild horses whose legal titles were obtained by private citizens through adoption or purchase were slaughtered. During that same time period, at least 90 adopted wild horses that were still owned by the government were brought to these slaughterhouses, and all were retrieved by BLM and interested wild horse groups.

As of fall 2007, all horse slaughter facilities in the United States had been shut down following unsuccessful legal challenges to state laws effectively banning the practice. In January 2007, the U.S. Court of Appeals for the Fifth Circuit ruled that a 1949 Texas law banning the sale, possession, or transfer of horsemeat applied to the two slaughterhouses in Texas.[47] In September 2007, the U.S. Court of Appeals for the Seventh Circuit upheld an Illinois ban.[48] These rulings effectively closed the plants and ended horse slaughter in the United States.

Even though all horse slaughter facilities in the United States have been closed, it is still possible for wild horses and burros to be sold to facilities outside the United States.[49] Prior to the closure of all U.S. horse slaughter facilities, about 50,000 domestic horses were brought to slaughter in the United States annually between 2001 and 2004. Generally, exporting horses and burros to other countries for slaughter, such as Canada or Mexico, is not prohibited; for example, about 3,000 horses per month were exported for slaughter in 2007, according to Department of Agriculture

---

[47]*Empacadora de Carnes de Fresnillo v. Curry*, 476 F.3d 326 (5th Cir. 2007), *cert. denied*, 75 U.S.L.W. 3569 (U.S. May 21, 2007). *See also*, Tex. Agric. Code Ann. §§ 149.001-149.007.

[48]*Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551 (7th Cir. 2007), *cert. denied*, 76 U.S.L.W. 3410 (U.S. June 16, 2008). *See also*, 225 Ill. Comp. Stat. 635/1.5.

[49]Current legislation pending in the 110th Congress (H.R. 503 and S. 311) would prohibit the commercial sale of horses to foreign countries, such as Canada and Mexico, to be slaughtered for human consumption.

information. We attempted to determine how many of these horses were at one time wild, but we were not able to do so. The Department of Agriculture, which certifies the inspections of horses and other livestock exported to other countries, is not required and does not report how many of the horses exported to other countries were once wild horses.

# Challenges to the Long-Term Sustainability of the Program Include Growing Holding Costs and Limited Options for Dealing with Unadoptable Animals

The long-term sustainability of BLM's Wild Horse and Burro Program depends on the resolution of two significant challenges. First, holding costs are overwhelming the program's ability to manage animals on the range and will continue to do so if BLM does not consider alternatives to holding. Second, BLM has limited options for dealing with unadoptable animals off of the range because its alternatives under the act—humane destruction of the animals or selling the animals without limitation—are thought to be unacceptable to the public. As a result, BLM has placed over 30,000 wild horses and burros in holding.

## If Not Controlled, Off-the-Range Holding Costs Will Continue to Overwhelm the Program

The portion of the Wild Horse and Burro Program's spending that is directed toward short- and long-term holding has increased from 46 percent of the program's direct costs in 2000 to 67 percent in 2007. This increase leaves a smaller portion of the budget available for on-the-range management activities. Much of the increase has occurred because accelerated removals implemented to reach AML have coincided with a decline in adoption demand. Because long-term holding facilities are at capacity, BLM has had little choice but to hold excess unadoptable horses in more expensive short-term holding. BLM's spending on short- and long-term holding has increased from about $7.0 million in 2000, or 46 percent of the program's direct costs, to about $20.9 million in 2007, or 67 percent of the program's direct costs (see fig. 10). In 2008, BLM anticipates that holding costs will account for about 74 percent of the program's direct costs. To deal with its long-term holding problem, BLM has primarily sought increased funding to open additional long-term holding facilities. However, funding is not likely to increase in the future, and limited funding is forcing BLM to make difficult choices. For example, in January 2008, BLM considered canceling all remaining removals scheduled for the fiscal year because of the amount needed for short- and long-term holding. As of July 2008, BLM was seeking the funds to continue these removals by redirecting money from other BLM activities to the Wild Horse and Burro

Program. As a result, under current funding levels, BLM must now choose between either managing the range to prevent overpopulation or exercise one or both of its other options—destroying animals or selling them without limitation.

**Figure 10: BLM Estimated Wild Horse and Burro Direct Program Costs, Fiscal Years 2000 through 2008**



Source: GAO analysis of BLM data.

Note: This chart represents direct program spending. It omits spending on overhead items—which average about $7 million per year—such as administrative costs, vehicle costs, and other nondirect program related costs.

To continue to reduce overpopulation on the range by using gathers alone, BLM projects that the program's budget would have to increase to about $77 million by fiscal year 2012, from about $36 million in 2008. If BLM does not receive this increase or exercise its other options to reduce populations off the range, then it will not have sufficient funds to manage wild horses and burros on the range, and populations will sharply

increase. BLM's current projections indicate that caring for unadoptable animals would reduce the agency's ability to gather horses to an average of about 4,500 animals per year, which would only be enough to prevent animals from dying from the effects of overpopulation and drought. At these removal levels, BLM projects that the on-the-range population would reach 50,000 animals by 2012—about 80 percent greater than the upper limit of AML. This on-the-range population level would be greater than the population level prior to the beginning of BLM's 2001 strategic plan.

Since 2004, BLM has had the goal of reducing the total population on the range to the midpoint of AML. If it were to reach this level, which is currently about 22,588 animals, an annual population growth rate of 20 percent would require the annual removal of about 4,500 animals to maintain that level, approximately equal to the recent adoption rate. Assuming that rate remained constant, fewer animals would be sent to long-term holding. However, even if BLM is able to reach a balance between animals removed and those adopted, it still has the challenge of dealing with 30,088 animals that are currently held in short-term and long-term holding facilities across the country. Furthermore the number of animals held in holding would exceed 40,000 animals if BLM were to remove the approximately 11,000 animals necessary to reach the midpoint of AML.

BLM has a number of research projects under way and ideas in development that could slow the increase in the population on the range. These include fertility control efforts, such as the development of a fertility vaccine (see app. II for more information on this vaccine) and releasing sterilized male horses back to the range after capture. Given that many existing HMAs are already over AML, releasing a large number of sterilized male horses or nonreproducing herds back to the range as a means of trying to reduce future holding costs would likely require changing existing land use decisions within BLM's existing authority to increase AMLs, expand existing HMAs or designate new HMAs; or through seeking new legislative authority. Under the 1971 act, the land available for the management of wild horses and burros is limited to the areas where they existed at the time of the act. The originally designated herd areas consisted of 53.5 million acres compared to the existing HMA acreage of 34.3 million, a difference of 19.2 million acres. Specifically, the BLM owned acreage managed for wild horses and burros has changed from 42.2 million acres to 29.0 million acres, a difference of 13.2 million acres. As we mentioned earlier, BLM is in the process of compiling a history of actions that led to these changes. At this point, however, it is not clear how much of the 13.2 million acres is still public land under BLM's control.

BLM_000085

While BLM could change AMLs, expand existing HMAs, or designate new HMAs within its existing authority, BLM is a multiple use agency and it weighs the needs of wild horses and burros against other competing uses. Alternatively, should BLM chose to do so, new legislative authority could be pursued to allow nonreproducing herds to be relocated to areas where they were not found at the time of the act. We believe that it is important to consider increasing AML or expanding HMA acreage only as a means to accommodate nonreproducing herds. Increasing the number of reproducing animals on the range without corresponding solutions for fertility control or declining adoption demand will, in the long run, only exacerbate BLM's problems with dealing with excess animals.

## Under Current Law BLM's Options Are Limited for Dealing with Unadoptable Animals

Despite these budget problems, BLM has avoided using two options in the act for dealing with unadoptable animals because of concerns over the public and congressional reaction to the large-scale slaughter of thousands of healthy horses. The Wild Free-Roaming Horses and Burros Act, as amended, requires that excess animals, for which the adoption demand is not sufficient to absorb all the animals removed from the range, be destroyed in the most humane and cost-efficient manner possible or, under certain circumstances, be sold without limitation. The 1978 amendments to the original 1971 act directed that "[t]he Secretary shall cause additional excess wild free-roaming horses and burros for which an adoption demand by qualified individuals does not exist to be destroyed in the most humane and cost efficient manner possible."[50] From 1981 to 1982, BLM destroyed at least 47 excess animals. BLM decided not to destroy excess unadoptable animals in 1982 after the Director issued a policy prohibiting the destruction of healthy animals because of public dismay. Furthermore, from fiscal year 1988 through fiscal year 2004, Congress prohibited BLM from using its Management of Lands and Resources appropriations to destroy excess healthy, unadoptable wild horses and burros.

In our 1990 report, we found that keeping excess animals in long-term holding was costly and recommended that BLM examine alternatives, such as sterilizing animals and releasing them back into the wild.[51] Although BLM was prohibited from using its Management of Lands and Resources appropriations for humanely destroying excess animals through

---

[50]16 U.S.C. § 1333(b)(2)(C).

[51]GAO/RCED-90-110.

BLM_000086

euthanasia at the time of that report, we also recommended that BLM consider this action as a last resort in the event that Congress lifted the prohibition in the future. The recurring prohibition in the annual appropriations bills ended after fiscal year 2004. Since then, BLM has no longer been prohibited from using its Management of Lands and Resources appropriations for carrying out the requirement to destroy excess animals. BLM still has not used this option.

In 2004, Congress provided BLM with an alternative to destroying unadoptable excess animals by amending the act to state that "[a]ny excess animal or the remains of an excess animal shall be sold if—(A) the excess animal is more than 10 years of age; or (B) the excess animal has been offered unsuccessfully for adoption at least 3 times."[52] Furthermore, the amendment stipulated that the excess animals "shall be made available for sale without limitation."[53] BLM has instead imposed limitations on the sales of excess animals in an effort to reduce the risk that animals purchased at a low price would be resold to slaughterhouses for profit.

As a result, BLM is not in compliance with the act. BLM officials told us that they have chosen not to destroy excess animals or sell them without limitation because of concerns about public and congressional reaction to the large-scale slaughter of thousands of healthy horses. Various BLM officials at different levels of responsibility also told us that the agency has not complied with these provisions because doing so would cause an immediate threat to the careers of any officials involved, due to the anticipated negative reaction of the public and Congress. Nevertheless, as of June 2008, budget constraints forced BLM to reconsider all of its options, officials told us. Specifically, for fiscal year 2009, BLM is considering euthanizing about 2,300 horses from short-term holding— about one-third of the animals currently in short-term holding. In addition, they are considering selling without limitation about 8,000 animals from both short- and long-term holding. However, as of August 31, 2008, legislation was pending in the 110th Congress that would repeal the directive for BLM to sell animals without limitation, but not the requirement to destroy unadoptable excess horses.[54]

---

[52]16 U.S.C. § 1333(e)(1).

[53]16 U.S.C. § 1333(e)(2).

[54]H.R. 249, 110th Cong. (2007). The bill was passed by the House of Representatives on April 26, 2007. As of August 31, 2008, the Senate had not acted on the bill.

BLM_000087

Other than one pilot project, BLM has not initiated strategies to reduce the number of horses they currently manage in long-term holding and has not formally considered other possible solutions to indefinitely caring for horses in long-term holding. BLM officials who lead state Wild Horse and Burro Programs suggested several actions that could be taken to alleviate off-the-range costs to the program, but many of these changes would require changes in the law or BLM regulations. The most common suggestion, made by 4 of the 10 state leads, was that the federal government should provide incentives for private individuals or organizations to care for unwanted wild horses, such as monetary incentives or tax deductions. In 2003, BLM initiated a pilot project in Wyoming to pay private ranchers a one-time lump sum to care for unadoptable excess animals. This pilot project ended because of a lack of up-front funds. In addition, a BLM official familiar with the project told us that private ranchers had less interest in the project as the market for cattle grazing improved. Implementing tax deductions would likely require changes in the tax law. Another suggestion made by three of the state leads was that the act should be changed to allow the government to manage unadoptable wild horses and burros on public or private lands outside areas where they were originally found. The act currently does not allow BLM to relocate wild horses and burros to areas of public lands where they were not found when the act was passed. To date, BLM has not sought the legislative changes that would make these suggestions possible.

# Conclusions

The management of a program consisting of wild free-roaming animals is unique within BLM, and it presents distinct management challenges. While BLM has made significant progress in increasing the number of HMAs that have set AML and in moving toward meeting AML, its recent removal efforts have resulted in the agency managing almost the same number of animals off of the range as they manage in the wild. By spending an ever increasing amount of funding on caring for animals off the range, little funding is left to conduct important on-the-range management activities, as originally envisioned in the act. Now that BLM is closer to meeting AML, it is important for field offices to have the resources necessary to maintain those levels and to monitor whether those levels indeed create the "thriving natural ecological balance" called for in the act.

Future changes to AML determinations should be based on consistent factors across HMAs. With the turnover of the more experienced senior BLM staff that set the existing AMLs to newer more junior staff, it is important that the newer staff have clear official guidance to follow on making AML determinations. It is also important for the management of

BLM_000088

the program that BLM have the most accurate population estimates possible. While counting wild free-roaming animals is an inherently challenging task, the widespread use of statistically based counting methods across more HMAs, as appropriate, would provide a scientifically sound basis for compensating for possible undercounts. BLM provides a great deal of information about the Wild Horse and Burro Program through its Web site, including information on AML and population estimates for each HMA. However, despite public concerns about the humane treatment of these animals, BLM has not provided the public with easily accessible information about their treatment. In some cases, BLM headquarters does not centrally compile information on the treatment of animals during gathers. Providing the public with additional information on the treatment of animals during gathers and once they are removed from the range would help inform the public about their treatment.

In our 1990 report, we noted that given the amount of federal resources needed to maintain unadoptable excess horses in long-term holding, BLM would need to seek alternative options. At the time, we recommended that BLM consider a variety of disposal options for these horses that were not being used, including sterilization and euthanasia. Today, about 20 years after the first long-term holding facility opened, with adoption demand declining and alternative disposal options still not being used, BLM is continuing to open new long-term holding facilities to care for unadoptable wild horses, and the costs continue to escalate. Cost-effective alternatives for long-term holding are still needed.

BLM is faced with a dilemma as it attempts to comply with the act. On one hand, the act directs BLM to protect and preserve wild horses and burros, and on the other hand the act directs BLM to destroy excess animals for which an adoption demand does not exist or, under certain circumstances, to sell them without limitation, which has led to the slaughter of some animals. BLM has committed to caring for these animals, even though the law requires their humane destruction or sale without limitation and the cost for their care off-the-range is now overwhelming the program. The program is at a critical crossroads. Within the program's existing budget, BLM cannot afford to care for all of the animals off the range, while at the same time managing wild horse and burro populations on the range. Resource limitations are forcing BLM to reconsider all available management options, and a workable solution must be developed to bring BLM into compliance with the act.

# Recommendations for Executive Action

We make five recommendations to the Secretary of the Interior.

To improve the management of BLM's Wild Horse and Burro Program, we make four recommendations that the Secretary of the Interior direct BLM to:

- finalize and issue the new *Wild Horse and Burro Program Handbook* that establishes a policy for setting AML to ensure that AML is determined based on consistent factors across HMAs into the future;

- continue to adopt and employ statistically based methods to estimate animal populations across HMAs, such as those being evaluated by animal population researchers, to improve the accuracy of population estimates integral to BLM's management of wild horses and burros on the range and in planning for capacity needed for excess animals once they are removed from the range;

- track the number of animals harmed or killed during the gather process in a centralized database system and determine what information on the treatment of gathered animals, short-term and long-term holding animals, and adopted animals could easily be provided to the public to help inform them about the treatment of wild horses and burros; and

- develop cost-effective alternatives to the process of caring for wild horses removed from the range in long-term holding facilities and seek the legislative changes that may be necessary to implement those alternatives.

To address BLM's noncompliance with the act, as amended, we recommend that the Secretary of the Interior direct BLM to discuss with Congress and other stakeholders how best to comply with the act or amend it so that BLM would be able to comply. As part of this discussion, BLM should inform Congress of its concerns with (1) the act's requirement for the humane destruction of excess animals and (2) the possible slaughter of healthy horses if excess animals are sold without limitation, under certain circumstances, as the act requires.

# Agency Comments and Our Evaluation

We provided a draft of this report to the Department of the Interior for review and comment. The department concurred with our findings and recommendations and believes they will help to improve the Wild Horse and Burro Program. In addition, the department provided several technical clarifications, which we incorporated as appropriate. Appendix IV contains the Department of the Interior's comment letter.

As agreed with your office, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies of this report to the Secretary of the Interior, the Director of BLM, and other interested parties. We will also make copies available to others upon request. In addition, the report will be available at no charge on the GAO Web site at http://www.gao.gov.

If you or your staff has any questions about this report, please contact me at (202) 512-3841 or nazzaror@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made major contributions to this report are listed in appendix V.

