**Figure 8: Helicopter Used to Gather Wild Horses Near Ely, Nevada, c. 2006**



Source: BLM.

Due to the stress caused to wild animals by gathering them into pens, gather operations have the potential to cause harm to wild horses and burros, such as nervous agitation; conflict between captured animals; or more rarely, animal death. Because of the potential for harm and to help ensure the safe and humane handling of all animals captured, BLM has implemented a range of standard operating procedures for its gather contractors. Prior to the start of gather operations, BLM personnel evaluate the site of the gather to determine whether it is suitable based on environmental and safety concerns. They also approve gather facility plans ensuring, among other things, that they do not present puncture or laceration hazards and that they prevent animals from seeing humans, vehicles, and other perceived threats. During the herding of the animals, BLM sets limitations on the distance and speed the animals will travel, depending on the condition of the animals and other factors. As the animals are herded into the gather site, BLM requires contractors to segregate horses by age and sex to reduce the possibility of conflict and to ensure that very young horses and burros are not left behind to fend for themselves on the range. Finally, as the captured animals are transported from the gather site to short-term holding facilities, contractors are required to follow procedures to ensure animal safety, such as using adequately sized motorized equipment that has been inspected for safety. BLM has managed gathers with standard operating procedures since the passage of the act in 1971.

BLM_000163

Although BLM's controls are designed to enhance the safety of wild horses and burros during gather operations, some animals are accidentally killed in the course of gathers or are euthanized because of ill health or prior injury. Six of the 10 BLM state offices reported data about the number of animals that die as a result of their gather operations. Data collected from 6 of the 10 states from fiscal years 2005 through 2007 indicate that, of the 24,855 animals removed from these states during this period, about 1.2 percent were either euthanized or died accidentally (see table 13). Horses and burros sometimes die due to accidents during gather operations on the range or after they are brought to the holding pens. For example, wild horses will sometimes panic and break their necks against capture pens. Animals found with conditions that make it unlikely they will be able to live their life without significant pain, such as lameness or club feet, are euthanized.

**Table 13: Number and Percentage of Wild Horses and Burros That Died During Gather Operations, (for 6 of 10 States) Fiscal Years 2005 through 2007**

| Fiscal year | Number removed | Number of accidental deaths | Percentage | Number euthanized | Percentage |
|---|---|---|---|---|---|
| 2005 | 9,830 | 25 | 0.25% | 46 | 0.47% |
| 2006 | 8,081 | 64 | 0.79 | 79 | 0.98 |
| 2007 | 6,944 | 28 | 0.40 | 60 | 0.86 |
| **Total** | **24,855** | **117** | **0.47%** | **185** | **0.74%** |

Source: GAO analysis of BLM data.

Note: This chart is based on data reported by 6 of 10 states: California, Colorado, Idaho, Nevada, New Mexico, and Wyoming. The data provided could not be verified for its reliability. We requested this information from the other four states (Arizona, Montana, Oregon, and Utah), but the information was not provided.

Although BLM national and state officials told us that they sometimes record data about the animals accidentally killed or euthanized during gathers at the BLM state office level, BLM does not centrally compile or report these data to the public on a regular basis on a national level. A BLM official told us that although their main tracking database has the capability to record the number of animals that are killed or euthanized during gathers, they generally do not use the database to do so because it was originally intended to track adoptions. Moreover, BLM has not regularly reported to the public how many wild horses and burros are killed in the course of gathers, although BLM officials have cited the data during public hearings. Some advocates and members of the public believe that gathers are held in secret and highlight individual cases of apparent mistreatment as evidence that inhumane treatment is widespread.

However, a BLM official told us that it is BLM's standard practice to allow the public and the media to observe gather operations, and BLM is required to hold public hearings prior to scheduled gathers using helicopters. If BLM does not improve its transparency by presenting reliable data to members of the public, BLM will continue to be vulnerable to accusations that gathers are generally cruel and inhumane.

**Short-Term Holding**

BLM has issued standard operating procedures to help ensure that wild horses and burros held in short-term holding facilities are well cared for. They include procedures for minimizing the excitement of the animals to prevent injury; separating horses by age, sex, and size; observation of the animals on a regular basis; and recording information about the animals that BLM later uses for tracking the animals in BLM's database. BLM's short-term holding facilities are mostly maintained and directly managed by BLM, either on government property or on leased property. Several are at state prisons, and a few others are maintained by contractors in privately-owned feedlots or ranches that BLM has leased. According to BLM staff, they regularly inspect the short-term holding facilities and the animals they hold. They inspect to see that the corral equipment is up to code and that animals are treated with appropriate veterinary care. For example, staff check to see that the horses' hooves are regularly trimmed so that they do not become too long and cause injury. At two of the short-term holding facilities we visited, we observed specially constructed chutes that hold and rotate horses in place so that horses' hooves can be trimmed more quickly, easily, and with less risk to the animals and the employee than other methods, such as using tranquilizer darts or roping (see fig. 9).

**Figure 9: BLM Contractor Trimming Horse Hooves Using a Special Holding Chute at a Contract Short-Term Holding Facility in Fallon, Nevada, October 2007**



Source: GAO.

BLM data indicate that the wild horses and burros held in short-term holding facilities from 2003 to 2007 had a mortality rate of about 5 percent. Specifically, for 2007, BLM reported 936 deaths in short-term holding facilities out of a total of 17,363 animals that passed through short-term holding facilities in that year.[45] BLM reported that none of the animals in its care died of neglect or abuse between 2005 and 2007, aside from one case in 2006, where a reclaimed adopted horse died in BLM care due to the effects of abuse suffered while it was in the care of an adopter. BLM data showed that the animals generally died due to sickness, broken limbs, or injuries sustained accidentally during gathers. BLM does not report this information regularly to members of the public who remain concerned that the agency does not adequately care for animals in short-term holding.

**Long-Term Holding**

BLM has similar controls in place for its long-term holding facilities. BLM staff inspect long-term holding facilities annually to count the number of animals held. Staff also monitor pasture conditions, winter feeding, and

[45]For 2007, BLM also reported 616 births in short-term holding facilities.

GAO-09-77  BLM's Wild Horse and Burro Program

BLM_000166

animal health throughout the year. According to BLM staff, during these visits they ensure the contractors comply with BLM provisions and discuss possible problems that can be corrected. In addition, veterinary staff from the Department of Agriculture's Animal and Plant Health Inspection Service inspect long-term holding facilities annually; these inspections involve a full count of the horses held there, an inspection of the horses' general health, and written reports. Animal and Plant Health Inspection Service reports from 2007 indicate that the horses kept in long-term holding sanctuaries are generally in "good" or "excellent" condition. These reports, however, highlight some areas for possible improvement. At one facility, one area of improvement included the proper disposal of the remains of animals that have died of natural causes. To help ensure the animals are well cared for, a contract veterinarian provides care when needed at BLM direction and expense. In addition to inspecting the facilities for the well being of wild horses in long-term holding, contractors are required to count and report the number of horses held on a weekly basis for billing and payment purposes. In 2007, long-term holding contractors were paid an average fee of $1.27 per horse per day, or about $460 per horse per year. While this contract fee structure is not in itself a control that guarantees humane treatment, it provides a profit incentive for contractors to ensure the continued health of the horses. According to one BLM official, BLM does not regularly document the results of its inspections. This official told us that the agency would take actions and record them if it found problems, but the official generally has not found problems with the contractors that have warranted action beyond informal conversations to address minor issues.

BLM collects data on how wild horses are cared for in long-term holding, including the number of animals that die in long-term holding. The average mortality rate of wild horses in long-term holding from 2003 through 2007 was about 8 percent, but it fluctuated from a low of 5 percent to a high of 14 percent during that time period. Specifically, for 2007, BLM reported 938 deaths in long-term holding facilities.[46] The number of wild horses in long-term holding in 2007 was 19,652. The animals that die in long-term holding are generally found in the pastures, and unless there is evidence of foul play, BLM does not investigate the cause of death. According to BLM, barring any evidence to the contrary, it is assumed that the animals in

---

[46]For 2007, BLM also reported 303 births in long-term holding facilities. Although studs are gelded prior to being sent to long-term holding and the wild horses are separated by sex, pregnant mares may be transferred from short-term holding facilities into long-term holding facilities.

BLM_000167

long-term holding die of old age. Officially, BLM reported about 95 percent of the animal deaths in long-term holding as "undiagnosed." Some of the other causes of deaths reported included old age and respiratory illness. No animals in long-term holding died from neglect or abuse, according to BLM reports. While BLM collects this data, it does not report this data regularly to the public. In the absence of this data, some members of the public who advocate greater protection for wild horses have repeatedly expressed their concern that BLM does not adequately care for animals in long-term holding.

**Adoption**

The act requires BLM to determine that adopters have provided humane conditions, treatment, and care for adopted animals for at least 1 year before BLM transfers ownership to the adopter. To implement the act, BLM has established policies for inspecting adopted horses or burros in this first year through telephone calls or personal visits. BLM inspections focus on the condition of the animal; the condition of the facilities; and whether the adopter has notified BLM if the adopted animal has been moved, was stolen, has escaped, or has died. Prior to taking possession of an adopted animal, BLM requires that adopters describe the facility where they will maintain the adopted animal. This is documented in their application, which confers penalties for providing false information.

According to BLM data, from 2005 through 2007, an average of about 9 percent of adopted wild horses and burros that still belong to the government have not been treated in compliance with BLM standards (see table 14). BLM randomly selects a sample from the universe of approximately 5,000 adopters per year who have not yet received title of their adopted animal for inspection. BLM inspects these adopters in order to generate a statistical sample of the likely percentage of adopted animals kept under conditions that do not comply with BLM's policies and standards. The most common conditions in need of improvement included the failure to report changes in the animal's location or status and substandard facilities, such as inadequate fencing or shelter. Less common conditions included lack of care of the animal, such as inadequate feeding or failure to trim the animal's hooves before they grew too long.

BLM_000168

**Table 14: Results of Random Inspections of Wild Horse and Burro Adoptions, 2005 through 2007**

| Result of random adoption inspections | 2005 | | 2006 | | 2007 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| No violation | 395 | 94% | 614 | 91% | 805 | 89% |
| Failure to notify BLM of change in status | 10 | 2 | 24 | 4 | 36 | 4 |
| Failure to provide adequate facilities/care | 4 | 1 | 3 | 0 | 30 | 3 |
| Failure to produce animal | 5 | 1 | 13 | 2 | 19 | 2 |
| Unauthorized transfer/sale | 0 | 0 | 6 | 1 | 15 | 2 |
| Commercial exploitation | 0 | 0 | 0 | 0 | 4 | 0 |
| Inadequate facility | 4 | 1 | 6 | 1 | 0 | 0 |
| Unauthorized destruction | 0 | 0 | 5 | 1 | 0 | 0 |
| Inhumane treatment | 2 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **420** | **100%** | **671** | **100%** | **909** | **100%** |

Source: GAO analysis of BLM data.

In addition, BLM policy directs that officials or certified volunteers conduct personal inspections of all adopted animals whenever BLM receives complaints about mistreatment or when an individual or organization adopts more than four wild horses or burros at one time.

Similar to the data collected on the animals in short- and long-term holding, BLM does not provide information on the results of its adoption inspections to the public. The information regularly provided to the public on the treatment of these animals is in contrast to the comparatively large amount of information BLM provides on the program's Web site regarding information on AML and population estimates for each HMA.

Sales

In the case of animals that were legally sold, BLM has implemented limitations to prevent these animals from being resold to slaughter facilities. In 2004, the act was changed and directed BLM to sell, "without limitation," excess wild horses and burros more than 10 years of age or that had been offered unsuccessfully for adoption at least three times, until all excess animals for sale are sold or until AML is met in all HMAs. However, shortly after BLM began to sell wild horses and burros without limitation, in early 2005, it was discovered that 41 of these wild horses had been slaughtered. In April 2005, BLM suspended its wild horse sales program and resumed sales in May 2005, after adding controls intended to restrict the sale of animals for the purpose of selling them for slaughter. These controls included BLM's requirement that buyers sign a statement

they do not intend to sell the animals for slaughter and verification that potential buyers would provide adequate care for the animals.

## BLM Implemented Controls to Prevent Slaughter of Wild Horses in the United States

Although BLM is no longer required to protect animals after ownership has passed to adopters or buyers, BLM implemented controls to help prevent their slaughter beginning in 1998. BLM had negotiated agreements with all three U.S. facilities that operated horse slaughterhouses. The slaughterhouses agreed to alert BLM to all wild horses that entered their facilities and refrain from slaughtering those wild horses whose title still belonged to BLM. According to BLM data, which it was able to provide since 2002, about 2,000 wild horses whose legal titles were obtained by private citizens through adoption or purchase were slaughtered. During that same time period, at least 90 adopted wild horses that were still owned by the government were brought to these slaughterhouses, and all were retrieved by BLM and interested wild horse groups.

As of fall 2007, all horse slaughter facilities in the United States had been shut down following unsuccessful legal challenges to state laws effectively banning the practice. In January 2007, the U.S. Court of Appeals for the Fifth Circuit ruled that a 1949 Texas law banning the sale, possession, or transfer of horsemeat applied to the two slaughterhouses in Texas.[47] In September 2007, the U.S. Court of Appeals for the Seventh Circuit upheld an Illinois ban.[48] These rulings effectively closed the plants and ended horse slaughter in the United States.

Even though all horse slaughter facilities in the United States have been closed, it is still possible for wild horses and burros to be sold to facilities outside the United States.[49] Prior to the closure of all U.S. horse slaughter facilities, about 50,000 domestic horses were brought to slaughter in the United States annually between 2001 and 2004. Generally, exporting horses and burros to other countries for slaughter, such as Canada or Mexico, is not prohibited; for example, about 3,000 horses per month were exported for slaughter in 2007, according to Department of Agriculture

---

[47]*Empacadora de Carnes de Fresnillo v. Curry*, 476 F.3d 326 (5th Cir. 2007), *cert. denied*, 75 U.S.L.W. 3569 (U.S. May 21, 2007). *See also*, Tex. Agric. Code Ann. §§ 149.001-149.007.

[48]*Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551 (7th Cir. 2007), *cert. denied*, 76 U.S.L.W. 3410 (U.S. June 16, 2008). *See also*, 225 Ill. Comp. Stat. 635/1.5.

[49]Current legislation pending in the 110th Congress (H.R. 503 and S. 311) would prohibit the commercial sale of horses to foreign countries, such as Canada and Mexico, to be slaughtered for human consumption.

BLM_000170

information. We attempted to determine how many of these horses were at one time wild, but we were not able to do so. The Department of Agriculture, which certifies the inspections of horses and other livestock exported to other countries, is not required and does not report how many of the horses exported to other countries were once wild horses.

## Challenges to the Long-Term Sustainability of the Program Include Growing Holding Costs and Limited Options for Dealing with Unadoptable Animals

The long-term sustainability of BLM's Wild Horse and Burro Program depends on the resolution of two significant challenges. First, holding costs are overwhelming the program's ability to manage animals on the range and will continue to do so if BLM does not consider alternatives to holding. Second, BLM has limited options for dealing with unadoptable animals off of the range because its alternatives under the act—humane destruction of the animals or selling the animals without limitation—are thought to be unacceptable to the public. As a result, BLM has placed over 30,000 wild horses and burros in holding.

## If Not Controlled, Off-the-Range Holding Costs Will Continue to Overwhelm the Program

The portion of the Wild Horse and Burro Program's spending that is directed toward short- and long-term holding has increased from 46 percent of the program's direct costs in 2000 to 67 percent in 2007. This increase leaves a smaller portion of the budget available for on-the-range management activities. Much of the increase has occurred because accelerated removals implemented to reach AML have coincided with a decline in adoption demand. Because long-term holding facilities are at capacity, BLM has had little choice but to hold excess unadoptable horses in more expensive short-term holding. BLM's spending on short- and long-term holding has increased from about $7.0 million in 2000, or 46 percent of the program's direct costs, to about $20.9 million in 2007, or 67 percent of the program's direct costs (see fig. 10). In 2008, BLM anticipates that holding costs will account for about 74 percent of the program's direct costs. To deal with its long-term holding problem, BLM has primarily sought increased funding to open additional long-term holding facilities. However, funding is not likely to increase in the future, and limited funding is forcing BLM to make difficult choices. For example, in January 2008, BLM considered canceling all remaining removals scheduled for the fiscal year because of the amount needed for short- and long-term holding. As of July 2008, BLM was seeking the funds to continue these removals by redirecting money from other BLM activities to the Wild Horse and Burro

Program. As a result, under current funding levels, BLM must now choose between either managing the range to prevent overpopulation or exercise one or both of its other options—destroying animals or selling them without limitation.

**Figure 10: BLM Estimated Wild Horse and Burro Direct Program Costs, Fiscal Years 2000 through 2008**



Source: GAO analysis of BLM data.

Note: This chart represents direct program spending. It omits spending on overhead items—which average about $7 million per year—such as administrative costs, vehicle costs, and other nondirect program related costs.

To continue to reduce overpopulation on the range by using gathers alone, BLM projects that the program's budget would have to increase to about $77 million by fiscal year 2012, from about $36 million in 2008. If BLM does not receive this increase or exercise its other options to reduce populations off the range, then it will not have sufficient funds to manage wild horses and burros on the range, and populations will sharply

BLM_000172

increase. BLM's current projections indicate that caring for unadoptable animals would reduce the agency's ability to gather horses to an average of about 4,500 animals per year, which would only be enough to prevent animals from dying from the effects of overpopulation and drought. At these removal levels, BLM projects that the on-the-range population would reach 50,000 animals by 2012—about 80 percent greater than the upper limit of AML. This on-the-range population level would be greater than the population level prior to the beginning of BLM's 2001 strategic plan.

Since 2004, BLM has had the goal of reducing the total population on the range to the midpoint of AML. If it were to reach this level, which is currently about 22,588 animals, an annual population growth rate of 20 percent would require the annual removal of about 4,500 animals to maintain that level, approximately equal to the recent adoption rate. Assuming that rate remained constant, fewer animals would be sent to long-term holding. However, even if BLM is able to reach a balance between animals removed and those adopted, it still has the challenge of dealing with 30,088 animals that are currently held in short-term and long-term holding facilities across the country. Furthermore the number of animals held in holding would exceed 40,000 animals if BLM were to remove the approximately 11,000 animals necessary to reach the midpoint of AML.

BLM has a number of research projects under way and ideas in development that could slow the increase in the population on the range. These include fertility control efforts, such as the development of a fertility vaccine (see app. II for more information on this vaccine) and releasing sterilized male horses back to the range after capture. Given that many existing HMAs are already over AML, releasing a large number of sterilized male horses or nonreproducing herds back to the range as a means of trying to reduce future holding costs would likely require changing existing land use decisions within BLM's existing authority to increase AMLs, expand existing HMAs or designate new HMAs; or through seeking new legislative authority. Under the 1971 act, the land available for the management of wild horses and burros is limited to the areas where they existed at the time of the act. The originally designated herd areas consisted of 53.5 million acres compared to the existing HMA acreage of 34.3 million, a difference of 19.2 million acres. Specifically, the BLM owned acreage managed for wild horses and burros has changed from 42.2 million acres to 29.0 million acres, a difference of 13.2 million acres. As we mentioned earlier, BLM is in the process of compiling a history of actions that led to these changes. At this point, however, it is not clear how much of the 13.2 million acres is still public land under BLM's control.

BLM_000173

While BLM could change AMLs, expand existing HMAs, or designate new HMAs within its existing authority, BLM is a multiple use agency and it weighs the needs of wild horses and burros against other competing uses. Alternatively, should BLM chose to do so, new legislative authority could be pursued to allow nonreproducing herds to be relocated to areas where they were not found at the time of the act. We believe that it is important to consider increasing AML or expanding HMA acreage only as a means to accommodate nonreproducing herds. Increasing the number of reproducing animals on the range without corresponding solutions for fertility control or declining adoption demand will, in the long run, only exacerbate BLM's problems with dealing with excess animals.

## Under Current Law BLM's Options Are Limited for Dealing with Unadoptable Animals

Despite these budget problems, BLM has avoided using two options in the act for dealing with unadoptable animals because of concerns over the public and congressional reaction to the large-scale slaughter of thousands of healthy horses. The Wild Free-Roaming Horses and Burros Act, as amended, requires that excess animals, for which the adoption demand is not sufficient to absorb all the animals removed from the range, be destroyed in the most humane and cost-efficient manner possible or, under certain circumstances, be sold without limitation. The 1978 amendments to the original 1971 act directed that "[t]he Secretary shall cause additional excess wild free-roaming horses and burros for which an adoption demand by qualified individuals does not exist to be destroyed in the most humane and cost efficient manner possible."[50] From 1981 to 1982, BLM destroyed at least 47 excess animals. BLM decided not to destroy excess unadoptable animals in 1982 after the Director issued a policy prohibiting the destruction of healthy animals because of public dismay. Furthermore, from fiscal year 1988 through fiscal year 2004, Congress prohibited BLM from using its Management of Lands and Resources appropriations to destroy excess healthy, unadoptable wild horses and burros.

In our 1990 report, we found that keeping excess animals in long-term holding was costly and recommended that BLM examine alternatives, such as sterilizing animals and releasing them back into the wild.[51] Although BLM was prohibited from using its Management of Lands and Resources appropriations for humanely destroying excess animals through

---

[50]16 U.S.C. § 1333(b)(2)(C).

[51]GAO/RCED-90-110.

euthanasia at the time of that report, we also recommended that BLM consider this action as a last resort in the event that Congress lifted the prohibition in the future. The recurring prohibition in the annual appropriations bills ended after fiscal year 2004. Since then, BLM has no longer been prohibited from using its Management of Lands and Resources appropriations for carrying out the requirement to destroy excess animals. BLM still has not used this option.

In 2004, Congress provided BLM with an alternative to destroying unadoptable excess animals by amending the act to state that "[a]ny excess animal or the remains of an excess animal shall be sold if—(A) the excess animal is more than 10 years of age; or (B) the excess animal has been offered unsuccessfully for adoption at least 3 times."[52] Furthermore, the amendment stipulated that the excess animals "shall be made available for sale without limitation."[53] BLM has instead imposed limitations on the sales of excess animals in an effort to reduce the risk that animals purchased at a low price would be resold to slaughterhouses for profit.

As a result, BLM is not in compliance with the act. BLM officials told us that they have chosen not to destroy excess animals or sell them without limitation because of concerns about public and congressional reaction to the large-scale slaughter of thousands of healthy horses. Various BLM officials at different levels of responsibility also told us that the agency has not complied with these provisions because doing so would cause an immediate threat to the careers of any officials involved, due to the anticipated negative reaction of the public and Congress. Nevertheless, as of June 2008, budget constraints forced BLM to reconsider all of its options, officials told us. Specifically, for fiscal year 2009, BLM is considering euthanizing about 2,300 horses from short-term holding—about one-third of the animals currently in short-term holding. In addition, they are considering selling without limitation about 8,000 animals from both short- and long-term holding. However, as of August 31, 2008, legislation was pending in the 110th Congress that would repeal the directive for BLM to sell animals without limitation, but not the requirement to destroy unadoptable excess horses.[54]

---

[52]16 U.S.C. § 1333(e)(1).

[53]16 U.S.C. § 1333(e)(2).

[54]H.R. 249, 110th Cong. (2007). The bill was passed by the House of Representatives on April 26, 2007. As of August 31, 2008, the Senate had not acted on the bill.

BLM_000175

Other than one pilot project, BLM has not initiated strategies to reduce the number of horses they currently manage in long-term holding and has not formally considered other possible solutions to indefinitely caring for horses in long-term holding. BLM officials who lead state Wild Horse and Burro Programs suggested several actions that could be taken to alleviate off-the-range costs to the program, but many of these changes would require changes in the law or BLM regulations. The most common suggestion, made by 4 of the 10 state leads, was that the federal government should provide incentives for private individuals or organizations to care for unwanted wild horses, such as monetary incentives or tax deductions. In 2003, BLM initiated a pilot project in Wyoming to pay private ranchers a one-time lump sum to care for unadoptable excess animals. This pilot project ended because of a lack of up-front funds. In addition, a BLM official familiar with the project told us that private ranchers had less interest in the project as the market for cattle grazing improved. Implementing tax deductions would likely require changes in the tax law. Another suggestion made by three of the state leads was that the act should be changed to allow the government to manage unadoptable wild horses and burros on public or private lands outside areas where they were originally found. The act currently does not allow BLM to relocate wild horses and burros to areas of public lands where they were not found when the act was passed. To date, BLM has not sought the legislative changes that would make these suggestions possible.

## Conclusions

The management of a program consisting of wild free-roaming animals is unique within BLM, and it presents distinct management challenges. While BLM has made significant progress in increasing the number of HMAs that have set AML and in moving toward meeting AML, its recent removal efforts have resulted in the agency managing almost the same number of animals off of the range as they manage in the wild. By spending an ever increasing amount of funding on caring for animals off the range, little funding is left to conduct important on-the-range management activities, as originally envisioned in the act. Now that BLM is closer to meeting AML, it is important for field offices to have the resources necessary to maintain those levels and to monitor whether those levels indeed create the "thriving natural ecological balance" called for in the act.

Future changes to AML determinations should be based on consistent factors across HMAs. With the turnover of the more experienced senior BLM staff that set the existing AMLs to newer more junior staff, it is important that the newer staff have clear official guidance to follow on making AML determinations. It is also important for the management of

the program that BLM have the most accurate population estimates possible. While counting wild free-roaming animals is an inherently challenging task, the widespread use of statistically based counting methods across more HMAs, as appropriate, would provide a scientifically sound basis for compensating for possible undercounts. BLM provides a great deal of information about the Wild Horse and Burro Program through its Web site, including information on AML and population estimates for each HMA. However, despite public concerns about the humane treatment of these animals, BLM has not provided the public with easily accessible information about their treatment. In some cases, BLM headquarters does not centrally compile information on the treatment of animals during gathers. Providing the public with additional information on the treatment of animals during gathers and once they are removed from the range would help inform the public about their treatment.

In our 1990 report, we noted that given the amount of federal resources needed to maintain unadoptable excess horses in long-term holding, BLM would need to seek alternative options. At the time, we recommended that BLM consider a variety of disposal options for these horses that were not being used, including sterilization and euthanasia. Today, about 20 years after the first long-term holding facility opened, with adoption demand declining and alternative disposal options still not being used, BLM is continuing to open new long-term holding facilities to care for unadoptable wild horses, and the costs continue to escalate. Cost-effective alternatives for long-term holding are still needed.

BLM is faced with a dilemma as it attempts to comply with the act. On one hand, the act directs BLM to protect and preserve wild horses and burros, and on the other hand the act directs BLM to destroy excess animals for which an adoption demand does not exist or, under certain circumstances, to sell them without limitation, which has led to the slaughter of some animals. BLM has committed to caring for these animals, even though the law requires their humane destruction or sale without limitation and the cost for their care off-the-range is now overwhelming the program. The program is at a critical crossroads. Within the program's existing budget, BLM cannot afford to care for all of the animals off the range, while at the same time managing wild horse and burro populations on the range. Resource limitations are forcing BLM to reconsider all available management options, and a workable solution must be developed to bring BLM into compliance with the act.

BLM_000177

# Recommendations for Executive Action

We make five recommendations to the Secretary of the Interior.

To improve the management of BLM's Wild Horse and Burro Program, we make four recommendations that the Secretary of the Interior direct BLM to:

- finalize and issue the new *Wild Horse and Burro Program Handbook* that establishes a policy for setting AML to ensure that AML is determined based on consistent factors across HMAs into the future;

- continue to adopt and employ statistically based methods to estimate animal populations across HMAs, such as those being evaluated by animal population researchers, to improve the accuracy of population estimates integral to BLM's management of wild horses and burros on the range and in planning for capacity needed for excess animals once they are removed from the range;

- track the number of animals harmed or killed during the gather process in a centralized database system and determine what information on the treatment of gathered animals, short-term and long-term holding animals, and adopted animals could easily be provided to the public to help inform them about the treatment of wild horses and burros; and

- develop cost-effective alternatives to the process of caring for wild horses removed from the range in long-term holding facilities and seek the legislative changes that may be necessary to implement those alternatives.

To address BLM's noncompliance with the act, as amended, we recommend that the Secretary of the Interior direct BLM to discuss with Congress and other stakeholders how best to comply with the act or amend it so that BLM would be able to comply. As part of this discussion, BLM should inform Congress of its concerns with (1) the act's requirement for the humane destruction of excess animals and (2) the possible slaughter of healthy horses if excess animals are sold without limitation, under certain circumstances, as the act requires.

# Agency Comments and Our Evaluation

We provided a draft of this report to the Department of the Interior for review and comment. The department concurred with our findings and recommendations and believes they will help to improve the Wild Horse and Burro Program. In addition, the department provided several technical clarifications, which we incorporated as appropriate. Appendix IV contains the Department of the Interior's comment letter.

As agreed with your office, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies of this report to the Secretary of the Interior, the Director of BLM, and other interested parties. We will also make copies available to others upon request. In addition, the report will be available at no charge on the GAO Web site at http://www.gao.gov.

If you or your staff has any questions about this report, please contact me at (202) 512-3841 or nazzaror@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made major contributions to this report are listed in appendix V.

Sincerely yours,

*Robin M. Nazzaro*

Robin M. Nazzaro
Director, Natural Resources and Environment

BLM_000179

# Appendix I: Objectives, Scope, and Methodology

We examined (1) the Bureau of Land Management's (BLM) progress in managing wild horses and burros on the range through setting and meeting appropriate management levels (AML); (2) BLM's management of wild horses and burros off of the range through adoption, sales, and holding facilities; (3) the controls BLM has in place to help ensure humane treatment of wild horses and burros; and (4) what challenges, if any, BLM faces in managing for the long-term sustainability of the Wild Horse and Burro Program. We were also asked to review how and why the acreage available for wild horses and burros had changed since the 1971 act. We did not examine the acreage issue because BLM is in the process of compiling a history of acreage determinations. BLM officials expect their review to be completed by March 2009.

To examine how BLM manages wild horses and burros on and off of the range and to identify the challenges facing BLM, we reviewed relevant laws, regulations, BLM policy, and BLM strategic plans. We also surveyed, and analyzed documents from, 26 of the 44 BLM field offices that manage wild horses and burros.[1] We collected and reviewed relevant resource management decision documents from the surveyed field offices to help corroborate their responses about specific questions, including those about factors used to make AML determinations and gather decisions. We surveyed field offices in all 10 western states that manage HMAs. The field offices we surveyed represent 82 percent of all BLM acres managed for wild horses and burros, 74 percent of all BLM managed wild horses, and 69 percent of burros on the range at the time of the survey. Our survey sample included 100 percent of the BLM field offices that manage HMAs in Nevada, including the Tonopah Field Station (seven offices); three randomly selected field offices from each of the five states whose field offices or district offices manage a population of wild horses and burros that fall between 1,000 and 10,000 horses (Arizona, California, Oregon, Utah, and Wyoming); and one randomly selected field office from each of the four states whose field offices manage a population of wild horses and burros that is less than 1,000 (Colorado, Idaho, Montana, and New Mexico). Because most of our survey questions focused on the management of a particular HMA, we judgmentally selected an HMA for each field office to consider in responding to our survey. We considered a

---

[1]We drew our sample of 26 field units from among the 44 field units that manage Herd Management Areas (HMA), which include 39 field offices, 4 district offices in Oregon, and 1 field station in Nevada. We will refer to these 44 BLM field units collectively as field offices. BLM's count of the number of offices that manage HMAs may differ because the 4 district offices in Oregon manage 7 resource area offices.

**Appendix I: Objectives, Scope, and Methodology**

variety of factors in making these HMA selections, including herd population size and whether the HMA had met or not met AML (according to 2007 BLM Statistics). Table 15 lists the 26 BLM field offices and HMAs we selected as part of our survey.

**Table 15: BLM Field Offices and HMAs Included in GAO's Survey**

| BLM field office by state | HMA |
|---|---|
| Arizona | |
| Yuma Field Office | Cibola–Trigo |
| Hassayampa Field Office | Lake Pleasant |
| Kingman Field Office | Black Mountain |
| California | |
| Surprise Field Office | High Rock |
| Alturas Field Office | Red Rock Lakes |
| Ridgecrest Field Office | Centennial |
| Colorado | |
| White River Field Office | Piceance–East Douglas Creek |
| Idaho | |
| Four Rivers Field Office | Four Mile |
| Montana | |
| Billings Field Office | Pryor Mountain Wild Horse Range |
| Nevada | |
| Tonopah Field Station | Montezuma Peak |
| Battle Mountain Field Office | South Shoshone |
| Carson City Field Office | Flanigan |
| Elko Field Office | Rock Creek |
| Ely Field Office | Dry Lake |
| Las Vegas Field Office | Red Rock |
| Winnimucca Field Office | Granite Range |
| New Mexico | |
| Socorro Field Office | Bordo Atravesado |
| Oregon | |
| Prineville District Office | Liggett Table |
| Lakeview District Office | Beaty's Butte |
| Vale District Office | Coyote Lake–Alvord Tule Springs |

**Appendix I: Objectives, Scope, and Methodology**

| BLM field office by state | HMA |
|---|---|
| Utah | |
|    Richfield Field Office | Canyon Lands |
|    Vernal Field Office | Hill Creek |
|    Fillmore Field Office | Conger |
| Wyoming | |
|    Rock Springs Field Office | Divide Basin |
|    Cody Field Office | McCullough Peaks |
|    Lander Field Office | Dishpan Butte |

Source: GAO.

The survey included several open-ended responses aimed at determining the primary challenges associated with meeting and maintaining AML, the primary challenges facing the Wild Horse and Burro Program as a whole, and suggestions for ways to improve the program. Two GAO analysts independently reviewed these open-ended survey responses, agreed upon the categories for coding each response, and resolved any disagreements in coding to determine what the respondents as a whole thought about these issues.

The practical difficulties of conducting any survey may introduce errors, commonly referred to as nonsampling errors. For example, difficulties in how a particular question is interpreted, in the sources of information that are available to the respondents, or in how the data are entered into a database or were analyzed can introduce unwanted variability into the survey results. We took steps in the development of the questionnaire, the data collection, and the data analysis to minimize these nonsampling errors. For example, survey specialists designed the questionnaire in collaboration with GAO staff with subject matter expertise. Then, the draft questionnaire was pretested with officials from five BLM field offices in four different states to ensure that the questions were relevant, clearly stated, and easy to comprehend. We also conducted follow-up phone calls to clarify ambiguous or incomplete responses. We received usable responses from all field offices that we surveyed—a 100 percent response rate. See appendix III for a summary of the survey responses not presented elsewhere in the report.

We also interviewed agency officials at BLM Headquarters; the National Program Office in Reno, Nevada; and Wild Horse and Burro Program State Leads from each of the 10 states that manage wild horses and burros. In addition, we conducted site visits at two field offices that manage HMAs in Nevada and Colorado; one long-term holding facility in Oklahoma; three

BLM_000182

**Appendix I: Objectives, Scope, and Methodology**

short-term holding facilities in Colorado, Nevada, and Wyoming; and attended two adoption events in Arizona and Colorado.

To examine humane treatment, we reviewed relevant laws, regulations, and BLM policies. We collected and analyzed reports from BLM Headquarters, state offices, and data from BLM's compliance database. We also interviewed BLM compliance officials from two states, a veterinarian from the Department of Agriculture's Animal and Plant Health Inspection Service, and public citizens and advocacy groups that work to promote the well being of wild horses and burros.

As part of our overall methodology, we interviewed a range of stakeholders interested in BLM's management of the Wild Horse and Burro Program, including, but not limited to, the American Wild Horse Preservation Campaign, the Animal Welfare Institute, the Cloud Foundation, the Humane Society of the United States, the National Cattlemen's Beef Association, and Nevada Bighorns Unlimited.

We conducted this performance audit from September 2007 to October 2008 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

BLM_000183

# Appendix II: Fertility Control and Genetic Variability

In addition to the information provided in this report to answer our primary objectives, we encountered two other issues related to BLM's management of the Wild Horse and Burro Program. The issues primarily relate to BLM's on-the-range management activities, including fertility control and genetic variability.

## Fertility Control

BLM has been pursuing a fertility control vaccine called porcine zonae pellucida since 1992 to use as a tool for slowing the reproductive rate in wild horse populations. A slower reproductive rate would reduce the number of animals that would have to be gathered and removed, adopted, and held. BLM officials do not consider this treatment as the best short-term management tool to achieve AML but believe that once HMAs are at AML, fertility treatment can help to maintain that level. Much research has been conducted about the use of the vaccine in domestic and wild horses. The Department of the Interior's National Park Service has used this treatment to successfully manage wild horse populations at two national seashores. BLM field offices have been directed to consider the use of fertility control as an alternative in their gather plans, but they are not required to choose this research tool. The vaccine is considered experimental, and as such, there are barriers to its use. Since 2004, 47 HMAs have used fertility treatments, and a total of about 1,800 wild horses have been injected with the treatment. BLM considers the use of this treatment as a research tool; however, according to a prominent wild horse fertility researcher, BLM should more actively pursue its use as a management tool. According to BLM officials, fertility control may offer the possibility of reducing reproduction rates and costs, but BLM will still need to place horses in long-term holding in the future.

## Genetic Variability

Herd health is another important component of BLM's on-the-range management of wild horses and burros. Specifically, it is important to maintain a degree of genetic variability to decrease the likelihood of disease and to maintain the biological fitness of the population. The amount of genetic variability that is sufficient to maintain a healthy population, however, is difficult to discern. Some groups have criticized BLM for setting AMLs at levels that are less than 100 or 150 animals. As of February 2008, 135 of the 199 HMAs had an upper limit of 150 or less for AML (see table 16). Several of these smaller HMAs, however, are part of a complex of HMAs that are managed as one unit where there is regular genetic interchange. For example, 13 complexes in Nevada encompass 45 of their 102 HMAs. According to a leading researcher in the field of wild

horse genetics, however, a herd that has a population of less than 100 can be maintained with the introduction of at least one or two horses every 6 to 7 years, including those whose herd size are as small as 10 to 15 horses.

**Table 16: Number of HMAs Managed at Various AMLs, February 2008**

| Upper limit of AML | Number of HMAs |
|---|---:|
| 0 | 8 |
| 1–100 | 102 |
| 101–150 | 25 |
| 151–200 | 16 |
| 201–300 | 25 |
| 301–500 | 16 |
| 501–1,000 | 5 |
| Not yet determined | 2 |
| **Total** | **199** |

Source: BLM.

BLM manages a few herds that show strong evidence of old Spanish heritage which no longer exists outside of the Americas. For example, the Kiger Mustangs of Oregon and the Pryor Mustangs of Montana have some colonial Spanish traits. For most of the HMAs, however, genetic variability is important primarily in maintaining the health of the herd, rather than managing for a specific genetic trait or bloodlines.

BLM_000185

# Appendix III: Wild Horse and Burro Survey Results

The following tables summarize responses collected through our survey instrument that was sent to 26 BLM field offices that manage HMAs. See appendix I for a complete explanation of which offices were chosen and the methodology used to select those field offices and specific HMAs. Our survey was divided into two sections. The first asked questions specific to the field offices' management of particular HMAs. The second section asked questions related to the field offices' general management of all HMAs.[1]

## Section I: Field Office Responses Specific to Selected HMAs

**Table 17: Current and Initial AML and Year of Determination per HMA Surveyed**

| HMA, by state | Initial AML | Year initial AML was set | Current AML | Year current AML was set |
|---|---|---|---|---|
| Arizona | | | | |
| Cibola–Trigo | 315 | 1980 | [a] | [a] |
| Lake Pleasant | 80 | 1988 | 208 | 2000 |
| Black Mountain | 148 | 1978 | 478 | 1996 |
| California | | | | |
| High Rock | 70–100 | 1981 | 78–120 | 2001 |
| Red Rock Lakes | 16–25 | 1981 | [a] | [a] |
| Centennial | 168 | 1980 | 168 | 2005 |
| Colorado | | | | |
| Piceance–East Douglas Creek | 90–140 | 1981 | 135–235 | 1999 |
| Idaho | | | | |
| Four Mile | 37–60 | 2001 | [a] | [a] |
| Montana | | | | |
| Pryor Mountain Wild Horse Range | 121 | 1984 | 95 | 1992 |

---

[1]Eight of the 26 field offices surveyed manage only one HMA.

Appendix III: Wild Horse and Burro Survey
Results

| HMA, by state | Initial AML | Year initial AML was set | Current AML | Year current AML was set |
|---|---|---|---|---|
| **Nevada** | | | | |
| Montezuma Peak | 161 | 1974 | 0 | 2007 |
| South Shoshone | 78 | 1986 | 60–100 | 2005 |
| Flanigan | 83–125 | 1990 | [a] | [a] |
| Rock Creek | 119 | 1987 | 250 | 2003 |
| Dry Lake | 82 | 1983 | 94 | 2001 |
| Red Rock | 116 | 1982 | 41–76 | 2004 |
| Granite Range | 155–258 | 1993 | [a] | [a] |
| **New Mexico** | | | | |
| Bordo Atravesado | 20–30 | 1980 | 50 | 1991 |
| **Oregon** | | | | |
| Liggett Table | 10–25 | 1989 | [a] | [a] |
| Beaty's Butte | 234 | 1971 | 100–250 | 1983 |
| Coyote Lake–Alvord Tule Springs | 198–390 | 1978 | [a] | [a] |
| **Utah** | | | | |
| Canyon Lands | 60–100 | 2001 | [a] | [a] |
| Hill Creek | 195 | 1985 | [a] | [a] |
| Conger | 34 | 1977 | 40-80 | 1987 |
| **Wyoming** | | | | |
| Divide Basin | 425–588 | 1979 | 415–600 | 1997 |
| McCullough Peaks | 70–140 | 1985 | 70–140 | 1990 |
| Dishpan Butte | 35–50 | 1983 | 50–100 | 1993 |

Source: GAO survey results.

[a]At the time of our survey, AML for 9 of the 26 HMAs we selected had not been revised since it was initially set. For those 9 HMAs, the initial AML and the year initial AML was set is also the current AML and the year current AML was set.

**Table 18: Level of Data Sufficiency Used to Determine Current AML**

| Level of sufficiency | Number of respondents |
|---|---|
| Very sufficient | 15 |
| Moderately sufficient | 7 |
| Moderately insufficient | 2 |
| Very insufficient | 1 |
| Unsure/don't know | 1 |

Source: GAO survey results.

**Appendix III: Wild Horse and Burro Survey
Results**

**Table 19: Respondents' Opinions about Current AML**

| Current AML | Number of respondents |
|---|---|
| Too high | 3 |
| About right | 17 |
| Too low | 2 |
| Unsure/don't know | 4 |

Source: GAO survey results.

**Table 20: Population Level in Comparison with AML Range**

| Population level | Number of respondents |
|---|---|
| Above | 15 |
| Within limits | 10 |
| Below | 0 |
| Unsure/don't know | 1 |

Source: GAO survey results.

**Table 21: Primary Challenges in Meeting or Maintaining AML**

| Challenge | Number of respondents |
|---|---|
| Impediments to conducting gathers | 20 |
| Lack of sufficient removal outlet | 12 |
| Inability to conduct range management | 9 |
| Limitations to accurate population counts | 8 |
| HMA boundary issues | 5 |
| Public pressure to not remove animals | 4 |
| Multiple use balance | 4 |
| Staffing limitations | 3 |
| Litigation | 2 |
| Habitat limitations | 2 |
| High reproductive rates of the animals | 2 |
| Other | 2 |

Source: GAO survey results.

BLM_000188

Appendix III: Wild Horse and Burro Survey
Results

**Table 22: Impact on Rangeland Resources in HMA When Herd Populations Exceed the Upper Limit of AML by Less Than 25 Percent**

| | Level of impact | | | | | |
| Rangeland resource | Positive | Slightly positive | No impact | Slightly negative | Negative | Blank |
|---|---|---|---|---|---|---|
| Horse and burro herd health | 1 | 2 | 10 | 10 | 3 | 0 |
| Rangeland health | 0 | 1 | 5 | 10 | 10 | 0 |
| Livestock habitat requirements | 0 | 1 | 10 | 9 | 5 | 1 |
| Wildlife habitat requirements | 0 | 1 | 8 | 9 | 8 | 0 |

Source: GAO survey results.

**Table 23: Impact on Rangeland Resources in HMA When Herd Populations Exceed the Upper Limit of AML by 25 to 50 Percent**

| | Level of impact | | | | | |
| Rangeland resource | Positive | Slightly positive | No impact | Slightly negative | Negative | Blank |
|---|---|---|---|---|---|---|
| Horse and burro herd health | 1 | 1 | 4 | 10 | 10 | 0 |
| Rangeland health | 0 | 0 | 0 | 8 | 18 | 0 |
| Livestock habitat requirements | 0 | 0 | 4 | 9 | 12 | 1 |
| Wildlife habitat requirements | 0 | 0 | 3 | 8 | 15 | 0 |

Source: GAO survey results.

**Table 24: Impact on Rangeland Resources in HMA When Herd Populations Exceed the Upper Limit of AML by 51 to 100 Percent**

| | Level of impact | | | | | |
| Rangeland resource | Positive | Slightly positive | No impact | Slightly negative | Negative | Blank |
|---|---|---|---|---|---|---|
| Horse and burro herd health | 0 | 1 | 2 | 4 | 19 | 0 |
| Rangeland health | 0 | 0 | 0 | 0 | 26 | 0 |
| Livestock habitat requirements | 0 | 0 | 3 | 3 | 19 | 1 |
| Wildlife habitat requirements | 0 | 0 | 3 | 2 | 21 | 0 |

Source: GAO survey results.

BLM_000189

**Table 25: Number of Field Offices That Have or Do Not Have Procedures in Place to Distinguish Impact of Wild Horses and Burros, Cattle, and Wildlife on Rangeland Condition**

| Procedure to distinguish impact | Number of respondents |
|---|---:|
| Yes | 20 |
| No | 6 |
| Unsure/don't know | 0 |

Source: GAO survey results.

**Table 26: Actions Taken to Manage HMAs Since 2000**

| Action taken | Yes | No | Don't know | Not applicable | Blank |
|---|---|---|---|---|---|
| Conducted population inventory | 24 | 2 | 0 | 0 | 0 |
| Conducted gathers and removals | 23 | 3 | 0 | 0 | 0 |
| Reduced or modified livestock use | 15 | 7 | 0 | 4 | 0 |
| Increased resource monitoring | 14 | 10 | 2 | 0 | 0 |
| Vegetative/riparian restoration | 14 | 11 | 1 | 0 | 0 |
| Other land management actions | 12 | 2 | 1 | 2 | 9 |
| Changed AML | 7 | 18 | 1 | 0 | 0 |

Source: GAO survey results.

**Table 27: Number of HMAs with a Herd Management Area Plan**

| Plan | Yes | No | Unsure/don't know |
|---|---|---|---|
| Herd Management Area Plan | 16 | 9 | 1 |
| Plan to develop a Herd Management Area Plan | 8 | 2 | 5 |

Source: GAO survey results.

**Table 28: Primary Physical Method Used in Most Recent Census/Inventory**

| Primary method | Number of respondents |
|---|---:|
| Fixed-wing aircraft | 3 |
| Helicopter | 20 |
| Horseback/on foot | 2 |
| Don't know | 1 |

Source: GAO survey results.

BLM_000190

Appendix III: Wild Horse and Burro Survey
Results

**Table 29: Primary Statistical Method Used in Most Recent Census/Inventory**

| Primary method | Number of respondents |
|---|---|
| Direct count (single number) | 17 |
| Direct count (range) | 2 |
| Simultaneous double-count | 3 |
| Sightability bias correction model | 2 |
| Other | 2 |

Source: GAO survey results.

**Table 30: Level of Accuracy of Most Recent Census/Inventory**

| Level of accuracy | Number of respondents |
|---|---|
| Greatly over counted | 0 |
| Over counted | 0 |
| Counted about right | 15 |
| Undercounted | 10 |
| Greatly undercounted | 0 |
| Unsure/don't know | 1 |

Source: GAO survey results.

**Table 31: Level of Data Sufficiency Used to Support Most Recent Gather**

| Level of sufficiency | Number of respondents |
|---|---|
| Very sufficient | 21 |
| Moderately sufficient | 4 |
| Moderately insufficient | 0 |
| Very insufficient | 0 |
| Unsure/don't know | 1 |

Source: GAO survey results.

**Table 32: Timing of Gather in Relation to Scheduled Date of Gather**

| Timing of gather | Number of respondents |
|---|---|
| Conducted earlier | 2 |
| Neither earlier nor delayed | 18 |
| Delayed | 4 |
| Unsure/don't know | 2 |

Source: GAO survey results.

BLM_000191

Appendix III: Wild Horse and Burro Survey
Results

**Table 33: Level of AML to Which HMA Is Typically Gathered**

| Level of AML | Number of respondents |
|---|---|
| Upper | 7 |
| Middle | 7 |
| Lower | 7 |
| Unsure/don't know | 5 |

Source: GAO survey results.

## Section II: Field Offices' Responses to General Questions Regarding All of the HMAs They Manage

**Table 34: Actions Taken to Manage HMA's Since 2000**

| Action taken | Yes | No | Don't know | Not applicable | Blank |
|---|---|---|---|---|---|
| Conducted population inventory | 19 | 0 | 0 | 0 | 0 |
| Conducted gathers and removals | 18 | 1 | 0 | 0 | 0 |
| Reduced or modified livestock use | 14 | 2 | 1 | 2 | 0 |
| Vegetative/riparian restoration | 14 | 5 | 0 | 0 | 0 |
| Increased resource monitoring | 12 | 7 | 0 | 0 | 0 |
| Changed AML | 11 | 8 | 0 | 0 | 0 |
| Other land management actions | 6 | 2 | 1 | 0 | 10 |

Source: GAO survey results.

**Table 35: Field Offices Whose HMAs Have Herd Management Area Plans**

| Plan | All | Some | None | Unsure/don't know |
|---|---|---|---|---|
| Herd Management Area Plan | 11 | 6 | 8 | 1 |

Source: GAO survey results.

**Table 36: Field Offices Working to Develop Herd Management Area Plans for All of Their HMAs**

| Response | Number of respondents |
|---|---|
| Yes | 6 |
| No | 8 |

Source: GAO survey results.

BLM_000192

**Table 37: Actions to Help Field Offices Achieve Healthy Herd Populations in Balance with the Range and Other Multiple Uses**

| Actions | Number of respondents |
|---|---|
| Increase range management activities | 15 |
| Reach and maintain AML | 9 |
| Improve staff capacity | 7 |
| Improve census/inventory | 7 |
| Increase funding | 6 |
| Improve adoption outlet | 3 |
| Improve coordination in management | 3 |
| Improve access to HMAs | 2 |
| Solve long-term holding situation | 2 |

Source: GAO survey results.

**Table 38: Major Challenges Facing Field Offices in Managing HMAs to Achieve Healthy Herd Populations That Are in Balance with the Range and Other Multiple Uses**

| Major challenges | Number of respondents |
|---|---|
| Impediments to conducting gathers | 13 |
| Staffing limitations | 11 |
| Limitations to accurate population counts | 8 |
| Inability to conduct range management | 8 |
| Multiple use balance | 7 |
| Lack of sufficient removal outlet | 6 |
| Ability to maintain AML | 4 |
| Habitat limitations | 4 |
| Other | 4 |
| Planning process | 3 |
| Public pressure | 3 |
| HMA boundary issues | 3 |

Source: GAO survey results.

BLM_000193

**Table 39: Major Challenges Facing BLM's Wild Horse and Burro Program As a Whole**

| Major challenges | Number of respondents |
|---|---|
| Lack of sufficient removal outlet[a] | 18 |
| Staffing limitations | 11 |
| Inability to conduct range management | 8 |
| Public pressure | 7 |
| Impediments to conducting gathers | 5 |
| Unwanted horses released to BLM lands | 5 |
| Funding | 3 |
| Lack of support | 3 |
| Limitations to accurate population counts | 2 |
| Habitat limitations | 2 |
| Lack of management flexibility | 2 |
| Multiple use balance | 2 |
| Poor public perception | 2 |

Source: GAO survey results.

[a]Removal outlet limitations include decreased options for animals once removed from the range, such as decreased adoptions, expense of caring for animals removed from the range, and limited capacity in long-term holding facilities.

BLM_000194

# Appendix IV: Comments from the Department of the Interior



United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Washington, DC 20240
http://www.blm.gov



SEP 0 5 2008

Robin M. Nazzaro
Director, Natural Resources and Environment
Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548-0001

Dear Ms. Nazzaro:

Thank you for the opportunity to review and comment on the Government Accountability Office draft report entitled, *"Bureau of Land Management: Effective Long-Term Options Needed to Manage Unadoptable Wild Horses,* (GAO-08-989).

The Department of the Interior concurs with the findings and recommendations for executive action and believes these will help us improve the Wild Horses and Burro Program. The Bureau of Land Management will work to develop cost effective alternatives to long term holding. BLM will seek advice from the National Wild Horse and Burro Advisory Board and other partners and stakeholders to find acceptable solutions, and will discuss any helpful legislative proposals with Congress.

The enclosure provides technical comments on the draft report.

If you have any questions, please contact Don Glenn, Chief, Division of Wild Horses and Burros at (202) 452-5082 or LaVanna Stevenson-Harris, BLM Audit Liaison Officer, at (202) 785-6580.

Sincerely,

James L. Caswell
Director

Enclosure

BLM_000195

# Appendix V: GAO Contact and Staff Acknowledgments

**GAO Contact**

Robin M. Nazzaro, (202) 512-3841 or nazzaror@gao.gov

**Staff Acknowledgments**

In addition to the individual named above, Jeffery D. Malcolm, Assistant Director; Ulana Bihun; Kevin Bray; Lee Carroll; Benjamin Shouse; Gregory Wilmoth; and Elizabeth Wood made key contributions to this report. Also contributing to the report were Beverly Ross and Monica Wolford.

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday afternoon, GAO posts on its Web site newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to www.gao.gov and select "E-mail Updates." |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's Web site, http://www.gao.gov/ordering.htm. Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact: Web site: www.gao.gov/fraudnet/fraudnet.htm E-mail: fraudnet@gao.gov Automated answering system: (800) 424-5454 or (202) 512-7470 |
| Congressional Relations | Ralph Dawn, Managing Director, dawnr@gao.gov, (202) 512-4400 U.S. Government Accountability Office, 441 G Street NW, Room 7125 Washington, DC 20548 |
| Public Affairs | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |

BLM_000197

| | |
|---|---|
| **From:** | Don_Glenn@blm.gov |
| **To:** | Paul_McGuire@nm.blm.gov |
| **Cc:** | Bob_D_Mitchell@nm.blm.gov; Sally_Spencer@blm.gov |
| **Bcc:** | blm@bridge1.iggbcloud.local |
| **Subject:** | Re: NM WHB Pilot Proposal: First-year care and feeding allowances for older horses |
| **Date:** | Wednesday, November 12, 2008 3:56:46 PM |
| **Attachments:** | FinalStatement of Work.doc |
| | Adoption incentive cover letter.pdf |
| | Adoption Incentive Program (rev 5.8.08).docx |

Paul,

Thanks for sending this. This is very similar to how we structured the Stewardship Incentive program which has not gone out to the public, but we have been talking to the Dept. Budget Office and Congress about it. A "focus group" I held last year indicated that for this to work in a significant way it would take $1500 per head. After talking to you a year ago about this, I restructured the incentive program to incorporate your idea about a payment when the animal is titled. We are thinking about going out for bid on the stewardship incentive program soon. In the mean time, we can keep talking about how best to do it. Perhaps some funding for you to try the NM WH Pilot Project could also be in the cards.

Attached is the Statement of Work for the Stewardship program FYI.

(See attached file: FinalStatement of Work.doc)

Don Glenn
Division Chief
Wild Horses and Burros

Office: 202-452-5082
Cell: 202-744-6697
Fax: 202-653-9084


Paul
McGuire/MFS/NM/BL
M/DOI To
Don Glenn/WO/BLM/DOI@BLM
11/06/2008 02:10 cc
PM Bob D Mitchell/MFS/NM/BLM/DOI@BLM,
Sally Spencer/WO/BLM/DOI@BLM
Subject
NM WHB Pilot Proposal: First-year
care and feeding allowances for
older horses

Here you go, Don. This is the proposal we prepared for Linda regarding a pilot program in New Mexico to offer first-year care and feeding allowances to adopters of older horses. The goal of this program is to curtail the number of horses entering long-term holding. The program is structured to be entirely budget neutral and wouldn't (shouldn't) require any statutory or regulatory changes. It also avoids the complications and controversy associated with the various sale and/or euthanasia proposals. The greatest challenge affecting implementation of this program would be on the marketing front, simply making people aware of this new avenue for adoption.

Appreciate your consideration. Perhaps it's something that would receive a favorable airing at the upcoming Advisory Board Meeting.

I'm available if you have any questions.

Thanks,

Paul McGuire
Public Affairs Specialist
Oklahoma Field Office
Moore, OK
Ofc: 405-790-1009
Cell: 405-826-3036

p.s. Also attached is a scan (.pdf) of the cover memo that accompanied the proposal when it was submitted to Linda back in May.
(See attached file: Adoption incentive cover letter.pdf)(See attached file: Adoption Incentive Program (rev 5.8.08).docx)

## SECTION C - DESCRIPTION/SPECIFICATIONS/WORK STATEMENT

1.      **BACKGROUND**

a. The Bureau of Land Management (BLM) manages wild horses and burros on public lands in 10 western states.  Wild Horses increase their population by approximately 20% each year, so the BLM must remove excess wild horses from the public lands to ensure that soils, water, vegetation, and other animals that depend on the public lands are protected and an ecological balance is maintained.  The BLM currently has 30,000 wild horses that have been relocated from public rangelands to holding facilities. There is an ongoing need to remove several thousand more each year to ensure proper health of BLM rangelands.

Wild horses and burros on public lands administered by the Bureau of Land Management (BLM), and Forest Service are protected, managed and controlled under the provisions of the Act of December 15, 1971, as amended (16 U.S.C. 1331-1340).  As resource conditions and other factors warrant, excess wild horses and burros are removed from the public lands and placed in private maintenance through the Adopt-A-Horse program. .  As animals get older, they become more difficult to adopt.  The BLM currently has a large number of animals between the age of 4 and 10 for which there is little adoption demand.

The purpose of this contract is to facilitate the placement of wild horses between the age of 4 and 10 into private maintenance.    This would be done by promoting adoption of these animals to the public through an incentive program aimed at people in the field of agriculture who have the land, knowledge and wherewithal to care for these animals

2.      **OBJECTIVES**

a.   The BLM is seeking one or more contractors who would find adopters for excess wild horses currently in BLM holding facilities.  The contractor would also administer grant payments to those adopters as an incentive to adopt. The contractors could be agricultural agencies, non-profit groups, 4-H, Farm Bureau, FFA, or other such agriculturally based groups.

The contractor will locate and solicit adopters to provide good homes for wild horses the age of 4 to 10 years.  The adopters could be individual ranchers, farmers or landowners who might only adopt one or two animals, or they could be wealthy philanthropists, groups, corporations, who could adopt and care for large numbers of animals.

b.  Place wild horse in private maintenance and care by individuals who are knowledgeable and experienced about the behavior, health, and nutritional requirements of horses.

c.  Reduce the number of wild horses in the BLM's holding facilities.

3.      **GENERAL SERVICES**

a.   All materials, supplies and workforce to advertise, market and implement a program to locate & solicit farmers, ranchers, landowners or other groups or individuals who have the knowledge, facilities, and financial means to provide appropriate humane care for one or more horses under the BLMs wild horse adoption program.

b.   Preparation of the paperwork necessary to adopt wild horses to the public.

    c.   All materials, supplies and workforce to establish, facilitate & oversee a stewardship grant program where those groups and/or individuals who adopt horses under this contract receive a grant payment on a per horse basis to defer the cost of caring for the animals.

### 4.    <u>SPECIFIC SERVICES</u>

    a.   Provide materials and information to the public and inform them of how to adopt a wild horse under the incentive program.

    b.   Coordinate with the shipping coordinator on the number and types of horses that are available to the public for adoption..

    c.   Inform the prospective adopters of the rules and regulations that govern the adoption of wild horses.

    d.   Insure that the adopter does not have any intention of selling these wild horses for slaughter.

    e.   Make sure that the adopter has the facilities to care for the number of wild horses they would like to adopt.

        a.   For each horse that is not fence broke they will need a minimum of 400 square feet of corral space

        b.   The corral needs to be made of panels, wood, woven wire (no bigger than 2"X2") with a sight board and middle board.

        c.   If the horse(s) are fence broke or when they become fence broke they can be let out into a pasture with regular pasture fencing.

    f.   Ensure that all the paperwork is understood by the adopter, filled out correctly and then approved.

        a.   Application for adoption of wild horses(s) or burro(s), form 4710-10

            i.   This form is the basis for the adoption.  It will need to be completed with the adopters' personal information including address and phone numbers.  All of the information on their facility must be completed, and must comply with BLM regulations governing such facilities.

        b.   Private Maintenance and care agreement for wild horse(s) or burro(s) form 4710-9

            i.   This form is the contract that allows the adopter to care for a federally owned wild horse for one year.  This form needs to have all the information on the adopter, name, address, phone number and location of the wild horse(s).  This will also have the information (ie description and freeze mark) of the wild horse(s) that are to be adopted by this person.

    g.   Coordinate the location where the adopter desires to pick up his/her horse(s) with the facilities that are maintaining these horses. This would include BLM transported animals.

    h.   All of the necessary paperwork must be completed and provided to the facility before pickup of the horse(s).  The Private Maintenance and Care Agreement must be signed by the authorized officer and the adopter at time of pickup.

    i.   Oversee and administer an incentive grant program where adopters would receive grants amounting to maximum of $1,500 per horse as described below:

| Horses | Adoption date | 1st payment | Title date | 2nd payment | Title date | 3rd payment | Title date | Total per horse |
|---|---|---|---|---|---|---|---|---|
| 1 | 1-Oct-08 | 750 | 5-Oct-09 | 750 | | | | $1,500 |
| 2 | 1-Oct-08 | 750 | 5-Oct-09 | 750 | | | | $1,500 |
| 3 | 1-Oct-08 | 750 | 5-Oct-09 | 750 | | | | $1,500 |
| 4 | 1-Oct-08 | 750 | 5-Oct-09 | 750 | | | | $1,500 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 5 | 1-Oct-08 | 500 | 500 | 5-Oct-10 | 500 | | $1,500 |
| 6 | 1-Oct-08 | 500 | 500 | 5-Oct-10 | 500 | | $1,500 |
| 7 | 1-Oct-08 | 500 | 500 | 5-Oct-10 | 500 | | $1,500 |
| 8 | 1-Oct-08 | 500 | 500 | 5-Oct-10 | 500 | | $1,500 |
| 9 | 1-Oct-08 | 500 | 500 | | 500 | 5-Oct-11 | $1,500 |
| 10 | 1-Oct-08 | 500 | 500 | | 500 | 5-Oct-11 | $1,500 |
| 11 | 1-Oct-08 | 500 | 500 | | 500 | 5-Oct-11 | $1,500 |
| 12 | 1-Oct-08 | 500 | 500 | | 500 | 5-Oct-11 | $1,500 |
| | | 7000 | 7000 | | 4000 | | $18,000 |
| > 12 | 1-Oct-08 | 500 | 500 | | 500 | Max 4/year | |

More than 12 horses could be adopted to an individual with the $1500 incentive payment being the maximum to be paid on any horse. Since only 4 wild horses can be titled in any one year, the adopter would either have to keep the horses until they were eligible for title, or find another adopter to transfer the adoption to. If the adopter wished to add value to the horses (train) and find other individuals to whom the adoption could be transferred, that could be done, and any training fees paid by the new adopter to the original adopter could be kept by the original adopter. This could also be done with any of the adopted horses prior to title. If the adoption is transferred prior to the title eligibility date, the original adopter would be eligible for the full payment at the time of the transfer.

6.     **RESPONSIBILITIES OF BLM**

a.     Provide all application and adoption agreement forms

b.     Approve all application and adoption agreement forms.
     a.     Approvals may be completed by fax.

c.     Provide funding for incentive payments.
d.     Deliver animals to adopters when asked.

(Offerors are advised that offers solicited based on those locations, as defined in Section C, Statement of Work, Paragraph C.1(a) and offers that are not in the boundaries specified will be rejected and not subject to further review.)

Don below are the criteria that would be used in section L and M to evaluate the proposal.

**Criteria 1** - Promotion and marketing adoption of wild horses.

The offeror shall address the ability to promote the adoption incentive program, by submission of the following:

(i)  A detailed discussion of how they will market and promote the adoption incentive program.

(iii) The ability to conduct clinics or meetings to explain the wild horse and burro program and why people should be interested in adopting horses that are 4 to 10 years.

(iv) The ability to solicit prospective adopters to adopt 4 to 10 year old wild horses in the incentive program.

**Criteria 2** Knowledge of the care and maintenance of horses

(i)  A detailed discussion of your experience in the care and maintenance of horses.

**Criteria 3** The ability to oversee a stewardship grant program

(i)  A detailed discussion on the knowledge and ability to oversee the stewardship grant program.

(ii) A management plan on how they will oversee the stewardship incentive program.

5/8/08

A WHB Pilot Program
Administered by the New Mexico State Office

# Adoption Incentives for Older Horses:
First-Year Care & Feeding Allowances

## OVERVIEW

Any qualified individual who adopts an older animal targeted by this incentive program will be eligible to receive a first-year care and feeding allowance, payable upon issuance of title after one year.

Primary Objective – To reduce the Wild Horse & Burro (WHB) program's reliance on long-term holding facilities (LTHF) as the principle outlet for older animals removed from the public range, thus relieving the budgetary stress these facilities place upon the WHB and other BLM programs.

Secondary Objective – To boost the title rate for adopted animals, thus relieving the agency of the administrative overhead and potential liability posed by the ever growing backlog of untitled animals.

Duration of Pilot: Two years minimum, starting October 2008.

## BACKGROUND

The BLM currently houses 22,000 animals in 12 LTHFs around the country. These are large private ranches that keep horses under contract at a cost of nearly $500/horse/year. That translates into an annual program cost of $11,000,000, which often must be taken from other program areas such as gathering, compliance, etc. Horses placed in LTHF typically live out the remainder of their natural lives there (15-25 years), representing a potential lifetime cost of $12,500/horse. Conversely, every horse successfully adopted and titled – and therefore *not* ultimately sent to LTHF – represents a lifetime savings to the agency of that same amount.

The need to add, expand or renew LTHF contracts often implicates provisions of the Endangered Species Act. The required consultations and resulting monitoring/mitigation measures add considerable "hidden" costs to the administration of the LTHF program.

Horses sent to LTHF are generally those for which adoption demand is thought (or known) to be relatively low. There are two main categories of horses that meet this criterion:

- Older horses (generally 6-10 years) gathered from the public range in the normal course of herd management. This is the principal target group of this incentive program;

5/8/08

- Certain horses ineligible for adoption per a 2004 amendment to the Wild Free-Roaming Horses and Burros Act (commonly known as the Burns Amendment). These animals are very old (11 years-plus) and may only be removed from LTHF if sold under the terms of the Burns Amendment.

A third category of animals held (temporarily) in LTHF are younger ones born of recently-gathered older mares. Since adoption demand for younger animals is comparatively strong, they are not targeted by this incentive program.

## EXECUTION

Adoption Rules – All standard adoption rules and fees apply. Adopters must meet all requirements necessary for approval and abide by all PMACA terms and conditions.

Incentive Amounts –This is a two-tiered incentive program, with a greater incentive offered for older horses and a lesser incentive for mid-aged horses. No incentive is offered for younger horses and burros.

- Older horses (6-10 years) – First-year care and feeding allowance of $500.
- Mid-aged horses (4-5 years) – First-year care and feeding allowance of $250.
- Younger horses (3 years and under) and burros – No incentive offered.

Incentive Payments – Incentives are payable only upon issuance of title after one year. If a horse is relinquished or dies before title is issued, the incentive offer is voided. Payments will be made by means of convenience check issued by the titling office. Funds will be charged to WO 260 FY 1060 HH 269A (see Budget Implications for further explanation).

Titling – Titling under this incentive program will be carried out in much the same way as with conventional adoptions (that is, after one year the adopter will receive a title application in the mail and will complete and return it to the issuing office for processing). In order to receive the incentive payment offered under this program, the title application must include certification of the animal's fitness by a licensed veterinarian or BLM compliance inspector. This rule is to ensure the highest level of professional assessment in authorizing incentive payments. Other conventional methods of certification (e.g., county extension agent, farrier; ag teacher; etc.) will be acceptable for issuing title only, not incentive payments.

Mandatory Compliance – All horses adopted under the terms of this incentive program will be added to a mandatory compliance list. At some point prior to titling, a BLM inspector will personally verify that the animals are fit and are being properly cared for.

Budget Implications – This incentive program should be budget neutral in the short term, since the $250 or $500 first-year care and feeding allowances (as applicable), are less than or equal to what it would otherwise cost BLM to hold an animal in LTHF for one year (hence the rationale for charging incentive payments to 1060 HH 269A). The full impact that this incentive program

5/8/08

could have on the LTHF budget if successfully implemented nationally has yet to be analyzed in detail; but it is safe to assume that fewer additions to LTHF, coupled with predictable death rates over time, will reduce the budgetary scope of LTHF relative to other critical WHB program areas.

Public Affairs – An aggressive public information and marketing campaign will precede and accompany the implementation of this pilot program. All available media will be employed to educate the public (TV, radio, print, web, direct mail, signage, fairs/expos, briefings/meetings, etc.). Key points to be emphasized in the communications plan:

- Tremendous cost savings potential for taxpayers;
- Continued concern for the welfare of animals removed from the public range. As with standard adoption terms, this incentive program is structured to prevent the possibility of abuse/neglect and/or commercial exploitation by unscrupulous adopters.

## SUMMARY

Incentive payments offered to adopters of selected older animals will curtail population growth in LTHF and thereby positively impact the WHB budget, enabling more effective management of this valuable resource.



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Oklahoma Field Station
221 N. Service Road
Moore, OK 73160-4946
www.nm.blm.gov

In Reply Refer To:
4700 (04400)

May 09, 2008

Memorandum

To:      State Director, New Mexico

From:    Field Manager, Oklahoma

Subject: WHB Pilot Program

Please see the attached proposal for a WHB pilot program in New Mexico (Adoption Incentives for Older Horses: First-Year Care & Feeding Allowances).

Per our previous discussions, we believe this is an appropriate and necessary step to address the budgetary pressures posed by the WHB program's growing reliance on long-term holding facilities to control HMA populations. The concept underlying this proposal – that is, offering cash incentives to adopters of older horses – has been favorably received in numerous informal discussions with senior WO WHB staff. This proposal captures and presents the concept for formal consideration by BLM senior leadership.

We are available for consultation at your request. Questions of a technical nature can be answered by Bob Mitchell, New Mexico WHB Program Lead, or Paul McGuire, OFO Public Affairs Specialist (primary author).

John Mehlhoff

1 Attachment

BLM_000207

| From: | Paul_McGuire@nm.blm.gov |
|-------|--------------------------|
| To: | Don_Glenn@blm.gov |
| Cc: | Bob_D_Mitchell@nm.blm.gov; Sally_Spencer@blm.gov |
| Bcc: | blm@bridge1.iggbcloud.local |
| Subject: | Re: NM WHB Pilot Proposal: First-year care and feeding allowances for older horses |
| Date: | Wednesday, November 12, 2008 4:47:16 PM |

That's great news, Don. Thanks. A pilot project would enable us to generate hard data to gauge public support, identify kinks, refine the concept, etc. We're eager to spearhead the effort... Would be an exciting endeavor, both operationally and from a public affairs standpoint.
PM


----- Original Message -----
From: Don Glenn
Sent: 11/12/2008 03:56 PM EST
To: Paul McGuire
Cc: Bob Mitchell; Sally Spencer
Subject: Re: NM WHB Pilot Proposal: First-year care and feeding allowances for older horses
Paul,
Thanks for sending this. This is very similar to how we structured the Stewardship Incentive program which has not gone out to the public, but we have been talking to the Dept. Budget Office and Congress about it. A "focus group" I held last year indicated that for this to work in a significant way it would take $1500 per head. After talking to you a year ago about this, I restructured the incentive program to incorporate your idea about a payment when the animal is titled. We are thinking about going out for bid on the stewardship incentive program soon. In the mean time, we can keep talking about how best to do it. Perhaps some funding for you to try the NM WH Pilot Project could also be in the cards.

Attached is the Statement of Work for the Stewardship program FYI.


[attachment "FinalStatement of Work.doc" deleted by Paul McGuire/MFS/NM/BLM/DOI]

Don Glenn
Division Chief
Wild Horses and Burros

Office: 202-452-5082
Cell: 202-744-6697
Fax: 202-653-9084



Paul
McGuire/MFS/NM/BL

M/DOI To
Don Glenn/WO/BLM/DOI@BLM
11/06/2008 02:10 cc
PM Bob D Mitchell/MFS/NM/BLM/DOI@BLM,
Sally Spencer/WO/BLM/DOI@BLM
Subject
NM WHB Pilot Proposal: First-year
care and feeding allowances for
older horses

Here you go, Don. This is the proposal we prepared for Linda regarding a
pilot program in New Mexico to offer first-year care and feeding allowances
to adopters of older horses. The goal of this program is to curtail the
number of horses entering long-term holding. The program is structured to
be entirely budget neutral and wouldn't (shouldn't) require any statutory
or regulatory changes. It also avoids the complications and controversy
associated with the various sale and/or euthanasia proposals. The greatest
challenge affecting implementation of this program would be on the
marketing front, simply making people aware of this new avenue for
adoption.

Appreciate your consideration. Perhaps it's something that would receive a
favorable airing at the upcoming Advisory Board Meeting.

I'm available if you have any questions.

Thanks,

Paul McGuire
Public Affairs Specialist
Oklahoma Field Office
Moore, OK
Ofc: 405-790-1009
Cell: 405-826-3036

p.s. Also attached is a scan (.pdf) of the cover memo that accompanied the
proposal when it was submitted to Linda back in May.

[attachment "Adoption incentive cover letter.pdf" deleted by Paul
McGuire/MFS/NM/BLM/DOI]
[attachment "Adoption Incentive Program (rev 5.8.08).docx" deleted by Paul
McGuire/MFS/NM/BLM/DOI]

| From: | Jenna_Whitlock@blm.gov |
|---|---|
| To: | Julie_Kale@blm.gov; Karen_Mouritsen@blm.gov |
| Cc: | Andrea_Nelson@blm.gov; Bill_Gordon@ios.doi.gov; Deborah_Strickland@blm.gov; Don_Glenn@blm.gov; Edwin_Roberson@blm.gov; Janine_Velasco@blm.gov; Jeannine_Lesieutre@blm.gov; Julie_Kale@blm.gov; Linda_Bair@blm.gov; Nathalie_Brumfield-Brown@blm.gov; Tiya_Samuels@blm.gov |
| Bcc: | blm@bridge1.iqgbcloud.local |
| Subject: | Re: Hill meeting re WHB issues |
| Date: | Wednesday, January 28, 2009 2:08:42 PM |
| Attachments: | 1.28.09 TPs for approps briefing.docx |

Hello All -- here are Ron's draft talking points for discussion at our
pre-meeting this afternoon.

Julie -- I'm sure Ron is running from meeting to meeting, but could you
please print him these for him? Thanks much -- see you all at 4.

(See attached file: 1.28.09 TPs for approps briefing.docx)

Jenna Whitlock
BLM Wild Horse and Burro Program
(202) 452-5115




Karen E
Mouritsen/WO/BLM/
DOI To
Julie_Kale@blm.gov
01/27/2009 05:27 cc
PM Edwin Roberson/WO/BLM/DOI@BLM,
Don_Glenn@blm.gov,
Jenna_Whitlock@blm.gov, Jeannine M
Lesieutre/WO/BLM/DOI, Nathalie V
Brumfield-Brown/WO/BLM/DOI@BLM,
Janine Velasco/WO/BLM/DOI,
Deborah_Strickland@blm.gov,
Andrea_Nelson@blm.gov, Bill
Gordon/POB/OS/DOI@DOI, Tiya
Samuels/WO/BLM/DOI, Linda
Bair/ORSO/OR/BLM/DOI@BLM
Subject
Hill meeting re WHB issues

Hi Julie

The meeting will be Friday at 11 in Senate Hart 125. It will be Scott
Dalzell and Leif Fonnesbeck from Senate Approps, Chris Topik and Dave
LesStrang from House Approps, and Ben Kramer from Sen. Feinstein staff.
We should probably leave at 10:30 am. I think Ron and Ed for sure should
come, and anyone else that Ron wants to come.

Ed and I and Don Glenn would like to do a pre-meeting with Ron on Wednesday
or Thursday, to talk about the message. Ron will want to tell them about
the Pickens proposal as it stands now, and talk about some of the ideas
that have been floated to the Approps Committee on long-term holding for
the Stimulus Bill. We could have Ron give them an update on the various
options we are considering as a result of the GAO audit. Another idea is
to talk about the issues involved in removing cattle from the range in
order to leave more horses on the range.

Thanks for scheduling this. Karen


Karen Mouritsen
BLM Budget Office
202-452-7724
Fax 202-452-0323

<u>BACKGROUND</u>

- Thanks for having us.  We're here to answer your questions on Mrs. Pickens' proposal or our reprogramming request, or whatever else is on your mind.

- If it makes sense to you, I'd like to take a minute to fill you in on the recent **GAO report** which will give some context to our discussion on the Pickens proposal.

- Probably the most telling of GAO's findings was that the **Act doesn't give BLM the authority to hold excess animals indefinitely**.  The law requires that we sell without limitation or humanely euthanize excess animals.

- GAO's other key finding was that the long-term sustainability of the wild horse and burro program is challenged by the **growing holding costs** and BLM's **limited options for dealing with unadoptable animals**.

- The economic downturn has been a double-whammy for the program – adoptions are dramatically down and our costs for holding animals have skyrocketed.   **Holding now consumes 75% of our annual budget**. CHART

- We are constantly adapting our management to address these challenges:
  - <u>Finding ways to increasing sales and adoptions</u> – TWO EXAMPLES –  **stewardship incentive** program, where we give a one-time stipend to rescue groups or individuals willing to provide a good home; re-defining our policy on "three-strike" animals to make more desirable animals available for sale.  [**DISCUSS WITH RON**]
  - <u>Lowering our holding costs</u> – **find more long-term holding facilities** so that animals are not kept in more expensive short-term holding; GAO has discouraged additional long-term holding.

- We'll be thoroughly **analyzing our alternatives**, using our Advisory Board and stakeholders, in the months ahead – we'll be back with our ideas and any suggestions for legislative changes.

1

PICKENS PROPOSAL

- In November 2008 Mrs. Pickens approached BLM about **adopting outright the 30,000 excess horses** currently held in short- and long-term holding facilities.

-  Now Pickens proposes that BLM *pay her* **$500 per horse per year** for the life of 20,000 animals.  Pickens proposes to purchase a cattle ranch in Nevada and run horses on both the BLM grazing allotments and the separate, fenced private pastures.

- Pickens has asked for **BLM's commitment to the life-time annual payments and to providing up to 20,000 horses.**

- Although the proposal could save the BLM money, it poses several problems given existing legal requirements.

- The proposal would essentially be another long-term holding contract.  Under the law, BLM could only do this by **advertising a contract** under an open, competitive process, **subject to annual appropriations**.

- BLM would need to **assess the available forage** on public and private land before committing to the number of horses that could be provided to Pickens.  We would also need to assess impacts of our actions under the National Environmental Policy Act, FLMPA, Taylor Grazing Act and other statutes.

- Lastly, any **horses that run on *public lands* would need to be titled** (no longer considered "wild" under the definition of the Wild and Free-Roaming Horses and Burros Act).  The act limits wild horses to the areas where they existed at the time of passage. Private horses could then be authorized to graze public lands as domestic livestock under BLM's current grazing regulations and laws.

REPROGRAMMING

- BLM asks that the wild horse and burro (WH&B) program funding be increased from **$36.2 to $54.5 million in fiscal year 2009**.  Program increases will be covered by savings, carry-over, and by redirecting funding from earmarks and other subactivities.

    o At this level of funding, BLM estimates that it will accomplish the following:

2

BLM_000213

- o gather 5,500 horses, making progress towards meeting AML in 2012;
- o adopt 2,000 horses;
- o fund the Mustang Heritage Foundation to adopt 1,000 horses;
- o conduct routine program activities like, censuses, monitoring, planning, compliance, fertility research, etc.; and
- o provide care for 33,000 excess horses in short- and long-term holding.

- BLM will also dedicate $1 million ($250,000 over 4 years) for research on a **chemical sterilant**, and

- Implement a new **stewardship incentive** program I talked about earlier – language directing the incentive program would help!
  - o $7.5 million would be used for one-time incentive payments (up to $1,500 per horse) to rescue organizations or landowners who are willing to provide good homes to unadoptable horses.  Any unspent stewardship incentive funding would shift to cover short- or long-term holding costs.

- In the long run BLM now estimates it needs **$60 million in 2010, $71 million in 2011, and $83 million in FY 2012, and $91 million in FY 2013 to achieve the high end of AML**. Incremental increases would be need well beyond 2013 until the number of animals in long-term holding goes down.

- Future funding needs can be reduced somewhat if we are able to move a lot of horse under our proposed stewardship incentive program, or if we're able to secure additional lower cost long-term holding.  CHART

- BUT -- assuming we are able to adopt or sell 3,000 animals per year, there will still be almost 55,000 animals in long-term holding when we get to AML in 2013.

- BLM proposes that holding be funded separate from other program costs so that BLM has the funding it needs to reach and maintain AML.

3

BLM_000214

| | |
|---|---|
| **From:** | Paul_McGuire@nm.blm.gov |
| **To:** | Bob Mitchell |
| **Bcc:** | blm@bridge1.iggbcloud.local |
| **Subject:** | Adoption incentive pilot |
| **Date:** | Wednesday, March 18, 2009 12:39:34 PM |

Bob -

You've heard that we've gotten the go ahead to implement the adoption incentive pilot.

To see a successful start, I believe we need an effective up front public information/marketing campaign, with accompanying materials.

Would suggest initiating in Kellyville. This would give me a chance get back and work on that.

Will try to reach you later to discuss.

Thx,

Paul

BLM_000215

| | |
|---|---|
| **From:** | Paul_McGuire@nm.blm.gov |
| **To:** | Bob Mitchell |
| **Bcc:** | blm@bridge1.iggbcloud.local |
| **Subject:** | Fw: Adoption incentive proposal |
| **Date:** | Thursday, March 19, 2009 9:50:50 AM |
| **Attachments:** | Adoption Incentive Program (rev 3.11.09).docx |

Bob - I recently sent a copy of the adoption incentive proposal to Sally (see below and attached) which contains a few key edits throughout the text (example: strikes the reference to starting the pilot in October 2008). You might save this version in place of the earlier one you sent to Greg.
PM

---

**From:** Paul McGuire
**Sent:** 03/11/2009 01:21 PM MDT
**To:** Sally Spencer
**Cc:** Bob Mitchell
**Subject:** Adoption incentive proposal

Here you go, Sally. Glad to hear the proposal still has a pulse. Lemme know if you have any questions. We're eager to give it a shot!

Paul McGuire
Public Affairs Specialist
U.S. Bureau of Land Management
Oklahoma Field Office
Moore, OK
Ofc: 405-790-1009
Cell: 405-826-3036

3/11/09

A WHB Pilot Program
Administered by the New Mexico State Office

# Adoption Incentives for Older Horses:
First-Year Care & Feeding Allowances

## OVERVIEW

Any qualified individual who adopts an older animal targeted by this incentive program will be eligible to receive a first-year care and feeding allowance, payable upon issuance of title after one year.

Primary Objective – To reduce the Wild Horse & Burro (WHB) program's reliance on long-term holding facilities (LTH) as the principle outlet for older animals removed from the public range, thus relieving the budgetary stress these facilities place upon the WHB and other BLM programs.

Secondary Objective – To boost the title rate for adopted animals, thus relieving the agency of the administrative overhead and potential liability posed by the ever growing backlog of untitled animals.

Duration of Pilot: Two years minimum.

## BACKGROUND

The BLM currently houses 22,000 animals in 12 LTHs around the country. These are large private ranches that keep horses under contract at a cost of nearly $500/horse/year. That translates into an annual program cost of $11,000,000, which often must be taken from other program areas such as gathering, compliance, etc. Horses placed in LTH typically live out the remainder of their natural lives there (15-25 years), representing a potential lifetime cost of $12,500/horse. Conversely, every horse successfully adopted and titled – and therefore *not* ultimately sent to LTH – represents a lifetime savings to the agency of that same amount.

The need to add, expand or renew LTH contracts often implicates provisions of the Endangered Species Act. The required consultations and resulting monitoring/mitigation measures add considerable "hidden" costs to the administration of the LTH program.

Horses sent to LTH are generally those for which adoption demand is thought (or known) to be relatively low. There are two main categories of horses that meet this criterion:

- Older horses (generally 6-10 years) gathered from the public range in the normal course of herd management. This is the principal target group of this incentive program;

3/11/09

- Older horses (11 years +), ineligible for adoption per a 2004 amendment to the Wild Free-Roaming Horses and Burros Act (commonly known as the Burns Amendment). These animals may only be transferred to private ownership if sold under the terms of the Burns Amendment and therefore are not targetable by this adoption incentive program.

A third category of horses held (temporarily) in LTH are younger ones born of recently-gathered older mares. Since adoption demand for younger animals is comparatively strong, they are purposefully not targeted by this incentive program.

## EXECUTION

Adoption Rules – All standard adoption rules and fees apply. Adopters must meet all requirements necessary for approval and abide by all PMACA terms and conditions.

Incentive Amounts –This is a two-tiered incentive program, with a greater incentive offered for older horses and a lesser incentive for mid-aged horses. No incentive is offered for younger horses and burros.

- Older horses (6-10 years) – First-year care and feeding allowance of $500.
- Mid-aged horses (4-5 years) – First-year care and feeding allowance of $250.
- Younger horses (3 years and under) and burros – No incentive offered.

Incentive Payments – Incentives are payable only upon issuance of title after one year. If a horse is relinquished or dies before title is issued, the incentive offer is voided. Payments will be made by means of convenience check issued by the titling office. Funds will be charged against LTH animal feed days for the year in which title is issued.

Titling – Titling under this incentive program will be carried out in much the same way as with conventional adoptions (that is, after one year the adopter will receive a title application in the mail and will complete and return it to the issuing office for processing). In order to receive the incentive payment offered under this program, the title application must include certification of the animal's fitness by a licensed veterinarian or BLM compliance inspector. This rule is meant to ensure the highest level of professional assessment in authorizing incentive payments. Other conventional methods of certification (e.g., county extension agent, farrier; ag teacher; etc.) will be acceptable for issuing title only, not incentive payments.

Mandatory Compliance – All horses adopted under the terms of this incentive program will be added to a mandatory compliance list. At some point prior to titling, a BLM inspector will personally verify that the animals are fit and are being properly cared for.

Budget Implications – This incentive program is designed to be budget neutral in the short term, since the $250 or $500 first-year care and feeding allowances (as applicable), are less than or equal to what it would otherwise cost BLM to hold an animal in LTH for one year (hence

3/11/09

the rationale for charging incentive payments against LTH feed days). The full impact that this incentive program could have on the LTH budget if successfully implemented nationally has yet to be analyzed in detail; but it is safe to assume that fewer additions to LTH over time, coupled with predictable death rates, will reduce the budgetary scope of LTH relative to other critical WHB program areas.

Public Affairs – An aggressive public information and marketing campaign will precede and accompany the implementation of this pilot program. All available media will be employed to educate the public (TV, radio, print, web, direct mail, signage, fairs/expos, briefings/meetings, etc.). Key points to be emphasized in the communications plan:

- Tremendous cost savings potential for taxpayers;
- Continued concern for the welfare of animals removed from the public range. As with standard adoption terms, this incentive program is structured to prevent the possibility of abuse/neglect and/or commercial exploitation.

## SUMMARY

Incentive payments offered to adopters of selected older animals will curtail population growth in LTH and thereby positively impact the WHB budget, enabling more effective management of this valuable resource.

| | |
|---|---|
| **From:** | Gregory.Russell@sol.doi.gov |
| **To:** | Bob_D_Mitchell@nm.blm.gov |
| **Cc:** | Don_Glenn@blm.gov; Paul_McGuire@nm.blm.gov |
| **Bcc:** | sol@bridge1.iqgbcloud.local |
| **Subject:** | Re: Adoption incentive pilot |
| **Date:** | Tuesday, March 24, 2009 6:02:45 PM |
| **Attachments:** | NM Adoption Incentive Program (rev 5.8.08) -GR comments 3 ·24·09.docx |

Bob and Don,

Thanks for sending me the details of the adoption incentive program. I've reviewed it and offer these comments and suggestions, the most substantive of which are Comments 3–6 on page two.

Please don't hesitate to contact me if you have any questions or otherwise want to discuss this draft. If you make revisions, may you please shoot me an updated version? Thanks.

_____

Greg Russell
Division of Land and Water Resources
Public Lands Branch
202-208-4327

NOTICE: This email (including attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected by applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or use of this email or its content is strictly prohibited. If you receive this email in error, please notify the sender immediately and destroy all copies.

**Bob_D_Mitchell@nm.blm.gov**

03/19/2009 09:22 AM

To Gregory Russell/HQ/SOL/DOI@SOL
cc Don_Glenn@blm.gov, Paul_McGuire@nm.blm.gov
Subject Re: Adoption incentive pilot

Gregory - Please look over this proposal and let us know if there are any problems with it.

Thanks,
Bob

**Don Glenn/WO/BLM/DOI**

03/19/2009 08:10 AM

To  Bob D Mitchell/MFS/NM/BLM/DOI@BLM

cc  "Gregory Russell" <Gregory.Russell@sol.doi.gov>

Subject  Re: Adoption incentive pilot Link

Bob, send it to Greg Russell. Gregory.Russell@sol.doi.gov
Don Glenn,
Division Chief
Wild Horse and Burro Program
*******************************************
Sent from my BlackBerry Wireless Handheld


    ----- Original Message -----
    **From:** Bob D Mitchell
    **Sent:** 03/19/2009 07:57 AM CDT
    **To:** Don Glenn
    **Cc:** Paul McGuire
    **Subject:** Adoption incentive pilot

Hi Don - Holle said you'd like us to run the Adoption Incentive proposal past a solicitor.  If you'll let me know which solicitor you've run the other proposals thru I'll send it to them.  NM's solicitor doesn't have any working knowledge of the WH&B program but if you want I'll send it to them.

    Thanks,
    Bob

[attachment "Adoption Incentive Program (rev 5.8.08).docx" deleted by Gregory Russell/HQ/SOL/DOI]

BLM_000221

5/8/08

 A WHB Pilot Program
Administered by the New Mexico State Office

# Adoption Incentives for Older Horses:
## First-Year Care & Feeding Allowances

## OVERVIEW

Any qualified individual who adopts an animal through this incentive program will be eligible to receive a first-year care and feeding allowance, payable upon issuance of title after one year.

Primary Objective – To reduce the Wild Horse & Burro (WHB) program's reliance on long-term holding facilities (LTHF) as the principle outlet for older animals removed from the public range, thus relieving the budgetary stress these facilities place upon the WHB and other BLM programs.

Secondary Objective – To boost the title rate for adopted animals, thus relieving the agency of the administrative overhead and potential liability posed by the ever-growing backlog of untitled animals.

Duration of Pilot: Two years minimum, starting October 2008.

## BACKGROUND

The BLM currently houses 22,000 animals in 12 LTHFs around the country. These are large private ranches that keep horses under contract at a cost of nearly $500/horse/year. That translates into an annual program cost of $11,000,000, which often must be taken from other program areas such as gathering and compliance. Horses placed in LTHF typically live out the remainder of their natural lives there (15-25 years), representing a lifetime cost of approximately $7,500 to $12,500 per horse. Conversely, every horse successfully adopted and titled that would otherwise be sent to LTHF represents a lifetime savings to the agency of that same amount.

The need to add, expand, or renew LTHF contracts can implicate provisions of the Endangered Species Act. The required consultations and resulting monitoring/mitigation measures add considerable "hidden" costs to the administration of the LTHF program.

Horses sent to LTHF are generally those for which adoption demand is thought (or known) to be relatively low. There are two main categories of horses that meet this criterion:

- Older horses (generally 6-10 years old) gathered from the public range in the normal course of herd management. This is the principal target group of this incentive program;

BLM_000222

# Summary of Comments on _p.20090324.1802b.email.Glenn.re_NMPilot.att.pdf

## Page: 1

Number: 1        Author: Greg Russell        Date: 3/24/2009 5:00:00 PM

Number: 2        Author: Greg Russell        Date: 3/24/2009 10:30:00 AM

5/8/08

- Certain horses ineligible for adoption per a 2004 amendment to the Wild Free-Roaming Horses and Burros Act (commonly known as the Burns Amendment). These animals are very old (11 years plus) and may only be removed from LTHF if sold under the terms of the Burns Amendment.

A third category of animals held (temporarily) in LTHF are younger ones born of recently-gathered older mares. Since adoption demand for younger animals is comparatively strong, they are not targeted by this incentive program.

EXECUTION

Adoption Rules – All standard adoption rules and fees apply. Adopters must meet all requirements necessary for approval and abide by all PMACA terms and conditions.

Incentive Amounts –This is a two-tiered incentive program, with a greater incentive offered for older horses and a lesser incentive for mid-aged horses. No incentive is offered for younger horses and burros.

- Older horses (6-10 years) – First-year care and feeding allowance of $500.
- Mid-aged horses (4-5 years) – First-year care and feeding allowance of $250.
- Younger horses (3 years and under) and burros – No incentive offered.

Incentive Payments – Incentives are payable only upon issuance of title after one year. If a horse is relinquished or dies before title is issued, the incentive offer is voided. Payments will be made by means of convenience check issued by the titling office. Funds will be charged to WO 260 FY 1060 HH 269A (see Budget Implications for further explanation).

Titling – Titling under this incentive program will be carried out in much the same way as with conventional adoptions (that is, after one year the adopter will receive a title application in the mail and will complete and return it to the issuing office for processing). In order to receive the incentive payment offered under this program, the title application must include certification of the animal's fitness by a licensed veterinarian or BLM compliance inspector. This rule is to ensure the highest level of professional assessment in authorizing incentive payments. Other conventional methods of certification (e.g., county extension agent, farrier; ag teacher, etc.) will be acceptable for issuing title only, not incentive payments.

Mandatory Compliance – All horses adopted under the terms of this incentive program will be added to a mandatory compliance list. Prior to titling, a BLM inspector must personally verify that the animals are fit and properly cared for.

Budget Implications – This incentive program should be budget-neutral in the short term, since the $250 or $500 first-year care and feeding allowances (as applicable), are less than or equal to what it would otherwise cost BLM to hold an animal in LTHF for one year (hence the rationale for charging incentive payments to 1060 HH 269A). The full impact that this incentive program

# Page: 2

Number: 1        Author: Greg Russell        Date: 3/24/2009 5:06:00 PM

Number: 2        Author: Greg Russell        Date: 3/24/2009 5:15:00 PM

Number: 3        Author: Greg Russell        Date: 3/24/2009 6:00:00 PM

Number: 4        Author: Greg Russell        Date: 3/24/2009 5:38:00 PM
I think this budget analysis may be wrong. It presupposes that every horse that's adopted under the program would otherwise have sat in

5/8/08

could have on the LTHF budget if successfully implemented nationally has yet to be analyzed in detail, but it is safe to assume that fewer additions to LTHF, coupled with predictable death rates over time, will reduce the budgetary scope of LTHF relative to other critical WHB program areas.

Public Affairs – An aggressive public information and marketing campaign will precede and accompany the implementation of this pilot program. All available media will be employed to educate the public (TV, radio, print, web, direct mail, signage, fairs/expos, briefings/meetings, etc.). Key points to be emphasized in the communications plan:

- Tremendous cost savings potential for taxpayers; and
- Continued concern for the welfare of animals removed from the public range. As with standard adoption terms, this incentive program is structured to prevent the possibility of abuse/neglect and/or commercial exploitation by unscrupulous adopters.

## SUMMARY

Incentive payments offered to adopters of selected older animals will curtail population growth in LTHF and thereby positively impact the WHB budget, enabling more effective management of this valuable resource.

# Page: 3

Number: 1          Author: Greg Russell          Date: 3/24/2009 5:39:00 PM

| From: | Dean_Bolstad@blm.gov |
|---|---|
| To: | Don_Glenn@blm.gov |
| Cc: | Bea_Wade@nv.blm.gov; Lili_Thomas@blm.gov |
| Bcc: | blm@bridge1.igqbcloud.local |
| Subject: | Fw: More on Adoption incentive pilot |
| Date: | Wednesday, March 25, 2009 11:57:34 AM |
| Attachments: | NM Adoption Incentive Program (rev 5.8.08) -GR comments 3 ·24·09.docx |
| | Adoption Incentive Program (rev 3.11.09).docx |

Bea and Lili, Send any comments you have on the NM adoption incentive proposal to Don. It is attached to trailing email.

Don,
The NM proposal seems sound to me. I definately think it is worth a try.
A couple of things to consider.

1. Is this proposal compatable with Fran Ackley's proposal of adopting for $125 and selling for $250? I think it is. Would be important that the two proposals are compatible if both were implemented on trial or permanent basis.



```
|---------------------------------------------------------------------|
||                                                                    |
||                                                                    |
||                                                                    |
||                                                                    |
|---------------------------------------------------------------------|
```

Dean Bolstad
Deputy Division Chief
Wild Horse and Burro Program
(775) 861-6611(office)
(775) 750-6362 (cell)
----- Forwarded by Dean Bolstad/NVSO/NV/BLM/DOI on 03/25/2009 08:00 AM
-----

Don
Glenn/WO/BLM/DOI
To
03/25/2009 06:29 Dean_Bolstad@blm.gov
AM cc

Subject
More on Adoption incentive pilot

----- Forwarded by Don Glenn/WO/BLM/DOI on 03/25/2009 09:29 AM -----

Paul
McGuire/MFS/NM/BL
M/DOI To
Bob_D_Mitchell@nm.blm.gov,
03/25/2009 01:42 Don_Glenn@blm.gov
AM cc

Subject
Re: Adoption incentive pilot
(Document link: Don Glenn)

Bob and Don --

Greg offers some very useful edits and comments, most (or all) of which can
be readily incorporated or addressed:







Paul McGuire
Public Affairs Specialist
U.S. Bureau of Land Management
Oklahoma Field Office
Moore, OK
Ofc: 405-790-1009
Cell: 405-826-3036


Gregory.Russell@s
ol.doi.gov
To
03/24/2009 05:02 Bob_D_Mitchell@nm.blm.gov
PM cc
Don_Glenn@blm.gov,
Paul_McGuire@nm.blm.gov
Subject
Re: Adoption incentive pilot

Bob and Don,

Thanks for sending me the details of the adoption incentive program. I've reviewed it and offer these comments and suggestions, the most substantive of which are Comments 3–6 on page two.

Please don't hesitate to contact me if you have any questions or otherwise want to discuss this draft. If you make revisions, may you please shoot me an updated version? Thanks.

_____

Greg Russell
Division of Land and Water Resources
Public Lands Branch
202-208-4327

NOTICE: This email (including attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected by applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or use of this email or its content is strictly prohibited. If you receive this email in error, please notify the sender immediately and destroy all copies.

Bob_D_Mitchell@nm.blm.gov

03/19/2009 09:22 AM To
Gregory Russell/HQ/SOL/DOI@SOL
cc
Don_Glenn@blm.gov,
Paul_McGuire@nm.blm.gov
Subject
Re: Adoption incentive pilot

Gregory - Please look over this proposal and let us know if there are any problems with it.

Thanks,
Bob

Don Glenn/WO/BLM/DOI

03/19/2009 08:10 AM To
Bob D Mitchell/MFS/NM/BLM/DOI@BLM
cc
"Gregory Russell"
<Gregory.Russell@sol.doi.gov>
Subject
Re: Adoption incentive pilotLink

Bob, send it to Greg Russell. Gregory.Russell@sol.doi.gov
Don Glenn,
Division Chief
Wild Horse and Burro Program
*******************************************
Sent from my BlackBerry Wireless Handheld

----- Original Message -----
From: Bob D Mitchell
Sent: 03/19/2009 07:57 AM CDT
To: Don Glenn
Cc: Paul McGuire
Subject: Adoption incentive pilot
Hi Don - Holle said you'd like us to run the Adoption Incentive proposal

past a solicitor. If you'll let me know which solicitor you've run the
other proposals thru I'll send it to them. NM's solicitor doesn't have any
working knowledge of the WH&B program but if you want I'll send it to them.


Thanks,
Bob
[attachment "Adoption Incentive Program (rev 5.8.08).docx" deleted by
Gregory Russell/HQ/SOL/DOI] (See attached file: NM Adoption Incentive
Program (rev 5.8.08) -GR comments 3 ·24·09.docx)(See attached file:
Adoption Incentive Program (rev 3.11.09).docx)

BLM_000234

3/11/09

A WHB Pilot Program
Administered by the New Mexico State Office

# Adoption Incentives for Older Horses:
First-Year Care & Feeding Allowances

## OVERVIEW

Any qualified individual who adopts an older animal targeted by this incentive program will be eligible to receive a first-year care and feeding allowance, payable upon issuance of title after one year.

Primary Objective – To reduce the Wild Horse & Burro (WHB) program's reliance on long-term holding facilities (LTH) as the principle outlet for older animals removed from the public range, thus relieving the budgetary stress these facilities place upon the WHB and other BLM programs.

Secondary Objective – To boost the title rate for adopted animals, thus relieving the agency of the administrative overhead and potential liability posed by the ever growing backlog of untitled animals.

Duration of Pilot: Two years minimum.

## BACKGROUND

The BLM currently houses 22,000 animals in 12 LTHs around the country. These are large private ranches that keep horses under contract at a cost of nearly $500/horse/year. That translates into an annual program cost of $11,000,000, which often must be taken from other program areas such as gathering, compliance, etc. Horses placed in LTH typically live out the remainder of their natural lives there (15-25 years), representing a potential lifetime cost of $12,500/horse. Conversely, every horse successfully adopted and titled – and therefore *not* ultimately sent to LTH – represents a lifetime savings to the agency of that same amount.

The need to add, expand or renew LTH contracts often implicates provisions of the Endangered Species Act. The required consultations and resulting monitoring/mitigation measures add considerable "hidden" costs to the administration of the LTH program.

Horses sent to LTH are generally those for which adoption demand is thought (or known) to be relatively low. There are two main categories of horses that meet this criterion:

- Older horses (generally 6-10 years) gathered from the public range in the normal course of herd management. This is the principal target group of this incentive program;

3/11/09

- Older horses (11 years +), ineligible for adoption per a 2004 amendment to the Wild Free-Roaming Horses and Burros Act (commonly known as the Burns Amendment). These animals may only be transferred to private ownership if sold under the terms of the Burns Amendment and therefore are not targetable by this adoption incentive program.

A third category of horses held (temporarily) in LTH are younger ones born of recently-gathered older mares. Since adoption demand for younger animals is comparatively strong, they are purposefully not targeted by this incentive program.

EXECUTION

Adoption Rules – All standard adoption rules and fees apply. Adopters must meet all requirements necessary for approval and abide by all PMACA terms and conditions.

Incentive Amounts –This is a two-tiered incentive program, with a greater incentive offered for older horses and a lesser incentive for mid-aged horses. No incentive is offered for younger horses and burros.

- Older horses (6-10 years) – First-year care and feeding allowance of $500.
- Mid-aged horses (4-5 years) – First-year care and feeding allowance of $250.
- Younger horses (3 years and under) and burros – No incentive offered.

Incentive Payments – Incentives are payable only upon issuance of title after one year. If a horse is relinquished or dies before title is issued, the incentive offer is voided. Payments will be made by means of convenience check issued by the titling office. Funds will be charged against LTH animal feed days for the year in which title is issued.

Titling – Titling under this incentive program will be carried out in much the same way as with conventional adoptions (that is, after one year the adopter will receive a title application in the mail and will complete and return it to the issuing office for processing). In order to receive the incentive payment offered under this program, the title application must include certification of the animal's fitness by a licensed veterinarian or BLM compliance inspector. This rule is meant to ensure the highest level of professional assessment in authorizing incentive payments. Other conventional methods of certification (e.g., county extension agent, farrier; ag teacher; etc.) will be acceptable for issuing title only, not incentive payments.

Mandatory Compliance – All horses adopted under the terms of this incentive program will be added to a mandatory compliance list. At some point prior to titling, a BLM inspector will personally verify that the animals are fit and are being properly cared for.

Budget Implications – This incentive program is designed to be budget neutral in the short term, since the $250 or $500 first-year care and feeding allowances (as applicable), are less than or equal to what it would otherwise cost BLM to hold an animal in LTH for one year (hence

3/11/09

the rationale for charging incentive payments against LTH feed days). The full impact that this incentive program could have on the LTH budget if successfully implemented nationally has yet to be analyzed in detail; but it is safe to assume that fewer additions to LTH over time, coupled with predictable death rates, will reduce the budgetary scope of LTH relative to other critical WHB program areas.

Public Affairs – An aggressive public information and marketing campaign will precede and accompany the implementation of this pilot program. All available media will be employed to educate the public (TV, radio, print, web, direct mail, signage, fairs/expos, briefings/meetings, etc.). Key points to be emphasized in the communications plan:

- Tremendous cost savings potential for taxpayers;
- Continued concern for the welfare of animals removed from the public range. As with standard adoption terms, this incentive program is structured to prevent the possibility of abuse/neglect and/or commercial exploitation.

## SUMMARY

Incentive payments offered to adopters of selected older animals will curtail population growth in LTH and thereby positively impact the WHB budget, enabling more effective management of this valuable resource.

BLM_000237

5/8/08

 A WHB Pilot Program
Administered by the New Mexico State Office

# Adoption Incentives for Older Horses:
## First-Year Care & Feeding Allowances

## OVERVIEW

Any qualified individual who adopts an animal through this incentive program will be eligible to receive a first-year care and feeding allowance, payable upon issuance of title after one year.

Primary Objective – To reduce the Wild Horse & Burro (WHB) program's reliance on long-term holding facilities (LTHF) as the principle outlet for older animals removed from the public range, thus relieving the budgetary stress these facilities place upon the WHB and other BLM programs.

Secondary Objective – To boost the title rate for adopted animals, thus relieving the agency of the administrative overhead and potential liability posed by the ever-growing backlog of untitled animals.

Duration of Pilot: Two years minimum, starting October 2008.

## BACKGROUND

The BLM currently houses 22,000 animals in 12 LTHFs around the country. These are large private ranches that keep horses under contract at a cost of nearly $500/horse/year. That translates into an annual program cost of $11,000,000, which often must be taken from other program areas such as gathering and compliance. Horses placed in LTHF typically live out the remainder of their natural lives there (15-25 years), representing a lifetime cost of approximately $7,500 to $12,500 per horse. Conversely, every horse successfully adopted and titled that would otherwise be sent to LTHF represents a lifetime savings to the agency of that same amount.

The need to add, expand, or renew LTHF contracts can implicate provisions of the Endangered Species Act. The required consultations and resulting monitoring/mitigation measures add considerable "hidden" costs to the administration of the LTHF program.

Horses sent to LTHF are generally those for which adoption demand is thought (or known) to be relatively low. There are two main categories of horses that meet this criterion:

- Older horses (generally 6-10 years old) gathered from the public range in the normal course of herd management. This is the principal target group of this incentive program;

# Summary of Comments on
# _p.20090325.1157c.email.Glenn.re_NMPilot.att (1).pdf

## Page: 1

Number: 1          Author: Greg Russell          Date: 3/24/2009 5:00:00 PM

Number: 2          Author: Greg Russell          Date: 3/24/2009 10:30:00 AM

5/8/08

- Certain horses ineligible for adoption per a 2004 amendment to the Wild Free-Roaming Horses and Burros Act (commonly known as the Burns Amendment). These animals are very old (11 years plus) and may only be removed from LTHF if sold under the terms of the Burns Amendment.

A third category of animals held (temporarily) in LTHF are younger ones born of recently-gathered older mares. Since adoption demand for younger animals is comparatively strong, they are not targeted by this incentive program.

## EXECUTION

Adoption Rules – All standard adoption rules and fees apply. Adopters must meet all requirements necessary for approval and abide by all PMACA terms and conditions.

Incentive Amounts –This is a two-tiered incentive program, with a greater incentive offered for older horses and a lesser incentive for mid-aged horses. No incentive is offered for younger horses and burros.

- Older horses (6-10 years) – First-year care and feeding allowance of $500.
- Mid-aged horses (4-5 years) – First-year care and feeding allowance of $250.
- Younger horses (3 years and under) and burros – No incentive offered.

Incentive Payments – Incentives are payable only upon issuance of title after one year. If a horse is relinquished or dies before title is issued, the incentive offer is voided. Payments will be made by means of convenience check issued by the titling office. Funds will be charged to WO 260 FY 1060 HH 269A (see Budget Implications for further explanation).

Titling – Titling under this incentive program will be carried out in much the same way as with conventional adoptions (that is, after one year the adopter will receive a title application in the mail and will complete and return it to the issuing office for processing). In order to receive the incentive payment offered under this program, the title application must include certification of the animal's fitness by a licensed veterinarian or BLM compliance inspector. This rule is to ensure the highest level of professional assessment in authorizing incentive payments. Other conventional methods of certification (e.g., county extension agent, farrier; ag teacher, etc.) will be acceptable for issuing title only, not incentive payments.

Mandatory Compliance – All horses adopted under the terms of this incentive program will be added to a mandatory compliance list. Prior to titling, a BLM inspector must personally verify that the animals are fit and properly cared for.

Budget Implications – This incentive program should be budget-neutral in the short term, since the $250 or $500 first-year care and feeding allowances (as applicable), are less than or equal to what it would otherwise cost BLM to hold an animal in LTHF for one year (hence the rationale for charging incentive payments to 1060 HH 269A). The full impact that this incentive program

# Page: 2



5/8/08

could have on the LTHF budget if successfully implemented nationally has yet to be analyzed in detail, but it is safe to assume that fewer additions to LTHF, coupled with predictable death rates over time, will reduce the budgetary scope of LTHF relative to other critical WHB program areas.

Public Affairs – An aggressive public information and marketing campaign will precede and accompany the implementation of this pilot program. All available media will be employed to educate the public (TV, radio, print, web, direct mail, signage, fairs/expos, briefings/meetings, etc.). Key points to be emphasized in the communications plan:

- Tremendous cost savings potential for taxpayers; and
- Continued concern for the welfare of animals removed from the public range. As with standard adoption terms, this incentive program is structured to prevent the possibility of abuse/neglect and/or commercial exploitation by unscrupulous adopters.

## SUMMARY

Incentive payments offered to adopters of selected older animals will curtail population growth in LTHF and thereby positively impact the WHB budget, enabling more effective management of this valuable resource.

BLM_000242

Page: 3

Number: 1        Author: Greg Russell        Date: 3/24/2009 5:39:00 PM

| From: | Dean_Bolstad@blm.gov |
|---|---|
| To: | Don_Glenn@blm.gov |
| Cc: | Bea_Wade@nv.blm.gov; Lili_Thomas@blm.gov; Jenna_Whitlock@blm.gov |
| Bcc: | blm@bridge1.iggbcloud.local |
| Subject: | Fw: Adoption incentive pilot |
| Date: | Thursday, March 26, 2009 12:55:00 PM |
| Attachments: | NM Adoption Incentive Program (rev 5.8.08) -GR comments 3 ·24·09.docx |
|  | Adoption Incentive Program (rev 3.11.09).docx |

Further thoughts/discussion on adoption/sale options and effects of them.

Dean Bolstad
Deputy Division Chief
Wild Horse and Burro Program
(775) 861-6611(office)
(775) 750-6362 (cell)
----- Forwarded by Dean Bolstad/NVSO/NV/BLM/DOI on 03/26/2009 09:52 AM -----

Paul
McGuire/MFS/NM/BL
M/DOI To
Dean Bolstad/NVSO/NV/BLM/DOI@BLM
03/25/2009 11:11 cc
PM Bob D Mitchell/MFS/NM/BLM/DOI@BLM
Subject
Fw: Adoption incentive pilot

Dean --

Following up on our conversation this morning about this proposal, you
asked how Fran Ackley's adopt-or-buy concept might affect implementation of
this adoption incentive program.

As you know, I believe our sale program ought to be geared for volume
(wholesale) rather than individual (retail) movement of animals. That said,
I don't believe these two programs are inherently incompatible. ███████



Depending on one's point of view, any one of these scenarios my be preferable. From an adoption standpoint, Scenarios 2 & 3 are clearly best.

Appreciate the opportunity to provide input.

Paul McGuire
Acting NVSO WHB Program Lead
775-861-6469


----- Forwarded by Paul McGuire/MFS/NM/BLM/DOI on 03/25/2009 10:50 PM -----

Bob D
Mitchell/MFS/NM/B
LM/DOI To
Paul McGuire/MFS/NM/BLM/DOI@BLM
03/25/2009 02:58 cc
PM
Subject
Fw: Adoption incentive pilot

Bob and Don --

Greg offers some very useful edits and comments, most (or all) of which can be readily incorporated or addressed:





Paul McGuire
Public Affairs Specialist
U.S. Bureau of Land Management
Oklahoma Field Office
Moore, OK
Ofc: 405-790-1009
Cell: 405-826-3036


Gregory.Russell@s
ol.doi.gov
To
03/24/2009 05:02 Bob_D_Mitchell@nm.blm.gov
PM cc
Don_Glenn@blm.gov,
Paul_McGuire@nm.blm.gov
Subject

Re: Adoption incentive pilot

Bob and Don,

Thanks for sending me the details of the adoption incentive program. I've reviewed it and offer these comments and suggestions, the most substantive of which are Comments 3–6 on page two.

Please don't hesitate to contact me if you have any questions or otherwise want to discuss this draft. If you make revisions, may you please shoot me an updated version? Thanks.

_____

Greg Russell
Division of Land and Water Resources
Public Lands Branch
202-208-4327

NOTICE: This email (including attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected by applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or use of this email or its content is strictly prohibited. If you receive this email in error, please notify the sender immediately and destroy all copies.

Bob_D_Mitchell@nm.blm.gov

03/19/2009 09:22 AM To
Gregory Russell/HQ/SOL/DOI@SOL
cc
Don_Glenn@blm.gov,
Paul_McGuire@nm.blm.gov
Subject

BLM_000248

Re: Adoption incentive pilot

Gregory - Please look over this proposal and let us know if there are any problems with it.

Thanks,
Bob

Don Glenn/WO/BLM/DOI

03/19/2009 08:10 AM To
Bob D Mitchell/MFS/NM/BLM/DOI@BLM
cc
"Gregory Russell"
<Gregory.Russell@sol.doi.gov>
Subject
Re: Adoption incentive pilotLink

Bob, send it to Greg Russell. Gregory.Russell@sol.doi.gov
Don Glenn,

Division Chief
Wild Horse and Burro Program
*********************************************
Sent from my BlackBerry Wireless Handheld


----- Original Message -----
From: Bob D Mitchell
Sent: 03/19/2009 07:57 AM CDT
To: Don Glenn
Cc: Paul McGuire
Subject: Adoption incentive pilot
Hi Don - Holle said you'd like us to run the Adoption Incentive proposal
past a solicitor. If you'll let me know which solicitor you've run the
other proposals thru I'll send it to them. NM's solicitor doesn't have any
working knowledge of the WH&B program but if you want I'll send it to them.


Thanks,
Bob
[attachment "Adoption Incentive Program (rev 5.8.08).docx" deleted by
Gregory Russell/HQ/SOL/DOI] (See attached file: NM Adoption Incentive
Program (rev 5.8.08) -GR comments 3 ·24·09.docx)(See attached file:
Adoption Incentive Program (rev 3.11.09).docx)

BLM_000250

5/8/08

 A WHB Pilot Program
Administered by the New Mexico State Office

# Adoption Incentives for Older Horses:
First-Year Care & Feeding Allowances

## OVERVIEW

Any qualified individual who adopts an animal through this incentive program will be eligible to receive a first-year care and feeding allowance, payable upon issuance of title after one year.

Primary Objective – To reduce the Wild Horse & Burro (WHB) program's reliance on long-term holding facilities (LTHF) as the principle outlet for older animals removed from the public range, thus relieving the budgetary stress these facilities place upon the WHB and other BLM programs.

Secondary Objective – To boost the title rate for adopted animals, thus relieving the agency of the administrative overhead and potential liability posed by the ever-growing backlog of untitled animals.

Duration of Pilot: Two years minimum, starting October 2008.

## BACKGROUND

The BLM currently houses 22,000 animals in 12 LTHFs around the country. These are large private ranches that keep horses under contract at a cost of nearly $500/horse/year. That translates into an annual program cost of $11,000,000, which often must be taken from other program areas such as gathering and compliance. Horses placed in LTHF typically live out the remainder of their natural lives there (15-25 years), representing a lifetime cost of approximately $7,500 to $12,500 per horse. Conversely, every horse successfully adopted and titled that would otherwise be sent to LTHF represents a lifetime savings to the agency of that same amount.

The need to add, expand, or renew LTHF contracts can implicate provisions of the Endangered Species Act. The required consultations and resulting monitoring/mitigation measures add considerable "hidden" costs to the administration of the LTHF program.

Horses sent to LTHF are generally those for which adoption demand is thought (or known) to be relatively low. There are two main categories of horses that meet this criterion:

- Older horses (generally 6-10 years old) gathered from the public range in the normal course of herd management. This is the principal target group of this incentive program;

# Summary of Comments on _p.20090326.1255b.email.Glenn.NMPilot.att (1).pdf

## Page: 1

Number: 1          Author: Greg Russell          Date: 3/24/2009 5:00:00 PM

Number: 2          Author: Greg Russell          Date: 3/24/2009 10:30:00 AM

5/8/08

- Certain horses ineligible for adoption per a 2004 amendment to the Wild Free-Roaming Horses and Burros Act (commonly known as the Burns Amendment). These animals are very old (11 years plus) and may only be removed from LTHF if sold under the terms of the Burns Amendment.

A third category of animals held (temporarily) in LTHF are younger ones born of recently-gathered older mares. Since adoption demand for younger animals is comparatively strong, they are not targeted by this incentive program.

## EXECUTION

Adoption Rules – All standard adoption rules and fees apply. Adopters must meet all requirements necessary for approval and abide by all PMACA terms and conditions.

Incentive Amounts –This is a two-tiered incentive program, with a greater incentive offered for older horses and a lesser incentive for mid-aged horses. No incentive is offered for younger horses and burros.

- Older horses (6-10 years) – First-year care and feeding allowance of $500.
- Mid-aged horses (4-5 years) – First-year care and feeding allowance of $250.
- Younger horses (3 years and under) and burros – No incentive offered.

Incentive Payments – Incentives are payable only upon issuance of title after one year. If a horse is relinquished or dies before title is issued, the incentive offer is voided. Payments will be made by means of convenience check issued by the titling office. Funds will be charged to WO 260 FY 1060 HH 269A (see Budget Implications for further explanation).

Titling – Titling under this incentive program will be carried out in much the same way as with conventional adoptions (that is, after one year the adopter will receive a title application in the mail and will complete and return it to the issuing office for processing). In order to receive the incentive payment offered under this program, the title application must include certification of the animal's fitness by a licensed veterinarian or BLM compliance inspector. This rule is to ensure the highest level of professional assessment in authorizing incentive payments. Other conventional methods of certification (e.g., county extension agent, farrier; ag teacher, etc.) will be acceptable for issuing title only, not incentive payments.

Mandatory Compliance – All horses adopted under the terms of this incentive program will be added to a mandatory compliance list. Prior to titling, a BLM inspector must personally verify that the animals are fit and properly cared for.

Budget Implications – This incentive program should be budget-neutral in the short term, since the $250 or $500 first-year care and feeding allowances (as applicable), are less than or equal to what it would otherwise cost BLM to hold an animal in LTHF for one year (hence the rationale for charging incentive payments to 1060 HH 269A). The full impact that this incentive program

## Page: 2



Number: 1     Author: Greg Russell     Date: 3/24/2009 5:06:00 PM

Number: 2     Author: Greg Russell     Date: 3/24/2009 5:15:00 PM

Number: 3     Author: Greg Russell     Date: 3/24/2009 6:00:00 PM

Number: 4     Author: Greg Russell     Date: 3/24/2009 5:38:00 PM

5/8/08

could have on the LTHF budget if successfully implemented nationally has yet to be analyzed in detail, but it is safe to assume that fewer additions to LTHF, coupled with predictable death rates over time, will reduce the budgetary scope of LTHF relative to other critical WHB program areas.

Public Affairs – An aggressive public information and marketing campaign will precede and accompany the implementation of this pilot program. All available media will be employed to educate the public (TV, radio, print, web, direct mail, signage, fairs/expos, briefings/meetings, etc.). Key points to be emphasized in the communications plan:

- Tremendous cost savings potential for taxpayers; and
- Continued concern for the welfare of animals removed from the public range. As with standard adoption terms, this incentive program is structured to prevent the possibility of abuse/neglect and/or commercial exploitation by unscrupulous adopters.

## SUMMARY

Incentive payments offered to adopters of selected older animals will curtail population growth in LTHF and thereby positively impact the WHB budget, enabling more effective management of this valuable resource.

Page: 3

| Number: 1 | Author: Greg Russell | Date: 3/24/2009 5:39:00 PM |

3/11/09

A WHB Pilot Program
Administered by the New Mexico State Office

# Adoption Incentives for Older Horses:
First-Year Care & Feeding Allowances

## OVERVIEW

Any qualified individual who adopts an older animal targeted by this incentive program will be eligible to receive a first-year care and feeding allowance, payable upon issuance of title after one year.

Primary Objective – To reduce the Wild Horse & Burro (WHB) program's reliance on long-term holding facilities (LTH) as the principle outlet for older animals removed from the public range, thus relieving the budgetary stress these facilities place upon the WHB and other BLM programs.

Secondary Objective – To boost the title rate for adopted animals, thus relieving the agency of the administrative overhead and potential liability posed by the ever growing backlog of untitled animals.

Duration of Pilot: Two years minimum.

## BACKGROUND

The BLM currently houses 22,000 animals in 12 LTHs around the country. These are large private ranches that keep horses under contract at a cost of nearly $500/horse/year. That translates into an annual program cost of $11,000,000, which often must be taken from other program areas such as gathering, compliance, etc. Horses placed in LTH typically live out the remainder of their natural lives there (15-25 years), representing a potential lifetime cost of $12,500/horse. Conversely, every horse successfully adopted and titled – and therefore *not* ultimately sent to LTH – represents a lifetime savings to the agency of that same amount.

The need to add, expand or renew LTH contracts often implicates provisions of the Endangered Species Act. The required consultations and resulting monitoring/mitigation measures add considerable "hidden" costs to the administration of the LTH program.

Horses sent to LTH are generally those for which adoption demand is thought (or known) to be relatively low. There are two main categories of horses that meet this criterion:

- Older horses (generally 6-10 years) gathered from the public range in the normal course of herd management. This is the principal target group of this incentive program;

3/11/09

- Older horses (11 years +), ineligible for adoption per a 2004 amendment to the Wild Free-Roaming Horses and Burros Act (commonly known as the Burns Amendment). These animals may only be transferred to private ownership if sold under the terms of the Burns Amendment and therefore are not targetable by this adoption incentive program.

A third category of horses held (temporarily) in LTH are younger ones born of recently-gathered older mares. Since adoption demand for younger animals is comparatively strong, they are purposefully not targeted by this incentive program.

EXECUTION

Adoption Rules – All standard adoption rules and fees apply. Adopters must meet all requirements necessary for approval and abide by all PMACA terms and conditions.

Incentive Amounts –This is a two-tiered incentive program, with a greater incentive offered for older horses and a lesser incentive for mid-aged horses. No incentive is offered for younger horses and burros.

- Older horses (6-10 years) – First-year care and feeding allowance of $500.
- Mid-aged horses (4-5 years) – First-year care and feeding allowance of $250.
- Younger horses (3 years and under) and burros – No incentive offered.

Incentive Payments – Incentives are payable only upon issuance of title after one year. If a horse is relinquished or dies before title is issued, the incentive offer is voided. Payments will be made by means of convenience check issued by the titling office. Funds will be charged against LTH animal feed days for the year in which title is issued.

Titling – Titling under this incentive program will be carried out in much the same way as with conventional adoptions (that is, after one year the adopter will receive a title application in the mail and will complete and return it to the issuing office for processing). In order to receive the incentive payment offered under this program, the title application must include certification of the animal's fitness by a licensed veterinarian or BLM compliance inspector. This rule is meant to ensure the highest level of professional assessment in authorizing incentive payments. Other conventional methods of certification (e.g., county extension agent, farrier; ag teacher; etc.) will be acceptable for issuing title only, not incentive payments.

Mandatory Compliance – All horses adopted under the terms of this incentive program will be added to a mandatory compliance list. At some point prior to titling, a BLM inspector will personally verify that the animals are fit and are being properly cared for.

Budget Implications – This incentive program is designed to be budget neutral in the short term, since the $250 or $500 first-year care and feeding allowances (as applicable), are less than or equal to what it would otherwise cost BLM to hold an animal in LTH for one year (hence

3/11/09

the rationale for charging incentive payments against LTH feed days). The full impact that this incentive program could have on the LTH budget if successfully implemented nationally has yet to be analyzed in detail; but it is safe to assume that fewer additions to LTH over time, coupled with predictable death rates, will reduce the budgetary scope of LTH relative to other critical WHB program areas.

Public Affairs – An aggressive public information and marketing campaign will precede and accompany the implementation of this pilot program. All available media will be employed to educate the public (TV, radio, print, web, direct mail, signage, fairs/expos, briefings/meetings, etc.). Key points to be emphasized in the communications plan:

- Tremendous cost savings potential for taxpayers;
- Continued concern for the welfare of animals removed from the public range. As with standard adoption terms, this incentive program is structured to prevent the possibility of abuse/neglect and/or commercial exploitation.

## SUMMARY

Incentive payments offered to adopters of selected older animals will curtail population growth in LTH and thereby positively impact the WHB budget, enabling more effective management of this valuable resource.

| | |
|---|---|
| **From:** | Dean_Bolstad@blm.gov |
| **To:** | Don_Glenn@blm.gov |
| **Bcc:** | blm@bridge1.iggbcloud.local |
| **Subject:** | Re: Fw: Adoption incentive pilot (Greg"s revisions made) |
| **Date:** | Monday, March 30, 2009 10:30:06 AM |
| **Attachments:** | Adoption Incentive Program (rev 3.27.09).docx |

Don,

If solicitor says OK on this proposal. We need to:

1. Decide if it is nation wide or local to NM.
2. Need to coordinate with state leads to inform them before we kick this off. Will probably attract a lot of attention, and need to make sure everyone is on board.

Dean Bolstad
Deputy Division Chief
Wild Horse and Burro Program
(775) 861-6611(office)
(775) 750-6362 (cell)

Don
Glenn/WO/BLM/DOI
To
03/30/2009 07:22 Gregory Russell/HQ/SOL/DOI
AM cc
Edwin Roberson/WO/BLM/DOI@BLM,
Bud_Cribley@blm.gov,
Dean_Bolstad@blm.gov,
Sally_Spencer@blm.gov, Bob D
Mitchell/MFS/NM/BLM/DOI@BLM, Paul
McGuire/MFS/NM/BLM/DOI@BLM
Subject
Fw: Adoption incentive pilot
(Greg's revisions made)

Greg, Paul has revised the proposal and incorporated most if not all of

your comments. We would like to start offering these incentives ASAP.

 We could start
this program this weekend if ok.

Don Glenn
Division Chief
Wild Horses and Burros

Office: 202-452-5082
Cell: 202-744-6697
Fax: 202-653-9084
----- Forwarded by Don Glenn/WO/BLM/DOI on 03/30/2009 10:15 AM -----

Paul
McGuire/MFS/NM/BL
M/DOI To
Don Glenn/WO/BLM/DOI@BLM, Bob D
03/27/2009 04:39 Mitchell/MFS/NM/BLM/DOI@BLM
PM cc
Dean Bolstad/NVSO/NV/BLM/DOI@BLM
Subject
Fw: Adoption incentive pilot
(Greg's revisions made)

Bob and Don --

Not sure where we stand process-wise on this. I've incorporated Greg's
input. Revised draft attached. Recall, Greg requested that we shoot him the
latest version.

A couple of key points I'd say we need to ask him to focus on:





Please let me know if there's anything else I can do on this end to move this forward.

Thx,

Paul McGuire
Public Affairs Specialist
U.S. Bureau of Land Management
Oklahoma Field Office
Moore, OK
Ofc: 405-790-1009
Cell: 405-826-3036
(See attached file: Adoption Incentive Program (rev 3.27.09).docx)


Paul
McGuire/MFS/NM/BL
M/DOI To
Bob_D_Mitchell@nm.blm.gov,
03/25/2009 12:42 Don_Glenn@blm.gov
AM cc

Subject
Re: Adoption incentive pilot
(Document link: Bob Mitchell)




Bob and Don --

Greg offers some very useful edits and comments, most (or all) of which can be readily incorporated or addressed:





BLM_000263



Paul McGuire
Public Affairs Specialist
U.S. Bureau of Land Management
Oklahoma Field Office
Moore, OK
Ofc: 405-790-1009
Cell: 405-826-3036


Gregory.Russell@s
ol.doi.gov
                    To
03/24/2009 05:02   Bob_D_Mitchell@nm.blm.gov
PM                  cc
Don_Glenn@blm.gov,
Paul_McGuire@nm.blm.gov
                    Subject
Re: Adoption incentive pilot

BLM_000264

Bob and Don,

Thanks for sending me the details of the adoption incentive program. I've reviewed it and offer these comments and suggestions, the most substantive of which are Comments 3–6 on page two.

Please don't hesitate to contact me if you have any questions or otherwise want to discuss this draft. If you make revisions, may you please shoot me an updated version? Thanks.

_____

Greg Russell
Division of Land and Water Resources
Public Lands Branch
202-208-4327

NOTICE: This email (including attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected by applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or use of this email or its content is strictly prohibited. If you receive this email in error, please notify the sender immediately and destroy all copies.

Bob_D_Mitchell@nm.blm.gov

03/19/2009 09:22 AM To
Gregory Russell/HQ/SOL/DOI@SOL
cc
Don_Glenn@blm.gov,
Paul_McGuire@nm.blm.gov
Subject
Re: Adoption incentive pilot

BLM_000265

Gregory - Please look over this proposal and let us know if there are any problems with it.

Thanks,
Bob

Don Glenn/WO/BLM/DOI

03/19/2009 08:10 AM To
Bob D Mitchell/MFS/NM/BLM/DOI@BLM
cc
"Gregory Russell"
<Gregory.Russell@sol.doi.gov>
Subject
Re: Adoption incentive pilotLink

Bob, send it to Greg Russell. Gregory.Russell@sol.doi.gov
Don Glenn,
Division Chief
Wild Horse and Burro Program
*********************************************
Sent from my BlackBerry Wireless Handheld

----- Original Message -----
From: Bob D Mitchell
Sent: 03/19/2009 07:57 AM CDT
To: Don Glenn
Cc: Paul McGuire
Subject: Adoption incentive pilot

Hi Don - Holle said you'd like us to run the Adoption Incentive proposal
past a solicitor. If you'll let me know which solicitor you've run the
other proposals thru I'll send it to them. NM's solicitor doesn't have any
working knowledge of the WH&B program but if you want I'll send it to them.


Thanks,
Bob
[attachment "Adoption Incentive Program (rev 5.8.08).docx" deleted by
Gregory Russell/HQ/SOL/DOI] [attachment "NM Adoption Incentive Program (rev
5.8.08) -GR comments 3 ·24·09.docx" deleted by Paul McGuire/MFS/NM/BLM/DOI]
[attachment "Adoption Incentive Program (rev 3.11.09).docx" deleted by Paul
McGuire/MFS/NM/BLM/DOI]

3/27/09

A WHB Pilot Program
Administered by the New Mexico State Office

# Adoption Incentives for Older Horses:
First-Year Care & Feeding Allowances

OVERVIEW

Any qualified individual who adopts an animal through this incentive program will be eligible to receive a first-year care and feeding allowance, payable upon issuance of title after one year.

Primary Objective – To reduce the Wild Horse & Burro (WHB) program's reliance on long-term holding facilities (LTH) as the principle outlet for older animals removed from the public range, thus relieving the budgetary stress these facilities place upon the WHB and other BLM programs.

Secondary Objective – To boost the title rate for adopted animals, thus relieving the agency of the administrative overhead and potential liability posed by the ever-growing backlog of untitled animals.

Duration of Pilot: Two years minimum.

BACKGROUND

The BLM currently houses 22,000 animals in 12 LTHs around the country. These are large private ranches that keep horses under contract at a cost of nearly $500/horse/year. That translates into an annual program cost of $11,000,000, which often must be taken from other program areas such as gathering and compliance. Horses placed in LTH typically live out the remainder of their natural lives there (15-25 years), representing a lifetime cost of approximately $7,500 to $12,500 per horse. Conversely, every horse successfully adopted and titled that would otherwise be sent to LTH represents a lifetime savings to the agency of that same amount.

The need to add, expand or renew LTH contracts can implicate provisions of the Endangered Species Act. The required consultations and resulting monitoring/mitigation measures add considerable "hidden" costs to the administration of the LTH program.

Horses sent to LTH are generally those for which adoption demand is thought (or known) to be relatively low. There are two main categories of horses that meet this criterion:

- Mature horses (generally 6-10 years old) gathered from the public range in the normal course of herd management. This is the principal target group of this incentive program;

BLM_000268

3/27/09

- Older horses (11 years-plus), ineligible for adoption per a 2004 amendment to the Wild Free-Roaming Horses and Burros Act (commonly known as the Burns Amendment). The only legal means of disposing of these animals is sale or euthanasia, therefore they are not targetable by this adoption incentive program.

A third category of horses held (temporarily) in LTH are younger ones born of recently-gathered adult mares. Since adoption demand for younger animals is comparatively strong, they are purposefully not targeted by this incentive program.

## EXECUTION

Available Horses – This program will rely on the supply of eligible horses in short-term holding facilities, including those recently gathered from the range, that have yet to reach LTH. Horses that reach LTH will not be used, as these facilities are not staffed for routine sorting and shipping of animals.

Adoption Rules – All standard adoption rules and fees apply. Adopters must meet all requirements necessary for approval and abide by all PMACA terms and conditions.

Incentive Amounts – $500 first-year care and feeding allowance for mature horses (6-10 years old). No incentive for younger horses (5 years old and under) and burros.

Incentive Payments – Incentives are payable only upon issuance of title after one year. If a horse is relinquished or dies before title is issued, the incentive offer is voided. Payments will be made by means of convenience check issued by the titling office. Funds will be charged against LTH animal feed days for the year in which title is issued.

Titling – Titling under this incentive program will be carried out in much the same way as with conventional adoptions (that is, after one year the adopter will receive a title application in the mail and will complete and return it to the issuing office for processing). In order to receive the incentive payment offered under this program, the title application must include certification of the animal's fitness by a licensed veterinarian or BLM compliance inspector. This rule is meant to ensure the highest level of professional assessment in authorizing incentive payments. Other conventional methods of certification (e.g., county extension agent, farrier; ag teacher, etc.) will be acceptable for issuing title only, not incentive payments.

Mandatory Compliance – All horses adopted under the terms of this incentive program will be added to a mandatory compliance list. Prior to titling, a BLM inspector must personally verify that the animals are fit and are being properly cared for.

Budget Implications – This incentive program is designed to be budget-neutral in the short term, since the $500 first-year care and feeding allowance is equal to what it would otherwise cost BLM to hold an animal in LTH for one year (hence the rationale for charging incentive payments against LTH feed days). The full impact that this incentive program could have on the

3/27/09

WHB budget if successfully implemented nationally has yet to be analyzed in detail, but it is safe to assume that fewer additions to LTH over time, coupled with predictable death rates, will reduce the budgetary scope of LTH relative to other critical WHB program areas.

Public Affairs – An aggressive public information and marketing campaign will precede and accompany the implementation of this pilot program. All available media will be employed to educate the public (TV, radio, print, web, direct mail, signage, fairs/expos, briefings/meetings, etc.). Key points to be emphasized in the communications plan:

- Tremendous cost savings potential for taxpayers; and
- Continued concern for the welfare of animals removed from the public range. As with standard adoption terms, this incentive program is structured to prevent the possibility of abuse/neglect and/or commercial exploitation.

SUMMARY

Incentive payments offered to adopters of selected older animals will curtail population growth in LTH and thereby positively impact the WHB budget, enabling more effective management of this valuable resource.

| | |
|---|---|
| **From:** | Dean_Bolstad@blm.gov |
| **To:** | Don_Glenn@blm.gov |
| **Cc:** | Paul_McGuire@nm.blm.gov |
| **Bcc:** | blm@bridge1.iggbcloud.local |
| **Subject:** | Fw: Adoption incentive pilot |
| **Date:** | Monday, March 30, 2009 10:30:06 AM |
| **Attachments:** | NM Adoption Incentive Program (rev 5.8.08) -GR comments 3·24·09.docx |
| | Adoption Incentive Program (rev 3.11.09).docx |

Don,
Here are a few thoughts from Bea on the NM Pilot proposal.

Dean Bolstad
Deputy Division Chief
Wild Horse and Burro Program
(775) 861-6611(office)
(775) 750-6362 (cell)
----- Forwarded by Dean Bolstad/NVSO/NV/BLM/DOI on 03/30/2009 07:25 AM
-----

Bea
Wade/NVSO/NV/BLM/
DOI To
Dean Bolstad/NVSO/NV/BLM/DOI@BLM
03/27/2009 04:50 cc
PM Don_Glenn@blm.gov, Jenna
Whitlock/WO/BLM/DOI@BLM, Lili
Thomas/NVSO/NV/BLM/DOI@BLM
Subject
Re: Fw: Adoption incentive pilot
(Document link: Dean Bolstad)

Have a few thoughts:

1. Need to be clear on whether the incentive fee is based on age at
adoption or age at title. All will be one year older. Should be adoption
year.
2. Figure no burros are involved?

3. How do we handle the 4 yr olds that are in the training programs or any animal regardless of age that is trained?
4. For this to work we will need to market so folks can hear about it; will this cause problems with adjacent jurisdictions? Do we need to expand?
5. ████████████████████████████████████████████████████████████████

My 2 cents for the time being. Sounds like a good idea and it could work with the adopt or sale option.

B


Dean
Bolstad/NVSO/NV/B
LM/DOI To
Don_Glenn@blm.gov
03/26/2009 09:53 cc
AM Bea_Wade@nv.blm.gov, Lili
Thomas/NVSO/NV/BLM/DOI@BLM, Jenna
Whitlock/WO/BLM/DOI@BLM
Subject
Fw: Adoption incentive pilot




Further thoughts/discussion on adoption/sale options and effects of them.




Dean Bolstad
Deputy Division Chief
Wild Horse and Burro Program
(775) 861-6611(office)
(775) 750-6362 (cell)
----- Forwarded by Dean Bolstad/NVSO/NV/BLM/DOI on 03/26/2009 09:52 AM -----

Paul

McGuire/MFS/NM/BL
M/DOI To
Dean Bolstad/NVSO/NV/BLM/DOI@BLM
03/25/2009 11:11 cc
PM Bob D Mitchell/MFS/NM/BLM/DOI@BLM
Subject
Fw: Adoption incentive pilot

Dean --

Following up on our conversation this morning about this proposal, you
asked how Fran Ackley's adopt-or-buy concept might affect implementation of
this adoption incentive program.

As you know, I believe our sale program ought to be geared for volume
(wholesale) rather than individual (retail) movement of animals. That said,
I don't believe these two programs are inherently incompatible.



Depending on one's point of view, any one of these scenarios my be preferable. From an adoption standpoint, Scenarios 2 & 3 are clearly best.

Appreciate the opportunity to provide input.

Paul McGuire
Acting NVSO WHB Program Lead
775-861-6469

----- Forwarded by Paul McGuire/MFS/NM/BLM/DOI on 03/25/2009 10:50 PM -----

Bob D
Mitchell/MFS/NM/B
LM/DOI To
Paul McGuire/MFS/NM/BLM/DOI@BLM
03/25/2009 02:58 cc
PM
Subject
Fw: Adoption incentive pilot

Bob and Don --

Greg offers some very useful edits and comments, most (or all) of which can be readily incorporated or addressed:





BLM_000275



Paul McGuire
Public Affairs Specialist
U.S. Bureau of Land Management
Oklahoma Field Office
Moore, OK
Ofc: 405-790-1009
Cell: 405-826-3036


Gregory.Russell@s
ol.doi.gov
To
03/24/2009 05:02 Bob_D_Mitchell@nm.blm.gov
PM cc
Don_Glenn@blm.gov,
Paul_McGuire@nm.blm.gov
Subject
Re: Adoption incentive pilot


Bob and Don,

Thanks for sending me the details of the adoption incentive program. I've
reviewed it and offer these comments and suggestions, the most substantive
of which are Comments 3–6 on page two.

Please don't hesitate to contact me if you have any questions or otherwise
want to discuss this draft. If you make revisions, may you please shoot me
an updated version? Thanks.

_____
Greg Russell
Division of Land and Water Resources
Public Lands Branch
202-208-4327

NOTICE: This email (including attachments) is intended for the use of the
individual or entity to which it is addressed. It may contain information
that is privileged, confidential, or otherwise protected by applicable law.
If you are not the intended recipient, you are hereby notified that any
dissemination, distribution, copying, or use of this email or its content
is strictly prohibited. If you receive this email in error, please notify
the sender immediately and destroy all copies.

Bob_D_Mitchell@nm.blm.gov

03/19/2009 09:22 AM To
Gregory Russell/HQ/SOL/DOI@SOL
cc
Don_Glenn@blm.gov,
Paul_McGuire@nm.blm.gov
Subject
Re: Adoption incentive pilot

Gregory - Please look over this proposal and let us know if there are any
problems with it.

Thanks,
Bob

BLM_000277

Don Glenn/WO/BLM/DOI

03/19/2009 08:10 AM To
Bob D Mitchell/MFS/NM/BLM/DOI@BLM
cc
"Gregory Russell"
<Gregory.Russell@sol.doi.gov>
Subject
Re: Adoption incentive pilotLink

Bob, send it to Greg Russell. Gregory.Russell@sol.doi.gov
Don Glenn,
Division Chief
Wild Horse and Burro Program
*******************************************
Sent from my BlackBerry Wireless Handheld

----- Original Message -----
From: Bob D Mitchell
Sent: 03/19/2009 07:57 AM CDT
To: Don Glenn
Cc: Paul McGuire
Subject: Adoption incentive pilot
Hi Don - Holle said you'd like us to run the Adoption Incentive proposal
past a solicitor. If you'll let me know which solicitor you've run the
other proposals thru I'll send it to them. NM's solicitor doesn't have any
working knowledge of the WH&B program but if you want I'll send it to them.

Thanks,
Bob
[attachment "Adoption Incentive Program (rev 5.8.08).docx" deleted by
Gregory Russell/HQ/SOL/DOI) (See attached file: NM Adoption Incentive
Program (rev 5.8.08) -GR comments 3 ·24·09.docx)(See attached file:
Adoption Incentive Program (rev 3.11.09).docx)

5/8/08



A WHB Pilot Program
Administered by the New Mexico State Office

# Adoption Incentives for Older Horses:
First-Year Care & Feeding Allowances

## OVERVIEW

Any qualified individual who adopts an animal through this incentive program will be eligible to receive a first-year care and feeding allowance, payable upon issuance of title after one year.

Primary Objective – To reduce the Wild Horse & Burro (WHB) program's reliance on long-term holding facilities (LTHF) as the principle outlet for older animals removed from the public range, thus relieving the budgetary stress these facilities place upon the WHB and other BLM programs.

Secondary Objective – To boost the title rate for adopted animals, thus relieving the agency of the administrative overhead and potential liability posed by the ever-growing backlog of untitled animals.

Duration of Pilot: Two years minimum, starting October 2008.

## BACKGROUND

The BLM currently houses 22,000 animals in 12 LTHFs around the country. These are large private ranches that keep horses under contract at a cost of nearly $500/horse/year. That translates into an annual program cost of $11,000,000, which often must be taken from other program areas such as gathering and compliance. Horses placed in LTHF typically live out the remainder of their natural lives there (15-25 years), representing a lifetime cost of approximately $7,500 to $12,500 per horse. Conversely, every horse successfully adopted and titled that would otherwise be sent to LTHF represents a lifetime savings to the agency of that same amount.

The need to add, expand, or renew LTHF contracts can implicate provisions of the Endangered Species Act. The required consultations and resulting monitoring/mitigation measures add considerable "hidden" costs to the administration of the LTHF program.

Horses sent to LTHF are generally those for which adoption demand is thought (or known) to be relatively low. There are two main categories of horses that meet this criterion:

- Older horses (generally 6-10 years old) gathered from the public range in the normal course of herd management. This is the principal target group of this incentive program;

BLM_000279

# Summary of Comments on _p.20090330.1030b.email.Glenn.re_NMPilot.att.pdf

## Page: 1

Number: 1        Author: Greg Russell        Date: 3/24/2009 5:00:00 PM

Number: 2        Author: Greg Russell        Date: 3/24/2009 10:30:00 AM

5/8/08

- Certain horses ineligible for adoption per a 2004 amendment to the Wild Free-Roaming Horses and Burros Act (commonly known as the Burns Amendment). These animals are very old (11 years plus) and may only be removed from LTHF if sold under the terms of the Burns Amendment.

A third category of animals held (temporarily) in LTHF are younger ones born of recently-gathered older mares. Since adoption demand for younger animals is comparatively strong, they are not targeted by this incentive program.

EXECUTION

Adoption Rules – All standard adoption rules and fees apply. Adopters must meet all requirements necessary for approval and abide by all PMACA terms and conditions.

Incentive Amounts –This is a two-tiered incentive program, with a greater incentive offered for older horses and a lesser incentive for mid-aged horses. No incentive is offered for younger horses and burros.

- Older horses (6-10 years) – First-year care and feeding allowance of $500.
- Mid-aged horses (4-5 years) – First-year care and feeding allowance of $250.
- Younger horses (3 years and under) and burros – No incentive offered.

Incentive Payments – Incentives are payable only upon issuance of title after one year. If a horse is relinquished or dies before title is issued, the incentive offer is voided. Payments will be made by means of convenience check issued by the titling office. Funds will be charged to WO 260 FY 1060 HH 269A (see Budget Implications for further explanation).

Titling – Titling under this incentive program will be carried out in much the same way as with conventional adoptions (that is, after one year the adopter will receive a title application in the mail and will complete and return it to the issuing office for processing). In order to receive the incentive payment offered under this program, the title application must include certification of the animal's fitness by a licensed veterinarian or BLM compliance inspector. This rule is to ensure the highest level of professional assessment in authorizing incentive payments. Other conventional methods of certification (e.g., county extension agent, farrier; ag teacher, etc.) will be acceptable for issuing title only, not incentive payments.

Mandatory Compliance – All horses adopted under the terms of this incentive program will be added to a mandatory compliance list. Prior to titling, a BLM inspector must personally verify that the animals are fit and properly cared for.

Budget Implications – This incentive program should be budget-neutral in the short term, since the $250 or $500 first-year care and feeding allowances (as applicable), are less than or equal to what it would otherwise cost BLM to hold an animal in LTHF for one year (hence the rationale for charging incentive payments to 1060 HH 269A). The full impact that this incentive program

# Page: 2



5/8/08

could have on the LTHF budget if successfully implemented nationally has yet to be analyzed in detail, but it is safe to assume that fewer additions to LTHF, coupled with predictable death rates over time, will reduce the budgetary scope of LTHF relative to other critical WHB program areas.

Public Affairs – An aggressive public information and marketing campaign will precede and accompany the implementation of this pilot program. All available media will be employed to educate the public (TV, radio, print, web, direct mail, signage, fairs/expos, briefings/meetings, etc.). Key points to be emphasized in the communications plan:

- Tremendous cost savings potential for taxpayers; and
- Continued concern for the welfare of animals removed from the public range. As with standard adoption terms, this incentive program is structured to prevent the possibility of abuse/neglect and/or commercial exploitation by unscrupulous adopters.

## SUMMARY

Incentive payments offered to adopters of selected older animals will curtail population growth in LTHF and thereby positively impact the WHB budget, enabling more effective management of this valuable resource.

Page: 3

Number: 1          Author: Greg Russell          Date: 3/24/2009 5:39:00 PM

BLM_000284

3/11/09

A WHB Pilot Program
Administered by the New Mexico State Office

# Adoption Incentives for Older Horses:
First-Year Care & Feeding Allowances

OVERVIEW

Any qualified individual who adopts an older animal targeted by this incentive program will be eligible to receive a first-year care and feeding allowance, payable upon issuance of title after one year.

Primary Objective – To reduce the Wild Horse & Burro (WHB) program's reliance on long-term holding facilities (LTH) as the principle outlet for older animals removed from the public range, thus relieving the budgetary stress these facilities place upon the WHB and other BLM programs.

Secondary Objective – To boost the title rate for adopted animals, thus relieving the agency of the administrative overhead and potential liability posed by the ever growing backlog of untitled animals.

Duration of Pilot: Two years minimum.

BACKGROUND

The BLM currently houses 22,000 animals in 12 LTHs around the country. These are large private ranches that keep horses under contract at a cost of nearly $500/horse/year. That translates into an annual program cost of $11,000,000, which often must be taken from other program areas such as gathering, compliance, etc. Horses placed in LTH typically live out the remainder of their natural lives there (15-25 years), representing a potential lifetime cost of $12,500/horse. Conversely, every horse successfully adopted and titled – and therefore *not* ultimately sent to LTH – represents a lifetime savings to the agency of that same amount.

The need to add, expand or renew LTH contracts often implicates provisions of the Endangered Species Act. The required consultations and resulting monitoring/mitigation measures add considerable "hidden" costs to the administration of the LTH program.

Horses sent to LTH are generally those for which adoption demand is thought (or known) to be relatively low. There are two main categories of horses that meet this criterion:

- Older horses (generally 6-10 years) gathered from the public range in the normal course of herd management. This is the principal target group of this incentive program;

3/11/09

- Older horses (11 years +), ineligible for adoption per a 2004 amendment to the Wild Free-Roaming Horses and Burros Act (commonly known as the Burns Amendment). These animals may only be transferred to private ownership if sold under the terms of the Burns Amendment and therefore are not targetable by this adoption incentive program.

A third category of horses held (temporarily) in LTH are younger ones born of recently-gathered older mares. Since adoption demand for younger animals is comparatively strong, they are purposefully not targeted by this incentive program.

EXECUTION

Adoption Rules – All standard adoption rules and fees apply. Adopters must meet all requirements necessary for approval and abide by all PMACA terms and conditions.

Incentive Amounts –This is a two-tiered incentive program, with a greater incentive offered for older horses and a lesser incentive for mid-aged horses. No incentive is offered for younger horses and burros.

- Older horses (6-10 years) – First-year care and feeding allowance of $500.
- Mid-aged horses (4-5 years) – First-year care and feeding allowance of $250.
- Younger horses (3 years and under) and burros – No incentive offered.

Incentive Payments – Incentives are payable only upon issuance of title after one year. If a horse is relinquished or dies before title is issued, the incentive offer is voided. Payments will be made by means of convenience check issued by the titling office. Funds will be charged against LTH animal feed days for the year in which title is issued.

Titling – Titling under this incentive program will be carried out in much the same way as with conventional adoptions (that is, after one year the adopter will receive a title application in the mail and will complete and return it to the issuing office for processing). In order to receive the incentive payment offered under this program, the title application must include certification of the animal's fitness by a licensed veterinarian or BLM compliance inspector. This rule is meant to ensure the highest level of professional assessment in authorizing incentive payments. Other conventional methods of certification (e.g., county extension agent, farrier; ag teacher; etc.) will be acceptable for issuing title only, not incentive payments.

Mandatory Compliance – All horses adopted under the terms of this incentive program will be added to a mandatory compliance list. At some point prior to titling, a BLM inspector will personally verify that the animals are fit and are being properly cared for.

Budget Implications – This incentive program is designed to be budget neutral in the short term, since the $250 or $500 first-year care and feeding allowances (as applicable), are less than or equal to what it would otherwise cost BLM to hold an animal in LTH for one year (hence

3/11/09

the rationale for charging incentive payments against LTH feed days). The full impact that this incentive program could have on the LTH budget if successfully implemented nationally has yet to be analyzed in detail; but it is safe to assume that fewer additions to LTH over time, coupled with predictable death rates, will reduce the budgetary scope of LTH relative to other critical WHB program areas.

Public Affairs – An aggressive public information and marketing campaign will precede and accompany the implementation of this pilot program. All available media will be employed to educate the public (TV, radio, print, web, direct mail, signage, fairs/expos, briefings/meetings, etc.). Key points to be emphasized in the communications plan:

- Tremendous cost savings potential for taxpayers;
- Continued concern for the welfare of animals removed from the public range. As with standard adoption terms, this incentive program is structured to prevent the possibility of abuse/neglect and/or commercial exploitation.

## SUMMARY

Incentive payments offered to adopters of selected older animals will curtail population growth in LTH and thereby positively impact the WHB budget, enabling more effective management of this valuable resource.

| | |
|---|---|
| **From:** | Jenna_Whitlock@blm.gov |
| **To:** | Don_Glenn@blm.gov |
| **Bcc:** | blm@bridge1.iggbcloud.local |
| **Subject:** | Re: Fw: reverse auction |
| **Date:** | Tuesday, March 31, 2009 4:54:06 PM |

I think that the recent ideas to try get more horses into private hands
(this reverse auction, the exemption for the Sulphur Herd horses, and the
New Mexico incentives "pilot") are all innovative ideas. But... I think
that doing them before we have our programs/policies in place could
jeopardize our plans to use them widely in the future.

What I'm trying to say is that I think the cart is before the horse. I
think we should hold off on these three things and focus on getting the IMs
out on sale eligibility and national incentives. That way we get all our
legal issues ironed out with the SOL before moving forward.

Sorry to be a risk-averse curmudgeon. I just think we're too much in the
public eye to appear to be winging it. j

Jenna Whitlock
BLM Wild Horse and Burro Program
(202) 452-5115

Don
Glenn/WO/BLM/DOI
To
03/31/2009 03:32 Dean_Bolstad@blm.gov, Susie
PM Stokke/NVSO/NV/BLM/DOI@BLM, Bob D
Mitchell/MFS/NM/BLM/DOI@BLM,
Sally_Spencer@blm.gov,
jeannine_lesieutre@blm.gov,
Jenna_Whitlock@blm.gov
cc

Subject
Fw: reverse auction

Hi Folks, see email from Patti Colbert. She can conduct a reverse auction

for $1500 per head, about what we anticipated for the incentive program.
Lili had these comments:
When you do a reverse auction we are paying the adopters, since we can
not (BLM) then we are giving the $$ to the foundation so they can pay
the adopters.
We need to make sure that the money is slated for marketing, or other
related items, and not for giving to the adopters.
Have we contacted OK to make sure that they are available and willing to
do this auction?
The total $$ amount would b $375,000 for this event, do we have the
extra $$ this year.
How would the adoption fee be paid, and would we reduce the fee?
I feel that the horses should be 2 to 4 years old geldings, no
restriction on size or color. This way we could see what people are
willing to take, could be interesting.

For the most part it would be interesting to see how this would work,
and if the foundation could make this work, and if we could legally use
sale horses instead of adopted horses.

Since this would be part of the stewardship incentive program, we could
probably tell Patti we could committ the funding by the 7th, but need to
get the solcitors buy-off and ensure we can do a mod to her agreement to
accomodate before we can fully commit.

What do you all think?

Don Glenn
Division Chief
Wild Horses and Burros

Office: 202-452-5082
Cell: 202-744-6697
Fax: 202-653-9084
----- Forwarded by Don Glenn/WO/BLM/DOI on 03/31/2009 03:10 PM -----

Plcolbert@aol.com

03/31/2009 03:02 To
PM Don_Glenn@blm.gov
cc

Subject
Re: reverse auction

I'm going to be meeting with Superior on April 7, next Tuesday. I need a budget before I go visit with them. I don't think our $850 per horse is going to have much room in it - but I could try to start there.

Typically a sale company charges a fee plus commission. Because of the reverse auction concept, I'm going to assume that they will want a flat fee, perhaps a per head basis. If we talk about 200 head of horses, then they will probably want around $40,000 - that's just a guess. If we want to do RFD-TV (which Superior) has their own show, it might be more.

So if we pay Superior $200 a head, then the Foundation retains $250 per head for Administration/promotion, that only leaves us $400 to cap the payout on paying adopters to take each horse.

I can try that, but these are big boys and I think they will want more, but I can start there I guess.
A Good Credit Score is 700 or Above. See yours in just 2 easy steps!


Plcolbert@aol.com
To
03/31/2009 09:38   don_glenn@blm.gov
AM cc

Subject
reverse auction




Don - I have a meeting scheduled next with with Superior Livestock. If we do a pilot program with 250 horses, can you spend $1,500 per a horse? BLM responsibility will be as follows:

Select horses
Take photo of each horse for web site promotion (horses listed on BLM, MHF and Superior web sites)
Hold the horses in one BLM facility. (Oklahoma)
Sale Company will come to the BLM facility and hold video auction from that facility.
Adopters will come to that facility to pick up horses within a certain time frame.
It would help our efforts if horses would be available for pick up at two facilities, but I know that would require hauling once horses were sold

through adoption (Oklahoma and Reno).

The reason I ask $1500 per horse is because I'd like to work with Superior to do a RFD television special on this event. I'm guessing that would be at least $25,000 with production and air time.

We think we could get this done before October 1, but we'd have to hurry. I have a conference call with my trustees today at 3 pm Central. Give me a budget and I'll try to make something happen.

| From: | Paul_McGuire@nm.blm.gov |
|---|---|
| To: | Don Glenn |
| Cc: | Bob Mitchell |
| Bcc: | blm@bridge1.iggbcloud.local |
| Subject: | Fw: Adoption Incentive Form |
| Date: | Friday, April 3, 2009 9:54:00 AM |
| Attachments: | ADOPTION INCENTIVE PROGRAM.docx |

Don - got your email approving the pilot. I'm certain we can make the adjustments you noted. Attached is a draft form that we would provide eligible adopters. My commets back to Bob are pasted below. The final will incorporate any necessary changes. I suspect we can start this pilot as early as our Abilene adoption (April 23-25), or at least by Kellyville, OK (May 7-9).

FYI - Bob is at an adoption in Albuquerque right now, and his BlackBerry email is down, so I doubt he's seen your message yet; probably won't see it until he logs on at the hotel this evening. But I'll give him a call this morning to discuss.

Thanks. Hope this all goes well. Will be in touch.

Paul


My reply to Bob:

Looks good. The only things I'd change:

███████████████████████████████

Delete the bullet regarding younger horses and burros, since no one adopting one of those animals would be receiving one of these incentive forms anyway.

Thx,

Paul


----- Original Message -----
From: Bob D Mitchell
Sent: 04/01/2009 07:15 PM MDT
To: Paul McGuire
Subject: Fw: Adoption Incentive Form
Your Thoughts? I'll show it to the team tomorrow.

----- Forwarded by Bob D Mitchell/MFS/NM/BLM/DOI on 04/01/2009 08:13 PM -----

Kris
Rittenberry/MFS/N
M/BLM/DOI To
Bob D Mitchell/MFS/NM/BLM/DOI@BLM

04/01/2009 05:37 cc
PM
Subject
Adoption Incentive Form

(See attached file: ADOPTION INCENTIVE PROGRAM.docx)

Here is my first shot, let me know what you think.

BLM_000293

# ADOPTION INCENTIVE PROGRAM

Any qualified individual who adopts an older animal targeted by this incentive program will be eligible to receive a first-year care and feeding allowance, payable upon issuance of the title after one year.

Incentive amounts:

- **Older horses (6-10 years)** – First –year care and feeding allowance of **$500**.
- **Mid-aged horses (4-5 years)** – First-year care and feeding allowance of **$250**.
- **Younger horses (3 years and under) and burros- No incentive offered.**

If a horse is relinquished or dies before title is issued, the incentive offer is voided.

In order to receive the incentive payment offered under this program, the **Title application must be signed by a licensed veterinarian certificating the animal's fitness along with this form.**

Other conventional methods of certification (e.g., county extension agent; farrier; ag teacher; etc) will be acceptable for issuing **Title only, not incentive payments.**

**ANIMAL FREEZEMARK:** _____

**SIGNALMENT KEY:** _____

**Adopter name:** _____  **Date:** _____

**Licensed Veterinarian (print name):**_____

**Licensed Veterinarian phone number:** _____

**Licensed Veterinarian address:** _____

**Licensed Veterinarian (signature):** _____ **Date:** _____

BLM_000294

| | |
|---|---|
| **From:** | Don_Glenn/WO/BLM/DOI%BLM%DOI@sol.doi.gov |
| **To:** | Gregory_Russell/HQ/SOL/DOI%BLM%DOI@sol.doi.gov |
| **Cc:** | Amy Sosin; Jesse Juen |
| **Bcc:** | sol@bridge1.iqqbcloud.local |
| **Subject:** | New Mexico Adoption Incentive Pilot |
| **Date:** | Friday, April 3, 2009 11:20:14 AM |

Greg,

████████████████████████████████████████

Don Glenn,
Division Chief
Wild Horse and Burro Program
*******************************************
Sent from my BlackBerry Wireless Handheld

| | |
|---|---|
| **From:** | Jesse_Juen@blm.gov |
| **To:** | Don_Glenn@blm.gov |
| **Cc:** | Amy Sosin; Gregory.Russell@sol.doi.gov; Edwin_Roberson@blm.gov; Janine_Velasco@blm.gov |
| **Bcc:** | sol@bridge1.iqgbcloud.local |
| **Subject:** | Re: New Mexico Adoption Incentive Pilot |
| **Date:** | Friday, April 3, 2009 12:57:11 PM |

Don thank you for checking on this. ███████████████████████
████████████████          It would be great if we can clear up the
concerns/confusion. Thank you very much.

Jesse


Don
Glenn/WO/BLM/DOI
To
04/03/2009 09:19 Gregory Russell/HQ/SOL/DOI
AM cc
"Amy Sosin"
<Amy.Sosin@sol.doi.gov>, "Jesse
Juen" <Jesse_Juen@blm.gov>
Subject
New Mexico Adoption Incentive Pilot


Greg,
████████████████████████████████
████████████████████████████████
██████████

Don Glenn,
Division Chief
Wild Horse and Burro Program
*******************************************
Sent from my BlackBerry Wireless Handheld

BLM_000296

| | |
|---|---|
| **From:** | Bob_D_Mitchell@nm.blm.gov |
| **To:** | Don_Glenn@blm.gov |
| **Cc:** | Dean_Bolstad@blm.gov; jeannine_lesieutre@blm.gov; Jenna_Whitlock@blm.gov; Sally_Spencer@blm.gov; Susie_Stokke@blm.gov; Linda_Rundell@blm.gov; Jesse_Juen@blm.gov; John_Mehlhoff@blm.gov; Pat_Hofmann@nm.blm.gov; Gary_Hughes@nm.blm.gov; Patrick_Williams@nm.blm.gov; Holle_Hooks@nm.blm.gov; Cody_Bedford@nm.blm.gov; Jimmy_Galloway@nm.blm.gov; Paul_McGuire@nm.blm.gov; Kris_Rittenberry@blm.gov; Crystal_Cowan@blm.gov |
| **Bcc:** | blm@bridge1.iggbcloud.local |
| **Subject:** | Re: Fw: reverse auction |
| **Date:** | Monday, April 6, 2009 2:32:10 PM |

Linda and Jesse suggest that if several incentive programs are being conducted concurrently that it would make it very confusing to the public. We propose to do the NM pilot for a period of time before implementing new incentive proposals.

The MHF proposal (except for the paying people to adopt) is very similar to the Satellite Adoptions that used to be run by Nevada. Therefore, BLM has some experience in conducting these events with Superior Livestock. I will address my comments based on the concept since we don't have a detailed proposal.

It appears that Pauls Valley is the recommended location to conduct this auction. Pauls Valley consists of two separate locations. The only way to get animals form one location to another is to transport them in a gooseneck trailer and that is also weather dependent. The 200 - 250 head would need to stay in the pastures surrounding the facility office until the auction is completed. The adoptable animals would be in the North pasture. This would severely hamper our ability to adopt animals at the facility and provide animals to ours and SE Eastern States. We would need to ship animals from Pauls Valley to make room for these animals. To video the animals at Pauls Valley the pen that connects to our chute is 25' X 30'. To adequately present the animals in a video would require us to construct a larger pen for this event. I also don't know when this event would occur but Pauls Valley is already scheduled to receive animals for the EMM events in Ft Worth and Tennessee so that may also become a issue. If animals are to be shipped after the event to other facilities then BLM would pay to ship the animals from the West to Pauls Valley only to pay the shipping costs to ship them back West. And as your aware, Pauls Valley only has two employees to do all that is required at a WH&B facility.

Now with that said as to why Pauls Valley is not the perfect location here is my suggestion.

I assume that the animals would be coming from PVC/Fallon. I suggest that the animals be video taped there as they were in the previous Satellite adoptions. Then once that has been completed do one of these two options. Option A: After the auction is completed they could be shipped to the facility closest to where the adopter is located (as has been done for Satellite and Internet adoptions).
Option B: Ship one load to each facility before the auction and those are the only animals available for adoption at that facility for this event.

I would also suggest that this event have the same parameters as the NM Adoption Incentive Pilot. Age of animals (4 and older) and incentive amount ($500) would be the same so that an analysis could be conducted as to which would be a better way of conducting business. If the parameters are not the some, the proposal that gives the most money or has younger animals has an advantage from the beginning.

Call me if you'd like to discuss in further detail!

Bob




Don
Glenn/WO/BLM/DOI
To
03/31/2009 02:32 Dean_Bolstad@blm.gov, Susie
PM Stokke/NVSO/NV/BLM/DOI@BLM, Bob D
Mitchell/MFS/NM/BLM/DOI@BLM,
Sally_Spencer@blm.gov,
jeannine_lesieutre@blm.gov,
Jenna_Whitlock@blm.gov
cc

Subject
Fw: reverse auction




Hi Folks, see email from Patti Colbert. She can conduct a reverse auction for $1500 per head, about what we anticipated for the incentive program. Lili had these comments:
When you do a reverse auction we are paying the adopters, since we can not (BLM) then we are giving the $$ to the foundation so they can pay the adopters.
We need to make sure that the money is slated for marketing, or other related items, and not for giving to the adopters.
Have we contacted OK to make sure that they are available and willing to do this auction?
The total $$ amount would b $375,000 for this event, do we have the extra $$ this year.
How would the adoption fee be paid, and would we reduce the fee?
I feel that the horses should be 2 to 4 years old geldings, no

restriction on size or color. This way we could see what people are willing to take, could be interesting.

For the most part it would be interesting to see how this would work, and if the foundation could make this work, and if we could legally use sale horses instead of adopted horses.

Since this would be part of the stewardship incentive program, we could probably tell Patti we could commit the funding by the 7th, but need to get the solcitors buy-off and ensure we can do a mod to her agreement to accomodate before we can fully commit.

What do you all think?

Don Glenn
Division Chief
Wild Horses and Burros

Office: 202-452-5082
Cell: 202-744-6697
Fax: 202-653-9084
----- Forwarded by Don Glenn/WO/BLM/DOI on 03/31/2009 03:10 PM -----

Plcolbert@aol.com

03/31/2009 03:02 To
PM Don_Glenn@blm.gov
cc

Subject
Re: reverse auction

I'm going to be meeting with Superior on April 7, next Tuesday. I need a budget before I go visit with them. I don't think our $850 per horse is going to have much room in it - but I could try to start there.

Typically a sale company charges a fee plus commission. Because of the reverse auction concept, I'm going to assume that they will want a flat fee, perhaps a per head basis. If we talk about 200 head of horses, then they will probably want around $40,000 - that's just a guess. If we want to do RFD-TV (which Superior) has their own show, it might be more.

So if we pay Superior $200 a head, then the Foundation retains $250 per head for Administration/promotion, that only leaves us $400 to cap the payout on paying adopters to take each horse.

I can try that, but these are big boys and I think they will want more, but I can start there I guess.
A Good Credit Score is 700 or Above. See yours in just 2 easy steps!

Plcolbert@aol.com
To
03/31/2009 09:38    don_glenn@blm.gov
AM cc

Subject
reverse auction

Don - I have a meeting scheduled next with with Superior Livestock. If we do a pilot program with 250 horses, can you spend $1,500 per a horse? BLM responsibility will be as follows:

Select horses
Take photo of each horse for web site promotion (horses listed on BLM, MHF and Superior web sites)
Hold the horses in one BLM facility. (Oklahoma)
Sale Company will come to the BLM facility and hold video auction from that facility.
Adopters will come to that facility to pick up horses within a certain time frame.
It would help our efforts if horses would be available for pick up at two facilities, but I know that would require hauling once horses were sold through adoption (Oklahoma and Reno).

The reason I ask $1500 per horse is because I'd like to work with Superior to do a RFD television special on this event. I'm guessing that would be at least $25,000 with production and air time.

We think we could get this done before October 1, but we'd have to hurry. I have a conference call with my trustees today at 3 pm Central. Give me a budget and I'll try to make something happen.

BLM_000300

| From: | Don_Glenn@blm.gov |
|---|---|
| To: | Dean_Bolstad@blm.gov |
| Bcc: | blm@bridge1.iggbcloud.local |
| Subject: | Re: Reverse Auction & NM Pilot, Convenience Checks, other stuff |
| Date: | Wednesday, April 8, 2009 9:21:17 AM |

Dean,

On the Reverse Auction, Just talked to Patti, They will hold the funds in a trust for a year, and at the end of the year, the adopters will get a payment with interest.

Don Glenn
Division Chief
Wild Horses and Burros

Office: 202-452-5082
Cell: 202-744-6697
Fax: 202-653-9084

Dean
Bolstad/NVSO/NV/B
LM/DOI To
Don_Glenn@blm.gov
04/07/2009 06:25 cc
PM
Subject
Reverse Auction & NM Pilot,
Convenience Checks, other stuff

Don,

Field Concerns about Reverse Auction
I talked with Bea and Lili further about reverse auction and NM Pilot.



What is the best instrument of payment for incentive proposed in the NM
Pilot

I talked to the lead Nevada procurement lady. Here opinion is that
convenience checks are the best method of payment. If we do anything
else then the payee would have to register a DUNs number in the
government system and it would be a nightmare. In order to use
convenience checks we have to be paying for goods and services. It
would be a service of caring for the horse for a year and payment can't
exceed $2,500 per fiscal year. Convenience checks can't be used for
incentive payments, only goods and services. If we want to call it an
incentive payment to adopt, then current policy for convenience checks
would need to be changed which could be done. This would probably
involve an IM to present an amendment to a manual. She said we should
talk to WO-800 to work through this. If we don't get this resolved
every person who has authority to write convenience checks will probably
be asking questions.

I have a few other things in regards to NM pilot and reverse auction that I
want to share, but I'm out of time. Lets talk tomorrow.


Dean Bolstad
Deputy Division Chief
Wild Horse and Burro Program
(775) 861-6611(office)
(775) 750-6362 (cell)

**From:**          Bob_D_Mitchell@nm.blm.gov
**To:**            Don Glenn; Paul_McGuire@nm.blm.gov
**Bcc:**           blm@bridge1.iggbcloud.local
**Subject:**       Re: Fw: Adoption Incentive Form
**Date:**          Wednesday, April 8, 2009 2:05:18 PM
**Attachments:**   ADOPTION INCENTIVE PROGRAM.docx

Here's the latest version of the form we'd use.  The idea is that it will be a two part form with the adopter signing it and BLM keeping the original for the file and the adopter gets the copy.

I'm sure we'll modify this again before the pilot takes off.

    Bob

BLM_000303

# ADOPTION INCENTIVE PROGRAM

As a qualified individual who adopted a mature animal targeted by this incentive program you will be eligible to receive your first-year care and feeding allowance, payable upon issuance of the title after one year.

Incentive amount:

- **Mature horses (4-10 years)** – First-year care and feeding allowance of **$500**.

If your horse is relinquished, dies or your PMACA is cancelled before title is issued, the incentive offer is void.

In order to receive the incentive payment offered under this program, the **<u>Title application must be signed by a licensed veterinarian certificating the animal's fitness along with this form within 6 months of your title eligibility date.</u>**

**ANIMAL FREEZEMARK:**  _____

**SIGNALMENT KEY:**  _____

**Adopter Name:**  _____     **Date:** _____

Mail this form along with your title application to:
**Bureau of Land Management**
**Oklahoma Field Station**
**221 N. Service Road**
**Moore, OK 73160**

BLM_000304

**Nathan, Alexi L**

---

**From:**        Don_Glenn@blm.gov
**Sent:**        Tuesday, April 14, 2009 8:20 AM
**To:**          Bob_D_Mitchell@nm.blm.gov; Paul_McGuire@nm.blm.gov
**Cc:**          Dean_Bolstad@blm.gov; Sally_Spencer@blm.gov; Jenna_Whitlock@blm.gov;
                 jeannine_lesieutre@blm.gov; Edwin_Roberson@blm.gov; Bud_Cribley@blm.gov
**Subject:**     Fw: New Mexico pilot program
**Attachments:** Adoption Incentive Program (rev 3.27.09) -SOL comments comments.docx; Destruction and sale
                 memo.June 23 2008.doc

Bob and Paul,
See Amy Sosin's comments below on the NM Pilot. ████████████████████████████
████████████████      ████████████████████████████████████

Don Glenn
Division Chief
Wild Horses and Burros

Office: 202-452-5082
Cell: 202-744-6697
Fax: 202-653-9084
----- Forwarded by Don Glenn/WO/BLM/DOI on 04/14/2009 08:16 AM -----

            Gregory
            Russell/HQ/SOL/DO
            I@SOL                        To
                        Don Glenn/WO/BLM/DOI@BLM
            04/13/2009 10:01             cc
            AM
                                Subject
                        New Mexico pilot program

Don,

Here is the mark-up for the New Mexico program. As you can see, Amy added comments, as well. I will look into the
procurement issue.

1

Also attached is the draft document that you requested, ███████████████████
████████████████████████████████

(See attached file: Adoption Incentive Program (rev 3.27.09) -SOL comments comments.docx)(See attached file: Destruction and sale memo.June 23 2008.doc)
_____
Greg Russell
Division of Land and Water Resources
Public Lands Branch
202-208-4327

NOTICE: This email (including attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected by applicable law.
If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or use of this email or its content is strictly prohibited. If you receive this email in error, please notify the sender immediately and destroy all copies.

BLM_000306

3/27/09

## A WHB Pilot Program
### Administered by the New Mexico State Office

# Adoption Incentives for Older Horses:
## First-Year Care & Feeding Allowances

OVERVIEW

Any qualified individual who adopts an animal through this incentive program will be eligible to receive a first-year care and feeding allowance, payable upon issuance of title after one year.

Primary Objective – To reduce the Wild Horse & Burro (WHB) program's reliance on long-term holding facilities (LTH) as the principle outlet for older animals removed from the public range, thus relieving the budgetary stress these facilities place upon the WHB and other BLM programs.

Secondary Objective – To boost the title rate for adopted animals, thus relieving the agency of the administrative overhead and potential liability posed by the ever-growing backlog of untitled animals.

Duration of Pilot: Two years minimum.

BACKGROUND

The BLM currently houses 22,000 animals in 12 LTHs around the country. These are large private ranches that keep horses under contract at a cost of nearly $500/horse/year. That translates into an annual program cost of $11,000,000, which often must be taken from other program areas such as gathering and compliance. Horses placed in LTH typically live out the remainder of their natural lives there (15-25 years), representing a lifetime cost of approximately $7,500 to $12,500 per horse. Conversely, every horse successfully adopted and titled that would otherwise be sent to LTH represents a lifetime savings to the agency of that same amount.

The need to add, expand or renew LTH contracts can implicate provisions of the Endangered Species Act. The required consultations and resulting monitoring/mitigation measures add considerable "hidden" costs to the administration of the LTH program.

Horses sent to LTH are generally those for which adoption demand is thought (or known) to be relatively low. There are two main categories of horses that meet this criterion:

- Mature horses (generally 6-10 years old) gathered from the public range in the normal course of herd management. This is the principal target group of this incentive program;

BLM_000307

# Summary of Comments on _p.20090414.0820b.email.Glenn.re_NMPilot.att (1).pdf

## Page: 1



Number: 1        Author: Greg Russell        Date: 4/1/2009 5:29:00 PM

Number: 2        Author: absosin        Date: 4/3/2009 11:39:00 AM

Number: 3        Author: absosin        Date: 4/3/2009 11:38:00 AM

3/27/09

- Older horses (11 years-plus) are not included as part of this adoption incentive program.

A third category of horses held (temporarily) in LTH are younger ones born of recently-gathered adult mares. Since adoption demand for younger animals is comparatively strong, they are purposefully not targeted by this incentive program.

## EXECUTION

Available Horses – This program will rely on the supply of eligible horses in short-term holding facilities, including those recently gathered from the range, that have yet to reach LTH. Horses that reach LTH will not be used, as these facilities are not staffed for routine sorting and shipping of animals. [1]

Adoption Rules – All standard adoption rules and fees apply. Adopters must meet all requirements necessary for approval and abide by all PMACA terms and conditions.

Incentive Amounts – $500 first-year care and feeding allowance for mature horses (6-10 years old). No incentive for younger horses (5 years old and under) and burros.

Incentive Payments – Incentives are payable only upon issuance of title after one year. If a horse is [2] relinquished or dies before title is issued, the incentive offer is voided. Payments will be made by means of convenience check issued by the titling office. Funds will be charged against LTH animal feed days for the year in which title is issued.

Titling – Titling under this incentive program will be carried out in much the same way as with conventional adoptions (that is, after one year the adopter will receive a title application in the mail and will complete and return it to the issuing office for processing). In order to receive the incentive payment offered under this program, the title application must include certification of the animal's fitness by a licensed veterinarian or BLM compliance inspector. This rule is meant to ensure the highest level of professional assessment in authorizing incentive [3] payments. Other conventional methods of certification (e.g., county extension agent, farrier; ag teacher, etc.) will be acceptable for issuing title only, not incentive payments.

Mandatory Compliance – All horses adopted under the terms of this incentive program will be added to a mandatory compliance list. Prior to titling, a BLM inspector must personally verify that the animals are fit and are being properly cared for.

Budget Implications – This incentive program [4] is designed to be budget-neutral in the short term, since the $500 first-year care and feeding allowance is equal to what it would otherwise cost BLM to hold an animal in LTH for one year (hence the rationale for charging incentive payments against LTH feed days). The full impact that this incentive [5] program could have on the WHB budget if successfully implemented nationally has yet to be analyzed in detail, but it anticipated that fewer additions to LTH over time, coupled with predictable death rates, will reduce the budgetary scope of LTH relative to other critical WHB program areas.

BLM_000309

## Page: 2



3/27/09

Public Affairs – An aggressive public information and marketing campaign will precede and accompany the implementation of this pilot program. All available media will be employed to educate the public (TV, radio, print, web, direct mail, signage, fairs/expos, briefings/meetings, etc.). Key points to be emphasized in the communications plan:

- Tremendous cost savings potential for taxpayers; and
- Continued concern for the welfare of animals removed from the public range. As with standard adoption terms, this incentive program is structured to prevent the possibility of abuse/neglect and/or commercial exploitation.

## SUMMARY

Incentive payments offered to adopters of selected older animals will curtail population growth in LTH and thereby positively impact the WHB budget, enabling more effective management of this valuable resource.

BLM_000311

Page: 3

Number: 1        Author: absosin        Date: 4/3/2009 11:48:00 AM

| | |
|---|---|
| **From:** | Gregory.Russell@sol.doi.gov |
| **To:** | Don_Glenn@BLM.GOV |
| **Bcc:** | sol@bridge1.iggbcloud.local |
| **Subject:** | Re: Fw: WH&B question |
| **Date:** | Thursday, April 16, 2009 6:16:03 PM |

Don,

████████████████████████████████████

████████████████████████████████

_____

Greg Russell
Division of Land and Water Resources
Public Lands Branch
202-208-4327

NOTICE: This email (including attachments) is intended for the use of the
individual or entity to which it is addressed. It may contain information
that is privileged, confidential, or otherwise protected by applicable law.
If you are not the intended recipient, you are hereby notified that any
dissemination, distribution, copying, or use of this email or its content
is strictly prohibited. If you receive this email in error, please notify
the sender immediately and destroy all copies.


Don
Glenn/WO/BLM/DOI@
BLM To
Gregory Russell/HQ/SOL/DOI
04/14/2009 01:16 cc
PM Edwin Roberson/WO/BLM/DOI@BLM
Subject
Fw: WH&B question


Greg, know you are busy, but NM is clamoring for an answer.
Don Glenn,

Division Chief
Wild Horse and Burro Program
*******************************************
Sent from my BlackBerry Wireless Handheld


----- Original Message -----
From: Jesse Juen
Sent: 04/14/2009 10:56 AM MDT
To: Edwin Roberson; Janine Velasco
Cc: Bud Cribley; Don Glenn
Subject: WH&B question
Hi Ed/Janine. ████████████████████████████████
████████████████████████ We hope to pilot our effort at our May
adoption in TX. Need some help asap.

Jesse

| From: | Paul_McGuire@nm.blm.gov |
|---|---|
| To: | Bob_D_Mitchell@nm.blm.gov; Don_Glenn@blm.gov |
| Cc: | Dean_Bolstad@blm.gov; Lili_Thomas@blm.gov; Jesse_Juen@blm.gov; John_Mehlhoff@blm.gov |
| Bcc: | blm@bridge1.iggbcloud.local |
| Subject: | Re: Fw: New Mexico pilot program |
| Date: | Friday, April 17, 2009 1:08:17 PM |

I may be stepping outside my lane just a bit, but I wanted to offer a concurring opinion with Bob.

The suggestion that ███████████████████████████████████████ s amended), which is to set clear markers for determining when "the clock runs out" on an animal's adoption eligibility. That is, once an animal accrues "three strikes" or reaches the age of 11 (i.e. no adoption demand exists), the law grants only two options for its disposal: sale or destruction. This has been our reasoned operating assumption since passage of the Burns Amendment in 2004.

I also agree with Bob (and Jesse) that the Solicitor's memo from June 2008 appears to be an internal working draft that wouldn't carry the weight of a formal Opinion. Even so, as I read it, the draft memo doesn't clearly affirm the proposition that ███████████████████████████████

Interestingly, however, on a related matter, ███████████████████████

██████████████████████████████████████████████████

PM


----- Original Message -----
From: Bob D Mitchell
Sent: 04/17/2009 09:56 AM CDT
To: Don Glenn
Cc: Dean Bolstad; Paul McGuire; Lili Thomas; Jesse Juen; John Mehlhoff
Subject: Re: Fw: New Mexico pilot program
As a follow-up to the email yesterday with our comments about the draft sale IM, I wanted to discuss a little more about the Solicitor memo. I had called it a Solicitor Opinion but after discussion with Jesse, he confirmed that it was not an "opinion". It was a "Draft Memorandum" that was developed to advise BLM of its legal authorities and duties under the WH&B Act related to ████████████████████████████ It was not developed to answer the question ████████████████████████

Here's my take on what the Solicitor says about adoption and sales under the ██████████████████████

██████████████████████



Anyway,

Call me if you have any questions about this subject.

Thanks,
Bob

Don
Glenn/WO/BLM/DOI
To
04/14/2009 07:19 Bob D Mitchell/MFS/NM/BLM/DOI@BLM,
AM Paul McGuire/MFS/NM/BLM/DOI@BLM
cc
Dean_Bolstad@blm.gov,
Sally_Spencer@blm.gov,
Jenna_Whitlock@blm.gov,
jeannine_lesieutre@blm.gov, Edwin
Roberson/WO/BLM/DOI@BLM,
Bud_Cribley@blm.gov
Subject
Fw: New Mexico pilot program

BLM_000316

Bob and Paul,
See Amy Sosin's comments below on the NM Pilot. ███████████
████████████████████████████████████████████████████
Also see ███
████████████████████

Don Glenn
Division Chief
Wild Horses and Burros

Office: 202-452-5082
Cell: 202-744-6697
Fax: 202-653-9084
----- Forwarded by Don Glenn/WO/BLM/DOI on 04/14/2009 08:16 AM -----

Gregory
Russell/HQ/SOL/DO
I@SOL                              To
Don Glenn/WO/BLM/DOI@BLM
04/13/2009 10:01                   cc
AM
                                   Subject
New Mexico pilot program

Don,

Here is the mark-up for the New Mexico program. As you can see, Amy added
comments, as well. I will look into the procurement issue.

Also attached is the draft document that you requested, █████████
██████████████████████████████████

[attachment "Adoption Incentive Program (rev 3.27.09) -SOL comments
comments.docx" deleted by Bob D Mitchell/MFS/NM/BLM/DOI] [attachment
"████████████████.June 23 2008.doc" deleted by Bob D
Mitchell/MFS/NM/BLM/DOI]

——————————————————

Greg Russell

Division of Land and Water Resources
Public Lands Branch
202-208-4327

NOTICE: This email (including attachments) is intended for the use of the
individual or entity to which it is addressed. It may contain information
that is privileged, confidential, or otherwise protected by applicable law.
If you are not the intended recipient, you are hereby notified that any
dissemination, distribution, copying, or use of this email or its content
is strictly prohibited. If you receive this email in error, please notify
the sender immediately and destroy all copies.

| | |
|---|---|
| **From:** | Paul_McGuire@nm.blm.gov |
| **To:** | Mustang Heritage Foundation; Plcolbert@aol.com; Julie Bryant; Don_Glenn@blm.gov; Dean_Bolstad@blm.gov; Bea_Wade@blm.gov; Lili_Thomas@blm.gov; Susie_Stokke@blm.gov; Hanson_Stuart@nm.blm.gov; Donna_Hummel@nm.blm.gov; Jeannine_Lesieutre@blm.gov; Jenna_Whitlock@blm.gov; Sally_Spencer@blm.gov; Debbie_Collins@blm.gov; Jesse_Juen@blm.gov; Linda_Rundell@blm.gov; NM_ALL_OKFO@blm.gov; Alan_Shepherd@blm.gov; Amy_Dumas@ca.blm.gov; Fran_Ackley@blm.gov; Karen_Malloy@es.blm.gov; Thomas_G_Miles@blm.gov; Jared_Bybee@blm.gov; Gary_McFadden@blm.gov; Gus_Warr@blm.gov; Roger_Oyler@blm.gov; Robert_Hopper@blm.gov; Al_Burch@blm.gov |
| **Bcc:** | blm@bridge1.iqgbcloud.local |
| **Subject:** | NM WH&B $500 Adoption Incentive Pilot info on web site |
| **Date:** | Thursday, April 23, 2009 12:31:46 PM |

All -- Information about the NM $500 WHB adoption incentive program is now
live and worldwide:

http://www.blm.gov/nm/st/en/prog/wild_horse_and_burro/_500_Wild_Horse_Adoption_Incentive.html

FYI - We'll be launching the pilot at our next upcoming adoption in
Kellyville, OK (near Tulsa), May 7-9. Full court press in local media
underway; will take to regional level in coming weeks ...


r/

Paul McGuire
Public Affairs Specialist
U.S. Bureau of Land Management
Oklahoma Field Office
Moore, OK
Ofc: 405-790-1009
Cell: 405-826-3036

| | |
|---|---|
| **From:** | Karen_Malloy@es.blm.gov |
| **To:** | Steven_Wells@blm.gov |
| **Bcc:** | blm@bridge1.iggbcloud.local |
| **Subject:** | Fw: Response needed |
| **Date:** | Monday, April 27, 2009 1:36:54 PM |
| **Attachments:** | WildHorseAdoptDayAdVersions.pdf |
| | Adoption Options.doc |

----- Forwarded by Karen Malloy/ESO/ES/BLM/DOI on 04/27/2009 01:20 PM -----

Sally
Spencer/WO/BLM/DO
I To
"Paul McGuire"
04/25/2009 12:22 <paul_mcguire@blm.gov>, "Ms. Holle
AM Hooks" <Holle_Hooks@nm.blm.gov>,
"KAren Malloy"
<karen_malloy@blm.gov>, "Debbie
Collins" <Debbie_Collins@blm.gov>
cc

Subject
Fw: Response needed

FYI - I haven't looked at this yet. Please send comments early next week.
Thanks, Sally
-------------------------
Sent from my BlackBerry Wireless Handheld

Sally Spencer
Wild Horse and Burro Program

----- Original Message -----
From: angie
Sent: 04/24/2009 06:16 PM AST
To: Stephanie Boyles <sboyles@hsus.org>; Julie Bryant <julie@golatigo.com>;
Paula Carr <carrsholding@aol.com>; Patti Colbert <plcolbert@aol.com>; Holly
Hazard <hhazard@hsus.org>; Robin Lohnes <amhrseprot@aol.com>; Jerry
Reynoldson <jerrynbuck@yahoo.com>; Sally Spencer
Subject: Response needed

Attached please find four options to choose from for the first wild horse adoption day ad. Please indicate in order of preference 1 to 4 which ad you
prefer. Please rank all ads so the group can come to consensus.

If you have any comments about the copy or images, please advise. If you have images you prefer to use, please send immediately.

Also attached is another press release outlining adoption options and the $500 payment program recently introduced by the BLM. Please read for approval.

The ad and press release will be due to publications no later than May 4 for
July issues. Please have your comments to me no later than April 28 so any changes can me made and resubmitted to the group.

Thank you for your cooperation.

(See attached file: WildHorseAdoptDayAdVersions.pdf)(See attached file: Adoption Options.doc)



*Rugged. Earthy. Authentic. Legendary*

Maybe it's the first time a whiskered nose brushes your hand,
or the slight twitch of a muscle as he stands,
but when a Mustang allows you to become part of its world
you know the bond is more than you expected.
It's a trust that can't be defined.
**And even better . . . It's America's REAL horse.**

**Celebrate National Wild Horse Adoption Day**
**Saturday, September 26**
More than 1,000 wild and gentled
horses available for adoption

For more information about events
near you or to volunteer, go to
adoptawildhorse.com or call 817.559.5650



BLM_000322



Maybe it's the first time a whiskered nose brushes your hand,
or the slight twitch of a muscle as he stands,
but when a Mustang allows you to become part of its world
you know the bond is more than you expected.
It's a trust that can't be defined.
And even better . . .

# IT'S AMERICA'S REAL HORSE.

Rugged. Earthy. Authentic. Legendary

## CELEBRATE
## NATIONAL WILD HORSE
## ADOPTION DAY
## SATURDAY,
## SEPTEMBER 26

More than 1,000 wild and gentled
horses available for adoption

For more information about events
near you or to volunteer, go to adoptawildhorse.com
or call 817.559.5650



BLM_000323



*Maybe it's the first time a whiskered nose brushes your hand,*
*or the slight twitch of a muscle as he stands,*
*but when a Mustang allows you to become part of its world*
*you know the bond is more than you expected.*
*It's a trust that can't be defined.*
**And even better . . . It's America's REAL horse.**
*Rugged. Earthy. Authentic. Legendary*

**Celebrate National Wild Horse Adoption Day**
**Saturday, September 26**
More than 1,000 wild and gentled
horses available for adoption

For more information about
events near you or to volunteer,
go to adoptawildhorse.com
or call 817.559.5650



BLM_000324



Maybe it's the first time a whiskered nose brushes your hand,
or the slight twitch of a muscle as he stands,
but when a Mustang allows you to become part of its world
you know the bond is more than you expected.
It's a trust that can't be defined.
**And even better . . . It's America's REAL horse.**
*Rugged. Earthy. Authentic. Legendary*

**Celebrate National Wild Horse Adoption Day**
**Saturday, September 26**
More than 1,000 wild and gentled
horses available for adoption

For more information about events
near you or to volunteer, go to
adoptawildhorse.com or call 817.559.56 BLM_000325

**National Wild Horse Adoption Day Offers Many Options**
*September 26 To Mark 1,000 Horse and Burro Adoption Goal*

*Fort Worth, Texas, April 27* – A goal of 1,000 adoptions has been set for the first National Wild Horse Adoption Day to be held September 26, 2009, and potential adopters have many options from which choose, including one that will pay $500 to adopters of older horses.

The offer is designed to help defray the initial cost of keeping a horse. Payment is made after one year when adopters receive title to the animal.

This adoption incentive is being offered on a trial basis in the Bureau of Land Management (BLM)-New Mexico region only (which also includes Texas, Oklahoma, and Kansas). The incentive is designed to increase the number of mature horses (4-10 years old) placed into private ownership through adoption. This, in turn, can reduce the number of older horses that BLM must care for at considerable taxpayer expense in contracted pasture facilities, sometimes referred to as long-term holding. If successful, this program could reduce the pressure on BLM to sell or euthanize excess horses, and it could free up critical resources needed for on-the-range management.

Under this program, all standard adoption rules and fees apply. At the end of one year, adopters return the title application mailed to them by the BLM along with the incentive voucher received at the time of adoption. The only additional requirement to receive payment is that a licensed veterinarian must attest to the animal's fitness on your completed title application. Upon receipt of those items, a $500 check and title to the animal will be provided.

If for some reason you must relinquish the animal within one year, meaning you return it to the BLM, the allowance cannot be paid. The same is true if the animal dies before title is issued.

Nearly 33,000 mustangs roam federal lands across the West. In order to manage the herds and maintain both land and herd health, the Bureau of Land Management oversees the adoption of wild horses and burros through public adoptions held throughout the United States. Since 1973, more than 220,000 wild horses and burros have been adopted.

"We're encouraging people to adopt now even though we would like to see a major increase in adoptions leading to the week prior to September 26 and will have a number of events dedicated to the goal of 1,000 adoptions" said spokesperson Jerry Reynoldson. "There are several options to adopting a wild horse interested people can look to with all of them available through the BLM web site. Adopters can go to BLM holding facilities, satellite adoptions across the country or to events like the Extreme Mustang Makeover or to adoptions conducted by some of the prisons where gentled horses are available."

Horses between the ages of one and six years old are typically selected from the herds for adoption, but a horse of any age can fit into the right farm or ranch.  For many mustang adopters, having the opportunity to work with a horse or burro with a storied past and an unconventional upbringing brings a unique and special element to their relationship.

The groups supporting National Wild Horse Adoption Day, in addition to the BLM, include Wild Horses 4 Ever, the American Horse Protection Association, the Mustang Heritage Foundation and The Humane Society of the United States.

The goal of 1,000 horses adopted through a National Adoption Day program could create a savings of more than $1,500,000 for the BLM and the American taxpayer.

State BLM offices, as well as rescue centers, wild horse groups, and volunteers will be engaged in activities leading up to and on September 26 to promote an understanding of and interest in opening new homing opportunities to these magnificent animals.

Activities will not only include adoptions, but will also include educational events and wild horse expos. More than 65 events will take place across the country in support of national wild horse adoption day, and other events may apply to be included on the calendar through the event web site at nationalwildhorseadoptionday.org.

For more information on events or how to volunteer, go to nationalwildhorseadoptionday.org or contact coordinating director Angie Grizzell at 817-559-5650. For information on available adoptions, go to wildhorseandburro.blm.gov or call 866-4MUSTANGS.

| From: | Karen_Malloy@es.blm.gov |
|---|---|
| To: | David_Berg@es.blm.gov; Deborah_Allen@es.blm.gov; Duane_Winters@blm.gov; Emma_Rinehart@blm.gov; Fran_Edwards@es.blm.gov; Gabriele_Thompson@es.blm.gov; Grace_Guess@blm.gov; James_Hood@es.blm.gov; Marcia_Sieckman@es.blm.gov; Marty_Neugebauer@es.blm.gov; Randall_Anderson@es.blm.gov; Rebecca_Chase@es.blm.gov; Steve_Meyer@es.blm.gov; Scott_D_Swanson@blm.gov |
| Cc: | Steven_Wells@blm.gov |
| Bcc: | blm@bridge1.iggbcloud.local |
| Subject: | No WHB call today |
| Date: | Wednesday, May 6, 2009 1:26:24 PM |

But here are the notes from State Lead Call, so that you're not bored this p.m. -

Pickens proposal - She gave WO a proposal last month regarding opening sanctuary in NV. She is asking for $500 per horse per year, minimum 20,000 horses for 40 yrs. (!) Don will be discussing proposal with WO management.
Options include possible LTH for Public Land users, or private sanctuary funded by Congress for a finite time (15 yrs).

ROAM Act - Wanted to ban helicopters, no removals unless animals could be adopted, horses could roam anywhere on public land. Passed out of committee last week after markup, Don has given testimony about the impact to program. Helicopter ban has been removed, but horses could still roam on any public land in current version, and no removal unless adoption demand exists. Will be a few more weeks until latest revision comes out.

NM Adoption Incentive Pilot - Approved to give $500 incentive payments to adopters of animals 4-10 yrs old. Payment upon issuance of Title Certificate. Will be offered to adopters this weekend in Kellyville, OK (mandatory compliance for all of these).

Meduna Abuse Case - Investigation ongoing, all horses have all been removed from ranch, Meduna's wife cited for violating her PMACA, Meduna facing Felony charges. HSUS is taking lead on animal placement, horses must be removed from NE fairgrounds by next week. Sally gave interview to NPR (radio) regarding case.

WHB Strategy - Draft strategy not out yet, but results of work from Reno meeting in March will be forthcoming. ELT Meeting and Field Committee and DSD meetings will be given a briefing.

TIP Youth Initiative - TIP trainer could place a yearing horse with a youth (parents would sign PMACA), youth would train under guidance of TIP trainer, and horse could be reassigned (or stay with youth) once gentled.

4710 Handbook - Should be final today, all comments incorporated, if approved it will go to Advisory Board Subcommittee on Friday. 4700-4740 Manual also under review to maintain consistency. Gather handbook (draft) is being finalized. 4700-07 Class to be held in SLC in March 2010. Will be on DOI Learn in Dec 2009 for registration.

IM - Reissuance of all Policy IM's. Six are issued already, Gather and Population Control IM's are pending. Plus Population Survey/Census memo still pending.

AWP/Budget - AWP has been funded down to state level. Jenny leaving after this week for Reno. 2010 PTA funded at $68 million level. INTRANET Budget web site does not reflect this yet, but FBMS is updated.

WHBPS Update - Sept 30, 2009 Deployment date. Training scheduled tentatively in July for 20 Superusers (Deb Allen, Rebecca Chase, Fran Edward have been suggested to go) in Denver at NOC. Oct-Nov training for the rest of WHB staff. WHBIS will not be turned off until new system is up and running.

Status Herd Area Reasons and History - Four years of research on this project, due by June 15 at Adv Board Meeting. Congressional delegations want report too.

Solicitations for LTH - Instructions out on how to find the solicitations on line. Should be posted today. July 6 deadline for proposals (one for 200 - 1000 head and one for 1000 - 5000 head).

FY2010 Gathers - Need to remove 12,000 animals, more to gather in winter than summer, contingency plans if LTH is not available. FY2009 - all the pending gathers have been approved. Fertility control is being encouraged, along with sex ratio turnbacks heavy on geldings.

National Adoption Day - 15 groups around US participating besides BLM, email will be sent out regarding meeting being held today about plans, website will be posted.

Roundtable -

AZ - waiting on response to fertility control on Jennies
CA - Norco Makeover coming up next week
CO - West Douglas Lawsuit has more filings, 5 declarations, judge has been notified that BLM must do partial gather this fall
ES - Waiting for WO memo allowing payment for fostering more than $3000 per year per volunteer, adoption numbers are beyond half way mark for year
ID - Challis Gather coming up
MT - Decision on HMA plan will be rolled out next week, USFS is reviewing currently
NM - Adoption Incentive Pilot going forward this week
NV - Recent meeting for NV strategy mirroring National Strategy, Garfield Flats Herd - proposed non breeding herd of 125 animals (geldings), adoption in Winnemucca this weekend, 22 HMA's have escalating issues, Jenny L. from WO taking over as Acting State Lead on Monday, May 30 adoption in Carson City
OR - OR/WA program meeting requesting funding for new WHB positions;

adoptions down

UT - Karen Sussman proposal for Sale Animals, trying to buy ranch in South Dakota (200 head of Sulphurs)

Potential for problem on the range, may need an emergency gather in Muddy Creek

Open house at Gunnison Prison, opportunity for Secretary Visit

Working with State of UT on estray issues for abandoned horses

WY - State Coordination meeting tomorrow, Sat adoption in Riverton, Makeover in Aug with 20 horses

WO - Advisory Board Mtg June 15 in Sacramento, New Population/AML is on website - reduction in AML target

FOIA from HSUS regarding euthanasia may include emails on this subject

| From: | Jeannine_Lesieutre@blm.gov |
|-------|----------------------------|
| To: | Don_Glenn@blm.gov |
| Cc: | Dean_Bolstad@blm.gov; Jenna_Whitlock@blm.gov |
| Bcc: | blm@bridge1.iggbcloud.local |
| Subject: | Re: Legislative Proposals |
| Date: | Friday, May 29, 2009 10:27:33 AM |
| Attachments: | pic02737.jpg |

Hi Don,

A couple things - first, I agree that we need to try and get some kind of
language / provision allowing holding contracts on public lands and;
In regards to the Forest Service Funding, I thought we were going to
change the wording so that the transfer of funds were indefinite and we
wouldn't have to worry every 4 years that the funding could go away AND
I suggest that we add the word "holding" into the list of how the funds
are used.... Jenna came up with a language example.
A tax credit OR incentive payment that authorizes the government to pay
a private citizen an incentive to adopt and title an animal; ███████████
████████████████████████████████████████████████████
███████████████████████████████████████ Again, Jenna understands
best how this type of language should be crafted.

That's my 2-cents......

Jeannine (Jenny) Lesieutre
Acting Nevada Wild Horse and Burro Program Manager
Office: 775-861-6469
Cell: 202-412-5784
*************************************************************
Information contained in this communication is confidential and privileged
proprietary information for Official Government purposes only. Any
unauthorized use, distribution, copying or disclosure is prohibited. If you
have received this email in error, please contact the sender immediately.

Don
Glenn/WO/BLM/DOI
To
05/29/2009 04:56 Dean_Bolstad@blm.gov,
AM jeannine_lesieutre@blm.gov
cc

Subject
Legislative Proposals

BLM_000331

Dean and Jenny, if we are going to submit any leg proposals for 2011 we need to do it by 6/1 and need to run it by Ed before that. Any ideas?
This is what we submitted for 2010. I thought maybe LTH contracts on public land?
(Embedded image moved to file: pic02737.jpg)
Don Glenn
Division Chief
Wild Horses and Burros

Office: 202-452-5082
Cell: 202-744-6697
Fax: 202-653-9084

BLM_000332

*Bureau of Land Management - Internal Use Only*                    *2010 Budget Request*

| Subactivity/ Program | New/ Existing | Type of Request | Summary of change and Citation (if applicable) | Citation and Language (if available) |
|---|---|---|---|---|
| | | | Administration proposes an extension of this provision through 2011. | |
| Wild Horses and Burros / Cadastral Survey | Existing | Legislative | *P.L. 108-447, Dec. 8, 2004 118 Stat. 3075* **Proposed Language to Extend Existing Forest Service Authority:** Amend authority for the Forest Service to transfer funds to BLM to cover the cost of wild horse and burro management on Forest Service lands, P.L. 108-447, Dec. 8, 2004 118 Stat. 3075 | *Provided further, That, through fiscal year 2010, the Secretary may authorize the expenditure or transfer of such sums as necessary to the Department of the Interior, Bureau of Land Management, for removal, preparation, and adoption of excess wild horses and burros from National Forest System lands, and for the performance of cadastral surveys to designate the boundaries of such lands.* |
| Wild Horses and Burros | Existing | Legislative | **Proposed Amendment to the Wild Horse and Burro Act** to (1)allow the Secretary to title more than four animals per year when he determines, in writing, that the adopter can humanely care for more than four animals. (2)to lower the age of sale-eligible animals from "more than 10 years old" to "more than 4 years old", require buyers to be "qualified", and remove the "without limitation" language. **Tax credit** for anyone who adopts or purchases a BLM/FS wild horse or burro. **Farm Bill Amendment** to provide a subsidy for anyone who adopts or purchases a BLM/FS wild horse | |
| Forestry | | Legislative | **Proposed Language to Extend Existing Good Neighbor Policy** - Forestry would like to extend the Good Neighbor | SEC. 336. Section 331 of the Department of the Interior and Related Agencies Appropriations |

*Legislative & Revenue Proposals*                                    *Page - 5*

BLM_000333

| | |
|---|---|
| **From:** | Don_Glenn@blm.gov |
| **To:** | Amy_Dumas@ca.blm.gov; Fran_Ackley@blm.gov; Karen_Malloy@es.blm.gov; Jared_Bybee@blm.gov; Bob_D_Mitchell@nm.blm.gov; Gary_McFadden@blm.gov; Gus_Warr@blm.gov; Alan_Shepherd@blm.gov; Roger_Oyler@blm.gov; Paul_McGuire@nm.blm.gov; jeannine_lesieutre@blm.gov; Myra_Black@blm.gov; Sally_Spencer@blm.gov; Jenna_Whitlock@blm.gov; Lili_Thomas@blm.gov; Dean_Bolstad@blm.gov; Susie_Stokke@blm.gov; Joe_Stratton@nv.blm.gov; Kenneth_Visser@blm.gov; Mary_D"Aversa@blm.gov; Debbie_Collins@blm.gov; Albert.J.Kane@aphis.usda.gov; John_Neill@nv.blm.gov; James_Hood@es.blm.gov; Randall_Anderson@es.blm.gov; Holle_Hooks@nm.blm.gov |
| **Bcc:** | blm@bridge1.iggbcloud.local |
| **Subject:** | Fw: draft e-mail to strategy team |
| **Date:** | Tuesday, May 5, 2009 11:45:14 AM |
| **Attachments:** | Strategic Template for Field Committee WH&B.doc |

Hello Everybody -- I don't know if I properly thanked you all for your participation in our strategy session at the end of March. It was a good group of folks and we really got a good start on drafting a strategy for the program. Special thanks to Mary D'Aversa and Ken Visser for their participation -- they brought an important perspective to our discussions.

I wanted to let you know that I have been making some presentations on our strategy to several groups. Last week I briefed the Executive Leadership Team and next week I'll be addressing the Field Committee (Associate State Directors) and the Deputy State Directors. The timing of these meetings is admittedly a little backwards. Ideally we would briefed these important groups AFTER you all had a chance to review and massage a draft strategy. But we couldn't let these important meetings pass without letting our State Directors and managers know what we were up to. I've attached the very high-level strategy document that we put together for the ELT. We used the elements of the four strategic areas we developed at our meeting in Reno and took them up to the 30,000 foot-level. Hopefully you recognize some of the good ideas you helped develop.

(See attached file: Strategic Template for Field Committee WH&B.doc)

I had hoped to send you the draft strategy in advance of our State Lead phone call tomorrow, but it's not quite ready for prime time due to some other priorities. I hope to have the draft out to you by the end of this week or the first part of next. Thank you for your patience

Don Glenn
Division Chief
Wild Horses and Burros

Office: 202-452-5082
Cell: 202-744-6697
Fax: 202-653-9084

BLM_000334

| VISION/Mission: Achieve and maintain healthy, viable wild horse and burro populations while maintaining healthy rangelands. | | | | | |
|---|---|---|---|---|---|

| GOALS | OPERATIONAL PRIORITIES | Strategic Focus Areas | | | |
|---|---|---|---|---|---|
| | | Legislative | Policy | National Program Assistance[1] | External Conferences, Meetings or Forums |
| **Goal 1:** Achieve AML and reduce population growth rates | ▪ Increase population inventory accuracy ▪ Conduct gathers ▪ Increase use of fertility control and other means of slowing herd growth rates | <u>Congressional</u> ▪ H.R. 1018 (ROAM) – work with Congress to address concerns <u>Administration</u> ▪ Ensure adequate funding through President's Budget | ▪ Finalize WH&B strategy ▪ Issue policy on new population inventory techniques ▪ Update 4700 Manual Sections and 4710 (WH&B Management) Handbook ▪ Issue policy on population control (increased use of fertility control, sex ratio adjustments, etc.) | ▪ Provide training on new population inventory techniques ▪ Hire new position to support field in implementing new inventory techniques ▪ Train additional PZP application teams ▪ Continue research of improved fertility control or sterilant ▪ Provide training on WH&B Management Handbook | ▪ National Wild Horse and Burro Advisory Board (meets biennially or quarterly) ▪ Outreach on new WH&B strategy to conservation, livestock and hunter/angler groups. |
| **Goal 2:** Reduce holding costs | ▪ Increase sales and adoptions through expanded partnerships, incentives and new sale policy ▪ Secure additional long-term holding on private land | ▪ Report to Congress on new strategy, alternatives to better manage holding costs, and recommended changes to the Act | ▪ Develop alternatives for new Director (other than euthanasia) for managing excess animals: ○ continue holding on private land ○ seek authority to expand holding to public land ○ sale without limitation ▪ Update policy to allow sale of younger horses ▪ Issue national incentive policy | ▪ Implement National Adoption Team proposed in Futuring ▪ Update agreement with Mustang Heritage Foundation to expand their role in adoptions and sales | |
| **Goal 3:** Increase transparency and improve public image | ▪ Implement independent operational audits ▪ Improve WH&B website, develop a rapid response process for negative media and more proactive outreach | | ▪ Issue policy on independent audits | | |

[1] *National Program Assistance Common to all Goals* -- Annual State Lead Meeting, Program-wide Meeting, State Lead Conference Calls, Daily Communications, Coordination with Leg Affairs and Public Affairs, Use  WH&B steering committee for high level guidance.

| | |
|---|---|
| **From:** | Don_Glenn@blm.gov |
| **To:** | Corey_Grant@blm.gov |
| **Cc:** | Don_Glenn@blm.gov |
| **Bcc:** | blm@bridge1.iggbcloud.local |
| **Subject:** | Fw: NM Wild Horse Insentive Pilot |
| **Date:** | Tuesday, June 23, 2009 8:49:10 AM |

Corey, the persons name is Cynthia Martin, in Acquisition and Property Management (PAM) .

See email below from Greg Russell in our Sol office.

Thanks
Don Glenn
----- Forwarded by Don Glenn/WO/BLM/DOI on 06/22/2009 01:44 PM -----

Jesse
Juen/NMSO/NM/BLM/
DOI To
Edwin Roberson/WO/BLM/DOI@BLM
04/17/2009 10:41 cc
AM Don Glenn/WO/BLM/DOI@BLM, Janine
Velasco/WO/BLM/DOI@BLM, Bud
Cribley/WO/BLM/DOI@BLM, Jenna
Whitlock/WO/BLM/DOI@BLM, Rosemary E
Herrell/NMSO/NM/BLM/DOI@BLM, Linda
Rundell/NMSO/NM/BLM/DOI@BLM, John
Mehlhoff/TUFO/NM/BLM/DOI@BLM, Bob D
Mitchell/MFS/NM/BLM/DOI@BLM, Bill
Merhege/NMSO/NM/BLM/DOI@BLM, Mary
Ann
Crafton-Williams/RPFO/NM/BLM/DOI@BL
M
Subject
Re: Fw: NM Wild Horse Insentive
Pilot(Document link: Don Glenn)

Yes that works. Yahoooooo! I will share with our folks. Thank you very much for the good news on a Friday. We will move forward with our pilot effort in May.

Jesse

BLM_000336

-----Edwin Roberson/WO/BLM/DOI wrote: -----

To: Jesse Juen/NMSO/NM/BLM/DOI@BLM
From: Edwin Roberson/WO/BLM/DOI
Date: 04/16/2009 03:14PM
cc: Don Glenn/WO/BLM/DOI@BLM, Janine Velasco/WO/BLM/DOI@BLM, Bud
Cribley/WO/BLM/DOI@BLM, Jenna Whitlock/WO/BLM/DOI@BLM
Subject: Fw: NM Wild Horse Insentive Pilot

Jesse,
Here is the legal answer straight from the "horses mouth" (pardon the
pun). Is this good enough for your procurement folks? Ed
Inactive hide details for Don GlennDon Glenn

----- Original Message -----
From: Don Glenn
Sent: 04/16/2009 05:07 PM EDT
To: Edwin Roberson; Janine Velasco
Cc: Jenna Whitlock
Subject: NM Wild Horse Insentive Pilot
Ed, please let Jesse know we are good to go.
Don Glenn,
Division Chief
Wild Horse and Burro Program
*********************************************
Sent from my BlackBerry Wireless Handheld
Inactive hide details for Gregory RussellGregory Russell

----- Original Message -----
From: Gregory Russell
Sent: 04/16/2009 04:42 PM EDT
To: Don Glenn
Subject: Re: Fw: WH&B question
Don,

████████████████████ we consulted with our office's
Division of General Law. General Law, in turn, contacted Cynthia Martin,
in Acquisition and Property Management (PAM) .

█████████████████████████████████
████████████

_____
Greg Russell
Division of Land and Water Resources
Public Lands Branch
202-208-4327

NOTICE: This email (including attachments) is intended for the use of the
individual or entity to which it is addressed. It may contain information

that is privileged, confidential, or otherwise protected by applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or use of this email or its content is strictly prohibited. If you receive this email in error, please notify the sender immediately and destroy all copies.

Inactive hide details for Don Glenn/WO/BLM/DOI@BLMDon Glenn/WO/BLM/DOI@BLM

Don
Glenn/WO/BL
M/DOI@BLM

To
04/14/2009
01:16 PM Gregory
Russell/HQ/SOL/DOI

cc

Edwin
Roberson/WO/BLM/DOI@BLM

Subject

Fw: WH&B question

Greg, know you are busy, but NM is clamoring for an answer.
Don Glenn,
Division Chief
Wild Horse and Burro Program
*********************************************
Sent from my BlackBerry Wireless Handheld
Inactive hide details for Jesse JuenJesse Juen

----- Original Message -----
From: Jesse Juen
Sent: 04/14/2009 10:56 AM MDT
To: Edwin Roberson; Janine Velasco
Cc: Bud Cribley; Don Glenn
Subject: WH&B question
Hi Ed/Janine. We were hoping you all had some resolution on whether we have the green light to ██████████████████████?█

██████████████████████ We hope to pilot our effort at our May
adoption in TX. Need some help asap.

Jesse

**Nathan, Alexi L**

| | |
|---|---|
| **From:** | Jesse_Juen@blm.gov |
| **Sent:** | Thursday, June 25, 2009 9:33 AM |
| **To:** | Don_Glenn@blm.gov |
| **Subject:** | Re: Fw: NM Wild Horse Incentive Pilot |
| **Attachments:** | pic04675.gif; pic12938.gif; pic02223.gif; pic22142.gif; pic23754.gif; pic06511.gif; pic22741.gif; pic20175.gif; pic21459.gif; pic17825.gif; pic03221.gif; pic17870.gif |

As I peppard before.  I think this is a Ed and Janine fix.  Please ask them to get it resolved.

Jesse


----- Original Message -----
From: Don Glenn
Sent: 06/24/2009 11:04 AM EDT
To: Jesse Juen
Cc: Bud Cribley
Subject: Re: Fw: NM Wild Horse Incentive Pilot Jesse, So where are we on this.  Who has the final say?

Don Glenn
Division Chief
Wild Horses and Burros

Office: 202-452-5082
Cell: 202-744-6697
Fax: 202-653-9084



| | | |
|---|---|---|
| Jesse Juen/NMSO/NM/BLM/ DOI | To | |
| | | "Bud Cribley" |
| 06/15/2009 10:04 AM | | <Bud_Cribley@blm.gov>, "Don Glenn" <Don_Glenn@blm.gov> |
| | cc | |
| | Subject | |
| | | Fw: NM Wild Horse Incentive Pilot |

1

FYI.  Note she still did not say it was ok to use checks.

Jesse

    ----- Original Message -----
    From: Nancy Adrain
    Sent: 06/12/2009 04:17 PM EDT
    To: Mary Ann Crafton-Williams
    Cc: Rosemary Herrell; Jesse Juen; Ruth Welch
    Subject: Re: NM Wild Horse Incentive Pilot Mary-Ann,

I don't know who gave you that mis information.  But it is just that!  I never once mentioned anything about NM or any State for that matter.  In addition, I never mentioned anything about checks!  I don't know what your office does w/checks.  I clarified to the people in the room that the BLM does not pay people to adopt our horses.  Those were my exact words.  If there is a mis understanding on the of someone from your office i have over 100 people that heard me say what I said!  I have always been told that it is not our policy to pay people to adopt our horses, that is why I made the claification as I did; which had nothing to do w/NM.

With that said I would greatly appreciate it if NM would stop thinking I'm trying to incenuate that you are doing something wrong.

I hope this email clears your mind on what I said.

Nancy Adrain
Bureau Procurement Chief
Bureau of Land Management
Washington Office, WO 850
1049 C St., NW (1075 LS)
Washington, DC 20240
Phone;  (202) 452-5175

    ----- Original Message -----
    From: Mary Ann Crafton-Williams
    Sent: 06/12/2009 01:41 PM MDT
    To: Nancy Adrain
    Cc: Rosemary Herrell; Jesse Juen
    Subject: Fw: NM Wild Horse Incentive Pilot Nancy,

I understand that you had concerns yesterday about the Wild Horse and Burro Program and the writing of checks to Adpoters for the 1st year of care.
Jesse Juen wanted to make sure that the use of checks was appropriate and from the e-mail traffic below, you can see the Jesse posed the question to Janine Velasco and Ed Roberson on 4/14/2009. ████████████████
██████████████████████████ I hope this information is what you were looking for and will help put your mind at ease about New Mexico doing something wrong.

Mary Ann Crafton-Williams
Procurement Analyst
New Mexico State Office

2

505-761-8946 ABQ Desk
505-249-3890 Cell
----- Forwarded by Mary Ann Crafton-Williams/RPFO/NM/BLM/DOI on 06/12/2009 01:18 PM -----

Bob D Mitchell/MFS/NM/BLM/DOI

06/12/2009 10:07 AM

To      Mary Ann Crafton-Williams/RPFO/NM/BLM/DOI@BLM

cc

Subject      Fw: NM Wild Horse Incentive Pilot

This is the correct email!

    Thanks,
      Bob

----- Forwarded by Bob D Mitchell/MFS/NM/BLM/DOI on 06/12/2009 11:06 AM -----

Jesse Juen/NMSO/NM/BLM/DOI

04/17/2009 09:41 AM

To      Edwin Roberson/WO/BLM/DOI@BLM

cc      Don Glenn/WO/BLM/DOI@BLM, Janine Velasco/WO/BLM/DOI@BLM, Bud Cribley/WO/BLM/DOI@BLM, Jenna Whitlock/WO/BLM/DOI@BLM, Rosemary E Herrell/NMSO/NM/BLM/DOI@BLM, Linda Rundell/NMSO/NM/BLM/DOI@BLM, John Mehlhoff/TUFO/NM/BLM/DOI@BLM, Bob D Mitchell/MFS/NM/BLM/DOI@BLM, Bill Merhege/NMSO/NM/BLM/DOI@BLM, Mary Ann Crafton-Williams/RPFO/NM/BLM/DOI@BLM

Subject      Re: Fw: NM Wild Horse Insentive Pilot(Document link: Bob Mitchell)

3

Yes that works.  Yahooooo!  I will share with our folks.  Thank you very much for the good news on a Friday.  We will move forward with our pilot effort in May.

Jesse
-----Edwin Roberson/WO/BLM/DOI wrote: -----

To: Jesse Juen/NMSO/NM/BLM/DOI@BLM
From: Edwin Roberson/WO/BLM/DOI
Date: 04/16/2009 03:14PM
cc: Don Glenn/WO/BLM/DOI@BLM, Janine Velasco/WO/BLM/DOI@BLM, Bud  Cribley/WO/BLM/DOI@BLM, Jenna Whitlock/WO/BLM/DOI@BLM
Subject: Fw: NM Wild Horse Insentive Pilot

Jesse,
 Here is the legal answer straight from the "horses mouth" (pardon the  pun). Is this good enough for your procurement folks?  Ed
     (Embedded image moved to file: pic04675.gif)Inactive hide details
     for Don GlennDon Glenn

     ----- Original Message -----
     From: Don Glenn
     Sent: 04/16/2009 05:07 PM EDT
     To: Edwin Roberson; Janine Velasco
     Cc: Jenna Whitlock
     Subject: NM Wild Horse Insentive Pilot  Ed, please let Jesse know we are good to go.
Don Glenn,
Division Chief
Wild Horse and Burro Program
*********************************************
Sent from my BlackBerry Wireless Handheld
     (Embedded image moved to file: pic12938.gif)Inactive hide details
     for Gregory RussellGregory Russell

     ----- Original Message -----
     From: Gregory Russell
     Sent: 04/16/2009 04:42 PM EDT
     To: Don Glenn
     Subject: Re: Fw: WH&B question
Don,

4

████████████████████████████████

_____
Greg Russell
Division of Land and Water Resources
Public Lands Branch
202-208-4327

 NOTICE: This email (including attachments) is intended for the use of the  individual or entity to which it is addressed. It may contain information  that is privileged, confidential, or otherwise protected by applicable  law. If you are not the intended recipient, you are hereby notified that  any dissemination, distribution, copying, or use of this email or its content is strictly prohibited. If you receive this email in error, please  notify the sender immediately and destroy all copies.

 (Embedded image moved to file: pic02223.gif)Inactive hide details for Don  Glenn/WO/BLM/DOI@BLMDon Glenn/WO/BLM/DOI@BLM


            Don
            Glenn/WO/BL
            M/DOI@BLM
                    (Embedded image moved to file:
                    pic22142.gif)
            04/14/2009                    To
            01:16 PM            (Embedded image moved to
                    file: pic23754.gif)
                    Gregory
                    Russell/HQ/SOL/DOI
            (Embedded image moved to file:
            pic06511.gif)
                            cc
            (Embedded image moved to
            file: pic22741.gif)
            Edwin
            Roberson/WO/BLM/DOI@BLM
            (Embedded image moved to file:
            pic20175.gif)
                    Subject
            (Embedded image moved to
            file: pic21459.gif)
            Fw: WH&B question


            (Embedded image moved to file:
            pic17825.gif)
                    (Embedded image moved to
                    file: pic03221.gif)

BLM_000344

Greg, know you are busy, but NM is clamoring for an answer.

Don Glenn,
Division Chief
Wild Horse and Burro Program
*******************************************

Sent from my BlackBerry Wireless Handheld
   (Embedded image moved to file: pic17870.gif)Inactive hide details
   for Jesse JuenJesse Juen

   ----- Original Message -----
   From: Jesse Juen
   Sent: 04/14/2009 10:56 AM MDT
   To: Edwin Roberson; Janine Velasco
   Cc: Bud Cribley; Don Glenn
   Subject: WH&B question

Hi Ed/Janine. ███████████████████████████████████████████████
█████████████████████████████████████████ We hope to pilot our effort at our May  adoption in
TX.  Need some help asap.

   Jesse

6

BLM_000345

| From: | Paul_McGuire@blm.gov |
|---|---|
| To: | Dean_Bolstad@blm.gov; Patrick_Williams@blm.gov; Bob_D_Mitchell@blm.gov; Holle_Hooks@blm.gov; Kris_Rittenberry@blm.gov; Crystal_Cowan@blm.gov; Gary_Hughes@blm.gov; Pat_Hofmann@blm.gov; Cody_Bedford@blm.gov; Jimmy_Galloway@blm.gov; Meredith_Kueck@blm.gov; Don_Glenn@blm.gov; Sally_Spencer@blm.gov |
| Bcc: | blm@bridge1.jqgbcloud.local |
| Subject: | Re: Fw: Adoption incentive update |
| Date: | Tuesday, June 30, 2009 2:33:01 PM |

All -- Here's a brief comparison of our pre- and post-incentive adoption results. The pre-incentive figures go back to October 2006, which is about when we began to see overall adoption demand slip. The post-incentive figures are the same ones I provided earlier, which capture three adoptions in Oklahoma since May 2009.

We found that the adoption rate among target-age horses (4 years +) since May 2009 exceeds the historical average by 20 points. Our overall adoption rate, however, remains level over time at 51%. Holding all else constant, if this age group were continuing to adopt at the low historical rate, our overall adoption rate since May 2009 would have dipped to 43.5%. This may suggest that the incentive has been effective in keeping our numbers level even as the market continues to soften. Or it could be masking a "cannibal" effect where adopters are passing on younger horses in favor of incentive horses.

We'll know more as we move forward with the pilot.

Adoption Results, Pre-Incentive (10/2006-4/2009)

Total number of animals presented: 2,522
Total number of animals adopted: 1,284
Overall adoption rate: 51%

Total number of adult horses presented: 407
Total number of adult horses adopted: 208
Adoption rate among adult horses: 51%

Adult horses as a percentage of all animals presented: 16%
Adult adoptions as a percentage of overall adoptions: 16%

Adoption Results, Post-Incentive (5/2009- )

Total number of animals presented: 200
Total number of animals adopted: 102
Overall adoption rate: 51%

Total number of incentive horses presented: 31
Total number of incentive horses adopted: 22
Adoption rate among incentive horses: 71%

Incentive horses as a percentage of all animals presented: 15.5%

Incentive adoptions as a percentage of overall adoptions: 21.5%


Paul McGuire
Public Affairs Specialist
U.S. Bureau of Land Management
Oklahoma Field Office
Moore, OK
Ofc: 405-790-1009
Cell: 405-826-3036



Dean
Bolstad/NVSO/NV/B
LM/DOI To
Paul McGuire/MFS/NM/BLM/DOI@BLM
06/26/2009 03:27 cc
PM Bob D Mitchell/MFS/NM/BLM/DOI@BLM,
Holle Hooks/MFS/NM/BLM/DOI@BLM, Pat
Hofmann/MFS/NM/BLM/DOI@BLM
Subject
Re: Fw: Adoption incentive update
(Document link: Paul McGuire)




Thanks to all, and I'll look forward to a brief update from someone on how the incentive program is going when we have the State Lead call this Wed.

Thanks



Dean Bolstad
Deputy Division Chief
Wild Horse and Burro Program
(775) 861-6611(office)
(775) 750-6362 (cell)

Paul
McGuire/MFS/NM/BL
M/DOI To
Dean Bolstad/NVSO/NV/BLM/DOI@BLM
06/26/2009 11:28 cc
AM Holle Hooks/MFS/NM/BLM/DOI@BLM, Pat
Hofmann/MFS/NM/BLM/DOI@BLM, Bob D
Mitchell/MFS/NM/BLM/DOI@BLM
Subject
Fw: Adoption incentive update

Dean -- FYI below. Bob won't be able to make the call, but Pat and Holle'
are co-acting while he's out. They should be able to brief on the incentive
program.

Bob refers to an historical adoption results spreadsheet. We've captured
adoption data from several years back which should enable us to compare
results between target-age horses (4 years old +) with and without the
incentive. We'll have more on that before the call next Wednesday.

Paul McGuire
Public Affairs Specialist
U.S. Bureau of Land Management
Oklahoma Field Office
Moore, OK
Ofc: 405-790-1009
Cell: 405-826-3036
----- Forwarded by Paul McGuire/MFS/NM/BLM/DOI on 06/26/2009 01:16 PM -----

Bob D
Mitchell/MFS/NM/B
LM/DOI To
Paul McGuire/MFS/NM/BLM/DOI@BLM,
06/26/2009 12:48 Pat Hofmann/MFS/NM/BLM/DOI@BLM,
PM Holle Hooks/MFS/NM/BLM/DOI@BLM
cc

Subject
Fw: Adoption incentive update

I won't be on the call but between the three of you should be able to give on update on the incentive program.

Meredith has completed to historical adoption results spreadsheet (although I haven't looked at it). Suggest she start with the blank of the same spreadsheet and input the adoptions since Kellyville. That way it would be easy to compare.

Thanks!

----- Forwarded by Bob D Mitchell/MFS/NM/BLM/DOI on 06/26/2009 12:42 PM -----

Paul
McGuire/MFS/NM/BL
M/DOI To
Dean Bolstad/NVSO/NV/BLM/DOI@BLM
06/26/2009 09:15 cc
AM Bob D Mitchell/MFS/NM/BLM/DOI@BLM
Subject
Re: Fw: Adoption incentive update
(Document link: Bob Mitchell)

Dean -- Horses have all been 4-5 years old.

FYI - Bob's on extended personal leave. Is checking e-mail regularly via BlackBerry though.

Paul McGuire
Public Affairs Specialist
U.S. Bureau of Land Management
Oklahoma Field Office
Moore, OK
Ofc: 405-790-1009
Cell: 405-826-3036

Dean
Bolstad/NVSO/NV/B
LM/DOI To
Paul McGuire/MFS/NM/BLM/DOI@BLM,
06/26/2009 09:05 Bob D Mitchell/MFS/NM/BLM/DOI@BLM
AM cc

Subject
Fw: Adoption incentive update

Paul,
What is the age range for the incentive horses presented?

Bob,
Will be available to give an update on the Incentive pilot on this
Wednesday's WHB State Lead call?

Thanks,
Dean

Dean Bolstad
Deputy Division Chief
Wild Horse and Burro Program
(775) 861-6611(office)
(775) 750-6362 (cell)
----- Forwarded by Dean Bolstad/NVSO/NV/BLM/DOI on 06/26/2009 07:04 AM
-----

Paul
McGuire/MFS/NM/BL
M/DOI To
Sally Spencer/WO/BLM/DOI@BLM
06/26/2009 06:34 cc
AM Bob D Mitchell/MFS/NM/BLM/DOI@BLM,
Cody Bedford/MFS/NM/BLM/DOI@BLM,
Crystal Cowan/MFS/NM/BLM/DOI@BLM,
Dean Bolstad/NVSO/NV/BLM/DOI@BLM,
Debbie Collins/WO/BLM/DOI@BLM, Don

Glenn/WO/BLM/DOI@BLM, Gary
Hughes/MFS/NM/BLM/DOI@BLM, Hanson
Stuart/NMSO/NM/BLM/DOI@BLM, Holle
Hooks/MFS/NM/BLM/DOI@BLM, Jimmy
Galloway/MFS/NM/BLM/DOI@BLM, Kris
Rittenberry/MFS/NM/BLM/DOI@BLM, Pat
Hofmann/MFS/NM/BLM/DOI@BLM, Patrick
Williams/MFS/NM/BLM/DOI@BLM
Subject
Re: Adoption incentive update
(Document link: Dean Bolstad)

Wow! 100% success is a pretty high standard, but we'll shoot for it!

Thx,

Paul McGuire
Public Affairs Specialist
U.S. Bureau of Land Management
Oklahoma Field Office
Moore, OK
Ofc: 405-790-1009
Cell: 405-826-3036

Sally
Spencer/WO/BLM/DO
I To
Paul McGuire/MFS/NM/BLM/DOI@BLM
06/26/2009 07:28 cc
AM Bob D Mitchell/MFS/NM/BLM/DOI@BLM,
Cody Bedford/MFS/NM/BLM/DOI@BLM,
Crystal Cowan/MFS/NM/BLM/DOI@BLM,
Dean Bolstad/NVSO/NV/BLM/DOI@BLM,
Debbie Collins/WO/BLM/DOI@BLM, Don
Glenn/WO/BLM/DOI@BLM, Gary
Hughes/MFS/NM/BLM/DOI@BLM, Hanson
Stuart/NMSO/NM/BLM/DOI@BLM, Holle
Hooks/MFS/NM/BLM/DOI@BLM, Jimmy
Galloway/MFS/NM/BLM/DOI@BLM, Kris
Rittenberry/MFS/NM/BLM/DOI@BLM, Pat

Hofmann/MFS/NM/BLM/DOI@BLM, Patrick
Williams/MFS/NM/BLM/DOI@BLM
Subject
Re: Adoption incentive update
(Document link: Paul McGuire)

Hi Paul,

Thanks for the update. We'll know for sure if this project is a 100 %
success when all horses are titled, but the initial results are great.
This is exciting. Sally

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Sally Spencer
Wild Horse & Burro Program
Office: 202-452-5196
Cell: 202-641-6106
Fax: 202-653-9084
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Paul
McGuire/MFS/NM/BL
M/DOI To
Don Glenn/WO/BLM/DOI@BLM, Dean
06/25/2009 04:16 Bolstad/NVSO/NV/BLM/DOI@BLM, Bob D
PM Mitchell/MFS/NM/BLM/DOI@BLM, Sally
Spencer/WO/BLM/DOI@BLM, Hanson
Stuart/NMSO/NM/BLM/DOI@BLM
cc
Patrick
Williams/MFS/NM/BLM/DOI@BLM, Bob D
Mitchell/MFS/NM/BLM/DOI@BLM, Holle
Hooks/MFS/NM/BLM/DOI@BLM, Kris
Rittenberry/MFS/NM/BLM/DOI@BLM,
Crystal Cowan/MFS/NM/BLM/DOI@BLM,
Gary Hughes/MFS/NM/BLM/DOI@BLM, Pat
Hofmann/MFS/NM/BLM/DOI@BLM, Cody
Bedford/MFS/NM/BLM/DOI@BLM, Jimmy
Galloway/MFS/NM/BLM/DOI@BLM, Debbie

Collins/WO/BLM/DOI@BLM
Subject
Adoption incentive update

All --

Thought I'd provide an update on the adoption incentive program we've been piloting. So far we've offered the incentive at three satellite events in Oklahoma, and figures show that incentive horses adopt at slightly higher rates than the general mix of animals. Since we began, incentive horses have accounted for 21.5% of all animals adopted, while comprising only 15.5% of the total number of animals presented.

Below is a more thorough breakdown of the numbers. Please let me know if you have any questions.

We'll continue to gather data and provide updates.

Thanks,

Paul McGuire
Public Affairs Specialist
U.S. Bureau of Land Management
Oklahoma Field Office
Moore, OK
Ofc: 405-790-1009
Cell: 405-826-3036

_____

Kellyville, OK, May 7-9 (satellite event)

Total number of animals presented: 79
Total number of animals adopted: 44
Overall adoption percentage: 55.6%

Total number of incentive horses presented: 8
Total number of incentive horses adopted: 8
Adoption percentage among incentive horses: 100%

Incentive horses as a percentage of all animals presented: 10.1%
Incentive adoptions as a percentage of overall adoptions: 18.1%

BLM_000353

Duncan, OK, May 28-30 (satellite event)

Total number of animals presented: 67
Total number of animals adopted: 21
Overall adoption rate: 31.3%

Total number of incentive horses presented: 11
Total number of incentive horses adopted: 6
Adoption rate among incentive horses: 54.5%

Incentive horses as a percentage of all animals presented: 16.4%
Incentive adoptions as a percentage of overall adoptions: 28.5%

Woodward, OK, June 18-20 (satellite event)

Total number of animals presented: 54
Total number of animals adopted: 37
Overall adoption rate: 68.5%

Total number of incentive horses presented: 12
Total number of incentive horses adopted: 8
Adoption rate among incentive horses: 66.6%

Incentive horses as a percentage of all animals presented: 22.2%
Incentive adoptions as a percentage of overall adoptions: 21.6%

Aggregate Figures for Kellyville, Duncan, and Woodward

Total number of animals presented: 200
Total number of animals adopted: 102
Overall adoption rate: 51%

Total number of incentive horses presented: 31
Total number of incentive horses adopted: 22
Adoption rate among incentive horses: 71%

Incentive horses as a percentage of all animals presented: 15.5%
Incentive adoptions as a percentage of overall adoptions: 21.5%

_____

Pauls Valley, OK, May 12 (facility adoption)
1 horse adopted, including 0 incentive horses.
Incentive adoptions as a percentage of overall adoptions: 0%

Pauls Valley, OK, June 9 (facility adoption)
10 horses adopted, including 8 incentive horses.
Incentive adoptions as a percentage of overall adoptions: 80%

_____

Incentive horses also appeared to generate demand, in terms of bids

received:

At Kellyville, high bid of $200 went to a 4-year-old grulla mare (incentive horse). This was matched only by bids of $200 on three gentled foster horses (non-incentive).
At Duncan, high bid of $140 went to a 5-year-old bay mare (incentive horse).
At Woodward, a 4-year-old bay mare went for $220, and a 4-year-old buckskin gelding went for $200 (incentive horses). These were exceeded only by a $400 bid on a yearling buckskin gelding (non-incentive).

BLM_000355

| From: | Dean_Bolstad@blm.gov |
|---|---|
| To: | Fran_Ackley@blm.gov; Alan_Shepherd@blm.gov; Bob_D_Mitchell@blm.gov; Gus_Warr@blm.gov; Karen_Malloy@es.blm.gov; Marty_Griffith@blm.gov; Jared_Bybee@blm.gov; Gary_McFadden@blm.gov; Al_Burch@blm.gov; Roger_Oyler@blm.gov; Amy_Dumas@ca.blm.gov; Robert_Hopper@blm.gov; Jim_Sparks@blm.gov; Nancy_Bjelland@blm.gov; bimler@fs.fed.us; Glenna_Eckel@blm.gov; Myra_Black@blm.gov; Ramona_DeLorme@nv.blm.gov; Lili_Thomas@blm.gov; Janet_Neal@blm.gov; Joe_Stratton@blm.gov; albert.j.kane@aphis.usda.gov; Debbie_Collins@blm.gov; Ted_Bailey@blm.gov; Sally_Spencer@blm.gov; John_Neill@blm.gov; Mark_O"Brien@blm.gov; Jeannine_Lesieutre@blm.gov; Sharon_Kipping@blm.gov; Bea_Wade@blm.gov; Alan_Shepherd@blm.gov; Jenna_Whitlock@blm.gov; Susie_Stokke@blm.gov; bimler@fs.fed.us; Don_Glenn@blm.gov |
| Cc: | Paul_McGuire@blm.gov |
| Bcc: | blm@bridge1.iggbcloud.local |
| Subject: | Fw: Adoption incentive update |
| Date: | Tuesday, June 30, 2009 4:09:49 PM |

New Mexico is going to talk about their experience with the Adoption Incentive Pilot tomorrow on the WHB State Lead Conference call. The trailing email contains some data and analysis of the Pilot.

Paul, thanks for the analysis.

Dean Bolstad
Deputy Division Chief
Wild Horse and Burro Program
(775) 861-6611(office)
(775) 750-6362 (cell)
----- Forwarded by Dean Bolstad/NVSO/NV/BLM/DOI on 06/30/2009 12:55 PM -----

Paul
McGuire/MFS/NM/BL
M/DOI To
Dean Bolstad/NVSO/NV/BLM/DOI@BLM,
06/30/2009 11:28 Patrick
AM Williams/MFS/NM/BLM/DOI@BLM, Bob D
Mitchell/MFS/NM/BLM/DOI@BLM, Holle
Hooks/MFS/NM/BLM/DOI@BLM, Kris
Rittenberry/MFS/NM/BLM/DOI@BLM,
Crystal Cowan/MFS/NM/BLM/DOI@BLM,
Gary Hughes/MFS/NM/BLM/DOI@BLM, Pat
Hofmann/MFS/NM/BLM/DOI@BLM, Cody
Bedford/MFS/NM/BLM/DOI@BLM, Jimmy
Galloway/MFS/NM/BLM/DOI@BLM,
Meredith Ann
Kueck/OFO/NM/BLM/DOI@BLM, Don
Glenn/WO/BLM/DOI@BLM, Sally
Spencer/WO/BLM/DOI@BLM
cc

Subject
Re: Fw: Adoption incentive update
(Document link: Dean Bolstad)

BLM_000356

All -- Here's a brief comparison of our pre- and post-incentive adoption results. The pre-incentive figures go back to October 2006, which is about when we began to see overall adoption demand slip. The post-incentive figures are the same ones I provided earlier, which capture three adoptions in Oklahoma since May 2009.

We found that the adoption rate among target-age horses (4 years +) since May 2009 exceeds the historical average by 20 points. Our overall adoption rate, however, remains level over time at 51%. Holding all else constant, if this age group were continuing to adopt at the low historical rate, our overall adoption rate since May 2009 would have dipped to 43.5%. This may suggest that the incentive has been effective in keeping our numbers level even as the market continues to soften. Or it could be masking a "cannibal" effect where adopters are passing on younger horses in favor of incentive horses.

We'll know more as we move forward with the pilot.

Adoption Results, Pre-Incentive (10/2006-4/2009)

Total number of animals presented: 2,522
Total number of animals adopted: 1,284
Overall adoption rate: 51%

Total number of adult horses presented: 407
Total number of adult horses adopted: 208
Adoption rate among adult horses: 51%

Adult horses as a percentage of all animals presented: 16%
Adult adoptions as a percentage of overall adoptions: 16%


Adoption Results, Post-Incentive (5/2009- )

Total number of animals presented: 200
Total number of animals adopted: 102
Overall adoption rate: 51%

Total number of incentive horses presented: 31
Total number of incentive horses adopted: 22
Adoption rate among incentive horses: 71%

BLM_000357

Incentive horses as a percentage of all animals presented: 15.5%
Incentive adoptions as a percentage of overall adoptions: 21.5%

Paul McGuire
Public Affairs Specialist
U.S. Bureau of Land Management
Oklahoma Field Office
Moore, OK
Ofc: 405-790-1009
Cell: 405-826-3036

| | |
|---|---|
| **From:** | Karen_Malloy@es.blm.gov |
| **To:** | James_Hood@blm.gov; Randall_Anderson@blm.gov |
| **Cc:** | Michael_Reiland@blm.gov; Steven_Wells@blm.gov |
| **Bcc:** | blm@bridge1.iggbcloud.local |
| **Subject:** | Fw: Secretary Briefing Paper |
| **Date:** | Wednesday, July 8, 2009 3:51:35 PM |
| **Attachments:** | Secretarybrief 6-29-09.docx |

----- Forwarded by Karen Malloy/ESO/ES/BLM/DOI on 07/08/2009 03:45 PM -----

Dean
Bolstad/NVSO/NV/B
LM/DOI To
Fran Ackley/CCFO/CO/BLM/DOI@BLM,
07/08/2009 03:41 Alan Shepherd/NVSO/NV/BLM/DOI@BLM,
PM Bob D Mitchell/MFS/NM/BLM/DOI@BLM,
Gus Warr/UTSO/UT/BLM/DOI@BLM, Karen
Malloy/ESO/ES/BLM/DOI@BLM, Marty
Griffith/WYSO/WY/BLM/DOI@BLM, Jared
Bybee/MTSO/MT/BLM/DOI@BLM, Gary
McFadden/BUFO/OR/BLM/DOI@BLM, Al
Burch/AZSO/AZ/BLM/DOI@BLM, Roger
Oyler/AZSO/AZ/BLM/DOI@BLM, Amy
Dumas/CASO/CA/BLM/DOI@BLM, Robert
Hopper/ORSO/OR/BLM/DOI@BLM, Jim
Sparks/MTSO/MT/BLM/DOI@BLM, Nancy
Bjelland/MTSO/MT/BLM/DOI@BLM, Barry
Imler/WO/USDAFS@FSNOTES, Glenna
Eckel/WFO/NV/BLM/DOI@BLM, Myra
Black/ISO/ID/BLM/DOI@BLM
cc

Subject
Fw: Secretary Briefing Paper

Last week on our WHB State Lead conference call, Don mentioned a briefing
paper that had been prepared for the Secretary's Office during the last
week in June.. The paper is attached to the trailing email.

Dean Bolstad
Deputy Division Chief
Wild Horse and Burro Program
(775) 861-6611(office)
(775) 750-6362 (cell)
----- Forwarded by Dean Bolstad/NVSO/NV/BLM/DOI on 07/08/2009 12:38 PM
-----

Don
Glenn/WO/BLM/DOI
To
07/08/2009 12:22 Dean Bolstad/NVSO/NV/BLM/DOI@BLM,
PM Lili Thomas/NVSO/NV/BLM/DOI@BLM,
Bea Wade/NVSO/NV/BLM/DOI@BLM, Janet
Neal/NVSO/NV/BLM/DOI@BLM, Debbie
Collins/WO/BLM/DOI@BLM, Sally
Spencer/WO/BLM/DOI@BLM, Ted
Bailey/MTSO/MT/BLM/DOI@BLM, Joe
Stratton/NVSO/NV/BLM/DOI@BLM,
Ramona DeLorme/NVSO/NV/BLM/DOI@BLM,
John Neill/NVSO/NV/BLM/DOI@BLM, Pam
Irvine/NVSO/NV/BLM/DOI@BLM, Sharon
L Kipping/WO/BLM/DOI@BLM, Jeannine
M Lesieutre/WO/BLM/DOI@BLM,
Albert.J.Kane@aphis.usda.gov, Alan
Shepherd/NVSO/NV/BLM/DOI@BLM, Mark
O'Brien/NVSO/NV/BLM/DOI@BLM,
Aynalem Tadesse/WO/BLM/DOI@BLM,
Jenna Whitlock/WO/BLM/DOI@BLM,
Susie Stokke/NVSO/NV/BLM/DOI@BLM,
John Parsons/NVSO/NV/BLM/DOI@BLM
cc

Subject
Secretary Briefing Paper

Howdy Folks,
We have been briefing the Deputy Assistant Secretary, Ned Farquhar, who in
turn has been briefing the Secretary. I have attached the briefing paper
we provided to the Secretary FYI. The Secretary has assigned us to come up
with a long term comprehensive plan to "solve the Wild Horse Program" and
reduce the budget by 1/2 over the next 5 to 10 years allowing early budgets

BLM_000360

to float to accomplish this. Legislative proposals can be in the mix. This is a pretty tall order, but with the 5 year Strategy we have been working on, using the appropriate mix of the actions to accomplish the goals in the strategy along with some help from Congress to deal with the holding situation, I think it is possible. Anyway, we are working on some alternatives along with our best cost estimates for the Secretary. We had a preliminary briefing with Ned Farquhar today to make sure we are on the right track.

I will keep every one informed of the approach we are taking as we progress. May be asking for your help from time to time.

Thanks
(See attached file: Secretarybrief 6-29-09.docx)
Don Glenn
Division Chief
Wild Horses and Burros

Office: 202-452-5082
Cell: 202-744-6697
Fax: 202-653-9084

BLM_000361

**Briefing Paper for the Secretary on Wild Horse and Burro Program**
**June 25, 2009**

**BACKGROUND**

**Statutory direction:** The Bureau of Land Management (BLM) manages wild horses and burros in 180 herd management areas (HMAs) in 10 western states under the 1971 Wild Free-Roaming Horses and Burros Act (Act). The Act requires that the BLM and the Forest Service:

> (1) Protect, manage, and control wild horses and burros;
>
> (2) Determine the appropriate management level (AML) of wild horses and burros in consultation with state game and fish agencies;
>
> (3) Achieve a "thriving natural ecological balance" by removing animals in excess of AML or by other means, including sterilization;
>
> (4) Manage animals with minimum human disturbance;
>
> (5) Manage the animals where they existed when the Act was passed; and
>
> (6) Adopt or sell without limitation (under certain circumstances) excess animals, and humanely destroy those for which no adoption demand exists.

AML is the number of animals that can graze without causing damage to the range.

**Issues:** The following are the major issues in the wild horse and burro program:

- Available lands can support approximately 26,600 horses and burros;

- Current herd population is 36,000 animals (10,000 over AML, with about half of this excess in Nevada);

- Herd size doubles about every four years without removals and controls;

- Current fertility control is expensive and temporary; more effective methods are projected to be five to eight years from production;

- Adoption demand has declined; holding costs have increased;

- Short-term holding is very expensive, but necessary to prevent damage to public lands and to prepare for adoption and long-term holding;

- Long-term holding opportunities are limited and there has been no response to recent requests for proposals for long-term holding; and

- Wild horse sanctuary proposals have been introduced in Congress, but none have offered a viable long-term solution, and some may not be affordable or manageable over time.

1

**FY 2009 Wild Horse and Burro Populations and AML by State**

| State | Horse Pops | Burro Pops | Total Pops | Total AML | Number over AML |
|-------|-----------:|-----------:|-----------:|----------:|----------------:|
| AZ | 390 | 1,967 | 2,357 | 1,676 | 681 |
| CA | 4,057 | 895 | 4,952 | 2,237 | *2,715 |
| CO | 772 | 0 | 772 | 812 | -40 |
| ID | 913 | 0 | 913 | 617 | 296 |
| MT | 195 | 0 | 195 | 105 | 90 |
| NV | 16,688 | 819 | 17,507 | 12,652 | *4,855 |
| NM | 114 | 0 | 114 | 83 | 31 |
| OR | 2,508 | 15 | 2,523 | 2,715 | -192 |
| UT | 2,495 | 142 | 2,637 | 1,956 | 681 |
| WY | 4,062 | 0 | 4,062 | 3,725 | 337 |
| TOTAL | 32,194 | 3,838 | 36,032 | 26,578 | 9,454 |

*California numbers are high due to changed program priorities caused by implementing Nevada emergency removals and Wyoming consent decree. Nevada numbers have always been high as the state had the largest horse population when the Act was passed.*

**Herd History:** Since the BLM first started to track animal numbers in the 1970s, herd populations have consistently exceeded AML. (AMLs are established locally through BLM's land use planning process.) Herd populations in the 1970s and 1980s reached over 64,000 animals, more than twice what the rangelands could sustain. Since the 1970s, the BLM has removed over 270,000 excess animals and adopted out more than 220,000. Unfortunately, despite the BLM's aggressive marketing efforts, adoptions and sales have declined significantly in recent years. The cost of feed and fuels has gone up. In addition, there is no market for unwanted horses; after the closing of horse slaughter plants (the last one closed in 2007), adoptions declined by about half because the adoption program competes with large numbers of unwanted domestic horses. The BLM now holds close to 31,000 animals in corrals and pastures, three times the number of animals cared for in 2001.

**Long-Term Holding:** The FY 2009 BLM budget for long-term holding is $10.8 million; for FY 2010 projected budget is close to $11 million. The BLM currently has eleven long-term contract holding facilities. These facilities comprise roughly 200,000 acres of rangeland in Oklahoma, Kansas, and South Dakota and are filled to capacity with 22,100 unadopted wild horses. The average cost to maintain horses in these facilities is $1.27 per head per day or about $465 per head per year. Additional holding pastures will be

2

needed in FY 2010 and beyond to enable the BLM to continue to remove excess horses from the range and to make significant progress toward achieving and maintaining AML.

The advantage of long-term holding is that it allows wild horses to be maintained in a free-roaming environment at substantially less cost than wild horses held in short-term holding feedlots. While long-term holding was initially intended for animals age 10 or older, adoption demand for wild horses ages 5-10 years has declined significantly. As a result, wild horses ages 5 and older are now shipped to long-term holding. Horses held in long-term facilities tend to live longer – up to 30 years as opposed to an estimated 15 years on the open range. According to federal acquisition regulations, BLM can only issue contracts for long-term holding facilities for a period of five years. Two solicitations during the past year have failed to yield qualified long-term holding proposals. The BLM has issued a third request for long-term holding proposals; that request closes in July.

**Short-Term Holding:** The FY 2009 BLM budget for short-term holding is $18.7 million; for FY 2010 projected budget is $25.6 million, the largest single item in the wild horse and burro budget. The BLM has 22 short-term holding facilities, with total capacity of 15,600. Currently there are 8,532 animals in short-term holding. While there is additional capacity in short-term holding now, it is not enough to handle the removals planned in BLM's strategy over the next three years. Wild horses are held at these facilities until they are adopted or sold, or are shipped to long-term holding. The average short-term holding cost is $5.75 per head per day, with an average stay of 395 days. These facilities are used to prepare wild horses and burros for adoption or sale.

**Fertility Control:** Contraception is expensive to administer and its benefits are temporary. The cost of fertility control is about $1,610 per mare. Subject to appropriations, the BLM plans to spend $550,000 per year for the next three years for fertility control research and treatment of mares in the field. Since 2004, 2,200 wild horse mares have received contraception treatments. Subject to appropriations, the BLM plans to treat 1,200 mares in year FY 2010 and 700 annually in FY 2011 and 2012. (In order to treat 1,200 animals, BLM must gather 2,400 additional animals, due to 50 percent male/female herd sex ratios. These gathers are conducted concurrent with gathers for removal.) While fertility control in wild horse mares may be helpful to reduce annual rates of increase in treated herds, it will not help to achieve AML. For example, the National Park Service's fertility control program on Assateague Island has not decreased the small wild horse herd's population, but only maintained it at a consistent level. Herd reduction can only be achieved by removing animals from the range. Removals will continue to be necessary until significant advances in fertility control technology are achieved. More effective contraceptives are being tested, but results will not be available for another five to eight years.

3

**Budget:** In FY 2008, nearly 75 percent of the program's enacted budget of $36.2 million was used to care for unadopted animals in holding. Total funding, including reprogramming requests to support the program, increased from $39.2 million in FY 2007, to $46.5 million in FY 2008, to $52.3 in 2009. BLM has requested $67.4 in the FY 2010 President's budget. Past budget increases have been covered by reprogramming and are almost entirely related to holding costs. The following tables show a side by side comparison of 2009 and 2010 by workload and by state.

| Description | FY 2009 Funding | FY 2010 Funding | | State | FY2009 Cost Target (Includes Enacted, Carryover, Forest Service, and Reprogramming) | FY2010 PTA (Includes President's Proposed Budget and Forest Service Income) |
|---|---|---|---|---|---|---|
| FY2009 Enacted / President's Budget: | $40,613,000 | $67,486,000 | | | | |
| FY2008 WHB Carryover: | $2,416,000 | | | | | |
| FY2009 Reprogramming: | $9,300,000 | | | AZ | $307,000 | $482,000 |
| Forest Service Balance / Estimated Income: | $648,491 | $1,500,000 | | CA | $3,916,000 | $5,937,000 |
| **Total FY2009, FY2010 Projected Funding:** | **$52,977,491** | **$68,986,000** | | CO | $3,045,000 | $4,064,000 |
| Gather/Remove (Winter) | $2,164,770 | $2,010,000 | | ES | $2,744,000 | $2,721,000 |
| Additional Fertility Control Gathers | | $2,552,000 | | ID | $624,000 | $439,000 |
| Gather/Remove (Summer) | $1,918,210 | $4,020,000 | | MT | $278,000 | $332,000 |
| Gather/Remove (Forest Service) | $237,180 | $348,000 | | NV | $3,477,000 | $6,545,000 |
| Short-term Holding | $18,716,503 | $25,596,000 | | NM | $2,760,000 | $3,481,000 |
| Long-term Holding | $10,769,160 | $10,980,000 | | OR | $2,327,000 | $2,701,000 |
| Adoption | $3,168,000 | $3,114,000 | | UT | $3,495,000 | $3,907,000 |
| Mustang Heritage Foundation | $1,000,000 | $1,000,000 | | WY | $2,030,000 | $2,686,000 |
| National Adoption Day Support | $287,000 | | | *WO | $27,326,000 | $35,691,000 |
| Adoption & Program Marketing | $600,000 | $1,000,000 | | Forest Service | $648,491 | $1,500,000 |
| Compliance | $682,185 | $687,000 | | Total | **$52,977,491** | **$68,986,000** |
| Herd Management | $2,005,200 | $2,000,000 | | * Includes all Support functions, Long Term Holding, PVC and Fallon Short Term Holding, Transportation, Vaccines, Marketing and the Foundation | | |
| Transportation | $1,600,000 | $2,200,000 | | | | |
| Research and Development | $645,000 | $940,000 | | | | |
| Incentive Programs/Emergency Gathers | | $2,260,000 | | ** APHIS veterinarian support position, T& E Mitigation on LTH, fertility control expenses, vaccine contract, information technology, public affairs, law enforcement, management , budget, training, Advisory Board meetings, Bureau wide initiatives, new positions for field work, Washington Office WHB labor, travel expenses. | | |
| Forest Service for Adoptions and Holding | | $1,152,000 | | | | |
| **Overhead/Uncontrollable | $9,184,283 | $9,127,000 | | | | |
| **Total Expenses:** | **$52,977,491** | **$68,986,000** | | | | |
| Total Holding Costs (STH & LTH) | $29,485,663 | $36,576,000 | | | | |
| Percentage (Holding vs Enacted) | 72.6% | 54.2% | | | | |

4

BLM_000365

The following chart shows the costs to achieve AML by 2013. The costs of achieving AML with no additional long-term holding contracts are shown in blue. This assumes that all newly gathered, unadopted animals are held in more expensive short-term holding. If additional long-term holding is secured, program costs would decrease by $70.6 million over four years (2011 to 2014), shown in green.



**Wild Horse & Burro Population / Removals / Adoptions**

Funding (blue is without additional long term holding)
(light green 5000 head additional LTH each year 2010 to 2013)

| | FY 2001 | FY 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Funding ($ in millions) | $34,471 | $29,629 | $29,524 | $29,051 | $39,045 | $36,362 | $36,354 | $46,585 | $52,977 | $67,486 | $79,355 | $88,844 | $93,446 | $96,298 |
| Funding with more LTH | $34,471 | $29,629 | $29,524 | $29,051 | $39,045 | $36,362 | $36,354 | $46,585 | $52,977 | $67,415 | $71,433 | $76,484 | $71,747 | $67,615 |
| Adoptions | 7,630 | 7,746 | 6,165 | 6,644 | 5,701 | 5,172 | 4,772 | 3,739 | 3,640 | 3,595 | 3,500 | 3,500 | 3,500 | 3,500 |
| Total Removals | 13,277 | 12,029 | 10,081 | 9,899 | 10,232 | 10,272 | 7,726 | 5,142 | 6,094 | 11,500 | 9,250 | 8,750 | 5,750 | 5,250 |
| Feb Population | 45,400 | 38,800 | 37,200 | 37,100 | 32,700 | 31,700 | 28,600 | 33,100 | 35,900 | 34,700 | 30,700 | 28,300 | 27,000 | 26,800 |
| High AML | 25,280 | 24,623 | 28,849 | 28,468 | 28,186 | 27,512 | 27,492 | 27,219 | 27,219 | 27,219 | 27,219 | 27,219 | 27,219 | 27,219 |
| Animals in Holding (Sep 30) | | | | | | | | | 31,969 | 39,731 | 44,817 | 49,402 | 50,988 | 52,073 |

Budget figures do not include Forest Service

**GAO Report:** In a year-long review of the wild horse and burro program completed in October 2008, the GAO found that the BLM has made progress toward establishing and maintaining AML, but is challenged by limited options for dealing with unadoptable animals. The GAO recommended that the BLM: 1) issue the new wild horse and burro program handbook; (2) improve the accuracy of population estimates; (3) provide the public better information on the treatment of animals; (4) develop alternatives for long-term holding facilities and seek legislative changes if necessary; and (5) discuss with Congress ways to comply with provisions of the Act that require the destruction or sale without limitation of unadopted horses. BLM has proposed a 5-year strategy to address these recommendations.

BLM_000366

**BLM PROPOSED 5-YEAR STRATEGY**

The BLM's proposed five-year strategy is based upon a vision for the program of achieving and maintaining healthy wild horse and burro populations while maintaining healthy rangelands. The goals of the strategy are to:

- Achieve AML;
- Reduce population growth rate while maintaining healthy herds;
- Reduce holding costs;
- Increase transparency and improve the BLM's visibility; and
- Expand partnerships and the public's awareness and enjoyment wild horses and burros.

A number of priority actions will assist in achieving these goals, including:

- Increasing the accuracy of population estimates. (BLM is working with USGS on a more scientific methodology for population counts.)
- Conducting gathers to reach and maintain AML in 90 to 95% of HMAs by 2012. (e.g. removing 11,500 in 2010; by comparison, in 2008, BLM removed about 5,000).
- Increasing the use of fertility control.
- Implementing sex ratio adjustments favoring males over mares to reduce the number of mares foaling on-the-range.
- Establishing non-reproducing herds of gelded males in a limited number of HMAs.
- Acquiring more long-term holding capacity to replace more expensive short-term holding in corrals.
- Developing and implementing a suite of incentives to encourage adoption or purchase of wild horses. For example, BLM-New Mexico is piloting a program to provide $500 to adopters upon titling. BLM is also looking into possible agreements with State Departments of Agriculture to help provide incentives to adopters.
- Updating policies to expand sales (with limitation) of younger animals, including sales to foreign countries.
- Expanding the role of our partners, such as the Mustang Heritage Foundation, and developing new partnerships to help place animals into good homes and encourage use of "virtual" adoptions and activities that increase adoptions and sales.
- Developing opportunities for ecotourism around wild horse and burro HMAs.

**RECENT PROPOSALS/LEGISLATIVE OPTIONS**

**Pickens Proposal:** In November 2008, Madeleine Pickens approached the BLM with a proposal to adopt the 30,000 wild horses that the BLM now cares for in short- and long-term holding facilities and began searching for a ranch/sanctuary for unadopted horses. Ms. Pickens was considering a large Elko County, Nevada ranch with BLM grazing permits. Ms. Pickens' proposal immediately presented two major legal problems. (1) The Wild and Free-Roaming Horses and Burros Act of 1971 limits wild horses to lands where they existed at the time of passage of the law. None of the BLM grazing allotments associated with the ranch that Ms. Pickens proposes to purchase had wild horses in 1971. (2) The BLM cannot commit the Congress to the payments Ms. Pickens requires. These problems were conveyed to her in a letter and in person and in April, Ms. Pickens proposed legislative language that would authorize the Secretary to enter into a cooperative agreement with a competitively-selected nonprofit

6

corporation that would assume the ownership of at least 10,000 wild horses. In exchange, the BLM would pay the nonprofit up to $500 per horse (adjusted for inflation), with a guaranteed minimum payment based on 20,000 horses for up to 40 years.

The primary issues with Ms. Pickens' proposal follow:

- This arrangement would require the Federal government to pay the nonprofit to care for privately-owned animals.
- The required $500 stipend is more than the $465 per year the BLM now pays for long-term holding.
- Potential liability to the Federal government would be very high as the Federal government would assume the assets (land, buildings, horses) if the nonprofit is later dissolved.
- The ranch is very arid, and would therefore provide less forage per acre, compared to the Midwestern facilities where the BLM now holds unadopted animals.
- It is doubtful the ranch has the capacity to handle the 20,000 animals Ms. Pickens proposes. (The BLM-managed portion would support about 5,000; including private lands, the BLM roughly estimates the ranch could support a total of 10,000 animals.)
- The ranch is located in a checkerboard land ownership pattern with hundreds of land owners in one portion of the area. This would greatly complicate management of the ranch as a sanctuary. BLM is required by law to remove wild horses from private lands when requested to do so by the landowner.

Rather than react to a single constituent proposal, BLM would prefer to develop a more comprehensive policy that would effectively address the long-term holding of wild horses and burros, taking into consideration various proposals that have been put forth by a number of entities.

**Rahall Bill:** In February, Representative Rahall introduced a bill (H.R. 1018) to amend the Wild Free-Roaming Horses and Burros Act. The bill was reported out of the House Committee on Natural Resources on June 23, 2009. H.R. 1018 (or Restore Our American Mustangs – ROAM) removes the limits on the number of adopted animals the BLM can title to an individual each year. This could help BLM better work with horse rescue groups willing to adopt large numbers of animals. However, there are issues concerning other provisions in the bill, which were discussed in our testimony (March 3, 2009). H.R. 1018 would expand wild horses and burros from their current herd management areas to all public lands, and then limit BLM's ability to keep herds in check. The impacts to delicate rangelands and wildlife habitat would be catastrophic and program costs would explode. Specifically, the bill would:

- Allow animals to expand to *all* public lands;
- Limit the animals that are removed from the range to only those than can be adopted;
- Eliminate sale of animals, leaving adoption as the only tool to place animals in good homes; and
- Limit humane euthanasia to only animals that are terminally ill.

7

| | |
|---|---|
| **From:** | Corey_Grant@blm.gov |
| **To:** | Juan Palma; Mr. Steven Wells |
| **Bcc:** | blm@bridge1.iqgbcloud.local |
| **Subject:** | Fw: Use of Convenience Checks for the incentive payments associated with the WH&B initiatives in ESO and NM |
| **Date:** | Thursday, July 9, 2009 8:31:10 AM |

FYI... Good News for the Wild Horse and Burro Program


--------------------------
Sent from Corey Grant's BlackBerry Wireless Handheld so forgive me for any typos.


----- Original Message -----
From: Janine Velasco
Sent: 07/08/2009 05:25 PM EDT
To: Jesse Juen; Don Glenn; Edwin Roberson; Sally Spencer; Nancy Adrain; Corey Grant
Cc: Gregory Russell/HQ/SOL/DOI@SOL; Cynthia Martin; Thomas Boyd; Bud Cribley; Ruth Welch; Laura Ceperley
Subject: Use of Convenience Checks for the incentive payments associated with the WH&B initiatives in ESO and NM
Jesse - - We convened a discussion with the Dept to get confirmation that we are okay to move ahead with in NM with the use of $500 convenience checks for incentives associated with people who have adopted horses and done a good job in caring for them for a year (and offset their costs for care/feeding). We all agreed that this is acceptable. Tom Boyd participated in the meeting and was comfortable with the controls that are in place to ensure that convenience checks are distributed properly and that you will have clear documentation and approvals prior to issuing the convenience check. Since one owner can only have four horses at one time, no owner could receive more than $2000 in any given year.

Corey - - We also discussed the pilot under review at ESO to foster volunteers who will gentle horses so that they can be adopted. We also agreed that it is appropriate to use $500 convenience checks for these incentives to offset costs. In this case there is also documentation that the horse that has been gentled is adopted so that there is clear documenation and approvals prior to issuing the check.

As was noted in previous emails,

For the other participants in the meeting, please let me know if there is other information to add or if you have clarifications.
Janine Velasco
Assistant Director, Business & Fiscal Res.
202-208-4864

| From: | Don_Glenn@blm.gov |
|---|---|
| To: | Dean_Bolstad@blm.gov; Lili_Thomas@blm.gov; Bea_Wade@blm.gov; Janet_Neal@blm.gov; Debbie_Collins@blm.gov; Sally_Spencer@blm.gov; Ted_Bailey@blm.gov; Joe_Stratton@blm.gov; Ramona_DeLorme@blm.gov; John_Neill@blm.gov; Pam_Irvine@blm.gov; Sharon_Kipping@blm.gov; Jeannine_Lesieutre@blm.gov; Albert.J.Kane@aphis.usda.gov; Alan_Shepherd@blm.gov; Mark_O"Brien@blm.gov; Aynalem_Tadesse@blm.gov; Jenna_Whitlock@blm.gov; Susie_Stokke@blm.gov; John_Parsons@blm.gov; Alan_Shepherd@blm.gov; Bob_D_Mitchell@blm.gov; Fran_Ackley@blm.gov; Gus_Warr@blm.gov; Karen_Malloy@es.blm.gov; Susie_Stokke@blm.gov; Jared_Bybee@blm.gov; Roger_Oyler@blm.gov; Al_Burch@blm.gov; Gary_McFadden@blm.gov; Amy_Dumas@ca.blm.gov; Robert_Hopper@blm.gov; Jim_Sparks@blm.gov; Myra_Black@blm.gov; Amy_Lueders@blm.gov; Don_Simpson@blm.gov; Jeff_Rawson@blm.gov; Jesse_Juen@blm.gov; Jim_Abbott@blm.gov; Jim_Kenna@blm.gov; Bud_Cribley@blm.gov; Peter_Ditton@blm.gov; Howard_Lemm@blm.gov; Alan_Barron_Bail@blm.gov; Carl_Rountree@blm.gov; Helen_Hankins@blm.gov; Edwin_Roberson@blm.gov; Dave_Hunsaker@blm.gov |
| Bcc: | blm@bridge1.iqgbcloud.local |
| Subject: | Fw: ROAM Passes |
| Date: | Friday, July 17, 2009 3:59:37 PM |
| Attachments: | RAHALL_029_xml.pdf<br>WHB Act with ROAM Amendment per H_Report__070209.docx<br>house report 111-177.pdf |

Folks, attached is the final version of ROAM with ammendments. It still has to pass the Senate before it becomes law, and it has not been introduced in the Senate. There are 3 things of concern 1) Allows all public land to be horse areas; 2) Requires an adoption demand exist before removals are allowed, and cannot remain in holding more than 6 months; 3) requires BLM find 19million additional acres for reproducing herds within one year among other things.

Don Glenn
Division Chief
Wild Horses and Burros

Office: 202-452-5082
Cell: 202-744-6697
Fax: 202-653-9084
----- Forwarded by Don Glenn/WO/BLM/DOI on 07/17/2009 03:46 PM -----

Jenna
Whitlock/WO/BLM/D
OI To
Don Glenn/WO/BLM/DOI@BLM
07/17/2009 02:42 cc
PM Bea_Wade@nv.blm.gov,
Dean_Bolstad@blm.gov,
jeannine_lesieutre@blm.gov, Jeff
Rawson/UTSO/UT/BLM/DOI@BLM,
Lili_Thomas@blm.gov,
Sally_Spencer@blm.gov, Susie
Stokke/NVSO/NV/BLM/DOI@BLM
Subject
Re: ROAM Passes(Document link: Don
Glenn)

Jeff - I missed the whole thing, but talking with Leg Affairs, it sounds like the version of the bill that passed out of the committee is what passed, but with these amendments:

Summary of the Rahall Manager's Amendment

H.R. 1018: the Restore Our American Mustangs (ROAM) Act (Rahall, D-WV)

The manager's amendment to H.R. 1018 broadens the types of fertility controls authorized under the bill, narrows the definition of prohibited "commercial" uses for wild horses and burros and clarifies the membership of the Wild Horse and Burro Advisory Council. Lastly, the amendment relaxes the requirement that the acreage available to wild horses and burros never be less than when the original Act passed in 1971; the amendment makes restoration of the acreage a goal, rather than a requirement.

(See attached file: RAHALL_029_xml.pdf)

Here is the House Report & a mark-up that Leg Affairs did, which is staff work, for internal use.

(See attached file: WHB Act with ROAM Amendment per H_Report__070209.docx)
(See attached file: house report 111-177.pdf)

Jenna Whitlock
BLM Wild Horse and Burro Program
(202) 452-5115

Don
Glenn/WO/BLM/DOI
To
07/17/2009 01:39 Jeff Rawson/UTSO/UT/BLM/DOI@BLM
PM cc
Dean_Bolstad@blm.gov,
Lili_Thomas@blm.gov,

BLM_000371

jeannine_lesieutre@blm.gov,
Jenna_Whitlock@blm.gov,
Sally_Spencer@blm.gov,
Bea_Wade@nv.blm.gov, Susie
Stokke/NVSO/NV/BLM/DOI@BLM
Subject
Re: ROAM Passes(Document link:
Jenna Whitlock)

Jeff, I saw a hard copy yesterday do not have it electronically. It is
still really bad. 3 primary problems. 1) Allows all public land to be
horse areas; 2) Requires an adoption demand exist before removals are
allowed, and cannot remain in holding more than 6 months; 3) requires BLM
find 19million additional acres for reproducing herds within one year among
other things.

Don Glenn
Division Chief
Wild Horses and Burros

Office: 202-452-5082
Cell: 202-744-6697
Fax: 202-653-9084

Jeff
Rawson/UTSO/UT/BL
M/DOI To
Don Glenn/WO/BLM/DOI@BLM
07/17/2009 01:34 cc
PM
Subject
Re: ROAM Passes(Document link: Don
Glenn)

Do you have a copy of how the bill actually reads as passed?


Jeff Rawson

Associate State Director, BLM Utah

(801) 539-4010

Fax: (801) 539-4013



Don
Glenn/WO/BLM/DOI
To
07/17/2009 11:19 Dean Bolstad/NVSO/NV/BLM/DOI@BLM,
AM Lili Thomas/NVSO/NV/BLM/DOI@BLM,
Bea Wade/NVSO/NV/BLM/DOI@BLM, Janet
Neal/NVSO/NV/BLM/DOI@BLM, Debbie
Collins/WO/BLM/DOI@BLM, Sally
Spencer/WO/BLM/DOI@BLM, Ted
Bailey/MTSO/MT/BLM/DOI@BLM, Joe
Stratton/NVSO/NV/BLM/DOI@BLM,
Ramona DeLorme/NVSO/NV/BLM/DOI@BLM,
John Neill/NVSO/NV/BLM/DOI@BLM, Pam
Irvine/NVSO/NV/BLM/DOI@BLM, Sharon
L Kipping/WO/BLM/DOI@BLM, Jeannine
M Lesieutre/WO/BLM/DOI@BLM,
Albert.J.Kane@aphis.usda.gov,
Alan_Shepherd@blm.gov, Mark
O'Brien/NVSO/NV/BLM/DOI@BLM,
Aynalem Tadesse/WO/BLM/DOI@BLM,
Jenna Whitlock/WO/BLM/DOI@BLM,
Susie Stokke/NVSO/NV/BLM/DOI@BLM,
John Parsons/NVSO/NV/BLM/DOI@BLM,
Alan Shepherd/NVSO/NV/BLM/DOI@BLM,
Bob D Mitchell/MFS/NM/BLM/DOI@BLM,
Fran Ackley/CCFO/CO/BLM/DOI@BLM,
Gus Warr/UTSO/UT/BLM/DOI@BLM, Karen
Malloy/ESO/ES/BLM/DOI@BLM, Susie
Stokke/NVSO/NV/BLM/DOI@BLM, Jared
Bybee/MTSO/MT/BLM/DOI@BLM, Roger
Oyler/AZSO/AZ/BLM/DOI@BLM, Al
Burch/AZSO/AZ/BLM/DOI@BLM, Gary
McFadden/BUFO/OR/BLM/DOI@BLM, Amy
Dumas/CASO/CA/BLM/DOI@BLM, Robert
Hopper/ORSO/OR/BLM/DOI@BLM, Jim
Sparks/MTSO/MT/BLM/DOI@BLM, Myra
Black/ISO/ID/BLM/DOI@BLM, Amy
Lueders/NVSO/NV/BLM/DOI@BLM, Don
Simpson/WYSO/WY/BLM/DOI, Jeff

Rawson/WO/BLM/DOI@BLM, Jesse
Juen/NMSO/NM/BLM/DOI@BLM, Jim
Abbott/CASO/CA/BLM/DOI@BLM, Jim
Kenna/AZSO/AZ/BLM/DOI@BLM, Bud
Cribley/WO/BLM/DOI@BLM, Peter
Ditton/ISO/ID/BLM/DOI@BLM, Howard
Lemm/MTSO/MT/BLM/DOI@BLM, Alan
Barron Bail/WO/BLM/DOI@BLM, Carl
Rountree/WO/BLM/DOI@BLM, Helen
Hankins/AZSO/AZ/BLM/DOI@BLM, Edwin
Roberson/WO/BLM/DOI@BLM, Dave
Hunsaker/COSO/CO/BLM/DOI@BLM
cc
Edwin Roberson/WO/BLM/DOI@BLM
Subject
ROAM Passes

Folks,
The House just passed the Rahall bill R.O.A.M. 239 to 185

Don Glenn
Division Chief
Wild Horses and Burros

Office: 202-452-5082
Cell: 202-744-6697
Fax: 202-653-9084

F:\M11\RAHALL\RAHALL_029.XML

# EN BLOC AMENDMENT TO H.R. 1018, AS REPORTED

## OFFERED BY MR. RAHALL OF WEST VIRGINIA

Page 6, line 20, insert ", to the extent practicable," after "ensure that".

Page 11, line 4, before "surgical" insert "fertility control for mares, stallions, or both, such as".

Page 11, line 5, insert ", humane, and effective" after "safe".

Page 12, line 11, strike "and" and all that follows through line 12, and insert "or their remains shall not be sold or transferred for consideration for processing into commercial products; and".

Page 17, line 6, strike "at a minimum".

Page 19, line 22, strike "immunocontraception" and insert "fertility control".



f:\VHLC\071409\071409.012.xml          (439754l1)
July 14, 2009 (9:24 a.m.)

BLM_000375

| 111TH CONGRESS<br>*1st Session* | HOUSE OF REPRESENTATIVES | REPORT<br>111–177 |
| --- | --- | --- |

## RESTORE OUR AMERICAN MUSTANGS ACT

———————————

JUNE 23, 2009.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

———————————

Mr. RAHALL, from the Committee on Natural Resources, submitted the following

# R E P O R T

together with

## DISSENTING VIEWS

[To accompany H.R. 1018]

[Including cost estimate of the Congressional Budget Office]

The Committee on Natural Resources, to whom was referred the bill (H.R. 1018) to amend the Wild Free-Roaming Horses and Burros Act to improve the management and long-term health of wild free-roaming horses and burros, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike all after the enacting clause and insert the following:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Restore Our American Mustangs Act".

**SEC. 2. REFERENCE.**

Except as otherwise expressly provided, whenever in this Act an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Act of December 15, 1971 (commonly known as the "Wild Free-Roaming Horses and Burros Act"; 16 U.S.C. 1331 et seq.).

**SEC. 3. POLICY.**

The first section is amended by striking "in the area where presently found, as".

**SEC. 4. DEFINITIONS.**

Section 2 (16 U.S.C. 1332) is amended—

(1) in paragraph (b), by inserting "born or present" after "unclaimed horses and burros";

79–006

2

(2) in paragraph (c), by striking "which does not exceed their known territorial limits,"

(3) in paragraph (d)—
(A) by inserting "and any associated foals" after "his mares"; and
(B) by striking "and" after the semicolon;

(4) in paragraph (e), by striking the period and inserting a semicolon;

(5) in paragraph (f)—
(A) by striking "(1) which" and all that follows through "(2)";
(B) by inserting ", in accordance with section 3(d)," after "from an area"; and
(C) by striking the period at the end and inserting a semicolon; and

(6) by adding at the end the following:

"(g) 'thriving natural ecological balance' means a condition that protects ecosystem health, the ecological processes that sustain ecosystem function and a diversity of life forms, including those species listed under the Endangered Species Act of 1973, and further ensures that wild horses and burros, livestock and wildlife species are given fair consideration in the allocation of resources on those lands where said species are authorized or managed consistent with the requirements of the Federal Land Policy and Management Act of 1976 (P.L. 94–579) and other applicable law; and

"(h) 'fatally injured or terminally ill' means an animal exhibiting one or more of the following:
"(1) A hopeless prognosis for life.
"(2) A chronic or incurable disease, injury, lameness, or serious physical defect (including severe tooth loss or wear, club foot, and other severe congenital abnormalities).
"(3) A condition requiring continuous treatment for the relief of pain and suffering in a domestic setting.
"(4) An acute or chronic illness, injury, physical condition or lameness that would preclude an acceptable quality of life for the foreseeable future.".

SEC. 5. INVENTORY AND DETERMINATIONS.

(a) Section 3(a) (16 U.S.C. 1333(a)) is amended as follows:
(1) By striking "is authorized and directed to" and inserting "shall—
"(1)".
(2) By striking ", and he may" and inserting a semicolon.
(3) By inserting before "designate" the following:
"(2)".
(4) In paragraph (2) (as so designated)—
(A) by striking "their" and inserting "the";
(B) by inserting "of wild free-roaming horses and burros" after "preservation";
(C) by striking "wherein" and inserting "where";
(D) by striking "deems" and inserting ", considers"; and
(E) by striking "desirable. The Secretary shall" and inserting "desirable;
"(3)".
(5) In paragraph (3) (as so designated), by striking the period after "public lands" and inserting a semicolon.
(6) By striking "He shall" and inserting the following:
"(4)".
(7) In paragraph (4) (as so designated), by striking "of this Act." and inserting "of this Act;".
(8) By striking "All" and inserting the following:
"(5) ensure that".
(9) In paragraph (5) (as so designated)—
(A) by inserting "related to wild free-roaming horses and burros are" after "activities";
(B) by striking "shall be" both places it appears;
(C) by inserting "relevant State" after "in consultation with the";
(D) by striking "of the State wherein such lands are located";
(E) by striking "which inhabit such lands"; and
(F) by striking the period after "endangered wildlife species" and inserting a semicolon.
(10) By striking "Any" and inserting the following:
"(6) ensure that any".
(11) In paragraph (6) (as so designated)—
(A) by striking "on any such lands shall take" and inserting "are made after taking"; and
(B) by striking "which inhabit such lands." and inserting "; and".

3

(12) At the end of such subsection, add the following:

"(7) ensure that the acreage available for wild and free-roaming horses and burros shall never be less than the acreage where wild and free-roaming horses and burros were found in 1971.".

(b) Subsection (b)(1) of section 3 is amended as follows:

(1) By striking "(b)(1) The Secretary shall" and inserting the following:

"(b) In order to determine if a thriving natural ecological balance exists with regards to wild free-roaming horses and burros, the Secretary shall—

"(1)".

(2) In paragraph (1) (as so designated)—

(A) by striking "a current" and inserting "an"; and

(B) by striking the period after "public lands" and inserting a semicolon and the following:

"(2) update the inventory every two years; and

"(3) make the inventory available to the public on the Website of the Bureau of Land Management.".

(3) By striking "The purpose" and all that follows through "the Secretary" and inserting the following:

"(c) In order to better manage and protect wild free-roaming horses and burros, and to achieve and maintain a thriving natural ecological balance, the Secretary, not later than one year after the date of the enactment of this section, shall take the following actions:

"(1) Adopt and employ the best scientific, peer-reviewed methods to accurately estimate wild free-roaming horse and burro populations on public lands for purposes of the inventory required in subsection (b).

"(2) Develop a policy and standards, with public involvement, for setting consistent, appropriate management levels on public lands, based on scientifically sound methodologies.

"(3) Provide a public process, including a period for notice and comment, for finalizing appropriate management level standards.

"(4) Publish and distribute these standards to each field office so that the methodology for estimating population and determining appropriate management levels is consistent across public lands.

"(5) Train Federal personnel on the use of these standard techniques to estimate population and determine appropriate management levels.".

(4) By striking "shall consult with" and inserting the following:

"(6) Develop and finalize the standards in consultation with—".

(5)(A) By inserting "(A)" before "the United States Fish".

(B) By inserting "(B)" before "wildlife agencies".

(C) By striking "wherein" and inserting "where".

(D) By striking "such individuals" and inserting "(C) individuals".

(E) By striking "such other individuals" and inserting "(D) individuals".

(F) By striking "he" and inserting "the Secretary".

(G) By inserting "to" after "determines".

(6) In subparagraphs (A) through (C) of paragraph (6) (as so designated), by striking each comma and inserting a semicolon.

(7) In subparagraphs (A) through (D) of paragraph (6) (as so designated), by moving the margins of such subparagraphs 4 ems to the right.

(8) After paragraph (6) (as so designated), by inserting the following:

"(7) Identify new, appropriate rangeland for wild free roaming horses and burros, including use of land acquisitions, exchanges, conservation easements, voluntary grazing buyouts, and agreements with private landowners to allow for the federally supervised protection of wild horses and burros on private lands, except that the Secretary shall assess the effects of new range for wild free-roaming horses and burros on rangeland health, riparian zones, water quality, soil compaction, seed bed disturbance, native wildlife, and endangered or threatened species and transmit the results of the assessment to the Committee on Natural Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate.

"(8) Establish sanctuaries or exclusive use areas, except that the Secretary shall assess the effects of sanctuaries or exclusive use areas for wild free-roaming horses and burros on rangeland health, riparian zones, water quality, soil compaction, seed bed disturbance, native wildlife and endangered or threatened species and transmit the results of the assessment to the Committee on Natural Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate.

"(9) In identifying or designating any new rangeland, or establishing any sanctuary or exclusive use area for wild free-roaming horses and burros, the Secretary of the Interior and the Secretary of Agriculture shall take into ac-

BLM_000378

4

count and avoid any potential conflicts with wind, solar, geothermal, oil, natural gas, energy transmission, and mineral resources potential of the lands affected by the identification, designation, or establishment.

"(10)   Research,   develop,   and   implement   enhanced   surgical   or immunocontraception sterilization or other safe methods of fertility control.".

(c) In subsection (b) of section 3, by striking "(2) Where" and inserting "(d) If".

(d) In subsection (d) (as so designated) of section 3—

(1) by striking "determines" and all that follows through "horses and burros to be" in subparagraph (B) and inserting "has exhausted all practicable options for maintaining a thriving natural ecological balance on the range, the Secretary may provide that wild free-roaming horses and burros are";

(2) by striking "for which he determines" the first place it appears and inserting "so long as the Secretary has determined";

(3) by striking "and for which he determines he can assure" and inserting "and the Secretary can ensure";

(4) by striking "(including" and all that follows through "That, not" and inserting the following: "by requiring that—

"(1) no";

(5) in paragraph (1) (as so designated)—

(A) by striking "animals" the first two places it appears and inserting "wild free-roaming horses and burros";

(B) by striking "such" the first place it appears and inserting "the"; and

(C) by striking "and" after the semicolon and adding the following:

"(2) each individual adopter shall execute an appropriate attestation, pursuant to section 1001 of title 18, United States Code, affirming that adopted animals and their remains shall not be used for commercial purposes; and

"(3) wild free-roaming horses and burros may not be contained in corrals or short-term holding facilities for more than 6 months while awaiting disposition."; and

(6) by striking subparagraph (C) and paragraph (3).

(e) Redesignate subsection (c) of section 3 as subsection (e) and in such subsection—

(1) by striking "Where excess animals have" and inserting "When a wild free-roaming horse or burro has";

(2) by striking "a period of";

(3) by striking "is authorized" and inserting "shall,";

(4) by inserting a comma after "transferee";

(5) by striking "to" before "grant";

(6) by striking "title to not more than four animals to"; and

(7) by striking "at the end of the one-year period" and inserting "title to that animal".

(f) Redesignate subsection (d) of section 3 as subsection (f) and in such subsection—

(1) by striking "Wild" and inserting "(1) Except as provided for in paragraph (2), wild";

(2) by redesignating paragraphs (1) through (4) as subparagraphs (A) through (D), respectively;

(3) in subparagraph (A) (as so redesignated), by striking "(c) except for the limitation of subsection (c)(1)" and inserting "(e)";

(4) in subparagraph (C) (as so redesignated), by striking "(b)"and inserting "(h)";

(5) in subparagraph (D) (as so redesignated), by striking "; or" and inserting a period; and

(6) in paragraph (5), by striking "(5)" and all that follows through "burro" and inserting the following:

"(2) No animal ever covered under this Act".

(g) By inserting after section 3(f) (as so redesignated) the following:

"(g) Not later than one year after the date of enactment of this subsection, for the purposes of carrying out a successful wild free-roaming horse and burro adoption program the Secretary shall—

"(1) implement creative and more aggressive marketing strategies for the adoption program, including the use of the internet or other media to showcase horses and the adoption program;

"(2) explore public outreach opportunities, including agreements with local and State organizations that are using horses for rehabilitation, therapy, or prisoner programs;

"(3) provide resources to properly screen and train potential adopters;

"(4) conduct tours of Bureau of Land Management facilities for interested parties;

5

"(5) develop volunteer mentor and compliance check programs for assisting the agency in facilitating successful adoptions;

"(6) develop a program through which potential adopters may be offered an economic incentive for successful completion of the adoption process; and

"(7) take any and all other actions that the Secretary determines to be necessary and useful towards expanding the wild horse and burro adoption program.

"(h) The Secretary may not destroy or authorize the destruction of wild free-roaming horses or burros unless the Secretary—

"(1) determines that the wild free-roaming horse or burro is terminally ill or fatally injured; and

"(2) ensures that the terminally ill or fatally injured wild free-roaming horse or burro will be destroyed in the most humane manner.

"(i) If the immediate health or safety of wild free-roaming horses or burros is threatened, such as in severe drought conditions, the Secretary may temporarily remove animals from the range.

"(j) The Secretary may remove from the range wild free-roaming horses and burros determined to be a threat to the health and well being of native plant or wildlife species.

"(k) Except in cases of removal under subsection (d), (i), or (j), if the Secretary removes wild free-roaming horses or burros from an area, the Secretary shall provide a public notice on the Website of the Bureau of Land Management 30 days prior to the planned removal.

"(l) The Secretary shall—

"(1) track the number of wild free-roaming horses and burros injured or killed during gathering or holding in a centralized database system;

"(2) determine what information on the treatment of gathered wild free-roaming horses and burros in holding and adopted wild free-roaming horses and burros could be provided to the public to help inform the public about the treatment of wild free-roaming horses and burros; and

"(3) ensure that such information is easily accessible on the website of the Bureau of Land Management.".

(h) By striking subsection (e) (relating to sale of excess animals).

**SEC. 6. PRIVATE MAINTENANCE.**

Section 4 (16 U.S.C. 1334) is amended—

(1) by striking "animals removed" and inserting "animals returned to public land"; and

(2) by inserting "pursuant to section 3(h)" after "agents of the Secretary".

**SEC. 7. COOPERATIVE AGREEMENTS.**

Section 6 (16 U.S.C. 1336) is amended by inserting "and other private entities" after "landowners".

**SEC. 8. JOINT ADVISORY BOARD.**

Section 7 (16 U.S.C. 1337) is amended—

(1) by striking "nine" and inserting "12";

(2) by striking "Governments" and all that follows "management." and inserting "Governments and shall include at a minimum three representatives of the livestock industry; three representatives of the environmental community; three representatives of the animal protection community; and three scientists with expertise in wildlife management, animal husbandry, or natural resource management."; and

(3) by adding at the end the following new sentence: "Nomination of members of the board shall be conducted by public notice and comment in accordance with the Federal Advisory Committee Act (5 U.S.C. Appendix) and shall be for a term of four years. No individual shall serve more then two consecutive terms.".

**SEC. 9. CRIMINAL PROVISIONS.**

Section 8 (16 U.S.C. 1338) is amended——

(1) by striking "Any person who" and inserting "(a) Any person who"; and

(2) in paragraph (4) of subsection (a) (as so designated)—

(A) by striking "except as provided in section 3(e),";

(B) by inserting ", transports for processing," after "processes";

(C) by striking "the remains of a" and inserting "a live or deceased"; and

(D) by inserting "for consideration" after "burro".

**SEC. 10. LIMITATION OF AUTHORITY.**

Strike section 10 (16 U.S.C. 1339) and redesignate section 11 as section 10.

BLM_000380

6

**SEC. 11. REPORTS.**

Section 10 (as so redesignated by section 10 of this Act) is amended as follows:

(1) By striking "After the expiration" and all that follows through "thereafter" and inserting "(a)(1) Not later than one year after the date of enactment of this subsection and annually thereafter".

(2) By striking "will submit to Congress a joint report" and inserting "shall submit to the Committee on Natural Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate a joint report".

(3) By striking "he" and inserting "the Secretaries".

(4) By inserting after subsection (a)(1) (as so designated) the following:

"(2) The report shall also contain the following—

"(A) the number of acres managed by the Bureau of Land Management and the USDA Forest Service for wild free-roaming horses and burros;

"(B) the appropriate management levels on public rangelands;

"(C) a description of the methods used to determine the appropriate management levels and whether it was applied consistently across the agency;

"(D) the number of wild free-roaming horses and burros on public lands;

"(E) a description of the methods used to determine the wild free-roaming horse and burro population;

"(F) any land acquisitions, exchanges, conservation easements, and voluntary grazing buyouts that the Secretary has acquired or pursued for wild free-roaming horses and burros;

"(G) any sanctuaries or exclusive use areas established for wild free-roaming horses and burros;

"(H) programs established for immunocontraception research, development, and management level implementation;

"(I) the extent to which fertility control is being used by the Secretary to control the population of wild free-roaming horses and burros;

"(J) the percentage of the Bureau of Land Management budget devoted to contraception annually;

"(K) the ratio of animals the agency has contracepted and put back on the range; and

"(L) which herds have been administered contraception and with what results.

"(3) Each report submitted under paragraph (2) shall be made available to the public on the Website of the Bureau of Land Management.".

(5) By inserting "(b)" before "The Secretary of the Interior".

## Purpose of the Bill

The purpose of H.R. 1018 is to amend the Wild and Free-Roaming Horses and Burros Act of 1971 to improve the management and long-term health of wild free-roaming horses and burros, and for other purposes.

## Background and Need for Legislation

Although horses evolved in North America, none existed on the continent when Europeans initially explored the Americas. It is believed that Spanish explorers first brought domesticated horses and burros to the Americas in the 1500's. Some of these animals are thought to have escaped and become the first wild herds found in this country. Native Americans soon integrated these horses and burros into their cultures, and these animals became an essential part of tribal life and an enduring facet of our image of the American Indian.

Horses and burros were crucial to the pioneers as well. During America's westward expansion they played a fundamental role in the activities—such as ranching and mining—which led to the development of the American west. Many of these animals though, over time, either escaped or were released, so that by the 19th century as many as 2 million horses and burros roamed wild across

BLM_000381

7

the western range—and into America's collective vision of the western landscape.

However, by the 1950's, the wild horse and burro population had plummeted, and it was estimated that less then 10,000 animals remained on the rangelands. Reports of abuse, disease, and cruelty ignited public awareness, and the outcry over the mistreatment of these animals led to efforts to protect these wild horses and burros and allow them to roam freely on western lands.

THE WILD FREE-ROAMING HORSE AND BURRO ACT OF 1971

The actions of one woman in particular, Mrs. Velma Bronn Johnston (better known by the nickname she earned, "Wild Horse Annie") galvanized public opinion and prompted an educational crusade—which included a massive letter-writing campaign and a beloved children's book. The campaign culminated successfully with the enactment of the landmark *Wild Free-Roaming Horse and Burro Act of 1971* (the 1971 Act) (16 U.S.C. § 1331 et seq.). The Act stated clearly that:

> Congress finds and declares that wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene. It is the policy of Congress that wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of the public lands.

However, while this legislation dramatically improved the plight of wild horses and burros, the law has proven to be far from perfect. As wild animals living on public land, management of these horses and burros fell to the federal government, acting principally through the Bureau of Land Management (BLM). But, under-funding and charges of mismanagement have plagued the BLM since passage of the 1971 Act, and have undermined the BLM Wild Horse and Burro Program and the intent of the law.

While the 1971 Act originally identified 53 million acres of public land on which wild horse and burro herds could roam freely, the BLM has since systematically removed horses and burros from nearly 19 million of those acres. Further, since 1971, more than 200,000 wild horses and burros have been rounded-up from public lands and either adopted or placed in long-term holding facilities. Critics assert that the round-ups are unnecessary and aggressive, and that the BLM has yet to provide adequate justification for their removal and the loss of the 19 million acres. However, of greater concern recently was the announcement in the summer of 2008 that, due to a combination of a lack of funding, facilities and options, the BLM would be required to kill as many as 30,000 healthy wild horses and burros.

THE 2008 GOVERNMENT ACCOUNTABILITY OFFICE REPORT

A 2008 Government Accountability Office (GAO) report identified a number of deficiencies with the BLM wild horse and burro program. The report found that the BLM uses poorly managed removals as the primary method for managing horses. As a result, BLM

BLM_000382

8

now has more horses in holding facilities than in the wild and expends more than two-thirds of the program's budget to care for horses collected with no long-term plan for their care or adoption.

Further, many of the horses and burros currently housed in the BLM's holding centers should likely not have been removed from the range in the first place. The GAO found that the BLM uses an inaccurate method to determine wild horse populations and has yet to provide specific formal guidance to field offices to set Appropriate Management Levels (AMLs) consistently across the states where wild horses and burros are found.

Finally, the report found that BLM had not formally considered other possible solutions to deal with the large number of wild horses in long-term holding facilities. Thus, expanded use of contraception, creation of sanctuaries, and more aggressive adoption programs are all potential alternatives that could address the BLM's challenges, but have not yet been utilized.

### H.R. 1018, THE RESTORE OUR AMERICAN MUSTANGS (ROAM) ACT

H.R. 1018 would amend the 1971 Act to address the issues raised in the 2008 GAO report and includes the GAO's recommendations, as well as other improvements. It is designed to provide federal land managers a broad array of tools with which to maintain healthy, thriving wild horse and burro herds on public lands.

Specifically, the ROAM Act would expand the areas available for wild horses and burros to roam in order to provide BLM needed flexibility in maintaining healthy herds on public lands. The bill would require more scientific methods for estimating the number of wild horses and burros and make that information public through annual reports. Following a specific GAO recommendation, BLM would be required to develop standard criteria for managing wild horses and burros and, after an opportunity for public input, employ those criteria uniformly across the states where wild horses and burros are found. The establishment of sanctuaries and use of enhanced contraception techniques would also be required. The bill would also define the term "thriving natural ecological balance," which was included in the underlying law but never defined. In doing so, the bill requires that the public lands where wild horses and burros are found will be managed in a way that protects ecosystem health, the ecological processes that sustain ecosystem function and a diversity of life-forms, including those listed under the Endangered Species Act, and in a manner consistent with the multiple use mandate of the Federal Lands Policy Management Act (FLPMA).

In instances where these management tools fail to produce an appropriate herd size, the legislation would authorize BLM to humanely capture and remove animals from the range so long as adoption demand exists. The bill tightens adoption requirements and would require BLM to strengthen its adoption program. The ROAM Act specifically prohibits the killing of healthy wild horses and burros. Lastly, the bill would expand the BLM's existing Wild Horse and Burro Advisory Board and require board members with more diverse qualifications.

BLM_000383

9

COMMITTEE ACTION

H.R. 1018 was introduced on February 12, 2009, by Natural Resources Committee Chairman Nick Rahall (D–WV) and National Parks, Forests, and Public Lands Subcommittee Chairman Raúl Grijalva (D–AZ). The bill was referred to the Committee on Natural Resources, and within the Committee to the Subcommittee on National Parks, Forests, and Public Lands.

On March 3, 2009, the House Subcommittee on National Parks, Forests and Public Lands held a hearing on the bill, during which a representative of the Department of the Interior deferred taking a position because of the transition to a new Administration.

On April 29, 2009, the subcommittee was discharged from further consideration of H.R. 1018 and the full Natural Resources Committee met to consider the bill. Subcommittee Chairman Grijalva offered an amendment in the nature of a substitute to H.R. 1018. In addition to technical changes, the substitute clarified changes in response to input from the Administration and advocacy groups.

Representative Bishop (R–UT) offered an amendment to the Grijalva substitute (Bishop #2) to allow a state to override any federal agency decision regarding proposals for new range and sanctuaries for wild free-roaming horses and burros. The amendment was not agreed to by a rollcall vote of 13 yeas and 16 nays, as follows:

10

**COMMITTEE ON NATURAL RESOURCES**
U.S. House of Representatives
111th Congress

Date:   April 29, 2009

Meeting on: <u>HR 1018 - Amendment offered by Mr. Bishop #2 to the Amendment in the Nature of a Substitute was NOT AGREED TO by a roll call vote of 13 yeas and 16 nays.</u>

Recorded Vote # 1 (for office use only)

| MEMBERS | Yea | Nay | Pres | MEMBERS | Yea | Nay | Pres |
|---|---|---|---|---|---|---|---|
| Mr. Rahall, WV | | ✔ | | *Mr. Wittman, VA* | ✔ | | |
| *Mr. Doc Hastings, WA* | ✔ | | | Mr. Boren, OK | | | |
| Mr. Miller, CA | | | | *Mr. Broun, GA* | ✔ | | |
| *Mr. Don Young, AK* | | | | Mr. Sablan, MP | | ✔ | |
| Mr. Markey, MA | | | | *Mr. Fleming, LA* | ✔ | | |
| *Mr. Gallegly, CA* | | | | Mr. Heinrich, NM | | ✔ | |
| Mr. Kildee, MI | | | | *Mr. Coffman, CO* | ✔ | | . |
| *Mr. Duncan, TN* | | | | Mr. Hinchey, NY | | | |
| Mr. DeFazio, OR | | | | *Mr. Chaffetz, UT* | ✔ | | |
| *Mr. Flake, AZ* | ✔ | | | Mrs. Christensen, VI | | ✔ | |
| Mr. Faleomavaega, AS | | ✔ | | *Mrs. Lummis, WY* | ✔ | | |
| *Mr. Brown, SC* | | | | Ms. DeGette, CO | | ✔ | |
| Mr. Abercrombie, HI | | ✔ | | *Mr. McClintock, CA* | ✔ | | |
| *Mrs. McMorris Rodgers, WA* | | | | Mr. Kind, WI | | | |
| Mr. Pallone, NJ | | | | *Mr. Cassidy, LA* | ✔ | | |
| *Mr. Gohmert, TX* | | | | Mrs. Capps, CA | | ✔ | |
| Mrs. Napolitano, CA | | ✔ | | Mr. Inslee, WA | | ✔ | |
| *Mr. Bishop, UT* | ✔ | | | Mr. Baca, CA | | | |
| Mr. Holt, NJ | | | | Ms. Herseth Sandlin, SD | | ✔ | |
| *Mr. Shuster, PA* | | | | Mr. Sarbanes, MD | | ✔ | |
| Mr. Grijalva, AZ | | ✔ | | Ms. Shea-Porter, NH | | ✔ | |
| *Mr. Lamborn, CO* | ✔ | | | Ms. Tsongas, MA | | | |
| Mrs. Bordallo, GU | | | | Mr. Kratovil, Jr., MD | | ✔ | |
| *Mr. Adrian Smith, NE* | ✔ | | | Mr. Pierluisi, PR | | | |
| Mr. Costa, CA | | ✔ | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | **Total** | 13 | 16 | |

Markups - 1/3 to meet (16), 25 to report
May 6, 2009 (6:07pm)

11

Representative Chaffetz (R–UT) offered an amendment to the Grijalva substitute (Chaffetz #1) that would require that the wild horse Joint Advisory Board include representatives from the live-stock industry and from state grazing boards. The amendment was not agreed to by a rollcall vote of 15 yeas and 17 nays, as follows:

12

**COMMITTEE ON NATURAL RESOURCES**
U.S. House of Representatives
111th Congress

Date:   April 29, 2009

Meeting on: **HR 1018 - Amendment offered by Mr. Chaffetz #1 to the Amendment in the Nature of a Substitute was NOT AGREED TO by a roll call vote of 15 yeas and 17 nays.**

Recorded Vote # 2 (for office use only)

| MEMBERS | Yea | Nay | Pres | MEMBERS | Yea | Nay | Pres |
|---|---|---|---|---|---|---|---|
| Mr. Rahall, WV | | ✔ | | *Mr. Wittman, VA* | ✔ | | |
| *Mr. Doc Hastings, WA* | ✔ | | | Mr. Boren, OK | | | |
| Mr. Miller, CA | | | | *Mr. Broun, GA* | ✔ | | |
| *Mr. Don Young, AK* | | | | Mr. Sablan, MP | | ✔ | |
| Mr. Markey, MA | | | | *Mr. Fleming, LA* | ✔ | | |
| *Mr. Gallegly, CA* | | | | Mr. Heinrich, NM | | ✔ | |
| Mr. Kildee, MI | | | | *Mr. Coffman, CO* | ✔ | | |
| *Mr. Duncan, TN* | | | | Mr. Hinchey, NY | | | |
| Mr. DeFazio, OR | | | | *Mr. Chaffetz, UT* | ✔ | | |
| *Mr. Flake, AZ* | ✔ | | | Mrs. Christensen, VI | | ✔ | |
| Mr. Faleomavaega, AS | | ✔ | | *Mrs. Lummis, WY* | ✔ | | |
| *Mr. Brown, SC* | | | | Ms. DeGette, CO | | ✔ | |
| Mr. Abercrombie, HI | | ✔ | | *Mr. McClintock, CA* | ✔ | | |
| *Mrs. McMorris Rodgers, WA* | | | | Mr. Kind, WI | | | |
| Mr. Pallone, NJ | | | | *Mr. Cassidy, LA* | ✔ | | |
| *Mr. Gohmert, TX* | | | | Mrs. Capps, CA | | ✔ | |
| Mrs. Napolitano, CA | | ✔ | | Mr. Inslee, WA | | ✔ | |
| *Mr. Bishop, UT* | ✔ | | | Mr. Baca, CA | | | |
| Mr. Holt, NJ | | ✔ | | Ms. Herseth Sandlin, SD | ✔ | | |
| *Mr. Shuster, PA* | | | | Mr. Sarbanes, MD | | ✔ | |
| Mr. Grijalva, AZ | | ✔ | | Ms. Shea-Porter, NH | | ✔ | |
| *Mr. Lamborn, CO* | ✔ | | | Ms. Tsongas, MA | | ✔ | |
| Mrs. Bordallo, GU | | | | Mr. Kratovil, Jr., MD | | ✔ | |
| *Mr. Adrian Smith, NE* | ✔ | | | Mr. Pierluisi, PR | | | |
| Mr. Costa, CA | ✔ | | | | | | |
| | | | | | | | |
| | | | | **Total** | 15 | 17 | |

Markups - 1/3 to meet (16), 25 to report
May 6, 2009 (6:08pm)

13

Representative Chaffetz then offered an amendment to the Grijalva substitute (Chaffetz #2) that would require the Secretary of the Interior to take into account potential conflicts with oil and gas development, renewable energy resource development, and energy transmission when identifying and designating any new rangeland for wild horses and burros. The amendment was agreed to by voice vote.

Representative Lummis (R–WY) offered an amendment to the Grijalva substitute (Lummis #1) that would limit the rangeland available to wild horses and burros. The amendment was not agreed to by a voice vote.

Representative Lummis then offered an amendment to the Grijalva substitute (Lummis #2) requiring the Secretary to conduct a study of the effects of the designation of new wild horse and burro range, and of the establishment of sanctuaries, on natural resources. The amendment was modified to only require an assessment of new designations and the amendment was then agreed to by voice vote.

Representative Lummis then offered an amendment to the Grijalva substitute (Lummis #4) requiring the Secretary to remove wild and free roaming horses and burros from the range if there is a threat to native plants and wildlife. The amendment was modified to make such removals discretionary and the amendment was agreed to by voice vote.

Representative Lummis then offered an amendment to the Grijalva substitute (Lummis #5) that would strike language in the bill to expand the range available to wild horses and burros. The amendment was not agreed to by a rollcall vote of 14 yeas and 20 nays, as follows:

14

**COMMITTEE ON NATURAL RESOURCES**
U.S. House of Representatives
111th Congress

Date:   April 29, 2009

**Meeting on: <u>HR 1018 - Amendment offered by Mrs. Lummis #5 to the Amendment in the Nature of a Substitute was NOT AGREED TO by a roll call vote of 14 yeas and 20 nays.</u>**

Recorded Vote # 3 (for office use only)

| MEMBERS | Yea | Nay | Pres | MEMBERS | Yea | Nay | Pres |
|---|---|---|---|---|---|---|---|
| Mr. Rahall, WV | | ✔ | | *Mr. Wittman, VA* | ✔ | | |
| *Mr. Doc Hastings, WA* | ✔ | | | Mr. Boren, OK | | | |
| Mr. Miller, CA | | | | *Mr. Broun, GA* | ✔ | | |
| *Mr. Don Young, AK* | | | | Mr. Sablan, MP | | ✔ | |
| Mr. Markey, MA | | ✔ | | *Mr. Fleming, LA* | ✔ | | |
| *Mr. Gallegly, CA* | | | | Mr. Heinrich, NM | | ✔ | |
| Mr. Kildee, MI | | | | *Mr. Coffman, CO* | ✔ | | |
| *Mr. Duncan, TN* | | | | Mr. Hinchey, NY | | ✔ | |
| Mr. DeFazio, OR | | | | *Mr. Chaffetz, UT* | ✔ | | |
| *Mr. Flake, AZ* | ✔ | | | Mrs. Christensen, VI | | ✔ | |
| Mr. Faleomavaega, AS | | ✔ | | *Mrs. Lummis, WY* | ✔ | | |
| *Mr. Brown, SC* | | | | Ms. DeGette, CO | | ✔ | |
| Mr. Abercrombie, HI | | ✔ | | *Mr. McClintock, CA* | ✔ | | |
| *Mrs. McMorris Rodgers, WA* | | | | Mr. Kind, WI | | | |
| Mr. Pallone, NJ | | ✔ | | *Mr. Cassidy, LA* | ✔ | | |
| *Mr. Gohmert, TX* | | | | Mrs. Capps, CA | | ✔ | |
| Mrs. Napolitano, CA | | ✔ | | Mr. Inslee, WA | | ✔ | |
| *Mr. Bishop, UT* | ✔ | | | Mr. Baca, CA | | | |
| Mr. Holt, NJ | | ✔ | | Ms. Herseth Sandlin, SD | ✔ | | |
| *Mr. Shuster, PA* | | | | Mr. Sarbanes, MD | | ✔ | |
| Mr. Grijalva, AZ | | ✔ | | Ms. Shea-Porter, NH | | ✔ | |
| *Mr. Lamborn, CO* | ✔ | | | Ms. Tsongas, MA | | ✔ | |
| Mrs. Bordallo, GU | | | | Mr. Kratovil, Jr., MD | | ✔ | |
| *Mr. Adrian Smith, NE* | ✔ | | | Mr. Pierluisi, PR | | | |
| Mr. Costa, CA | | ✔ | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | **Total** | **14** | **20** | |

Markups - 1/3 to meet (16), 25 to report
June 18, 2009 (11:40am)

15

The Grijalva amendment in the nature of a substitute was then agreed to by voice vote. The bill, as amended, was then ordered favorably reported to the House of Representatives by a rollcall vote of 21 yeas and 14 nays, as follows:

BLM_000390

16

**COMMITTEE ON NATURAL RESOURCES**
U.S. House of Representatives
111th Congress

Date:   April 29, 2009

Meeting on: <u>**HR 1018 - Favorably reported to the House, as amended, by a roll call vote of of 21 yeas and 14 nays.**</u>

Recorded Vote # 4 (for office use only)

| MEMBERS | Yea | Nay | Pres | MEMBERS | Yea | Nay | Pres |
|---|---|---|---|---|---|---|---|
| Mr. Rahall, WV | ✔ | | | *Mr. Wittman, VA* | | ✔ | |
| *Mr. Doc Hastings, WA* | | ✔ | | Mr. Boren, OK | | | |
| Mr. Miller, CA | | | | *Mr. Broun, GA* | | ✔ | |
| *Mr. Don Young, AK* | | | | Mr. Sablan, MP | ✔ | | |
| Mr. Markey, MA | ✔ | | | *Mr. Fleming, LA* | | ✔ | |
| *Mr. Gallegly, CA* | | | | Mr. Heinrich, NM | ✔ | | |
| Mr. Kildee, MI | | | | *Mr. Coffman, CO* | | ✔ | |
| *Mr. Duncan, TN* | | | | Mr. Hinchey, NY | ✔ | | |
| Mr. DeFazio, OR | ✔ | | | *Mr. Chaffetz, UT* | | ✔ | |
| *Mr. Flake, AZ* | | ✔ | | Mrs. Christensen, VI | ✔ | | |
| Mr. Faleomavaega, AS | ✔ | | | *Mrs. Lummis, WY* | | ✔ | |
| *Mr. Brown, SC* | | | | Ms. DeGette, CO | ✔ | | |
| Mr. Abercrombie, HI | ✔ | | | *Mr. McClintock, CA* | | ✔ | |
| *Mrs. McMorris Rodgers, WA* | | | | Mr. Kind, WI | | | |
| Mr. Pallone, NJ | ✔ | | | *Mr. Cassidy, LA* | | ✔ | |
| *Mr. Gohmert, TX* | | | | Mrs. Capps, CA | ✔ | | |
| Mrs. Napolitano, CA | ✔ | | | Mr. Inslee, WA | ✔ | | |
| *Mr. Bishop, UT* | | ✔ | | Mr. Baca, CA | | | |
| Mr. Holt, NJ | ✔ | | | Ms. Herseth Sandlin, SD | | ✔ | |
| *Mr. Shuster, PA* | | | | Mr. Sarbanes, MD | ✔ | | |
| Mr. Grijalva, AZ | ✔ | | | Ms. Shea-Porter, NH | ✔ | | |
| *Mr. Lamborn, CO* | | ✔ | | Ms. Tsongas, MA | ✔ | | |
| Mrs. Bordallo, GU | | | | Mr. Kratovil, Jr., MD | ✔ | | |
| *Mr. Adrian Smith, NE* | | ✔ | | Mr. Pierluisi, PR | | | |
| Mr. Costa, CA | | ✔ | | | | | |
| | | | | | | | |
| | | | | **Total** | **21** | **14** | |

Markups - 1/3 to meet (16), 25 to report
May 6, 2009 (6:08pm)

17

SECTION-BY-SECTION ANALYSIS

*Section 1. Short title*

Section 1 provides that this Act may be cited as the "Restore Our American Mustangs Act."

*Section 2. Reference*

Section 2 establishes that all instructions in the bill to repeal or amend existing law shall be considered to be made to a section or other provision of the "*Wild Free-Roaming Horses and Burros Act of 1971*" (16 U.S.C. 1331 et seq.; hereafter in this report referred to as the "1971 Act"), except as otherwise expressly provided.

*Section 3. Policy*

Section 3 makes a minor amendment to the policy statement of the 1971 Act by striking the phrase "in the area where presently found,". This is one of several amendments which will allow the BLM to find new range for wild horses and burros.

*Section 4. Definitions*

Section 4 amends Section 2 of the 1971 Act, by updating several existing definitions and then adding and defining two new terms.

Specifically, Section 4 includes the addition and definition of the term "thriving natural ecological balance" and the term "fatally injured or terminally ill". They are defined as follows:

(g) "thriving natural ecological balance" means a condition that protects ecosystem health, the ecological processes that sustain ecosystem function and a diversity of life forms, including those species listed under the Endangered Species Act of 1973, and further ensures that wild horses and burros, livestock and wildlife species are given fair consideration in the allocation of resources on those lands where said species are authorized or managed consistent with the requirements of the Federal Land Policy and Management Act of 1976 (P.L. 94–579) and other applicable law. The Committee would note that this term already appears in the law but has not been defined previously. In providing a definition, it is the Committee's intent that management of wild horses and burros be more consistent and balanced and that resource management decisions, including the allocation of forage, be more equitable.

(h) "fatally injured or terminally ill" means an animal exhibiting one or more of the following: (1) A hopeless prognosis for life. (2) A chronic or incurable disease, injury, lameness, or serious physical defect (including severe tooth loss or wear, club foot, and other severe congenital abnormalities). (3) A condition requiring continuous treatment for the relief of pain and suffering in a domestic setting. (4) An acute or chronic illness, injury, physical condition or lameness that would preclude an acceptable quality of life for the foreseeable future.

*Section 5. Inventory and determinations*

Section 5 amends and rewrites significant parts of Section 3 of the 1971 Act. References below are made to section 3 of the 1971 Act as amended by section 5 of H.R. 1018, and are as follows:

Section 3(a) of the 1971 Act is amended to update and clarify the Secretary's jurisdiction and responsibilities with regards to the

18

management and protection of wild horses and burros. Specifically, a new provision is added, subsection (a)(7), which requires the Secretary to ensure that the acreage available for wild horses and burros shall never be less then the acreage available to these animals at the time of the passage of the 1971 Act.

Section 3(b) of the 1971 Act is amended to require the Secretary to determine if a thriving natural ecological balance exists with regards to the population of wild horses and burros on public lands. In order make that determination, the Secretary is first required to maintain an inventory of wild and free-roaming horses and burros on public lands. Two new subsections are included, which also require the Secretary to update the inventory every two years make the inventory available to the public on the Bureau of Land Management's website.

Section 3(c) is a new section which directs the Secretary to take certain actions in order to manage wild horses and burros and to achieve and maintain a thriving natural ecological balance on rangelands where these animals are found.

Section 3(c) provides that fertility control shall be one of the tools that the Secretary shall use to manage wild horses and burros. It is the Committee's intent that the Bureau of Land Management shall research, develop, and implement enhanced fertility control for mares and/or stallions, including but not limited to surgical, chemical or immunocontraception or other safe, humane and effective methods of fertility control.

Section 3(d) is a new section, but in drafting this section, substantial parts of section 3(b) of the 1971 Act were rewritten or deleted to accommodate a shift in policy. Specifically, the bill strikes language in section 3(b)(2)(A) of the 1971 Act allowing the Secretary to order "old, sick, or lame animals" to be destroyed. The bill also strikes section 3(b)(2)(C), which authorizes the Secretary to destroy any wild horse or burro, for which an adoption demand does not exist.

Section 3(d) provides that wild horses and burros may only be removed if the Secretary has exhausted all practicable options for maintaining a thriving natural ecological balance on the range, as laid out in section 3(c); and so long as the Secretary has determined that an adoption demand, by a qualified individual, exists; and so long as the Secretary can ensure their humane capture and removal. Once removed for private maintenance and care, the Secretary must ensure the humane treatment and care of these animals.

Section 3(e) updates section 3(c) of the 1971 Act. It authorizes the Secretary to transfer title of a wild horse or burro, to a qualified individual, one year after adoption of that animal. However, it provides that the transfer of title can only occur if the Secretary has determined that the individual has provided humane conditions, treatment and care for these animals.

Section 3(f) rewrites section 3(d) of the 1971 Act. This section provides that (1) wild and free-roaming horses and burros or their remains shall lose their status as wild free-roaming horses or burros, and shall no longer fall within the purview of this Act under certain stipulations listed under this subsection. However, under subsection (2) no animal ever covered under this Act, or its re-

BLM_000393

mains, may be sold or transferred for consideration for processing into commercial products.

Section 3(g) is a new section that requires the Secretary to implement a more effective and dynamic adoption program within one year of enactment of this subsection. Specifically, it requires the Secretary to: (1) implement more aggressive marketing strategies for the adoption program, including the use of the internet of other media to showcase adoptable horses; (2) explore public outreach opportunities, including agreements with local and state organizations that are using horses for rehabilitation, therapy or prisoner programs; (3) provide resources to properly screen and train potential adopters; (4) conduct tours of Bureau of Land Management facilities for interested parties; (5) develop a volunteer mentor and compliance check program for assisting the agency in facilitating successful adoptions; (6) develop a program through which potential adopters may be offered an economic incentive for successful completion of the adoption program; and (7) take all other actions that the Secretary determines to be necessary and useful towards expanding the wild horse and burro adoption program.

Section 3(h) is a new section which provides that the Secretary may not destroy or authorize the destruction of wild free-roaming horses or burros unless the Secretary, (1) determines that the wild free-roaming horse or burro is terminally ill or fatally injured (as defined in section 2(h)); and (2) ensures that the terminally ill or fatally injured wild free-roaming horse or burro will be destroyed in the most humane manner.

Section 3(i) is a new section that provides for emergency removal. It provides that if the immediate health or safety of wild free-roaming horses or burros is threatened, such as in severe drought conditions, the Secretary may temporarily remove these animals from the range.

Section 3(j) is a new section that provides that the Secretary may remove from the range wild free-roaming horses and burros determined to be a threat to the health and well being of native plant or wildlife species.

Section 3(k) is a new section. It provides that, except in cases of removal under subsections (d), (i), or (j), if the Secretary removes wild free-roaming horses or burros from an area, the Secretary shall provide a public notice 30 days prior to the planned removal.

Section 3(l) is a new section to address transparency. It provides that the Secretary shall (1) track the number of wild free-roaming horses and burros injured or killed during gathering or holding in a centralized database system; (2) determine what information on the treatment of gathered wild free-roaming horses and burros in holding and adopted wild free-roaming horses and burros could be provided to the public to help inform the public about the treatment of wild free-roaming horses and burros; and (3) ensure that such information is easily accessible on the website of the Bureau of Land Management.

*Section 6. Private maintenance*

Section 6 amends Section 4 of the 1971 Act. Specifically it directs that wild and free-roaming horses or burros that wander onto privately owned land, shall be returned to the public land.

BLM_000394

20

### Section 7. Cooperative agreements

Section 7 amends the 1971 Act to authorize the Secretary to enter into cooperative agreements with other landowners, and with state and local governmental agencies. This section also amends the 1971 Act to authorize the Secretary to enter into cooperative agreements with "other private entities" as well.

### Section 8. Joint Advisory Board

Section 8 amends Section 7 of the 1971 Act. It increases the number of members that make up the Joint Advisory Board from 9 to 12 members.

Further, this section reorganizes the make-up of the Joint Advisory Board. It provides that the Advisory Board include at a minimum three representatives of the livestock industry, three representatives of the environmental community, three representatives of the animal protection community; and three scientists with expertise in wildlife management, animal husbandry, or natural resource management. It also provides that the nomination of members shall be conducted by public notice and comment in accordance with the Federal Advisory Committee Act (5 U.S.C. Appendix) and shall be for a term of four years. Finally it directs that no individual shall serve on the Board for more then two consecutive terms.

### Section 9. Criminal provisions

Section 9 amends Section 8 of the 1971 Act. Specifically, it amends Section 8(4) and provides that any person who processes, transports for processing, or permits to be processed into commercial products a live or deceased wild free-roaming horse or burro for consideration, will be subject to a fine of not more than $2,000 or imprisonment for not more than one year, or both.

### Section 10. Limitation of authority

Section 10 strikes all of section 10 of the 1971 Act. This section in the 1971 Act restricted the authority of the Secretary to relocate wild free-roaming horses or burros to areas of the public lands where they did not exist at the time of passage of the 1971 Act. This bill would lift that restriction.

This section also redesignates section 11 of the 1971 Act as section 10.

### Section 11. Reports

Section 11 amends and updates the newly redesignated section 10 of the 1971 Act. Specifically, it updates the reporting requirements to require that not later than one year after the date of enactment of this section and annually thereafter, the Secretaries of the Interior and Agriculture shall submit to the Committee on Natural Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate a joint report on the administration of this Act, including a summary of enforcement and/or other actions taken thereunder, costs, and such recommendations for legislative or other actions as the Secretaries may deem appropriate.

21

### COMMITTEE OVERSIGHT FINDINGS AND RECOMMENDATIONS

Regarding clause 2(b)(1) of rule X and clause 3(c)(1) of rule XIII of the Rules of the House of Representatives, the Committee on Natural Resources' oversight findings and recommendations are reflected in the body of this report.

### CONSTITUTIONAL AUTHORITY STATEMENT

Article I, section 8 and Article IV, section 3, of the Constitution of the United States grant Congress the authority to enact this bill.

### COMPLIANCE WITH HOUSE RULE XIII

1. Cost of Legislation. Clause 3(d)(2) of rule XIII of the Rules of the House of Representatives requires an estimate and a comparison by the Committee of the costs which would be incurred in carrying out this bill. However, clause 3(d)(3)(B) of that rule provides that this requirement does not apply when the Committee has included in its report a timely submitted cost estimate of the bill prepared by the Director of the Congressional Budget Office under section 402 of the Congressional Budget Act of 1974.

2. Congressional Budget Act. As required by clause 3(c)(2) of rule XIII of the Rules of the House of Representatives and section 308(a) of the Congressional Budget Act of 1974, this bill does not contain any new budget authority, spending authority, credit authority, or an increase or decrease in revenues or tax expenditures.

3. General Performance Goals and Objectives. As required by clause 3(c)(4) of rule XIII, the general performance goal or objective of this bill is to amend the Wild and Free-Roaming Horses and Burros Act of 1971 to improve the management and long-term health of wild free-roaming horses and burros.

4. Congressional Budget Office Cost Estimate. Under clause 3(c)(3) of rule XIII of the Rules of the House of Representatives and section 403 of the Congressional Budget Act of 1974, the Committee has received the following cost estimate for this bill from the Director of the Congressional Budget Office:

*H.R. 1018—Restore Our American Mustangs Act*

Summary: H.R. 1018 would amend the Wild Free-Roaming Horses and Burros Act, which governs the protection of wild herds of horses and burros in the western United States. The bill would require that the acreage available to such animals never be less than the area they occupied in 1971. It also would prohibit keeping wild animals in holding facilities for longer than six months. Assuming appropriation of the necessary amounts, CBO estimates that implementing H.R. 1018 would cost about $200 million over the 2010–2014 period. Enacting the bill would not affect revenues or direct spending.

The bill contains no intergovernmental or private-sector mandates as defined in the Unfunded Mandates Reform Act (UMRA) and would not affect the budgets of state, local, or tribal governments.

Estimated cost to the Federal Government: The estimated budgetary impact of H.R. 1018 is shown in the following table. The costs of this legislation fall within budget function 300 (natural resources and environment).

22

| | By fiscal year, in millions of dollars— | | | | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2010–2014 |
| CHANGES IN SPENDING SUBJECT TO APPROPRIATION | | | | | |
| Estimated Authorization Level ............................................. | 6 | 13 | 15 | 136 | 140 | 310 |
| Estimated Outlays ................................................................ | 5 | 9 | 12 | 70 | 104 | 200 |

Basis of estimate: For this estimate, CBO assumes that H.R. 1018 will be enacted during fiscal year 2009 and that the amounts estimated to be necessary will be appropriated for each of fiscal years 2010 through 2014. Estimated outlays are based on spending patterns for similar programs.

CBO estimates that implementing H.R. 1018 would increase discretionary costs of the Bureau of Land Management (BLM), which has primary responsibility for managing herds of wild horses and burros, by about $200 million over the 2010–2014 period. Additional funds would be needed after 2014 to continue acquiring and restoring range land for those animals.

Based on information from federal agencies, CBO estimates that additional funding would be needed by BLM to comply with provisions in the bill that require the agency to manage herds on about 20 million more acres of public land and to restrict the practice of holding animals in corrals in the Midwest. Those provisions would both increase the area that wild herds occupy (from about 33 million acres to 53 million acres) and raise the number of animals kept in the wild (currently around 36,000 animals). The estimated costs of complying with those provisions include:

• $1 million annually (through 2012) to amend federal land use plans to accommodate additional herds and manage them in conjunction with grazing, protection of endangered species, and other agency missions;

• Between $5 million and $13 million annually to manage the herds, including the costs of gathering, treating, and moving animals from existing herds to new federal lands as they breed;

• About $5 million annually (beginning in 2011) to restore damaged rangelands; and

• About $140 million a year (beginning in 2013) to purchase new land to increase the range of herds to the level they occupied in 1971 and to accommodate additional animals that are gathered and moved to avoid over-grazing. For this estimate, CBO assumes that BLM would be able to increase the acreage on which it manages herds by moving some animals to lands managed by other federal agencies. We expect that the agency would also have to purchase significant new acreage, assuming other suitable properties are available. The costs of acquiring additional acreage (primarily after 2013) could be as high as $500 million. We assume that BLM would acquire acreage for the herds rather than free up federal lands currently used for cattle grazing (as authorized by the bill) because very few holders of grazing permits would voluntarily cash in their allotments.

The above costs are net of reductions in the existing program that would result from eliminating the use of Midwest facilities to hold horses and burros for more than six months. The cost of holding currently accounts for well over half of the BLM budget for this

23

program and will, under current law, consume an increasing portion of the agency's budget as wild horses continue to reproduce.

Intergovernmental and private-sector impact: H.R. 1018 contains no intergovernmental or private-sector mandates as defined in UMRA and would not affect the budgets of state, local, or tribal governments.

Estimate prepared by: Federal Costs: Deborah Reis; Impact on State, Local, and Tribal Governments: Melissa Merrell; Impact on the Private Sector: Amy Petz.

Estimate approved by: Theresa Gullo, Deputy Assistant Director for Budget Analysis.

### COMPLIANCE WITH PUBLIC LAW 104–4

This bill contains no unfunded mandates.

### EARMARK STATEMENT

H.R. 1018 does not contain any congressional earmarks, limited tax benefits, or limited tariff benefits as defined in clause 9(d), 9(e) or 9(f) of rule XXI.

### PREEMPTION OF STATE, LOCAL OR TRIBAL LAW

This bill is not intended to preempt any State, local or tribal law.

### CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3(e) of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

## ACT OF DECEMBER 15, 1971

#### (Commonly known as the "Wild Free-Roaming Horses and Burros Act")

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That Congress finds and declares that wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene. It is the policy of Congress that wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death; and to accomplish this they are to be considered 【in the area where presently found, as】 an integral part of the natural system of the public lands.

SEC. 2. As used in this Act—

(a) * * *

(b) "wild free-roaming horses and burros" means all unbranded and unclaimed horses and burros *born or present* on public lands of the United States;

(c) "range" means the amount of land necessary to sustain an existing herd or herds of wild free-roaming horses and burros, 【which does not exceed their known territorial limits,】 and which is devoted principally but not necessarily exclusively to

BLM_000398

24

their welfare in keeping with the multiple-use management concept for the public lands;

(d) "herd" means one or more stallions and his mares *and any associated foals*; 〖and〗

(e) "public lands" means any lands administered by the Secretary of the Interior through the Bureau of Land Management or by the Secretary of Agriculture through the Forest Service 〖.〗*;*

(f) "excess animals" means wild free-roaming horses or burros 〖(1) which have been removed from an area by the Secretary pursuant to applicable law or, (2)〗 which must be removed from an area, *in accordance with section 3(d)*, in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area〖.〗*;*

*(g) "thriving natural ecological balance" means a condition that protects ecosystem health, the ecological processes that sustain ecosystem function and a diversity of life forms, including those species listed under the Endangered Species Act of 1973, and further ensures that wild horses and burros, livestock and wildlife species are given fair consideration in the allocation of resources on those lands where said species are authorized or managed consistent with the requirements of the Federal Land Policy and Management Act of 1976 (P.L. 94–579) and other applicable law; and*

*(h) "fatally injured or terminally ill" means an animal exhibiting one or more of the following:*

*(1) A hopeless prognosis for life.*

*(2) A chronic or incurable disease, injury, lameness, or serious physical defect (including severe tooth loss or wear, club foot, and other severe congenital abnormalities).*

*(3) A condition requiring continuous treatment for the relief of pain and suffering in a domestic setting.*

*(4) An acute or chronic illness, injury, physical condition or lameness that would preclude an acceptable quality of life for the foreseeable future.*

SEC. 3. (a) All wild free-roaming horses and burros are hereby declared to be under the jurisdiction of the Secretary for the purpose of management and protection in accordance with the provisions of this Act. The Secretary 〖is authorized and directed to〗 *shall—*

*(1)* protect and manage wild free-roaming horses and burros as components of the public lands〖, and he may may〗*;*

*(2)* designate and maintain specific ranges on public lands as sanctuaries for 〖their〗 *the* protection and preservation *of wild free-roaming horses and burros*, where the Secretary after consultation with the wildlife agency of the State 〖wherein〗 *where* any such range is proposed and with the Advisory Board established in section 7 of this Act 〖deems〗*, considers* such action 〖desirable. The Secretary shall〗 *desirable;*

*(3)* manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands〖. He shall〗*;*

*(4)* consider the recommendations of qualified scientists in the field of biology and ecology, some of whom shall be independent of both Federal and State agencies and may include

25

members of the Advisory Board established in section 7 【of this Act. All】*;*

*(5) ensure that* management activities 【shall be】 *related to wild free-roaming horses and burros are* at the minimal feasible level and 【shall be】 carried out in consultation with the *relevant State* wildlife agency 【of the State wherein such lands are located】 in order to protect the natural ecological balance of all wildlife species 【which inhabit such lands】, particularly endangered wildlife species【. Any】*;*

*(6) ensure that any* adjustments in forage allocations 【on any such lands shall take】 *are made after taking* into consideration the needs of other wildlife species 【which inhabit such lands.】*; and*

*(7) ensure that the acreage available for wild and free-roaming horses and burros shall never be less than the acreage where wild and free-roaming horses and burros were found in 1971.*

【(b)(1) The Secretary shall】

*(b) In order to determine if a thriving natural ecological balance exists with regards to wild free-roaming horses and burros, the Secretary shall—*

*(1) maintain* 【a current】 *an* inventory of wild free-roaming horses and burros on given areas of the public lands【.】*;*

*(2) update the inventory every two years; and*

*(3) make the inventory available to the public on the Website of the Bureau of Land Management.*

【The purpose of such inventory shall be to: make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals; determine appropriate management levels of wild free-roaming horses and burros on these areas of the public lands; and determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels). In making such determinations the Secretary】

*(c) In order to better manage and protect wild free-roaming horses and burros, and to achieve and maintain a thriving natural ecological balance, the Secretary, not later than one year after the date of the enactment of this section, shall take the following actions:*

*(1) Adopt and employ the best scientific, peer-reviewed methods to accurately estimate wild free-roaming horse and burro populations on public lands for purposes of the inventory required in subsection (b).*

*(2) Develop a policy and standards, with public involvement, for setting consistent, appropriate management levels on public lands, based on scientifically sound methodologies.*

*(3) Provide a public process, including a period for notice and comment, for finalizing appropriate management level standards.*

*(4) Publish and distribute these standards to each field office so that the methodology for estimating population and determining appropriate management levels is consistent across public lands.*

26

*(5) Train Federal personnel on the use of these standard techniques to estimate population and determine appropriate management levels.*

⟦shall consult with⟧ *(6) Develop and finalize the standards in consultation with—*

*(A)* the United States Fish and Wildlife Service⟦,⟧*;*

*(B)* wildlife agencies of the State or States ⟦wherein⟧ *where* wild free-roaming horses and burros are located⟦, such individuals⟧*;*

*(C) individuals* independent of Federal and State government as have been recommended by the National Academy of Sciences⟦,⟧*;* and ⟦such other individuals⟧

*(D) individuals* whom ⟦he⟧ *the Secretary* determines *to* have scientific expertise and special knowledge of wild horse and burro protection, wildlife management and animal husbandry as related to rangeland management.

*(7) Identify new, appropriate rangeland for wild free roaming horses and burros, including use of land acquisitions, exchanges, conservation easements, voluntary grazing buyouts, and agreements with private landowners to allow for the federally supervised protection of wild horses and burros on private lands, except that the Secretary shall assess the effects of new range for wild free-roaming horses and burros on rangeland health, riparian zones, water quality, soil compaction, seed bed disturbance, native wildlife, and endangered or threatened species and transmit the results of the assessment to the Committee on Natural Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate.*

*(8) Establish sanctuaries or exclusive use areas, except that the Secretary shall assess the effects of sanctuaries or exclusive use areas for wild free-roaming horses and burros on rangeland health, riparian zones, water quality, soil compaction, seed bed disturbance, native wildlife and endangered or threatened species and transmit the results of the assessment to the Committee on Natural Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate.*

*(9) In identifying or designating any new rangeland, or establishing any sanctuary or exclusive use area for wild free-roaming horses and burros, the Secretary of the Interior and the Secretary of Agriculture shall take into account and avoid any potential conflicts with wind, solar, geothermal, oil, natural gas, energy transmission, and mineral resources potential of the lands affected by the identification, designation, or establishment.*

*(10) Research, develop, and implement enhanced surgical or immunocontraception sterilization or other safe methods of fertility control.*

⟦(2) Where⟧ *(d) If* the Secretary ⟦determines on the basis of (i) the current inventory of lands within his jurisdiction; (ii) information contained in any land use planning completed pursuant to section 202 of the Federal Land Policy and Management Act of 1976; (iii) information contained in court ordered environmental impact statements as defined in section 2 of the Public Range Lands Improvement Act of 1978; and (iv) such additional information as becomes available to him from time to time, including that informa-

27

tion developed in the research study mandated by this section, or in the absence of the information contained in (i-iv) above on the basis of all information currently available to him, that an over-population exists on a given area of the public lands and that action is necessary to remove excess animals, he shall immediately remove excess animals from the range so as to achieve appropriate management levels. Such action shall be taken, in the following order and priority, until all excess animals have been removed so as to restore a thriving natural ecological balance to the range, and protect the range from the deterioration associated with over-population:

⟦(A) The Secretary shall order old, sick, or lame animals to be destroyed in the most humane manner possible;

⟦(B) The Secretary shall cause such number of additional excess wild free-roaming horses and burros to be⟧ *has exhausted all practicable options for maintaining a thriving natural ecological balance on the range, the Secretary may provide that wild free-roaming horses and burros are* humanely captured and removed for private maintenance and care ⟦for which he determines⟧ *so long as the Secretary has determined* an adoption demand exists by qualified individuals, ⟦and for which he determines he can assure⟧ *and the Secretary can ensure* humane treatment and care ⟦(including proper transportation. feeding, and handling): *Provided*, That, not⟧ *by requiring that—*

*(1) no* more than four ⟦animals⟧ *wild free-roaming horses and burros* may be adopted per year by any individual unless the Secretary determines in writing that ⟦such⟧ *the* individual is capable of humanely caring for more than four ⟦animals⟧ *wild free-roaming horses and burros*, including the transportation of such animals by the adopting party; ⟦and⟧

*(2) each individual adopter shall execute an appropriate attestation, pursuant to section 1001 of title 18, United States Code, affirming that adopted animals and their remains shall not be used for commercial purposes; and*

*(3) wild free-roaming horses and burros may not be contained in corrals or short-term holding facilities for more than 6 months while awaiting disposition.*

⟦(C) The Secretary shall cause additional excess wild free-roaming horses and burros for which an adoption demand by qualified individuals does not exist to be destroyed in the most humane and cost efficient manner possible.

⟦(3) For the purpose of furthering knowledge of wild horse and burro population dynamics and their interrelationship with wildlife, forage and water resources, and assisting him in making his determination as to what constitutes excess animals, the Secretary shall contract for a research study of such animals with such individuals independent of Federal and State government as may be recommended by the National Academy of Sciences for having scientific expertise and special knowledge of wild horse and burro protection, wildlife management and animal husbandry as related to rangeland management. The terms and outline of such research study shall be determined by a research design panel to be appointed by the President of the National Academy of Sciences. Such study shall be completed and submitted by the Secretary to the

BLM_000402

28

Senate and House of Representatives on or before January 1, 1983.〕

〔(c) Where excess animals have〕 *(e) When a wild free-roaming horse or burro has* been transferred to a qualified individual for adoption and private maintenance pursuant to this Act and the Secretary determines that such individual has provided humane conditions, treatment and care for such animal or animals for 〔a period of〕 one year, the Secretary 〔is authorized〕 *shall,* upon application by the transferee, *to* grant 〔title to not more than four animals to〕 the transferee 〔at the end of the one-year period〕 *title to that animal.*

〔(d) Wild〕 *(f)(1) Except as provided for in paragraph (2),* wild free-roaming horses and burros or their remains shall lose their status as wild free-roaming horses or burros and shall no longer be considered as falling within the purview of this Act—

〔(1)〕 *(A)* upon passage of title pursuant to subsection 〔(c) except for the limitation of subsection (c)(1)〕 *(e)* of this section; or

〔(2)〕 *(B)* if they have been transferred for private maintenance or adoption pursuant to this Act and die of natural causes beforepassage of title; or

〔(3)〕 *(C)* upon destruction by the Secretary or his designee pursuant to subsection 〔(b)〕 *(h)* of this section; or

〔(4)〕 *(D)* if they die of natural causes on the public lands or on private lands where maintained thereon pursuant to section 4 and disposal is authorized by the Secretary or his designee〔; or〕.

〔(5) upon destruction or death for purposes of or incident to the program authorized in section 3 of this Act; Provided, That no wild free-roaming horse or burro〕

*(2) No animal ever covered under this Act* or its remains may be sold or transferred for consideration for processing into commercial products.

*(g) Not later than one year after the date of enactment of this subsection, for the purposes of carrying out a successful wild free-roaming horse and burro adoption program the Secretary shall—*

*(1) implement creative and more aggressive marketing strategies for the adoption program, including the use of the internet or other media to showcase horses and the adoption program;*

*(2) explore public outreach opportunities, including agreements with local and State organizations that are using horses for rehabilitation, therapy, or prisoner programs;*

*(3) provide resources to properly screen and train potential adopters;*

*(4) conduct tours of Bureau of Land Management facilities for interested parties;*

*(5) develop volunteer mentor and compliance check programs for assisting the agency in facilitating successful adoptions;*

*(6) develop a program through which potential adopters may be offered an economic incentive for successful completion of the adoption process; and*

*(7) take any and all other actions that the Secretary determines to be necessary and useful towards expanding the wild horse and burro adoption program.*

BLM_000403

29

(h) The Secretary may not destroy or authorize the destruction of wild free-roaming horses or burros unless the Secretary—

   (1) determines that the wild free-roaming horse or burro is terminally ill or fatally injured; and

   (2) ensures that the terminally ill or fatally injured wild free-roaming horse or burro will be destroyed in the most humane manner.

(i) If the immediate health or safety of wild free-roaming horses or burros is threatened, such as in severe drought conditions, the Secretary may temporarily remove animals from the range.

(j) The Secretary may remove from the range wild free-roaming horses and burros determined to be a threat to the health and well being of native plant or wildlife species.

(k) Except in cases of removal under subsection (d), (i), or (j), if the Secretary removes wild free-roaming horses or burros from an area, the Secretary shall provide a public notice on the Website of the Bureau of Land Management 30 days prior to the planned removal.

(l) The Secretary shall—

   (1) track the number of wild free-roaming horses and burros injured or killed during gathering or holding in a centralized database system;

   (2) determine what information on the treatment of gathered wild free-roaming horses and burros in holding and adopted wild free-roaming horses and burros could be provided to the public to help inform the public about the treatment of wild free-roaming horses and burros; and

   (3) ensure that such information is easily accessible on the website of the Bureau of Land Management.

〔(e) SALE OF EXCESS ANIMALS.—

   〔(1) IN GENERAL.—Any excess animal or the remains of an excess animal shall be sold if—

      〔(A) the excess animal is more than 10 years of age; or

      〔(B) the excess animal has been offered unsuccessfully for adoption at least 3 times.

   〔(2) METHOD OF SALE.—An excess animal that meets either of the criteria in paragraph (1) shall be made available for sale without limitation, including through auction to the highest bidder, at local sale yards or other convenient livestock selling facilities, until such time as—

      〔(A) all excess animals offered for sale are sold; or

      〔(B) the appropriate management level, as determined by the Secretary, is attained in all areas occupied by wild free-roaming horses and burros.

   〔(3) DISPOSITION OF FUNDS.—Funds generated from the sale of excess animals under this subsection shall be—

      〔(A) credited as an offsetting collection to the Management of Lands and Resources appropriation for the Bureau of Land Management; and

      〔(B) used for the costs relating to the adoption of wild free-roaming horses and burros, including the costs of marketing such adoption.

   〔(4) EFFECT OF SALE.—Any excess animal sold under this provision shall no longer be considered to be a wild free-roaming horse or burro for purposes of this Act.〕

BLM_000404

30

SEC. 4. If wild free-roaming horses or burros stray from public lands onto privately owned land, the owners of such land may inform the nearest Federal marshall or agent of the Secretary, who shall arrange to have the ⟦animals removed⟧ *animals returned to public land.* In no event shall such wild free-roaming horses and burros be destroyed except by the agents of the Secretary *pursuant to section 3(h).* Nothing in this section shall be construed to prohibit a private landowner from maintaining wild free-roaming horses or burros on his private lands, or lands leased from the Government, if he does so in a manner that protects them from harassment, and if the animals were not willfully removed or enticed from the public lands. Any individuals who maintain such wild free-roaming horses or burros on their private lands or lands leased from the Government shall notify the appropriate agent of the Secretary and supply him with a reasonable approximation of the number of animals so maintained.

\*    \*    \*    \*    \*    \*    \*

SEC. 6. The Secretary is authorized to enter into cooperative agreements with other landowners *and other private entities* and with the State and local governmental agencies and may issue such regulations as he deems necessary for the furtherance of the purposes of this Act.

SEC. 7. The Secretary of the Interior and the Secretary of Agriculture are authorized and directed to appoint a joint advisory board of not more than ⟦nine⟧ *12* members to advise them on any matter relating to wild free-roaming horses and burros and their management and protection. They shall select as advisers persons who are not employees of the Federal or State ⟦Governments and whom they deem to have special knowledge about protection of horses and burros, management of wildlife, animal husbandry, or natural resources management.⟧ *Governments and shall include at a minimum three representatives of the livestock industry; three representatives of the environmental community; three representatives of the animal protection community; and three scientists with expertise in wildlife management, animal husbandry, or natural resource management.* Members of the board shall not receive reimbursement except for travel and other expenditures necessary in connection with their services. *Nomination of members of the board shall be conducted by public notice and comment in accordance with the Federal Advisory Committee Act (5 U.S.C. Appendix) and shall be for a term of four years. No individual shall serve more then two consecutive terms.*

SEC. 8. *(a)* Any person who—
(1)  \*  \*  \*

\*    \*    \*    \*    \*    \*    \*

(4) ⟦except as provided in section 3(e),⟧ processes*, transports for processing,* or permits to be processed into commercial products ⟦the remains of a⟧ *a live or deceased* wild free-roaming horse or burro *for consideration,* or

\*    \*    \*    \*    \*    \*    \*

⟦SEC. 10. Nothing in this Act shall be construed to authorize the Secretary to relocate wild free-roaming horses or burros to areas of the public lands where they do not presently exist.⟧

BLM_000405

31

Sec. ⟦11. After the expiration of thirty calendar months following the date of enactment of this Act, and every twenty-four calendar months thereafter⟧ *10. (a)(1) Not later than one year after the date of enactment of this subsection and annually thereafter,* the Secretaries of the Interior and Agriculture ⟦will submit to Congress a joint report⟧ *shall submit to the Committee on Natural Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate a joint report* on the administration of this Act, including a summary of enforcement and/or other actions taken thereunder, costs, and such recommendations for legislative or other actions as ⟦he⟧ *the Secretaries* might deem appropriate.

*(2) The report shall also contain the following—*

*(A) the number of acres managed by the Bureau of Land Management and the USDA Forest Service for wild free-roaming horses and burros;*

*(B) the appropriate management levels on public rangelands;*

*(C) a description of the methods used to determine the appropriate management levels and whether it was applied consistently across the agency;*

*(D) the number of wild free-roaming horses and burros on public lands;*

*(E) a description of the methods used to determine the wild free-roaming horse and burro population;*

*(F) any land acquisitions, exchanges, conservation easements, and voluntary grazing buyouts that the Secretary has acquired or pursued for wild free-roaming horses and burros;*

*(G) any sanctuaries or exclusive use areas established for wild free-roaming horses and burros;*

*(H) programs established for immunocontraception research, development, and management level implementation;*

*(I) the extent to which fertility control is being used by the Secretary to control the population of wild free-roaming horses and burros;*

*(J) the percentage of the Bureau of Land Management budget devoted to contraception annually;*

*(K) the ratio of animals the agency has contracepted and put back on the range; and*

*(L) which herds have been administered contraception and with what results.*

*(3) Each report submitted under paragraph (2) shall be made available to the public on the Website of the Bureau of Land Management.*

*(b)* The Secretary of the Interior and the Secretary of Agriculture shall consult with respect to the implementation and enforcement of this Act and to the maximum feasible extent coordinate the activities of their respective departments and in the implementation and enforcement of this Act. The Secretaries are authorized and directed to undertake those studies of the habits of wild free-roaming horses and burros that they may deem necessary in order to carry out the provisions of this Act.

DISSENTING VIEWS

The Wild Horse and Burro Program of the Bureau of Land Management and the U.S. Forest Service is not working well, and although this bill would dramatically change the program, the proposed changes will not be for the better.

This legislation would expand wild horse and burro populations to all public land and greatly complicate management of wild horse and burro herds by limiting the methods by which the federal agencies can manage the herds and mitigate the damage done to native plants, wildlife and rangeland. We are concerned that expanding the range of free-roaming horses and burros to all public lands will have devastating impacts on rangeland health, damage riparian areas, and threaten long-term sustainability of native fish and wildlife resources and their habitat.

The Wild, Free-Roaming Horses and Burros Act of 1971 gave the Secretaries of the Interior and Agriculture authority to manage wild horses and burros on BLM and National Forest rangelands to protect the herds and ensure healthy rangelands. But with no natural predators, the wild horse and burro populations have grown significantly each year. Wild horses and burros can increase their population at a rate of 15–20% per year, resulting in a population doubling in size every three to four years.

BLM currently manages over 34,000 horses and burros in 181 herd management areas in 10 western states. This population level far exceeds the scientifically determined Appropriate Management Level (AML) or the optimum number of animals on the range of about 27,200 animals. Under current law, where an overpopulation exists, the Secretary is to protect the health of both the herd and the range by removing excess animals to restore a "thriving natural ecological balance" to the range and protect the range from the deterioration associated with overpopulation. As a result, BLM must remove thousands of animals from Western public rangelands each year to ensure that herd sizes are consistent with the land's capacity to support them. The 1971 Act requires the BLM to manage wild horse and burro populations only in the areas where they were found when the law was passed in 1971. These current herd management areas cover a vast area, over 32.6 million acres in ten states, an area bigger than the state of New York. H.R. 1018 would allow these animals to *expand* beyond their current herd management areas to *all public lands*.

Since 2001, over 79,000 animals have been removed from the range. Adoptions and sales of the animals, however, have declined over that same time period. Only 47,000 animals have been placed in private care since 2001. Additionally, extensive attempts to employ birth control technologies have proven expensive, very difficult to administer and ineffective. BLM now holds close to 33,000 un-

(32)

BLM_000407

33

adopted animals, up from 9,807 in 2001. Last year's holding costs accounted for nearly 75% of the program's enacted appropriation.

Clearly, changes in the program are needed. Unfortunately, instead of correcting the problems in the current program, this bill compounds its failures by requiring that wild horses and burros be considered an "integral part of the natural system" on all public lands, not just the areas where they were found when the Act was enacted in 1971. Because rangelands are finite, reductions in forage for wildlife—including endangered species—and reduced allocations for cattle are expected in areas where wild horse and burro herds are expanded. Wild horses are particularly aggressive in defending scarce water sources against use by native wildlife in the critically water-short rangeland of the West.

Unfortunately, the Committee rejected efforts during mark-up to strengthen the bill by adding scientific range management and "look before you leap" provisions. Amendments for studying the impacts on rangeland before creating new wild horse and burro sanctuaries and balancing the advisory panels by adding members with actual range management experience in the affected states were rejected. An amendment to include two representatives of existing grazing boards on the advisory panels was turned down based on the erroneous claim that they are state employees. Questions about where the new sanctuaries would be located and whether or not the bill's ban on "commercial" use of adopted horses bars their use on farms and ranches were left unanswered.

Much as we appreciate the role wild horses play in the romance and mythology of the American West, we believe the laws governing the management of our public lands need to be based on firmer ground. Our goal should be to devise a real-world management program in which healthy herds of these non-native, feral animals thrive in their allotted habitat in a balanced, self sustaining relationship with the land, vegetation, human activities and wildlife. Unfortunately, the well-meaning but misguided policies contained in H.R. 1018, do not take us in that direction.

Doc Hastings.
Doug Lamborn.
Paul C. Broun.
John Fleming.
Rob Bishop.
Adrian Smith.
Cynthia M. Lummis.
Jason Chaffetz.

○

1

070209—prepared for Internal Use by WO-620.
Effect on 1971 WH&B Act of enactment of H.R. 1018, as reported by House Natural
Resources Committee on June 23, 2009 [Report No. 111-177]

The Wild Free-Roaming Horses and Burros Act of 1971, (Public Law 92-195) was
amended as follows:  Sections 1332 and 1333 were modified by the Public Rangelands
Improvement Act of 1978 (Public Law 95-514); Section 1338 was modified by the
Federal Land Policy and Management Act of 1976 (Public Law 94-579);  The Omnibus
Parks and Public Lands Management Act of 1996 (Public Law 104-333) added Section
1338a.; and Section 1333 was again modified by the Fiscal Year 2005 Omnibus
Appropriations Act (Public Law 108-447)

## THE WILD FREE-ROAMING HORSES AND BURROS ACT OF 1971
## (PUBLIC LAW 92-195)

### §1331.  Congressional findings and declaration of policy

Congress finds and declares that wild free-roaming horses and burros are living symbols
of the historic and pioneer spirit of the West; that they contribute to the diversity of life
forms within the Nation and enrich the lives of the American people; and that these
horses and burros are fast disappearing from the American scene. It is the policy of
Congress that wild free-roaming horses and burros shall be protected from capture,
branding, harassment, or death; and to accomplish this they are to be considered in the
area where presently found, as an integral part of the natural system of the public lands.

### §1332.  Definitions

As used in this Act-

(a) "Secretary" means the Secretary of the Interior when used in connection with public
lands administered by him through the Bureau of Land Management and the Secretary of
Agriculture in connection with public lands administered by him through the Forest
Service;

(b) "wild free-roaming horses and burros" means all unbranded and unclaimed horses and
burros born or present on public lands of the United States;

BLM_000409

2

(c) "range" means the amount of land necessary to sustain an existing herd or herds of wild free-roaming horses and burros, ~~which does not exceed their known territorial limits,~~ and which is devoted principally but not necessarily exclusively to their welfare in keeping with the multiple-use management concept for the public lands;

(d) "herd" means one or more stallions and his mares and any associated foals; ~~and~~

(e) "public lands" means any lands administered by the Secretary of the Interior through the Bureau of Land Management or by the Secretary of Agriculture through the Forest Service.~~;~~

(f) "excess animals" means wild free-roaming horses or burros ~~:~~

~~(1) which have been removed from an area by the Secretary pursuant to application law or,~~

~~(2)~~ which must be removed from an area in accordance with section 3(d) in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area~~;~~:

(g) "thriving natural ecological balance" means a condition that protects ecosystem health, the ecological processes that sustain ecosystem function and a diversity of life forms, including those species listed under the Endangered Species Act of 1973, and further ensures that wild horses and burros, livestock and wildlife species are given fair consideration in the allocation of resources on those lands where said species are authorized or managed consistent with the requirements of the Federal Land Policy and Management Act of 1976 (P.L. 94-579) and other applicable law; and

(h) "fatally injured or terminally ill" means an animal exhibiting one or more of the following:
(1) A hopeless prognosis for life.
(2) A chronic or incurable disease, injury, lameness, or serious physical defect (including severe tooth loss or wear, club foot, and other severe congenital abnormalities).

3

(3) A condition requiring continuous treatment for the relief of pain and suffering in a domestic setting.

(4) An acute or chronic illness, injury, physical condition or lameness that would preclude an acceptable quality of life for the foreseeable future.

**§1333.  Powers and duties of Secretary**

(a) Jurisdiction; management; ranges; ecological balance objectives; scientific recommendations; forage allocations adjustments.

All wild free-roaming horses and burros are hereby declared to be under the jurisdiction of the Secretary for the purpose of management and protection in accordance with the provisions of this Act.  The Secretary is authorized and directed to shall

(1) protect and manage wild free-roaming horses and burros as components of the public lands, and he may:

(2) designate and maintain specific ranges on public lands as sanctuaries for their the protection and preservation of wild free-roaming horses and burros, where the Secretary after consultation with the wildlife agency of the State wherein where any such range is proposed and with the Advisory Board established in section 1337 of this Act deems considers such action desirable: .  The Secretary shall

(3) manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands.:

(4) He shall consider the recommendations of qualified scientists in the field of biology and ecology, some of whom shall be independent of both Federal and State agencies and may include members of the Advisory Board established in section 1337 of this Act:

(5) .  Allensure that management activities related to wild free-roaming horses and burros are shall be at the minimal feasible level and shall be carried out in consultation with the wildlife agency of the relevant State wherein such lands are located in order to protect the natural ecological balance of all wildlife species which inhabit such lands, particularly endangered wildlife species:

4

(6) ensure that a  Any adjustments in forage allocations on any such lands shall take are made after taking into consideration the needs of other wildlife species which inhabit such lands; and

(7) ensure that the acreage available for wild and free-roaming horses and burros shall never be less than the acreage where wild and free-roaming horses and burros were found in 1971.

(b) Inventory and determinations; consultations; overpopulations; research study; submittal to Congress.

In order to determine if a thriving natural ecological balance exists with regards to wild free-roaming horses and burros, the Secretary shall—

(1)(1) The Secretary shall maintain a current an inventory of wild free-roaming horses and burros on given areas of the public lands;

(2) update the inventory every two years; and

(3) make the inventory available to the public on the Website of the Bureau of Land Management.

To further protect wild free-roaming horses and burros and to help ensure that BLM makes decisions that will help wild free-roaming horse and burro populations achieve and maintain a thriving natural ecological balance, the Secretary, not later than one year after the date of the enactment of this section, shall take the following actions:

(1) Adopt and employ the best scientific, peer-reviewed methods to accurately estimate wild free-roaming horse and burro populations on public lands for purposes of the inventory required in subsection (b).

(2) Develop a policy and standards, with public involvement, for setting consistent, appropriate management levels on public lands, based on scientifically sound methodologies.

(3) Provide a public process, including a period for notice and comment, for finalizing appropriate management level standards.

(4) Publish and distribute these standards to each field office so that the methodology for estimating population and determining appropriate management levels is consistent across public lands.

5

(5) Train Federal personnel on the use of these standard techniques to estimate population and determine appropriate management levels."

(6)  ~~shall consult with~~ Develop and finalize the standards in consultation with—

(A)

the United States Fish and Wildlife Service~~,~~;

(B) wildlife agencies of the State or States ~~wherein~~ where wild free-roaming horses and burros are located~~,~~; ~~such individuals~~

(C) individuals independent of Federal and State government as have been recommended by the National Academy of Sciences; and ~~such other~~

(D) individuals whom ~~he~~ the Secretary determines to have scientific expertise and special knowledge of wild horse and burro protection, wild-life management, and animal husbandry as related to rangeland management.


(7) Identify new, appropriate rangeland for wild free-roaming horses and burros, including use of land acquisitions, exchanges, conservation easements, voluntary grazing buyouts, and agreements with private landowners to allow for the federally supervised protection of wild horses and burros on private lands, except that the Secretary shall assess the effects of new range for wild free-roaming horses and burros on rangeland health, riparian zones, water quality, soil compaction, seed bed disturbance, native wildlife, and endangered or threatened species and transmit the results of the assessment to the Committee on Natural Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate.


(8) Establish sanctuaries or exclusive use areas,  except that the Secretary shall assess the effects of sanctuaries or exclusive use areas for wild free-roaming horses and burros on rangeland health, riparian zones, water quality, soil compaction, seed bed disturbance, native wildlife, and endangered or threatened species and transmit the results of the assessment to the Committee on Natural Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate.

6

(9) In identifying or designating any new rangeland, or establishing any sanctuary or exclusive use area for wild free-roaming horses and burros, the Secretary of the Interior and the Secretary of Agriculture shall take into account and avoid any potential conflicts with wind, solar, geothermal, oil, natural gas, energy transmission, and mineral resources potential of the lands affected by the identification, designation, or establishment.

(10) Research, develop, and implement enhanced surgical or immunocontraception sterilization or other safe methods of fertility control.

(2) Where (d) If the Secretary has exhausted all practicable options for maintaining a thriving natural ecological balance on the range, the Secretary may provide that wild free-roaming horses and burrow are determines on the basis of:
(i) the current inventory of lands within his jurisdiction;
(ii) information contained in any land use planning completed pursuant to section 1712 of title 43;
 (iii) information contained in court ordered environmental impact statements as defined in section 1902 of title 43; and
(iv) such additional information as becomes available to him from time to time, including that information developed in the research study mandated by this section, or in the absence of the information contained in (i-iv) above on the basis of all information currently available to him, that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, he shall immediately remove excess animals from the range so as to achieve appropriate management levels. Such action shall be taken, in the following order and priority, until all excess animals have been removed so as to restore a thriving natural ecological balance to the range, and protect the range from the deterioration associated with overpopulation.
        (A) The Secretary shall order old, sick, or lame animals to be destroyed in the most humane manner possible;
        (B) The Secretary shall cause such number of additional excess wild free-roaming horses and burros to be humanely captured and removed for private maintenance and care for which he determines so long as the Secretary has determined an adoption demand

7

exists by qualified individuals, and for which he determines he can assure and the Secretary can ensure humane treatment and care (including proper transportation, feeding, and handling): Provided, that, not by requiring that—

(1) no more than four wild free-roaming horses and burros animals may be adopted per year by any individual, unless the Secretary determines in writing that such the individual is capable of humanely caring for more than four wild free-roaming horses and burros animals, including the transportation of such animals by the adopting party;.

(2) each individual adopter shall execute an appropriate attestation, pursuant to section 1001 of title 18, United States Code, affirming that adopted animals and their remains shall not be used for commercial purposes; and

(3) wild free-roaming horses and burros may not be contained in corrals or short-term holding facilities for more than 6 months while awaiting disposition.

(C) The Secretary shall cause additional excess wild free-roaming horses and burros for which an adoption demand by qualified individuals does not exist to be destroyed in the most humane and cost efficient manner possible.

(3)  For the purpose of furthering knowledge of wild horse and burro population dynamics and their interrelationship with wildlife, forage and water resources, and assisting him in making his determination as to what constitutes excess animals, the Secretary shall contract for a research study of such animals with such individuals independent of Federal and State government as may be recommended by the National Academy of Sciences for having scientific expertise and special knowledge of wild horse and burro protection, wildlife management and animal husbandry as related to rangeland management. The terms and outline of such research study shall be determined by a research design panel to be appointed by the President of the National Academy of Sciences. Such study shall be completed and submitted by the Secretary to the Senate and House of Representatives on or before January 1, 1983.

8

(c)  (e) Title of transferee to limited number of excess animals adopted for requisite period;

Where excess animals have When a wild free-roaming horse or burro has been transferred to a qualified individual for adoption and private maintenance pursuant to this Act and the Secretary determines that such individual has provided humane conditions, treatment and care for such animal or animals for a period of one year, the Secretary is authorized shall, upon application by the transferee, to grant title to not more than four animals to the transferee at the end of the one-year period title to that animal.

(d) (f) Loss of status as wild free-roaming horses and burros; exclusion from coverage;

Wild (1) Except as provided for in paragraph (2), wild free-roaming horses and burros or their remains shall lose their status as wild free-roaming horses or burros and shall no longer be considered as falling within the purview of this Act-

(1) (A) upon passage of title pursuant to subsection (c) except for the limitation of subsection (c)(1) (e) of this section, or

(2) (B) if they have been transferred for private maintenance or adoption pursuant to this Act and die of natural causes before passage of title; or

(3) (C) upon destruction by the Secretary or his designee pursuant to subsection (b) (h) of this section; or

(4) (D) if they die of natural causes on the public lands or on private lands where maintained thereon pursuant to section 4 and disposal is authorized by the Secretary or his designee.

; or

(5) upon destruction or death for purposes of or incident to the program authorized in this section.

(e)  Sale of excess animals;

(1)  In general.  Any excess animal or the remains of an excess animal shall be sold if-

9

~~(A)  the excess animal is more than 10 years old; or~~

~~(B)  the excess animal has been offered unsuccessfully for adoption at least 3 times.~~

~~(2)  Method of sale~~

~~An excess animal that meets either of the criteria in paragraph (1) shall be made available for sale without limitation, including through auction to the highest bidder, at local sale yards or other convenient livestock selling facilities, until such time as-~~

~~(A)  all excess animals offered for sale are sold; or~~

~~(B)  the appropriate management level, as determined by the Secretary is attained in all areas occupied by wild free-roaming horses and burros.~~

~~(3)  Disposition of funds~~

~~Funds generated from the sale of excess animals under this subsection shall be-~~

~~(A)  credited as an offsetting collection to the Management of Lands and   Resources appropriation for the Bureau of Land Management; and~~

~~(B)  used for the costs relating to the adoption of wild free-roaming horses and       burros, including the costs of marketing such adoptions.~~

~~(4)  Effect of sale.  Any excess animal sold under this provision shall no longer be considered to be a wild free-roaming horse or burro~~  (2) No animal ever covered under this Act ………..[?]  ~~for purposes of this Act.~~

(g) Not later than one year after the date of enactment of this subsection, for the purposes of carrying out a successful wild free-roaming horse and burro adoption program the Secretary shall—

(1) implement creative and more aggressive marketing strategies for the adoption program, including the use of the internet or other media to showcase horses and the adoption program;

BLM_000417

10

(2) explore public outreach opportunities, including agreements with local and State organizations that are using horses for rehabilitation, therapy, or prisoner programs;

(3) provide resources to properly screen and train potential adopters;

(4) conduct tours of Bureau of Land Management facilities for interested parties;

(5) develop volunteer mentor and compliance check programs for assisting the agency in facilitating successful adoptions;

(6) develop a program through which potential adopters may be offered an economic incentive for successful completion of the adoption process; and

(7) take any and all other actions that the Secretary determines to be necessary and useful towards expanding the wild horse and burro adoption program.

(h) The Secretary may not destroy or authorize the destruction of wild free-roaming horses or burros unless the Secretary—

(1) determines that the wild free-roaming horse or burro is terminally ill or fatally injured; and

(2) ensures that the terminally ill or fatally injured wild free-roaming horse or burro will be destroyed in the most humane manner.

(i) If the immediate health or safety of wild free-roaming horses or burros is threatened, such as in severe drought conditions, the Secretary may temporarily remove animals from the range.

(j) The Secretary may remove from the range wild free-roaming horses and burros determined to be a threat to the health and well being of native plant or wildlife species.

(k) Except in cases of removal under subsections (d), (i), or (j), if the Secretary removes wild free-roaming horses or burros from an area, the Secretary shall provide a public notice on the Website of the Bureau of Land Management 30 days prior to the planned removal.

(l) The Secretary shall—

11

(1) track the number of wild free-roaming horses and burros injured or killed during a gathering or holding in a centralized database system;

(2) determine what information on the treatment of gathered wild free-roaming horses and burros in holding and adopted wild free-roaming horses and burros could be provided to the public to help inform the public about the treatment of wild free-roaming horses and burros; and

(3) ensure that such information is easily accessible on the website of the Bureau of Land Management.

**§ 1334.  Private maintenance; numerical approximation; strays on private lands; removal; destruction by agents**

If wild free-roaming horses or burros stray from public lands onto privately owned land, the owners of such land may inform the nearest Federal marshal or agent of the Secretary, who shall arrange to have the animals returned to public land animals removed. In no event shall such wild free-roaming horses and burros be destroyed except by the agents of the Secretary pursuant to section 3(h). Nothing in this section shall be construed to prohibit a private landowner from maintaining wild free-roaming horses or burros on his private lands, or lands leased from the Government, if he does so in a manner that protects them from harassment, and if the animals were not willfully removed or enticed from the public lands. Any individuals who maintain such wild free-roaming horses or burros on their private lands or lands leased from the Government shall notify the appropriate agent of the Secretary and supply him with a reasonable approximation of the number of animals so maintained.

**§ 1335.  Recovery rights**

A person claiming ownership of a horse or burro on the public lands shall be entitled to recover it only if recovery is permissible under the branding and estray laws of the State in which the animal is found.

12

### § 1336.  Cooperative agreements; regulations

The Secretary is authorized to enter into cooperative agreements with other landowners and other private entities and with the State and local governmental agencies and may issue such regulations as he deems necessary for the furtherance of the purposes of this Act.

### § 1337.  Joint advisory board; appointment; membership; functions; qualifications; reimbursement limitations

The Secretary of the Interior and the Secretary of Agriculture are authorized and directed to appoint a joint advisory board of not more than ~~nine~~ 12 members to advise them on any matter relating to wild free-roaming horses and burros and their management and protection. They shall select as advisers persons who are not employees of the Federal or State Governments and shall include at a minimum three representatives of the livestock industry; three representatives of the environmental community; three representatives of the animal protection community; and three scientists with expertise in wildlife management, animal husbandry, or natural resource management. ~~whom they deem to have special knowledge about protection of horses and burros, management of wildlife, animal husbandry, or natural resources management.~~ Nomination of members of the board shall be conducted by public notice and comment in accordance with the Federal Advisory Committee Act (5 U.S.C. Appendix) and shall be for a term of four years.  No individual shall serve more then two consecutive terms Members of the board shall not receive reimbursement except for travel and other expenditures necessary in connection with their services.

**Commented [aln1]:** As spelled in the legislation.

### §1338.  Criminal provisions

~~(a)~~ Violations; penalties; trial.

(a) Any person who-

 (1) willfully removes or attempts to remove a wild free- roaming horse or burro from the public lands, without authority from the Secretary, or

(2) converts a wild free-roaming horse or burro to private use, without authority from the Secretary, or

13

(3) maliciously causes the death or harassment of any wild free-roaming horse or burro, or

(4) ~~except as provided in section 1333 (e),~~ processes, transfers for processing, or permits to be processed into commercial products ~~the remains of~~ a live or deceased wild free-roaming horse or burro for consideration, or

(5) sells, directly or indirectly, a wild free-roaming horse or burro maintained on private or leased land pursuant to section 1334 of this Act, or the remains thereof, or

(6) willfully violates a regulation issued pursuant to this Act, shall be subject to a fine of not more than $2,000, or imprisonment for not more than one year, or both. Any person so charged with such violation by the Secretary may be tried and sentenced by any United States commissioner or magistrate designated for that purpose by the court by which he was appointed, in the same manner and subject to the same conditions as provided for in section 3401, title 18.


(b) Arrest; appearance for examination or trial; warrants; issuance and execution.

Any employee designated by the Secretary of the Interior or the Secretary of Agriculture shall have power, without warrant, to arrest any person committing in the presence of such employee a violation of this Act or any regulation made pursuant thereto, and to take such person immediately for examination or trial before an officer or court of competent jurisdiction, and shall have power to execute any warrant or other process issued by an officer or court of competent jurisdiction to enforce the provisions of this Act or regulations made pursuant thereto. Any judge of a court established under the laws of the United States, or any United States magistrate may, within his respective jurisdiction, upon proper oath or affirmation showing probable cause, issue warrants in all such cases.


**§ 1338a.  Transportation of captured animals; procedures and prohibitions applicable**

In administering this Act, the Secretary may use or contract for the use of helicopters or, for the purpose of transporting captured animals, motor vehicles. Such use shall be undertaken only after a public hearing and under the direct supervision of the Secretary or

14

of a duly authorized official or employee of the Department.  The provisions of section 47 (a) of title 18 shall not be applicable to such use.  Such use shall be in accordance with humane procedures prescribed by the Secretary.  Nothing in this Act shall be deemed to limit the authority of the Secretary in the management of units of the National Park System, and the Secretary may, without regard either to the provisions of this Act, or provisions of section 47 (a) of title 18, use motor vehicles, fixed-wing aircraft, or helicopters, or to contract for such use, in furtherance of the management of the National Park System, and section 47 (a) of title 18 shall be applicable to such use.

**§ 1339.  Limitation of authority**

Nothing in this Act shall be construed to authorize the Secretary to relocate wild free-roaming horses or burros to areas of the public lands where they do not presently exist.

**§ 1340.1339.  Joint report to Congress; consultation and coordination of implementation, enforcement, and departmental activities; studies**

After the expiration of thirty calendar months following the date of enactment of this Act, and every twenty-four calendar months thereafter(a)(1) Not later than one year after the date of enactment of this subsection and annually thereafter, the Secretaries of the Interior and Agriculture will submit to Congress a joint report shall submit to the Committee on Natural Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate a joint report on the administration of this Act, including a summary of enforcement and/or other actions taken thereunder, costs, and such recommendations for legislative or other actions he the Secretaries might deem appropriate.

(2) The report shall also contain the following--

(A)  the number of acres managed by the Bureau of Land Management and the USDA Forest Service for wild free-roaming horses and burros;

(B)  the appropriate management levels on public rangelands;

**Formatted:** No Spacing, Indent: First line:  0", Adjust space between Latin and Asian text, Adjust space between Asian text and numbers

15

(C)  a description of the methods used to determine the appropriate management levels and whether it was applied consistently across the agency;

(D)  the number of wild free-roaming horses and burros on public lands;

(E)  a description of the methods used to determine the wild free-roaming horse and burro population;

(F)  any land acquisitions, exchanges, conservation easements, and voluntary grazing buyouts that the Secretary has acquired or pursued for wild free-roaming horses and burros;

(G) any sanctuaries or exclusive use areas established for wild free-roaming horses and burros;

(H) programs established for immunocontraception research, development, and management level implementation;

(I) the extent to which fertility control is being used by the Secretary to control the population of wild free-roaming horses and burros;

(J) the percentage of the Bureau of Land Management budget devoted to contraception annually;

(K) the ratio of horses the agency has contracepted and put back on the range; and

(L) which herds have been administered contraception and with what results.


(3) Each report submitted under paragraph (2) shall be made available to the public on the Website of the Bureau of Land Management.


(b) The Secretary of the Interior and the Secretary of Agriculture shall consult with respect to the implementation and enforcement of this Act and to the maximum feasible extent coordinate the activities of their respective departments and in the implementation and enforcement of this Act. The Secretaries are authorized and directed to undertake those studies of the habits of wild free-roaming horses and burros that they may deem necessary in order to carry out the provisions of this Act.

As reported by the House Committee on Natural Resources on June 23, 2009 [Report No. 111-177]

| From: | Dean_Bolstad@blm.gov |
|---|---|
| To: | Fran_Ackley@blm.gov; Bob_D_Mitchell@blm.gov; Gus_Warr@blm.gov; Karen_Malloy@es.blm.gov; Marty_Griffith@blm.gov; Jared_Bybee@blm.gov; Gary_McFadden@blm.gov; Roger_Oyler@blm.gov; Amy_Dumas@ca.blm.gov; Robert_Hopper@blm.gov; bimler@fs.fed.us; Myra_Black@blm.gov; Alan_Shepherd@blm.gov |
| Bcc: | blm@bridge1.iggbcloud.local |
| Subject: | Fw: ROAM in the Senate |
| Date: | Monday, August 17, 2009 1:44:26 PM |
| Attachments: | s1579.pdf |

Dean Bolstad
Deputy Division Chief
Wild Horse and Burro Program
(775) 861-6611(office)
(775) 750-6362 (cell)
----- Forwarded by Dean Bolstad/NVSO/NV/BLM/DOI on 08/17/2009 10:40 AM
-----

Jenna
Whitlock/WO/BLM/D
OI To
Dean Bolstad/NVSO/NV/BLM/DOI@BLM,
08/17/2009 10:00 Lili Thomas/NVSO/NV/BLM/DOI@BLM,
AM Bea Wade/NVSO/NV/BLM/DOI@BLM,
Ramona DeLorme/NVSO/NV/BLM/DOI@BLM,
Mark O'Brien/NVSO/NV/BLM/DOI@BLM,
John Neill/NVSO/NV/BLM/DOI@BLM, Joe
Stratton/NVSO/NV/BLM/DOI@BLM,
Jeannine M
Lesieutre/WO/BLM/DOI@BLM, Sharon L
Kipping/WO/BLM/DOI@BLM, Sally
Spencer/WO/BLM/DOI@BLM, Jenna
Whitlock/WO/BLM/DOI@BLM, Don
Glenn/WO/BLM/DOI@BLM,
Albert.J.Kane@aphis.usda.gov, Janet
Neal/NVSO/NV/BLM/DOI@BLM, Debbie
Collins/WO/BLM/DOI@BLM, Ted
Bailey/MTSO/MT/BLM/DOI@BLM, Alan
Shepherd/NVSO/NV/BLM/DOI@BLM, Susie
Stokke/NVSO/NV/BLM/DOI@BLM
cc

Subject
ROAM in the Senate

FYI, Senator Byrd of West Virginia introduced a companion bill to HR 1018 in the Senate (attached). You'll see that Sen. Reid actually introduced it for Mr. Byrd. This is because Byrd has been infirmed now for months. Reid is the Democratic Majority Leader so he gets the honors of introducing bills when his someone from his caucus is physically unable to. That's how I understand it anyway.

Please call if questions. j

(See attached file: s1579.pdf)

Jenna Whitlock
BLM Wild Horse and Burro Program
(202) 912-7262 desk
(202) 222-8980 cell

II

**111TH CONGRESS**
**1ST SESSION** # S. 1579

To amend the Wild Free-Roaming Horses and Burros Act to improve the management and long-term health of wild free-roaming horses and burros, and for other purposes.

————————————

## IN THE SENATE OF THE UNITED STATES

AUGUST 5, 2009

Mr. REID (for Mr. BYRD) introduced the following bill; which was read twice and referred to the Committee on Energy and Natural Resources

————————————

# A BILL

To amend the Wild Free-Roaming Horses and Burros Act to improve the management and long-term health of wild free-roaming horses and burros, and for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

3  **SECTION 1. SHORT TITLE.**

4    This Act may be cited as the "Restore Our American

5  Mustangs Act".

6  **SEC. 2. REFERENCE.**

7    Except as otherwise expressly provided, whenever in

8  this Act an amendment or repeal is expressed in terms

BLM_000426

2

1 of an amendment to, or repeal of, a section or other provi-

2 sion, the reference shall be considered to be made to a

3 section or other provision of the Act of December 15, 1971

4 (commonly known as the "Wild Free-Roaming Horses and

5 Burros Act"; 16 U.S.C. 1331 et seq.).

**SEC. 3. POLICY.**

7 The first section is amended by striking "in the area

8 where presently found, as".

**SEC. 4. DEFINITIONS.**

10 Section 2 (16 U.S.C. 1332) is amended—

11 (1) in paragraph (b), by inserting "born or

12 present" after "unclaimed horses and burros";

13 (2) in paragraph (c), by striking "which does

14 not exceed their known territorial limits,";

15 (3) in paragraph (d)—

16 (A) by inserting "and any associated foals"

17 after "his mares"; and

18 (B) by striking "and" after the semicolon;

19 (4) in paragraph (e), by striking the period and

20 inserting a semicolon;

21 (5) in paragraph (f)—

22 (A) by striking "(1) which" and all that

23 follows through "(2)";

24 (B) by inserting ", in accordance with sec-

25 tion 3(d)," after "from an area"; and

•S 1579 IS

3

1        (C) by striking the period at the end and

2        inserting a semicolon; and

3      (6) by adding at the end the following:

4        ''(g) 'thriving natural ecological balance' means

5   a condition that protects ecosystem health, the eco-

6   logical processes that sustain ecosystem function and

7   a diversity of life forms, including those species list-

8   ed under the Endangered Species Act of 1973, and

9   further ensures that wild horses and burros, live-

10   stock and wildlife species are given fair consideration

11   in the allocation of resources on those lands where

12   said species are authorized or managed consistent

13   with the requirements of the Federal Land Policy

14   and Management Act of 1976 (Public Law 94–579)

15   and other applicable law; and

16        ''(h) 'fatally injured or terminally ill' means an

17   animal exhibiting one or more of the following:

18        ''(1) A hopeless prognosis for life.

19        ''(2) A chronic or incurable disease, injury,

20        lameness, or serious physical defect (including

21        severe tooth loss or wear, club foot, and other

22        severe congenital abnormalities).

23        ''(3) A condition requiring continuous

24        treatment for the relief of pain and suffering in

25        a domestic setting.

BLM_000428

4

1               "(4) An acute or chronic illness, injury,

2           physical condition or lameness that would pre-

3           clude an acceptable quality of life for the fore-

4           seeable future.".

**5  SEC. 5. INVENTORY AND DETERMINATIONS.**

6     (a) Section 3(a) (16 U.S.C. 1333(a)) is amended as

7  follows:

8     (1) By striking "is authorized and directed to"

9  and inserting "shall—

10     "(1)".

11     (2) By striking ", and he may" and inserting

12  a semicolon.

13     (3) By inserting before "designate" the fol-

14  lowing:

15     "(2)".

16     (4) In paragraph (2) (as so designated)—

17        (A) by striking "their" and inserting

18       "the";

19        (B) by inserting "of wild free-roaming

20       horses and burros" after "preservation";

21        (C) by striking "wherein" and inserting

22       "where";

23        (D) by striking "deems" and inserting ",

24       considers"; and

5

1        (E) by striking "desirable. The Secretary

2      shall" and inserting "desirable;

3      "(3)".

4      (5) In paragraph (3) (as so designated), by

5   striking the period after "public lands" and insert-

6   ing a semicolon.

7      (6) By striking "He shall" and inserting the

8   following:

9      "(4)".

10     (7) In paragraph (4) (as so designated), by

11  striking "of this Act." and inserting "of this Act;".

12     (8) By striking "All" and inserting the fol-

13  lowing:

14     "(5) ensure that".

15     (9) In paragraph (5) (as so designated)—

16        (A) by inserting "related to wild free-roam-

17      ing horses and burros are" after "activities";

18        (B) by striking "shall be" both places it

19      appears;

20        (C) by inserting "relevant State" after "in

21      consultation with the";

22        (D) by striking "of the State wherein such

23      lands are located";

24        (E) by striking "which inhabit such

25      lands"; and

BLM_000430

6

1           (F) by striking the period after "endan-
2       gered wildlife species" and inserting a semi-
3       colon.

4           (10) By striking "Any" and inserting the fol-
5       lowing:

6           "(6) ensure that any".

7           (11) In paragraph (6) (as so designated)—

8           (A) by striking "on any such lands shall
9       take" and inserting "are made after taking";
10      and

11          (B) by striking "which inhabit such
12      lands." and inserting "; and".

13          (12) At the end of such subsection, add the fol-
14      lowing:

15          "(7) ensure that, to the extent practicable, the
16      acreage available for wild and free-roaming horses
17      and burros shall never be less than the acreage
18      where wild and free-roaming horses and burros were
19      found in 1971.".

20      (b) Subsection (b)(1) of section 3 is amended as fol-
21      lows:

22          (1) By striking "(b)(1) The Secretary shall"
23      and inserting the following:

7

1     ''(b) In order to determine if a thriving natural eco-

2  logical balance exists with regards to wild free-roaming

3  horses and burros, the Secretary shall—

4     ''(1)''.

5     (2) In paragraph (1) (as so designated)—

6          (A) by striking ''a current'' and inserting

7       ''an''; and

8          (B) by striking the period after ''public

9       lands'' and inserting a semicolon and the fol-

10      lowing:

11     ''(2) update the inventory every two years; and

12     ''(3) make the inventory available to the public

13     on the Website of the Bureau of Land Manage-

14     ment.''.

15     (3) By striking ''The purpose'' and all that fol-

16     lows through ''the Secretary'' and inserting the fol-

17     lowing:

18     ''(c) In order to better manage and protect wild free-

19  roaming horses and burros, and to achieve and maintain

20  a thriving natural ecological balance, the Secretary, not

21  later than one year after the date of the enactment of this

22  section, shall take the following actions:

23     ''(1) Adopt and employ the best scientific, peer-

24     reviewed methods to accurately estimate wild free-

25     roaming horse and burro populations on public lands

BLM_000432

8

1    for purposes of the inventory required in subsection

2    (b).

3       ''(2) Develop a policy and standards, with pub-

4    lic involvement, for setting consistent, appropriate

5    management levels on public lands, based on sci-

6    entifically sound methodologies.

7       ''(3) Provide a public process, including a pe-

8    riod for notice and comment, for finalizing appro-

9    priate management level standards.

10       ''(4) Publish and distribute these standards to

11    each field office so that the methodology for esti-

12    mating population and determining appropriate

13    management levels is consistent across public lands.

14       ''(5) Train Federal personnel on the use of

15    these standard techniques to estimate population

16    and determine appropriate management levels.''.

17       (4) By striking ''shall consult with'' and insert-

18    ing the following:

19       ''(6) Develop and finalize the standards in con-

20    sultation with—''.

21       (5)(A) By inserting ''(A)'' before ''the United

22    States Fish''.

23       (B) By inserting ''(B)'' before ''wildlife agen-

24    cies''.

BLM_000433

9

1   (C) By striking "wherein" and inserting
2   "where".

3   (D) By striking "such individuals" and insert-
4   ing "(C) individuals".

5   (E) By striking "such other individuals" and
6   inserting "(D) individuals".

7   (F) By striking "he" and inserting "the Sec-
8   retary".

9   (G) By inserting "to" after "determines".

10   (6) In subparagraphs (A) through (C) of para-
11   graph (6) (as so designated), by striking each
12   comma and inserting a semicolon.

13   (7) In subparagraphs (A) through (D) of para-
14   graph (6) (as so designated), by moving the margins
15   of such subparagraphs 4 ems to the right.

16   (8) After paragraph (6) (as so designated), by
17   inserting the following:

18   "(7) Identify new, appropriate rangeland for
19   wild free-roaming horses and burros, including use
20   of land acquisitions, exchanges, conservation ease-
21   ments, voluntary grazing buyouts, and agreements
22   with private landowners to allow for the federally su-
23   pervised protection of wild horses and burros on pri-
24   vate lands, except that the Secretary shall assess the
25   effects of new range for wild free-roaming horses

BLM_000434

10

1     and burros on rangeland health, riparian zones,

2     water quality, soil compaction, seed bed disturbance,

3     native wildlife, and endangered or threatened species

4     and transmit the results of the assessment to the

5     Committee on Natural Resources of the House of

6     Representatives and the Committee on Energy and

7     Natural Resources of the Senate.

8     ''(8) Establish sanctuaries or exclusive use

9     areas, except that the Secretary shall assess the ef-

10     fects of sanctuaries or exclusive use areas for wild

11     free-roaming horses and burros on rangeland health,

12     riparian zones, water quality, soil compaction, seed

13     bed disturbance, native wildlife and endangered or

14     threatened species and transmit the results of the

15     assessment to the Committee on Natural Resources

16     of the House of Representatives and the Committee

17     on Energy and Natural Resources of the Senate.

18     ''(9) In identifying or designating any new

19     rangeland, or establishing any sanctuary or exclusive

20     use area for wild free-roaming horses and burros,

21     the Secretary of the Interior and the Secretary of

22     Agriculture shall take into account and avoid any

23     potential conflicts with wind, solar, geothermal, oil,

24     natural gas, energy transmission, and mineral re-

BLM_000435

11

1    sources potential of the lands affected by the identi-

2    fication, designation, or establishment.

3    ''(10) Research, develop, and implement en-

4    hanced fertility control for mares, stallions, or both,

5    such as surgical or immunocontraception steriliza-

6    tion or other safe, humane, and effective methods of

7    fertility control.''.

8    (c) In subsection (b) of section 3, by striking ''(2)

9  Where'' and inserting ''(d) If''.

10    (d) In subsection (d) (as so designated) of section 3—

11    (1) by striking ''determines'' and all that fol-

12    lows through ''horses and burros to be'' in subpara-

13    graph (B) and inserting ''has exhausted all prac-

14    ticable options for maintaining a thriving natural ec-

15    ological balance on the range, the Secretary may

16    provide that wild free-roaming horses and burros

17    are'';

18    (2) by striking ''for which he determines'' the

19    first place it appears and inserting ''so long as the

20    Secretary has determined'';

21    (3) by striking ''and for which he determines he

22    can assure'' and inserting ''and the Secretary can

23    ensure'';

BLM_000436

12

1    (4) by striking "(including" and all that follows

2    through "That, not" and inserting the following: "by

3    requiring that—

4    "(1) no";

5    (5) in paragraph (1) (as so designated)—

6        (A) by striking "animals" the first two

7        places it appears and inserting "wild free-roam-

8        ing horses and burros";

9        (B) by striking "such" the first place it

10       appears and inserting "the"; and

11       (C) by striking "and" after the semicolon

12       and adding the following:

13   "(2) each individual adopter shall execute an

14   appropriate attestation, pursuant to section 1001 of

15   title 18, United States Code, affirming that adopted

16   animals or their remains shall not be sold or trans-

17   ferred for consideration for processing into commer-

18   cial products; and

19   "(3) wild free-roaming horses and burros may

20   not be contained in corrals or short-term holding fa-

21   cilities for more than 6 months while awaiting dis-

22   position."; and

23   (6) by striking subparagraph (C) and para-

24   graph (3).

BLM_000437

13

1    (e) Redesignate subsection (c) of section 3 as sub-
2    section (e) and in such subsection—

3        (1) by striking "Where excess animals have"
4        and inserting "When a wild free-roaming horse or
5        burro has";

6        (2) by striking "a period of";

7        (3) by striking "is authorized" and inserting
8        "shall,";

9        (4) by inserting a comma after "transferee";

10       (5) by striking "to" before "grant";

11       (6) by striking "title to not more than four ani-
12       mals to"; and

13       (7) by striking "at the end of the one-year pe-
14       riod" and inserting "title to that animal".

15   (f) Redesignate subsection (d) of section 3 as sub-
16   section (f) and in such subsection—

17       (1) by striking "Wild" and inserting "(1) Ex-
18       cept as provided for in paragraph (2), wild";

19       (2) by redesignating paragraphs (1) through
20       (4) as subparagraphs (A) through (D), respectively;

21       (3) in subparagraph (A) (as so redesignated),
22       by striking "(c) except for the limitation of sub-
23       section (c)(1)" and inserting "(e)";

24       (4) in subparagraph (C) (as so redesignated),
25       by striking "(b)"and inserting "(h)";

BLM_000438

14

1        (5) in subparagraph (D) (as so redesignated),

2    by striking "; or" and inserting a period; and

3        (6) in paragraph (5), by striking "(5)" and all

4    that follows through "burro" and inserting the fol-

5    lowing:

6    "(2) No animal ever covered under this Act".

7    (g) By inserting after section 3(f) (as so redesig-

8    nated) the following:

9    "(g) Not later than one year after the date of enact-

10   ment of this subsection, for the purposes of carrying out

11   a successful wild free-roaming horse and burro adoption

12   program the Secretary shall—

13       "(1) implement creative and more aggressive

14   marketing strategies for the adoption program, in-

15   cluding the use of the internet or other media to

16   showcase horses and the adoption program;

17       "(2) explore public outreach opportunities, in-

18   cluding agreements with local and State organiza-

19   tions that are using horses for rehabilitation, ther-

20   apy, or prisoner programs;

21       "(3) provide resources to properly screen and

22   train potential adopters;

23       "(4) conduct tours of Bureau of Land Manage-

24   ment facilities for interested parties;

BLM_000439

15

1         ''(5) develop volunteer mentor and compliance

2         check programs for assisting the agency in facili-

3         tating successful adoptions;

4         ''(6) develop a program through which potential

5         adopters may be offered an economic incentive for

6         successful completion of the adoption process; and

7         ''(7) take any and all other actions that the

8         Secretary determines to be necessary and useful to-

9         wards expanding the wild horse and burro adoption

10        program.

11   ''(h) The Secretary may not destroy or authorize the

12 destruction of wild free-roaming horses or burros unless

13 the Secretary—

14         ''(1) determines that the wild free-roaming

15         horse or burro is terminally ill or fatally injured; and

16         ''(2) ensures that the terminally ill or fatally in-

17         jured wild free-roaming horse or burro will be de-

18         stroyed in the most humane manner.

19   ''(i) If the immediate health or safety of wild free-

20 roaming horses or burros is threatened, such as in severe

21 drought conditions, the Secretary may temporarily remove

22 animals from the range.

23   ''(j) The Secretary may remove from the range wild

24 free-roaming horses and burros determined to be a threat

BLM_000440

16

1  to the health and well being of native plant or wildlife spe-
2  cies.

3      "(k) Except in cases of removal under subsection (d),
4  (i), or (j), if the Secretary removes wild free-roaming
5  horses or burros from an area, the Secretary shall provide
6  a public notice on the Website of the Bureau of Land
7  Management 30 days prior to the planned removal.

8      "(l) The Secretary shall—

9          "(1) track the number of wild free-roaming
10         horses and burros injured or killed during gathering
11         or holding in a centralized database system;

12         "(2) determine what information on the treat-
13         ment of gathered wild free-roaming horses and bur-
14         ros in holding and adopted wild free-roaming horses
15         and burros could be provided to the public to help
16         inform the public about the treatment of wild free-
17         roaming horses and burros; and

18         "(3) ensure that such information is easily ac-
19         cessible on the Website of the Bureau of Land Man-
20         agement.".

21     (h) By striking subsection (e) (relating to sale of ex-
22  cess animals).

23  **SEC. 6. PRIVATE MAINTENANCE.**

24     Section 4 (16 U.S.C. 1334) is amended—

BLM_000441