| | | |
|---|---|---|
| | | areas for future training needs, or to identify if an SOP needs to be changed. |
| | *The Advisory Board recommends that the wording in Goal change to read: Use a progressive approach to implement a CAWP. Develop and implement a CAWP to ensure the well-being of animals at gathers, in facilities, and on the range along with healthy ecosystems. The CAWP will bring together a progression of new components such as education for employees, volunteers, and contractors; an ongoing internal animal welfare assessment program; and periodic external reviews of our animal care and handling. Conduct the CAWP with complete transparency. | *This recommendation has been accepted as described above. |
| | *The Advisory Board recommends that Objective 5; Action 3 from Sustainable herds be copied and pasted into this section as a new Action. | *The recommendation has been accepted; Animal Welfare, Objective 1, Action 8. |
| | *The Advisory Board recommends that the wording in Objective 3 change to read: Provide a continuing education program on animal care and handling for employees, volunteers, and contractors with an emphasis on natural horsemanship. | *The recommendation has been accepted. |
| **Science and Research** | There was strong support for science and research, particularly with regard to methods for slowing population control growth. However, many urged the BLM to be careful to ensure the agents that are being tested are safe, with limited impacts to individual animal and herd behavior. | Fertility control research was considered in the Strategy. This was further refined in the Strategy. The BLM's Strategic Research Plan (2003) identifies fertility control research as a high priority. Research plans for specific drugs or agents are tiered to this plan. The BLM will determine if scientific information from the NAS review indicates that policy changes are needed or the Strategic Research Plan should be modified. |
| | *The Advisory Board recommends that the wording in Objective 1; Action 1 change to read: Continue research on fertility control and other topics. | *This recommendation has been accepted. |
| | *The Advisory Board recommends that a new Action be added under Objective 2: Review the science behind rangeland monitoring and AML development. | *This recommendation has been accepted; Science and Research, Objective 2, Action 1. |
| **Public Outreach** | Many supported the goals and objectives for Public Outreach and commended the BLM on the progress made. Some cautioned that a key component of this outreach must include the BLM's legal responsibilities to balance WH&B use with the land's capacity and other multiple | Under the Strategy, the BLM will reaffirm throughout the agency a fundamental commitment to transparency in all facets of the wild horse and burro program. This will include continued efforts to improve the ability of the public to observe WH&B operations with public safety and minimal |

34

| | |
|---|---|
| uses. Others asked the BLM to incorporate specific suggestions to further improve public outreach and to make all aspects of the WH&B Program transparent. | intrusiveness to operations in mind. The BLM will explore the feasibility, costs, privacy issues and value-added to web-based media in certain locations. The BLM is also committed to doing a better job of proactively providing web-based information to all audiences and will post mortality information on the national WH&B website. |
| *The Advisory Board recommends that the Goal change to read: Utilize effective communications to build the public's confidence and trust for the BLM's management of the WH&B Program with increased transparency. | *This recommendation has been accepted. |
| *The Advisory Board recommends that the BLM include a robust communication plan with the public on the strategy and on ongoing WH&B Program efforts. | *This recommendation has been accepted. |
| *The Advisory Board recommends that the wording in Objective 2; Action 3 change to read: Update website information on a regular basis, including updated videos and photographs of all phases of BLM's WH&B handling and management. | *This recommendation has been accepted. |
| *The Advisory Board recommends that the BLM look at the possibility of having public access to long-term holding facilities. | *This recommendation is accepted to the extent that existing contract language allows. |
| *The Advisory Board recommends that the wording in Objective 3; Action 2 to include communications section to include internal communications such as DOI/BLM consistency and coordination. | *This recommendation on internal communication is rejected, but the BLM will work to improve internal communications. |

BLM_002071

## Other Management Approaches Proposed by the Public

Many of the management approaches suggested by the public would result in the type of changes that would require the BLM to amend existing RMPs, and complete appropriate NEPA analysis before they could be implemented. Changes to existing Federal laws may also be needed. The other management approaches, which are not fully included in the new strategy, but were proposed by the public include:

- *A suggestion to euthanize or sell, "without limitation," unadopted wild horses*. While humane euthanasia and sale without limitation of healthy horses for which there is no adoption demand is authorized under the ACT, Congress prohibited the use of appropriated funds for this purpose between FY 1988 and FY 2004, and again in FY 2010 and FY 2011. This prohibited use reflects the public's values and passion for America's wild horses and burros, and is not under consideration by the BLM.

- *Expand public lands for WH&B use*. Another suggested management approach was to return un-adopted wild horses to Herd Areas (HAs), or to expand the areas of the public lands designated for their use. Herd Areas are geographic areas of the public lands identified as habitat used by WHBs at the time the ACT was enacted, December 15, 1971. Decisions to return un-adopted horses to HAs would require the BLM to amend existing land use plans and complete appropriate NEPA analysis on a case-by-case basis, or on a national level. Designating lands for wild horse and burro use that are outside the 1971 HA boundaries would require changes to the ACT.

- *Make WH&Bs a principal land use*. Some suggested a management approach in which wild horses and burros, and wildlife would be the principal use of the public lands, and other uses would be reduced or eliminated. These types of actions would require the BLM to amend existing land use plans in accordance with the NEPA and applicable Federal regulations and could also require changes to Federal law. This approach is inconsistent with the Federal Land Management Policy Act's multiple-use mandate.

- *Use only fertility control*. Others suggested a management approach that would rely on the sole use of fertility control to manage wild horse and burro population size (i.e., no further gathers to remove excess animals). The current PZP-22 fertility control vaccine is not 100 percent effective and has a maximum efficacy of about two years when it is applied within the four months prior to the time a mare foals. In order to maintain zero growth in the existing population it would be necessary to capture half of all wild horses every year during this four month period for the administration of fertility control to target mares. This is not operationally feasible. Under the new strategy, the BLM will conduct research into the development of longer acting fertility control agents and other population growth suppression methods, and use a combination of methods to reduce annual population growth. The goal for this research will be to develop safe, humane, longer lasting and more effective methods for managing population size.

- *Let nature takes its course*. Allowing populations to regulate themselves through starvation, disease or predators to control wild horse and burro population size was also suggested. The BLM has requested that the NAS review the WH&B Program to determine if there is credible scientific evidence that population "self-regulation," and/or predation would be effective in controlling wild horse and burro population size before land and herd health is compromised.

BLM_002072

- *Stop using helicopters*. Another suggested management approach would suspend the use of helicopters to assist in the gather and removal of excess wild horses and burros. The OIG (Report No.: C-IS-BLM-0018-2010, December 2010) found that gathers to remove excess wild horses and burros were necessary and humane. Several reviews of data from gather operations indicate that gather-related mortality is typically limited to about one half of one percent (0.5%) or less which is very low compared to most capture methods and capture operations for wild animals. A 2008 GAO Report (GAO-09-77, October 2008) found that .47% of 24,855 horses gathered and removed from 2005 to 2007 in six states accidently died as a result of capture. Based on the results of these reviews, the BLM will continue to use helicopters to assist in the removal of excess wild horses and burros when it is determined through gather planning that it is the safest, most effective, and most humane manner of doing so.

- *Allocate new lands for WH&Bs*. Some commenters suggested the BLM manage wild horses and burros in the future by implementing a reserve design. Under this approach, wild horses and burros would be allocated large areas of the Western landscape. Population size would be regulated through natural processes. This approach would require changes in existing Federal law.

- *Base management on herd social dynamics.* Some suggested that future management of wild horses and burros be based on family band structure and herd social dynamics. However, the makeup of individual bands is a dynamic and ever-changing aspect of herd social behavior. Research indicates that 9 to 30% of mares change bands (Rutberg, 1990; Singer et.al., from the 2002 United States Geological Survey Expert Panel Report). Band structure can be made up of a lead stallion and secondary stallion, as well as bachelor bands that contribute to breeding. Research further suggests that $1/3^{rd}$ of foals are sired by non-harem stallions (National Research Council, 1991, and Bowling and Touchberry from the 2002 USGS Expert Panel Report). Eagle et.al, 1993, discusses the instability of breeding males in a band. Based on the current literature, the usefulness of managing to maintain family bands is in question given the extent of changes that take place on a continual basis.

- *Stop gathering until population sizes are proven*. A number of commenters asked the BLM to temporarily halt further removals until wild horse and burro numbers in the West can be independently verified, or to consider the use of other technology such as drones or infrared satellite imagery. Current best science indicates greater accuracy when aerial counts are conducted by trained and experienced personnel. Additionally, a previous test of infrared imagery in Nevada provided mixed results. Use of drones has also been considered, but limitations such as cost, safety, and de-confliction with military flight zones would need to be overcome. Pending the NAS review of scientific information relative to this topic, the BLM will continue its plans to progressively implement use of the latest methods developed by the United States Geological Survey (USGS).

- *Stop gathering until 2013*. Many of the commenters suggested an immediate gather moratorium until the NAS study is complete. This option is not feasible at this time for several reasons. First, the ACT directs the BLM to immediately remove excess wild horses and burros to AML levels and protect land health. Second, the BLM's management actions must conform to decisions made in existing RMPs; these plans require the BLM to maintain wild horse and burro population size within AML. Third, if the BLM stopped gathers, populations could exceed 66,500 animals by FY

37

2014, requiring the future removal of at least 13,300 excess animals annually just to hold population size steady. Allowing populations to grow to this level would not only adversely affect other multiple uses, but would also damage rangeland vegetation, threaten habitat for wildlife, including threatened, endangered and sensitive species, and ultimately threaten the quality and quantity of forage and water available for use by wild horses and burros. This rate of removal would far exceed expected adoption demand. The removal of even larger numbers of excess animals would be needed in the future to achieve AML in the ten Western States ─ and lead to placing even greater numbers of un-adopted wild horses into long-term holding, escalating costs for their care. As noted by GAO (2009) and the OIG (2010), such cost increases are not sustainable.

38



The BLM's top priority is to ensure the health of the public lands so that the species depending on them, including the Nation's wild horses and burros can thrive.



To maintain land and animal health, the BLM must remove thousands of excess wild horses and burros from the range every year.

39

# FY 2005-2010 Program Report

## Overview

During FY 2005 through 2010, the BLM removed over 51,000 excess wild horses and burros from the range in an effort to attain the established AML of 26,600 wild horses and burros in the ten Western States. In FY 2007, the BLM came close to achieving AML reaching an estimated 28,365 wild horses and burros on the range. However, escalating program costs primarily associated with the long-term care of unadopted or unsold wild horses quickly eroded the progress (see Figure 3 below and Tables 9 and 10, pages 55 and 56). Of the more than 51,000 animals removed from the range, fewer than 26,000 were placed in private care through the BLM's adoption program. As of February 2012, the BLM is holding about 46,000 un-adopted (and unsold) wild horses in contracted short-term holding and long-term pastures



Between FYs 2005 through 2010, Wild Horse and Burro Program costs have increased by nearly $25 million. Nearly $20 million of this increase is associated with the humane long-term care of un-adopted or unsold wild horses.

**Figure 3. Total Population, Removals and Funding Levels, 2005 to 2010**

A summary of other program policy and developments during FY 2005 through FY 2010 as required by the 1971 Act follows.

## External Program Reviews

### Government Accountability Office

The GAO completed a review of the WH&B Program in FY 2009 (GAO-09-77). The GAO found that:

- The BLM has made significant progress toward setting and meeting AML, but has not provided specific formal guidance to the field offices on how to set AML;
- The BLM was closer to meeting AML in FY 2007 than in any other year since AMLs were first reported in 1984;
- Undercounting animals can put the animals at risk and lead to increased program costs; and

40

- The BLM has implemented multiple controls to help ensure humane treatment, including random checks on adopted horses and agreements with adopters and buyers to prevent slaughter.

The GAO also found that the number of animals removed from the range is far greater than the number adopted or sold, resulting in increased need for short and long-term holding. If not controlled, GAO warned that off-the-range holding costs will continue to overwhelm the program. The GAO determined that the budget increases necessary to pay for caring for so many un-adopted horses were not sustainable and recommended that the BLM find effective long-term options. A detailed summary of the GAO's findings and recommendations, and the BLM's response is provided in Appendix 1.

**Office of Inspector General**
The OIG completed a review of the BLM's WH&B Program in December 2010 (C-IS-BLM-0018-2010). The OIG found that gathers to remove excess wild horses and burros are necessary and humane, but recommended that the BLM:

- Focus on research and testing of improved population growth suppression methods to balance wild horse and burro population growth with adoption demand, thereby minimizing the need for additional long-term holding facilities and preserves;
- Put into practice the best science for wild horse and burro management and required new research, as coordinated with and confirmed by the NAS; and
- Undertake an ambitious effort to minimize and reduce the need for short and long-term storage facilities over the long-term.

See Appendix 2 for a detailed summary of the OIG's findings and recommendations, and the BLM's response.

**Advisory Board**
The National Wild Horse and Burro Advisory Board continues to advise the BLM and make recommendations about WH&B Program guidance and procedures. The Act directs that membership reflect special knowledge about protection of horses and burros, management of wildlife, animal husbandry or natural resource management. Members are appointed and serve at the pleasure of the Secretaries of the Interior and Agriculture to serve three-year terms, and are designated as representatives or special government employees from among, but not limited to, the following:

- Wild horse and burro advocacy;
- Wild horse and burro research;
- Veterinary medicine;
- Natural resource management;
- Humane advocacy;
- Wildlife management;
- Livestock management;
- General public interest with special knowledge of equine behavior and management or,

41

- General public interest (with special knowledge about protection of wild horses and burros, management of wildlife, animal husbandry, or natural resource management)

The Advisory Board meets between one and four times per year. Their past advice has informed the BLM's WH&B management program since the first meeting in 1973.

## Appropriate Management Level (AML)

In FY 2009, the GAO found the BLM has made significant progress toward establishing the AML, but recommended specific formal guidance be provided to the field offices to ensure that the factors considered in future AML revisions are consistent across all HMAs (GAO-09-77).

In July 2010, the BLM revised its WH&B Management Manual and finalized the WH&B Management Handbook. Consistent with the new policy guidance, the BLM will continue to revise or adjust AML in the future through a multi-tiered analysis. This analysis: (1) determines whether the four essential habitat components (forage, water, cover and space) are present in sufficient amounts to sustain healthy wild horse and burro populations and healthy rangelands over the long-term; (2) determines the amount of sustainable forage available for wild horse and burro use; and (3) determines whether or not the projected wild horse and burro herd size is sufficient to maintain genetically diverse populations (avoid inbreeding).

The BLM generally sets the AML in consideration of rangeland productivity and capacity as stated above, and as part of the multiple-use decisions for the public lands; for example, the Act of 1971 requires coordination with the state fish and game management agency. The AML is established as a population range that allows wild horse and burro populations to grow from the lower limit to the upper limit over a four to five-year period without the need for interim gathers. The BLM also considers more than one year's data because forage production can vary substantially from year-to-year based on the timing and amount of precipitation received, among other factors. As an example, under the same level of grazing, use pattern mapping may indicate light to moderate utilization during above normal precipitation years and heavy or severe utilization during below normal precipitation years.

The results of the BLM's analyses are documented and made available to the interested public for review and comment in NEPA documents and/or in RMPs. After careful consideration of the comments received, the BLM issues a final decision and adversely affected parties are provided the opportunity to request administrative review of the final decision.

BLM_002078



The amount of sustainable forage available for wild horse and burro use is determined based on the results of in-depth analysis of utilization monitoring, use pattern mapping and other rangeland monitoring data collected over at least a three to five-year period.

At the present time, the BLM has set AML for all but two HMAs: Montgomery Pass (Nevada) and Cerbat (Arizona). The U.S. Forest Service (USFS) has the lead for establishing AML for the jointly managed BLM/USFS Montgomery Pass HMA. The BLM is working on establishing the AML for the Cerbat HMA (see Table 4).

**Table 4. AML Establishment by Year and State**

| State | Number of HMAs | 2005 - 2009 | 2000 - 2004 | 1995 – 1999 | 1990- 1994 | 1985 - 1989 | 1980 - 1984 | Not Set |
|---|---|---|---|---|---|---|---|---|
| AZ | 7 | 3 | 0 | 1 | 1 | 1 | 0 | 1 |
| CA | 21 | 6 | 7 | 3 | 4 | 0 | 1 | 0 |
| CO | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| ID | 6 | 0 | 1 | 3 | 0 | 2 | 0 | 0 |
| MT | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| NM | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| NV | 85 | 29 | 26 | 17 | 12 | 0 | 0 | 1 |
| OR | 18 | 5 | 8 | 0 | 4 | 1 | 0 | 0 |
| UT | 19 | 13 | 4 | 0 | 0 | 0 | 2 | 0 |
| WY | 16 | 3 | 2 | 5 | 6 | 0 | 0 | 0 |
| **Total** | **179** | **65** | **49** | **29** | **27** | **4** | **3** | **2** |

# Gathers and Removals

During the period from FY 2005 to FY 2010, the BLM continued to implement a management approach that conducts gathers to remove excess wild horses and burros (the number above AML), adopts as many of the excess animals as possible, and places any unadopted or unsold wild horses in contracted long-term grassland pastures (see Tables 5 and 6, pages 46 and 47).

On several occasions, emergency gathers were conducted due to the occurrence of extreme drought or wildfires. These gathers removed horses whose lives were imperiled due to a shortage of forage and to allow for rangeland recovery.

BLM_002079





Drought can substantially reduce the amount of forage available for use by wildlife and wild horses and burros. Recurring drought conditions as seen in this photograph, left insufficient forage in the Augusta Mountains HMA (Nevada) to carry wild horses through the winter in a healthy

A wild fire in the South Shoshone HMA (Nevada) in the summer of 2007 destroyed 27,000 acres of habitat. The BLM determined there was not enough forage to carry wild horses through the winter. An emergency

This approach is consistent with the management strategy presented in the 2004 Report to Congress. Under this strategy, gathers are conducted to remove excess wild horses and burros. This is required to protect land and animal health and to make progress toward achieving AML in the ten Western States. However, because adoption rates have not kept pace with the number of excess animals removed to protect land and animal health, the BLM is holding 47,500 (as of February 2012) unadopted wild horses in short-term corrals and long-term pastures. As the number of unadopted wild horses has increased, the costs for their humane care have escalated – from about $28 million in FY 2008 to an expected $48 million in FY 2011 – an increase of nearly $20 million in a four year period.

As the number of unadopted wild horses has increased, the costs for their care have escalated.



## Use of Helicopters to Assist in Wild Horse and Burro Capture

Before the BLM had the legal authority to use a helicopter to assist in the capture of excess wild horses and burros, crews worked from horseback to roundup the animals. These gather operations were conducted without any of the controls the BLM has in place today. The riders would apply pressure to the wild horses to get them to move in the direction of the trap. Horses would often be started eight to ten miles from a trap site by one or more persons on horseback and herded toward the trap in order to achieve the goal of gathering the animals. To achieve the

44

goal, riders on horseback were often unable to control the animals pace, had to keep the pressure of movement on regardless of any daytime temperatures and needed to herd the mares in a manner that allowed foals to remain at their side. Riders attempted to safely move the animals around barbed wire fences or through gates. However, many times foals were left behind or the animals themselves ran through barbed wire fences. It was not infrequent to have an injury to a rider, due to long hours and rough conditions in the saddle.

In 1976, Congress amended the Act to allow the use of helicopters and provide the BLM with a safe, humane and practical means to gather excess wild horses and burros. Helicopters also apply pressure to groups of horses to move them towards the trap. However, pressure can be eased up when needed to slow animals when care of movement is necessary, but then reapplied when needed to turn animals in a specific direction. Gathering by helicopter has proven much more effective in gathering larger numbers of animals. At the same time, injuries to riders were substantially reduced. Since the mid-1970s, the BLM has worked hard to identify, refine and improve methods and procedures to minimize stress and impacts to wild horses and burros during gather implementation. These Standard Operating Procedures (SOPs) are implemented to ensure a safe and humane gather occurs and that stress and injury to the animals is minimized to the greatest extent possible, while still meeting gather objectives.



Unlike the often brutal methods used by individuals known as *mustangers* prior to the passage of the Act — today the BLM uses helicopters that allow pilots to control the animals pace, keep foals at their mare's side or to mark their location if needed, and to safely move the animals around barriers such as barbed wire fences.

The BLM prohibits the use of helicopters to gather wild horses during March 1 through June 30. This period represents the six weeks before and the six weeks following the peak of foaling which occurs within a two-week period during mid-April to mid-May. In accordance with this policy, the BLM routinely uses helicopters to assist in the capture of wild horses, including foals, which by this age are generally able to keep up with other horses at the rate of speed applied, from July 1 through February 28. Helicopters may be used year-round in the capture of wild burros as they do not have a defined foaling season. Care is always taken to not leave foals behind by using an appropriate rate of travel, or if a foal does drop behind, care is taken to allow the foal's mare to stay behind as well.

45

## Transparency

Partially in response to the GAO's recommendation, the BLM issued policy which requires all field offices to report the results of gather operations, including the number of animals that died or were euthanized to the National Program Office. Updates on gather results, short-term and long-term facility reports, and sales and adoptions are posted on the BLM's website at www.blm.gov. When gathers are being conducted, the BLM also posts daily reports on the district or field office's website. The daily reports provide updates on the gather's progress and any animal deaths.

## Public Observation

Based on heightened public interest in observing wild horse and burro gathers over the past two years, the BLM has established policy for public and media observation of wild horse and burro gathers. In addition to policy issuance, the BLM has formed a National Wild Horse and Burro Communications Team to assist states and field offices to safely and effectively host visitors at gathers.

The public may informally observe gathers from designated viewing points when gather operations occur on public land. When the BLM uses historic trap sites or holding facilities that are located on privately-owned land, public viewing may not be available.

The BLM's primary focus, while gathering wild horses and burros, is to conduct the gather in an efficient manner, while also assuring the safety of the animals, the safety of contractors and staff and the safety of the public. The BLM estimates that hosting an increasing number of interested public at gathers (and at short-term holding facilities) increased the BLM's operating costs by nearly $1 million in FY 2010. This funding was primarily used to provide Communications and Law Enforcement support at gathers.

**Table 5. Wild Horse and Burro Population (est), Removals, Adoptions and Expenditures**

| Year | Estimated Wild Horse and Burro Population Size[1] | Number Removed | Number Adopted | Actual Expenditures[2] |
|------|------|------|------|------|
| 2005 | 31,760 | 11,023 | 5,701 | $39,648 |
| 2006 | 31,206 | 9,926 | 5,172 | $36,782 |
| 2007 | 28,563 | 7,726 | 4,772 | $37,743 |
| 2008 | 33,105 | 5,275 | 3,706 | $39,109 |
| 2009 | 36,922 | 6,413 | 3,474 | $50,168 |
| 2010 | 38,365 | 10,782 | 3,074 | $64,682 |
|  |  | **51,145** | **25,899** | **($ in Millions)** |

---

[1] Wild horse and burro population size, removal and adoption data is from the BLM's Public Land Statistics.
[2] Funding and cost data throughout this report is from the BLM's Financial and Business Management System (FBMS) and Activity Based Costing (ABC) database. Actual expenditures include funding from all sources.

BLM_002082

## Short-Term Corrals

The BLM currently manages 19 short-term corrals with a combined capacity of nearly 16,000 animals (see Table 6). Each short-term corral provides 400 to 800 square feet per animal. By providing adequate square footage, the BLM can assure wild horses and burros are not overcrowded and are able to move freely, which reduces stress and decreases the potential for injury. When excess wild horses and burros are removed from the range, they are transported to short-term corrals where they are fed, watered, vaccinated against disease and freeze marked with a unique number. They are then made available for adoption or sale to qualified individuals who can provide the animals with a good home.

The BLM staff at short-term corrals have extensive experience in caring for and handling equines. Many adopt, train, and ride their adopted mustangs as they perform their daily work. Each facility also has a veterinarian that administers veterinary treatment and makes recommendations to the BLM regarding animal care. These dedicated professionals are experts in equine care, handling and behavior.

## Long-Term Pastures

Long-term pastures are an alternative to provisions in the Act that require certain categories of unadopted wild horses to be euthanized or sold without limitation. These provisions in the Act have been restricted by Congress in many recent years, and are not under consideration by the BLM. The BLM therefore transports excess, unadopted wild horses to contracted privately-owned grassland pastures. Here, the animals are provided with humane, life-long care in an uncrowded and free-roaming setting off the public rangelands. This allows the BLM to continue to make progress toward achieving the goal of healthy wild horses and burros on healthy Western rangelands, now and into the future. The BLM presently has 22 contracts with ranchers for 291,976 acres of grassland pasture for a combined capacity of 34,326 animals, an average of 8.5 acres per animal year-round.

**Table 6. Average Number of Unadopted Animals in Short-term Corrals or Long-term Pastures and Funding Levels**

| Year | Average Number of Un-adopted Animals in Short-Term Corrals or Long-Term Pastures[3] | Costs |
|------|------|------|
| 2005 | 22,687 | $19.262 |
| 2006 | 26,211 | $17.196 |
| 2007 | 28,359 | $20.754 |
| 2008 | 30,738 | $23.854 |
| 2009 | 29,560 | $28.478 |
| 2010 | 37,799 | $36.940 |
| | | ($ in Millions) |

---

[3] Performance data throughout the report is from the BLM's Performance Management Data System (PMDS).

BLM_002083

Although long-term pastures represent an economic cost to the American taxpayer, they are more cost-effective than short-term corrals. In FY 2010, the direct long-term pasture contract cost was about $1.30 per animal per day, as compared to the BLM's cost for short-term corrals of about $5.25 — a savings of about $3.95 per animal, per day.



## Herd Area (HA) History

The Wild Free Roaming Horse and Burro Act (Act) limits the presence and management of wild horses and burros to public lands where they existed in 1971. These areas are called Herd Areas (HA). BLM evaluated each HA through the land use planning process to determine if the goal of managing healthy wild horse and burro populations on healthy rangelands over the long term could be met. As a result of these evaluations and planning decisions, some HAs or portions are managed for horses and burros and some are not. Managed areas are called HMAs.

Inventories after the Act was enacted, found wild horses and burros located on public lands and intermingled lands of other ownerships that were not controlled by the BLM. These HAs included 53.8 million acres of land (42.4 million acres of public land or BLM lands and 11.4 million acres of other ownerships not controlled by BLM). Today, 31.6 million acres (26.9 million acres of BLM lands and 4.7 million acres of other ownerships) are managed for wild horses and burros in 179 HMAs. There are 22.2 million acres (15.5 million acres BLM lands and 6.7 million acres of other ownerships) that are not being managed for wild horses and burros.

Recently Congress and the public requested an explanation as to why some public lands are no longer managed for wild horses and burros. The BLM reviewed LUPs along with Federal legislation, land exchanges and court decisions that affected decisions to not manage for wild horses and burros in some HAs. Appendix 3 provides a detailed summary of the reasons that 15.5 million acres of BLM lands are not managed for wild horses and burros. Over 71% of these public lands are not managed for wild horses and burros today because:

- BLM did not own or control water and/or large amounts of intermingled lands which made management infeasible.
- Federal legislation transferred BLM lands to other federal agencies.
- Conflicts with other resource values and designations such as threatened and endangered species, National Conservation Areas and wilderness areas that were not resolved in favor of wild horses and burros.

The BLM's policy provides for periodic re-evaluation of HAs through the land use planning process. Through land use planning, the BLM reviews whether reasons for non-management of wild horses and burros are still valid, and makes a new determination if warranted.

48

Appendix 3 provides a detailed summary of the reasons the BLM no longer manages these areas for wild horse and burro use.

## Herd Management

Herd management activities include Land Use Plan (LUP) development or revision, AML establishment or adjustment, HMA planning, and habitat improvement. Any herd management activity in an HMA is reported as one unit of accomplishment. Table 7 summarizes herd management units of accomplishment and funding levels for FY 2005 to FY 2010. Costs may differ substantially, based on the complexity of the HMA and the issues to be resolved.

**Table 7. Herd Management Accomplishments and Funding Levels**

| Year | Units of Accomplishment (Number of HMAs) | Costs |
|---|---|---|
| 2005 | 22 | $365 |
| 2006 | 8 | $313 |
| 2007 | 6 | $136 |
| 2008 | 4 | $114 |
| 2009 | 10 | $142 |
| 2010 | 6 | $233 |
| | | ($ in Thousands) |

Under the provisions of the Act and the implementing regulations (43 CFR 4710.4), the BLM is required to manage wild horse and burro herds at the minimum level necessary to attain the objectives identified in approved LUPs and HMA plans. This means that a minimum level of actions or activities can be used on the range to support wild horse and burro management. Based on this requirement, the BLM sets wild horse and burro AMLs at numbers which will ensure land and animal health and at the same time provide for other resource uses, even during the driest years.

Consistent with the minimum feasible level of management requirement in law and regulation, the BLM manages wild horses and burros in a manner similar to that for wildlife (as compared to domestic livestock). For example, livestock may be provided with constructed fencing systems and water developments (reservoirs, wells, etc.): for wildlife, there is an expectation that in most cases the natural availability of water will meet wildlife needs.

The BLM does not provide supplemental feed for wild horses and burros and avoids relying on constructed water developments such as troughs, pipelines or wells that require frequent maintenance. This is to prevent the animal's death from dehydration if the water development should fail. Occasionally, the BLM does provide water in temporary emergency situations when necessary to protect land or animal health. However, water hauling is not a sustainable practice over the long-term because of cost. Areas where wild horses and burros are located also often lack road access.

49



Wild horses remain at a dry trough trying to get water in this aerial photograph of the New Pass/Ravenswood HMA (September 2007). Extended drought, coupled with the impacts of a wildfire which destroyed thousands of acres of habitat, led to the emergency removal of excess wild horses from the HMA in November 2007.

Healthy rangelands are comprised of diverse and productive native vegetation species composed of grasses, forbs, and shrubs as shown in this photograph of Razorback Spring (below left). Rangelands in poor ecological health exhibit a lack of native species diversity and productivity. In the photograph of the Red Rock National Conservation Area (below right), perennial grasses and forbs have been replaced with invasive species such as red brome that are less nutritious, and that increase the potential risk for wildfire.

The BLM undertakes rangeland health improvement projects such as seeding, prescribed fire, emergency fire rehabilitation or shrub and tree removal as necessary and appropriate. These projects may be used to restore rangelands where natural fire regimes have been suppressed, or where historic grazing patterns by both livestock and wild horses have decreased the availability for healthy forage plants. While these projects have the potential to increase the amount of forage available for wild horse and burro use, they can be very expensive and ecologically challenging to successfully establish; particularly in many arid regions of the West which can receive less than five to eight inches of annual precipitation.

It is more cost effective to manage public lands in a manner designed to preserve and maintain land health, than it is to try to restore damaged rangelands. If an additional forage base became available on a sustained basis, the land could potentially support an increased number of wild horses and burros.

BLM_002086

# Herd Areas and Herd Management Areas



BLM_002087

## Livestock Use



Livestock use is one of the many multiple uses of the public lands authorized under federal law. Livestock actual use data from 1971-2008 indicates a 29% reduction in livestock use.

Livestock use is one of the many multiple uses of the public lands authorized by Congress under several Federal statutes. Of the 248 million acres (2010 Public Land Statistics) of public lands managed by the BLM, livestock grazing is authorized on 157 million acres under the provisions of the 1934 Taylor Grazing Act. [The Federal Land Policy and Management Act (1976) and the Public Rangelands Improvement Act (1978) also recognize public lands livestock grazing as a legitimate and valued use of public lands.] By comparison, through the Act, Congress limits the management of wild horses and burros to the 53.8 million acres of public, private and other non-BLM managed land where the animals existed in 1971.

Protection of soil, water and plant productivity, as well as availability of forage, water and cover for wildlife managed by the States, is an important reason for removal of excess wild horses and burros. The BLM does not remove wild horses and burros in order to make the forage available for use by domestic livestock, but does manage wild horses and burros (including removal of excess horses and burros) to assure that forage that has been allocated for domestic livestock is available for this permitted use. The BLM's records indicate there has been a 14 % reduction in authorized (permitted) livestock use from 1971 through 2008, in consideration of forage availability and forage allocations in LUPs. Review of actual use data indicates a 29% reduction in livestock use for the same time period (see Table 8) while authorized wild horse and burro use has increased. However, because AML has not been achieved by the BLM in the past years, the actual use by wild horses and burros has exceeded authorized use.

BLM_002088

**Table 8: Authorized and Actual Livestock vs. Wild Horse and Burro Use**

| Authorized Use | Livestock | Wild Horses and Burros |
|---|---|---|
| 1971 | 14.5 million AUMs | 252,000 AUMs |
| 2008 | 12.5 million AUMs (-14 %) | 301,452 AUMs (+20 %) |
| Actual Use | Livestock | Wild Horses and Burros |
| Actual Use - 1971 (AUMs) | 12.1 million AUMs | 252,000 AUMs |
| Actual Use - 2008 (AUMs) | 8.6 million AUMs (-29 %) | 420,252 AUMs (+67 %) |

The BLM typically manages domestic livestock intensively through rest or deferred rotation grazing systems that provide for periodic growing season rest of key forage plants. This periodic rest allows plants to produce strong roots, seeds, and sufficient plant growth to provide for soil cover which protects against soil erosion. Under these grazing systems, livestock are authorized to graze during part of the year -- not year-round. In the event of drought, wildfire or other situations such as severe grasshopper infestations, the BLM adjusts numbers of livestock and the seasons of use to protect land and plant health. In contrast, wild horses and burros typically graze on a continuous basis year-round. This year-round by wild horse and burros results in greater impacts to plant communities than does controlled livestock grazing use, because forage plant seed production and stronger plant roots and soil cover may not be achieved.

In managing livestock grazing on public rangelands, the BLM's overall objective is to ensure the long-term health and productivity of these rangelands and to create multiple environmental benefits such as improved wildlife habitat, stable soils and healthy upland and riparian vegetation, that result from healthy watersheds.

# Monitoring

## Population Estimation

The Act requires the BLM to maintain a current inventory of wild horses and burros on given areas of the public lands. In the past, most BLM offices have based their population estimates on direct counts from either a helicopter or a fixed wing airplane. However, research reviewed by the National Research Council (1982) indicated that this practice can undercount the actual number of wild horses by 7% to 60% depending on topography, vegetation, observer experience, weather, type of aircraft, etc. More recently, Lubow and Ransom (2009) found an undercount bias as large as 32% before making any statistical corrections.

In FY 2009, the GAO found undercounting the number of wild horses and burros can put animals at risk and lead to increased program costs. The GAO recommended the BLM continue to adopt and employ statistically based methods to estimate animal populations across HMAs, such as those being evaluated by animal population researchers. These methods account for the wild horses and burros that are not seen during the inventory.

In FY 2010, the BLM issued policy adopting the use of one of two viable, proven techniques for field use as the new principle methods for estimating wild horse and burro population numbers. The two techniques are mark re-sight using photographs and simultaneous double count with sight ability bias correction. These two techniques produced the best results in the variety of

BLM_002089

conditions that existed during research and testing. Selection and use of a specific technique is the responsibility of the individual BLM field office and is based on the HMA or HMA complex's topography, size and vegetative cover.

Due to the importance of obtaining accurate wild horse and burro population estimates, the BLM doubled the amount of funding dedicated to aerial inventory in FY 2010. In FY 2010, the BLM also issued policy requiring that population surveys should be conducted every two years whenever possible, and within six to 12 months prior to a proposed gather and removal.



*How many horses are there?* Counting horses from a moving aircraft several hundred feet above the ground is not easy. Tree cover, rugged terrain, and poor weather, make estimating the number of wild free-roaming horses and burros even more difficult, and an exact count impossible.

Aerial population surveys are conducted primarily by trained and experienced BLM personnel. Other professional agency personnel such as the USFS, U.S. Geological Survey (USGS), and State wildlife agencies, NPS or USFWS occasionally assist the BLM. In some areas, volunteers also assist the BLM by conducting ground counts; however, ground counts alone are not generally adequate.

The BLM's simultaneous double-count and mark re-sight survey methodologies require the use of trained and experienced observers. The best practice is to use the same observers repeatedly to develop an index of the observer's ability to see wild horses and burros and facilitate statistical analysis of the survey data. The BLM's aviation safety policy also limits passengers aboard any aircraft to "mission-critical personnel." Mission-critical personnel are required to undergo safety training, and to wear and use personal protective clothing and equipment. Therefore, BLM has not allowed non-government affiliated observers to participate in aircraft surveys.

For information on research on population estimation, see Research section on page 59.

54

Table 9 summarizes the number of HMAs inventoried and funding levels for population estimation during FYs 2005 to 2010.

**Table 9. Wild Horse and Burro Population Inventory and Funding Levels**

| Year | HMAs Inventoried | Costs |
|------|------------------|-------|
| 2005 | 77 | $488 |
| 2006 | 85 | $504 |
| 2007 | 75 | $347 |
| 2008 | 84 | $391 |
| 2009 | 63 | $377 |
| 2010 | 90 | $766 |
| ($ in Thousands) | | |

Due to the importance of obtaining accurate wild horse and burro population estimates, the BLM doubled the amount of funding dedicated to aerial inventory in FY 2010.

In FY 2010, the BLM also issued policy requiring that at a minimum population surveys should be conducted every two years whenever possible, and within six to 12 months prior to a proposed gather and removal.

**Habitat Monitoring**

One of the BLM's primary missions under the Federal Land Policy and Management Act of 1976 is to protect land health. Rangeland habitat monitoring helps the BLM assess and evaluate the effects of wild horse and burro, wildlife, and domestic livestock use and management on land health. The WH&B Management Handbook issued in July 2010 established the BLM's policy for habitat monitoring within HMAs and within associations of combined HMAs (HMA Complex). The Handbook outlines annual and long-term monitoring objectives. The primary purpose of habitat monitoring is to collect the resource data necessary to:

- Make a determination of excess animals (i.e. support the need to gather and remove excess animals).
- Establish or adjust AML.
- Develop or revise HMA Plans.
- Evaluate conformance with Land Health Standards, LUP goals and objectives, or other site specific or landscape level objectives.

To ensure the BLM has the data necessary to support these types of wild horse and burro management decisions, collection of habitat monitoring data is coordinated with other resource programs (e.g., range, watershed, wildlife) to maximize efficiency and minimize duplication.

Monitoring and assessment of land health conditions is primarily conducted by BLM staff, but is also managed in coordination with other agencies, including the USFS, USFWS, Natural Resources Conservation Service (NRCS) and state wildlife management agencies, when agencies agree on monitoring protocols and have common interests in monitoring information. In some cases, volunteer groups or individuals also collect rangeland habitat monitoring data using acceptable and agreed upon monitoring protocols.

55

Table 10 summarizes the number of HMAs monitored during FYs 2005 to 2010 and the level of funding provided by the WH&B Program.

**Table 10. HMA Monitoring and Funding Levels**

| Year | HMAs Monitored | Costs |
|------|----------------|-------|
| 2005 | 124 | $718 |
| 2006 | 122 | $762 |
| 2007 | 95 | $762 |
| 2008 | 107 | $920 |
| 2009 | 123 | $1,028 |
| 2010 | 135 | $1,174 |
| | | ($ in Thousands) |

**Genetic Diversity Monitoring**

The BLM continues to work closely with Texas A&M University to establish the baseline genetic diversity for each herd and to periodically collect genetic material (hair or blood samples) to detect any change from the baseline in periodic re-testing of wild horse or burro DNA. When monitoring indicates that genetic diversity is a concern, BLM considers recommendations from Texas A&M University to improve the herd's genetic diversity. Options to mitigate genetic concerns can include maximizing the number of breeding age wild horses (ages six to ten years) within the herd; adjusting the sex ratio to favor of males and increase the number of harems and effective breeding males; or introducing one to two young mares every generation (about every ten years), from other herds living in similar environments.

# Population Growth Suppression Methods

Wild horse and burro populations grow in number by about 20 percent per year. In FY 2010, the BLM issued policy that requires the authorized officer to consider a range of alternatives to reduce population growth rates in wild horse herds with annual growth rates that are greater than or equal to five percent per year. A range of alternatives are considered during gather or HMA planning and may include application of fertility control, adjustment of sex ratios and sterilization (Section 1333(b)(1) of the Act). Prior to making a decision, the BLM conducts a site-specific environmental analysis to evaluate the potential environmental impacts of the alternatives.

As part of the environmental analysis, the BLM uses a computer modeling technique to estimate the impacts to wild horse and burro population size, average population growth rate, and average removal number from a comparison of the various management alternatives. The Win Equus model was developed by Dr. Stephen Jenkins, Professor of Biology at University of Nevada at Reno, and was peer reviewed in April 2000. Another objective of the modeling is to identify whether any of the alternatives would be likely to "crash" the population based on a number of stochastic factors (varying environmental conditions).

The BLM began testing techniques to reduce or suppress population growth, as early as 1992 and routinely applies several of these methods today. Population growth suppression is currently

56

subject to the limitations of specific fertility control vaccines, the expense of application, and the large number of animals that need to be treated to significantly suppress population growth rates. The products and techniques are described below.

**Population Growth Suppression through Fertility Control Agent PZP**
Research and development since 1992 has produced both one-year and 22-month applications of PZP fertility control (vaccines). The one-year vaccine is about 90% effective when applied annually. Early research indicated the 22-month time release (pellet) vaccine (PZP-22) was 80% to 90% effective if applied during November through February; however, preliminary data from field research studies starting in 2009 indicate it may be less effective than previously thought.

Wild horses have an 11-month gestation period. Without treatment, 50% to 80% of mares produce live foals. When PZP treatment is applied, most mares are already pregnant (treatment does not adversely impact the fetus). This means that fertility control will not have an effect until one year after its application. PZP-22, if applied from November to February, is only effective for two years. If the drug is applied to a pregnant mare in January 2012, the mare will foal in May 2012 and should not have another foal until May 2015.

With current technology, the only practical and effective way to treat large numbers of mares with PZP fertility control on Western ranges is to capture most of the herd through helicopter gathers, administer the 22-month PZP vaccine to the mares while they are in a chute, and then release them. The largest cost of treatment is the cost to gather a sufficient number of horses to allow treatment of reproductively viable females. Therefore, more animals must be gathered than will be treated.

For example, of 1,000 horses gathered, only about 400 of these horses are mares within the suitable age range for treatment. Additionally, to maintain infertility, wild horse herds would need to be re-captured every two years to reapply the vaccine to maintain infertility. BLM has observed that wild horses become progressively more difficult to capture after being captured and released on previous occasions. They learn to avoid subsequent roundups by helicopter by hiding under trees and or refusing to be herded into a trap. There is a real concern that horses subject to gathers on an every other year basis, will become harder to capture for removal or for subsequent fertility control treatment and that these repeated capture efforts will become progressively harder and more tiring and stressful to the animals.

The one-year PZP vaccine may be delivered remotely via dart gun when mares are approachable at close distances. This is currently being tested in a limited number of small HMAs where the horses are used to being approached by humans. Remote delivery of PZP-22 pellets is also currently being tested in a field research project. Remote delivery of either of the PZP vaccines may be of possible use in small HMAs where horses and burros are approachable. For the majority of BLM herds that roam across millions of acres of Western rangelands, horses are mostly unapproachable within the distances needed for darting

From 2004 to 2010, the BLM has treated 2,837 mares in about 79 of its 179 HMAs with PZP. Treatments were administered during gathers that were conducted to achieve AML. These efforts have not appreciably slowed population growth or extended the gather cycle, largely because too few mares were able to be treated. An estimated 70% to 80% of a herd's mares would need to be

57

treated to substantially reduce population growth rates. This is very difficult to achieve during gathers conducted to reduce the herd population size down to AML.

Many HMAs have not been gathered until the population size is three to five times the upper limit of AML due to funding limitations. When this happens, the BLM is physically unable to capture enough horses to achieve AML and still have enough mares available to treat with fertility control and then release. As a result, only a small percentage of a herd's mares have been treated and released in most HMAs. To substantially reduce population growth rates, HMAs must be gathered when herd size is at or near the AML upper limit so that most mares can be captured for fertility control treatment and release. With current technology, these same mares must be re-captured and re-treated every two years to maintain infertility to reduce the necessity of removals.



PZP-22 vaccine must be physically applied to the mare. When applied during November through February, the vaccine is effective for approximately 22 months. To maintain infertility, mares need to be re-captured and re-treated every two years.

In FY 2011, the BLM treated 1,017 mares with PZP fertility control vaccine through gathers to achieve AML (AML Gathers) and catch, treat and release (CTR) gathers. CTR gathers are principally aimed at applying fertility control vaccine to the captured mares, or adjusting herd sex ratios to favor males, and then most of the captured wild horses are released back to the range. Specific criteria and objectives for the CTR gathers conducted in FY 2011 include:

- Treat wild horse herds with population sizes that are below the upper limit of AML;
- Capture each herd, apply fertility control, and release most of the captured animals back to the range; and,
- Treat 70% to 80% of a herd's mares to reduce population growth rates for two years following treatment.

To maintain population growth suppression, the mares treated in the fall/winter of 2011 would need to be recaptured, and two years later in the fall/winter of 2013. This level of capture and treatment would be very costly and could result in increased impacts to individual horses and herd social behavior as a result of more frequent capture and handling. As a result, the BLM is supporting and pursuing the development of longer lasting fertility control agents (see Research). Ideally, if the BLM were able to achieve an AML of 26,600 across the West, the BLM would be able to more effectively use fertility control and other population control measures. This would better align removal numbers with the adoption demand. Over time, there would be fewer animals in short-term corrals or long-term pastures and reduced costs for their care.

58

**Population Growth Suppression through Adjustments to Sex Ratios and Sterilization (Stallions Only)**

Adjusting sex ratios to favor males reduces the number of mares available to foal and slows herd growth rates. Current research indicates that wild horse populations generally have sex ratios of about 50% males and 50% females. However, this can vary from about 40% to 60% in favor of either males or females (Garrott 1991, Berger 1986, Feist and McCullough 1975, Goodloe 2000, Green and Green 1977, Greger and Romney 1999, Hall 1972, Nelson 1978, Roelle et al. 2010, Turner et al. 1992).

In herds with about the same number of males or females, or fewer males than females, sex ratio adjustments to favor males may be accomplished by releasing greater numbers of stallions or geldings following the gather. This leaves fewer mares and reduces pregnancies on the range; thus reducing population growth. An increase in the proportion of male horses as geldings is likely to have fewer impacts on the herd's social structure than would an increase in the proportion of stallions. This is because stallions are generally more competitive when forage or water is limited, and BLM observations are that geldings tend to form bachelor bands and lose their male dominant (stallion-like) behavior. The goal of adjusting sex ratios is to produce a herd with at least 60% male horses, usually in conjunction with applying PZP-22 to the mares of the herd.

Non-reproducing herds (all animals sterilized) may be considered in some HMAs and for reintroduction in some herd areas. This concept would allow long-term holding of excess animals on public lands and at the same time reduce the number of reproductive animals that contribute to the national annual rate of population increase.

# Research

Direction to conduct research is contained in the Act (16 U.S.C. § 1333(b)(2)(C)(3)), and the Strategic Plan for Management of Wild Horses and Burros on Public Lands (1992). Research priorities for the WH&B Program were determined in the 2003 Strategic Research Plan for WH&B Management (Research Plan). Principal input into the Research Plan came from the USGS and APHIS on the topics of contraception, aerial census, population modeling and genetics, as well as disease and animal health monitoring and surveillance. Advice and input was also provided by WH&B Program managers and specialists, the Wild Horse Advisory Board, the BLM Director's Science and Advisory Committee, and seven topic-specific advisory panels convened by USGS. The Research Plan identified continuing fertility control research as the highest priority.

BLM_002095

**Table 11. Summary of BLM's Research Funding from FY 2005 to FY 2010**

| Year | Direct and Partner-Contributed Research Funding |
|---|---|
| 2005 | $524.751 |
| 2006 | $401.783 |
| 2007 | $239.568 |
| 2008 | $230.189 |
| 2009 | $636.315 |
| 2010 | $875.356 |
| ($ in Thousands) | |

Research funding increased by nearly four times between FY 2008 and FY 2010. This reflects the BLM's increased emphasis on fertility control use, research and development, including efforts to develop a longer-lasting (three to four-year) fertility control agent that is safe, effective and humane.

**Fertility Control Research**

- **PZP:** To minimize the cost and potential impacts to wild horses associated with either annual darting of one-year PZP or the recapture and re-treatment of mares with PZP-22 every two years, the BLM is supporting and pursuing the development of a longer lasting fertility control vaccines. An effective, longer lasting fertility control agent could eventually reduce the number of excess wild horses that need to be removed from the range as required by Section 1333(b)(2) of the Act. Over time, this would result in fewer wild horses that need to be adopted or sold, and held or handled in short or long-term holding facilities, and reduced costs. As part of this important effort, the BLM is continuing research in partnership with the University of Toledo (Ohio) on the development of PZP-22 into a longer lasting three to four-year PZP vaccine.
- The BLM developed a Fertility Control Field Trial Plan designed to evaluate the effectiveness of PZP use in slowing herd growth rates in wild horses. Field research for two components of the Plan is nearly complete: (1) Individual based trials and (2) Population based trials. The individual animal-based studies were designed to investigate the behavioral implications of PZP treatments on wild horses, population dynamics, efficacy of the vaccine, body condition and foal health. The primary focus for population based studies was to determine effect on population growth rates.
- Ransom et al. (2010) found no differences in how PZP-treated and control mares allocated their time between feeding, resting, travel, maintenance and social behaviors in three populations of wild horses, which is consistent with Powell's (1999) findings in another population. Likewise, body condition of PZP-treated and control mares did not differ between treatment groups in Ransom et al (2010) study. Turner and Kirkpatrick (2002) found that PZP treated mares had higher body condition than control mares in another population, presumably because energy expenditure was reduced by the absence of pregnancy and lactation.
- In two studies involving a total of four wild horse populations, both Nunez et al. (2009) and Ransom et al. (2010) found that PZP treated mares were involved in reproductive interactions with stallions more often than control mares, which is not surprising given the evidence that PZP-treated females of other mammal species can regularly demonstrate estrus behavior while contracepted (Shumake and Wilhelm 1995, Heilmann et al. 1998, Curtis et al. 2002). Ransom et al. (2010) found that control mares were

60

BLM_002096

herded by stallions more frequently than PZP-treated mares, and Nunez et al. (2009) found that PZP-treated mares exhibited higher infidelity to their band stallion during the non-breeding season than control mares. Madosky et al. (in press) found this infidelity was also evident during the breeding season in the same population that Nunez et al. (2009) studied, resulting in PZP-treated mares changing bands more frequently than control mares.

- Aggression between stallions and mares has also been studied in three wild horse populations and no difference was found between the treatment groups (Ransom et al. 2010). Data regarding level of competition and aggression between band stallions in relation to the presence and number of treated mares were also collected during this study; the results will be published upon completion of the analyses. Harem tending by stallions, such as urine and fecal covering of mare excretion and active defense of mares against other stallions, was best explained by a model of mare body condition in the Ransom et al. (2010) study. Stallions in this study tended higher condition mares more frequently than lower condition mares. Long-term implications of all of the detected changes in social behavior are currently unknown.

- **SpayVac®**: The BLM is currently working with the USGS to conduct a five-year research project on the use of SpayVac® as a potential longer lasting fertility control agent for wild horse mares, which should be completed in 2016. SpayVac®, which is also based on the PZP antigen, uses a novel liposome technology that may stimulate a stronger and longer lasting immune response and hopefully longer lasting infertility. The USGS will evaluate the safety and effectiveness of SpayVac® in captive wild horses. It is easy to handle and administer, and in one previous study a single vaccination with SpayVac® maintained a high level of contraception for four years in captive Nevada stray horses (Killian et.al. 2008).

- **Ovariectomy (Spaying):** The BLM is reviewing a research proposal to investigate the development of a safe, effective, and humane surgical method for spaying (sterilizing) mares (ovariectomy). While the technique has been applied to a small number of wild horse mares, it remains to be seen how well it will work when attempted on mares that may be pregnant at any stage of gestation. This is what one would encounter in the field. The feasibility of using these techniques on large numbers of mares in the field, the incidence of abortion or other complications and the likelihood that enough mares could be spayed to have a population level impact on herd growth rates are unknown.

- **Research Studies with the Humane Society of the United States:** Since 2008, the HSUS and the BLM have collaborated on a research project to test the ability to control population growth rates within two HMAs — the Sand Wash Basin HMA in Colorado and Cedar Mountain HMA in Utah. As part of this effort, the BLM conducted removal operations on the Sand Wash Basin HMA and Cedar Mountain HMA in October and December of 2008, respectively. The HSUS applied PZP by hand injection and the treated mares were returned to their ranges. The HSUS has been collecting foaling information for the two herds since 2008. During the fall and winter of 2010-2011, the HSUS also began attempting remote delivery of PZP by darting as many of the previously treated mares as possible in a continuing effort to control population growth rates. The HSUS treatment protocol is combining the treatment of some mares with one-year PZP, as well as treating some mares using a newly developed dart that is designed to deliver PZP remotely. This is a novel approach for control of wild horse population

61

growth since the remote delivery of the pellets that make up PZP-22 had never before been attempted in a wild and free-roaming setting. The project is ongoing and is currently scheduled to continue with funding from the Annenberg Foundation until November of 2013. The BLM is continuing to provide project review and staff support.

- The HSUS is also currently in discussions with the USFS concerning the Jarita Mesa Wild Horse Territory in New Mexico. The HSUS may be furthering their efforts to refine techniques for the remote delivery of PZP-22 to control the population growth rate on this Wild Horse Territory.

**Population Estimation Research**

Aerial surveys rarely detect all the wild horses and burros within an HMA. As a result, population estimates must be developed using statistical correction factors to account for the animals not identified during the census. The BLM's research, conducted in partnership with USGS and Colorado State University, has identified two improved techniques as the most promising methods for population estimation (simultaneous double count with sightability via correction and photo mark re-sight). Both methods provide for the use of such correction factors.

**Population Growth Suppression - Other Methods Considered**

- **Vasectomies (Stallions):** The focus of the past fertility control research has been mainly for mares. Given the social structure of the herds, mature males have the ability to breed dozens of mares within or outside of their harems. Existing research shows that under normal circumstances at least 15% to 33% of foals are sired by non-harem stallions; making it unlikely that fertility control focused on males would be effective in slowing population growth (Asa 1999, Bowling and Touchberry 1990, Kaseda and Khalil 1996). Although the technique has been developed, performing vasectomies on stallions is not a widely practiced procedure within veterinary medicine. Post vasectomy, it is expected that stallions would retain their stallion-like behavior. By contrast, gelding stallions (castration) is a routine veterinary procedure in both domestic and wild horses. Geldings usually lose most of their stallion-like behavior after a few months, are less competitive than stallions, and have fewer impacts on herd social behavior as a result. However, because of the continuing public interest in vasectomies as a tool for slowing wild horse population growth, the BLM has asked the NAS to determine if there is credible, scientific evidence to indicate vasectomies would be effective in controlling herd growth rates or if there are other methods that the BLM should consider for managing stallions that would tangibly suppress population growth.
- **IUDs:** Pilot studies using coil-type intrauterine devices (IUD) and glass balls or marbles as IUDs have failed to demonstrate a long-lasting effect on conception in mares. In both instances, the devices fell out and the mares became pregnant soon thereafter. The application of IUDs is further complicated by the difficulties associated with identifying a time window for application when mares are not pregnant before the devices can be implanted.
- **GonaCon™:** GonaCon™ is a fertility control vaccine that is experimental for horses and is being developed for potential use as a management tool for deer and horses. Previous studies indicate it is effective in maintaining infertility in horses for about one year ─ comparable to the one-year formulation of PZP. A GonaCon™ vaccine on wild horses

62

managed by the National Park Service is ongoing in Theodore Roosevelt National Park in North Dakota. The BLM will consider the potential of GonaCon™ as a contraceptive agent based on the results of this research.

## Sales and Adoptions

Over the past decade, adoptions of excess wild horses and burros have declined from a high of just over 7,700 animals in 2002 to just over 3,000 in 2010. Changing demographics and economic and other factors have made many Americans less willing to accept the challenge of taming and caring for an untrained wild horse. As a result, sales and adoptions of untrained animals have declined in recent years (Table 12). Despite these challenges, the BLM remains committed to finding as many good homes as possible for excess wild horses and burros, and has been working with partners capable of training wild animals.

**Table 12. Sales, Adoptions and Funding Levels**

| Year | No. Sold | No. Adopted | Costs |
|------|----------|-------------|-------|
| 2005 | 1,468 | 5,701 | $5.198 |
| 2006 | 643 | 5,172 | $5.262 |
| 2007 | 436 | 4,772 | $5.295 |
| 2008 | 351 | 3,706 | $5.174 |
| 2009 | 790 | 3,474 | $6.797 |
| 2010 | 545 | 3,074 | $6.795 |
| Total | | | ($ in Millions) |

To offer more trained animals for adoption without a Federal investment in infrastructure, the BLM has increased the amount of funding for partnerships with organizations like the Mustang Heritage Foundation and the National Wild Horse Association.

**Sales**

Following Congressional approval of sale authority for certain categories of animals in 2004, the BLM has sold over 4,200 wild horses and burros "with limitations." A Bill of Sale is executed by each purchaser; the Bill of Sale dictates the humane treatment and care of the animal(s) and prohibits re-sale for slaughter or commercial use. Sales involving the purchase of more than four animals are conducted by the BLM Washington, DC office. Short-term facility managers have the authority to sell up to four animals per sale.

**Adoptions**

The BLM implemented a number of adoption program initiatives during FY 2005 to FY 2010 to maintain or increase the number of animals placed in good homes (see Table 13).

63

**Table 13. Summary of Adoption Program Initiatives and Results**

| Program Initiative | Description | Results |
|---|---|---|
| **FY 2005:** | | |
| Fostering Volunteers | Participating volunteers in Eastern States, California and New Mexico gentle one or more wild horses a year and help find an adopter for these horses. | About 400 animals have been adopted through this program to date. |
| **FY 2006:** | | |
| Letter Campaign | Letters sent to over 320 wild horse advocacy groups offering $100 from the Save the Mustang Fund for each excess wild horse purchased. | Over 450 animals purchased by six advocacy groups. Of these, one group is under investigation for selling horses to slaughter in Mexico. Another group ran out of money to feed the horses and was placed on trial for animal abuse. |
| | Letters sent to over 15,250 public land ranchers from the BLM Director and the Public Lands Council Executive Director asking ranchers to adopt or purchase excess wild horses. | No response from public land ranchers. |
| | Letters sent to over 100 Sport and Recreation groups by the Division Chief. | Groups educated about the Program, unknown effect. |
| Equine University Training/ Adoption Program | Saint Mary of the Woods College and Rutgers University are using ungentle yearling horses in their university's equine program. Students gentle the horses and assist BLM to adopt their gentled horses. | Each year, five to eight wild horses are trained by each equine program and then adopted. |
| **FY 2009:** | | |
| Pilot Adoption Incentive Program | BLM implemented a pilot adoption incentive program in an effort to increase the adoption of horses four years old and older. Under this program, a $500 incentive payment is made to the adopter after one year when the adopter receives title to the animal. | The number of four year and older animals adopted has remained steady. Animals were eligible to start receiving titles in May 2010. There were animals adopted through the pilot adoption incentive program and all were titled. |
| Ken McNabb | The BLM contracted with Ken McNabb, a respected horse clinician and television personality, to tell BLM's story through his weekly television program on RFD TV. | Mr. McNabb has been effective in educating over 564,000 viewers on the adoption program. |
| National Adoption Day | In 2009, the BLM partnered with HSUS, Jerry Reynoldson, the American Horse Protection Association, and the Mustang Heritage Foundation to sponsor the first ever National Adoption Day. | About 500 animals were adopted in events sponsored mainly by the BLM. Only a few advocacy groups participated. The focus shifted to a National Adoption Awareness campaign in 2010. |

64

## Volunteers

The partnership between the BLM and volunteers is one of the best practices in the WH&B Program in all states. Volunteers assist the BLM to monitor the herds and their habitat while fostering public awareness about the importance of maintaining land and animal health. Some volunteers help the BLM to apply fertility control, or are very active at adoption events or helping to find qualified adopters for the animals. Many volunteers serve as mentors for new adopters and assist the BLM with adoption compliance once the animals are adopted.



Volunteers play an important role in the Wild Horse and Burro Program and contributed more than 114,000 hours valued at $2.377 million in FY 2010.

**Table 14. Volunteer Hours and Their Economic Value**

| Year | Volunteer Hours | Economic Value |
|------|-----------------|----------------|
| 2005 | 145,230 | $3.028 |
| 2006 | 177,701 | $3.705 |
| 2007 | 147,096 | $3.067 |
| 2008 | 125,638 | $2.619 |
| 2009 | 125,081 | $2.608 |
| 2010 | 114,017 | $2.377 |
| ($ in Millions) | | |

As shown Table 14, the number of volunteer hours contributed to the Wild Horse and Burro Program has declined from a high of nearly 178,000 hours in FY 2006 to about

The BLM also works closely with several volunteer groups that apply their passion for America's wild horses and burros by assisting the BLM with public education and outreach, herd and habitat monitoring, gathers, fertility control and adoptions.

Volunteers represent the BLM and are subject to all applicable Federal rules and regulations. Assigned work is completed in accordance with the BLM's policy using approved methods, techniques and procedures. Volunteers are prohibited from fundraising, addressing or commenting on policy or taking a position on pending legislation while acting on behalf of the BLM. The BLM has the responsibility to orient, train and supervise volunteers, ensure their safety, and to evaluate each individual volunteer's conduct and performance.

65

# Compliance and Enforcement

To ensure that adopted animals have received humane care, the BLM conducts post-adoption compliance inspections. Some adopter's animals are selected randomly for inspection and other inspections are completed by volunteers and BLM employees on a routine basis. All complaints alleging improper care are investigated; all adopted animals are inspected by the BLM or a qualified individual prior to ownership of the animal being transferred to adopters after the animal becomes eligible for title one year after adoption. If an adopted animal has not been treated humanely and the adopter fails to correct the situation in a timely manner, the BLM will repossess the animal in accordance with applicable Federal regulations. Table 15 provides a summary of the number of compliance inspections completed and the associated costs for FYs 2005 to 2010.

**Table 15. Adoption Compliance and Funding Levels**

| Year | Compliance Inspections | Costs |
|------|-----------------------|-------|
| 2005 | 6,023 | $926 |
| 2006 | 6,406 | $825 |
| 2007 | 4,978 | $816 |
| 2008 | 4,388 | $697 |
| 2009 | 2,882 | $665 |
| 2010 | 3,061 | $630 |
| ($ in Thousands) | | |

The number of compliance inspections completed during FYs 2005 to 2010 has decreased, commensurate with a reduction in the number of excess animals adopted.

# Environmental Education

The BLM continues to develop and deliver environmental education programs about WH&B management to America's youth. As an example, in FY 2007, the BLM partnered with the Sierra Nevada Chapter of the Girl Scouts of America to develop and implement a pilot *Wild Horse and Burro Patch Project*. This innovative program includes a field trip to learn about the management of wild horses and burros on the range, the BLM's Adoption Program, and the humane care of the animals at short and long-term holding facilities. The BLM also participates in the annual Boy Scouts of America National Jamboree. Many of the BLM State Offices also work closely with the 4-H or other partners to host events such as *Kids and Mustangs Days*. These programs all share a common purpose: to share the story of America's wild horses and burros in a meaningful and personal way.

# Save the Mustangs Fund

The Save the Mustangs Fund (Fund) was established in May 2005 by the Ford Motor Company in partnership with the BLM and the Take Pride in America campaign. The Fund allows all horse lovers, young and old, to be involved with our nation's "Living Legends." Its goal is to raise public awareness of the urgency of wild horse and burro issues and to find good, caring homes for them. Since 2005, $236,099.75 has been donated by members of the public to the Fund. Of this, $208,300 has been paid out of the Fund for incentives for 501(c) 3 (non-profit groups) to purchase or adopt animals, for college equine wild horse training programs, and public education.

BLM_002102

# Mustang Heritage Foundation

The Fleishman Hillard Marketing Study (2001) recommended the BLM create a National Wild Horse and Burro Foundation. The Foundation was created in 2003 through a partnership between the BLM and the Nevada Commission for the Preservation of Wild Horses. In 2005, the name was changed to the Mustang Heritage Foundation (MHF). In FY 2007, the BLM issued a solicitation requesting proposals for the training and adoption of excess wild horses. Following evaluation of the proposals received, the BLM awarded a grant to the MHF in recognition that trained horses are much more readily adopted than untrained animals.

The BLM's partnership with the MHF is a unique and ground-breaking effort to work with a private non-profit organization on a large scale to provide training and adoption of excess wild horses to qualified individuals. At the heart of this partnership are the following shared goals:

- Implement a number of pilot projects and other programs and activities aimed at increasing the number of trained wild horses available for adoption without a Federal investment in infrastructure; and
- Reach new and previously untapped adoption markets.

Since September 2007, nearly 2,700 excess wild horses have been trained and adopted through various MHF Programs and events. Equally important is the marketing coverage which has directly benefited the WH&B Adoption Program through social media and the Internet (i.e., YouTube, Facebook, Twitter, Trainer Blogs, etc.).

## Extreme Mustang Makeover Events

Crowd-pleasing *Extreme Mustang Makeover* (EMM) events capitalize on a marketing and business model from the private horse industry to showcase the versatility and trainability of American mustangs. Each participating trainer has 90-100 days to gentle their assigned mustang. Trainers then bring their mustang to a competition.



During the competition, trainers are evaluated on the body condition of their mustang, as well as their ability to handle the horse "in hand" through a series of maneuvers which include picking up the horse's feet, maneuvering it through obstacles and loading it into a trailer. Following the "in hand" course, trainers mount their animals and complete a "horse course" that includes a series of obstacles that requires the trainer to demonstrate the level of competency the horse has accomplished. Trained horses are offered to the public for adoption. Trainers compete for substantial prize money in EMM events.

## Trainer Incentive Program (TIP)

Trainers who meet the BLM's minimum adoption, facilities and trailer requirements are eligible to train up to four mustangs at a time through the MHF's Trainer Incentive Program (TIP). Participating trainers are required to pick up their assigned

BLM_002103

mustangs from a designated BLM facility and to humanely care for the animal throughout the training period. Humane care includes providing the animals with ample water, good quality hay, and veterinary or farrier care as necessary. The use of natural horsemanship (least resistance) training methods is mandatory. Once the mustang has been successfully trained, the trainer identifies a qualified adopter and works with the BLM to complete the adoption paperwork.

**Youth and Yearling Program**

TIP trainers, sponsored by the MHF may also work with youth and their families to adopt and train yearling mustangs (filly or gelding colts 18 months of age and younger). TIP trainers sponsor a competition designed to showcase the youth's gentled yearling. At the time of the competition, the youth's family may take their mustang home by adoption, or offer the horse for reassignment to a new adopter.



Youth and yearling events allow young people and their families to get involved — by adopting, training and caring for a living symbol of our nation's history. Each youth's family must meet the BLM's minimum adoption, facility and trailer requirements to participate.

**Youth Employment Program**

In FY 2010, the BLM partnered with the MHF to implement a youth employment program. The program resulted in successfully training and adopting 150 mustangs. Through the assistance agreement with the BLM, the MHF employed 150 young people ranging in age 15 to 24. In this program, youth are offered a $1,000 scholarship to attend college.

Program requirements included writing a history research paper, current issue paper, press releases, presentations to both youth and adult organizations, social networking, connecting with horses and their trainers while developing a business plan for their own horse training business, as well as an active role as camp counselors.

Three youth camps sponsored by the MHF were conducted in 2010 with 130 students in attendance. Held at the National Cowboy Hall of Fame, the National Cowgirl Hall of Fame, and the Pan Handle Plains Museums, the camps employed more than 30 youth as camp counselors.

**Adoption Success**

Through the assistance agreement, the full unit cost to the BLM for the work performed by the MHF averaged $1,974 per adopted animal in FY 2010. This compares to a full unit cost for BLM adoptions of $2,856 per animal (2010 Federal Business Management System data).

A review of adoption data from the BLM's Wild Horse and Burro Program System (WHBPS) demonstrates a solid rate of adoption success for the MHF-sponsored training and adoption

68

programs (see Table 16). Adoption success is defined as: the adopted animal was not returned to the BLM; was not repossessed by the BLM for noncompliance with adoption requirements; and was titled to the adopter of record after successfully demonstrating one year of humane care. The BLM expects this trend to continue as we work together to improve these programs, events and activities.

**Table 16. Adoption Success, WHBPS Data for 2007-2010**

| Adoption Type | Description | Total No. | No. Successful | Success Rate |
|---|---|---|---|---|
| EMM | MHF Events | 1,118 | 1,032 | 92.3% |
| TIP | MHF TIP Program | 959 | 730 | 76.1%* |
| Training | BLM Prison and Mantle Programs | 1,098 | 966 | 87.9% |
| Facilities | BLM Facility Adoptions | 5,799 | 4,917 | 84.7% |
| Other | Internet and Satellite Adoptions | 12,701 | 11,259 | 88.6% |

* Adoption success for the TIP program's trained horses has increased over the past three years as the BLM and the MHF work together to make improvements to the program.

# Wild Horse and Burro Program System

In FY 2010, the BLM deployed a redesigned data management program called the Wild Horse and Burro Program System (WHBPS). The comprehensive computerized program system is a series of relational databases that function as the primary records for use by WH&B Program personnel. Additional data needed to manage the WH&B Program is included in geographic (land) information system (GIS) databases. Full utility of WHBPS is dependent on timely and accurate entry of data into the databases by BLM field offices.

WHBPS tracks animals from gather to titling, as a result of the animal's adoption or sale, or death if the animal remains in the BLM's care and control. The numbers of animals in long-term pastures is annually confirmed through counts by experienced BLM personnel.

The numbers of animals the BLM reports are a snapshot at a given point in time. As excess animals are removed, adopted or sold, transported to long-term pastures, or new population inventory data becomes available, the numbers change.

# Animal Welfare

During FY 2009, the GAO found that the BLM had implemented multiple controls to help ensure the humane treatment of wild horses and burros. Included are:

- Prior to their closure in 2007, the BLM maintained standard operating procedures and agreements with all three slaughterhouses in the United States to alert the BLM about any wild horses entering their slaughter facilities.
- A variety of controls are used at various stages in the management of wild horses and burros which include standard operating procedures, inspections and data collection at gathers and in short-term corrals and long-term pastures and random checks on adopted horses and agreements with adopters and buyers to prevent slaughter.

69

The GAO also found that although offices collect data on animal treatment, the BLM does not always compile the information in its central database or report it to the public. The GAO recommended the BLM track the number of animals harmed or killed during the gather process in a centralized database. The GAO also recommended informing the public about the treatment of animals following their adoption and during gathers and in short and long-term holding facilities. The BLM is engaging in a number of activities to address these recommendations.

## Animal Care and Welfare Assessment

For nearly 40 years, the BLM has protected the health and welfare of wild horses and burros to ensure their humane treatment. In FY 2010, as part of the ongoing commitment to animal care and welfare, the BLM implemented three pilot projects that are expected to contribute information that the BLM can utilize to develop and implement a CAWP:

- The BLM has partnered with the University of California at Davis to develop a "Wild Horse and Burro Care and Welfare Assessment Tool" which will define specific standards for wild horse and burro care and handling. Once fully developed, the BLM will have a template for continuous internal assessment of wild horse and burro care and handling from on-the-range through titling.

- Through a partnership with the American Horse Protection Association (AHPA), independent teams comprised of credentialed university equine specialists observed and reported on the BLM's animal handling and care associated with wild horse gathers and at short-term holding facilities. The AHPA's report was given to the BLM in November 2010 and confirms the humane and effective use of helicopters and the easy pace at which the animals are moved during gather operations.

- The BLM invited an independent and external review by the American Association of Equine Practitioners to evaluate gathers, short-term corral facilities and long-term pastures. This review was completed in August 2011 and found that BLM's care, handling and management of wild horses is appropriate. Several recommendations were provided to strengthen existing practices and that will be utilized in the development of the CAWP.

In addition, the BLM has expanded its partnership with the USDA, APHIS: a multifaceted Agency with a broad mission area that includes protecting and promoting U.S. agricultural health: regulating genetically engineered organisms; administering the Animal Welfare Act; and carrying out wildlife damage management activities. These efforts support the overall mission of the USDA, which is to protect and promote food, agriculture, natural resources and related issues.

Through the BLM's partnership agreement, APHIS provides credentialed professionals with doctorates in veterinary medicine to make recommendations to the BLM for animal care and handling. These individuals possess extensive professional experience in humanely caring for and handling large animals, including equines, and are engaged in horse and burro gathers, incident investigation teams, research teams, and as needed to review and make recommendations to the BLM.

BLM_002106

## Mortality

The OIG (Report No.: C-IS-BLM-0018-2010, December 2010) found that the BLM's gathers to remove excess wild horses and burros are necessary and humane. "Our inspection confirmed that wild horse and burro gathers are necessary because BLM lands cannot sustain the growing population of wild horses and burros. The growing population of these animals must be addressed to achieve and maintain a thriving natural ecological balance of the authorized uses of the land, thus gathers are necessary and justified actions. Further, we did not observe any inhumane treatment of wild horses and burros."

The BLM's gather data demonstrates that gather related mortality for wild horses and burros is much less than that associated with gathering other wild animals. Several reviews of data from wild horse and burro gather operations indicate that gather-related mortality is typically limited to about one half of one percent (0.5%) or less which is very low compared to most capture methods and capture operations for wild animals. The 2008 GAO Report (GAO-09-77, October 2008) found that .47% of 24,855 horses gathered and removed from 2005 to 2007 in six states accidently died as a result of capture. The data affirms that the use of helicopters is a safe, humane, effective and practical means to gather excess wild horses and burros from the public lands.

GAO also reported that because of the potential for harm and to help ensure the safe and humane handling of all animals captured, BLM has implemented a range of standard operating procedures for its gather contractors. They also cited that animals may be humanely euthanized due to preexisting conditions and in accordance with BLM policy. The gather statistics and BLM's standard operating procedures underscore that excess animals above AML are removed safely. BLM's goal is to remove animals before forage and water supplies become too limiting for growing populations and cause greater impacts and potential death to the animals.

71

# Summary

During FY 2005 through 2010, the BLM implemented a number of management actions to improve the management of America's wild horses and burros. These changes ranged from issuing policy guidance to establishing a consistent approach for future AML revisions; increasing funding for aerial population inventories and fertility control and other population growth suppression research; inviting independent external reviews of the BLM's animal care and handling practices; and increasing management transparency by providing opportunities for the public to view gathers, short and long-term holding operations and posting the results of gather operations including any mortality on the BLM's website.

The BLM's Program Strategy includes fundamental changes for future wild horse and burro management. This strategy includes actions to improve the range-management of the animals, strengthen measures to ensure the humane treatment and care of wild horses and burros, and provide increased opportunities for public/ private partnerships in support of the program.

Over the next two years, the BLM expects to be able to reduce removals of excess wild horses and burros from the range, significantly increase the number of mares treated with fertility control, implement other population growth suppression methods and work to boost adoption demand by offering more trained animals without a Federal investment in infrastructure. The BLM has called on the NAS to review previous wild horse management studies and make recommendations on how the BLM should proceed in light of the latest scientific research. The NAS report is expected in mid-2013.

Placing the WH&B Program on a sustainable track will depend on careful consideration of the findings from the NAS review, and may result in a need to realign WH&B Program priorities and resources. Their findings, together with ongoing research into the development of longer lasting fertility control agent(s), and the use of existing fertility control agents and other techniques to suppress annual population growth will be important keys for the long-term success of the WH&B Program and will be a critical step for developing a sustainable management program for America's wild horses and burros.

BLM_002108

# Bibliography

Asa, C.S. 1999. Male reproductive success in free-ranging feral horses. Behavioral Ecology and Sociobiology 47:89–93.

Berger, J. 1986. Wild horses of the Great Basin. University of Chicago Press.

Bowling, A.T., and R.W. Touchberry.1990. Parentage of Great Basin feral horses. Journal of Wildlife Management 54(3):424–429.

Cothran, Gus, 2009. Letter dated July 16, 2009. Effective population size to keep the rate of loss of genetic variation at 1% per generation.

Curtis, P.D., Pooler, R.L., Richmond, M.E., Miller, L.A., Mattfield, G.F., Quimby, F.W. 2002. Comparative effects of GnRH and porcine zona pellucida (PZP) immunocontraception vaccines for controlling reproduction in white-tailed deer (*Odocoileus virginianus*). Reproduction Supplement 60:131–141.

Feist, J.D., and D.R. McCullough. 1975. Reproduction in feral horses. Journal of Reproduction and Fertility, Supplement 23:13-18.

Garrott, R.A. 1991. Sex ratios and differential survival of feral horses. Journal of Animal Ecology 60:929-937.

Goodloe, R.B., R.J. Warren, D.A. Osborn, and C. Hall. 2000. Population characteristics of feral horses on Cumberland Island, Georgia and their management implications. Journal of Wildlife Management 64:114-121.

Green, N.F., and H.D. Green. 1977. The wild horse population of Stone Cabin Valley, Nevada: a preliminary report. Pages 59-65 in Proceedings, National Wild Horse Forum, April 4-7. 1977. University of Nevada, Reno.

Hall, R. 1972. Wild horse biology and alternatives for management; Pryor Mountain Wild Horse Range. Bureau of Land Management, Billings District Office.

Heilmann, T.J., Garrott, R.A., Caldwell, L.L., Tiller, B.L. 1998. Behavioral response of free-ranging elk treated with an immunocontraceptive vaccine. Journal of Wildlife Management 62:243–250.

Jenkins, S.H. 1996. Wild Horse Population Model. Version 3.2.

Kaseda, Y., and A.M. Khalil. 1996. Harem size and reproductive success of stallions in Misaki feral horses. Applied Animal Behaviour Science 47:163–173.

Killian, G., Thain, D., Diehl, N.K., Rhyan, J., Miller, L. 2008. Four-year contraception rates of mares treated with single injection porcine zona pellucida and GnRH vaccines and intrauterine devices. Wildlife Research 35:531-539.

BLM_002109

Madosky, J.M., Rubenstein, D.I., Howard, J.J., Stuska, S. In press. The effects of immunocontraception on harem fidelity in a feral horse (*Equus caballus*) population. Applied Animal Behaviour Science.

Nelson, K.J. 1978. On the question of male-limited population growth in feral horses (*Equus caballus*). Master's thesis, New Mexico State University, Las Cruces.

Nunez, C.M.V., Adelman, J.S., Mason, C., Rubenstein, D.I. 2009. Immunocontraception decreases group fidelity in a feral horse population during the non-breeding season. Applied Animal Behaviour Science 117:74–83.

Powell, D.M. 1999. Preliminary evaluation of porcine zona pellucida (PZP) immunocontraception for behavioral effects in feral horses (*Equus caballus*). Journal of Applied Animal Welfare Science 2:321–335.

Ransom, J.I., Cade, B.S., Hobbs, N.T. 2010. Influences of immunocontraception on time budgets, social behavior, and body condition in feral horses. Applied Animal Behaviour Science 124:51–60.

Shumake, S.A., Wilhelm, E.S. 1995. Comparisons of effects of four immunocontraceptive treatments on estrous cycle and rutting behavior in captive white-tailed deer. Denver Wildlife Research Center, Colorado, USA.

Singer, F.J., L. Zeigenfuss, L. Coates-Markle, and Rev. F. Schwieger. 2000. A demographic analysis, group dynamics, and genetic effective number in the Pryor Mountain wild horse population. Pages 73–89 in F.J. Singer and K.A. Schoenecker (compilers), Managers' summary—ecological studies of the Pryor Mountain Wild Horse Range, 1992–1997. U.S. Geological Survey, Midcontinent Ecological Science Center, Fort Collins, Colorado.

Roelle, J.E., F.J. Singer, L.C. Zeigenfuss, J.I. Ransom, L. Coates-Markle, and K.A. Schoenecker. 2010. Demography of the Pryor Mountain Wild Horses, 1993-2007. U.S. Geological Survey Scientific Investigations Report 2010-5125.

Turner, A., Kirkpatrick, J.F. 2002. Effects of immunocontraception on population, longevity and body condition in wild mares (*Equus caballus*). Reproduction Supplement 60:187–195.

Turner, J.W., Jr., I.K.M. Liu, D.R. Flanagan, A.T. Rutberg, and J.K. Kirkpatrick. 2007. Immunocontraception in wild horses: one inoculation provides two years of infertility. Journal of Wildlife Management 71(2):662–667.

Turner, J.W., Jr., M.L. Wolfe, and J.F. Kirkpatrick. 1992. Seasonal mountain lion predation on a feral horse population. Canadian Journal of Zoology 70:929-934.

BLM_002110

# A Brief History of the Wild Free-Roaming Horses and Burros Act of 1971

During the 1950s in Nevada, Velma B. Johnston, later known as "Wild Horse Annie," became aware of the ruthless and indiscriminate manner in which wild horses were being gathered from the rangelands. Ranchers, hunters, and "mustangers" played a major role in harvesting wild horses for commercial purposes. Wild Horse Annie led a grassroots campaign involving mostly school children. The exposure of how wild horses were being treated outraged people and ultimately got the public fully engaged in the issue. Newspapers published articles about the exploitation of wild horses and burros and, as noted in a July 15, 1959, Associated Press article, "Seldom has an issue touched such a responsive chord."

In January 1959, Nevada Rep. Walter Baring introduced a bill prohibiting the use of motorized vehicles to hunt wild horses and burros on all public lands. The House of Representatives unanimously passed the legislation, which became known as the "Wild Horse Annie Act." The bill became Public Law 86-234 on Sept. 8, 1959, but it did not include Annie's recommendation that Congress initiate a program to protect, manage, and control wild horses and burros. Public interest and concern continued to mount, and with it came the realization that Federal protection and management was essential.

By 1971, the population of wild horses had declined significantly because of the encroachment of man and the mustangers' elimination of the animals. In response to the public outcry, members of the Senate and House introduced a billed in the 92nd Congress to provide for the necessary management, protection, and control of wild horses and burros. The Senate unanimously passed the bill on June 19, 1971. After making some revisions and adding a few amendments, the House also passed the bill by unanimous vote. Then-President Richard M. Nixon signed the bill into law on December 15, 1971. The new law (Public Law 92-195) was titled the Wild Free-Roaming Horses and Burros Act of 1971.

The Act declares wild horses and burros to be "living symbols of the historic and pioneer spirit of the West." Under the law, the BLM and U.S. Forest Service manage herds in their respective jurisdictions within areas where wild horses and burros were found roaming in 1971. The 1971 Act was later amended by the Federal Land Policy and Management Act (FLPMA) of 1976, and the Public Rangelands Improvement Act of 1978. FLPMA (Public Law 94-579) allowed for the Secretaries of the Interior and Agriculture to use or contract for the use of helicopters and motorized vehicles for the purpose of managing wild horses and burros on public lands.

The Public Rangelands Improvement Act (Public Law 95-514) established or reaffirmed:

- the need for inventory and identification of current public rangeland conditions (through monitoring);
- the management, maintenance, and improvement of public rangeland conditions to support all rangeland values;
- the continuance of provisions protecting wild free-roaming horses and burros from capture, branding, harassment, or death while facilitating the removal of excess wild horses and burros that pose a threat to their own habitat and other rangeland resources;

75

- and the transfer of the title of ownership after one year to individuals that adopted wild horses and burros removed from public rangelands, so long as the animals had received humane care and treatment during that year.

To help carry out its assignment, the BLM established the Wild Horse and Burro Program, through which the agency manages and protects wild horses and burros, both on and off the range, while striving to maintain rangeland health.

76

# Glossary of Terms and Acronyms

**Adoption Success -** Adoption of horses and burros to qualified good homes.

**AML – Appropriate Management Levels** – The desired number of adult horses or burros (expressed as a range with an upper and lower limit) to be managed within an HMA. Forage for WH&B (AUMs) is allocated based on the AML upper limit.

**APHIS - Animal Plant Health Inspection Service** - Animal and Plant Health Inspection Service is an agency of the United States Department of Agriculture (USDA) responsible for protecting animal health, animal welfare, and plant health www.aphis.usda.gov.

**AUM – Animal Unit Month** – The amount of forage (approximately 800 pounds of air dried forage) necessary to sustain one adult horse or two burros for one month.

**Authorized Officer -** Any employee of the BLM to whom authority has been delegated to perform the duties of his job description.

**BLM - Bureau of Land Management** - The Bureau of Land Management is an agency within the United States Department of the Interior which administers America's public lands, totaling approximately 253 million acres. www.blm.gov

**CAWP - Comprehensive Animal Welfare Plan -** A comprehensive plan to ensure humane care and animal wellbeing throughout the lifetime of a wild horse or burro from the range through capture, holding, sale or adoption and post-adoption compliance in private homes.

**CTR - Catch Treat and Release** - Type of gather were the principal goal is to apply fertility control measures.

**Emergency Gather -** An unexpected event that threatens the health and welfare of a wild horse and burro population and/or its habitat. Examples include fire, insect infestation, disease or other events of a catastrophic and unanticipated nature that results in a necessary gather.

**Excess wild horses and burros -** Wild free-roaming horses and burros which have been removed or which must be removed in order to preserve and maintain a thriving natural ecological balance and multiple use relationship in an area.

**Filly -** Young female horse less than three years of age.

**Foal -** Young un-weaned horse or burro of either sex.

**FS – U.S. Forest Service** - The United States Forest Service is an agency of the United States Department of Agriculture that administers the nation's 155 national forests and 20 national grasslands, which encompass 193 million acres.

77

**FWS - U.S. Fish and Wildlife Service** - The United States Fish and Wildlife Service is a federal government agency within the United States Department of the Interior dedicated to the management of fish, wildlife, and natural habitats. www.fws.gov

**GAO - Government Accountability Office** – The Government Accountability Office is the audit, evaluation, and investigative arm of the United States Congress. It is part of the legislative branch of the United States government. www.gao.gov

**Gelding** - Male horse or burro that has been castrated.

**Habitat –** The area or type of environment in which an organism or biological population normally lives or occurs.

**HA – Herd Area -** Geographic areas of the public lands identified as habitat and were used by wild horses and burros when the Wild Free-Roaming Horses and Burros Act was enacted (12/15/1971)

**HMA - Herd Management Area –** May be established in those HAs within which WH&Bs can be managed for the long term. HMAs are designated through the LUP process for the maintenance of WH&B herds. In delineating each HMA, the authorized officer shall consider the appropriate management level for the herd, the habitat requirements of the animals, the relationships with other uses of the public and adjacent private lands, and the constraints contained in 43 CFR 4710.4

**Hinny -** Offspring of a male horse and a female donkey

**Herd Management Area Complex –** Herd management areas that are managed in close proximity to each other and as a unit.

**HSUS – Humane Society of the United States** - The Humane Society of the United States (HSUS), based in Washington, D.C., is the largest animal advocacy organization in the world. www.humanesociety.org

**Jack** - A male donkey or burro.

**Jenny** - Female donkey or burro.

**LUP- Land Use Plan -** Tracts or areas that provide for the use of public lands. LUPs are prepared in accordance with established land use planning procedures in 43 CFR 1600 and pursuant to FLPMA.

**Mare** - Mature female horse four years or older.

**MHF – Mustang Heritage Foundation** - The Mustang Heritage Foundation is a 501 (c)(3) public, charitable, nonprofit organization dedicated to facilitating successful adoptions for

BLM_002114

America's excess mustangs and burros. Founded in 2001, its mission is to help promote the Bureau of Land Management's National Wild Horse and Burro Program and increase the number of successful adoptions. www.mustangheritagefoundation.org.

**Mule** – The offspring of a male donkey or burro and a female horse.

**NAS** – **National Academy of Science -** The National Academy of Sciences is a corporation in the United States whose members serve pro bono as "advisers to the nation on science, engineering, and medicine." As a national academy, new members of the organization are elected annually by current members, based on their distinguished and continuing achievements in original research. www.nasonline.org .

**NEPA** – **The National Environmental Policy Act -** NEPA is a United States environmental law that established a U.S. national policy promoting the enhancement of the environment and also established the President's Council on Environmental Quality (CEQ).

**NPS** – **U. S. National Park Service** - The National Park Service is the U.S. federal agency that manages all national parks, many national monuments, and other conservation and historical properties with various title designations. It was created on August 25, 1916, by Congress through the National Park Service Organic Act. www.nps.gov.

**NRCS** – **National Resources Conservation Service** - The Natural Resources Conservation Service (NRCS), formerly known as the Soil Conservation Service (SCS), is an agency of the United States Department of Agriculture (USDA) that provides technical assistance to farmers and other private landowners and managers. www.nrcs.usda.gov.

**OIG** – **Office of the Inspector General** - The mission of the OIG is to provide independent oversight and promote excellence, integrity, and accountability within the programs, operations, and management of the Department of the Interior. www.doioig.gov.

**Population** - All of the organisms that constitute a specific group or occur in a specified habitat.

**Porcine Zona Pellucida** – PZP is extracted from pig ovaries. PZP is incorporated into the PZP vaccine to act as an antigen against which the treated mare produces antibodies.

**Porcine Zona Pellucida vaccine** – The PZP vaccine acts as a foreign protein against which the treated mare produces antibodies which blocks fertilization of the mare's egg. This makes the PZP fertility control agent a vaccine. *In January 2012, The Humane Society of the United States announced that the Environmental Protection Agency has approved the liquid form of PZP as ZonaStat-H, the first registered contraceptive vaccine for horses.

**PZP-22** – **A** PZP vaccine that will deliver approximately 22 months of efficacy.

**PZP-3 to 4 year vaccine** – A PZP vaccine, still under development, that will hopefully deliver 3 to 4 years of efficacy.

BLM_002115

**RMP – Resource Management Plan -** A RMP is a land use plan that describes broad multiple-use direction for managing public lands administered to by the BLM.

**Save the Mustang Fund -** The Save the Mustangs Fund was established in May 2005 by the Ford Motor Company in collaboration with the BLM and Take Pride in America. The fund was created to accept donations to help raise public awareness of the urgency of wild horse and burro issues and to find good homes for them.

**Stallion** – Un-castrated male horse 4 years or older.

**SOP** – Standard Operating Procedures

**SpayVac®** -- An immunocontraceptive vaccine developed using liposome technology and the Porcine Zona Pellucida antigen.

**Stochastic -** A random probability distribution or pattern that may be analyzed statistically but may not be predicted precisely.

**Title -** Certificate of ownership transferred to an adopter of wild horses or burros after one year of humane care.

**USGS – U.S. Geological Survey -** The United States Geological Survey is a scientific agency of the United States government. The scientists of the USGS study the landscape of the United States, its natural resources, and the natural hazards that threaten it. The organization has four major science disciplines, concerning biology, geography, geology, and hydrology. The USGS is a fact-finding research organization with no regulatory responsibility. www.fort.usgs.gov/WildHorsePopulations/

**Act -** **Wild Free-Roaming Horses and Burros Act -** Law passed in 1971 to protect and manage wild horses and burros. www.blm.gov/wo/st/en/prog/whbprogram/history_and_facts.html

**Wild Horse and Burro Patch Program** - An environmental education programs about WH&B management to America's youth. BLM partnered with the Sierra Nevada Chapter of the Girl Scouts of America to develop and implement a pilot Wild Horse and Burro Patch Project.

**WH&B – Wild Horses and Burros -** All unbranded and unclaimed horses and burros that use public lands within the 10 western states as all or part of their habitat, or that have been removed from the public lands, or have been born of wild horses or burros in authorized BLM facilities, but have not lost their status under the Wild Free-Roaming Horses and Burros Act.

**WHBPS – Wild Horse and Burro Program System -** WHBPS is a centrally hosted web-based application that is only accessible by authorized government users through the BLM intranet. The new system covers the full range of activities related to management of wild horses and burros.

80

BLM_002116

**ZonaStat-H** – The name of the first registered immunocontraceptive vaccine for horses approved and registered by the Environmental Protection Agency (EPA), formerly commonly referred to as PZP. See PZP in Glossary for further information.

81

BLM_002117

# Appendices

## Appendix 1: Summary of the GAO's Findings, Recommendations and the BLM's Response

In FY 2009, the GAO released a report which examined the BLM's Wild Horse and Burro Program (GAO-09-77). A summary of the GAO's findings, recommendations and the BLM's response follows:

| The BLM's Progress in Setting AML | | |
| --- | --- | --- |
| **The GAO's Findings** | **The GAO's Recommendations** | **The BLM's Response** |
| • BLM has made significant progress toward setting and meeting AML but has not provided specific formal guidance to the field offices on how to set AML. | • Finalize and issue the new Wild Horse and Burro Program Handbook that establishes a policy for setting AML to ensure that AML is determined based on consistent factors across HMAs into the future. | • Issued the 4700-1 Wild Horses and Burros Management Handbook (June, 2010).<br>• Revised and issued Manual Sections 4700-4740 (June, 2010). |
| **The BLM's Progress in Meeting AML** | | |
| • BLM was closer to meeting AML (about 27,200 animals) in 2007 than in any other year since AMLs were first reported in 1984.<br>• The extent to which BLM has actually met AML depends on the accuracy of BLM's population counts. Most offices use a method that researchers say consistently undercounts animals. Undercounting can put | • Continue to adopt and employ statistically-based methods to estimate animal populations across HMAs to improve the accuracy of population estimates integral to BLM's management of wild horses and burros on the range and in planning for capacity needed for excess animals once they are removed from the range. | • Issued Instruction Memorandum (IM) 2010-057, Wild Horse and Burro Population Inventory and Estimation (February, 2010).<br>• Conducted training for use of new statistically based population survey methods (August, 2011). |

82

BLM_002118

| | | |
|---|---|---|
| animals at risk and lead to increased program costs. | | |

| **The BLM's Management of Animals Off the Range** | | |
|---|---|---|
| <ul><li>The number of animals removed from the range is far greater than the number adopted or sold, resulting in increased need for short and long-term holding.</li><li>Compared to average adoption rates in the 1990s, 36% fewer animals were adopted in 2007.</li><li>As of June 2008, the BLM was holding over 30,000 animals in holding facilities, up from nearly 10,000 in 2001.</li><li>If not controlled, off the range holding costs will continue to overwhelm the program.</li></ul> | <ul><li>Develop cost-effective alternatives to the process of caring for wild horses removed from the range in long-term holding facilities and seek the legislative changes that may be necessary to implement those alternatives.</li></ul> | <ul><li>On October 7, 2009, Secretary Salazar sent a letter to U. S. Senate Majority Leader Harry Reid outlining his proposal to put the Wild Horse and Burro Program on a more sustainable track.</li><li>The BLM has developed a strategy for wild horse and burro management which incorporates the components of the Secretary's initiative.</li></ul> |

| **The BLM's Controls to Ensure Humane Treatment of Animals** | | |
|---|---|---|
| <ul><li>The BLM has implemented multiple controls to help ensure humane treatment, including random checks on adopted horses and agreements with adopters and buyers to prevent slaughter.</li><li>Although the BLM collects data on the treatment of the animals, the information is not always compiled in a central data base or</li></ul> | <ul><li>Track the number of animals harmed or killed during the gather process in a centralized data base system and determine what information on the treatment of gathered animals, short and long-term holding animals, and adopted animals could easily be provided to the public to help inform them about the treatment of WH&B.</li></ul> | <ul><li>Finalized and issued IM 2009-041 requiring field offices to report the results of gather operations, including the number of animals that died or were euthanized, to the National Program Office July, 2010).</li><li>Posting monthly updates on gathers, sales and adoptions at www.blm.gov</li></ul> |

83

| | | |
|---|---|---|
| reported to the public.<br>• Providing additional information to the public on the treatment of these animals could help inform the public about their treatment and improve transparency. | | |

**Challenges in Managing for the Long-Term Sustainability of the Program**

| | | |
|---|---|---|
| • The BLM has limited options for dealing with unadoptable animals. The Act provides that un-adopted excess animals shall be humanely destroyed or, under certain circumstances, sold without limitation. However, the BLM only manages these animals through sales with limitations. BLM is concerned about the possible reaction to the destruction of healthy animals. | • The Secretary of the Interior and the BLM should discuss with Congress and other stakeholders how best to comply with the Act or amend it so that the BLM would be able to comply. | • The Department of the Interior and the BLM has met with key House and Senate members and their staff regarding the Secretary's initiative, including discussion of possible amendments to the 1971 Wild Free-Roaming Horses and Burros Act.<br>• The Secretary's initiative was presented to the National Wild Horse and Burro Advisory Board on December 7, 2009.The draft strategy was provided to the Board on March 11, 2011.<br>• Met with key stakeholders regarding the Secretary's initiative.<br>• Engaged the public and key stakeholders in strategy development. |

84

# Appendix 2: Summary of the Office of Inspector General's Findings, Recommendations and the BLM's Response

The OIG released a report which examined the BLM's Wild Horse and Burro Program in December 2010 (Report No.: C-IS-BLM-0018-2010).  A summary of the OIG's findings, recommendations and the BLM's response follows:

| The OIG's Findings | The OIG's Recommendations | The BLM's Response |
|---|---|---|
| • Gathers to remove excess wild horses and burros are justified.<br><br>• The BLM's care and handling of the animals is humane.<br><br>• Growing populations and waning public interest in horse adoptions, and mounting costs are straining the BLM's ability to sustain the Wild Horse and Burro Program.<br><br>• Continued unchecked horse population increases will result in a growing need to hold horses, and commensurate increases in program funding. | 1. There is urgent and aggressive focus on research and testing of improved population control methods to balance wild horse and burro population growth with adoption demand, thereby minimizing the need for additional long-term holding facilities and preserves.<br><br><br><br><br><br><br><br>2. There is an ambitious effort to minimize and reduce over the long-term the need for short and long-term storage facilities. | • In FY 2011, the BLM increased the number of mares treated with PZP fertility control to over 1,013 mares.  Adjustment of herd sex ratios to favor males is also planned in some HMAs as an additional population growth suppression method.<br>• The BLM is pursuing with USGS, industry and academia research studies designed to develop longer lasting fertility control agents.  They are:  (1) continuing research with the University of Toledo (Ohio) on the development of a three-year PZP vaccine; (2) continuing work with USGS, Oregon State University and Telamar Laboratories on a five-year research project to evaluate the safety and effectiveness of SpayVac®; and (3) evaluation of a research proposal for the development of a safe, effective and humane surgical method for spaying mares (ovariectomy).<br>• The BLM is consulting with the NAS to determine if there is credible scientific evidence to indicate vasectomies would be effective in controlling herd growth rates or if there are other methods for managing stallions that would tangibly suppress population growth.<br>• Lastly, the BLM will review earlier research recommendations by the Wild Horse and Burro Advisory Board to determine whether recommendations were implemented, or are no longer relevant or need to be pursued.<br>• The BLM is seeking to reduce costs by implementing partnership eco-sanctuaries or Farm service Agency pasture programs when it is equally or more cost effective to do so.<br>• The BLM will also boost annual adoptions to over 4,000 animals by offering more trained animals through the Mustang Heritage Foundation. |

85

BLM_002121

## Appendix 3: Principle Reasons Some Herd Area's Acreage is not Managed for Wild Horses and Burros

*Table 1: Acreage Managed for WH&B use in 1971 vs. 2011. All land ownerships, 53.8 million acres, that made up Herd Areas (HAs) are listed. The areas within the HAs where WH&B are currently managed are called Herd Management Areas (HMAs).*

| Item | Acres of Public Lands in Millions | Other Landownership | Break Down of lands originally identified under the Wild Free-Roaming Horses and Burro Act 1971 and current status. |
|---|---|---|---|
| HA Acreage (1971) | 42.4 | 11.4 | 53.8 |
| HMA Acreage (2011) | 26.9 | 4.7 | 31.6 |
| HA Acreage Not Managed Today | 15.5 | 6.7 | 22.2 |

*Table 2: Detailed Summary of Reasons that 15.5 Million Acres of BLM Lands Are No Longer Managed for Wild Horses and Burros. Of the 42.4 million acres of public land originally identified within Herd Areas when the WFRHB Act was enacted, 15.5 million acres of BLM land are not currently managed for Wild Horses and Burros. Below is a breakdown of the Principle Reasons and Other Reasons that this acreage is not managed for Wild Horses and Burros.* **Reasons WH&Bs are not being managed on 15.5 million BLM acres are as follows**

| Number of Acres (Public Lands Only) | % | Principle Reasons Some Areas Are Not Currently Managed for Wild Horse and Burro Use |
|---|---|---|
| 3,003,023 | 19.4 | Significant portion of the HA not owned or controlled by the BLM, and water not owned or controlled by BLM and/or not available within the HA |
| 2,464,758 | 15.9 | Significant portion of the HA not owned or controlled by BLM. |
| 2,054,319 | 13.3 | Water not owned or controlled by BLM and/or not available within the HA. |

BLM_002122

| | | |
|---|---|---|
| 1,935,238 | 12.5 | Federal legislation-BLM land transferred to Park Service (1,447,776 acres), Forest Service (437,436 acres of which 165,568 are currently managed for horses and burros in territories) and other agencies. |
| 1,645,758 | 10.6 | Conflicts with other resource values or designations (such as Threatened and Endangered Species, National Conservation Areas, wilderness, etc.) that were not resolved in favor of wild horses and burros. |
| **11,103,096** | **71.7%** | **SUBTOTAL** |

| Number of Acres (Public Lands Only) | % | Principle Reasons Some Areas Are Not Currently Managed for Wild Horse and Burro Use |
|---|---|---|
| 1,342,382 | 8.7 | Land was inappropriately designated as part of the Herd Area (i.e., The animals observed when making the determination of use were actually privately owned horses identified as such only after the claiming period provided for in the 1971 Act). |
| 860,991 | 5.6 | Unsuitable habitat-unproductive land or inadequate forage. |
| 703,532 | 4.5 | Other reasons -- such as Department of Defense withdrawals, etc. |
| 392,836 | 2.5 | Areas where the long-term management of wild horses and burros was not feasible (e.g., animals would not stay in the Herd Area, the presence of multiple fences, etc.). |
| 310,663 | 2.0 | Areas where wild horses and burros could no longer be managed as a result of various Federal Court decisions. |

BLM_002123

| | | |
|---|---|---|
| 266,718 | 1.7 | Herd Areas with herd sizes too small to allow for effective management over the long-term (i.e., less than a handful of animals present at the time the Act passed; thus genetics concerns). |
| 156,471 | 1.0 | Land exchanges -- BLM land transferred to private or state ownership. |
| 142,686 | .9 | Inappropriately or mistakenly designated as a Herd Area (i.e., areas of public land with no animals present at the time of the passage of the Act). |
| 113,185 | .7 | Critical habitat component absent or not controlled -- such as winter range or summer range. |
| 65,595 | .4 | Areas where habitat fragmentation has occurred as a result of highway corridor fencing, etc., to the extent that management of wild horses and burros is no longer possible. |
| 39,553 | .3 | Areas impacted by urban expansion to the extent that effective management of wild horses and burros no longer possible. |
| **4,394,612** | **28.3%** | **SUBTOTAL** |

| Total Number of Acres of Public Land Currently Found within Herd Areas that are not Managed for Wild Horses and Burros | % | |
|---|---|---|
| **15,497,708** | **100.0%** | **TOTAL** |

88

BLM_002124

| | |
|---|---|
| **From:** | Bolstad, Dean |
| **To:** | Russell, Gregory; Ryan Sklar |
| **Cc:** | Michael Mottice |
| **Subject:** | Fwd: Draft Strategy |
| **Date:** | Tuesday, August 29, 2017 9:58:30 AM |
| **Attachments:** | 2017 Congressional Report082817.docx |

Greg and Ryan,

Attached is the latest version of the WHB Strategy due for delivery to Congress by Nov. 5. As we discussed last week, please review this version. Mary Jo Rugwell is the lead for the project asked if you complete your review by this Friday, September 1st. Can you make that deadline?

Mike Mottice is the Project Manager who is in control of the document. Please send your edits to Mike using Word's track changes and comment boxes. The document hasn't gone to the professional editor yet so there are formatting things that will be remedied by the editor.

Thanks in advance for you review and a quick turn around. Call me if you have questions.

Dean


Dean Bolstad
Division Chief, Wild Horse and Burro Program
Washington Office (WO-260)
(202) 912-7648 Office
(775) 750-6362 Cell

---------- Forwarded message ----------
From: **Mottice, Michael** <mmottice@blm.gov>
Date: Mon, Aug 28, 2017 at 8:47 PM
Subject: Draft Strategy
To: Mary Jo Rugwell <mrugwell@blm.gov>, Kristin Bail <kbail@blm.gov>, Steve Tryon <stryon@blm.gov>
Cc: "Bolstad, Dean" <dbolstad@blm.gov>, "Holle (Hooks) Waddell" <hhooks@blm.gov>, Michael Reiland <mreiland@blm.gov>, Jason Lutterman <jlutterman@blm.gov>, Alan Shepherd <ashepher@blm.gov>


Here is the latest version of the strategy. I made numerous changes in response to Kristin's comments. I also addressed the funding issue as we discussed today.

Major changes are:

1. Removed budget chart and addressed budget issue with language on reprogramming and supplemental approps on page 18/19 per group discussion.

2. Added more comments in the public opinion section from 2012 strategic plan per Kristin and Dean's comments.

3. Added how the strategy is or is not consistent with the summit notes.

4. Added attachment 5 for Michael to note basic cost data used to build the excel spreadsheets

per Kristin's comment.

5.  I will add some more info (later this week) on the BLM's response to the IG and GAO reports per Kristin's comments.

6.  Dean will add a short history (later this week) on how we got to AML briefly in about 2006 without sale and euthanasia tools and how we got in the predicament we are in now.

7.  Dean will add a short summary of other findings from the NAS report (later this week).

Follow-up.

Dean will provide to Solicitors for review and comment by COB this Friday.  All reviewers should make changes or comments directly in the doc on google drive if possible. Kristin, you now have access on googl drive.

Comments from internal BLM reviewers should be completed by COB Friday as well.

Mike

| | |
|---|---|
| **From:** | Russell, Gregory |
| **To:** | Michael Mottice; Bolstad, Dean |
| **Cc:** | Ryan Sklar |
| **Subject:** | Re: WHB Report to Congress/Strategy |
| **Date:** | Thursday, August 31, 2017 8:17:03 PM |
| **Attachments:** | 2017 Congressional Report082817 + RS GR edits.docx |

Mike and Dean – here are our comments on the draft strategy. Is it going to come through DTS? Our management would like to see the final draft version before it issues. Thanks!


—Greg


_____

Greg Russell
Division of Land Resources
Office of the Solicitor
Department of the Interior
202.208.4327

NOTICE: This email (including attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected by applicable law. Any unauthorized disclosure, copying, use or distribution of this email or its content is strictly prohibited. If you receive this email in error, please notify the sender immediately and destroy all copies.


On Thu, Aug 31, 2017 at 10:23 AM, Bolstad, Dean <dbolstad@blm.gov> wrote:
> Thank you much.
>
> Please send the comment to Mike Mottice with copies to me.  If you and Ryan can send only one track change document that would be nice, but if not possible we are good with two documents.
>
>
>
> Dean Bolstad
> Division Chief, Wild Horse and Burro Program
> Washington Office (WO-260)
> (202) 912-7648 Office
> (775) 750-6362 Cell
>
> On Thu, Aug 31, 2017 at 9:28 AM, Russell, Gregory <gregory.russell@sol.doi.gov> wrote:
>> Dean – I got your voicemail; we'll transmit our comments by tomorrow.
>>
>> On Wed, Aug 30, 2017 at 4:57 PM, Sklar, Ryan <ryan.sklar@sol.doi.gov> wrote:
>>> Dean,
>>>
>>> Greg will correct me if I'm wrong, but that getting you our comments by COB on Friday should not be a problem.
>>>
>>> Ryan
>>>
>>> On Wed, Aug 30, 2017 at 4:55 PM, Bolstad, Dean <dbolstad@blm.gov> wrote:
>>>> Hello Greg and Ryan,
>>>> Mary Jo asked to to confirm that you will be able to review and comment by Friday COB?
>>>>
>>>> Thanks

Dean Bolstad
Division Chief, Wild Horse and Burro Program
Washington Office (WO-260)
(202) 912-7648 Office
(775) 750-6362 Cell

--

**Ryan Sklar**
Attorney-Advisor
Office of the Solicitor
U.S. Department of the Interior
202-208-3039

NOTICE: This e-mail (including attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected by applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or use of this e-mail or its contents is strictly prohibited. If you receive this e-mail in error, please notify the sender immediately and destroy all copies.

| | |
|---|---|
| **From:** | Bolstad, Dean |
| **To:** | Michael Reiland |
| **Subject:** | Adv Brd Recommendations |
| **Date:** | Tuesday, October 3, 2017 3:55:09 PM |
| **Attachments:** | 2016 April Meeting_WHB Adv Bred Recs 2016.September.27.docx |

Dean Bolstad
Division Chief, Wild Horse and Burro Program
Washington Office (WO-260)
(202) 912-7648 Office
(775) 750-6362 Cell

**BLM Response to April 13-14, 2016 Wild Horse and Burro Advisory Board Recommendations**

Recommendation #1:  The National Wild Horse and Burro Advisory Board asks the BLM to continue to work toward full implementation of previously accepted recommendations of the Board and prioritize according to BLM matrix of meeting AML.

BLM Response:
The BLM accepts this recommendation and will conduct work within the limitations of available resources that contributes to the achievement of AML in the highest priority areas.  Priority work includes continuing to conduct gathers to achieve AML in all greater sage-grouse habitat sagebrush focal areas by 2020; continuing research to develop more effective contraception methods and implementing them as they become available; reducing off-range holding costs by acquiring more pastures to reduce corrals numbers freeing up funds for on-range management; increasing the number of trained animals offered for adoption; piloting an adoption incentive program; increasing animal availability to adopters through new storefronts with emphasis in the East; developing and implementing new internet adoption capability; and procuring the services of a professional marketing firm.

Recommendation #2:  The National Wild Horse and Burro Advisory Board recommends BLM create a crisis/emergency plan in case of severe drought or natural disaster that necessitates removal of either over 1,000 horses or over the amount BLM can hold in short-term holding facilities.  The situation would be triggered by a BLM determination that animals are 'imperiled'.

BLM Response:
The BLM accepts this recommendation.  In fiscal year 2016, $500,000 was held in reserve for the removal of imperiled animals.  In addition, fire rehabilitation funding has been available for the removal of animals from wildfire areas.  To date about 200 imperiled animals have or are being removed.  Larger scale removals will begin compromising the ability to conduct priority removals to achieve AML in greater sage-grouse/sagebrush focal area habitat; conduct court ordered removals; mitigate public safety and health issues; remove from private lands outside of HMAs; and initiate field research.

Recommendation #3:  The National Wild Horse and Burro Advisory Board recommends BLM make it easier for trusted trainers or MHF or other organizations to acquire sale eligible and 'riding desirable' (based on age and adoptability) horses.

BLM Response:
BLM accepts this recommendation in part due to the Board's suggestion during the development of the recommendation to reduce or eliminate the paperwork requirements for reliable or "trusted" trainers who purchase horses. The requirements for purchasing an animal involve the completion of an Application to Purchase and a signature on a Bill of Sale that commit the buyer to provide humane care.  BLM doesn't anticipate reducing these requirements but greater efforts will be made to increase the availability of "riding desirable" sale eligible animals for enrollment into BLM's partnership with the Mustang Heritage Foundation, who utilizes reliable trainers for training and placement into private care.

1

Recommendation #4:  The National Wild Horse and Burro Advisory Board support efforts by BLM to engage professional marketers to identify and attract appropriate demographic segments in order to increase mustang adoptions.

BLM Response:
The BLM accepts this recommendation and recognizes the need for a comprehensive and consistent marketing strategy that effectively supports the placement of animals into private care and raises awareness of wild horse and burro on-range management.  The BLM has issued a solicitation to procure the services of a marketing firm and plans to issue a contract by October 1, 2016.  The contractor will assist BLM to build on the existing brand; develop a marketing strategy; create marketing and communication products; and provide professional guidance based on recent market research acquired by BLM under a different contract.

Recommendation #5:  The National Wild Horse and Burro Advisory Board recommends BLM create and pilot a Mustang Mentoring program consisting of a two-week on-site training conducted by a qualified trainer at a short-term holding facility for up to 10 horses and 10 adopters.

BLM Response:
The BLM accepts this recommendation and would like to develop this concept through additional work with the board.

Recommendation #6:  The National Wild Horse and Burro Advisory Board urges BLM to institute the volunteer strategy as soon as possible (September 2015 Recommendation # 10 which states "Develop strategy to train and use more qualified volunteers to support wild horse and burro activities, off-range and on-range.)

BLM Response:
BLM accepts this recommendation.  A formalized process and strategy for a volunteer program has been discussed and will be developed when personnel are hired to lead this initiative. In the interim, field offices will be encouraged to continue using and expand the use of volunteers for both on-range and off-range management activities.  The Washington Office will consider offering financial incentives through a "Division Chief Challenge" to encourage and support field offices who initiate new programs to engage community groups and/or volunteers to advance on-range population management endeavors such as those recommended in the following Recommendation #7.

BLM_002131

<u>Recommendation #7:</u>  The National Wild Horse and Burro Advisory Board encourages state and local BLM offices to embrace volunteers to document wild horses with photography, work with local offices to create a sustainable management plan, and enable qualified volunteers to participate in the implementation of the sustainable plan including the use of reversible contraceptives.

BLM Response:
The BLM accepts this recommendation and will provide encouragement to BLM field offices as per BLM's response to the preceding Recommendation #6.  BLM retains its authority and responsibility for the development of herd management plans.  Volunteers and other members of the public can contribute to the development of management plans through the NEPA process.  Once management plans and implementation actions are determined, local offices can engage volunteers and community groups to assist.

<u>Recommendation #8:</u>  The National Wild Horse and Burro Advisory Board would encourage aggressive use of all tools in the tool box as addressed in the Board's September 2015 Recommendation #16, which reads "Prioritize use of currently available tools in the field to reduce population growth **right now** and implement promising new tools as quickly as they become available."

BLM Response:
The BLM accepts the recommendation and recognizes the need to implement an aggressive fertility control program utilizing available tools and new methods as they become available.

BLM_002132



**Wild Horse and Burro Program**

TM

**U.S. Department of the Interior Bureau of Land Management**

# NATIONAL WILD HORSE & BURRO ADVISORY BOARD

Courtyard Marriot
Salt Lake City Downtown
345 West 100 South
Salt Lake City, UT 84101

October 10-11, 2018

Volume 1

Day 1 Meeting Minutes

U. S. Department of the Interior
Bureau of Land Management

# Contents

**WEDNESDAY, OCTOBER 10, 2018** ......................................................................................................... 2

WELCOME ..................................................................................................................................................... 2

RULES OF THE ROOM ................................................................................................................................. 2

INTRODUCTIONS ......................................................................................................................................... 3

OPENING REMARKS .................................................................................................................................... 3

APPROACH TO MANAGE WILD HORSES AND BURROS ......................................................................... 4

BUREAU OF LAND MANAGEMENT, UTAH ................................................................................................ 6

BUREAU OF LAND MANAGEMENT, UTAH WILD HORSE & BURRO PROGRAM ................................. 7

BUREAU OF LAND MANAGEMENT, NATIONAL WILD HORSE & BURRO PROGRAM ..................... 10

UTAH DEPARTMENT OF NATURAL RESOURCES .................................................................................. 13

BLM RESPONSES TO THE WILD HORSE & BURRO ADVISORY BOARD RECOMMENDATIONS 2016 - 2017 ......... 14

FOREST SERVICE WILD HORSE & BURRO PROGRAM ......................................................................... 19

BLM MANAGEMENT OPTIONS FOR A SUSTAINABLE WILD HORSE & BURRO PROGRAM ........... 21

BLM WILD HORSE & BURRO PROGRAM RESEARCH UPDATE .......................................................... 24

BLM_002134

# Wednesday, October 10, 2018

## Welcome

### *Mr. Fred T. Woehl, Jr., Chair, Wild Horse and Burro Advisory Board*

Mr. Woehl called the meeting to order at 8:00 a.m. and asked any Veterans to first stand and then asked all to stand and join in the Pledge of Allegiance.

Mr. Woehl turned the time over to Dan Adams.

## Rules of the Room

### *Dan Adams, Facilitator, The Langdon Group*

Mr. Adams, serving as the meeting's facilitator, introduced himself and reviewed the rules of the room. Mr. Adams mentioned that it is our hope and intent that by everyone listening and following these rules, we'll have a good meeting. Mr. Adams also reviewed the emergency exit procedure in the case of an emergency and the location of restrooms. The rules of the room were as follows:

1. Seating is available for attendees. Anyone needing or wishing to stand will stand in the designated area behind the seats. All attendees are to stay in the seating or standing area at all times, unless addressing the Board during the public comment period.
2. Speakers and other attendees will not approach the dais at any time without prior consent from the Chair of the meeting.
3. Media will check in at the door and will be guided to the space designated for cameras.
4. No attendees will be allowed to place microphones, cameras or other equipment in the space set aside for the Board meeting.
5. All attendees will show mutual respect for each other and for speakers and Board members. This includes refraining from using cell phones or talking while the meeting is in session.
6. If anyone disrupts the meeting they will be asked to leave or be escorted out.
7. Those wishing to address the Board will sign in at the door. Speakers will address their comments to the Board, while seated at the designated speaker table. Generally, speakers have about 3 minutes each and are asked to finish in the designated time to allow for the maximum number of individuals to express their viewpoints.
8. Attendees wishing to provide handouts to the Board will leave handouts with the BLM representative at the door. Handouts will not be brought to the speaker's table and no one will be allowed to approach the Board with handouts.
9. Within the meeting room, attendees may not display signs, placards, or other items that are likely to obscure the view of participants or disrupt the meeting.
10. The Board will not respond to comments made during the public participation period. This should not be interpreted to mean the members of the board agree or disagree with anything said.
11. The Chair reserves the right to comment on any factual inaccuracies that may be shared during the public comment period.
12. The BLM commits to maintaining these rules for the benefit of all involved and appreciates everyone's cooperation with these rules.

## Introductions

Mr. Woehl asked the board members to introduce themselves (see Table 1).

| NATIONAL WILD HORSE & BURRO ADVISORY BOARD MEMBERS | |
|---|---|
| **Board Member** | **Representing** |
| **Mr. Fred T. Woehl, Jr.** | Public Interest (Equine Behavior) |
| **Ms. Ginger Kathrens** | Humane Advocacy |
| **Mr. Ben Masters** | Wildlife Management |
| **Mr. Steven Yardley** | Livestock Grazing |
| **Dr. Tom Lenz** | Veterinary Medicine |
| **Ms. Celeste Carlisle** | Wild Horse & Burro Advocacy |
| **Dr. Barry Perryman** | Public Interest (NRM/Special Knowledge) |
| **Mr. James French** | Natural Resource Management |
| **Dr. Sue M. McDonnell** | Wild Horse & Burro Research |

**Table 1 - National Wild Horse and Burro Advisory Board Members**

Mr. Woehl introduced Ms. Kristin Bail and turned the time over to her.

## Opening Remarks

### *Kristin Bail, Dedicated Official for the Bild Horse & Burro Advisory Board, Director of Resources and Planning, BLM*



**Ms. Kristin Bail**

Ms. Bail thanked everyone for being there and knows that many of you traveled a long ways to be there. She is impressed by the passion and dedication of everyone involved in the program and the people that care about the horses and range land. Ms. Bail thanked everyone for attending and thanked those attending on the livestream. She also thanked the great group of folks that travel and do an amazing amount of setup to bring the live stream to us, thank you for your work on that. She thanked the Advisory Board members for their services, their contribution to dealing with tough, complex and important issues. She mentioned that Dr. Sue McDonnell, one of the board members, had a previous commitment and would be unable to attend in person, but would be participating by phone. Ms. Bail thanked Dr. McDonnell for taking the time to continue to participate. Ms. Bail joined Mr. Woehl in welcoming the new members of the board. It takes a large team to put these meetings together. Ms. Bail thanked the Washington D.C. office, Wild Horse & Burro staff, and Ms. Dorothea Boothe, the Public Affairs Specialist for the National Wild Horse and Burro Program in Washington D.C. Ms. Bail also introduced Mr. Bruce Rittenhouse, the Acting Division Chief, Wild Horse and Burro Program, BLM.

Ms. Bail continued, this will start two days of dialogue on a variety of issues. The healthy, constructive dialogue is for the board members. We have the privilege of having a variety of important presentations. That is to inform all of us as we move forward in the program to help the board provide recommendations to the Bureau of Land Management. We continue to look for the Board's and our presenter's insights as we work toward having a healthy, productive, and thriving ecological balance for our horse herds.

An Advisory Board is a special privilege because the Federal Advisory Committee Act gives boards the right to provide group advice to an agency, something that can only happen within a chartered advisory board. The board is here to offer advice and recommendations for the secretaries of both interior and secretary of agriculture.

Of note, formal board recommendations are done by a vote, but that vote does not require 100% consensus. We do encourage that the board members work to achieve consensus, but these are tough issues. It is tough because we all have strong, valid approaches to what should be done, and we don't always reach agreement. We want to continue to have that diverse, important, challenging dialogue, and move together to reach consensus where we can. We also want to honor the fact that there are diverse opinions. We continue to look for ways where we have interactions and cross pollination, and more importantly, also have a close tie to what is going on in the field. For example, the Resource Advisory Councils (RACs) are close to what is happening on the ground in their areas and how to inform what is going on in local conditions. Ms. Bail looks forward to the dialogue and hopes that we can build on our successes, continue to roll up our

BLM_002136

sleeves and deal with our challenges, and work toward the thriving ecological balance we all seek. We want to continue to work toward thriving relationships on behalf of the land and very importantly on behalf of the wild horses and burros. Thank you.

Ms. Bail was then asked to introduce the first presenter, Brian Steed. Ms. Bail introduced Mr. Steed as a son of Utah who knows western issues. He cares about western issues and has been very engaged.

## Approach to Manage Wild Horses and Burros
### *Brian Steed, Deputy Director for Policy and Programs, BLM*

 Mr. Brian Steed is the BLM's Deputy Director for Policy and Programs. Mr. Steed said that it has been a real pleasure working with the people in the BLM. This is an important issue. It is an issue that inspires a lot of passion. It is important that we have a dialogue. Speaking to the Board, Mr. Steed said that you have been given a difficult job. This is an issue that inspires many strong emotions and those emotions are often communicated to you all. I appreciate your passion. The protection of wild horses and burros is at a critical juncture. No action is not an option. Allowing the present course is contrary to the BLM's mission. We have seen negative consequences for the environment. We believe that healthy horses and rangelands equals healthy communities. That's what we are striving for on the range. Off-range, we are working hard to find placement into good homes for horses after some of them have been removed from the range:

- On-range Vision – healthy horses & rangelands equals healthy communities
- Off-range Vision – removals from the range equals placement into good homes

Those two visions work together and can't be separated. I would also be remiss in saying this is not only the BLM vision but the Secretary of the Interior who asked me to address this in a direct manner. There are many horses on the range; currently we sit at multiple times of what was deemed to be the appropriate management levels. As a result, we are seeing impacts on the range, also impacts on the bottom line of the BLM where we spend an additional portion of the yearly appropriations budget on horses gathered off the range.

Mr. Steed continued and pointed out that these visions align well with BLM's overall mission of multiple use and sustained yields both for future and present generations. That means it's critically important to achieve the vision for the offline population as well as on range to do that. We hope to find a permanent home for all of the horses removed from the range.

The following are some consequences of overpopulation:

- Overpopulation causes degradation of animals on the range and impacts to local communities. Congress in 2017 noted the failure to address these problems will result in irreparable damage to the landscape and created the Consolidated Appropriations Act of 2017: "The failure to address these problems will result in irreparable damage to the landscape and the welfare of the animals protected by the Wild Free-Roaming Horses and Burros Act."
- Overpopulation causes degradation of habitat and competition with wildlife. There are many examples of wild horses and burros, as water sources become scarce, keeping other wildlife at bay from water sources. Horses are trying to reach as much water as they can, and this will also have severe impact to the springs over time.
- Overpopulation causes decline in the health of wild horses and burros. As the competition for resources increases, we have noticed a decline in the health of horses and burros. It's important, I think, that we pay attention to the consequences of our choices as we are going forward.
- Overpopulation causes destruction of private property and creates a public safety issue. As there is increased competition for resources, horses will travel. Horses and burros have sought reprieve on private property. This has led to issues of public safety. Again, healthy range lands equal healthy communities.

Mr. Steed continued: we are faced with a number of difficult choices as an agency, and indeed are turning to the advisory board for good ideas on what is a pressing problem every single year. Mr. Steed mentioned that there are two things that he views as threats to the BLM: wildfire and wild horses. We are in a trend line to where horses are consuming a large portion of our budget. We are not entirely sure how to get in front of that in the timeframe that we have.

BLM_002137

The BLM has a budget of $81 million per year for this program, over half of that is spent on housing horses off-range. We have limited tools in the tool box. One of the tools we have used as aggressively as we can of late is gathers. Gathers remains an important part of the management portfolio. This year has been particularly rough, where we have animals in declining health, and animals that are clearly on a pathway to where they won't survive in certain areas.

The Secretary of the Interior has instructed us to look for additional means of population growth suppression.  We submitted a report to congress that details several options on pathways forward. One of the options that was presented there included extensive use of population growth suppression, methodologies, both including temporary vaccine based as well as spay and neuter techniques. We are pursuing both as expeditiously as we can given the constraints that we face. Mr. Steed thinks both certainly have merit. The value of both mean that the more population growth suppression we employ on the range, the less need we have for gathers and long term holding of the animals, which is a costly endeavor. We look to doing more of that in the future, and we continue to do that as aggressively as we can. We are also engaged in an active research program to improve fertility control methods through vaccine-based as well as spay and neuter techniques.

Mr. Steed addressed off-range horse management as well. We had about 46,000 horses in holding at the beginning of this year. Each of those horses will cost, depending on what we do with them over short-term or long-term holding, it could cost about a billion dollars to care for the horses over their lifetimes. This year we have an additional 11,000 horses off of the range. We have not seen the exact numbers yet on how many horses, but it's almost certainly north of 50,000 horses off-range. That means the price tag of holding the horses long term is increasing. We are looking for aggressive means to move the horses into good homes, looking to pursue adoptions and sales. One of the things upcoming is adoption incentives; potentially a $1,000 dollar incentive, distributed $500 at the time of adoption, and $500 at titling of the horse. We are seeing the animals and how they are doing so we are able to make sure we abide by the mandates of the Act in terms of adoption. This is a novel idea. We'll be rolling out the adoption incentive this fall. We hope to increase the number of sales to good homes as well. We have been partnering with a variety of partners to increase the number of sales and make sure they are going to homes that treat them well.

Lastly, Mr. Steed expressed that we can't do this by ourselves. We are looking for partnerships with anyone willing to partner with us to make sure that we can maintain a viable horse and burro population and to maintain healthy horses on the range. We have been in discussions with many advocacy groups as well as a variety of other groups. The BLM has a fixed appropriation on this, and so while we are as creative as we can be, we also need as much help from our partner organizations as possible.

The BLM is moving ahead on new innovative tools and strategies to address on-range population and increasing placement of animals into good homes. Mr. Steed is absolutely optimistic that as we go forward and educate as many people as possible on this issue, there are real long-term solutions. We probably have to make hard decisions, but Mr. Steed is optimistic that we can make the decisions and have a viable and long-lasting program beneficial to the range as well as the horses. He then welcomed questions.

Mr. Woehl pointed out that the incentive program was a Board recommendation from 2015 and the Board is please to see that coming back.

Mr. Ben Masters mentioned that it means a lot to have someone from this level of the BLM come to a board meeting and shows that they are dedicated to tackling this issue. He hopes that the same dedication exists within congress. We've wanted to have this meeting in Washington for that reason, to engage. Mr. Masters asked, is this topic being discussed in Washington D.C.? Do people want to find a sustainable solution? Are they willing to put money into making that happen? What is the talk on Capitol Hill regarding this topic?

Mr. Steed responded that he works for the administration and it is hard to gauge all of the talk. He has been asked about it many times by colleagues and this shows that there is a real interest. Mr. Steed believes there is interest on Capitol Hill and that there is increased awareness that the way things have been done in the past is probably unsustainable. It is either going to take more money or more tools.

Mr. Steven Yardley asked about the two major concerns, wildfire and wild horses. Both have implications on the

BLM_002138

rangeland. There is a lot of publicity about wildfire, is there a lot of urgency or publicity regarding wild horses and burros?

Mr. Steed said that the response is mixed. He has had a lot of opportunity to discuss it. There is an increased understanding about what is going on and we are working on it. This is a slow-burn (in keeping with the analogy) and there is not a lot of consensus on what to do about the problem whereas there seems to be consensus on what to do about wildfire.

Mr. Yardley pointed out that sometimes the fire that burns the slowest, burns the most.

Dr. Barry Perryman pointed out that our challenges aren't going to be fixed without active involvement of congress. Dr. Perryman stated that he is not sure that congress has the political appetite to take this up. It may be because they are uninformed. There may be other things that take priority of their time, for example. Some states don't have the problem that Nevada has. The fact of the matter is that we have many of our herd management areas (HMAs) that overlap with threatened/endangered (T/E) species habitat. We are in the middle of an ecological train wreck and congress needs to know. Dr. Perryman asked, do you think, in your opinion, it would be helpful to have a meeting with the Advisory Board in Washington D.C.?

Mr. Steed responded that the more attention we bring to this, the better outcomes we will see. Furthermore, Mr. Steed pointed out that this may be a question of tradeoffs, from an economic perspective. Every dollar I spend on keeping a horse in long-term holding is a dollar the federal government doesn't spend someplace else or doesn't go into the deficit. That's a conversation worthy of having. Mr. Steed continued that tradeoffs on the range, for every additional horse on the range, there are tradeoffs regarding vegetation, wildlife, and habitat. The more information about this topic the better.

Mr. Jim French thanked Mr. Steed for coming and pointed out that the Board may be tasked with a job that has no solution or there is no appetite for a solution. Mr. French stated that one of the places we are dropping the ball is that after the fire is out, we are faced with a reclamation disaster. For example, after the Martin fire, the fire took the grass out of the ecosystem. The budget support for the reclamation that needs to occur there in the next 18 months isn't there. We have about 18 months in much of the Great Basin before we lose the habitats to invasive species. Mr. French asked, what is the perspective relative to the reclamation budget? We have an ecological disaster that is going to create much bigger problems down the road that we haven't seen.

Mr. Steed acknowledged and stated that they are aware that reclamation is an enormous priority. We have to balance the resources and the priorities. We report to Congress, they are our boss.

Mr. Yardley followed-up the questions from Mr. French and Dr. Perryman with a question regarding a paradigm shift. He pointed out that although Congress is your boss, if there were an issue with wildfire, it is the responsibility of the agency to report the issues to Congress. Could there be a paradigm shift to inform Congress of the dire economic needs to deal with wild horses?

Mr. Steed pointed out that BLM cannot lobby Congress, but that yes, they can inform. He spends a lot of time talking about the issues with members of Congress and the resource needs that exist.

### Bureau of Land Management, Utah
***Ed Roberson, State Director, BLM Utah***



Mr. Roberson explained that BLM Utah manages nearly 23 million acres of public lands representing about 42 percent of the state and 32 million subsurface acres. The economic output (FY2017) is measured amongst seven industries and accounts for 25,000 jobs. There were 7.9 million visitors to BLM Utah's public lands in FY2017 and supported 5,203 jobs and contributed $577.7 million in economic activity to the state of Utah. Our priorities are Energy Independence, Shared Conservative Stewardship, Safe Borders, Job Creation, and Serving America. Mr. Roberson also reviewed Utah's Watershed Restoration Initiative that was established in 2006 as a partner-driven effort to conserve, restore, and manage ecosystems. To date, 1,902 projects have been completed on 1,560,073 acres with an investment over

$207 million throughout Utah. In FY2017, BLM contributed $10.5 million in funding.

Mr. Roberson pointed out that the partnerships is part of an all hands, all lands approach. We are providing continuity on the ground and working as good neighbors with others to pool together our resources to focus on the highest priority activities and projects and to reduce administrative implementation. We are improving our restoration activities, and over the time period of the last 13 years, we have treated 1.4 million-acres, 400-miles of stream restored to proper conservation, and healthy watersheds. Because of these efforts, Mr. Roberson said that you can see islands of juniper converted back to range land and shrub land to host the sage-grouse as well as 300 other species as well as providing healthier lands for wild horses, wildlife and livestock. These are all opportunities for the public and visitors to see an intact landscape. Mr. Roberson then turned it back to the Board for any questions.

Ms. Ginger Kathrens mentioned that we had a great tour yesterday with Gus Warr and Lisa Reid (BLM) at the Onaqui Mountain HMA and that they showed us the signage and information provided at kiosks in the HMA. Do you have plans for that for all of the HMAs in Utah? People love to see wild horses and if the signage is there, that would be great.

Mr. Roberson referred to Mr. Gus Warr, the Utah Wild Horse and Burro Lead with the BLM, to answer that question in his presentation

Mr. Yardley asked that with all of the activities and economic outputs from lands under the direction of the BLM, where do you see the excessive numbers of wild horses and burros and ecological damages occurring in the long list of problems and priorities?

Mr. Roberson again referred to Mr. Gus Warr and Mr. Mike Styler, the Executive Director of the Utah Department of Natural Resources, to answer that question.

## Bureau of Land Management, Utah Wild Horse & Burro Program
### V. Gus Warr, Wild Horse & Burro Program Lead, BLM Utah

Mr. Gus Warr introduced himself and then expressed that he had a great trip yesterday and he hopes that the Board enjoyed it as much as he did. He expressed thanks to the members of the Board and their willingness to be on the board. Mr. Warr spent the last 28 years with the BLM in the wild horse and burro program.

Mr. Warr explained that Utah has an amazing horse and burro team.  We are a small state. We have two full time horse and burro experts (specialists) in the state of Utah.  We have three others across the state that work in the horse and burro program but also have other duties (dual hat). There are three facility workers. And we have one, wonderful, full-time public affairs officer, Lisa, who you met yesterday. Mr. Warr explained that what makes our management team successful is people like Ed Roberson, at the head, clear down to our field manager and district managers. They support us as a team and are able to get things done. Mr. Warr is proud of that coordination and work.

In Utah, Mr. Warr explained that we have two off-range facilities. The Delta facility is a 300 animal facility and is inside the city limits. And we have the Axtell facility, a burro contract and horse contract facility. There is a contract for 1,000 horses and 1,200 burros. There is also an off-range pasture in central Utah near Fountain Green.

Mr. Warr explained that there are 19 herd management areas (HMAs) in the state within 29 herd areas (HAs). 17 of the HMAs are for wild horses and two are for wild burros. For information, between 1998 and 2006 we did extensive gathers and identified 98 individuals positive for equine infectious anemia off of public lands that had to be euthanized. This is very unique, something other HMAs don't deal with.

There are estimates of 2,000 plus horses on tribal land that go back and forth to the BLM. Through land use planning, we have been able to focus on where we can manage the horses effectively. For example, you can see the original herd area of the Onaquis is large, and unfortunately, a lot of it has no water source. There is also the issue of the military land that is adjacent to the herd area. After consideration, we identified 200,000-acres is what we can manage on the Onaquis. Each zone within Utah has their own management challenges and opportunities.

BLM_002140

Mr. Warr continued showing maps of the state with the HMAs and referred to the southeast part of the state, including the Muddy Creek and Sinbad areas that are managed by BLM. Robert's Roost is an area that was a HMA, but there is not effective water there (we couldn't keep a population of 25 to 30 animals there because of a lack of water). In 2008 the land use plan went through the public process and determined that we can't effectively manage animals there. There are still horses there. There are other populations that are self-regulating that are not in HMAs. We are active in how to better manage the 5,100 animals in the state of Utah, down from 2017 (we were up to 5,800 roughly). We estimate there are approximately 4800 horses and 344 burros today (plus or minus 15%).  Mr. Warr explained that BLM has been active in removing animals in 2017 and 2018. The appropriate management level (AML) for Utah is just under 2,000. Even though we have been actively removing, trying to do the best we can, we are two and a half times where we should be.

Mr. Warr pointed out that Utah is not as bad as some states. The BLM is working hard at being, and has been, effective in some areas, but we have a long way to go. We have had four very dry months in Utah. Mr. Warr showed the U.S Drought Monitor dated September 18, 2018 and explained that the whole west is in a drought condition.  That dictates in a big way what BLM does and pushes us in one direction or another when it comes to long-term management. We deal with the water issue every year on many of the HMAs. In 2016, there were so many horses without water, we had no choice but to bring water to them or they would be compromised, and we would have to do an emergency removal.

Mr. Warr pointed out that most of the issue is the water. The BLM tries to improve the water sources so we don't have to haul water. There are cases where the BLM has had to euthanize horses that can't walk because of lack of water. Mr. Warr said that he will not go into an area to see a horse in that condition and not relieve that suffering.

Mr. Warr expressed that the long-term solution is keeping the numbers in check.  As for signage, to Ms. Kathren's question, the signs are critical in future management to educate the public. We talk a lot about the herd in the Onaquis, where people love the horses to death. But, they start petting them, feeding them and making pets out of them, that's the concern BLM has. The kiosks, Mr. Warr, said he would love to see them across the state.

Mr. Warr talked about partnerships. He mentioned the partnership with the Mustang Heritage Foundation, a competition between mustangs and domestic horses and have convinced many domestic horse owners into adopting mustangs because they are blown away by what they can do. Mr. Warr pointed out many other possibilities for public awareness in the state that the BLM uses, including displaying wild horses at the local zoo, a 4-H program and similar youth programs we do, all of which are great partnerships.

In summary, Mr. Warr explained that Utah is two and a half times AML. There are several HMAs that are four or five times over what they should be. The extended drought periods and water limitations create even more problems.  Mr. Warr suggested that perhaps we need to look at the AMLs. For example, if we don't have enough water to sustain the populations, do we develop more water or do we reduce AML? There are public safety and private property issues to deal with as well. Mr. Warr turned it over to the Board for questions.

Mr. Woehl asked Mr. Warr to explain the difference between an HMA and an HA.

Mr. Warr explained that a herd area (HA) is the original 1971 designation. After the Act was passed in 1971, there was a period between '73, '74, and '75 where each district had to identify where wild horses were found. Sometimes that was done on the ground, by helicopter, or fixed-wing airplane. The BLM made a circle on a map and said that's where they were found. After that, the BLM had to identify within the HA, where can we effectively manage the horses. A herd management area (HMA) has to fall within a herd area. HMAs are a subset of the HA.

Mr. Woehl asked Mr. Warr to explain social media posts about a gather that occurred in Utah where some of the comments were not very flattering.

Mr. Warr thanked the chairman for bringing this up. He explained that there was a gather called the Muddy Creek gather where they removed 150 horses. There was a situation with passionate people that love horses. Mr. Warr explained that he loves that about this program, that people are passionate and love the animals. He went on to explain that he had been accused on social media of making fun of the emotional people at the gather but that he had not been up where the people were, rather he had simply asked the law enforcement team to be there to make sure everything went well. The gather

BLM_002141

went really well.

Mr. Masters asked if BLM Utah has synopsis or have any data of the number of horses that are outside HAs.

Mr. Warr explained that out of the 4,800 animals in Utah, there are 300 to 400 animals outside of the HA boundary. There are a subset of 800 to 1,000 animals that are within HAs but not in HMAs. They still fall under the Act.

Mr. Masters stated that he is not familiar with any data that support the claims of mountain lion predation.

Mr. Warr would refer to Dr. Peterson, that he may be able to answer that question for the Board and that he will be at the meeting tomorrow.

Mr. Yardley referred to his question to Mr. Roberson, that there are a lot of activities, economic activities on public land in the state of Utah. As far as on the list of priorities and problems we are faced with, Mr. Yardley asked, where are the ecological problems occurring?

Mr. Warr explained that it is not uncommon to get questions from the BLM director regarding the wild horse and burro problem we are facing. It is a priority in the state of the Utah, because it impacts the livestock community, interest groups and many more, this is a priority program.

Dr. Tom Lenz asked if all the horses, as they are removed, are tested for anemia, and to explain if the BLM goes back to any horses remaining to test them.

Mr. Warr explained that when the BLM gathers horses, the BLM contracts with the State Veterinarian to test them onsite and the BLM won't ship them to a facility until they have been tested. In cases where they test positive, the BLM institutes a quarantine onsite where the animal is in quarantine for several months on public lands. This is rare, but we have to hold the animals and test them.

Mr. French asked that if the 1,100 or so that were gathered this year were gathered based on emergency conditions or were they scheduled?

Mr. Warr responded that a couple of them were emergencies, however most were scheduled. There was one private land gather where there were wild horses on private land. In one emergency gather, there was a lack of water, not on the entire HMA. And the rest were planned.

Mr. French asked if there is a lead for the 4-H programs mentioned and that this would be a good opportunity for Nevada.

Mr. Warr explained that Idaho kicked it off and there are now multiple states doing the same program. The program is working well and that BLM could help connect the 4-H leaders to help each other.

Dr. Perryman referred to the drought monitor and asked, how are you using the drought monitor in your decision-making process?

Mr. Warr responded that he encourages the field specialist, when they are doing an analysis on doing a gather or not, to use the information in the drought monitor as part of the analysis. He explained that BLM has encouraged its staff to look at not only utilization or trends, but use the drought data. This data is predictable and provides a clear picture of where we are right now. There is also a rain gauge we use in the field.

Dr. Perryman pointed out that the drought monitor is based on surface water availability. There are some years you can have all kinds of feed on the ground but there's no water, basically. There have been issues where some of the BLM offices have been relying exclusively on the drought monitor and it can be off base what is happening on the ground.

Mr. Warr agreed that it is one piece of data in the analysis. They have to look at the local data, the local trend, monitoring data, utilization, all of the factors.

BLM_002142

Ms. Celeste Carlisle pointed out that the Onaqui HMA is often referred to (or looked to) as a successful fertility program. Ms. Carlisle mentioned that this herd has approachable horses and a team supportive of doing this, including the state lead. That's really important. Other field offices have looked to Utah for advice and practicality and the do's and the don'ts. Ms. Carlisle asked then, what are your limitations for 60 at this point instead of 100, are there reasons you are not just saying 80% of the mares or whatever?

Mr. Warr responded that one of the biggest challenges is that there is a mob, the large group of horses. Those are approachable, however there are sub-populations on the Onaqui Mountains that are not as approachable. The BLM recently held a training this summer where there were half a dozen individuals taking the training. The identification of the individual animal is key. Making sure you have the database and making sure you can identify each individual mare so you know which animal you are darting.  We don't want to haphazardly dart any mare.  We want to be precise in what we do. There are limitations on the horses in the Onaquis. Another example, Mr. Warr stated, is Muddy Creek. There are a subset of the Muddy Creek that are approachable, however there are a lot of those in Muddy Creek you can't get within a mile. Mr. Warr explained that their approach is to take what they can get; any suppression will support the program in the long run.

Ms. Kathrens pointed out that in some cases, like in McCullough Peaks HMA, the transition from a herd not being approachable to being approachable happened over only two or three years, once the public begin to engage the herd.

Mr. Warr concluded that the BLM direction is to look at each HMA and determine what is the applicability of darting. At every level, we need to do what we can and use all of the tools we have.

10:00 a.m.: 15-minute break

Mr. Woehl introduced the BLM Acting Division Chief, Wild Horse and Burro Program, Mr. Bruce Rittenhouse and turned the time over to him.

## Bureau of Land Management, National Wild Horse & Burro Program
*Bruce Rittenhouse, Acting Division Chief, Wild Horse & Burro Program*

Mr. Rittenhouse first acknowledged the Board and thanked them for being here. He also thanked the BLM wild horse and burro staff that are dedicated to this program. Mr. Rittenhouse pointed out that the people in this program care very much about the animals and that it is their main motivation for being in the program. He pointed out that the division chief position may be one of the most challenging positions in the bureau and that he is honored to be in this position.

Mr. Rittenhouse pointed out that the Wild and Free-Roaming Horses and Burros Act of 1971 was meant to protect wild horses and burros as a component of public lands managed in a manner designed to achieve a thriving ecological balance. We've heard those words several times already, "thriving ecological balance," which falls in line with the mission to sustain diversity and productivity for the use and enjoyment of current and future generations. Unhealthy horses is not a thriving ecological balance. Mr. Rittenhouse pointed out that HMAs are not the exclusive use of land, rather the land consists of multiple uses, including other wildlife habitat, rangeland, and many other opportunities. Another component is determining minimum feasible level. That term, along with "thriving ecological balance", have never been defined.

Mr. Rittenhouse continued, as of March 2018, there are about 82,000 animals. From the facilities holding report, 48,000 animals. This past year we adopted or sold 4,647 animals, an increase of 600 from last year. We are 7,000 short of meeting the goal of putting animals into homes that have been removed off of the range. As a nation, we are three times over the appropriate management level (AML) on the range.

Mr. Rittenhouse stated that we are at a crossroads. He emphasized that no action at this moment is not an option. There are consequences of inaction. He shared an example of the Antelope Valley HMA where they are over seven times AML, and over six years have seen dramatic losses of soil near water sources, primarily from horses.

Mr. Rittenhouse pointed out that there has been a decline in private care adoptions and sales of wild mustangs and there

are several factors. We are better at moving animals into long-term care simply to reduce current costs. Estimates vary year by year, but roughly, we use the numbers of cost, $5 a day per animal in a corral and $2 per day in a long-term pasture. However, there is an escalation of costs. One day to feed 36,500 horses in our pastures is $73,000. One year is $26 million. For the lifetime of the animals, assuming 15 to 20 years, approximately $500 million. If we add the corrals, you add another $500 million, for a total of $1 billion. Mr. Rittenhouse stated that we are at a fork in the road, and then asked, what fork are we going to take?

Mr. Rittenhouse stated that the Advisory Board has a key role in what fork to take. The information has been presented, we know that nearly every HMA is overpopulated. We are starting to see a lot more degradation of the public lands in the HMAs, with soil loss, vegetation changes, and that emergency gathers are increasing. Mr. Rittenhouse reiterated a response to Dr. Perryman regarding the drought monitor, stating that there are processes in place to consider drought conditions when requesting emergency gathers due to resource conditions. We are dealing with emergency gather requests because of resource conditions, but also because of cases where the animals are damaging private property. There are multiple tools, including expanding temporary fertility control and exploring permanent fertility control. There are cases, as has been mentioned, where darting is not feasible. The BLM is always looking for ways to increase adoptions and sales by expanding the markets and reaching new audiences for adoptions.  One way to do this is to strengthen and expand partnerships, we know we can't do this alone, and the BLM needs people's help and assistance. BLM has great partners at the national and local level and are trying to work on expanding the use of volunteers. There are partnerships with other agencies, for example, the BLM has adopted 400 animals to the U.S. Border Patrol. There is interest from other law enforcement agencies, state and local. Mr. Rittenhouse opened it up for questions.

Mr. French pointed out that, based on the numbers for long-term and short-term holdings, and the budget presented, that we will exceed the program budget within six years.  He pointed out that it's unsustainable and unsustainable in a short period of time.  He then asked, is congress fully aware of where this is headed right now?

Mr. Rittenhouse referred to Mr. Steed's presentation and earlier response. Mr. Rittenhouse thinks there are some that are aware, but believes they really become aware when their constituents write them letters. He pointed out that the public needs to really be engaged and that we can help really look at a long-term vision rather than just snapshots in time. It does begin with curbing population growth first.  In response, Mr. Rittenhouse continued that to get congress engaged is to really have the public engage them and to have networks of advocacy groups that provide information to Congress is helpful.

Mr. French followed up with a question regarding the management side of Mr. Rittenhouse's presentation, and asked, by concentrating horses in a location based on artificially providing water, are we even thinking about what the ramifications are to those other obligate species that have been impacted by the shortage of water as well?  Are we exacerbating the problem by artificially watering the horses that remain in that location and enabling the behavior that they become dependent on it? Are there impacts to the ecosystem by doing so?

Mr. Rittenhouse agreed and stated that it removes the free-roaming aspect of their livelihood. The BLM has debated about whether to haul water or not haul water and considers how and when management practices would potentially exacerbate the impact to the ecosystem.

Mr. Woehl asked whether there is any part of the 1971 law that says you have to haul water?

Mr. Rittenhouse stated that he is not aware of any part of the law that requires the BLM to haul water. The BLM considers how their actions impact ecosystems, in the example of degradation around artificially water provided by the BLM.

Ms. Kathrens asked how the 27,000 number (for AML) of wild horses and burros that could live in the west was arrived at?

Mr. Rittenhouse explained that AML is based on range capability, water, the habitat of horses in conjunction with permanent grazing and wildlife use. There was reference in the Academy of Sciences report that perhaps AML was not determined in a scientific way. In summary, if we have horses in HMAs that we have to haul water to every year, that would not meet a minimum feasible level of management standard and removes the free-roaming aspect of the animals.

BLM_002144

AML was determined based on range condition, forage, site potential, the availability of water and cover, as well as permanent uses.

Ms. Kathrens referred to the BLM's presentation on healthy range land and genetic variability contend that a healthy herd is variable. She acknowledged that it is a balancing act, but stated that she thinks the 27,000 number seems incredibly low. We should consider whether AML was determined scientifically and that perhaps there needs to be a reevaluation of AML.

Mr. Rittenhouse stated that AML was determined using the best information available at the time. AML will always be adjustable based on the data and information.

Mr. French offered some insight into the determination of AML: AML was established by a group of people sitting around the table with a set of maps and overlays and considered everything from watershed management to big-game management to species management to permitted livestock as well as other users on the ground. The process was deliberative. We considered genetic viability. The process was a deliberative process, it wasn't a flipping of the coin. It was understood at the time that AML could be adjusted, both up or down, based on data at the time. Mr. French was not involved with setting a nationwide number, rather he worked on the management areas for which he had some responsibility.

Ms. Kathrens pointed out that it seems the intent was to involve the best people on the ground in the area where they work, have knowledge, and have responsibility.

Mr. Yardley referred to Mr. Rittenhouse's comments about a major event happening if something isn't done. He asked, what a major event would look like if we continue the status quo from both an ecological standpoint, from the range the animals run on and for the animals themselves?

Mr. Rittenhouse stated that we are seeing a decline in health in some areas and that as the problem gets worse so does the decline in health. As for the range, Mr. Rittenhouse agrees that we'll see further degradation of lands like invasive species encroachment or spreading, resource degradation, vegetation changes, soil loss, soil changes, displacement of animals and other wildlife

Mr. Yardley asked, which of those happens first?  The ecological crash or the population crash?

Mr. Rittenhouse responded that he thinks we are seeing an ecological crash in several areas and that we have crossed the threshold in many areas making it hard and difficult to reverse. With wildfire, we can manage the reclamation, in some cases, fairly easily, through reseeding and moving livestock off the land. But, with the horses, we remove horses, we dart, we do things and even if we got to AML, there is no chance for restoration or reclamation, the horses are still there.

Ms. Carlisle pointed out that we hear a lot of doom and gloom projections. She asked, if we maintain the status quo, does the BLM have good predictions what can occur with layered management approaches? She pointed out that the problem is the population growth rate and asked, what management areas address population growth and has the BLM modeled, using economies of scale, these outcomes?

Mr. Rittenhouse responded that we get to AML based on certain actions. Mr. Alan Shepherd will talk about that more this afternoon and will present options that have been presented, from full implementation of the act to current management practices. Mr. Rittenhouse deferred to Mr. Shepherd later this afternoon.

Dr. Perryman pointed out that we have been talking about management paradigm changes over most of his career. He pointed out that some HMAs are in good shape where things are doing well, and perhaps those just need a management tweak every now and then to maintain things. However, there are other HMAs where we have already lost ecological potential, we have lost three feet of soil, and the AMLs associated with those sites have now been automatically decreased, the carrying capacity is no longer what it was. Dr. Perryman explained that there is going to have to be critical assessments of the AMLs, up and down, based on the data. There are cases where we have limiting seasonal habitat for sage grass that overlaps the preferred habitat for horses and burros. Dr. Perryman explained that more horses and better

BLM_002145

brood habitat are mutually exclusive. He then asked, does your gather authority include threats to other wildlife habitat? Has the BLM had discussion on that?

Mr. Rittenhouse responded that yes, and in identifying priorities for gathers. In the past year, BLM has considered habitats for other species as one of those priorities. $4 million of sage-grouse funds in FY2018 was used for gathers that have been planned (these are not emergency gathers) and BLM hopes to do that again this year, combining resources. BLM has encouraged states to identify projects on the ground that are for restoration and enhancement of sage-grouse habitat and work together where our needs overlap.

Dr. Perryman asked whether it is in the BLM's emergency gather authority to go out and remove horses from the priority habitats?

Mr. Rittenhouse stated that emergency orders have mostly to do with the health of the horses and burros and that perhaps the policy needs to be reviewed. Sage-grouse is just one example, there are desert tortoise, and many others. Other revisions include revising the adoption manual to include the incentive program, for example.

Ms. Carlisle asked how BLM prioritizes areas selected for gathers? Is it based on AML only, or sage-grouse habitat, or both, or others?

Mr. Rittenhouse deferred to Mr. Shepherd and mentioned that in cases where an HMA also has sage-grouse habitat, this would likely be a priority gather. The BLM does consider other protections in place when considering gathers.

Mr. Woehl directed the group to break for 5 minutes and

## Utah Department of Natural Resources
### Michael Styler, Executive Director, Utah DNR



Mr. Michael Styler, the Executive Director of the Utah Department of Natural Resources, introduced himself. The Utah DNR has a dynamic department of 1,500 employees responsible for natural resources, geologic surveys, state parks and more. Mr. Styler is a fourth-generation owner of mustangs. The Utah legislature is concerned about the impacts from the wild horse and burro population, especially in the last year, we suffered the driest year in our history. We have been working for many years to offset the effects of invasive species and drought. We have great partners with the BLM to work on our watershed restoration work.

Mr. Styler walked through how DNR has partnered with the Natural Resources Conservation Service (NRCS) of USDA, the Fish and Wildlife Service, the Forest Service, and private landowners to lessen the impact of wild horses, including the removal of brush and then reseeding. This is a great solution for sage-grouse habitat in the state. There are areas, for example, that are used for livestock, horses and elk, as well. DNR partners for funding and was able to use nearly $9 million to do some of the projects he was showing on his slides. DNR looks at the carrying capacity of the land and considers the cattle, sheep, elk, deer and horses it can support. We can manage livestock, but there is no way to manage the number of horses.

Mr. Styler went on to discuss how things are changing. DNR held a Wild Horse and Burro Summit last year that mirrored some of the information and presentations you are hearing at these meetings. Ultimately, the science was very clear about what is happening with wild horses and burros. The Utah Legislature, for example, gave DNR more budget after that summit. Mr. Styler continued, explaining that there are opportunities to partner and work together. A good example of this was a soft gather that DNR was willing to pay for on private property. The horses were baited into a corral and they shut the gate behind them, without the use of helicopters and with no stress to the horses. There were 93 or 94 horses gathered in that case. DNR does not care whether it is on private land or public land, we want to reduce the problem, we have a wonderful relationship with BLM, and we are working together to identify other ways to reduce the problem.

Mr. Styler talked about the drought in Utah, that the impact of last winter's and summer's drought means there is no grass on the ground. Now, since October 1, we have had rain, and the ponds might be full, but there is no grass. This has DNR

especially concerned. DNR has wildlife resources to deal with. There have been more fires this year. DNR reseeds after the fires, and on a positive note, met with the Utah State Governor's staff, gave them the proposed budget of $6.2 million, and they didn't bat an eye. The Governor's office understands that our reclamation effort (reseeding after a fire) is simply something we have to do and is an important part of what the department of natural resources does.

Mr. Styler pointed out that we have to have a balance because we believe in multiple use. That is the foundation of the DNR, multiple use. If, together, we are providing for the users of the land, we will have a healthy landscape. If we have healthy landscape, the water will be taken up by a root system and will recharge the aquifers in the spring. Mr. Styler went on to state that in responding to the drought, Utah has increased the elk tag numbers by 700 to reduce elk populations, increased the bison permit numbers to 220, and increased the pronghorn tags above 50. Cattlemen in Utah have voluntarily removed livestock because there is no feed. There is a need for a similar effort with wild horses and burros and management is key. Mr. Styler feels that BLM is trying to do their part, but that their hands are tied. He doesn't know if the political will in the country exists to do what needs to be done, but that DNR is committed along with its partners and the BLM to do whatever it takes to have healthy watersheds and maintain the balance that needs to be there so wildlife and livestock can live together in a healthy ecosystem. He asked the Board for questions.

Mr. Woehl stated that the the majority of the Board agrees with Mr. Styler that we need to have a cooperative effort made with all stakeholders, and for all of the best use of the range.

Mr. Yardley thanks Mr. Styler for partnering to have a positive impact on the land by replacing viable feed and wildlife. This is a step in the right direction in fire prevention, getting these areas to have a higher carrying capacity.

Mr. Styler pointed out that the grazing improvement program, where they help ranchers develop new water sources, help with fencing, help to have more scientifically managed grazing and more intensive short-term grazing, is a win-win for all involved. Both parties present projects and the projects with the most benefit are selected and completed together. A good example of this is a recent project with fire resistant cover that DNR planted. It has stopped fires and is a win-win for sage-grouse habitat and the rangeland in that area.

Mr. Woehl asked about bush hogging that the DNR does, and Mr. Styler showed a video of a front-end loader with a grinder to remove/reduce junipers that are then reseeded with the cover and grasses from that area.

Ms. Kathrens referred to the Wild Horse and Burro Summit and asked if there was going to be another one.

Mr. Styler stated that probably not, simply because there really isn't any new information to present. However, if the Board feels that there is a need, and there is new information that we should have brought to the table, DNR would be happy to consider having another summit.

Adjourned until 1:15 p.m.

### BLM Responses to the Wild Horse & Burro Advisory Board Recommendations 2016 - 2017
*Bruce Rittenhouse, BLM Acting Division Chief, Wild Horse & Burro Program*

#### Recommendations from the September 2016 Meeting in Elko, Nevada

**Recommendation #1:** BLM should follow stipulations of Wild Horse and Burro Act by offering all suitable animals in long and short-term holding deemed unadoptable for sale without limitation or humane euthanasia. Those animals deemed unsuitable for sale should then be destroyed in the most humane manner possible.—Approved

> **BLM Response:** Congress includes in the annual appropriations bill that "*Appropriations herein made shall not be available for the destruction of healthy, unadopted, wild horses and burros in the care of the Bureau or its contractors or for the sale of wild horses and burros that results in their destruction for processing into commercial products.*" With or without the prohibition, one of BLM's top priorities will continue to be the placement of animals into private care through adoptions and sales, and transfer animals to other federal, state, and local agencies.

BLM_002147

**Recommendation #2:** BLM should prioritize designated sage-grouse habitat for removal of excess animals. BLM should use degree of range degradation as a criterion for prioritization for removal of excess animals i.e., consideration should be given to those rangelands that can be restored and maintained in a healthy status.—Approved

> **BLM Response:** Gather priorities are based on the following criteria: compliance with court orders, public safety and protection of private property, priority habitats for threatened/endangered and sensitive species (including greater sage-grouse), initiation of research, and to achieve appropriate management levels in HMAs. In FY 2018, the BLM will have removed over 10,000 animals of which approximately 5,000 are in HMA's that overlap priority sage-grouse habitat. The BLM directed $4.15 million of sage-grouse habitat improvement funds specifically to remove excess horses in areas where they were impacting priority sage-grouse habitat.

**Recommendation #3:** BLM should develop partnerships with economic agencies and or departments to conduct an analysis of socioeconomic and environmental effects on communities with reduced AUMs on HMAs due to range degradation resulting from overpopulation of wild horses and/or burros. Further analysis should be conducted regarding the effects of the potential removal of all domestic livestock from all HMAs.—Approved

> **BLM Response:** The BLM is not prepared to fund this without outside help. The BLM recognizes that other uses of public lands such as recreation (including public viewing of wild horses and burros), energy development, permitted livestock grazing and the presence of wild horse and burro herds all contribute to the economic viability of western communities and the national economy. The BLM also recognizes that a decline in the health and productivity of rangelands negatively affects the resources that the economies of many rural western communities depend upon.

**Recommendation #4:** BLM should encourage BLM Resource Advisory Councils (RACs) to develop and submit for consideration their ideas for herd management and range rehabilitation strategies tailored to their specific areas and HMAs based on local knowledge and expertise.—Approved

> **BLM Response:** Several RACs have a keen interest in wild horse and burro management. The BLM Wild Horse and Burro Program will prepare and transmit a letter to the RACs representing areas where wild horses and burros are present and ask for their insight into herd and rangeland management strategies, including suggestions for partnership opportunities with local, State and national organizations.

**Recommendation #5:** BLM should advertise and conduct more frequent adoption events at off-range corrals to enable more horses & burros to reach sale eligible status.—Approved

> **BLM Response:** In calendar year 2018, the BLM will hold a total of 96 adoption events (www.blm.gov/whb) to be held in numerous states. Of these events, 39 will be held at BLM off-range corrals. For example, the BLM's Pauls Valley (OK) off-range facility holds monthly adoption events on the second Tuesday of the month. The BLM has also begun to implement internet adoptions through the on-line corral system. Through this system the public has a wider range of animals to select from for adoption. Adoption events at other facilities and events across the country allows more people an opportunity to adopt animals without having to travel to BLM facilities which are primarily located in the west.

**Recommendation #6:** BLM should facilitate invitation to all Board members to attend spay trials when they might occur, if allowed by protocols governing the trial.—Approved

> **BLM Response:** Spay research is currently being proposed for a gather in Oregon at the Warm Springs HMA in fall 2018. BLM intends to contract for veterinary services to spay approximately 100 mares using the ovariectomy via colpotomy technique. It is the BLM's intention to be transparent and allow public viewing of the surgeries, while at the same time to be prudent and consider the nature of the research and protecting the veterinarians and the health of the animals. There are no special provisions in the Warm Springs HMA Environmental Assessment that would give preferential access to board members for viewing, but board members are certainly allowed and encouraged to join the public viewing.

BLM_002148

**Recommendation #7 (Repeat from last meeting):** BLM should continue to work toward full implementation of previously accepted recommendations of the Board and prioritize according to BLM matrix of meeting AML. Note: This is the first recommendation from the Board's April 13-14, 2016 meeting.—Approved

> **BLM Response**: The BLM is working towards the implementation of accepted recommendations from previous meetings within the limitations of available resources (staffing and budgetary) and other influencing factors. Priority work includes reducing off-range holding costs, increasing the number of trained animals offered for adoption, increasing animal availability to adopters through new "storefronts" with more emphasis in the east, continuing research to develop more effective contraceptive methods, and managing HMAs to achieve and maintain AML.

Mr. French asked, in the case of prioritizing sage-grouse habitat for gathers, is this a routine operation to determine whether or not there is a trigger, or is there something else the BLM is waiting for from other agencies, for example? Mr. Rittenhouse explained that this refers to planned gathers, which considers priority habitats for greater sage-grouse when determining where. There are also times when sage-grouse funds can be used to help with wild horse and burro gathers.

Mr. French pointed out that the decisions made by BLM have impacts to state and local governments and that it is mandated, often court-ordered, to consider those impacts in their decision-making process. Mr. Rittenhouse agreed and stated that the socioeconomic analysis is part of the process. Mr. French, Dr. Perryman, and Mr. Yardley went on to explain that when the recommendations refer to effects on resources, that many rural western communities depend upon, this is not just the tail end of a statement. There are a lot of western communities that do not have the tax base that others have in eastern states, for example. There is not enough private land that can be taxed. In Nevada, for instance, the only tax base, and something we rely on, is a ranch-based income. Smaller communities in the west are solely dependent on the use of public land, it affects everything, and it is the livelihoods of the people in these communities that is at stake. If the range isn't maintained and taken care of, and the carrying capacity is decreased, these communities are the ones that suffer. It has everything to do with their livelihood and the traditions that they have.

Mr. French brought up having RACs attend the Advisory Board meetings. Mr. Rittenhouse agreed that this is a good idea.

The Board asked about making adoptions more available by increasing where and when they take place. They also asked about online adoptions. Ms. Hollé Waddell, BLM's Wild Horse and Burro Program Off-Range Branch Chief, responded that there is a new system in which you can adopt a horse online. The BLM identifies different pick up locations so someone can register, get approved, submit an application for purchasing or adopting an animal, etc. After some paperwork, verification, and logistics, someone can pick up the animal at a store front, off-range event, or a corral. The online adoptions are improving, the site was improved and is up and running. Ms. Waddell explained that this has increased the number of events that we've had online. There are volunteers that take videos and photos to help create a catalog for the animals. There is a search feature online as well.

Mr. Rittenhouse explained that in response to the recommendation regarding adoptions, BLM is not attempting to get animals to reach sale-eligible status. BLM's goal is to get animals into good homes. Ms. Waddell explained that BLM has developed additional policy regarding animal selection requirements and to demonstrate that the BLM is making the best effort to put the best animals forward for adoption events. Mr. Rittenhouse clarified that this is one way to have successful adoptions and give everyone interested an opportunity to adopt a horse, by putting the best animals forward for adoption. This is just one tool in the toolbox. Ms. Waddell explained that one of the policy changes was that animals would be offered for adoption three times before becoming sale-eligible. If the animal is sale-eligible, it can still be adopted.

The Board asked about restrictions to public viewing of gathers. Mr. Rittenhouse explained that there was a gather that involved Colorado State University (CSU) and it was CSU that had proposed restricting video of a particular gather that it was involved in. Once CSU was no longer involved, BLM revised and provided for public viewing, videography and photography.

Mr. Rittenhouse summarized that from the 2016 recommendations, the BLM is working on the recommendations to increase the number of trained animals offered for adoption, increase animal availability to adopters through more store

---

BLM_002149

fronts with more emphasis on the eastern part of the U.S., research more effective contraceptive measures, and more.

### Recommendations from the October 2017 Meeting in Grand Junction, Colorado

**Recommendation #1:** That the Wild Horse and Burro (WHB) Advisory Board have their next meeting in Washington DC and present their most recent recommendations, including those presented in September 2016, to agency officials. Tentatively to be scheduled early in the calendar year, but before the middle of March 2018. Motion carried 7-0.

> **BLM Response:** The BLM seeks Board input on identifying future meeting locations and dates. The BLM considers the Board's input to ensure that future meeting dates and locations maximize the attendance of WHB Advisory Board members, senior BLM management and staff, stakeholders and public while still being cost effective. The BLM considered having a spring 2018 meeting in Washington DC but selected Salt Lake City Utah for reasons of cost and access to the field. This meeting was cancelled due to not meeting the 30-day meeting notice requirement.

**Recommendation #2:** Phase out long-term holding over the next 3 years and apply that budget to on-range management and adoptions. Motion carried 6-1

> **BLM Response:** The BLM does not have the capacity to implement this recommendation since it would require the BLM sell or euthanize the approximately 35,000 animals currently in long-term holding over the next three years. Refer to the BLM's response to the Board's Recommendation #1 from the September 2016 Elko advisory board meeting.

**Recommendation #3:** Create funding mechanisms to maximize adoptions and or sales, especially through successful programs, and to include international adoptions and or sales. Motion carried 6-1.

> **BLM Response:** The BLM continues seeking innovative and creative ways to increase private care placement through adoptions and sales.  For example, the BLM has developed an Adoption Incentive Program that provides $500 to adopters at time of adoption and $500 to adopters at time of titling to help defray their costs for humane care of the animal.
> The BLM received authority from Congress to transfer animals to Federal, state, and local government agencies for use as work animals. The BLM has developed policy (BLM Instruction Memorandum 2018-052) and began communication and outreach efforts. No authority at this time exists to directly transfer wild horses and burros to private, non-government entities nor outside of the country.
> An international program is being considered as well to place animals into other countries for the purposes of humanitarian aid or economic development.

**Recommendation #4:** Increase WHB funding for reversible fertility control by $3M in FY 2019.  Motion carried 6-1.

> **BLM Response:** The BLM is currently partnering with several research institutions to support new research into additional fertility control methods. Some of these methods show promise but have not been tested on horses on the range. BLM continues to use, and hopefully expand reversible fertility control methods (PZP and GonaCon vaccines) if it can be effectively and efficiently administered, to reduce removals and achieve and maintain AML. Reversible fertility control does have limited applicability such that it works best when HMA's are within AML and the animals are easily approached for darting.

**Recommendation #5:** BLM will immediately (within the next 3 years) follow the WHB Act and remove excess animals from the range to achieve AML. Further, BLM will use the help and assistance of all state and local agencies, organizations and individuals in achieving AML. Motion carried 6-1.

> **BLM Response:** With on-range population levels at approximately 82,000 animals and having finite off-range holding space, removing large numbers of animals, especially over consecutive years, is currently not feasible. Unless, the BLM receives legislative support that increases placing animals into private/public care through

adoptions, sales and transfers or increases future BLM budgets to support acquiring additional holding space, this recommendation cannot be achieved in the recommended time-frame.

In April 2018 the BLM, through the Secretary of the Interior submitted a report to Congress titled "Management Options for a Sustainable Wild Horse and Burro Program." This report outlined four options to move the program towards achieving and maintaining the appropriate management levels across the program. These management options rely heavily on achieving AML quickly which included developing partnerships with our stakeholders and public.

**Recommendation #6:** Maintain AML by using fertility control to slow population growth at levels where removals equal the adoption demand. Motion carried 6-1.

**BLM Response:** After AML is achieved in any one particular HMA or HMA complex, temporary and/or permanent fertility control can be effectively and efficiently administered, to reduce future removals and help maintain AML. With most HMAs or HMA complexes well above their AML, though, it will take many years using only fertility control to reach AML. Permanent and temporary fertility control alone will also not be able to achieve AML at a national level.

**Recommendation #7:** Adjust AML where appropriate. Motion 7-0.

**BLM Response:** After AML is achieved in any one particular HMA or HMA complex, BLM will assess the need to adjust the AML and make other multiple use decisions following in-depth analysis of rangeland monitoring and population inventory data collected over three to five years (in accordance with the procedures outlined in the BLM's 4700-1 Wild Horses and Burros Management Handbook) as part of long-term management and land use planning. The goal of any adjustment of AML for an HMA is to have sufficient water and forage to manage herds at the minimum feasible level to maintain their free roaming behavior.

Ms. Kathrens commented that there are third-party groups working right now that could take on long-term care for a large number of horses, or provide the support that is going to be necessary to figure out what to do with that many horses.

Dr. Perryman also pointed out that we've got to explore the idea of shared participation of care for a very large number of animals. This would likely have to be done through tax credits and accelerated tax write-offs to create some kind of economic incentive for taking on this responsibility. BLM could put whatever kind of stipulations they want on the care, but it would transfer the ownership and care responsibility from the federal government to the private sector. This would be an opportunity for some of the vocal horse advocacy groups to play a participatory role in the care and maintenance of the animals.

Mr. Rittenhouse explained that there is no authority at this time to directly transfer wild horse and burros to other private non-government entities, nor outside of the country. Mr. French commented that this policy flies in the face of just exactly what Dr. Perryman was talking about. At one time, Mr. French explained that there were discussions about the possibility of organizing a foundation that could take donations that would then support horses in long-term holdings. Ms. Waddell clarified that the recent Instruction Memorandum (IM) outlines the policies and procedures concerning the sale of wild horses and burros. That is separate from any work to develop a BLM foundation that Mr. French referred to. There is BLM policy being developed to address the solicitation and acceptation of donations. This is separate. So, if there are non-governmental entities that are interested in acquiring animals, they can still do that. There's no law against it. They can adopt or purchase those animals. And in fact, we have a memorandum of understanding right now with an organization that has been very successful, Equine Solutions. They have purchased animals and are doing great training work and looking at doing an open house later this fall. I would encourage organizations, if you're interested in acquiring the animals, then they can do that through adoptions and sales.

Mr. Rittenhouse agreed that there is no better way of empowering people who have that interest to follow through, other than creating a foundation independent of the protocols on the ground right now, and allow for entities that have and are looking, through a tax benefit incentive or through just the goodness of their heart, to donate to a foundation.

Ms. Waddell encourages organizations to coordinate amongst themselves, contact BLM, and move through adoptions and sales.

Mr. French stated that he believes the Board and BLM are scratching the surface of a solution. There are a lot of foundations out there on the ground right now, corporations that would like to donate large amounts of money to support, especially if they get a tax write-off or credits to do so. There are a lot of private sector models on the ground that I think we should try to take a look at.

In reference to adjusting AML, Mr. French recalled that the recommendation had to do with adjusting AML following a catastrophic event, such as a three- to five-year analysis following a major fire event or the end of a drought cycle. Any event that has dramatically impacted the HMA habitat should then trigger a review of AML and adjustment of AML based on conditions on the ground.

Mr. Alan Shepherd was invited to the front to address how AML is determined and measured. Alan Shepherd is the On-Range Branch Chief, Wild Horse and Burro Program in Washington D.C. Mr. Shepherd explained that BLM collects monitoring data over several years on forage utilization, animal distribution, animal use distribution, water availability, impacts to private property and considers all of the factors. As for multiple use, BLM considers livestock use and coordinates with wildlife agencies to review target elk and deer numbers. This resource monitoring data is the key to look at what that production is on an annual basis.

Mr. Shepherd, to address Mr. French's comment about catastrophic events, also explained that AML would not be adjusted immediately based on any one year or event, rather the BLM may adjust the current animal population to benefit restoration and then continue monitoring to determine the success of that action and determine over time an appropriate adjustment to AML. Mr. Shepherd stated that in 85 to 90% of HMAs, we have never achieved AML and are therefore uncertain whether the AML is correct. In 29 years, Mr. Shepherd has never achieved AML from gathers. It is the goal of BLM to first achieve AML and then monitor the effects of that population on the ecosystem and on the horses.

After a short break, Mr. Woehl introduced Ms. Hope Woodward and turned the time over to her.

## Forest Service Wild Horse & Burro Program
***Ms. Hope Woodward, Wild Horse and Burro Program Manager***
***USDA Forest Service, Washington, DC***

Ms. Woodward introduced herself and explained that the Forest Service (USFS) is about a tenth of the size, however, are authorized similarly as the BLM under the Act. The issues the USFS faces, and the opportunities, are similar. There are approximately 8,700 wild horses and 600 wild burros in 19 national forests in 8 western states. Wild horses and burros are managed in 34 active territories of approximately 2.1 million acres (24 of which are jointly managed with the BLM).

Ms. Woodward reviewed the staffing & budget for FY2018 of the Wild Horse and Burro Program for the USFS, the territories with Management Plans, and the territories with on-range fertility control, short-term, off-range facilities, territories that conduct gathers, that have gentling and training contracts, and that have adoptions and sales.

The AML population of all territories for the USFS is set at approximately 2,000 for horses and 296 for burros. The USFS has proposed management planning to review AML in 25 territories. The average over AML is at almost 400% for all USFS territories.

Ms. Woodward talked about the gather that started today (Oct 10, 2018) via helicopter in Devil's Garden in the Modoc National Forest, which is a planned removal of 1,000 horses. The USFS uses every method available and deemed appropriate for the conditions for gathers, including bait trapping, etc. The USFS agrees that more public signage to educate the public and reduce the potential for animals to become habituated and to trespass on private property. There are many other gathers taking place, including at Jicarilla. There are partnerships in place, including with the Jicarilla Mustang Heritage Alliance, and programs that support our efforts to provide internships and similar college programs to provide volunteers and interns an opportunity to assist in the USFS efforts.

BLM_002152

Ms. Woodward referred to agreements with other agencies, including the BLM. One such agreement is a refund of BLM services for care of the horses, which expires this calendar year. These types of agreements and partnerships are helpful. The USFS wishes to engage and create more partnerships and having open and honest communications, respectful communications, to keep all parties informed.

Ms. Woodward stated that the removal of horses via helicopter, which began today, falls under the authority of the Act in terms of achieving and maintaining a thriving natural ecological balance. She mentioned that it is important to reach AML for the health of the horses and the ecosystem moving forward. She then opened it up for questions.

Mr. Woehl asked whether the USFS is terminating their cooperative agreement with the BLM for holding facilities or if they plan to continue sending horses to BLM facilities?

Ms. Woodward explained that USFS is not planning to manage long-term holding, and that animals that are removed would continue to go to BLM facilities for adoption and sale under the provisions of the existing MOU and national agreement. Ms. Woodward stated that if the horses don't get adopted, the plan is to have them there for one year and USFS is in the process of finalizing what would happen thereafter.

Mr. Woehl asked if the USFS would offer horses for sale in the same way that BLM does?

Ms. Woodward answered yes and recognizes that sale without limits is controversial. There is a priority, and it is adoption, then sales with limits under the current BLM guidance criteria, and then sales without limitations, addressed by the Act as amended as well as California State law (in the case of Modoc).

Mr. Woehl asked why the USFS can provide sale without limits and BLM cannot.

Ms. Woodward explained that for sale without limits, the Act does not say that agencies cannot offer sale without limits, and USFS has chosen to exercise that authority to do so.

Mr. French asked for clarification on the California State law provision.

Ms. Woodward read from California State Code 598-C and -D: It's unlawful for any person to buy or accept a horse with the intent of killing the horse if that person knows or should have known that any part of that horse will be used for human consumption. And, it's unlawful under that law to offer for sale horse meat for human consumption. Ms. Woodward also pointed out that there is still legal discussion about the application of California State law on federal forms and procedures.

Ms. Woehl asked if the USFS is going to do everything they can to be sure that horses go to good homes.

Ms. Woodward responded yes. The direction from the Washington office, as well as from management of gathers ongoing, is that the first priority is to find good homes for these animals, either through adoption or sale with limitation.

Ms. Kathrens asked about the number of horses planned for removal and if the long-term plan is to get to AML.

Ms. Woodward reiterated that they plan to remove up to 1,000 horses. That action started today and will continue until they have gathered 1,000 horses. In this case, they are about 3,500 over AML. This is part of a four-year plan to get to AML.

Ms. Kathrens asked if those horses have draft blood in them.

Ms. Woodward responded that yes, and they are generally recognized as being horses that are easy to train. They are larger size horses, approaching 15 to 16 hands.

Mr. Yardley pointed out that some adoptions aren't as successful because the wild horses were not big enough. Perhaps there could be some additional outreach to get these bigger horses adopted.

Ms. Woodward agreed and would pass the word along to start discussing possibilities for marketing the adoption of these animals.

Mr. Woehl asked if USFS horses are branded the same way as BLM horses are branded.

Ms. Woodward explained that they use microchipping primarily to track the animals.

Break until 3:20 p.m.

Mr. Woehl introduced Mr. Alan Shepherd.

## BLM Management Options for a Sustainable Wild Horse & Burro Program
### Alan Shepherd, On-Range Branch Chief, Wild Horse & Burro Program

Mr. Shepherd introduced himself and explained that the BLM was asked to prepare a report to Congress. At the time, there over 82,000 animals, roughly three times the AML. The overpopulation of horses and burros is threatening the western rangelands, degrading ecosystem functions and limiting the forage and water available for domestic and wildlife species. Mr. Shepherd also pointed out that emergency gathers are becoming more common to save impacted animals

Mr. Shepherd pointed out that the BLM cannot gather enough animals and treat enough animals to reduce the herd sizes through fertility control alone. Fertility control is not 100% effective. It is a valuable tool and will be a valuable tool when we're at AML, but at the current rate, it will not solve the problem. Low adoptions and sales have definitely resulted in the volume of horses we've got in holding and BLM is spending 60% of appropriated funds for holding and care. Mr. Shepherd reported that Congress requested a report from the BLM to prepare options for humanely achieving appropriate management level (AML). There was no direction as to how many options or what they should look like. The program put together a team of managers and specialists that worked toward developing that document and the options. The report was finalized in and submitted in March of 2018. There were several management assumptions in the report, including: sales without limitation and euthanasia; acquiring funding from external sources for gathers, adoptions and holding; availability of long-term holding space, including through partnerships; authority to transfer animals to non-profits, other federal agencies and state and local governments; categorical exclusions under NEPA; availability of trained veterinarians; effective fertility control vaccines; and, additional legislative options and changes.

Option 1:  Achieve AML in eight years using all the authorities within the act while substantially decreasing off-range holding costs.
- Remove 156,000 animals over a 10-year period
- Treat 38,000 mares w/fertility control over 10-year period
- 40,000 adoptions; 110,000 sales without restriction; 24,000 animals euthanized – over a 10-year period
- Off-range population reduced to 6,000 by year 10
- Costs would exceed current average annual appropriations by about $200 million over the 10 years
- AML would be achieved within 8 years

Option 2: Achieve AML in 10 years using existing authorities within the Act and substantially increasing program funding.
- Remove 151,200 animals over 10-year period
- Treat 52,400 mares w/fertility control over a 10-year period
- 40,000 adoptions and 2,000 sales with current restrictions over a 10-year period
- Off-range population increased to 110,000 by year 10
- Costs would exceed current average annual budget by about $1.12 billion over the 10 years
- AML would be achieved within 10 years

Option 3: Achieve AML in Six Years Using Existing Authorities and Create an Adoption Incentive Program
- Remove 129,000 animals over a 10-year period

---

BLM_002154

- Treat 26,000 mares w/fertility control over a 10-year period
- 84,000 adoptions over a 10-year period, increasing adoptions through a financial incentive program; 2,000 sales with current restrictions
- Off-range population increased to 71,000 by year 10
- Costs would exceed current average annual appropriations by about $1.43 billion over the 10 years
- Appropriate Management Levels would be achieved within 6 years

Option 4: Achieve AML in 12 Years Using Existing Authorities, Creating an Adoption Incentive Program, and Increasing Permanent Sterilization
- Remove 36,600 animals over a 10-year period
- Treat 103,000 mares with fertility control methods (focusing on permanent sterilization) over a 10-year period
- 40,000 adoptions over a 10-year period, developing a financial adoption incentive program; 2,000 sales with current restrictions
- Off-range population decreased to 36,800 by year 10
- Costs would exceed current average annual appropriations by about $320 million over the 10 years
- Appropriate Management Levels would be achieved within 12 year

Mr. Woehls asked about the costs over 10 years in option 2. Mr. Shepherd explained that the increased budget, of approximately $1.12 billion would be over the 10 years, and it is the intent to have spending level off and then decrease once we achieve AML. That is the case for all the options presented, costs would stabilize and/or decrease for each option.

Ms. Carlisle asked how feasible is it to spay over 10,000 mares in a year? The BLM has parameters and logistics challenges associated with that kind of effort. The options are difficult to compare and measure because of the lack of data for each. Mr. Shepherd referred back to the assumptions and stated that each option assumes that the effort can be achieved. In the case of sterilization, yes, the BLM assumes that it would have the contract crews to gather the animals, which would require, as Ms. Carlisle mentioned, additional staff and management. The options take that into account and assume that the logistics, additional staff, and additional funds are made available to accomplish each task associated with each option. Each option attempts to accomplish the goal in ten years.

Dr. Perryman asked that if the BLM were to accomplish the goal and get to AML, what is the path moving forward so we're not revisiting the same problem down the road ten years? Mr. Shepherd believes that if the BLM maintains the tools it can use and the funding, then AML is perfectly maintainable. That means using all of the tools. It is our job to get to AML, maintain it, and then see how the ecosystem responds.

Mr. Woehl believes there is a non-lethal way out of this situation. He appreciates the BLM's efforts to clarify the reality of the situation. Dr. Perryman talked about wild horse on tribal lands, tribal lands adjacent to public lands. When we get to AML, there's going to be a vacuum that pulls horses from reservations onto public lands and we may be right back where we are now. He then asked, what is the BLM and Forest Service doing to coordinate with tribes to address this? Mr. Shepherd pointed out that it is BLM's role, in his opinion, to open the lines of communication with tribes, knowing full well that this is shared problem that requires a shared solution. Dr. Perryman suggested that the BLM have an action plan for coordinating with the various tribal governments moving forward. There are more like 125,000 horses, not 82,000.

Dr. Lenz asked if the BLM expects a response from Congress and what expertise do they have to review the report at hand? Mr. Shepherd said that it is unknown on a response and that Congress have staff that are looking at the report and have asked a lot of really good questions. BLM is hoping for an opportunity to sit down with Congress to clarify the report if needed and answer any questions they have.

Mr. Lenz pointed out that for option 4, if there are 80,000 horses out there and half of them are mares and almost all of them are pregnant, and we know we can't spay them the first 120 to 140 days, and we haven't had a research project done to determine how far into pregnancy we can spay them, the number of 10,000 a year may not be feasible. Mr. Shepherd referred back to the assumptions and the goal of 10 years. That is what it is going to take to do it in 10 years, although it may take more time than that, as the Board has pointed out.

BLM_002155

The Board discussed whether the problem is beyond repair. Mr. Masters expressed that people wish they had double the budget, wish they had more tools in the tool box, but nothing has really changed in ten years. Mr. Masters asked that, if we continue with the status quo and end up with tens of thousands of horses on 40 million acres, 50 million acres, or 60 million acres, is there anything that we can do to cap it at 31 million acres (the current status) and have our triage and sacrifice it so that it doesn't become 40 or 50 or 60 million acres over the next few decades? Is there anything with fencing or with priorities or discussions about containing it at 30 million acres? Is there any budget for fencing to try to help with that expansion? If money was allocated for fencing, would it be beneficial. Mr. Shepherd answered that BLM spends very little on that type of work and that HMAs and HAs also have to consider grazing allotments, wildlife habitat, and similar where fencing would create problems.

Ms. Carlisle suggested that the options don't provide the data and details to really analyze and understand them, mostly because Congress only gave the BLM 30 days to get the report to them. She is hopeful that Congress understands that in the presentation of these four options that these are very basic starting points, because otherwise, they are not good options. Mr. Shepherd said that BLM made it very clear when they talked to Congress that this is the national AML and did not consider each HMA individually.

Ms. Kathrens suggested that it is time that we look at the whole program in a very different way and said that she thinks it is the HMA concept that is not successful. In some places, we have discussed having a wild horse common area rather than worrying about multiple herds that is managed primarily for wildlife and where there would be no livestock grazing. It seems that a lot of the conflicts come from the multiple use concept. This kind of thinking usually gets rejected immediately because it would require reopening the Wild Horse and Burro Act and looking at management of wild horses in a completely different way. This may still require killing some animals and using PZP and other methods, but it would be good to work through how to manage horses in a different way than in HMAs. As for the tools, Ms. Kathrens asked, what would be the method of killing the animals that you're talking about in the BLM options? Mr. Shepherd responded that it would be any approved method, in consultation with our vet advisor and in the most humane way practical.

Mr. French commented that rewriting the Wild Horse and Burro Act and how it is administered likely require reconsidering and would impact NEPA and is therefore not an easy task. Mr. French asked if there was any plan of action for marketing with regard to the 40,000 adoptions, associated public awareness and public acceptance? How will the BLM go about marketing to that degree? Mr. Shepherd responded that in the main approaches that considered adoptions, the BLM assumed that the adoption level would remain static except for the option with adoption incentives. If we are able to accomplish more adoptions, then we may not have to sell as many, or we may not have to do as many sterilizations. The main point is that if we're successful with placement, that will affect a lot of the components of each option.

Ms. Hope Woodward introduced Dr. Tolani Francisco, a Wild Horse and Burro Coordinator at the U.S. Forest Service in New Mexico, to address some of the questions regarding the U.S. Forest Service and coordination with tribes. Dr. Francisco explained that the USFS is working hard and has relationships with tribal governments in New Mexico, Arizona, Utah, Colorado, and California. There have been horse hunts proposed on tribal lands that received a lot of opposition. There have been discussions with professionals, the food safety inspection service, and others to educate tribes on the history of wild horses to answer questions about why slaughtering wild horses is frowned upon.

Ms. Waddell talked about the adoption incentive program, how it works, and where the amount of $1,000 came from. The Board discussed several options for the adoption incentive program, such as a sliding scale that would give more money to individuals and organizations that adopt more than one horse, an incentive amount that covered the cost of training a wild horse, and others.

Dr. Perryman pointed out that with the passage of the Wild Horse and Burro Act, under the original authorization, we had the ability and the potential to show the world how to manage horses and burros with a thriving ecological balance and in a multiple use environment. Unfortunately, Dr. Perryman said that this is a national disgrace. He encouraged the board to really think about the public trust, the public interest, and that interest has to include the resource base. Without the resource base, there is no future.

Mr. Woehl introduced the next presenter, Dr. Paul Griffin.

BLM_002156

## BLM Wild Horse & Burro Program Research Update
### *Dr. Paul Griffin, Research Coordinator, BLM Wild Horse and Burro Program*

Dr. Griffin mentioned the working sessions the previous day and expressed that there are a lot of topics to cover, including population growth suppression, genetics, survey methods, and population modeling and demography. Dr. Griffin went on to discuss what we know regarding population growth suppression. We know that PZP works well in both horses and burros. PZP pellets work for about a year, and they may lead to two or three more years of marginally more improved effects after a PZP booster dose, but it doesn't cause great effects for the first year or two. There may be some variation in batch quality for the pellets. We know that the vaccine doesn't have great effects after the first dose, but after a booster dose, the second overall dose, it can lead to four years of overall, at least 80% contraception. We know that spaying mares via colpotomy leads to permanent and immediate sterilization and reduced growth rates. Of note, Dr. Griffin pointed out that spayed mares continued to be in bands with other horses.

Mr. Yardley asked, regarding the Oregon study, what all has been done and how far out are they? Dr. Griffin responded that it is ongoing and that the research aspect to that project is under litigation, but our schedule would be, as I understand, to begin in late October with radio collaring and then spaying to follow.

Dr. Perryman asked about SpayVac and its effectiveness. Dr. Griffin responded that SpayVac was promising as a vaccine. It's a PZP vaccine, instead of being oil based or in capsules or in pellets, the PZP is surrounded by liposomes, and would lead to a long lasting immune response. In the initial trial, there were a couple of years of good response after one year of SpayVac, however in a follow-up study, on the second dose, the results were not as good. There are several variables we are dealing with and we don't which variable it was that caused the positive result. BLM could be open to looking at further studies of SpayVac if the company demonstrates that it works again. A representative with SpayVac commented, at the request of the Board, that preliminary results from one of the studies that indicated that a comparison of PZP produced in 2016 was had a lower effectiveness than PZP produced in 2018 at the university of Toledo.

Ms. Kathrens pointed out that the National Academy of Sciences (NAS) report recommended certain types of infertility treatments, and they did not recommend an ovariectomy. They said it may be followed by prolonged bleeding or infection, and makes it inadvisable for field application. Ms. Kathrens asked, has something changed that we would amend that decision with the NAS, do you think? Dr. Griffin responded that he didn't think there were recommendations in the report, rather they were listed as the three most promising methods, but the report did not say that other methods were not promising. He went on to say that yes, additional information has been shared since 2013, and it was made public in the first Oregon environmental assessment in 2016, that was the 2015 panel convened to assess a number of different spaying methods, their risks, their costs, other concerns or things that BLM should be aware of when choosing a method. That 2015 report concluded that colpotomy was one of the most promising of the spay methods available for a use by BLM. I also think that it's an important misnomer that I need to point out here is that the proposed work at Warm Springs for horses that would be coming from Warm Springs, as clarified in the EA, would not be conducted in the field. No one at BLM has considered using gelding or spaying in an HMA. These animals would be removed from the HMA, transported to the corral, which you have visited, and the facility there is set up with padded squeeze chutes for appropriate restraint of an animal, of animals, that is suitable for this type of surgery. So, it shouldn't be interpreted as a method that's being considered for use in the field.

Dr. Lenz clarified that the corral is in the field. When they say the surgery can be done in the field, it doesn't mean it's done out where they caught the horses. It's not done in a clinic. A corral is considered in the field. Dr. Griffin pointed out that one reason that the ovariectomy is preferred is because there is a smaller incision for healing.

Dr. Lenz explained the review of surgical procedures. One was ablation of the oviduct papulation in the uterus, with a laser, you would scar that, so the fertilized egg couldn't pass to the uterus, and so they would be sterile. The other was a forward-looking scope, putting a ligature around the oviduct to cut off the blood supply to the ovary. The reality was that some of the ovaries caused adhesions in the abdomen or dropped to the floor, and maintained the production of hormones, so the mares continued to cycle. The other was a laser and cutting the oviduct and tube. That one could not be done in the field because of equipment. You would have to have a laser guided endoscope, so that is tens of thousands of dollars that would not work well in the field. Dr. Lenz said that SpayVac is most promising for this type of procedure for these types of horses in this type of environment.

BLM_002157

Dr. Griffin referred again to the report by the National Academy of Sciences and recommended that the Board also consider additional information that came in afterwards and that NAS concluded that spaying via colpotomy was suitable for use in management and that it is a well established procedure. The research has more to do with the stage of the pregnancy and how the horses interact.

Dr. Griffin described how PZP is formulated, through the use of pig ovaries. He also explained that there are other research looking into the development of recombinant protein through the harvesting of microbes. In any case, it would have to be demonstrated that it is biologically active, that is works at and at what concentrations under what protocols.

Mr. French asked about the cost of a dose of PZP. Dr. Griffin answered that a dose of liquid PZP is about $28, that is to say the cost of purchasing that dose is $28. The cost of PZP22 pellet vaccine is $580, and the other is about $50. That doesn't mean it's $30 to give a mare a dose of PZP, because you have to have that mare in hand. To get the mare in hand, you have to capture her, and to capture a mare, you typically have to capture at least a stallion and .4 or .5 foals on average. So, if you're talking about $1,000 to capture each animal, it's a $30 PZP dose, and then $3,000 to catch the animals. There has been discussions about which HMAs are suitable for darting. And you have to know what that mare is and what her history is. You use a different regimen if it's a primer or booster dose. If you give two primer doses, it leads to horrible abscessing

The Board asked if PZP22 is now dartable. Dr. Griffin stated that BLM has been told that it is dartable, however we are not confident and are hesitant until we see a further demonstration about how often all of those pellets get injected and to the right musculature and so on. So, we're hesitant to rely on darting for PZP22.

Dr. Griffin talked about other research, including an ongoing cooperation with Texas A&M University. Our handbook calls for roughly every ten years, we try to sample a number of animals from herds when they're gathered.  We send off the samples, and we get information about heterozygosity. The population right now is four times what it was in 1971. Genetic viability is not really a big concern for most populations, and moreover, each herd really shouldn't be considered an isolated population, as Mr. French pointed out that there's a lot of movement between herds, and we can facilitate movement as management agency to make sure that each herd is viable. Mr. Woehl asked if there is there a minimum number in a herd to be genetically viable? Dr. Griffin explained that if you had an endangered species like a toad living in one pond, then yes. Different people will give you different numbers whether it's 50 or 500 or 5,000. But horses are not an endangered species.  They number in the millions around the planet. They come from breeds that are pretty well known. Most come from breeds that have recently come about, and they're not isolated. Geographically, there's nothing in the act that says that they need to be maintained by themselves.  BLM has a purview to move animals between herds.

The meeting was adjourned at 5:00 p.m.



**Wild Horse and Burro Program**

**U.S. Department of the Interior Bureau of Land Management**

# NATIONAL WILD HORSE & BURRO ADVISORY BOARD

Courtyard Marriot
Salt Lake City Downtown
345 West 100 South
Salt Lake City, UT 84101

October 10-11, 2018

Volume 2

Day 2 Meeting Minutes

U. S. Department of the Interior
Bureau of Land Management

# Contents

**THURSDAY, OCTOBER 11, 2018** ................................................................................................................ 2

Welcome ................................................................................................................................................... 2

ASPCA: Wild Horse & Burro Opportunities and Obligations ................................................................ 2

BLM: Grazing Administration .................................................................................................................. 3

Utah Governor's Office: Healthy Rangelands, Ecosystems, Herds and Economies ............................... 5

BYU: Ecological Interactions of Free-roaming Horses and Rangeland Resources ................................. 6

Advisory Board Discussion Part 1 ........................................................................................................... 8

Advisory Board Discussion Part 2 ........................................................................................................... 8

Public Comments ..................................................................................................................................... 9

Advisory Board Discussion Part 3 ........................................................................................................... 9

Wild Horse & Burro Advisory Board Recommendations ..................................................................... 10



BLM_002160

# Thursday, October 11, 2018

## Welcome
*Mr. Fred T. Woehl, Jr., Chair, Wild Horse and Burro Advisory Board*
Mr. Woehl called the meeting to order at 8:00 a.m. and turned the time over to Mr. Bruce Rittenhouse, the BLM Acting Division Chief of the Wild Horse & Burro Program to introduce the panel to discuss healthy horses and burros, healthy rangelands, and continue to discuss the context of the complex management of public lands in a multiple use environment. Mr. Rittenhouse introduced the panelists and turned the time over to them.

## ASPCA: Wild Horse & Burro Opportunities and Obligations
*Nancy Perry, Senior Vice President of Government Relations, American Society for the Prevention of Cruelty to Animals (ASPCA)*

Ms. Perry introduced herself and talked about the ASPCA, the first animal welfare organization to be formed on this continent. The focus of the APSCA has not been on wild horses until fairly recently, primarily because we felt that there are now opportunities for making a genuine difference. We are here to discuss the ways we see forward and opportunities to address some of the potential obstacles to moving forward. The ASPCA initially got involved in Nevada, meeting with stakeholders and discussing with people who have dramatically different views on this topic. We were able to focus on where we agreed, we found we had a lot more common ground than we even knew walking in the door, which led to fruitful conversations. The ASPCA cares about ecosystem health, humane treatment, fiscal responsibility, and a long-term vision. We all want this to be something that can be resolved quickly, and we all know if we are looking hard at this problem, that it requires a long-term commitment, and working in Washington, D.C., I know that that is not always a given, and it's a big challenge that we all face together. Getting any administration to commit to something that lives beyond them is difficult.

Ms. Perry went on to explain how the ASPCA has been working on a proposal and has met with the Secretary of the Interior, leaders at the BLM, budget folks, and more to provide a proposal that genuinely focuses on how to move forward, what the logistics should look like, and a non-lethal approach to managing wild horses. The ASPCA is willing to argue for robust roundups and gathers and to prioritize where the rangeland has been degraded, where wildlife is impacted, and where there is T&E species. We want to focus on a regional approach rather than an HMA-based approach. We couple those efforts in the proposal with the need to be very committed to fertility control, treating at least 80% of the horses on the range to realize the benefits of prevention in this plan. We believe that we have an effective tool with PZP, if it's properly applied. I think we should start with the tools that we have at our disposal now and bring new things online as they are appropriate. Ms. Perry stated that we have a real interest in making sure all of the tools that are brought online are humane and effective, but we are very interested in being pragmatic too about whatever fertility control methods are applied.

Ms. Perry talked about the steps following a gather and stated that there are potential streamlining benefits in the long term holding part of any proposal. There have been a lot of interested parties in helping with this problem, and we believe that if we can commit to a non-lethal, synergistic, multi-pronged approach, we can see long-term, cost effective pasturing. Ms. Perry talked about adoptions and stated that she has been really encouraged to hear about some of the innovative ideas that are really taking hold now around the adoption program. The ASPCA is a huge proponent of adoption, in many different ways. The ASPCA is really great at marketing and has offered the administration opportunities to lean in. Edge Research did a study with us a year and a half ago and found that 2.3 million people have the resources now to take in the horses and desire to. It is about finding them and marketing.

In summary, Ms. Perry stated that first, prevention, getting out on the range and having a commitment to the rangeland work, finding success in adoptions, and prevention on the range is going to be critical. Some of the challenges are building trust and making sure we can bring the right partners along in the plan. We can prevent horses going to slaughter by including provisions with time limits, having the ability to report concerns, and having a database to track buyers. We should revisit roundup protocols to ensure comprehensive animal welfare protocols are in place and training for contractors to avoid problems and build trust. We cannot do nothing, but we cannot kill as a management option. We can euthanize, but killing healthy horses to control the population will not be supported in Washington or among Americans. I think working together and collectively, and really emphasizing where we agree is going to be the way to get done what

BLM_002161

we need to get done in the long-term.

Mr. Woehl asked for questions from the Board.

Mr. Masters asked about where the money would come from in a private partnership approach to taking care of the horses that would be gathered, estimating 100 to $150 million annually to feed and house those animals? Ms. Perry responded that we won't have certainty about anything that we do, but we have to have a strong enough plan that we can look at where that money should be spent. We have been working with a biologist and an economist to model out options for gathering, but there is cost savings if we know how many we need in long-term holding to prevent moving animals multiple times in the process, all while maintaining stable contracts. This also requires building up adoptions and employing preventative measures on the range

Mr. Masters asked if there are entities that could commit $20 million annually for the next 15 years? Ms. Perry responded that they have not gotten far enough to identify specific corporate entities that would be in that position. I know there are some entities, like the American Mustang Foundation, as a potential long-term holder with some facilities already online. I think we are a little premature to have examples of those corporate entities, however, I think there is an appetite for this.

Mr. Yardley asked, how do you propose to accomplish all of this work (gathers) and treat 80% of horses on the range while at the same time minimizing helicopter gathers? Ms. Perry responded, I think the helicopter gathers are always going to be necessary in certain geographies and we appreciate that. I think finding the areas where they are not necessary will help avoid some of the incidents that erode trust in the agency's management. I'm not suggesting that we don't do helicopter gathers. Mr. Yardley asked, what is the opposition or concern with helicopter gathers? Mr. Perry responded that she thinks most of the incidents that happened in recent days, months, and years, that gain a lot of attention have to do with the stress of helicopter gathers, and frankly, some inappropriate behavior on the part of contractors. Mr. Yardley pointed out that the things the ASPCA is recommending are going to require a greatly increased amount of helicopter gathers versus the current amount. Ms. Perry agreed.

Mr. French asked if the ASPCA would have an interest in brokering international adoptions to make sure that the receiving end of the adoptions is appropriate? Ms. Perry responded that the ASPCA is a domestically focused organization, with few external connections. Ms. Perry said that she would feel more comfortable keeping them in this country, because we have laws in place that would help us if we did see problems. That doesn't mean there wouldn't be potential for someone good taking horses and giving them good jobs in another country.

Mr. Woehl asked about ASPCA's support of euthanasia for cats and dogs, but not horses. Ms. Perry explained that the ASPCA has been actively engaging with the shelter community and encouraged them to move towards a higher live release rate and get to the point where euthanasia is not employed for space purposes. Ms. Perry explained that it is the goal to not use it as a population control technique for dogs and cats. We have seen live release rates go up in our shelter community. It is important for our voice to be in favor of pushing everyone away from utilizing euthanasia lightly or conveniently. If we feel the problem is partially our responsibility, then we have an obligation to pursue non-lethal methods of management.

Ms. Kathrens asked if the ASPCA proposal presupposes AML of 26,710 horses, which many organizations believe is unrealistically low to sustain certain small populations? Ms. Perry responded that the ASPCA starts the conversation with AML and recognizes this is what the agency is working toward. We recognize that AML may need to be adjusted, but agrees that a precise number may not be the critical piece, rather more work is needed regardless and if the number was 35,000 instead of 82,000, the conversation would be very different. It would be great to have more conversation about this.

Mr. Woehl mentioned that if we have a policy in place, that when abused or when they result in one or two isolated cases where something terrible happens, we should not reject the policy completely. Ms. Perry agreed but suggested that we can look at the policies together.

### BLM: Grazing Administration
*Alan Bass, BLM Rangeland Management Specialist, Vernal, Utah*

Mr. Bass introduced himself and stated that his presentation would focus on livestock grazing on public lands while thinking about how horses are managed, considering with or without the same kind of regulations or direction. Mr. Bass reviewed the history of livestock grazing in the United States. The western U.S. range livestock industry boomed after the Civil War. This was because of minimal start-up costs, free forage and unregulated use of land. It was an attractive investment for eastern banks and foreign venture capitalists. The post-Civil War prosperity in the east created big demand for livestock products. "Free for all" led to overstocking and deterioration of the range, which led to tension between cattle, sheep growers, homesteaders, and downstream communities whose watersheds were denuded. Sheepmen could roam at will, often across federal lands that cattle ranchers were counting on for seasonal forage needs. Cattle ranchers used deadly force to keep sheep from the public ranges. Homesteaders began to settle on the lands and "crowding" the western stockman. As time went on, ranchers began to homestead as well.

Mr. Bass reviewed the Taylor Grazing Act of 1934: "to stop injury to the public grazing lands by preventing overgrazing and soil deterioration; to provide for their orderly use, improvement, and development; to stabilize the livestock industry dependent upon the public range, and for other purposes." Of note, Section 1 authorizes the Secretary of the Interior to create "grazing districts" from public domain lands that in his opinion are "chiefly valuable for grazing." Section 3 authorizes bona fide settlers, residents and other stock owners to be issued grazing permits for up to 10-year terms within districts. Section 3 also provides that "those within or near a district who are landowners engaged in the livestock business, bona fide settlers, or owners of water or water rights… " have first priority to receive a permit. Another term for the "first priority" is "preference." Section 3 also authorizes a grazing fee. Section 4 authorizes issuing permits or entering into "cooperative arrangements" to construct range improvements. Section 15 authorizes issuing leases to graze public lands outside grazing districts. In the 1930's and 40's there was adjudication of the range based on permit application and recommendations of the Board of District Advisors on who, where, when, and how much to graze. Mr. Bass reviewed other acts that influence livestock grazing administration, including: Wilderness Act (1964), NEPA (1969), Wild Free-Roaming Horses and Burros Act (1971), Endangered Species Act (1973), Clean Water Act (1973), Federal Land Policy and Management ACT (1976), Public Rangelands Improvement Act (1978), and Archeological Resources Protection Act (1979).

Mr. Bass reviewed the 2017 grazing statistics: 17,886 permits/leases, 12.3 million AUMs active of which 8.8 million are billed (sold) and 3.5 million in non-use. 1.96 million AUMs suspended. Mr. Bass reviewed 43 CFR 4100 Grazing Regulations (10-1-05): 4100.0-8; 4110.3; 4110.3-1; 4110.3-2; 4120.3-1; 4130.2; 4130.3; 4130.3-1; 4130.3-2; 4130.3-3; 4140.1; 4160.1; and 4180.1. In summary, the administration of livestock grazing by the Bureau of Land Management is to:

- promote healthy sustainable rangeland ecosystems;
- to accelerate restoration and improvement of public rangelands to properly functioning conditions;
- to promote the orderly use, improvement and development of the public lands;
- to establish efficient and effective administration of grazing of public rangelands; and
- to provide for the sustainability of the western livestock industry and communities that are dependent upon productive, healthy public rangelands.

These objectives shall be realized in a manner that is consistent with land use plans, multiple use, sustained yield, environmental values, economic and other objectives as stated in the Taylor Grazing Act and the Federal Land Policy and Management Act. Mr. Bass turned it over to the Board for questions.

Mr. Woehl asked about water rights in the west. Mr. Bass deferred to Mr. Redge Johnson, the next speaker on the panel. Mr. Bass went on to respond that the BLM holds many water rights and that permittees hold many water rights and for a myriad of those interactions we are able to work together for the joint purpose of improvement of public lands. They need water on the ground to have better health of their animals. It is our goal to distribute water across allotments as we are able and to design systems that do that. There are cases with shared management where only a few hold the water rights but many benefit, including wild horses and burros from the use of the private water rights, so it is our goal to maintain those positive relationships.

Mr. Yardley asked if Mr. Bass could talk about the socioeconomic benefits to the state of Utah from public grazing. Mr. Bass responded that many rural communities rely on public grazing. He pointed out that the grazing industry is very flexible in helping to maintain the range, primarily because it is their livelihood. There are positive relationships to

BLM_002163

maintain the health of the land. The livestock operators understand what is going on and know there are management practices that are better than others and can provide feedback to the agency. Livestock grazing has been occurring on this landscape for many years and it our goal to continue to manage that and make a multiple use mission work.

Mr. French pointed out that water rights, specifically in Nevada, are not always competition between livestock and horses, sometimes it is the case where springs have been beat out and quit flowing. In many cases, water projects were funded by 8100 funds (Range Improvement), having to do with pipelines and troughs. He mentioned that the nature of horses to gather around those water locations, they damage them often to the point where they quit working. This has implications for more than just livestock, including wildlife in that area. Mr. French went on to point out that there is a paradigm shift going on right now with regard to the Taylor Grazing Act regarding the sustained yield model and orderly use. As for water, we are seeing a lack of snow and snow pack, which dramatically changes how water is delivered during the season. Mr. French asked, what is the shift in management protocol from the livestock industry regarding these changes? Mr. Bass stated that BLM is having discussions with permittees about hauling water and the implications of doing so. In Utah, there have been proposals to consolidate allotments and have bigger herds that run through rotations quicker, which would require significant water negotiations and management. There are conversations about the resource objectives and determining where we want to be in 10 or 15 years.

Mr. French pointed out that with wildfires and water concerns, the competition between users on the ground is becoming much more critical. Livestock operators have been able to provide voluntary actions to help the situation.

Mr. Woehl turned the time over to Mr. Redge Johnson.

## Utah Governor's Office: Healthy Rangelands, Ecosystems, Herds and Economies
### Redge Johnson, County Liaison for the Governor's Public Lands Coordinating Office

Mr. Johnson introduced himself and thanked the Board for the opportunity to present on behalf of Governor Gary Herbert and welcomed the Board to Utah. Mr. Johnson reviewed the history and origins of wild horses in the west. 57% of the State of Utah is public lands. Every decision that is made at the federal level impacts our economy, and our ecosystem, and local communities. Mr. Johnson went on to discuss how his family is fully aware of the management challenges, having owned horses and having responsibility growing up to train nearly 80 foals every year. All 80 mares their family owned ran on open range year round. His family was very specific regarding when they put their herd into a pasture, how much they let them utilize a pasture, and the number of horses that they put in a pasture. Those three elements determine the grasses you see under the horses, and they had to manage that in order to maintain a healthy range and a healthy herd. Mr. Johnson explained the multiple use mandate that the BLM operates, including the BLM Mission and Multiple Use and Sustained Yield Mission: The Bureau of Land Management's mission is to sustain the health, diversity, and productivity of public lands for the use and enjoyment of present and future generations; Congress tasked the BLM with a mandate of managing public lands for a variety of uses such as energy development, livestock grazing, recreation, and timber harvesting while ensuring natural, cultural, and historic resources are maintained for present and future use. The economy in Utah is based 67% on public lands and requires support of the multiple use and sustained yield mission. Mr. Johnson also pointed out that unhealthy rangelands impact more than just horses, burros, and livestock, there are T&E species, and other wildlife that depend on the same rangeland.

Mr. Johnson talked about recreation in Utah and mentioned the mighty five, or five National Parks in the state. Of note, grazing is a critical impact for local communities, for their economies as well as for the cultural and historic aspects of that lifestyle that we strive to protect.

Mr. Johnson showed how the landscape has changed in the last three decades. This is a dry state, and water is key in these desert communities and what we are seeing is some significant impacts to the water sources. As for defoliation, over time, and at high levels of grazing, root growth is severely limited because plants are allocating resources to leaf growth to increase photosynthesis. There is a loss of root mass that then limits the ability of a plant to survive disturbance moving forward. If we don't leave half of a plant to regrow, then the percent of root growth is decreased. It is important to note as well that horses compact the earth more than cloven hooved animals. Cloven hoof animals almost till the earth when they walk, but the solid hoof compacts it.

Mr. Johsnon presented five recommendations:
1. Achieve Appropriate Management Level within 3 years
2. Use all available fertility control options; HMA's will require site specific solutions
3. Remove young adoptable animals
4. Retain an adequate number of high quality, young animals for herd viability and genetic diversity
5. Implement proven grazing principles

Mr, Johnson reiterated that we have a lot to do to get to where we need to be. Seeding is unsuccessful in areas where we are over AML. The Governor's office is in support of using available fertility control options. Of course, different HMAs will require different solutions. Some may require permanent sterilization and some we can do the darting but we have to look at each HMA and see what works in those areas. We also propose removing young adoptable animals. Mr. Johnson, based on his experience and background, stated that it is easier to train younger animals, and we should concentrate on bringing off those animals that are trainable and adoptable. Mr. Johnson discussed ways to maintain genetic viability. As for management of where, if we don't think about how to move the animals and ways to get them to new pastures, we will always end up with localized impacts. We need to work as partners, and this includes finding ways for both grazing and free-roaming horses to coexist, rather than being in conflict with each other. Mr. Johnson then turned it over to the Board for questions.

Mr. French asked if there is appetite on the part of the state and local governments to partner with the federal government to achieve the recommendations? Mr. Johnson responded that yes, two years ago the legislature put $500,000 to doing rangeland projects and $250,000 went in this year for managing rangelands, including some water projects and some gathers. The State has not done anything on the adoption side or fertility side. Mr. French commented that the subject matter experts and the ability to provide specific management direction is crucial. He also stated that he thinks that part of the solution is going to be not only public and private partnerships but also state and local partnerships.

Mr. Johnson stated that State and county Resource Management Plans provide local ecological knowledge. There are management practices that are working and we have seen marked improvement in many areas.

Mr. Masters asked, based on estimates of 800 to 1,000 horses outside of HMAs, and a doubling effect every 4 years, does the state of Utah have a plan on what to do with potentially exponential growth of horse herds outside of HMAs? Mr. Johnson responded that it is the intent of the State to work together with partners, wildlife divisions, BLM, and local land use authorities to manage the problem of horses outside of HMAs. Mr. Masters asked a clarifying question, does a horse, an unclaimed horse that's on state land, that's not inside an HMA or HA, belong to the BLM? Mr. Gus Warr answered the question by stating that when there are horses reported outside of HAs, the BLM tries to determine if it is a feral horse that would fall under the Wild Horse and Burro Act, or whether it is a horse that has simply been turned loose. A horse that's unbranded, unclaimed, on public lands falls under the Wild Horse and Burro Act.

The Board commented on Mr. Johnson's comments about returning healthy horses to the herd and that it would be beneficial to provide more training to contractors that complete gathers and to encourage people in the industry to participate in adoptions.

Mr. Woehl turned the time over to the next panelist, Dr. Steven Petersen.

## BYU: Ecological Interactions of Free-roaming Horses and Rangeland Resources
### Dr. Steven Petersen, Plant and Wildlife Sciences, Brigham Young University, Provo, Utah

Dr. Petersen introduced himself and talked about his background in rangeland ecology and management. He talked about rangeland management principles to conserve rangeland resources, including the following:
- Sustain rangelands as renewable resources;
- Maintain green plants to capture solar energy and sustain grazing animals;
- Provide protection to soil, water, vegetation, and climate; and
- Sustain multiple uses of rangelands (food, water, wildlife habitat, ecosystem dynamics)

Dr. Petersen went on to explain the things that keep the rangelands sustainable: precipitation is the single most important

factor in determining the type and productivity of vegetation; and soil texture, structure, depth, and organic matter influences forage production. Dr. Petersen stressed the relationship between where the horses are on the range and the annual average precipitation in those areas. He pointed out that it is really important to think about the influence of the environment and the ecological responses to these conditions. When thinking about rangeland, consider the potential disturbances. One of the disturbances is animal density and is the most important of all grazing management decisions. It has to deal with frequency, intensity, and duration of grazing. Ecosystem sustainability also depends on carrying capacity. These ecosystems are tolerant of disturbance and over time we can see the level an ecosystem can support and maintain. The goal is to avoid damage to vegetation in order to maintain the ecological processes and maintain the plant community. The plants stabilize the soils, allows for infiltration rates and nutrient cycling and other processes that result in overall rangeland health. Dr. Petersen pointed out that it is important to understand individual plant species responses.

Dr. Petersen referred to the BLM management direction to maintain a thriving natural ecological balance. This is accomplished by setting AML (stocking rates) and managing lands to prevent rangeland deterioration.

Dr. Petersen referred to studies on the rangelands: upland plant community response to free-roaming horses.
- Compared vegetation and soil surface characteristics in grazed areas and ungrazed
- Horse grazed areas had lower sagebrush density and plant diversity, greater soil penetration resistance, and lower soil aggregate stability
- Herbaceous cover and density generally did not differ between grazed and ungrazed treatments
- Horses may have an affect on the ecological function of semi-arid rangelands (risk of soil erosion and lower water availability)

Another study considered the impact on other wildlife at water sources where horses were included and at water sources where horses were excluded. In the case of pronghorns and based on observations, when horsed were present at water sources, pronghorns would vacate the water source 50% of the time. We think this is mostly due to size.

In summary, Dr. Petersen made the following points:
- Increasingly dependent on manager's knowledge of range management, agronomy, animal husbandry, and wildlife management
- Integrated (coordinated) resource planning
- Need skilled personnel who can evaluate rangeland condition and assess risks
- Implement technological advancements to improve management strategies

He then turned the time back to the Board for questions.

Mr. Yardley commented that this may be the most important information that has been presented at this meeting, understanding the significant impact that the rangeland resource has on many different animals. He asked, what are the ramifications on arid and semi-arid communities of crossing an "ecological threshold" and how long does it potentially take to reclaim or return to its natural state? Dr. Petersen responded that it depends on the soil, decomposition rates, and water infiltration. All of these processes are nitrogen cycling. When a site is degraded, no matter the cause, it can disrupt those processes. We first have to determine at what point, a threshold, where there is a decoupling. For example, in cases where you start to lose soils and the ability to infiltrate water, going from biotic to abiotic, these are much more difficult to recover. If the degradation goes on long enough, it could be hundreds or even thousands of years to recover.

Mr. Yardley asked, what is the cost involved and the success rate in arid communities through recovery efforts, such as reseeding. Dr. Stevensen responded that simply, it costs a lot. In areas with 10 inches or less of annual average precipitation, the ability to seed and have the seed germinate and be established, 1 to 5% success rate is pretty good.

Ms. Carlisle pointed out that in the studies presented by Dr. Petersen, the degradation does not preclude other large hoof ungulates, the goal is to figure out how to better manage. She agreed that we need better information to help us do the right thing and supports that. She thanked Dr. Petersen.

Dr. Perryman asked Dr. Petersen to clarify statements that there is no such thing as grazed or ungrazed, that it is always in some context of timing, duration and intensity. Dr. Petersen explained that the rangeland, and the plants on the rangeland,

BLM_002166

are sensitive to the way they are grazed. The timing of grazing is really important. Also, grazing during a critical growing period when they are producing their inflorescences, will impact plant health, especially if grazed multiple times in a single growing season. Dr. Perryman added that the study in Sheldon, although there were no major differences between the two treatments, it was only true under that specific grazing scenario of timing, duration and intensity. If you change that timing, duration and intensity, you can expect different results, depending on whether it was more intense or less intense.

## Advisory Board Discussion Part 1

Mr. Woehl asked the Board members to report on the subcommittee work sessions held on Wednesday, October 9 and to discuss any of the topics from presentations made in the last two days.

Ms. Kathrens brought up the use of reflective posts and lighting (Strieter-lites) on major roads near HAs and HMAs to reduce vehicle-horse incidents. She also brought up signage to provide HMA identification, visitor information, which includes signs relating to regulations, interpretation, resource protection, general information, safety, and wayfinding.

Mr. Yardley commented that the Board should consider the options presented to Congress, presented to the Board by Mr. Alan Shepherd, and find one, or a combination of several, to support and recommend. Ms. Carlisle suggested that the Board should support much more detailed solutions, not just the options presented, a solution that outline the resources and time to complete.

Ms. Carlisle referred to the marketing survey that recommended that the BLM do some branding to provide consistency between and among their adoption events. Ms. Carlisle and other members of the Board agreed that implementing the marketing plan could be a good recommendation by the Board.

The Board discussed increasing adoptions. The Board discussed the wording regarding horse sales. Perhaps it should be reworded to prevent undesirable sales, or sales that result in the slaughter or mistreatment of animals.

Dr. Lenz reported on the population growth suppression working group. We believe the consensus was once at AML, a combination of current contraceptives sterilization, sex ratio adjustments and removals should be able to maintain herds at an acceptable level. Other members of the Board commented that fertility controls could be utilized more so now.

The Board discussed on-range euthanasia in cases of suffering. There was some disagreement and alternatives to this proposal, including that even before AML is achieved that we increase use of fertility control in all situations. Members of the Board pointed out that euthanasia is sometimes the humane option in cases of suffering.

Ms. Carlisle suggested that it would be bold and empowering to unify as a Board to make recommendations that don't include euthanasia.

Mr. French pointed out that the Board should be talking about the land being able to ever support animals again. There are cases where we are beyond the point of return and any additional inaction is going to be disastrous. He suggested that this is about habitat and that the Board should be making recommendations to improve that habitat. Other members of the board emphasized the carrying capacity of the land and how that impacts wildlife, grazing, and horses and burros. If we don't maintain the habitat, we lose options for the future.

The Board discussed private partnerships that could be leveraged to increase long-term holding. The Board agreed that partnerships should be a part of any solution moving forward and that the energy in the room could be the catalyst for these groups and the BLM together to take action and move forward.

## Advisory Board Discussion Part 2

Mr. Woehl asked the Board members to continue discussions and to move toward proposing specific recommendations or topics to consider in the recommendations.

BLM_002167

Mr. Yardley proposed the Board consider supporting option one of the options presented to Congress and advise the BLM to support that option moving forward. Ms. Carlisle suggested that there were elements of each option that are good, however they lack details. The Board discussed how the options were developed and to whom they were presented. The options were presented from BLM leadership, through the Department of the Interior and then to OMB, PMB, and then to the consolidated appropriations committee (Congress). The Board asked if the Interior Secretary's office acknowledged the development of the report and if they, and members of Congress, have received the information and asked about it. BLM staff responded that there have been follow-up questions from staff and others and that there has been some attention to it from both the Secretary of the Interior and Congress. BLM reported that they are looking forward to a response from Congress, the report was requested by and prepared for them and the agency is interested in their response. It is unknown if and when they will receive a response.

The Board discussed a proposed recommendation, that is to encourage BLM to gather horses on HMAs that are over AML that are reliant upon supplemental water. The Board discussed the impacts involved with providing supplemental water, both positive and negative, acknowledging there are circumstances where it is deemed necessary. Mr. French pointed out, in light of earlier discussions of ecosystems and preservation of those ecosystems, that there are BLM districts that have programmed water hauling on an annual basis. In those HMAs, that is a clear indication that they are well above carrying capacity.

Mr. French proposed that the BLM provide specific policies that address the triggers for emergency gathers that consider wildlife habitat and threatened and endangered species. There may be cases where HMAs have greater sage-grouse spring brood habitat that are potentially competing for the same lush riparian habitat. The Board agreed that more information on this topic would be helpful when considering management of wild horses.

Mr. Masters proposed that the BLM: notify all western states governor's offices, western counties, RACs and state wildlife agencies where wild horses exist that the Bureau of Land Management's wild horse and burro program is unsustainable, underfunded and has no plan to stop the exponential growth of wild horse and burros which are currently three times over the appropriate management level; notify these parties that thousands of horses have already left the defined herd management areas, and that large breeding herds are expanding in number and range, far outside where they are legally designated; notify these parties to expect the increased potential for ecological impacts, economic ramifications, highway safety concerns, litigation from multiple parties, and needed press; and to recognize that if it's beyond the Bureau of Land Management's current ability to stop either the population growth or the expansion of these wild horse herds, to encourage states and local stakeholders to develop management plans for thousands of breeding horses outside of herd management areas. Ms. Carlisle stated that this sounded like trying to blame the BLM for all of the problems, but that preparing state agencies for participation in what is going to take many stakeholders, including counties, states, and cities is a way forward. She agreed that there is a need to involve different levels of administration. Other Board members commented that the BLM is 100% committed but agree that tackling the issue is going to take cooperation from federal, state, and local agencies as well as support from private and non-government organizations.

## Public Comments

A public comment period was conducted from 2:30 p.m. to 4:15 p.m. allowing individuals and individual representatives of groups the opportunity to address the Board. Speakers were encouraged to submit their comments in a written format. A summary of the individual comments and written comments have been provided as subsequent volumes 3 and 4, respectively.

## Advisory Board Discussion Part 3

The Board proposed draft recommendations and discussed the wording of those recommendations together. Topics included the following:

- Cooperation between interested third-parties and BLM
- The role of BLM in managing partnerships with interested parties
- Maximizing adoptions and marketing opportunities
- Considerations for sales without limitations
- The BLM report to Congress and the options proposed to reach AML in 10 years

- Emergency gathers in priority habitat and habitat for threatened, endangered, and sensitive species
- Horses that rely on supplemental water
- PZP, PZP 22, other reversible options, and humane, permanent sterilization
- Tracking of mares and database management

## Wild Horse & Burro Advisory Board Recommendations

Present:                          Excused:
Fred Woehl, Chair                 Dr. Sue McDonnell
Dr. Tom Lenz                      Dr. Barry Perryman
Ben Masters
Ginger Kathrens
Steven Yardley
Celeste Carlisle
Jim French

1. Encourage BLM to gather horses in HMA's that are over AML that are reliant upon supplemental water.  Once HMA is at AML, stop hauling supplemental water except under extreme circumstances.

   *Approved. Vote was unanimous.*

2. Continue to support and increase funding and the use of programs like the Mustang Heritage Foundation Trainer Incentive Program to place horses and burros in good homes.

   *Approved. Vote was unanimous.*

3. Encourage volunteer and partnership opportunities for fertility control and adoptions including inmate training programs or 4-H and youth programs, local fertility control advocacy groups, public off-range pastures, and organizations like The Mustang Heritage Foundation.

   *Approved. Vote was unanimous.*

4. Support the existing Great Lakes Marketing Research Report submitted to BLM.  Support and implement the list of feasible recommendations from the marketing report.

   *Approved. Vote was unanimous.*

5. Reach out to military and veteran organizations for help with adoption and volunteer fertility control application.

   *Approved. Vote was unanimous.*

6. Board accepts Option 1 and the required changes to the regulation and the Act *(Wild Free-Roaming Horse and Burro Act)* from the report to Congress as the preferred path forward to reach AML.

   *Approved. Split vote of five in favor and two opposed, Ms. Carlisle and Ms. Kathrens.*

7. The advisory board recognizes the value of and supports ongoing research and funding of humane permanent sterilization as one of many viable tools in our quest to achieve a thriving ecological balance by achieving and maintaining AML.

   *Approved. Split vote of five in favor and two opposed, Ms. Carlisle and Ms. Kathrens.*

8. The board encourages the BLM to collaborate with interested equine advocacy groups to decrease current unadoptable horse and burro inventories.

   *Approved. Vote was unanimous.*

9. We recommend that the BLM first focus resources on reaching AML in 3-5 years by utilizing removals as can be accomplished and accommodated by off-range holding.

   *Approved. Split vote of four in favor, two opposed, Ms. Carlisle and Ms. Kathrens, and one abstain, Mr. Masters.*

10. On the HMA and HA that exceed AML, initiate emergency gathers where these boundaries overlap primary habitat of sensitive, threatened and endangered species and initiate the evaluations to establish carrying capacity.

    *Approved. Vote was unanimous.*

11. Implement safe, reversible fertility control vaccines as part of the management control to mares captured and returned to the range.

    *Approved. Vote was unanimous.*

12. Update and make available to all BLM field offices the existing national database to track all treated mares.

    *Approved. Split vote of six in favor and one opposed, Mr. Yardley.*

13. We as the Board, prefer non-lethal management options for population control purposes when possible.

    *Approved. Split vote of four in favor and three opposed, Mr. Yardley, Dr. Lenz, and Ms. Kathrens.*

The Board unanimously voted to approve the executive summary and minutes from the Advisory Board Meeting dated October 18-19, 2017 in Grand Junction, Colorado.

BLM_002170

**From:**        Waddell, Holle
**To:**          Michael Reiland; Alan Shepherd; Dean O Bolstad
**Subject:**     Adoption Incentive Briefing Paper
**Date:**        Wednesday, December 6, 2017 10:50:00 AM
**Attachments:** Adoption Incentive Pilot Program BP for the Director 2016.09.07.docx



Thank you,

Holle Waddell | Branch Chief | Division of Wild Horses and Burros |

Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood

BLM_002171

*Internal Working Document*

**INFORMATION MEMORANDUM FOR THE DIRECTOR – September 7, 2016**

FROM:        Dean Bolstad, Wild Horse and Burro Division Chief

CC:            Kristin Bail, Acting Assistant Director, Resources and Planning;
              Nancy Haug, Acting Deputy Assistant Director, Resources & Planning

SUBJECT:   Wild Horse and Burro Adoption Assistance Incentive Program

I.      INTRODUCTION

The adoption incentive pilot program is proposed to increase the number of adopted wild horses and burros (WH&B) that are difficult to adopt because of their age. The pilot would offer financial assistance through an Assistance Agreement to an individual or organization that would oversee the program and distribute funding to adopters of WH&Bs of older specified ages, who train them to specified standards, and apply for title (ownership) of the animal(s) after providing at least one year of humane care.  The financial assistance would help defray expenses for the care and training of adopted animals and be paid out at the time title is granted.  The program has completed the required documentation to initiate the solicitation however the adoption incentive pilot program has been placed on hold due to the unavailability of a grants management officer to issue a solicitation, make an award and execute an agreement. The program hopes to move forward next fiscal year.

The attached graphs display the ages of horses and burros adopted during the past 5 years.  Three percent of adopted horses were 7 years and older and 5% of burros were 9 years and older.

Gentling and training mustangs and burros adds monetary value to the animals and reduces the risk that they would be sold for slaughter.  In addition, a bond develops between the adopter and animal during the training process that increases the likelihood the animal would be retained by the adopter.

II.     BACKGROUND

The BLM has been adopting WH&Bs since 1971 and has placed more than 235,000 animals into private care.  Over the last 10 years, adoptions have steadily declined to a low of 2,135 animals in 2014. Adoptions increased to 2,631 animals in FY 2015 compared to 6,644 in FY 2004.

Placing wild horses and burros into private care is a vital component of the WH&B program. An increase in adoptions would reduce corral holding costs.  Cost savings would be diverted other aspects of managing our wild horses and burros such as fertility control and or increased removals.

Adoption Incentive Pilot Program
- Issue a RFA solicitation offering financial assistance to an organization/individual to administer the Incentive Program
- Incentive offered for 100 animals currently located in corrals.

1

*Internal Working Document*

- $1,500 incentive paid to individuals who:
    - Adopt a 7 year or older and halter/saddle train
- $800 incentive paid to adopters who:
    - 9 years and older burro and halter train
- Halter trained is defined as an animal that may be approached, caught and haltered in an open restricted area, led safely from one area to another, stand tied, allow its feet to be picked up, and load into a trailer.
- Saddle trained is defined as an animal that has successfully mastered all the components of the halter trained animal and have the ability to be ridden at a walk and trot.
- Adopter must apply for and receive title at the same time incentive is paid out.

III.    POSITION of INTERESTED PARTIES

Some wild horse and burro advocate organizations may oppose the program due to fears that the older aged animals would be more susceptible to sale for slaughter.

IV.    BUDGET IMPACT

In August 18, 2016, over 32,000 horses are located in off-range pastures (ORPs) and Eco-Sanctuaries and over 13,500 animals in off-range corrals (ORCs). Nearly $49 million was expended in FY 2015 for off-range animal care. Costs for animals in ORCs average $1,927 annually and over a lifetime (estimated 25 years) average $48,000.

Attachments:
1 – Average annual cost to care for and train a horse (Infographic)
2 – Ages of Adopted Horses and Burros 2011 to 2015 (Charts)

BLM_002173

| From: | Bolstad, Dean |
|---|---|
| To: | Reiland, Michael |
| Cc: | Holle Hooks; Alan Shepard; Anna-Maria Easley |
| Subject: | Re: Adoption Incentive Paper |
| Date: | Friday, December 8, 2017 12:29:03 PM |
| Attachments: | Adoption Assistance Program BP for the Director 2016.May.05 DRAFT.docx |
| | Projected Costs  Payments Chart 20150520.xlsx |
| | AdoptAgesFY2011toFY2015 Ages in Corrals 2016.xlsx |
| | BLM vs Boarding Average Annual Boarding Costs 2016.05.06.pdf |

Michael,

Thanks for initiating the draft.  Perhaps we need a conference call to decide what to present in this BP.  I have the following thoughts.

Rather than present the questions (all are relevant but perhaps more appropriate as an attachment with answers) as the main part of the briefing paper maybe we need to present the process that the solicitors advised was doable.  I think we should do the following but would like a group think/discussion:

- Present the process for an incentive program
- Provide a financial analysis in a spreadsheet like you did before.  Can you find your previous spreadsheets or the ones that Molly developed?  For the new BP, maybe the spreadsheet would present a couple of examples of how much it would cost and how many additional adoptions it would take to break even for the incentive to be cost effective.  Maybe present two alternatives, a $1,000 incentive and a $2,500 incentive

I've attached our previous BP and its attachments that we presented to Neil.  Perhaps we could start with this, but revise it to be an incentive for all aged horses excluding trained animals.

What do you all think?

Dean Bolstad
Division Chief, Wild Horse and Burro Program
Washington Office (WO-260)
(202) 912-7648 Office
(775) 750-6362 Cell

On Fri, Dec 8, 2017 at 11:40 AM, Reiland, Michael <mreiland@blm.gov> wrote:

> To All:
>
> Here's the draft of the Adoption Incentive Paper.  Please comment and return to me ASAP.
>
> Thanks,
>
> --
> Michael Reiland
> WO-260 Budget-Analyst
> 202-912-7261
> 202-794-2479

|  | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 as of 06/30/16 |
|--------|------|------|------|------|------|------|
| HORSES | 2387 | 2176 | 2218 | 1753 | 2305 | 1749 |
| BURROS | 362 | 350 | 299 | 344 | 297 | 297 |
| TOTAL: | 2749 | 2526 | 2517 | 2097 | 2602 | 2046 |



# Average annual cost to care for a horse




## UNIQUELY AMERICAN.
## UNIQUELY YOURS.



**BLM**
**Off-Range Corral**

**Untrained**
Feed & Care

$1,927



**At Home**

**Annual Estimated**
Feed & Care Expenses

$1,962

**Halter-Trained***
Feed, Care & Halter training

$2,499

**Saddle-Trained****
Feed, Care & Saddle Training

$3,436



**Boarding Facility**

**Annual Estimated**
Feed & Care Expenses

$10,375

**Halter-Trained***
Feed, Care & Halter training

$10,913

**Saddle-Trained****
Feed, Care & Saddle Training

$11,850

\* **Halter-Trained** is defined as an animal that may be approached, caught and haltered in an open unrestricted area, safely led from one area to another, stand tied for farrier and pick up feet, and load into a trailer.

\*\* **Saddle-Trained** is defined as an animal that may be approached, caught and haltered in an open unrestricted area, safely led from one area to another, stand tied for farrier and pick up feet, load into a trailer and ridden at a walk and trot.

BLM_002176        **Rev 5/03/16**

|  | Low | High | Average |
|---|---|---|---|
| **BLM Off-Range Corral** | | | **$1,927**<br>12 months<br>Actual 2015 |
| Corral<br>includes feed, supplements, salt, mineral, water and housing facitily, hoof trimming, routine veterinary care including vaccines, de-worming and health inspections. | | | |
| **At Home** | | | |
| Home<br>includes feed, supplements, salt, mineral, water and housing facility for the horse | $913 | $1,460 | n/a |
| Farrier Services<br>including trimming and/or shoeing every 6-8 weeks and<br>Routine Veterinary Care<br>including vaccines, de-worming, dental and service call | $700 | $850 | n/a |
| **Annual Estimated**<br>Feed & Care Expenses | **$1,613** | **$2,310** | **$1,962** |
| Training Fees – Halter-Trained<br>(Professional) | $300<br>60 days of training | $775<br>60 days of training | n/a |
| **Annual Estimated – Halter-Trained**<br>Feed & Care and Training Expenses | **$1,913** | **$3,085** | **$2,499** |
| Training Fees – Saddle-Trained*<br>(Professional) | $1,000<br>120 days of training | $1,950<br>120 days of training | n/a |
| **Annual Estimated – Saddle-Trained***<br>Feed & Care and Training Expenses | **$2,613** | **$4,260** | **$3,436** |
| **Boarding Facility** | | | |
| Boarding<br>includes feed, supplements, salt, mineral, water and housing facility for the horse | $1200 | $18,000 | n/a |
| Farrier Services<br>including trimming and/or shoeing every 6-8 weeks and<br>Routine Veterinary Care<br>including vaccines, de-worming, dental and service call | $700 | $850 | n/a |
| **Annual Estimated**<br>Feed & Care Expenses | **$1,900** | **$18,850** | **$10,375** |
| Training Fees – Halter-Trained<br>(Professional) | $300<br>60 days of training | $775<br>60 days of training | n/a |
| **Annual Estimated – Halter-Trained**<br>Feed & Care and Training Expenses | **$2,200** | **$19,625** | **$10,913** |
| Training Fees – Saddle-Trained*<br>(Professional) | $1,000<br>120 days of training | $1,950<br>120 days of training | n/a |
| **Annual Estimated – Saddle-Trained***<br>Feed & Care and Training Expenses | **$2,900** | **$20,800** | **$11,850** |

**NOTE: Cost estimate sources:** AAEP 2012, American Horse Council, BLM existing contracts as well as subject matter experts in the WHB program. Data compiled 4/2016

|  | BLM Incentive Payment | BLM Lifetime Cost Saving if maintained in Off-Range Corral | BLM Lifetime Cost Saving if maintained in Off-Range Pasture |
|---|---|---|---|
| Horse | $1,500 | $33,186 | $13,074 |
| Burro | $750 | $30,082 | N/A |



| | |
|---|---|
| **From:** | Bail, Kristin |
| **To:** | Reiland, Michael |
| **Subject:** | Fwd: Wild Horses Meeting |
| **Date:** | Thursday, December 21, 2017 4:48:27 PM |
| **Attachments:** | InfoMemo_LegOptions_Director_09.06.16 FINAL (1).doc |

Another incentive paper.

---------- Forwarded message ----------
From: **Velasco, Janine** <jvelasco@blm.gov>
Date: Tue, Sep 6, 2016 at 3:51 PM
Subject: Re: Wild Horses Meeting
To: "Gordon, Bill" <bill_gordon@ios.doi.gov>
Cc: Ann DeBlasi <amdeblas@blm.gov>, Tonya Jackson <tmjackson@blm.gov>, Lance
Porter <l50porte@blm.gov>, Kristin Bail <kbail@blm.gov>, Linda Smith
<lhsmith@blm.gov>


Hi Bill -- here is the briefing paper that 200 did for Neil, but I dont' think it works for OMB.  I
believe that they are still working on the incentives materials that they reference in this.



On Tue, Sep 6, 2016 at 2:38 PM, Gordon, Bill <bill_gordon@ios.doi.gov> wrote:
> Janine/Ann - I know Linda is out today, so I am reaching out to you.  As you probably
> know, on Thursday BLM is briefing OMB on the WH&B program.  As noted in the
> message/invitation below, a primary focus of the meeting, as far as OMB senior
> management is concerned, is Neil/BLM briefing OMB on the DETAILS of some of the
> novel reform ideas that Neil previously pitched to OMB and that he has also mentioned in
> public since then (e.g. in hearings).  These include tax credits, among other things.  Mike
> Hagan just called me to stress this again.  He really wants to see these details/substantive
> proposals BEFORE the meeting.  Can you let me know if BLM will be able to send the
> details to him by tomorrow.  I am afraid it will reflect poorly on BLM if this meeting is not
> productive - - - i.e. a substantive discussion of very detailed proposals.
>
> Please let me know if you will be able to send the proposals to Mike by tomorrow so I can
> let him know.
>
> Thanks,
>
> Bill
>
> ---------- Forwarded message ----------
> From: **Hagan, Michael B. EOP/OMB** <Michael_B._Hagan@omb.eop.gov>
> Date: Wed, Aug 31, 2016 at 5:54 PM
> Subject: Wild Horses Meeting
> To: "Gordon, Bill" <bill_gordon@ios.doi.gov>, "Smith, Linda" <lhsmith@blm.gov>
> Cc: "kbail@blm.gov" <kbail@blm.gov>

(202)

**Bridge Number** 395-6392

**Conferee Passcode** 982 5991

This meeting follows up on two items: (1) information OMB requested via Passback (due on March 4, 2016) on BLM's near-term actions and a long-term plan to effectively address the many long-standing (and increasingly costly) problems with this program, and (2) an OMB agreement earlier this summer during testimony review to work with BLM on alternative approaches to meeting this objective, and notably a novel 'payment incentives' or tax-related idea that was not sufficiently developed for inclusion in the 2017 Budget.

**In addition to the passback report, we are expecting to see as much detail as possible on proposals in advance of the meeting, particularly on the tax incentive idea. Please aim to get something to us by Tuesday or Weds morning.**

Please forward to Neil, Dean, and Kristin. Look forward to seeing you all on Thursday.

BLM_002180

*Internal Working Document*

**INFORMATION MEMORANDUM FOR THE DIRECTOR**

DATE:　　　　　August 24, 2016

FROM:　　　　　Dean Bolstad, Division Chief, Wild Horse and Burro Program

CC:　　　　　　Kristin Bail, Assistant Director, Resources and Planning
　　　　　　　　Lance Porter, Acting Deputy Assistant Director, Resources and Planning

SUBJECT:　　　Legislative and Management Options to Improve Wild Horse and Burro
　　　　　　　　Management

## I.　　INTRODUCTION

This memorandum identifies legislative proposals to support long-term solutions for the management of wild horses and burros, as well as eleven potential unfunded management scenarios to achieve Appropriate Management Levels (AML) in 4 to 31 years utilizing gathers and fertility-control options.

It is important to note that OMB may be expecting a big ask from the BLM during 2018 budget development in terms of both funding and legislative options.  It is also worth noting that recent discussions with appropriations staff disclosed some frustration with the challenges of the program being presented to Congress but no substantive budget request being submitted to address those challenges.

OMB has also requested information regarding incentive options in advance of the meeting with Janet Irwin that is scheduled for September 8th at 1pm.  The program is aware of the request and is working to pull information together in response to that request.

The Wild Horse and Burro Program is on an unsustainable path.  The BLM was successful in getting the attention of the Congress with the legislative proposal for transfer authority in the 2016 budget, perhaps it is time to "go big" and propose a moon shot approach that will allow the BLM to achieve AML quickly and sustain AML over time.  If the status quo is maintained the number of horses and the associated challenges will more than double during the new President's first term.

Many of the following proposals have been shared with OMB as a component of the report transmitted on August 31, 2016 in response to their 2017 budget passback directive.

## II.　　LEGISLATIVE and REGULATORY OPTIONS

A variety of possible legislative and regulatory changes have been identified that could assist with wild horse and burro management.  These are briefly examined below.

BLM_002181

*Internal Working Document*

- Amend the Wild Free-Roaming Horses and Burros Act of 1971 (the Act) to clarify and establish that the BLM may manage for minimally reproducing or non-reproducing herds.

These changes would allow for tailored management at a regional or state level and limitation of population growth. Some herds would consist of spayed and/or neutered animals (minimal or non-reproducing herds) while others would remain breeding herds. Excess, unadoptable animals would be spayed and neutered and managed in non-reproducing herds or as a component of breeding herds, while overall population viability would be maintained via breeding herds.  In time, after achievement of Appropriate Management Levels (AML), rather than moving excess animals to costly off-range pastures and corrals, they could remain on the range in non-reproducing herds.

- Amend the Act to allow spayed or neutered horses and burros to be placed on public lands where they were not found in 1971 when the Act was passed.  The Act expressly prohibits the relocation of wild horses and burros to areas where they did not exist in 1971.

This change would provide opportunities to maintain wild horses and burros on public lands where animals did not exist in 1971 and allow BLM to enter into agreements with willing partners to establish eco-sanctuaries comprised of a mix of public and private lands, rather than private lands only.  Some stakeholders have shown interest in cooperating with BLM to set up eco-sanctuaries of this type.  Further, ranchers could request conversion of their public land grazing preference from livestock use to wild horses and burro use, if they wished to do so.  A provision to allow wild horses and burros on lands not previously occupied would allow the maintenance of unadopted animals on public lands at lower cost than off-range corrals and contracted private land pastures.

- Amend the Act to create new terms for adoption and incentives for private individuals to adopt, buy or otherwise financially support animals such as: introducing a tax credit for adoptions; shortening the time period to six months from adoption to transfer of title of ownership (currently one year); and increasing the number of animals that can be titled to one individual (currently four animals per year); offering tax credits for a donation of funds to care for horses in BLM facilities; and offering tax credits to off-range pasture contractors to encourage provision of pasture space.

Providing tax incentives to individuals or organizations that adopt animals through the BLM's adoption process could help expand the adoption program and increase adoptions. Additionally, offering tax credits to contractors who provide pasture space for wild horses could help decrease costs to care for excess animals. A shorter time period to gain ownership of adopted animals and increasing the number that may be titled to an individual may increase adoptions and especially so to entrepreneurs who wish to train wild horses and burros and sell them for profit as manageable, trust worthy mounts and companions.

BLM_002182

*Internal Working Document*

- Amend the Act to enable immediate transfer of animal ownership from BLM to other federal, state or local agencies that have a need for work animals (e.g. Border patrol).

By allowing for a direct transfer of animals to other government agencies, more animals can be put to doing productive work on behalf of the public while reducing the number of animals BLM supports in its off-range corrals and pastures. There is evidence for the potential of a public agency "market" – the U.S. Border Patrol has adopted approximately 300 former wild horses over the past decade.

- Amend the Act to enable the BLM to directly transfer ownership of animals to other countries for humanitarian or economic development purposes.

With oversight guidelines, excess wild horses or burros could be offered for humanitarian and economic development purposes in other countries, such as Guatemala, if logistical challenges to transportation can be solved.

- Authorize a BLM Foundation

The President's FY 2017 Budget includes a legislative proposal for a congressionally-chartered non-profit foundation to support the BLM's work.  A foundation could vastly expand the BLM's ability to foster public-private partnerships aimed at finding good homes for and encouraging sustainable management of wild horses. Legislation authorizing the Bureau of Land Management Foundation passed the House on July 5, 2016 (H.R. 3844). Language to establish the Foundation is also included in the Senate version of the FY 2017 Interior, Environment, and Related Agencies Appropriations bill, S. 3068.

- Other

It should be noted that for many years the annual Interior Appropriations Acts have included language, as proposed in the President's Budgets, prohibiting the destruction of healthy, unadopted wild horses and burros by BLM or unrestricted sales.

III.    MANAGEMENT SCENARIOS

Included in Attachments 1 and 2 are eleven management scenarios to achieve AML over the next 3-15 years utilizing gathers and fertility-control options. No meaningful program to achieve AML or curb population growth with fertility control can be implemented without large increases in program funding, as illustrated by the scenarios presented. These scenarios assume initiation of implementation in FY 2017.  Implementation at a later date will increase the cost.

These scenarios were provided in two letters (May 11, 2016 and June 21, 2016) in response to a congressional correspondence inquiry by 20 members of the House and

BLM_002183

*Internal Working Document*

Senate.  The scenarios presented are simplified and involve one or two population control methods.  As research produces more fertility control alternatives, multiple methods of contraception in combination with removals will likely present a better management approach.  No matter what combination of actions is implemented, it will be very costly. These scenarios include the following:

- Six "gather only" scenarios to reduce on-range population numbers to AML that were specifically requested by 20 Congressional members.  Table 1 in Attachment 1 summarizes the actions and costs related to these actions.

- Five gather/fertility treatment scenarios utilizing a selection of treatment methods combined with varying numbers of removals.  Table 2 in Attachment 2 summarizes the actions and costs related to these actions.

BLM_002184

*Internal Working Document*

**Attachment 1**

Table 1: Gather only Scenarios

| Management Scenario | Year AML Achieved | Range of Annual Costs to Implement During the First 15 Years (in millions)[2] | Total Cost Over a 40-year Time Period for Actions Taken in First 15 Years[3] |
|---|---|---|---|
| **Scenario 1: Achieve High AML in 3 yrs**<br><br>Remove 3,500 in year 1 (2016); 26,760 in each of years 2-4; and 4,650 annually thereafter through year 15 to maintain AML. 2,500 animals adopted annually results in 97,430 total unadopted animals maintained off-range. | Year 4 | $81 - $193 | $3.1 billion |
| **Scenario 2: Achieve High AML in 5 yrs**<br><br>Remove 3,500 in year 1 (2016); 19,965 in years 2-6; and 4,650 annually thereafter to maintain AML. 2,500 animals adopted annually results in 107,675 total unadopted animals maintained off-range. | Year 6 | $62 - $211 | $3.4 billion |
| **Scenario 3: Achieve High AML in 10 yrs**<br><br>Remove 3,500 in year 1 (2016); 15,230 in each of years 2-11; and 4,650 annually thereafter through year 15 to maintain AML. 2,500 animals adopted annually results in 136,000 total unadopted animals maintained off-range. | Year 11 | $49 - $265 | $4.0 billion |
| **Scenario 4: Achieve Low AML in 3 yrs**<br><br>Remove 3,500 in year 1 (2016); 29,700 in each of years 2-4; and 2,835 annually thereafter through year 15 to maintain AML. 2,500 animals adopted annually results in 86,285 total unadopted animals maintained off-range. | Year 4 | $89 - $188 | $2.9 billion |
| **Scenario 5: Achieve Low AML in 5 yrs**<br><br>Remove 3,500 in year 1; 21,440 in each of years 2-6; and 2,835 annually thereafter through year 15 to maintain AML. 2,500 animals adopted annually results in 98,715 total unadopted animals maintained off-range. | Year 6 | $66 - $204 | $3.2 billion |
| **Scenario 6: Achieve Low AML in 10 yrs**<br><br>Remove 3,500 in year 1; 15,685 in each of years 2-11; and 2,835 annually thereafter through year 15 to maintain AML. 2,500 animals adopted annually results in 134,190 total unadopted animals maintained off-range. | Year 11 | $51 - $267 | $4.0 billion |

**Note 1:** These costs assume that all unadopted animals will be maintained in corrals. This assumption is made because of the difficulty the BLM has had in obtaining cost-effective off-range pastures.

**Note 2:** The annual cost to implement each management scenario includes the cost of gathers and adoptions in addition to the cost providing of off-range care for animals removed from the range but not adopted. Because additional animals would be removed each year, the numbers of unadopted animals maintained off-range increases over time. This, in turn, increases the annual cost of the management scenario over time. Therefore, the table displays the range of expected annual costs over the 15-year period. This is the additional cost beyond the current program annual budget of $80.6 million (i.e. FY2016 enacted).

**Note 3:** The lifetime cost of care for unadopted animals is substantial and will be incurred for another 25 years past the 15-year mark. For this reason, the total actual cost of each management scenario is accrued over a 40-year time period. These estimates are derived from the present value of costs incurred due to actions taken in the first 15 years, assuming a 3 percent annual discount rate. These estimates depend on a number of factors, e.g. the actual cost of off-range care, cost for gathers, and the number of animals adopted. This is the additional total cost beyond the current program annual budget of $80.6 million (i.e. FY2016 enacted).

BLM_002185

*Internal Working Document*

**Note 4:** "Low AML nationwide is 16,292. "High" AML nationwide is 26,725.  Low AML and high AML constitutes the AML Range which is the number of adult animals within which herd size will be allowed to fluctuate and that is in balance with land capacity and other land uses.

**Note 5**: The number of unadopted animals maintained off-range that are described in these Management Scenarios are the additional animals added to the holding facilities under these scenarios; i.e. above the number of animals presently in holding facilities.

BLM_002186

*Internal Working Document*

**Attachment 2**

Table 2: Gather and Fertility Control Scenarios

| Management Scenario | Year AML Achieved | Range of Annual Costs to Implement During the First 15 Years (in millions)[2] | Total Cost Over a 40-year Time Period for Actions Taken in First 15 Years[3] |
|---|---|---|---|
| **Scenario 7: Present Situation With $80.6 Million Budget.** Remove 3,500 per year. PZP 1,000 annually. 2,500 animals adopted annually results in 15,000 total unadopted animals maintained off-range. | Never | $20 - $44 | $602 million |
| **Scenario 8: Remove 14,000 Per Year Until High AML is Achieved.** Remove 3,500 in year 1 (2016), 14,000 in each of years 2-15; 10,700 in year 16; and 4,650 annually thereafter to maintain high AML. 2,500 animals adopted annually results in 162,000 total unadopted animals maintained off-range. | Year 16 | $46 - $319 | $4.6 billion |
| **Scenario 9: Removal Combined With Spay/Neuter** Remove 3,500 in year 1 (2016); 8,000 in each of years 2-16; and 2,835 annually thereafter to maintain AML. Spay/neuter 300 in year 2; 2,000 in year 3, 6,000 in year 4; 10,000 in each of years 5-17; and 1,500 in year 15. 2,500 animals adopted annually results in 78,000 total unadopted animals maintained off-range. | Year 31 | $30 - $177 | $2.4 billion |
| **Scenario 10: 7,500 PZP-22 Applications Per Year** Remove 3,500 per year. PZP 7,500 annually, years 2-16. 2,500 animals adopted annually results in 15,000 unadopted animals maintained off-range. | Never | $37 - $61 | $793 million |
| **Scenario 11: 3,500 Removals and varying PZP-22 Applications Per Year** Remove 3,500 in years 1-14 year. PZP up to 70% of mares annually (27,000 in 2017 year 2, decreasing to 9,700 in year 15). 2,500 animals adopted annually results in 15,000 unadopted animals maintained off-range. | Year 15 | $66 - $98 | $1.04 billion |

**Note 1:** These costs were developed with the assumption that all unadopted animals will be maintained in corrals. This assumption was made because of the increasing difficulty that the BLM has had in obtaining cost-effective off-range pastures. The additional number of unadopted animals in the table is in addition to the current number of animals maintained in off-range corrals.

**Note 2:** In addition to the cost of gathers, adoptions, PZP treatments, and/or spaying and neutering, the annual costs include the cost of off-range care for animals that are removed from the range during years 1 through 15 but not adopted. These costs generally increase over time as additional animals are removed each year. Therefore, the table displays the range of expected annual costs over the 15-year period. This is the additional cost beyond the current program annual budget of $80.6 million (ie. FY 2016 enacted).

**Note 3:** The lifetime cost of care for unadopted animals is substantial, and some animals will require support for another 25 years past the 15-year mark. For this reason, the total actual cost of each management scenario is accrued over a 40-year time period. These estimates are derived from the present value of costs incurred due to actions taken in the first 15 years, assuming a 3 percent annual discount rate. These estimates depend on a number of factors, e.g. the actual cost of off-range care, cost for gathers, and the number of animals adopted. This is the additional total cost beyond the current program annual budget of $80.6 million (ie. FY 2016 enacted).

BLM_002187

*Internal Working Document*

**Note 4:** "Low AML nationwide is 16,292. "High" AML nationwide is 26,725.  Low AML and high AML constitutes the AML Range which is the number of adult animals within which herd size will be allowed to fluctuate and that is in balance with land capacity and other land uses.

**Note 5**: The number of unadopted animals maintained off-range that are described in these Management Scenarios are the additional animals added to the holding facilities under these scenarios; i.e. above the number of animals presently in holding facilities.

8

BLM_002188

| | |
|---|---|
| **From:** | Shepherd, Alan |
| **To:** | Reiland, Michael |
| **Cc:** | Holle Hooks |
| **Subject:** | Re: Updated Options Paper |
| **Date:** | Thursday, January 4, 2018 7:53:11 PM |
| **Attachments:** | 2017 Congressional Report 20171227 (Clean)_ABS.docx |

Here's some edits to this version.

Do we fit in Brian Steed's "Incentive Program" into this somehow?


Thanks,
Alan

Alan Shepherd
Branch Chief, On-Range (WO261)
National WH&B Program
1340 Financial Blvd
Reno, NV 89502

Office #: (775) 861-6611
Cell #: (775) 530-2784
Fax #: (775) 861-6618

email: ashepher@blm.gov
http://www.blm.gov/programs/wild-horse-and-burro

On Thu, Jan 4, 2018 at 12:05 PM, Reiland, Michael <mreiland@blm.gov> wrote:
> Holle/Alan,
>
> Please review and comment/make suggestions.  Please be ready to discuss in detail by
> tomorrow morning for our scheduled discussion.
>
> Thanks,
>
> --
> Michael Reiland
> WO-260 Budget-Analyst
> 202-912-7261
> 202-794-2479

| | |
|---|---|
| **From:** | Bail, Kristin |
| **To:** | Reiland, Michael |
| **Cc:** | Steve Tryon |
| **Subject:** | Re: Updated Options Paper |
| **Date:** | Tuesday, January 9, 2018 5:49:47 PM |
| **Attachments:** | KBInput.docx |

Thanks, Michael, for your work on this.  My comments are shown in track changes.  Please let me know if you want to discuss (or don't understand) any of my comments.  -K

On Fri, Jan 5, 2018 at 4:31 PM, Reiland, Michael <mreiland@blm.gov> wrote:

Kristin/Steve,

Please find attached our updated draft of the Options Paper.  I am available whenever you want to discuss anything within the document.  Please let me know if there's anything we can do to complete the work and get it to the Director's office by Wednesday.

Thanks,

--
Michael Reiland
WO-260 Budget-Analyst
Office: 202-912-7261
Cell: 202-794-2479

| | |
|---|---|
| **From:** | Strickland, Deborah |
| **To:** | Bolstad, Dean O |
| **Cc:** | Waddell, Holle |
| **Subject:** | Re: Adoption Incentives Follow up |
| **Date:** | Monday, February 1, 2016 10:31:39 AM |
| **Importance:** | High |

Hi Dean,

OK. I updated the invite with call in number.
Thanks

On Mon, Feb 1, 2016 at 11:17 AM, Bolstad, Dean <dbolstad@blm.gov> wrote:
Hi Deborah,
I'd like to include my Off-range Branch Chief, Holle' Hooks, in this meeting. I'll add her to the invite but she will need to call in from Oklahoma. Can you provide a conference call number please? Others might also need to call in.

Looking forward to your review of this matter and answers to the list of questions we submitted.

Thanks,
Dean

Dean Bolstad
Acting Division Chief, Wild Horse and Burro Program
Washington Office (WO-260)
(202) 912-7297 Office
(775) 750-6362 Cell

On Mon, Feb 1, 2016 at 9:57 AM, Strickland, Deborah <dstrick@blm.gov> wrote:
Majority are available on Thursday at 2:30. I will send out the invite shortly. Thanks all!

On Mon, Feb 1, 2016 at 9:47 AM, Bolstad, Dean <dbolstad@blm.gov> wrote:
Wed at 2:30 is best for me but I can do Thursday also. The sooner we have this discussion the better given Neil's interest in advancing adoption incentives.

Dean Bolstad
Acting Division Chief, Wild Horse and Burro Program
Washington Office (WO-260)
(202) 912-7297 Office
(775) 750-6362 Cell

On Mon, Feb 1, 2016 at 9:15 AM, Strickland, Deborah <dstrick@blm.gov> wrote:
Good morning,

Please let me know which dates works best for you.

Wed, Feb 3 at 2:30
Thurs, Feb 4 at 2:30

Thanks

On Fri, Jan 29, 2016 at 11:11 AM, Strickland, Deborah <dstrick@blm.gov> wrote:
Unfortunately this meeting will have to be rescheduled for next week due to schedule conflicts. Thank you for your patience and I apologize for any confusion. Please let me know your availability for next week.

Thanks again!

On Fri, Jan 29, 2016 at 10:37 AM, Russell, Gregory <gregory.russell@sol.doi.gov> wrote:
Yes, I am available at 3 PM today.

On Fri, Jan 29, 2016 at 10:35 AM, Strickland, Deborah <dstrick@blm.gov> wrote:
Good morning,

Kevin Oliver is not available at 1:00 today and asked if we can move to 3:00. Are you all available at 3:00 today?

On Thu, Jan 21, 2016 at 1:03 PM, Smith, Linda <lhsmith@blm.gov> wrote:
Thanks so much, Greg. We are hoping to resolve these issues by the time the budget is released on February 9th so that we can adequately respond to inquiries that come our way during discussions on the budget, hearings, etc.

Happy to meet next week to discuss. Will ask Deborah Strickland (cc:d here) to coordinate timing and send an invitation.

On Thu, Jan 21, 2016 at 11:41 AM, Russell, Gregory <gregory.russell@sol.doi.gov> wrote:
**\*\*Privileged Attorney–Client Communication\*\***

Thanks, Linda. I was tied up in meetings yesterday afternoon so didn't get a chance to review until this morning. What I've done is taken your write-up, added some comments/annotations that might help to inform our thinking ███████████ and other issues, and added Maria Lurie to the email. If folks are available, I suggest that we try to schedule a call for later today or tomorrow—or next week, if that's consistent with your schedule. Speaking of which, last week, you and Dean indicated that you needed to resolve these issues quickly so that BLM and the Department could draft budget-related documents and engage with members of Congress on these issues. What's your current timeframe? Do you have dates/times that you would like to recommend for a discussion?

\* \* \*



—Greg

_____

Greg Russell
Office of the Solicitor
Division of Land and Water Resources
Department of the Interior
202.208.4327

NOTICE: This email (including attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected from disclosure. Dissemination, distribution, or copying of this email or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is strictly prohibited. If you receive this email in error, please notify the sender immediately and destroy all copies.

On Wed, Jan 20, 2016 at 2:25 PM, Smith, Linda <lhsmith@blm.gov> wrote:

Resending......

---------- Forwarded message ----------
From: **Smith, Linda** <lhsmith@blm.gov>
Date: Wed, Jan 20, 2016 at 2:23 PM
Subject: Adoption Incentives Follow up
To: Greg Russell <greg.russell@sol.doi.gov>
Cc: Dean Bolstad <dbolstad@blm.gov>, Kevin Oliver
<koliver@blm.gov>, Tonya Jackson <tmjackson@blm.gov>

Good afternoon, Greg. Please find attached a document that lays out some potential adoption incentive scenarios as we discussed last week. We are interested in ████████████████████████████████████

Many thanks for your assistance.

------------------------------------------------------------------
Linda H. Smith
Acting Deputy Assistant Director for Business, Fiscal, and Information
Resources
Bureau of Land Management
20 M Street SE
Washington, DC 20003
Office: 202-912-7060
Cell/Alternative Telework Number: 202-760-0379
lhsmith@blm.gov

--
Linda H. Smith
Acting Deputy Assistant Director for Business, Fiscal, and Information
Resources
Bureau of Land Management
20 M Street SE
Washington, DC 20003
Office: 202-912-7060
Cell/Alternative Telework Number: 202-760-0379
lhsmith@blm.gov

--
Linda H. Smith
Acting Deputy Assistant Director for Business, Fiscal, and Information
Resources
Bureau of Land Management
20 M Street SE
Washington, DC 20003
Office: 202-912-7060
Cell/Alternative Telework Number: 202-760-0379
lhsmith@blm.gov

| | |
|---|---|
| **From:** | Reiland, Michael |
| **To:** | Alan Shepard; Steve Tryon |
| **Subject:** | Updated Paper |
| **Date:** | Friday, February 2, 2018 1:56:46 PM |
| **Attachments:** | 2017 Congressional Report 20180202.docx |

Alan/Steve,

Here's the newest update

--
Michael Reiland
WO-260 Budget-Analyst
202-912-7261
202-794-2479

| | |
|---|---|
| **From:** | Tryon, Steve |
| **To:** | Reiland, Michael |
| **Cc:** | Alan Shepard |
| **Subject:** | Re: Updated Paper |
| **Date:** | Friday, February 2, 2018 3:30:06 PM |
| **Attachments:** | 2017 Congressional Report ST Edits 20180202.docx |

Please review my edits. Will catch KB on break between our meetings, to review changes with her. Ready to share with leadership later this afternoon. Let me know if I messed up anything.

Thank you!!

st

Steve Tryon
Deputy Assistant Director, Resources and Planning
Bureau of Land Management
1849 C Street, NW
Room 5654
Washington, DC 20240
202-208-4896

On Fri, Feb 2, 2018 at 1:56 PM, Reiland, Michael <mreiland@blm.gov> wrote:

> Alan/Steve,
>
> Here's the newest update
>
> --
> Michael Reiland
> WO-260 Budget-Analyst
> 202-912-7261
> 202-794-2479

| | |
|---|---|
| **From:** | Tryon, Steve |
| **To:** | Alan Shepherd; Michael Reiland |
| **Subject:** | Fwd: whb report |
| **Date:** | Monday, February 12, 2018 6:16:39 PM |
| **Attachments:** | 2017 Congressional Report 20180202 CH.docx |

Alan/Michael, per my discussion with Alan a little while ago, please work off this copy of the report, retaining all previous drafts separately. I am sending it to you in track changes, so you can follow.

In this:

- Option 3 is deleted.
- Option 4 (now 3) needs some attention on the table. It is _likely_ that the numbers do not work precisely, because they are not input in your master spreadsheet. But you will see that the reviewers are wanting to be more aggressive/optimistic about creating market demand for adoptions with the $1,000 incentive, and that our ability to ramp up sterilization would be accelerated by focusing on studs, not mares. You may want to discuss this latter assumption in the AM, before re-working the report. You can call my cell at 202-527-2651, if so.
- Some previous changes made by yourselves or me have already been accepted. Other changes, especially involving sterilization of mares, have been rejected

Please run the numbers using these assumptions for adoption demand and fertility control, and see what you get for a bottom line, and make adjustments accordingly. I think it might be useful to first accept all changes that are unrelated to the increased adoption demand/incentive and then highlight those tracked changes specifically.

Feel free to call me in the AM if you want to discuss.

Could I get a revised paper by 0900 hrs?

Thank you!

Steve Tryon
Deputy Assistant Director, Resources and Planning
Bureau of Land Management
1849 C Street, NW
Room 5654
Washington, DC 20240
202-208-4896

| | |
|---|---|
| **From:** | Tryon, Steve |
| **To:** | Alan Shepherd; Michael Reiland |
| **Subject:** | Fwd: Latest Draft of WH&B Report |
| **Date:** | Monday, February 26, 2018 11:06:06 AM |
| **Attachments:** | DRAFT BLM Wild Horse and Burro Report_2-24-18_CLEAN.docx |

Gentlemen,

Attached is the latest draft of the report to Congress. Could you please take another pass through with an eye to keeping the distinctions among the options clean, where:

- Option 1 = sale & euthanasia & use of contraceptives where needed
- Option 2 = add money for storage, possibly for third parties, and use of contraceptives where needed
- Option 3 = de-emphasis on contraception, emphasis on sterilization, and presumption that adoption incentives will increase adoption demand.

Please use track changes so we can see what's been updated. I'm mostly interested in changes to our underlying cost assumptions, and not formatting or word choices.

We are in the home stretch, at least within DOI. This is now headed to the Secretary.

Cheers,

Steve Tryon
Deputy Assistant Director, Resources and Planning
Bureau of Land Management
1849 C Street, NW
Room 5654
Washington, DC 20240
202-208-4896

**From:**       Reiland, Michael
**To:**         Steve Tryon
**Cc:**         Alan Shepard
**Subject:**    Re: DRAFT Wild Horse and Burro Report
**Date:**       Wednesday, March 7, 2018 10:46:14 AM
**Attachments:** DRAFT BLM Wild Horse and Burro Report 20180307.docx

Steve/Alan,

Here's the updated draft.  Please also see my comments where there are issues with the existing text.

Thanks,

Michael

On Tue, Mar 6, 2018 at 2:30 PM, Steve Tryon <stryon@blm.gov> wrote:

> Sent from my iPhone
>
> Begin forwarded message:
>
>> **From:** "Brune, Jeff" <jbrune@blm.gov>
>> **Date:** February 26, 2018 at 5:55:54 PM EST
>> **To:** Brian Steed <bsteed@blm.gov>, Casey Hammond <casey_hammond@ios.doi.gov>
>> **Subject: DRAFT Wild Horse and Burro Report**
>>
>> Attached is the draft of the WH&B Report to Congress.
>>
>> --
>> Jeff Brune
>> Advisor, Office of the Director
>> Bureau of Land Management
>> U. S. Department of the Interior
>> 1849 C Street, N.W., Rm. 5649
>> Washington, D.C. 20240
>>
>> (202) 208-3774
>> Email: jbrune@blm.gov

--
Michael Reiland

WO-260 Budget-Analyst
202-912-7261
202-794-2479

| | |
|---|---|
| **From:** | Steve Tryon |
| **To:** | mreiland@blm.gov; ashepher@blm.gov |
| **Cc:** | kbail@blm.gov |
| **Subject:** | WHB Strategic Plan, with ST Edits |
| **Date:** | Wednesday, March 28, 2018 8:59:02 AM |
| **Attachments:** | ATT00001.htm |
| | DRAFT BLM Wild Horse and Burro Report 03.28.2018.docx |

Morning, guys.

I reworked the first couple of paragraphs pretty extensively. Not sure when this happened - I think during 100 edits - but the introduction to this report had become bland and not really getting to the point: We need more legal authorities and more money.

I also re-labeled some of the options towards the back of the paper, to make them more descriptive of what it was that we are actually proposing.

Michael could you try to blend this with any new edits. I notice you sent another version of this document about an hour ago. Could you try to put those together please and re-send?

st

Sent from my iPhone

Begin forwarded message:

> **From:** Steve Tryon <stryon@mac.com>
> **To:** Steve Tryon <stryon@blm.gov>
> **Subject: [EXTERNAL] WHB Strategic Plan, with ST Edits**

| | |
|---|---|
| **From:** | Tryon, Steve |
| **To:** | Alan Shepherd; Michael Reiland |
| **Subject:** | Fwd: WHB Report, for 100 Review |
| **Date:** | Wednesday, March 28, 2018 5:49:30 PM |
| **Attachments:** | DRAFT BLM Wild Horse and Burro Report 20180328 (Final with Edits).docx |

Please down-load into your folder of drafts. I think I punched out a couple more sentences since Michael returned his latest copy this morning.

Steve Tryon
Deputy Assistant Director, Resources and Planning
Bureau of Land Management
1849 C Street, NW
Room 5654
Washington, DC 20240
202-208-4896

---------- Forwarded message ----------
From: **Steve Tryon** <stryon@blm.gov>
Date: Wed, Mar 28, 2018 at 12:18 PM
Subject: WHB Report, for 100 Review
To: bsteed@blm.gov, jbrune@blm.gov
Cc: mnedd@blm.gov, kbail@blm.gov

Brian/Jeff,

Attached please find a review copy of the wild horse and Burro strategic report to Congress. I know that several of us on this email chain are on leave this week, but as you know we are now on a 30-day clock and I would like to have this out of BLM's hands and into the hands of the other reviewers (Dep Sec., PMB, and OMB), so that BLM is not the cause of missing another deadline.

This version:
• uses more direct language in the exec summary and in the options about the need for legal authorities and increased funding.
• addresses the outline of requirements from the 2018 omnibus, without specifically spelling out that report language.
• Shows changes since the last version

I assume the next step on this is for Jeff to take a pass through on behalf of 100. Let us know what more you need from 200. We will make time for this project!

st

ps. At some point, I assume you'll have us upload this to DTS, for formal routing. I can do that from home this week when you think we are ready to go.

Sent from my iPhone

Begin forwarded message:

BLM_002203

BLM

# Report to Congress

# Management Options for a Sustainable Wild Horse and Burro Program






# Executive Summary

The Bureau of Land Management (BLM) is providing this report, in accordance with the Consolidated Appropriations Act of 2017 (Public Law 115-31), to improve the management of wild horses and burros on the Western public rangelands.  Since receiving Federal protection in 1971, wild horse and burro populations on public lands have dramatically increased, far exceeding what is healthy for the land and the animals.  The BLM is committed to finding solutions to achieve long-term sustainable populations on the range in a humane manner.

Today the BLM manages and protects our Nation's wild horses and burros on 26.9 million acres of public lands in the West.  The goal of the Wild Horse and Burro Program is to ensure healthy wild horses and burros on thriving public rangelands.  The 1971 Wild Free-Roaming Horses and Burros Act, as amended, contains a variety of tools for managing herd numbers.  However, current congressional appropriation riders prohibit the BLM from using all the authorities available in the Act.  Specifically, Congress blocks the sale of wild horses and burros without limitation and has limited the use of euthanasia.

The BLM retains the ability to gather the animals from the range, but then must care for them until they are adopted or sold.  If the animals are not adopted or sold, the BLM is required to care for them for the remainder of their lives.  The cost of holding and caring for these animals off-range has increased substantially in recent years and remains the largest component of the program's budget.  In Fiscal Year 2017, for example, the BLM spent nearly 60 percent of its $81.0 million budget on the care of animals removed from the range.  That's nearly $48,000 for one unadopted horse that remains in BLM's care over its lifetime.  The cost of caring for the 46,000 unadopted and unsold animals currently in holding will top $1.0 billion over their lifetimes.

In establishing the "Appropriate Management Level" (AML) for wild horses and burros on the public lands, the BLM uses scientific principles of rangeland management to determine the population of wild horses and burros that the habitat can sustain.  The BLM seeks to protect the rangeland, soil, water, and vegetation resources in balance with other uses, including ranching, hunting, recreation, and wildlife habitat.  The national AML for wild horses and burros is a total of 26,715 animals across 10 western states.  At the end of 2017, the BLM determined these public lands were home to nearly 83,000 wild horses and burros, more than three times the national AML.

Wild horses and burros have no natural predators and herds can double in size every 4 years.  As herd sizes increase, the forage and water resources from the land become depleted, resulting in starvation, dehydration, and death.  In their search for food and water, the animals often move onto private land or along highways resulting in safety issues and habitat destruction for horses and humans alike.  Public-land ranchers have cut back on grazing to accommodate increasing numbers of wild horses and burros.

The current overpopulation of wild horses and burros threatens the overall health of the western rangelands, degrading ecosystem functions and limiting the forage and water available for domestic and wildlife species, including game and nongame species.  For example, overgrazing by wild horses and burros has reduced sagebrush and grass cover vital to Greater Sage-Grouse and has resulted in lower survival rates in those areas.   Overpopulated herds have displaced native species including pronghorn, deer, elk, and bighorn sheep.  Across the Great Basin, areas with wild horses have less plant cover, fewer native plants, and more unpalatable and invasive plant species, including cheatgrass, compared to areas without wild horses.

1

If wild horse and burro populations continue to expand, the impacts to animal and plant species will grow more severe across even larger swaths of the western public rangelands.  The damaging environmental effects may soon become irreversible and large die-offs of wild horses/burros and multiple species of plants and other animals could begin.  The groundwork for this unacceptable outcome has been developing for some time, and certain areas have already experienced damaging effects of overpopulation.  As rangeland health has decreased, animals have died due to a lack of water and forage.  The most inhumane and costly solution is to continue to take no decisive action.

This report details four options for addressing the reality of the situation and improving the management of wild horses and burros over the long term.

**Option I**:  This option focuses on achieving national AML in 8 years, while reducing off-range holding costs dramatically over the first 4 years.  In addition, during the first 4 years, the BLM would achieve AML in Herd Management Areas (HMAs) that overlap priority habitat for multiple species. This would require making use of all legal authorities contained in the Act (especially sale without limitation and euthanasia of unadopted or unsold animals), including use of contraceptives and limited sterilization techniques.

Under this option, the national AML of 26,715 wild horses and burros would be achieved in 2026.

**Option II**:  This option focuses on achieving national AML in 10 years using contraceptive fertility control treatments such as Porcine Zona Pellucida (PZP) and minimal permanent sterilization of mares or stallions.  Current operations to dart mares with a contraceptive in HMAs would continue, where this option is effective.  Under this option, the off-range costs of caring for animals would significantly increase over current levels, because of increased reliance on off-range care.  Due to the large numbers of animals being held in off-range facilities, the cost of this option could be greatly affected by changes in the cost of contracting for off-range pastures, as the BLM would need more facility space than is currently available.  The costs reflected in this option depend upon identifying partners who are willing and able to provide low-cost, off-range housing for excess animals.  In addition, as in Option III, the BLM or its partners would attempt to secure lower cost, pasture-based holding facilities in lieu of short-term corrals that resemble livestock feedlots and cost twice as much as pasture facilities.

Under this option, the national AML of 26,715 wild horses and burros would be achieved in 2028.

**Option III:**  This option focuses on achieving national AML in 6 years using an aggressive removal operation in conjunction with sterilization of 3,000 mares and stallions gathered annually, and later returned to the range.  Current operations to dart mares with a contraceptive in some HMAs would continue.  Under this option, far fewer animals would be gathered and returned to the range than Option II, and all of those animals would be sterile upon reintroduction.  Animals that are gathered and not sterilized would be moved to off-range facilities.  As the off-range population increases, keeping control of holding costs will require continually acquiring additional low-cost contracted pasture space to alleviate the need to keep animals in expensive short-term corrals.  The BLM would strive to keep corral populations to minimum levels necessary to supply the adoption pipeline.

Current research on long-term contraceptives would continue, with the possibility of greater use of contraceptives in the future should a longer-acting agent prove to be effective.  It should be noted that the additional demand for long-term pastures could significantly increase program costs over current levels until AML is achieved, at which point costs would begin to decline.

2

Finally, under this option the BLM would institute a program to increase adoptions by providing a monetary incentive to the adopter of up to $1,000. While this would increase costs in the initial years, it will quickly pay for itself by lowering off-range holding expenditures.

Under this option, the national AML of 26,715 wild horses and burros would be achieved in 2024.

**Option IV:** This option would achieve national AML in 2030 by using an aggressive effort to gather, sterilize, and return wild horses and burros to the range, while also developing the same adoption incentives described in Option III. The BLM would hire veterinarians to sterilize and return approximately 18,000 animals per year in each of the first 5 years and 8,000 in year 6. Under this option, off-range populations would begin to decrease almost immediately through natural mortality and continued efforts for private care placement. In addition, the total number of animals removed each year would be less than the annual adoption/sale levels, keeping down costs in the out years. In fact, program costs would be reduced to less than current levels in the seventh year. By the tenth year, off-range populations would begin to decline even faster through natural mortality in BLM's contracted off-range pastures, as almost all animals held in those pastures would reach normal lifespan limits.

Fertility control treatments would focus on permanent sterilization through FY24 when more than 80 percent of the animals on the range would be permanently sterilized. Sterilizing this number of animals for 6 years would take high levels of coordination in all areas of the BLM, including updating our environmental analysis, contracting for services, and training personnel. There is a distinct risk that the BLM might need to hold and care for the animals gathered in the initial year for longer than planned to achieve these totals, which would increase costs in the first year above stated levels. At the same time, if this were to occur, the BLM would continue all efforts to increase adoptions to not only reduce holding costs, but also reduce the need to sterilize animals and return them to the range. However, once the environmental analysis is complete and the service contracts are in place, the BLM could effectively implement the plan. Current research on long-term contraceptives would continue, with the possibility of reducing the need for permanent sterilization and increasing the use of contraceptives in the future should a longer-acting agent prove to be effective.

Finally, under this option, the BLM would institute a program to increase adoptions by providing a monetary incentive to the adopter of up to $1,000. If the incentive proves to increase adoptions beyond the planned 5,000, the BLM could decrease the use of permanent sterilization and increase removals to match adoption/sale totals. While this incentive would increase costs in the initial years, it will quickly pay for itself by lowering off-range holding expenditures.

Under this option, the national AML of 26,715 wild horses and burros would be achieved in 2030.

Regardless of which option is chosen, the BLM will need the help of all stakeholders – Congress, livestock operators, state and local governments, and public interest organizations – to solve the wild horse and burro overpopulation challenge. The BLM is open to working with partners on common sense solutions and will continue to pursue collaboration where possible.

3

## Background

The BLM's mission is to sustain the health, diversity, and productivity of America's public lands for the multiple use and enjoyment of present and future generations.  To implement this mission, the BLM must ensure the health of America's public lands for the species and multiple uses depending on them, including the Nation's wild horses and burros.  As directed by Congress under the Wild Free-Roaming Horses and Burros Act of 1971, as amended (Act), the BLM protects and manages the wild horses and burros that roam 26.9 million acres of Western public rangelands.  For more information about the history of the BLM's wild horse and burro program and a full, amended text of the Act, refer to: https://www.blm.gov/programs/wild-horse-and-burro/about-the-program/program-history.

The Act requires the BLM to "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands," and if the BLM determines that an overpopulation exists and action is necessary to remove excess animals, to "immediately remove [them] from the range so as to achieve appropriate management levels."  The Act defines excess animals as "wild free-roaming horses or burros (1) which have been removed from an area by the Secretary pursuant to law or, (2) which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area."  After excess animals are removed from the range, the Act authorizes disposal through adoption, sale, and euthanasia. For more than a decade, Congress has used appropriation riders to block both the unrestricted sale and euthanasia of wild horses and burros.

When Congress first passed the Act in 1971, it found that wild horses and burros warranted legal protection.  Now, 46 years after that law was enacted, wild horses and burros are experiencing population levels that are unsustainable for the animals and the range.



A wild horse mare and foal in very poor condition because of lack of forage just outside Las Vegas, Nevada in August 2015. *Photo by BLM.*



An enclosure shows the negative impacts of wild horse over-grazing of rangeland resources. *Photo by BLM.*

## *America's Wild Horse and Burro Challenge*

Herd Management Areas (HMAs) are areas where wild horse and burro herds were known to exist at time of enactment of the Act and that have been designated for wild horse and burro management through BLM's land use planning process.  For each HMA, the BLM has determined the appropriate management level (AML) by applying principles of rangeland management and wildlife biology through a National Environmental Policy Act (NEPA) review process.  These reviews are the process by which the BLM establishes the number of horses and burros that can exist in an HMA, while also protecting rangeland, soil, water, and vegetation resources in balance with other multiple uses.

4

Current populations of wild horses and burros far exceed the established AML in most HMAs.  The national AML for wild horses and burros is 26,715 animals in 10 western states.  As of the end of 2017, however, public lands were home to approximately 73,000 adult wild horses and burros, plus an estimated 13,000 foals, for a total of 86,000 animals.



Wild horses crossing the road in Antelope Valley HMA in NV.  *Photo by BLM.*

Based on existing research, wild horse herds increase 15 to 20 percent annually and can double in size in just 4 or 5 years.  The herds have no natural predators.  Current methods of fertility control have shown limited success, and even then only in smaller herds that are already at or near AML.  Further compounding the challenge, the number of adoptions have not kept pace with the number of horses that the BLM has needed to remove from the range (refer to Chart 1).

**Chart 1 - Wild Horses and Burros Removed/Adopted and Off-Range Population (FY10-FY17)**



| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|
| ■Total Removed | 10,255 | 8,877 | 8,255 | 4,196 | 1,857 | 3,819 | 3,320 | 4,209 |
| ■Total Adopted | 3,074 | 2,844 | 2,583 | 2,311 | 2,135 | 2,631 | 2,912 | 3,602 |
| ■Off-Range Population + | 34,979 | 40,589 | 46,429 | 49,687 | 48,179 | 47,545 | 45,661 | 43,813 |

+ Population as of Septebmer 30 of each fiscal year.

Off-range, the BLM is currently caring for about 46,000 unadopted and unsold animals, including about 11,000 in 27 BLM corrals (facilities with a capacity for holding and caring for nearly 23,000 animals until adopted, sold, or transported to off-range pastures) and about 35,000 in 30 contracted private pastures (primarily in Iowa, Kansas, Nebraska, and Oklahoma with a capacity of almost 38,000).  These are the more productive pastures of the Midwest, and animals there tend to live longer compared to wild horses on the range.

BLM_002209

The total cost of operating off-range holding facilities is nearly $48 million annually, accounting for nearly 60 percent of the BLM's Fiscal Year (FY) 2017 budget for the wild horse and burro program (refer to Chart 2). This cost, relative to the overall program budget, results in less funding to gather and remove excess horses and burros, causing the on-range population of wild horses and burros to continue to grow.

**Chart 2 - Holding Costs Compared to BLM's Total Expenditures for the Wild Horse and Burro Program (FY07-FY17).**



| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ■ Total Holding Expenditures * | 20,754 | 27,492 | 27,666 | 31,088 | 36,290 | 43,279 | 47,531 | 43,623 | 52,552 | 49,428 | 47,536 |
| ■ Total Expenditures * | 37,743 | 46,585 | 44,926 | 56,596 | 65,812 | 70,713 | 74,604 | 67,923 | 75,147 | 78,298 | 81,475 |
| ■ % (Holding) of Expenditures | 55% | 59% | 62% | 55% | 55% | 61% | 64% | 64% | 70% | 63% | 58% |

From 2013 through 2016, the on-range population nearly doubled (refer to Chart 3). This trend is

6

expected to continue unless removals are increased.  As currently managed, by the summer of 2019 there will likely be well over 100,000 wild horses on BLM-managed land, with up to 20,000 more the year after.

**Chart 3 - Wild Horse and Burro Populations On/Off Range (FY01-FY17)**



Overpopulated herds are already having a negative impact on the health of the range and on the health of the wild horses and burros themselves.

Western rangelands have limited forage production capability—soils are often shallow and moisture is limited.  The current overpopulation of wild horses and burros on the arid rangelands of the West threaten the health of the western rangelands and the quality and quantity of forage and water available for domestic and wildlife species, including game and nongame species, as well as federal and state threatened, endangered, and sensitive species.

7

 

Wild horses in poor condition at a degraded spring in Nevada's Seaman HMA, July 2013. *Photo by BLM,*

Two thin wild horses in the Goshute Herd Management Area, September 2016. *Photo by BLM.*

Impacts to a variety of species will grow more severe across even larger swaths of the western public rangelands if populations continue to expand. America is nearing the time when the devastating effects of wild horse and burro overpopulation become irreversible and large die-offs of wild horses/burros and multiple species of plants and other animals could begin. The groundwork for this unacceptable outcome has been developing for some time, and certain areas have already experienced damaging effects of overpopulation. As rangeland health has decreased, animals have died due to a lack of water and forage.



The Maverick-Medicine HMA in Nevada has very limited water and was 474 percent over the AML as of March 1, 2017. The BLM conducted an emergency gather to remove 60 horses in 2016 to rescue the horses and relieve demand on Cherry Spring. Pictured is a group of horses at Cherry Spring in August 2017 waiting for water to come to the trough. *Photo by BLM.*

8

## Impacts to Greater Sage-Grouse and Native Ungulates

A 2017 USDA report stated that wild horse presence can have broad effects on ecosystem function in the sagebrush biome.[1]  Another scientific study determined that wild horses and burros are a present and widespread threat in 10 of 29 Greater Sage-Grouse populations in the western portion of the bird's range.[2]  In the Great Basin, areas with wild horses had less shrub cover, plant cover, species richness, native plant cover, and overall plant biomass, and more unpalatable and invasive plant species, including cheatgrass, compared to areas without horses.[3,4]  Grazing by wild horses can have severe impacts on water source quality, aquatic ecosystems, and riparian communities that may be important for Greater Sage-Grouse.  Greater Sage-Grouse survival rates are lower in areas of reduced sagebrush, grass, and for cover, so wild horse overgrazing can influence conservation and restoration efforts for that species. At water sources, wild horses displace native ungulates including pronghorn antelope, deer, and elk.[5]

## Public Involvement

The BLM has a long history of involving the public in the management of wild horses and burros.  In preparing this report, the BLM considered the public opinions (see Appendix 3, Public Opinion) already expressed in the previous strategic planning efforts, NEPA documents, editorials, legal actions, letters, and other materials and forums generated over many years of interacting with the public, interest groups, and state and local governments.  It is important to note that the public will continue to be involved in the BLM's management of wild horses and burros on a regular basis as site-specific actions, such as gathers and fertility control, are planned and implemented.

### The National Wild Horse and Burro Advisory Board

The BLM's National Wild Horse and Burro Advisory Board consists of representatives from multiple interest groups and the public.  Board members represent various interests: wild horse and burro advocacy groups, wild horse and burro research institutions, veterinarians, natural resource organizations, humane advocacy groups, wildlife associations, and livestock organizations, plus the general public with a special knowledge of equine behavior.  The Board meets periodically to discuss program challenges and make recommendations for the BLM to consider.

At a meeting in September 2016, the Board recommended that the BLM offer for sale without limitation all suitable animals in long- and short-term holding which are deemed unadoptable.  Those animals that remain unsold would then be destroyed in the most humane manner possible.  In addition, at the most recent meeting in October 2017, the Board offered the following recommendations for future wild horse and burro management.  The Board recommended that the BLM:

---

[1] Chambers, J.C. et al. 2017. Science framework for conservation and restoration of the sagebrush biome. Part 1. Science basis and applications. USDA General Technical Report RMRS-GTR-360.
[2] USFWS. 2013. Greater Sage-Grouse conservation objectives: final report. U.S. Fish and Wildlife Service, Denver, Colorado. February 2013.
[3] Beever, E.A. and C.L. Aldridge. 2011. Influences of free-roaming equids on sagebrush ecosystems, with focus on Greater Sage-Grouse. Studies in Avian Biology 38:273-290.
[4] Davies, K.W. et al.  2014.  Effects of free-roaming horses on semi-arid rangeland ecosystems: an example from the sagebrush steppe.  Ecosphere 5:1-14.
[5] Hall, L.K. et al. 2016.  Influence of exotic horses on the use of water by communities of native wildlife in a semi-arid environment.  Journal of Arid Environments 127:100-105.

BLM_002213

1. Phase out long-term holding over the next 3 years and apply that budget to on-range management and adoptions.
2. Create funding mechanisms to maximize adoptions and or sales, especially through successful programs, and to include international adoptions and/or sales.
3. Increase funding for reversible fertility control by $3 million in FY 2019.
4. Immediately (within the next 3 years) address overpopulation by removing animals from the range to achieve AML in accordance with the Act.
5. Use the help and assistance of all state and local agencies, organizations, and individuals in achieving AML.
6. Maintain AML by using fertility control to slow population growth at levels where removals equal the adoption demand.
7. Adjust AML where appropriate.

## The 2017 National Wild Horse and Burro Summit

The State of Utah, Utah State University, the Berryman Institute, and the Wild Sheep Foundation co-hosted a summit in Salt Lake City, Utah on August 22-24, 2017.  The goal of the summit was "full implementation of the 1971 Wild Horse and Burro Management Act (Act)."  Participation included representatives of state, local, and tribal governments, academia, public land users, conservation groups, wildlife interest groups, and Federal agencies.

The workshop included a tour to view on-the-ground management issues and sessions on wild horse and burro policy, legal matters, science, and best management practices.  Participants shared their preferences regarding the future management of BLM's wild horse and burro program.  Options 1 and 2 within this document are generally consistent with the preferences of the majority of the participants. Those preferences are shown in Attachment 1.

## Consultation with Outside Groups

The Humane Society of the United States, the American Society for the Prevention of Cruelty to Animals, Return to Freedom, and the American Mustang Foundation, all advocate for a management approach founded on the following principles:

- Conduct removals to quickly achieve AML and initially focus on those areas of most immediate concern due to potential conflicts with native wildlife, rangeland degradation, and human-horse conflict;
- After AML achievement, implement aggressive fertility control and continue wherever feasible to prevent the need for future large scale removals;
- Horses removed from the range must be relocated into large cost-effective pasture holding facilities, and where possible, public-private partnerships with landowners and non-profits must be pursued; and
- Promote adoptions with better marketing and support from partner organizations to increase adoptions and reduce captive populations and costs.

BLM_002214

## Other Considerations

_Population Growth Suppression_**:**  While fertility control methods will decrease the number of new horses and burros born each year, the only way to immediately and significantly reduce the on-range population is to gather and remove excess horses and burros.  At the same time, the BLM believes that fertility control vaccines and sterilization are important tools to help maintain AML once it has been achieved.

Given the scope and scale of the current overpopulation, significantly reducing the population growth rate of wild horses and burros through application of currently available fertility control vaccines would not be logistically feasible as there are 35,000 to 40,000 mares on the range that would need to be gathered, mostly using helicopters, and treated every year.  However, the BLM recognizes that permanent sterilization techniques would be a more effective long-term solution to controlling population growth than currently available vaccines.  Under all options, the BLM will utilize permanent sterilization techniques to take advantages of this fact.  Darting is effective as a means to administer fertility control vaccines, but only in limited situations in certain smaller HMAs where the wild horse population is at or near the AML and the horses can be approached within about 40 yards on a regular schedule.

In a breeding population, the majority of the adult males and females in the population participate in breeding and add to herd growth.  A single stallion (male) usually breeds about 6 to 8 mares (females) a year in his own harem but has the capability of siring 50 or more foals in a year if he has access to the mares.  An adult mare can produce a foal every year if she is healthy and in good condition.  Typically, about 70 percent of the mares in a herd have a foal each year.  When breeding age mares are replaced by sterilized animals—whether they are geldings (castrated males) or spayed females— the overall size of the herd can remain the same while the portion of the herd that is actively breeding and contributing to population growth is reduced.  Fewer breeding females in the herd means fewer foals and slower population growth, however just replacing breeding stallions with geldings will not have an appreciable effect on population growth.  In this scenario, with a "non-reproducing component," the herd can still be a thriving, reproducing herd.  However, the advantage is the reproducing component of the herd is smaller and the non-reproducing animals in the herd simply live out their lives on the range as free-roaming animals that do not participate in population growth.

No single population growth suppression tool is universally appropriate for all HMAs.  As AML is achieved in various HMAs, a variety of fertility control methods will need to be used.  Research continues into creating longer-lasting vaccines and developing new methods of contraception.  The BLM will deploy fertility control methods that are more effective if their development is successful and application is cost-effective, which could significantly decrease the need for gathers over time.

Limits on Gather Operations:  Due to the size of many HMAs, the distribution of animals on the HMAs, the logistics of gather operations, the availability of contractors, and the operational capability to manage animals in BLM's off-range corrals, there is a limit to the number of animals that can be gathered and removed in any single year.  The BLM estimates the maximum number of horses and burros that could be gathered and removed is about 20,000 animals annually.  For the longer-term (year 10), the BLM estimates that fewer than 4,000 animals would be gathered and removed annually under any of the options outlined in this report.  The BLM is looking at ways to increase capacity for both gather operations and managing those animals in off-range facilities.

11

<u>Adoption Incentive Program:</u>  To increase the number of animals placed into private care, one of the options presented in this report assumes that an incentive program will be developed to offer private care providers $1,000 at the point of adoption, with proper controls.  This will allow adopters to help defray expenses for care and training of adopted animals, and will increase the chances that the animals remain in private care for the rest of their lives.  This investment would save money for the taxpayer and the BLM program in the first year of implementation alone. For instance, if that same adopted animal were instead held in a short-term holding facility, it would have cost the United States $1,000 after only 200 days in captivity.  Over a period of 25 years, holding that same animal in an off-range corral would have cost the taxpayers nearly $46,000.

<u>Intergovernmental and International Transfer of Animals:</u>  Due to the increased interest from private, non-government organizations as well as countries outside the US, an international program will be developed to allow the use of wild horses and burros for various purposes. These include border patrol, humanitarian efforts, or economic development.  In its 2017 appropriations, the BLM received the authority to transfer animals to Federal, state, and local government agencies.  However, other than selling animals, no authority exists under the Wild Free-Roaming Horses and Burros Act to transfer wild horses and burros to private, non-government entities nor outside of the country.

## Legal Authorities to Implement Options Presented in this Report

Each of the four options presented in this report would require new legal authorities, or benefit from clarified legal authorities.  Included among those possible authorities are the following:

*Sales without limitation and euthanasia.*  Given the scope of America's wild horse and burro challenge, the BLM has previously requested authority to implement the Act as amended (i.e., the ability to sell without limitation all excess wild horses and burros and euthanize horses for which an adoption demand does not exist).  Returning authority to the BLM to sell wild horses and burros without limitation would help considerably, but this authority alone would not be sufficient.

*Amendments to the Act.*  The following amendments to the Act would facilitate a more sustainable approach to the long-term management of wild horses and burros and help control costs over the long term.  Amendments could consider one or more of the following, though not all of them are required to support the four options presented in this report.

1. Provide that animals that are sale-eligible, pursuant to the Wild Free-Roaming Horses and Burros Act, are no longer subject to the protections of the Act, and should be offered for sale as soon as is practicable.
2. Stipulate that areas identified for long-term management may be managed as non-reproducing herds, in whole or part, through the use of surgical and/or chemical sterilization methods.
3. Lower the sale-eligibility age from older than 10 years to older than 5 years.
4. Eliminate the provision that limits an adopter to acquire title to only 4 animals per year.
5. Reduce the time to title an adopted wild horse and burro from 1 year to 6 months.
6. Provide a) for transfer of wild horses and burros to nonprofit organizations or other countries for humanitarian purposes or to promote economic development outside the United States, and b) that such transfer causes animals to lose their status as wild horses and burros under the Act.
7. Enable the BLM to redirect receipts from sales towards gathering and removing excess wild horses and burros from the range instead of using those funds for the adoption program.

12

BLM_002216

8. Provide permanent authority to transfer excess wild horses or burros that have been removed from the public lands to other Federal, state, and local government agencies for use as work animals.

*Categorical Exclusions from Detailed Review Under NEPA.*  Currently when planning for gather and removal operations and other management activities, such as administering fertility control, the BLM must conduct a lengthy environmental analysis process to comply with NEPA, typically through an environmental assessment (EA).  These analyses are completed for either individual HMA or groups of HMAs (Complex).  Development of the individual analysis documents can take hundreds of hours of staff time as well as periods of public involvement. The BLM has been writing these EA documents for over 40 years and BLM's decision-makers routinely conclude that the proposed actions would not have a significant effect on the quality of the human environment (individually or cumulatively). NEPA regulations provide that categories of actions that individually or cumulatively do not have a significant effect on the human environment may be excluded from further environmental review through a "categorical exclusion."  Thus, the BLM recommends that certain wild horse and burro management actions be categorically excluded from detailed NEPA analysis, specifically:

1. Removal of excess wild horses and burros utilizing helicopter, bait/water, and other trapping techniques for the achievement and maintenance of AML, to promote the health and safety of human populations, or to respond to emergencies and declining resource conditions (e.g., water and forage) caused by disease, drought, wildfire, and extreme weather events.
2. Application of population growth suppression techniques, including fertility control such as sterilization, vaccines and contraception, in wild horses and burros for the achievement and maintenance of AML.
3. Unrestricted sale of excess wild horses and burros for which an adoption demand does not exist.
4. Euthanasia of healthy excess wild horses and burros for which an adoption or sale demand does not exist.
5. Sterilization of wild horses and burros for the purpose of managing HMAs as non-reproducing in whole or part.

# Options for Management of Wild Horses and Burros

**Option I:  Achieve AML in 8 Years, Using All the Authorities within the Act, while Substantially Decreasing Off-Range Holding Costs**

Under this option, the BLM would achieve AML within priority HMAs (about 115 of the 177 HMAs, or about two-thirds of the total, including HMAs that overlap priority Greater Sage-Grouse habitat) by 2021, and within all HMAs by 2026, through an intensive gather and removal program for excess wild horses and burros to dramatically decrease on-range populations.  In addition, any animals returned to the range during gather operations would be treated/boostered with some form of population growth suppression, focusing mainly on temporary fertility control vaccines or where appropriate, minimal amounts of permanent sterilization to help maintain AML. Off-range actions would focus on placing excess horses and burros into private care through adoptions and sales, including international sales to countries for agricultural, law enforcement, park management, and other uses.  Animals not placed in private care would be sold without limitation or euthanized.

13

**Factors for Success**

1. Congress would remove prohibitions that preclude the BLM from fully implementing the Act as amended.  This would allow the BLM to sell without limitation all excess wild horses and burros, and in the event an adoption or sale demand by qualified individuals does not exist, destroy excess wild horses and burros in the most humane and cost-efficient manner possible.
2. The BLM would acquire funding, including through private/public partnerships, to address the higher cost of gathering, removing, selling, and euthanizing substantially higher numbers of excess horses than currently planned.
3. The BLM would complete needed resource management planning and NEPA reviews to implement this option.  Completion of NEPA reviews would be much more efficient and timely if Congress authorized the categorical exclusions recommended by the BLM.
4. The BLM would find enough trained veterinarians to perform the necessary number of permanent sterilization procedures.

**Total Funding Requirements:**  Within FY 2019 the BLM could begin implementing this option to achieve AML in priority HMAs by FY 2021 and non-priority HMAs by FY 2026  Full implementation of this option will require both appropriated funds and public/private partnerships and resources.

From FY 2019 through FY 2021, the number of excess horses removed and the number of animals adopted, sold and euthanized would increase from FY 2018 levels.  The BLM estimates a total funding need, including public/private partnerships and other sources, equivalent to about $115 million per year for that time period.  Total program costs would be reduced each year after that.  In FY 2022, off-range pastures would be closed and costs would continue to decrease through FY 2026 when AML would be achieved.  Once again, the BLM would look to reduce the need for appropriated funding through private-public partnerships and working with the BLM Foundation to create these opportunities.

Once AML is achieved, the annual budget for the wild horse and burro program would be about $65 million per year (adjusted for inflation) due to the significant reductions in holding and removal costs.  At that time, funding and public/private partnerships and resources would be used to manage the populations through fertility control and other appropriate means.  In the event more efficient population control methods are developed and deployed, and less excess animals have to be removed, costs for managing the program in the out-years may be reduced further.

See Attachment 2, "Cost Estimates," for more information on the FY 2017 data used to estimate these budget projections.  These cost estimates are based on actual FY17 costs.  For the purposes of this option, the costs for out-years are increased over time based on anticipated inflation.

**Results of Implementing this Option:**  This option would allow the BLM to reach AML in 8 years with increasingly less annual appropriations.  Range conditions would continue to improve over this time and animals will be less likely to move outside of the HMAs.  This option would also allow the BLM to effectively monitor HMA condition as population decreases to help determine if AML adjustments are necessary.

14

**Option II:  Achieve AML in 10 Years Using Existing Authorities, By Substantially Increasing Program Funding**

Under this option, the BLM would achieve AML within priority HMAs (about 115 of the 177 HMAs, or about two-thirds of the total, including HMAs that overlap priority Greater Sage-Grouse habitat) by 2021, and within all HMAs by 2028, through a gather and removal program for excess wild horses and burros to dramatically decrease on-range populations, while treating large numbers of animals with currently available fertility control vaccines starting in 2021. Aggressive (i.e. permanent sterilization) fertility control treatments would be used to maintain AML once achieved.  Off-range actions would focus on placing excess horses and burros into private care through adoptions and sales, including international sales to countries for agricultural, law enforcement, park management, and other uses.  However, even in best-case scenarios, off-range populations would increase significantly over 10 years, as adoption and sale would not be able to match removals.  Animals not placed in private care would remain in BLM care until natural mortality.  The BLM would focus on finding partners who are willing and able to provide low- to no-cost housing for excess animals.

**Factors for Success**

1. The BLM and its partners would acquire funding to address the increased cost of gathering, removing, and adopting substantially higher numbers of excess horses than currently planned.
2. The BLM and its partners would acquire funding and authority to transport animals that have already been sold to nonprofit organizations or other countries for humanitarian purposes or to promote economic development, and therefore are no longer considered to be wild horses and burros under the Act.
3. The BLM would be able to complete needed resource management planning and NEPA reviews to implement this option.  Completion of NEPA reviews would be much more efficient and timely if Congress authorized the categorical exclusions recommended by the BLM.
4. The BLM would be able to find partner(s) who are willing and able to provide low-cost off-range housing and care for excess animals.

**Total Funding Requirements:**  The BLM estimates a total funding need, including public/private partnerships and other sources equivalent to about $116 million in FY 2019 and increasing to $246 million in FY 2027.  Total program costs slowly decrease from FY 2028 and beyond as the number of animals in off-range facilities would decrease over time due to natural mortality.  Once again, the BLM would look to reduce the need for appropriated funding through private-public partnerships and working with the BLM Foundation to create these opportunities.  In the event more efficient population control methods are developed and deployed, and less excess animals have to be removed, costs for managing the program in the out-years may be reduced.

See Attachment 2, "Cost Estimates," for more information on the FY 2017 data used to estimate these budget projections.  These estimates are based on actual FY17 costs.  For the purposes of this option, the costs for out-years are increased over time based on anticipated inflation.

**Results of Implementing this Option:**  This option allows the BLM to reach AML in 10 years while focusing off-range operations on private care placement and finding low-cost options for animal care through private pastures and local partnerships.  The actual cost of implementing this option could vary widely.  If organizations throughout the United States come forward with lower

15

than current or no-cost options for caring for thousands of animals, the overall cost could be drastically lower.  However, if only a few or no organizations provide services in this way, the BLM could see increases for off-range holding facilities above those estimated in this analysis.  This option does provide the opportunity for the BLM to find care for all animals removed from the range without the need to pursue the removal of Congressional prohibitions on the use of specific authorities available under the Act, as amended.

## Option III:  Achieve AML in 6 Years Using Existing Authorities and Creating an Adoption Incentive Program

Under this option, the BLM would achieve national AML within priority HMAs (about 115 of the 177 HMAs, or about two-thirds of the total, including HMAs that overlap priority Greater Sage-Grouse habitat) by 2021, and within all HMAs by 2024, through an intensive gather and removal program for excess wild horses and burros to dramatically decrease on-range populations. The BLM would use permanent sterilization throughout the 6 years to help control population growth and maintain AML once achieved.

Off-range actions would focus on placing excess horses and burros into private care through adoptions and sales, including international transfers to countries for agricultural, law enforcement, park management, and other uses.  Animals not placed in private care would remain in BLM care until natural mortality.  This option focuses on large removals and permanent sterilization over the first few years to get to AML in key areas while allowing time for fertility control treatment research to produce reliable options for long-lasting, easily administered vaccines.  Ultimately, if the research is successful, this would reduce the need for removals and significantly reduce future funding needs.

In addition, an adoption incentive program would be established to increase adoptions to good homes, thereby reducing future funding needs.  An incentive program of $1,000 per animal, given at the point of adoption with appropriate controls, would allow adopters to defray part of the expenses for care and training of these animals. This investment would help ensure these animals remain in private care for the rest of their lives and would also result in considerable savings for the taxpayer.  If that same adopted animal were held in a short-term facility, for example, it would cost the United States $1,000 after only 200 days in captivity.  Over a period of 25 years, holding that same animal in an off-range corral would cost the taxpayers nearly $46,000.

### Factors for Success

1. The BLM and its partners would acquire funding to address the cost of gathering, treating, and removing substantially higher numbers of excess horses and burros than currently planned.
2. The BLM would be able to complete needed resource management planning and NEPA reviews to implement this option.  Completion of NEPA reviews would be much more efficient and timely if Congress authorized the categorical exclusions recommended by the BLM.
3. The BLM would be able to find enough trained veterinarians to perform the necessary number of permanent sterilization procedures.
4. The BLM could acquire significant acres of additional off-range pasture space through partners and contractors without inflationary pressures causing large increases above current cost levels.

16

**Total Funding Requirements:**  Under this option, for the next 10 years, the number of excess horses removed and the number of animals adopted/sold would increase from FY 2018 levels. The BLM estimates a total funding need, including public/private partnerships and other sources equivalent to about $133 million in FY 2019 and increasing to $147 million in FY 2023, at which time costs would reduce to about $72 million in FY 2028.  Total program costs continue to decrease from FY 2029 and beyond, as the number of animals in off-range facilities would decrease over time due to natural mortality and removal operations would be minimized.  Once again, the BLM would look to reduce the need for appropriated funding through private-public partnerships and working with the BLM Foundation to create these opportunities.  In the event more efficient population control methods are developed/deployed and less excess animals have to be removed, costs for managing the program in the out-years may be reduced further.

See Attachment 2, "Cost Estimates," for more information on the FY 2017 cost data used to estimate these budget projections. These cost estimates are based on actual FY17 costs.  For the purposes of this option, the cost for out-years are increased over time based on anticipated inflation.

**Results of Implementing this Option:**  This option allows the BLM to reach national AML in 6 years while focusing off-range operations on private care placement and finding low-cost options for animal care through private pastures and local partnerships.  The actual costs of implementing this option could vary widely.  If organizations throughout the United States come forward with lower than current or no-cost options for caring for thousands of animals, the overall costs could be drastically lower.  However, if only a few or no organizations provide services in this way, the BLM could see increases for off-range holding facilities above those estimated in this analysis. This option provides the opportunity for the BLM to find care for all animals removed from the range with the current Congressional prohibitions on the use of specific authorities available under the Act, as amended.

## Option IV:  Achieve AML in 12 Years Using Existing Authorities, Creating an Adoption Incentive Program, and Increasing Permanent Sterilization

Under this option, the BLM would achieve national AML within all HMAs by 2030, through a program of intensive gathering, permanent sterilization, and return of sterilized animals to the range to decrease on-range populations through natural mortality over 12 years.  The BLM would use permanent sterilization through the first 6 years to help control population growth, at which time over 80percent percent of the on-range population would be permanently sterilized.

Off-range actions would focus on placing excess horses and burros into private care through adoptions and sales, including international transfers to countries for agricultural, law enforcement, park management, and other uses.  Annual removals would stay within the annual adoption/sale totals to allow for steady decreases in off-range populations.  This option focuses on permanent sterilization over the first 6 years, although during this time fertility control treatment research would continue in hopes of producing reliable options for long-lasting, easily administered vaccines.  Ultimately, if the contraceptive research is successful, this would reduce the need for permanent sterilization.

In addition, an incentive program would be established to increase adoptions to good homes, thereby reducing future funding needs.  An incentive program of $1,000 per animal, given at the

17

point of adoption with appropriate controls, would allow adopters to defray part of the expenses for care and training of these animals.  This investment would help ensure these animals remain in private care for the rest of their lives and would also result in considerable savings for the taxpayer.  If that same adopted animal were held in a short-term facility, for example, it would cost the United States $1,000 after only 200 days in captivity.  Over a period of 25 years, holding that same animal in an off-range corral would cost the taxpayers nearly $46,000.

**Factors for Success**

1.  The BLM would need to complete resource management planning and NEPA reviews to implement this option.  Completion of NEPA reviews would be much more efficient and timely if Congress authorized the categorical exclusions recommended by the BLM.
2.  The BLM would be able to find enough trained veterinarians and/or facilities to perform the necessary number of permanent sterilization procedures.

**Total Funding Requirements:**  Under this option, for the next 10 years, the number of excess horses removed and the number of animals adopted/sold would increase from FY 2018 levels. The BLM estimates a total funding need, including public/private partnerships and other sources, of about $135 million in FY 2019 and increasing to $143 million in FY 2023, at which time costs would reduce to about $104 million in FY 2024.  Total program costs would then decrease to about $80 million from FY 2025 to FY 2030, at which time, costs could significantly decrease as animals in pasture facilities reach natural lifespan limits and natural mortality levels begin to increase.  In the event more efficient population control methods are developed and deployed, and less animals have to be permanently sterilized, costs for managing the program in the out-years may be reduced further.

See Attachment 2, "Cost Estimates," for more information on the FY 2017 cost data used to estimate these budget projections.  These cost estimates are based on actual FY17 costs.  For the purposes of this option, the costs for out-years are increased over time based on anticipated inflation.

**Results of Implementing this Option:**  This option allows the BLM to reach national AML in 12 years while focusing off-range operations on private care placement and finding low-cost options for animal care through private pastures and local partnerships.  The actual costs of implementing this option could vary widely.  This option provides the opportunity for the BLM to find care for all animals removed from the range with the current Congressional prohibitions on the use of specific authorities available under the Act.  While on-range populations would not decrease as quickly as in other options, option IV focuses on population control through permanent sterilization and lets natural mortality on the range decrease population levels over time.

# Conclusion

In each of the four options addressed above, the BLM will need the help of all stakeholders – Congress, livestock operators, state and local governments, and public interest organizations – to solve the wild horse and burro overpopulation challenge.  The BLM looks forward to working with Congress and other interested parties on common sense solutions and will continue to pursue collaboration where possible.  We request that Congress examine each of the options and advise on which of the tools it deems most suitable for addressing this urgent challenge.

18

## Attachment 1 - National Wild Horse and Burro Summit - Preferences of Participants

The State of Utah, Utah State University, the Berryman Institute, and the Wild Sheep Foundation co-hosted a summit in Salt Lake City Utah on August 22-24, 2017.  The goal of the summit was "full implementation of the 1971 Wild Horse and Burro Management Act (Act)."  Participation was by invitation and included representatives of state, local and tribal governments, academia, public land users, conservation groups, wildlife interest groups, and federal agencies.

The workshop included a tour to view on-the-ground management issues and sessions on wild horse and burro policy, legal matters, science, and best management practices.  Participants shared their preferences regarding the future management of BLM's wild horse and burro program.  Summit participants who voted in the session indicated their level of support for various suggestions to address horse and burro issues.

Highly-supported options:

- 99 percent Commercial use of horses of protein for pet food
- 96 percent Commercial use of horses of protein for zoo animals
- 96 percent of respondents favor changing the current status quo situation
- 96 percent Euthanizing unadoptable horses for population control
- 92 percent Allowing sale without restrictions
- 93 percent Reducing the age of "sale without restrictions" from 10+ years old to 5+ years old
- 92 percent Commercial use of horses of protein for human consumption

Well-supported options:

- 89 percent Permanent sterilization of mares by spaying
- 88 percent Allowing private organizations to acquire/adopt large numbers of horses
- 88 percent Adding additional contraceptives as management tools
- 87 percent Developing additional adoption opportunities outside the U.S.
- 85 percent Developing additional adoption opportunities within the U.S.
- 80 percent Creating coordination committees or working groups at appropriate local scales
- 76 percent Allowing individual states to manage horses within their boundaries without Federal restrictions

Options with mixed levels of support:

- Gathering excess horses off the range and moving them to private leased pastures (43 percent supported, 43 percent opposed)
- Increased use of the contraceptive PZP (63 percent supported, 31 percent opposed)
- Maintaining non-reproducing herds in areas where population could be supplemented by outside sterile horses (60 percent supported, 40 percent uncertain or opposed)
- Attempting rest-rotation grazing systems for horses on the range (40 percent supported, 60 percent uncertain or opposed)
- Reducing horse forage allocation limits for horses in HMAs, effectively reducing AML (68 percent supported, 28 percent unsure or opposed)
- Adding mules to horse herds to control herd growth via harem gathering (21 percent supported, 31 percent uncertain, 48 percent opposed)

19

Options with comparatively low support:

- 98 percent were "completely opposed" to allowing horses to self-regulate on the range; no actions taken
- 94 percent opposed to increasing the number (thus, total acreage) of HMAs
- 92 percent opposed to expanding the size of current HMAs
- 75 percent opposed to BLM hauling water to horses in the same location each year
- 82 percent opposed to reducing cattle AUMs in HMAs

As noted, this information reflects only the opinions of the National Wild Horse and Burro Summit participants who participated in the voting exercise conducted on August 24, 2017. Although those voting represented a diverse cross-section of stakeholders, this information cannot be extrapolated beyond this context.

20

## Attachment 2 - FY 2017 Cost Estimates

| Action | Cost per Unit | Comment |
|---|---|---|
| Removals | $1,000 per head | Based on average cost of animal removed from the range and into a BLM-managed or contracted facility.  Includes cost of shipment to the facility for processing (vaccines, Coggins test, gelding.) |
| Fertility Control | $3,000 per treated mare | Average cost to treat one animal, includes costs to gather enough animals to treat a single mare with a fertility control vaccine. |
| Sale | $1,931 per head | Average cost for all private care placements, including BLM adoptions and those facilitated by partners, like the Mustang Heritage Foundation, Trainer Incentive Program (TIP), sales etc. |
| Euthanasia | $1,000 | Cost of gather not included here.  Includes humanely dispatching the excess animal and disposing of the carcass.  Cost estimates for carcass disposal based on USDA's Animal and Plant Health Inspection Service Programmatic EIS. |
| BLM Adoption | $1,931 per head | Average cost for all private care placements, including BLM adoptions and those facilitated by partners, like the Mustang Heritage Foundation, TIP, sales etc. |
| Holding in BLM corrals | $5.05 per head per day | Includes cost of caring for the animal while in a BLM managed or contracted corral. |
| Off-range Pastures | $1.98 per head per day | Includes cost of caring for the animal until natural death in a contracted pasture. |
| * These cost estimates are based on actual FY17 costs and actions taken.  For the purposes of this options paper, the costs for out-years are increased over time based on anticipated inflation. | | |

21

## Attachment 3 – Public Opinion



A public wild horse and burro advisory board meeting.
*Photo by the BLM.*

There are strong, determined advocacy groups and many thousands of interested members of the public throughout the United States, and internationally, that participate in the "conversation" regarding management of wild horses and burros.  Those who speak out regarding the BLM's wild horse and burro program are generally interested in the well-being of the horses and/or the health of the public lands.  Conflict levels are often high and the program is controversial and politically sensitive.

Many of the management approaches suggested by the public would result in the type of changes that would require the BLM to amend existing Resource Management Plans, and complete appropriate NEPA analysis before they could be implemented.  Changes to existing Federal laws may also be needed. The other management approaches, which are not fully included in any of the options, but were proposed by the public, include:

· *Expand public lands for use by wild horses and burros.*  Another suggested management approach was to return unadopted wild horses to Herd Areas (HAs), or to expand the areas of the public lands designated for their use.  Herd Areas are geographic areas of the public lands identified as habitat used by wild horses and burros in 1971, when they were first protected by the Wild Free-Roaming Horses and Burros Act. These areas were not designated, through the BLM's land use planning process, for long-term management of wild horses and burros. Decisions to return unadopted horses to HAs would require the BLM to amend existing land use plans and complete appropriate NEPA analysis on a case-by-case basis, or on a national level.  Designating lands for wild horse and burro use that are outside the 1971 HA boundaries would require changes to the Act.

· *Make wild horses and burros a principal land use.*  Some suggested a management approach in which wild horses and burros, and wildlife, would be the principal use of the public lands, and other uses would be reduced or eliminated.  These types of actions would require the BLM to amend existing land use plans in accordance with NEPA and applicable Federal regulations and could also require changes to Federal law.  .

22

· *Use only fertility control*.  Others suggested a management approach that would rely on the sole use of fertility control to manage wild horse and burro population size (i.e., no further gathers to remove excess animals).  The current PZP-22 fertility control vaccine is not 100 percent effective and annual retreatments are necessary.  In order to maintain zero growth in the existing population it would be necessary to capture most wild horses every year for the administration of fertility control to target mares.  This is not operationally feasible.  Under any option, the BLM will conduct research into the development of longer acting fertility control agents and other population growth suppression methods, and use a combination of methods to reduce annual population growth.  The goal for this research will be to develop safe, humane, longer-lasting, and more effective methods for managing population size.  At the same time, the BLM recognizes that fertility control vaccines, even with their limited effectiveness, are a crucial component of maintaining AML, especially in those HMAs where it can be applied through ground darting.

· *Let nature takes its course*.  Allowing populations to regulate themselves through starvation, disease, or predators to control wild horse and burro population size was also suggested.  The BLM requested that the National Research Council (NRC) review the Wild Horse and Burro Program to determine if there is credible scientific evidence that population "self-regulation," and/or predation would be effective in controlling wild horse and burro population size before land and herd health is compromised.  The NRC concluded that at the 2013 population levels, contraception or self-limitation strategies may not reduce horse and burro populations to target levels and that horses may first have to be removed.  The NRC also stated that it is evident that the consequences of simply letting horse populations expand to the level of "self-limitation"—bringing suffering and death due to disease, dehydration, and starvation accompanied by degradation of the land—are unacceptable.  The NRC cited previous research stating that wild horses and burros can kill plants through uprooting and trampling, create areas of low vegetation cover, and change plant species composition to favor less desirable or exotic species.  At some point, reduced vegetation cover can lead to accelerated soil erosion and decreased vegetation productivity and rangeland health.

· *Stop using helicopters*.  Another suggested management approach would suspend the use of helicopters to assist in the gather and removal of excess wild horses and burros. The Office of the Inspector General (Report No.: C-IS-BLM-0018-2010, December 2010) found that gathers to remove excess wild horses and burros were necessary and humane.  Several reviews of data from gather operations indicate that gather-related mortality is typically limited to about one half of one percent (0.5 percent) or less, which is very low compared to most capture methods and capture operations for wild animals.  A 2008 General Accounting Office Report (GAO-09-77, October 2008) found that .47 percent of 24,855 horses gathered and removed from 2005 to 2007 in six states accidently died as a result of capture.  Based on the results of these reviews, the BLM will continue to use helicopters to assist in the removal of excess wild horses and burros when it is determined through gather planning that it is the safest, most effective, and most humane manner of doing so.

· *Allocate more public lands for wild horses and burros*. Some commenters suggested the BLM manage wild horses and burros in the future by implementing a reserve design.  Under this approach, wild horses and burros would be allocated large areas of the Western landscape.

23

Population size would be regulated through natural processes.  This approach would require changes in existing Federal law.

· *Base management on herd social dynamics.* Some suggested that future management of wild horses and burros be based on family band structure and herd social dynamics. However, the makeup of individual bands is a dynamic and ever-changing aspect of herd social behavior. Research indicates that 9 to 30 percent of mares change bands (Rutberg, 1990; Singer et.al., from the 2002 United States Geological Survey Expert Panel Report).  Band structure can be made up of a lead stallion and secondary stallion, as well as bachelor bands that contribute to breeding. Research further suggests that one-third of foals are sired by non-harem stallions (National Research Council, 1991, and Bowling and Touchberry from the 2002 USGS Expert Panel Report).  Eagle et.al, 1993, discusses the instability of breeding males in a band.  Based on the current literature, the usefulness of managing to maintain family bands is in question given the extent of changes that take place on a continual basis.

24

| From: | Lutterman, Jason |
|---|---|
| To: | Jeff Krauss |
| Cc: | Michael Reiland |
| Subject: | Fwd: Urgent and close hold |
| Date: | Tuesday, April 24, 2018 2:33:32 PM |
| Attachments: | Director Presentation to Advocacy Groups_JL.pptx |

Jeff -- here's what I sent up to Michael.

Michael, please let us know if you had made any changes to the version I sent you.

Thanks
Jason

--
Jason Lutterman
Public Affairs Specialist (On Range)
National Wild Horse and Burro Program
Bureau of Land Management
Office: (775) 861-6614
Mobile: (202) 304-0967

Visit us online:
www.BLM.gov/WHB

---------- Forwarded message ----------
From: **Lutterman, Jason** <jlutterman@blm.gov>
Date: Wed, Apr 18, 2018 at 1:23 PM
Subject: Re: Urgent and close hold
To: "Reiland, Michael" <mreiland@blm.gov>


Michael, see attached.

Also in \Public Affairs\Presentations\FY18

--
Jason Lutterman
Public Affairs Specialist (On Range)
National Wild Horse and Burro Program
Bureau of Land Management
Office: (775) 861-6614
Mobile: (202) 304-0967

Visit us online:
www.BLM.gov/WHB

On Wed, Apr 18, 2018 at 11:53 AM, Reiland, Michael <mreiland@blm.gov> wrote:
> Jason,
>
> Ok, great.  Thanks!!

Michael

On Wed, Apr 18, 2018 at 2:53 PM, Jason Lutterman <jlutterman@blm.gov> wrote:
Headed back now, will try to get it to you quickly.

Sent from my iPhone. Please excuse any typos.

On Apr 18, 2018, at 10:11 AM, Reiland, Michael <mreiland@blm.gov> wrote:

Jason,

I was hoping to get it back earlier, but if you're out there, not much you can
do about that.  So, please do get it back to me as soon as you can.

Thanks,

Michael

On Wed, Apr 18, 2018 at 12:40 PM, Jason Lutterman <jlutterman@blm.gov>
wrote:
Hi Michael, will do. I'm at pvc now for the Sinclair interview but will look
at this ASAP when I get back...probably around 1 my time. Will that work?

Sent from my iPhone. Please excuse any typos.

On Apr 18, 2018, at 8:59 AM, Reiland, Michael <mreiland@blm.gov>
wrote:

Jason,

Can you take a look at this and add comments/suggestions?  It's
for the Director to meet with advocacy groups and the
Secretary next week.  Please do not share with anyone.

Thanks,

--
Michael Reiland
WO-260 Budget-Analyst
202-912-7261
202-794-2479

<Director Presentation to Advocacy Groups.pptx>

--

Michael Reiland
WO-260 Budget-Analyst
202-912-7261
202-794-2479


--
Michael Reiland
WO-260 Budget-Analyst
202-912-7261
202-794-2479

# BLM Wild Horse and Burro Program

- Wild horses and burros are federally protected and have virtually no natural predators. Herds can double in size every four years

- More than 82,000 animals currently on the range, 55,300 of which are excess (Appropriate Management Level (AML) is 26,700)

- The current overpopulation threatens the health of the western rangelands, degrading ecosystem functions and limiting the forage and water available for domestic and wildlife species, including game and non-game species

- Emergency gathers required to save endangered animals

- The BLM cannot gather and treat enough animals to reduce herd sizes through fertility control vaccines alone

- Low adoptions and sales have resulted an additional 46,000 excess, unadopted and unsold animals in off-range facilities

- The BLM spends almost 60% of its appropriated funding on holding/care of animals removed from the range – increased removals to achieve AML would increase these funding needs



Wild horses in the Antelope Herd Management Area of Eastern Nevada, which is nearly 500% of appropriate management level



Wild horses often must leave their designated ranges when food and water becomes depleted

BLM_002232

# Achieve AML in Eight Years, Using All the Authorities within the Act, while Substantially Decreasing Off-Range Holding Costs

- **Removal of 156,000 animals** from the range over a 10-year period

- **Treat 38,000 mares** with fertility control methods (i.e. PZP) over a 10-year period

- **40,000 adoptions**; **110,000 sales without restriction**; **24,000 animals euthanized** – over a 10-year period

- Off-range population reduced to 6,000 by year 10

- Costs would exceed current average annual appropriations by about $200 million over the 10 years

- Appropriate Management Levels would be achieved within 8 years



Wild horses standing in a field of invasive cheat grass



Excess wild horses in an off-range corral

# Achieve AML in 10 Years Using Existing Authorities, By Substantially Increasing Program Funding

- **Removal of 151,200 animals** from the range over a 10-year period

- **Treat 52,400 mares** with fertility control methods (i.e. PZP) over a 10-year period

- **40,000 adoptions** and **2,000 sales** with current restrictions over a 10-year period

- Off-range population increased to 110,000 by year 10

- Costs would exceed current average annual budget by about $1.12 billion over the 10 years

- Appropriate Management Levels would be achieved within 10 years



Wild horses and burros on western rangelands roam over 26.9 million acres



Wild horses prepared for an adoption event. BLM adopted/sold almost 4,200 animals in FY17

# Achieve AML in Six Years Using Existing Authorities and Creating an Adoption Incentive Program

- **Removal of 129,000 animals** from the range over a 10-year period

- **Treat 26,000 mares** with fertility control methods (i.e. PZP) over a 10-year period

- **84,000 adoptions** over a 10-year period, increasing adoptions through a financial incentive program; **2,000 sales** with current restrictions

- Off-range population increased to 71,000 by year 10

- Costs would exceed current average annual appropriations by about $1.43 billion over the 10 years

- Appropriate Management Levels would be achieved within 6 years



A helicopter carefully herds animals into traps.



*Prada horses* are specially trained horses that help lead wild horses into the trap

BLM_002235

# Achieve AML in 12 Years Using Existing Authorities, Creating an Adoption Incentive Program, and Increasing Permanent Sterilization

- **Removal of 36,600 animals** from the range over a 10-year period

- **Treat 103,000 mares** with fertility control methods (focusing on permanent sterilization) over a 10-year period

- **40,000 adoptions** over a 10-year period, developing a financial adoption incentive program; **2,000 sales** with current restrictions

- Off-range population decreased to 36,800 by year 10

- Costs would exceed current average annual appropriations by about $320 million over the 10 years

- Appropriate Management Levels would be achieved within 12 years



Overpopulated herds put animals at risk of starvation and thirst.



Once gathered and adopted out, wild horses make great show animals.

BLM_002236

**From:**       Shepherd, Alan B
**To:**         Rittenhouse, Bruce H; Waddell, Holle
**Subject:**    Fwd: WHB Program Update for the Director
**Date:**       Friday, May 4, 2018 5:02:56 PM
**Attachments:** mime-attachment.html
                ATT00001.htm
                Revised 2018 Gather Schedule.docx
                ATT00002.htm
**Importance:** High

Keeping you in the loop on the info provided to Director

Thanks,
Alan

Alan Shepherd
On-Range Branch Chief, WO261

Sent from my iPhone, please excuse any grammar or spelling errors!

Begin forwarded message:

> **From:** Steve Tryon <stryon@blm.gov>
> **Date:** May 4, 2018 at 5:54:50 PM EDT
> **To:** bsteed@blm.gov, mnedd@blm.gov
> **Cc:** jbrune@blm.gov, kbail@blm.gov, jkrauss@blm.gov, mschneider@blm.gov,
> ashepher@blm.gov, cmcalear@blm.gov
> **Subject: WHB Program Update for the Director**
>
>
> Happy weekend, Brian and Mike,
>
> There are a number of things going on in the Wild Horse and Burro
> program to share with you, including the guidance on gathers in the
> soon-to-be-released Annual Work Plan. With many of us out this
> coming week for Field Committee, RMC, or Pathways, I thought I
> would reach out to you by email, and then see if we need to get
> together on Friday May 11 - when we will all be back at MIB - to
> discuss any of this face-to-face.
>
> Program Briefings for OMB and Approps Staff
> On Wednesday, May 2, Alan Shepherd and I joined Linda Smith,
> Denise Flanagan, and Bill Gordon of the BLM and DOI budget teams
> to brief OMB examiner Mike Hagan, and Approps staff Betsy
> Bynum, Rita Culp, Dave Listra(?), and Mac Loyes(?), in two separate
> briefings. The briefings and the report were well received. We spent a
> lot of time covering the logistics of sale, euthanasia, sterilization,
> adoption incentives, and the presumed positions of interested parties

such as advocacy groups and PLC. We covered the four options in detail, and the backup numbers.

In both briefings we discussed the changes in legal authorities that are requested at the end of the report. We did not characterize any of the measures as being "the Secretary's preferred option," but noted that he had been briefed on the report in its entirety and was comfortable with the section requesting new legal authorities, as written. We are expecting to brief the Senate Approps staff on Friday, May 11.

- OMB requested follow up information on deteriorating rangelands, including evidence, if any, that horse populations were impeding energy development.
- OMB also asked for any proposals that might affect taxes/tax incentives

Legislative Request from DOI Budget

The day after we briefed House Approps., DOI budget requested legislative language from us on:

- Management of horse areas as non-reproducing herds through sterilization methods
- Reducing time to title from 12 months to 6 months
- Transferring WHB to nonprofit groups or other countries
- Allowing sales receipts to support on-range activities and not just adoptions

We provided the legislative language to WO 880/Budget. I believe the audience for this request is House Approps., and will confirm that for you this week.

On-Range Population Estimates

Every March, after winter mortality has taken its natural toll, and after a few winter gathers have reduced numbers, and before the new crop of foals starts to show up, we estimate the current on-range WHB population. "The number" this year is 81,951. This is the same number that varied between 83,000 and 86,000 in draft versions of the report to Congress, net of winter gathers, which makes it a smaller number. We will be publishing this figure through a press release, so we just want to make sure there are no surprises to any of you when the PR comes out. It is a good number until foaling season, which is upon us now. We are estimating this year's foal crop at 14,500 animals, btw.

Sterilization/Spay & Neuter

- We are pushing forward this year with the behavior study at Burns, OR.
- We are not expecting to sterilize any animals in 2018 gathers,

as it is not addressed in the relevant NEPA documents for the planned gathers.

- We will begin incorporating sterilization into NEPA and gather design - where sterilization will be conducted at BLM facilities by contract veterinarians - and the subsequent return of sterilized animals to the range as part of our 2019 gather schedule. We will do this through site-specific NEPA, even though the USGS study at Burns will only just be getting started.

## Gather Schedule/2018 Annual Work Plan/Implement Program Changes ASAP

Brian we really appreciated our conversation with you last Friday, following the report's release and your conversations with the Secretary. Here is what we are doing to be more aggressive with the program in the short term:

- We have identified six more NEPA-ready gather opportunities in GRSG habitat, using $4.1 million of Wildlife funding that can be accomplished this year. The Wildlife subactivity will also pay the 2018 increment of holding costs, at $350,000.
- We have set aside $500,000 for $1,000 adoption incentives on an estimated 500 horses by year end. This should give us a good opportunity to evaluate the sensitivity to price that this represents to adopters, before we scale up for an entire fiscal year without good cost data. This is a good thing.
- We are beginning to re-write adoption policy to: 1) reduce up-front payment to $25, from $125, 2) receive a check for $1,000 from the NOC shortly after the animal is adopted and not at the time of titling, and 3) lower the cost of adoption compliance by relying on veterinarians and travel by BLM employees only when nearby the adopted animal's location.
- We are starting up the behavior study on sterilized horses, in Burns, OR.
- Big thing you need to know is that these additional gathers will commit us to another $10 million in holding expenses in 2019, and if we ramp up 2019 gathers, we will incur additional holding costs still. This deviates significantly from the President's Budget, and really should be addressed as a base funding increase for 2019 and beyond, rather than as a reprogramming.
- Please see the attached, modified gather schedule, which normally requires approval by DD-Ops because of the substantial future year funding commitments that gather decisions today represent.

Alan will be over at MIB on Monday, covering for the AD, if you want to discuss then. I will be back from the Field Committee meeting on Friday May 11.

Thanks for working with us on these hard decisions!

Steve Tryon
Deputy Assistant Director, Resources and Planning
Bureau of Land Management
o) 202-208-4896
c) 202-527-2651

| | |
|---|---|
| **From:** | Lesieutre, Jeannine (Jenny) M |
| **To:** | Waddell, Holle |
| **Subject:** | Fwd: Ideas on how to implement incentive if we get funding |
| **Date:** | Wednesday, May 9, 2018 11:21:52 AM |
| **Importance:** | High |

I'm sorry, I probably should have copied you on the below.... FYI....

Jenny Lesieutre, Wild Horse and Burro Public Affairs Specialist
Bureau of Land Management, Nevada State Office
1340 Financial Boulevard, Reno, NV 89502
Office: 775-861-6594
Cell: 202-412-5784
Email: jlesieut@blm.gov

Follow BLM Nevada on Social Media

Twitter | Facebook| YouTube| Flickr

---------- Forwarded message ----------
From: **Lesieutre, Jeannine (Jenny)** <jlesieut@blm.gov>
Date: Wed, May 9, 2018 at 9:10 AM
Subject: Ideas on how to implement incentive if we get funding
To: Alan Shepherd <ashepher@blm.gov>
Cc: Stephen Clutter <sclutter@blm.gov>, Ruth Thompson <rthompso@blm.gov>

Hi Alan,

I have some out of the box ideas based on lessons learned when we tried this back when I was in DC if you want to discuss? As we know from the NM program and then of course with the Director back then that how we implemented it caused questions on fraud so my ideas are more in the mechanism(s) to use to provide a dollar incentive. Let me know!

Jenny Lesieutre, Wild Horse and Burro Public Affairs Specialist
Bureau of Land Management, Nevada State Office
1340 Financial Boulevard, Reno, NV 89502
Office: 775-861-6594
Cell: 202-412-5784
Email: jlesieut@blm.gov

Follow BLM Nevada on Social Media

Twitter | Facebook| YouTube| Flickr

| | |
|---|---|
| **From:** | Lesieutre, Jeannine (Jenny) M |
| **To:** | Shepherd, Alan B; Waddell, Holle |
| **Cc:** | Stephen Clutter; Thompson, Ruth A |
| **Subject:** | Re: Ideas on how to implement incentive if we get funding |
| **Date:** | Wednesday, May 9, 2018 12:49:48 PM |
| **Importance:** | High |

Thanks Alan! Will do and yes, based on what we dealt with in the past, it can be challenging and could cost much more then the proposed $1,000 if we implement the same way as we did in the past! I will try and get it pulled together within the next few weeks!

Thanks for your quick response!!

Jenny Lesieutre, Wild Horse and Burro Public Affairs Specialist
Bureau of Land Management, Nevada State Office
1340 Financial Boulevard, Reno, NV 89502
Office: 775-861-6594
Cell: 202-412-5784
Email: jlesieut@blm.gov

Follow BLM Nevada on Social Media

Twitter | Facebook| YouTube| Flickr

On Wed, May 9, 2018 at 10:44 AM, Shepherd, Alan <ashepher@blm.gov> wrote:
Hey Jenny
I would suggest writing them down and sharing with Holle and I. This will be an interesting process and likely confusing for a while to who gets incentive vs not.

Thx

Thanks,
Alan

Alan Shepherd
Acting Division Chief (WO260)
National WH&B Program
20 M St SE
Washington, DC 20003

Office #: (202) 912-7648
Cell #: (775) 530-2784

email: ashepher@blm.gov
http://www.blm.gov/programs/wild-horse-and-burro

On Wed, May 9, 2018 at 12:10 PM, Lesieutre, Jeannine (Jenny) <jlesieut@blm.gov> wrote:
Hi Alan,

I have some out of the box ideas based on lessons learned when we tried this back when I was in DC if you want to discuss? As we know from the NM program and then of course with the Director back then that how we implemented it caused questions on fraud so my ideas are more in the

mechanism(s) to use to provide a dollar incentive. Let me know!

Jenny Lesieutre, Wild Horse and Burro Public Affairs Specialist
Bureau of Land Management, Nevada State Office
1340 Financial Boulevard, Reno, NV 89502
Office: 775-861-6594
Cell: 202-412-5784
Email: jlesieut@blm.gov

Follow BLM Nevada on Social Media

Twitter | Facebook| YouTube| Flickr

**From:** Todd, Marci L
**To:** Waddell, Holle
**Subject:** Re: Private Care Placement Team: Adoption Incentive Program
**Date:** Tuesday, May 15, 2018 2:53:15 PM
**Importance:** High

Hi Holle,

I'm sorry but I have a conflict that week - our State Leadership Team is meeting. M

Sent from my iPhone

On May 15, 2018, at 10:57, Waddell, Holle <hwaddell@blm.gov> wrote:

Hello Marci and I hope you are well. I wanted to follow-up with you regarding re-engaging the team to begin development of the adoption incentive program per leadership direction based on the WH&B Options paper submitted to Congress.

I know you are busy however would appreciate you being a part of a pre-meeting/discussion with me as well as the initial meeting with the team. Please let me know your availability the week of June 4, 2018.

I look forward to hearing from you.

Thank you,

Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |

Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov



"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood

BLM_002244

**From:** Todd, Marci L
**To:** Waddell, Holle
**Subject:** Re: Private Care Placement Team: Adoption Incentive Program
**Date:** Wednesday, May 16, 2018 8:41:37 AM
**Importance:** High

Sure. Give me a call. M

Sent from my iPhone

On May 15, 2018, at 21:43, Waddell, Holle <hwaddell@blm.gov> wrote:

> Thank you for your response. There is an urgency to begin work on the adoption incentive program. Perhaps you and I could chat next Wednesday and I will still plan to have the meeting with the team the week of June 4.
>
> Thank you,
>
> Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |
>
> Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov
>
> "A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood
>
> 
>
> On Tue, May 15, 2018 at 2:53 PM, Marci Todd <m1todd@blm.gov> wrote:
>> Hi Holle,
>>
>> I'm sorry but I have a conflict that week - our State Leadership Team is meeting. M
>>
>> Sent from my iPhone
>>
>> On May 15, 2018, at 10:57, Waddell, Holle <hwaddell@blm.gov> wrote:
>>
>>> Hello Marci and I hope you are well. I wanted to follow-up with you regarding re-engaging the team to begin development of the adoption incentive program per leadership direction based on the WH&B Options paper submitted to Congress.
>>>
>>> I know you are busy however would appreciate you being a part of a pre-meeting/discussion with me as well as the initial

meeting with the team. Please let me know your availability the week of June 4, 2018.

I look forward to hearing from you.

Thank you,

Holle' Waddell │ Branch Chief │ Division of Wild Horses and Burros │

Bureau of Land Management │ 405.579.1860 (O) │ 405.579.7102 (F) │
hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood



**From:** Lesieutre, Jeannine (Jenny) M
**To:** Waddell, Holle
**Subject:** Re: Ideas on how to implement incentive if we get funding
**Date:** Wednesday, May 9, 2018 1:16:37 PM
**Importance:** High

Sounds good - I think you'll like the direction I'm thinking - give me a few days and I'll shoot off my ideas!

Jenny Lesieutre, Wild Horse and Burro Public Affairs Specialist
Bureau of Land Management, Nevada State Office
1340 Financial Boulevard, Reno, NV 89502
Office: 775-861-6594
Cell: 202-412-5784
Email: jlesieut@blm.gov

Follow BLM Nevada on Social Media

Twitter | Facebook| YouTube| Flickr

On Wed, May 9, 2018 at 11:02 AM, Waddell, Holle <hwaddell@blm.gov> wrote:
> Thanks. I plan to re-engage the private care placement team to jump start SOPs as this was a topic addressed in the the past.
>
> Thank you,
>
> Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |
>
> Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov
>
> "A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood
> 
>
> On Wed, May 9, 2018 at 11:21 AM, Lesieutre, Jeannine (Jenny) <jlesieut@blm.gov> wrote:
>> I'm sorry, I probably should have copied you on the below.... FYI....
>>
>> Jenny Lesieutre, Wild Horse and Burro Public Affairs Specialist
>> Bureau of Land Management, Nevada State Office
>> 1340 Financial Boulevard, Reno, NV 89502
>> Office: 775-861-6594
>> Cell: 202-412-5784
>> Email: jlesieut@blm.gov
>>
>> Follow BLM Nevada on Social Media
>>
>> Twitter | Facebook| YouTube| Flickr
>>
>> ---------- Forwarded message ----------
>> From: **Lesieutre, Jeannine (Jenny)** <jlesieut@blm.gov>

Date: Wed, May 9, 2018 at 9:10 AM
Subject: Ideas on how to implement incentive if we get funding
To: Alan Shepherd <ashepher@blm.gov>
Cc: Stephen Clutter <sclutter@blm.gov>, Ruth Thompson <rthompso@blm.gov>

Hi Alan,

I have some out of the box ideas based on lessons learned when we tried this back when I was in
DC if you want to discuss? As we know from the NM program and then of course with the Director
back then that how we implemented it caused questions on fraud so my ideas are more in the
mechanism(s) to use to provide a dollar incentive. Let me know!

Jenny Lesieutre, Wild Horse and Burro Public Affairs Specialist
Bureau of Land Management, Nevada State Office
1340 Financial Boulevard, Reno, NV 89502
Office: 775-861-6594
Cell: 202-412-5784
Email: jlesieut@blm.gov

Follow BLM Nevada on Social Media

Twitter | Facebook| YouTube| Flickr

| From: | Leonard, Stephen P |
|---|---|
| To: | Waddell, Holle |
| Cc: | Deborah Collins; Lockie, Grant E; Tiel-Nelson, Heather J; Neill, John J; Fontaine, Kristen A; Johnson, Krystal F; Reid, Lisa; Kueck, Meredith A; Roberson, Peter (PJ) L; Spencer, Sally J; Frost, Scarlett H; Fluer, Scott L; Easley, Anna-Maria |
| Subject: | Re: Adoption Incentive Program |
| Date: | Thursday, May 24, 2018 8:57:37 AM |
| Importance: | High |

The week of June 4th is pretty open for me.

Steve Leonard
Canon City Facility Manager/Colorado Program Lead
(719)269-8511

On Wed, May 23, 2018 at 11:01 PM, Waddell, Holle <hwaddell@blm.gov> wrote:

> Hello all - As you know, the "Options" paper submitted to Congress identified an adoption incentive program as a component to increasing the placement animals into private care. I'd like to re-engage the PCPT to develop the adoption incentive program and have a draft to Bruce for his review at the end of the month (tentatively 06/29/18). I would like to meet sometime during the week of June 4, 2018. Please send me your availabilities as soon as possible for the week of June 4, 2018 and I will send a calendar invite.
>
> I look forward to hearing from you.
>
> Thank you,
>
> Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |
>
> Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov
>
>
> "A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood

| | |
|---|---|
| **From:** | Rittenhouse, Bruce H |
| **To:** | Waddell, Holle |
| **Subject:** | Briefing paper |
| **Date:** | Wednesday, May 30, 2018 3:05:32 PM |
| **Attachments:** | Info briefing for ASLM 30May2018 final draft.docx |

Holle

Here is the briefing paper to the ASLM on adoptive incentive program, off-range pastures and CXs.

--
Bruce Rittenhouse
Acting Wild Horse and Burro Division Chief (WO-260)
20 M Street, Southeast
Washington DC 20003
202-912-7648 (office)
720-454-5747 (mobile)
brittenh@blm.gov

## INFORMATION/ BRIEFING MEMORANDUM FOR THE BLM DIRECTOR AND ASSISTANT SECRETARY FOR LANDS AND MINERALS

DATE:        May 30, 2018

FROM:        Kristin Bail, Assistant Director, Resources and Planning (WO-200)

SUBJECT:     Update on Status of Wild Horse and Burro Adoption Incentive Program, Off-Range Pastures, and Schedule of Categorical Exclusions

This information briefing is an update on the status of the BLM's proposed Adoption Incentive Program, increasing the capacity of utilizing Off-Range Pastures, and streamlining NEPA to use Categorical Exclusions (CXs) for wild horse and burro activities.

## BACKGROUND

On April 26, 2018 the BLM released a report to Congress titled "*Management Options for a Sustainable Wild Horse and Burro Program*" (Options Paper).  The Options Paper outlined four options with objectives to reach Appropriate Management Level (AML) for horses on the range along with increasing adoptions and reducing costs of feeding and caring for wild horses and burros.  The key components are listed below.

- Establish a $1,000/animal adoption incentive program to increase adoptions, thereby reducing future holding costs.
- Use CXs to streamline NEPA for certain wild horse and burro actions (e.g. removal of excess animals, population growth suppressants, among other actions).
- Increase use of long-term off-range pastures to reduce holding costs for wild horses and burros.

## DISCUSSION

Below are the updates of accomplishments since the release of the Options Paper.

**Adoption Incentive Program** – Currently WO-262 (Off-Range) is developing the necessary Adoption Incentive processes and procedures.  Processes such as how the $1,000 will be dispersed to the adopter, return of funds to BLM if the animal is returned within the timeframe prior to the transfer of title, and streamlining adoption compliances.  New templates have to be created during this development phase.  It is anticipated that a preliminary draft of the Adoption Incentive Program will be completed by the end of June 2018.  In addition, $500,000 has been set aside in fiscal year (FY) 2018 budget for implementation.

**Long-Term Off-Range Pastures** – It is expected that a competitive solicitation contract will be released in early June for three wild horse Public Off-range Pastures with an expected award in early September with an estimated budget of $900,000.  Also in late June, additional Off-Range Pasture solicitations are expected.  These should provide increased capacity to accommodate the

additional removals planned for in FY 2018.  The timeframe for each solicitation usually takes up to 12-15 months from the beginning of solicitation to placing the horses on the pastures.  This has been the typical timeframe to solicit, review proposals, inspect the proposed pasture, complete the NEPA, and finally award contract.  To streamline this process WO-260 plans to use a national Indefinite Delivery Indefinite Quantity (IDIQ) contract that reduces the NEPA workload for the individual state and the timeframe to complete the analysis.

**Schedule for Categorical Exclusions** – Currently, the request for use of CXs in the wild horse and burro program are in the second tier of CXs.  It is expected that the second tier of CXs will be submitted in fall 2018 with a public comment period occurring sometime in early 2019.  Until the use of CXs are approved, the full NEPA analysis will continue for most wild horse and burro activities.

**NEXT STEPS**

1.  Develop processes, protocols, and templates to develop policy to implement the Adoption Incentive Program.
2.  Streamline process to award Off-Range Pastures.
3.  Support WO-210 (Planning) to allow use of CXs for wild horse and burro activities.

**1 ATTACHMENT**
    1 - Wild Horse and Burro Off Range Pasture (ORP) Request for Proposals (15 pp)

Attachment 1: Example of Off-Range Pasture Contract

# WILD HORSE AND BURRO OFF RANGE PASTURE (ORP) FACILITIES LOCATED IN THE UNITED STATES



## REQUEST FOR PROPOSAL (RFP)

## L16PS00305

## ISSUED

## (Amendment 1)



DEPARTMENT OF INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON OFFICE

BLM_002253

Contents

**L16PS00305** ..................................................................Error! Bookmark not defined.

**SECTION B - SUPPLIES OR SERVICES AND PRICES/COSTS** ..........................................6

**SECTION C - DESCRIPTION/SPECIFICATIONS/WORK STATEMENT** ........................9

1               BACKGROUND ........................................................................................9

2. OBJECTIVE ...........................................................................................................10

3               GENERAL SERVICES ........................................................................11

4               SPECIFIC SERVICES .........................................................................12

5               RESPONSIBILITES OF BLM ..........................................................18

**ATTACHMENTS** ............................................................................Error! Bookmark not defined.

**52.212-2     EVALUATION – COMMERCIAL ITEMS (JAN 1999)** ........Error! Bookmark not defined.

AWARD OF CONTRACT(S) ........................................................**Error! Bookmark not defined.**

LOWEST PRICE TECHNICALLY ACCEPTABLE FOR TASK ORDER SELECTION.. **Error! Bookmark not defined.**

**GENERAL PROPOSAL INSTRUCTIONS** ...................................Error! Bookmark not defined.

VOLUME I- OFFER AND OTHER DOCUMENTS- One original and one portable document format (PDF) copy on a thumb drive.  (thumb drives will not be returned). **Error! Bookmark not defined.**

VOLUME II - TECHNICAL APPROACH ................................................**Error! Bookmark not defined.**

Criterion 1 - Vegetation, Water, Pasture Management, and Soils (35%) ............. **Error! Bookmark not defined.**

Criterion 2 - Site Design, Fences, Working Facilities, and Handling of Horses (TOTAL PTS  35%) ........................................................................................... **Error! Bookmark not defined.**

Criterion 3 - Supplemental Feed (TOTAL 15%) ................................... **Error! Bookmark not defined.**

Criterion 4 - Land, Access, Equipment, and Shelter (TOTAL 10%) ..... **Error! Bookmark not defined.**

Criterion 5 - Safety and Well-Being (TOTAL 3%) ............................... **Error! Bookmark not defined.**

Criterion 6 – Personnel (TOTAL PTS 2%) ............................................ **Error! Bookmark not defined.**

VOLUME III:  EXPERIENCE AND PAST PERFORMANCE ...................**Error! Bookmark not defined.**

VOLUME IV - PRICE PROPOSAL .......................................................**Error! Bookmark not defined.**

SUMMARY.      ..................................................................................**Error! Bookmark not defined.**

AWARD DETERMINATION ............................................................. **Error! Bookmark not defined.**

**SOLICITATION PROVSIONS** .......................................................Error! Bookmark not defined.

52.212-3 -- OFFEROR REPRESENTATIONS AND CERTIFICATIONS -- COMMERCIAL ITEMS (DEC 2012).       **Error! Bookmark not defined.**

**CONTRACT CLAUSES** .................................................................Error! Bookmark not defined.

52.252-2        CLAUSES INCORPORATED BY REFERENCE (FEB 1998) ............... **Error! Bookmark not defined.**

**CONTRACT CLAUSES IN FULL TEXT** ......................................Error! Bookmark not defined.

52.204-99 SYSTEM FOR AWARD MANAGEMENT REGISTRATION (DEVIATION) AUG

2012                    **Error! Bookmark not defined.**

52.212-4 -- CONTRACT TERMS AND CONDITIONS -- COMMERCIAL ITEMS (JUNE 2013).......... **Error! Bookmark not defined.**

52.212-5 -- CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT STATUTES OR EXECUTIVE ORDERS -- COMMERCIAL ITEMS (JAN 2013)...............**Error! Bookmark not defined.**

52.232-99 PROVIDING ACCELERATED PAYMENT TO SMALL BUSINESS SUBCONTRACTORS (DEVIATION 2012-00014) AUG 2012...**Error! Bookmark not defined.**

52.25206 AUTHORIZED DEVIATIONS IN CLAUSES – APR 1984...... **Error! Bookmark not defined.**

ELECTRONIC INVOICING AND PAYMENT REQUIREMENTS –....... **Error! Bookmark not defined.**

INTERNET PAYMENT PLATFORM    (IPP) (AUG 2011) .......**Error! Bookmark not defined.**

1452.201-70       AUTHORITIES AND DELEGATIONS (SEP 2011).....**Error! Bookmark not defined.**

1452.228-70       LIABILITY INSURANCE -DEPARTMENT OF THE INTERIOR (JUL 1996) .......... **Error! Bookmark not defined.**

52.216-18 ORDERING – OCT 1995 .............................................**Error! Bookmark not defined.**

52.216-19 ORDER LIMITATIONS - OCT 1995 ...........................**Error! Bookmark not defined.**

52.219-22 INDEFINITE QUANTITY- OCT 1995 .......................**Error! Bookmark not defined.**

CRITERIA FOR ISSUING TASK ORDERS ...............................**Error! Bookmark not defined.**

BASIS FOR PAYMENT ....................................................................**Error! Bookmark not defined.**

WORK HOURS ....................................................................**Error! Bookmark not defined.**

PREWORK CONFERENCE.....................................................**Error! Bookmark not defined.**

NOTICE TO PROCEED .....................................................**Error! Bookmark not defined.**

POST AWARD/PRE-WORK CONFERENCE ...........................**Error! Bookmark not defined.**

INDEMNIFICATION.................................................................**Error! Bookmark not defined.**

PUBLICITY       .........................................................................**Error! Bookmark not defined.**

AUTHORITY (APR 1998)...........................................................**Error! Bookmark not defined.**

GOVERNMENT FURNISHED PROPERTY AND DATA.........**Error! Bookmark not defined.**

KEY PERSONNEL ....................................................................**Error! Bookmark not defined.**

CONFIDENTIALITY OF INFORMATION ...............................**Error! Bookmark not defined.**

TECHNICAL DIRECTION .........................................................**Error! Bookmark not defined.**

MANDATORY INSURANCE COVERAGE ..............................**Error! Bookmark not defined.**

OTHER CONTRACTS ...............................................................**Error! Bookmark not defined.**

HEALTH AND SAFETY.............................................................**Error! Bookmark not defined.**

STATE AND LOCAL TAXES .....................................................**Error! Bookmark not defined.**

UNDOCUMENTED WORKERS .................................................**Error! Bookmark not defined.**

**CONTRACT AND TASK ORDER ADMINISTRATION ..........**Error! Bookmark not defined.

CONTRACTOR REPRESENTATIVE/USE OF ENGLISH LANGUAGE ........**Error! Bookmark not defined.**

SERVICE CONTRACT ACT WAGE RATES ........................**Error! Bookmark not defined.**

TASK ORDER OMBUDSMAN ....................................................**Error! Bookmark not defined.**

CONTRACTING OFFICER'S REPRESENTATIVES (COR) AND/OR PROJECT INSPECTOR (PI)                    **Error! Bookmark not defined.**

TECHNICAL DIRECTION.............................................................**Error! Bookmark not defined.**

CONTRACTING OFFICE REPRESENTATIVE.........................**Error! Bookmark not defined.**

**PROPOSAL SUBMISSION CHECKLIST..................................**Error! Bookmark not defined.

## SECTION B - SUPPLIES OR SERVICES AND PRICES/COSTS

**BASE PERIOD OF PERFORMANCE – JANUARY 1, 2017 THROUGH DECEMBER 31, 2017**

| Item Number | Services | Est. Qty | Unit | Unit Price | Total |
|---|---|---|---|---|---|
| 0001 | Provide all necessary facilities, personnel and supplies for an Off Range  Wild Horse Maintenance Facility for _____ horses* (Contractor shall propose number), from date of award through twelve (12) months after award, with animals arriving at the facility after contract award, in accordance with the specifications, terms and conditions contained herein. | ** | Feed Day *** | | |
| | | | | | |

**OPTION PERIOD 1 – JANUARY 1, 2018 THROUGH DECEMBER 31, 2018**

| Item Number | Services | Est. Qty | Unit | Unit Price | Total |
|---|---|---|---|---|---|
| 0002 | Provide all necessary facilities, personnel and supplies for an Off Range Wild Horse Maintenance Facility for _____ horses* (Contractor shall propose number), from date of award through twelve (12) months after award. | ** | Feed Day *** | | |
| | | | | | |

**OPTION PERIOD 2 – JANUARY 1, 2019 THROUGH DECEMBER 31, 2019**

| Item Number | Services | Est. Qty | Unit | Unit Price | Total |
|---|---|---|---|---|---|
| 0003 | Provide all necessary facilities, personnel and supplies for an Off Range Wild Horse Maintenance Facility for _____ horses* (Contractor shall propose number), from date of award through twelve (12) months after award. | ** | Feed Day *** | | |
| | | | | | |

**OPTION PERIOD 3 – JANUARY 1, 2020 THROUGH DECEMBER 31, 2020**

| Item Number | Services | Est. Qty | Unit | Unit Price | Total |
|---|---|---|---|---|---|
| 0004 | Provide all necessary facilities, personnel and supplies for an Off Range Wild Horse Maintenance Facility for _____ horses* (Contractor shall propose number), from date of award through twelve (12) months after award. | ** | Feed Day *** | | |
| | | | | | |

**OPTION PERIOD 4 – JANUARY 1, 2021 THROUGH DECEMBER 31, 2021**

| Item Number | Services | Est. Qty | Unit | Unit Price | Total |
|---|---|---|---|---|---|
| 0005 | Provide all necessary facilities, personnel and supplies for an Off Range Wild Horse Maintenance Facility for _____ horses* (Contractor shall propose number), from date of award through twelve (12) months after award. | ** | Feed Day *** | | |

**OPTION PERIOD 5 – JANUARY 1, 2022 THROUGH DECEMBER 31, 2022**

| Item Number | Services | Est. Qty | Unit | Unit Price | Total |
|---|---|---|---|---|---|
| 0006 | Provide all necessary facilities, personnel and supplies for an Off Range Wild Horse Maintenance Facility for _____ horses* (Contractor shall propose number), from date of award through twelve (12) months after award. | ** | Feed Day *** | | |
| | | | | | |

**OPTION PERIOD 6 – JANUARY 1, 2023 THROUGH DECEMBER 31, 2023**

| Item Number | Services | Est. Qty | Unit | Unit Price | Total |
|---|---|---|---|---|---|
| 0007 | Provide all necessary facilities, personnel and supplies for an Off Range Wild Horse Maintenance Facility for _____ horses* (Contractor shall propose number), from date of award through twelve (12) months after award. | ** | Feed Day *** | | |
| | | | | | |

**OPTION PERIOD 7 – JANUARY 1, 2024 THROUGH DECEMBER 31, 2024**

| Item Number | Services | Est. Qty | Unit | Unit Price | Total |
|---|---|---|---|---|---|
| 0008 | Provide all necessary facilities, personnel and supplies for an Off Range Wild Horse Maintenance Facility for _____ horses* (Contractor shall propose number), from date of award through twelve (12) months after award. | ** | Feed Day *** | | |
| | | | | | |

**OPTION PERIOD 8 – JANUARY 1, 2025 THROUGH DECEMBER 31, 2025**

| Item Number | Services | Est. Qty | Unit | Unit Price | Total |
|---|---|---|---|---|---|
| 0009 | Provide all necessary facilities, personnel and supplies for an Off Range Wild Horse Maintenance Facility for _____ horses* (Contractor shall propose number), from date of award through twelve (12) months after award. | ** | Feed Day *** | | |

**OPTION PERIOD 9 – JANUARY 1, 2026 THROUGH DECEMBER 31, 2026**

| Item Number | Services | Est. Qty | Unit | Unit Price | Total |
|---|---|---|---|---|---|
| 0010 | Provide all necessary facilities, personnel and supplies for an Off Range Wild Horse Maintenance Facility for _____ horses* (Contractor shall propose number), from date of award through twelve (12) months after award. | ** | Feed Day *** | | |

* Once the contract is awarded the proposed amount for the contractor will be set as the maximum capacity for the ranch. During the period of performance this total amount can only fluctuate 10% over or under the contract total amount.  In the event of unforeseen circumstances and/or emergencies an adjustment other than the 10% may need to be done after consultation with the COTR/PI and approved by the CO.

** A feed day is defined as: "The price to feed one animal for one full day, except mare pairs, which count as one animal feed day." **Contractor shall complete by multiplying the number of animals they propose to care for by 365 (for evaluation purposes only)**

*** The unit price must estimate one year of feed per animal.

NOTE: The Contractor will be reimbursed based on the actual number of feed days per month, using the unit price per feed day, as offered by the Contractor.

BLM_002258

## SECTION C - DESCRIPTION/SPECIFICATIONS/WORK STATEMENT

## 1      BACKGROUND

a.  Wild horse and burros on public lands administered by the Bureau of Land Management (BLM) and U.S. Forest Service are protected, managed and controlled under the provisions of the Wild and Free-Roaming Horses and Burro Act of December 15, 1971, as amended (16 U.S.C. 1331-1340).  As resource conditions and other factors warrant, excess wild horses are removed from the public lands and placed in private maintenance through the Adopt-A-Horse Program.  Horses that have not been adopted because of age or other factors are being cared for on private land.

b.  The purpose of this solicitation is to obtain one or more off range pasture (ORP) facilities located in the states of ~~Arkansas~~ Arkansas Colorado, Idaho, Iowa, Kansas, Missouri, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, South Dakota, Utah~~200,Texas~~ Texas, Wyoming, Oregon and Washington excluding the area west of the Cascade Mountain Range.  The objective for each ORP facility is to pasture a minimum of 200 up to a maximum of 5000 wild horses. The intent is to provide a pasture (grassland) setting for these animals while they are cared for on private land.  During the first years of this contract the majority of the horses will be  older unadoptable animals that will be shipped and received on a year-round basis.  .

c.  On December 8, 2004 Public Law 108-341; Section 142 amended the 1971 Wild and Free-roaming Horses and Burros Act (Public Law 92-195) and requires the BLM to sell excess wild horses and burros which meet the following criteria:

Animals that are 11 years of age and older; or
Animals that have been offered unsuccessfully at three or more adoptions.

This may require BLM to remove animals that meet the above criteria from the contracted facility during the course of the contract.  All animals that are in too poor of health to be prepared or transported will be evaluated consistent with BLM policy for euthanasia due to acts of mercy, health and safety.  All wild horses that do not meet the above criteria will remain in a free-roaming environment.

d.  Each facility considered for contract award must have the capacity to maintain a minimum of 200 to a maximum of 5000 wild horses throughout each year of a 1 year contract with either a 4-year or 9-year option period.

e.  The BLM will award the contract and then complete an Environmental Assessment (EA). The purpose of the EA is to determine the property's carrying capacity (an appropriate stocking level) and to analyze the potential environmental impacts associated with the operation and maintenance of an ORP facility on the offered private and/or leased lands. The BLM can terminate the contract for convenience if:  (a) resource issues are identified during the environmental analysis process which cannot be effectively mitigated; (b) an agreement cannot be reached as to an appropriate stocking level for the offered property

(based on in-depth analysis of the best available data); or (c) the contractor is unable or unwilling to comply with any mitigation or additional management or monitoring requirements identified in the EA.

Facilities formerly used by the BLM for which the requirements of the National Environmental Policy Act have been met will be awarded upon the completion of a Documentation of NEPA Adequacy (DNA).

f.   BLM will also inspect the offered property to assure it complies with the minimum requirements identified in the contract specifications.  If the contractor is unable or unwilling to comply with the contract specifications, the BLM will terminate for default.

g.   The BLM will begin shipping animals to the facility only after the offered property meets the minimum requirements outlined in the contract specifications together with any mitigation or additional requirements identified in the BLM's EA.  Shipment of animals to the facility is anticipated to occur  following a  completed EA, signed Decision Record (DR) and award of the contract.  No payments shall be made until after animals are received at the facilities and have resided at the facility for one month.  The Contractor will be reimbursed on a per animal feed day basis for the previous month of service.  No advance payments are authorized.

## 2.    OBJECTIVE

a.   Protecting animal welfare by ensuring appropriate care handling and humane treatment of all wild horses and burros (WH&B) under BLM management is a primary consideration for all Wild Horse and Burro Program activities.

The objectives of this contract are:

b.   To maintain the excess wild horses in pastures large enough to allow free-roaming behavior and that can provide the food, water and shelter necessary to sustain the animals in good condition;

c.   To gather and prepare all horses in a humane manner that falls under the criterion of saleable or adoptable animals.

d.   To minimize the handling of wild horses by humans;

e.   To provide regular, on-the-ground monitoring and inventory of the wild horses to ascertain their well-being and safety;

f.   Provide management by individuals who are knowledgeable and experienced about the behavior and nutritional requirements of equines and the management of land for the sustained production of grass and other desirable forage plants.

**3        GENERAL SERVICES**

The contractor shall provide all necessary land, facilities, personnel and supplies to perform the following general tasks.  Specific requirements for each are set forth in the subsequent paragraphs of the Description/Specifications/Work Statement.

a.  Provide land, forage, salt, minerals, water and fences necessary to properly care for and maintain a minimum of 200 up to a maximum of 5000 wild horses (based on the offeror's proposal).  The contractor must also provide supplemental feed as necessary to maintain the horses in good condition (i.e. during periods of drought, deep snow, ice storms, fire, during times when the forage is depleted of protein content or when other circumstances warrant). The animals should be grazed on grassland pastures that are capable of producing sufficient standing forage for a period of at least 8 months or longer.  Supplemental feeding may need to occur for a period of up to 4 months.  The pastures should have sufficient rock and soil type to maintain proper hoof size and shape without trimming.

b.  Maintain fences and to keep horses on offered lands and prevent animals from escaping onto neighboring lands.  Should escape of animals occur costs to catch, gather, remove and/or return any escaped horses to said facility shall be incurred by the contractor.  In the event the contractor fails to return escaped horses within 30 days, BLM will retrieve said animals and charge the contractor accordingly.

c.  Provide corrals and adequate facilities to load and unload wild horses on an as-needed basis.

d.  Unload, sort and segregate animals upon their arrival, when additional horses are transported to the facility.

e.  Gather and move horses from pasture to pasture as needed, supervise their health and welfare, and maintain the facilities in a safe hazard free condition.

f.  Gather and hold in isolation horses that fall under the criterion of adoptable or saleable wild horses for a minimum of 30 days, until time for shipment.

g.  Provide weekly monitoring of the animals to assess their health and determine death loss. Prior to submission of the monthly invoice the contractor will conduct a complete inventory of all wild horses.  The results of the each inventory will be included in the monthly invoice.  Maintain a record keeping system that documents the frequency and results of these observations. ( see attachment 4)

h.  Provide a record keeping system that identifies  each horse at the facility and its overall condition.  Each death will be recorded by the freeze mark and/or description of the animal, date the animal was noted as dead and then submitted on each months invoice. The records shall be made available for duplication within 5 days after a request is made by the COR and/or PI. The monthly invoice; death records and receiving information will

be due to the COR by the first week of the month for the last months payment.

i. Dispose of the remains of dead horses according to their state and or local requirements for disposal of dead animals.  The contractor may be required to euthanize horses for reasons of acts of mercy, health and safety consistent with BLM policy.

## 4   SPECIFIC SERVICES

A. Handling and Gathering

1. When animals are transported to the facility, they will normally arrive at the site in trailer loads of approximately 32-36 head per load.  The contractor will provide a telephone number where they can be reached 24 hours per day for scheduling shipments.  BLM will attempt to schedule shipments for daytime arrival.  Horses shall be unloaded as reasonable as possible.                          The contractor will unload, sort by age, and condition, if determined to be appropriate by the Contracting Officer's Representative (COR) and/or the Project Inspector (PI), into various groups.

2. Animal handling will be done with the goal of minimizing fear, stress and the risk of injury to the greatest degree possible using pressure and release methods to use move, sort and load animals. Horses in corrals and          chutes shall be worked to minimize excitement of the horses to prevent injuries from crowding or trampling.

3. Gathering or movement of horses between pastures may be done by the contractor, except in emergency situations, when the contractor determines an immediate gather or movement is necessary for the safety and welfare of the horses.  The contractor shall notify the COR and/or PI within 24 hours after such movement.  Handling of the horses will be kept to a minimum. However, it may be necessary to move the horses from one pasture to another because of range management practices.

4. Gathering for the purpose of removing animals will be conducted when it is deemed necessary by the COR/PI.  The gather time will be determined by the COR and/or PI. A BLM designated representative will be on site during the gather.  The gather will be conducted in a humane manner.  Horses will be maintained in a corral area or small holding pasture with sufficient feed and water to maintain proper body condition, until notified by the COR and/or PI for shipment.  Contractor will provide sufficient labor and facilities to move and sort horses during holding prior to shipment.

5. The contractor will be notified by the COR and/or PI a minimum of two weeks prior to gathering of the animals.  The COR and/or PI will notify the contractor of the number of animals that need to be gathered, prepared and shipped.

6. When necessary, euthanasia for reasons related to acts of mercy, health and safety

will be performed in a timely and humane manner in accordance with BLM policy.

B. Corral/Alleyways/Holding Facility

1. Corrals and alleys may be permanent or temporary (portable panels). It is anticipated that the corrals will be used to receive, hold, gather, ship and prepare horses. The corrals must be at least 72" high and made of stoutly constructed material i.e. pipe, steel, lumber, etc. No barbed wire will be allowed in the construction of corrals and any corral constructed of mesh wire (openings no larger than 2 by 4 inches) must be equipped with at least 3 wood sight boards (2 by 8 inches) . The three sight boards shall be spaced no more than 12 inches apart. Corrals constructed of pipe or wood must have openings of not more than 12 inches between horizontal members. Corrals, alleys and holding areas need to be free of protrusions, and hazards. Corral gates shall be constructed of wood or pipe the same height as the fences. Gates shall be visible to the horses either from the materials used in construction or by using materials such as plywood or plastic mesh placed on the gates. The contractor will furnish a stable area (concrete or gravel) to place a hydraulic "Tip Chute" provided by the Bureau. Electricity (120 volts) must be available to run the hydraulic squeeze chute.

2. A minimum of three sorting corrals, each with a minimum of 2,500 square feet, which would be used for holding horses for short term (up to five days prior to shipment). Additional pasture/trap/drylot space shall be available for close up holding of 20% of the animals under contract.

3. Soil types in corrals/pens must be well drained and non-alkaline in nature. Slopes within the pens shall provide for adequate drainage.

4. At least two or more small pastures to maintain approximately 100 wild horses prior to shipment (30 days or more) will be necessary. These pastures need to be accessible to the working corral, and constructed to have fencing to hold foals if needed during the weaning process. Fencing must be constructed of small wire mesh, low to the ground to prevent a foal from going under the fencing.

5. For small pastures/traps/drylots, described under (4) above, water will be available at all times for animals being maintained therein.

6. All newly received animals should be held and fed for a minimum of two weeks before being turned out into larger pastures to acclimate the horses to the feed truck and the fences. If any newly arrived horse(s) are still wearing a neck rope, animals will need to be sorted off and neck ropes removed prior to turnout into larger pastures. COR/PI shall be notified if any horses have neck ropes upon arrival.

7. All foals born at the facility must be gathered from the pastures and made available upon BLM request. Shipment of foals would occur within 12 months, but not before 4 months of age.

8.  Adequate chutes and crowding alleys are required to facilitate gathering, preparing, and shipping animals.

9.  The runway must have solid sides, have at least three sliding gates, be solidly constructed of steel or lumber, be at least 36' in length, 28-32" wide, and at least 72"tall.

C.  Unloading and Working Facility -The facility shall have a loading and unloading chute, sufficient to safely unload and load semi-trailer trucks and small stock trailers.  Chutes shall have solid sides which restrict the animal's vision and will minimize the risk that animals may attempt to jump out of the chute.  Width of the chute must be at least 32 inches.  If chute has brace bar(s) between the two sides, across the top, there must be a 72" minimum head clearance.  Fences, in the working area shall be at a minimum of 72 inches high, stoutly constructed and made of lumber, pipe, or steel.

D.  Fences - Perimeter fences shall be at least four strands and a minimum of 48" in height and completely enclose the facility and shall be of barbed wire.  ==All division fences shall consist of four strands== of barbed wire or other acceptable fencing materials. If determined by the COR and/or PI, it may be necessary for the contractor to flag certain fences with eight (8) inches of flagging attached to the top horizontal member of the fence every 20 feet to make the fences more visible to the horses (or native wildlife).  In some areas, wildlife-friendly fences will need to be constructed (these may include raising the bottom wire from 16-18" off the ground; use of a white resin coated top wire, use of smooth (as compared to barbed wire) at key wildlife crossings; the use of extensive flagging or attaching a piece of white PVC pipe to the top wire to increase visibility; or the construction of gates or sections of let-down fence at key wildlife crossings and opening or letting down these sections when horses are not grazing in the pasture.  The need for modification of any existing fences or the construction of any new fences to meet wildlife-friendly guidelines will be identified as mitigation during the BLM's EA process.  The one constant is that the height of the perimeter fencing will not be any lower than 48".  Gates, rather than cattle guards, should be used at all road crossings or fence openings to keep horses in pastures.

E.  Pastures

1.  The facility shall have sufficient land and forage to sustain a minimum of 200 up to a maximum of 5000 depending on the offeror's proposal) wild horses year round. The pastures must have sufficient rock and soil types to maintain proper hoof size and shape to maintain horse's hooves in good shape without the need for trimming.

    a.  The offered private lands must be either: (1) privately owned by the offeror; or (2) controlled by the offeror for a period of no less than the contract period applied for under this solicitation.

BLM_002264

The offered lands cannot include unfenced public lands (e.g., no National Forest or BLM lands may be included).   If any unfenced public lands are located within the privately owned or controlled land, the public lands must be fenced out using the fence specifications outlined in item d above, and will not be used in the BLM's calculation of the carrying capacity.

The offered private lands must be located at least 10 miles away from any BLM wild horse and burro herd area, herd management area or Forest Service Wild Horse and Burro Territory.  It is the responsibility of the offeror to verify that offered lands meet this requirement. Information on the location of BLM Wild Horse and Burro Herd Management Areas, Herd Areas and/or Forest Service Wild Horse and Burro Territory can be obtained by the Forest Service office or, for BLM land, by the BLM local office or the Wild Horse and Burro web site (www.wildhorseandburro.blm.gov.)

   b.  Pastures or combination of pastures shall be of sufficient size to allow horse's freedom of movement and the ability to exercise for good health, natural hoof trimming and to continue their free-roaming behavior. Pastures shall be contiguous.  Pastures shall be free of hazards such as unfenced graveled or paved public highways, junk, old spools of wire or other stored fencing materials, old cars, etc.

2. Sufficient land and forage shall be made available for the number of horses maintained.  However, as the herd is reduced by mortality or removal, pastures may be converted to domestic livestock use by the contractor, provided the use does not interfere with the wild horses.  Stocking domestic horses adjacent to or with the wild horses is not allowed or acceptable.

3. The available standing vegetation in pastures must be of sufficient nutritive quality and quantity to maintain the horses in good condition yearlong, with supplemental feeding as described in paragraph g, below.  Good condition is described as follows: ribs cannot be visually distinguished, but can be easily felt; backbone is not visible; hip bones do not show; withers are distinguishable but do not protrude; shoulders and neck blend smoothly into the body.  Animal body condition should be consistent with animal's age and health.

4. The stocking rate for the site shall be adjusted as necessary to assure horses are maintained in good condition, as described above.

5. Shelter from the natural elements shall be provided in each pasture by the topography (e.g., canyons, hills, etc.), other natural features such as trees, or manmade structures. The offered lands cannot have a tree canopy cover that prevents desirable forage species from growing or a canopy cover which prevents the Contractor and the BLM from obtaining an accurate monthly inventory of horses at the facility.

F.  Vegetation monitoring will be done by qualified BLM personnel.  If vegetation

utilization exceeds the moderate level(41-60% use), changes may need to be made so land health standards are maintained.

G.  Supplemental Feed

Supplemental feed shall be available at the site to feed horses when natural forage quantity or nutritional value is low.  When hay is used, animals shall be fed long stemmed alfalfa, grass, grass-alfalfa mix or  other supplements, with energy and protein sufficient to meet the nutritional needs of the animals. Hay used shall be leafy, green, well cured, and free of dust, mold, weeds and foreign material.  The amount of hay fed may need to be 2-3% of their body weight depending on the amount of forage available and other supplemental feeds used as needed to maintain the animals in good condition.  If animals begin to show poor body condition, specific feeding practices will be developed in consultation with the COR/PI. Inclement weather will stress animals, requiring that the volume of feed be increased to maintain good body condition. Feed shall be provided to the animals in a clean, well-drained area free of mud or standing water.

For animals maintained in corrals or small pastures access to water will be continuous, and checked or topped off twice each day, feed will be provided continuously or twice daily.

During times that natural forage will not maintain animals in good condition, typically during the dormant period (November 15 through March 15), the Contractor will supplement animals depending on location and weather.  The contractor shall coordinate with the COR/PI as to when supplementation during the dormant period occurs as well as during adverse acts of mother nature.

Funding for additional supplemental feed beyond 120 day period, will only be provided to the contractor after consultation (i.e. site visit) with the COR/PI and approval of the CO, and it is deemed necessary due to extenuating circumstances such as a recognized emergency or disaster (ie. Flood, fire, blizzard or drought).

H.  Water, Minerals, and Salt

1.  Each pasture shall have reliable water sources capable of supplying a continuous supply of clean water to horses daily.  The maximum distance to water in any pasture shall be 4 miles.

2.  Granulated, rock, or block salt shall be accessible to all horses in each pasture.

3.  Minerals necessary to maintain the horses in good condition and that are deficient in the available forage in the pasture shall be provided to all horses in each pasture, either as a supplement or added to the salt.

I.  Deaths and Disposal of Remains- Dead horses shall be identified by freeze number and

physical description to the extent possible, and disposed of in accordance with State and/or local sanitation laws. Rendering plants may be used for carcass disposal provided no compensation is received by any agency or individual disposing of the remains. The contractor shall notify the COR and/or PI, or designated representative immediately if the death of a horse is suspicious and it appears that a postmortem examination should be performed by a veterinarian. The COR and/or PI shall hire a veterinarian and make the arrangements for this procedure.

J. Observation of Horses- Wild horses shall be observed by the contractor at a minimum of one (1) time per week, to determine the overall condition of the animals, and any deaths. Observation will be conducted more frequently when conditions warrant; such as extreme weather (i.e., flooding, tornados, following blizzards) during fire season or escaped animals, to ascertain their safety and wellbeing and assure that fences are properly maintained. Except in emergency situations, observations shall be carried out on foot, from a vehicle, or horseback. In unusual situations, such as deep snow, etc., which make ground transportation impractical, aircraft may be used, with the prior approval of the COR and/or PI. Prior to submission of the monthly invoice the contractor will conduct a complete inventory of all wild horses. Records that document, as a minimum, the date of the observation, number and condition of the horses, problems and concerns of the observer, and the name(s) of individual(s) making the observation shall be maintained and sent to the COR every month along with the monthly invoice and death record. Any problems or concerns shall be reported to the COR and/or PI within 24 hours of discovery.

K. Access to the Facility- Access to the unloading and loading chute shall accommodate both trucks with stock trailers and semi-trucks. Access shall be available during inclement weather.

L. Observation for the Public - The site is not intended to be a public viewing area. Therefore, the contractor will restrict or prohibit access onto the site by the general public. The BLM may require access for the public and/or media tours hosted by BLM staff and the Contractor during the life of the contract.

1. The contractor shall notify the COR and/or PI within 24 hours of any request from humane organizations, general public, media or wild horse interest groups, to observe the horses.

2. All request from organizations and groups may be allowed to tour the site only under the approval and guidance of the COR and/or PI.

3. All requests to view the animals shall be directed to the COR and/or PI.

M. Records - An inventory that identifies all horses delivered to the site shall be kept at the facility. A record shall be kept on the location (pasture) each horse occupies. Each horse will be identified with a 4-digit freeze number on the hip, along with an angle freeze mark on the left side of the neck. Horses that die shall be identified as soon as possible

and noted on the monthly inventory.  Probable cause of death shall also be noted.   All records will be e-mailed to the COR the first week of every month, detailing the previous months information.

**5       RESPONSIBILITES OF BLM**

A.  Veterinary Care - The BLM will provide and pay for a veterinarian to treat sick or injured horses, as deemed necessary by the COR and/or PI.  The veterinarian may be used to perform euthanasia on horses and conduct postmortem examinations as requested by the COR and/or PI consistent with BLM policy for reasons related to acts of mercy, health and safety.  The contractor shall gather and hold such animals and assist the veterinarian if necessary.

B.  All pre-conditioning (vaccinations, de-worming, blood testing) and preparation for shipment of horses will be conducted by the BLM with assistance from the contractor.

C.  BLM will conduct periodic inspections throughout the year including an annual count to assess current inventory and overall horse health.

D.  Working of Horses - The BLM will provide the hydraulic "tip" chute, to work horses to be shipped from the facility.  This may also be used to work horses in case of an outbreak of disease.  The panels and chute will be in the working corral area of the facility, and be able to tie into the loading chute area.

BLM_002269

| | |
|---|---|
| **From:** | McElroy, Sarah |
| **To:** | Stevenson, Brent A |
| **Cc:** | Richey, Christopher W; Waddell, Holle |
| **Subject:** | Re: Payment Discussion |
| **Date:** | Friday, June 1, 2018 3:28:04 PM |
| **Importance:** | High |

Brent,

Thank you for you email. The inter-Agency Agreement  can be part of the discussion on Friday.I will extend a calendar invite to Christopher.

*Sarah A McElroy*
*Program Management Analyst*
*BLM - Division of Wild Horses and Burros WO262*
**(405) 579-1864**

On Fri, Jun 1, 2018 at 3:09 PM, Stevenson, Brent <brent_stevenson@ibc.doi.gov> wrote:

Hi Chris - I have been working with Holle and Sarah on some questions they have with their program. These programs are managed by BLM, but the 'Save the Mustangs' program was recorded in DO's instance of FBMS in the following LOA ( XXXD8369DT, DS69200000 ,DDTSM0000.000000). Here are the questions:

1) In the Save the Mustangs account which is in DO's instance of FBMS, they would like to use the money in there to fund the new incentive program for adopting wild horses. However, that new incentive program may be in BLM's instance of FBMS as Holle indicated it may need to go into fund center LLWO260000. Question is how would this work if they are spending the money in BLM's instance of FBMS and the money to fund the program is in DO's instance of FBMS? Is it an option to set up the disbursements for the incentive program in DO's instance of FBMS as well? I am not sure how the relationship works between DO-BLM with the initial decision on Save the Mustangs, so thought I would ask what the possibilities are...

2) How operationally will this work for payments to be made to individuals who are in the adoption incentive program? This is more of a question for accounting ops in either BLM or DO depending on where this activity ends up getting disbursed (based on question #1 above). Just didn't want to lose sight of this issue.

Any thoughts on this? Determining how we deal with question #1 will help us overcome question #2....

Sarah - If you did want IBC to perform this work and it ended up being in the BLM instance of FBMS, we would have to talk about getting our folks access to FBMS and doing an Inter-Agency Agreement to perform the work. Can cross that bridge depending on what guidance Chris can provide to us.

Thank you!

Brent Stevenson, CPA
Chief, Accounting Operations Services Division
Financial Management Directorate
Interior Business Center
303-969-5416 (Office)

720-602-5722 (Cell)
brent_stevenson@ibc.doi.gov
U.S. Department of the Interior
Office of the Secretary
www.ibc.doi.gov

*Your Focus: Your Mission*
*Our Focus: You*

---------- Forwarded message ----------
From: **McElroy, Sarah** <smcelroy@blm.gov>
Date: Fri, Jun 1, 2018 at 12:23 PM
Subject: Re: Payment Discussion
To: "Stevenson, Brent" <brent_stevenson@ibc.doi.gov>
Cc: Holle Hooks <hwaddell@blm.gov>

Brent,

One of the projects I have been working on is how can we spend/have access to the money from the Save the Mustang account. I am not sure if the program is thinking of using that money for the incentive program or not but any information or guidance you have on how we can gain access would be helpful.
I will reach out to BLM folks that process vendor/commercial payments. However, I would like to continue the conversation as it might be useful for us to set up an account with IBC for the sole purpose of the intensive program. I am a little unsure myself to what might be the best approach.

Thank you,


*Sarah A McElroy*
*Program Management Analyst*
*BLM - Division of Wild Horses and Burros WO262*
**(405) 579-1864**




On Fri, Jun 1, 2018 at 10:49 AM, Stevenson, Brent <brent_stevenson@ibc.doi.gov> wrote:
  I believe with that fund center (beginning with 'LL') indicates that it is a BLM fund center and that would fall under the BLM instance of FBMS (and IBC does not have any access to that). I believe it is a different program, but the save the mustangs program is under DO (Departmental Offices) where we do input the collections and it has a fund center of DS69200000 where we post those collections. The 'DS' fund center indicates it is within DO's instance of FBMS.

Based on that, I think you may need to get with the BLM folks that process vendor/commercial payments to go through the process...let me know what you think or if I may have missed anything.

Thank you,

Brent Stevenson, CPA
Chief, Accounting Operations Services Division
Financial Management Directorate
Interior Business Center
303-969-5416 (Office)
720-602-5722 (Cell)
brent_stevenson@ibc.doi.gov
U.S. Department of the Interior
Office of the Secretary
www.ibc.doi.gov

*Your Focus: Your Mission*
*Our Focus: You*

On Fri, Jun 1, 2018 at 8:44 AM, Holle Waddell <hwaddell@blm.gov> wrote:
> LLWO260000
>
> Sent from my iPhone
>
> On Jun 1, 2018, at 9:37 AM, Stevenson, Brent <brent_stevenson@ibc.doi.gov> wrote:
>
>> Do either of you happen to have the cost center/fund center that you operate
>> out of in Departmental Offices' instance of FBMS?
>>
>> Thanks!
>>
>> Brent Stevenson, CPA
>> Chief, Accounting Operations Services Division
>> Financial Management Directorate
>> Interior Business Center
>> 303-969-5416 (Office)
>> 720-602-5722 (Cell)
>> brent_stevenson@ibc.doi.gov
>> U.S. Department of the Interior
>> Office of the Secretary
>> www.ibc.doi.gov
>>
>> *Your Focus: Your Mission*
>> *Our Focus: You*
>>
>> On Fri, Jun 1, 2018 at 6:54 AM, Stevenson, Brent
>> <brent_stevenson@ibc.doi.gov> wrote:
>>> Thanks, Sarah...let's try Wednesday at 4:30PM EST to touch base.
>>>
>>> Thank you!

Brent Stevenson, CPA
Chief, Accounting Operations Services Division
Financial Management Directorate
Interior Business Center
303-969-5416 (Office)
720-602-5722 (Cell)
brent_stevenson@ibc.doi.gov
U.S. Department of the Interior
Office of the Secretary
www.ibc.doi.gov

*Your Focus: Your Mission*
*Our Focus: You*

On Fri, Jun 1, 2018 at 6:51 AM, McElroy, Sarah <smcelroy@blm.gov>
wrote:

> Good Morning,
>
> Looking at everyone's schedule it looks like Wednesday after
> 4:00 pm eastern time will work or Friday after 1:00 pm. Brent do
> you have a preference? Let me know.
>
> Thank you,
>
>
> *Sarah A McElroy*
> *Program Management Analyst*
> *BLM - Division of Wild Horses and Burros WO262*
> **(405) 579-1864**

On Fri, Jun 1, 2018 at 6:54 AM, Stevenson, Brent
<brent_stevenson@ibc.doi.gov> wrote:

> Good morning Sarah - I will be TDY next to DC so only have the
> availability that I noted below to Holle Monday-Thursday. Outside of
> that, I could meet on Friday. I am planning on talking to our Vendor
> Payments Branch Chief today to get some more information on
> options.
>
> Thank you,
>
> Brent Stevenson, CPA
> Chief, Accounting Operations Services Division
> Financial Management Directorate
> Interior Business Center

303-969-5416 (Office)
720-602-5722 (Cell)
brent_stevenson@ibc.doi.gov
U.S. Department of the Interior
Office of the Secretary
www.ibc.doi.gov

*Your Focus: Your Mission*
*Our Focus: You*

On Fri, Jun 1, 2018 at 1:40 AM, Waddell, Holle
<hwaddell@blm.gov> wrote:

> Thank you Brent for returning my call as well as your
> willingness to assist in the implementation of the adoption
> incentive program. I am unsure of availability next week as
> there are a few things up in the air however please work with
> Sarah, cc'd here, on finding a time to meet sometime next
> week with the Division Chief and myself.
>
>
> Thank you,
>
> Holle' Waddell │ Branch Chief │ Division of Wild Horses and Burros │
>
> Bureau of Land Management │ 405.579.1860 (O) │ 405.579.7102 (F) │
> hwaddell@blm.gov
>
> "A positive outlook, regardless of how bleak the circumstances may look, is a
> **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an
> internal gratitude for all blessings you have. When you shift your thoughts, your
> actions will follow suit and you will begin to create the reality you desire." - Cheryl
> Wood
>
> 

On Thu, May 31, 2018 at 3:33 PM, Stevenson, Brent
<brent_stevenson@ibc.doi.gov> wrote:

> Hi Holle - Good talking with you this afternoon. Per our
> conversation, I will talk with our Vendor Payments Branch Chief
> on some possibilities with the incentive program you described.
>
> Also, I will be TDY next week and will be in the MIB on 6/5 for
> IBC's DOI Customer Day. It is scheduled to run from 2PM-5PM.
> I have noon-1PM available before I need to set up (and have
> meetings prior to that). I will also be back at the MIB around
> 4PM on 6/6 after some meetings in Reston earlier that day. If it
> works out to talk while I'm in town, we can certainly try and get
> together.
>
> Thank you!

Brent Stevenson, CPA
Chief, Accounting Operations Services Division
Financial Management Directorate
Interior Business Center
303-969-5416 (Office)
720-602-5722 (Cell)
brent_stevenson@ibc.doi.gov
U.S. Department of the Interior
Office of the Secretary
www.ibc.doi.gov

*Your Focus: Your Mission*
*Our Focus: You*

| | |
|---|---|
| **From:** | Google Calendar on behalf of Waddell, Holle |
| **To:** | Leonard, Stephen P; Johnson, Krystal F; Frost, Scarlett H; Kueck, Meredith A; Roberson, Peter (PJ) L; Fontaine, Kristen A; Reid, Lisa; Rittenhouse, Heather H; Tiel-Nelson, Heather J; Neill, John J; Fluer, Scott L; Spencer, Sally J; Todd, Marci L; Lockie, Grant E; Waddell, Holle; dacollin@blm.gov |
| **Subject:** | PCPT: Adoption Incentive Program |
| **Date:** | Tuesday, June 5, 2018 9:34:52 AM |
| **Importance:** | High |

Hello all - Below is the language from the Options Paper submitted to Congress in April: Adoption Incentive Program: To increase the number of animals placed into private care, one of the options presented in this report assumes that an incentive program will be developed to offer private care providers $1,000 at the point of adoption, with proper controls. This will allow adopters to help defray expenses for care and training of adopted animals, and will increase the chances that the animals remain in private care for the rest of their lives. This investment would save money for the taxpayer and the BLM program in the first year of implementation alone. For instance, if that same adopted animal were instead held in a short-term holding facility, it would have cost the United States $1,000 after only 200 days in captivity. Over a period of 25 years, holding that same animal in an off-range corral would have cost the taxpayers nearly $46,000.

---

## PCPT: Adoption Incentive Program

- Initial Overview of Task
- Timeline
- Availability/Calendar for month of June
- Review Previous Work

| | |
|---|---|
| When | Tue Jun 5, 2018 10am – 11am Central Time |
| Where | Conference Line: 877.973.6205 Passcode: 9821164# (map) |
| Video call | https://hangouts.google.com/hangouts/_/doi.gov/hwaddell |
| Who | - hwaddell@blm.gov - organizer |
| | - sspencer@blm.gov |
| | - dacollin@blm.gov |
| | - sleonard@blm.gov |
| | - glockie@blm.gov |
| | - hnelson@blm.gov |
| | - kfjohnso@blm.gov |
| | - mkueck@blm.gov |
| | - lreid@blm.gov |
| | - proberson@blm.gov |
| | - jneill@blm.gov |
| | - kfontaine@blm.gov |
| | - sfluer@blm.gov |
| | - sfrost@blm.gov |
| | - m1todd@blm.gov - optional |

- brittenh@blm.gov - optional

BLM_002277

| | |
|---|---|
| **From:** | Johnson, Krystal F |
| **To:** | Waddell, Holle; Kueck, Meredith A |
| **Subject:** | Re: PCPT: Adoption Incentive Program |
| **Date:** | Tuesday, June 5, 2018 11:07:12 AM |
| **Importance:** | High |

Hey ladies,

What about a WHBPS enhancement to include a drop down when entering the PMACA to select if the adopter will recieve or has received the incentive? Then in theory you could pull a report in OBIEE that identifies those PMACAs and also tie it into any compliance status and any returned or relinquished actions.

On Tue, Jun 5, 2018 at 10:34 AM, <hwaddell@blm.gov> wrote:

> Hello all - Below is the language from the Options Paper submitted to Congress in April: Adoption Incentive Program: To increase the number of animals placed into private care, one of the options presented in this report assumes that an incentive program will be developed to offer private care providers $1,000 at the point of adoption, with proper controls. This will allow adopters to help defray expenses for care and training of adopted animals, and will increase the chances that the animals remain in private care for the rest of their lives. This investment will save money for the taxpayer and the BLM program in the first year of implementation alone. For instance, if that same adopted animal were instead held in a short-term holding facility, it would have cost the United States $1,000 after only 200 days in captivity. Over a period of 25 years, holding that same animal in an off-range corral would have cost the taxpayers nearly $46,000.

> ## PCPT: Adoption Incentive Program
>
> - Initial Overview of Task
> - Timeline
> - Availability/Calendar for month of June
> - Review Previous Work
>
> | | |
> |---|---|
> | When | Tue Jun 5, 2018 10am – 11am Central Time |
> | Where | Conference Line: 877.973.6205 Passcode: 9821164# (map) |
> | Video call | https://hangouts.google.com/hangouts/_/doi.gov/hwaddell |
> | Who | • hwaddell@blm.gov - organizer |
> | | • sspencer@blm.gov |
> | | • dacollin@blm.gov |
> | | • sleonard@blm.gov |
> | | • glockie@blm.gov |
> | | • hnelson@blm.gov |
> | | • kfjohnso@blm.gov |
> | | • mkueck@blm.gov |

- [lreid@blm.gov](mailto:lreid@blm.gov)
- [proberson@blm.gov](mailto:proberson@blm.gov)
- [jneill@blm.gov](mailto:jneill@blm.gov)
- [kfontaine@blm.gov](mailto:kfontaine@blm.gov)
- [sfluer@blm.gov](mailto:sfluer@blm.gov)
- [sfrost@blm.gov](mailto:sfrost@blm.gov)
- [m1todd@blm.gov](mailto:m1todd@blm.gov) - optional
- [brittenh@blm.gov](mailto:brittenh@blm.gov) - optional

--

~Krystal

Krystal Johnson

Wild Horse and Burro Specialist/State Program Lead
Eastern States Office
20 M Street, SE
Washington DC 20003

Office (202) 912-7741
Cell (202) 329-4728

BLM_002279

| | |
|---|---|
| **From:** | Lutterman, Jason W |
| **To:** | Waddell, Hollie |
| **Subject:** | Re: Summary of Adoption Incentive Program |
| **Date:** | Tuesday, June 5, 2018 6:11:35 PM |
| **Importance:** | High |

My suggested edits. Call me if you want to discuss. I'm not a fan of the name of the program (especially since the incentive is available when purchasing animals too, right?)

The purpose of the Adoption Incentive Program (AIP) is to encourage more adoptions and sales of excess animals by providing a financial incentive to help defray initial ownership costs, such as veterinary care, feed and training. Increasing the placement of animals into private care is a critical priority of the program and of upmost interest to BLM due to the costs associated with caring for unadopted/unsold animals in BLM corrals and pastures. Costs savings may be utilized for other management operations, such as gathers.

--
Jason Lutterman
Public Affairs Specialist (On Range)
National Wild Horse and Burro Program
Bureau of Land Management
Office: (775) 861-6614
Mobile: (202) 304-0967

Visit us online:
www.BLM.gov/WHB

On Tue, Jun 5, 2018 at 4:02 PM Waddell, Hollie <hwaddell@blm.gov> wrote:

**Purpose**
The purpose of the Adoption Incentive Program (AIP) is to encourage, motivate and invest in the animals and adopters while increasing the number of animals placed into private care. Placing animals into private care is a vital component of the program as well as BLM due to the costs savings from caring for animals in corrals and pastures. These costs savings may be diverted to other critical operations and aspects of managing our wild horses and burros. The BLM is offering an incentive fee to assist with the care, feed and, training skills of the adopted animals.

Thank you,

Hollie' Waddell | Branch Chief | Division of Wild Horses and Burros |
Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a CHOICE. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood

| From: | Prendergast (Kim), Kimberly N |
|---|---|
| To: | Waddell, Holle |
| Subject: | Re: Follow-up: Adoption Incentive Program Payment Discussion |
| Date: | Thursday, June 7, 2018 8:48:09 AM |
| Importance: | High |

Good morning Holle, thanks for the summary. Can you confirm who your Solicitor POCs were from General Law, etc? Also, have you been in contact with the BLM Budget Office regarding this initiative/pilot?
I will be in touch on next steps...

On Wed, Jun 6, 2018 at 6:54 PM, Waddell, Holle <hwaddell@blm.gov> wrote:

First, I'd like to thank you all for joining the call and your willingness to assist the program in finding a solution and a path forward to offer adoption incentive fee payments to the public (adopters) in an effort to increase the private care placement of wild horses and burros. Increasing the placement of animals into private care is a critical priority of the program and of utmost interest to BLM due to the costs associated with caring for unadopted/unsold animals in BLM corrals and pastures. Costs savings may be utilized for other management operations, such as gathers. As discussed, I've compiled thoughts and opinions from our solicitors regarding adoption incentive for untrained and trained animals:

*The adoption/training incentive question, is really subsidiary to the general adoption incentive question. I.e., provided that BLM has authority to incentivize adoption à la the New Mexico pilot, then it follows that BLM has authority to incentivize adoption with training.*

Scenario 1

*BLM and its Wild Horse Advisory Board have discussed a potential pilot program whereby a wild horse adopter would be eligible for a cash incentive if it takes an ungentled wild animal, trains that animal to enhance its value, then allows BLM to subsequently adopt or sell that animal to a third party.*

████████████████████████████████

I look forward to hearing from for next steps.

Thank you,

Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |

Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood

--
*R, Kim Prendergast*
U.S. Department of the Interior
Division of Budget Administration and Departmental Management
1849 C Street, NW, Room 4127
Washington, DC 20240
Phone: 202-208-6443
Email: Kim_Prendergast@ios.doi.gov

*We appreciate your feedback. Tell us what you think here, and respond to our survey. If you have trouble accessing the survey, please paste the following link into your browser:*

*https://docs.google.com/a/ios.doi.gov/forms/d/12k5bgm01hs7a_H5rGqoMfhFWGc8XV2GoP_0LAIf9jJ4/viewform.*

| | |
|---|---|
| **From:** | Roberson, Peter (PJ) L |
| **To:** | Waddell, Holle |
| **Subject:** | Re: Adoption Incentive Program DRAFT |
| **Date:** | Friday, June 8, 2018 10:15:58 AM |
| **Attachments:** | Adoption Incentive Agreement.docx |
| **Importance:** | High |

Good Morning Holle,

Attached is the revised document

Thank You

On Fri, Jun 8, 2018 at 2:28 AM, Waddell, Holle <hwaddell@blm.gov> wrote:

PJ - As discussed yesterday, attached is the incentive program draft for the team to review and edit during Tuesday's meeting. Give me a call in the am. I am hoping you have had time to pull things together and prior to getting on the road.

Thank you,

Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |

Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood



--
Best Regards,

**PJ Roberson**
**Program Administrator**
**Bureau of Land Management - Wild Horse & Burro Program**
**Office: (405) 579-1863**
**201 Stephenson Parkway Suite 1200 Norman, OK 73109**
proberson@blm.gov

*"How we seek to spend our time may depend on how much time we perceive ourselves to have" -Atul Gawande*

BLM_002283

# Adoption Incentive Agreement

| Adopter Information | | |
|---|---|---|
| First Name: | Middle Name: | Last Name: |
| Address: | City | State: |
| Zip Code: | Email Address: | |
| Financial Institution Name: | Primary Account Holder Name: | |

Select account for Incentive deposit:

| Account Type | Routing Number | Account Number |
|---|---|---|
| ☐ Checking | | |
| ☐ Savings | | |

## Terms and Conditions:

Initial: _____    I _____ (Print Name) hearby..........

Initial: _____    I hereby authorize the Department of Interior- Bureau of Land Management to initiate automatic deposits/ and debits to my account at the financial institution listed above.

Initial: _____    This agreement will remain in effect until DOI-BLM receives written notice of cancellation from me or my financial institution, or until I submit a new direct deposit form.

Initial: _____    Under penalty of prosecution for violating 18 U.S.C. 1001, which makes it a Federal crime to make false statements to any agency of the United States, I hereby certify that I will provide humane care for any animals that I adopt and will not sell or transfer ownership of them to any person or organization that intends to resell, trade, or give away such animals for slaughter or processing into commercial products.

Initial: _____    The BLM will use this information to process your agreement for private maintenance and care of wild horses or burros. BLM will use your driver's license and social security numbers for debt collection purposes under the authority of the Debt Collection Improvement Act, 31  U.S.C. 7701.

Full Name (Print): _____

Signature: _____

Date: _____

BLM_002284

| | |
|---|---|
| **From:** | Roberson, Peter (PJ) L |
| **To:** | Waddell, Holle; Tiel-Nelson, Heather J; Johnson, Krystal F; Reid, Lisa; Lockie, Grant E; Kueck, Meredith A; Fluer, Scott L; Deborah Collins; Neill, John J; Frost, Scarlett H; Fontaine, Kristen A; Spencer, Sally J; Todd, Marci L; Rittenhouse, Bruce H; Leonard, Stephen P |
| **Subject:** | PCPT- Draft Adoption Incentive Agreement |
| **Date:** | Monday, June 11, 2018 9:41:18 AM |
| **Attachments:** | Adoption Incentive Agreement.docx |

Good Morning Team,

Attached is the draft "Adoption Incentive Agreement" for your review. Please make revisions/comments and be prepared to discuss on tomorrow's PCPT call.

Best Regards,

**PJ Roberson**
**Program Administrator**
**Bureau of Land Management - Wild Horse & Burro Program**
**Office: (405) 579-1863**
**201 Stephenson Parkway Suite 1200 Norman, OK 73109**
**proberson@blm.gov**

*"How we seek to spend our time may depend on how much time we perceive ourselves to have" -Atul Gawande*

# Adoption Incentive Agreement

| Adopter Information | | |
|---|---|---|
| First Name: | Middle Name: | Last Name: |
| Address: | City | State: |
| Zip Code: | Email Address: | |
| Financial Institution Name: | Primary Account Holder Name: | |

**Select account for Incentive deposit:**

| Account Type | Routing Number | Account Number |
|---|---|---|
| ☐ Checking | | |
| ☐ Savings | | |

## Terms and Conditions:

I _____ (Print Name) hearby……….

Initial: _____   I hereby authorize the Department of Interior- Bureau of Land Management to initiate automatic deposits/ and debits to my account at the financial institution listed above.

Initial: _____   This agreement will remain in effect until DOI-BLM receives written notice of cancellation from me or my financial institution, or until I submit a new direct deposit form.

Initial: _____   Under penalty of prosecution for violating 18 U.S.C. 1001, which makes it a Federal crime to make false statements to any agency of the United States, I hereby certify that I will provide humane care for any animals that I adopt and will not sell or transfer ownership of them to any person or organization that intends to resell, trade, or give away such animals for slaughter or processing into commercial products.

Initial: _____   The BLM will use this information to process your agreement for private maintenance and care of wild horses or burros. BLM will use your driver's license and social security numbers for debt collection purposes under the authority of the Debt Collection Improvement Act, 31  U.S.C. 7701.

Full Name (Print): _____

Signature: _____

Date: _____

| From: | Roberson, Peter (PJ) L |
|---|---|
| To: | Waddell, Holle; Tiel-Nelson, Heather J; Johnson, Krystal F; Reid, Lisa; Lockie, Grant E; Kueck, Meredith A; Fluer, Scott L; Deborah Collins; Neill, John J; Frost, Scarlett H; Fontaine, Kristen A; Spencer, Sally J; Todd, Marci L; Rittenhouse, Bruce H; Leonard, Stephen P |
| Subject: | Re: PCPT- Draft Adoption Incentive Agreement |
| Date: | Monday, June 11, 2018 10:05:54 AM |
| Attachments: | Adoption Incentive Program_DRAFT.docx |

Good Morning Team,

My apologies- In addition please review the attached Adoption Incentive Program draft document as well and be prepared to discuss. Both files will be available on the calendar invite.

Thank You

On Mon, Jun 11, 2018 at 9:41 AM, Roberson, Peter <proberson@blm.gov> wrote:

> Good Morning Team,
>
> Attached is the draft "Adoption Incentive Agreement" for your review. Please make revisions/comments and be prepared to discuss on tomorrow's PCPT call.
>
> **Best Regards,**
>
> **PJ Roberson**
> **Program Administrator**
> **Bureau of Land Management - Wild Horse & Burro Program**
> **Office: (405) 579-1863**
> **201 Stephenson Parkway Suite 1200 Norman, OK 73109**
> **proberson@blm.gov**
>
> *"How we seek to spend our time may depend on how much time we perceive ourselves to have" -Atul Gawande*

--
**Best Regards,**

**PJ Roberson**
**Program Administrator**
**Bureau of Land Management - Wild Horse & Burro Program**
**Office: (405) 579-1863**
**201 Stephenson Parkway Suite 1200 Norman, OK 73109**
**proberson@blm.gov**

*"How we seek to spend our time may depend on how much time we perceive ourselves to have" -Atul Gawande*

BLM_002287

| | |
|---|---|
| **From:** | Rittenhouse, Bruce H |
| **To:** | Waddell, Holle; Shepherd, Alan B |
| **Subject:** | Fwd: End of the Week Horse Round-up |
| **Date:** | Tuesday, June 12, 2018 10:55:39 AM |
| **Attachments:** | Advisory Board Nominations Summary.docx |
| | Sale Barn Notice_2018.04.27.pdf |

Here is the list of topics that Steve has for a briefing scheduled for next Tuesday. Some of these should be really quick while others such as MHF and the emergency/water hauling possibly be stand alone briefings but getting on Rich's calendar may tough. Because of that I think we can devote enough time to discuss MHF and possibly the emergency/water hauling issue. Additional items I have besides what Steve includes is Gather Approval Process; Transfer Program updates. Hopefully I can get regular briefings with Rich similar to what Dean/Alan had with Mike Nedd.

---------- Forwarded message ----------
From: **Tryon, Steve** <stryon@blm.gov>
Date: Fri, Jun 8, 2018 at 6:15 PM
Subject: End of the Week Horse Round-up
To: Richard Cardinale <richard_cardinale@ios.doi.gov>, Brian Steed <bsteed@blm.gov>, Michael Nedd <mnedd@blm.gov>
Cc: Kristin Bail <kbail@blm.gov>, Bruce Rittenhouse <brittenh@blm.gov>, Jeff Brune <jbrune@blm.gov>, Jeff Krauss <jkrauss@blm.gov>


Greetings, all.

We have not had an opportunity for a face-to-face briefing on the WHB program since May 15, and there are any number of issues pending that we would like to discuss. Rich, I suggest we get on your calendar for some time next week. Several of the items below are being reported in the press, and can and will make their way to the Director's office. Also, changes to the approved gather schedule are sometimes approved by the DD-Ops, and sometimes made at a lower level. We are recommending a change that affects a gather now <u>scheduled to start in Wendon, AZ tomorrow morning</u>.

<u>Pending Items That Merit Discussion at the Director/DD-Ops Level</u>

- We should brief Rich on the approved 2018 gather schedule, which at approximately 10,500 animals, is the most aggressive gather schedule we have run in a decade, with attendant outyear costs.
- The House Appropriations Committee has opened an investigation of the WHB program. Linda Smith and I are listed as the points of contact. This is basically a program audit.
- We have been working closely with the AZSO on the need to gather burros that have wandered first onto private land, and then onto highway 60 and its adjacent right-of-way near Wendon, AZ. So far this week, six animals have been hit by a vehicle and died. In addition, other animals were herded into a BOR drainage ditch, with the opening then sealed with chain link fence. They need to be moved. We have authorized re-allocating funding from within amounts previously approved for AZ, and work is going to start on gathering up to 60 head beginning tomorrow morning. <u>This is the sort of operational detail we would normally run by DD-O first</u>, but 200 has authorized it in this case because it is not at all budget affecting and it is desired by the AZSO management team. And we haven't been able to get on your schedules this week.
- The preliminary list of new WHB Advisory Board members is attached. Normally we

BLM_002288

would not brief 100 on this until the review team had narrowed the list to three recommended, and one or two alternates. But if any of you would like an opportunity to weigh in early, we can give you a preliminary briefing any time.

- The Huffington Post is getting ready to run a piece on foreign countries' interest in BLM mustangs, including Guyana and Russia. Kristin will remember that an entrepreneur named Lon Ball told the Adv. Board in Grand Junction last fall that Russia was interested in adopting all 45,000 animals then in holding, if only we would cover shipping costs. HuffPo may also mention the upcoming adoption incentive.
- The USFS-led Cold Creek, NV gather conducted on May 22, with 19 animals either euthanized or dead of natural causes. 127 animals were shipped to Ridgecrest, CA. One has since been euthanized. This gather is worth an after-action review with 100 as to why USFS didn't ask BLM to euthanize more animals. They were leading the charge and wanted to bring the animals back to health in a BLM facility, but by BLM policy we could have euthanized more animals prior to shipping the remaining condition class 3 or greater animals.
- The number of burros shot and killed near Beatty, NV topped out at 22, with one of the jennies carrying a foal, also deceased. I spoke to Special Agent Chris Allen tonight, and the investigation is still open. He told me another two burros were found shot and killed in Clark County, NV in the last two weeks. All neck shots. Similar caliber.
- We will soon be ready to update Brian on feedback from the states on discontinuing the practice of hauling water for horses. All states water, so this would be a change in practice that would need to be socialized with the State Directors.
- We should probably have a discussion on the meaning of "emergency" in our gather priority-setting guidance. Some states interpret a crash in WHB herd health as an "emergency." If we are going to discontinue hauling water, we probably ought to couple that change with a clarification that declines in horse and burro health do not constitute an emergency and should not be the basis of a gather. They could be the basis for euthanasia, just not for gathers. These subjects run in tandem because discontinuing hauling water will result in more states appealing to the WO for funding for emergency gathers, under their current interpretation.
- Would like to update you on efforts to place checks and balances on the Mustang Heritage Foundation, per discussions with Brian. No issues of public interest, here, just making sure we have appropriate fiduciary and program sideboards in place in this important partnership.
- We can provide an update on changes to the adoption program at any time. Basically we are looking to get an IM pulled together by the end of June that: 1) lowers the adoption fee from $125 to $25, 2) pays an adoption incentive of $1,000 immediately after adoption, 3) pays a second financial incentive of $500 at the time of titling, and 4) minimizes compliance costs by placing more of the burden on the adopter working with his/her veterinarian and less on a traveling BLM inspector.
- We recently OKd the placement of the attached notice in horse sale barns. These are sale barns for private horses, but there have been occasions when an animal with a freezebrand showed up at a sale barn. If properly titled, this is not a problem. The notice tells the barn managers what to do if a U.S. freeze branded horse shows up in their facility.

Steve Tryon
Deputy Assistant Director, Resources and Planning
Bureau of Land Management
1849 C Street, NW
Room 5654

Washington, DC 20240
202-208-4896


--
Bruce Rittenhouse
Acting Wild Horse and Burro Division Chief (WO-260)
20 M Street, Southeast
Washington DC 20003
202-912-7648 (office)
720-454-5747 (mobile)
brittenh@blm.gov

| | |
|---|---|
| **From:** | Lund, Kenneth E (Moved) |
| **To:** | Carter, David D |
| **Cc:** | Sarah McElroy; Waddell, Holle; Pagal, Eric V |
| **Subject:** | Re: Convenience Check Writing for WHB Adoption Incentive Payments |
| **Date:** | Thursday, June 14, 2018 3:49:00 PM |
| **Importance:** | High |

Good afternoon David

Please see Holle's email. There is an initiative to pay incentives to people to adopt horses up to $1,500 total. The main question is; could we use convenience checks as a method of payment?

v/r
Ken


Kenneth E. Lund

Senior Procurement Analyst

BLM-WO

20 M St SE

Washington, DC 20003

Office:202-912-7034

Cell: 202-744-1847

Fax: 202-912-7186

Monday-Regular day off

Thursday-Telework


On Thu, Jun 14, 2018 at 2:09 PM, Waddell, Holle <hwaddell@blm.gov> wrote:

Hi Ken - As discussed this morning, the Wild Horse and Burro program submitted an Options Paper to Congress in April 2018. One of the components mentioned was an Adoption Incentive Program. The purpose of the Adoption Incentive Program (AIP) is to increase the numbers of excess animals placed into private care through adoptions. This program will encourage new individuals to adopt a wild horse or burro, motivate previous adopters to re-engage with the program and invest in animals by providing a financial incentive, $1,000 at the time of adoption and an additional $500 at time of title, to help defray initial ownership costs, such as veterinary care, feed and training. Increasing the placement of animals into private care is a critical priority of the program and of utmost interest to BLM due to the costs associated with caring for unadopted/unsold animals in BLM corrals and pastures. Costs savings may be utilized for other management operations, such as gathers.

The program has identified a line item for FY 2018 to potentially fund 500 incentives using appropriated funds however I need assistance with the logistics of providing the incentive payments. I have begun working with solicitors, IBC and others regarding the authority, process and overall logistics of administering and executing the incentive fee payments.

I have been asked to provide a draft program by the end of June so any assistance you can provide will be

great.

Thank you,

Holle' Waddell │ Branch Chief │ Division of Wild Horses and Burros │

Bureau of Land Management │ 405.579.1860 (O) │ 405.579.7102 (F) │ hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood



| | |
|---|---|
| **From:** | Carter, David D |
| **To:** | Lund, Kenneth E (Moved) |
| **Cc:** | Sarah McElroy; Waddell, Holle; Pagal, Eric V |
| **Subject:** | Re: Convenience Check Writing for WHB Adoption Incentive Payments |
| **Date:** | Friday, June 15, 2018 9:47:45 AM |
| **Importance:** | High |

Hi Ken

I have a few questions.

1. Use of Convenience Checks requires the check writer to collect Tax IDs for individuals and 1099 Reporting to IRS. How will this process work? Will checks be written to individuals that do not have a Tax ID?
2. Do we have a process to prevent splitting a transaction?
3. The bank charges a fee for each Convenience Check issuance and in SmartPay3 the check fees are much higher.
4. Can you provide additional details on this new program?
    1. Program Duration
    2. How many Wild Horse and Burro will be adopted?

Have you considered using Grants/Financial Assistance for this requirement?
Thanks
David

On Thu, Jun 14, 2018 at 4:49 PM, Lund, Kenneth <klund@blm.gov> wrote:
> Good afternoon David
>
> Please see Holle's email. There is an initiative to pay incentives to people to adopt horses up to $1,500 total. The main question is; could we use convenience checks as a method of payment?
>
> v/r
> Ken
>
>
> Kenneth E. Lund
>
> Senior Procurement Analyst
>
> BLM-WO
>
> 20 M St SE
>
> Washington, DC 20003
>
> Office:202-912-7034
>
> Cell: 202-744-1847
>
> Fax: 202-912-7186

Monday-Regular day off

Thursday-Telework

On Thu, Jun 14, 2018 at 2:09 PM, Waddell, Holle <hwaddell@blm.gov> wrote:

Hi Ken - As discussed this morning, the Wild Horse and Burro program submitted an Options Paper to Congress in April 2018. One of the components mentioned was an Adoption Incentive Program. The purpose of the Adoption Incentive Program (AIP) is to increase the numbers of excess animals placed into private care through adoptions. This program will encourage new individuals to adopt a wild horse or burro, motivate previous adopters to re-engage with the program and invest in animals by providing a financial incentive, $1,000 at the time of adoption and an additional $500 at time of title, to help defray initial ownership costs, such as veterinary care, feed and training. Increasing the placement of animals into private care is a critical priority of the program and of utmost interest to BLM due to the costs associated with caring for unadopted/unsold animals in BLM corrals and pastures. Costs savings may be utilized for other management operations, such as gathers.

The program has identified a line item for FY 2018 to potentially fund 500 incentives using appropriated funds however I need assistance with the logistics of providing the incentive payments. I have begun working with solicitors, IBC and others regarding the authority, process and overall logistics of administering and executing the incentive fee payments.

I have been asked to provide a draft program by the end of June so any assistance you can provide will be great.

Thank you,

Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |

Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood



--

David D. Carter | Integrated Charge Card Program Manager

U.S. Department of the Interior | Office of Acquisition and Property Management

1849 C Street., N.W.., Mail Stop 4262, Room 4249 | Washington, DC 20240

202-513-7544 (o) | 202- 513-7645 (f) | david_carter@ios.doi.gov

| | |
|---|---|
| **From:** | Roberson, Peter (PJ) L |
| **To:** | Waddell, Holle |
| **Subject:** | Re: Adoption Incentive Agreement Changes |
| **Date:** | Friday, June 15, 2018 12:09:19 PM |
| **Attachments:** | Adoption Incentive Agreement_PCPT_6.15.2018.docx |
| **Importance:** | High |

I just fixed a couple of formatting things I saw other than that it looks great

File is attached

On Thu, Jun 14, 2018 at 5:45 PM, Waddell, Holle <hwaddell@blm.gov> wrote:

PJ - Please review the attached adoption incentive agreement. I think I may have captured the changes/edits well but want to double-check formatting. Please update and resend so that I can add it to the calendar invite for Tuesday's meeting.

Thank you,

Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |

Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood



--
Best Regards,

**PJ Roberson**
**Program Administrator**
**Bureau of Land Management - Wild Horse & Burro Program**
**Office: (405) 579-1863**
**201 Stephenson Parkway Suite 1200 Norman, OK 73109**
**proberson@blm.gov**

*"How we seek to spend our time may depend on how much time we perceive ourselves to have" -Atul Gawande*

| | |
|---|---|
| **From:** | Kali Sublet |
| **To:** | Waddell, Holle |
| **Subject:** | [EXTERNAL] Board Interest in Adoption Incentive Program |
| **Date:** | Friday, June 15, 2018 12:23:53 PM |

I have spoken with our Board President, Paula Carr, and she is interested in continuing the conversation with BLM regarding the administration of an adoption incentive program with the BLM WH&B Program.


Thank you,

Kali Sublett
Executive Director



Creators and exclusive producers of the most talked about equine competition in America, the Extreme Mustang Makeover! Interested in adopting a gentled Mustang? Attend one of our events or call us about contacting a Trainer Incentive Program participant in your area. For more information, tickets and event schedules, go to www.extrememustangmakeover.com.

Follow us: ☐ ☐ ☐

**From:** Smith, Linda H
**To:** Waddell, Holle; Barker, Jammal L
**Cc:** Tryon, Steve; Jackson, Tonya M; Allen, Wayne S; Rittenhouse, Bruce H
**Subject:** Re: Wild Horse and Burro Adoption Incentive Program
**Date:** Friday, June 15, 2018 4:38:03 PM
**Importance:** High

Looping in my assistant for scheduling on Tuesday.

Jammal - Please include Michael, Wayne, and Sudani. Thanks.

Sent from my iPad

On Jun 15, 2018, at 5:27 PM, Waddell, Holle <hwaddell@blm.gov> wrote:

Hello all - The program has made continuous efforts regarding the logistics of the adoption incentive payments however need additional assistance from the budget office. Please let me know your availability for a meeting Monday or Tuesday of next week to discuss.

Thank you,

Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |
Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE.** Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood



On Fri, Jun 8, 2018 at 2:23 AM, Waddell, Holle <hwaddell@blm.gov> wrote:
Hi Linda, Tonya and Wayne - As you all are aware, the Wild Horse and Burro program submitted an Options Paper to Congress in April 2018. One of the components mentioned was an Adoption Incentive Program. The purpose of the Adoption Incentive Program (AIP) is to increase the numbers of excess animals placed into private care through adoptions. This program will encourage new individuals to adopt a wild horse or burro, motivate previous adopters to re-engage with the program and invest in animals by providing a financial incentive, $1,000 at the time of adoption and an additional $500 at time of title, to help defray initial ownership costs, such as veterinary care, feed and training. Increasing the placement of animals into private care is a critical priority of the program and of utmost interest to BLM due to the costs associated with caring for unadopted/unsold animals in BLM corrals and pastures. Costs savings may be utilized for other management operations, such as gathers.

The program has identified a line item for FY 2018 to potentially fund 500 incentives using appropriated funds. I have begun working with IBC and others regarding the authority, process and overall logistics of administering and executing the incentive fee payments.

The program will provide updates as there may be a need to engage you and your staff at some point. We have been asked to provide a draft program by the end of June so any assistance you can provide will be great.

Thank you,

Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |

Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood



| | |
|---|---|
| **From:** | Rittenhouse, Bruce H |
| **To:** | Waddell, Holle |
| **Cc:** | Kali Sublett |
| **Subject:** | Re: [EXTERNAL] Board Interest in Adoption Incentive Program |
| **Date:** | Friday, June 15, 2018 5:04:12 PM |

I can go home now happy! Thanks for the good news Kali.

On Fri, Jun 15, 2018 at 3:29 PM Waddell, Holle <hwaddell@blm.gov> wrote:

> Thanks for the update Kali. We will be in touch.
>
> Thank you,
>
> Holle' Waddell │ Branch Chief │ Division of Wild Horses and Burros │
>
> Bureau of Land Management │ 405.579.1860 (O) │ 405.579.7102 (F) │ hwaddell@blm.gov
>
> "A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood
>
> 
>
> On Fri, Jun 15, 2018 at 12:23 PM, Kali Sublet <kali@mustangheritagefoundation.org> wrote:
>
>> I have spoken with our Board President, Paula Carr, and she is interested in continuing the conversation with BLM regarding the administration of an adoption incentive program with the BLM WH&B Program.
>>
>>
>> Thank you,
>>
>> Kali Sublett
>> Executive Director
>>
>> 
>>
>> Creators and exclusive producers of the most talked about equine competition in America, the Extreme Mustang Makeover! Interested in adopting a gentled Mustang? Attend one of our events or call us about contacting a Trainer Incentive Program participant in your area. For more information, tickets and event schedules, go to www.extrememustangmakeover.com.
>>
>> Follow us: ☐ ☐ ☐

BLM_002299

--
Bruce Rittenhouse
Acting Wild Horse and Burro Division Chief (WO-260)
20 M Street, Southeast
Washington DC 20003
202-912-7648 (office)
720-454-5747 (mobile)
brittenh@blm.gov

| **From:** | Tryon, Steve |
| **To:** | Ursula Massey; Yolando Mack-Thompson; Jeff Brune |
| **Cc:** | Angela Falwell; Kristin Bail; Thomas Bartholomew; Hathaway, Ryan; Bruce Rittenhouse |
| **Subject:** | Materials for 06/19/2018 Briefing for DD-Ops on Wild Horse and Burro Management |
| **Date:** | Monday, June 18, 2018 11:12:46 AM |
| **Attachments:** | Briefing for Director WHB Program Status June 2018.pdf |

For our discussion with Rich (and Brian?) tomorrow morning.

Cheers,

Steve Tryon
Deputy Assistant Director, Resources and Planning
Bureau of Land Management
1849 C Street, NW
Room 5654
Washington, DC 20240
202-208-4896

## INFORMATION BRIEFING FOR THE BLM DIRECTOR

**DATE:**      June 19, 2018

**FROM:**      Kristin Bail,
              Assistant Director – Renewable Resources and Planning

**SUBJECT:**   Update on Program Direction for the Wild Horse and Burro Management Program

This memorandum provides an update on the annual work planning guidance for the wild horse and burro (WHB) management program, and program changes underway since delivery of a report to Congress in April 2018. Specific briefing topics include:

- 2018 Gather Schedule
- House Appropriations Committee program investigation and request for additional reporting
- Recent emergency gathers at Cold Creek, NV and Wendon, AZ
- Beatty, NV Burro Deaths
- Progress in implementing changes to the BLM adoption program
- Progress on selecting new members of the WHB Advisory Board).

## KEY FACTS

In fiscal year 2018, the BLM is planning to remove over 10,000 wild horses and burros from the range (Attachment #2). This is the highest number of animals removed in the last decade and represents one of the highest removal years since passage of the Wild Free-Roaming Horses and Burros Act. With this increase in removals the WHB program will need additional capacity to place animals into private care. Increased holding capacity is being acquired through new long-term holding solicitations. Partnerships with the Mustang Heritage Foundation and other groups can also provide relief by increasing the number of adopted animals in 2019.

## BACKGROUND

WHBs occur across 10 western states in 177 Herd Management Areas (HMA) that cover 26.9 million acres.  Additional public and private lands surrounding HMAs may also be affected as WHB potentially move onto these lands.

Currently, there are approximately 82,000 animals on public lands.  The national Appropriate Management Level (AML) is 26,715.  In addition, 45,295 animals (May 2018) are in holding facilities with 8,955 in 26 corrals (with an average cost of about $5.05 per animal per day) and 36,340 in 35 pastures (with an average cost of about $2.05 per animal per day).  Total holding costs for these animals were almost $50 million in FY17 (58% of the total wild horse and burro budget).

1

**DISCUSSION: PENDING ISSUES OF NATIONAL IMPORTANCE**

***Supplemental Water/Emergency Situations***: The WHB Program is currently evaluating both its supplemental water hauling procedures and what constitutes a need for an emergency gather. State Office WHB Program Leads indicated they have provided supplemental water in the past. Two states are currently hauling water and others are considering doing so in the next month. All states responded that if BLM stops hauling water, it would eventually result in the death of horses and burros in those areas of extreme drought.  Currently much of the four corner states, southern Wyoming, southern Nevada and southeast Oregon are in either severe or extreme drought conditions.  The drought outlook through August indicates that drought will persist in most of these areas.

WO-260 was asked by the Deputy Director – Policy and Programs to develop guidance on how to proceed with these issues and how this should be communicated to state leadership and WHB program staff.  In addition, an expired Instruction Memorandum that defines the term "emergency" in the context of the WHB program needs to be updated.  Drought conditions in the west may lead to state's submitting "emergency" gather requests.  Clear guidance is needed to determine what is meant by the term emergency.

***2018 Approved Gather Schedule***: In May the Deputy Director for Operations approved the FY 2018 gather/removal plan and gather schedule (Attachment #1a and #1b).  This plan will remove approximately 10,500 horses and burros from the range which is the most since 2010.  The priorities for these gathers include; sage-grouse priority habitat, public safety, private lands, and reducing resource conflicts.

***Adoption Incentive Program***: The purpose of the Adoption Incentive Program is to increase the numbers of excess animals into private care through adoptions. This program will encourage new individuals to adopt a wild horse or burro (WHB), motivate previous adopters to re-engage with the program and invest in animals by providing a financial incentive; $1,000 at the time of adoption with an additional $500 at time of title. This incentive will help defray adopter costs, such as veterinary care, feed and training. Increasing the placement of animals into private care is a critical priority of the WHB program. This new program was one of the key components described in the recent report submitted to Congress.  The policy and implementation of this program are currently in development and a briefing for the Director is expected in July 2018. Further, the WHB program is holding $500,000 for adoption incentives this fiscal year.

***WHB Advisory Board***: Nominations for three board members (Public Interest, Veterinary Medicine, WHB Advocacy) closed on May 29. Attachment #1c summarizes the nominations. A total of 19 applications were received and are being reviewed by a team of subject matter experts. This review is expected to be done in early July with briefings to WO-100 expected in late-July or August.  Further, WO-260 is beginning to plan for the next advisory board meeting possibly held in early 2019.

***Cold Creek Emergency Gather***: The Forest Service recently conducted an emergency bait-trap gather (due to poor animal body condition) using a BLM contractor in southern Nevada to remove up to 200 animals. This gather removed a total of 148 animals of which 19 were

BLM_002303

humanely euthanized due to poor body condition (Attachment #1d).  The remaining 126 animals were shipped to the BLM Ridgecrest facility.  One animal died in transport and another died at the facility.  Forest Service is paying BLM for holding costs through a national reimbursement agreement.

***Beatty NV Burro Deaths****:*  A total of 22 burros have been shot and killed near the town of Beatty, NV.  Most of the animals were shot only once but a few were shot multiple times.  The case is still being investigated.

***Wendon AZ Emergency Burro Gather***:  WO-260 received an emergency gather request from to the Arizona State office to remove 60 burros near Wendon AZ for public safety concerns. This gather was requested by AZ State Police and AZ Dept. of Transportation.  Six animals were hit by vehicles and were killed.  No human fatalities occurred. The burros were repeatedly breaking the highway right-of-way fence in search for water.  The initial 60 burros were removed in two days. After BLM assessed the situation it was determined that there were an additional 75 burros still in the vicinity that needed to be removed to alleviate the public safety issue.  This gather is being completed this week.

***Great Escape Mustang Sanctuary/Sand Wash Advocate Team (GEMS/SWAT) National Group Volunteer Award****:* GEMS/SWAT recently were awarded the BLM National Volunteer Group Excellence award for their work with assisting in placing animals in private care through their "Storefront" facility in Colorado along with their volunteers conducting fertility control (darting PZP) at BLM Colorado's Sand Wash HMA.

***Huffington Post Article on BLM International Programs***:  This past Tuesday Huffington Post published an article about the BLM's international program to ship wild horses as work animals. Here is the link to the article: https://www.huffingtonpost.com/entry/feds-weigh-proposals-to-ship-wild-horses-overseas_us_5b1eb5bce4b09d7a3d75ab9c

***International/Transfer Programs***:  Congress authorized the transfer of excess WHB to other federal, state, and local government agencies for use as work animals. We are currently working with a number of agencies including the Caisson Unit at Arlington Cemetery, the Half Section at Ft. Sill, the US Border Patrol, and other mounted Law Enforcement units. We have also received requests from numerous foreign countries that are interested in using WHB as work animals and we are actively pursuing those requests.

***Sale Barn Notices***:  The BLM will be sending out notices to horse sale barns to the post an announcement (Attachment #1e) about the sale of untitled wild horses and burros.  The message is that when an animal is brought to a sale barn it must be accompanied by ownership documentation.

***Mustang Heritage Foundation****:* The program requests approval to provide funding to MHF in the amount of $900K from the FY 2018 budget and $3 million from the FY 2019 budget (depending on final appropriations) to support the increased efforts of placing animals into private care.

3

*Internal Working Document*

Table 1:  Completed FY18 Removals to date and Proposed Removals based on Additional L1110 Funds and Adjustments in L1060 Funds

| Action | Removal Reason(s) | PGS | Removals | 1060 Funding | 1110 Funding |
|---|---|---|---|---|---|
| Removals as of 3/1/2018 | Court orders, public safety, priority sage-grouse habitat, private land encroachment, and emergencies. | 67 (includes 27 geldings) | 4,245 | | |
| Planned Ground Darting for PGS Treatments | N/A | 518 | 0 | | |
| Recommended Spring/Summer Removals and PGS by Location | | | | | |
| -   Red Desert Complex, WY | GRSG, big game habitat | TBD | 2,670 | | $1.7 M |
| -   Warm Springs, OR | GRSG, big game habitat, spay research | 0 | 685 | | $800,000 |
| -   Onaqui Mountain, UT | GRSG | 0 | 50 | | $50,000 |
| -   Silver King, NV | GRSG, public safety, private lands | | 800 | | $800,000 |
| -   Pine Nut, NV | Bi-State SG, public safety, private lands | | 575 | | $600,000 |
| -   Bible Springs Complex, UT | GRSG, public safety, private lands | | 200 | | $200,000 |
| -   | | Totals | 4,980 | | $4.15 M |
| -   Bullfrog, NV | T/E habitat, public safety, private lands | | 300 | $300,000 | |
| -   Muddy Creek, UT | State of UT agreement | 0 | 50 | $50,000 | |
| -   Pryor Mountain, MT | AML progress | 61 - darting | 20 | $25,000 | |
| -   Goshute (Ferguson Spring), NV | public safety, private lands | | 125 | $150,000 | |
| -   Little Bookcliffs, CO | AML, successful public working group | | 75 | $75,000 | |
| -   Chemehuevi, CA | Public safety, T/E habitat | | 200 | $250,000 | |
| -   Chocolate Mule, CA | Public safety, T/E habitat, military installation | | 25 | $25,000 | |
| -   Range Creek, UT | Private lands, wildlife | | 100 | $100,000 | |
| -   Unallocated | Emergency | TBD | 600 | $600,000 | |
| | | | 1,495 | $1.575 M | $4.15 M |
| **TOTAL** | | | 6,475 | | |

L1060 funded removals = $1,575,000 + 125,000 for holding = $1,700,000 (available from $1.7 M moved from L1060 to L1110 for WY Red Desert Complex Gather)

L1110 funded removals = $4,150,000 + 350,000 for holding = $4.5 million

BLM_002305

*Internal Working Document*

Table 2:  Current Planned FY19 Removals and Planned Population Growth Suppression (PGS) Treatments

| Action | Removal Reason(s) | PGS | Removals | Funding |
|---|---|---|---|---|
| Planned Ground Darting for PGS Treatments | N/A | 518 | 0 | |
| Recommended Fall Removals and PGS by Location | | | | |
| - Owyhee Complex, NV | GRSG | 250 | 800 | $800,000 |
| - Unallocated* | | TBD | 3700 | |
| **TOTAL** | | **768** | **4500** | |

*Note – Unallocated removals cannot be estimated until FY2019 budget is determine. Current estimated 800 is based on President's 2019 Budget.

BLM_002306

TENTATIVE
## FY 2018 Wild Horse and Burro Removal by Date
### as of May 21, 2018

| State | Herd Management Area (HMA) or Herd Area (HA) | Start Date | End Date | Animals Proposed to be Gathered | Animals Proposed to be Removed | Animals Actually Gathered | Animals Actually Removed | Proposed # of Mares/Jennies Treated with Fertility Control | Actual # of Mares/Jennies Treated with Fertility Control | Gather Method | Species | Rationale | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WY | Salt Wells Creek | 10/3/2017 | 10/17/2017 | 296 | 296 | 779 | 779 | 0 | 0 | Helicopter | Horse | Court order | Gather crossed FY's 17 & 18 |
| WY | Adobe Town | 10/10/2017 | 10/17/2017 | 656 | 616 | 567 | 567 | 0 | 0 | Helicopter | Horse | Court order | Gather crossed FY's 17 & 18 |
| WY | Great Divide Basin | 10/1/2017 | 10/4/2017 | 386 | 386 | 265 | 265 | 0 | 0 | Helicopter | Horse | Court order | Gather crossed FY's 17 & 18 |
| AZ | Black Mtn | 10/1/2017 | 9/30/2018 | 125 | 125 | 127 | 127 | 0 | 0 | Bait or Water | Burro | Pvt Land/Safety | Gather crossed FY's 17 & 18 |
| AZ | Lake Pleasant | 10/1/2017 | 9/30/2018 | 65 | 65 | 20 | 20 | 0 | 0 | Bait or Water | Burro | Pvt Land/Safety | Gather crossed FY's 17 & 18 |
| AZ | Cibola-Trigo | 10/1/2017 | 9/30/2018 | 60 | 60 | 1 | 1 | 0 | 0 | Bait or Water | Burro | Pvt Land/Safety | Gather crossed FY's 17 & 18 |
| AZ | Havasu | 10/1/2017 | 11/5/2017 | | | 81 | 81 | 0 | 0 | Bait or Water | Burro | Pvt Land/Safety | Gather crossed FY's 17 & 18 |
| NV | Antelope (Water Canyon) | 10/2/2017 | 10/12/2017 | 65 | 40 | 53 | 53 | 15 | 12 | Bait or Water | Horse | GonaCon pilot | Gather crossed FY's 17 & 18 |
| | Nuisance | 10/10/2017 | 9/30/2018 | | | | 5 | | | | | | |
| NV | Fox and Lake Range | 11/13/2017 | 11/19/2017 | 200 | 200 | 189 | 189 | 0 | 0 | Helicopter | Horse | Fire rehab | |
| OR | Hog Creek | 10/26/2017 | 2/15/2018 | 50 | 30 | 50 | 18 | 15 | 14 | Helicopter | Horse | Achieve/Maintain AML | |
| UT | Conger | 11/27/2017 | 12/3/2017 | 100 | 0 | 111 | 1 | 0 | 27 | Helicopter | Horse | Research | 27 geldings |
| CA | Twin Peaks | 12/20/2017 | 3/3/2018 | 125 | 125 | 32 | 32 | 0 | 0 | Bait or Water | Burro | Pvt Land/Safety | |
| NV | Johnnie | 12/20/2017 | 1/31/2018 | 75 | 75 | 117 | 117 | 0 | 0 | Bait or Water | Burro | Pvt Land/Safety | |
| OR | South Steens | 1/3/2018 | 2/28/2018 | 150 | 150 | 102 | 95 | 15 | 9 | Bait or Water (in house) | Horse | Selective Removal | |
| OR | Cold Springs | 1/23/2018 | 1/26/2018 | 120 | 80 | 134 | 72 | 35 | 30 | Helicopter | Horse | Achieve/Maintain AML | |
| NV | Triple B Complex (2 HMAs) | | | (1,368) | (1,368) | | | | | Helicopter | Horse | Pvt Land/Safety | |
| | Triple B | 1/30/2018 | 2/28/2018 | 800 | 800 | 993 | 924 | 28 | 28 | | | | |
| | Maverick-Medicine | 2/11/2018 | 2/19/2018 | 500 | 500 | 435 | 443 | 0 | 0 | | | | |
| UT | Bible Springs Complex (4 HMAs/1 HA) | | | (425) | (425) | | | | | Helicopter | Horse | BLM/UT State Agreement | |
| | Blawn Wash | 1/29/2018 | 2/5/2018 | 100 | 100 | 103 | 103 | 0 | 0 | | | | |
| | Four Mile | 2/5/2018 | 2/8/2018 | 150 | 150 | 144 | 144 | 0 | 0 | | | | |
| | Tilly Creek | 2/10/2018 | 2/11/2018 | 105 | 105 | 113 | 113 | 0 | 0 | | | | |

BLM_002307

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Bible Springs | 2/12/2018 | 2/14/2018 | 70 | 70 | 71 | 71 | 0 | 0 | | | |
| NV | Spring Mtn/Wheeler Pass (Cold Creek) | 5/10/2018 | 6/11/2018 | 200 | | | | 0 | 0 | Bait or Water | Horse | USFS Emergency; lack of forage |
| AZ | Outside Black Mountain (Bullhead) | | | 60 | | | | | | Bait or Water | Burro | BLM/AZ State Agreement |
| AZ | Lake Pleasant | | | | | | | | | Bait or Water | Burro | BLM/AZ State Agreement |
| UT | Range Creek | 6/11/2018 | 7/30/2018 | 100 | 100 | | | | | Bait or Water | Horse | Private lands/wildlife |
| NV | Goshute (Ferguson Spring) | 6/18/2018 | 6/30/2018 | 125 | 125 | | | | | Bait or Water | Horse | Public safety; private lands |
| UT | Muddy Creek | 7/1/2018 | 7/30/2018 | 100 | 100 | | | | | Bait or Water | Horse | BLM/UT State Agreement |
| MT | Pryor Mtn | 7/1/2018 | 8/30/2018 | 75 | 20 | | | | | Bait or Water | Horse | |
| NV | Bullfrog | 7/10/2018 | 8/10/2018 | 300 | 300 | | | | | Bait or Water | Burro | T/E habitat; public safety; private lands |
| CA | Chemehuevi | 7/15/2018 | 8/30/2018 | 200 | 200 | | | | | Bait or Water (in house) | Burro | Public safety; T/E habitat |
| CA | Chocolate Mules | 7/15/2018 | 7/31/2018 | 25 | 25 | | | | | Bait or Water (in house) | Burro | Public safety; T/E habitat |
| UT | Bible Springs Complex/Sulphur | 8/1/2018 | 8/15/2018 | 200 | 200 | | | | | Helicopter | Horse | GrSG; public safety; private lands |
| WY | Red Desert Complex (5 HMAs) | | | 2,670 | 2,670 | | | | | Helicopter | Horse | GrSG; big game habitat |
| | Crooks Mountain | 8/6/2018 | 9/30/2018 | | | | | | | | | |
| | Green Mountain | 8/6/2018 | 9/30/2018 | | | | | | | | | |
| | Stewart Creek | 8/6/2018 | 9/30/2018 | | | | | | | | | |
| | Lost Creek | 8/6/2018 | 9/30/2018 | | | | | | | | | |
| | Antelope Hills | 8/6/2018 | 9/30/2018 | | | | | | | | | |
| CO | Little Book Cliffs | 8/15/2018 | 8/30/2018 | 75 | 75 | | | | | Bait or Water (in house) | Horse | Public safety; private lands |
| UT | Onaqui Mtn | 9/1/2018 | 9/15/2018 | 50 | 50 | | | | | Bait or Water | Horse | BLM/UT State Agreement |
| NV | Silver King | 9/1/2018 | 9/21/2018 | 800 | 800 | | | | | Helicopter | Horse | GrSG; public safety; private lands |
| NV | Pine Nuts | 9/10/2018 | 9/24/2018 | 575 | 575 | | | | | Helicopter | Horse | Bi-State SG; public safety; private lands |
| OR | Warm Springs | 10/1/2018 | 10/15/2018 | 685 | 685 | | | | | Helicopter | Horse | GrSG; big game habitat; spay research |
| Total | | | | 10,438 | 9,898 | 4,487 | 4,220 | 108 | 120 | | | |

Note: The "Lake Pleasant" row has "collaring research; no removal" in the final column, and a "CX" appears in the final column aligned with the Range Creek row.

# Darting Fertility Control and Research Schedule by Date
## as of January 10, 2018

| State | Herd Management Area (HMA) or Herd Area (HA) | Start Date | End Date | Proposed # of Mares/Jennies Treated with Fertility Control | Actual # of Mares/Jennies Treated with Fertility Control | Species | Rationale |
|---|---|---|---|---|---|---|---|
| AZ | Black Mtn | 10/1/2017 | | | | Burro | |
| CO | Spring Creek Basin | 2/1/2017 | 5/30/2017 | 20 | | Horse | |
| CO | Sand Wash Basin | 2/1/2017 | 5/30/2017 | 175 | | Horse | |
| CO | Little Book Cliffs Wild Horse Range | 3/1/2017 | 7/30/2017 | 25 | | Horse | |
| ID | Challis | 2/1/2017 | 9/30/2017 | 5 | | Horse | |
| MT | Pryor Mtn | 2/1/2017 | 8/31/2017 | 61 | | Horse | |
| UT | Onaqui | 3/1/2017 | 5/31/2017 | 53 | | Horse | |
| WY | McCullough Peaks | 1/1/2017 | 9/30/2017 | 60 | | Horse | |
| ID | Sand Wash | 5/1/2018 | | 15 | | Horse | released from a previous year's removal |
| ID | Hard Trigger | 5/1/2018 | | 40 | | Horse | released from a previous year's removal |
| TOTAL | | | | 454 | 0 | | |
| GRAND TOTAL | | | | | | | |

| | | |
|---|---|---|
| Completed Helicopter Removals | | **3,689** |
| Completed Bait Trap Gathers | | **251** |
| Completed Fertility Control Treatments | | **40** |
| Completed PZP darting | | **0** |
| Gathers in Progress | | **275** |

| Completed Removals and PZP treatments to Date | | | |
|---|---|---|---|
| | Helicopter | Bait Trap | Fertility Control Treatments |
| AZ | 0 | 81 | 0 |
| CA | 0 | 0 | 0 |
| CO | 0 | 0 | 0 |

BLM_002309

| | | | |
|---|---|---|---|
| **ID** | 0 | 0 | 0 |
| **MT** | 0 | 0 | 0 |
| **NV** | 1,556 | 170 | 40 |
| **NM** | 0 | 0 | 0 |
| **OR** | 90 | 0 | 0 |
| **UT** | 432 | 0 | 0 |
| **WY** | 1,611 | 0 | 0 |
| **TOTAL** | **3,689** | **251** | **40** |

BLM_002310

# Federal Law Warning

## Notice to all sale barns and customers

## Selling untitled wild horses (mustangs) and burros is illegal.

Horses and burros that are adopted from or sold by the Bureau of Land Management (BLM) have a freeze mark on the left side of the neck. Federal regulation (43 CFR 4770.1(d)) prohibits the sale of such animals unless they are accompanied by paperwork showing that title (ownership) has passed from the BLM to a private individual. **Sale barns and sellers must not sell freeze marked horses or burros unless they are accompanied by a signed Certificate of Title or letter from the BLM certifying that title has been granted by the United States Department of the Interior, Bureau of Land Management**. The animal must match the freeze mark and other identifying features listed on the Certificate of Title or letter certifying title.

Below is an example of the information shown on the back of a Certificate of Title that is used to decipher the identifying freeze mark and signalment key. The freeze mark number and signalment key are shown on the front of the Certificate of Title or will be noted in the letter that certifies title has been granted. Any questions about this notice should be directed to the Bureau of Land Management at 1-866-4MUSTANGS (1-866-468-7826).

**ALPHA ANGLE CODE FOR FREEZE MARK INTERPRETATION**




**FACE WHORLS**

**HEIGHT OF WHITE LEG MARKINGS**



**WHITE FACE MARKINGS**



### SIGNALMENT KEY CODES USED FOR DESCRIBING ANIMALS

| SPECIES | SEX | FACE WHORLS | LEG MARKINGS | | | | FACE MARKINGS | COLOR |
|---|---|---|---|---|---|---|---|---|
| (Col. 1) | (Col. 2) | (Col. 3) | (Col. 4) Rt. Fore | (Col. 5) Rt. Hind | (Col. 6) L. Fore | (Col. 7) L. Hind | (Col. 8) | (Col. 9) |
| Horse H | Gelding G | One 1 | **WHITE MARKINGS** | | | | **HORSES AND LIGHT MUZZLED BURROS** | White A |
| Burro B | Male M | Two 2 | No White A | A | A | A | No Marking A | Bay B |
| Mule M | Female F | Three 3 | Coronet B | B | B | B | Star B | Black C |
| | | Four 4 | Half Pastern C | C | C | C | Strip C | Brown D |
| | | | Full Pastern D | D | D | D | Snip D | Sorrel E |
| | | | Sock E | E | E | E | Star-Strip E | Chestnut F |
| | | | Stocking F | F | F | F | Star-Snip F | Gray G |
| | | | Over Knee / Hock G | G | G | G | Strip-Snip G | Grulla H |
| | | | | | | | Star-Strip-Snip H | Roan-Strawberry I |
| | | | | | | | Blaze I | Roan-Red J |
| | | | **OTHER MARKINGS** | | | | Bald J | Roan-Blue K |
| | | | Striped Below Knee H | H | H | H | Frosted K | Buckskin L |
| | | | Striped Above Knee I | I | I | I | **DARK MUZZLED BURROS** | Dun M |
| | | | Not Examined Y | Y | Y | Y | No Markings M | Pinto N |
| | | | Other Z | Z | Z | Z | Star N | Palomino O |
| | | | | | | | Strip O | Appaloosa P |
| | | | | | | | Snip P | Pink Burro Q |
| | | | | | | | Star-Strip Q | Blue Burro R |
| | | | | | | | Star-Snip R | Red Burro S |
| | | | | | | | Strip-Snip S | Other Z |
| | | | | | | | Star-Strip-Snip T | |
| | | | | | | | Blaze U | |
| | | | | | | | Bald V | |
| | | | | | | | Frosted W | |

Stocking (knee / hock)
Sock
Full Pastern
Half Pastern
Coronet

STAR, STRIP, and SNIP is a merging of these three marks;

BLAZE is a broad, white marking covering almost all of the forehead but not including the eyes and nostrils;

BALD is a white face including the eyes and nostrils.

**Violations of the prohibition on the sale of wild horses and burros may result in criminal penalties and fines up to $2,000 and imprisonment up to one year, or both. (43 CFR 4770.5)**



**U.S. Department of the Interior**
**Bureau of Land Management**
Wild Horse and Burro Program

This notice is to be posted in a conspicuous location where animals are unloaded at your sale barn.

BLM_002311



## USDA Humboldt-Toiyabe National Forest
### United States Department of Agriculture

# DAILY GATHER OVERVIEW
## Current as of 7 p.m. on May 22, 2018

### FINAL REPORT

**State**:  Nevada
**Forest/District**:  Humboldt-Toiyabe National Forest's Spring Mountains National Recreation Area
**Gather Name**:  Cold Creek Emergency Wild Horse Gather
**Contractor**: Warner Livestock
**Gather Method**:  Bait Trap
**Planned Gathered (#)**:  200
**Planned Removed (#)**:  200
**Facility Destination:** Ridgecrest Regional WH&B Corral, 3210 Randsburg Wash Rd, Ridgecrest, CA 93555

| Date | Gathered/Removed | | | | Deaths | | | Shipped | Foals Fostered |
|------|-------|-------|-------|--------|-------|---------|--------|---------|---------|
|      | Studs | Mares | Foals | Totals | Acute | Chronic | Totals |         |         |
| 05/10/18 | 0  | 0  | 0 | 0   | 0 | 0  | 0  | 0   | 0 |
| 05/11/18 | 9  | 12 | 4 | 25  | 0 | 0  | 0  | 0   | 0 |
| 05/12/18 | 15 | 11 | 2 | 28  | 1 | 1  | 2  | 23  | 0 |
| 05/13/18 | 10 | 11 | 1 | 22  | 0 | 0  | 0  | 0   | 1 |
| 05/14/18 | 7  | 3  | 0 | 10  | 0 | 2  | 2  | 35  | 0 |
| 05/15/18 | 10 | 5  | 0 | 15  | 0 | 1  | 1  | 0   | 0 |
| 05/16/18 | 7  | 8  | 0 | 15  | 0 | 4  | 4  | 0   | 0 |
| 05/17/18 | 4  | 4  | 0 | 8   | 0 | 0  | 0  | 33  | 1 |
| 05/18/18 | 5  | 2  | 1 | 8   | 0 | 4  | 4  | 0   | 0 |
| 05/19/18 | 3  | 7  | 1 | 11  | 0 | 0  | 0  | 0   | 0 |
| 05/20/18 | 1  | 2  | 0 | 3   | 0 | 4  | 4  | 0   | 0 |
| 05/21/18 | 1  | 2  | 0 | 3   | 0 | 0  | 0  | 30  | 1 |
| 05/22/18 | 0  | 0  | 0 | 0   | 0 | 2  | 2  | 5   | 0 |
| **Total:** | **72** | **67** | **9** | **148** | **1** | **18** | **19** | **126** | **3** |

**List animal's age, color, gender and cause(s) of death:**
- 05/22/18: 10-year-old bay mare with a BCS 1, very emaciated, was humanely euthanized in accordance with IM 2015-070 due to a hopeless prognosis for improvement.
- 05/22/18: 11-year-old black stud with a BCS 2, was humanely euthanized in accordance with IM 2015-070 due a hopeless prognosis for recover due to preexisting condition (blindness).
- 05/20/18: 28-year-old sorrel stud with a BCS 1, very emaciated, was humanely euthanized in accordance with IM 2015-070 due to a hopeless prognosis for improvement.

BLM_002312



**Humboldt-Toiyabe National Forest**
United States Department of Agriculture

- 05/20/18: 2-year-old black stud with a BCS 1, very emaciated, was humanely euthanized in accordance with IM 2015-070 due to a hopeless prognosis for improvement.
- 05/20/18: 3-year-old bay stud with a BCS 1, very emaciated, was humanely euthanized in accordance with IM 2015-070 due to a hopeless prognosis for improvement.
- 05/20/18: 6-year-old brown stud with a BCS 1, very emaciated, was humanely euthanized in accordance with IM 2015-070 due to a hopeless prognosis for improvement.
- 05/18/18: 9-year-old brown mare with a BCS 1, very emaciated, was humanely euthanized in accordance with IM 2015-070 due to a hopeless prognosis for improvement.
- 05/18/18: 13-year-old bay mare with a BCS 1, very emaciated, was humanely euthanized in accordance with IM 2015-070 due to a hopeless prognosis for improvement.
- 05/18/18: 11-year-old bay mare with a BCS 1, very emaciated, was humanely euthanized in accordance with IM 2015-070 due to a hopeless prognosis for improvement.
- 05/18/18: 15-year-old bay mare with a BCS 1, very emaciated, was humanely euthanized in accordance with IM 2015-070 due to a hopeless prognosis for improvement.
- 05/16/18: 4-year-old grey mare with a BCS 1, very emaciated, was humanely euthanized in accordance with IM 2015-070 due to a hopeless prognosis for improvement.
- 05/16/18: 18-year-old bay mare with a BCS 1, very emaciated, was humanely euthanized in accordance with IM 2015-070 due to a hopeless prognosis for improvement.
- 05/16/18: 16-year-old bay mare with a BCS 1, very emaciated, was humanely euthanized in accordance with IM 2015-070 due to a hopeless prognosis for improvement.
- 05/16/18: 12-year-old brown mare with a BCS 1, very emaciated, was humanely euthanized in accordance with IM 2015-070 due to a hopeless prognosis for improvement.
- 05/15/18: 4-year-old paint stud with a BCS 1, very emaciated, with a pre-existing injury to the right hind leg, was humanely euthanized in accordance with IM 2015-070 due to a hopeless prognosis for improvement.
- 05/14/18: 10-year-old black mare with a BCS 1, very emaciated, was humanely euthanized in accordance with IM 2015-070 due to a hopeless prognosis for improvement.
- 05/14/18: 12-year-old bay mare with a BCS 1, very emaciated, was humanely euthanized in accordance with IM 2015-070 due to a hopeless prognosis for improvement.
- 05/12/18: 14-year-old black mare with a BCS 1, very emaciated, was humanely euthanized in accordance with IM 2015-070 due to a hopeless prognosis for improvement.
- 05/12/18: Bay foal with an acute injury (broken leg) was humanely euthanized in accordance with IM 2015-070.

*For more information on IM 2015-0707, visit https://www.blm.gov/policy/im-2015-070*

*A death labeled as "acute" is when an animal dies or is euthanized due to acute injuries or medical conditions brought about by the gather and removal process including those that occur during capture, sorting and holding at the gather site. This term will include animals that die for known or unknown reasons thought to be related to gather activities.*

*A death labeled as "chronic/pre-existing" is when an animal dies or is euthanized for reasons related to chronic or pre-existing conditions such as body condition, lameness, serious physical defects, etc. This term will include animals that are euthanized for conditions not brought about by the gather activity.*

BLM_002313

| From: | Rittenhouse, Bruce H |
| --- | --- |
| To: | Waddell, Holle |
| Subject: | Fwd: Authority |
| Date: | Tuesday, June 19, 2018 9:02:42 AM |

Including you on this discussion.

Sent from my iPhone

Begin forwarded message:

> **From:** "Tryon, Steve" <stryon@blm.gov>
> **Date:** June 19, 2018 at 9:36:29 AM EDT
> **To:** "Smith, Linda" <lhsmith@blm.gov>
> **Cc:** "Bail, Kristin" <kbail@blm.gov>, Margaret Schneider
> <mschneider@blm.gov>, Ann DeBlasi <amdeblas@blm.gov>, Michael Jackson
> <michaeljackson@blm.gov>, Tonya Jackson <tmjackson@blm.gov>, Bruce
> Rittenhouse <brittenh@blm.gov>
> **Subject: Re: Authority**
>
>
> Morning, Linda.
>
> We have worked with SOL on this question, going back several years now. What
> we are now writing policy to implement was originally proposed by the Advisory
> Board, and then again by senior leadership of the last administration. ███
> ███████████████████████████████████████████████████████
> ███████████████████████████
>
> st
>
> Steve Tryon
> Deputy Assistant Director, Resources and Planning
> Bureau of Land Management
> 1849 C Street, NW
> Room 5654
> Washington, DC 20240
> 202-208-4896
>
> On Tue, Jun 19, 2018 at 8:33 AM, Smith, Linda <lhsmith@blm.gov> wrote:
>> Good morning, Steve. Circling back on a question that came my way last week
>> re: incentive payments. ████████████████████████████████
>> ████████████████ I don't have anything in my records
>> but thought that you all might since you've been working on this. Please pass
>> along what you have as we are meeting with the NOC later this afternoon to
>> discuss the mechanics of making incentive payments.
>>
>> Thanks.
>>
>> --------------------------------------------------------

Linda H. Smith
BLM Budget Officer
Office: 202-912-7060
Cell/Alternative Telework Number: 703-517-3382
lhsmith@blm.gov

This email (including attachments) is intended for the addressee(s) only. It may contain information that is privileged, confidential, sensitive, or otherwise protected from disclosure by applicable law. If you are not the intended recipient or the employee or agent responsible for delivery of this e-mail to the intended recipient, you are hereby notified that any dissemination, distribution, copying, or use of this e-mail or its contents is strictly prohibited. If you have received this email in error, please notify the sender immediately and delete this e-mail and all copies.

| From: | Schneider, Margaret N |
|---|---|
| To: | Waddell, Holle; Weiner, Jim; Keable, Edward; Smith, Linda H |
| Cc: | Tryon, Steve; Rittenhouse, Bruce H; Bail, Kristin M; DeBlasi, Ann M; Jackson, Michael A; Jackson, Tonya M |
| Subject: | Re: Adoption Incentive Authorities (per Solicitors) |
| Date: | Tuesday, June 19, 2018 11:19:05 AM |
| Importance: | High |

Because we will need to establish a separate account to move money into to pay individuals, we will need a bit more detail to support the establishment of the new account. Linda Smith and 200 folks are meeting this afternoon to determine the mechanism to accomplish this and then provide you more details to support the addition to the above note (opinion) that is needed. We may also required a signed memo but we can follow up with you all on that. Thank you. Getting this incentive program rolled out is a high priority for the Department and we appreciate your quick attention to the issue.

On Tue, Jun 19, 2018 at 11:49 AM, Waddell, Holle <hwaddell@blm.gov> wrote:

Linda - The program has coordinated and received opinions and guidance from solicitors Greg Russell and Jim Weiner regarding adoption incentives for untrained and trained animals. In previous years, BLM and its Wild Horse Advisory Board have discussed a potential pilot program whereby an adopter would be eligible for a cash incentive if it adopts an ungentled wild animal, trains that animal to enhance its value, then allows BLM to subsequently adopt or sell that animal to a third party. The solicitors stated that ███████████████████████████████

███████████████████████████ Here is the information provided by the solicitors:

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

Regarding BLM's ability to incentivize adoptions or animal training that would assist to promote and increase adoptions, ███████████████████████

███████████████████████████████ Here is the information provided by the solicitors:

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

Thank you,

Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |

Bureau of Land Management │ 405.579.1860 (O) │ 405.579.7102 (F) │ hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood

| | |
|---|---|
| **From:** | Sklar, Ryan M |
| **To:** | Waddell, Holle |
| **Subject:** | Re: Follow-up: Adoption Incentive Program Payment Discussion |
| **Date:** | Wednesday, June 20, 2018 9:07:51 AM |
| **Importance:** | High |

Based on the info you sent me yesterday, ██████████████████████████████
████████████████████ I'll reach out to DGL to follow-up on your questions about
the ████████████████████████

On Wed, Jun 20, 2018 at 10:05 AM Holle Waddell <hwaddell@blm.gov> wrote:

Yes correct. ██████████████████████████████████████████████
████████████████████████████████████████████████

Sent from my iPhone

On Jun 20, 2018, at 8:45 AM, Ryan Sklar <ryan.sklar@sol.doi.gov> wrote:

Thanks, Holle. I remember that Jim Weiner and DGL were supposed to get you
a deliverable on the adoption incentives issue back in January 2018. Did that
occur? Based on the email you sent, I think the answer is yes, and that they
informed you that ███████████████████████████████████

████████████████████████████████████████████
███████████████████████

Feel free to give me a call if that's easier. I just want to make sure I understand
the lay of the land before reaching out to Jim and Brett Myrick for their
assistance.

Thanks,
Ryan

On Tue, Jun 19, 2018 at 4:27 PM Waddell, Holle <hwaddell@blm.gov> wrote:

Ryan - Please see the solicitors notes in italics.

Thank you,

Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |

Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) |
hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each
day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all
blessings you have. When you shift your thoughts, your actions will follow suit and you will
begin to create the reality you desire." - Cheryl Wood

---------- Forwarded message ----------
From: **Waddell, Holle** <hwaddell@blm.gov>
Date: Wed, Jun 6, 2018 at 5:54 PM
Subject: Follow-up: Adoption Incentive Program Payment Discussion
To: "Kimberly Prendergast (Kim)" <kimberly_prendergast@ios.doi.gov>,
Sarah McElroy <smcelroy@blm.gov>, Stephen Benson
<stephen_l_benson@ibc.doi.gov>, Christopher Richey
<christopher_richey@ios.doi.gov>, Bruce Rittenhouse <brittenh@blm.gov>,
"Stevenson, Brent" <brent_stevenson@ibc.doi.gov>

First, I'd like to thank you all for joining the call and your willingness to
assist the program in finding a solution and a path forward to offer
adoption incentive fee payments to the public (adopters) in an effort to
increase the private care placement of wild horses and burros.
Increasing the placement of animals into private care is a critical
priority of the program and of utmost interest to BLM due to the costs
associated with caring for unadopted/unsold animals in BLM corrals
and pastures. Costs savings may be utilized for other management
operations, such as gathers. As discussed, I've compiled thoughts and
opinions from our solicitors regarding adoption incentive for untrained
and trained animals:



*under the Wild Horses Act; (c) BLM incurs substantial costs in its*



I look forward to hearing from for next steps.

Thank you,

Holle' Waddell │ Branch Chief │ Division of Wild Horses and Burros │

Bureau of Land Management │ 405.579.1860 (O) │ 405.579.7102 (F) │
hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood


--

**Ryan Sklar**
Attorney-Advisor
Office of the Solicitor
U.S. Department of the Interior
202-208-3039

NOTICE: This e-mail (including attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected by applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or use of this e-mail or its contents is strictly prohibited. If you receive this e-mail in error, please notify the sender immediately and destroy all copies.

--

**Ryan Sklar**
Attorney-Advisor
Office of the Solicitor
U.S. Department of the Interior
202-208-3039

NOTICE: This e-mail (including attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected by applicable

law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or use of this e-mail or its contents is strictly prohibited. If you receive this e-mail in error, please notify the sender immediately and destroy all copies.

BLM_002321

| | |
|---|---|
| **From:** | Roberson, Peter (PJ) L |
| **To:** | Waddell, Holle |
| **Subject:** | Re: Adoption Incentive Agreement Revision |
| **Date:** | Wednesday, June 20, 2018 12:04:23 PM |
| **Attachments:** | Adoption Incentive Agreement_DRAFT_2018.06.19.docx |
| **Importance:** | High |

Ok see if you like this

File is attached

On Wed, Jun 20, 2018 at 11:28 AM, Waddell, Holle <hwaddell@blm.gov> wrote:

PJ - Attached is the adoption incentive agreement we discussed this morning. The following changes need to be made:

1. ADD: A bullet and initial line that states something like...I understand that I am no longer eligible to participate in the adoption incentive program in the future if I return of two or more animals within a six month time-frame. (Take a stab at it)

2. CHANGE: Opt Out section so that it is not similar, it needs to stand out perhaps be at the top with "I _____ opt out of participating in the adoption incentive program and forfeit/waive any incentive payments from BLM." (Take a stab at it)

Once these two changes are made let's review it. Today before 1:30pm would be great...I am leaving at 2:00pm today. Call me if you have any questions.

Thank you,

Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |

Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood



--

Best Regards,

**PJ Roberson**
**Program Administrator**
**Bureau of Land Management - Wild Horse & Burro Program**
**Office: (405) 579-1863**
**201 Stephenson Parkway Suite 1200 Norman, OK 73109**
**proberson@blm.gov**

*"How we seek to spend our time may depend on how much time we perceive ourselves to have" -Atul Gawande*

Form 4710-XX
(June 2018)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
ADOPTION INCENTIVE AGREEMENT

NOTE: THIS IS A
CONTRACT, RETAIN
WITH OTHER LEGAL
RECORDS.

| Adopter's First Name: | Middle Name: | Last Name: |
|---|---|---|

| Address: | City | State: |
|---|---|---|

| Zip Code: | Email Address: |
|---|---|

| FREEZE MARK(S): | SIGNALMENT KEY(S): |
|---|---|

| Financial Institution Name: | Primary Account Holder Name: |
|---|---|

| Account Type | Routing Number | Account Number |
|---|---|---|
| ☐ Checking | | |
| ☐ Savings | | |

*Please initial the following terms that apply to all wild horses and burros adopted under this adoption incentive agreement.*

Initial: _____ I _____ chose to **opt out** of the adoption incentive program and forfeit/waive any incentive payments from the BLM.

OR

Initial: _____ I _____ (Print Name) understand that failure to comply with the following terms may result in the cancellation of this adoption incentive agreement, repossession of the animals, disapproval of request for adoption of additional animals as well as your eligibility to participate in the adoption incentive program.

Initial: _____ I have read and understand the terms of adoption and prohibited acts.

Initial: _____ I understand that I am responsible to complete and submit both the Incentive copy of this agreement and the title application 4710-18) in order to receive the $500 incentive per adopted animal. (2nd Payment)

Initial: _____ In accordance with the terms of adoptions, I authorize BLM employees and other BLM approved individuals to conduct mandatory compliance inspections on adopted animals participating in the incentive program.

Initial: _____ I hereby authorize electronic funds transfers to my account at the financial institution listed above.

Initial: _____ I agree to notify of any changes regarding my banking information until my adopted animal(s) are titled.

Initial: _____ Under penalty of prosecution for violating 18 U.S.C. 1001, which makes it a Federal crime to make false statements to any agency of the United States, I hereby certify that I will provide humane care for any animals that I adopt and will not sell or transfer ownership of them to any person or organization that intends to resell, trade, or give away such animals for slaughter or processing into commercial products.

Initial: _____ I certify that I am not a BLM employee, immediate family member of a BLM employee, BLM contractor or cooperator.

The BLM will use this information to process your agreement for private maintenance and care of wild horses or burros. BLM will use your driver's license and social security number for debt collection purposes under the authority of the Debt Collection Improvement Act, 31 U.S.C. 7701.

Initial: _____ I understand I will lose my eligibility to participate in the adoption incentive program in the future if I return two or more animals within a six month time-frame.

Full Name (Print): _____

Signature: _____ Date: _____   BLM_002323

# Summary of Comments on 20180620.1204a.email.Re_ Adoption Incentive Agreement Revision.att.pdf

## Page: 1

Number: 1          Author: Waddell, Holle          Date: 6/19/2018 7:20:00 PM
CHANGE "Opt Out" so that it is different from other lines

Number: 2          Author: Waddell, Holle          Date: 6/14/2018 4:37:00 PM
ADD: Freeze marks and Signalment Key information DONE
ADD: Statement certifying that the adopter is not a BLM employee, etc...DONE
ADD: Certify that they DO NOT want to participate in the incentive program DONE

Number: 3          Author: Waddell, Holle          Date: 6/19/2018 7:00:00 PM
ADD Ineligible if return 2 or more w/n 6 months

Number: 4          Author: Roberson_Peter L          Date: 6/14/2018 12:42:00 PM
S▮▮▮▮▮▮▮▮▮▮

Number: 5          Author: Waddell, Holle          Date: 6/14/2018 4:15:00 PM
ADD: Terms are on reverse...check PMACA

**From:** Roberson, Peter (PJ) L
**To:** Waddell, Holle
**Subject:** Re: Adoption Incentive Agreement Revision
**Date:** Wednesday, June 20, 2018 1:27:32 PM
**Attachments:** Adoption Incentive Agreement_DRAFT_2018.06.19.docx
**Importance:** High

The revised file is attached

Thanks

On Wed, Jun 20, 2018 at 1:20 PM, Waddell, Holle <hwaddell@blm.gov> wrote:
Here it is...sorry!

Thank you,

Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |

Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood



On Wed, Jun 20, 2018 at 12:04 PM, Roberson, Peter <proberson@blm.gov> wrote:
Ok see if you like this

File is attached

On Wed, Jun 20, 2018 at 11:28 AM, Waddell, Holle <hwaddell@blm.gov> wrote:
PJ - Attached is the adoption incentive agreement we discussed this morning. The following changes need to be made:

1. ADD: A bullet and initial line that states something like...I understand that I am no longer eligible to participate in the adoption incentive program in the future if I return of two or more animals within a six month time-frame. (Take a stab at it)
2. CHANGE: Opt Out section so that it is not similar, it needs to stand out perhaps be at the top with "I _____ opt out of participating in the adoption incentive program and forfeit/waive any incentive payments from BLM." (Take a stab at it)

Once these two changes are made let's review it. Today before 1:30pm would be great...I am leaving at 2:00pm today. Call me if you have any questions.

Thank you,

Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |

BLM_002325

--

Best Regards,

PJ Roberson
Program Administrator
Bureau of Land Management - Wild Horse & Burro Program
Office: (405) 579-1863
201 Stephenson Parkway Suite 1200 Norman, OK 73109
proberson@blm.gov

*"How we seek to spend our time may depend on how much time we perceive ourselves to have."- Atul Gawande*

--

Best Regards,

PJ Roberson
Program Administrator
Bureau of Land Management - Wild Horse & Burro Program
Office: (405) 579-1863
201 Stephenson Parkway Suite 1200 Norman, OK 73109
proberson@blm.gov

*"How we seek to spend our time may depend on how much time we perceive ourselves to have."- Atul Gawande*


Wood

*"A positive outlook, regardless of how bleak the circumstances may look, is a CHOICE. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl*

Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov

Form 4710-XX
(June 2018)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
ADOPTION INCENTIVE AGREEMENT

NOTE: THIS IS A
CONTRACT, RETAIN
WITH OTHER LEGAL
RECORDS.

| Adopter's First Name: | Middle Name: | Last Name: |
|---|---|---|
| | | |

| Address: | City | State: |
|---|---|---|
| | | |

| Zip Code: | Email Address: |
|---|---|
| | |

| FREEZE MARK(S): | SIGNALMENT KEY(S): |
|---|---|
| | |

| Financial Institution Name: | Primary Account Holder Name: |
|---|---|
| | |

| Account Type | Routing Number | Account Number |
|---|---|---|
| ☐ Checking | | |
| ☐ Savings | | |

I _____ choose to **opt out** of the adoption incentive program and forfeit/waive any incentive payments from the BLM.

**OR**

*Please initial the terms that apply to all wild horses and burros adopted under this adoption incentive agreement.*

Initial: _____   I _____ (Print Name) understand that failure to comply with the following terms may result in the cancellation of this adoption incentive agreement, repossession of the animals, disapproval of request for adoption of additional animals as well as your eligibility to participate in the adoption incentive program.

Initial: _____   I have read and understand the terms of adoption and prohibited acts.

Initial: _____   I understand that I am responsible to complete and submit both the Incentive copy of this agreement and the title application 4710-18) in order to receive the $500 incentive per adopted animal. (2nd Payment)

Initial: _____   In accordance with the terms of adoptions, I authorize BLM employees and other BLM approved individuals to conduct mandatory compliance inspections on adopted animals participating in the incentive program.

Initial: _____   I hereby authorize electronic funds transfers to my account at the financial institution listed above.

Initial: _____   I agree to notify of any changes regarding my banking information until my adopted animal(s) are titled.

Initial: _____   Under penalty of prosecution for violating 18 U.S.C. 1001, which makes it a Federal crime to make false statements to any agency of the United States, I hereby certify that I will provide humane care for any animals that I adopt and will not sell or transfer ownership of them to any person or organization that intends to resell, trade, or give away such animals for slaughter or processing into commercial products.

Initial: _____   I certify that I am not a BLM employee, immediate family member of a BLM employee, BLM contractor or cooperator.

Initial: _____   The BLM will use this information to process your agreement for private maintenance and care of wild horses or burros. BLM will use your driver's license and social security number for debt collection purposes under the authority of the Debt Collection Improvement Act, 31 U.S.C. 7701.

Initial: _____   I understand I will lose my eligibility to participate in the adoption incentive program in the future if I return two or more animals within a six month time-frame.

Full Name (Print): _____

Signature: _____   Date: _____   BLM_002327

# Summary of Comments on 20180620.1327a.email.Re_ Adoption Incentive Agreement Revision.att.pdf

## Page: 1

Number: 1          Author: Waddell, Holle          Date: 6/19/2018 7:20:00 PM
CHANGE "Opt Out" so that it is different from other lines

Number: 2          Author: Waddell, Holle          Date: 6/14/2018 4:37:00 PM
ADD: Freeze marks and Signalment Key information DONE
ADD: Statement certifying that the adopter is not a BLM employee, etc...DONE
ADD: Certify that they DO NOT want to participate in the incentive program DONE

Number: 3          Author: Waddell, Holle          Date: 6/19/2018 7:00:00 PM
ADD Ineligible if return 2 or more w/n 6 months

Number: 4          Author: Roberson  Peter L          Date: 6/14/2018 12:42:00 PM

Number: 5          Author: Waddell, Holle          Date: 6/14/2018 4:15:00 PM
ADD: Terms are on reverse...check PMACA

| From: | Myrick, Brett H |
|---|---|
| To: | Waddell, Holle |
| Cc: | Sklar, Ryan M |
| Subject: | Re: Question about 1109 fund |
| Date: | Thursday, June 21, 2018 8:55:44 AM |
| Importance: | High |

Holle-

Thanks,
Brett

On Wed, Jun 20, 2018 at 1:24 PM Waddell, Holle <hwaddell@blm.gov> wrote:

My apologies Ryan.

Thank you,

Holle' Waddell │ Branch Chief │ Division of Wild Horses and Burros │

Bureau of Land Management │ 405.579.1860 (O) │ 405.579.7102 (F) │ hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood

On Wed, Jun 20, 2018 at 12:02 PM, Ryan Sklar <ryan.sklar@sol.doi.gov> wrote:

Holle,

Thanks,
Ryan

--

Ryan Sklar
Attorney-Advisor
Office of the Solicitor
U.S. Department of the Interior
202-208-3039

NOTICE: This e-mail (including attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected by applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or use of this e-mail or its contents is strictly prohibited. If you receive this e-mail in error, please notify the sender immediately and destroy all copies.

--
Brett H. Myrick
Department of the Interior - Office of the Solicitor
Attorney-Adviser - Division of General Law
202-208-3820
Room 6444

| | |
|---|---|
| **From:** | Roberson, Peter (PJ) L |
| **To:** | Waddell, Holle |
| **Subject:** | Re: Adoption Incentive Agreement Revision |
| **Date:** | Thursday, June 21, 2018 9:35:29 AM |
| **Attachments:** | BLM Adoption Incentive Agreement.pdf |
| | Adoption Incentive Agreement_BACK_DRAFT_2018.06.20 (1).docx |
| | Adoption Incentive Agreement_FRONT_DRAFT_2018.06.21.docx |
| **Importance:** | High |

New files are attached

On Wed, Jun 20, 2018 at 2:34 PM, Waddell, Holle <hwaddell@blm.gov> wrote:
> Thank you. Ok I made some final changes. Please review both files thoroughly and
> then give me a call on my cell. Instead of the privacy notice at the bottom of the
> back, perhaps we add each office of jurisdiction phone numbers.
>
> Thank you,
>
> Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |
>
> Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov
>
> "A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by
> shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift
> your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood
> 
>
> On Wed, Jun 20, 2018 at 1:27 PM, Roberson, Peter <proberson@blm.gov> wrote:
>> The revised file is attached
>>
>> Thanks
>>
>> On Wed, Jun 20, 2018 at 1:20 PM, Waddell, Holle <hwaddell@blm.gov> wrote:
>>> Here it is...sorry!
>>>
>>> Thank you,
>>>
>>> Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |
>>>
>>> Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov
>>>
>>> "A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by
>>> shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you
>>> shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl
>>> Wood
>>> 
>>>
>>> On Wed, Jun 20, 2018 at 12:04 PM, Roberson, Peter <proberson@blm.gov> wrote:
>>>> Ok see if you like this

File is attached

On Wed, Jun 20, 2018 at 11:28 AM, Waddell, Holle <hwaddell@blm.gov> wrote:

PJ - Attached is the adoption incentive agreement we discussed this morning. The following changes need to be made:

1. ADD: A bullet and initial line that states something like...I understand that I am no longer eligible to participate in the adoption incentive program in the future if I return of two or more animals within a six month time-frame. (Take a stab at it)

2. CHANGE: Opt Out section so that it is not similar, it needs to stand out perhaps be at the top with "I _____ opt out of participating in the adoption incentive program and forfeit/waive any incentive payments from BLM." (Take a stab at it)

Once these two changes are made let's review it. Today before 1:30pm would be great...I am leaving at 2:00pm today. Call me if you have any questions.

Thank you,

Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |

Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov

--



"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood

Best Regards,

--

PJ Roberson
Program Administrator
Bureau of Land Management - Wild Horse & Burro Program
Office: (405) 579-1863
201 Stephenson Parkway Suite 1200 Norman, OK 73109
proberson@blm.gov

*"How we seek to spend our time may depend on how much time we perceive ourselves to have"* -
*Atul Gawande*

Best Regards,

**PJ Roberson**
**Program Administrator**
**Bureau of Land Management - Wild Horse & Burro Program**
**Office: (405) 579-1863**
**201 Stephenson Parkway Suite 1200 Norman, OK 73109**
**proberson@blm.gov**

*"How we seek to spend our time may depend on how much time we perceive ourselves to have" -Atul*
*Gawande*

--
Best Regards,

**PJ Roberson**
**Program Administrator**
**Bureau of Land Management - Wild Horse & Burro Program**
**Office: (405) 579-1863**
**201 Stephenson Parkway Suite 1200 Norman, OK 73109**
**proberson@blm.gov**

*"How we seek to spend our time may depend on how much time we perceive ourselves to have" -Atul*
*Gawande*

BLM_002333

Form 4710-XX
(June 2018)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
**BLM ADOPTION INCENTIVE AGREEMENT**

NOTE: THIS IS A
CONTRACT, RETAIN
WITH OTHER LEGAL
RECORDS.

| Adopter's First Name: | Middle Name: | Last Name: |
|---|---|---|

| Address: | City | State: |
|---|---|---|

| Zip Code: | Email Address: |
|---|---|

| FREEZE MARK(S): | SIGNALMENT KEY(S): |
|---|---|

| Financial Institution Name: | Primary Account Holder Name: |
|---|---|

| Account Type | Routing Number | Account Number |
|---|---|---|
| ☐ Checking | | |
| ☐ Savings | | |

I _____ choose to **opt out** of the BLM adoption incentive program and forfeit/waive any incentive payments from the BLM.

**OR**

*Please initial the terms that apply to all wild horses and burros adopted under this BLM adoption incentive agreement.*

Initial: _____   I _____ (Print Name) understand that failure to comply with the following terms may result in the cancellation of this BLM adoption incentive agreement, repossession of the animals, disapproval of request for adoption of additional animals as well as your eligibility to participate in the BLM adoption incentive program.

Initial: _____   I have read and understand the terms of adoption and prohibited acts.

Initial: _____   I understand that I am responsible to complete and submit both the Incentive copy of this agreement and the title application 4710-18) in order to receive the $500 incentive per adopted animal. (2nd Payment)

Initial: _____   In accordance with the terms of adoptions, I authorize BLM employees and other BLM approved individuals to conduct mandatory compliance inspections on adopted animals participating in the incentive program.

Initial: _____   I hereby authorize electronic funds transfers to my account at the financial institution listed above.

Initial: _____   I agree to notify of any changes regarding my banking information until my adopted animal(s) are titled.

Initial: _____   Under penalty of prosecution for violating 18 U.S.C. 1001, which makes it a Federal crime to make false statements to any agency of the United States, I hereby certify that I will provide humane care for any animals that I adopt and will not sell or transfer ownership of them to any person or organization that intends to resell, trade, or give away such animals for slaughter or processing into commercial products.

Initial: _____   I certify that I am not a BLM employee, immediate family member of a BLM employee, BLM contractor or cooperator.

Initial: _____   The BLM will use this information to process your agreement for private maintenance and care of wild horses or burros. BLM will use your driver's license and social security number for debt collection purposes under the authority of the Debt Collection Improvement Act, 31 U.S.C. 7701.

Initial: _____   I understand I will lose my eligibility to participate in the BLM adoption incentive program in the future if I return two or more animals within a six month time-frame.

Full Name (Print): _____

Signature: _____   Date: _____

BLM_002334

## PROHIBITED ACTS

(a) Maliciously or negligently injuring or harassing a wild horse or burro;

(b) Treating a wild horse or burro inhumanely;

(c) Removing or attempting to remove a wild horse or burro from the public lands without authorization from the BLM;

(d) Destroying a wild horse or burro without authorization from the BLM, except as an act of mercy

(e) Selling or attempting to sell a wild horse or burro or its remains;

(f) Branding a wild horse or burro;

(g) Removing or altering a freeze mark on a wild horse or burro;

(h) Violating an order, term, or condition established by the BLM under this part;

(i) Commercially exploiting a wild horse or burro;

Any person who commits a prohibited act is subject to a fine of not more than $2,000 or imprisonment for not more than one year, or both, for each violation.

## TERMS OF ADOPTION

The following terms apply to all wild horses and burros adopted under the Private Maintenance and Care Agreement:

(a) Adopters are financially responsible for providing proper care;

(b) Adopters are responsible, as provided by State law, for any personal injury, property damage, or death caused by animals in their care, for pursuing animals that escape or stray, and for costs of recapture;

(c) Adopters must not transfer animals for more than 30 days to another location or to the care of another individual without the prior approval of the BLM;

(d) Adopters must make animals available for physical inspection within 7 days of receipt of a written request by the BLM;

(e) Adopters must notify the BLM within 7 days of discovery of an animal's death, theft or escape;

(f) Adopters must notify the BLM within 30 days of any change in the adopter's address;

(g) Adopters must dispose of remains in accordance with applicable sanitation laws;

(h) Title will remain with the Federal Government for at least 1 year after the Private Maintenance and Care Agreement is executed and until a Certificate of Title is issued by the BLM;

(i) Adoption fees are non-refundable; and

(j) Adopters are entitled to a replacement, if, within 6 months of the adoption date, the animal dies or is required to be destroyed due to a condition that existed at the time of adoption and if the adopter provides a veterinarian statement that certifies that reasonable care would not have corrected the condition. All replacement animals will be handled as a refund (completed within 2 weeks of notification), or a voucher for a replacement animal will be provided. A voucher is non-refundable; is valid for six months; can be applied to more than one animal; is non-transferable; has to be redeemed at the same type of event as the original adoption; and does not give the adopter any kind of preferential treatment. Additionally, the amount of the voucher has to be redeemed all at once; non-used funds are forfeited; and bids above the voucher amount are due in full at the time of the adoption. This policy will only apply to replacement animals, and not repossessions or reassignments.

## TITLE QUALIFICATIONS

A person may receive title to as many as four (4) wild horses or burros per 12-month period provided the following qualifications are met:

The applicant has had the horses or burros assigned by a Private Maintenance and Care Agreement for a minimum of 12 months.

At the end of the 12-month period, the applicant has submitted written certification of a qualified individual attesting, to the best of his/her knowledge, that the adopted animals are receiving proper care.

Title applicants participating in the BLM Adoption Incentive Program are required to retain their copy of the BLM Adoption Incentive Agreement provided at the time of adoption as it must accompany the completed title application when submitting for the certificate of title to receive the 2nd incentive payment in the amount of $500.

## NOTICES

The Privacy Act and the regulation at 43 CFR 2.48 (d) require that you be furnished the following information in connection with information required by this application.

**AUTHORITY:** 16 U.S.C. 1333 and 31 U.S.C. 7701.

**PRINCIPAL PURPOSE:** The BLM will use this information to process your adoption incentive agreement for wild horses or burros. BLM will use your financial information, driver's license and social security numbers for debt collection purposes under the authority of the Debt Collection Improvement Act, 31 U.S.C. 7701.

**ROUTINE USES:** The primary uses of the information are to:

(1) Identify individuals who have applied to obtain custody of a wild horse or burro through adoption or sale;

(2) Document the rejection, suspension, or granting of the request for adoption or sale;

(3) Monitor compliance with laws / regulations concerning maintenance of adopted animals;

(4) Identify contractors / employees / volunteers / service providers required to perform program functions;

(5) Provide necessary program management information to other agencies involved in management of wild horses and burros on public lands, i.e., the U.S. Forest Service (USFS) and the Animal and Plant Health Inspection Service (APHIS);

(6) Identify and assign level of system access required by BLM, USFS and APHIS wild horse and burros program personnel; and

(7) Authorize the disclosure of records to individuals involved in responding to a breach of Federal data.

**EFFECT OF NOT PROVIDING INFORMATION:** Submission of the requested information is necessary to obtain or retain a benefit. Failure to submit all of the requested information or to complete this form may result in the rejection and/or denial of your application.

The Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.) requires us to inform you that:

The BLM collects this information in accordance with the statutes and regulations listed above, and for the purposes listed above.

Submission of the requested information is necessary to obtain or retain a benefit. You do not have to respond to this or any other Federal agency-sponsored information collection unless it displays a currently valid OMB control number.

## PROHIBITED ACTS

(a) Maliciously or negligently injuring or harassing a wild horse or burro;

(b) Treating a wild horse or burro inhumanely;

(c) Removing or attempting to remove a wild horse or burro from the public lands without authorization from the BLM;

(d) Destroying a wild horse or burro without authorization from the BLM, except as an act of mercy

(e) Selling or attempting to sell a wild horse or burro or its remains;

(f) Branding a wild horse or burro;

(g) Removing or altering a freeze mark on a wild horse or burro;

(h) Violating an order, term, or condition established by the BLM under this part;

(i) Commercially exploiting a wild horse or burro;

Any person who commits a prohibited act is subject to a fine of not more than $2,000 or imprisonment for not more than one year, or both, for each violation.

## TERMS OF ADOPTION

The following terms apply to all wild horses and burros adopted under the Private Maintenance and Care Agreement:

(a) Adopters are financially responsible for providing proper care;

(b) Adopters are responsible, as provided by State law, for any personal injury, property damage, or death caused by animals in their care, for pursuing animals that escape or stray, and for costs of recapture;

(c) Adopters must not transfer animals for more than 30 days to another location or to the care of another individual without the prior approval of the BLM;

(d) Adopters must make animals available for physical inspection within 7 days of receipt of a written request by the BLM;

(e) Adopters must notify the BLM within 7 days of discovery of an animal's death, theft or escape;

(f) Adopters must notify the BLM within 30 days of any change in the adopter's address;

(g) Adopters must dispose of remains in accordance with applicable sanitation laws;

(h) Title will remain with the Federal Government for at least 1 year after the Private Maintenance and Care Agreement is executed and until a Certificate of Title is issued by the BLM;

(i) Adoption fees are non-refundable; and

(j) Adopters are entitled to a replacement, if, within 6 months of the adoption date, the animal dies or is required to be destroyed due to a condition that existed at the time of adoption and if the adopter provides a veterinarian statement that certifies that reasonable care would not have corrected the condition. All replacement animals will be handled as a refund (completed within 2 weeks of notification), or a voucher for a replacement animal will be provided. A voucher is non-refundable; is valid for six months; can be applied to more than one animal; is non-transferable; has to be redeemed at the same type of event as the original adoption; and does not give the adopter any kind of preferential treatment. Additionally, the amount of the voucher has to be redeemed all at once; non-used funds are forfeited; and bids above the voucher amount are due in full at the time of the adoption. This policy will only apply to replacement animals, and not repossessions or reassignments.

## TITLE QUALIFICATIONS

A person may receive title to as many as four (4) wild horses or burros per 12-month period provided the following qualifications are met:

The applicant has had the horses or burros assigned by a Private Maintenance and Care Agreement for a minimum of 12 months.

At the end of the 12-month period, the applicant has submitted written certification of a qualified individual attesting, to the best of his/her knowledge, that the adopted animals are receiving proper care.

Title applicants participating in the BLM Adoption Incentive Program are required to retain their copy of the BLM Adoption Incentive Agreement provided at the time of adoption as it must accompany the completed title application when submitting for the certificate of title to receive the 2nd incentive payment in the amount of $500.

## NOTICES

The Privacy Act and the regulation at 43 CFR 2.48 (d) require that you be furnished the following information in connection with information required by this application.

**AUTHORITY:** 16 U.S.C. 1333 and 31 U.S.C. 7701.

**PRINCIPAL PURPOSE:** The BLM will use this information to process your adoption incentive agreement for wild horses or burros. BLM will use your financial information, driver's license and social security numbers for debt collection purposes under the authority of the Debt Collection Improvement Act, 31 U.S.C. 7701.

**ROUTINE USES:** The primary uses of the information are to:

(1) Identify individuals who have applied to obtain custody of a wild horse or burro through adoption or sale;

(2) Document the rejection, suspension, or granting of the request for adoption or sale;

(3) Monitor compliance with laws / regulations concerning maintenance of adopted animals;

(4) Identify contractors / employees / volunteers / service providers required to perform program functions;

(5) Provide necessary program management information to other agencies involved in management of wild horses and burros on public lands, i.e., the U.S. Forest Service (USFS) and the Animal and Plant Health Inspection Service (APHIS);

(6) Identify and assign level of system access required by BLM, USFS and APHIS wild horse and burros program personnel; and

(7) Authorize the disclosure of records to individuals involved in responding to a breach of Federal data.

**EFFECT OF NOT PROVIDING INFORMATION:** Submission of the requested information is necessary to obtain or retain a benefit. Failure to submit all of the requested information or to complete this form may result in the rejection and/or denial of your application.

The Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.) requires us to inform you that:

The BLM collects this information in accordance with the statutes and regulations listed above, and for the purposes listed above.

Submission of the requested information is necessary to obtain or retain a benefit. You do not have to respond to this or any other Federal agency-sponsored information collection unless it displays a currently valid OMB control number.

Form 4710-XX
(June 2018)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
**BLM ADOPTION INCENTIVE AGREEMENT**

NOTE: THIS IS A
CONTRACT, RETAIN
WITH OTHER LEGAL
RECORDS.

| Adopter's First Name: | Middle Name: | Last Name: |
|---|---|---|

| Address: | City | State: |
|---|---|---|

| Zip Code: | Email Address: |
|---|---|

| FREEZE MARK(S): | SIGNALMENT KEY(S): |
|---|---|

| Financial Institution Name: | Primary Account Holder Name: |
|---|---|

| **Account Type** | **Routing Number** | **Account Number** |
|---|---|---|
| ☐ Checking | | |
| ☐ Savings | | |

I _____ choose to **opt out** of the BLM adoption incentive program and forfeit/waive any incentive payments from the BLM.

**OR**

*Please initial the terms that apply to all wild horses and burros adopted under this BLM adoption incentive agreement.*

Initial: _____  I _____ (Print Name) understand that failure to comply with the following terms may result in the cancellation of this BLM adoption incentive agreement, repossession of the animals, disapproval of request for adoption of additional animals as well as your eligibility to participate in the BLM adoption incentive program.

Initial: _____  I have read and understand the terms of adoption and prohibited acts.

Initial: _____  I understand that I am responsible to complete and submit both the Incentive copy of this agreement and the title application 4710-18) in order to receive the $500 incentive per adopted animal. (2nd Payment)

Initial: _____  In accordance with the terms of adoptions, I authorize BLM employees and other BLM approved individuals to conduct mandatory compliance inspections on adopted animals participating in the incentive program.

Initial: _____  I hereby authorize electronic funds transfers to my account at the financial institution listed above.

Initial: _____  I agree to notify of any changes regarding my banking information until my adopted animal(s) are titled.

Initial: _____  Under penalty of prosecution for violating 18 U.S.C. 1001, which makes it a Federal crime to make false statements to any agency of the United States, I hereby certify that I will provide humane care for any animals that I adopt and will not sell or transfer ownership of them to any person or organization that intends to resell, trade, or give away such animals for slaughter or processing into commercial products.

Initial: _____  I certify that I am not a BLM employee, immediate family member of a BLM employee, BLM contractor or cooperator.

Initial: _____  The BLM will use this information to process your agreement for private maintenance and care of wild horses or burros. BLM will use your driver's license and social security number for debt collection purposes under the authority of the Debt Collection Improvement Act, 31 U.S.C. 7701.

Initial: _____  I understand I will lose my eligibility to participate in the BLM adoption incentive program in the future if I return two or more animals within a six month time-frame.

Full Name (Print): _____

Signature: _____   Date: _____

BLM_002337

| | |
|---|---|
| **From:** | Tiel-Nelson, Heather J |
| **To:** | Waddell, Holle |
| **Subject:** | edited docs |
| **Date:** | Thursday, June 21, 2018 12:44:32 PM |
| **Attachments:** | Adoption Incentive Agreement_DRAFT_2018.06.15_htn edits.docx |
| | Adoption Incentive Program_DRAFT_PCPT_20180616_htn editst.docx |
| | IM 2018-XXX, Guidance forthe Adoption Incentive Program_DRAFT_htn edits.docx |
| **Importance:** | High |

Hi Holle--

Apologize for missing the calls; here are the documents with my edits -- sorry if they are redundant coming in after the review call!

--
Heather Tiel-Nelson
Public Affairs Specialist
Twin Falls District
2878 Addison Ave. East
Twin Falls, ID 83301
(208) 736-2352 w
(208) 308-3727 c

BLM_002338

Form 4710-XX
(June 2018)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
ADOPTION INCENTIVE AGREEMENT

NOTE: THIS IS A CONTRACT, RETAIN WITH OTHER LEGAL RECORDS.

| Adopter's First Name: | Middle Name: | Last Name: |
|---|---|---|

| Address: | City | State: |
|---|---|---|

| Zip Code: | Email Address: |
|---|---|

| FREEZE MARK(S): | SIGNALMENT KEY(S): |
|---|---|

| Financial Institution Name: | Primary Account Holder Name: |
|---|---|

| Account Type | Routing Number | Account Number |
|---|---|---|
| ☐ Checking | | |
| ☐ Savings | | |

*Please initial, print and sign the following terms that apply to all wild horses and burros adopted under this adoption incentive agreement.*

Initial: _____    I _____ (Print Name) understand that failure to comply with the following terms may result in the cancellation of this adoption incentive agreement, repossession of the animals, disapproval of request for adoption of additional animals as well as eligibility to participate in the adoption incentive program.

Initial: _____    I have read and understand the terms of adoption and prohibited acts.

Initial: _____    I understand that I am responsible to complete and submit both the incentive copy of this agreement and the title application 4710-18) to receive the $500 incentive per adopted animal. (second payment)

Initial: _____    In accordance with the terms of adoption, I authorize BLM employees and other BLM approved individuals to conduct mandatory compliance inspections on adopted animals participating in the incentive program.

Initial: _____    I hereby authorize electronic funds transfers to my account at the financial institution listed above.

Initial: _____    I agree to notify BLM of any changes regarding my banking information until my adopted animal(s) are titled.

Initial: _____    Under penalty of prosecution for violating 18 U.S.C. 1001, which makes it a Federal crime to make false statements to any agency of the United States, I hereby certify that I will provide humane care for any animals that I adopt and will not sell or transfer ownership of them to any person or organization that intends to resell, trade, or give away such animals for slaughter or processing into commercial products.

Initial: _____    I certify that I am not a BLM employee, immediate family member of a BLM employee, BLM contractor or cooperator.

Initial: _____    The BLM will use this information to process your agreement for private maintenance and care of wild horses or burros. BLM will use your driver's license and social security number for debt collection purposes under the authority of the Debt Collection Improvement Act, 31 U.S.C. 7701.

Initial: _____    I opt out of participating in the adoption incentive program and forfeit/waive any incentive payments from BLM.

Full Name (Print): _____

Signature: _____    Date: _____   BLM_002339

# Summary of Comments on 20180621.1244a.email.edited docs.att.pdf

## Page: 1

Number: 1          Author: Waddell, Holle          Date: 6/14/2018 4:37:00 PM
ADD: Freeze marks and Signalment Key information DONE
ADD: Statement certifying that the adopter is not a BLM employee, etc...DONE
ADD: Certify that they DO NOT want to participate in the incentive program DONE

Number: 2          Author: Roberson_Peter L          Date: 6/14/2018 12:42:00 PM

Number: 3          Author: Waddell, Holle          Date: 6/14/2018 4:15:00 PM
ADD: Terms are on reverse...check PMACA

| | |
|---|---|
| **From:** | Collins, Deborah |
| **To:** | Waddell, Holle; Roberson, Peter (PJ) L |
| **Subject:** | Draft Adoption Incentive Program - DC edit to bullet |
| **Date:** | Thursday, June 21, 2018 1:38:46 PM |
| **Attachments:** | Adoption Incentive Program_DRAFT_PCPT_DC_2018.06.21.docx |

Here you go. Thank you.


**Debbie Collins/WHB Outreach Specialist**
**Bureau of Land Management - Washington Office/Off-Range Branch**
**201 Stephenson Parkway, Suite 1200, Norman, OK 73072**
**405-579-1861/918-625-5292/dacollin@blm.gov**

*Internal Use ONLY*

# Adoption Incentive Program

**Purpose**

The purpose of the Adoption Incentive Program (AIP) is to increase the numbers of excess animals placed into private care through adoptions. This program will encourage new individuals to adopt a wild horse or burro, motivate previous adopters to re-engage with the program and invest in animals by providing a financial incentive, $1,000 at the time of adoption and an additional $500 at time of title, to help defray initial ownership costs, such as veterinary care, feed and training. Increasing the placement of animals into private care is a critical priority of the program and of utmost interest to BLM due to the costs associated with caring for unadopted/unsold animals in BLM corrals and pastures. Costs savings may be utilized for other management operations, such as gathers.

**Incentive Guidelines**

➢ Adopters participating in AIP must adhere to the terms of adoptions and prohibited acts provided at the time of adoption.

➢ The AIP applies to ONLY untrained animals that are adopted and will not apply to purchase animals.

➢ All untrained animals are eligible to participate in the AIP regardless of species, age, sex, color, herd management area or the number of times the animal has been offered for adoption.

➢ Each adopter must meet adoption requirements, complete and sign an Application for Adoption and/or Sale of Wild Horses and Burros (Attachment 1: BLM #4710-10) and have it approved by BLM.

➢ If there is evidence indicating an adopter does not meet the minimum adoption requirements or does not intend to provide humane care, the BLM authorized officer will deny the adoption.

➢ Adopters have an opportunity to receive a total of $1,500 for each animal adopted through the incentive program, $1,000 within 90 days from the adoption date and an additional $500 at time of title.

   o Adopters participating in the AIP must complete the Adoption Incentive Agreement (Attachment 2) to receive the 1st incentive payment in the amount of $1,000. The payment will be received within 90 days from the adoption date.

   o Adopters are required to retain their copy of the Adoption Incentive Agreement as it must accompany the completed title application when submitting for the certificate of title to receive the 2nd incentive payment in the amount of $500.

➢ The minimum adoption fee is reduced to $25 for untrained animals. This may be competitive or non-competitive.

➢ The BLM authorized officer must maintain the signed Private Care and Maintenance Agreement, completed and signed Application for Adoption and/or Sale of Wild Horses and Burros and the completed and signed Adoption Incentive Agreement for official Bureau records.

➢ The adoption information is required to be entered in the Wild Horse and Burro Program System

*Internal Use ONLY*

within seven business days after the adoption is completed.

➢ All animals participating in AIP will require mandatory compliance and identified on the mandatory list.

➢ Any adopter that relinquishes two or more animals in a six month time-frame or does not follow the terms and conditions of the Adoption Incentive Agreement (Attachment 2) as agreed upon becomes ineligible to participate in the adoption incentive program.

➢ Adopters may be removed from the incentive program due to not following guidelines or misuse.

➢ Reassigned animals are not eligible for the incentive program.

➢ BLM employees, their immediate family members, BLM Program contractors and cooperators are **<u>NOT</u>** eligible to participate in the incentive program.

**Incentive Program Process**

**Step 1:** At time of adoption, BLM staff should ask the adopter if they are participating in AIP.

NO – Continue normal adoption process;

YES – Adopter must complete the Adoption Incentive Agreement (Attachment 2) in addition to the normal adoption process, an approved adoption application and a PMACA.

**Step 2:** BLM staff complete the adoption process, providing two copies of the Adoption Incentive Agreement (Attachment 2) to the adopter along with other required adoption paperwork.

**Step 3:** BLM staff return to the office, complete data entry into WHBPS (indicating adopters and animals participating in AIP, build official file and compete record.

**Step 4:**



| | |
|---|---|
| **From:** | Kueck, Meredith A |
| **To:** | Hofstra, Kurt W; Hardesty, Amanda; Waddell, Holle; Lambert, Brent A |
| **Subject:** | Adoption Incentive Program WHBPS Updates |
| **Date:** | Thursday, June 21, 2018 3:07:24 PM |
| **Attachments:** | Adoption Incentive Program_DRAFT_PCPT_2018.06.21.docx |
| **Importance:** | High |

Kurt,

The program is currently anticipating the need for the following updates to be made in WHBPS to accommodate the Adoption Incentive Program (AIP).

- A mandatory drop down field to indicate if an animal is an incentive or non-incentive when being added to a PMACA. Ideally this drop down would have "Select One" or something similar as the default so users are forced to take the time to select either incentive or non-incentive. Only untrained animals are eligible for the AIP. Reassigned animals are not eligible for AIP. The base adoption fee for AIP animals will be reduced to $25 and can be competitive or non-competitive.
    - An alternative to adding a drop-down would be adding 2 new adoption fee codes, Incentive - Competitive and Incentive - Noncompetitive. We can discuss further, but I think this may be the better option.
- All incentive animals will have a mandatory compliance requirement. A report to track AIP animals and associated inspections will be needed. The report title will be "Required Inspections for Incentive Animals" and the layout should be modeled after the Required Compliance List.
- Adopters that relinquish two or more animals in a six month time frame or who do not adhere to the terms and conditions of the Adoption Incentive Agreement will no longer be eligible to participate in the program. There will need to be a new Adoption Incentive Eligibility field associated with individual and organization records to will prevent users from adopting incentive animals to ineligible adopters. The Adoption Incentive Eligibility should be recorded separately from Adoption Eligibility Status. An adopter can be ineligible for the incentive program, but still eligible to adopt non-incentive animals.
- Adopters will receive an additional payment when their incentive animal is titled. A pop-up or some type of indicator needs to be added in the titling screen to remind users to initiate final payment when the title is recorded.

I've attached the draft AIP guidelines to provide additional details on the program. I am available any time tomorrow if you need to discuss or clarify any points.

Thanks,

Meredith Kueck
Wild Horse & Burro Specialist
Bureau of Land Management
Desk (405) 579-7183
Cell (405) 312-8607

**WHBPS SHARE POINT SITE**

*Internal Use ONLY*

# Adoption Incentive Program

**Purpose**

The purpose of the Adoption Incentive Program (AIP) is to increase the numbers of excess animals placed into private care through adoptions. This program will encourage new individuals to adopt a wild horse or burro, motivate previous adopters to re-engage with the program and invest in animals by providing a financial incentive, $1,000 at the time of adoption and an additional $500 at time of title. This incentive money will help defray initial ownership costs, such as veterinary care, feed and training. Increasing the placement of animals into private care is a critical priority of the program and of utmost interest to BLM due to the costs associated with caring for unadopted/unsold animals in BLM managed or contracted corrals and pastures. Costs savings may be utilized for other management operations, such as gathers.

**Incentive Guidelines**

➢ Adopters participating in AIP must adhere to the terms of adoptions and prohibited acts provided at the time of adoption.

➢ The AIP applies ONLY to untrained animals that are adopted and will not apply to purchase animals.

➢ All untrained animals are eligible to participate in the AIP regardless of species, age, sex, color, herd management area or the number of times the animal has been offered for adoption.

➢ Each adopter must meet adoption requirements, complete and sign an Application for Adoption and/or Sale of Wild Horses and Burros (Attachment 1: BLM #4710-10) and have it approved by BLM.

➢ If there is evidence indicating an adopter does not meet the minimum adoption requirements or does not intend to provide humane care, the BLM authorized officer will deny the adoption.

➢ Adopters have an opportunity to receive a total of $1,500 for each animal adopted through the incentive program, $1,000 within 90 days from the adoption date and an additional $500 at time of title.

  o Adopters participating in the AIP must complete the Adoption Incentive Agreement (Attachment 2) to receive the first incentive payment in the amount of $1,000. The payment will be received within 90 days of the adoption date.

  o Adopters are required to retain their copy of the Adoption Incentive Agreement as it must accompany the completed title application when submitting for the certificate of title to receive the second incentive payment in the amount of $500.

➢ The minimum adoption fee is reduced to $25 for untrained animals. This may be competitive or non-competitive.

➢ The BLM authorized officer must maintain the signed Private Care and Maintenance Agreement, completed and signed Application for Adoption and/or Sale of Wild Horses and Burros and the completed and signed Adoption Incentive Agreement for official Bureau records.

➢ The adoption information is required to be entered in the Wild Horse and Burro Program System

*Internal Use ONLY*

within seven business days after the adoption is completed.

➢ All animals participating in the BLM AIP will require mandatory compliance and identified on a newly developed report, Required Inspections for Incentive Animals.

➢ Any adopter that relinquishes two or more animals in a six month time-frame or does not adhere to the terms and conditions of the Adoption Incentive Agreement (Attachment 2) is no longer to participate in the adoption incentive program.

➢ Adopters that misuse or do not follow the adoption incentive guidelines may be prohibited from future participation in the program.

➢ Reassigned animals are not eligible for the incentive program.

➢ BLM employees, their immediate family members, BLM Program contractors and cooperators are **<u>NOT</u>** eligible to participate in the incentive program.

**Incentive Program Process**

**Step 1:** At time of adoption, BLM staff should ask the adopter if they are participating in AIP.

NO – Continue normal adoption process;

YES – Adopter must complete the Adoption Incentive Agreement (Attachment 2) in addition to the normal adoption process, an approved adoption application and a PMACA.

**Step 2:** BLM staff will complete the adoption process and provide two copies of the Adoption Incentive Agreement (Attachment 2) to the adopter along with other required adoption paperwork.

**Step 3:** Upon BLM staff return to the office, complete data entry into WHBPS (indicating adopters and animals participating in AIP, build official file and compete record.

**Step 4:**



| | |
|---|---|
| **From:** | Hofstra, Kurt W |
| **To:** | Kueck, Meredith A |
| **Cc:** | Hardesty, Amanda; Waddell, Holle; Lambert, Brent A |
| **Subject:** | Re: Adoption Incentive Program WHBPS Updates |
| **Date:** | Thursday, June 21, 2018 4:06:24 PM |
| **Importance:** | High |

Hi Meredith!

Thank you for forwarding this information. I think you mentioned the first two items are needed immediately to kick off the program, and the other two could be incorporated later.

I'll review with the team, and look forward to receiving your thoughts on the screens where you would like the information displayed.

The guidelines look to be a work in progress. A couple of initial questions...

- is there is an upper limit on the number of animals one adopter in the AIP can adopt under the program?
- when it comes to the $25 fee, what is the difference between how a competitive vs. non-competitive situation is handled? This implies variable fees; will the competitive situation result in a higher fee?
- if the initial and final incentive fees are subject to change over time, do we need to track the value of the initial and final incentives offered when the AIP is initiated to avoid confusion later as to what's due, or is that tacked outside the PS?
- do we need a new report for tracking incentive payments across the program? Or is there a current report where that information would fit? What would the frequency of the report be?

Thanks again. Talk to you tomorrow!

Kurt

On Thu, Jun 21, 2018 at 2:07 PM, Meredith Kueck <mkueck@blm.gov> wrote:
> Kurt,
>
> The program is currently anticipating the need for the following updates to be made in WHBPS to accommodate the Adoption Incentive Program (AIP).
>
> - A mandatory drop down field to indicate if an animal is an incentive or non-incentive when being added to a PMACA. Ideally this drop down would have "Select One" or something similar as the default so users are forced to take the time to select either incentive or non-incentive. Only untrained animals are eligible for the AIP. Reassigned animals are not eligible for AIP. The base adoption fee for AIP animals will be reduced to $25 and can be competitive or non-competitive.
>   - An alternative to adding a drop-down would be adding 2 new adoption fee codes, Incentive - Competitive and Incentive - Noncompetitive. We can discuss further, but I think this may be the better option.
> - All incentive animals will have a mandatory compliance requirement. A report to track AIP animals and associated inspections will be needed. The report title will be "Required Inspections for Incentive Animals" and the layout should be modeled after

the Required Compliance List.

- Adopters that relinquish two or more animals in a six month time frame or who do not adhere to the terms and conditions of the Adoption Incentive Agreement will no longer be eligible to participate in the program. There will need to be a new Adoption Incentive Eligibility field associated with individual and organization records to will prevent users from adopting incentive animals to ineligible adopters. The Adoption Incentive Eligibility should be recorded separately from Adoption Eligibility Status. An adopter can be ineligible for the incentive program, but still eligible to adopt non-incentive animals.
- Adopters will receive an additional payment when their incentive animal is titled. A pop-up or some type of indicator needs to be added in the titling screen to remind users to initiate final payment when the title is recorded.

I've attached the draft AIP guidelines to provide additional details on the program. I am available any time tomorrow if you need to discuss or clarify any points.

Thanks,

Meredith Kueck
Wild Horse & Burro Specialist
Bureau of Land Management
Desk (405) 579-7183
Cell (405) 312-8607

**WHBPS SHARE POINT SITE**

--
**Kurt Hofstra**
Technical Manager
Contractor, DSG Systems
DIRM Support Services
National Operations Center, BLM
cell - 303-877-7110

**From:** Roberson, Peter (P) L.
**To:** Waddell, Holle
**Subject:** Re: Adoption Incentive Agreement Revision
**Date:** Friday, June 22, 2018 8:40:14 AM
**Attachments:** Adoption Incentive Agreement FINAL.pdf
**Importance:** High

Good Morning,

File is attached

Thank You

On Thu, Jun 21, 2018 at 5:12 PM, Waddell, Holle <hwaddell@blm.gov> wrote:
Hi PJ! Please review thoroughly, giving the documents one last look and thanks for creating a pdf of the attached files. Please do first thing in the morning so that I may send out to state leads for review.

Thank you,

Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |
Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a CHOICE. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood 

On Thu, Jun 21, 2018 at 9:35 AM, Roberson, Peter <proberson@blm.gov> wrote:
New files are attached

On Wed, Jun 20, 2018 at 2:34 PM, Waddell, Holle <hwaddell@blm.gov> wrote:
Thank you. Ok I made some final changes. Please review both files thoroughly and then give me a call on my cell. Instead of the privacy notice at the bottom of the back, perhaps we add each office of jurisdiction phone numbers.

Thank you,

Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |
Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a CHOICE. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood

BLM_002349

On Wed, Jun 20, 2018 at 1:27 PM, Roberson, Peter <proberson@blm.gov> wrote:

The revised file is attached

Thanks

On Wed, Jun 20, 2018 at 1:20 PM, Waddell, Holle <hwaddell@blm.gov> wrote:

Here it is.. sorry!

Thank you,

Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |

Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood



On Wed, Jun 20, 2018 at 12:04 PM, Roberson, Peter <proberson@blm.gov> wrote:

Ok see if you like this

File is attached

On Wed, Jun 20, 2018 at 11:28 AM, Waddell, Holle <hwaddell@blm.gov> wrote:

PJ - Attached is the adoption incentive agreement we discussed this morning. The following changes need to be made:

1. ADD: A bullet and initial line that states something like...I understand that I am no longer eligible to participate in the adoption incentive program in the future if I return of two or more animals within a six month time-frame. (Take a stab at it)

2. CHANGE: Opt Out section so that it is not similar, it needs to stand out perhaps be at the top with "I _____ opt out of participating in the adoption incentive program and forfeit/waive any incentive payments from BLM." (Take a stab at it)

Once these two changes are made let's review it. Today before 1:30pm would be great...I am leaving at 2:00pm today. Call me if you have any questions.

Thank you,

Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |

Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each

day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood



--
Best Regards,

**PJ Roberson**
**Program Administrator**
**Bureau of Land Management - Wild Horse & Burro Program**
**Office: (405) 579-1863**
**201 Stephenson Parkway Suite 1200 Norman, OK 73109**
**proberson@blm.gov**

*"How we seek to spend our time may depend on how much time we perceive ourselves to have" -Atul Gawande*

--
Best Regards,

**PJ Roberson**
**Program Administrator**
**Bureau of Land Management - Wild Horse & Burro Program**
**Office: (405) 579-1863**
**201 Stephenson Parkway Suite 1200 Norman, OK 73109**
**proberson@blm.gov**

*"How we seek to spend our time may depend on how much time we perceive ourselves to have" -Atul Gawande*

--
Best Regards,

**PJ Roberson**
**Program Administrator**
**Bureau of Land Management - Wild Horse & Burro Program**
**Office: (405) 579-1863**
**201 Stephenson Parkway Suite 1200 Norman, OK 73109**
**proberson@blm.gov**

*"How we seek to spend our time may depend on how much time we perceive ourselves to have" -Atul Gawande*

--

Best Regards,

**PJ Roberson**
**Program Administrator**
**Bureau of Land Management – Wild Horse & Burro Program**
**Office: (405) 579-1863**
**201 Stephenson Parkway Suite 1200 Norman, OK 73109**
**proberson@blm.gov**

*"How we seek to spend our time may depend on how much time we perceive ourselves to have" –Atul Gawande*

BLM_002352

Form 4710-XX
(June 2018)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
**ADOPTION INCENTIVE AGREEMENT**

NOTE: THIS IS A
CONTRACT, RETAIN
WITH OTHER LEGAL
RECORDS.

| Adopter's First Name: | Middle Name: | Last Name: |
|---|---|---|
| | | |

| Address: | City | State: |
|---|---|---|
| | | |

| Zip Code: | Email Address: |
|---|---|
| | |

| FREEZE MARK(S): | SIGNALMENT KEY(S): |
|---|---|
| | |

| Financial Institution Name: | Primary Account Holder Name: |
|---|---|
| | |

| Account Type | Routing Number | Account Number |
|---|---|---|
| ☐ Checking | | |
| ☐ Savings | | |

I _____ choose to **opt out** of the BLM adoption incentive program and forfeit/waive any incentive payments from the BLM.

**OR**

*Please initial the terms that apply to all wild horses and burros adopted under this BLM adoption incentive agreement.*

Initial: _____   I _____ (Print Name) understand that failure to comply with the following terms may result in the cancellation of this BLM adoption incentive agreement, repossession of the animals, disapproval of request for adoption of additional animals as well as eligibility to participate in the BLM adoption incentive program.

Initial: _____   I have read and understand the terms of adoption and prohibited acts.

Initial: _____   I understand that I am responsible to complete and submit both the incentive copy of this agreement and the title application 4710-18) to receive the $500 incentive per adopted animal. (second payment)

Initial: _____   In accordance with the terms of adoption, I authorize BLM employees and other BLM approved individuals to conduct mandatory compliance inspections on adopted animals participating in the incentive program.

Initial: _____   I hereby authorize electronic funds transfers to my account at the financial institution listed above.

Initial: _____   I agree to notify BLM of any changes regarding my banking information until my adopted animal(s) are titled.

Initial: _____   Under penalty of prosecution for violating 18 U.S.C. 1001, which makes it a Federal crime to make false statements to any agency of the United States, I hereby certify that I will provide humane care for any animals that I adopt and will not sell or transfer ownership of them to any person or organization that intends to resell, trade, or give away such animals for slaughter or processing into commercial products.

Initial: _____   I certify that I am not a BLM employee, immediate family member of a BLM employee, BLM contractor or cooperator.

Initial: _____   The BLM will use this information to process your agreement for private maintenance and care of wild horses or burros. BLM will use your driver's license and social security number for debt collection purposes under the authority of the Debt Collection Improvement Act, 31 U.S.C. 7701.

Initial: _____   I understand I will lose my eligibility to participate in the BLM adoption incentive program in the future if I return two or more animals within a six month time-frame.

Full Name (Print): _____

Signature: _____   Date: _____

BLM_002353

## PROHIBITED ACTS

(a) Maliciously or negligently injuring or harassing a wild horse or burro;

(b) Treating a wild horse or burro inhumanely;

(c) Removing or attempting to remove a wild horse or burro from the public lands without authorization from the BLM;

(d) Destroying a wild horse or burro without authorization from the BLM, except as an act of mercy

(e) Selling or attempting to sell a wild horse or burro or its remains;

(f) Branding a wild horse or burro;

(g) Removing or altering a freeze mark on a wild horse or burro;

(h) Violating an order, term, or condition established by the BLM under this part;

(i) Commercially exploiting a wild horse or burro;

Any person who commits a prohibited act is subject to a fine of not more than $2,000 or imprisonment for not more than one year, or both, for each violation.

## TERMS OF ADOPTION

The following terms apply to all wild horses and burros adopted under the Private Maintenance and Care Agreement:

(d) Adopters are financially responsible for providing proper care;

(e) Adopters are responsible, as provided by State law, for any personal injury, property damage, or death caused by animals in their care, for pursuing animals that escape or stray, and for costs of recapture;

(f) Adopters must not transfer animals for more than 30 days to another location or to the care of another individual without the prior approval of the BLM;

(g) Adopters must make animals available for physical inspection within 7 days of receipt of a written request by the BLM;

(h) Adopters must notify the BLM within 7 days of discovery of an animal's death, theft or escape;

(i) Adopters must notify the BLM within 30 days of any change in the adopter's address;

(j) Adopters must dispose of remains in accordance with applicable sanitation laws;

(a) Title will remain with the Federal Government for at least 1 year after the Private Maintenance and Care Agreement is executed and until a Certificate of Title is issued by the BLM;

(b) Adoption fees are non-refundable; and

(c) Adopters are entitled to a replacement, if, within 6 months of the adoption date, the animal dies or is required to be destroyed due to a condition that existed at the time of adoption and if the adopter provides a veterinarian statement that certifies that reasonable care would not have corrected the condition. All replacement animals will be handled as a refund (completed within 2 weeks of notification), or a voucher for a replacement animal will be provided. A voucher is non-refundable; is valid for six months; can be applied to more than one animal; is non-transferable; has to be redeemed at the same type of event as the original adoption; and does not give the adopter any kind of preferential treatment. Additionally, the amount of the voucher has to be redeemed all at once; non-used funds are forfeited; and bids above the voucher amount are due in full at the time of the adoption. This policy will only apply to replacement animals, and not repossessions or reassignments.

## TITLE QUALIFICATIONS and INELIGIBLE PARTICIPANTS

A person may receive title to as many as four (4) wild horses or burros per 12-month period provided the following qualifications are met:

The applicant has had the horses or burros assigned by a Private Maintenance and Care Agreement for a minimum of 12 months.

At the end of the 12-month period, the applicant has submitted written certification of a qualified individual attesting, to the best of his/her knowledge, that the adopted animals are receiving proper care.

Title applicants participating in the BLM Adoption Incentive Program are required to retain their copy of the BLM Adoption Incentive Agreement provided at the time of adoption as it must accompany the completed title application when submitting for the certificate of title to receive the 2nd incentive payment in the amount of $500.

BLM employees, immediate family members of a BLM employee, BLM contractors, cooperators or partners are not eligible to participate in the BLM adoption incentive program.

## NOTICES

The Privacy Act and the regulation at 43 CFR 2.48 (d) require that you be furnished the following information in connection with information required by this application.

**AUTHORITY:** 16 U.S.C. 1333 and 31 U.S.C. 7701.

**PRINCIPAL PURPOSE:** The BLM will use this information to process your adoption incentive agreement for wild horses or burros. BLM will use your financial information, driver's license and social security numbers for debt collection purposes under the authority of the Debt Collection Improvement Act, 31 U.S.C. 7701.

**ROUTINE USES:** The primary uses of the information are to:

(1) Identify individuals who have applied to obtain custody of a wild horse or burro through adoption or sale;

(2) Document the rejection, suspension, or granting of the request for adoption or sale;

(3) Monitor compliance with laws / regulations concerning maintenance of adopted animals;

(4) Identify contractors / employees / volunteers / service providers required to perform program functions;

(5) Provide necessary program management information to other agencies involved in management of wild horses and burros on public lands, i.e., the U.S. Forest Service (USFS) and the Animal and Plant Health Inspection Service (APHIS);

(6) Identify and assign level of system access required by BLM, USFS and APHIS wild horse and burros program personnel; and

(7) Authorize the disclosure of records to individuals involved in responding to a breach of Federal data.

EFFECT OF NOT PROVIDING INFORMATION: Submission of the requested information is necessary to obtain or retain a benefit. Failure to submit all of the requested information or to complete this form may result in the rejection and/or denial of your application.

The Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.) requires us to inform you that:

The BLM collects this information in accordance with the statutes and regulations listed above, and for the purposes listed above.

Submission of the requested information is necessary to obtain or retain a benefit. You do not have to respond to this or any other Federal agency-sponsored information collection unless it displays a currently valid OMB control number.

BLM_002354

| | |
|---|---|
| **From:** | Kueck, Meredith A |
| **To:** | Hofstra, Kurt W |
| **Cc:** | Hardesty, Amanda; Waddell, Holle; Lambert, Brent A |
| **Subject:** | Re: Adoption Incentive Program WHBPS Updates |
| **Date:** | Friday, June 22, 2018 9:37:52 AM |
| **Importance:** | High |

Hi Kurt,

Yes, the first two would be top priority and the other two could wait for a regular release.

To answer your first two questions;

- No, there currently is not an upper limit on the number of animals one adopter can adopt through the AIP.
- The competitive base fee would still start at $25, but also could be any amount above that. For example, at an adoption with competitive bid, the bidding would start at $25 but could go up to any amount. Non-competitive would always be $25.00.

Holle' - what are your thoughts on the second two questions?

Meredith Kueck
Wild Horse & Burro Specialist
Bureau of Land Management
Desk (405) 579-7183
Cell (405) 312-8607

**WHBPS SHARE POINT SITE**


On Thu, Jun 21, 2018 at 4:06 PM Hofstra, Kurt <khofstra@blm.gov> wrote:
Hi Meredith!

Thank you for forwarding this information. I think you mentioned the first two items are needed immediately to kick off the program, and the other two could be incorporated later.

I'll review with the team, and look forward to receiving your thoughts on the screens where you would like the information displayed.

The guidelines look to be a work in progress. A couple of initial questions...

- is there is an upper limit on the number of animals one adopter in the AIP can adopt under the program?
- when it comes to the $25 fee, what is the difference between how a competitive vs. non-competitive situation is handled? This implies variable fees; will the competitive situation result in a higher fee?
- if the initial and final incentive fees are subject to change over time, do we need to track the value of the initial and final incentives offered when the AIP is initiated to avoid confusion later as to what's due, or is that tacked outside the PS?
- do we need a new report for tracking incentive payments across the program? Or is there a current report where that information would fit? What would the frequency of

the report be?

Thanks again. Talk to you tomorrow!

Kurt

On Thu, Jun 21, 2018 at 2:07 PM, Meredith Kueck <mkueck@blm.gov> wrote:

Kurt,

The program is currently anticipating the need for the following updates to be made in WHBPS to accommodate the Adoption Incentive Program (AIP).

- A mandatory drop down field to indicate if an animal is an incentive or non-incentive when being added to a PMACA. Ideally this drop down would have "Select One" or something similar as the default so users are forced to take the time to select either incentive or non-incentive. Only untrained animals are eligible for the AIP. Reassigned animals are not eligible for AIP. The base adoption fee for AIP animals will be reduced to $25 and can be competitive or non-competitive.
    - An alternative to adding a drop-down would be adding 2 new adoption fee codes, Incentive - Competitive and Incentive - Noncompetitive. We can discuss further, but I think this may be the better option.
- All incentive animals will have a mandatory compliance requirement. A report to track AIP animals and associated inspections will be needed. The report title will be "Required Inspections for Incentive Animals" and the layout should be modeled after the Required Compliance List.
- Adopters that relinquish two or more animals in a six month time frame or who do not adhere to the terms and conditions of the Adoption Incentive Agreement will no longer be eligible to participate in the program. There will need to be a new Adoption Incentive Eligibility field associated with individual and organization records to will prevent users from adopting incentive animals to ineligible adopters. The Adoption Incentive Eligibility should be recorded separately from Adoption Eligibility Status. An adopter can be ineligible for the incentive program, but still eligible to adopt non-incentive animals.
- Adopters will receive an additional payment when their incentive animal is titled. A pop-up or some type of indicator needs to be added in the titling screen to remind users to initiate final payment when the title is recorded.

I've attached the draft AIP guidelines to provide additional details on the program. I am available any time tomorrow if you need to discuss or clarify any points.

Thanks,

Meredith Kueck
Wild Horse & Burro Specialist
Bureau of Land Management
Desk (405) 579-7183
Cell (405) 312-8607

**WHBPS SHARE POINT SITE**

--
**Kurt Hofstra**
Technical Manager
Contractor, DSG Systems
DIRM Support Services
National Operations Center, BLM
cell - 303-877-7110

| From: | Sklar, Ryan M |
|---|---|
| To: | Waddell, Holle |
| Subject: | Fwd: WHB Questions |
| Date: | Friday, June 22, 2018 9:45:02 AM |
| Importance: | High |

Hi Holle,

Please see Brett's email below.



Can you please make sure that this information reaches the necessary folks in BLM? I'm not really sure who it needs to go to, and I'd rather not send it to the wrong folks.

Thanks,
Ryan

---------- Forwarded message ---------
From: **Brett Myrick** <brett.myrick@sol.doi.gov>
Date: Fri, Jun 22, 2018 at 8:05 AM
Subject: Fwd: WHB Questions
To: Sklar, Ryan <ryan.sklar@sol.doi.gov>

Ryan-



Thanks,
Brett