**From:** Waddell_Holle
**To:** Jenkins_David B
**Cc:** St George_Brian C
**Subject:** Re: Insights for WHB Discussion
**Date:** Tuesday, May 18, 2021 8:24:11 AM
**Attachments:** WHB Briefing Paper NYT Article_REVISED.docx
Outlook-ez03z110.png

David/Brian - Please find the revised briefing paper attached that I believe incorporates both Mike and Nada's comments. I consulted with SOL this morning for the "Future Considerations" section in the BP.

Thank you,

Holle' Waddell
Department of the Interior
Bureau of Land Management
Division Chief *(Acting)*
Division of Wild Horses and Burros, HQ-260
405.579.1860 (office)
202.603.3740 (cell)
hwaddell@blm.gov

*"When you can identify injustice, when you can identify inequality and unfairness, and you confront that, then in my mind you are doing justice." - Bryan Stevenson, Founder and Executive Director for the Equal Justice Initiative*



https://www.blm.gov/programs/wild-horse-and-burro/50th-anniversary

## Wild Horse and Burro | Bureau of Land Management

FIND THE LATEST INFORMATION on changes to wild horse and burro events and facility operating hours. The Bureau of Land Management manages and protects wild horses and burros on 26.9 million acres of public lands across 10 Western states as part of its mission to administer public lands for a variety of uses.

www.blm.gov

---

**From:** Jenkins, David B <djenkins@blm.gov>
**Sent:** Tuesday, May 18, 2021 9:16 AM
**To:** Waddell, Holle <hwaddell@blm.gov>
**Cc:** St George, Brian C <bstgeorg@blm.gov>
**Subject:** Fw: Insights for WHB Discussion

Holle,
See Nada's note. Could you provide a paragraph for the briefing paper on the issues she and Mike raised.
Thanks,
David

David Jenkins, PhD
Assistant Director, Resources and Planning
Bureau of Land Management
U.S. Department of the Interior
760 Horizon Drive, Grand Junction, CO 81506
office: (970) 256-4951
mobile: (970) 852-1964

Directorate of Resources and Planning (HQ200)

---

**From:** Culver, Nada L <nculver@blm.gov>
**Sent:** Monday, May 17, 2021 11:57 PM
**To:** Nedd, Michael D <mnedd@blm.gov>; Jenkins, David B <djenkins@blm.gov>
**Cc:** McDonald, Monique S <m1mcdona@blm.gov>; Eggers, Barbara L <beggers@blm.gov>; Waddell, Holle <hwaddell@blm.gov>; Laub, Mary K <mlaub@blm.gov>; St George, Brian C <bstgeorg@blm.gov>
**Subject:** RE: Insights for WHB Discussion

The overview of the adoption process was very helpful.

████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████

Thanks for moving this along so quickly.

Nada Wolff Culver
Deputy Director, Policy and Programs
Bureau of Land Management
Cell: 202-255-6979
nculver@blm.gov

---

**From:** Nedd, Michael D <mnedd@blm.gov>
**Sent:** Monday, May 17, 2021 7:41 PM
**To:** Jenkins, David B <djenkins@blm.gov>
**Cc:** McDonald, Monique S <m1mcdona@blm.gov>; Culver, Nada L <nculver@blm.gov>; Eggers, Barbara L <beggers@blm.gov>; Waddell, Holle <hwaddell@blm.gov>; Laub, Mary K <mlaub@blm.gov>; St George, Brian C <bstgeorg@blm.gov>
**Subject:** RE: Insights for WHB Discussion

David,

Thx for the documents and the BP.

I believe the documents, including the BP, convey a number of key points that critical to the on-going discussion.

That said and notwithstanding the following in the BP "Once the adopted animal is titled, the adopter has fulfilled their obligations and assumes ownership. At that point, the animal is no longer protected under the Wild Free-Roaming Horses and Burros Act of 1971," ███████████████████████████████████████████████████
███████████████████████

*Take care and have a wonderful day! : )*

*Michael D. Nedd*
*970-256-4900 Office*
*202-236-2867 Cell*
*mnedd@blm.gov*

*A thought to consider* "*Do all the good you can, in all the ways you can, for all the people you can, while you can!*"

*"Working together we're stronger - BLM Strong" - and our Core Values are "To serve with honesty, integrity, accountability, respect, courage, and commitment to make a difference."*

---

**From:** Jenkins, David B <djenkins@blm.gov>

**Sent:** Monday, May 17, 2021 8:05 PM
**To:** Culver, Nada L <nculver@blm.gov>; Eggers, Barbara L <beggers@blm.gov>; St George, Brian C <bstgeorg@blm.gov>; Waddell, Holle <hwaddell@blm.gov>; Laub, Mary K <mlaub@blm.gov>
**Cc:** Nedd, Michael D <mnedd@blm.gov>; McDonald, Monique S <m1mcdona@blm.gov>
**Subject:** Re: Insights for WHB Discussion

Hi All,

In preparation for the morning's meeting, please find attached a briefing paper and some background documentation.

Thanks,

David

David Jenkins, PhD
Assistant Director, Resources and Planning
Bureau of Land Management
U.S. Department of the Interior
760 Horizon Drive, Grand Junction, CO 81506
office: (970) 256-4951
mobile: (970) 852-1964
Directorate of Resources and Planning (HQ200)

---

**From:** Culver, Nada L <nculver@blm.gov>
**Sent:** Monday, May 17, 2021 5:03 PM
**To:** Eggers, Barbara L <beggers@blm.gov>; Jenkins, David B <djenkins@blm.gov>; St George, Brian C <bstgeorg@blm.gov>; Waddell, Holle <hwaddell@blm.gov>; Laub, Mary K <mlaub@blm.gov>
**Cc:** Nedd, Michael D <mnedd@blm.gov>; McDonald, Monique S <m1mcdona@blm.gov>
**Subject:** RE: Insights for WHB Discussion

Thanks, Barbara. That's helpful to know.

Nada Wolff Culver
Deputy Director, Policy and Programs
Bureau of Land Management
Cell: 202-255-6979
nculver@blm.gov

**From:** Eggers, Barbara L <beggers@blm.gov>
**Sent:** Monday, May 17, 2021 4:26 PM
**To:** Jenkins, David B <djenkins@blm.gov>; St George, Brian C <bstgeorg@blm.gov>; Waddell, Holle <hwaddell@blm.gov>; Laub, Mary K <mlaub@blm.gov>
**Cc:** Nedd, Michael D <mnedd@blm.gov>; Culver, Nada L <nculver@blm.gov>; Eggers, Barbara L <beggers@blm.gov>; McDonald, Monique S <m1mcdona@blm.gov>
**Subject:** Insights for WHB Discussion

Good Afternoon,

Niall spoke to Jocelyn and received a few insights as to what she is looking for,

"she has reviewed contracts and understands BLM includes language about prohibition of selling for slaughter,
so I think she's generally more interested in a  robust conversation  (her words) about why this happens and how it might be prevented.
Specifically, she mentioned the penalties for doing this being somewhat light. So my general sense is this is fact-finding at this stage"

I hope this is helpful leading up to the meeting tomorrow.

*Barbara L. Eggers, Assistant Director*
*Business Management & Administration HQ700*

760 Horizon Drive, Suite 324
Grand Junction, CO  81506
Office (970) 256-4912
Cell (202) 779-3900
beggers@blm.gov

Warning:  This email may contain Privacy Act Sensitive Data, wh ch is intended for the use of the ndividual to which it is addressed.  It may conta n information that is privileged, confidential or otherwise protected under appl cable laws.  If you are not the intended rec pient, you are hereby notif ed that you should not review, use, disclose, distr bute, or forward this e-mail or its contents. If you have received this e-mail in error, please notify the sender immediately and delete/destroy any and all cop es of this message.

Feeling gratitude and not expressing it is like wrapping a present and not giving it. – William Arthur Ward

**INFORMATION/BRIEFING MEMORANDUM**
FOR THE ASSISTANT DIRECTOR, RESOURCES AND PLANNING

**DATE:**      May 17, 2021

**FROM:**      Holle Waddell
              Division Chief *(Acting)*, Wild Horse and Burro Program

**SUBJECT:**   Adoption Incentive Program (AIP)

This memo provides information about the authority, logistics and importance of the AIP.

**BACKGROUND:**

Since 1971, the BLM has continuously removed horses and burros from the range to address herd overpopulation. It has placed more than 270,000 of these animals into private care. Placing animals into private care through sales, adoptions, and transfers is a vital component of the WHB program. "Sales" refers to horses and burros which are directly bought at sales events, at which point federal ownership of the animal ends. "Adoptions" refers to horses and burros which are "adopted" by a private party, often with a cash incentive. After one year, the adopter assumes ownership of the animal. "Transfers" refers to horses and burros moved from federal ownership to another governmental agency, such as the New York City Police or the Border Patrol.

Animals removed from the range and not placed into private care are instead placed in corrals and pastures for the remainder of their lives. Corrals and pastures consume over 50 percent of the WHB program's budget.

With advice from the Wild Horse and Burro Advisory Board, the Adoption Incentive Program was launched on March 12, 2019 as part of an overall effort to increase the number of wild horses and burros placed into good care. The BLM determined in conjunction with the Office of Solicitor that the agency has authority to provide reasonable incentives to adopters, when those incentives create savings to the public. Adopters of untrained animals are eligible for a $1,000 incentive payment: $500 within 60-days of the adoption date and $500 within 60-days of the date of "titling" the animal, which marks transfer of ownership to the adopter. Once the adopted animal is titled, the adopter has fulfilled their obligations and assumes ownership. At that point, the animal is no longer protected under the Wild Free-Roaming Horses and Burros Act of 1971.

**DISCUSSION:**

The Adoption Incentive Program resulted in a 90 percent increase in adoptions, which includes first-time and repeat adopters.

Each adopter signs an adoption agreement, which includes an agreement not to sell or attempt to sell an untitled, adopted wild horse or burro, or to adopt a wild horse or burro with the intention of selling it for commercial exploitation or slaughter.  In addition, the adopter does not receive the second half of the $1,000 payment until after titling has occurred, which is at least one year

from the adoption date.  During this year waiting period before the animal can be titled, the animal is included on a list of mandatory compliance checks, which means local BLM staff (or an authorized individual) may complete an inspection of the animal and its current holding arrangements.

Since March 2019, 13,372 wild horses and burros have been adopted. Of these, 7,310 animals have been adopted through the Adoption Incentive Program. Over this time, only 18 animals have been repossessed because an adopter illegally sold an untitled animal at a sale barn. These animals were identified as untitled and returned to the BLM for care at off-range corrals.  In addition, if an adopter is found to have violated any of the Prohibited Acts outlined in the Private Care and Maintenance Agreement  (PCMA), they are issued a Decision Letter rendering them ineligible to participate in the adoption program in the future.

Certain offences may be referred to BLM Law Enforcement, who then investigates and determines if there is sufficient evidence to bring the case to the Department of Justice (DOJ). This has occurred in the past; however, DOJ has yet to attempt to prosecute a case.

Adopters report that owning a wild horse or burro is an extraordinary experience. Adopted wild horses and burros have reached national acclaim through disciplines such as dressage, endurance, and therapeutic programs for veterans. Wild horses and burros are routinely preferred by public officials for important tasks such as patrolling the border and local policing.

The WHB program anticipates continued strong public interest in and support of the Adoption Incentive Program.

FUTURE CONSIDERATIONS



   

May 18, 2021

The Honorable Debra Haaland
Secretary
Department of Interior
Debra.Haaland@doi.gov

<u>Sent via email</u>

**Re: Bureau of Land Management, Wild Horse and Burro Program's Adoption Incentive Program**

Dear Secretary Haaland:

Together, our organizations have been steadfastly pressing for humane, proactive, and non-lethal management of the nation's cherished wild horses and burros because we believe they deserve a better future. We have envisioned a way to make that possible after decades of inaction and challenges for the agency's management program and are working collaboratively with diverse stakeholders who are willing to support effective, humane and non-lethal management of these animals.

This is why we were appalled by the recent New York Times article[1] which unveiled potential abuses of Bureau of Land Management's (BLM) adoption incentive program allowing these animals to be put in the slaughter pipeline. We request the program be immediately suspended until a thorough investigation into these allegations occurs and remedies are in place to ensure no more mustangs are siphoned from adoption to slaughterhouse.

The Trump Administration created this adoption incentive program as a way to move more untrained wild horses or burros into private care to reduce costs created by the growing number of animals removed from the range. Sadly, the allegations included in the New York Times article presents a very different picture of how the program is working compared to BLM's articulation of it[2] as it highlights the lack of oversight during the year the BLM retains title of the equines. It is distressing to hear that BLM employees may be telling adopters they could send these animals to slaughter after title transfers, and there are apparently inadequate background checks on prospective adopters. The Department of Interior must act swiftly to suspend the adoption incentive program while investigating systemic abuses, pursuing all available penalties for any violations discovered and working to ensure future abuses are prevented.

While we recognize that the animals discussed in the New York Times article were no longer considered BLM horses as title had already transferred, that does not lessen BLM's obligation to ensure that adopters do not have the intent of sending these horses to slaughter after title transfers

---

[1] <u>Wild Horses Adopted Under a Federal Program Are Going to Slaughter - The New York Times (nytimes.com)</u>.
[2] See <u>https://www.blm.gov/programs/wild-horse-and-burro/adoptions-and-sales/adoption-incentive-program</u>.

   

as stated in the affidavit they sign to enter the adoption program. Your agency must take a hard look at ensuring it is providing the necessary oversight over adopters and not turning a blind eye to nefarious activities.

Collectively, we have successfully secured language in federal spending packages that specifically prevents BLM and U.S. Forest Service wild horses and burros from being sold for slaughter. Additionally, we have long championed efforts to stop horses from being sent to slaughter here in the United States through the federal appropriations process and continue to have broad bipartisan support to permanently ban domestic horse slaughter and the export of horses abroad for that purpose.

We have long appreciated your leadership in Congress and we urge you to continue to work to ensure that these animals do not end up being slaughtered for human consumption. The horses and the public who care deeply about them deserve no less – and the future of this program depends on solidifying the confidence of Congress, the American public, and the advocates who work tirelessly to protect these animals from such a tragic fate.

Sincerely,

Nancy Perry
Senior Vice President, Government Relations
American Society for the Prevention of Cruelty

Tracie Letterman
Vice President of Federal Affairs
Humane Society Legislative Fund

Neda DeMayo
President
Return to Freedom
Wild Horse Preservation and Sanctuary

Jennifer Hillman
Vice President, Wildlife
The Humane Society of the United States

**From:** Strauss, Toni L
**To:** St George, Brian C
**Cc:** Waddell, Holle
**Subject:** AIP Response Briefing
**Date:** Tuesday, May 25, 2021 9:43:34 AM
**Attachments:** DOI BRIEFINGMEMO-WHB-AIP May2021_DDOPP_260_TLSedits_HW edits.docx

Attached is the AIP Response Briefing version that Holle and I worked on since yesterday's meeting.

Toni Strauss
HQ-200 Resource Advisor
USDI Bureau of Land Management

BLM_003768

| | |
|---|---|
| **From:** | McGuire, Paul M |
| **To:** | Dahle, David M; Baca, Roxane D |
| **Cc:** | Holle Hooks; Ruhs, Amy G |
| **Subject:** | Ethics question re: eligibility to participate in WHB Adoption Incentive Program |
| **Date:** | Tuesday, May 25, 2021 12:52:00 PM |
| **Attachments:** | IM 2019-025 AIP for WHB - rev draft 5.6.21 core grp edits - clean.docx |

David & Roxanne – Hello. I've been advised that you may be able to assist us with an ethics question regarding an IM we are currently in the process of revising. The IM governs implementation of the Wild Horse and Burro Adoption Incentive Program (AIP). A draft of the revised IM is attached for your information.

Background: The AIP offers cash incentives to people who successfully adopt and ultimately receive title to an untrained wild horse or burro. The program has been in effect since March 2019. We are currently renewing the IM and incorporating a few changes. One of the changes concerns who is *not* eligible to participate in the AIP. The original version of the IM provided a long list of ineligible participants, including BLM employees/contractors and their immediate and extended family members. We are proposing to pare the list of ineligible participants to include only BLM employees/contractors and members of their immediate households. Text of the proposed and original sections of the IM dealing with this matter are pasted below for ease of comparison.

We would thank you for your thoughtful feedback on this proposed change. I am available at your convenience to discuss. Thank you,

PROPOSED LANGUAGE TO BE USED GOING FORWARD:
**BLM employees and members of their immediate household (defined as spouse and any dependents 18 years old and older) and individuals or organizations receiving BLM wild horse and burro funds either through a contract or agreement and members of their immediate household are NOT eligible to participate in the AIP**

ORIGINAL LANGUAGE TO BE REPLACED BY PROPOSED LANGUAGE:
**BLM employees, immediate family members (spouse, domestic partner, cohabitant, child, stepchild, grandchild, parent, stepparent, mother-in-law, father-in-law, son-in-law, daughter-in-law, grandparent, great grandparent, aunt, uncle, niece, nephew, or first cousin (that is, a child of an aunt or uncle), sibling, half-sibling, stepsibling, brother-in-law, sister-in-law, including adoptive relationships) of BLM employees, and individuals or organizations receiving BLM funds either through a contract or agreement and their immediate family members are NOT eligible to participate in the AIP.**

Paul McGuire
Acting Off-Range Branch Chief
National Wild Horse & Burro Program
Norman, OK
Ofc: 405-579-7190
Mobile: 405-826-3036
pmcguire@blm.gov

*Suprema lex libertatis*

BLM_003770

| | |
|---|---|
| **From:** | Jenkins, David B |
| **To:** | St George, Brian C |
| **Cc:** | Waddell, Holle; Strauss, Toni L |
| **Subject:** | Re: AIP Response Briefing |
| **Date:** | Tuesday, May 25, 2021 1:34:31 PM |
| **Attachments:** | WHB Briefing Response to Public Claims.docx |

excellent work, all. Many thanks.

Here are some editorial suggestions.

David

David Jenkins, PhD

Assistant Director, Resources and Planning

Bureau of Land Management

U.S. Department of the Interior

760 Horizon Drive, Grand Junction, CO 81506

office: (970) 256-4951

mobile: (970) 852-1964

Directorate of Resources and Planning (HQ200)

---

**From:** St George, Brian C <bstgeorg@blm.gov>
**Sent:** Tuesday, May 25, 2021 11:34 AM
**To:** Jenkins, David B <djenkins@blm.gov>
**Cc:** Waddell, Holle <hwaddell@blm.gov>; Strauss, Toni L <tstrauss@blm.gov>
**Subject:** RE: AIP Response Briefing

Hi David. I think we're done on our end and are delivering you a good product and message! I recommend sending a complete package that includes the response plan memo, the AIP memo, and the sale barn notice attachments (press release announcments at your discretion).

We stand ready for more changes as needed. My thanks to Toni and Holle' for high-level work here.

~ bsg

Brian St George

Deputy Assistant Director for Resources and Planning

Bureau of Land Management

(o) 303-239-3741

(m) 970-275-2215

bstgeorg@blm.gov

*Interested in* HQ200 *Directorate for Resources and Planning,* who we are, *and* what we do?
*Take a closer look at our teams* HQ210, HQ220, HQ230, HQ260, *and* HQ200 Business.

---

**From:** Strauss, Toni L <tstrauss@blm.gov>
**Sent:** Tuesday, May 25, 2021 9:44 AM
**To:** St George, Brian C <bstgeorg@blm.gov>
**Cc:** Waddell, Holle <hwaddell@blm.gov>
**Subject:** AIP Response Briefing

Attached is the AIP Response Briefing version that Holle and I worked on since yesterday's meeting.

Toni Strauss
HQ-200 Resource Advisor
USDI Bureau of Land Management

BLM_003772

| | |
|---|---|
| **From:** | Strauss, Toni L |
| **To:** | Jenkins, David B; St George, Brian C |
| **Cc:** | Waddell, Holle |
| **Subject:** | RE: AIP Response Briefing |
| **Date:** | Tuesday, May 25, 2021 1:46:23 PM |
| **Attachments:** | WHB Briefing Response to Public Claims_Davidedits.docx |

I have accepted David's edits, plus removed the table.  I have added a few words that are still in track changes.  Please let me know if other edits are desired.

Toni

---

**From:** Jenkins, David B <djenkins@blm.gov>
**Sent:** Tuesday, May 25, 2021 1:34 PM
**To:** St George, Brian C <bstgeorg@blm.gov>
**Cc:** Waddell, Holle <hwaddell@blm.gov>; Strauss, Toni L <tstrauss@blm.gov>
**Subject:** Re: AIP Response Briefing

excellent work, all. Many thanks.
Here are some editorial suggestions.
David

David Jenkins, PhD

Assistant Director, Resources and Planning

Bureau of Land Management

U.S. Department of the Interior

760 Horizon Drive, Grand Junction, CO 81506

office: (970) 256-4951

mobile: (970) 852-1964

Directorate of Resources and Planning (HQ200)

---

**From:** St George, Brian C <bstgeorg@blm.gov>
**Sent:** Tuesday, May 25, 2021 11:34 AM
**To:** Jenkins, David B <djenkins@blm.gov>
**Cc:** Waddell, Holle <hwaddell@blm.gov>; Strauss, Toni L <tstrauss@blm.gov>
**Subject:** RE: AIP Response Briefing

Hi David. I think we're done on our end and are delivering you a good product and message! I recommend sending a complete package that includes the response plan memo, the AIP memo, and the sale barn notice attachments (press release announcments at your discretion).

We stand ready for more changes as needed. My thanks to Toni and Holle' for high-level work here.

~ bsg

Brian St George
Deputy Assistant Director for Resources and Planning
Bureau of Land Management

(o) 303-239-3741
(m) 970-275-2215
bstgeorg@blm.gov

*Interested in* HQ200 *Directorate for Resources and Planning,* who we are, *and* what we do?
*Take a closer look at our teams* HQ210, HQ220, HQ230, HQ260, *and* HQ200 Business.

---

**From:** Strauss, Toni L <tstrauss@blm.gov>
**Sent:** Tuesday, May 25, 2021 9:44 AM
**To:** St George, Brian C <bstgeorg@blm.gov>
**Cc:** Waddell, Holle <hwaddell@blm.gov>
**Subject:** AIP Response Briefing

Attached is the AIP Response Briefing version that Holle and I worked on since yesterday's meeting.

Toni Strauss
HQ-200 Resource Advisor
USDI Bureau of Land Management

| | |
|---|---|
| **From:** | Strauss, Toni L |
| **To:** | St George, Brian C; Jenkins, David B |
| **Cc:** | Waddell, Holle |
| **Subject:** | FW: AIP Response Briefing |
| **Date:** | Tuesday, May 25, 2021 2:23:45 PM |
| **Attachments:** | WHB Briefing adoption incentive program summary.docx |
| | Sale Barn Notice_2018.pdf |
| | WHB_AIP_Public Announcements_Combined.pdf |
| | WHB Briefing Response to Public Claims_Davidedits.docx |

Here is the whole package with the finalized briefing.

Toni

**From:** St George, Brian C <bstgeorg@blm.gov>
**Sent:** Tuesday, May 25, 2021 11:35 AM
**To:** Jenkins, David B <djenkins@blm.gov>
**Cc:** Waddell, Holle <hwaddell@blm.gov>; Strauss, Toni L <tstrauss@blm.gov>
**Subject:** RE: AIP Response Briefing

Hi David. I think we're done on our end and are delivering you a good product and message! I recommend sending a complete package that includes the response plan memo, the AIP memo, and the sale barn notice attachments (press release announcments at your discretion).

We stand ready for more changes as needed. My thanks to Toni and Holle' for high-level work here.

~ bsg

Brian St George
Deputy Assistant Director for Resources and Planning
Bureau of Land Management

(o) 303-239-3741
(m) 970-275-2215
bstgeorg@blm.gov

*Interested in* HQ200 *Directorate for Resources and Planning,* who we are, *and* what we do*?*
*Take a closer look at our teams* HQ210, HQ220, HQ230, HQ260,*and* HQ200 Business*.*

**From:** Strauss, Toni L <tstrauss@blm.gov>

**Sent:** Tuesday, May 25, 2021 9:44 AM
**To:** St George, Brian C <bstgeorg@blm.gov>
**Cc:** Waddell, Holle <hwaddell@blm.gov>
**Subject:** AIP Response Briefing

Attached is the AIP Response Briefing version that Holle and I worked on since yesterday's meeting.

Toni Strauss
HQ-200 Resource Advisor
USDI Bureau of Land Management

BLM_003776



U.S. Department of the Interior
Bureau of Land Management

# News Release

Washington, D.C.

FOR IMMEDIATE RELEASE
Date: March 12, 2019
Contact: Debbie Collins, dacollin@blm.gov, (405) 579-1861

### Bureau of Land Management offers new incentives to encourage
### more adoptions of wild horses and burros

WASHINGTON— As part of the Bureau of Land Management's (BLM) effort to find good homes for wild horses and burros removed from public lands, the agency today began offering new financial incentives to encourage qualified people to adopt one or more of the animals.  The program is part of the BLM's efforts to confront a growing over-population of wild horses and burros on fragile rangelands and in off-range holding facilities, which cost taxpayers nearly $50 million every year to maintain.

As of March 1, 2018, the wild horse and burro population on public lands was estimated at approximately 81,950 animals, which is now more than triple the size the land can support along with other legally mandated uses.  High costs and a growing number of unadopted and unsold animals in BLM holding facilities have hindered the agency's ability to reduce over-population in recent years.  Chronic overpopulation increases the risk of damage to rangeland resources through overgrazing, and raises the chances of starvation and thirst for animals in overpopulated herds.

Through the new incentive program, qualified adopters are eligible to receive $500 within 60 days of the adoption date and an additional $500 within 60 days of titling for each animal, which normally occurs one year from the adoption date.  The incentive is available for all animals that are eligible for adoption, including animals at BLM facilities, off-site events or on the agency's Online Corral website. Adopters will just pay a minimum $25 adoption fee per animal.

"We understand that adopting a wild horse or burro represents a commitment.  The incentive is designed to help with the adopter's initial training and humane care," said BLM Deputy Director of Programs and Policy Brian Steed. "I encourage anyone who has considered adopting a wild horse or burro to join the thousands of owners who have provided good homes to more than 245,000 wild horses or burros since 1971."

Potential adopters are required to complete an application proving they can feed and provide humane care to the animals and that they will adhere to the prohibited acts and titling requirements. In addition, potential adopters must authorize the incentive to be deposited via electronic funds transfers to their preferred account at their financial institution.  Potential adopters should visit the BLM website or call (866) 468-7826 to learn more about the guidelines and requirements for adopting a wild horse or burro.

The BLM manages and protects wild horses and burros under the authority of the 1971 Wild Free-Roaming Horses and Burros Act. The Act directs the BLM to address overpopulation by removing excess animals from over-populated herds and offering them to the public for adoption or purchase.
"Finding good homes for excess animals and reducing overpopulation on the range are top priorities for the BLM as we strive to protect the health of these animals while balancing other legal uses of our public

BLM_003777

rangelands, including allowing for other traditional land uses such as wildlife conservation and grazing," Steed added.

Owning a wild horse or burro is an extraordinary experience.  They have reached national notoriety through disciplines such as dressage, endurance and therapeutic programs that help veterans fulfill a new mission. Wild horses and burros are routinely preferred by public officials for important tasks such as patrolling the border and local policing. Read stories from recent wild horse and burro adopters and purchasers on the BLM's Flickr page.

-BLM-

The BLM manages more than 245 million acres of public land located primarily in 12 Western states, including Alaska. The BLM also administers 700 million acres of sub-surface mineral estate throughout the nation. The agency's mission is to sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations. Diverse activities authorized on these lands generated $96 billion in sales of goods and services throughout the American economy in fiscal year 2017. These activities supported more than 468,000 jobs.

# TWO SIMPLE WAYS

## TO BRING HOME YOUR OWN WILD HORSE OR BURRO



**① Adoption Incentive Program**

To assist the BLM in the placement of these animals into new homes, BLM now offers an incentive for the approved adoption of any untrained wild horse or burro. **Adopters receive:**

## $500 + $500 =

Within 60 days of the adoption date

Within 60 days of the title date

## $1,000

*(Must complete application process and adhere to prohibited acts and titling requirements. Direct deposit to financial institution also required.)*

---

**② Wild Horse and Burro Online Corral**

**Use the Online Corral to find your very own wild horse or burro!**

★ Locate your animal using an interactive map

★ Search by terms and receive notifications when matches become available

★ Track the status of your application

★ Pay for your purchase through *Pay.gov*

**View available animals at *WildHorsesOnline.BLM.gov.*** *(This replaces BLM.gov/adoptahorse.)*

**For more information call (800) 370-3936 or email *BLM_es_inet_adoption@BLM.gov.***

**U.S. Department of the Interior Bureau of Land Management Wild Horse and Burro Program**

**For more information on events, adoption and direct purchase options, visit *BLM.gov/whb* or call (866) 468-7826** ·

BLM_003779

**Adoption Incentive Program**
**Questions and Answers**
As of 5/17/21 at BLM.gov/Adoption-Incentive

**AIP Marketing Video – click to watch**



**Which animals are eligible to participate in the Adoption Incentive Program?**

All untrained animals offered at any BLM off-range corrals, online corral events, satellite events and any BLM approved events and locations as of March 12, 2019 are eligible to be adopted through the Adoption Incentive Program regardless of species, age, sex, color, herd management area or the number of times the animal has been offered for adoption. Animals purchased through the Sales Program are not eligible.

**As a Trainer Incentive Program trainer, am I eligible to receive an incentive?**

No. TIP trainers are not eligible to receive the incentive.

**Are animals trained through a BLM training program or the Mustang Heritage Foundation's training programs eligible?**

No. Trained animals are not eligible for an incentive.

**Can I receive an incentive for purchasing a wild horse or burro through the Sale Program?**

No. Only adopted animals are eligible for the incentive program.

**Can I retroactively receive the incentive for an animal I adopted prior to March 12, 2019?**

No. Only animals adopted on or after March 12, 2019 are eligible for the incentives.

**Do I still have to pay an adoption fee?**

Yes. A minimum fee of $25 is still required at time of adoption.

**How will I receive the incentive?**

The incentives will be deposited at your preferred financial institution. You must authorize electronic funds transfers in order to receive the incentive. (See Example)

**Is there a limit to the number of animals for which I can receive an incentive?**

BLM_003780

The BLM may allow each adopter participating in the incentive program to adopt and maintain a maximum of four untitled animals annually; however, as each participating animal is titled, the BLM may allow an adopter to adopt additional animal(s) (up to a maximum of four untitled animals at any one time) through the Adoption Incentive Program.

**Can I combine the Adoption Incentive with other incentives offered by the BLM?**

The Adoption Incentive Program replaces all current incentive programs, such as the Buddy System and the $500 incentive for horses four years and older common in the New Mexico region.

**What if I reassign or return a horse for which I received an incentive?**

You will not be required to return the incentive received at time of adoption, but you will no longer be eligible to receive the second incentive at time of title. The BLM will remove eligibility to participate in the incentive program from any adopter that relinquishes two or more animals within a 12 month period or does not adhere to the terms and conditions of the Adoption Incentive Agreement. Adopters who relinquish an animal, but retain other animals participating in the Adoption Incentive Program, remain eligible to receive incentive payments when the remaining animals are titled.

In addition, reassigned animals (defined as a previously adopted animal returned to BLM and readopted to another individual) are not eligible for the incentive program.

**Are BLM employees, contractors or partners eligible to participate in the incentive program?**

BLM employees, immediate family members (spouse, domestic partner, cohabitant, child, stepchild, grandchild, parent, stepparent, mother-in-law, father-in-law, son-in-law, daughter-in-law, grandparent, great grandparent, aunt, uncle, niece, nephew, or first cousin (that is, a child of an aunt or uncle), sibling, half-sibling, stepsibling, brother-in-law, sister-in-law, including adoptive relationships) of BLM employees, and individuals or organizations receiving BLM funds either through a contract or agreement and their immediate family members are NOT eligible to participate in the Adoption Incentive Program.

## WILD HORSE AND BURRO

# ADOPTION INCENTIVE PROGRAM

*Simply follow the steps below to begin:*



☐ *Step 1:*
**Get Approved!**
Complete an adoption application

☐ *Step 2:*
**Sign Up!**
Complete an AIP agreement form
(BLM keeps yellow page; Adopter keeps the pink & green pages)

☐ *Step 3:*
**Confirm your bank!**
Complete an ACH Direct Deposit form
(BLM processes and retains information in a secured location)

☐ *Step 4:*
**Submit your forms!**
To a BLM Authorized Staff member or local BLM Office

☐ *Step 5:*
**Get your funds!**
The first payment ($500) will deposit into your account within 60 days of the initial adoption date

☐ *Step 6:*
**Tick Tock! Tick Tock!**
You must wait until your animal(s) are eligible for title (1 year) before applying for the second payment ($500)
(BLM mails Title Application automatically)

☐ *Step 7:*
**Get your final payment!**
Submit your green AIP agreement form, Title Application and 2nd ACH Direct Deposit form to your local BLM Office.
(Second payment ($500) will deposit within 60 days)

☐ *Step 8:*
**Congratulations…You are Done!**

Today you adopted from the **BLANK State Office.**

Please contact **BLANK** at **123-456-7890** if you have additional questions.


**U.S. Department of the Interior
Bureau of Land Management
Wild Horse and Burro Program**

**For more information on events, adoption and direct purchase options, visit *BLM.gov/whb* or call (866) 468-7826** • 🅕 🅣 🅘 🅨

**THIS IS A SAMPLE**

OMB No. 1510-0056

# ACH VENDOR/MISCELLANEOUS PAYMENT
## ENROLLMENT FORM

This form is used for Automated Clearing House (ACH) payments with an addendum record that contains payment-related information processed through the Vendor Express Program. Recipients of these payments should bring this information to the attention of their financial institution when presenting this form for completion. See reverse for additional instructions.

## PRIVACY ACT STATEMENT

The following information is provided to comply with the Privacy Act of 1974 (P.L. 93-579). All information collected on this form is required under the provisions of 31 U.S.C. 3322 and 31 CFR 210. This information will be used by the Treasury Department to transmit payment data, by electronic means to vendor's financial institution. Failure to provide the requested information may delay or prevent the receipt of payments through the Automated Clearing House Payment System.

## AGENCY INFORMATION

FEDERAL PROGRAM AGENCY

Bureau of Land Management - Wild Horse & Burro Program

| AGENCY IDENTIFIER: | AGENCY LOCATION CODE (ALC): | ACH FORMAT: ☐ CCD+   ☐ CTX |
|---|---|---|

ADDRESS:

| CONTACT PERSON NAME: | TELEPHONE NUMBER: |
|---|---|
| Insert BLM OOJ OR POC here | Insert BLM OOJ OR POC number here |

ADDITIONAL INFORMATION:

## PAYEE/COMPANY INFORMATION

| NAME | SSN NO. OR TAXPAYER ID NO. |
|---|---|
| Jane B. Doe (Adopter Information) | 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 |

ADDRESS

1234 Anywhere Lane

Sun Valley, CA 91352

| CONTACT PERSON NAME: | TELEPHONE NUMBER: |
|---|---|
| John Doe | (   818   ) 555-1212 |

## FINANCIAL INSTITUTION INFORMATION

NAME:

Bank of the World

ADDRESS:

5678 Anyplace Lane

Sun Mountain, CA 91353

| ACH COORDINATOR NAME: | TELEPHONE NUMBER: (   ) |
|---|---|

NINE-DIGIT ROUTING TRANSIT NUMBER:   1   0   1   0   1   0   1   0   1

DEPOSITOR ACCOUNT TITLE:

| DEPOSITOR ACCOUNT NUMBER: | LOCKBOX NUMBER: |
|---|---|
| 321321321 | N/A |

TYPE OF ACCOUNT: ☒ CHECKING   ☐ SAVINGS   ☐ LOCKBOX

| SIGNATURE AND TITLE OF AUTHORIZED OFFICIAL: (Could be the same as ACH Coordinator) | TELEPHONE NUMBER: (   ) |
|---|---|

AUTHORIZED FOR LOCAL REPRODUCTION

SF 3881 (Rev. 2/2003 )
Prescribed by Department of Treasury
31 U S C 3322; 31 CFR 210

BLM_003783

**THIS IS A SAMPLE**

Form 4710-25
(June 2018)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
**ADOPTION INCENTIVE AGREEMENT**

NOTE: THIS IS A
CONTRACT, RETAIN
WITH OTHER LEGAL
RECORDS.

| Adopter's First Name: Jane | Middle Name: B. | Last Name: Doe |
|---|---|---|
| Address: 1234 Anywhere Lane | City Sun Valley | State: CA |
| Zip Code: 91354 | Email Address: none@mail.com | |

| Animal Identification *(Freezemark/Signalment Key)* | Incentive Amount (1st) | Adoption Date | Incentive Amount (2nd) | Title Date | Cost Code | Source Year: 2019 *BLM USE ONLY* |
|---|---|---|---|---|---|---|
| #1  12345678 | $ 500 | 1/1/2097 | $ 500 | 1/1/2098 | LLWO260000 L10600000.HG0000 LXSIADOPTWHB |
| #2  23456789 | $ 500 | 1/1/2097 | $ 500 | 1/1/2098 | LLWO260000 L10600000.HG0000 LXSIADOPTWHB |
| #3  87654321 | $ 500 | 1/1/2097 | $ 500 | 1/1/2098 | LLWO260000 L10600000.HG0000 LXSIADOPTWHB |
| #4  98765432 | $ 500 | 1/1/2097 | $ 500 | 1/1/2098 | LLWO260000 L10600000.HG0000 LXSIADOPTWHB |

I_____choose to **opt out** of the BLM adoption incentive program and forfeit/waive any incentive payments from the BLM.

**OR**

*Please initial the terms below for all wild horses and burros adopted under this BLM Adoption Incentive Agreement.*

JD_____ I have read and understand the terms of adoption and prohibited acts.

JD_____ I understand that I can adopt four animals through the BLM adoption incentive program within 12 months.

JD_____ In accordance with the terms of adoption, I authorize BLM employees and other BLM approved individuals to conduct compliance inspections on adopted animals participating in the incentive program.

JD_____ I understand I will lose my eligibility to participate in the adoption incentive program in the future if I return two or more animals within any 12 month period.

JD_____ I hereby authorize electronic funds transfers to my account at the financial institution provided. **NOTE: All incentive payments are made via electronic funds transfer.**

JD_____ I understand that I become eligible to receive (i) a first adoption incentive payment of $500 within 60 days of the adoption date by submitting the Adoption Incentive Agreement (4710-25), ACH Form (SF 3881) and taking possession of a wild horse or burro through the BLM's adoption program; and (ii) a second adoption incentive payment of $500 within 60 days of the title date by submitting the Adoption Incentive Agreement (4710-25), ACH Form (SF 3881), a completed Title Application (4710-18) and satisfying the Title Qualifications listed on page 2.

JD_____ I certify that I am not a BLM employee, immediate family member (spouse, domestic partner, cohabitant, child, stepchild, grandchild, parent, stepparent, mother-in-law, father-in-law, son-in-law, daughter-in-law, grandparent, great grandparent,  aunt, uncle, niece, nephew,   or first cousin (that is, a child of an aunt or uncle), sibling, half-sibling, stepsibling, brother-in-law, sister-in-law, including adoptive relationships) of a BLM employee or individual, family member of an individual, or organization receiving BLM funds either through a contract or agreement.

I_____Jane B. Doe_____(Print Name) understand that failure to comply with the following terms may result in the cancellation of this BLM Adoption Incentive Agreement, repossession of the animals, disapproval of request for adoption of additional animals as well as eligibility to participate in the BLM adoption incentive program. **I further understand that in the event any of the above actions results in a financial liability to BLM, the BLM will pursue collection from me by all appropriate methods, in accordance with the Federal Claims Collection Act and the Debt Collection Improvement Act (DCIA) of 1996 (31 U.S.C 3701 et seq).**

JD_____ Under penalty of prosecution for violating 18 U.S.C. 1001, which makes it a Federal crime to make false statements to any agency of the United States, I hereby certify that I will provide humane care for any animals that I adopt and will not sell or transfer ownership of them to any person or organization that intends to resell, trade, or give away such animals for slaughter or processing into commercial products.

Adopter Signature:_____BLM authorized officer: _____



# News Release

Washington, D.C.

FOR IMMEDIATE RELEASE
Date: October 23, 2019

Contact: Paul McGuire; pmcguire@blm.gov; (405) 579-7190

## BLM Announces Banner Year for Wild Horse and Burro Adoptions and Sales
*Largest Number of Adoptions in 15 Years – More than 7,100 Placed into Private Homes*

**WASHINGTON**— The Bureau of Land Management (BLM) announced today that it reached a significant milestone by placing 7,104 wild horses and burros into private homes nationwide during Fiscal Year 2019 (which ended September 30). This is the highest number of adoptions and sales the agency has seen over the last 15 years and represents a 54 percent increase (nearly 2,500 animals) over the previous year's total of 4,609 animals.

"We are thrilled to see the tremendous response from the American people to our new adoption initiatives," said Casey Hammond, Acting Assistant Secretary of the Interior for Land and Minerals Management. "Adopted animals  are given  good homes and contribute to healthier herds, and is a testament to how strongly our nation is committed to participating in the success of public lands. ."

The BLM attributes the sharp increase in combined adoptions and sales to a number of factors, including an increase in the number of placement events held, an increase in the number of animals offered, and implementation of the Adoption Incentive Program (AIP) last March. The AIP, which offers successful adopters $1,000 to give an untrained wild horse or burro a good home, accounted for nearly 53 percent of all adoptions in 2019.

"The current overpopulation of wild horses and burros represents an existential threat to the health of landscapes across the West. In many places, the range will take decades to recover – and in some cases, it's unlikely that it ever will," said BLM Deputy Director for Policy and Programs William Pendley. "For this reason, the Wild Horse and Burro Adoption Program is critical to the health of native wildlife populations and the economic health of countless communities."

As of March 1, 2019, the wild horse and burro population on public lands was estimated at more than 88,000, which is more than triple the number of animals the land can sustainably support in conjunction with other legally mandated uses, making every successful adoption or sale vitally important in helping the agency regain proper balance.

Given the extensive overpopulation, wild horses and burros routinely face starvation and death from lack of water.  The high number of excess wild horses and burros causes habitat damage that forces animals to leave public lands and travel onto private property or even highways in search of food and water.

BLM_003785

Placement of wild horses and burros into private care is critical to the agency's ability to effectively manage these valued resources as integral parts of America's public lands. Under a 1971 law, the Wild Free-Roaming Horses and Burros Act, the agency is responsible for preserving and protecting these animals as part of a thriving natural ecological system on public lands. The agency achieves this objective primarily by gathering and removing excess animals from the range and offering them for adoption or purchase at facilities and events around the country.

When the number of animals removed from the range exceeds the number the agency can place through adoption or sale, the remaining animals are held in off-range corrals or contracted pastures at taxpayer expense. Currently there are approximately 46,000 wild horses and burros in off-range corrals and pastures. The cost of providing quality, humane care for these animals runs about $50 million annually.

To learn more about the wild horse or burro program, visit https://blm.gov/whb

<div align="center">–BLM–</div>

*The BLM manages more than 245 million acres of public land located primarily in 12 Western states, including Alaska. The BLM also administers 700 million acres of sub-surface mineral estate throughout the nation. In fiscal year 2018, the diverse activities authorized on BLM-managed lands generated $105 billion in economic output across the country. This economic activity supported 471,000 jobs and contributed substantial revenue to the U.S. Treasury and state governments, mostly through royalties on minerals.*



**U.S. Department of the Interior**
**Bureau of Land Management**

# News Release

Washington, D.C.

FOR IMMEDIATE RELEASE
Date: May 14, 2020

Contact: Paul McGuire; pmcguire@blm.gov; (405) 579-7190
or blm_press@blm.gov

## Cash incentives help agency adopt more wild horses and burros

*First year of program sees 91% increase in placement numbers*

**WASHINGTON**— The Bureau of Land Management announced today that the Wild Horse and Burro Adoption Incentive Program launched in March 2019 contributed to a significant increase of animals placed into private care. In the first 12 months of the AIP, the agency adopted 6,026 animals, compared with 3,158 during the previous full fiscal year. That increase of 91% revives and accelerates an upward trend of adoptions that began in 2015.

The AIP, which began mid-way through Fiscal Year 2019, helped the agency to achieve a 15-year record for total placements that year of 7,104 animals. Total placements include animals adopted, sold or transferred to another public agency. Each animal successfully placed into private care is estimated to save taxpayers approximately $24,000 in lifetime off-range holding costs. That amounts to over $170 million in lifetime savings generated during Fiscal Year 2019 alone, in large measure due to the AIP.

"We're excited that the public has responded so strongly to this innovative program. The successful use of incentives to increase adoption rates is a win for all involved – saving taxpayers hundreds of millions of dollars, reducing the overpopulation of wild horses and burros on the range, and helping these animals find homes with families who will care for and enjoy them for years to come," **said Acting Assistant Secretary of the Interior for Land and Minerals Management Casey Hammond.**

The AIP seeks to increase placements of wild horses or burros by paying individuals $1,000 for each untrained animal they adopt. Payments are made in two installments: $500 within 60 days of adoption, and $500 within 60 days of receiving title (approximately one year later). By contrast, it costs an average of $1,850 per year for the BLM to care for a wild horse or burro in an off-range corral facility.

"Placing animals into private care is a vital component of our mission to restore and maintain balance to America's public lands where extensive wild horse and burro overpopulation threatens ecosystems, economies and even the health of the herds themselves," **said BLM's Deputy Director for Policy and Programs William Pendley.** "The response we've seen to this incentive reveals how much the American people value wild horses and burros and understand the importance of BLM's mission to properly manage them."

Besides an increase in overall adoption numbers, the first year of the AIP also saw a sharp rise in the number of first-time and repeat adopters, as well as the number of individuals who adopted multiple animals. In all, there were 2,923 first-time adopters, 932 repeat adopters and 1,280 multiple-animal adoptions – all of which represent substantial increases over previous years.

BLM_003787

Brad Smoot and his family, who live in Arco, Idaho, learned of the Adoption Incentive Program and ultimately adopted eight wild horses. They started their herd by adopting two weanlings and two 2-year-olds from the Boise Wild Horse Off-Range Corrals. The initial experience with BLM Wrangler Ruby Kyle was so positive they made a trip to Boise and adopted three more mares. The Smoots then adopted a pregnant mare during the wild horse adoption held in Challis the winter of 2020. Having grown up with Quarter horses and Tennessee Walkers, Brad Smoot knew he wanted his family to enjoy experiencing life with horses.

"Together my wife and I have eight children and we enjoy getting into the back country and trail riding," **said Brad.** "These horses have been relatively easy to start. I really do prefer working with horses that do not have any developed or spoiled habits. My 15-year-old daughter has already started riding one of them."

During the same time the agency ramped up other efforts to find good homes for more animals, including holding more events and offering more animals. Nationwide, there were a total of 223 adoption events held at BLM facilities, remote venues and online, at which 9,228 animals were offered. This also represents a substantial increase over previous years.

Under a 1971 law, the Wild Free-Roaming Horses and Burros Act, BLM is responsible for preserving and protecting these animals as part of a thriving natural ecological system on public lands. The agency achieves this objective primarily by gathering and removing excess animals from the range and offering them for adoption or purchase at facilities and events around the country.

As of March 1, 2019, the wild horse and burro population on public lands was estimated at more than 88,000, which is more than triple the number of animals the land can sustainably support in conjunction with other legally mandated uses, making every successful adoption or sale vitally important in helping the agency regain proper balance.

Given the extensive overpopulation, wild horses and burros routinely face starvation and death from lack of water. The high number of excess wild horses and burros causes habitat damage that forces animals to leave public lands and travel onto private property or even highways in search of food and water.

"The current overpopulation of wild horses and burros represents an existential threat to the health of landscapes across the West. In many places, the range will take decades to recover – and in some cases, it's unlikely that it ever will," **said Pendley.** "For this reason, the Wild Horse and Burro Adoption Program is critical to the health of native wildlife populations and the economic health of countless communities."

When the number of animals removed from the range exceeds the number the agency can place through adoption or sale, the remaining animals are held in off-range corrals or contracted pastures at taxpayer expense. Currently there are approximately 50,000 wild horses and burros in off-range corrals and pastures. The cost of providing quality, humane care for these animals runs about $50 million annually.

To learn more about the wild horse or burro program, visit https://blm.gov/whb

–BLM–

*The BLM manages more than 245 million acres of public land located primarily in 12 Western states, including Alaska. The BLM also administers 700 million acres of sub-surface mineral estate throughout the nation. In fiscal year 2018, the diverse activities authorized on BLM-managed lands generated $105 billion in economic output across the country. This economic activity supported 471,000 jobs and contributed substantial revenue to the U.S. Treasury and state governments, mostly through royalties on minerals.*



U.S. Department of the Interior
Bureau of Land Management

# News Release

Washington, D.C.

FOR IMMEDIATE RELEASE
Date:  May 29, 2020
Contact:  BLM_Press@blm.gov

## ICYMI: BLM's Adoption Incentive Program a Success at the One Year Mark as Agency Takes Steps to Address Wild Horse and Burro Overpopulation

WASHINGTON – The Bureau of Land Management (BLM) took significant strides in May to address the burdens that the Nation's overpopulation of wild horses and burros put on Western rangelands and the American taxpayer.  The BLM announced that its innovative Adoption Incentive Program has already helped the agency save taxpayers $170 million by adopting out a record number of wild horses and burros to private care in its first year.  In addition, a potentially ground-breaking fertility control study got underway, and finally, the agency reported to Congress on the outlook for wild horses and burros in coming years.

**Adoptions and sales of wild horses and burros reach a 15-year high**

Thanks in part to a new cash-incentive program launched last year, the Bureau of Land Management announced a significant increase of animals placed into private care. In the first 12 months of the Adoption Incentive Program, the agency adopted out more than 6,000 animals, helping the agency to achieve a 15-year record for total adoptions and sales in Fiscal Year 2019.

The BLM currently cares for and feeds nearly 50,000 unadopted and unsold wild horses and burros in its off-range corrals and pastures. Each animal successfully placed into private care is estimated to save taxpayers approximately $24,000 in lifetime off-range holding costs. With more than 7,100 animals adopted last year, taxpayers saved approximately $170 million that would have been spent on lifetime care for the animals.

"We're excited that the public has responded so strongly to this innovative program. The successful use of incentives to increase adoption rates is a win for all involved – saving taxpayers hundreds of millions of dollars, reducing the overpopulation of wild horses and burros on the range, and helping these animals find homes with families who will care for and enjoy them for years to come," **said Casey Hammond, Principal Deputy Assistant Secretary Exercising the Authority of the Assistant Secretary for Land and Minerals Management.**

The BLM relies primarily on its Adoption and Sale Programs to carry out its mission of preserving and protecting wild horses and burros on public lands as required by a 1971 law, the Wild Free-Roaming Horses and Burros Act. When the number of animals removed from the range to prevent overpopulation exceeds the number the agency can place into private care



U.S. Department of the Interior
Bureau of Land Management

through adoption or sale, the remaining animals are held in off-range corrals or contracted pastures at taxpayer expense.

**BLM starts trial for promising new fertility control method for wild horses**

To help address the growing overpopulation of wild horses on public rangelands, the Bureau of Land Management has started testing a promising new fertility control vaccine as part of a joint research project between the BLM and the U.S. Department of Agriculture, Animal and Plant Health Inspection Service's National Wildlife Research Center. Researchers believe the Oocyte Growth Factor (OGF) vaccine, administered to a captured wild mare through a single dose, may safely prevent pregnancy for up to three years or longer.

Though the research is still in its very early phase, if proven viable, the OGF vaccine could help bolster existing methods used by the BLM to manage wild horse populations. The most common fertility control vaccines for wild horses in use today are short-lasting and require near-annual retreatment to remain effective. A single-dose vaccine that can last multiple years, such as the OGF vaccine if proven viable, would provide a number of benefits for BLM, including requiring fewer instances of gathering animals for retreatment or permanent removal.

**Strategy Document Sent to Congress**

On May 8, the BLM submitted a report to Congress outlining a strategy for achieving healthy and sustainable populations of wild horses and burros on public lands. In the report, the BLM proposes a combination of non-lethal methods to reduce overpopulation and achieve sustainable population levels over 15-18 years.

"The current trajectory of rapid wild horse and burro population growth is unsustainable and dangerous to the health of the land and the animals," said **BLM's Deputy Director for Policy and Programs William Pendley**. "The strategy outlined in the report is our best, most realistic chance for reversing this long-term trend, and it puts us on a path toward managing sustainable populations of wild horses and burros that are in balance with what the land can support."

As of March 1, 2020, the BLM estimated more than 95,000 wild horses and burros lived on public lands that can sustainably support just 27,000. Absent a change in course and support from Congress, wild horse and burro populations on public lands are expected to rise to approximately 2.8 million by 2040, but not before causing catastrophic harm to the land and other wildlife species.

Download the report.

--BLM--



U.S. Department of the Interior
Bureau of Land Management

# News Release

BLM Headquarters Office
**Media Contact:** blm_press@blm.gov
July 20, 2020

## ICYMI: Home on the range

*Op-Ed by Principal Deputy Assistant Secretary Casey Hammond*

**WASHINGTON**– As of March 1, approximately 95,000 federally protected wild horses and burros were estimated to roam on BLM-managed public lands in the West — more than three and a half times what the land can sustainably support and the most ever estimated by the BLM in a given year.

**Principal Deputy Assistant Secretary for Land and Minerals Management Casey Hammond** highlighted the BLM's challenging mission to preserve and protect these animals in an op-ed published last week in the Las Vegas Review Journal. Hammond explains in the op-ed the BLM's strategy to address the growing crisis of the animals' rapid population growth in some of the most at-risk places on public lands. Those efforts include kicking off a new trial of a fertility control vaccine that, if viable, could lower herd growth rates and reduce the need for gathers and off-range holding. The BLM also launched last year a successful adoption incentive program that refocuses taxpayer money to put more animals into private care, saving taxpayers an estimated $170 million that would have otherwise been spent on the BLM's lifetime care for those animals.

The full article is below.

## Commentary: Home on the range

America's vast public lands support an astounding array of natural resources. Along with providing habitat for wildlife, public lands serve the American people as well by maximizing economic and recreational opportunities and fostering many other traditional uses.

To balance the use and protection of our shared resources, the Bureau of Land Management acts as a steward of nearly 245 million acres of public lands across the country.

Among the most challenging missions the BLM faces is preserving and protecting America's wild horses and burros on these public lands. Federally protected since 1971, wild horse and burro herds have been rapidly outgrowing their habitats for years, often exceeding the water and forage that is available to them. Under these conditions, wild horses and burros (as well as other wildlife) are put at greater risk of starvation and thirst, often prompting emergency action by the BLM to save the animals and prevent irreparable damage to the land.

Today, wild horse and burro overpopulation has reached new heights and continues to grow. As of March 1, approximately 95,000 wild horses and burros were estimated to roam on BLM-

managed public lands — more than three and a half times what the land can sustainably support and the most ever estimated by the BLM in a given year. In some places, herds have reached 10 or 15 times their appropriate size. Furthermore, the BLM currently cares for and feeds nearly 50,000 unadopted and unsold wild horses and burros in its off-range corrals and pastures.

Absent any change, wild horse and burro populations on public lands will continue to burgeon exponentially over the coming years — potentially reaching 2.8 million by 2040. The result of these expanding herds is unsustainable, catastrophic damage to wildlife and habitat health.

The BLM is already taking unprecedented action to combat overpopulation in some of the most at-risk places on public lands. Since 2018, the BLM has gathered more wild horses and burros from overpopulated herds than the previous five years combined. Simultaneously, the BLM continues to support research and development, harnessing the latest science and technology for wild horse and burro management. The BLM recently kicked off a new trial of an innovative fertility control vaccine that, if viable, could be a powerful new tool to lower herd growth rates and reduce the need for gathers and off-range holding.

Dozens of additional ongoing projects are focused on improving existing fertility control vaccines and other management tools. Last year, under President Donald Trump's leadership, the BLM launched an innovative new incentive program that refocuses taxpayer money to put more animals into private care. Individuals are paid $1,000 for each untrained animal they adopt. The program has helped the BLM break a 15-year record on the number of animals placed into private homes in a given year, saving taxpayers an estimated $170 million that would have otherwise been spent on the lifetime care for those animals.

Now is the time to chart a bold new course for the management and protection of the horses and burros and prevent unnecessary degradation to their habitat.

The strategy calls for — among other priorities — gathering and removing more excess animals from overpopulated herds; placing removed animals into private homes through adoption or sale, or with private partners who can provide long-term care; and treating animals left on the range with fertility control to slow future herd growth. This is an ambitious plan that focuses on what we can realistically accomplish to achieve sustainable, healthy populations of wild horses and burros on public lands in the years ahead.

Make no mistake, the path to a sustainable, responsible and healthy management strategy for our nation's wild horses and burros will not be an easy one, as years of neglect cannot be undone overnight. And yet by working together with Congress, private partners and state and local governments — and with the support of the American people — the Trump administration is finding innovative ways to solve this growing crisis.

We owe it the wildlife, to our public lands and to future generations of Americans to get this right.

*Casey Hammond is Principal Deputy Assistant Secretary of the Interior for Land and Minerals Management.*

-BLM-

*The BLM manages more than 245 million acres of public land located primarily in 12 Western states, including Alaska. The BLM also administers 700 million acres of sub-surface mineral estate throughout the nation. In fiscal*

*year 2018, the diverse activities authorized on BLM-managed lands generated $105 billion in economic output across the country. This economic activity supported 471,000 jobs and contributed substantial revenue to the U.S. Treasury and state governments, mostly through royalties on minerals.*

Follow the BLM on Twitter, Facebook, and Flickr @BLMNational



**U.S. Department of the Interior**
**Bureau of Land Management**

# News Release

Grand Junction, Colorado

FOR IMMEDIATE RELEASE
Date: Nov. 19, 2020

Contact: Paul McGuire; pmcguire@blm.gov; (405) 826-3036

## The Bureau of Land Management posts significant accomplishments for wild horse and burro management in fiscal year 2020

**Grand Junction, Colo.**— The Bureau of Land Management (BLM) announced several important accomplishments that support the agency's mission of preserving wild horses and burros on public range lands in an ecologically sustainable way. During Fiscal Year 2020 – which ended Sept. 30, 2020 – the BLM humanely removed 10,139 wild horses and burros from overpopulated Herd Management Areas throughout the West. At the same time, the agency placed 6,162 animals into private care through adoptions and sales. The agency also secured contracts for seven new off-range pastures to provide humane long-term care for up to 5,000 unadopted and unsold wild horses in a cost-efficient free-roaming environment.

"The Trump Administration is pleased to deliver this impressive update showing the BLM's successes and commitment to managing the Wild Horse and Burro Program," **said Casey Hammond, Principal Deputy Assistant Secretary for Land and Minerals Management**. "The continued successful use of incentives is saving taxpayers hundreds of millions of dollars while reducing the overpopulation of wild horses and burros on the range."

The BLM continued to offer the Adoption Incentive Program (AIP) in Fiscal Year 2020, which is believed to have bolstered performance. The AIP, which was launched by the Trump Administration in 2019, offers qualified adopters $500 within 60 days of adoption and $500 within 60 days of receiving title. With more than 6,160 animals adopted and sold last year, taxpayers saved approximately $154 million that would have been spent on lifetime care for the animals.

Despite the pandemic, through such outreach efforts as the Online Corral adoption/sale platform and partnerships with organizations such as the Mustang Heritage Foundation, the agency took advantage of every safe opportunity to place animals into good homes. As states began to lift COVID-related restrictions, field offices safely resumed operations that allowed even more people to bring home their own wild horse or burro from satellite events around the country.

As of March 1, 2020, the wild horse and burro population on public lands was estimated at more than 95,000, which is more than triple the number of animals the land can sustainably support in conjunction with other legally mandated uses, making targeted removals and successful adoptions and sales essential for enabling the agency to regain proper balance.

Given the extensive overpopulation, wild horses and burros routinely face starvation and death from lack of water. The high number of excess wild horses and burros causes habitat damage that forces animals to leave

public lands and travel onto private property or even highways in search of food and water, creating increases in public safety concerns.

Placement of wild horses and burros into private care is critical to the agency's ability to effectively manage these valued resources as integral parts of America's public lands. Under a 1971 law, the Wild Free-Roaming Horses and Burros Act, the agency is responsible for preserving and protecting these animals as part of a thriving natural ecological system on public lands. The agency achieves this objective primarily by gathering and removing excess animals from the range and offering them for adoption or purchase at facilities and events around the country.

When the number of animals removed from the range exceeds the number the agency can place through adoption or sale, the remaining animals are held in off-range corrals or contracted pastures at taxpayer expense. Currently there are approximately 52,000 wild horses and burros in off-range corrals and pastures. The cost of providing quality, humane care for these animals runs about $57 million annually.

To learn more about the wild horse or burro program and how to adopt or purchase an animal, visit
https://blm.gov/whb

<div align="center">-BLM–</div>

*The BLM manages more than 245 million acres of public land located primarily in 12 Western states, including Alaska. The BLM also administers 700 million acres of sub-surface mineral estate throughout the nation. In fiscal year 2018, the diverse activities authorized on BLM-managed lands generated $105 billion in economic output across the country. This economic activity supported 471,000 jobs and contributed substantial revenue to the U.S. Treasury and state governments, mostly through royalties on minerals.*

| | |
|---|---|
| **From:** | Waddell, Holle |
| **To:** | Reiland, Michael J; McGuire, Paul M; Fluer, Scott L |
| **Subject:** | Fw: Response to concerns about adoption inventive program |
| **Date:** | Thursday, May 27, 2021 1:56:42 PM |
| **Attachments:** | WHB Briefing Response to Public Claims.docx |
| | WHB Briefing adoption incentive program summary (2).docx |
| | WHB_AIP_Public Announcements_Combined (1).pdf |
| | Sale Barn Notice_2018 (2).pdf |
| | Outlook-t0ut32qp.png |

Hello al! Based on today's Weekly Check-in, here is the email David sent to Nada and Mike that includes the "Briefing Response to Public Claims" Brian referenced as a frame for our TPs. We can further discuss on Tuesday.

Thank you,

Holle' Waddell
Department of the Interior
Bureau of Land Management
Division Chief *(Acting)*
Division of Wild Horses and Burros, HQ-260
405.579.1860 (office)
202.603.3740 (cell)
hwaddell@blm.gov

*"When you can identify injustice, when you can identify inequality and unfairness, and you confront that, then in my mind you are doing justice." - Bryan Stevenson, Founder and Executive Director for the Equal Justice Initiative*



https://www.blm.gov/programs/wild-horse-and-burro/50th-anniversary

### Wild Horse and Burro | Bureau of Land Management

FIND THE LATEST INFORMATION on changes to wild horse and burro events and facility operating hours. The Bureau of Land Management manages and protects wild horses and burros on 26.9 million acres of public lands across 10 Western states as part of its mission to administer public lands for a variety of uses.

www.blm.gov

---

**From:** Jenkins, David B <djenkins@blm.gov>
**Sent:** Tuesday, May 25, 2021 5:23 PM
**To:** Culver, Nada L <nculver@blm.gov>; Nedd, Michael D <mnedd@blm.gov>
**Cc:** St George, Brian C <bstgeorg@blm.gov>; Waddell, Holle <hwaddell@blm.gov>
**Subject:** Response to concerns about adoption inventive program

Nada and Mike,

Attached please find a response to recent concerns over the adoption incentive program. I also attach a briefing paper outlining the adoption incentive program (previously sent), along with the first news release announcing the program (from March, 2019) and an example of a notice sent to sale barns about animals with BLM freeze marks and the selling of untitled animals. I thought it useful to keep them together for you in one email.

Note the response briefing provides factual refutation of five common allegations, which appeared in print and in various letters sent to the Secretary of the Interior. It additionally outlines seven potential improvements to the program, the full consideration of which would require more analysis and, if pursued, time to implement.

Thanks, and please let me know if you need other information.

David

David Jenkins, PhD
Assistant Director, Resources and Planning
Bureau of Land Management
U.S. Department of the Interior
760 Horizon Drive, Grand Junction, CO 81506
office: (970) 256-4951
mobile: (970) 852-1964
Directorate of Resources and Planning (HQ200)

BLM_003797

U.S. SENATOR DIANNE FEINSTEIN
CALIFORNIA



COMMITTEE ON THE JUDICIARY
 - CHAIR, HUMAN RIGHTS AND THE LAW
SELECT COMMITTEE ON INTELLIGENCE
COMMITTEE ON APPROPRIATIONS
 - CHAIR, ENERGY AND WATER SUBCOMMITTEE
COMMITTEE ON RULES AND ADMINISTRATION

### United States Senate

May 27, 2021

The Honorable Deb Haaland
Secretary
U.S. Department of the Interior
1849 C Street NW
Washington, DC 20240

Dear Secretary Haaland:

I write with great concern regarding the attached *New York Times* article, which indicates that the Department of the Interior's Bureau of Land Management (BLM) Wild Horse and Burro Adoption Incentive Program has provided federal incentive payments to adopters who abandoned these animals at slaughter auctions. I strongly urge BLM to immediately suspend this program and conduct a thorough investigation to ensure federal funds are used to protect wild horses and burros against abuse, neglect, or slaughter, as intended by Congress.

Although adopters sign a contract swearing under penalty of perjury that they will not sell adopted wild horses and burros directly or indirectly to slaughter, this report suggests that some adopters have done exactly that and BLM has failed to use all appropriate tools to enforce its contracts and prevent adopters who previously sold their wild horses to slaughter auctions from adopting again.

Subsidizing the slaughter of wild horses and burros with taxpayer dollars violates Congressional intent outlined in the Fiscal Year 2021 *Consolidated Appropriations Act* (Public Law 116-260), which prohibits the use of funds for the destruction of wild horses and burros and directs BLM to adopt a robust expansion of proven, safe, effective, and humane fertility control methods to manage these herds.

It is my hope that you will immediately halt the Adoption Incentive Program and ensure a proper investigation is conducted to prevent future wild horses and burros from suffering abuse or slaughter.  Thank you for your attention to this

BLM_003798

U.S. SENATOR DIANNE FEINSTEIN
CALIFORNIA

COMMITTEE ON THE JUDICIARY
 - CHAIR, HUMAN RIGHTS AND THE LAW
SELECT COMMITTEE ON INTELLIGENCE
COMMITTEE ON APPROPRIATIONS
 - CHAIR, ENERGY AND WATER SUBCOMMITTEE
COMMITTEE ON RULES AND ADMINISTRATION



## United States Senate

important matter and I look forward to working with you to ensure humane outcomes for wild horses and burros.

Sincerely,

Dianne Feinstein
United States Senator

DF/hm

BLM_003799

# The New York Times

## Wild Horses Adopted Under a Federal Program Are Going to Slaughter

**By Dave Philipps | May 15, 2021**

In a lifetime of working with horses, Gary Kidd, 73, had never adopted an untrained wild mustang before. But when the federal government started paying people $1,000 a horse to adopt them, he signed up for as many as he could get. So did his wife, two grown daughters and a son-in-law.

Mr. Kidd, who owns a small farm near Hope, Ark., said in a recent telephone interview that he was using the mustangs, which are protected under federal law, to breed colts and that they were happily eating green grass in his pasture.

In fact, by the time he spoke on the phone, the animals were long gone. Records show that Mr. Kidd had sold them almost as soon as he legally could. He and his family received at least $20,000, and the mustangs ended up at a dusty Texas livestock auction frequented by slaughterhouse brokers known as kill buyers.

When asked about the sale, Mr. Kidd abruptly hung up.

The Bureau of Land Management, which is in charge of caring for the nation's wild horses, created the $1,000-a-head Adoption Incentive Program in 2019 because it wanted to move a huge surplus of mustangs and burros out of government corrals and find them "good homes." Thousands of first-time adopters signed up, and the bureau hailed the program as a success.

But records show that instead of going to good homes, truckloads of horses were dumped at slaughter auctions as soon as their adopters got the federal money. A program intended to protect wild horses was instead subsidizing their path to destruction.

"This is the government laundering horses," said Brieanah Schwartz, a lawyer for the advocacy group American Wild Horse Campaign, which has tracked the program. "They call it adoptions, knowing the horses are going to slaughter. But this way the B.L.M. won't get its fingerprints on it."

The bureau denies the allegations, noting that the government requires all adopters to sign affidavits promising not to resell the horses to slaughterhouses or their middlemen. But a spokesman said the bureau had no authority to enforce those agreements or to track the horses once adopters have title to them.

People who dump mustangs at auctions, the spokesman said, are free to adopt and get paid again.

It has been 50 years since Congress unanimously passed a law meant to protect wild horses and burros from wholesale roundup and slaughter and to ensure that they have a permanent, sustainable place on public land in

BLM_003800

the West. But decades of missteps, systemic problems and spiraling costs have put both the horses and the western landscape at risk.

Wild horses once roamed North America in the millions, but as the open range disappeared in the early 20th century, they were nearly all hunted down and turned into fertilizer and dog food. When they were finally protected in 1971, there were fewer than 20,000 left.

Once protected, though, the remnant herds started growing again — far faster than the government was prepared for. The bureau estimates that, left alone, wild horse herds increase by about 20 percent a year.

The bureau has tried for decades to stabilize numbers by using helicopters to round up thousands of mustangs annually. But the bureau has never been able to find enough people willing to adopt the untamed broncos it removes. So surplus mustangs — about 3,500 a year — have gone instead into a network of government storage pastures and corrals known as the holding system.

There are now more than 51,000 animals in holding, eating up so much of the program's budget — about $60 million a year — that the bureau has little left to manage mustangs in the wild.

"It's completely unsustainable," said Terry Messmer, a professor of wildlife resources at Utah State University who has studied the program history. "I don't think anyone who passed this law would be happy with how things turned out 50 years later."

The bureau declined to comment on the record for this article.

Bureau leaders have repeatedly proposed culling the storage herds, but they have always been blocked by lawmakers mindful that a vast majority of voters do not want symbols of their heritage turned into cuts of meat.

Enter the Adoption Incentive Program, which is built on the idea that paying adopters $1,000 a head is far cheaper than the $24,000 average lifetime cost of keeping a horse in government hands.

The program nearly doubled the number of horses leaving the holding system, and the bureau called it "a win for all involved" that was helping "animals find homes with families who will care for and enjoy them for years to come."

The bureau's once-sleepy adoption events were transformed. "It became a feeding frenzy — I have never seen anything like it," said Carol Walker, a photographer who documents the wild herds of Wyoming.

In February, she arrived at an event in Rock Springs, Wyo., and found a line of trailers a half-mile long. When the gates opened, people rushed to sign up for adoptions without even inspecting the mustangs.

"Those people weren't there because they cared about the horses," Ms. Walker said. "They were there because they cared about the money."

BLM_003801

To be sure, tens of thousands of wild horses have been adopted over the years by people who kept and cared for them as the law intended. Some became ranch horses, some work with the Border Patrol, and one became a world champion in dressage.

But the adoption program has hardly been selective. One man in Oklahoma was paid to take horses even though he had previously gone to prison for kidnapping and beating two men during a horse-slaughter deal gone bad.

The program has rules meant to discourage quick-buck seekers. Adopters are limited to four animals a year and do not get full payment or title papers for 12 months.

Even so, records show several instances where families like the Kidds banded together to get more than four horses. And numerous mustangs bearing the distinctive government brand began showing up at slaughter auctions after the one-year wait was up.

"We used to see one or two mustangs occasionally, usually old ones that someone had owned for years, but suddenly the floodgates opened," said Clare Staples, who founded a wild horse sanctuary in Oregon called Skydog Ranch.

Ms. Staples said she had helped find homes for more than 20 adopted mustangs that were dumped at auctions, apparently after having been given little care. Many were emaciated, with unkempt manes and untrimmed hooves, she said, and they often had parasites.

The bureau has refused to provide lists of adopters. But an informal network of wild-horse advocates has pieced together what is happening by using donated money to outbid kill buyers at auctions. That way, they spare mustangs from slaughter and obtain title papers that detail the horses' ownership history.

The papers show that many adopters who quickly resell live in stretches of the Great Plains where pasture is cheap and people often derive a living from several sources. These adopters often took the maximum number of horses and sent them to auction soon after their final government payments cleared.

Lonnie Krause, a rancher in Bison, S.D., adopted four horses in 2019, and so did his grandson. In an interview, he said he saw nothing wrong with sending the mustangs to auction and acknowledged that they would probably go to kill buyers.

"It's economics," he said. "I can make about $800 putting a calf on my land for a year. With the horses, I made $1,000, then turned around and sold them for $500."

Mr. Krause said bureau employees had told him he wasn't breaking any rules. "Once you get title, they told me, there is no limitation — you can do whatever you want with them," he said.

Getting mustangs out of storage is critical for the bureau because its wild horse program is now in a crisis. The cost of storing horses has cannibalized the helicopter budget, and roundups can no longer keep pace with growing herds. There are now about 100,000 wild horses in the West — triple what the bureau says the land can support. If left unchecked, in another decade they could number 500,000.

Page **3** of 4

BLM_003802

Managers warn that the growing herds could graze public lands down to dirt, which would devastate cattle ranchers who compete for grass, and harm delicate desert landscapes and native species.

For decades government auditors and scientific advisers have warned the bureau to move away from roundups and instead control populations on the range through fertility control drugs delivered by dart and other management tools that don't add horses to the holding system, but the bureau has never changed course, in part because the cost of storing horses has crippled its ability to do anything else.

"We are at a make-or-break point," said Celeste Carlisle, a member of the wild horse program's citizen advisory board and a biologist for a wild horse sanctuary called Return to Freedom, which has pushed for alternatives to roundups. "We have to turn things around, or it will result in disaster."

At the kill-buyer auctions, people who love wild horses are scrambling to respond.

One night last fall, Candace Ray, who runs a wild horse rescue organization near Dallas called Evanescent Mustang Rescue, was clicking through photos on the website of a nearby auction when she spotted 24 young, untamed mustangs. Within hours she was rallying hundreds of donors on Facebook.

Ms. Ray cajoled a young couple who give riding lessons on their nearby farm, Cody and Shawnee Barham, to drive to the auction and do the bidding.

The mustangs were all small and skittish. None had apparently ever been handled. Serial numbers branded on their necks showed they had been born free in Nevada, Utah or New Mexico.
The Barhams kept bidding for hours. By midnight they had spent $16,000 in donations and owned 24 horses. When they got the title papers, the names of the adopters who sold the horses had been blacked out with marker. But holding the papers up to a light revealed the names and addresses of the Kidd family.

The Barhams brought the mustangs to their farm, opened the trailer doors and let them run. The couple plans to train them to accept a halter and then find people who will give them "forever homes."

Cody Barham stood one recent morning watching the herd nibble in one of his fields, a grease-stained John Deere hat on his head and a 9-millimeter pistol on his hip (for snakes). He watched his wife walk quietly into the pasture with her outstretched hand holding a horse cookie. One of the braver mustangs, a little black stallion, approached to sniff.

"Our goal is to get them to the point where you can just love up on 'em," he said. "But after all they've been through, it might take them a while to trust people."

BLM_003803

**From:**     Baca, Roxane D
**To:**       McGuire, Paul M
**Subject:**  Re: Ethics question re: eligibility to participate in WHB Adoption Incentive Program
**Date:**     Friday, May 28, 2021 4:01:48 PM

Paul,

Do you by chance have any notes, or know who in ethics addressed this issue back in 2018-2019?

Roxane D. Baca
Acting Deputy Ethics Counselor for the Bureau of Land Management
Departmental Ethics Office |Office of the Solicitor
U.S. Department of the Interior | Rocky Mountain Region
(303) 445-0615
Email: roxane.baca@sol.doi.gov

Visit us online at: www.doi.gov/ethics or visit the BLM Ethics page:
https://doimspp.sharepoint.com/sites/blm-wo-700/ethics/SitePages/Home.aspx

**Integrity is our mission.**

*Advice rendered does not create an* **attorney-client relationship or any other confidential relationship.** This email, including all attachments, may constitute a Federal record or other Government property that is intended only for the use of the individual or entity to which it is addressed. If you are not the intended recipient or the employee or agent responsible for delivering the transmission to the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this email or its contents is strictly prohibited. If you have received this email in error, please notify the sender by responding to the email and then immediately delete the email.

**From:** McGuire, Paul M <PMcGuire@blm.gov>
**Sent:** Tuesday, May 25, 2021 2:47 PM
**To:** Baca, Roxane D <roxane.baca@sol.doi.gov>
**Subject:** RE: Ethics question re: eligibility to participate in WHB Adoption Incentive Program

Hello, Roxane. Thank you for engaging so quickly. █████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████ . █████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████
█████████████████████████

Happy to discuss that or any other aspect of the program with you.

Thanks again,

Paul McGuire
Acting Off-Range Branch Chief
National Wild Horse & Burro Program
Norman, OK
Ofc: 405-579-7190
Mobile: 405-826-3036
pmcguire@blm.gov

*Suprema lex libertatis*

---

**From:** Baca, Roxane D <roxane.baca@sol.doi.gov>
**Sent:** Tuesday, May 25, 2021 3:24 PM
**To:** McGuire, Paul M <PMcGuire@blm.gov>
**Subject:** Re: Ethics question re: eligibility to participate in WHB Adoption Incentive Program

Paul,

████████████████████████████████████

Roxane D. Baca
Acting Deputy Ethics Counselor for the Bureau of Land Management
Departmental Ethics Office |Office of the Solicitor
U.S. Department of the Interior | Rocky Mountain Region
(303) 445-0615
Email: roxane.baca@sol.doi.gov

Visit us online at: www.doi.gov/ethics or visit the BLM Ethics page:
https://doimspp.sharepoint.com/sites/blm-wo-700/ethics/SitePages/Home.aspx

**Integrity is our mission.**

*Advice rendered does not create an* **attorney-client relationship or any other confidential relationship.** This email, including all attachments, may constitute a Federal record or other Government property that is intended only for the use of the individual or entity to which it is addressed. If you are not the intended recipient or the employee or agent responsible for delivering the transmission to the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this email or its contents is strictly prohibited. If you have received this email in error, please notify the sender by responding to the email and then immediately delete the email.

**From:** McGuire, Paul M <PMcGuire@blm.gov>
**Sent:** Tuesday, May 25, 2021 12:49 PM
**To:** Ethics_Office, BLM_WO <BLM_WO_Ethics_Office@blm.gov>
**Cc:** Dahle, David M <david.dahle@sol.doi.gov>; Baca, Roxane D <roxane.baca@sol.doi.gov>;
Waddell, Holle <hwaddell@blm.gov>; Ruhs, Amy G <aruhs@blm.gov>
**Subject:** FW: Ethics question re: eligibility to participate in WHB Adoption Incentive Program

Forwarding to the main Ethics inbox.

Thank you again,

Paul McGuire
Acting Off-Range Branch Chief
National Wild Horse & Burro Program
Norman, OK
Ofc: 405-579-7190
Mobile: 405-826-3036
pmcguire@blm.gov

*Suprema lex libertatis*

**From:** McGuire, Paul M
**Sent:** Tuesday, May 25, 2021 12:52 PM
**To:** Dahle, David M <david.dahle@sol.doi.gov>; Baca, Roxane D <roxane.baca@sol.doi.gov>
**Cc:** Holle Hooks <hwaddell@blm.gov>; Ruhs, Amy G <aruhs@blm.gov>
**Subject:** Ethics question re: eligibility to participate in WHB Adoption Incentive Program

David & Roxanne – Hello. I've been advised that you may be able to assist us with an ethics question
regarding ███████████████████████████████████████████
████████████████████████████████████████
████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████
████████████████████████████████████
██████████████████████████████████
████████████████████████████████████████
████████████████████████████████.

We would thank you for your thoughtful feedback on this proposed change. I am available at your
convenience to discuss. Thank you,



Paul McGuire

Acting Off-Range Branch Chief

National Wild Horse & Burro Program

Norman, OK

Ofc: 405-579-7190

Mobile: 405-826-3036

pmcguire@blm.gov

*Suprema lex libertatis*

| | |
|---|---|
| **From:** | McGuire, Paul M |
| **To:** | Baca, Roxane D |
| **Subject:** | FW: Question re:Adoption Incentive Program |
| **Date:** | Tuesday, June 1, 2021 12:56:00 PM |

Hi, Roxane. Please see below. Another email to follow.

Paul McGuire

Acting Off-Range Branch Chief

National Wild Horse & Burro Program

Norman, OK

Ofc: 405-579-7190

Mobile: 405-826-3036

pmcguire@blm.gov

*Suprema lex libertatis*

**From:** Waddell, Holle <hwaddell@blm.gov>
**Sent:** Tuesday, June 1, 2021 12:05 PM
**To:** McGuire, Paul M <PMcGuire@blm.gov>
**Subject:** Fwd: Question re:Adoption Incentive Program

Paul - I found the following email thread with the previous ethics officer Michelle Sharrow. I will keep looking.

Get Outlook for iOS

**From:** Waddell, Holle <hwaddell@blm.gov>
**Sent:** Tuesday, April 30, 2019 11:39 AM
**To:** Sharrow, Michelle P (Moved)
**Subject:** Re: Question re:Adoption Incentive Program

Thank you for the clarification Michelle. BLM employees are still allowed to adopt however not eligible to participate in the incentive program as well as those organizations receiving BLM funds through contract or agreement. In addition, organizations not receiving BLM funds can adopt and participate in the incentive program.

Thank you,

Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |

Bureau of Land

Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all

blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood



On Tue, Apr 30, 2019 at 10:21 AM Sharrow, Michelle <msharrow@blm.gov> wrote:

Good morning, Holle.

Thank you for sharing the manual. ████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████

Sincerely,

**Michelle P. Sharrow**
Deputy Ethics Counselor
Bureau of Land Management
Department of the Interior
*Tel*: 202-208-3474
*Cell*: 202-309-6783
*Email*:  msharrow@blm.gov

*Public service is a public trust.*

On Mon, Apr 29, 2019 at 3:23 PM Waddell, Holle <hwaddell@blm.gov> wrote:

Hi Michelle! Here is the link to the H-4750-2 Adoption of Wild Horses and Burros. The program is currently in the process of revising this handbook.

Thank you,

Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |

Bureau of Land

Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow

suit and you will begin to create the reality you desire." - Cheryl Wood



On Mon, Apr 29, 2019 at 1:47 PM Sharrow, Michelle <msharrow@blm.gov> wrote:

Hi.  Can you provide a link to this handbook - The Adoption of Wild Horses and Burros Handbook, H 4750-2, Chapter 2 – General Adoption Requirements and Procedures.

Sincerely,

**Michelle P. Sharrow**
Deputy Ethics Counselor
Bureau of Land Management
Department of the Interior
*Tel*: 202-208-3474
*Cell*: 202-309-6783
*Email*:  msharrow@blm.gov

*Public service is a public trust.*

On Thu, Apr 25, 2019 at 1:50 PM Holle Waddell <hwaddell@blm.gov> wrote:

Hi Michelle and thanks for the response. We moved forward with the application pending guidance from you. Monday works.

Sent from my iPhone

On Apr 25, 2019, at 10:35 AM, Sharrow, Michelle <msharrow@blm.gov> wrote:

Holle,

I've been on travel for the past two weeks and am currently in Phoenix at the ELT meeting.  Are you able to take an application and delay approval?  I will be back in the office on Monday.

Sincerely,

**Michelle P. Sharrow**
Deputy Ethics Counselor
Bureau of Land Management
Department of the Interior
*Tel*: 202-208-3474
*Cell*: 202-309-6783
*Email*:  msharrow@blm.gov

*Public service is a public trust.*

BLM_003810

On Thu, Apr 25, 2019 at 12:13 PM Waddell, Holle <hwaddell@blm.gov> wrote:

> Hi Michelle! █████████████████████████████████
> ████████████████ Do you have any feedback from my previous
> question in the trailing email?
>
> Thank you,
>
> Holle' Waddell | Branch Chief | Division of Wild Horses and
> Burros |
>
> Bureau of Land
> Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@bl
> m.gov
>
> "A positive outlook, regardless of how bleak the circumstances may
> look, is a **CHOICE**. Each day, start by shifting your thoughts to develop
> and demonstrate an internal gratitude for all blessings you have.
> When you shift your thoughts, your actions will follow suit and you
> will begin to create the reality you desire." - Cheryl Wood
>
> [?]
>
>
> On Thu, Apr 18, 2019 at 11:44 AM Waddell, Holle <hwaddell@blm.gov>
> wrote:
>
>> Hi Michelle! Thanks again for your assistance answering
>> questions re:the Wild Horse and Burro Adoption Incentive
>> Program (AIP). Last week's program call generated the following
>> question:
>>
>> 1. ████████████████████████████████████
>>
>> 
>>
>>    ○ BLM employees, immediate family
>>      members........of BLM
>>      employees, and individuals or organizations
>>      receiving BLM funds either through a contract or

agreement and their immediate family members are **NOT** eligible to participate in the AIP

Thank you,

Holle Waddell | Branch Chief | Division of Wild Horses and Burros |

Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell @blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood

**From:** Baca, Roxane D
**To:** McGuire, Paul M
**Subject:** Re: Various Questions re: New Wild Horse and Burro Program Adoption Incentive Program
**Date:** Tuesday, June 1, 2021 12:59:06 PM

Thanks Paul. I've forwarded to my supervisor, hope to have an answer back to you soon.

Roxane D. Baca
Acting Deputy Ethics Counselor for the Bureau of Land Management
Departmental Ethics Office |Office of the Solicitor
U.S. Department of the Interior | Rocky Mountain Region
(303) 445-0615
Email: roxane.baca@sol.doi.gov

Visit us online at: www.doi.gov/ethics or visit the BLM Ethics page:
https://doimspp.sharepoint.com/sites/blm-wo-700/ethics/SitePages/Home.aspx

**Integrity is our mission.**

*Advice rendered does not create an* **attorney-client relationship or any other confidential**
**relationship.** This email, including all attachments, may constitute a Federal record or other
Government property that is intended only for the use of the individual or entity to which it
is addressed. If you are not the intended recipient or the employee or agent responsible for
delivering the transmission to the intended recipient, you are hereby notified that any
dissemination, distribution, copying or use of this email or its contents is strictly prohibited.
If you have received this email in error, please notify the sender by responding to the email
and then immediately delete the email.

---

**From:** McGuire, Paul M <PMcGuire@blm.gov>
**Sent:** Tuesday, June 1, 2021 11:56 AM
**To:** Baca, Roxane D <roxane.baca@sol.doi.gov>
**Subject:** FW: Various Questions re: New Wild Horse and Burro Program Adoption Incentive Program

Here's another..

Paul McGuire

Acting Off-Range Branch Chief

National Wild Horse & Burro Program

Norman, OK

Ofc: 405-579-7190

Mobile: 405-826-3036

pmcguire@blm.gov

*Suprema lex libertatis*

---

**From:** Waddell, Holle <hwaddell@blm.gov>
**Sent:** Tuesday, June 1, 2021 12:08 PM
**To:** McGuire, Paul M <PMcGuire@blm.gov>
**Subject:** Fwd: Various Questions re: New Wild Horse and Burro Program Adoption Incentive Program

Get Outlook for iOS

---

**From:** Waddell, Holle <hwaddell@blm.gov>
**Sent:** Wednesday, April 10, 2019 9:06:44 AM
**To:** Rittenhouse, Bruce H <brittenh@blm.gov>
**Subject:** Fwd: Various Questions re: New Wild Horse and Burro Program Adoption Incentive Program

Sent from my iPhone

Begin forwarded message:

> **From:** "Sharrow, Michelle" <msharrow@blm.gov>
> **Date:** March 18, 2019 at 2:21:10 PM CDT
> **To:** "Waddell, Holle" <hwaddell@blm.gov>
> **Subject: Re: Various Questions re: New Wild Horse and Burro Program Adoption Incentive Program**
>
> Hi, Holle. I hope you had a good weekend. ███████████████
> █████████████████████████████████████████████████████
> ██████████████████████████████████████████████
> ████████████████████████████████████████████
> ███████████████████████████
>
> Sincerely,
>
> **Michelle P. Sharrow**
> Deputy Ethics Counselor
> Bureau of Land Management
> Department of the Interior
> *Tel*: 202-208-3474
> *Cell*: 202-309-6783
> *Fax*: 202-208-5242
> *Email*:  msharrow@blm.gov
>
>
> On Fri, Mar 15, 2019 at 11:47 AM Waddell, Holle <hwaddell@blm.gov> wrote:
>
>> This is super helpful but I want to clarify. ██████████████████



Thank you,

Holle' Waddell | Branch Chief | Division of Wild Horses and Burros | Bureau of Land

Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a
**CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate
an internal gratitude for all blessings you have. When you shift your thoughts,
your actions will follow suit and you will begin to create the reality you desire."
- Cheryl Wood

On Fri, Mar 15, 2019 at 10:27 AM Sharrow, Michelle <msharrow@blm.gov> wrote:

No worries. I know the swamped feeling all too well.

Sincerely,

**Michelle P. Sharrow**
Deputy Ethics Counselor
Bureau of Land Management
Department of the Interior
*Tel*: 202-208-3474
*Cell*: 202-309-6783
*Fax*: 202-208-5242
*Email*: msharrow@blm.gov

BLM_003815

On Fri, Mar 15, 2019 at 9:42 AM Holle Waddell <hwaddell@blm.gov> wrote:

Thanks Michelle. I am swamped this morning however the following is the question that may have ethics concerns but again I am not the SME.

████████████████████████████████████████████

███████████████████████████████

This is a question as I coordinated with the previous ethics counselor to identify ineligible participation. Here is the text in the policy:

- BLM employees, immediate family members (spouse, domestic partner, cohabitant, child, stepchild, grandchild, parent, stepparent, mother-in-law, father-in-law, son-in-law, daughter-in-law, grandparent, great grandparent,  aunt, uncle, niece, nephew, or first cousin (that is, a child of an aunt or uncle), sibling, half-sibling, stepsibling, brother-in-law, sister-in-law, including adoptive relationships) of BLM employees, and individuals or organizations receiving BLM funds either through a contract or agreement and their immediate family members are **NOT** eligible to participate in the AIP.

Sent from my iPhone

On Mar 15, 2019, at 8:27 AM, Sharrow, Michelle <msharrow@blm.gov> wrote:

Holle,
The primary purpose of the ethics program is to promote an ethical culture among BLM employees by helping them think through potential conflicts of interest between their official duties and any impacts an official action they would be involved in might have on their financial interests before they take action.  None of your questions fall into this area.  If there is a specific one that you'd like to talk through by phone, I'm happy to do that and have the time to do so this morning.  You can reach me at the number below.
Respectfully,

**Michelle P. Sharrow**
Deputy Ethics Counselor
Bureau of Land Management
Department of the Interior
*Tel*: 202-208-3474
*Cell*: 202-309-6783
*Fax*: 202-208-5242
*Email*:  msharrow@blm.gov

On Fri, Mar 15, 2019 at 9:07 AM Holle Waddell

<hwaddell@blm.gov> wrote:

Good morning Michelle. I am the Branch Chief for the Off-Range Branch of the Wild Horse and Burro Program and would be the POC in 200 to respond to these questions. Prior to issuing responses, I wanted to ensure that these questions do not have any ethical or legal implications.

Sent from my iPhone

On Mar 15, 2019, at 8:03 AM, Sharrow, Michelle <msharrow@blm.gov> wrote:

Good morning, Holle.

I've looked through your questions and suggest you reach out to Steve Tryon's group in DC for responses.

Sincerely,

**Michelle P. Sharrow**
Deputy Ethics Counselor
Bureau of Land Management
Department of the Interior
*Tel*: 202-208-3474
*Cell*: 202-309-6783
*Fax*: 202-208-5242
*Email*:  msharrow@blm.gov

On Thu, Mar 14, 2019 at 8:59 PM Ethics, DOI <doi_ethics@sol.doi.gov> wrote:

Michelle,

Would you please help Holle with any ethics questions that this may raise?

Thank you very much,
Ed

---------- Forwarded message ---------
From: **Waddell, Holle** <hwaddell@blm.gov>
Date: Thu, Mar 14, 2019 at 8:13 PM
Subject: Various Questions re: New Wild Horse and Burro Program Adoption Incentive Program

To: <DOI_Ethics@sol.doi.gov>, Sklar, Ryan
<ryan.sklar@sol.doi.gov>
Cc: Bruce Rittenhouse <brittenh@blm.gov>

Hi Ryan and Ethics! The BLM has
developed and launched the Adoption
Incentive Program (AIP) to increase the
number of adoptions of untrained wild
horses and burros placed into private care
through offering financial incentives to
defray associated initial costs, such as
veterinary care, feed, and training. The AIP
encourages new individuals and
organizations to adopt a wild horse or burro,
and motivates previous adopters to re-
engage with the program and adopt
additional animals. All untrained animals
are eligible for adoption in the AIP
regardless of species, age, sex, color, herd
management area or the number of times
the animal has been offered for adoption.
The minimum adoption fee is $25 for
untrained animals and may be competitive
or non-competitive. The AIP offers a
financial incentive in the amount of $500
within 60 days from the adoption date and
an additional $500 within 60 days from the
title date, if completed within 60 days of title
eligibility. Based on the new launch of the
AIP Tuesday, March 12, 2019, several
questions are coming in from the field and
the public. I have my own personal
thoughts/answers but wasn't sure how to
answer "officially". I apologize if you are not
the correct person to address these
questions but thanks in advance.





I appreciate any guidance and support you may be able to provide. Feel free to contact me with any questions.

Thank you,

Holle' Waddell | Branch Chief | Division of Wild Horses and Burros | Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood

BLM_003819

**From:** McGuire, Paul M
**To:** Lutterman, Jason W; Reiland, Michael J; Reid, Lisa
**Cc:** Fluer, Scott L
**Subject:** RE: Draft response to Feinstein
**Date:** Thursday, June 3, 2021 10:53:00 AM
**Attachments:** image001.png
image002.png

Thanks, Jason. I've made a few suggested edits in Track Changes.

Paul McGuire

Acting Off-Range Branch Chief

National Wild Horse & Burro Program

Norman, OK

Ofc: 405-579-7190

Mobile: 405-826-3036

pmcguire@blm.gov

*Suprema lex libertatis*

**From:** Lutterman, Jason W <jlutterman@blm.gov>
**Sent:** Tuesday, June 1, 2021 6:17 PM
**To:** Reiland, Michael J <mreiland@blm.gov>; McGuire, Paul M <PMcGuire@blm.gov>; Reid, Lisa <lreid@blm.gov>
**Cc:** Fluer, Scott L <sfluer@blm.gov>
**Subject:** Draft response to Feinstein

Hi Michael, Paul and Lisa,

Michael asked me to take a first shot at drafting a response to Senator Feinstein's letter (attached), and at the same time to develop a draft narrative (in talking point-form) on AIP that we can use to craft additional responses going forward. I've included both drafts below for your review and input before sending to Holle' (some of it is based on the draft narrative Taneisha has been using for the NIC). There are three gaps left that I'm hoping one of you might be able to help fill: number of animals adopted through AIP, cost-savings to taxpayers, and whether or not we are investigation or responding in any way to the allegations made in the NYT. You will see the highlighted gaps in the draft letter.

📄 draft06012021_AIPSafeguardsTPs.docx

📄 draft06012021_FeinsteinResponse.docx

Thanks!
Jason

--
Jason Lutterman
Public Affairs Specialist
National Wild Horse and Burro Program
Located in Reno, Nevada
Office: (775) 861-6614
Mobile: (202) 304-0967



# United States Department of the Interior
## BUREAU OF LAND MANAGEMENT
Grand Junction, Colorado 81506
https://www.blm.gov



DATE

The Honorable Dianne Feinstein
ADDRESS

Dear Senator Feinstein,

Thank you for your letter dated May 27, 2021 regarding the Bureau of Land Management's Adoption Incentive Program for wild horses and burros. The BLM cares about the health and well-being of the animals placed under our management and protection, and I am happy to provide a response to your concerns.

The BLM is aware of the report about the program in the New York Times. The agency takes seriously any legitimate allegations of violations of the law and regulations governing the placement of federally protected wild horses and burros into private care. The agency is reviewing ways to enhance our current safeguards for the protection of adopted animals.

I want to assure you that the BLM has in place robust adoption requirements that prioritize the best interests of wild horses or burros under agency management. All adopters must demonstrate their ability and intent to provide good quality care and affirm in writing that they know it is illegal to adopt a wild horse or burro with the intent of selling or transferring animals for slaughter or processing into commercial products. This affirmation is enforceable under 18 U.S.C. 1001, which makes it a federal crime to make false statements to any agency of the United States.

The BLM carefully considers any potential violations of the terms of the Private Maintenance and Care Agreement. If any such violation does occur, BLM can and will take appropriate action, which can include repossessing animals and/or barring the individual(s) from participating in the adoption program in the future. More serious actions can be taken – including referral for criminal prosecution – if warranted.

When a wild horse or burro is titled, it is no longer legally protected under the Wild Free-Roaming Horses and Burros Act or associated federal regulations (43 CFR 4750.5). For that reason, the BLM works to ensure adopted animals go to good homes before they are titled, and the BLM has implemented additional safeguards to guide animals into good homes. For example, the BLM limits adopters to titling a maximum of 4 animals within a 12-month period, retains title of ownership for at least 12 months from adoption date, and may conduct compliance inspections on untitled animals while in private care.

The required investment to feed and care for a horse or burro for 12 months also serves as a strong dis-incentive to adopt animals with an eye toward turning them for profit, even with the $1,000 incentive payment. Though it varies by state, it can typically cost several thousand dollars every year to provide good feed and care for a horse.

Additionally, the BLM has worked to inform livestock sale facilities across the country of the illegality of selling freeze-marked wild horses and burros without the required paperwork showing that title has passed from BLM to a private individual. Violations of the prohibition on the sale of wild horses and burros may result in criminal penalties and fines up to $2,000 and imprisonment up to one year, or both. (43 CFR 4770.5)

I hope this letter satisfactorily addresses your concerns regarding BLM's commitment to the health and welfare of wild horses and burros under its care. More than 7,500 wild horses and burros have been adopted through the Adoption Incentive Program, which has provided an estimated cost savings of more than $150 million over their lifetime and helps support the BLM's critical mission to protect herd and habitat health on public lands. I look forward to continuing this conversation with you and welcome an opportunity to discuss in more detail.

| | |
|---|---|
| **From:** | Culver, Nada L |
| **To:** | Jenkins, David B; Nedd, Michael D; St George, Brian C; Waddell, Holle |
| **Cc:** | Jackson, Danna R |
| **Subject:** | FW: [EXTERNAL] Petition for Withdrawal of Adoption Incentive Program |
| **Date:** | Thursday, June 3, 2021 11:37:29 AM |
| **Attachments:** | Petition for Withdrawal of Adoption Incentive Program.pdf |

Hi Team – Wanted to make sure you saw this. Will be touching base with Interior of course, too.

Nada Wolff Culver
Deputy Director, Policy and Programs
Bureau of Land Management
Cell: 202-255-6979
nculver@blm.gov

---

**From:** Nick Lawton <nick@eubankslegal.com>
**Sent:** Thursday, June 3, 2021 11:20 AM
**To:** OS, DOIExecSec <DOIExecSec@ios.doi.gov>; Culver, Nada L <nculver@blm.gov>; Bill Eubanks <bill@eubankslegal.com>
**Subject:** [EXTERNAL] Petition for Withdrawal of Adoption Incentive Program

> **This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.**

Dear Secretary Haaland and Deputy Director Culver,

On behalf of our client the American Wild Horse Campaign ("AWHC"), please find attached a formal petition, pursuant to 5 U.S.C. § 553(e), asking the Department of Interior and the Bureau of Land Management to terminate the Adoption Incentive Program ("AIP") for wild horses. As the attached petition discusses, the creation and implementation of the AIP violated federal law in various important ways. Moreover, as documented in an extensive report from AWHC that is attached to the petition, the AIP has led to extremely bad outcomes for wild horses in contravention of congressional intent to protect these animals.

Thank you for your attention to this important matter. We look forward to hearing a response from the agencies.

Sincerely,

Nick Lawton
Senior Associate

Eubanks & Associates PLLC
1331 H Street NW
Suite 902
Washington, DC 20005
(202) 556-1243

BLM_003825

Eubanks & Associates, PLLC
LAW FOR THE PUBLIC INTEREST

1331 H STREET NW
SUITE 902
WASHINGTON, DC 20005
(202) 556-1243

June 3, 2021

**VIA E-MAIL**

Deb Haaland, Secretary
United States Department of Interior
1849 C Street N.W.
Washington, D.C. 20240
doiexecsec@ios.doi.gov

Nada Culver, Deputy Director
United States Bureau of Land Management
760 Horizon Drive
Grand Junction, CO 81506
Nculver@blm.gov

     Re:    **The Bureau of Land Management's Unlawful Adoption Incentive Program**

Dear Secretary Haaland and Deputy Director Culver:

     On behalf of our client the American Wild Horse Campaign ("AWHC"), we are writing to inform the United States Department of Interior ("DOI") and the United States Bureau of Land Management ("BLM") of significant violations of federal law associated with BLM's creation and implementation of its wild horse and burro Adoption Incentive Program ("AIP"). This letter also serves as a formal petition, pursuant to 5 U.S.C. § 553(e), to either withdraw the AIP in its entirety or, if the agency insists on retaining the AIP in some form, to impose a moratorium on any further payments under the AIP while the agencies engage in formal notice-and-comment rulemaking to provide interested parties with an opportunity for input and design a program that comports with federal law. **Pursuant to 5 U.S.C. § 555(e), AWHC respectfully requests a timely response to this petition; given the urgency involved, we request an response no later than <u>June 30, 2021</u>.**

     As described in AWHC's attached report, the AIP has led to, and if allowed to persist will continue to lead to, extremely bad outcomes for federally protected wild horses that are fundamentally inconsistent with Congress's goals in enacting the Wild Free-Roaming Horses and Burros Act ("WHA"), 16 U.S.C. §§ 1331–1340. Indeed, despite the fact that Congress has repeatedly and specifically forbidden DOI and BLM from expending federal funds for the slaughter of healthy wild horses, the AIP has exactly that effect. Specifically, the AIP provides nominal adopters of wild horses with payments—federal expenditures coming directly from BLM's budget—of up to $1,000 per wild horse; once these nominal adopters receive title to the animal, they are then free to sell it for slaughter. In this manner, the AIP effectuates an ongoing end-run around Congress's prohibition on expending federal funds to slaughter wild horses. The practical outcomes for wild horses are profoundly inhumane and contrary to Congress's goals of

protecting these animals. Additionally, as detailed below, the creation of the AIP violated federal law in several critical ways. Accordingly, we respectfully request, and formally petition, DOI and BLM to end this unlawful program, or at minimum to immediately suspend the AIP until and unless DOI and BLM conduct and complete a lawful decision-making process to authorize the AIP.

## BACKGROUND

### I.  The Wild Free-Roaming Horses and Burros Act

Finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West," and that "they contribute to the diversity of life forms within the Nation and enrich the lives of the American people," Congress enacted the WHA in 1971 to ensure that "wild free-roaming horses and burros shall be protected from capture, branding, harassment, [and] death," and that they are "considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331.

The WHA mandates that the Secretary of the Interior "shall manage wild free-roaming horses and burros as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." *Id.* § 1333(a). To that end, the WHA further directs the Secretary to "maintain a current inventory" of wild horses and burros and to use that inventory to "determine appropriate management levels" in various areas of public lands, and "make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals." *Id.* § 1333(b)(1). The statute defines "excess animals" as those "which have been removed" from public lands or "which must be removed" to preserve and maintain a thriving natural ecological balance. *Id.* § 1332. The WHA further provides discretion for BLM to determine "whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options . . . ." *Id.* § 1333(b)(1).

Where BLM determines both that "an overpopulation exists and that action is necessary to remove excess animals" the WHA provides that the agency "shall immediately remove excess animals from the range so as to achieve appropriate management levels." *Id.* § 1333(b)(2). As the Tenth Circuit Court of Appeals has explained, the plain text of the WHA "quite clearly affords BLM with discretion to decide whether or not to remove excess animals." *Wyoming v. U.S. Dep't of Interior*, 839 F.3d 938, 944 (10th Cir. 2016).

If BLM decides to remove wild horses, the WHA authorizes the BLM to allow the public to adopt wild horses "for private maintenance and care," provided that the agency "determines an adoption demand exists by qualified individuals" and that certain other conditions are met. 16 U.S.C. § 1333(b)(2)(B). In particular, the agency must determine that any adopter "can assure humane treatment and care (including proper transportation, feeding, and handling)." *Id.* Likewise, the statute restricts any individual from adopting more than four animals in a year "unless the Secretary determines in writing that such individual is capable of humanely caring for more than four animals, including the transportation of such animals by the adopting party."

2

*Id.* In this manner, Congress sought to accommodate the public's interest in adopting wild horses while also ensuring that any horses so adopted would be cared for humanely.

Although the WHA contemplates that unadoptable wild horses may be "destroyed in the most humane and cost efficient manner possible," *id.* § 1333(b)(2)(C), Congress has routinely and specifically forbidden DOI and BLM from using federal funds for the slaughter of healthy, unadopted wild horses. *See*, *e.g.*, *In Defense of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1059 n.3 (9th Cir. 2014) (noting that "Congress has never appropriated funds for extermination, as opposed to ongoing maintenance, of excess horses even if not adopted") (citing Pub.L. 111-88, 123 Stat. 2904, 2907 (2009)). Most recently, the Consolidated Appropriations Act, 2021, specifically provided that federal funds "shall not be available for . . . the destruction of any healthy, unadopted, and wild horse or burro" or "the sale of a wild horse or burro that results in the destruction of the wild horse or burro for processing into a commercial product." Pub. L. 116-260 § 419(e).

## II.     The National Environmental Policy Act

Congress enacted the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, to ensure that federal agencies fully consider the environmental impacts of their actions before taking them, consider alternatives to proposed actions that may have less adverse environmental impacts, and make information publicly available with sufficient detail to promote fully informed public participation in agency decision-making.

To meet these objectives, all agencies must prepare an Environmental Impact Statement ("EIS") for any major federal action that may "significantly affect[]" the environment. 42 U.S.C. § 4332(C). The Council on Environmental Quality ("CEQ")—an agency within the Executive Office of the President—has promulgated regulations implementing NEPA that are "binding on all Federal agencies." 40 C.F.R. § 1500.3. These regulations provide that in determining whether an EIS is required with respect to a particular proposed action, an agency must prepare an Environmental Assessment ("EA") that analyzes the environmental impacts of the proposed action as well as alternatives. *Id.* §§ 1501.4(c), 1509.9.[1]

In determining whether an EIS is required, the agency must consider whether the proposed action may have a "significant" effect on the human environment. 40 C.F.R. § 1508.27. The "significance" determination is based on factors such as the degree to which the effects on the environment "are likely to be highly controversial" or "are highly uncertain"; the degree to which the action "may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration," or "may cause loss or destruction of significant scientific, cultural, or historical resources"; and whether the action "threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." *Id.*

---

[1] CEQ amended its regulations in 2020. *See* 85 Fed. Reg. 43,304 (July 16, 2020). However, because BLM created the AIP before that date, the new regulations do not apply here.

3

BLM_003828

A significant effect, requiring an EIS, may exist "even if the Federal agency believes that on balance the effect will be beneficial." 40 C.F.R. § 1508.27(b)(1). The existence of any one of the CEQ significance criteria usually requires the preparation of an EIS.

If an agency decides that an EIS is not required, it issues a Finding of No Significant Impact ("FONSI"), which must present the reasons why the agency has determined its proposed action "will not have a significant impact" on the environment." 40 C.F.R. § 1508.13.

NEPA requires agencies to consider a range of reasonable alternatives to its proposed action. *See* 40 C.F.R. § 1502.14. An agency may not artificially constrain its analysis of reasonable alternatives by framing its purpose and need statement for a proposed action in an excessively narrow manner.

## III.   <u>The Administrative Procedure Act</u>

The Administrative Procedure Act ("APA") mandates that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . in excess of statutory jurisdiction, authority or limitations," or adopted "without observance of procedure required by law." 5 U.S.C. § 706(2). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The APA also provides the "basic procedural requirement" that "an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2125 (2016). "Agencies are free to change their existing policies so long as they provide a reasoned explanation for the change." *Id.* In doing so, "the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy." *Id.* at 2126. Likewise, agencies "must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* In such circumstances, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* For these reasons, "an unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Id.*

The APA also mandates that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e). If an agency denies such a petition, "[p]rompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding"; "the notice shall be accompanied by a brief statement of the grounds for denial." *Id.* § 555(e). Courts will "set aside an agency's decision to deny a petition for rulemaking only if it is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 5 (D.C. Cir. 2011). "In other

BLM_003829

words, [courts] look to see whether the agency employed reasoned decisionmaking in rejecting the petition." *Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 919 (D.C. Cir. 2008).

## IV.    **The Adoption Incentive Program**

Under the Trump Administration, BLM implemented the AIP in January 2019 through Instruction Memorandum No. 2019-025 ("IM 2019-025").[2] The AIP aims "to increase the number of adoptions of untrained wild horses and burros placed into private care through offering financial incentives." IM 2019-025 at 1. "The AIP offers a financial incentive in the amount of $500 within 60 days from the adoption date [of a wild horse or burro] and an additional $500 within 60 days from the title date . . . ." *Id.* In adopting the AIP, BLM stated that "[i]ncreasing the placement of animals into private care is a critical priority of the [wild horse and burro] program and of utmost interest to the BLM due to the costs associated with caring for unadopted animals in BLM managed or contracted corrals and pastures." *Id.* BLM noted that because the number of wild horses and burros the agency removes from public lands significantly exceeds the rate at which the public adopts wild horses and burros, "the feed and care of the animals removed from the range continue to consume over 50 percent of the WHB program's budget." *Id.* at 3. BLM further explained that "this policy will reduce off-range holding costs and allow those savings to support critical on-range operations," and that "[i]ncreasing adoptions reduces holding costs, creating a cost savings that allows funding to be dedicated to other aspects of managing wild horses and burros." *Id.*

Although the AIP nominally allows "each adopter participating in AIP to adopt and maintain a maximum of four untitled animals annually," the program actually allows individuals to adopt more than four horses in a year so long as they have "up to a maximum of four untitled animals at any one time." *Id.* at 2. As an adopted gains title to an animal, that adopter becomes eligible to adopt another animal through the AIP.

Although the AIP requires adopters to sign an "Adoption Incentive Agreement," *id.* at 1, which requires adopters to "certify that [they] will provide humane care for any animals [they] adopt and will not sell or transfer ownership of them to any person or organization that intends to resell, trade, or give away any such animals for slaughter or processing into commercial products," Form 4710-25, AWHC's attached report documents how BLM has in fact failed to adequately ensure the humane treatment of adopted animals or prevent their sale for slaughter. Moreover, the AIP's plain language contains troubling indications that BLM views any ongoing oversight of adopted horses to be discretionary rather than mandatory. For example, it states that "BLM employees or other BLM approved individuals *should* conduct compliance inspections on adopted animals," and that "BLM *should* remove eligibility to participate in the AIP from any adopter that relinquishes two or more animals within a 12 month period or does not adhere to the terms and conditions of the Adoption Incentive Agreement." *Id.* at 2 (emphases added). Likewise, the AIP's instruction memorandum states that "BLM employees *should* issue an Adoption Incentive Ineligibility Letter . . . to adopters who are no longer eligible to participate in the AIP." *Id.* (emphasis added). By using the discretionary word "should" instead of any mandatory word such as "shall" or "must," BLM fails to provide the public with any guarantee

---

[2] IM 2019-025 is available at https://www.blm.gov/policy/im-2019-025

BLM_003830

that the agency will in fact ensure humane outcomes for wild horses. Likewise, the AIP fails to provide any meaningful guidelines for how the agency may attempt to verify the humane treatment of adopted horses; for example, there is no mandatory timeline for "compliance inspections" and no description of how the agency will determine whether an adopter passes or fails a compliance inspection.

The AIP has roughly doubled the rate at which BLM adopts wild horses. In a press release dated May 14, 2020, the BLM stated that there had been "an increase of 91%" in the number of adoptions "[i]n the first 12 months of the AIP." BLM further noted that in the AIP's first year (2019 to 2020), the agency saw "substantial increases" in the number of first-time adopters, repeat adopters, and "multiple-animal adoptions."[3]

However, as extensively documented in the attached report by AWHC, the AIP has in fact led to profoundly inhumane outcomes that are inconsistent with Congress's objectives in enacting the WHA and its repeated prohibition on using any federal funds directly or indirectly for the slaughter of wild horses and burros. As AWHC's report describes, AWHC and cooperating animal rescue organizations have discovered at least 180 BLM-branded wild horses and burros at livestock auctions that are known to, and in some instances principally aim to, sell horses for slaughter. As the report notes, the horses documented in that report constitute only a subset of all the horses that meet this fate, because AWHC and its partner organizations continue to find wild horses and burros at these auctions. The report further explains that "[m]any of these horses were young, unhandled animals, some with their BLM tags still around their necks more than a year after their adoption from BLM holding corrals, suggesting that adopters simply held the animals for a year without care in order to collect the $1,000 incentive" and then sold the horses at auctions where slaughter is the most common outcome.

Troublingly, BLM has expressed the view, as documented in AWHC's report, that so long as an adopter takes title to a wild horse before selling it for slaughter, no violation of the WHA or the adoption agreement has occurred, and the adopter *would still be eligible to receive AIP funds and continue to adopt wild horses*. AWHC's report also cites a New York Times article that documents BLM telling adopters that once the horses are titled, "there is no limitation — you can do whatever you want with them."[4] Accordingly, BLM has made clear that its priority is simply having members of the public take title to wild horses, without regard to any practical consequences for the wild horses once they are titled. By taking this position, BLM has created a system in which federal expenditures in the form of AIP payments lead to the slaughter of federally protected wild horses—which Congress has specifically forbidden the agency from doing.

Nor is the sale of wild horses for slaughter the only type of inhumane outcome documented in AWHC's report. To the contrary, AWHC's report documented numerous

---

[3] *See* BLM, *Cash Incentives Help Agency Adopt More Wild Horses and Burros*, https://www.blm.gov/press-release/cash-incentives-help-agency-adopt-more-wild-horses-and-burros

[4] *See* https://www.nytimes.com/2021/05/15/us/wild-horses-adoptions-slaughter.html

BLM_003831

instances in which BLM's compliance inspections revealed that—far from providing good homes and humane care—adopters were neglecting or abusing the wild horses they had adopted. For example, AWHC's report documents instances in which BLM's inspector "put [a horse] out of her misery" due to "a severe neck injury," as well as instances in which horses were neglected or housed in unsafe or otherwise inadequate facilities.

<div align="center">

**DISCUSSION**

</div>

## I.   BLM Violated Federal Law When Creating the AIP

As discussed below, BLM's creation of the AIP violated federal law in several critical ways, any one of which would be a sufficient basis for a reviewing court to find the program unlawful and set it aside.

### A.   The AIP is final agency action subject to judicial review

As an initial matter, it is beyond any reasonable dispute that IM 2019-025 constitutes "final agency action" within the meaning of the APA and is thus subject to judicial review. The APA authorizes judicial review of "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. Agency action is "final" where: (1) the action "mark[s] the consummation of the agency's decision-making process," and is not "merely tentative or interlocutory [in] nature"; and (2) "the action [is] one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

The AIP "marks the consummation of [BLM's] decision-making process" with regard to the creation of this new program and is not "merely tentative or interlocutory." *Id.* One clear signal of the finality of an agency action is the fact that "immediate compliance with its terms is expected." *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094–95 (9th Cir. 2014). Here, BLM clearly stated that the IM creating the AIP "is effective immediately." IM 2019-025 at 3. The fact that the IM was "effective immediately . . . lets the air out of any argument that [an IM] operates only as provisional guidance," and is instead a powerful indication that the agency action was indeed final. *W. Watersheds Proj. v. Zinke*, 441 F. Supp. 3d 1042, 1062 (D. Idaho 2020). Likewise, IM 2019-025 uses no language that suggests an ongoing deliberative process with regard to the creation of the AIP. Moreover, confirming that the AIP constituted the consummation of BLM's decision-making process, BLM has in fact followed the terms of IM 2019-025 in issuing numerous payments to adopters of wild horses. *See, e.g.*, BLM, *Cash Incentives Help Agency Adopt More Wild Horses and Burros*, https://www.blm.gov/press-release/cash-incentives-help-agency-adopt-more-wild-horses-and-burros (noting that BLM had in fact issued numerous payments under the AIP).

Likewise, IM 2019-025 determined "rights or obligations," and "legal consequences" flowed from the IM. IM 2019-025 created a new right for members of the public to obtain up to $1,000 of federal funds in association with the adoption of a wild horse or burro, and conversely imposed an obligation on BLM to confer payment of up to $1,000 in federal funds. By providing a new right for individuals to obtain federal funding associated with the adoption of a wild horse

<div align="center">7</div>

or burro, IM 2019-025 determined "rights," and by obligating BLM to issue payments of federal funding to adopters of wild horses, the IM created both "obligations" for the agency and determined "legal consequences." Accordingly, there can be no legitimate dispute that IM 2019-025 constitutes final agency action subject to judicial review. *See W. Watersheds Proj.*, 441 F. Supp. 3d at 1060–66 (concluding that another IM issued by BLM constituted final agency action).

### B. BLM failed to undertake required notice-and-comment procedures when creating the AIP

"As a general matter, the APA requires an agency to use notice-and-comment procedures to make any "rule." *Id.* at 1067. The APA broadly defines a "rule" to mean "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). The definition of a "rule" specifically includes any "approval or prescription for the future of . . . rates . . . financial structures . . . prices . . . services . . . or . . . valuations, costs, or accounting, or practices bearing on" any agency practice. *Id.* "[T]he hallmark of a substantive agency rule is that it carries the force and effect of law via the creation of new rights or duties." *W. Watersheds Proj.*, 441 F. Supp. 3d at 1067.

IM 2019-025 falls squarely within the definition of a "rule" under the APA. As described above, the IM establishes a set of procedures under which BLM must issue payments of federal funds to adopters of wild horses or burros who meet certain criteria. In doing so, the IM both establishes a new right for adopters of wild horses—namely the right to receive up to $1,000 in federal funds per animal adopted—and establishes new obligations for BLM, including the obligation to issue payments to adopters, as well as certain (albeit minimal) obligations associated with oversight of the program. In doing so, the IM "prescribe[s] law or policy" within the definition of a "rule" under the APA.

Nonetheless, when BLM established IM 2019-025, it entirely failed to undertake any notice-and-comment procedures, in clear violation of the requirements of the APA. *See* 5 U.S.C. § 553(b)–(c). The agency's failure to provide any notice or opportunity for comment was not only a flagrant violation of the APA in its own right, but also led the agency to ignore critical input that wild horse advocates such as AWHC would have provided. For example, had the agency followed proper procedures and allowed for public comment, wild horse advocates would have had the opportunity to explain how the AIP is vulnerable to exactly the kind of manipulation that AWHC has now documented in its attached report—namely, the abuse of the system by individuals who have no sincere interest in providing a good home to an adopted animal but are instead interested principally in the receipt of $1,000 per wild horse plus the amount they can obtain by subsequently selling the animal—regardless of the fate it will eventually meet once sold. Likewise, wild horse advocates could have explained that common-sense safeguards could have at least mitigated the disastrous consequences that the AIP has wrought for wild horses, including for example terms restricting the payment of federal funds to any adopter that has previously sold an adopted animal in circumstances that will likely lead to the animal being slaughtered. However, because BLM unlawfully ignored its obligation to

8

provide the public with any notice or opportunity for comment, the public was deprived of any chance to provide valuable input on this new program.

### C.      BLM failed to consider highly relevant factors when creating the AIP

In part due to BLM's unlawful promulgation of IM 2019-025 without any notice or opportunity for public comment, BLM failed to consider numerous relevant factors when creating the AIP. For example, IM 2019-025 reflects no consideration of the obvious ways in which the system of federal payments that it established is easily prone to abuse—as AWHC has now documented has in fact occurred. Likewise, BLM failed to consider that a system that provides cash payment for those that adopt a wild horse would predictably attract—and has in fact attracted—individuals who are interested principally in a cash payment rather than the welfare of the animal being adopted. Notably, as AWHC's report documents, BLM's own officials raised such concerns after the AIP had been adopted, specifically warning that the program could attract "people only seeing the initial cash payment and not thinking about the lifetime costs associated with owning a horse" or lead to "the adoption of animals to people who have no business owning a horse." However, despite the clear ways in which the AIP's design was prone to abuse, to our knowledge, BLM's sole contemplation of such issues occurred *after* the agency issued IM 2019-025—thus confirming that BLM failed to consider highly relevant issues before taking this action as the APA requires.

Critically, the agency failed to consider how the structure of the AIP creates a *de facto* pipeline that allows wild horses and burros to be sold for slaughter or conversion into commercial products in violation of Congress's explicit and repeated bans on this practice. Although the AIP requires adopters to sign a statement that they "will not sell or transfer ownership" of adopted animals "to any person or organization that intends to resell, trade, or give away such animals for slaughter or processing into commercial products," Form 4710-25, AWHC's report documents how that statement has not served as a practical deterrent to wild horses in fact being sold for slaughter. Moreover, AWHC's report also documents how—as a matter of the AIP's design—the program is highly vulnerable to this practice. Because BLM has taken the position that even where an adopter has in fact sold a wild horse at auctions where the most common outcome is slaughter, no violation of the AIP has occurred so long as the adopter took title to the animal before sale, BLM's own design of the AIP reveals that it is highly vulnerable to abuse by those who merely hold an animal for the required period to obtain title, gain their $1,000 payment, and then turn around to sell the animal for slaughter. Moreover, BLM's position as documented in AWHC's report is that even if BLM knows that an adopter has in fact sold adopted animals for slaughter, that individual remains eligible for future adoptions and future payments of federal funds. Accordingly, the AIP's design serves as a mechanism for BLM to expend federal funds in a way that results in wild horses being sold for slaughter— exactly the practice that Congress has routinely forbidden. BLM's failure to consider or guard against this abuse of federally protected wild horses in any rigorous manner renders BLM's adoption of the AIP arbitrary and capricious.

9

BLM_003834

### D.   The AIP reflects an unexplained reversal of position

Although IM 2019-025 misleadingly states that "[n]othing in this IM is intended to effect a substantive regulatory change," IM 2019-025 at 1, in fact the IM does exactly that. Prior to the IM's issuance, nothing in BLM's regulations entitled any adopter of a wild horse or burro to the receipt of any federal funds; however, in a "substantive regulatory change," IM 2019-025 for the first time established a program that allows adopters of wild horses to receive up to $1,000 per animal adopted. IM 2019-025 thus created a significant new federal payment that was never before contemplated in BLM's regulations, and which served as a financial incentive to bring new adopters to the agency focused principally (if not exclusively) on obtaining federal funds and then offloading horses to the highest bidder.

Moreover, at the same time that it created a significant new federal benefit, IM 2019-025 also created a far laxer system for oversight of adoptions than the BLM previously applied to the sales of wild horses or burros. Since 2014, the sale of wild horses and burros has been governed by BLM IM 2014-132; under that prior IM, before selling a wild horse or burro BLM was obligated to "look up the purchasers name," "determine if there are any documented notes" about the purchaser in BLM's possession, and "[w]hen there is evidence that may indicate a purchaser does not intend to provide a good home . . . deny the sale and document the reasons for their decision." IM 2014-132, att. 1 at 4. In sharp contrast, IM 2019-025 includes no such requirements. Indeed, as documented in AWHC's report, under IM 2019-025, BLM has taken the position that even where the has actual proof that an adopter under the AIP has failed to provide humane care of an adopted animal or has sold the animal for slaughter, so long as such violations occurred after the adopter took title to the animal BLM believes no violation has occurred and that the adopter will continue to be eligible to adopt horses through the AIP.

BLM's creation of a less stringent program for the payment of adoption incentives than it previously created for the sale of wild horses constitutes an unexplained change in the agency's policy. To pass muster under the APA, an agency that changes its policy "must at least display awareness that it is changing position." *Encino Motorcars*, 136 S.Ct. at 2126. However, IM 2019-025 does not even to acknowledge that BLM previously imposed a more stringent set of requirements on those who purchase wild horses than the agency now provides for those whom it pays to adopt wild horses. By failing to even "display awareness" that it was changing its policy regarding the circumstances under which it would allow individuals to take possession of wild horses, the agency violated the APA in a fundamental way.

Likewise, BLM also ran afoul of the APA's requirement that an agency changing policy must "show that there are good reasons for the new policy." *Id.* at 2126. Although BLM stressed that increasing adoptions could reduce "costs associated with caring for unadopted animals in BLM managed or contracted corrals and pastures," IM 2019-025 at 1, the agency provided no reason why such cost-savings could not, or should not, be balanced against the need to ensure that adopters actually provide good homes for wild horses rather than merely taking federal payments and then promptly selling the horses for slaughter. Particularly in light of Congress's repeated prohibitions on the use of federal funds for slaughter of healthy wild horses, BLM provided no good reason for the relaxation of its standards for who could be trusted to take

10

possession of a wild horse. In this manner as well, BLM's promulgation of IM 2019-025 was arbitrary and capricious.

### E.       The AIP required NEPA analysis

As described above, NEPA requires the preparation of an EIS for any major federal action with significant environmental effects and, where an agency is uncertain whether an action will have significant effects, requires the preparation of an EA. With particular relevance to BLM's creation of the Adoption Incentive *Program*, NEPA's implementing regulations define "Federal actions" broadly to include the "adoption of *programs*, such as a group of actions to implement a specific policy or plan." 40 C.F.R. § 1508.18(b)(3) (emphasis added).

The need for NEPA analysis of the AIP is clear. To begin with, the AIP itself clearly has environmental impacts because it has effects on wild horses themselves. Indeed, as AWHC's report documents, the impacts to wild horses have proven to be extremely severe. Moreover, BLM explicitly intended the AIP to free up federal funding for activities with environmental impacts. As BLM noted, the AIP's "[c]ost savings may be utilized for other management operations," including "allow[ing] those savings to support critical on-range operations." IM 2019-025 at 1, 3. Because the AIP was intended to allow additional "on-range operations," NEPA obligated BLM to consider the environmental impacts of such operations—as well as alternatives to the AIP that could potentially address the concerns raised by BLM in adopting the AIP without subjecting wild horses and burros to slaughter.

Nevertheless, BLM adopted IM 2019-025 without any environmental analysis whatsoever. Indeed, BLM did not even make any effort to discuss NEPA or even assert that the AIP was somehow exempt from NEPA's requirements (which it is not). The result is that BLM adopted this new program in clear violation of the nation's bedrock environmental law.

## II.      BLM Must End the AIP

For the reasons described above, BLM's creation of the AIP violated federal law in numerous important ways. In such circumstances, a reviewing court "shall hold unlawful and set aside" the AIP, 5 U.S.C. § 706(2), resulting in the vacatur of the program in its entirety. However, in light of the now amply documented ways in which the AIP has resulted in disastrous outcomes for federally protected wild horses that are entirely inconsistent with the congressional intent behind the WHA and behind Congress's routine prohibitions on BLM expending federal funds for the slaughter of healthy wild horses, AWHC hopes that it will not be necessary to have a federal court terminate the AIP. Instead, AWHC hopes that now that it has been confronted with the awful outcomes of the AIP, as well as having been apprised of the numerous ways in which the AIP's creation violated federal law, BLM will itself immediately withdraw IM 2019-025 and end this disastrous program.

BLM_003836

### III.   BLM Must Immediately Investigate How the AIP Has Led to the Slaughter and/or Inhumane Treatment of Wild Horses

As AWHC's report has extensively documented, numerous wild horses and burros adopted through the AIP have encountered inhumane treatment while in the charge of their adopters, and/or have been quickly sold in auctions that cater to slaughter facilities shortly after their adopter taking title to the wild horses. However, to AWHC's knowledge, BLM has not conducted any comprehensive investigation of the outcomes from the AIP. Instead, BLM has touted the AIP's success while apparently turning a blind eye to the extremely dire consequences the AIP has caused for wild horses and burros. Consequently, AWHC has been forced to utilize Freedom of Information Act ("FOIA") requests to obtain information about BLM's administration of the AIP. Although BLM has not complied with FOIA's statutory mandate to promptly release information, the agency has provided some information that has extremely troubling implications for how the AIP is continuing to subject wild horses to inhumane outcomes. For example, AWHC has obtained records through FOIA that show that many individuals are adopting the 4-horse maximum at any given time. Moreover, these records also demonstrate that in many instances, several members of a single family simultaneously each adopt 4 horses at once, resulting in families that adopt 12, 16, or 20 horses at a time to the same location —all without any apparent effort by BLM to ensure that these individuals can care for so many horses and burros at once. AWHC believes that this pattern of behavior—adopting the maximum number of horses at once—constitutes a red flag that suggests that an adopter is more interested in a cash payment than in the welfare of the adopted animal, and that such adopters are highly likely to sell adopted animals as soon as they take title—without regard to whether the animals suffer slaughter as a consequence.

The time has come for BLM itself to meaningfully assess the outcomes from the AIP. To that end, AWHC respectfully requests, and formally petitions pursuant to 5 U.S.C. § 553(e), that BLM immediately undertake a thorough investigation of what fates have befallen wild horses and burros adopted through the AIP. In addition to verifying that adopters provide humane care of wild horses and burros prior to taking title, BLM must investigate what happens to the animals after the adopters take title. Those who have taken title to wild horses or burros through the AIP should prove that the animals have been treated humanely by showing the animals to agency inspectors and demonstrating what kind of care and treatment the adopted animals endure. If an adopter no longer has possession of an animal adopted through the AIP, BLM should make every effort to determine what has happened to that animal—and in particular should conduct a thorough investigation to determine whether these animals have been sold for slaughter or the conversion into commercial products. In that event, BLM should not allow an adopter that has sold an adopted animal in such a manner to adopt (or purchase) a wild horse in the future. Moreover, BLM should make the results of such an investigation open to the public.

Additionally, DOI and BLM should request that the U.S. Department of Justice and the Department of Interior's Office of Inspector General immediately commence investigations into the fates of wild horses adopted through the AIP, and to what extent the creation and implementation of the AIP has involved violations of federal law by the agencies or by adopters. Notably, the AIP is not the first time that DOI and BLM have allowed wild horses to be sent to slaughter, and ample precedent exists for inquiries by the Inspector General and/or the

BLM_003837

Department of Justice. For example, in 2015, DOI's Office of the Inspector General issued an *Investigative Report of Bureau of Land Management Wild Horse Buyer*, which found that "BLM did not follow current law while managing [wild horses and burros]" and instead sold 1,700 wild horses to a buyer that "wrongfully sent them to slaughter."[5] Although BLM's response to that report was ostensible to "strengthen[] its policies for adoption and sale" of wild horses and to a high-level official's approval for the sale or adoption of more than four wild horses to any individual, the AIP reflects a weakening of exactly this type of restriction, as described above. As another example, in 1997, the Los Angeles Times reported that a federal grand jury investigation showing that BLM "allowed the slaughter of hundreds of wild horses taken from federal lands, falsified records and tried to prevent investigators from uncovering the truth."[6]

These prior instances in which independent federal investigations revealed negligent oversight of the adoption or sale of wild horses, or outright wrongdoing by BLM itself, which led to the slaughter of wild horses in contravention of congressional intent—as is currently occurring under the AIP—reinforces the need for a truly independent investigation into BLM's creation and implementation of the AIP. If DOI and BLM wish to recover the public's trust that the agencies are faithfully protecting wild horses, it is important that the agencies request—and do not obstruct—a truly independent investigation of the AIP. If DOI and BLM do not immediately request that the Department of Justice and DOI's Office of Inspector General commence independent investigations of the AIP, AWHC will have no choice but to explore all options for ensuring that the public receives an accurate and unbiased account of the agencies' creation and implementation of this program, such as requesting that Congress direct that such an independent investigation be conducted and made public.

## IV.   Any Ongoing Implementation of the Adoption Incentive Program Will Require Notice-and-Comment Rulemaking

As described above, because the AIP clearly meets the APA's definition of a "rule," prior to the implementation of any similar action—and prior to any ongoing implementation of the AIP in its current form—BLM must undertake notice-and-comment rulemaking. Accordingly, this letter serves as a formal petition under the APA, 5 U.S.C. § 553(e), for BLM to (1) withdraw IM 2019-025 and permanently end the AIP; and (2) to the extent the agency wishes to provide incentives for the adoption of wild horses in the future, to provide the public with clear notice of what specific incentives the agency intends to provide and allow a meaningful opportunity for public comment.

## CONCLUSION

BLM's creation of the Adoption Incentive Program violated federal law in numerous ways and continues to have extremely negative outcomes for federally protected wild horses. To come into compliance with federal law, BLM must withdraw IM 2019-025 and end the AIP immediately.

---

[5] This report is available at
https://www.doioig.gov/sites/doioig.gov/files/WildHorseBuyer_Public.pdf
[6] *See* Martha Mendoza, Los Angeles Times, March 23, 1997,
https://www.latimes.com/archives/la-xpm-1997-03-23-mn-41176-story.html

13

Although AWHC hopes that it will not be necessary to resort to litigation in order to bring BLM into compliance with its duty to protect wild horses, unless BLM immediately withdraws IM 2019-025 and terminates the AIP, AWHC will have no choice but to contemplate all options to bring the agency into compliance with federal law, including litigation.

**Please provide a response to this letter no later than <u>June 30, 2021</u>**. Thank you for your time and attention to this critically important matter.

Respectfully,

William N. Lawton
Senior Associate

William S. Eubanks II
Owner & Managing Attorney

14

BLM_003839

# **Attachments**

BLM_003840



May 19, 2021

The Honorable Secretary Deb Haaland
U.S. Department of Interior
Email: doiexecsec@ios.doi.gov

CC: Laura Daniel Davis, Principal Deputy Assistant Secretary
U.S. Department of the Interior
Land and Minerals Management
Email: ldavis@blm.gov

Nada Culver, Acting Director
U.S. Bureau of Land Management
Email: nculver@blm.gov

Dear Secretary Haaland:

This letter and the enclosed report  are sent to you as a follow up to my letter of May 17 regarding the urgent need to suspend and investigate the Bureau of Land Management Adoption Incentive Program.

The report entitled The *BLM's Adoption Incentive Program: Pipeline to Slaughter for Federally-Protected Wild Horses and Burros*, is respectfully submitted on behalf of the American Wild Horse Campaign ("AWHC"), Skydog Sanctuary, Black Hills Wild Horse Sanctuary, and Evanescent Mustang Rescue.

The report adds detail and evidence to the *New York Times* report "Wild horses adopted under a federal program are going to slaughter" May 15, 2021 about the Bureau of Land Management ("BLM") Wild Horse and Burro Program's Adoption Incentive Program ("AIP"). The program pays individuals $1,000 to adopt a wild, untamed horse or burro, and the article detailed numerous instances of adopters collecting the payments, then immediately sending the horses to slaughter auctions.

Our report provides additional evidence of this link to slaughter, as well as documentation indicating an additional problem: the AIP is incentivizing adopters who lack

skills, resources or interest to properly care for and manage wild, unhandled horses or burros, resulting in severe neglect and abuse.

This report and the *New York Times* article provide compelling evidence that the AIP is defrauding the American public and sending federally protected wild horses and burros, resulting in abuse, neglect and  slaughter in contravention of a Congressional ban on the practice. As a result, we respectfully request that the AIP be suspended and an immediate inquiry into the issues raised in this report. Thank you for your consideration, and should you have any questions we can be available by conference call to discuss this matter.

Sincerely,

Suzanne Roy
Executive Director
American Wild Horse Campaign



*BLM's Adoption Incentive Program: Pipeline to Slaughter for Federally-Protected Wild Horses and Burros*

**A Request for Termination & Investigation**

**American Wild Horse Campaign**
**P.O. Box 1733**
**Davis, CA 95617**

&

**Skydog Sanctuary**

**Evanescent Mustang Rescue**

**The Institute of Range and the American Mustang's Black Hills Wild  Horse Sanctuary**

BLM_003843

In the last six months, the American Wild Horse Campaign ("AWHC") and several rescue organizations have discovered more than 80 titled Bureau of Land Management ("BLM") wild horses and burros, and over 100 BLM-branded wild horses and burros for whom titles could not be obtained and whose status is unknown, unidentifiable animals, at eight different livestock auctions known to sell horses to kill buyers across five different states. These ungentled, BLM wild horses and burros arrived at those auctions within 1–4 months after their adopters received title, a timeframe that strongly suggested their adopters opted into the agency's Adoption Incentive Program ("AIP") as explained below. Below is a summary of the AIP, followed by a detailed description of each case identified by our coalition.

Additional BLM wild horses and burros are continually found at auctions like the ones listed below; as a result, the 79 individual BLM wild horses and one BLM wild burro herein described represent an initial subset of the total cases. Information regarding additional cases can be provided upon request.

1. **Organizations**

   A. **American Wild Horse Campaign**

AWHC is a national nonprofit organization dedicated to preserving the American wild horse in viable, free–roaming herds for generations to come, as part of our national heritage. Our grassroots efforts are supported by a coalition of over 60 historic preservation, conservation, horse advocacy, and animal welfare organizations. AWHC is working with rescue organizations to investigate the BLM's AIP with the goal of bringing an end to government subsidized slaughter of our wild horses and burros.

   B. **Skydog Sanctuary**

Skydog Sanctuary is a forever home for wild mustangs and burros who have ended up in horrible and dangerous situations—in kill pens, at auctions, and in unloving homes where they have often been starved and neglected. As a "boots on the ground" organization, Skydog Sanctuary closely monitors and documents mustangs landing in kill pens and auctions throughout the year, saving many of them and working with other organizations to coordinate rescues. Skydog Sanctuary also educates and raises awareness of these issues, and has worked hard on their "Pass the SAFE Act" initiative to eliminate kill pens once and for all.

Skydog Sanctuary has rescued many of the horses and the burro documented in this report, and provided their titles and other support for this investigation.

### C.   Evanescent Mustang Rescue and Sanctuary

Evanescent Mustang Rescue and Sanctuary was created for the prevention of animal cruelty through educating the public about horse care and safety as well as rescuing equines (specifically mustangs and burros) from slaughter.  Evanescent Mustang Rescue and Sanctuary has rescued many of the horses documented in this report, and provided their titles and other support for this investigation.

### D.   The Institute of Range and American Mustang/ Black Hills Wild Horse Sanctuary

The Institute of Range and American Mustang's (IRAM) Black Hills Wild Horse Sanctuary has been providing a forever home for America's Wild Horses for over 33 years. This 12,000 acres of privately owned non-profit sanctuary is a home to all wildlife and hundreds of wild mustangs. The IRAM/ Black Hills Wild Horse Sanctuary has rescued many of the horses documented in this report, and provided their titles and other support for this investigation.

2. **Background on the BLM's Adoption Incentive Program**

On January 30, 2019, the BLM published Instruction Memorandum ("IM") IM 2019-025,

*Adoption Incentive Program for Wild Horses and Burros*. The policy summary stated that the

AIP was developed in order to increase the number of adoptions of untrained wild horses and

burros by offering financial incentives: two payments of $500. The first incentive payment is

made within 60 days from the adoption date and the second $500 payment is made within 60

days from the title date. (Under the Wild Free-Roaming Horses and Burros Act, title transfers

from the BLM to qualified adopters one year from the adoption date. 16 U.S.C. § 1333(c)).

Compliance inspections are a requirement of the AIP where BLM personnel, or other BLM

approved individuals, *should* conduct compliance inspections on adopted animals participating in

the AIP. These inspections are completed for title transfer and eligibility. BLM then tracks these

inspections in the agency's Wild Horse and Burro Program System, report titled "*Required*

*Inspections for Incentive Animals*."

Adopters pay a minimum adoption fee of $25 per wild horse. Each adopter is allowed to

take a maximum of four wild horses or burros annually, but as each animal is titled the BLM

may allow the adopter to adopt additional animals, up to four at one time. An adopter is removed

from AIP eligibility if they relinquish two or more animals within a 12-month period or do not

adhere to the terms of the Agreement (4710-25).

The purpose of this program was to increase the placement of as many wild horses and

burros into private care as possible, a proclaimed critical priority for the agency's Wild Horse

and Burro Program because of the long-term costs associated with caring for unadopted animals,

but also in order to free up more space for animals to be removed from public lands en masse. It

was presumed (but not required) that the AIP money would be used for training and initial care of these ungentled wild horses and burros.

The program was implemented in March of 2019 and the BLM has sung its praises ever since. As recently as November 19, 2020, the agency touted the success of the AIP: "The BLM continued to offer the [AIP] in Fiscal Year 2020, which is believed to have bolstered performance." In May 2020, the BLM reported that "[i]n the first 12 months of the AIP, the agency adopted out more than 6,000 animals." This represents a more than 100 percent increase over the BLM's 2,900 per year adoption average in the five years preceding the AIP program. According to Paul McGuire, Outreach Specialist, BLM National Wild Horse & Burro Program, "most but not all of the 6,026 animals adopted during the first 12 months of the AIP received or were eligible for the incentive." (personal email communication, December 7, 2020).

Adopters participating in the AIP are required to sign the BLM's adoption and sale forms which require certification that each adopter has "no intent to sell this wild horse or burro for slaughter or bucking stock, or for processing into commercial products, within the meaning of the Wild and Free-Roaming Horse and Burro Act, 16 U.S.C. 1331 et seq., and regulations 43 CFR 4700.0-5(c)." Consistent with Congress' mandate in the Interior Department's annual appropriations bills, BLM may only sell horses "with limitations," thereby requiring *anyone adopting or purchasing* a wild horse to certify at the time of adoption or purchase that they do not intend to kill or sell the horse for commercial slaughter, *nor would they transfer ownership to any person or organization who they knew or had reason to believe would "resell, trade or give away the animal(s) for slaughter or commercial processing."* The appropriations language prohibiting sale for slaughter specifically applies to BLM.

**3.  2020 Influx of Wild Horses in Kill Pens**

March 2020 marked the end of the first year of the AIP, meaning that participants would begin to receive title and subsequently the second $500 incentive payment on all their eligible adopted wild horses and burros. The IM noted that the second payment would be issued within 60 days of titling, meaning that the adopter of a horse or burro adopted through the program on, for example March 30, 2019, would potentially not receive the second incentive payment until May 30, 2020.

By August 2020, rescue groups began to see an increase in BLM branded wild horses and burros at auctions known to sell the animals to kill buyers (individuals who purchase horses and burros and sell them to horse slaughter plants in Canada or Mexico). Titles available from the auctions revealed ungentled wild horses arriving within 1–4 months of their adopters receiving title, a timeframe during which program participants would receive their second AIP payment. Many of these horses were young, unhandled animals, some with their BLM tags still around their necks more than a year after their adoption from BLM holding corrals, suggesting that adopters simply held the animals for a year without care in order to collect the $1,000 incentive. Even more concerning, the titles showed that several families had adopted horses and sent them to kill pens together within 3–4 months of receiving title to the animals. Each individual adopter can adopt up to four horses in a year, meaning a family of four could each take four horses and flip all 16 to a kill pen together.

Rescues worked with AWHC to uncover a total of 80 cases of identified individual horses and burros who arrived in kill pens and were put up for auction in a timeframe that strongly suggested their adopters opted in to the AIP. The following are examples of BLM adoption horses who were "flipped" to kill pens months after adopters received title to the animals:

**A.  Peabody Horse Pen**

The Peabody Horse Pen in Peabody, Kansas, is run in partnership with a 501c(3) organization that has an agreement with a well-known kill buyer to try to sell horses before the kill buyer ships them to slaughter. (Appendix 1, 1A).

- **Case Number 1**: Thirteen BLM wild horses were titled to a family of four: Lacey Cumin, Nathan Cumin, Cole Cumin, and Jessica Cumin. Each member of the family adopted between 3–4 horses and those horses were later relinquished to the Peabody auction. Of the 13 horses, 10 were titled to the same address. The other three titled under Lacey Cumin listed a different address. The horses were titled to the Cumin family in three batches: three were titled on June 30, 2020, eight were titled on July 7, 2020, and two were titled on July 15, 2020. All 13 horses were sent to Peabody on October 1, 2020, after the 60-day window for receipt of the second $500 AIP payment. All were later rescued with assistance from Skydog Sanctuary from the Peabody Horse Pen in Kansas. Two of these animals were confirmed as being adopted through the AIP by records received through Freedom of Information Act ("FOIA") requests. Compliance inspections on the other horses are pending. See Appendix 2, section 1 A-E for in-depth information on the titles.

  Of note: According to an internal BLM email dated June 14, 2019 and obtained in response to a FOIA request, both Nathan and Lacey Cumin were designated as "no longer eligible for the Adoption Incentive Program due to returning 2 or more animals within a 12 month period." Nevertheless, they received titles for three adopted horses each in June and July 2020 and flipped the horses to the kill pen on October 1, 2020.

- **Case Number 2:** Three BLM wild horses were titled to David A. Wilkie on October 5, 2020. All three horses were posted to Peabody Horse Pen's Facebook page for sale on January 1, 2021, after the 60-day window for receipt of the second AIP installment of $500. It is confirmed that all three of these horses were adopted through the AIP from compliance inspections obtained via FOIA requests. See Appendix 2, section 2 A-C for in depth information on the titles.

- **Case Number 3:** Staci S. Jacques adopted two BLM wild horses who were titled to her on July 15, 2020 and were later rescued from Peabody Horse Pen in September 2020 within the 60-day period when adopters would receive the second AIP installment of $500. See Appendix 2, section 3A and 3B for in depth information on the titles.

- **Case Number 4:** Sandy K. Tiede adopted one BLM horse. The title date was obscured by kill pen officials. The animal was found in the Peabody Horse Pen on April 14, 2021. See Appendix 2, section 4A for in depth information on title.

- **Case Number 5:** Kurt W. Fast adopted one BLM burro who was later found in the Peabody Horse Pen in September 2020. While the title date is unknown, compliance inspections obtained through FOIA requests confirm this burro was adopted through the AIP. The animal was adopted on July 9, 2019 and the compliance inspection was conducted on April 13, 2020. See Appendix 2, section 5A for in depth information on title.

### B. Stroud Oklahoma Kill Pen

Stroud Oklahoma Kill Pen is a livestock auction in Stroud, Oklahoma. It is a self-proclaimed kill pen. At this particular auction, owners selling horses can designate whether or not their horse(s) can be sold to slaughter. None of the horses listed below were designated as NOT to be sold for slaughter. See Appendix 1, 3A and 3B for proof of slaughter auction status.

- **Case Number 1:** John L. Massingale adopted four BLM wild horses, the maximum number of horses allowed under BLM policy. All four were titled to Massingale on September 21, 2020 and were later sent to Stroud Kill Pen in early November, within the 60-day period when adopters were to receive the second AIP installment of $500. All were later rescued from Stroud Kill Pen in Oklahoma. See Appendix 2, section 6A-D for in-depth information on the titles.

- **Case Number 2:** Edward L. Chauncey adopted two BLM wild horses. Both were titled on September 21, 2020 and were sent to Stroud Kill Pen in early November 2020, within the 60-day period when adopters were to receive the second AIP installment of $500. All were later rescued from Stroud Kill Pen in Oklahoma. See Appendix 2, section 7A and 7B for in-depth information on the titles.

- **Case Number 3:** Clint L. Couch adopted one BLM wild horse who was titled to Couch on August 10, 2020 and was later sent to Stroud Kill Pen in early November 2020. The horse was later rescued from Stroud Kill Pen in Oklahoma. The animal was confirmed as being adopted through the AIP by compliance inspection records obtained through FOIA requests. Clint L. Couch was convicted of kidnapping and assault in a horse deal gone wrong. Act See Appendix 2, section 8A and 8B for in-depth information on the title and assault charges

- **Case Number 4:** Kaeli Seay adopted one BLM wild horse who was titled to Seay on August 18, 2020. The horse was sent to Stroud Kill Pen in early November 2020. The horse was later rescued from Stroud Kill Pen in Oklahoma. This animal was confirmed as being adopted through the AIP by compliance inspection records obtained through FOIA requests. See Appendix 2, section 9A for in-depth information on the title.

- **Case Number 5:** Ben A. Baugh received the title of one BLM wild horse on April 22, 2020. The horse was later rescued in early November 2020 by Black Hills Wild Horse Sanctuary and still had a BLM identification tag around her neck. See Appendix 2, section 10A for in-depth information on the title.

- **Case Number 6:** Julie Auld (also listed as Auld Julie in official records) adopted one wild horse on June 11, 2019. She received the title of one BLM wild horse on August 27, 2020. The animal was later found in the Stroud Kill Pen in December 2020 and was rescued by Black Hills Wild Horse Sanctuary. BLM compliance inspections, received through FOIA requests, confirmed this horse was adopted through the AIP. FOIA records also indicate that she adopted an additional wild horse. See Appendix 2, section 11A and 11B for in-depth information on the title.

- **Case Number 7:** The Castagno family, consisting of Tracy Castango, Nicki Castango and Steve Castango, adopted a minimum of 3 wild horses. Compliance inspections obtained through FOIA requests confirm all three animals were adopted through the AIP. The animals were adopted on May 31, 2019 and were titled on or around June 15, 2020. The animals were found in Stroud Kill Pen in September 2020. See Appendix 2 Section 12 A-C for in-depth information on the titles.

- **Case Number 8**: Wayne A. Nicho received the titles to two wild horses on February 9, 2021. Both animals were found in Stroud Kill Pen on April 10, 2021, within the 60-day period when adopters were to receive the second AIP installment of $500. See Appendix 2 section 13A and 13B for in depth information on the titles.

### C.  Cleburne Horse Sale

According to an Animal's Angels undercover investigation, sellers at the Cleburne Horse Sale in Texas *must acknowledge* that their horse may end up sold to a slaughter auction (Appendix 1, 3A). According to that same investigation, well known kill buyer Mike McBarron, who runs the Kaufman Kill Pen (Appendix 1, 3B), often frequents Cleburne Horse Sale (Appendix 1, 3B). This is further supported by a *Weatherford Democrat* article that details the tragic journey of a veterinarian who relinquished horses to the Cleburne Horse Sale and later found them at McBarron's Kaufman Kill Pen (Appendix 1, 3B).

- **Case:** Twenty-one BLM wild horses together arrived at Cleburne Horse Sale on November 11, 2020. All names on the titles were either redacted or there was an attempt to redact the information. Per the auction, these horses were all from the same location. The horses were titled in four batches, the earliest being on September 14, 2020 and the latest on October 5, 2020. The mustangs arrived at the auction house a little over a month after the last batch of titles was awarded, within the 60-day window for receipt of the second $500 AIP installment. Despite attempts to redact information on the titles, three names and addresses were legible. Brenda J. Kidd adopted at least two mustangs titled on September 14, 2020, Gary Kidd adopted at least one mustang titled on September 14, 2020, and Dustin Banks adopted four mustangs titled on October 5, 2020. The address for the Kidd's and Banks's horses were the same, affirming the auction house's claim the horses arrived from the same location. All 21 wild horses were rescued by Evanescent Mustang Rescue and Sanctuary. One of these horses was confirmed to be adopted through the AIP by compliance inspections obtained through FOIA requests. There are pending FOIAs on the other 20 animals. Gary Kidd, was included in the recent *New York Times* exposé, the interview shows Kidd lied about the status of his horses and was

confronted with records that showed all 21 animals went to a kill pen. See Appendix 2,

section 14A-D for in-depth information on the titles.

### D.  Fabrizius Livestock Auction

Fabrizius Livestock Auction is a self-proclaimed kill pen (Appendix 1, section 5A)

located in Eaton, CO. It is run by Jason Fabrizius, who according to a 2018 article in the Denver

Channel, stated that, "I buy them, and I buy them by the truckloads. And we send them to

Mexico." In the same article, he claims to regularly send 34 horses a week to Mexico. (Appendix

1, 5B).

- **Case Number 1:** Lonnie D. Krause adopted three BLM wild horses who were sent to the

  Fabrizius Livestock Auction. The horses were titled on September 14, 2020 and sent to

  Fabrizius on September 25, 2020, well within the 60-day period when adopters were to

  receive the second AIP installment of $500. All were  later rescued from the Fabrizius

  Livestock Auction in Colorado. Lonnie Krause admitted in an interview for the *New York

  Times* that he and his grandson (Conner Palmer) adopted the maximum number of horses

  each as a more profitable venture than raising cattle. He saw no issue with this, as BLM

  officials stated "once you get title, there is no limitation on slaughter." See Appendix 2,

  section 15A-C for in-depth information on the titles.

- **Case Number 2:** Conner A. Palmer adopted two BLM wild horses and received their

  titles in his name on September 14, 2020. They were later sent to Fabrizius around

  September 25, 2020, well within the 60-day period when adopters were to receive the

  second AIP installment of $500. All were later rescued  from the Fabrizius Livestock

  Auction in Colorado. See Appendix 2, section 16A and  16B for in-depth information on

  the titles.

**Special Note:** These horses were flipped to the kill pen quicker than we've seen in the previous cases, but once the BLM conducts their second compliance inspection and issues the title, the owner is under no obligation to keep the horse in their care. The BLM would **not** know if the horse(s) remained with the adopter(s) or not and yet would still issue the second incentive payment of $500 since the title had already been transferred.

### E.  Bowie Auction House

Bowie Auction is a self-proclaimed kill pen (Appendix 1, 5A) located in Bowie, TX.

- **Case:** Dennis M. Schwitzer adopted one BLM wild horse and received the title in August 2020. The horse was later rescued from Bowie Auction House by a private individual on September 9, 2020, arriving at the auction well within the 60-day period when adopters were to receive the second AIP installment of $500.  See Appendix 2, section 17A for in-depth information on the title.

**Special Note:** Compliance Inspection records note that four BLM animals, adopted through the AIP, were flipped to Bowie before titles were transferred to the adopter. The BLM was notified and all four horses were repossessed.  See Appendix 2, section 17B for freeze brand information.

### F.  Kaufman Kill Pen:

Kaufman Kill Pen is a self-proclaimed kill pen (Appendix 1, section 6) located in Forney Texas. According to an Animal's Angels investigation, this kill pen is owned and operated by Mike McBarron (Appendix 1, 3B).

- **Case Number 1:** Myra N. Sander adopted one BLM wild horse on August 3, 2019. The horse was titled to her on August 8, 2020 and was flipped to Kaufman Kill Pen within the 60–90 day timeframe. This horse was confirmed to be adopted through the AIP by BLM compliance inspection records obtained by FOIA requests. See Appendix 2, 18A for in-depth information on the title.

- **Case Number 2:** Henry D. Jump adopted one wild horse on August 3, 2019. The horse was titled to him in 2020. While the month of titling is obscured, the horse was inspected for title eligibility by BLM officials on January 1, 2020. The date of actual titling is unknown. The horse was found in Kaufman Kill Pen February 1, 2021 and was one of seven BLM horses found in the kill pen on that day. FOIA records confirm this animal was adopted through the AIP. Records also note Henry Jump adopted two horses. See Appendix 2, 19A and 19B for in-depth information on the title and FOIA information.

### G.  North Louisiana Equine Transport and Feedlot

North Louisiana Equine Transport and Feedlot is a feedlot located in Bastrop, LA. According to a 2021 article, this feedlot is run by brothers Gregory and Mitchell Stanley. The Stanley brothers are considered some of the most notorious kill buyers in the country and have been the subjects of multiple investigations including animal cruelty, inauthentic transport paperwork, and assault allegations. See Appendix 1 section 7.1 and 7.2 for more information.

- **Case:** Hugh C. Hession adopted two BLM wild horses. Both were titled on November 18, 2020 and both were found in the North Louisiana kill pen in early February 2021. Appendix 2, sections 20A and 20B for in-depth information on the titles.

### H.  Centennial Livestock Auction:

The Centennial Livestock Auction is a slaughter auction in Fort Collins, Colorado. While not explicitly stated on their website, the weekly market report published on their website clearly shows they sell horses, by the pound, to slaughter. See Appendix 1 section 8 for more information.

- **Case:** Debra J. Harris received title for three wild horses on November 19, 2020. The three horses were found at the Centennial Livestock Auction in early May 2021. See Appendix 2 Section 21 A-C.

  **Special note:** These horses were flipped to the kill pen outside of the typical 60–90 days after titling, but it is highly probable that they are AIP animals as the 60–90 day window for titling and payment is just an estimate.

### I. Miscellaneous

- **Case Number 1** Tarrah L. Hern adopted one BLM wild horse who was titled to her on March 24, 2020. According to information obtained through FOIA requests, Hern adopted the horse through the AIP. The horse was later rescued from a livestock auction in August 2020. See Appendix 2, section 22A for in-depth  information on the title.

- **Case Number 2:** Joni R. Flemming adopted four horses on August 13, 2019. One horse, who was rescued from an undisclosed kill pen by a private individual, was titled October 9, 2020. Compliance inspection records indicate all four animals were adopted through the AIP. The status of the other three animals is unknown. See appendix 2 section 23 A-D for in-depth information on titles.

- **Case Number 3:** Joe A. Anderson adopted three wild horses and received titles for all four on March 31 2021. All four horses were discovered in an undisclosed kill pen in Texas on April 11 2021. See appendix 2 section 24A-C for in-depth information on titles.

- **Case Number 4**: Dymiti Anderson adopted one wild horse and received the title on March 31 2021. The one horse was discovered in an undisclosed kill pen in Texas on April 11 2021. See appendix 2 section 25A for in-depth information on the title.

This information is based on evidence that AWHC has been able to gather working with various rescues such as our partners, Skydog Wild Horse Sanctuary, Black Hills Wild Horse Sanctuary, and Evanescent Mustang Rescue. Some of the individuals named above may have adopted more than the horses listed here, but those potential horses were likely sold to various individuals or, in the worst case, to a kill buyer who shipped them across the border without being detected by rescue groups.

### 4. Compliance Inspections Show AIP Wild Horses and  Burros Are Suffering Severe Cruelty After Being "Adopted"

AWHC's concerns about the AIP expand further than federally protected horses and burros being funneled to kill pens. Through the records received on BLM compliance inspections for AIP animals, it is obvious many adopters using this incentive program either have nefarious intent, or lack the basic ability and knowledge to care for unhandled wild animals. AWHC has documented many cases of abuse and neglect of AIP animals. Additionally, in several instances, when the time came for compliance inspections BLM officials were not able to locate or get in contact with numerous adopters in Texas and Oklahoma. Many cases were turned over to law enforcement and the status of those AIP animals is unknown. Examples from the documents are as follows:

**Abuse cases (animal is identified by freeze brand number):**

- **19025517:** "Found 19025517 Sorrel horse upside down with her head folded back with a severe neck injury. The neck injury prevented her from standing and being able to lay upright. We tried to assist her to stand but she was unable to do so. We then called every vet in the valley. None returned our phone calls due to the Veterans Day Holiday. After no calls she was laboring to breath [sic] so I put her out of her misery."

- **16861637:** "We received a complaint about this horse being underweight [sic] and in a dog pen. We contacted the adopter and found that she had moved the horse a second time and she gave the new location to us. Upon arrival at the location we found this horse with a body score of 2 and in a 10x10 area with a peice [sic] of plywood on top standing in 5 inches of mud. We repossessed the animal that day."

**Neglect cases (animal is identified by freeze brand number):**

- **18869274:** "Body Score is a 2.5. Had numerous [sic] sores on body. Sent out a correction letter in regards to the weight of the animal. We are requesting for the vet to come out to make a nutritional plan and to do another inspection in 4 weeks."

- **18869242:** "We arrived at this facility to inspect (b) REDACTED animals that had just moved there and found this yearling. The animal was very thin on rating on the scale at a 2. He was eating moldy hay and the adopter admitted that last week he had eaten a fly trap. The water also had thick algae [sic] in it. The animal was repossessed that day."

- **16025230:** "body condition: very poor, score of 2, ribs and spine apparent. Hoof condition: long, overgrown hooves. Comments: horse was obviously malnourished and did not receive [sic] basic care." "with a brief look at facility there was not an adequate shelter with attached safe turn out"

- **17632030 and 17632043:** "On 1/15/2020 received pictures of thin horses and a complaint that they were not being fed [sic]. Called REDACTED at 2:21 pm and left a message [sic]. Called back at 3:08 pm. Mr. Seals was told about a complaint [sic] and the BLM would be there tomorrow. He said that he called and left a message last week about his job and to move the horses. There was not a message sent to my knowledge. He was told that he needed to be there. He was told that he would get a telephone call 30 miles out. 1/16/2020 8:33am Telephone call was made, no answer, left message that the BLM will be there. 9:14 am Dan & I arrived at the REDACTED place and was not home. FM 17632043 & FM 17632030 Body condition was 2 1/2-3. Talked to the next door neighbors  and said that the horses had not been fed [sic] in a couple of days [sic] and that they have been feeding them. Said that their [sic] was another mustang down the road that sold. FM 18632317 was verified and it is a sold animal, but the animal was at 1 1/2 body condition. called back and I told him that I was giving him a warning and that I would check on the animals. Said that he needed to turn the horses back because he needed [sic] to move closer to work.voluntarily relinquished the horses. Horses were picked up."

- **12188414:** "Grant received information from SB FICC Dispatch regarding burros escaping from their adopter. I conducted the compliance inspection on Tuesday, March 3, at 1 PM. The holding pen design described on the application which met the qualifications to adopt was not how the actual pen design was, where the two burros escaped after two days after being brought home. The two burros could have either escaped by climbing over a 10 foot high dirt mound that was in the first pen that was not fenced or over a 2 -4 foot rock/earth barrier next to the shelter in the lower pen. See pictures at: \\blm.doi.net\dfs\ca\ri\pub\Photos\aneiberg\2020 WHB Compliance The pen

design where the burros were kept, did not meet the BLM requirements for adoption.
After inspection of the facility, went with Janey to scout the area where reports from the
public had either seen them or seen signs [sic] indicating they were in the area. Animals
missing in the desert."

These are the most egregious cases, but there are many more instances of negligence by
adopters such as falsifying government documents and failing to provide care for these animals.

5.  **BLM Washes Hands of Situation Despite Internal Concerns**

At least one BLM employee accurately predicted the outcome of the AIP.   In records
received by AWHC under FOIA, Rob Sharp, Supervisory Wild Horse & Burro Specialist for
BLM Oregon, stated on June 25, 2019:

[H]here's some thoughts on the Adoption Incentive Program:

Since its inception we've seen a pretty good boost in adoption numbers. Some are repeat
adopters but the majority have been new adopters. My concerns focus on the welfare of
the animal after they are adopted. For many first time adopters, getting a gentled horse
from a TIP trainer or other gentled horse program is a great segway into wild horses.
However, since the AIP isn't applicable to gentled animals, this removes that option.
Time will tell if we see a surge in compliance issues with AIP animals as a result of
people only seeing the initial cash payment and not thinking about the lifetime costs
associated with owning a horse and the adoption of animals to people who have no
business owning a horse!… And personally I don't agree with the government providing
cash incentives to a product (horses) which has an existing private market… I have
spoken with… trainers who can offset the cost of care for a year and resell their horses
after they are titled and make some money.

Mr. Sharp's concerns have been borne out, however, the agency he works for has turned a blind eye to the fate of the horses and burros adopted under this program. On October 6, 2020, AWHC contacted Acting Off-Range Branch Chief Paul McGuire via email regarding the 13 BLM wild horses sent to Peabody Horse Pen. Mr. McGuire responded that because the adopters of the horses had fulfilled their obligations under the adoption agreement and received title for the horses before sending them to auction, *the BLM had no cause to issue a violation.* Mr. McGuire answered affirmatively when asked if these adopters would still be eligible to participate in adopting horses in the future from BLM. See the email chain here. Mr. McGuire is conveying the BLM apparent policy of taking no responsibility for wild horses and burros once title is transferred (including whether the adopters adhere to the enforceable no-slaughter provision of their adoption contracts).

Additionally, the *NY Times* reported that according to one AIP adopter, the agency tells AIP participants "Once you get a title, they told me, there is no limitation — you can do whatever you want with them." Additionally, the BLM told the *NY Times* that it had no authority to enforce adoption contracts and their anti-slaughter provision that is signed under penalty of perjury.

The actions of the BLM with regard to the AIP are similar to the agency's behavior a decade ago when it sold truckloads of horses to a known kill buyer, turning a blind eye to the implausible explanations about what the buyer intended to do with the horses, such as using truckloads of horses for "use in movies" in Mexico. (The buyer also told the BLM that he didn't care what kind of horses (male/female) he purchased, as long as they were big.)

### 6. <u>Conclusion: An Immediate Termination  of AIP  and Full Investigation of the Program is Required</u>

AWHC has submitted several FOIA requests[1] seeking to obtain further evidence of the connection between these incidents and the BLM's AIP, including records related to AIP payments. We also continue to collect data from rescue organizations and sanctuaries in order to document all BLM wild horses and burros adopted via BLM internet adoptions as well as BLM horses and burros being sold at kill pens across the country.

However, the incidents listed above provide compelling evidence that the BLM has created, a government subsidized slaughter pipeline and is defrauding U.S. taxpayers by providing payments of $1,000 per a BLM wild horse or burros adopted through AIP while turning a blind eye when those same animals are immediately flipped to known slaughter auctions after the adopters receive full incentive payments.In light of this report and the *NY Times* expose', the Interior Department and Congress must investigate the extent of the problem, agency complicity in the illegal sale of wild horses and burros at slaughter auction in violation of the spirit and the letter of federal law.

Additionally, the Interior Department must identify all wild horses and burros adopted under the AIP who remain at risk of slaughter and abuse, as well as refer adopters who sold horses to slaughter auctions in violation of their adoption contracts, signed under penalty of perjury,  for criminal prosecution. Due to the length of time it will take to receive responses to AWHC's FOIA requests, and the urgency of the threat that the AIP is driving the sale of BLM wild horses and burros for slaughter in contravention of federal law, we officially request a suspension of the AIP pending an immediate inquiry into the issues raised in this report.

---

[1] AWHC's requests include: DOI-BLM-2021-000789, 2021-000803, 2021-000825, 2021-001001, DOI-BLM-2021-002679, DOI-BLM-2021-002681, DOI-BLM-2021-002683, DOI-BLM-2021-002685, DOI-BLM-2021-003104, DOI-BLM-2021-003106, DOI-BLM-2021-003112, DOI-BLM-2021-003110, DOI-BLM-2021-003107, DOI-BLM-2021-003109, DOI-BLM-2021-003111, DOI-BLM-2021-003175, DOI-BLM-2021-003134, DOI-BLM-2021-003331, 2020-00726, and DOI-BLM-2021-004024 which are still outstanding.

## Appendix 1: Proof of Auction Houses as Kill pens

1. Peabody Horse Pen

   1. Screenshot of Peabody Horse Pen Facebook page

   

2. Stroud Kill Pen

   1. Screenshot of Stroud Kill Pen's website

   

2. Horse marked as a non-slaughter horse



3. Cleburne Horse Sale



1.

https://myemail.constantcontact.com/Animals--Angels-Investigators-Call-Strike-Three-on-Trent-Ward-s-Cleburne-Auction-in-Texas.html?soid=1101655399670&aid=temyncmaGeA



2. 

weatherforddemocrat.com/news/cutting-horse-vet-s-horses-slated-for-slaughter/article_70c9b4b2-5675-11e6-9d2b-735fc8e9a5c7.html

Menu | Contact Us | Subscribe | Login

E-Paper | Local Events | Celebrations | Obituaries | Public Notices | Podcasts | Mineral Wells News

week, calling the slaughter designation unintended.

Photos posted by the Kaufman Kill Pen Facebook page on July 22 and July 23 show at least a dozen horses bearing the LA brand and/or distinctive shoulder numbers, with some described as recipient mares.

The posts listed the dollar amounts required to save the horses from death.

Kaufman Kill Pen describes itself as a "page existing to help network homes for slaughter-bound horses" and lists animals for sale from McBarronhorses@yahoo.com in Forney.

Kaufman County horse trader Mike McBarron has drawn criticism from some animal welfare groups for his practices, including purchasing horses to send to Mexico for slaughter.

After social media posts about the horses went viral among the horse rescue community, The Arnold Reproduction Center acknowledged the incident.

"I recently sent some mares to the Cleburne Horse Sale," The Arnold Reproduction Center wrote on Facebook Sunday. "I certainly never intended for them to end up in the slaughter pen. Many of these mares came to me through the sale barn system, were sick, completely unbroken and certainly destined for slaughter at that time (15 or so years ago). As long as these mares are reproductively sound, they stay in my herd – many probably longer than they are useful. My staff and I have taken the time, money, and resources we have to help these mares become useful and give them a viable purpose.

THIS WEEK'S CIRCULARS

LIFESTYLES

GET HEALTHY: Resolutions that are easy to keep

Tons of traditions: The history of observing New Year's

Holidays and Alzheimer's

MORE LIFESTYLE NEWS

[https://www.weatherforddemocrat.com/news/cutting-horse-vet-s-horses-slated-for-slaughter/article_70c9b4b2-5675-11e6-9d2b-735fc8e9a5c7.html](https://www.weatherforddemocrat.com/news/cutting-horse-vet-s-horses-slated-for-slaughter/article_70c9b4b2-5675-11e6-9d2b-735fc8e9a5c7.html)

4. Fabrizius Livestock Auction

   1. Screenshot of Fabrizius's website affirming slaughter auction status.

fabriziuslivestock.com

Menu

Fabrizius Livestock

Welcome to Fabrizius Livestock

We are a kill pen that offer each horse a second chance before shipping to slaughter. Each horse is posted with weekly deadlines. All HORSES ARE SOLD AS IS NO GUARANTEES. Can purchase horses via Venmo to https://venmo.com/code?user_id=2773854514577408319 card or cash. Customer is responsible for shipping.

Make Enquiry

Our Updates

View All

Deadline For All Horses

Sunday January 17th 10AM Pickup is Monday or Tuesday Advise no 2 horse trailers For payment accept card, direct deposit (wire info below) Venmo or cash. Our Venmo link is https://venmo.com/c...

Read More →

Haulers/Quarantine

Haulers/Quarantine (If Quarantine is offered by the haulers QT is by their name) Haulers: Cheyenne WY state stock yards (jayR): (307) 287-2984 K-L Hauling: 940 577 7180 Heather & Dawn 817 637...

Read More →

   2. [https://www.thedenverchannel.com/news/360/colorado-horses-sold-for-slaughter-even-when-rescues-want-to-help](https://www.thedenverchannel.com/news/360/colorado-horses-sold-for-slaughter-even-when-rescues-want-to-help)

5. Bowie Auction House

1. Screenshot of Bowie Auction House's website



6. [Kaufman Kill Pen](#)

   1. Screenshot of Kaufman Kill Pen's Facebook page affirming its kill pen status



7. [North Louisiana Transport and Feedlot](#)

1. Screengrab from a 2021 article stating the Stanley's own the North Louisiana Transport and Feedlot.

The Louisiana Second Circuit Court of appeal determined that three men who worked at a horse kill pen in Bastrop are liable and must pay damages caused by a videoed attack.

Gregory, Mitchell and Michael Stanley reportedly attacked Andrew Payne in September of 2016. The trio will pay $136,000, and 4th Judicial District Court Judge Robert C. Johnson will have to apportion fault to determine how the payment is split.

Gregory and Mitchell Stanley were co-owners of Stanley Brothers Livestock Inc and Stanley Brothers Farm LLC. At the time of the incident, the business was known as the Bastrop Kill Pen (BKP). Michael Stanley is the son of Mitchell and was employed by the business.

The business offered rescue horses for sale, but the bulk of the business lies in exporting horses to Mexico for slaughter, processing and human consumption.

BKP now operates under the name North Louisiana Equine Transport & Feed Lot.

**2016 animal cruelty case**

In August 2016, BKP gained national attention after Gregory Stanley's son Boots Stanley uploaded a graphic video of Stephen Sadler cutting a brown and white dog's throat on Snapchat.

Footage of the dog before it's death was also uploaded to Boots Stanley's Snapchat, including video of the dog on the back of a horse Stanley was riding. The dog struggled to stay on , and laughter could be heard off-screen.

Ultimately, Sadler cut the dog's throat multiple times.

Animal rights activists from across the nation took interest in the case, and several protested at the Morehouse Parish Courthouse and attended court dates, calling for retribution for the canine they called Justice.

In 2018, 4th Judicial District Judge Carl Sharp sentenced each to: three years in prison, a $5,000 fine and 480 hours of community service. The jail time was suspended; they were to remain on probation for three years. A a $5,000 donation to the Morehouse Parish Humane Society gave the option to reduce their community service requirements to 240 hours.

**2018:** No jail time for Snapchat dog killers

**Research leads to dead end, attack**

Andrew F. Payne, a 65-year-old retiree, was among the people who came to the courthouse to learn more about the case.

2. Further information on investigations into the Stanley brothers can be found here and here

8. Centennial Livestock Auctions
    1. Screengrab from CLA's website showing the price per pound of horses going through their auction. CWT is the livestock abbreviation of hundredweight, which is the price per 100 lbs of any given animal.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Hors es | 1 | brwm | mule | 245 | lbs | 386.00 hd | Eaton |
| | 1 | blm | stud | 735 | lbs | 215.00 cwt | Rawlins |
| | 1 | bksk | stud | 885 | lbs | 150.00 cwt | Rawlins |
| | 1 | pnt | stud | 790 | lbs | 115.00 cwt | Rawlins |
| | 1 | bksk | hors | 880 | lbs | 175.00 cwt | Chugwater |
| | 1 | grey | hors | 895 | lbs | 150.00 cwt | Carbondale |
| | 1 | palo | hors | 665 | lbs | 145.00 cwt | Rawlins |
| | 1 | pnt | hors | 1045 | lbs | 120.00 cwt | Carbondale |
| | 1 | palo | hors | 1125 | lbs | 100.00 cwt | Carbondale |
| | 1 | blm | hors | 1100 | lbs | 95.00 cwt | Rawlins |
| | 1 | palo | hors | 1070 | lbs | 92.50 cwt | Rawlins |
| | 1 | pnt | hors | 1035 | lbs | 82.50 cwt | Carbondale |
| | 1 | palo | hors | 1005 | lbs | 80.00 cwt | Rawlins |
| | 1 | sorr | hors | 970 | lbs | 80.00 cwt | Carbondale |
| | 1 | sorr | hors | 910 | lbs | 80.00 cwt | Carbondale |
| | 1 | grey | hors | 745 | lbs | 65.00 cwt | Rawlins |

**Appendix 2: In-depth information on adopters and BLM wild horses:**

1. Cumin Family: (All horses were later rescued with assistance from Skydog from the Peabody Horse Pen in Kansas.)

    a. Lacey N. Cumin: (Note: Lacey Cumin is banned from adopting any more AIP horses as of June 14, 2019 per compliance inspection FOIA received by AWHC. However, she received three titles in 2020.)

        i. 12978012: Titled on June 30, 2020. Found in Peabody Horse Pen on October 1, 2020.

        ii. 12978020: Titled on June 30, 2020. Found in Peabody Horse Pen on October 1, 2020.

        iii. 14862300: Titled on June 30, 2020. Found in Peabody Horse Pen on October 1, 2020.

    b. Nathan H. Cumin: (Note: Nathan Cumin is banned from adopting any more AIP horses as of June 14, 2019 per compliance inspection FOIA received by AWHC. However, he received three titles in 2020.)

        i. 12978046: Titled on July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

        ii. 13978036: Titled on July 15, 2020. Found in Peabody Horse Pen on October 1, 2020.

        iii. 13978059: Titled on July 15, 2020. Found in Peabody Horse Pen on October 1, 2020.

    c. Cole T. Cumin:

        i. 17632360: Titled July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

        ii.    18631903: Titled July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

        iii.    18632325: Titled July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

    d.   Jessica S. Cumin:

        i.    18629609: Titled on July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

        ii.    18631914: Titled on July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

        iii.    18631993: Titled on July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

    e.   Unknown member of the Cumin Family:

        i.    18631953: Titled on July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

2.   David A. Wilkie:

    a.   17632598: Titled on October 5, 2020. Arrived at auction around January 5, 2021.

    b.   17632608: Titled on October 5, 2020. Arrived at auction around January 5, 2021.

    c.   16631881: Titled on October 5, 2020. Arrived at auction around January 5, 2021.

3.   Staci S. Jaques: (Both were later rescued from Peabody Horse Pen in September 2020.)

    a.   14732785: Titled July 15, 2020. Arrived at Peabody Horse Pen in September, 2020.

    b.   17628969: Titled July 15, 2020. Arrived at Peabody Horse Pen in September, 2020.

4.   Sandy K. Tiede:

     a. 14224743: Title date unknown. Arrive at Peabody Horse Pen in April 2021.

5. Kurt W. Fast

     a. 11145215: Title date unknown. Arrived at Peabody horse pen in September 2020. Compliance inspections obtained through AWHC's FOIA requests confirm this burro was adopted through the AIP. The animal was adopted on July 9, 2019 and the compliance inspection was conducted on April 13, 2020.

6. John L. Massingale: (Adopted the following four BLM wild horses who were later rescued from Stroud Kill Pen in Oklahoma.)

     a. 15626752: Titled on September 21, 2020. Found in a slaughter auction early November, 2020

     b. 15730345: Titled on September 21, 2020. Found in a slaughter auction on approximately November 5, 2020.

     c. 15731037: Titled on September 21, 2020. Found in a slaughter auction on approximately November 5, 2020. Adopted from KS Correctional in 2019.

     d. 16626723: Titled on September 21, 2020. Found in a slaughter auction on approximately November 5, 2020.

7. Edward L. Chauncey: (Adopted the following two BLM wild horses which were later rescued from Stroud Kill Pen in Oklahoma.)

     a. 14733288: Titled on September 21, 2020. Found in a slaughter auction early November 2020.

     b. 15861728: Titled on September 21, 2020. Found in a slaughter auction early November, 2020.

8. Clint L. Couch: (Adopted the following one BLM wild horse who was later rescued from Stroud Kill Pen in Oklahoma.)

    a. 12625474: Titled on August 10, 2020. Found in a slaughter auction on approximately November 5, 2020.

    b. Article detail Clint Couch's arrest

9. Kaeli Seay: (Adopted the following one BLM wild horse who was later rescued from Stroud Kill Pen in Oklahoma.)

    a. 16862192: Titled August 18, 2020. Found in a slaughter auction early November, 2020.

10. Ben A. Baugh: (Adopted the following one BLM wild horse who was later rescued from Stroud Kill Pen in Oklahoma.)

    a. 15730993: Titled April 22, 2020. Rescued by Black Hills. Still had a BLM tag around her neck.

11. Auld Julie (Adopted the following two BLM wild horses, one of which was later rescued from Stroud Kill Pen in Oklahoma.)

    a. 18628990: Adopted on June 11, 2019. Titled on August 27th, 2020. Found in the kill pen in December 2020.

    b. 18628955: Adopted on June 11, 2019. Title date and the status date of this horse is unknown.

12. The Castango Family (Adopted the following three BLM wild horses, which were later rescued from Stroud Kill Pen in Oklahoma.)

    a. Steve Castango:

        i. 18862753: Adopted on May 31, 2019. Titled on June 15, 2020. The horse was found in a kill pen in September 2020.

    b. Tracy Castango:

       i.     18862329: Adopted on May 31, 2019. Titled on June 15, 2020. The horse was found in a kill pen in September 2020.

  c.  Unknown Castango:

       i.     18862743: Adopted on May 31, 2019. Titled on June 15, 2020. The horse was found in a kill pen in September 2020.

13. Wayne A. Nichol:

  a.  18862430: Titled on February 9, 2021. The horse was found in a kill pen on April 10th, 2021. Status of this horse is unknown.

  b.  18862611: Titled on February 9, 2021. The horse was found in a kill pen on April 10th, 2021. Status of this horse is unknown.

14. The Cleburne 21:

  a.  Titles with names redacted: (All later rescued by Evanescent Mustang Rescue from Cleburne Horse Sale in Texas.)

       i.     13646627: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

      ii.    14623671: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

     iii.   15626070: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

     iv.   15632314: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

      v.    16632238: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

vi.    16632261: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

vii.    16632313: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

viii.    16632483: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.  This BLM wild horse arrived at the auction trained, unlike the others we have seen. However, this trained horse may have still been adopted through AIP as an unhandled BLM wild horse at the time of adoption.

ix.    17632268: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

x.    17632299: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

xi.    17632453: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

xii.    18629272: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

xiii.    18629290: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

xiv.    18633484: Titled on September 29, 2020. Arrived at Cleburne on November 11, 2020.

b.  Brenda J. Kidd: (Adopter's name was legible through attempted redaction. Horses were later rescued from Cleburne Horse Sale in Texas.)

      i.    14629187: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

      ii.   18629053: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

  c.  Gary Kidd: (Adopter's name was legible through attempted redaction. Horse was later rescued from Cleburne Horse Sale in Texas.)

      i.    15766749: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

  d.  Dustin Banks: (Adopter's name was legible through attempted redaction. Horses were later rescued from Cleburne Horse Sale in Texas.)

      i.    16632343: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

      ii.   18625966: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

     iii.  18628912: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

     iv.  18629276: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

15. Lonnie D. Krause: (All horses were later rescued from Fabrizius Livestock Auction in Colorado.)

  a.  12024193: Titled September 14, 2020. Found in Fabrizius Livestock auction around September 25th, 2020.

  b.  157334818: Titled September 14, 2020. Found in Fabrizius Livestock auction around September 25th, 2020.

BLM_003876

    c.  15862383: Titled September 14, 2020. Found in Fabrizius Livestock Auction.

        Rescued by a private individual from the auction house on November 3, 2020.

16.  Conner A. Palmer: (All horses were later rescued from Fabrizius Livestock Auction in

    Colorado.)

    a.  147311725: Titled on September 14, 2020. Found in Fabrizius Livestock Auction

        on September 25, 2020.

    b.  15733657: Titled on September 14, 2020. Found in Fabrizius Livestock Auction

        on September 25, 2020.

17.  Dennis M. Schwitzer:

    a.  18631933: Titled in August 2020. Rescued from Bowie Auction House on

        September 9, 2020. Rescued by a private individual.

    b.  Freeze Brands of horses repossessed by the BLM:

        i.  17627871

        ii.  16628049

        iii.  16627991

        iv.  13628044

18.  Myra N. Sanders:

    a.  15633342: Adopted on August 3 2019 and titled on August 8 2020. Later found in

        Kaufman Kill pen.

19.  Henry D. Jump

    a.  18629097: Adopted on August 3, 2019 and titled in 2020. Later found in

        Kaufman Kill Pen.

    b.  18629282: This horse was discovered through a Freedom of Information Act

        request for BLM Compliance inspection data.  Adopted on August 3, 2019 and

was inspected on January 7, 2020 by a BLM employee. The Compliance

inspection noted "horse in pasture 240 acers did not see Mr. Jump said horse is

doing good comes in about every three days." The status of this horse is unknown.

20.  Hugh C. Hession:

    a.  18627042: Titled on November 18, 2020 and was found in a kill pen in February

        2021

    b.  18627153: Titled on November 18, 2020 and was found in a kill pen in February

        2021

21. Debra J. Harris:

    a.  18862516: Titled on November 19 2020 and was found in the CLA slaughter

        auction in early May 2021

    b.  18862473: Titled on November 19 2020 and was found in the CLA slaughter

        auction in early May 2021

    c.  18862467: Titled on November 19 2020 and was found in the CLA slaughter

        auction in early May 2021

22. Tarrah L. Hern:

    a.  18025303: Titled on March 24, 2020. Rescued from an auction house in August

        2020 by a rescue organization and reported to AWHC by the new owner. Records

        received from BLM in response to a FOIA request submitted by AWHC for

        compliance inspection records on all horses that went through Nevada under the

        AIP, confirmed that this horse was adopted through the AIP.

23.  Joni R. Flemming:

    a.  17632207: Adopted August 13, 2019. Titled October 9, 2020. Was found in a kill pen early 2021. Compliance inspection records indicate that BLM officials completed the compliance inspection on April 24, 2020.

    b.  18628904: Adopted August 13, 2019. The title date  is unknown, but compliance inspection records indicate that BLM officials completed the compliance inspection on April 24, 2020.

    c.  18629335: Adopted August 13, 2019. The title date  is unknown, but compliance inspection records indicate that BLM officials completed the compliance inspection on April 24, 2020.

    d.  18631927: Adopted August 13, 2019. The title date  is unknown, but compliance inspection records indicate that BLM officials completed the compliance inspection on April 24, 2020.

24. Joe A. Anderson:

    a.  13628079: Titled on March 3, 2021. This animal was found in a kill pen April 4, 2021.

    b.  16628229: Titled on March 3, 2021. This animal was found in a kill pen April 4, 2021.

    c.  17628141: Titled on March 3, 2021. This animal was found in a kill pen April 4, 2021.

25. Dymiti Anderson:

    a.  16628531: Titled on March 3, 2021. This animal was found in a kill pen April 4, 2021.

BLM_003879



**Addendum to "BLM's Adoption Incentive Program: Pipeline to Slaughter for Federally-Protected Wild Horses and Burros" Report**
**June 2, 2021**

1. **Additional  Confirmed Adoption Incentive Program (AIP) Animals Sold at Kill Pens**

- **Case Number 1:** A minimum of nine BLM Burros were rescued from Cleburne Horse Sale. The animals were titled in two batches, five were titled on June 2, 2020 and four were titled on May 19th, 2020. Records obtained by AWHC's Freedom of Information Act (FOIA) request prove all nine were adopted through the AIP. See Appendix section 1A-1I.

- **Case Number 2:** Chad W. Lessert adopted a minimum of three BLM burros. The animals were titled on the same date, June 17, 2020. The animals were titled in Blackwell OK. The animals were later rescued from an undisclosed kill pen. Records obtained by AWHC's FOIA request prove all three were adopted through the AIP. Further, records noted that cursory compliance inspections were conducted via email and with five photos.

- **Case Number 3:** Sherry Lessert adopted a minimum of one BLM burro, titled in Blackwell OK. The animal was titled in July 2021 and later rescued from an undisclosed kill pen. Records obtained by AWHC's FOIA request prove this animal was adopted through the AIP. Further, records noted that cursory compliance inspections were conducted via email and with five photos.

- **Case Number 4:**  Randy L. Davis adopted a minimum of two BLM burros, both titled in Blanchard OK. One of the animals was titled on July 15 2020. The second animal was titled in 2020, but the date is redacted. Both burros were rescued from an undisclosed kill pen. Records obtained by AWHC's FOIA request prove the two burros were adopted through the AIP.

- **Case Number 5:** An owner of a burro rescued from a kill pen sent AWHC the identifying freeze brand number of the animal. While no title was obtained, the freeze brand matched FOIA records obtained by AWHC confirming this burro was adopted through the AIP. The burro was adopted May 14, 2019 and was inspected by a private vet on April 23, 2020 in Paoli OK.

- **Case number 6**: Frank R. Myers adopted a minimum of two horses who were rescued from Strouds Oklahoma Kill Pen on January 19, 2021. The two horses were titled on the same date, August 24, 2020.  Records obtained by AWHC's FOIA request prove these animals were adopted through the AIP. The horses were adopted on August 3, 2019 and were inspected by a BLM employee on December 3, 2020 in Binger, OK.

2. **Potential Idaho Burro Slaughter Ring**

In a recent Freedom of Information Act Request (FOIA), records from the Bureau of Land Management's Idaho Field office indicate 14 families who have adopted four burros each (the maximum number allowed per adoption).  Of concern:

- Shelly, Rodney, Robert and Leeann Harrop all adopted four burros each

- Heath, Bobbie Jo, Alicia, Marian, and Wendy Marley all adopted four burros each.

- Upon further investigation into the families, it was uncovered that they are connected through marriage. Bobbie Jo's maiden name is Harrop and she is married to Heath Marley.

- Included in this group was Dawn Erickson, a woman from the same town as the Harrop family. Her Facebook account shows she is connected to Rodney Harrop.

- Included in the group are Coti and Cody Weeks. Each of them adopted four burros. Cody Weeks Facebook account shows he is connected to Rodney Harrop as well.

- Included in this group is Floyd Fife. He adopted four BLM burros. Adoption records show he has the same address as Marian Marley.

- This brings the total number of burros adopted to one family to 52 animals, meaning one family received a total of $52,000 taxpayer funds.

- One family member, Heath Marley, either works or worked at Skaar Livestock Auction, a large and controversial livestock auction yard.

The FOIA release also contained photos of burros in a **folder** called "Marley Burros" indicating they were housed at the Marley property. These images showed approximately 40 burros

2

housed in one pasture together. An immediate investigation is required  to determine whether these individuals are still in possession of these burros.

**3.    Alleged BLM Employee Consigning or Transporting Burros to Slaughter Auction**

- Evanescent Mustang Rescue recently sent AWHC the titles for 16 burros the group rescued from kill pens.

- We also received Coggins paperwork for 9 of the 16 burros. The names of the adopters were redacted on the title paperwork.

- The bloodwork for the Coggins was drawn on 7/1/2020 for the 2 of the 9 burros, and on 7/8/2020 for the remaining 7. The location of the blood draw is recorded as "Cleburne Horse Sale." Each coggins was matched to its corresponding title through the tube number (section 9 on the Coggins), which was also handwritten on the title.

- We have confirmed from the brand numbers on the titles that the 9 burros for whom we obtained Coggins paperwork were adopted through the AIP, and all were located in Paoli, OK, which has a population of 691 people.

- The Coggins paperwork records  a "Jimmy Galloway" as the owner of the 9 burros.

- Candace Ray of Evanescent informed AWHC that Jimmy Galloway is an employee of the Bureau of Land Management, specifically at Pauls Valley Off Range Holding Facility, located just 10 minutes away from Paoli, Oklahoma. Candace also told us that Jimmy frequents the Clerburne auction, allegedly to "run brands." Candace believes that individuals who transport horses to kill pens are able to sign as the owner on required paperwork.

- Two NY Times articles (here and here) indicate that a James D. Galloway was an employee of the Texas Bureau of Land Management who investigated in the 1990's for planning to sell wild horses he adopted to slaughter. The article notes "... *Mr. Galloway saying he planned to get horses from the adoption program, fatten them and sell them for slaughter.*" The article also states that Galloway lost his job as a result of the incident.

- Further investigation shows that in 2014, a Jimmy Galloway was part of a BLM crew that moved 1,493 wild horses out of the Teterville Long-Term Holding Facility in Oklahoma after 196 horses perished there.  This may be James D. Galloway, the BLM employee

3

found to be preparing to send wild horses he adopted to slaughter, or it may be his son. A comment left on a 2011 Associated Press article indicates that the former Galloway had a son working at the BLM at the time.

- In either case, it appears that an individual associated with or employed by the BLM is signing paperwork for BLM wild horses and burros sent to livestock auctions and an immediate investigation into this individual is warranted.  **The titles and coggins can be found in this Dropbox.**

**Appendix:**

1. Nine burros were sent to Cleburne Horse Sale by an individual, or individuals, whose name(s) are redacted on the titles. All animals were inspected by a private veterinarian.

    a. 07730058: Burro titled on June 3, 2020. The burro was adopted on May 14, 2019 and was inspected on April 23, 2020 in Paoli, OK.

    b. 11144297: Burro titled on May 19, 2020. The burro was adopted on May 14, 2019 and was inspected on April 23, 2020 in Paoli, OK.

    c. 14144226: Burro titled on May 19, 2020. The burro was adopted on May 14, 2019 and was inspected on April 23, 2020 in Paoli, OK.

    d. 14732935: Burro titled on May 19, 2020. The burro was adopted on May 14, 2019 and was inspected on April 23, 2020 in Paoli OK

    e. 16732988: Burro titled on May 19, 2020. The animal was confirmed to be adopted through the AIP by FOIA records obtained by AWHC. The burro was adopted on May 14, 2019 and was inspected on April 23, 2020 in Paoli OK

    f. 14733071: Burro titled on June 3, 2020. The burro was adopted on May 14, 2019 and was inspected on April 23, 2020 in Paoli, OK.

    g. 16144289: Burro titled on June 3, 2020. The burro was adopted on May 14, 2019 and was inspected on April 23, 2020 in Paoli, OK.

    h. 18646708: Burro titled on June 3, 2020. The burro was adopted on May 14, 2019 and was inspected on April 23, 2020 in Paoli, OK.

4

     i.   18646712: Burro titled on June 3, 2020. The burro was adopted on May 14, 2019 and was inspected on April 23, 2020 in Paoli, OK.

2. Three burros were titled to Chad W. Lessert.

    a.   09145147: Burro titled on June 17, 2019. The burro was adopted on June 11, 2019 and was inspected, virtually, on April 9, 2020. The compliance check records note: "Virtual compliance inspection over email with adopter. Sent 5 pictures. Animal is in excellent condition. BCS 5."

    b.   16144271: Burro titled on June 17, 2019. The burro was adopted on June 11, 2019 and was inspected, virtually, on April 9, 2020. The compliance check records note: "Virtual compliance inspection over email with adopter. Sent 5 pictures. Animal is in excellent condition. BCS 5."

    c.   18646709: Burro titled on June 17, 2019. The burro was adopted on June 11, 2019 and was inspected, virtually, on April 9, 2020. The compliance check records note: "Virtual compliance inspection over email with adopter. Sent 5 pictures. Animal is in excellent condition. BCS 5."

3. One  burro was titled to Sherry Lessert

    a.   13733107: Burro titled on July 9, 2020. The burro was adopted on July 9, 2019 and was inspected, virtually, on April 9, 2020. The compliance check records note: "Virtual compliance inspection over email with adopter. Sent 5 pictures. Animal is in excellent condition. BCS 5."

4. Two BLM burros were titled to Randy L. Davis

    a.    12799612: The burro was titled on July 15, 2020.  The burro was adopted on July 9, 2019 and inspected on July 7, 2020 by a BLM employee.
    b.   14145212: The burro was titled in 2020, the exact month not shown. The burro was adopted on July 9, 2019 and inspected on July 7, 2020 by a BLM employee.

5. One BLM burro titled to an unknown individual

BLM_003884

      a.  1614427: TItle date is unknown. The burro was adopted on May 14. 2019 and was inspected on April 23, 2020 by a private vet in PAOLI OK

6.   Two BLM horses were titled to Frank R. Myers
   a. 17629141: The horse titled on August 24, 2020 and rescued from Strouds Ok Kill Pen on January 19, 2021. The horse was adopted on August 3, 2019 and was inspected by a BLM employee on December 3, 2020 in Binger OK.

   b. 17629194: The horse titled on August 24, 2020 and rescued from Strouds Ok Kill Pen on January 19, 2021. The horse was adopted on August 3, 2019 and was inspected by a BLM employee on December 3, 2020 in Binger OK.

7.   Four BLM burros were titled to Marian Marley
   a. 12145104:  The burro was adopted on June 17, 2019 and was titled on July 6, 2020.
   b. 12733168:  The burro was adopted on June 17, 2019 and was titled on July 6, 2020.
   c. 12733267:  The burro was adopted on June 17, 2019 and was titled on July 6, 2020.
   d. 13730738:  The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

8.   Four BLM burros were titled to Alicia Marley:
   a. 08730145: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.
   b. 05185047: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.
   c. 1573134: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.
   d. 16733128: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

9.   Four BLM burros were titled to Wendy Marley
   a. 06733219: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.
   b. 16144361: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

6

    c.  08184411: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    d.  08184627: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

10.  Four BLM burros were titled to Heath Marley

    a.  09185075: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    b.  07184428: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    c.  09185149: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    d.  09185471: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

11.  Four BLM burros were titled to Bobbie Jo Marley

    a.  09730256: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    b.  09733167: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    c.  09733274: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    d.  09799424: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

12. Four BLM burros were titled to Shelly Harrop

    a.  12732966: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

    b.  13732954: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

    c.  13733035: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

    d.  14732930: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

13. Four BLM burros were titled to Robert Harrop

    a.  10184782: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

BLM_003886

b. 10185133: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

c. 10186524: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

d. 10730222: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

14. Four BLM burros were titled to Leeann Harrop

a. 10733218: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

b. 10733241: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

c. 11185978: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

d. 11733247: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

15. Four BLM burros were titled to Rodney Harrop:

a. 14732936: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

b. 15732976: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

c. 16144366: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

d. 06730247: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

16. Four BLM burros were titled to Cody D Weeks

a. 12145204: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

b. 12186532: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

c. 12733224: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

d. 12733236: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

17. Four BLM burros were titled to Coti B Weeks

a. 05733136: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

8

    b.  08733135: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

    c.  09733253: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

    d.  107300546: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

18. Four BLM burros were titled to Dawn Erickson

    a.  12143838: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    b.  09143773: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    c.  05185617: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    d.  12733063: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

19. Four BLM burros were titled to Floyd Fife

    a.  13733208: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    b.  14733187: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    c.  14773195: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    d.  15730794: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

20. [Images of the "Marley Burros"](#)

9

**From:**    Strauss, Toni L
**To:**    St George, Brian C
**Subject:**    AIP Letter from Congress to Sec Haaland
**Date:**    Thursday, June 3, 2021 12:23:15 PM
**Attachments:**    2021-06-02 Wild Horse and Burro AIP Letter.pdf

Brian,

This is the letter that Paul mentioned 260 received in DTS today.  It is from Congress to Sec. Haaland requesting suspension of AIP and encouraging a ban on equine slaughter, including export of horses for slaughter.

Interesting that you mentioned someone suggested we let horses starve to death on the range (someone from Congress?) and yet others want to ban the option for slaughter.  Anyway, thought I'd share the letter as an early alert.  It's in the 260 DTS inbox.

Toni
HQ-200 Resource Advisor
USDI Bureau of Land Management

# Congress of the United States
## Washington, DC 20515

June 2, 2021

The Honorable Deb Haaland
Secretary
U.S. Department of the Interior
1849 C Street, NW
Washington, D.C. 20240

Dear Secretary Haaland:

We write in collective concern over a report ("Wild Horses Go to 'Good Homes,' Then Slaughter" in the May 15 *New York Times*) that found that federally protected wild horses and burros were sent to slaughter after passing through the Bureau of Land Management's (BLM) Adoption Incentive Program. Until a full and transparent investigation has been conducted into the fate of the horses and burros that have passed through this program, we urge its immediate suspension.

The BLM created the Adoption Incentive Program with the goal of transferring untamed horses and burros from BLM management into private care. The BLM has promoted the program as a success, as adoptions ballooned considerably the year after its creation. Under this scheme, individuals adopting a horse received $1000 total for each animal adopted - $500 up front and $500 at the time of titling. According to the agency, this results in an overall cost savings as adopted animals may otherwise live out their days in taxpayer funded holding facilities.

Though certain safeguards exist – adopters receive the incentive funds incrementally, sign contracts stating they will not sell the animal for slaughter, and only receive funds for up to four horses per year – some adopted horses and burros still end up in slaughterhouses.

Wild horses and burros are icons of the American West. They are protected under federal law and cherished by Americans across this country. Congress has prevented their lethal management, including sale to slaughter, for decades. But once transferred into private ownership, either through sales or adoptions, wild horses and burros are largely subject to the same risks and lack of protections as the domestic equine population.

The best way to ensure that wild horses and burros will not be sent to slaughter is to ban horse slaughter entirely, including domestic horse slaughter and the export of horses for slaughter

abroad. We continue to work with our colleagues in Congress to pass the Save America's Forgotten Equines (SAFE) Act to protect all horses – domestic and wild – from this cruel fate.

Until this critical bill becomes law, we urge that the Department of Interior (DOI) take quick action to immediately suspend the Adoption Incentive Program to conduct a full and transparent investigation into the prevalence of federally protected wild horses and burros being sent to slaughter once placed into private ownership. In addition to suspending the program until an investigation is conducted, we urge DOI to strengthen existing protections against slaughter and clarify the Department's authority to enforce violations through penalties and other measures.  We look forward to your continued leadership on protecting the nation's equines and a prompt response to the allegations put forth in the article.


Sincerely,


Earl Blumenauer
Member of Congress

Mike Quigley
Member of Congress

Steve Cohen
Member of Congress

Dina Titus
Member of Congress

/s/
Jan Schakowsky
Member of Congress


/s/
Alma S. Adams, Ph.D.
Member of Congress

/s/
Julia Brownley
Member of Congress

/s/
Salud Carbajal
Member of Congress


/s/
Peter A. DeFazio
Member of Congress

/s/
Brian Fitzpatrick
Member of Congress

/s/
Jesús G. "Chuy" García
Member of Congress


/s/
Raúl M. Grijalva
Member of Congress

/s/
Marcy Kaptur
Member of Congress

/s/
Barbara Lee
Member of Congress


/s/
Andy Levin
Member of Congress

/s/
Alan Lowenthal
Member of Congress

/s/
Nancy Mace
Member of Congress


/s/
Lucy McBath

/s/
Jerrold Nadler

/s/
Grace F. Napolitano

| | | |
|---|---|---|
| Member of Congress | Member of Congress | Member of Congress |
| /s/ | /s/ | /s/ |
| Joe Neguse | Eleanor Holmes Norton | Mark Pocan |
| Member of Congress | Member of Congress | Member of Congress |
| /s/ | /s/ | /s/ |
| Ayanna Pressley | Lucille Roybal-Allard | Albio Sires |
| Member of Congress | Member of Congress | Member of Congress |
| /s/ | /s/ | /s/ |
| Adam Smith | Thomas R. Suozzi | Rashida Tlaib |
| Member of Congress | Member of Congress | Member of Congress |
| /s/ | /s/ | |
| Nydia M. Velázquez | Nikema Williams | |
| Member of Congress | Member of Congress | |

BLM_003892

**Nguyen, Brianna E**

| | |
|---|---|
| **From:** | Wolfe, Shane B |
| **Sent:** | Monday, June 7, 2021 2:27 PM |
| **To:** | Nguyen, Brianna E |
| **Cc:** | Heard, Preston S |
| **Subject:** | FW: [EXTERNAL] Petition for Withdrawal of Adoption Incentive Program |

| | |
|---|---|
| **Categories:** | For entry |

Incoming for entry.

-----Original Message-----
From: Martinez-Niles, Raquel <raquel_martinez-niles@ios.doi.gov> On Behalf Of OS, DOIExecSec
Sent: Monday, June 7, 2021 2:25 PM
To: Wolfe, Shane B <shane_wolfe@ios.doi.gov>
Subject: FW: [EXTERNAL] Petition for Withdrawal of Adoption Incentive Program


-----Original Message-----
From: Nick Lawton <nick@eubankslegal.com>
Sent: Thursday, June 3, 2021 1:20 PM
To: OS, DOIExecSec <DOIExecSec@ios.doi.gov>; Culver, Nada L <nculver@blm.gov>; Bill Eubanks
<bill@eubankslegal.com>
Subject: [EXTERNAL] Petition for Withdrawal of Adoption Incentive Program


 This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or
responding.




Dear Secretary Haaland and Deputy Director Culver,

On behalf of our client the American Wild Horse Campaign ("AWHC"), please find attached a formal petition, pursuant to
5 U.S.C. § 553(e), asking the Department of Interior and the Bureau of Land Management to terminate the Adoption
Incentive Program ("AIP") for wild horses. As the attached petition discusses, the creation and implementation of the
AIP violated federal law in various important ways. Moreover, as documented in an extensive report from AWHC that is
attached to the petition, the AIP has led to extremely bad outcomes for wild horses in contravention of congressional
intent to protect these animals.

Thank you for your attention to this important matter. We look forward to hearing a response from the agencies.

Sincerely,

Nick Lawton

1

BLM_003893

Senior Associate
Eubanks & Associates PLLC

1331 H Street NW
Suite 902
Washington, DC 20005
(202) 556-1243

BLM_003894

Eubanks & Associates, PLLC
LAW FOR THE PUBLIC INTEREST

1331 H STREET NW
SUITE 902
WASHINGTON, DC 20005
(202) 556-1243

June 3, 2021

**VIA E-MAIL**

Deb Haaland, Secretary
United States Department of Interior
1849 C Street N.W.
Washington, D.C. 20240
doiexecsec@ios.doi.gov

Nada Culver, Deputy Director
United States Bureau of Land Management
760 Horizon Drive
Grand Junction, CO 81506
Nculver@blm.gov

  **Re:**  **The Bureau of Land Management's Unlawful Adoption Incentive Program**

Dear Secretary Haaland and Deputy Director Culver:

  On behalf of our client the American Wild Horse Campaign ("AWHC"), we are writing to inform the United States Department of Interior ("DOI") and the United States Bureau of Land Management ("BLM") of significant violations of federal law associated with BLM's creation and implementation of its wild horse and burro Adoption Incentive Program ("AIP"). This letter also serves as a formal petition, pursuant to 5 U.S.C. § 553(e), to either withdraw the AIP in its entirety or, if the agency insists on retaining the AIP in some form, to impose a moratorium on any further payments under the AIP while the agencies engage in formal notice-and-comment rulemaking to provide interested parties with an opportunity for input and design a program that comports with federal law. **Pursuant to 5 U.S.C. § 555(e), AWHC respectfully requests a timely response to this petition; given the urgency involved, we request an response no later than <u>June 30, 2021</u>.**

  As described in AWHC's attached report, the AIP has led to, and if allowed to persist will continue to lead to, extremely bad outcomes for federally protected wild horses that are fundamentally inconsistent with Congress's goals in enacting the Wild Free-Roaming Horses and Burros Act ("WHA"), 16 U.S.C. §§ 1331–1340. Indeed, despite the fact that Congress has repeatedly and specifically forbidden DOI and BLM from expending federal funds for the slaughter of healthy wild horses, the AIP has exactly that effect. Specifically, the AIP provides nominal adopters of wild horses with payments—federal expenditures coming directly from BLM's budget—of up to $1,000 per wild horse; once these nominal adopters receive title to the animal, they are then free to sell it for slaughter. In this manner, the AIP effectuates an ongoing end-run around Congress's prohibition on expending federal funds to slaughter wild horses. The practical outcomes for wild horses are profoundly inhumane and contrary to Congress's goals of

protecting these animals. Additionally, as detailed below, the creation of the AIP violated federal law in several critical ways. Accordingly, we respectfully request, and formally petition, DOI and BLM to end this unlawful program, or at minimum to immediately suspend the AIP until and unless DOI and BLM conduct and complete a lawful decision-making process to authorize the AIP.

## BACKGROUND

## I.      The Wild Free-Roaming Horses and Burros Act

Finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West," and that "they contribute to the diversity of life forms within the Nation and enrich the lives of the American people," Congress enacted the WHA in 1971 to ensure that "wild free-roaming horses and burros shall be protected from capture, branding, harassment, [and] death," and that they are "considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331.

The WHA mandates that the Secretary of the Interior "shall manage wild free-roaming horses and burros as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." *Id.* § 1333(a). To that end, the WHA further directs the Secretary to "maintain a current inventory" of wild horses and burros and to use that inventory to "determine appropriate management levels" in various areas of public lands, and "make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals." *Id.* § 1333(b)(1). The statute defines "excess animals" as those "which have been removed" from public lands or "which must be removed" to preserve and maintain a thriving natural ecological balance. *Id.* § 1332. The WHA further provides discretion for BLM to determine "whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options . . . ." *Id.* § 1333(b)(1).

Where BLM determines both that "an overpopulation exists and that action is necessary to remove excess animals" the WHA provides that the agency "shall immediately remove excess animals from the range so as to achieve appropriate management levels." *Id.* § 1333(b)(2). As the Tenth Circuit Court of Appeals has explained, the plain text of the WHA "quite clearly affords BLM with discretion to decide whether or not to remove excess animals." *Wyoming v. U.S. Dep't of Interior*, 839 F.3d 938, 944 (10th Cir. 2016).

If BLM decides to remove wild horses, the WHA authorizes the BLM to allow the public to adopt wild horses "for private maintenance and care," provided that the agency "determines an adoption demand exists by qualified individuals" and that certain other conditions are met. 16 U.S.C. § 1333(b)(2)(B). In particular, the agency must determine that any adopter "can assure humane treatment and care (including proper transportation, feeding, and handling)." *Id.* Likewise, the statute restricts any individual from adopting more than four animals in a year "unless the Secretary determines in writing that such individual is capable of humanely caring for more than four animals, including the transportation of such animals by the adopting party."

BLM_003896

*Id.* In this manner, Congress sought to accommodate the public's interest in adopting wild horses while also ensuring that any horses so adopted would be cared for humanely.

Although the WHA contemplates that unadoptable wild horses may be "destroyed in the most humane and cost efficient manner possible," *id.* § 1333(b)(2)(C), Congress has routinely and specifically forbidden DOI and BLM from using federal funds for the slaughter of healthy, unadopted wild horses. *See*, *e.g.*, *In Defense of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1059 n.3 (9th Cir. 2014) (noting that "Congress has never appropriated funds for extermination, as opposed to ongoing maintenance, of excess horses even if not adopted") (citing Pub.L. 111-88, 123 Stat. 2904, 2907 (2009)). Most recently, the Consolidated Appropriations Act, 2021, specifically provided that federal funds "shall not be available for . . . the destruction of any healthy, unadopted, and wild horse or burro" or "the sale of a wild horse or burro that results in the destruction of the wild horse or burro for processing into a commercial product." Pub. L. 116-260 § 419(e).

## II.     The National Environmental Policy Act

Congress enacted the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, to ensure that federal agencies fully consider the environmental impacts of their actions before taking them, consider alternatives to proposed actions that may have less adverse environmental impacts, and make information publicly available with sufficient detail to promote fully informed public participation in agency decision-making.

To meet these objectives, all agencies must prepare an Environmental Impact Statement ("EIS") for any major federal action that may "significantly affect[]" the environment. 42 U.S.C. § 4332(C). The Council on Environmental Quality ("CEQ")—an agency within the Executive Office of the President—has promulgated regulations implementing NEPA that are "binding on all Federal agencies." 40 C.F.R. § 1500.3. These regulations provide that in determining whether an EIS is required with respect to a particular proposed action, an agency must prepare an Environmental Assessment ("EA") that analyzes the environmental impacts of the proposed action as well as alternatives. *Id.* §§ 1501.4(c), 1509.9.[1]

In determining whether an EIS is required, the agency must consider whether the proposed action may have a "significant" effect on the human environment. 40 C.F.R. § 1508.27. The "significance" determination is based on factors such as the degree to which the effects on the environment "are likely to be highly controversial" or "are highly uncertain"; the degree to which the action "may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration," or "may cause loss or destruction of significant scientific, cultural, or historical resources"; and whether the action "threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." *Id.*

---

[1] CEQ amended its regulations in 2020. *See* 85 Fed. Reg. 43,304 (July 16, 2020). However, because BLM created the AIP before that date, the new regulations do not apply here.

BLM_003897

A significant effect, requiring an EIS, may exist "even if the Federal agency believes that on balance the effect will be beneficial." 40 C.F.R. § 1508.27(b)(1). The existence of any one of the CEQ significance criteria usually requires the preparation of an EIS.

If an agency decides that an EIS is not required, it issues a Finding of No Significant Impact ("FONSI"), which must present the reasons why the agency has determined its proposed action "will not have a significant impact" on the environment." 40 C.F.R. § 1508.13.

NEPA requires agencies to consider a range of reasonable alternatives to its proposed action. *See* 40 C.F.R. § 1502.14. An agency may not artificially constrain its analysis of reasonable alternatives by framing its purpose and need statement for a proposed action in an excessively narrow manner.

## III.   <u>The Administrative Procedure Act</u>

The Administrative Procedure Act ("APA") mandates that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . in excess of statutory jurisdiction, authority or limitations," or adopted "without observance of procedure required by law." 5 U.S.C. § 706(2). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The APA also provides the "basic procedural requirement" that "an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2125 (2016). "Agencies are free to change their existing policies so long as they provide a reasoned explanation for the change." *Id.* In doing so, "the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy." *Id.* at 2126. Likewise, agencies "must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* In such circumstances, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* For these reasons, "an unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Id.*

The APA also mandates that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e). If an agency denies such a petition, "[p]rompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding"; "the notice shall be accompanied by a brief statement of the grounds for denial." *Id.* § 555(e). Courts will "set aside an agency's decision to deny a petition for rulemaking only if it is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 5 (D.C. Cir. 2011). "In other

words, [courts] look to see whether the agency employed reasoned decisionmaking in rejecting the petition." *Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 919 (D.C. Cir. 2008).

## IV.    The Adoption Incentive Program

Under the Trump Administration, BLM implemented the AIP in January 2019 through Instruction Memorandum No. 2019-025 ("IM 2019-025").[2] The AIP aims "to increase the number of adoptions of untrained wild horses and burros placed into private care through offering financial incentives." IM 2019-025 at 1. "The AIP offers a financial incentive in the amount of $500 within 60 days from the adoption date [of a wild horse or burro] and an additional $500 within 60 days from the title date . . . ." *Id.* In adopting the AIP, BLM stated that "[i]ncreasing the placement of animals into private care is a critical priority of the [wild horse and burro] program and of utmost interest to the BLM due to the costs associated with caring for unadopted animals in BLM managed or contracted corrals and pastures." *Id.* BLM noted that because the number of wild horses and burros the agency removes from public lands significantly exceeds the rate at which the public adopts wild horses and burros, "the feed and care of the animals removed from the range continue to consume over 50 percent of the WHB program's budget." *Id.* at 3. BLM further explained that "this policy will reduce off-range holding costs and allow those savings to support critical on-range operations," and that "[i]ncreasing adoptions reduces holding costs, creating a cost savings that allows funding to be dedicated to other aspects of managing wild horses and burros." *Id.*

Although the AIP nominally allows "each adopter participating in AIP to adopt and maintain a maximum of four untitled animals annually," the program actually allows individuals to adopt more than four horses in a year so long as they have "up to a maximum of four untitled animals at any one time." *Id.* at 2. As an adopted gains title to an animal, that adopter becomes eligible to adopt another animal through the AIP.

Although the AIP requires adopters to sign an "Adoption Incentive Agreement," *id.* at 1, which requires adopters to "certify that [they] will provide humane care for any animals [they] adopt and will not sell or transfer ownership of them to any person or organization that intends to resell, trade, or give away any such animals for slaughter or processing into commercial products," Form 4710-25, AWHC's attached report documents how BLM has in fact failed to adequately ensure the humane treatment of adopted animals or prevent their sale for slaughter. Moreover, the AIP's plain language contains troubling indications that BLM views any ongoing oversight of adopted horses to be discretionary rather than mandatory. For example, it states that "BLM employees or other BLM approved individuals *should* conduct compliance inspections on adopted animals," and that "BLM *should* remove eligibility to participate in the AIP from any adopter that relinquishes two or more animals within a 12 month period or does not adhere to the terms and conditions of the Adoption Incentive Agreement." *Id.* at 2 (emphases added). Likewise, the AIP's instruction memorandum states that "BLM employees *should* issue an Adoption Incentive Ineligibility Letter . . . to adopters who are no longer eligible to participate in the AIP." *Id.* (emphasis added). By using the discretionary word "should" instead of any mandatory word such as "shall" or "must," BLM fails to provide the public with any guarantee

---

[2] IM 2019-025 is available at https://www.blm.gov/policy/im-2019-025

BLM_003899

that the agency will in fact ensure humane outcomes for wild horses. Likewise, the AIP fails to provide any meaningful guidelines for how the agency may attempt to verify the humane treatment of adopted horses; for example, there is no mandatory timeline for "compliance inspections" and no description of how the agency will determine whether an adopter passes or fails a compliance inspection.

The AIP has roughly doubled the rate at which BLM adopts wild horses. In a press release dated May 14, 2020, the BLM stated that there had been "an increase of 91%" in the number of adoptions "[i]n the first 12 months of the AIP." BLM further noted that in the AIP's first year (2019 to 2020), the agency saw "substantial increases" in the number of first-time adopters, repeat adopters, and "multiple-animal adoptions."[3]

However, as extensively documented in the attached report by AWHC, the AIP has in fact led to profoundly inhumane outcomes that are inconsistent with Congress's objectives in enacting the WHA and its repeated prohibition on using any federal funds directly or indirectly for the slaughter of wild horses and burros. As AWHC's report describes, AWHC and cooperating animal rescue organizations have discovered at least 180 BLM-branded wild horses and burros at livestock auctions that are known to, and in some instances principally aim to, sell horses for slaughter. As the report notes, the horses documented in that report constitute only a subset of all the horses that meet this fate, because AWHC and its partner organizations continue to find wild horses and burros at these auctions. The report further explains that "[m]any of these horses were young, unhandled animals, some with their BLM tags still around their necks more than a year after their adoption from BLM holding corrals, suggesting that adopters simply held the animals for a year without care in order to collect the $1,000 incentive" and then sold the horses at auctions where slaughter is the most common outcome.

Troublingly, BLM has expressed the view, as documented in AWHC's report, that so long as an adopter takes title to a wild horse before selling it for slaughter, no violation of the WHA or the adoption agreement has occurred, and the adopter *would still be eligible to receive AIP funds and continue to adopt wild horses*. AWHC's report also cites a New York Times article that documents BLM telling adopters that once the horses are titled, "there is no limitation — you can do whatever you want with them."[4] Accordingly, BLM has made clear that its priority is simply having members of the public take title to wild horses, without regard to any practical consequences for the wild horses once they are titled. By taking this position, BLM has created a system in which federal expenditures in the form of AIP payments lead to the slaughter of federally protected wild horses—which Congress has specifically forbidden the agency from doing.

Nor is the sale of wild horses for slaughter the only type of inhumane outcome documented in AWHC's report. To the contrary, AWHC's report documented numerous

---

[3] *See* BLM, *Cash Incentives Help Agency Adopt More Wild Horses and Burros*, https://www.blm.gov/press-release/cash-incentives-help-agency-adopt-more-wild-horses-and-burros

[4] *See* https://www.nytimes.com/2021/05/15/us/wild-horses-adoptions-slaughter.html

BLM_003900

instances in which BLM's compliance inspections revealed that—far from providing good homes and humane care—adopters were neglecting or abusing the wild horses they had adopted. For example, AWHC's report documents instances in which BLM's inspector "put [a horse] out of her misery" due to "a severe neck injury," as well as instances in which horses were neglected or housed in unsafe or otherwise inadequate facilities.

## DISCUSSION

## I.   BLM Violated Federal Law When Creating the AIP

As discussed below, BLM's creation of the AIP violated federal law in several critical ways, any one of which would be a sufficient basis for a reviewing court to find the program unlawful and set it aside.

### A.   The AIP is final agency action subject to judicial review

As an initial matter, it is beyond any reasonable dispute that IM 2019-025 constitutes "final agency action" within the meaning of the APA and is thus subject to judicial review. The APA authorizes judicial review of "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. Agency action is "final" where: (1) the action "mark[s] the consummation of the agency's decision-making process," and is not "merely tentative or interlocutory [in] nature"; and (2) "the action [is] one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

The AIP "marks the consummation of [BLM's] decision-making process" with regard to the creation of this new program and is not "merely tentative or interlocutory." *Id.* One clear signal of the finality of an agency action is the fact that "immediate compliance with its terms is expected." *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094–95 (9th Cir. 2014). Here, BLM clearly stated that the IM creating the AIP "is effective immediately." IM 2019-025 at 3. The fact that the IM was "effective immediately . . . lets the air out of any argument that [an IM] operates only as provisional guidance," and is instead a powerful indication that the agency action was indeed final. *W. Watersheds Proj. v. Zinke*, 441 F. Supp. 3d 1042, 1062 (D. Idaho 2020). Likewise, IM 2019-025 uses no language that suggests an ongoing deliberative process with regard to the creation of the AIP. Moreover, confirming that the AIP constituted the consummation of BLM's decision-making process, BLM has in fact followed the terms of IM 2019-025 in issuing numerous payments to adopters of wild horses. *See*, *e.g.*, BLM, *Cash Incentives Help Agency Adopt More Wild Horses and Burros*, https://www.blm.gov/press-release/cash-incentives-help-agency-adopt-more-wild-horses-and-burros (noting that BLM had in fact issued numerous payments under the AIP).

Likewise, IM 2019-025 determined "rights or obligations," and "legal consequences" flowed from the IM. IM 2019-025 created a new right for members of the public to obtain up to $1,000 of federal funds in association with the adoption of a wild horse or burro, and conversely imposed an obligation on BLM to confer payment of up to $1,000 in federal funds. By providing a new right for individuals to obtain federal funding associated with the adoption of a wild horse

or burro, IM 2019-025 determined "rights," and by obligating BLM to issue payments of federal funding to adopters of wild horses, the IM created both "obligations" for the agency and determined "legal consequences." Accordingly, there can be no legitimate dispute that IM 2019-025 constitutes final agency action subject to judicial review. *See W. Watersheds Proj.*, 441 F. Supp. 3d at 1060–66 (concluding that another IM issued by BLM constituted final agency action).

### B.   BLM failed to undertake required notice-and-comment procedures when creating the AIP

"As a general matter, the APA requires an agency to use notice-and-comment procedures to make any "rule." *Id.* at 1067. The APA broadly defines a "rule" to mean "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). The definition of a "rule" specifically includes any "approval or prescription for the future of . . . rates . . . financial structures . . . prices . . . services . . . or . . . valuations, costs, or accounting, or practices bearing on" any agency practice. *Id.* "[T]he hallmark of a substantive agency rule is that it carries the force and effect of law via the creation of new rights or duties." *W. Watersheds Proj.*, 441 F. Supp. 3d at 1067.

IM 2019-025 falls squarely within the definition of a "rule" under the APA. As described above, the IM establishes a set of procedures under which BLM must issue payments of federal funds to adopters of wild horses or burros who meet certain criteria. In doing so, the IM both establishes a new right for adopters of wild horses—namely the right to receive up to $1,000 in federal funds per animal adopted—and establishes new obligations for BLM, including the obligation to issue payments to adopters, as well as certain (albeit minimal) obligations associated with oversight of the program. In doing so, the IM "prescribe[s] law or policy" within the definition of a "rule" under the APA.

Nonetheless, when BLM established IM 2019-025, it entirely failed to undertake any notice-and-comment procedures, in clear violation of the requirements of the APA. *See* 5 U.S.C. § 553(b)–(c). The agency's failure to provide any notice or opportunity for comment was not only a flagrant violation of the APA in its own right, but also led the agency to ignore critical input that wild horse advocates such as AWHC would have provided. For example, had the agency followed proper procedures and allowed for public comment, wild horse advocates would have had the opportunity to explain how the AIP is vulnerable to exactly the kind of manipulation that AWHC has now documented in its attached report—namely, the abuse of the system by individuals who have no sincere interest in providing a good home to an adopted animal but are instead interested principally in the receipt of $1,000 per wild horse plus the amount they can obtain by subsequently selling the animal—regardless of the fate it will eventually meet once sold. Likewise, wild horse advocates could have explained that common-sense safeguards could have at least mitigated the disastrous consequences that the AIP has wrought for wild horses, including for example terms restricting the payment of federal funds to any adopter that has previously sold an adopted animal in circumstances that will likely lead to the animal being slaughtered. However, because BLM unlawfully ignored its obligation to

BLM_003902

provide the public with any notice or opportunity for comment, the public was deprived of any chance to provide valuable input on this new program.

### C.        BLM failed to consider highly relevant factors when creating the AIP

In part due to BLM's unlawful promulgation of IM 2019-025 without any notice or opportunity for public comment, BLM failed to consider numerous relevant factors when creating the AIP. For example, IM 2019-025 reflects no consideration of the obvious ways in which the system of federal payments that it established is easily prone to abuse—as AWHC has now documented has in fact occurred. Likewise, BLM failed to consider that a system that provides cash payment for those that adopt a wild horse would predictably attract—and has in fact attracted—individuals who are interested principally in a cash payment rather than the welfare of the animal being adopted. Notably, as AWHC's report documents, BLM's own officials raised such concerns after the AIP had been adopted, specifically warning that the program could attract "people only seeing the initial cash payment and not thinking about the lifetime costs associated with owning a horse" or lead to "the adoption of animals to people who have no business owning a horse." However, despite the clear ways in which the AIP's design was prone to abuse, to our knowledge, BLM's sole contemplation of such issues occurred *after* the agency issued IM 2019-025—thus confirming that BLM failed to consider highly relevant issues before taking this action as the APA requires.

Critically, the agency failed to consider how the structure of the AIP creates a *de facto* pipeline that allows wild horses and burros to be sold for slaughter or conversion into commercial products in violation of Congress's explicit and repeated bans on this practice. Although the AIP requires adopters to sign a statement that they "will not sell or transfer ownership" of adopted animals "to any person or organization that intends to resell, trade, or give away such animals for slaughter or processing into commercial products," Form 4710-25, AWHC's report documents how that statement has not served as a practical deterrent to wild horses in fact being sold for slaughter. Moreover, AWHC's report also documents how—as a matter of the AIP's design—the program is highly vulnerable to this practice. Because BLM has taken the position that even where an adopter has in fact sold a wild horse at auctions where the most common outcome is slaughter, no violation of the AIP has occurred so long as the adopter took title to the animal before sale, BLM's own design of the AIP reveals that it is highly vulnerable to abuse by those who merely hold an animal for the required period to obtain title, gain their $1,000 payment, and then turn around to sell the animal for slaughter. Moreover, BLM's position as documented in AWHC's report is that even if BLM knows that an adopter has in fact sold adopted animals for slaughter, that individual remains eligible for future adoptions and future payments of federal funds. Accordingly, the AIP's design serves as a mechanism for BLM to expend federal funds in a way that results in wild horses being sold for slaughter— exactly the practice that Congress has routinely forbidden. BLM's failure to consider or guard against this abuse of federally protected wild horses in any rigorous manner renders BLM's adoption of the AIP arbitrary and capricious.

BLM_003903

### D.      The AIP reflects an unexplained reversal of position

Although IM 2019-025 misleadingly states that "[n]othing in this IM is intended to effect a substantive regulatory change," IM 2019-025 at 1, in fact the IM does exactly that. Prior to the IM's issuance, nothing in BLM's regulations entitled any adopter of a wild horse or burro to the receipt of any federal funds; however, in a "substantive regulatory change," IM 2019-025 for the first time established a program that allows adopters of wild horses to receive up to $1,000 per animal adopted. IM 2019-025 thus created a significant new federal payment that was never before contemplated in BLM's regulations, and which served as a financial incentive to bring new adopters to the agency focused principally (if not exclusively) on obtaining federal funds and then offloading horses to the highest bidder.

Moreover, at the same time that it created a significant new federal benefit, IM 2019-025 also created a far laxer system for oversight of adoptions than the BLM previously applied to the sales of wild horses or burros. Since 2014, the sale of wild horses and burros has been governed by BLM IM 2014-132; under that prior IM, before selling a wild horse or burro BLM was obligated to "look up the purchasers name," "determine if there are any documented notes" about the purchaser in BLM's possession, and "[w]hen there is evidence that may indicate a purchaser does not intend to provide a good home . . . deny the sale and document the reasons for their decision." IM 2014-132, att. 1 at 4. In sharp contrast, IM 2019-025 includes no such requirements. Indeed, as documented in AWHC's report, under IM 2019-025, BLM has taken the position that even where the has actual proof that an adopter under the AIP has failed to provide humane care of an adopted animal or has sold the animal for slaughter, so long as such violations occurred after the adopter took title to the animal BLM believes no violation has occurred and that the adopter will continue to be eligible to adopt horses through the AIP.

BLM's creation of a less stringent program for the payment of adoption incentives than it previously created for the sale of wild horses constitutes an unexplained change in the agency's policy. To pass muster under the APA, an agency that changes its policy "must at least display awareness that it is changing position." *Encino Motorcars*, 136 S.Ct. at 2126. However, IM 2019-025 does not even to acknowledge that BLM previously imposed a more stringent set of requirements on those who purchase wild horses than the agency now provides for those whom it pays to adopt wild horses. By failing to even "display awareness" that it was changing its policy regarding the circumstances under which it would allow individuals to take possession of wild horses, the agency violated the APA in a fundamental way.

Likewise, BLM also ran afoul of the APA's requirement that an agency changing policy must "show that there are good reasons for the new policy." *Id.* at 2126. Although BLM stressed that increasing adoptions could reduce "costs associated with caring for unadopted animals in BLM managed or contracted corrals and pastures," IM 2019-025 at 1, the agency provided no reason why such cost-savings could not, or should not, be balanced against the need to ensure that adopters actually provide good homes for wild horses rather than merely taking federal payments and then promptly selling the horses for slaughter. Particularly in light of Congress's repeated prohibitions on the use of federal funds for slaughter of healthy wild horses, BLM provided no good reason for the relaxation of its standards for who could be trusted to take

BLM_003904

possession of a wild horse. In this manner as well, BLM's promulgation of IM 2019-025 was arbitrary and capricious.

### E.        The AIP required NEPA analysis

As described above, NEPA requires the preparation of an EIS for any major federal action with significant environmental effects and, where an agency is uncertain whether an action will have significant effects, requires the preparation of an EA. With particular relevance to BLM's creation of the Adoption Incentive *Program*, NEPA's implementing regulations define "Federal actions" broadly to include the "adoption of *programs*, such as a group of actions to implement a specific policy or plan." 40 C.F.R. § 1508.18(b)(3) (emphasis added).

The need for NEPA analysis of the AIP is clear. To begin with, the AIP itself clearly has environmental impacts because it has effects on wild horses themselves. Indeed, as AWHC's report documents, the impacts to wild horses have proven to be extremely severe. Moreover, BLM explicitly intended the AIP to free up federal funding for activities with environmental impacts. As BLM noted, the AIP's "[c]ost savings may be utilized for other management operations," including "allow[ing] those savings to support critical on-range operations." IM 2019-025 at 1, 3. Because the AIP was intended to allow additional "on-range operations," NEPA obligated BLM to consider the environmental impacts of such operations—as well as alternatives to the AIP that could potentially address the concerns raised by BLM in adopting the AIP without subjecting wild horses and burros to slaughter.

Nevertheless, BLM adopted IM 2019-025 without any environmental analysis whatsoever. Indeed, BLM did not even make any effort to discuss NEPA or even assert that the AIP was somehow exempt from NEPA's requirements (which it is not). The result is that BLM adopted this new program in clear violation of the nation's bedrock environmental law.

## II.        BLM Must End the AIP

For the reasons described above, BLM's creation of the AIP violated federal law in numerous important ways. In such circumstances, a reviewing court "shall hold unlawful and set aside" the AIP, 5 U.S.C. § 706(2), resulting in the vacatur of the program in its entirety. However, in light of the now amply documented ways in which the AIP has resulted in disastrous outcomes for federally protected wild horses that are entirely inconsistent with the congressional intent behind the WHA and behind Congress's routine prohibitions on BLM expending federal funds for the slaughter of healthy wild horses, AWHC hopes that it will not be necessary to have a federal court terminate the AIP. Instead, AWHC hopes that now that it has been confronted with the awful outcomes of the AIP, as well as having been apprised of the numerous ways in which the AIP's creation violated federal law, BLM will itself immediately withdraw IM 2019-025 and end this disastrous program.

BLM_003905

### III.   BLM Must Immediately Investigate How the AIP Has Led to the Slaughter and/or Inhumane Treatment of Wild Horses

As AWHC's report has extensively documented, numerous wild horses and burros adopted through the AIP have encountered inhumane treatment while in the charge of their adopters, and/or have been quickly sold in auctions that cater to slaughter facilities shortly after their adopter taking title to the wild horses. However, to AWHC's knowledge, BLM has not conducted any comprehensive investigation of the outcomes from the AIP. Instead, BLM has touted the AIP's success while apparently turning a blind eye to the extremely dire consequences the AIP has caused for wild horses and burros. Consequently, AWHC has been forced to utilize Freedom of Information Act ("FOIA") requests to obtain information about BLM's administration of the AIP. Although BLM has not complied with FOIA's statutory mandate to promptly release information, the agency has provided some information that has extremely troubling implications for how the AIP is continuing to subject wild horses to inhumane outcomes. For example, AWHC has obtained records through FOIA that show that many individuals are adopting the 4-horse maximum at any given time. Moreover, these records also demonstrate that in many instances, several members of a single family simultaneously each adopt 4 horses at once, resulting in families that adopt 12, 16, or 20 horses at a time to the same location —all without any apparent effort by BLM to ensure that these individuals can care for so many horses and burros at once. AWHC believes that this pattern of behavior—adopting the maximum number of horses at once—constitutes a red flag that suggests that an adopter is more interested in a cash payment than in the welfare of the adopted animal, and that such adopters are highly likely to sell adopted animals as soon as they take title—without regard to whether the animals suffer slaughter as a consequence.

The time has come for BLM itself to meaningfully assess the outcomes from the AIP. To that end, AWHC respectfully requests, and formally petitions pursuant to 5 U.S.C. § 553(e), that BLM immediately undertake a thorough investigation of what fates have befallen wild horses and burros adopted through the AIP. In addition to verifying that adopters provide humane care of wild horses and burros prior to taking title, BLM must investigate what happens to the animals after the adopters take title. Those who have taken title to wild horses or burros through the AIP should prove that the animals have been treated humanely by showing the animals to agency inspectors and demonstrating what kind of care and treatment the adopted animals endure. If an adopter no longer has possession of an animal adopted through the AIP, BLM should make every effort to determine what has happened to that animal—and in particular should conduct a thorough investigation to determine whether these animals have been sold for slaughter or the conversion into commercial products. In that event, BLM should not allow an adopter that has sold an adopted animal in such a manner to adopt (or purchase) a wild horse in the future. Moreover, BLM should make the results of such an investigation open to the public.

Additionally, DOI and BLM should request that the U.S. Department of Justice and the Department of Interior's Office of Inspector General immediately commence investigations into the fates of wild horses adopted through the AIP, and to what extent the creation and implementation of the AIP has involved violations of federal law by the agencies or by adopters. Notably, the AIP is not the first time that DOI and BLM have allowed wild horses to be sent to slaughter, and ample precedent exists for inquiries by the Inspector General and/or the

BLM_003906

Department of Justice. For example, in 2015, DOI's Office of the Inspector General issued an *Investigative Report of Bureau of Land Management Wild Horse Buyer*, which found that "BLM did not follow current law while managing [wild horses and burros]" and instead sold 1,700 wild horses to a buyer that "wrongfully sent them to slaughter."[5] Although BLM's response to that report was ostensible to "strengthen[] its policies for adoption and sale" of wild horses and to a high-level official's approval for the sale or adoption of more than four wild horses to any individual, the AIP reflects a weakening of exactly this type of restriction, as described above. As another example, in 1997, the Los Angeles Times reported that a federal grand jury investigation showing that BLM "allowed the slaughter of hundreds of wild horses taken from federal lands, falsified records and tried to prevent investigators from uncovering the truth."[6]

These prior instances in which independent federal investigations revealed negligent oversight of the adoption or sale of wild horses, or outright wrongdoing by BLM itself, which led to the slaughter of wild horses in contravention of congressional intent—as is currently occurring under the AIP—reinforces the need for a truly independent investigation into BLM's creation and implementation of the AIP. If DOI and BLM wish to recover the public's trust that the agencies are faithfully protecting wild horses, it is important that the agencies request—and do not obstruct—a truly independent investigation of the AIP. If DOI and BLM do not immediately request that the Department of Justice and DOI's Office of Inspector General commence independent investigations of the AIP, AWHC will have no choice but to explore all options for ensuring that the public receives an accurate and unbiased account of the agencies' creation and implementation of this program, such as requesting that Congress direct that such an independent investigation be conducted and made public.

## IV.    Any Ongoing Implementation of the Adoption Incentive Program Will Require Notice-and-Comment Rulemaking

As described above, because the AIP clearly meets the APA's definition of a "rule," prior to the implementation of any similar action—and prior to any ongoing implementation of the AIP in its current form—BLM must undertake notice-and-comment rulemaking. Accordingly, this letter serves as a formal petition under the APA, 5 U.S.C. § 553(e), for BLM to (1) withdraw IM 2019-025 and permanently end the AIP; and (2) to the extent the agency wishes to provide incentives for the adoption of wild horses in the future, to provide the public with clear notice of what specific incentives the agency intends to provide and allow a meaningful opportunity for public comment.

## CONCLUSION

BLM's creation of the Adoption Incentive Program violated federal law in numerous ways and continues to have extremely negative outcomes for federally protected wild horses. To come into compliance with federal law, BLM must withdraw IM 2019-025 and end the AIP immediately.

---

[5] This report is available at
https://www.doioig.gov/sites/doioig.gov/files/WildHorseBuyer_Public.pdf
[6] *See* Martha Mendoza, Los Angeles Times, March 23, 1997,
https://www.latimes.com/archives/la-xpm-1997-03-23-mn-41176-story.html

BLM_003907

Although AWHC hopes that it will not be necessary to resort to litigation in order to bring BLM into compliance with its duty to protect wild horses, unless BLM immediately withdraws IM 2019-025 and terminates the AIP, AWHC will have no choice but to contemplate all options to bring the agency into compliance with federal law, including litigation.

**Please provide a response to this letter no later than <u>June 30, 2021</u>**. Thank you for your time and attention to this critically important matter.

Respectfully,

William N. Lawton
Senior Associate

William S. Eubanks II
Owner & Managing Attorney

14

# **Attachments**

BLM_003909



May 19, 2021

The Honorable Secretary Deb Haaland
U.S. Department of Interior
Email: doiexecsec@ios.doi.gov

CC: Laura Daniel Davis, Principal Deputy Assistant Secretary
U.S. Department of the Interior
Land and Minerals Management
Email: ldavis@blm.gov

Nada Culver, Acting Director
U.S. Bureau of Land Management
Email: nculver@blm.gov

 Dear Secretary Haaland:

    This letter and the enclosed report  are sent to you as a follow up to my letter of May 17
regarding the urgent need to suspend and investigate the Bureau of Land Management Adoption
Incentive Program.

        The report entitled The *BLM's Adoption Incentive Program: Pipeline to Slaughter for
Federally-Protected Wild Horses and Burros*, is respectfully submitted on behalf of the
American Wild Horse Campaign ("AWHC"), Skydog Sanctuary, Black Hills Wild Horse
Sanctuary, and Evanescent Mustang Rescue.

        The report adds detail and evidence to the *New York Times* report "Wild horses adopted
under a federal program are going to slaughter" May 15, 2021 about the Bureau of Land
Management ("BLM") Wild Horse and Burro Program's Adoption Incentive Program ("AIP").
The program pays individuals $1,000 to adopt a wild, untamed horse or burro, and the article
detailed numerous instances of adopters collecting the payments, then immediately sending the
horses to slaughter auctions.

        Our report provides additional evidence of this link to slaughter, as well as
documentation indicating an additional problem: the AIP is incentivizing adopters who lack

skills, resources or interest to properly care for and manage wild, unhandled horses or burros, resulting in severe neglect and abuse.

This report and the *New York Times* article provide compelling evidence that the AIP is defrauding the American public and sending federally protected wild horses and burros, resulting in abuse, neglect and  slaughter in contravention of a Congressional ban on the practice. As a result, we respectfully request that the AIP be suspended and an immediate inquiry into the issues raised in this report. Thank you for your consideration, and should you have any questions we can be available by conference call to discuss this matter.

Sincerely,

Suzanne Roy
Executive Director
American Wild Horse Campaign



*BLM's Adoption Incentive Program: Pipeline to Slaughter for Federally-Protected Wild Horses and Burros*

**A Request for Termination & Investigation**

**American Wild Horse Campaign**
**P.O. Box 1733**
**Davis, CA 95617**

&

**Skydog Sanctuary**

**Evanescent Mustang Rescue**

**The Institute of Range and the American Mustang's Black Hills Wild  Horse Sanctuary**

In the last six months, the American Wild Horse Campaign ("AWHC") and several rescue organizations have discovered more than 80 titled Bureau of Land Management ("BLM") wild horses and burros, and over 100 BLM-branded wild horses and burros for whom titles could not be obtained and whose status is unknown, unidentifiable animals, at eight different livestock auctions known to sell horses to kill buyers across five different states. These ungentled, BLM wild horses and burros arrived at those auctions within 1–4 months after their adopters received title, a timeframe that strongly suggested their adopters opted into the agency's Adoption Incentive Program ("AIP") as explained below. Below is a summary of the AIP, followed by a detailed description of each case identified by our coalition.

Additional BLM wild horses and burros are continually found at auctions like the ones listed below; as a result, the 79 individual BLM wild horses and one BLM wild burro herein described represent an initial subset of the total cases. Information regarding additional cases can be provided upon request.

1. **Organizations**

    A.    **American Wild Horse Campaign**

AWHC is a national nonprofit organization dedicated to preserving the American wild horse in viable, free–roaming herds for generations to come, as part of our national heritage. Our grassroots efforts are supported by a coalition of over 60 historic preservation, conservation, horse advocacy, and animal welfare organizations. AWHC is working with rescue organizations to investigate the BLM's AIP with the goal of bringing an end to government subsidized slaughter of our wild horses and burros.

    B.    **Skydog Sanctuary**

Skydog Sanctuary is a forever home for wild mustangs and burros who have ended up in horrible and dangerous situations—in kill pens, at auctions, and in unloving homes where they have often been starved and neglected. As a "boots on the ground" organization, Skydog Sanctuary closely monitors and documents mustangs landing in kill pens and auctions throughout the year, saving many of them and working with other organizations to coordinate rescues. Skydog Sanctuary also educates and raises awareness of these issues, and has worked hard on their "Pass the SAFE Act" initiative to eliminate kill pens once and for all.

Skydog Sanctuary has rescued many of the horses and the burro documented in this report, and provided their titles and other support for this investigation.

### C.   Evanescent Mustang Rescue and Sanctuary

Evanescent Mustang Rescue and Sanctuary was created for the prevention of animal cruelty through educating the public about horse care and safety as well as rescuing equines (specifically mustangs and burros) from slaughter.  Evanescent Mustang Rescue and Sanctuary has rescued many of the horses documented in this report, and provided their titles and other support for this investigation.

### D.   The Institute of Range and American Mustang/ Black Hills Wild Horse Sanctuary

The Institute of Range and American Mustang's (IRAM) Black Hills Wild Horse Sanctuary has been providing a forever home for America's Wild Horses for over 33 years. This 12,000 acres of privately owned non-profit sanctuary is a home to all wildlife and hundreds of wild mustangs. The IRAM/ Black Hills Wild Horse Sanctuary has rescued many of the horses documented in this report, and provided their titles and other support for this investigation.

2.  **Background on the BLM's Adoption Incentive Program**

On January 30, 2019, the BLM published Instruction Memorandum ("IM") IM 2019-025,

*Adoption Incentive Program for Wild Horses and Burros*. The policy summary stated that the

AIP was developed in order to increase the number of adoptions of untrained wild horses and

burros by offering financial incentives: two payments of $500. The first incentive payment is

made within 60 days from the adoption date and the second $500 payment is made within 60

days from the title date. (Under the Wild Free-Roaming Horses and Burros Act, title transfers

from the BLM to qualified adopters one year from the adoption date. 16 U.S.C. § 1333(c)).

Compliance inspections are a requirement of the AIP where BLM personnel, or other BLM

approved individuals, *should* conduct compliance inspections on adopted animals participating in

the AIP. These inspections are completed for title transfer and eligibility. BLM then tracks these

inspections in the agency's Wild Horse and Burro Program System, report titled "*Required*

*Inspections for Incentive Animals.*"

Adopters pay a minimum adoption fee of $25 per wild horse. Each adopter is allowed to

take a maximum of four wild horses or burros annually, but as each animal is titled the BLM

may allow the adopter to adopt additional animals, up to four at one time. An adopter is removed

from AIP eligibility if they relinquish two or more animals within a 12-month period or do not

adhere to the terms of the Agreement (4710-25).

The purpose of this program was to increase the placement of as many wild horses and

burros into private care as possible, a proclaimed critical priority for the agency's Wild Horse

and Burro Program because of the long-term costs associated with caring for unadopted animals,

but also in order to free up more space for animals to be removed from public lands en masse. It

was presumed (but not required) that the AIP money would be used for training and initial care of these ungentled wild horses and burros.

The program was implemented in March of 2019 and the BLM has sung its praises ever since. As recently as November 19, 2020, the agency touted the success of the AIP: "The BLM continued to offer the [AIP] in Fiscal Year 2020, which is believed to have bolstered performance." In May 2020, the BLM reported that "[i]n the first 12 months of the AIP, the agency adopted out more than 6,000 animals." This represents a more than 100 percent increase over the BLM's 2,900 per year adoption average in the five years preceding the AIP program. According to Paul McGuire, Outreach Specialist, BLM National Wild Horse & Burro Program, "most but not all of the 6,026 animals adopted during the first 12 months of the AIP received or were eligible for the incentive." (personal email communication, December 7, 2020).

Adopters participating in the AIP are required to sign the BLM's adoption and sale forms which require certification that each adopter has "no intent to sell this wild horse or burro for slaughter or bucking stock, or for processing into commercial products, within the meaning of the Wild and Free-Roaming Horse and Burro Act, 16 U.S.C. 1331 et seq., and regulations 43 CFR 4700.0-5(c)." Consistent with Congress' mandate in the Interior Department's annual appropriations bills, BLM may only sell horses "with limitations," thereby requiring *anyone adopting or purchasing* a wild horse to certify at the time of adoption or purchase that they do not intend to kill or sell the horse for commercial slaughter, *nor would they transfer ownership to any person or organization who they knew or had reason to believe would "resell, trade or give away the animal(s) for slaughter or commercial processing."* The appropriations language prohibiting sale for slaughter specifically applies to BLM.

### 3. <u>2020 Influx of Wild Horses in Kill Pens</u>

March 2020 marked the end of the first year of the AIP, meaning that participants would begin to receive title and subsequently the second $500 incentive payment on all their eligible adopted wild horses and burros. The IM noted that the second payment would be issued within 60 days of titling, meaning that the adopter of a horse or burro adopted through the program on, for example March 30, 2019, would potentially not receive the second incentive payment until May 30, 2020.

By August 2020, rescue groups began to see an increase in BLM branded wild horses and burros at auctions known to sell the animals to kill buyers (individuals who purchase horses and burros and sell them to horse slaughter plants in Canada or Mexico). Titles available from the auctions revealed ungentled wild horses arriving within 1–4 months of their adopters receiving title, a timeframe during which program participants would receive their second AIP payment. Many of these horses were young, unhandled animals, some with their BLM tags still around their necks more than a year after their adoption from BLM holding corrals, suggesting that adopters simply held the animals for a year without care in order to collect the $1,000 incentive. Even more concerning, the titles showed that several families had adopted horses and sent them to kill pens together within 3–4 months of receiving title to the animals. Each individual adopter can adopt up to four horses in a year, meaning a family of four could each take four horses and flip all 16 to a kill pen together.

Rescues worked with AWHC to uncover a total of 80 cases of identified individual horses and burros who arrived in kill pens and were put up for auction in a timeframe that strongly suggested their adopters opted in to the AIP. The following are examples of BLM adoption horses who were "flipped" to kill pens months after adopters received title to the animals:

**A.  Peabody Horse Pen**

The Peabody Horse Pen in Peabody, Kansas, is run in partnership with a 501c(3) organization that has an agreement with a well-known kill buyer to try to sell horses before the kill buyer ships them to slaughter. (Appendix 1, 1A).

- **Case Number 1**: Thirteen BLM wild horses were titled to a family of four: Lacey Cumin, Nathan Cumin, Cole Cumin, and Jessica Cumin. Each member of the family adopted between 3–4 horses and those horses were later relinquished to the Peabody auction. Of the 13 horses, 10 were titled to the same address. The other three titled under Lacey Cumin listed a different address. The horses were titled to the Cumin family in three batches: three were titled on June 30, 2020, eight were titled on July 7, 2020, and two were titled on July 15, 2020. All 13 horses were sent to Peabody on October 1, 2020, after the 60-day window for receipt of the second $500 AIP payment. All were later rescued with assistance from Skydog Sanctuary from the Peabody Horse Pen in Kansas. Two of these animals were confirmed as being adopted through the AIP by records received through Freedom of Information Act ("FOIA") requests. Compliance inspections on the other horses are pending. See Appendix 2, section 1 A-E for in-depth information on the titles.

  Of note: According to an internal BLM email dated June 14, 2019 and obtained in response to a FOIA request, both Nathan and Lacey Cumin were designated as "no longer eligible for the Adoption Incentive Program due to returning 2 or more animals within a 12 month period." Nevertheless, they received titles for three adopted horses each in June and July 2020 and flipped the horses to the kill pen on October 1, 2020.

BLM_003918

- **Case Number 2:** Three BLM wild horses were titled to David A. Wilkie on October 5, 2020. All three horses were posted to Peabody Horse Pen's Facebook page for sale on January 1, 2021, after the 60-day window for receipt of the second AIP installment of $500. It is confirmed that all three of these horses were adopted through the AIP from compliance inspections obtained via FOIA requests. See Appendix 2, section 2 A-C for in depth information on the titles.

- **Case Number 3:** Staci S. Jacques adopted two BLM wild horses who were titled to her on July 15, 2020 and were later rescued from Peabody Horse Pen in September 2020 within the 60-day period when adopters would receive the second AIP installment of $500. See Appendix 2, section 3A and 3B for in depth information on the titles.

- **Case Number 4:** Sandy K. Tiede adopted one BLM horse. The title date was obscured by kill pen officials. The animal was found in the Peabody Horse Pen on April 14, 2021. See Appendix 2, section 4A for in depth information on title.

- **Case Number 5:** Kurt W. Fast adopted one BLM burro who was later found in the Peabody Horse Pen in September 2020. While the title date is unknown, compliance inspections obtained through FOIA requests confirm this burro was adopted through the AIP. The animal was adopted on July 9, 2019 and the compliance inspection was conducted on April 13, 2020. See Appendix 2, section 5A for in depth information on title.

### B.  Stroud Oklahoma Kill Pen

Stroud Oklahoma Kill Pen is a livestock auction in Stroud, Oklahoma. It is a self-proclaimed kill pen. At this particular auction, owners selling horses can designate whether or not their horse(s) can be sold to slaughter. None of the horses listed below were designated as NOT to be sold for slaughter. See Appendix 1, 3A and 3B for proof of slaughter auction status.

BLM_003919

- **Case Number 1:** John L. Massingale adopted four BLM wild horses, the maximum number of horses allowed under BLM policy. All four were titled to Massingale on September 21, 2020 and were later sent to Stroud Kill Pen in early November, within the 60-day period when adopters were to receive the second AIP installment of $500. All were later rescued from Stroud Kill Pen in Oklahoma. See Appendix 2, section 6A-D for in-depth information on the titles.

- **Case Number 2:** Edward L. Chauncey adopted two BLM wild horses. Both were titled on September 21, 2020 and were sent to Stroud Kill Pen in early November 2020, within the 60-day period when adopters were to receive the second AIP installment of $500. All were later rescued from Stroud Kill Pen in Oklahoma. See Appendix 2, section 7A and 7B for in-depth information on the titles.

- **Case Number 3:** Clint L. Couch adopted one BLM wild horse who was titled to Couch on August 10, 2020 and was later sent to Stroud Kill Pen in early November 2020. The horse was later rescued from Stroud Kill Pen in Oklahoma. The animal was confirmed as being adopted through the AIP by compliance inspection records obtained through FOIA requests. Clint L. Couch was convicted of kidnapping and assault in a horse deal gone wrong. Act See Appendix 2, section 8A and 8B for in-depth information on the title and assault charges

- **Case Number 4:** Kaeli Seay adopted one BLM wild horse who was titled to Seay on August 18, 2020. The horse was sent to Stroud Kill Pen in early November 2020. The horse was later rescued from Stroud Kill Pen in Oklahoma. This animal was confirmed as being adopted through the AIP by compliance inspection records obtained through FOIA requests. See Appendix 2, section 9A for in-depth information on the title.

- **Case Number 5:** Ben A. Baugh received the title of one BLM wild horse on April 22, 2020. The horse was later rescued in early November 2020 by Black Hills Wild Horse Sanctuary and still had a BLM identification tag around her neck. See Appendix 2, section 10A for in-depth information on the title.

- **Case Number 6:** Julie Auld (also listed as Auld Julie in official records) adopted one wild horse on June 11, 2019. She received the title of one BLM wild horse on August 27, 2020. The animal was later found in the Stroud Kill Pen in December 2020 and was rescued by Black Hills Wild Horse Sanctuary. BLM compliance inspections, received through FOIA requests, confirmed this horse was adopted through the AIP. FOIA records also indicate that she adopted an additional wild horse. See Appendix 2, section 11A and 11B for in-depth information on the title.

- **Case Number 7:** The Castagno family, consisting of Tracy Castango, Nicki Castango and Steve Castango, adopted a minimum of 3 wild horses. Compliance inspections obtained through FOIA requests confirm all three animals were adopted through the AIP. The animals were adopted on May 31, 2019 and were titled on or around June 15, 2020. The animals were found in Stroud Kill Pen in September 2020. See Appendix 2 Section 12 A-C for in-depth information on the titles.

- **Case Number 8**: Wayne A. Nicho received the titles to two wild horses on February 9, 2021. Both animals were found in Stroud Kill Pen on April 10, 2021, within the 60-day period when adopters were to receive the second AIP installment of $500. See Appendix 2 section 13A and 13B for in depth information on the titles.

### C. Cleburne Horse Sale

According to an Animal's Angels undercover investigation, sellers at the Cleburne Horse Sale in Texas *must acknowledge* that their horse may end up sold to a slaughter auction (Appendix 1, 3A). According to that same investigation, well known kill buyer Mike McBarron, who runs the Kaufman Kill Pen (Appendix 1, 3B), often frequents Cleburne Horse Sale (Appendix 1, 3B). This is further supported by a *Weatherford Democrat* article that details the tragic journey of a veterinarian who relinquished horses to the Cleburne Horse Sale and later found them at McBarron's Kaufman Kill Pen (Appendix 1, 3B).

- **Case:** Twenty-one BLM wild horses together arrived at Cleburne Horse Sale on November 11, 2020. All names on the titles were either redacted or there was an attempt to redact the information. Per the auction, these horses were all from the same location. The horses were titled in four batches, the earliest being on September 14, 2020 and the latest on October 5, 2020. The mustangs arrived at the auction house a little over a month after the last batch of titles was awarded, within the 60-day window for receipt of the second $500 AIP installment. Despite attempts to redact information on the titles, three names and addresses were legible. Brenda J. Kidd adopted at least two mustangs titled on September 14, 2020, Gary Kidd adopted at least one mustang titled on September 14, 2020, and Dustin Banks adopted four mustangs titled on October 5, 2020. The address for the Kidd's and Banks's horses were the same, affirming the auction house's claim the horses arrived from the same location. All 21 wild horses were rescued by Evanescent Mustang Rescue and Sanctuary. One of these horses was confirmed to be adopted through the AIP by compliance inspections obtained through FOIA requests. There are pending FOIAs on the other 20 animals. Gary Kidd, was included in the recent *New York Times* exposé, the interview shows Kidd lied about the status of his horses and was

confronted with records that showed all 21 animals went to a kill pen. See Appendix 2, section 14A-D for in-depth information on the titles.

### D.  Fabrizius Livestock Auction

Fabrizius Livestock Auction is a self-proclaimed kill pen (Appendix 1, section 5A) located in Eaton, CO. It is run by Jason Fabrizius, who according to a 2018 article in the Denver Channel, stated that, "I buy them, and I buy them by the truckloads. And we send them to Mexico." In the same article, he claims to regularly send 34 horses a week to Mexico. (Appendix 1, 5B).

- **Case Number 1:** Lonnie D. Krause adopted three BLM wild horses who were sent to the Fabrizius Livestock Auction. The horses were titled on September 14, 2020 and sent to Fabrizius on September 25, 2020, well within the 60-day period when adopters were to receive the second AIP installment of $500. All were  later rescued from the Fabrizius Livestock Auction in Colorado. Lonnie Krause admitted in an interview for the *New York Times* that he and his grandson (Conner Palmer) adopted the maximum number of horses each as a more profitable venture than raising cattle. He saw no issue with this, as BLM officials stated "once you get title, there is no limitation on slaughter." See Appendix 2, section 15A-C for in-depth information on the titles.

- **Case Number 2:** Conner A. Palmer adopted two BLM wild horses and received their titles in his name on September 14, 2020. They were later sent to Fabrizius around September 25, 2020, well within the 60-day period when adopters were to receive the second AIP installment of $500. All were later rescued  from the Fabrizius Livestock Auction in Colorado. See Appendix 2, section 16A and  16B for in-depth information on the titles.

**Special Note:** These horses were flipped to the kill pen quicker than we've seen in the previous cases, but once the BLM conducts their second compliance inspection and issues the title, the owner is under no obligation to keep the horse in their care. The BLM would **not** know if the horse(s) remained with the adopter(s) or not and yet would still issue the second incentive payment of $500 since the title had already been transferred.

### E. Bowie Auction House

Bowie Auction is a self-proclaimed kill pen (Appendix 1, 5A) located in Bowie, TX.

- **Case:** Dennis M. Schwitzer adopted one BLM wild horse and received the title in August 2020. The horse was later rescued from Bowie Auction House by a private individual on September 9, 2020, arriving at the auction well within the 60-day period when adopters were to receive the second AIP installment of $500.  See Appendix 2, section 17A for in-depth information on the title.

  **Special Note:** Compliance Inspection records note that four BLM animals, adopted through the AIP, were flipped to Bowie before titles were transferred to the adopter. The BLM was notified and all four horses were repossessed.  See Appendix 2, section 17B for freeze brand information.

### F. Kaufman Kill Pen:

Kaufman Kill Pen is a self-proclaimed kill pen (Appendix 1, section 6) located in Forney Texas. According to an Animal's Angels investigation,  this kill pen is owned and operated by Mike McBarron (Appendix 1, 3B).

- **Case Number 1:** Myra N. Sander adopted one BLM wild horse on August 3, 2019. The horse was titled to her on August 8, 2020 and was flipped to Kaufman Kill Pen within the 60–90 day timeframe. This horse was confirmed to be adopted through the AIP by BLM compliance inspection records obtained by FOIA requests. See Appendix 2, 18A for in-depth information on the title.

- **Case Number 2:** Henry D. Jump adopted one wild horse on August 3, 2019. The horse was titled to him in 2020. While the month of titling is obscured, the horse was inspected for title eligibility by BLM officials on January 1, 2020. The date of actual titling is unknown. The horse was found in Kaufman Kill Pen February 1, 2021 and was one of seven BLM horses found in the kill pen on that day. FOIA records confirm this animal was adopted through the AIP. Records also note Henry Jump adopted two horses. See Appendix 2, 19A and 19B for in-depth information on the title and FOIA information.

### G.  North Louisiana Equine Transport and Feedlot

North Louisiana Equine Transport and Feedlot is a feedlot located in Bastrop, LA. According to a 2021 article, this feedlot is run by brothers Gregory and Mitchell Stanley. The Stanley brothers are considered some of the most notorious kill buyers in the country and have been the subjects of multiple investigations including animal cruelty, inauthentic transport paperwork, and assault allegations. See Appendix 1 section 7.1 and 7.2 for more information.

- **Case:** Hugh C. Hession adopted two BLM wild horses. Both were titled on November 18, 2020 and both were found in the North Louisiana kill pen in early February 2021. Appendix 2, sections 20A and 20B for in-depth information on the titles.

### H.  Centennial Livestock Auction:

The Centennial Livestock Auction is a slaughter auction in Fort Collins, Colorado. While not explicitly stated on their website, the weekly market report published on their website clearly shows they sell horses, by the pound, to slaughter. See Appendix 1 section 8 for more information.

- **Case:** Debra J. Harris received title for three wild horses on November 19, 2020. The three horses were found at the Centennial Livestock Auction in early May 2021. See Appendix 2 Section 21 A-C.

  **Special note:** These horses were flipped to the kill pen outside of the typical 60–90 days after titling, but it is highly probable that they are AIP animals as the 60–90 day window for titling and payment is just an estimate.

I. **Miscellaneous**

- **Case Number 1** Tarrah L. Hern adopted one BLM wild horse who was titled to her on March 24, 2020. According to information obtained through FOIA requests, Hern adopted the horse through the AIP. The horse was later rescued from a livestock auction in August 2020. See Appendix 2, section 22A for in-depth information on the title.

- **Case Number 2:** Joni R. Flemming adopted four horses on August 13, 2019. One horse, who was rescued from an undisclosed kill pen by a private individual, was titled October 9, 2020. Compliance inspection records indicate all four animals were adopted through the AIP. The status of the other three animals is unknown. See appendix 2 section 23 A-D for in-depth information on titles.

- **Case Number 3:** Joe A. Anderson adopted three wild horses and received titles for all four on March 31 2021. All four horses were discovered in an undisclosed kill pen in Texas on April 11 2021. See appendix 2 section 24A-C for in-depth information on titles.

- **Case Number 4**: Dymiti Anderson adopted one wild horse and received the title on March 31 2021. The one horse was discovered in an undisclosed kill pen in Texas on April 11 2021. See appendix 2 section 25A for in-depth information on the title.

This information is based on evidence that AWHC has been able to gather working with various rescues such as our partners, Skydog Wild Horse Sanctuary, Black Hills Wild Horse Sanctuary, and Evanescent Mustang Rescue. Some of the individuals named above may have adopted more than the horses listed here, but those potential horses were likely sold to various individuals or, in the worst case, to a kill buyer who shipped them across the border without being detected by rescue groups.

**4. Compliance Inspections Show AIP Wild Horses and  Burros Are Suffering Severe Cruelty After Being "Adopted"**

AWHC's concerns about the AIP expand further than  federally protected horses and burros being funneled to kill pens. Through the records received on BLM compliance inspections for AIP animals, it is obvious many adopters using this incentive program either have nefarious intent, or lack the basic ability and knowledge to care for unhandled wild animals. AWHC has documented many cases of abuse and neglect of AIP animals. Additionally, in several instances, when the time came for compliance inspections BLM officials were not able to locate or get in contact with numerous adopters in Texas and Oklahoma. Many cases were turned over to law enforcement and the status of those AIP animals is unknown. Examples from the documents are as follows:

**Abuse cases (animal is identified by freeze brand number):**

- **19025517:** "Found 19025517 Sorrel horse upside down with her head folded back with a severe neck injury. The neck injury prevented her from standing and being able to lay upright. We tried to assist her to stand but she was unable to do so. We then called every vet in the valley. None returned our phone calls due to the Veterans Day Holiday. After no calls she was laboring to breath [sic] so I put her out of her misery."

- **16861637:** "We received a complaint about this horse being underweight [sic] and in a dog pen. We contacted the adopter and found that she had moved the horse a second time and she gave the new location to us. Upon arrival at the location we found this horse with a body score of 2 and in a 10x10 area with a peice [sic] of plywood on top standing in 5 inches of mud. We repossessed the animal that day."

**Neglect cases (animal is identified by freeze brand number)**:

- **18869274:** "Body Score is a 2.5. Had numerous [sic] sores on body. Sent out a correction letter in regards to the weight of the animal. We are requesting for the vet to come out to make a nutritional plan and to do another inspection in 4 weeks."

- **18869242:** "We arrived at this facility to inspect (b) REDACTED animals that had just moved there and found this yearling. The animal was very thin on rating on the scale at a 2. He was eating moldy hay and the adopter admitted that last week he had eaten a fly trap. The water also had thick algae [sic] in it. The animal was repossessed that day."

- **16025230:** "body condition: very poor, score of 2, ribs and spine apparent. Hoof condition: long, overgrown hooves. Comments: horse was obviously malnourished and did not receive [sic] basic care." "with a brief look at facility there was not an adequate shelter with attached safe turn out"

- **17632030 and 17632043:** "On 1/15/2020 received pictures of thin horses and a complaint that they were not being fed [sic]. Called REDACTED at 2:21 pm and left a message [sic]. Called back at 3:08 pm. Mr. Seals was told about a complaint [sic] and the BLM would be there tomorrow. He said that he called and left a message last week about his job and to move the horses. There was not a message sent to my knowledge. He was told that he needed to be there. He was told that he would get a telephone call 30 miles out. 1/16/2020 8:33am Telephone call was made, no answer, left message that the BLM will be there. 9:14 am Dan & I arrived at the REDACTED place and was not home. FM 17632043 & FM 17632030 Body condition was 2 1/2-3. Talked to the next door neighbors  and said that the horses had not been fed [sic] in a couple of days [sic] and that they have been feeding them. Said that their [sic] was another mustang down the road that sold. FM 18632317 was verified and it is a sold animal, but the animal was at 1 1/2 body condition. called back and I told him that I was giving him a warning and that I would check on the animals. Said that he needed to turn the horses back because he needed [sic] to move closer to work.voluntarily relinquished the horses. Horses were picked up."

- **12188414:** "Grant received information from SB FICC Dispatch regarding burros escaping from their adopter. I conducted the compliance inspection on Tuesday, March 3, at 1 PM. The holding pen design described on the application which met the qualifications to adopt was not how the actual pen design was, where the two burros escaped after two days after being brought home. The two burros could have either escaped by climbing over a 10 foot high dirt mound that was in the first pen that was not fenced or over a 2 -4 foot rock/earth barrier next to the shelter in the lower pen. See pictures at: \\blm.doi.net\dfs\ca\ri\pub\Photos\aneiberg\2020 WHB Compliance The pen

design where the burros were kept, did not meet the BLM requirements for adoption. After inspection of the facility, went with Janey to scout the area where reports from the public had either seen them or seen signs [sic] indicating they were in the area. Animals missing in the desert."

These are the most egregious cases, but there are many more instances of negligence by adopters such as falsifying government documents and failing to provide care for these animals.

5. **BLM Washes Hands of Situation Despite Internal Concerns**

At least one BLM employee accurately predicted the outcome of the AIP.   In records received by AWHC under FOIA, Rob Sharp, Supervisory Wild Horse & Burro Specialist for BLM Oregon, stated on June 25, 2019:

[H]here's some thoughts on the Adoption Incentive Program:

Since its inception we've seen a pretty good boost in adoption numbers. Some are repeat adopters but the majority have been new adopters. My concerns focus on the welfare of the animal after they are adopted. For many first time adopters, getting a gentled horse from a TIP trainer or other gentled horse program is a great segway into wild horses. However, since the AIP isn't applicable to gentled animals, this removes that option. Time will tell if we see a surge in compliance issues with AIP animals as a result of people only seeing the initial cash payment and not thinking about the lifetime costs associated with owning a horse and the adoption of animals to people who have no business owning a horse!… And personally I don't agree with the government providing cash incentives to a product (horses) which has an existing private market… I have spoken with… trainers who can offset the cost of care for a year and resell their horses after they are titled and make some money.

Mr. Sharp's concerns have been borne out, however, the agency he works for has turned a blind eye to the fate of the horses and burros adopted under this program. On October 6, 2020, AWHC contacted Acting Off-Range Branch Chief Paul McGuire via email regarding the 13 BLM wild horses sent to Peabody Horse Pen. Mr. McGuire responded that because the adopters of the horses had fulfilled their obligations under the adoption agreement and received title for the horses before sending them to auction, *the BLM had no cause to issue a violation.* Mr. McGuire answered affirmatively when asked if these adopters would still be eligible to participate in adopting horses in the future from BLM. See the email chain here. Mr. McGuire is conveying the BLM apparent policy of taking no responsibility for wild horses and burros once title is transferred (including whether the adopters adhere to the enforceable no-slaughter provision of their adoption contracts).

Additionally, the *NY Times* reported that according to one AIP adopter, the agency tells AIP participants "Once you get a title, they told me, there is no limitation — you can do whatever you want with them." Additionally, the BLM told the *NY Times* that it had no authority to enforce adoption contracts and their anti-slaughter provision that is signed under penalty of perjury.

The actions of the BLM with regard to the AIP are similar to the agency's behavior a decade ago when it sold truckloads of horses to a known kill buyer, turning a blind eye to the implausible explanations about what the buyer intended to do with the horses, such as using truckloads of horses for "use in movies" in Mexico. (The buyer also told the BLM that he didn't care what kind of horses (male/female) he purchased, as long as they were big.)

### 6. Conclusion: An Immediate Termination of AIP and Full Investigation of the Program is Required

AWHC has submitted several FOIA requests[1] seeking to obtain further evidence of the connection between these incidents and the BLM's AIP, including records related to AIP payments. We also continue to collect data from rescue organizations and sanctuaries in order to document all BLM wild horses and burros adopted via BLM internet adoptions as well as BLM horses and burros being sold at kill pens across the country.

However, the incidents listed above provide compelling evidence that the BLM has created, a government subsidized slaughter pipeline and is defrauding U.S. taxpayers by providing payments of $1,000 per a BLM wild horse or burros adopted through AIP while turning a blind eye when those same animals are immediately flipped to known slaughter auctions after the adopters receive full incentive payments.In light of this report and the *NY Times* expose', the Interior Department and Congress must investigate the extent of the problem, agency complicity in the illegal sale of wild horses and burros at slaughter auction in violation of the spirit and the letter of federal law.

Additionally, the Interior Department must identify all wild horses and burros adopted under the AIP who remain at risk of slaughter and abuse, as well as refer adopters who sold horses to slaughter auctions in violation of their adoption contracts, signed under penalty of perjury, for criminal prosecution. Due to the length of time it will take to receive responses to AWHC's FOIA requests, and the urgency of the threat that the AIP is driving the sale of BLM wild horses and burros for slaughter in contravention of federal law, we officially request a suspension of the AIP pending an immediate inquiry into the issues raised in this report.

---

[1] AWHC's requests include: DOI-BLM-2021-000789, 2021-000803, 2021-000825, 2021-001001, DOI-BLM-2021-002679, DOI-BLM-2021-002681, DOI-BLM-2021-002683, DOI-BLM-2021-002685, DOI-BLM-2021-003104, DOI-BLM-2021-003106, DOI-BLM-2021-003112, DOI-BLM-2021-003110, DOI-BLM-2021-003107, DOI-BLM-2021-003109, DOI-BLM-2021-003111, DOI-BLM-2021-003175, DOI-BLM-2021-003134, DOI-BLM-2021-003331, 2020-00726, and DOI-BLM-2021-004024 which are still outstanding.

## Appendix 1: Proof of Auction Houses as Kill pens

1. Peabody Horse Pen

    1. Screenshot of Peabody Horse Pen Facebook page



2. Stroud Kill Pen

    1. Screenshot of Stroud Kill Pen's website



BLM_003933

2. Horse marked as a non-slaughter horse

3. Cleburne Horse Sale

1. 

[https://myemail.constantcontact.com/Animals--Angels-Investigators-Call-Strike-Three-on-Trent-Ward-s-Cleburne-Auction-in-Texas.html?soid=1101655399670&aid=temyncmaGeA](https://myemail.constantcontact.com/Animals--Angels-Investigators-Call-Strike-Three-on-Trent-Ward-s-Cleburne-Auction-in-Texas.html?soid=1101655399670&aid=temyncmaGeA)

weatherforddemocrat.com/news/cutting-horse-vet-s-horses-slated-for-slaughter/article_70c9b4b2-5675-11e6-9d2b-735fc8e9a5c7.html

Menu Contact Us Subscribe Login

E-Paper Local Events Celebrations Obituaries Public Notices Podcasts Mineral Wells News

week, calling the slaughter designation unintended.

Photos posted by the Kaufman Kill Pen Facebook page on July 22 and July 23 show at least a dozen horses bearing the LA brand and/or distinctive shoulder numbers, with some described as recipient mares.

The posts listed the dollar amounts required to save the horses from death.

Kaufman Kill Pen describes itself as a "page existing to help network homes for slaughter-bound horses" and lists animals for sale from McBarronhorses@yahoo.com in Forney.

Kaufman County horse trader Mike McBarron has drawn criticism from some animal welfare groups for his practices, including purchasing horses to send to Mexico for slaughter.

After social media posts about the horses went viral among the horse rescue community, The Arnold Reproduction Center acknowledged the incident.

"I recently sent some mares to the Cleburne Horse Sale," The Arnold Reproduction Center wrote on Facebook Sunday. "I certainly never intended for them to end up in the slaughter pen. Many of these mares came to me through the sale barn system, were sick, completely unbroken and certainly destined for slaughter at that time (15 or so years ago). As long as these mares are reproductively sound, they stay in my herd – many probably longer than they are useful. My staff and I have taken the time, money, and resources we have to help these mares become useful and give them a viable purpose.

THIS WEEK'S CIRCULARS

LIFESTYLES

GET HEALTHY: Resolutions that are easy to keep

Tons of traditions: The history of observing New Year's

Holidays and Alzheimer's

MORE LIFESTYLE NEWS

2. https://www.weatherforddemocrat.com/news/cutting-horse-vet-s-horses-slated-for-slaughter/article_70c9b4b2-5675-11e6-9d2b-735fc8e9a5c7.html

4. Fabrizius Livestock Auction

   1. Screenshot of Fabrizius's website affirming slaughter auction status.

fabriziuslivestock.com

Menu

Fabrizius Livestock

Welcome to Fabrizius Livestock

We are a kill pen that offer each horse a second chance before shipping to slaughter. Each horse is posted with weekly deadlines. All HORSES ARE SOLD AS IS NO GUARANTEES. Can purchase horses via Venmo to https://venmo.com/code?user_id=2773854514577408319 card or cash. Customer is responsible for shipping.

Make Enquiry

Our Updates

View All

Deadline For All Horses

Sunday January 17th 10AM Pickup is Monday or Tuesday Advise no 2 horse trailers For payment accept card, direct deposit (wire info below) Venmo or cash. Our Venmo link is https://venmo.com/c...

Read More →

Haulers/Quarantine

Haulers/Quarantine (If Quarantine is offered by the haulers QT is by their name) Haulers: Cheyenne WY state stock yards (jayR): (307) 287-2984 K-L Hauling: 940 577 7180 Heather & Dawn 817 637...

Read More →

   2. https://www.thedenverchannel.com/news/360/colorado-horses-sold-for-slaughter-even-when-rescues-want-to-help

5. Bowie Auction House

1. Screenshot of Bowie Auction House's website



6. Kaufman Kill Pen

1. Screenshot of Kaufman Kill Pen's Facebook page affirming its kill pen status



7. North Louisiana Transport and Feedlot

1. Screengrab from a 2021 article stating the Stanley's own the North Louisiana Transport and Feedlot.

The Louisiana Second Circuit Court of appeal determined that three men who worked at a horse kill pen in Bastrop are liable and must pay damages caused by a videoed attack.

Gregory, Mitchell and Michael Stanley reportedly attacked Andrew Payne in September of 2016. The trio will pay $136,000, and 4th Judicial District Court Judge Robert C. Johnson will have to apportion fault to determine how the payment is split.

Gregory and Mitchell Stanley were co-owners of Stanley Brothers Livestock Inc and Stanley Brothers Farm LLC. At the time of the incident, the business was known as the Bastrop Kill Pen (BKP). Michael Stanley is the son of Mitchell and was employed by the business.

The business offered rescue horses for sale, but the bulk of the business lies in exporting horses to Mexico for slaughter, processing and human consumption.

BKP now operates under the name North Louisiana Equine Transport & Feed Lot.

**2016 animal cruelty case**

In August 2016, BKP gained national attention after Gregory Stanley's son Boots Stanley uploaded a graphic video of Stephen Sadler cutting a brown and white dog's throat on Snapchat.

Footage of the dog before it's death was also uploaded to Boots Stanley's Snapchat, including video of the dog on the back of a horse Stanley was riding. The dog struggled to stay on , and laughter could be heard off-screen.

Ultimately, Sadler cut the dog's throat multiple times.

Animal rights activists from across the nation took interest in the case, and several protested at the Morehouse Parish Courthouse and attended court dates, calling for retribution for the canine they called Justice.

In 2018, 4th Judicial District Judge Carl Sharp sentenced each to: three years in prison, a $5,000 fine and 480 hours of community service. The jail time was suspended; they were to remain on probation for three years. A a $5,000 donation to the Morehouse Parish Humane Society gave the option to reduce their community service requirements to 240 hours.

**2018:** No jail time for Snapchat dog killers

**Research leads to dead end, attack**

Andrew F. Payne, a 65-year-old retiree, was among the people who came to the courthouse to learn more about the case.

2. Further information on investigations into the Stanley brothers can be found here and here

8. Centennial Livestock Auctions
    1. Screengrab from CLA's website showing the price per pound of horses going through their auction. CWT is the livestock abbreviation of hundredweight, which is the price per 100 lbs of any given animal.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Hors | 1 | brwn | mule | 245 | lbs | 386.00 hd | Eaton |
| | 1 | blm | stud | 735 | lbs | 215.00 cwt | Rawlins |
| | 1 | bksk | stud | 885 | lbs | 150.00 cwt | Rawlins |
| | 1 | pnt | stud | 790 | lbs | 115.00 cwt | Rawlins |
| | 1 | bksk | hors | 880 | lbs | 175.00 cwt | Chugwater |
| | 1 | grey | hors | 895 | lbs | 150.00 cwt | Carbondale |
| | 1 | palo | hors | 665 | lbs | 145.00 cwt | Rawlins |
| | 1 | pnt | hors | 1045 | lbs | 120.00 cwt | Carbondale |
| | 1 | palo | hors | 1125 | lbs | 100.00 cwt | Carbondale |
| | 1 | blm | hors | 1100 | lbs | 95.00 cwt | Rawlins |
| | 1 | palo | hors | 1070 | lbs | 92.50 cwt | Rawlins |
| | 1 | pnt | hors | 1035 | lbs | 82.50 cwt | Carbondale |
| | 1 | palo | hors | 1005 | lbs | 80.00 cwt | Rawlins |
| | 1 | sorr | hors | 970 | lbs | 80.00 cwt | Carbondale |
| | 1 | sorr | hors | 910 | lbs | 80.00 cwt | Carbondale |
| | 1 | grey | hors | 745 | lbs | 65.00 cwt | Rawlins |

**Appendix 2: In-depth information on adopters and BLM wild horses:**

1. Cumin Family: (All horses were later rescued with assistance from Skydog from the Peabody Horse Pen in Kansas.)

   a. Lacey N. Cumin: (Note: Lacey Cumin is banned from adopting any more AIP horses as of June 14, 2019 per compliance inspection FOIA received by AWHC. However, she received three titles in 2020.)

      i. 12978012: Titled on June 30, 2020. Found in Peabody Horse Pen on October 1, 2020.

      ii. 12978020: Titled on June 30, 2020. Found in Peabody Horse Pen on October 1, 2020.

      iii. 14862300: Titled on June 30, 2020. Found in Peabody Horse Pen on October 1, 2020.

   b. Nathan H. Cumin: (Note: Nathan Cumin is banned from adopting any more AIP horses as of June 14, 2019 per compliance inspection FOIA received by AWHC. However, he received three titles in 2020.)

      i. 12978046: Titled on July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

      ii. 13978036: Titled on July 15, 2020. Found in Peabody Horse Pen on October 1, 2020.

      iii. 13978059: Titled on July 15, 2020. Found in Peabody Horse Pen on October 1, 2020.

   c. Cole T. Cumin:

      i. 17632360: Titled July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

      ii.   18631903: Titled July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

      iii.  18632325: Titled July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

  d.  Jessica S. Cumin:

      i.   18629609: Titled on July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

      ii.   18631914: Titled on July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

      iii.  18631993: Titled on July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

  e.  Unknown member of the Cumin Family:

      i.   18631953: Titled on July 7, 2020. Found in Peabody Horse Pen on October 1, 2020.

2. David A. Wilkie:

  a.  17632598: Titled on October 5, 2020. Arrived at auction around January 5, 2021.

  b.  17632608: Titled on October 5, 2020. Arrived at auction around January 5, 2021.

  c.  16631881: Titled on October 5, 2020. Arrived at auction around January 5, 2021.

3. Staci S. Jaques: (Both were later rescued from Peabody Horse Pen in September 2020.)

  a.  14732785: Titled July 15, 2020. Arrived at Peabody Horse Pen in September, 2020.

  b.  17628969: Titled July 15, 2020. Arrived at Peabody Horse Pen in September, 2020.

4. Sandy K. Tiede:

      a.  14224743: Title date unknown. Arrive at Peabody Horse Pen in April 2021.

5.  Kurt W. Fast
      a.  11145215: Title date unknown. Arrived at Peabody horse pen in September 2020. Compliance inspections obtained through AWHC's FOIA requests confirm this burro was adopted through the AIP. The animal was adopted on July 9, 2019 and the compliance inspection was conducted on April 13, 2020.

6.  John L. Massingale: (Adopted the following four BLM wild horses who were later rescued from Stroud Kill Pen in Oklahoma.)

      a.  15626752: Titled on September 21, 2020. Found in a slaughter auction early November, 2020

      b.  15730345: Titled on September 21, 2020. Found in a slaughter auction on approximately November 5, 2020.

      c.  15731037: Titled on September 21, 2020. Found in a slaughter auction on approximately November 5, 2020. Adopted from KS Correctional in 2019.

      d.  16626723: Titled on September 21, 2020. Found in a slaughter auction on approximately November 5, 2020.

7.  Edward L. Chauncey: (Adopted the following two BLM wild horses which were later rescued from Stroud Kill Pen in Oklahoma.)

      a.  14733288: Titled on September 21, 2020. Found in a slaughter auction early November 2020.

      b.  15861728: Titled on September 21, 2020. Found in a slaughter auction early November, 2020.

8.  Clint L. Couch: (Adopted the following one BLM wild horse who was later rescued from Stroud Kill Pen in Oklahoma.)

    a.  12625474: Titled on August 10, 2020. Found in a slaughter auction on approximately November 5, 2020.

    b.  [Article detail Clint Couch's arrest](#)

9. Kaeli Seay: (Adopted the following one BLM wild horse who was later rescued from Stroud Kill Pen in Oklahoma.)

    a.  16862192: Titled August 18, 2020. Found in a slaughter auction early November, 2020.

10. Ben A. Baugh: (Adopted the following one BLM wild horse who was later rescued from Stroud Kill Pen in Oklahoma.)

    a.  15730993: Titled April 22, 2020. Rescued by Black Hills. Still had a BLM tag around her neck.

11. Auld Julie (Adopted the following two BLM wild horses, one of which was later rescued from Stroud Kill Pen in Oklahoma.)

    a.  18628990: Adopted on June 11, 2019. Titled on August 27th, 2020. Found in the kill pen in December 2020.

    b.  18628955: Adopted on June 11, 2019. Title date and the status date of this horse is unknown.

12. The Castango Family (Adopted the following three BLM wild horses, which were later rescued from Stroud Kill Pen in Oklahoma.)

    a.  Steve Castango:

        i.  18862753: Adopted on May 31, 2019. Titled on June 15, 2020. The horse was found in a kill pen in September 2020.

    b.  Tracy Castango:

       i.    18862329: Adopted on May 31, 2019. Titled on June 15, 2020. The horse was found in a kill pen in September 2020.

   c.  Unknown Castango:

       i.    18862743: Adopted on May 31, 2019. Titled on June 15, 2020. The horse was found in a kill pen in September 2020.

13.  Wayne A. Nichol:

   a.   18862430: Titled on February 9, 2021. The horse was found in a kill pen on April 10th, 2021. Status of this horse is unknown.

   b.   18862611: Titled on February 9, 2021. The horse was found in a kill pen on April 10th, 2021. Status of this horse is unknown.

14. The Cleburne 21:

   a.   Titles with names redacted: (All later rescued by Evanescent Mustang Rescue from Cleburne Horse Sale in Texas.)

       i.    13646627: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

      ii.   14623671: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

     iii.   15626070: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

     iv.   15632314: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

      v.   16632238: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

vi.     16632261: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

vii.    16632313: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

viii.   16632483: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.  This BLM wild horse arrived at the auction trained, unlike the others we have seen. However, this trained horse may have still been adopted through AIP as an unhandled BLM wild horse at the time of adoption.

ix.     17632268: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

x.      17632299: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

xi.     17632453: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

xii.    18629272: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

xiii.   18629290: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

xiv.    18633484: Titled on September 29, 2020. Arrived at Cleburne on November 11, 2020.

b.  Brenda J. Kidd: (Adopter's name was legible through attempted redaction. Horses were later rescued from Cleburne Horse Sale in Texas.)

    i.    14629187: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

    ii.    18629053: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

c.    Gary Kidd: (Adopter's name was legible through attempted redaction. Horse was later rescued from Cleburne Horse Sale in Texas.)

    i.    15766749: Titled on September 14, 2020. Arrived at Cleburne on November 11, 2020.

d.    Dustin Banks: (Adopter's name was legible through attempted redaction. Horses were later rescued from Cleburne Horse Sale in Texas.)

    i.    16632343: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

    ii.    18625966: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

    iii.    18628912: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

    iv.    18629276: Titled on October 5, 2020. Arrived at Cleburne on November 11, 2020.

15. Lonnie D. Krause: (All horses were later rescued from Fabrizius Livestock Auction in Colorado.)

a.    12024193: Titled September 14, 2020. Found in Fabrizius Livestock auction around September 25th, 2020.

b.    157334818: Titled September 14, 2020. Found in Fabrizius Livestock auction around September 25th, 2020.

    c.  15862383: Titled September 14, 2020. Found in Fabrizius Livestock Auction. Rescued by a private individual from the auction house on November 3, 2020.

16.  Conner A. Palmer: (All horses were later rescued from Fabrizius Livestock Auction in Colorado.)

    a.  147311725: Titled on September 14, 2020. Found in Fabrizius Livestock Auction on September 25, 2020.

    b.  15733657: Titled on September 14, 2020. Found in Fabrizius Livestock Auction on September 25, 2020.

17. Dennis M. Schwitzer:

    a.  18631933: Titled in August 2020. Rescued from Bowie Auction House on September 9, 2020. Rescued by a private individual.

    b.  Freeze Brands of horses repossessed by the BLM:

        i.  17627871

        ii.  16628049

        iii.  16627991

        iv.  13628044

18. Myra N. Sanders:

    a.  15633342: Adopted on August 3 2019 and titled on August 8 2020. Later found in Kaufman Kill pen.

19. Henry D. Jump

    a.  18629097: Adopted on August 3, 2019 and titled in 2020. Later found in Kaufman Kill Pen.

    b.  18629282: This horse was discovered through a Freedom of Information Act request for BLM Compliance inspection data. Adopted on August 3, 2019 and

was inspected on January 7, 2020 by a BLM employee. The Compliance inspection noted "horse in pasture 240 acers did not see Mr. Jump said horse is doing good comes in about every three days." The status of this horse is unknown.

20.  Hugh C. Hession:

    a.  18627042: Titled on November 18, 2020 and was found in a kill pen in February 2021

    b.  18627153: Titled on November 18, 2020 and was found in a kill pen in February 2021

21. Debra J. Harris:

    a.  18862516: Titled on November 19 2020 and was found in the CLA slaughter auction in early May 2021

    b.  18862473: Titled on November 19 2020 and was found in the CLA slaughter auction in early May 2021

    c.  18862467: Titled on November 19 2020 and was found in the CLA slaughter auction in early May 2021

22. Tarrah L. Hern:

    a.  18025303: Titled on March 24, 2020. Rescued from an auction house in August 2020 by a rescue organization and reported to AWHC by the new owner. Records received from BLM in response to a FOIA request submitted by AWHC for compliance inspection records on all horses that went through Nevada under the AIP, confirmed that this horse was adopted through the AIP.

23.  Joni R. Flemming:

   a.  17632207: Adopted August 13, 2019. Titled October 9, 2020. Was found in a kill pen early 2021. Compliance inspection records indicate that BLM officials completed the compliance inspection on April 24, 2020.

   b.  18628904: Adopted August 13, 2019. The title date is unknown, but compliance inspection records indicate that BLM officials completed the compliance inspection on April 24, 2020.

   c.  18629335: Adopted August 13, 2019. The title date is unknown, but compliance inspection records indicate that BLM officials completed the compliance inspection on April 24, 2020.

   d.  18631927: Adopted August 13, 2019. The title date is unknown, but compliance inspection records indicate that BLM officials completed the compliance inspection on April 24, 2020.

24. Joe A. Anderson:

   a.  13628079: Titled on March 3, 2021. This animal was found in a kill pen April 4, 2021.

   b.  16628229: Titled on March 3, 2021. This animal was found in a kill pen April 4, 2021.

   c.  17628141: Titled on March 3, 2021. This animal was found in a kill pen April 4, 2021.

25. Dymiti Anderson:

   a.  16628531: Titled on March 3, 2021. This animal was found in a kill pen April 4, 2021.



**Addendum to "BLM's Adoption Incentive Program: Pipeline to Slaughter for Federally-Protected Wild Horses and Burros" Report**
**June 2, 2021**

1. **Additional  Confirmed Adoption Incentive Program (AIP) Animals Sold at Kill Pens**

● **Case Number 1:** A minimum of nine BLM Burros were rescued from Cleburne Horse Sale. The animals were titled in two batches, five were titled on June 2, 2020 and four were titled on May 19th, 2020. Records obtained by AWHC's Freedom of Information Act (FOIA) request prove all nine were adopted through the AIP. See Appendix section 1A-1I.

● **Case Number 2:** Chad W. Lessert adopted a minimum of three BLM burros. The animals were titled on the same date, June 17, 2020. The animals were titled in Blackwell OK. The animals were later rescued from an undisclosed kill pen. Records obtained by AWHC's FOIA request prove all three were adopted through the AIP. Further, records noted that cursory compliance inspections were conducted via email and with five photos.

● **Case Number 3:** Sherry Lessert adopted a minimum of one BLM burro, titled in Blackwell OK. The animal was titled in July 2021 and later rescued from an undisclosed kill pen. Records obtained by AWHC's FOIA request prove this animal was adopted through the AIP. Further, records noted that cursory compliance inspections were conducted via email and with five photos.

● **Case Number 4:**  Randy L. Davis adopted a minimum of two BLM burros, both titled in Blanchard OK. One of the animals was titled on July 15 2020. The second animal was titled in 2020, but the date is redacted. Both burros were rescued from an undisclosed kill pen. Records obtained by AWHC's FOIA request prove the two burros were adopted through the AIP.

● **Case Number 5:** An owner of a burro rescued from a kill pen sent AWHC the identifying freeze brand number of the animal. While no title was obtained, the freeze brand matched FOIA records obtained by AWHC confirming this burro was adopted through the AIP. The burro was adopted May 14, 2019 and was inspected by a private vet on April 23, 2020 in Paoli OK.

- **Case number 6**: Frank R. Myers adopted a minimum of two horses who were rescued from Strouds Oklahoma Kill Pen on January 19, 2021. The two horses were titled on the same date, August 24, 2020.  Records obtained by AWHC's FOIA request prove these animals were adopted through the AIP. The horses were adopted on August 3, 2019 and were inspected by a BLM employee on December 3, 2020 in Binger, OK.

2. **Potential Idaho Burro Slaughter Ring**

In a recent Freedom of Information Act Request (FOIA), records from the Bureau of Land Management's Idaho Field office indicate 14 families who have adopted four burros each (the maximum number allowed per adoption).  Of concern:

- Shelly, Rodney, Robert and Leeann Harrop all adopted four burros each

- Heath, Bobbie Jo, Alicia, Marian, and Wendy Marley all adopted four burros each.

- Upon further investigation into the families, it was uncovered that they are connected through marriage. Bobbie Jo's maiden name is Harrop and she is married to Heath Marley.

- Included in this group was Dawn Erickson, a woman from the same town as the Harrop family. Her Facebook account shows she is connected to Rodney Harrop.

- Included in the group are Coti and Cody Weeks. Each of them adopted four burros. Cody Weeks Facebook account shows he is connected to Rodney Harrop as well.

- Included in this group is Floyd Fife. He adopted four BLM burros. Adoption records show he has the same address as Marian Marley.

- This brings the total number of burros adopted to one family to 52 animals, meaning one family received a total of $52,000 taxpayer funds.

- One family member, Heath Marley, either works or worked at Skaar Livestock Auction, a large and controversial livestock auction yard.

The FOIA release also contained photos of burros in a **folder** called "Marley Burros" indicating they were housed at the Marley property. These images showed approximately 40 burros

2

housed in one pasture together. An immediate investigation is required  to determine whether these individuals are still in possession of these burros.

### 3.  Alleged BLM Employee Consigning or Transporting Burros to Slaughter Auction

- Evanescent Mustang Rescue recently sent AWHC the titles for 16 burros the group rescued from kill pens.

- We also received Coggins paperwork for 9 of the 16 burros. The names of the adopters were redacted on the title paperwork.

- The bloodwork for the Coggins was drawn on 7/1/2020 for the 2 of the 9 burros, and on 7/8/2020 for the remaining 7. The location of the blood draw is recorded as "Cleburne Horse Sale." Each coggins was matched to its corresponding title through the tube number (section 9 on the Coggins), which was also handwritten on the title.

- We have confirmed from the brand numbers on the titles that the 9 burros for whom we obtained Coggins paperwork were adopted through the AIP, and all were located in Paoli, OK, which has a population of 691 people.

- The Coggins paperwork records  a "Jimmy Galloway" as the owner of the 9 burros.

- Candace Ray of Evanescent informed AWHC that Jimmy Galloway is an employee of the Bureau of Land Management, specifically at Pauls Valley Off Range Holding Facility, located just 10 minutes away from Paoli, Oklahoma. Candace also told us that Jimmy frequents the Clerburne auction, allegedly to "run brands." Candace believes that individuals who transport horses to kill pens are able to sign as the owner on required paperwork.

- Two NY Times articles (here and here) indicate that a James D. Galloway was an employee of the Texas Bureau of Land Management who investigated in the 1990's for planning to sell wild horses he adopted to slaughter. The article notes "... *Mr. Galloway saying he planned to get horses from the adoption program, fatten them and sell them for slaughter.*" The article also states that Galloway lost his job as a result of the incident.

- Further investigation shows that in 2014, a Jimmy Galloway was part of a BLM crew that moved 1,493 wild horses out of the Teterville Long-Term Holding Facility in Oklahoma after 196 horses perished there.  This may be James D. Galloway, the BLM employee

3

found to be preparing to send wild horses he adopted to slaughter, or it may be his son. A comment left on a 2011 Associated Press article indicates that the former Galloway had a son working at the BLM at the time.

- In either case, it appears that an individual associated with or employed by the BLM is signing paperwork for BLM wild horses and burros sent to livestock auctions and an immediate investigation into this individual is warranted. **The titles and coggins can be found in this Dropbox.**

**Appendix:**

1. Nine burros were sent to Cleburne Horse Sale by an individual, or individuals, whose name(s) are redacted on the titles. All animals were inspected by a private veterinarian.

    a. 07730058: Burro titled on June 3, 2020. The burro was adopted on May 14, 2019 and was inspected on April 23, 2020 in Paoli, OK.

    b. 11144297: Burro titled on May 19, 2020. The burro was adopted on May 14, 2019 and was inspected on April 23, 2020 in Paoli, OK.

    c. 14144226: Burro titled on May 19, 2020. The burro was adopted on May 14, 2019 and was inspected on April 23, 2020 in Paoli, OK.

    d. 14732935: Burro titled on May 19, 2020. The burro was adopted on May 14, 2019 and was inspected on April 23, 2020 in Paoli OK

    e. 16732988: Burro titled on May 19, 2020. The animal was confirmed to be adopted through the AIP by FOIA records obtained by AWHC. The burro was adopted on May 14, 2019 and was inspected on April 23, 2020 in Paoli OK

    f. 14733071: Burro titled on June 3, 2020. The burro was adopted on May 14, 2019 and was inspected on April 23, 2020 in Paoli, OK.

    g. 16144289: Burro titled on June 3, 2020. The burro was adopted on May 14, 2019 and was inspected on April 23, 2020 in Paoli, OK.

    h. 18646708: Burro titled on June 3, 2020. The burro was adopted on May 14, 2019 and was inspected on April 23, 2020 in Paoli, OK.

4

      i.   18646712: Burro titled on June 3, 2020. The burro was adopted on May 14, 2019 and was inspected on April 23, 2020 in Paoli, OK.

2. Three burros were titled to Chad W. Lessert.

    a.   09145147: Burro titled on June 17, 2019. The burro was adopted on June 11, 2019 and was inspected, virtually, on April 9, 2020. The compliance check records note: "Virtual compliance inspection over email with adopter. Sent 5 pictures. Animal is in excellent condition. BCS 5."

    b.   16144271: Burro titled on June 17, 2019. The burro was adopted on June 11, 2019 and was inspected, virtually, on April 9, 2020. The compliance check records note: "Virtual compliance inspection over email with adopter. Sent 5 pictures. Animal is in excellent condition. BCS 5."

    c.   18646709: Burro titled on June 17, 2019. The burro was adopted on June 11, 2019 and was inspected, virtually, on April 9, 2020. The compliance check records note: "Virtual compliance inspection over email with adopter. Sent 5 pictures. Animal is in excellent condition. BCS 5."

3. One  burro was titled to Sherry Lessert

    a.   13733107: Burro titled on July 9, 2020. The burro was adopted on July 9, 2019 and was inspected, virtually, on April 9, 2020. The compliance check records note: "Virtual compliance inspection over email with adopter. Sent 5 pictures. Animal is in excellent condition. BCS 5."

4. Two BLM burros were titled to Randy L. Davis

    a.    12799612: The burro was titled on July 15, 2020.  The burro was adopted on July 9, 2019 and inspected on July 7, 2020 by a BLM employee.
    b.   14145212: The burro was titled in 2020, the exact month not shown. The burro was adopted on July 9, 2019 and inspected on July 7, 2020 by a BLM employee.

5. One BLM burro titled to an unknown individual

5

     a. 1614427: TItle date is unknown. The burro was adopted on May 14. 2019 and was inspected on April 23, 2020 by a private vet in PAOLI OK

6. Two BLM horses were titled to Frank R. Myers
   a. 17629141: The horse titled on August 24, 2020 and rescued from Strouds Ok Kill Pen on January 19, 2021. The horse was adopted on August 3, 2019 and was inspected by a BLM employee on December 3, 2020 in Binger OK.

   b. 17629194: The horse titled on August 24, 2020 and rescued from Strouds Ok Kill Pen on January 19, 2021. The horse was adopted on August 3, 2019 and was inspected by a BLM employee on December 3, 2020 in Binger OK.

7. Four BLM burros were titled to Marian Marley
   a. 12145104:  The burro was adopted on June 17, 2019 and was titled on July 6, 2020.
   b. 12733168:  The burro was adopted on June 17, 2019 and was titled on July 6, 2020.
   c. 12733267:  The burro was adopted on June 17, 2019 and was titled on July 6, 2020.
   d. 13730738:  The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

8. Four BLM burros were titled to Alicia Marley:
   a. 08730145: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.
   b. 05185047: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.
   c. 1573134: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.
   d. 16733128: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

9. Four BLM burros were titled to Wendy Marley
   a. 06733219: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.
   b. 16144361: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

BLM_003954

    c.  08184411: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    d.  08184627: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

10. Four BLM burros were titled to Heath Marley

    a.  09185075: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    b.  07184428: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    c.  09185149: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    d.  09185471: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

11. Four BLM burros were titled to Bobbie Jo Marley

    a.  09730256: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    b.  09733167: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    c.  09733274: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    d.  09799424: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

12. Four BLM burros were titled to Shelly Harrop

    a.  12732966: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

    b.  13732954: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

    c.  13733035: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

    d.  14732930: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

13. Four BLM burros were titled to Robert Harrop

    a.  10184782: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

7

    b.  10185133: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    c.  10186524: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    d.  10730222: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

14. Four BLM burros were titled to Leeann Harrop

    a.  10733218: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    b.  10733241: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    c.  11185978: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    d.  11733247: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

15. Four BLM burros were titled to Rodney Harrop:

    a.  14732936: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

    b.  15732976: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

    c.  16144366: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

    d.  06730247: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

16. Four BLM burros were titled to Cody D Weeks

    a.  12145204: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

    b.  12186532: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

    c.  12733224: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

    d.  12733236: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

17. Four BLM burros were titled to Coti B Weeks

    a.  05733136: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

BLM_003956

    b.  08733135: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

    c.  09733253: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

    d.  107300546: The burro was adopted on June 20, 2019 and was titled on July 6, 2020.

18. Four BLM burros were titled to Dawn Erickson

    a.  12143838: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    b.  09143773: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    c.  05185617: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    d.  12733063: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

19. Four BLM burros were titled to Floyd Fife

    a.  13733208: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    b.  14733187: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    c.  14773195: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

    d.  15730794: The burro was adopted on June 17, 2019 and was titled on July 6, 2020.

20. [Images of the "Marley Burros"](#)

9

## Response to your letter

Wild_Horse, BLM_WO <BLM_WO_Wild_Horse@blm.gov>

Mon 6/7/2021 2:02 PM

**To:** Sroy@americanwildhorsecampaign.org <Sroy@americanwildhorsecampaign.org>

📎 1 attachments (184 KB)
BLM0026713 (Emailed).doc;

Dear Suzanne Roy,

Thank you for contacting the Bureau of Land Management (BLM) and expressing your concerns regarding the Wild horse and Burro Program (WHBP) in your letter. The BLM takes the safety and well-being of wild horses and burros very seriously, and we continue to strive to fulfill our management responsibilities in the most humane manner possible. The goal of the WHBP is to ensure healthy wild horses and burros are thriving on healthy public range lands, using the available management tools under the 1971 Wild Free-Roaming Horses and Burros Act.

The Department of the Interior and the BLM care deeply about the wild horses and burros and the public lands in which they roam. It remains the current policy of the BLM not to send wild horses or burros to slaughter. The BLM will continue its partnership efforts to train and find homes for as many wild horses and burros as possible and work to develop tools to slow population growth by supporting continued research into long-lasting fertility control methods. With an expanded suite of management tools, the BLM can strengthen its efforts to reverse the declining health of our nation's wild horse and burro herds and manage the public lands on which they, and so many other species, depend.

We encourage you to participation in the upcoming National Wild Horse and Burro Advisory Board Meeting. The Bureau of Land Management's National Wild Horse and Burro Advisory Board will meet virtually **June 30 - July 1, 2021**. The board will discuss the management of wild horses and burros on public lands, including the challenges of safely reducing widespread overpopulation and measures for increasing the placement of wild horses and burros into good homes through adoptions and sales.

The board meeting will be held virtually using Zoom video conferencing technology and live streamed at BLM.gov/live. The agenda of the meeting will be published in the May28 Federal Register. A more detailed agenda, meeting materials and information to register to provide verbal comment to the board will be posted to [../June/BLM.gov/whb/advisoryboard]BLM.gov/whb/advisoryboard at least 15 days prior to the meeting. Speakers must be registered to deliver public comment at least 3 days prior to the meeting. The time available for public comment during the meeting is limited each day; registration will be on a first-come, first-served basis. The audio of all public comments will be recorded.

Speakers and those who cannot attend the virtual meeting can also submit a written copy of their comments to whbadvisoryboard@blm.gov. Please include "Advisory Board Comment" in the subject line of the e-mail. Written comments emailed three days prior to the meeting will be provided to the Advisory Board for consideration during the meeting.

For current information about our on- and off-range management activities, including opportunities for you to support the management of wild horses and burros by adopting or purchasing an animal. Again, thank you for reaching out to us and we really appreciate and hear your concern for our horses and burros.

**Department of the Interior, Bureau of Land Management**
**National Wild Horse and Burro Program**
**Monday - Friday, 8 am - 5 pm (CT); Closed on federal holidays holidays**

 

*Visit our website today→* ***www.blm.gov/whb***

| | |
|---|---|
| **From:** | Jenkins, David B |
| **To:** | Russell, Gregory B; St George, Brian C |
| **Cc:** | Moody, Aaron G; Sklar, Ryan M |
| **Subject:** | Re: AIP petition |
| **Date:** | Thursday, June 10, 2021 4:01:06 PM |
| **Attachments:** | WHB Briefing adoption incentive improvements.docx |

Hi Greg,

Here it is. I've not yet received any feedback from Nada and Mike.

Thanks,

David

David Jenkins, PhD
Assistant Director, Resources and Planning
Bureau of Land Management
U.S. Department of the Interior
760 Horizon Drive, Grand Junction, CO 81506
office: (970) 256-4951
mobile: (970) 852-1964
Directorate of Resources and Planning (HQ200)

---

**From:** Russell, Gregory B <Gregory.Russell@sol.doi.gov>
**Sent:** Thursday, June 10, 2021 2:45 PM
**To:** Jenkins, David B <djenkins@blm.gov>; St George, Brian C <bstgeorg@blm.gov>
**Cc:** Moody, Aaron G <Aaron.Moody@sol.doi.gov>; Sklar, Ryan M <ryan.sklar@sol.doi.gov>
**Subject:** Re: AIP petition

Thanks. Would you mind sharing the memo that you sent along, just for our background? We can also help on the next iteration or in responding to any feedback that you get from Nada and Mike.

---

**From:** Jenkins, David B <djenkins@blm.gov>
**Sent:** Thursday, June 10, 2021 2:49 PM
**To:** Russell, Gregory B <Gregory.Russell@sol.doi.gov>; St George, Brian C <bstgeorg@blm.gov>
**Cc:** Moody, Aaron G <Aaron.Moody@sol.doi.gov>; Sklar, Ryan M <ryan.sklar@sol.doi.gov>
**Subject:** Re: AIP petition

Hi Greg,

Great to have you and Aaron on the call with HQ200, very helpful,

I sent Mike and Nada a briefing memo today for review about how to improve the adoption incentive program, which included some SOL input from the other WHB briefings memos we put together.  I expect further tweaks will come from that memo and will keep you informed.

The AIP petition we've not yet talked in detail about but will keep you informed on that as well.

Thanks again,

David

David Jenkins, PhD
Assistant Director, Resources and Planning
Bureau of Land Management
U.S. Department of the Interior
760 Horizon Drive, Grand Junction, CO 81506
office: (970) 256-4951
mobile: (970) 852-1964
Directorate of Resources and Planning (HQ200)

---

**From:** Russell, Gregory B <Gregory.Russell@sol.doi.gov>
**Sent:** Thursday, June 10, 2021 12:14 PM
**To:** Jenkins, David B <djenkins@blm.gov>; St George, Brian C <bstgeorg@blm.gov>
**Cc:** Moody, Aaron G <Aaron.Moody@sol.doi.gov>; Sklar, Ryan M <ryan.sklar@sol.doi.gov>
**Subject:** AIP petition

Hi David and Brian – thanks again for letting Aaron and me join the 200 call on Tuesday. We thought it was great!

Last week, we saw the incoming AIP petition from AWHC, including its request for a response by June 30. Have there been discussions about whether or how the BLM will respond? Or, more broadly, any further discussions about policy tweaks relating to WH&B adoption or sale? I know this is on the Department's radar, so I wanted to check in and offer SOL assistance.

_____
Greg Russell
Assistant Solicitor, Public Lands Branch
Division of Land Resources
Office of the Solicitor
Department of the Interior
202.208.4327

NOTICE: This email (including attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected by applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or use of this email or its content is strictly prohibited. If you receive this email in error, please notify the sender immediately and destroy all copies.

**INFORMATION/BRIEFING MEMORANDUM**
FOR THE **ASSISTANT SECRETARY – LAND AND MINERALS MANAGEMENT**

**DATE:**  June 10, 2021

**THROUGH**: Nada Culver, Deputy Director for Policy and Programs

**FROM:**  David Jenkins, Assistant Director, Resources and Planning

**SUBJECT:**  Improvements to the Bureau of Land Management Wild Horse and Burro Adoption Incentive Program.

The purpose of this memo is to specify various improvements to the Bureau of Land Management Wild Horse and Burro Adoption Incentive Program. Please refer to the attached briefing memos for an overview of the program (May 19, 2021) and for a response to concerns about the program (May 25, 2021).

## BACKGROUND

Congress unanimously passed the Wild Free-Roaming Horses and Burros Act to provide for the management, protection, and control of wild horses and burros on public lands. President Nixon signed the bill into law on December 15, 1971. Since then, the BLM has regularly removed excess wild horses and burros from public lands. It has placed more than 270,000 of these animals into private care.

The Adoption Incentive Program began on March 12, 2019, as part of an overall effort to increase the number of wild horses and burros placed into good care. The Adoption Incentive Program resulted in a 90 percent increase in adoptions, saving an estimated $183 million in long-term holding costs. With the continuation of this program, the BLM anticipates similar savings as the number of adopted animals increases.

A May 15, 2021 article in *The New York Times* alleged the Bureau of Land Management failed in its oversight of the Wild Horse and Burro Adoption Incentive Program. Subsequent letters to the Secretary of the Interior from members of Congress, the American Wild Horse Campaign, the Humane Society of the United States, the American Society for the Prevention of Cruelty to Animals, and Return to Freedom, made the same general claim. The American Wild Horse Campaign filed a June 3, 2021 petition under the Administrative Procedure Act to suspend the program.

## DISCUSSION

The BLM considers the Adoption Incentive Program a success. Nevertheless, committed to wild horse and burro welfare, the BLM is making various improvements to the Adoption Incentive Program. The BLM anticipates continuing to work with the US Attorney's Office to prosecute an adopter or purchaser for false or misleading statements when adopting or purchasing a wild horse

1

or burro. The BLM will work with Congress to emphasize the importance of this cooperative effort.

**NEXT STEPS**

The BLM will immediately:

1. Ensure the obligations and restrictions of the intent clause on the Private Maintenance and Care Agreement are clear, consistent with the language on the adoption application and title application, and consistent with the BLM's legal authority.

2. Mail a second round of notices to hundreds of sale barns around the country to advise them on restrictions of sales of untitled wild horses and burros.

3. Improve the screening of potential applicants and identify and exclude ineligible and potentially problematic adopters from adoption.

4. Ensure that adopted animals are viewed by a BLM representative within the first six months after the adoption date.

5. Establish a requirement for adopters in the adoption incentive program to have the title eligibility letter certified by a veterinarian.

6. Continue to alert US Attorney's Office when the BLM needs assistance to prosecute an adopter or purchaser under 18 USC 1001 for false or misleading statements regarding their intentions when adopting or purchasing the animal.



2

| | |
|---|---|
| **From:** | Waddell, Holle |
| **To:** | McGuire, Paul M; Fluer, Scott L; Reiland, Michael J |
| **Subject:** | Updated AIP Refinement |
| **Date:** | Monday, June 14, 2021 9:58:26 AM |
| **Attachments:** | WHB Briefing Improvements.docx |
| | Outlook-nbamppy0.png |

All - Attached is the most recent document David referenced during last week's check-in. We have moved out on #1 and #2 which is a high-five to us and awaiting

Thank you,

Holle' Waddell
Department of the Interior
Bureau of Land Management
Division Chief *(Acting)*
Division of Wild Horses and Burros, HQ-260
405.579.1860 (office)
202.603.3740 (cell)
hwaddell@blm.gov

*"When you can identify injustice, when you can identify inequality and unfairness, and you confront that, then in my mind you are doing justice." - Bryan Stevenson, Founder and Executive Director for the Equal Justice Initiative*



https://www.blm.gov/programs/wild-horse-and-burro/50th-anniversary

Wild Horse and Burro | Bureau of Land Management

FIND THE LATEST INFORMATION on changes to wild horse and burro events and facility operating hours. The Bureau of Land Management manages and protects wild horses and burros on 26.9 million acres of public lands across 10 Western states as part of its mission to administer public lands for a variety of uses.

www.blm.gov

**INFORMATION/BRIEFING MEMORANDUM**
FOR THE **ASSISTANT SECRETARY – LAND AND MINERALS MANAGEMENT**

**DATE:**         June 10, 2021

**THROUGH**: Nada Culver, Deputy Director for Policy and Programs

**FROM:**        David Jenkins, Assistant Director, Resources and Planning

**SUBJECT:**   Improvements to the Bureau of Land Management Wild Horse and Burro
                       Adoption Incentive Program.

The purpose of this memo is to specify various improvements to the Bureau of Land
Management Wild Horse and Burro Adoption Incentive Program. Please refer to the attached
briefing memos for an overview of the program (May 19, 2021) and for a response to concerns
about the program (May 25, 2021).

**BACKGROUND**

Congress unanimously passed the Wild Free-Roaming Horses and Burros Act to provide for the
management, protection, and control of wild horses and burros on public lands. President Nixon
signed the bill into law on December 15, 1971. Since then, the BLM has regularly removed
excess wild horses and burros from public lands. It has placed more than 270,000 of these
animals into private care.

The Adoption Incentive Program began on March 12, 2019, as part of an overall effort to
increase the number of wild horses and burros placed into good care. The Adoption Incentive
Program resulted in a 90 percent increase in adoptions, saving an estimated $183 million in long-
term holding costs. With the continuation of this program, the BLM anticipates similar savings
as the number of adopted animals increases.

A May 15, 2021 *New York Times* article alleged the Bureau of Land Management failed in its
oversight of the Wild Horse and Burro Adoption Incentive Program. Subsequent letters to the
Secretary of the Interior from members of Congress, the American Wild Horse Campaign, the
Humane Society of the United States, the American Society for the Prevention of Cruelty to
Animals, and Return to Freedom, made the same general claim. The American Wild Horse
Campaign filed a June 3, 2021 petition under the Administrative Procedure Act to suspend the
program.

**DISCUSSION**

The BLM considers the Adoption Inventive Program a success. Nevertheless, committed to wild
horse and burro welfare, the BLM is making various improvements to the Adoption Incentive
Program.

1

**NEXT STEPS**

The BLM will immediately:

1. Ensure the obligations and restrictions of the intent clause on the Private Maintenance and Care Agreement are clear, consistent with the language on the adoption application and title application, and consistent with the BLM's legal authority.

2. Mail a second round of notices to hundreds of sale barns around the country to advise them on restrictions of sales of untitled wild horses and burros.

3. Improve the screening of potential applicants and identify and exclude ineligible and potentially problematic adopters from adoption.

4. Ensure that adopted animals are viewed by a BLM representative within the first six months after the adoption date.

5. Establish a requirement for adopters in the adoption incentive program to have the title eligibility letter certified by a veterinarian.

6. Alert US Attorney's Offices when we need assistance to prosecute an adopter or purchaser under 18 USC 1001 for false or misleading statements regarding their intentions when adopting or purchasing the animal.

7. Consider an update to the regulations at 43 CFR Part 4700 to potentially make it more difficult for, or impose penalties upon, adopters who knowingly sell titled animals to buyers that result in an animal's destruction.

8. Evaluate 16 USC 1333(e)(2&4) to determine possible limits to resale of titled animals for a certain period of time.

9. Explore additional incentives to ensure appropriate care of adopted animals.

10. Engage in a fact-finding review of the allegations contained in the *NYT* article, letters, and petition referenced above.

2

**From:** Press, BLM
**To:** Malo, Sebastien (Reuters)
**Subject:** Re: [EXTERNAL] Reporter seeking comment on Animal activists sue BLM over wild horses adoption program - DEADLINE 11:45 am EST
**Date:** Tuesday, June 15, 2021 10:09:13 AM

Hi Sebastien. No comment on this from us right now.

Thanks!

- Richard Packer

BLM Communications

_____

**From:** Malo, Sebastien (Reuters) <Sebastien.Malo@thomsonreuters.com>
**Sent:** Tuesday, June 15, 2021 10:45 AM
**To:** Press, BLM <BLM_Press@blm.gov>
**Subject:** [EXTERNAL] Reporter seeking comment on Animal activists sue BLM over wild horses adoption program - DEADLINE 11:45 am EST

**This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.**

Hi, can you please comment on the below:

Animal advocacy Friends of Animals accused on Monday the Bureau of Land Management of running a wild-horse adoption program that fails to prevent their resale to slaughter facilities that process them for meat, in violation of prohibitions by Congress and federal law.

Thank you

**Sebastien Malo**
Legal Reporter
**Reuters News**

Phone/Signal: +1 347-541-0815
Email: sebastien.malo@thomsonreuters.com
 @SebastienMalo
https://www.reuters.com/journalists/sebastien-malo

The Thomson Reuters Building
3 Times Square
New York City 10036

This e-mail is for the sole use of the intended recipient and contains information that may be privileged and/or confidential. If you are not an intended recipient, please notify the sender by return e-mail and delete this e-mail and any attachments. Certain required legal entity disclosures can be accessed on our website: https://www.thomsonreuters.com/en/resources/disclosures.html

BLM_003968

Response to your letter

Wild_Horse, BLM_WO <BLM_WO_Wild_Horse@blm.gov>

Thu 6/17/2021 11:13 AM

**To:** nick@eubankslegal.com <nick@eubankslegal.com>

Nick,

Thank you for expressing your concerns regarding the Wild Horse and Burro Program in your letter. The BLM takes action where it can to reduce overpopulation and put the Wild Horse and Burro Program on track toward having healthy herds on healthy rangelands, while also using taxpayer resources responsibly. The BLM aims to gather wild horses and burros from areas on public lands where the highest concerns exist when it comes to protecting animal health, saving critical wildlife habitat and protecting public safety by removing animals from highways and private property. Click here for the latest gather and removal stats.

The BLM initiated the Adoption Incentive Program to encourage more adopters to give a wild horse or burro a good home. The up to $1,000 incentive is available for approved adopters and all untrained wild horses and burros, including animals at BLM facilities, off-site events and the Online Corral. As with all wild horse and burro adoptions since the program began decades ago, adopted animals can become the property of adopters after a year, through a process in which title to the animal is passed to the adopter. BLM does not have the means or legal authority to track or direct the disposition of wild horses or burros once they pass into private ownership (i.e. once an animal is sold by BLM or an adopter receives title).

If/when BLM becomes aware of freeze marked animals arriving at commercial sale barns, the agency will conduct its due diligence to ensure the animals are in fact properly titled or sold. If they are not properly titled or sold, they remain subject to BLM's jurisdiction under the Wild Free-Roaming Horses and Burros Act. The agency will move to repossess such animals, investigate the matter and take appropriate legal or administrative action. It is important to note that BLM does not and cannot assume that any or every titled or sold wild horse or burro that arrives at a sale barn is destined for slaughter. Indeed, many such animals are acquired from sale barns by equine welfare organizations or by private individuals. BLM strongly encourages anyone who has the means and desire to adopt or purchase a wild horse or burro to avail themselves of the many opportunities at any of BLM's facilities, events or Online Corral.

The BLM also launched new initiatives to find more private homes for the wild horses and burros removed from public lands, including offering financial incentives to adopt animals and providing a better way to adopt online. The BLM continues to invest in research for better fertility control, supporting public-private partnerships for training and adopting out more animals and moving more animals to cost-effective off-range pastures for long-term care. Through all these actions, the BLM continues to work with Congress, our partners and the public to reduce overpopulation across the West.

## Ways to Get Involved

The Bureau of Land Management's National Wild Horse and Burro Advisory Board will meet virtually on **June 30 - July 1, 2021**. The board will discuss the management of wild horses and burros on public lands, including the challenges of safely reducing widespread overpopulation and measures for increasing the placement of wild horses and burros into good homes through adoptions and sales.

For more information on the upcoming National Wild Horse and Burro Advisory Board and/or how to participate, click here.

BLM_0005969

**Department of the Interior, Bureau of Land Management**
**National Wild Horse and Burro Program**
**Monday - Friday, 8 am - 5 pm (CT); <u>Closed on federal holidays holidays</u>**

 

*Visit our website today→ <u>www.blm.gov/whb</u>*

**From:**         Williams, Pat B
**To:**           McGuire, Paul M
**Subject:**      FW: Questions from the New York Times Reporter re: NM Pilot Program
**Date:**         Monday, June 21, 2021 4:06:06 PM
**Attachments:**  NM Adoption Incentive Program Graph.docx

Pat Williams

NM Region WH&B Program Mgr.

201 Stephenson Pkwy; Ste 1200

Norman, OK 73072

(office) 405-579-7180

(cell) 405-222-8676

**From:** Williams, Pat B <pbwillia@blm.gov>
**Sent:** Tuesday, April 30, 2019 2:06 PM
**To:** Waddell, Holle <hwaddell@blm.gov>
**Cc:** Rittenhouse, Bruce H <brittenh@blm.gov>; Deborah Collins <dacollin@blm.gov>; McGuire, Paul M <PMcGuire@blm.gov>; Lutterman, Jason W <jlutterman@blm.gov>
**Subject:** Re: Questions from the New York Times Reporter re: NM Pilot Program

Holle,

Attached is the data set (in graph form) comparing the total number of horses adopted through the NM adoption incentive pilot program and the total number of (all) horses adopted in the NM region during that same time period. The data was pulled from WHBPS, using the date range of FY 2010 through FY 2017, with the assumption that all (untrained) horses, 4 years of age and older, adopted at the full adoption fee of $125 or greater, participated in the pilot adoption incentive program. (Burros, trained horses and horses adopted at a reduced fee were not eligible to participate in the incentive program.)

- It is my understanding there was a pilot program before the policy was rolled out. Can you please provide for me any reports made on the effectiveness of the pilot program.  Please see attachment. From FY 2010 - FY 2017, a total of 3,942 (untrained) horses were adopted in the NM region. Of those 3,942 horses, 1,575 (40%) were adopted through the pilot program.
- The BLM had to repossess several horses during the pilot program, according to my sources.  Can you provide the number of horses the BLM took back, why they were taken back, and a rough estimate of the cost?   The data shows that BLM repossessed a total of 7 horses during the 8 year (pilot program) period. Of the 7 repossessed, 2 of those were adopted through the pilot program. (There is no record of estimated cost.)
  - Horse #7444 repossessed because adopter failed to provide care.
  - Horse #4230 repossessed because adopter failed to provide care, inhumane treatment & failure to notify BLM.

If any further information is needed, please let me know.

Thanks,
Pat


On Mon, Apr 15, 2019 at 4:46 PM Waddell, Holle <hwaddell@blm.gov> wrote:

> Pat - As discussed last Friday morning (04/12/19) as well as today (04/15/19), the BLM has received four questions from a New York Times reporter regarding the newly launched Adoption Incentive Program and the NM Adoption Incentive Pilot Program. Responses to the first two questions have been provided to the reporter. In addition, I provided the following summary about the NM Adoption Incentive Pilot Program based on our conversation on Friday:
> *New Mexico initiated a pilot I believe in 2009 where older, untrained animals were targeted by the incentive program to receive a "first-year care and feeding allowance" estimated at $500 which was payable upon issuance of title. The goal of the incentive program was to assist with the reduction in off-range care costs while increasing the number of animals adopted that are older than four years old. Adopters were required to meet all adoption requirements, abide by adoption/PMACA prohibited acts, terms and conditions and pay an adoption fee of $125. Each animal was identified as a mandatory compliance inspection. In order to receive the $500 incentive, adopters must have the title application completed by BLM staff or a veterinarian. Initially, adopters showed interest in the program however results showed that there was no increase in the number of animals placed. It was determined that individuals planning to adopt chose an incentive animal rather than an animal where no incentive was offered. No changes were made to the Wild Horse and Burro Program System so data is limited to cuff records.*
>
> Please provide a response to the following two questions from the reporter:
>
> - It is my understanding there was a pilot program before the policy was rolled out. Can you please provide for me any reports made on the effectiveness of the pilot program.
> - The BLM had to repossess several horses during the pilot program, according to my sources.  Can you provide the number of horses the BLM took back, why they were taken back, and a rough estimate of the cost?
>
> If you have specific questions regarding this press inquiry, please contact Debbie as Jason is out of the office this week.
>
> Thank you,
>
> Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |
>
> Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov
>
> "A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will

begin to create the reality you desire." - Cheryl Wood

Pat Williams
NM Wild Horse & Burro Program Mgr.
BLM - Oklahoma Field Office
201 Stephenson Pkwy, Suite 1200
Norman, OK 73072
405-579-7180 (Office)
405-222-8676 (Cell)

BLM_003973



| | Horses Adopted - NM Pilot Incentive | | Total Horses Adopted - NM Region | |
|---|---|---|---|---|
| Total Adopted | 1575 | | 3942 | |
| Titled | 1108 | | 2706 | |
| Untitled | 203 | | 685 | |
| Reassigned | 116 | | 213 | |
| Relinquished | 108 | | 220 | |
| Deaths | 38 | | 111 | |
| Repossessed | 2 | | 7 | |

*Titled – Adopter complied with the terms and conditions of the Private Maintenance and Care Agreement and a Certificate of Title was issued.

*Untitled – Adopter has not applied for the Certificate of Title.

*Reassigned – The original adopter could no longer care for, or no longer wanted to maintain their adopted animal. The animal was re-adopted to another qualified individual.

*Relinquished - The original adopter could no longer care for, or no longer wanted to maintain their adopted animal. The adopted animal was returned to the Bureau of Land Management.

*Repossessed – The adopter did not comply with the terms and conditions of the Private Maintenance and Care Agreement. The adopted animal was repossessed and placed back into the Bureau of Land Management's care.

| | |
|---|---|
| **From:** | Williams, Pat B |
| **To:** | McGuire, Paul M |
| **Subject:** | FW: NM Adoption Incentive |
| **Date:** | Tuesday, June 22, 2021 8:29:59 AM |
| **Attachments:** | Adoption Incentive Program (rev 3.11.09).docx |
| **Importance:** | High |

Morning Paul,

I cannot find any authority for or the NM Incentive Pilot. – I'll keep searching, but as noted below, I've conducted this very search in the past, lol!

Pat Williams

NM Region WH&B Program Mgr.

201 Stephenson Pkwy; Ste 1200

Norman, OK 73072

(office) 405-579-7180

(cell) 405-222-8676

**From:** Williams, Pat B <pbwillia@blm.gov>

**Sent:** Thursday, June 7, 2018 8:48 AM

**To:** Waddell, Holle <hwaddell@blm.gov>

**Subject:** NM Adoption Incentive

**Importance:** High

Holle,

I cannot find any reference to which authority was cited when the (pilot) incentive program was established, allowing NM to reimburse adopters.- I've gone through Bob's old files, conducted email searches & thumb drive searches and found nothing.

Attached is essentially a brief summary (or proposal) of the incentive program, which you probably already have.

Thanks,

Pat

--

Pat Williams

NM Wild Horse & Burro Program Mgr.

BLM - Oklahoma Field Office

201 Stephenson Pkwy, Suite 1200

Norman, OK 73072

405-579-7180 (Office)

405-222-8676 (Cell)

3/11/09

A WHB Pilot Program
Administered by the New Mexico State Office

# Adoption Incentives for Older Horses:
First-Year Care & Feeding Allowances

## OVERVIEW

Any qualified individual who adopts an older animal targeted by this incentive program will be eligible to receive a first-year care and feeding allowance, payable upon issuance of title after one year.

Primary Objective – To reduce the Wild Horse & Burro (WHB) program's reliance on long-term holding facilities (LTH) as the principle outlet for older animals removed from the public range, thus relieving the budgetary stress these facilities place upon the WHB and other BLM programs.

Secondary Objective – To boost the title rate for adopted animals, thus relieving the agency of the administrative overhead and potential liability posed by the ever growing backlog of untitled animals.

Duration of Pilot: Two years minimum.

## BACKGROUND

The BLM currently houses 22,000 animals in 12 LTHs around the country. These are large private ranches that keep horses under contract at a cost of nearly $500/horse/year. That translates into an annual program cost of $11,000,000, which often must be taken from other program areas such as gathering, compliance, etc. Horses placed in LTH typically live out the remainder of their natural lives there (15-25 years), representing a potential lifetime cost of $12,500/horse. Conversely, every horse successfully adopted and titled – and therefore *not* ultimately sent to LTH – represents a lifetime savings to the agency of that same amount.

The need to add, expand or renew LTH contracts often implicates provisions of the Endangered Species Act. The required consultations and resulting monitoring/mitigation measures add considerable "hidden" costs to the administration of the LTH program.

Horses sent to LTH are generally those for which adoption demand is thought (or known) to be relatively low. There are two main categories of horses that meet this criterion:

- Older horses (generally 6-10 years) gathered from the public range in the normal course of herd management. This is the principal target group of this incentive program;

3/11/09

- Older horses (11 years +), ineligible for adoption per a 2004 amendment to the Wild Free-Roaming Horses and Burros Act (commonly known as the Burns Amendment). These animals may only be transferred to private ownership if sold under the terms of the Burns Amendment and therefore are not targetable by this adoption incentive program.

A third category of horses held (temporarily) in LTH are younger ones born of recently-gathered older mares. Since adoption demand for younger animals is comparatively strong, they are purposefully not targeted by this incentive program.

EXECUTION

Adoption Rules – All standard adoption rules and fees apply. Adopters must meet all requirements necessary for approval and abide by all PMACA terms and conditions.

Incentive Amounts –This is a two-tiered incentive program, with a greater incentive offered for older horses and a lesser incentive for mid-aged horses. No incentive is offered for younger horses and burros.

- Older horses (6-10 years) – First-year care and feeding allowance of $500.
- Mid-aged horses (4-5 years) – First-year care and feeding allowance of $250.
- Younger horses (3 years and under) and burros – No incentive offered.

Incentive Payments – Incentives are payable only upon issuance of title after one year. If a horse is relinquished or dies before title is issued, the incentive offer is voided. Payments will be made by means of convenience check issued by the titling office. Funds will be charged against LTH animal feed days for the year in which title is issued.

Titling – Titling under this incentive program will be carried out in much the same way as with conventional adoptions (that is, after one year the adopter will receive a title application in the mail and will complete and return it to the issuing office for processing). In order to receive the incentive payment offered under this program, the title application must include certification of the animal's fitness by a licensed veterinarian or BLM compliance inspector. This rule is meant to ensure the highest level of professional assessment in authorizing incentive payments. Other conventional methods of certification (e.g., county extension agent, farrier; ag teacher; etc.) will be acceptable for issuing title only, not incentive payments.

Mandatory Compliance – All horses adopted under the terms of this incentive program will be added to a mandatory compliance list. At some point prior to titling, a BLM inspector will personally verify that the animals are fit and are being properly cared for.

Budget Implications – This incentive program is designed to be budget neutral in the short term, since the $250 or $500 first-year care and feeding allowances (as applicable), are less than or equal to what it would otherwise cost BLM to hold an animal in LTH for one year (hence

3/11/09

the rationale for charging incentive payments against LTH feed days). The full impact that this incentive program could have on the LTH budget if successfully implemented nationally has yet to be analyzed in detail; but it is safe to assume that fewer additions to LTH over time, coupled with predictable death rates, will reduce the budgetary scope of LTH relative to other critical WHB program areas.

Public Affairs – An aggressive public information and marketing campaign will precede and accompany the implementation of this pilot program. All available media will be employed to educate the public (TV, radio, print, web, direct mail, signage, fairs/expos, briefings/meetings, etc.). Key points to be emphasized in the communications plan:

- Tremendous cost savings potential for taxpayers;
- Continued concern for the welfare of animals removed from the public range. As with standard adoption terms, this incentive program is structured to prevent the possibility of abuse/neglect and/or commercial exploitation.

## SUMMARY

Incentive payments offered to adopters of selected older animals will curtail population growth in LTH and thereby positively impact the WHB budget, enabling more effective management of this valuable resource.

**Nguyen, Brianna E**

| | |
|---|---|
| **From:** | Wolfe, Shane B |
| **Sent:** | Thursday, June 24, 2021 1:49 PM |
| **To:** | Nguyen, Brianna E |
| **Subject:** | FW: [EXTERNAL] Re: Response to your letter |
| **Attachments:** | FINAL Response Letter re AIP 6.22.21.pdf |

Incoming.

**From:** Martinez-Niles, Raquel <raquel_martinez-niles@ios.doi.gov> **On Behalf Of** OS, DOIExecSec
**Sent:** Wednesday, June 23, 2021 6:13 PM
**To:** Wolfe, Shane B <shane_wolfe@ios.doi.gov>; Heard, Preston S <preston_heard@ios.doi.gov>
**Subject:** FW: [EXTERNAL] Re: Response to your letter

**From:** Nick Lawton <nick@eubankslegal.com>
**Sent:** Tuesday, June 22, 2021 5:11 PM
**To:** Wild_Horse, BLM_WO <BLM_WO_Wild_Horse@blm.gov>; OS, DOIExecSec <DOIExecSec@ios.doi.gov>; Culver, Nada L <nculver@blm.gov>; Bill Eubanks <bill@eubankslegal.com>
**Subject:** [EXTERNAL] Re: Response to your letter

This email has been received from outside of DOI – Use caution before clicking on links, opening attachments, or responding.

Dear Secretary Haaland and Deputy Director Culver,

I am writing to follow up on this response from the Bureau of Land Management's ("BLM") Washington Office to our petition submitted on June 3, 2021. As described in the attached letter, we construe BLM's response as a denial of the June 3 petition because BLM did not agree to take any of the actions requested in that petition. If BLM did not intend to deny the June 3 petition, we respectfully request a clarification by no later than June 30, 2021.

Thank you,

Nick Lawton
Senior Associate
Eubanks & Associates PLLC
1331 H Street NW
Suite 902

BLM_003979

Washington, DC 20005
(202) 556-1243


On Thu, Jun 17, 2021 at 12:14 PM Wild_Horse, BLM_WO <BLM_WO_Wild_Horse@blm.gov> wrote:

Nick,

Thank you for expressing your concerns regarding the Wild Horse and Burro Program in your letter. The BLM takes action where it can to reduce overpopulation and put the Wild Horse and Burro Program on track toward having healthy herds on healthy rangelands, while also using taxpayer resources responsibly. The BLM aims to gather wild horses and burros from areas on public lands where the highest concerns exist when it comes to protecting animal health, saving critical wildlife habitat and protecting public safety by removing animals from highways and private property. Click here for the latest gather and removal stats.

The BLM initiated the Adoption Incentive Program to encourage more adopters to give a wild horse or burro a good home. The up to $1,000 incentive is available for approved adopters and all untrained wild horses and burros, including animals at BLM facilities, off-site events and the Online Corral. As with all wild horse and burro adoptions since the program began decades ago, adopted animals can become the property of adopters after a year, through a process in which title to the animal is passed to the adopter. BLM does not have the means or legal authority to track or direct the disposition of wild horses or burros once they pass into private ownership (i.e. once an animal is sold by BLM or an adopter receives title).

If/when BLM becomes aware of freeze marked animals arriving at commercial sale barns, the agency will conduct its due diligence to ensure the animals are in fact properly titled or sold. If they are not properly titled or sold, they remain subject to BLM's jurisdiction under the Wild Free-Roaming Horses and Burros Act. The agency will move to repossess such animals, investigate the matter and take appropriate legal or administrative action. It is important to note that BLM does not and cannot assume that any or every titled or sold wild horse or burro that arrives at a sale barn is destined for slaughter. Indeed, many such animals are acquired from sale barns by equine welfare organizations or by private individuals. BLM strongly encourages anyone who has the means and desire to adopt or purchase a wild horse or burro to avail themselves of the many opportunities at any of BLM's facilities, events or Online Corral.

The BLM also launched new initiatives to find more private homes for the wild horses and burros removed from public lands, including offering financial incentives to adopt animals and providing a better way to adopt online. The BLM continues to invest in research for better fertility control, supporting public-private partnerships for training and adopting out more animals and moving more animals to cost-effective off-range pastures for long-term care. Through all these actions, the BLM continues to work with Congress, our partners and the public to reduce overpopulation across the West.

## Ways to Get Involved

The Bureau of Land Management's National Wild Horse and Burro Advisory Board will meet virtually on **June 30 - July 1, 2021**. The board will discuss the management of wild horses and burros on public lands, including the challenges of safely reducing widespread overpopulation and measures for increasing the placement of wild horses and burros into good homes through adoptions and sales.

For more information on the upcoming National Wild Horse and Burro Advisory Board and/or how to participate, click here.

**Department of the Interior, Bureau of Land Management**
**National Wild Horse and Burro Program**
**Monday - Friday, 8 am - 5 pm (CT); Closed on federal holidays holidays**

BLM_003980

 

*Visit our website today→ www.blm.gov/whb*

BLM_003981