Sincerely yours,

Robin M. Nazzaro

Robin M. Nazzaro
Director, Natural Resources and Environment

BLM_000091

# Appendix I: Objectives, Scope, and Methodology

We examined (1) the Bureau of Land Management's (BLM) progress in managing wild horses and burros on the range through setting and meeting appropriate management levels (AML); (2) BLM's management of wild horses and burros off of the range through adoption, sales, and holding facilities; (3) the controls BLM has in place to help ensure humane treatment of wild horses and burros; and (4) what challenges, if any, BLM faces in managing for the long-term sustainability of the Wild Horse and Burro Program. We were also asked to review how and why the acreage available for wild horses and burros had changed since the 1971 act. We did not examine the acreage issue because BLM is in the process of compiling a history of acreage determinations. BLM officials expect their review to be completed by March 2009.

To examine how BLM manages wild horses and burros on and off of the range and to identify the challenges facing BLM, we reviewed relevant laws, regulations, BLM policy, and BLM strategic plans. We also surveyed, and analyzed documents from, 26 of the 44 BLM field offices that manage wild horses and burros.[1] We collected and reviewed relevant resource management decision documents from the surveyed field offices to help corroborate their responses about specific questions, including those about factors used to make AML determinations and gather decisions. We surveyed field offices in all 10 western states that manage HMAs. The field offices we surveyed represent 82 percent of all BLM acres managed for wild horses and burros, 74 percent of all BLM managed wild horses, and 69 percent of burros on the range at the time of the survey. Our survey sample included 100 percent of the BLM field offices that manage HMAs in Nevada, including the Tonopah Field Station (seven offices); three randomly selected field offices from each of the five states whose field offices or district offices manage a population of wild horses and burros that fall between 1,000 and 10,000 horses (Arizona, California, Oregon, Utah, and Wyoming); and one randomly selected field office from each of the four states whose field offices manage a population of wild horses and burros that is less than 1,000 (Colorado, Idaho, Montana, and New Mexico). Because most of our survey questions focused on the management of a particular HMA, we judgmentally selected an HMA for each field office to consider in responding to our survey. We considered a

---

[1]We drew our sample of 26 field units from among the 44 field units that manage Herd Management Areas (HMA), which include 39 field offices, 4 district offices in Oregon, and 1 field station in Nevada. We will refer to these 44 BLM field units collectively as field offices. BLM's count of the number of offices that manage HMAs may differ because the 4 district offices in Oregon manage 7 resource area offices.

BLM_000092

**Appendix I: Objectives, Scope, and
Methodology**

variety of factors in making these HMA selections, including herd
population size and whether the HMA had met or not met AML (according
to 2007 BLM Statistics). Table 15 lists the 26 BLM field offices and HMAs
we selected as part of our survey.

**Table 15: BLM Field Offices and HMAs Included in GAO's Survey**

| BLM field office by state | HMA |
|---|---|
| Arizona | |
| Yuma Field Office | Cibola–Trigo |
| Hassayampa Field Office | Lake Pleasant |
| Kingman Field Office | Black Mountain |
| California | |
| Surprise Field Office | High Rock |
| Alturas Field Office | Red Rock Lakes |
| Ridgecrest Field Office | Centennial |
| Colorado | |
| White River Field Office | Piceance–East Douglas Creek |
| Idaho | |
| Four Rivers Field Office | Four Mile |
| Montana | |
| Billings Field Office | Pryor Mountain Wild Horse Range |
| Nevada | |
| Tonopah Field Station | Montezuma Peak |
| Battle Mountain Field Office | South Shoshone |
| Carson City Field Office | Flanigan |
| Elko Field Office | Rock Creek |
| Ely Field Office | Dry Lake |
| Las Vegas Field Office | Red Rock |
| Winnimucca Field Office | Granite Range |
| New Mexico | |
| Socorro Field Office | Bordo Atravesado |
| Oregon | |
| Prineville District Office | Liggett Table |
| Lakeview District Office | Beaty's Butte |
| Vale District Office | Coyote Lake–Alvord Tule Springs |

BLM_000093

| BLM field office by state | HMA |
|---|---|
| Utah | |
|    Richfield Field Office | Canyon Lands |
|    Vernal Field Office | Hill Creek |
|    Fillmore Field Office | Conger |
| Wyoming | |
|    Rock Springs Field Office | Divide Basin |
|    Cody Field Office | McCullough Peaks |
|    Lander Field Office | Dishpan Butte |

Source: GAO.

The survey included several open-ended responses aimed at determining the primary challenges associated with meeting and maintaining AML, the primary challenges facing the Wild Horse and Burro Program as a whole, and suggestions for ways to improve the program. Two GAO analysts independently reviewed these open-ended survey responses, agreed upon the categories for coding each response, and resolved any disagreements in coding to determine what the respondents as a whole thought about these issues.

The practical difficulties of conducting any survey may introduce errors, commonly referred to as nonsampling errors. For example, difficulties in how a particular question is interpreted, in the sources of information that are available to the respondents, or in how the data are entered into a database or were analyzed can introduce unwanted variability into the survey results. We took steps in the development of the questionnaire, the data collection, and the data analysis to minimize these nonsampling errors. For example, survey specialists designed the questionnaire in collaboration with GAO staff with subject matter expertise. Then, the draft questionnaire was pretested with officials from five BLM field offices in four different states to ensure that the questions were relevant, clearly stated, and easy to comprehend. We also conducted follow-up phone calls to clarify ambiguous or incomplete responses. We received usable responses from all field offices that we surveyed—a 100 percent response rate. See appendix III for a summary of the survey responses not presented elsewhere in the report.

We also interviewed agency officials at BLM Headquarters; the National Program Office in Reno, Nevada; and Wild Horse and Burro Program State Leads from each of the 10 states that manage wild horses and burros. In addition, we conducted site visits at two field offices that manage HMAs in Nevada and Colorado; one long-term holding facility in Oklahoma; three

BLM_000094

**Appendix I: Objectives, Scope, and
Methodology**

short-term holding facilities in Colorado, Nevada, and Wyoming; and
attended two adoption events in Arizona and Colorado.

To examine humane treatment, we reviewed relevant laws, regulations,
and BLM policies. We collected and analyzed reports from BLM
Headquarters, state offices, and data from BLM's compliance database. We
also interviewed BLM compliance officials from two states, a veterinarian
from the Department of Agriculture's Animal and Plant Health Inspection
Service, and public citizens and advocacy groups that work to promote the
well being of wild horses and burros.

As part of our overall methodology, we interviewed a range of
stakeholders interested in BLM's management of the Wild Horse and Burro
Program, including, but not limited to, the American Wild Horse
Preservation Campaign, the Animal Welfare Institute, the Cloud
Foundation, the Humane Society of the United States, the National
Cattlemen's Beef Association, and Nevada Bighorns Unlimited.

We conducted this performance audit from September 2007 to October
2008 in accordance with generally accepted government auditing
standards. Those standards require that we plan and perform the audit to
obtain sufficient, appropriate evidence to provide a reasonable basis for
our findings and conclusions based on our audit objectives. We believe
that the evidence obtained provides a reasonable basis for our findings
and conclusions based on our audit objectives.

BLM_000095

# Appendix II: Fertility Control and Genetic Variability

In addition to the information provided in this report to answer our primary objectives, we encountered two other issues related to BLM's management of the Wild Horse and Burro Program. The issues primarily relate to BLM's on-the-range management activities, including fertility control and genetic variability.

## Fertility Control

BLM has been pursuing a fertility control vaccine called porcine zonae pellucida since 1992 to use as a tool for slowing the reproductive rate in wild horse populations. A slower reproductive rate would reduce the number of animals that would have to be gathered and removed, adopted, and held. BLM officials do not consider this treatment as the best short-term management tool to achieve AML but believe that once HMAs are at AML, fertility treatment can help to maintain that level. Much research has been conducted about the use of the vaccine in domestic and wild horses. The Department of the Interior's National Park Service has used this treatment to successfully manage wild horse populations at two national seashores. BLM field offices have been directed to consider the use of fertility control as an alternative in their gather plans, but they are not required to choose this research tool. The vaccine is considered experimental, and as such, there are barriers to its use. Since 2004, 47 HMAs have used fertility treatments, and a total of about 1,800 wild horses have been injected with the treatment. BLM considers the use of this treatment as a research tool; however, according to a prominent wild horse fertility researcher, BLM should more actively pursue its use as a management tool. According to BLM officials, fertility control may offer the possibility of reducing reproduction rates and costs, but BLM will still need to place horses in long-term holding in the future.

## Genetic Variability

Herd health is another important component of BLM's on-the-range management of wild horses and burros. Specifically, it is important to maintain a degree of genetic variability to decrease the likelihood of disease and to maintain the biological fitness of the population. The amount of genetic variability that is sufficient to maintain a healthy population, however, is difficult to discern. Some groups have criticized BLM for setting AMLs at levels that are less than 100 or 150 animals. As of February 2008, 135 of the 199 HMAs had an upper limit of 150 or less for AML (see table 16). Several of these smaller HMAs, however, are part of a complex of HMAs that are managed as one unit where there is regular genetic interchange. For example, 13 complexes in Nevada encompass 45 of their 102 HMAs. According to a leading researcher in the field of wild

BLM_000096

horse genetics, however, a herd that has a population of less than 100 can be maintained with the introduction of at least one or two horses every 6 to 7 years, including those whose herd size are as small as 10 to 15 horses.

**Table 16: Number of HMAs Managed at Various AMLs, February 2008**

| Upper limit of AML | Number of HMAs |
|---|---:|
| 0 | 8 |
| 1–100 | 102 |
| 101–150 | 25 |
| 151–200 | 16 |
| 201–300 | 25 |
| 301–500 | 16 |
| 501–1,000 | 5 |
| Not yet determined | 2 |
| **Total** | **199** |

Source: BLM.

BLM manages a few herds that show strong evidence of old Spanish heritage which no longer exists outside of the Americas. For example, the Kiger Mustangs of Oregon and the Pryor Mustangs of Montana have some colonial Spanish traits. For most of the HMAs, however, genetic variability is important primarily in maintaining the health of the herd, rather than managing for a specific genetic trait or bloodlines.

BLM_000097

# Appendix III: Wild Horse and Burro Survey Results

The following tables summarize responses collected through our survey instrument that was sent to 26 BLM field offices that manage HMAs. See appendix I for a complete explanation of which offices were chosen and the methodology used to select those field offices and specific HMAs. Our survey was divided into two sections. The first asked questions specific to the field offices' management of particular HMAs. The second section asked questions related to the field offices' general management of all HMAs.[1]

## Section I: Field Office Responses Specific to Selected HMAs

**Table 17: Current and Initial AML and Year of Determination per HMA Surveyed**

| HMA, by state | Initial AML | Year initial AML was set | Current AML | Year current AML was set |
|---|---|---|---|---|
| Arizona | | | | |
| Cibola–Trigo | 315 | 1980 | [a] | [a] |
| Lake Pleasant | 80 | 1988 | 208 | 2000 |
| Black Mountain | 148 | 1978 | 478 | 1996 |
| California | | | | |
| High Rock | 70–100 | 1981 | 78–120 | 2001 |
| Red Rock Lakes | 16–25 | 1981 | [a] | [a] |
| Centennial | 168 | 1980 | 168 | 2005 |
| Colorado | | | | |
| Piceance–East Douglas Creek | 90–140 | 1981 | 135–235 | 1999 |
| Idaho | | | | |
| Four Mile | 37–60 | 2001 | [a] | [a] |
| Montana | | | | |
| Pryor Mountain Wild Horse Range | 121 | 1984 | 95 | 1992 |

[1]Eight of the 26 field offices surveyed manage only one HMA.

BLM_000098

Appendix III: Wild Horse and Burro Survey
Results

| HMA, by state | Initial AML | Year initial AML was set | Current AML | Year current AML was set |
|---|---|---|---|---|
| Nevada | | | | |
| Montezuma Peak | 161 | 1974 | 0 | 2007 |
| South Shoshone | 78 | 1986 | 60–100 | 2005 |
| Flanigan | 83–125 | 1990 | [a] | [a] |
| Rock Creek | 119 | 1987 | 250 | 2003 |
| Dry Lake | 82 | 1983 | 94 | 2001 |
| Red Rock | 116 | 1982 | 41–76 | 2004 |
| Granite Range | 155–258 | 1993 | [a] | [a] |
| New Mexico | | | | |
| Bordo Atravesado | 20–30 | 1980 | 50 | 1991 |
| Oregon | | | | |
| Liggett Table | 10–25 | 1989 | [a] | [a] |
| Beaty's Butte | 234 | 1971 | 100–250 | 1983 |
| Coyote Lake–Alvord Tule Springs | 198–390 | 1978 | [a] | [a] |
| Utah | | | | |
| Canyon Lands | 60–100 | 2001 | [a] | [a] |
| Hill Creek | 195 | 1985 | [a] | [a] |
| Conger | 34 | 1977 | 40-80 | 1987 |
| Wyoming | | | | |
| Divide Basin | 425–588 | 1979 | 415–600 | 1997 |
| McCullough Peaks | 70–140 | 1985 | 70–140 | 1990 |
| Dishpan Butte | 35–50 | 1983 | 50–100 | 1993 |

Source: GAO survey results.

[a]At the time of our survey, AML for 9 of the 26 HMAs we selected had not been revised since it was
initially set. For those 9 HMAs, the initial AML and the year initial AML was set is also the current AML
and the year current AML was set.

**Table 18: Level of Data Sufficiency Used to Determine Current AML**

| Level of sufficiency | Number of respondents |
|---|---|
| Very sufficient | 15 |
| Moderately sufficient | 7 |
| Moderately insufficient | 2 |
| Very insufficient | 1 |
| Unsure/don't know | 1 |

Source: GAO survey results.

BLM_000099

**Appendix III: Wild Horse and Burro Survey Results**

**Table 19: Respondents' Opinions about Current AML**

| Current AML | Number of respondents |
|---|---|
| Too high | 3 |
| About right | 17 |
| Too low | 2 |
| Unsure/don't know | 4 |

Source: GAO survey results.

**Table 20: Population Level in Comparison with AML Range**

| Population level | Number of respondents |
|---|---|
| Above | 15 |
| Within limits | 10 |
| Below | 0 |
| Unsure/don't know | 1 |

Source: GAO survey results.

**Table 21: Primary Challenges in Meeting or Maintaining AML**

| Challenge | Number of respondents |
|---|---|
| Impediments to conducting gathers | 20 |
| Lack of sufficient removal outlet | 12 |
| Inability to conduct range management | 9 |
| Limitations to accurate population counts | 8 |
| HMA boundary issues | 5 |
| Public pressure to not remove animals | 4 |
| Multiple use balance | 4 |
| Staffing limitations | 3 |
| Litigation | 2 |
| Habitat limitations | 2 |
| High reproductive rates of the animals | 2 |
| Other | 2 |

Source: GAO survey results.

BLM_000100

Appendix III: Wild Horse and Burro Survey
Results

**Table 22: Impact on Rangeland Resources in HMA When Herd Populations Exceed the Upper Limit of AML by Less Than 25 Percent**

| Rangeland resource | Level of impact | | | | | |
|---|---|---|---|---|---|---|
| | Positive | Slightly positive | No impact | Slightly negative | Negative | Blank |
| Horse and burro herd health | 1 | 2 | 10 | 10 | 3 | 0 |
| Rangeland health | 0 | 1 | 5 | 10 | 10 | 0 |
| Livestock habitat requirements | 0 | 1 | 10 | 9 | 5 | 1 |
| Wildlife habitat requirements | 0 | 1 | 8 | 9 | 8 | 0 |

Source: GAO survey results.

**Table 23: Impact on Rangeland Resources in HMA When Herd Populations Exceed the Upper Limit of AML by 25 to 50 Percent**

| Rangeland resource | Level of impact | | | | | |
|---|---|---|---|---|---|---|
| | Positive | Slightly positive | No impact | Slightly negative | Negative | Blank |
| Horse and burro herd health | 1 | 1 | 4 | 10 | 10 | 0 |
| Rangeland health | 0 | 0 | 0 | 8 | 18 | 0 |
| Livestock habitat requirements | 0 | 0 | 4 | 9 | 12 | 1 |
| Wildlife habitat requirements | 0 | 0 | 3 | 8 | 15 | 0 |

Source: GAO survey results.

**Table 24: Impact on Rangeland Resources in HMA When Herd Populations Exceed the Upper Limit of AML by 51 to 100 Percent**

| Rangeland resource | Level of impact | | | | | |
|---|---|---|---|---|---|---|
| | Positive | Slightly positive | No impact | Slightly negative | Negative | Blank |
| Horse and burro herd health | 0 | 1 | 2 | 4 | 19 | 0 |
| Rangeland health | 0 | 0 | 0 | 0 | 26 | 0 |
| Livestock habitat requirements | 0 | 0 | 3 | 3 | 19 | 1 |
| Wildlife habitat requirements | 0 | 0 | 3 | 2 | 21 | 0 |

Source: GAO survey results.

BLM_000101

Appendix III: Wild Horse and Burro Survey
Results

**Table 25: Number of Field Offices That Have or Do Not Have Procedures in Place to Distinguish Impact of Wild Horses and Burros, Cattle, and Wildlife on Rangeland Condition**

| Procedure to distinguish impact | Number of respondents |
|---|---|
| Yes | 20 |
| No | 6 |
| Unsure/don't know | 0 |

Source: GAO survey results.

**Table 26: Actions Taken to Manage HMAs Since 2000**

| Action taken | Yes | No | Don't know | Not applicable | Blank |
|---|---|---|---|---|---|
| Conducted population inventory | 24 | 2 | 0 | 0 | 0 |
| Conducted gathers and removals | 23 | 3 | 0 | 0 | 0 |
| Reduced or modified livestock use | 15 | 7 | 0 | 4 | 0 |
| Increased resource monitoring | 14 | 10 | 2 | 0 | 0 |
| Vegetative/riparian restoration | 14 | 11 | 1 | 0 | 0 |
| Other land management actions | 12 | 2 | 1 | 2 | 9 |
| Changed AML | 7 | 18 | 1 | 0 | 0 |

Source: GAO survey results.

**Table 27: Number of HMAs with a Herd Management Area Plan**

| Plan | Yes | No | Unsure/don't know |
|---|---|---|---|
| Herd Management Area Plan | 16 | 9 | 1 |
| Plan to develop a Herd Management Area Plan | 8 | 2 | 5 |

Source: GAO survey results.

**Table 28: Primary Physical Method Used in Most Recent Census/Inventory**

| Primary method | Number of respondents |
|---|---|
| Fixed-wing aircraft | 3 |
| Helicopter | 20 |
| Horseback/on foot | 2 |
| Don't know | 1 |

Source: GAO survey results.

BLM_000102

Appendix III: Wild Horse and Burro Survey
Results

**Table 29: Primary Statistical Method Used in Most Recent Census/Inventory**

| Primary method | Number of respondents |
|---|---|
| Direct count (single number) | 17 |
| Direct count (range) | 2 |
| Simultaneous double-count | 3 |
| Sightability bias correction model | 2 |
| Other | 2 |

Source: GAO survey results.

**Table 30: Level of Accuracy of Most Recent Census/Inventory**

| Level of accuracy | Number of respondents |
|---|---|
| Greatly over counted | 0 |
| Over counted | 0 |
| Counted about right | 15 |
| Undercounted | 10 |
| Greatly undercounted | 0 |
| Unsure/don't know | 1 |

Source: GAO survey results.

**Table 31: Level of Data Sufficiency Used to Support Most Recent Gather**

| Level of sufficiency | Number of respondents |
|---|---|
| Very sufficient | 21 |
| Moderately sufficient | 4 |
| Moderately insufficient | 0 |
| Very insufficient | 0 |
| Unsure/don't know | 1 |

Source: GAO survey results.

**Table 32: Timing of Gather in Relation to Scheduled Date of Gather**

| Timing of gather | Number of respondents |
|---|---|
| Conducted earlier | 2 |
| Neither earlier nor delayed | 18 |
| Delayed | 4 |
| Unsure/don't know | 2 |

Source: GAO survey results.

BLM_000103

Appendix III: Wild Horse and Burro Survey
Results

**Table 33: Level of AML to Which HMA Is Typically Gathered**

| Level of AML | Number of respondents |
|---|---|
| Upper | 7 |
| Middle | 7 |
| Lower | 7 |
| Unsure/don't know | 5 |

Source: GAO survey results.

## Section II: Field Offices' Responses to General Questions Regarding All of the HMAs They Manage

**Table 34: Actions Taken to Manage HMA's Since 2000**

| Action taken | Yes | No | Don't know | Not applicable | Blank |
|---|---|---|---|---|---|
| Conducted population inventory | 19 | 0 | 0 | 0 | 0 |
| Conducted gathers and removals | 18 | 1 | 0 | 0 | 0 |
| Reduced or modified livestock use | 14 | 2 | 1 | 2 | 0 |
| Vegetative/riparian restoration | 14 | 5 | 0 | 0 | 0 |
| Increased resource monitoring | 12 | 7 | 0 | 0 | 0 |
| Changed AML | 11 | 8 | 0 | 0 | 0 |
| Other land management actions | 6 | 2 | 1 | 0 | 10 |

Source: GAO survey results.

**Table 35: Field Offices Whose HMAs Have Herd Management Area Plans**

| Plan | All | Some | None | Unsure/don't know |
|---|---|---|---|---|
| Herd Management Area Plan | 11 | 6 | 8 | 1 |

Source: GAO survey results.

**Table 36: Field Offices Working to Develop Herd Management Area Plans for All of Their HMAs**

| Response | Number of respondents |
|---|---|
| Yes | 6 |
| No | 8 |

Source: GAO survey results.

GAO-09-77  BLM's Wild Horse and Burro Program

BLM_000104

**Appendix III: Wild Horse and Burro Survey
Results**

**Table 37: Actions to Help Field Offices Achieve Healthy Herd Populations in Balance with the Range and Other Multiple Uses**

| Actions | Number of respondents |
|---|---|
| Increase range management activities | 15 |
| Reach and maintain AML | 9 |
| Improve staff capacity | 7 |
| Improve census/inventory | 7 |
| Increase funding | 6 |
| Improve adoption outlet | 3 |
| Improve coordination in management | 3 |
| Improve access to HMAs | 2 |
| Solve long-term holding situation | 2 |

Source: GAO survey results.

**Table 38: Major Challenges Facing Field Offices in Managing HMAs to Achieve Healthy Herd Populations That Are in Balance with the Range and Other Multiple Uses**

| Major challenges | Number of respondents |
|---|---|
| Impediments to conducting gathers | 13 |
| Staffing limitations | 11 |
| Limitations to accurate population counts | 8 |
| Inability to conduct range management | 8 |
| Multiple use balance | 7 |
| Lack of sufficient removal outlet | 6 |
| Ability to maintain AML | 4 |
| Habitat limitations | 4 |
| Other | 4 |
| Planning process | 3 |
| Public pressure | 3 |
| HMA boundary issues | 3 |

Source: GAO survey results.

BLM_000105

**Table 39: Major Challenges Facing BLM's Wild Horse and Burro Program As a Whole**

| Major challenges | Number of respondents |
|---|---|
| Lack of sufficient removal outlet[a] | 18 |
| Staffing limitations | 11 |
| Inability to conduct range management | 8 |
| Public pressure | 7 |
| Impediments to conducting gathers | 5 |
| Unwanted horses released to BLM lands | 5 |
| Funding | 3 |
| Lack of support | 3 |
| Limitations to accurate population counts | 2 |
| Habitat limitations | 2 |
| Lack of management flexibility | 2 |
| Multiple use balance | 2 |
| Poor public perception | 2 |

Source: GAO survey results.

[a]Removal outlet limitations include decreased options for animals once removed from the range, such as decreased adoptions, expense of caring for animals removed from the range, and limited capacity in long-term holding facilities.

BLM_000106

# Appendix IV: Comments from the Department of the Interior



United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Washington, DC 20240
http://www.blm.gov



SEP 0 5 2008

Robin M. Nazzaro
Director, Natural Resources and Environment
Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548-0001

Dear Ms. Nazzaro:

Thank you for the opportunity to review and comment on the Government Accountability Office draft report entitled, *"Bureau of Land Management: Effective Long-Term Options Needed to Manage Unadoptable Wild Horses,* (GAO-08-989).

The Department of the Interior concurs with the findings and recommendations for executive action and believes these will help us improve the Wild Horses and Burro Program. The Bureau of Land Management will work to develop cost effective alternatives to long term holding. BLM will seek advice from the National Wild Horse and Burro Advisory Board and other partners and stakeholders to find acceptable solutions, and will discuss any helpful legislative proposals with Congress.

The enclosure provides technical comments on the draft report.

If you have any questions, please contact Don Glenn, Chief, Division of Wild Horses and Burros at (202) 452-5082 or LaVanna Stevenson-Harris, BLM Audit Liaison Officer, at (202) 785-6580.

Sincerely,

James L. Caswell
Director

Enclosure

# Appendix V: GAO Contact and Staff Acknowledgments

## GAO Contact

Robin M. Nazzaro, (202) 512-3841 or nazzaror@gao.gov

## Staff Acknowledgments

In addition to the individual named above, Jeffery D. Malcolm, Assistant Director; Ulana Bihun; Kevin Bray; Lee Carroll; Benjamin Shouse; Gregory Wilmoth; and Elizabeth Wood made key contributions to this report. Also contributing to the report were Beverly Ross and Monica Wolford.

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday afternoon, GAO posts on its Web site newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to www.gao.gov and select "E-mail Updates." |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's Web site, http://www.gao.gov/ordering.htm. Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact: Web site: www.gao.gov/fraudnet/fraudnet.htm E-mail: fraudnet@gao.gov Automated answering system: (800) 424-5454 or (202) 512-7470 |
| Congressional Relations | Ralph Dawn, Managing Director, dawnr@gao.gov, (202) 512-4400 U.S. Government Accountability Office, 441 G Street NW, Room 7125 Washington, DC 20548 |
| Public Affairs | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |

**United States Government Accountability Office**

# GAO

Report to the Chairman, Committee on Natural Resources, House of Representatives

October 2008

# BUREAU OF LAND MANAGEMENT

## Effective Long-Term Options Needed to Manage Unadoptable Wild Horses



**G A O**

Accountability * Integrity * Reliability

GAO-09-77

BLM_000110



**GAO**
Accountability · Integrity · Reliability
# Highlights

Highlights of GAO-09-77, a report to the Chairman, Committee on Natural Resources, House of Representatives

October 2008

# BUREAU OF LAND MANAGEMENT

## Effective Long-Term Options Needed to Manage Unadoptable Wild Horses

## Why GAO Did This Study

The Department of the Interior's Bureau of Land Management (BLM) manages about 33,100 wild horses and burros on 199 Herd Management Areas (HMA) in 10 western states. Under the Wild Free-Roaming Horses and Burros Act of 1971, as amended, BLM is to protect wild horses and burros, set appropriate management levels (AML), maintain current inventory counts, and remove excess animals to prevent overpopulation and rangeland damage. Over the years, various stakeholders have raised issues about BLM's management of the animals on and off the range.

GAO examined (1) BLM's progress in setting and meeting AML; (2) BLM's management of animals off the range through adoptions, sales, and holding facilities; (3) BLM's controls to help ensure the humane treatment of animals; and (4) what challenges, if any, BLM faces in managing for the long-term sustainability of the program. GAO surveyed and analyzed documents from 26 of the 44 BLM offices that manage wild horses and burros.

## What GAO Recommends

To improve the program, GAO is recommending, among other things, that BLM establish a formal policy for setting AML, develop alternatives for long-term holding facilities, and initiate a discussion with Congress and other stakeholders on how best to comply with the act, as amended. The Department of the Interior concurred with GAO's findings and recommendations.

To view the full product, including the scope and methodology, click on GAO-09-77. For more information, contact Robin M. Nazzaro at (202) 512-3841 or nazzaror@gao.gov.

## What GAO Found

BLM has made significant progress toward setting and meeting AML (the optimum number of animals which results in a thriving natural ecological balance and avoids range deterioration). BLM has set AML for 197 out of 199 HMAs. Most of the field offices GAO surveyed considered similar factors in determining AML, such as rangeland conditions; however, BLM has not provided specific formal guidance to the field offices on how to set AML. Without clear guidance, BLM cannot ensure that the factors considered in future AML revisions will be consistent across HMAs. At a national level, in 2007, BLM was closer to meeting AML (about 27,200 animals) than in any other year since AMLs were first reported in 1984. The extent to which BLM has actually met AML depends on the accuracy of BLM's population counts. Nineteen of the 26 field officials GAO surveyed used a counting method which, researchers say, consistently undercounts animals and does not provide a statistical range of population estimates. Undercounting can put animals at risk and lead to increased program costs.

The number of animals removed from the range is far greater than the number adopted or sold, which has resulted in the need for increased short-term and long-term holding. Since 2001, over 74,000 animals have been removed from the range, while only about 46,400 have been adopted or sold. Thirty-six percent fewer animals were adopted in 2007 than compared to the average adoption rates in the 1990s. As of June 2008, BLM was holding 30,088 animals in holding facilities, up from 9,807 in 2001. To accommodate the increased removals and declining adoptions and sales, BLM has increased the number of short-term and long-term holding facilities.

BLM has implemented multiple controls to help ensure humane treatment, including random checks on adopted horses and agreements with adopters and buyers to prevent slaughter. Although BLM state offices collect data on the treatment of the animals, BLM does not always compile the information in its central database or report it to the public. Providing additional information to the public on the treatment of these animals could help inform the public about their treatment and improve transparency.

The long-term sustainability of BLM's Wild Horse and Burro Program depends on the resolution of two significant challenges:

- *If not controlled, off-the-range holding costs will continue to overwhelm the program*. The percentage of the program's direct costs for holding animals off the range increased from $7 million in 2000 (46 percent) to $21 million in 2007 (67 percent). In 2008, these costs could account for 74 percent of the program's budget.
- *BLM has limited options for dealing with unadoptable animals*. The act provides that unadopted excess animals shall be humanely destroyed or, under certain circumstances, sold without limitation. However, BLM only manages these animals through sales with limitations. BLM is concerned about the possible reaction to the destruction of healthy animals.

**United States Government Accountability Office**

# Contents

**Letter**                                                                                      1

     Results in Brief                                                  7
     Background                                                        11
     BLM Has Made Progress in Setting and Meeting AML, but Guidance
      Is Lacking and Meeting AML Has Proven Difficult               23
     Declining Adoptions and Sales Have Increased the Need for Short-
      Term and Long-Term Holding Facilities, and Holding Costs Have
      Increased                                                    40
     BLM Has Controls in Place to Help Ensure the Humane Treatment
      of Wild Horses and Burros, but It Could Better Track and Report
      These Data to the Public                                     46
     Challenges to the Long-Term Sustainability of the Program Include
      Growing Holding Costs and Limited Options for Dealing with
      Unadoptable Animals                                          56
     Conclusions                                                       61
     Recommendations for Executive Action                              63
     Agency Comments and Our Evaluation                                64

**Appendix I**    **Objectives, Scope, and Methodology**   65

**Appendix II**   **Fertility Control and Genetic Variability**  69

     Fertility Control                                                 69
     Genetic Variability                                               69

**Appendix III**  **Wild Horse and Burro Survey Results**   71

     Section I: Field Office Responses Specific to Selected HMAs        71
     Section II: Field Offices' Responses to General Questions
      Regarding All of the HMAs They Manage                        77

**Appendix IV**   **Comments from the Department of the Interior** 80

**Appendix V**    **GAO Contact and Staff Acknowledgments**  81

**Page i**           **GAO-09-77  BLM's Wild Horse and Burro Program**

BLM_000112

# Tables

Table 1:    Major Legislation Governing BLM's Wild Horse and
            Burro Program                                                    11
Table 2:    Summary Statistics on BLM's Wild Horse and Burro
            Program, by State, February 2008                                 15
Table 3:    Years in Which Current AMLs Were Set for BLM's 199
            HMAs                                                              25
Table 4:    Extent to Which BLM Field Office Staff Considered
            Each of the Four Key Factors in Making the Most
            Recent AML Determination for Surveyed Field Offices              26
Table 5:    Factors Considered by BLM Field Office Staff in Making
            the Most Recent AML Determinations for Surveyed
            Field Offices                                                    27
Table 6:    Age of Data Used to Make Current AML Determinations
            for Surveyed Field Offices                                       30
Table 7:    Extent to Which BLM Field Office Staff Considered
            Each of the Five Key Factors in Making Their Most
            Recent Gather Determination                                      36
Table 8:    Factors Considered by Field Offices in Decisions to
            Gather Wild Horses and Burros from the Range                     37
Table 9:    Age of Data Used by Field Offices to Determine the
            Need for Most Recent Gather                                      38
Table 10:   Number of Wild Horses and Burros Sold under the
            December 8, 2004, Sales Directive                               43
Table 11:   Number of Wild Horses in Long-Term Holding, by Year,
            Since 2000                                                       44
Table 12:   BLM Long-Term Holding Facilities, June 2008                      45
Table 13:   Number and Percentage of Wild Horses and Burros
            That Died During Gather Operations, (for 6 of 10
            States) Fiscal Years 2005 through 2007                          49
Table 14:   Results of Random Inspections of Wild Horse and
            Burro Adoptions, 2005 through 2007                              54
Table 15:   BLM Field Offices and HMAs Included in GAO's Survey              66
Table 16:   Number of HMAs Managed at Various AMLs, February
            2008                                                             70
Table 17:   Current and Initial AML and Year of Determination per
            HMA Surveyed                                                     71
Table 18:   Level of Data Sufficiency Used to Determine Current
            AML                                                              72
Table 19:   Respondents' Opinions about Current AML                          73
Table 20:   Population Level in Comparison with AML Range                    73
Table 21:   Primary Challenges in Meeting or Maintaining AML                 73

| Table 22: | Impact on Rangeland Resources in HMA When Herd Populations Exceed the Upper Limit of AML by Less Than 25 Percent | 74 |
|---|---|---|
| Table 23: | Impact on Rangeland Resources in HMA When Herd Populations Exceed the Upper Limit of AML by 25 to 50 Percent | 74 |
| Table 24: | Impact on Rangeland Resources in HMA When Herd Populations Exceed the Upper Limit of AML by 51 to 100 Percent | 74 |
| Table 25: | Number of Field Offices That Have or Do Not Have Procedures in Place to Distinguish Impact of Wild Horses and Burros, Cattle, and Wildlife on Rangeland Condition | 75 |
| Table 26: | Actions Taken to Manage HMAs Since 2000 | 75 |
| Table 27: | Number of HMAs with a Herd Management Area Plan | 75 |
| Table 28: | Primary Physical Method Used in Most Recent Census/Inventory | 75 |
| Table 29: | Primary Statistical Method Used in Most Recent Census/Inventory | 76 |
| Table 30: | Level of Accuracy of Most Recent Census/Inventory | 76 |
| Table 31: | Level of Data Sufficiency Used to Support Most Recent Gather | 76 |
| Table 32: | Timing of Gather in Relation to Scheduled Date of Gather | 76 |
| Table 33: | Level of AML to Which HMA Is Typically Gathered | 77 |
| Table 34: | Actions Taken to Manage HMA's Since 2000 | 77 |
| Table 35: | Field Offices Whose HMAs Have Herd Management Area Plans | 77 |
| Table 36: | Field Offices Working to Develop Herd Management Area Plans for All of Their HMAs | 77 |
| Table 37: | Actions to Help Field Offices Achieve Healthy Herd Populations in Balance with the Range and Other Multiple Uses | 78 |
| Table 38: | Major Challenges Facing Field Offices in Managing HMAs to Achieve Healthy Herd Populations That Are in Balance with the Range and Other Multiple Uses | 78 |
| Table 39: | Major Challenges Facing BLM's Wild Horse and Burro Program As a Whole | 79 |

# Figures

| | | |
|---|---|---|
| Figure 1: | BLM Herd Areas and HMAs in the Western United States | 14 |
| Figure 2: | Drought Conditions and HMAs, February 2008 | 18 |
| Figure 3: | BLM Management of Wild Horses and Burros on and off of the Range | 20 |
| Figure 4: | BLM's Wild Horse and Burro Program Funding, Fiscal Years 2000 through 2007 | 23 |
| Figure 5: | Estimated Population of Wild Horses and Burros on the Range | 32 |
| Figure 6: | Number of Field Offices Who Reported Negative Impacts When Populations Exceed the Upper Limit of AML | 34 |
| Figure 7: | Comparison of Removed and Adopted Wild Horses and Burros, 1989 through 2007 | 42 |
| Figure 8: | Helicopter Used to Gather Wild Horses Near Ely, Nevada, c. 2006 | 48 |
| Figure 9: | BLM Contractor Trimming Horse Hooves Using a Special Holding Chute at a Contract Short-Term Holding Facility in Fallon, Nevada, October 2007 | 51 |
| Figure 10: | BLM Estimated Wild Horse and Burro Direct Program Costs, Fiscal Years 2000 through 2008 | 57 |

## Abbreviations

| | |
|---|---|
| AML | appropriate management level |
| BLM | Bureau of Land Management |
| HMA | Herd Management Area |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States Government Accountability Office**
**Washington, DC 20548**

October 9, 2008

The Honorable Nick J. Rahall, II
Chairman
Committee on Natural Resources
House of Representatives

Dear Mr. Chairman:

Wild horses have long been a symbol of the independence of the American West, but today, the health of their population depends heavily on government management. At their peak, in the mid-1800s, an estimated 2 million wild horses roamed America's rangelands. Populations decreased as development reduced habitat for wild horses and native grazers and as horses and burros were rounded up to make room for livestock and farming operations. By the early 1900s, most wild horses had disappeared from the Great Plains and those that remained were found primarily in the remote mountains, deserts, and badlands of the West. By 1971, only about 9,500 wild horses were thought to live on public rangelands. Public concerns about abuse and wild horse population declines swelled in the 1950s and 1960s. Subsequently, Congress enacted the Wild Free-Roaming Horses and Burros Act of 1971 to protect wild horses and burros from abuse and death and to manage them to achieve and maintain a thriving natural ecological balance on the public lands.[1] The 1971 act declared these wild animals to be "living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene." Since the passage of the act, wild horse and burro populations have increased, but the way they are managed on public lands has been controversial and wild horse advocates continue to voice concerns about horses being slaughtered.

The 1971 act authorized and directed the Secretary of the Interior, on public lands managed by the Bureau of Land Management (BLM), and the Secretary of Agriculture, on public lands managed by the Forest Service, "to protect and manage wild free-roaming horses and burros as

---

[1]Pub. L. No. 92-195, 85 Stat. 649 (1971) (codified as amended at 16 U.S.C. §§ 1331–1340).

BLM_000116

components of public lands."[2] The act also directed the Secretaries to manage them "to achieve and maintain a thriving natural ecological balance on the public lands." BLM field offices are responsible for determining where the animals are to be managed within areas where they were found as of 1971.[3] In fiscal year 2007, the program was funded at $36.4 million under BLM's Management of Lands and Resources appropriation. Forty-four BLM field units manage approximately 33,100 wild horses and burros on 199 Herd Management Areas (HMA) covering over 34 million acres in 10 western states—Arizona, California, Colorado, Idaho, Montana, New Mexico, Nevada, Oregon, Utah, and Wyoming.[4] BLM's Nevada State Office manages about half of the land and animals in the Wild Horse and Burro Program.

In the mid- to late 1970s, population counts indicated that there was a large increase in wild horses and burros and that they were contributing to overgrazing of the rangeland. Congress amended the 1971 act in 1978 to protect the range from wild horse overpopulation, among other things. The Public Rangelands Improvement Act of 1978 directed the Secretaries of the Interior and Agriculture to determine appropriate management levels (AML), maintain a current inventory of wild horses and burros, and determine whether and where overpopulation exists.[5] AML has been defined as the "optimum number of wild horses which results in a thriving natural ecological balance and avoids deterioration of the range."[6] Each BLM field office is responsible for determining AML for each of the HMAs it manages. The aggregate AML for BLM's 199 HMAs is approximately 27,200. Because wild horse populations can double every 4 years and few

---

[2]This report focuses solely on BLM's Wild Horse and Burro Program. BLM is responsible for managing over 90 percent of the wild horses and burros on public lands. The Forest Service is responsible for managing 2,200 wild horses and about 300 burros in 37 Wild Horse Territories that cover about 2.5 million acres of Forest Service land.

[3]Shortly after the 1971 act, BLM conducted a wild horse and burro population census and estimated the number of wild horses to be about 17,300 and the number of wild burros to be about 8,000.

[4]The 44 BLM field units include 39 field offices, 4 district offices in Oregon, and 1 field station—the Tonopah Field Station in Nevada. We will refer to these 44 BLM field units collectively as field offices. BLM's count of the number of offices that manage HMAs may differ because the 4 district offices in Oregon manage 7 resource area offices.

[5]Pub. L. No. 95-514, § 14, 92 Stat. 1803, 1808 (1978) (amending 16 U.S.C. §§ 1332–1333).

[6]*Animal Protection Institute of America*, 109 IBLA 112, 119 (1989) (internal quotes omitted).

natural predators remain, managing wild horse and burro populations at AML has become a primary objective of the program. To reach and maintain AML, BLM primarily conducts "gathers" to remove excess animals from the range. From 1971 through 2007, over 267,000 wild horses and burros were removed.[7] In 2001, BLM began implementing its most recent management strategy, to reach AML by increasing removals. Since then, about 10,600 animals have been removed, on average, per year.

Maintaining current and accurate inventories of wild horses and burros is a key component of on-the-range management. BLM has traditionally counted animals using the direct-count method, which involves flying over the HMA and reporting on each individual animal they see. BLM generally conducts this type of animal count or "census" every 4 years or so, leading up to a removal of excess animals. To produce annual population estimates between counts, BLM adjusts these census figures for each HMA based on an estimate of the herd's annual population growth. If the census numbers are inaccurate, particularly if they underestimate the actual population, BLM runs the risk that adequate forage or water may not be available for the wild horses and burros or for livestock and wildlife in the area.

After being removed from the range, excess animals are managed in short-term holding facilities, where they are either prepared for adoption or sale, or in long-term holding facilities, where they will live out the remainder of their lives. The preferred outcome for healthy animals removed from the range is that they be adopted through BLM's Adopt-a-Horse-or-Burro Program. As of 2007, approximately 235,700 animals have been adopted by the public since the start of the program in 1971. On average, about 6,300 wild horses and burros have been adopted annually since 2001. Under the act, as amended, BLM is required to assure that adopters can provide humane treatment and care.[8] When adoption demand is not sufficient to absorb all the animals removed, the act, as amended, directs BLM to either destroy the remaining healthy animals in the most humane and cost-efficient manner possible or, under certain circumstances, sell

---

[7]This total does not include the number of burros removed from the range in 1981. BLM was not able to verify older data or estimate the number of burro removals for 1981. The total number of wild horses and burros that BLM could verify were removed from the range between 1971 and 2007 was 249,489. Officials verified that the number of animals removed between 1977 and 1980 was 18,009; however, they were unable to further specify this number by year or by species. When added together, this total equals 267,498.

[8]16 U.S.C. § 1333(b)(2)(B).

them without limitation.[9] BLM has not destroyed any animals since January 1982, when a former BLM director issued a moratorium to end the destruction of excess unadoptable animals. To manage for the growing number of unadoptable animals, BLM began opening long-term holding facilities. Unlike the rangelands of the West where the animals normally live, the long-term holding facilities use Midwest grasslands that generally provide the animals with abundant forage and decreased stress. This allows most of the animals to live far longer than they would in the wild. BLM pays the private contractors that operate the long-term holding facilities a fee per horse per day. The sales directive, which was enacted on December 8, 2004, directs BLM to sell excess wild horses and burros without limitation if the animal is more than 10 years of age or has been offered unsuccessfully for adoption at least three times.[10]

Since the passage of the 1971 act, there has been controversy over the number of wild horses and burros that BLM manages in the wild and the amount of public land available for their management. There is concern by some, including wild horse and burro advocacy groups, that the number of animals managed in the wild is too low to protect their genetic integrity; that the numbers are based on insufficient rangeland monitoring data; and that BLM gives preference to other users of the range, primarily livestock and wildlife. For instance, groups often point out that BLM permits far more cattle and sheep to graze on BLM managed lands than horses. Specifically, in fiscal year 2007, approximately 567,000 head of cattle or sheep grazed BLM public lands.[11] However, livestock are managed on 160 million acres of BLM lands, compared to the 29 million BLM acres that

---

[9]16 U.S.C. § 1333(b)(2)(C) (destroy excess animals for which an adoption demand does not exist) and 16 U.S.C. § 1333(e) (sell without limitation excess animals under certain circumstances).

[10]Pub. L. No. 108-447, Div. E, Title I, § 142, 118 Stat. 2809, 3070 (2004) (amending 16 U.S.C. § 1333). In 2005, shortly after the 2004 sales directive was enacted, legislation was introduced in the 109th Congress that would have prohibited the sale of wild horses and burros for processing into commercial products (H.R. 297 and S. 576). Neither of these bills were enacted. More recently, in the 110th Congress, H.R. 249 was introduced to prohibit the sale of wild horses and burros for processing into commercial products. The bill was passed by the House of Representatives on April 26, 2007. As of August 31, 2008, the Senate had not acted on the bill.

[11]The number 567,000 represents the cattle yearlong equivalent derived by dividing the actual number of animal unit months billed in fiscal year 2007 by 12 months. An animal unit month refers to the amount of forage needed to sustain an adult cow and her calf or horse for 1 month. In reality, few livestock grazing permits are issued for yearlong grazing.

BLM_000119

are available for wild horses and burros.[12] Additionally, advocacy groups are concerned that the animals removed from the range are too often adopted into abusive homes or are ultimately sold for slaughter. Some livestock and wildlife groups argue that the population of wild horses and burros has far exceeded the level that provides ecological balance and equitable forage distribution for competing users, such as cattle and sage grouse.

We first reviewed BLM's Wild Horse and Burro Program in 1990.[13] At that time, regarding on-the-range management activities, we found that BLM's decisions on how many wild horses to remove from federal rangelands were not based on direct evidence that wild horse populations exceeded what the range could support and that removals were often not accompanied by reductions in livestock grazing levels or range management to increase the land's capacity. We recommended that BLM develop carrying capacity and range condition data and, in locations where overgrazing was occurring, that BLM implement range management techniques designed to give vegetation more opportunity to grow and, when necessary, remove wild horses and reduce livestock grazing in proportion to the numbers of each species on the range. Regarding off-the-range management activities, we found that "BLM's wild horse sanctuaries [long-term holding facilities] are likely to be much more expensive than originally envisioned and may represent only a temporary solution to the disposal of unadoptable horses.… If horse removals above levels that can be handled by private adoptions are reinstituted, other disposal options will have to be considered." We recommended that BLM consider a variety of disposal options for unadoptable horses and, as necessary, make recommendations for congressional consideration.

To update our 1990 report, we are reporting on (1) BLM's progress in managing wild horses and burros on the range through setting and meeting AML; (2) BLM's management of wild horses and burros off of the range through adoption, sales, and holding facilities; (3) the controls BLM has in place to help ensure humane treatment of wild horses and burros; and (4) what challenges, if any, BLM faces in managing the long-term sustainability of the Wild Horse and Burro Program. We were also asked to

---

[12]BLM manages wild horses and burros on 199 HMAs that are comprised of 29 million acres of BLM land and an additional 5.35 million acres of non-BLM land.

[13]GAO, *Rangeland Management: Improvements Needed in Federal Wild Horse Program*, GAO/RCED-90-110 (Washington, D.C.: Aug. 20, 1990).

BLM_000120

review how and why the acreage available for wild horses and burros had changed since the 1971 act. We did not examine the acreage issue because BLM is in the process of compiling a history of acreage determinations. BLM officials expect their review to be completed by March 2009.

To examine how BLM manages wild horses and burros on and off of the range and to identify the challenges facing BLM, we reviewed relevant laws, regulations, BLM policies, and strategic plans. We also surveyed, and analyzed documents from, 26 of the 44 BLM field offices that manage wild horses and burros.[14] We collected and reviewed relevant resource management decision documents from the surveyed field offices to help corroborate their responses about specific questions, including those about factors used to make AML determinations and gather decisions. In addition, we also conducted follow-up phone calls to clarify ambiguous or incomplete survey responses. We received usable responses from all field offices that we surveyed—a 100 percent response rate. We surveyed field offices in all 10 western states that have HMAs. The field offices we surveyed represented 82 percent of all BLM acres managed for wild horses and burros, 74 percent of all BLM managed wild horses, and 69 percent of burros on the range at the time of our survey. We interviewed BLM Wild Horse and Burro Program managers at the state and national levels and conducted site visits at two field offices that manage HMAs, two adoption events, three short-term holding facilities, and one long-term holding facility. To examine humane treatment, we collected information from BLM's compliance database and interviewed public citizens, advocacy groups, and BLM officials. A more detailed description of our scope and methodology is presented in appendix I.

We conducted this performance audit from September 2007 to October 2008 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

---

[14]We drew our sample of 26 field units from among the 44 field units that manage HMAs, which include 39 field offices, 4 district offices in Oregon, and 1 field station in Nevada. BLM's count of the number of offices that manage HMAs may differ because the 4 district offices in Oregon manage 7 resource area offices.

BLM_000121

## Results in Brief

BLM has made significant progress in setting and meeting AML for the HMAs. As of February 2008, BLM has set AML for 197 out of 199 HMAs. Most of the field offices we surveyed considered similar factors in determining AML, such as rangeland conditions and climate data; however, BLM has not provided specific formal guidance to the field offices on how to set AML. BLM has been working on revising the program's handbook to provide this guidance since 2006. Without clear guidance, BLM cannot ensure that the factors considered in future AML revisions will be consistent across HMAs, especially since the personnel most familiar with the current, informal practice of determining AML are retiring at an increasing rate. At the national level, BLM was closer to meeting AML in 2007 than in any other year since AMLs were first reported in 1984. Specifically, in February 2007, BLM estimated the population of wild horses and burros to be 28,563, about 1,000 animals over AML. To reach this level, BLM has reduced the nationwide population in the wild by about 40 percent since 2000. Our 1990 report was critical of BLM's decisions on the number of wild horses and burros to remove from the range. At that time we concluded that the decisions were made without adequate information about range carrying capacity or the impact of the animals on range conditions. Since then, in August 2005, BLM updated its formal policy on gathers and removals and specified the key factors that should be considered in the decision making process. The extent to which BLM has actually met AML depends on the accuracy of its population counts. Nineteen of the 26 field officials we surveyed used the direct-count method for their most recent gathers. This method, according to researchers, consistently undercounts animals and does not provide a statistical range of population estimates. Some BLM officials are concerned that other counting methods would require too much additional staff or are too expensive. However, undercounting is also costly since it often leads BLM to remove fewer animals than needed, which leads to overpopulation and costlier gathers in the future. For example, in the summer of 2007, BLM staff on an HMA in Nevada miscalculated the population by approximately 640 wild horses and found that the actual population was about five times greater than what they determined was sustainable. Many of the wild horses subsequently removed from this HMA were in poor condition due to severe drought, and about 150 animals ultimately died from disease in short-term holding as a result.

The number of wild horses and burros removed from the range is far greater than the number adopted or sold, which has resulted in a significant increase in the number of animals in short- and long-term holding and commensurate increases in spending for their care. Since 2001, over 74,000 animals have been removed from the range, while only

BLM_000122

about 46,400 have been adopted or sold. Thirty-six percent fewer wild horses and burros were adopted in 2007, compared to average adoption rates in the 1990s. BLM officials attribute the steady adoption decline in recent years to the decreasing demand for horses in general and increasing hay and fuel costs associated with their care. As of June 2008, BLM was holding 30,088 animals in short- and long-term holding facilities, far more than in 2001 when it held 9,807. From 2001 through June 2008, the number of short-term holding facilities increased from 14 to 24 to accommodate more animals, while the average cost per animal increased from $3.00 per day to $5.08 per day. The total cost for short-term holding increased from $6.4 million in 2000 to $11.2 million in 2001. From 2001 through 2007, the cost remained relatively stable, but for 2008, costs are anticipated to increase to $16.2 million. Similarly, BLM has increased the number of long-term holding facilities from 1 in 1988 to 11 as of June 2008, and the average cost per animal has increased to approximately $1.27 per day. Warnings issued in the 1990s by us and the Department of the Interior's Office of Inspector General about the potential for escalating costs for long-term holding have proven accurate, as spending on long-term holding has increased from about $668,000 in 2000 to more than $9.1 million in 2007. In addition, with the long-term holding facilities at full capacity—they held 22,101 wild horses as of June 2008 and had a capacity of 22,100—more wild horses are spending a longer time in the more expensive short-term holding facilities.

BLM has implemented multiple controls to help ensure the humane treatment of wild horses and burros, including standard operating procedures, random checks on adopted horses, and agreements with buyers to help prevent slaughter. For gathers, it has established standard operating procedures and reporting systems to help ensure humane treatment. According to data from 6 of the 10 states that manage wild horses and burros, 1.2 percent of animals removed from 2005 to 2007 were either euthanized or died accidentally. While BLM state offices sometimes collect data on animals that die during gathers, the information is not compiled by BLM headquarters in its centralized database, nor is it reported to the public. For animals held after removal in short- and long-term holding facilities, staff from BLM and veterinarians from the Department of Agriculture's Animal and Plant Health Inspection Service inspect facilities on a regular basis to help ensure adequate care and treatment are provided. For wild horses and burros that have been adopted, BLM guidance directs field offices to make follow-up phone calls or visits for all adopters during the first year of the adoption, physically inspect a random sample of adopted animals, and conduct inspections of adopted animals whenever complaints are received. According to the

results of BLM's random adoption inspections, from 2005 through 2007, on average about 9 percent of adopters did not comply with BLM standards of care for adopted wild horses and burros. The most common violations were failing to report changes in the animals' status or location to BLM and failing to provide adequate facilities or care. For animals that are sold, since the spring of 2005, BLM has required buyers to sign a statement that they do not intend to slaughter the animals. Although BLM tracks information about the treatment of animals in short- and long-term holding and after adoption, it does not regularly report this information to the public. Doing so could help inform the public about the treatment of the animals and improve transparency.

The long-term sustainability of BLM's Wild Horse and Burro Program depends on the resolution of two significant challenges:

- *If not controlled, off-the-range holding costs will continue to overwhelm the program.* The Wild Horse and Burro Program's spending for off-the-range holding increased from $7 million in 2000— 46 percent of the program's direct costs—to about $21 million in 2007—67 percent of the program's direct costs. In 2008, BLM anticipates that holding costs will account for about 74 percent of the program's direct costs. As holding costs continue to increase, less funding is available for on-the-range management, which could result in sharp increases to the animal population in the wild. To deal with its long-term holding problem, BLM has primarily sought increased funding to open additional holding facilities. However, funding is not likely to increase in the future, and limited funding is forcing BLM to make the difficult choice among managing the animals on the range to prevent overpopulation, destroying excess unadoptable animals, or selling them without limitation. If funding is not increased or if BLM does not dispose of animals in other ways, BLM projects that the number of wild horses on the range would reach about 50,000, or about 80 percent over AML, by 2012.

- *BLM's options are limited for dealing with unadoptable animals.* The Wild Free-Roaming Horses and Burros Act, as amended, requires that excess animals, for which the adoption demand is not sufficient to absorb all the animals removed from the range, be destroyed in the most humane and cost-efficient manner possible or, under certain circumstances, be sold without limitation. From fiscal year 1988 through fiscal year 2004, Congress prohibited BLM from using its Management of Lands and Resources appropriations to destroy excess healthy, unadopted wild horses and burros, despite the amended act's directive to destroy excess animals. However, since the enactment of

the sales directive in 2004, which provided BLM with another means of disposal for these excess animals, Congress has appropriated funds to BLM without the prohibition. BLM has still chosen not to destroy or sell excess animals without limitation because of concerns about public and congressional reaction to the large-scale slaughter of thousands of healthy horses. However, by not destroying or selling them without limitation, BLM is not in compliance with the requirements of the act. Legislation is pending in the 110th Congress that would repeal the 2004 sales directive but not the requirement to destroy excess horses. As of June 2008, budget constraints have forced BLM to reconsider all of its options, including humane destruction and sales without limitations. BLM has not formally considered other possible solutions to deal with the current number of wild horses in long-term holding other than one pilot project in Wyoming. Some BLM officials suggested that other options are possible, such as placing nonreproducing animals on vacant BLM grazing allotments or on other federal lands, but these actions would require legislative changes.

To improve the management of BLM's Wild Horse and Burro Program, we are recommending that the Secretary of the Interior direct BLM to finalize and issue the new program handbook to ensure that AML determinations are based on consistent factors across HMAs into the future, improve the accuracy of population estimates by continuing to adopt statistically based methods to estimate animal populations, improve public access to data about the welfare of wild horses and burros removed from the range, and develop cost-effective alternatives to caring for wild horses removed from the range in long-term holding facilities. We are also recommending that the Secretary of the Interior direct BLM to initiate discussions with Congress to address BLM's noncompliance with the act. In commenting on a draft of this report, the Department of the Interior concurred with our findings and recommendations and provided several technical clarifications, which we have made as appropriate. Appendix IV presents the Department of the Interior's comment letter.

# Background

During the 20th century, tens of thousands of wild horses were either killed or captured for slaughter on America's western ranges. Documented abuses suffered by wild horses led concerned individuals and national humane organizations to push for federal protections in the 1950s. Subsequently, Congress passed legislation in 1959 prohibiting the use of aircraft or motor vehicles to capture or kill wild horses or burros on public lands and polluting watering holes on public lands to trap, kill, wound, or maim wild horses or burros. Despite the 1959 act, wild horse exploitation continued, and some questioned whether the population would eventually be eradicated. To protect wild horses and burros, Congress passed additional legislation in 1971 to require the protection and management of wild free-roaming horses and burros on public lands. The 1971 act was amended in 1976, 1978, 1996, and 2004 (see table 1). The 2004 amendments directed BLM to sell, without limitation, excess animals more than 10 years of age or that have been offered unsuccessfully for adoption at least three times.

**Table 1: Major Legislation Governing BLM's Wild Horse and Burro Program**

| Legislation | Date | Major relevant provisions |
|---|---|---|
| Public Law 86-234 (Wild Horse Annie Act of 1959)[a] | Sept. 8, 1959 | Establishes criminal penalties for using an aircraft or motor vehicle to hunt wild horses or burros on public lands for capturing or killing and for polluting watering holes on public lands to trap, kill, wound, or maim wild horse or burros. |
| Public Law 92-195 (Wild Free-Roaming Horses and Burros Act of 1971)[b] | Dec. 15, 1971 | Authorizes and directs the Secretaries of the Interior and Agriculture to protect and manage wild horses and burros as components of the public lands to achieve and maintain a thriving natural ecological balance. Authorizes the Secretaries, in areas found to be overpopulated, to order old, sick, or lame animals destroyed in the most humane manner possible and to capture or remove wild horses and burros under humane conditions and care. Authorizes the Secretaries to order wild horses and burros destroyed in the most humane manner possible when such action is deemed necessary to preserve and maintain the habitat in a suitable condition for continued use. The act also establishes criminal penalties for a number of offenses involving wild horses and burros. |
| Federal Land Policy and Management Act of 1976[c] | Oct. 21, 1976 | Directs the Secretary of the Interior to prepare and maintain an inventory of public lands and their resources and other values and to, with public involvement, develop, maintain, and revise land use plans, which provide for the use of public lands. Directs the Secretary to manage the public lands under principles of multiple use and sustained yield. Authorizes the Secretaries of the Interior and Agriculture to contract for the use of helicopters and for using motor vehicles to transport captured animals after a public hearing and in accordance with humane procedures. |

BLM_000126

| Legislation | Date | Major relevant provisions |
|---|---|---|
| Public Rangelands Improvement Act of 1978[d] | Oct. 25, 1978 | Directs the Secretaries of the Interior and Agriculture to maintain a current inventory of wild horses and burros on given areas of public lands to determine whether and where overpopulation exists and whether to remove excess animals, the appropriate management levels, and whether appropriate management levels could be achieved by removal or destruction of excess animals or through other options. Directs the Secretaries, upon finding that an overpopulation exists and that action is necessary to remove excess wild horses and burros, to restore a thriving ecological balance by first destroying old, sick, and lame animals in the most humane manner possible; then humanely capturing and removing wild horses and burros for private maintenance and care for which an adoption demand exists by qualified individuals; and then destroying additional excess wild horses and burros in the most humane and cost-efficient manner possible. Authorizes the Secretaries, upon application, to grant title to excess wild horses and burros for which an individual provided humane conditions, treatment, and care for a period of 1 year. Provides that a wild horse or burro is no longer a wild horse and burro for purposes of the 1971 act once title has passed to an individual or in a number of other circumstances. No wild horse and burro or its remains may be sold or transferred for consideration for processing into a commercial product. |
| Omnibus Parks and Public Lands Management Act of 1996[e] | Nov. 12, 1996 | Attempts to clarify the effect of the 1976 amendment, which authorized the Secretaries of the Interior and Agriculture to use helicopters and motor vehicles in the capture and transportation of animals. |
| Department of the Interior and Related Agencies Appropriations Act, 2005[f] | Dec. 8, 2004 | Directs the sale, without limitation, of excess wild horses and burros, or their remains, if the animals are more than 10 years of age or have been offered unsuccessfully for adoption at least three times, until all excess animals are sold or until appropriate management levels are attained. It also provides that wild horses and burros, or their remains, once sold, are no longer wild horses and burros for the purposes of the 1971 act. Exempts animals sold under these provisions from the general prohibition under the 1971 act of processing the remains of wild horses and burros into commercial products. |

Source: GAO analysis of laws pertinent to BLM's management of the Wild Horse and Burro Program.

[a]Pub. L. No. 86-234, 73 Stat. 470 (1959) (codified as amended at 18 U.S.C. § 47).

[b]Pub. L. No. 92-195, 85 Stat. 649 (1971) (codified as amended at 16 U.S.C. §§ 1331–1340).

[c]Pub. L. No. 94-579, 90 Stat. 2743 (1976). Specifically, section 404 (90 Stat. 2775) amended the 1971 act (codified as amended at 16 U.S.C. § 1338a).

[d]Pub. L. No. 95-514, § 14, 92 Stat. 1803, 1808 (1978) (amending 16 U.S.C. §§ 1332–1333).

[e]Pub. L. No. 104-333, Title VIII, § 803, 110 Stat. 4093, 4186 (1996) (amending 16 U.S.C. § 1338a).

[f]Pub. L. No. 108-447, Div. E, Title I, § 142, 118 Stat. 3039, 3070 (2004) (amending 16 U.S.C. § 1333).

The passage of the 1971 act changed the way BLM managed wild horses and burros on public lands. Rather than considering them as feral species that caused damage to the rangeland, the agencies had to change their mind-set to protect and manage the animals as an integral part of the ecosystem. One of the first tasks in managing the animals was to determine where they lived and their populations. According to the act, BLM is only authorized to manage wild horses and burros in areas where

they were found in 1971.[15] The areas where wild horses and burros were found, largely on public lands managed by the BLM and the Forest Service, as of the date of the act are called herd areas, and they comprise about 53.5 million acres. Once the exact land status and ownership of the herd areas was verified, it was determined that most herd areas were on BLM administered public lands, but some also included private and state-owned in-holdings. The 1971 act states that the Secretaries of the Interior and Agriculture shall arrange for the removal of wild horses and burros that stray onto private land upon notification by the owner.[16]

Next, through its land management planning process, BLM designated HMAs within these herd areas. In making HMA designations, BLM determined whether or not the areas where wild horses and burros were found contained adequate forage and water to sustain the herds. BLM also designated some HMAs in such a way as to avoid conflicts with private landowners. Today, BLM is responsible for managing 199 HMAs covering 34.3 million acres across 10 western states (see fig. 1).[17] BLM is currently compiling a history of how BLM field offices made the determination to manage wild horses and burros on the current 34.3 million acres, compared to the 53.5 million acres where they were originally found in 1971. According to BLM officials, they expect the review to be completed by March 2009.

---

[15]Pub. L. No. 92-196, § 9, 85 Stat. 649, 651 (renumbered as § 10 of the act and codified at 16 U.S.C. § 1339).

[16]Pub. L. No. 92-196, § 4, 85 Stat. 649, 651 (codified at 16 U.S.C. § 1334).

[17]Three of the 199 HMAs are classified as Wild Horse Ranges—the Pryor Mountains Wild Horse Range in Montana, the Little Book Cliffs Wild Horse Range in Colorado, and the Nevada Wild Horse Range of south-central Nevada. One of the HMAs is classified as a Wild Burro Range—the Marietta Wild Burro Range located in Nevada. According to the 1971 act, under certain circumstances, the Secretaries of the Interior and Agriculture may designate and maintain specific ranges on public lands as sanctuaries for the protection and preservation of wild free-roaming horses and burros. 16 U.S.C. § 1333(a). Ranges are to be devoted principally, but not necessarily exclusively, to their welfare in keeping with the multiple-use management concept for the public lands. 16 U.S.C. § 1332(c). BLM can also choose to close appropriate areas of public lands to grazing use by all or a particular kind of livestock, if necessary, to provide habitat for wild horses or burros; to implement herd management actions; or to protect wild horses or burros from disease, harassment, or injury. 43 C.F.R. § 4710.5.

BLM_000128

**Figure 1: BLM Herd Areas and HMAs in the Western United States**



Source: BLM.

The number of HMAs and their acreage has changed over time for many different reasons, including BLM land being redesignated as National Park land and declines in forage or water that make an area unsustainable,

among others. About half the acreage managed under BLM's Wild Horse and Burro Program is located in Nevada (see table 2). While most of BLM's management activities for wild horses and burros occur within HMAs, BLM is responsible for removing populations of animals that stray onto public lands outside of HMAs, as well as those that stray onto private property.

**Table 2: Summary Statistics on BLM's Wild Horse and Burro Program, by State, February 2008**

| State | Number of HMAs | Total AML[a] | Population estimate | HMA acreage | | |
|---|---|---|---|---|---|---|
| | | | | BLM acreage | Other acreage | Total acreage |
| Nevada | 102 | 13,098 | 16,143 | 15,772,485 | 1,695,925 | **17,468,410** |
| Wyoming | 16 | 3,725 | 3,439 | 3,638,330 | 1,137,121 | **4,775,451** |
| Arizona | 7 | 1,676 | 2,173 | 1,756,086 | 1,327,777 | **3,083,863** |
| Oregon | 18 | 2,715 | 2,473 | 2,703,409 | 259,726 | **2,963,135** |
| Utah | 21 | 2,151 | 3,096 | 2,379,850 | 362,817 | **2,742,667** |
| California | 22 | 2,237 | 3,878 | 1,946,590 | 471,855 | **2,418,445** |
| Idaho | 6 | 617 | 703 | 377,907 | 40,287 | **418,194** |
| Colorado | 4 | 812 | 933 | 366,098 | 38,656 | **404,754** |
| Montana | 1 | 105 | 170 | 28,282 | 8,865 | **37,147** |
| New Mexico | 2 | 83 | 97 | 24,505 | 4,107 | **28,612** |
| **Total** | **199** | **27,219** | **33,105** | **28,993,542** | **5,347,136** | **34,340,678** |

Source: BLM.

[a]This column represents the upper limit of AML according to BLM data.

Wild horses and burros are to be managed as self-sustaining populations of healthy animals in balance with other multiple uses and the productive capacity of their habitat. Because wild horses and burros reproduce at an estimated rate of 20 percent annually and no natural predators remain, except for in a very few isolated HMAs, BLM must actively manage the population of the herds. AML has been defined as the "optimum number of wild horses which results in a thriving natural ecological balance and avoids deterioration of the range."[18] AML determinations can be made in a variety of land planning or decision documents, including, but not limited to, resource management plans, Herd Management Area Plans, and multiple use decision documents. The actual number set through an AML determination is predicated, in part, on (1) the number of acres set-aside

---

[18]*Animal Protection Institute of America*, 109 IBLA at 119 (internal quotes omitted).

for the management of wild horses and burros within a specific resource planning area and (2) the proportion allocation of the available forage allotted for wild horse and burro consumption among other users, such as livestock and wildlife. After these two key multiple use decisions have been made, BLM field offices can then set the actual AML numbers. Available forage is based on range conditions and other data.

BLM's Wild Horse and Burro National Program Office encourages field offices to establish AML as a range with an upper and lower limit.[19] The upper limit of the range equals the maximum number of animals that can be sustained to result in a thriving natural ecological balance and avoid deterioration of the range. The lower limit is generally determined as the number to which a population must be gathered to help ensure the population will not exceed the upper limit of AML within the established gather cycle. For example, if the established gather cycle was 4 years, it would be the number to which a population must be gathered to help ensure the population will not exceed the upper limit of AML within a 4 year time period. BLM strives to maintain a national herd population level that is at the midpoint of AML, where the recently gathered HMAs would be at the lower limit of AML, while those awaiting gathers would be closer to the upper limit of AML. As of February 2008, the upper limit of AML (the cumulative total for each of the 199 HMAs) was approximately 27,219, and the midpoint was about 22,588.[20]

Because AMLs are intended to reflect the population of animals that can be sustainably maintained in an HMA, they are subject to change over time. Changes in AML happen for several reasons, including when acreage is added to or subtracted from an HMA and when changes in rangeland conditions result in improved or reduced forage and water availability sufficient to sustain a certain population level. In the arid ranges where most wild horses and burros are managed, conditions generally do not

---

[19]Some HMAs report AML as a single number rather than as a range; however, they also calculate an upper and lower limit of AML to determine the level within which to manage herds. BLM is drafting guidance to direct all field offices to identify AML as a range.

[20]According to BLM officials, as of February 2008, the upper limit of AML nationally was approximately 27,219 animals, and the lower limit of AML was approximately 17,957. Based on our calculation, the midpoint between the two limits is approximately 22,588. These numbers are considered approximate because not all HMAs report AML as a range. AML for 7 HMAs are reported as the midpoint of AML, while 29 HMAs report AML as the upper limit. Therefore, to account for the 36 HMAs that report a single AML number, BLM may only approximate the true upper, lower, and midpoint of AML on a nationwide basis.

improve rapidly and have been further degraded by drought conditions that have lasted for over a decade (see fig. 2). The effects of climate change are likely to exacerbate the poor conditions that many HMAs are already experiencing.

**Figure 2: Drought Conditions and HMAs, February 2008**



Source: BLM.

Determining which type of animal is responsible for rangeland damage is important to properly managing an HMA and in determining the number of animals to permit on the range. BLM can control the number of livestock

and wild horses and burros to permit on the range, but BLM is not responsible for managing wildlife numbers on the range. Because BLM is not the lead agency responsible for wildlife on public lands, they are to coordinate with state wildlife officials about the forage allocation for wildlife populations. An increase in allocation of any species may cause increased competition for the remaining users of the range, especially under severe conditions. For example, in severe drought conditions, grazing and browsing is concentrated in limited areas near water sources. This intense competition causes heavy use and perhaps depletion of the resources the animals are dependent upon.

Throughout the life of the program, the population of wild horses and burros on the range has generally far exceeded AML. BLM has used the removal of animals from the range as a primary management tool for managing herd sizes. To gather animals for removal, BLM uses private contractors to herd the animals in an HMA into temporary on-site corrals.[21] The animals are primarily gathered using helicopters. In some cases, when gathering smaller numbers of wild horses and burros, BLM officials or contractors will use other trapping techniques, such as bait trapping, to capture the animals. Once collected into the temporary corrals, BLM officials use a selective removal process to determine which of those gathered animals to remove from the HMA.[22] Animals that are not selected are returned to the wild. When animals are removed from the range, they are taken to short-term holding facilities to receive vaccinations and other treatment prior to either being adopted, sold, or sent to long-term holding. Figure 3 depicts BLM's management of wild horses and burros on and off of the range.

---

[21]BLM has gather contracts with two private companies.

[22]The selective removal policy is used only for wild horses; it is not applicable to wild burros. When gathers are conducted, an emphasis is placed on removing the younger, more adoptable animals from the range. However, the sex ratio and age structure of the herd must also be considered to assure a healthy population.

BLM_000134

**Figure 3: BLM Management of Wild Horses and Burros on and off of the Range**



### 1. On-the-Range Management

On-the-range management of wild horses and burros includes management activities such as range condition monitoring, population counts, and rangeland improvements. As of February 2008, the estimated on the range population was 33,105.

Animals are periodically removed from HMAs to reach a level that is sustainable with other uses of the range. BLM typically uses helicopters to herd animals into temporary corrals. In 2007, BLM removed 7,726 animals from the range.

### 2. Short-Term Holding

Once animals are removed from the range, they enter short-term holding facilities where they receive veterinary care prior to being adopted, sold, or sent to long-term holding facilities. As of June 2008, the number of animals in short-term holding was 7,987.



### 3. Adoption and Sales

BLM offers animals removed from the range for adoption to private citizens. In 2007, 4,772 wild horses and burros were adopted.

Wild horses can be sold if they are offered unsuccessfully for adoption at least three times or are more than 10 years of age.

Wild horses and burros that are adopted or sold are used by some as companions and by others as working animals.

### 4. Long-Term Holding

Animals that are removed from the range and cannot be adopted or sold are placed in long-term holding facilities to live out the rest of their lives. Most of the facilities are located on Midwest grasslands in Kansas and Oklahoma. As of June 2008, the number of horses in long-term holding was 22,101.

Sources: GAO (photos, photo illustration), BLM (photos).

BLM_000136

For fiscal year 2001, BLM requested a budget increase for the program as part of a major initiative to reach the upper limit of AML by 2005.[23] Subsequently, program funding allocated from congressional appropriations—what the agency refers to as "enacted funding"—increased from $19.8 million in fiscal year 2000 to $34.4 million in fiscal year 2001, an increase of $14.6 million. In 2002, enacted funding for the program was $29.6 million, about $10 million over the 2000 congressional funding level. After reassessing the initiative in 2004, BLM estimated it needed an additional $10.5 million on top of their enacted funding level of $29.1 million in fiscal year 2004 to meet its revised goal of meeting the midpoint of AML by 2006. In fiscal year 2005, enacted funding was increased about $10 million for a total of $39 million in fiscal year 2005 (see fig. 4). The President's 2008 budget requested $32 million for the program, about $4 million less than enacted funding for fiscal year 2007.

---

[23]U.S. Department of the Interior, BLM, *Living Legends in Balance with the Land, A Strategy to Achieve Healthy Lands and Viable Herds, The Restoration of Threatened Watersheds Initiative* (Washington, D.C., 2000).



**Figure 4: BLM's Wild Horse and Burro Program Funding, Fiscal Years 2000 through 2007**

Source: BLM.

Note: The enacted funding level, as reported by BLM, is the amount allocated from congressional appropriations minus rescissions for the Wild Horse and Burro Program. Total program funding represents the sum of the enacted funding; reprogrammed funding; and funding from other sources, such as reimbursement for BLM's management of parts of the Forest Service's Wild Horse and Burro Program.

## BLM Has Made Progress in Setting and Meeting AML, but Guidance Is Lacking and Meeting AML Has Proven Difficult

BLM has made significant progress in setting and meeting AML for the HMAs. As of February 2008, BLM has set AML for 197 out of 199 HMAs. Most of the field offices we surveyed considered similar factors in determining AML, such as rangeland conditions and climate data; however, BLM has not provided specific formal guidance to the field offices on how to set AML. BLM has been working on revising the program's handbook to provide such guidance since 2006. With increased retirements, field offices reported losing the experienced personnel most familiar with the informal practice of determining AML. Until BLM finalizes the handbook or issues other guidance, it cannot ensure that the factors considered in future revisions of AML determinations are consistent across HMAs. At the national level, BLM reported that it was closer to meeting AML in 2007 than in any other year since AMLs were documented in 1984. Specifically, as of February 2007, BLM estimated the

population at 28,563, which was about 1,000 animals over AML. To reach this level, BLM has reduced the nationwide population in the wild by about 40 percent since 2000. However, the population estimates are higher for 2008, and BLM has not met its goal of meeting AML for each HMA. The fact that not all HMAs have met AML remains a concern because of the damage excessive populations can cause on the range. Twenty of 26 field officials we surveyed told us that conducting gathers to remove excess animals is among their top challenges to maintaining AML because delayed gathers can cause animal populations to quickly exceed AML. In our 1990 report we concluded that BLM's decisions on the number of wild horses and burros to remove were made without adequate information about range carrying capacity or the impact of the animals on range conditions. In August 2005, BLM updated its formal policy on gathers and removals and specified the key factors that should be considered in the decision making process. The extent to which BLM has actually met AML depends on the accuracy of BLM's wild horse and burro population counts. Nineteen of the 26 field officials we surveyed used a method that consistently undercounts animals and does not provide a statistical range of population estimates. Alternative counting methods may be more expensive, but undercounting a population can lead to overpopulation and costlier gathers in future years.

## BLM Has Set AML for 197 out of 199 HMAs, but No Formal Guidance Exists on How to Establish AML

BLM has made significant progress in setting AML using rangeland monitoring data for the HMAs. As of February 2008, BLM has set AML for 197 out of 199 HMAs, compared to 2002 when about two-thirds of HMAs had set AML.[24] Prior to 1984, many of the initial AMLs were not based on rangeland data but on factors such as initial herd population counts or administrative convenience. For example, the original AML established for Beaty's Butte HMA in Oregon in 1977 was based on the number of horses found in that area on December 15, 1971. In Wyoming, AMLs for about one-third of the HMAs were based on agreements with local grazing interests because they owned private lands that were interspersed with BLM lands where wild horses were found in 1971. Only 10 out of the 26 field offices we surveyed identified the use of rangeland data to determine their initial AMLs. But since 1984, in accordance with the *Dahl v. Clark* decision, BLM officials told us that field managers have generally

---

[24]The number of HMAs managed by BLM has changed over time. In 2002, BLM managed 208 HMAs, 142 of which had set AML, or 68 percent.

based AML decisions on monitoring data and an in-depth analysis.[25] Most of the current AMLs for the 199 HMAs were set after 1984 (see table 3). Although some current AMLs were set many years ago, they are generally reviewed every 4 years or so as part of the recurring process to gather and remove excess animals. If during this process, and through monitoring, it is determined that an AML is no longer appropriate, field offices will consider changing it. For example, table 17 in appendix III shows how the current AMLs for the 26 HMAs in our sample have been changed, as applicable, since they were initially set.

**Table 3: Years in Which Current AMLs Were Set for BLM's 199 HMAs**

| Years in which current AMLs were set | Number of HMAs |
|---|---|
| 1975–1979[a] | 2 |
| 1980–1984 | 13 |
| 1985–1989 | 13 |
| 1990–1994 | 45 |
| 1995–1999 | 32 |
| 2000–2004 | 68 |
| 2005–2008 | 24 |
| Not yet set | 2 |
| **Total** | **199** |

Source: GAO analysis of BLM data.

Note: Although an AML may have been set years ago, they are generally reviewed every 4 years or so as part of the reoccurring process to gather and remove excess animals.

[a]AML determinations were first required by the Public Rangelands Improvement Act of 1978.

Most of the field offices we surveyed considered similar factors in determining AML.[26] According to BLM National Program Office officials, field office staff should consider at least four factors in making AML determinations—climatic data, utilization data, actual use data, and trend data. Climate data measures the amount of precipitation within a specific area. In addition, temperature and wind data may be collected to evaluate

---

[25]*Dahl v. Clark*, 600 F. Supp. 585 (Dist. Ct. Nev. 1984).

[26]For this report we reviewed BLM's process for making AML determinations and the factors it considers during that process. We are not expressing a legal opinion as to whether any individual AML established through this process would achieve and maintain a "thriving natural ecological balance," as required by the act. 16 U.S.C. § 1333(a), (b)(2); *see also, Animal Protection Institute of America*, 109 IBLA 112, 115.

the effect of climate on vegetation; utilization data measures the percent of forage consumed by livestock, wild horses and burros, wildlife, and insects during a specified period; actual use data is the number of grazing animals that used an area within a certain amount of time; and trend data measures the direction of change in ecological status or resource rating observed over time. Our survey results indicate that these four key AML determination factors were considered by some, but not all, of the BLM field offices responsible for setting AML for our sample of 26 HMAs (see table 4).

**Table 4: Extent to Which BLM Field Office Staff Considered Each of the Four Key Factors in Making the Most Recent AML Determination for Surveyed Field Offices**

| Number of the four key factors considered | Number of BLM field offices |
|---|---|
| 4 | 16 |
| 3 | 6 |
| 2 | 2 |
| 1 | 1 |
| 0 | 1 |
| **Total** | **26** |

Source: GAO survey results.

Almost all of the field offices considered trend (25) and utilization (23) data, but only 19 considered climate and actual use data for livestock, while 14 considered actual use data for wildlife (see table 5).

**Table 5: Factors Considered by BLM Field Office Staff in Making the Most Recent AML Determinations for Surveyed Field Offices**

| Factor | Considered | Not considered | Don't know | Not applicable | Blank |
|---|---|---|---|---|---|
| Factors BLM officials told us should be considered | | | | | |
| Trend | 25 | 1 | 0 | 0 | 0 |
| Utilization | 23 | 2 | 1 | 0 | 0 |
| Climate data | 19 | 3 | 4 | 0 | 0 |
| Actual use: livestock | 19 | 2 | 2 | 3 | 0 |
| Actual use: wildlife | 14 | 5 | 6 | 1 | 0 |
| Other factors considered | | | | | |
| Carrying capacity | 23 | 1 | 2 | 0 | 0 |
| Census/inventory | 22 | 2 | 2 | 0 | 0 |
| Water resources | 21 | 3 | 2 | 0 | 0 |
| Stakeholder influence | 20 | 2 | 4 | 0 | 0 |
| Production | 19 | 2 | 5 | 0 | 0 |
| Herd health | 19 | 4 | 3 | 0 | 0 |
| Genetic viability | 16 | 6 | 3 | 1 | 0 |
| Recreational use | 14 | 6 | 3 | 3 | 0 |
| Cultural resources | 12 | 6 | 5 | 2 | 1 |
| Archeological resources | 12 | 6 | 5 | 2 | 1 |
| Livestock agreements | 11 | 4 | 7 | 4 | 0 |
| Human safety issues | 8 | 8 | 2 | 8 | 0 |
| Community expansion | 4 | 8 | 2 | 12 | 0 |
| Court order | 2 | 5 | 2 | 17 | 0 |
| Mineral extraction | 3 | 10 | 2 | 11 | 0 |
| Other factors | 7 | 1 | 0 | 1 | 17 |

Source: GAO survey results.

In addition to the four factors mentioned by BLM National Program Office officials, field offices considered other factors to help make their AML determinations, including census inventory, water resource availability, herd health, and unique local conditions. For instance, in Arizona, one field office reduced the AML for burros on an HMA because they found

that burros were foraging on the same willows critical to the survival of the endangered Southwestern Willow Flycatcher.[27]

In determining AML, field office staff must also consider rangeland conditions for wild horses and burros in conjunction with other users of the range, including livestock and wildlife. Determining which species is responsible for rangeland damage is an important task to properly managing the HMA and in determining the number of wild horses and burros to permit on the range. For example, if field staff determine that cattle are primarily responsible for damaging an area, they may pursue several management options, including fencing out cattle, reducing the number of cattle, or changing the time of year cattle are allowed to graze in a particular area. BLM lacks similar management techniques to control wild horse and burro use due to their free-roaming nature. BLM's direct management actions are limited to dealing with livestock and wild horses and burros, since individual states are responsible for managing wildlife.

We recognized the difficulty in distinguishing the difference between impacts that wild horses and burros have on the range versus other users in our 1990 report.[28] Some advocacy groups have criticized BLM because they believe that BLM unfairly faults wild horse and burros for damage to the range to justify their removal and reductions in AML. Several BLM officials told us ascribing range impacts can be difficult, but 20 out of the 26 field offices that we surveyed said they had a procedure in place do so. When the damage is caused by all the user groups or when the damage can not be attributed to a specific user group, BLM will generally make across-the-board reductions in the number of animals allowed on the range based on the historic proportion of each user group on the range. For example, if wild horses and burros historically accounted for 10 percent of the forage consumption on the range, then wild horses and burros would bear 10 percent of the necessary reductions.

BLM has also made steady reductions in cattle grazing on BLM land as drought conditions in much of the West have worsened, resulting in the reduction of forage and water availability. For example, in Nevada, the

---

[27]Under Section 7 of the Endangered Species Act, all federal agencies must ensure that any actions they authorize, fund, or carry out are not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of its designated critical habitat.

[28]GAO/RCED-90-110.

state that manages for the greatest number of wild horses, permitted livestock use was reduced from about 2.5 million animal unit months in 1990 to a little over 2 million in 2006.[29] The actual use during this same period, however, decreased from 1.8 million animal unit months to 1.2 million.

In addition to the factors considered in making AML determinations, the age of the data, or how current it is, can also be important. The meaning of "current" data collection depends on the ecosystem and may vary across HMAs. BLM national program officials explained that data used to support AML decisions should be collected on a frequent basis. In general, they told us climate, utilization, and actual use data should be collected annually and trend data should be analyzed and reviewed within 4 years of setting AML. However, of the respondents who provided the age for data used, fewer than half collected their data for actual use for livestock and wildlife within 1 year of their AML determination; half collected their data for utilization within 1 year of the determination; and more than half collected their data for climate within 1 year of the determination. Fifteen of the 19 respondents who provided the age for data used considered trend data within 4 years of the determination (see table 6).

---

[29]An animal unit month refers to the amount of forage needed to sustain an adult cow and her calf or horse for 1 month.

BLM_000144

**Table 6: Age of Data Used to Make Current AML Determinations for Surveyed Field Offices**

| | Age of the data | | | | | |
|---|---|---|---|---|---|---|
| Factor | 1 year | 2 years | 3 years | 4 years | 5-10 years | 11 years or older |
| Factors BLM officials told us should be considered | | | | | | |
| Trend | 8 | 3 | 1 | 3 | 4 | 0 |
| Utilization | 9 | 2 | 1 | 3 | 3 | 0 |
| Climate data | 9 | 2 | 0 | 2 | 2 | 0 |
| Actual use: livestock | 6 | 3 | 0 | 2 | 3 | 0 |
| Actual use: wildlife | 5 | 1 | 0 | 2 | 2 | 1 |
| Other factors considered | | | | | | |
| Carrying capacity | 7 | 3 | 0 | 2 | 5 | 1 |
| Census inventory | 13 | 1 | 1 | 2 | 1 | 0 |
| Water inventory | 11 | 2 | 0 | 2 | 1 | 0 |
| Production | 6 | 1 | 0 | 2 | 3 | 2 |
| Herd health | 11 | 1 | 0 | 3 | 1 | 0 |
| Genetic viability | 8 | 0 | 0 | 3 | 1 | 0 |

Source: GAO survey results.

Note: Some field offices that considered the factors listed in this table did not provide a year in which the data was collected.

Although field offices use many factors to make their AML determinations, BLM has no guidance or policy about the specific factors they must consider in determining AML. This is in contrast to the BLM policy that exists for a similar type of analysis that is conducted for removals. According to BLM's 2005 gather policy, the determination to remove animals must be supported by the following factors: climatic data, utilization data, actual use data, trend data, and current census data.[30] While 22 out of 26 BLM field offices responded that the data used to make their AML determination were moderate to very sufficient, several BLM officials told us that with increased retirements, field offices are losing the experienced personnel most familiar with the informal practice of determining AML. Therefore, without clear guidance, BLM cannot ensure

---

[30]U.S. Department of the Interior, BLM, *Gather Policy and Selective Removal Criteria*, Instruction Memorandum No. 2005-206 (Washington, D.C., Aug. 10, 2005). Although the instruction memorandum had an expiration date of September 30, 2006, according to BLM officials, it is still considered to be in effect until it is reissued.

that the factors considered in future revisions of AML determinations will be consistent across HMAs. To make the informal AML determination process official and to help ensure consistency among BLM field offices, BLM officials have been working on drafting a new handbook for the program since 2006, which specifies the factors field offices should use in making AML determinations.[31] Due to higher priorities and limited resources, the handbook is still in draft form and is undergoing final revision. BLM officials told us they expect the handbook to be completed in fall 2008.

## BLM Has Made Significant Progress toward Meeting AML, but Some HMAs Remain Far over AML

Since 2000, BLM has made significant progress toward meeting AML. At the national level, BLM was closer to meeting AML in 2007 than in any other year since 1984 (when AML levels were first reported by BLM), with a population of 28,563, or about 1,000 animals over the upper limit of AML (see fig. 5). Meeting AML has been a challenge for most of the lifetime of the program. In 1985, in reporting on the Department of the Interior and related agencies' appropriations, the Senate Committee on Appropriations recommended more than tripling the program's funding above the original budgeted amounts to, according to the committee, permit BLM to maintain nearly 14,000 animals in corrals through the end of fiscal year 1986 and to remove 17,000 excess animals during fiscal year 1986.[32] The program's funding was tripled in fiscal year 1986, and with the increased funding, BLM removed 18,959 excess animals. In fiscal year 2001, BLM began implementing a 4-year strategy to aggressively remove animals from the range to reach the upper limit of AML by 2005. However, just before initiating the strategy—which relied heavily on specific assumptions about the number of animals removed, adopted, and held in short-term and long-term holding—emergency drought and fire conditions called for the removal of wild horses and burros in numbers far greater than anticipated. These additional removals and decreases in adoption targets changed BLM's assumptions and made it clear the agency would not be able to meet the targets set forth in their plan. In 2004, BLM again revisited targets and management options that would help them to achieve and maintain the midpoint of AML by 2006. Over the past several years, the program is closer to meeting AML as a result of increases in the number of wild

---

[31]According to BLM, the effort to revise the *Wild Horse and Burro Program Handbook* was first initiated in 1997. The effort was restarted most recently in 2006 when the draft handbook was significantly rewritten and expanded.

[32]S. Rpt. 99-141, at 6, 121 (1985).

BLM_000146

horses and burros removed from the range, but it continues to face challenges in maintaining that level. According to BLM data, the population now exceeds the upper limit of AML by an estimated 5,886 animals. BLM attributes most of the increase in population to more accurate population census counts.



**Figure 5: Estimated Population of Wild Horses and Burros on the Range**



Source: BLM.

Note: All population levels are estimated based on aerial surveys that likely undercount the number of animals on the range. In 2000, BLM changed the time frame for its population counts from October 1 through September 30 of every year to March 1 through February 28 or 29 of every year. For AML levels prior to 1984, BLM was unable to provide estimated figures. For AML levels from 1984 through 1999, the figures are estimated and they do not necessarily reflect the upper limit of AML; from 2000 onward, the AML figures represent the upper limit of AML.

While the national statistics appear to indicate that BLM is close to meeting its goal, it is important to note that, under the act, BLM is required to maintain HMAs at a level that is at or below the upper limit of AML. To stay below the upper limit of AML, HMAs should be gathered to the lower limit of AML approximately every 3 to 5 years. However, only 7 of the 26 BLM field offices we surveyed said they were typically able to gather to this low level. When animals are not gathered to the low level of AML, a population can quickly rise well above the upper limit of AML. Fewer than

half (10) of the field offices surveyed said they were usually able to manage the population of wild horses and burros on their HMAs within the limits of AML. Fifteen field offices said they managed populations that were typically above AML.

We are not reporting in detail on the extent to which individual HMAs have met AML because we do not believe that BLM's data are precise enough to accurately make such a determination. BLM's estimates of the number of HMAs that are at or below AML may be overstated because, for reporting purposes, BLM considers the HMAs where the population is not more than 10 percent over the upper limit of the AML to be at AML. BLM officials told us that this is done to account for those HMAs that may slightly exceed AML. For example, in 2008, BLM reported that 61 of the 102 HMAs in Nevada were at or below AML. Without the 10 percent adjustment factor, we calculated that 52 HMAs were at or below AML. Because of this adjustment factor and questions about the accuracy of BLM's animal counting methods, we concluded that the data on whether or not individual HMAs had met AML were not sufficiently reliable to report because an error of plus or minus one or two animals could change the status of an HMA from being under or over AML. Aside from the precise issue of whether or not an HMA is within or over AML, it is clear from the data that some HMAs are significantly over AML. For example, as of February 2008, BLM reported that 87 HMAs were over AML. About half of these HMAs were over AML by 50 percent or less, about a quarter were over AML by between 51 and 100 percent, and about another quarter of the HMAs were over AML by more than 100 percent.

Populations that exceed AML can harm the health of the range. For example, in 2004, the Calico HMA in Nevada exceeded AML by about 200 percent. The herds were found to concentrate in sensitive areas, affecting the threatened Lahontan cutthroat trout and contributing to the nonattainment of grazing allotment objectives and standards for rangeland health.[33] As of February 2008, the wild horse population in this HMA exceeded the upper limit of AML by 160 percent. The excess population

---

[33]Rangeland health standards were developed to be consistent with the fundamentals of rangeland health, including watersheds that are in a properly functioning condition; ecological processes that are maintained in order to support healthy biotic populations and communities; water quality that complies with state water quality standards; and habitats that are being restored or maintained for federal threatened and endangered species, proposed or candidate threatened and endangered species, and other special status species.

levels and continued drought are expected to continue to negatively impact sensitive riparian areas relied upon by the Lahontan cutthroat trout. The overpopulation of wild horses and burros on the range may negatively impact herd health, rangeland health, and livestock and wildlife that depend on the range. An over-obligation of the vegetative resources can result in declines in the healthy vegetative condition that may take years to recover. See figure 6 for our survey results on the possible negative impacts of populations that exceed the upper limits of AML.

**Figure 6: Number of Field Offices Who Reported Negative Impacts When Populations Exceed the Upper Limit of AML**



Source: GAO analysis of survey data.

Note: We asked survey respondents to identify the impact (positive, slightly positive, no impact, slightly negative, and negative) that populations that exceed the upper limit of AML would have on the four factors above. The figure is a graphic depiction of survey respondents who reported negative impacts when populations exceed AML. See appendix III for the number of survey respondents who reported positive, slightly positive, no impact, or slightly negative impacts when the upper limit of AML is exceeded by a certain percentage.

In addition to the effects on the range, overpopulation in HMAs also results in costlier gathers because a greater number of animals would have to be removed to maintain AML in future years.

Although there has been an increased effort to meet AML, there have been many challenges in meeting and maintaining that level. Twenty of the 26 field officials we surveyed identified limitations to gathers to remove excess animals as one of their top challenges to meeting or maintaining AML. One limitation identified by these respondents included limited funding available to conduct gathers. Another limitation identified by respondents was unplanned gathers that alter the gather schedule as resources are directed to HMAs in critical need. Reasons for unplanned gathers include escalating problems and emergencies. An HMA with an escalating problem is defined as an area where deteriorating rangeland conditions, such as declining availability of forage or water, will negatively affect animal condition and rangeland health. Emergency situations are unexpected situations that threaten the immediate health of wild horses and burros or their habitat, such as fire, disease, or other catastrophic events.

In addition to using gathers and removals to manage the population on the range, BLM may also use fertility treatment to manage the reproductive rates of wild horses. BLM is using this tool on a limited number of HMAs. However, some animal fertility researchers and wild horse advocates believe that this tool should be used more widely. They say that unless the reproductive rate is curtailed, the need to gather a large number of animals from the range will continue. See appendix II for more information about BLM's use of this treatment.

## BLM Has Established a Formal Policy on Gathers and Removals that Specifies the Key Factors that Should Be Considered in the Decision Making Process

Removals are used as a primary method for managing wild horse and burro populations on the range; however, the data used to support these removal decisions have been criticized. Specifically, our 1990 report concluded that BLM's decisions on the number of wild horses and burros to remove were made without adequate information about range carrying capacity or the impact of the animals on range conditions.[34] In August 2005, BLM issued an update to their 2002 policy on gathers that determinations to support gathers and removals must be based on a National Environmental Policy Act analysis and a gather plan that consider five key factors—utilization, trend, actual use, climatic data, and

---

[34] GAO/RCED-90-110.

BLM_000150

current census.[35] Eleven of the 26 field offices we surveyed considered all five key factors in their most recent gather plan (see table 7). However, many of these field offices conducted their most recent gathers prior to the issuance of the 2005 policy that specified which factors to consider in their decision making process. Specifically, 11 field offices conducted their most recent gathers between 1990 and 2005. Additionally, some field offices' most recent gathers were conducted as a result of an emergency situation. In those cases, a field office may not have had enough time to consider all five criteria due to the critical time response necessary to remove the animals.[36]

**Table 7: Extent to Which BLM Field Office Staff Considered Each of the Five Key Factors in Making Their Most Recent Gather Determination**

| Number of the five key factors considered | Number of respondents |
|---|---|
| 5 | 11 |
| 4 | 4 |
| 3 | 5 |
| 2 | 1 |
| 1 | 4 |
| 0 | 1 |
| **Total** | **26** |

Source: GAO survey results.

Regardless of when the most recent gathers were conducted, 25 of the 26 field offices we surveyed considered the data used to support their removals for specific HMAs as moderately to very sufficient. See table 8 for the number of field offices that considered each of the factors we asked about in our survey.

---

[35]U.S. Department of the Interior, BLM, *Gather Policy and Selective Removal Criteria*, Instruction Memorandum No. 2005-206 (Washington, D.C., Aug. 10, 2005). The 2005 policy updated BLM Instruction Memorandum No. 2002-095, dated February 13, 2002. The 2002 policy did not explicitly enumerate the key factors that should be considered as part of the gather and removal analysis.

[36]U.S. Department of the Interior, BLM, *Establishment/Adjustment of Appropriate Management Levels, and Managing Planned Escalating Problem and Emergency Gathers*, Instruction Memorandum No. 2004-151 (Washington, D.C., Mar. 16, 2004). When gathers are conducted as a result of an emergency, such as a fire, a National Environmental Policy Act analysis and gather plans are still required prior to the animal removal, if time permits. If immediate action is required, emergency actions should be documented and a report prepared after resolution of the problem.

**Table 8: Factors Considered by Field Offices in Decisions to Gather Wild Horses and Burros from the Range**

| Factor | Considered | Not considered | Don't know | Not applicable | Blank |
|---|---|---|---|---|---|
| Factors that should be considered | | | | | |
| Census/inventory | 24 | 2 | 0 | 0 | 0 |
| Utilization | 21 | 3 | 1 | 0 | 1 |
| Climate data | 19 | 5 | 1 | 0 | 1 |
| Trend | 16 | 6 | 2 | 1 | 1 |
| Actual use: livestock | 11 | 8 | 2 | 4 | 1 |
| Actual use: wildlife | 8 | 10 | 3 | 4 | 1 |
| Other factors considered | | | | | |
| Herd health | 21 | 4 | 1 | 0 | 0 |
| Carrying capacity | 17 | 6 | 2 | 0 | 1 |
| Water resources | 16 | 7 | 1 | 0 | 2 |
| Stakeholder influence | 16 | 3 | 3 | 2 | 2 |
| Production | 12 | 8 | 4 | 1 | 1 |
| Livestock agreements | 12 | 6 | 1 | 5 | 2 |
| Cultural resources | 12 | 7 | 1 | 4 | 2 |
| Archeological resources | 12 | 8 | 1 | 3 | 2 |
| Genetic viability | 11 | 11 | 2 | 1 | 1 |
| Recreational use | 8 | 8 | 1 | 7 | 2 |
| Other factors | 8 | 0 | 1 | 3 | 14 |
| Human safety issues | 7 | 10 | 1 | 6 | 2 |
| Court order | 3 | 5 | 1 | 14 | 3 |
| Mineral extraction | 3 | 9 | 1 | 11 | 2 |
| Community expansion | 1 | 11 | 1 | 11 | 2 |

Source: GAO survey results.

Unlike our previous report, which stated that data to justify removals was outdated, most respondents who provided the year in which their data was collected indicated that their data was current as of the year of their most recent gather or less than 4 years old (see table 9).

BLM_000152

**Table 9: Age of Data Used by Field Offices to Determine the Need for Most Recent Gather**

| Factor | Age of the data | | | | | |
|---|---|---|---|---|---|---|
| | 1 year | 2 years | 3 years | 4 years | 5-10 years | 11 years or older |
| Factors that should be considered | | | | | | |
| Census/inventory | 14 | 2 | 3 | 0 | 0 | 0 |
| Utilization | 13 | 1 | 0 | 1 | 0 | 0 |
| Climate data | 15 | 0 | 0 | 1 | 0 | 0 |
| Trend | 8 | 1 | 1 | 1 | 2 | 0 |
| Actual use: livestock | 10 | 0 | 0 | 0 | 0 | 0 |
| Actual use: wildlife | 7 | 0 | 0 | 0 | 0 | 0 |
| Other factors considered | | | | | | |
| Herd health | 11 | 2 | 1 | 1 | 0 | 0 |
| Carrying capacity | 6 | 1 | 1 | 0 | 1 | 2 |
| Water resources | 8 | 0 | 0 | 1 | 0 | 0 |
| Production | 6 | 1 | 0 | 1 | 0 | 0 |
| Genetic viability | 1 | 1 | 1 | 2 | 1 | 0 |

Source: GAO survey results.

Half of the survey respondents identified impediments to conducting gathers as a major challenge in managing their HMAs to achieve healthy herd populations that are in balance with the range and other multiple uses. Only 7 of the 26 field offices surveyed said that they were able to typically gather to their lower limits of AML. While several BLM officials explained that gathers can be delayed as a result of funding restrictions or emergency gather priorities, only four of the field offices surveyed indicated that their most recent gather was delayed.

## Research and Experience Have Shown That BLM's On-the-Range Population Estimates Are Too Low

Accurate animal population counts are critical to BLM's ability to properly manage wild horse and burro herds and in determining whether AML targets were met. However, many field offices use a population counting method—the direct-count method—that researchers consider inaccurate. This method generally calls for one person to count each animal they spot from an airplane or helicopter. According to researchers, it consistently undercounts animals and does not provide a statistical range of estimates. Nineteen of the 26 field officials we surveyed used the direct-count method for conducting their most recent census.

Regardless of which method is used, counting wild horses and burros can be challenging, particularly when the animals are obscured by trees or when the rangeland is covered with snow. Because counting poses such challenges, researchers are investigating alternative counting methods to assist BLM in collecting accurate population data to form statistically valid population estimates.[37] Each method the researchers are evaluating includes some range of statistical error, whereas direct count only reports the raw number spotted on the ground. Researchers believe that the most effective method will likely be a combination of two or more counting techniques. BLM's population counts of wild horses and burros have long been questioned by managers and advocacy groups alike. By employing alternative methods that account for a range of error, BLM would have a more defensible way of determining population estimates. In the most recent 2008 BLM population estimates, for example, population counts exceeded those in 2007 by approximately 4,500 animals. As a result, on a nationwide level, BLM is once again well over the upper limit of AML, which brings into question earlier population estimates and whether or not those previous years were as close to meeting AML as once thought. BLM is working with the Department of the Interior's U.S. Geological Survey's Fort Collins Science Center and the Colorado State University to develop these methods to achieve greater accuracy in population counts. Some BLM offices have begun to employ some of these methods. For example, in Arizona, managers use the simultaneous double-count method to improve population counts and avoid underestimating burro populations. Some field offices, however, are reluctant to use alternate counting methods because they are concerned that they would require too much

---

[37]The five methods experts are investigating include the following: (1) Photographic mark-resight involves two or more separate counts. First, an aerial count is conducted, and each group of animals photographed. This is followed soon after by additional aerial counts. The photographs from each survey are compared to determine which animals were seen on each pass and which were missed. A statistical technique to estimate the number missed is based on the number missing on each pass. (2) Simultaneous double-count is a form of mark-resight that uses only one count where two observers in an aircraft independently observe and record a direct count of wild horses or burros. Sighting rates are estimated by comparing sighting records of the two observers, and the number of horses that were missed by both individuals can be estimated. (3) Sightability bias correction involves observers that count animals but also records other factors about each sighting, such as if the groups were large or small, terrain type, weather, and other factors that may have prevented some animals from being seen. (4) Distance sampling estimates the number of animals or herds based on the distance and location of the animals that are seen on the ground. The data enables statisticians to predict the number of animals that are not seen because they are too far away. (5) Combined techniques utilize different combinations of the aforementioned four techniques to mitigate known biases associated with each individual method.

additional staff or would be too expensive. Researchers agree that other methods may be slightly more expensive, given the greater number of staff needed.

When a population is undercounted, BLM is likely to remove fewer animals than is needed to control overpopulation. For example, in 2002, a direct count was used to census the wild horse population located on the Jackson Mountain HMA in northern Nevada, an area that has been affected by severe drought. When a gather was conducted in 2003, staff believed they removed the adequate number of wild horses to reach AML. Funds to conduct their scheduled census in 2006 were not available, and BLM was unable to conduct its population count until the summer of 2007. It was at this point that staff realized that their 2002 census was incorrect and that they miscalculated the population in 2007 by approximately 640 wild horses. They found that the actual population in 2007 was about five times greater than what they determined was sustainable. In the winter of 2007, BLM began to monitor water availability more regularly. The BLM field staff member who managed that HMA told us that although the herd condition was weakened, the horses did not appear to be in extremely poor condition. Nevertheless, more than 150 of the wild horses removed from this HMA died in a short-term holding facility due to disease that was able to overtake the animals in their weakened state.

## Declining Adoptions and Sales Have Increased the Need for Short-Term and Long-Term Holding Facilities, and Holding Costs Have Increased

The number of wild horses and burros removed from the range is far greater than the number adopted or sold. Since 2001, about 74,000 animals have been removed from the range, while only about 46,400 have been adopted or sold. This has resulted in significant spending increases due to a greater number of animals in short- and long-term holding. Thirty-six percent fewer wild horses and burros were adopted in 2007, compared to average adoption rates in the 1990s—a trend BLM officials attribute to the decrease in adoption demand and increasing hay and fuel costs. Since 2004, when BLM was directed to sell excess wild horses and burros without limitation, BLM has sold about 2,700 animals—far fewer than expected, despite the low average selling price of $15. As of June 2008, BLM was holding 30,088 animals in short- and long-term holding facilities, compared with the estimated 9,807 held in 2001. To accommodate the increase in animals removed from the range and the decline in adoptions and sales, BLM has increased the number of short- and long-term holding facilities. This has resulted in an increase in spending for short- and long-term holding facilities.

BLM_000155

## Adoption Rates Have Declined Since the 1990s, and the 2004 Sale Directive Generally Has Not Been Used

BLM has historically managed wild horses and burros removed from the range through adoptions to the general public. Adoption has been regarded as the most economical way to provide humane long-term care to animals that have been removed from the range. In the 1990s, the number of animals removed from the range was about equal to the number of animals adopted. The average number of animals adopted each year in the 1990s was about 7,500. Since 2000, the number of animals removed has outpaced the number of animals adopted or sold due to an increase in removals and a steady decline in adoption demand and sales. Since 2001, about 74,000 animals have been removed from the range, compared to about 46,400 adopted or sold. The average number removed annually from 2001 to 2007 was about 10,600, compared to the average adoption rate of about 6,300 annually. According to BLM's 2004 Report to Congress, at least 7,000 adoptions were needed annually to assist in achieving and maintaining AML. However, only about 4,700 animals were adopted in 2007. Although BLM has increased efforts to market adoptions, demand continues to decline for wild horses, even though the price for adopting them has remained at the minimum fee of $125 since 1997.[38] BLM officials attribute the steady wild horse adoption decline in recent years to increases in hay and fuel costs associated with horse care, the large number of domesticated horses that are currently flooding the adoption market,[39] a general urbanization of rural areas, and a shift toward other forms of recreation. For example, according to one official, individuals who once had corrals with two or three horses may now own one horse and four all-terrain vehicles. Figure 7 compares the number of wild horses and burros removed from the range with the number adopted from 1989 through 2007.

[38]Demand for burros has stayed relatively stable from an annual average of 1,154 burros adopted from 1990 through 1999 and an annual average of 1,092 burros adopted from 2000 through 2007.

[39]The last horse slaughterhouse in the United States closed in fall 2007. The number of domestic horses killed in slaughterhouses from 2000 to 2005 ranged from about 40,000 to 75,000 annually. Without these outlets, more domestic horses are available to the public, causing direct competition with wild horse adoptions and sales.

**Figure 7: Comparison of Removed and Adopted Wild Horses and Burros, 1989 through 2007**



Source: BLM.

One alternative for managing unadoptable excess wild horses and burros, as provided for by the 2004 amendment to the 1971 act, is to sell the animals "without limitation." The act directs BLM to offer excess animals for sale that are more than 10 years old or that have been offered unsuccessfully for adoption at least three times. At the time of the amendment, BLM estimated that approximately 8,400 animals were eligible for sale. To date, BLM has sold only about 2,700 animals—far fewer than originally expected, despite the low average selling price in 2006 of $15 (see table 10).

BLM_000157

**Table 10: Number of Wild Horses and Burros Sold under the December 8, 2004, Sales Directive**

| Year | Number sold |
|------|------------:|
| 2005 | 1,468 |
| 2006 | 645 |
| 2007 | 420 |
| 2008[a] | 211 |
| **Total** | **2,744** |

Source: BLM.

[a]As of June 2008.

In 2005, the first sale was made to a wild horse protection group in Wyoming who purchased 200 horses that would otherwise have likely ended up in long-term holding under BLM's care. A few other animals that were sold, however, ultimately ended up in slaughterhouses. To reduce the likelihood that a buyer would purchase these animals and then sell them for slaughter, BLM changed its sales process to require buyers to sign a "statement of intent" that they do not intend to sell the animals for slaughter. This limitation, as well as a decrease in demand, has contributed to the small number of sales.

## BLM Manages 30,088 Animals in an Increasing Number of Short-Term and Long-Term Holding Facilities, and Holding Costs Have Increased

As of June 2008, BLM was holding a combined 30,088 animals in short-term and long-term holding facilities, compared to 9,807 animals in 2001. To accommodate the increase in animals needing care once removed from the range, the number of short-term and long-term holding facilities has increased. Spending on combined short-term and long-term holding has also increased from about $7 million in 2000 to about $20.9 million in 2007. From 2001 through 2008, the number of short-term holding facilities increased from 14 to 24,[40] and the number of animals held in these facilities increased from 6,514 animals to 7,987 by June 2008. These holding facilities provide the animals with vaccinations and other care prior to their being adopted, sold, or sent to long-term holding. The average cost of animals in short-term holding increased from $3.00 per horse per day in 2001 to $5.08 per horse per day in 2008. From 2000 to 2001, the cost for short-term holding increased from $6.4 million to $11.2 million. From

---

[40]Three of these facilities were added to incorporate horse gentling programs to improve the likelihood of adoption.

2001 through 2007, the cost remained relatively stable, but for 2008, costs are anticipated to increase to $16.2 million. According to several BLM officials, the escalating cost for caring for animals in short-term holding is primarily a result of the dramatic increase in hay and fuel prices from 2007 to 2008. For example, hay prices for one short-term holding facility in Nevada increased from about $160 per ton in 2007 to almost $300 per ton in 2008. Decreases in adoption and sales and a lack of capacity in long-term holding has not only increased the number of animals held in short-term holding, but has also increased the time animals are held there. According to one state official, animals in his state spent 45 to 60 days in short-term holding facilities in the late 1990s. Beginning in 2000, this official told us, it was not uncommon to hold animals for more than a year. Nationwide, according to BLM, the average length of stay in short-term holding in 2008 has been 210 days. This is far longer than the 90 days BLM projected animals would spend in short-term holding in their 2001 initiative to meet AML.

Similarly, the number of long-term holding facilities has increased, as has the cost. The number of facilities increased from 1 in 1988 to 11 as of June 2008, and the number of animals cared for increased from 1,500 in 2000 to 22,101 as of June 2008 (see table 11). These long-term holding facilities have reached their capacity—currently 22,100—despite the increase in numbers of facilities. BLM anticipates it will need greater long-term holding capacity and is working to contract for additional facilities.

**Table 11: Number of Wild Horses in Long-Term Holding, by Year, Since 2000**

| Year | Number of facilities | Capacity | Number of horses in long-term holding |
|------|---------------------|----------|---------------------------------------|
| 2000 | 1 | 2,000 | 1,500 |
| 2001 | 3 | 6,000 | 3,293 |
| 2002 | 5 | 10,000 | 7,311 |
| 2003 | 7 | 14,000 | 10,122 |
| 2004 | 7 | 14,000 | 13,151 |
| 2005 | 9 | 20,600 | 15,379 |
| 2006 | 8 | 19,700 | 18,198 |
| 2007 | 10 | 21,800 | 19,652 |
| 2008[a] | 11 | 22,100 | 22,101 |

Source: BLM.

[a]As of June 2008.

BLM_000159

BLM pays private contractors an average of $1.27 per horse per day to maintain the animals for the remainder of their lifespan, unless removed from long-term holding for adoption or sale. While this fee has increased by only 7 cents since 2000, the number of animals cared for has also increased, resulting in a significant increase in BLM spending on long-term holding.[41] In 2000, BLM spent approximately $668,000 in 2000, compared to more than $9.1 million in 2007 to care for wild horses in long-term holding. The long-term holding facilities are primarily located in Oklahoma and Kansas, where forage is typically more abundant than on HMAs of the West. Table 12 lists the 11 long-term holding facilities.

**Table 12: BLM Long-Term Holding Facilities, June 2008**

| Name of facility | Location | Year(s) animals first held in facility | Capacity | Horses held |
|---|---|---|---|---|
| Bartlesville | Oklahoma | 1989 | 2,300 | 2,066 |
| Catoosa | Oklahoma | 2001 | 2,000 | 2,042 |
| Teterville East | Kansas | 2001 | 2,200 | 1,913 |
| Teterville West | Kansas | 2002 | 2,200 | 2,531 |
| Foraker | Oklahoma | 2003 | 2,500 | 2,507 |
| Pawhuska | Oklahoma | 2003–2004 | 3,400 | 3,646 |
| Grenola | Kansas | 2004 | 2,200 | 2,269 |
| Hulah | Oklahoma | 2004 | 2,200 | 2,203 |
| Herd | Oklahoma | 2007 | 1,000 | 1,042 |
| Whitehorse | South Dakota | 2007 | 1,100 | 1,169 |
| Strohm | Oklahoma | 2008 | 1,000 | 713 |
| **Total** | | | **22,100** | **22,101** |

Source: BLM.

For at least two decades, BLM's primary strategy to manage excess unadoptable wild horses has been to increase long-term holding, despite warnings in our 1990 report that these facilities were likely to be more expensive than envisioned and to be only a temporary solution to the disposal of unadoptable animals.[42] In 1994, the Department of the Interior's Office of Inspector General also issued a report that strongly discouraged

---

[41]Long-term holding costs were, on average, $1.20 in 2000, $1.22 in 2001, and $1.25 per horse per day from 2001 through 2004. In 2005, the cost increased to $1.27 per horse per day through 2007 and will increase to $1.28 per horse per day by the end of 2008.

[42]GAO/RCED-90-110.

long-term holding as a solution to managing horses removed from the range due to the large costs.[43] BLM continues to look for more facilities but faces difficulty attracting new contractors that can sustain a large number of animals and that will accept the fee BLM offers, compared to perhaps more profitable land uses.

# BLM Has Controls in Place to Help Ensure the Humane Treatment of Wild Horses and Burros, but It Could Better Track and Report These Data to the Public

BLM has implemented multiple controls to help ensure the humane treatment of wild horses and burros, including standard operating procedures and agreements with all three slaughterhouses in the United States before they closed in 2007. A variety of controls are used at various stages in the management of wild horses and burros, including for those animals that are gathered, in short-term holding facilities, in long-term holding facilities, adopted, or sold. BLM's controls for gathers include standard operating procedures, inspections, and data collection. While BLM state offices collect detailed data on animals that die during gathers, the information is not compiled by BLM headquarters in its centralized database, nor is it reported to the public. In addition, BLM does not regularly provide the information it tracks on the treatment of animals in short- and long-term holding and adoption inspections to the public. Making more of this data available to the public may help inform them about the treatment of the animals and improve transparency. Beginning in 1998, until the last horse slaughterhouse in the United States shut down in 2007, BLM sought agreements with all three slaughter facilities to alert BLM of wild horses that entered their facilities. According to BLM data, since 2002, about 2,000 wild horses whose legal titles were obtained by private citizens either through adoption or purchase were slaughtered. During that same period, another 90 wild horses whose title still belonged to BLM were retrieved from slaughterhouses by BLM and by wild horse groups. We reviewed the basic controls BLM has in place, but we did not evaluate their effectiveness. While BLM is required to implement controls to help ensure the humane treatment of wild horses and burros, such

---

[43]U.S. Department of the Interior, Office of Inspector General, *Selected Aspects of the Wild Horse and Burro Program* (Washington, D.C., May 1994).

controls cannot provide absolute assurance that all agency objectives will be met.[44]

## BLM Internal Controls Help Ensure Humane Treatment, but BLM Could Improve Data Gathering and Reporting in Some Areas

A variety of controls are used at various stages in the management of wild horses and burros, including for those animals that are gathered, in short-term holding facilities, in long-term holding facilities, adopted, or sold. BLM's controls for gathers include standard operating procedures, inspections, and data collection. Data collected from 6 of the 10 states from fiscal years 2005 through 2007 indicate that mortality as a result of gathers is about 1.2 percent. Similarly, controls for short- and long-term holding include standard operating procedures, inspections, and data collection. BLM did not report any deaths due to neglect or abuse at holding facilities, aside from one animal that was repossessed by BLM after having been abused by an adopter. BLM has controls over the adoption of wild horses and burros, and data indicate that from 2005 to 2007, about 9 percent of adopters were not in compliance with BLM's standards of care. BLM's controls over humane treatment primarily apply to horses and burros before ownership is passed to private individuals, but BLM has also implemented some controls to protect horses and burros once ownership passes, such as when wild horses and burros are sold. For animals that are sold, since spring 2005, BLM has required buyers to sign a statement that they do not intend to slaughter the animals. BLM does not consistently track information on treatment during gather operations through a central database, nor does it report information about the treatment of animals during gathers, holding, or adoption inspections to the public.

### Gathers

BLM has established controls, such as standard operating procedures and tracking systems, to help ensure humane treatment during gather operations. BLM hires contractors to remove wild horses and burros from the range. These contractors generally use helicopters to herd the animals into capture pens on the range (see fig. 8).

---

[44]Standards for internal control in the federal government describe internal controls as "a series of actions and activities that occur throughout an [agency's] operations and on an ongoing basis" used "to regulate and guide [the agency's] operations." See GAO, *Standards for Internal Control in the Federal Government*, GAO/AIMD-00-21.3.1 (Washington, D.C.: November 1999).