Eubanks & Associates, PLLC
LAW FOR THE PUBLIC INTEREST

1331 H STREET NW
SUITE 902
WASHINGTON, DC 20005
(202) 556-1243

June 22, 2021

**Via E-Mail**

Deb Haaland, Secretary
United States Department of Interior
1849 C Street N.W.
Washington, D.C. 20240
doiexecsec@ios.doi.gov

Nada Culver, Deputy Director
United States Bureau of Land Management
760 Horizon Drive
Grand Junction, CO 81506
Nculver@blm.gov

Re:   **Clarification Regarding BLM's Unlawful Adoption Incentive Program**

Dear Secretary Haaland and Deputy Director Culver:

On June 3, 2021, on behalf of the American Wild Horse Campaign ("AWHC"), we submitted a formal petition pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553(e), 555(e), identifying myriad of legal violations committed by the Department of Interior ("DOI") and the Bureau of Land Management ("BLM") in connection with the agencies' creation and implementation of their wild horse Adoption Incentive Program ("AIP"). Relying on extensive investigatory records and information compiled over the course of many months, AWHC specifically requested in its formal APA petition that the agencies either withdraw the AIP in its entirety, or, if the agencies insist on retaining the AIP in some form, impose a moratorium on any further payments under the AIP while the agencies engage in formal notice-and-comment rulemaking to provide interested parties with an opportunity for input in a manner that comports with federal law. Given the urgency of the situation, AWHC requested a response to its petition no later than June 30, 2021.

On June 17, 2021, BLM's Wild Horse Program responded to AWHC's petition via email. This response summarized BLM's wild horse removal statistics; the general parameters of the AIP; and government investments in fertility control research, public-private partnerships for training and adoption of wild horses, and moving horses to off-range pastures for long-term care. Specific to the serious concerns raised by AWHC regarding the AIP, the response stated that "BLM does not have the means or legal authority to track or direct the disposition of wild horses or burros once they pass into private ownership (i.e., once an animal is sold by BLM or an adopter receives title)." Further, BLM stated that it "will conduct its due diligence" by undertaking an investigation if it learns of wild horses "arriving at commercial sale barns," although BLM "does not and cannot assume that any or every titled or sold wild horse or burro

that arrives at a sale barn is destined for slaughter." The response did not expressly provide the government's view of the myriad ongoing legal violations AWHC identified with respect to the AIP, nor did it explicitly deny AWHC's formal APA petition. However, the clear import of BLM's response is that it intends to continue operating the AIP in the same manner as before AWHC's petition, and that BLM will continue to apply the erroneous presumption that not a single wild horse arriving at commercial sale barns is destined for slaughter unless it can be proven otherwise.

AWHC construes the June 17, 2021 response—in which DOI and BLM did *not* agree to take the action requested in AWHC's June 3, 2021 formal APA petition, while representing that the agencies view any further action to protect wild horses from slaughter as outside their legal authority—as a denial of AWHC's June 3, 2021 formal APA petition. If AWHC is incorrect in its understanding of the agencies' response, please clarify the agencies' actual position **no later than June 30, 2021**—i.e., the date by which AWHC requested a response to its petition. If we do not receive a response by that date, we will assume that our understanding is correct, and that the agencies will not be terminating the AIP or even imposing a moratorium on AIP payments pending the completion of a formal notice-and-comment rulemaking aimed at designing a more humane and sustainable adoption incentive program.

Please let us know if you have any questions. We look forward to your response.

Respectfully submitted,

William S. Eubanks II
Owner & Managing Attorney

William N. Lawton
Senior Associate

## RE: Wild Horse and Burro Program

## McGuire, Paul M <PMcGuire@blm.gov>

Thu 7/1/2021 12:16 PM

**To:** Clark, Taneisha L <tlclark@blm.gov>
**Cc:** Wild_Horse, BLM_WO <BLM_WO_Wild_Horse@blm.gov>

---

**From:** Jenkins, David B
**Sent:** Thursday, June 24, 2021 6:10 AM
**To:** Nick Lawton <nick@eubankslegal.com>
**Cc:** Culver, Nada L <nculver@blm.gov>; Nedd, Michael D <mnedd@blm.gov>; Jackson, Danna R
<djackson@blm.gov>; Gamper, Merry E <mgamper@blm.gov>; Waddell, Holle <hwaddell@blm.gov>
**Subject:** Wild Horse and Burro Program

Dear Mr. Lawton,

Thank you for your email and follow-up letter relating to the BLM's Wild Horse and Burro Program.
The BLM's Wild Horse and Burro Program appears to have mistakenly sent you an email on June 17,
2021, in response to your letter dated June 3. That email should not be construed as formal response
to your prior correspondence. I apologize for any confusion. The Department and the BLM continue to
review your June 3 letter and we expect to send you a response in writing soon.

Sincerely,

David Jenkins


David Jenkins, PhD

Assistant Director, Resources and Planning

Bureau of Land Management

U.S. Department of the Interior

760 Horizon Drive, Grand Junction, CO 81506

office: (970) 256-4951

mobile: (970) 852-1964

Directorate of Resources and Planning (HQ200)


**From:** Nick Lawton <nick@eubankslegal.com>
**Sent:** Tuesday, June 22, 2021 4:11 PM
**To:** Wild_Horse, BLM_WO <BLM_WO_Wild_Horse@blm.gov>; OS, DOIExecSec
<DOIExecSec@ios.doi.gov>; Culver, Nada L <nculver@blm.gov>; Bill Eubanks
<bill@eubankslegal.com>
**Subject:** [EXTERNAL] Re: Response to your letter

Dear Secretary Haaland and Deputy Director Culver,


I am writing to follow up on this response from the Bureau of Land Management's ("BLM") Washington Office to our petition submitted on June 3, 2021. As described in the attached letter, we construe BLM's response as a denial of the June 3 petition because BLM did not agree to take any of the actions requested in that petition. If BLM did not intend to deny the June 3 petition, we respectfully request a clarification by no later than June 30, 2021.


Thank you,


Nick Lawton

Senior Associate

Eubanks & Associates PLLC

1331 H Street NW

Suite 902

Washington, DC 20005

(202) 556-1243

On Thu, Jun 17, 2021 at 12:14 PM Wild_Horse, BLM_WO <BLM WO Wild Horse@blm.gov> wrote:

> Nick,
>
>
> Thank you for expressing your concerns regarding the Wild Horse and Burro Program in your letter. The BLM takes action where it can to reduce overpopulation and put the Wild Horse and Burro Program on track toward having healthy herds on healthy rangelands, while also using taxpayer resources responsibly. The BLM aims to gather wild horses and burros from areas on public lands where the highest concerns exist when it comes to protecting animal health, saving critical wildlife habitat and protecting public safety by removing animals from highways and private property. Click here for the latest gather and removal stats.
>
>
> The BLM initiated the Adoption Incentive Program to encourage more adopters to give a wild horse or burro a good home. The up to $1,000 incentive is available for approved adopters and all untrained wild horses and burros, including animals at BLM facilities, off-site events and the Online Corral. As with all wild horse and burro adoptions since the program began

BLM_003985

decades ago, adopted animals can become the property of adopters after a year, through a process in which title to the animal is passed to the adopter. BLM does not have the means or legal authority to track or direct the disposition of wild horses or burros once they pass into private ownership (i.e. once an animal is sold by BLM or an adopter receives title).

If/when BLM becomes aware of freeze marked animals arriving at commercial sale barns, the agency will conduct its due diligence to ensure the animals are in fact properly titled or sold. If they are not properly titled or sold, they remain subject to BLM's jurisdiction under the Wild Free-Roaming Horses and Burros Act. The agency will move to repossess such animals, investigate the matter and take appropriate legal or administrative action. It is important to note that BLM does not and cannot assume that any or every titled or sold wild horse or burro that arrives at a sale barn is destined for slaughter. Indeed, many such animals are acquired from sale barns by equine welfare organizations or by private individuals. BLM strongly encourages anyone who has the means and desire to adopt or purchase a wild horse or burro to avail themselves of the many opportunities at any of BLM's facilities, events or Online Corral.

The BLM also launched new initiatives to find more private homes for the wild horses and burros removed from public lands, including offering financial incentives to adopt animals and providing a better way to adopt online. The BLM continues to invest in research for better fertility control, supporting public-private partnerships for training and adopting out more animals and moving more animals to cost-effective off-range pastures for long-term care. Through all these actions, the BLM continues to work with Congress, our partners and the public to reduce overpopulation across the West.

## Ways to Get Involved

The Bureau of Land Management's National Wild Horse and Burro Advisory Board will meet virtually on **June 30 - July 1, 2021**. The board will discuss the management of wild horses and burros on public lands, including the challenges of safely reducing widespread overpopulation and measures for increasing the placement of wild horses and burros into good homes through adoptions and sales.

For more information on the upcoming National Wild Horse and Burro Advisory Board and/or how to participate, click here.

Department of the Interior, Bureau of Land Management

**National Wild Horse and Burro Program**

BLM-065968

**Monday - Friday, 8 am - 5 pm (CT); Closed on federal holidays holidays**

*Visit our website today→ **www.blm.gov/whb***

BLM_005967

U.S. Department of the Interior
Bureau of Land Management

# Wild Horse and Burro Program Off-Range Update



U.S. Department of the Interior
Bureau of Land Management

# Wild Horse and Burro Off-Range Space Update

**Number of wild horses at Off-Range Pastures:** 31,588

**Number of wild horses and burros at Off-Range Corrals:** 9,332

**Number of wild horses at Eco-Sanctuaries:** 562

2

BLM_003989

U.S. Department of the Interior
Bureau of Land Management

# Wild Horse and Burro Off-Range Space Update

- Seven Off-Range Pasture awards were made in FY 2016:
  - Two awards (MO and OK) from the 2015 ORP solicitation; 600 new spaces by October 2016
  - Five, tentative, awards (KS and OK) from the 2016 ORP Solicitation are awaiting NEPA completion; approximately 5,400 potential spaces expected by April 2017



U.S. Department of the Interior
Bureau of Land Management

# Wild Horse and Burro Off-Range Space Update

- Eco-Sanctuaries
  - 3 locations hold 580 wild horses (2-WY; 1-OK)
  - Goals for FY17 include developing educational and placement opportunities to expand program awareness
  - Wind River Eco-Sanctuary is in Lander, WY, and held a successful Open House on June 4.
  - Mowdy Ranch Eco-Sanctuary, Coalgate, OK held the 2nd Annual Mustang Marathon on June 11.

U.S. Department of the Interior
Bureau of Land Management

# Wind River Eco-Sanctuary (Lander, WY)

- Visitors information center
- Educational Opportunities
- Tours
- Gift Shop
- Campgrounds





U.S. Department of the Interior
Bureau of Land Management

# Mowdy Ranch Eco-Sanctuary (Coalgate OK)

- Educational Opportunities
- Tours
- Cabins
- Mustang Marathon (Run)





BLM_003993

U.S. Department of the Interior
Bureau of Land Management

# Comprehensive Animal Welfare Program (CAWP) Update

- Off-Range Corrals, Transportation and Adoption – Draft IM
  - Implementation
  - Training Development
  - Further define the draft assessment tool
- Off-Range Pastures and Eco-Sanctuaries – Developing draft Standard Operating Procedures (SOP)
  - Assessment tool
  - Training materials
- Future
  - Consider standards for animals outside of BLM care such as training programs and Storefronts

**7**

BLM_003994



U.S. Department of the Interior
Bureau of Land Management

# Wild Horse and Burro Off-Range Update

- Marketing Firm Support
  - Solicitation opened 8/26 and closes 9/16
  - Solicitation seeks professional and consistent marketing and communication products
  - Guidance on marketing strategies
  - TPEC will review proposals and make an award by 9/26

**8**

BLM_003995

U.S. Department of the Interior
Bureau of Land Management

# Wild Horse and Burro Off-Range Update

- Adoption Incentive Pilot Program
  - SPI was completed by the program and reviewed by procurement
  - RFA (Solicitation) will move forward next FY
  - 100 animals in ORCs (minimum in 1st year)
    - Incentive offered to adopters who:
      - Halter/Saddle train horses 7 years and older
      - Halter/Saddle train burros 9 years and older
  - Adopter must apply for and receive title at the same time incentive is paid out

U.S. Department of the Interior
Bureau of Land Management

# Internet Adoption Website

- Adopt-A-Horse website will be rebranded, modernized, and automated to benefit the adoption and sales program.
- Request for proposals (RFP)
  - RFP closed Tuesday, September 6th
  - TPEC identified, will review proposals and recommend within 48 hours
  - Award contract this fiscal year



**10**

U.S. Department of the Interior
Bureau of Land Management

# Trained Animal Opportunities

- Trainer Ambassador Pilot Program (TAPP)
  - Eastern States is leading the effort
  - Foundation Trainer proposals reviewed by TPEC
  - Site visits and coordination will continue after next FY
- Family of Horses (Partnership)
  - Placed over 150 trained burros since November 2015
  - Provided educational and program assistance

Wild
Horse
and
Burro
Program

**11**

BLM_003998

**U.S. Department of the Interior**
**Bureau of Land Management**

# Trained Animal Opportunities

- Mustang Heritage Foundation (Partnership)
  - Placed over 1,100 trained animals
    - Storefront Program
  - Provides educational and marketing assistance
- Correctional Centers (Partnership)
  - Placed over 300 trained horses
  - Host open houses and adoption events
- Mantle Horse Ranch (Contract)
  - Placed nearly 75 untrained and trained animals
  - Hosts adoption events

BLM_003999

U.S. Department of the Interior
Bureau of Land Management

# **Placement into Private Care**

- Adoption Demand Study
  - Great Lakes Marketing completed a review of the adoption/sales program
  - Findings will be submitted to BLM in September
  - Great Lakes will continue to be available to the program for clarification and questions until October 31

**13**

BLM_004000

U.S. Department of the Interior
Bureau of Land Management

# Placement into Private Care

- Private Care Placement Team
  - Comprehensive review of policies, procedures, and challenges associated with placing animals into private care
  - Review Adoption Demand Study Findings and Recommendations
  - Final report and recommendations in approximately 6 months



U.S. Department of the Interior
Bureau of Land Management

# Wild Horses and Burros Placed into Private Care FY 2014 – FY 2016 as of 8/18/16



| | FY14 | FY15 | FY16 |
|---|---|---|---|
| ■ Total animals sold by states | 76 | 225 | 153 |
| ■ Total animals adopted by states | 1710 | 2157 | 2439 |
| ■ Total animals adopted/sold by states | 1786 | 2423 | 2592 |

**# of Animals**

BLM_004002

15

U.S. Department of the Interior
Bureau of Land Management

# Questions?



BLM_004003

**16**

| | |
|---|---|
| **From:** | Waddell, Holle |
| **To:** | Jenkins, David B; Bernier, Heather A; St George, Brian C |
| **Cc:** | McGuire, Paul M; Fluer, Scott L |
| **Subject:** | Fw: [EXTERNAL] Senator Feinstein's Letter to Sec. Haaland re: Wild Horses and Burros |
| **Date:** | Thursday, July 1, 2021 4:39:07 PM |
| **Attachments:** | Outlook-rphtztit.png |

David/Heather/Brian - Please see the trailing email from Legislative Affairs regarding a briefing request from Senator Feinstein's office.

Thank you,

Holle' Waddell
Department of the Interior
Bureau of Land Management
Division Chief *(Acting)*
Division of Wild Horses and Burros, HQ-260
405.579.1860 (office)
202.603.3740 (cell)
hwaddell@blm.gov

*"When you can identify injustice, when you can identify inequality and unfairness, and you confront that, then in my mind you are doing justice." - Bryan Stevenson, Founder and Executive Director for the Equal Justice Initiative*



https://www.blm.gov/programs/wild-horse-and-burro/50th-anniversary

**Wild Horse and Burro | Bureau of Land Management**
FIND THE LATEST INFORMATION on changes to wild horse and burro events and facility operating hours. The Bureau of Land Management manages and protects wild horses and burros on 26.9 million acres of public lands across 10 Western states as part of its mission to administer public lands for a variety of uses.
www.blm.gov

---

**From:** Brown, Mark A <m3brown@blm.gov>
**Sent:** Thursday, July 1, 2021 3:08 PM
**To:** Waddell, Holle <hwaddell@blm.gov>
**Cc:** Reiland, Michael J <mreiland@blm.gov>
**Subject:** Fw: [EXTERNAL] Senator Feinstein's Letter to Sec. Haaland re: Wild Horses and Burros

Hi Holle,

FYI - Sen. Feinstein's office is requesting a WHB briefing on BLM's program. I will be in touch soon to work on scheduling a time for this meeting. BLM Leadership and DOI personnel may also want to attend.

Thanks,
Mark

Mark A. Brown
Legislative Affairs Specialist
HQ-620
Bureau of Land Management

U.S. Department of the Interior
Washington, D.C.  20003
Cell: (202) 774-7920

---

Hi Morgan and Drew,

We were pleased to see that BLM is investigating reports that federally protected wild horses and burros were sold to slaughter auctions.

Joe and I are hoping to set up a staff level meeting to learn more about the agency's efforts to look into these concerns and implement reforms, as well as learn how Congress could be helpful.

Please let us know if there are any particular dates/times over the next few weeks that work best.

All my best,
Haley

---

**From:** Gray, Morgan <Leslie_Morgan_Gray@ios.doi.gov>
**Sent:** Thursday, May 27, 2021 10:00 AM
**To:** Meyers, Haley (Feinstein); Wallace, Andrew G
**Cc:** Petrzelka, Joe (Feinstein)
**Subject:** RE: [EXTERNAL] Senator Feinstein's Letter to Sec. Haaland re: Wild Horses and Burros

Thanks Haley! Received

---

**From:** Meyers, Haley (Feinstein) <Haley_Meyers@feinstein.senate.gov>
**Sent:** Thursday, May 27, 2021 9:55 AM
**To:** Wallace, Andrew G <andrew_wallace@ios.doi.gov>; Gray, Morgan <Leslie_Morgan_Gray@ios.doi.gov>
**Cc:** Petrzelka, Joe (Feinstein) <Joe_Petrzelka@feinstein.senate.gov>
**Subject:** [EXTERNAL] Senator Feinstein's Letter to Sec. Haaland re: Wild Horses and Burros

> **This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.**

Good morning Drew and Morgan,

We hope this email finds you safe and well.

Please find Senator Feinstein's letter to Secretary Haaland regarding the Wild Horse and Burro Adoption Incentive Program and the related New York Times article attached.

We are happy to discuss further, as this is a priority issue for the Senator.

Thank you for your attention to this matter.

Best,
Haley

Haley Meyers
Legislative Correspondent
U.S. Senator Dianne Feinstein

331 Hart Senate Office Building
202-224-3841
haley_meyers@feinstein.senate.gov

COVID-19 Resources

BLM_004006

**U.S. Department of the Interior**
**Bureau of Land Management**

# Wild Horse and Burro Program

Overview – Holle' Waddell, Division Chief (Acting)



**Wild Horses, Sand Wash Basin Herd Management Area, Colorado**

BLM_004007

U.S. Department of the Interior
Bureau of Land Management

# Legal Authorities

- Wild Free-Roaming Horses and Burros Act, 1971
  - Protect and manage wild horses and burros "as components of public lands"
  - Maintain a "thriving natural ecological balance"
- Federal Land Policy and Management Act, 1976
  - Established BLM "multiple-use" mission
  - Allowed for motorized vehicles for wild horse management

BLM_004008

**U.S. Department of the Interior
Bureau of Land Management**

# Program Objective

- To manage wild horses and burros as an integral part of the natural system of public lands

- Healthy herds on healthy public rangelands



Map of Bureau of Land Management and Forest Service wild horse and burro management areas on public lands



**U.S. Department of the Interior**
**Bureau of Land Management**

# Current Situation: On-Range

- 177 herd management areas (HMAs) comprising 26.9 million acres across 10 Western states

- Appropriate management level (AML) across all HMAs: 26,770

- AML is the population level deemed compatible with the carrying capacity of the land within a multiple-use context

- Drought conditions continue to worsen

BLM_004010

U.S. Department of the Interior
Bureau of Land Management

# Drought Condition: May 1971



BLM_004011

**U.S. Department of the Interior
Bureau of Land Management**

# Drought Condition: May 2021



BLM_004012

U.S. Department of the Interior
Bureau of Land Management



## U.S. Drought Monitor Map with HMAs

Legend

- Herd Management Area (HMA) Polygons
- Herd Management Area (HMA) Polygons
- BOC National State Boundaries Map Service

**U.S. Drought Monitor.lyr**

**Intensity**

- D0 Abnormally Dry
- D1 Moderate Drought
- D2 Severe Drought
- D3 Extreme Drought
- D4 Exceptional Drought

Compiled by the Bureau of Land Management (BLM), National Operations Center (NOC), OC-530,
BLM_GeoSpatialGateway@blm.gov, U.S. Census Bureau

Data published in:
North American Datum 1983 (NAD83)
UTM coordinates, Zone 11, meters

"NO WARRANTY IS MADE BY THE BUREAU OF LAND MANAGEMENT
AS TO THE ACCURACY, RELIABILITY, OR COMPLETENESS OF THESE
DATA FOR INDIVIDUAL USE OR AGGREGATE USE WITH OTHER DATA."



U.S. Department of the Interior
Bureau of Land Management

# Management: On-Range

Gathers and Removals

- Principal tool used for reducing overpopulated herds; operations performed by way of helicopters and bait traps

- Gathers are conducted for one of several reasons: planned population management; emergency conditions on the ground; safety and nuisance concerns







U.S. Department of the Interior
Bureau of Land Management

# Management: On-Range

Population Growth Suppression

- Principal tool used for maintaining AML on HMAs
- Vaccines (currently in use PZP, PZP-22, and GonaCon) are administered during gather operations or by darting on the range; Intrauterine devices applied
- Combination of temporary fertility control vaccines and safe, permanent sterilization of some animals



BLM_004015

U.S. Department of the Interior
Bureau of Land Management

# Current Situation: Off-Range

- Off-Range Corrals (28): Holding facilities where animals are prepped and made available for private care placement adoption, sale and transfer

- Off-Range Pastures (42): Free-roaming facilities for excess animals for which there is no demand for placement into private care




BLM_004016



U.S. Department of the Interior
Bureau of Land Management

# Management: Off-Range

Adoptions and Sales

- Excess animals removed from the range are offered for placement into private care either through adoption, sale or transfer

- Adoption and sale events are held at BLM facilities, off-site events or online



WELCOME TO
**WILD HORSE AND BURRO ONLINE CORRAL**

Login



BLM_004017



U.S. Department of the Interior
Bureau of Land Management

# Management: Off-Range

Incentives and Partnerships



- The BLM's Adoption Incentive Program offers up to $1,000 to offset the cost of caring for and training an adopted wild horse or burro.

  o Over 7,500 animals have been adopted through the AIP program through 06/03/2021, reducing outyear holding costs by approximately $185 million.

- Gentled and trained animals are offered through partnerships and contracts

BLM_004018



U.S. Department of the Interior
Bureau of Land Management

# Instruction Memorandum

Gather Schedule

- Provides overview of management options when planning gathers
- Defines timeline for annual gather schedule approval process
- Defines emergency and nuisance gathers
- Identifies emergency and nuisance approval process
- Makes recommendations on items to consider in developing gather operations

BLM_004019

U.S. Department of the Interior
Bureau of Land Management

# Instruction Memorandum

Comprehensive Animal Welfare Program (CAWP) – **Permanent**

- Re-affirms and demonstrates the agency's commitment to humane treatment of wild horses and burros.

- (PIM) 2021-002 published 12/18/2020

- Direction, guidance, training, and requirements for BLM employees, contractors, and partners.





BLM_004020

**U.S. Department of the Interior
Bureau of Land Management**

# Instruction Memorandum

Euthanasia

- Defines conditions where euthanizing an animal may be appropriate
- Defines where the authority for euthanizing animals exists
- Defines terms related to euthanasia such as
  - Old Wild Horse or Burro
  - Sick Wild Horse or Burro
  - Lame Wild Horse or Burro

BLM_004021

U.S. Department of the Interior
Bureau of Land Management

# Compliance Handbook

Compliance Inspections

- Added virtual component
  - o Random first time
  - o Required by policy (mandatory compliance list)
  - o Random follow-up
  - o Title eligibility
  - o Same facility/area
- Updated language throughout document
- Modernized document
- Removed outdated attachments

BLM_004022

U.S. Department of the Interior
Bureau of Land Management

# By the Numbers

AML, Populations, Removals and Placements



BLM_004023



U.S. Department of the Interior
Bureau of Land Management

**FY 2021 Expenditures \***
**$69,106,700.41**
*as of  6/03/2021*



**(DI) Plan for Herd Management, 240,799.31, 0%**

**(HG) Placement into Private Care, 7,831,247.54, 11%**

**Program Support/Overhead/ Uncontrollables, 7,933,823.10, 12%**

**(NK) Compliance Inspections, 343,122.59, 1%**

**(MP) Monitor Herd Management Areas, 1,080,599.06, 2%**

**(MC) Conduct Census of WH&B Areas, 1,227,276.56, 2%**

**(KF) Population Growth Suppression, 147,509.24, 0%**

**(JJ) Gather, 4,111,995.44, 6%**

**(JB) (JC) Construct/Maintain Shrub/Grass Projects/Water Developments, 58,168.26, 0%**

**(HH) Off Range Pastures, 22,410,620.90, 32%**

**(HI) Off Range Corrals, 23,721,538.41, 34%**

\* Total expenditures includes L1020, L1110, L1150, L1170, L5210, L5220, L1920, and L9830, as well as L1060 (WHB Program), funding expended in FY2021.

BLM_004024

**U.S. Department of the Interior**
**Bureau of Land Management**

# Accomplishments

| Program Area | FY2020 | FY2021 (as of 5/10/2021) |
|---|---|---|
| Private Care Placement (HG) | 6,162 | 4,179 |
| Off-Range Corrals (HI) | 4,462,730 Feed Days (average daily population 12,227) | 3,633,556 Feed Days (average daily population 16,367) |
| Off-Range Pastures (HH) | 14,107,838 Feed Days (average daily population 38,651) | 9,002,058 Feed Days (average daily population 40,550) |
| Removals (JJ) | 10,824 | 5,430 |
| Population Growth Suppression (KF) | 758 | 332 |
| Compliance Check (NK) | 4,953 | 2,829 |

BLM_004025



**Questions?**

BLM_004026



# NATURAL WILD HORSE & BURRO ADVISORY BOARD

June 30 - July 1, 2021

Volume 1

Day 1 Meeting Minutes

U. S. Department of the Interior
Bureau of Land Management

BLM_004027

# Contents

**WEDNESDAY, JUNE 30, 2021** ........................................................................................................... 2

WELCOME AND CALL TO ORDER .................................................................................................... 2

BLM DIRECTOR REMARKS ............................................................................................................. 2

INTRODUCTIONS .......................................................................................................................... 6

BLM DIRECTOR REMARKS, CONTINUED ........................................................................................ 6

AGENDA & RULES OF THE ZOOM (VIRTUAL / ONLINE PLATFORM) ................................................. 7

APPROVAL OF SEPTEMBER 2020 MEETING MINUTES ...................................................................... 7

SEPTEMBER 2020 ADVISORY BOARD RECOMMENDATIONS AND BLM RESPONSES ........................... 7

AGENCY PRESENTATIONS TO THE BOARD .................................................................................... 15

PUBLIC COMMENT PERIOD (1) ................................................................................................... 26

AGENCY PRESENTATIONS TO THE BOARD, CONTINUED ............................................................... 39

COMPREHENSIVE ECOSYSTEM APPROACH TO MANAGEMENT WORK GROUP DISCUSSION .............. 40

BLM_004028

# Wednesday, June 30, 2021

## Welcome and Call to Order

*Bryant Kuechle, Facilitator, The Langdon Group*
Mr. Kuechle welcomed attendees to the Wild Horse and Burro Advisory Board meeting and introduced himself and his role as a neutral third-party facilitator.

*Ms. Celeste Carlisle, Wild Horse and Burro Advisory Board Chair*
Ms. Carlisle welcomed the Advisory Board members, Staff, and all attending by live stream. She called the meeting to order and introduced Dr. David Jenkins as the BLM designated federal officer.

## BLM Director Remarks

*Dr. David Jenkins, Assistant Director for Resources and Planning, BLM*

Dr. Jenkins greeted attendees and introduced himself. He then introduced Nada Culver as the current director for policy and programs, exercising delegated authority of the BLM and to provide comments.

*Nada Culver, Deputy Director for Policy and Programs, Acting BLM Director*

Ms. Culver: Great. Thanks for having me. As David mentioned, I'm Nada Culver, I'm the Deputy Director for Policy and Programs, and I'm really thrilled to be able to be here and virtually meet with some of you today.  We had a little bit of technical difficulties over here, we appreciate your patience.  I especially wanted to thank the board for taking all the time that you do out of your busy lives to meet and learn and discuss all these pressing issues facing the management and protection of wild horses and burros on our public lands. I know that you do this as volunteers, and I want you to know how grateful everyone at the BLM and the Department of the Interior is for your involvement and interest in this really important topic.

This meeting and the recommendations that will come from it are really coming at a great time for us.  We are looking forward to those, much of the American West right now is experiencing extreme drought.  We expect conditions to only get worse as we are pressing deeper into the summer season.  Many places on our public lands are already experiencing water shortages, reduced forage and an increase in wildfire activity, which are going to exacerbate resource conditions for many wild horses and burros.  I wanted to assure you that our goal is to take emergency action where we can to protect the welfare of the wild horses and burros under our care, as well as the habitat that they rely on, using the best available science and information on current and forecasted conditions to really inform our decision.  We're aware of the concerns of many in the public about the welfare of adopted wild horses and burros, and I wanted to tell you all that the BLM takes these allegations and any allegations of violations of the law and regulations governing the placement of federally protected wild horses and burros into private care very seriously. We're working on several approaches that we think will benefit adopted animals and reflect our goal to place animals into their homes and we'll be sharing those in the future.

Beyond that, as our administration gets more folks on board and digs into our priorities, I want to assure you that we're focused on finding common sense solutions that will help us achieve a thriving ecological balance on public lands.  Some of those priorities include addressing the impacts of climate change and conserving lands and waters.  So hopefully those will all benefit the issues that you care about and are advising us on.  Our overarching goal is always to manage and protect healthy wild horses and burros on healthy public rangelands.  And to do that, there are a combination of management actions to achieve that balance of sustainable herd sizes. By balancing herd size with the resources available to these animals, we're protecting them and their health and giving them a better chance to thrive on public land. Managing wild horses and burros at sustainable levels for those herds also helps to protect the health of our public rangelands, which then are in turn more resilient to other stressors such as drought and climate change.  I do know that management of wild horses and burros is a complicated issue with many different factors to be considered, and I know that the information you hear today will add to your expertise and help inform your discussions and recommendations that you'll deliver to us tomorrow.

BLM_004029

Before I turn it back over to David, and maybe take a few questions, I did want to mention that this year is the 75th anniversary of the creation of the Bureau of Land Management and the 50th anniversary of the Wild Free-Roaming Horses and Burros Act.  For 50 years, the BLM's mission has been to protect and manage wild horses and burros, as, quote, unquote, living legends, and also as part of the natural system of our public lands.  Today, as you know, wild horses and burros are prized for their natural beauty, intelligence, versatility, resiliency, and companionship. We have helped more than 270,000 wild horses and burros find new homes since 1971.  We hope you enthusiastically join the BLM in celebrating 50 years of the Wild Horses and Burros Act as well as celebrating 75 years of the Bureau of Land Management.  I look forward to hearing more about your advice for us addressing your recommendations and working with you all in the future to improve conditions for all wild horses and burros.  And again, I want to thank you so much for your dedication to your advisory role and to wild horses and burros.  We really, deeply appreciate your service.  So, thanks so much, and I'll hand it back over to David.

**Discussion**

Ms. Carlisle: I'm just going to jump in here because I'm going to help to ensure that board members who have questions do get to ask them.  I'll start out with a sort of general and quite sweeping question.  The Bureau of Land Management is up against a lot, and this is an incredibly heavy lift at an incredibly unprecedented time, conditions we've never seen before in the West. And Ms. Culver, do you feel like the BLM has the capacity and the resources that it's going to need to implement the many, many things that need to be implemented sort of in concert for any sort of sustainability to be achieved?

Ms. Culver: Thanks for that question.  We do say that multiple use is not easy, maybe not for the faint of heart even, but the BLM, you know, we have been doing this for 75 years, and this multiple use mission that we have and this goal for sustainability which of course includes protection of wild horses and burros, it is flexible, and it evolves to meet different conditions.  And as we learn more through science and as we learn more from the public and get more direction from Congress, and we are continuing evolve and adjust, but it is becoming very challenging on the range, as I'm sure you all know.  If you saw our budget request, we are asking for more resources to try to use all the tools we can.  I think we do have the right mission and we have the right vision, and we're trying to get all the resources we can.

Dr. Perryman:  Thank you for being with us, Ms. Culver, we'll spend a lot of time talking about that during this meeting and as well as talk about habitat degradation and dire, and I do mean dire situation that we have in several of our Western states right now. This relates to the Adoption Incentive Program and some of the comments that have been made it at the last meeting and I'm certain, I know they're coming in this meeting as well, about some of these animals somehow or another slipping into slaughter channels.  My question is this, has anyone, has an individual or any entity provided any information to the Bureau of Law Enforcement so that they can investigate any of these claims that have been put forward?  Because if these claims are real, I mean, if this is really happening, we need to know about it, and if we're not getting that information from the public who are making these statements, then had there's some kind of a disconnect there.  So, does the Bureau or is the Bureau currently receiving any information from any of these entities or individuals on specific instances of where this has happened?

Ms. Culver: It's a really important issue, and we, like you, certainly saw the press coverage, as I'm sure you all know, given your roles, we do have a lot of safeguards in place to try to prevent this from happening.  It's certainly not something we're allowed to do readily to have horses sent to slaughter, and we do have safeguards.  We are investigating this situation, and I can't speak to every single piece of information we've received, but certainly we would welcome more information on some of the statements that are made.  And I don't know, David, if there's more to say about what we're receiving.  I know we have some information we're following up on and again hope to be able to share some more on that in the near future. But I agree with you, more information is helpful for us to track down.  We know it's an emotional issue, it's a significant concern to think this could be happening.  So, we would certainly welcome that information that people have.

Dr. Jenkins: Thank you, Ms. Culver, and Dr. Perryman.  The last board meeting, they made a plea to the public, if you have information about this sort of thing happening, please give us credible action that we can take action on, and I suspect the board is going to make the same sort of request to the public.  Where there's credible information, the BLM,

BLM_004030

and Forest Service we need to hear about it so we can take appropriate action and that's our intention is to take appropriate action when we get that sort of action coming in.  Dr. Perryman and Ms. Carlisle, I suspect you'll make the same sort of request broadly to the public in the next couple of days.

Ms. Carlisle: Yes, we'll be covering this.

Dr. Perryman: So, it is my understanding that we have received very little if any information from the public on this?

Dr. Jenkins: We have received some information and not a lot of really specific information, but some that comes from various advocacy groups, Dr. Perryman, but most of that information, a lot of that information, we need to, you know, vet and investigate.  And I think that's what we're involved with right now. We haven't gotten the sort of robust information, as far as I'm aware, that you're referring to and referred to last year when we met.

Mr. Yardley: Thanks again, Ms. Culver, for being with us.  We appreciate your willingness to address the board and the public.  But my question kind of falls back a little bit to it, Dr. Perryman kind of touched on it, I live in Utah, southern Utah, and we're right in the heart of this catastrophic drought that we're facing, and the amount of -- the lack, I guess, it forage and water availability is leading to overgrazing by a lot of these wild horses especially in the management units where the AML exceeds 3 to 500 percent of what it's supposed to be  and just like you talked about it being the 75th year of the Bureau of Land Management being established under the Taylor Grazing Act and then after with the Wild Horse & Burro Program, like one of the key focuses was supposed to be to maintain that thriving ecological balance that we talked about. But there's a substantial amount of habitat degradation that's taking place every single day on these rangelands in these circumstances and I guess my question would be to you what in the short term and then also the long-term, what are the steps and strides BLM is taking to try to prevent this from happening in the future and also after it does happen, what are the steps that they're planning on taking to revegetate and rejuvenate and restore these rangelands?

Ms. Culver: So, as you know, there are a lot of stressors on these rangelands right now, and I agree with you, being in the West, we can see the drought, we can see the fires that are already happening here, and certainly we're off to quite a start this year that really like these challenges and the concerns ahead of us.  BLM, we do have a number of tools we can use to monitor the herd size to do emergency gathers where needed where we feel that the herds are in jeopardy from lack of forage and lack of water.  And that kind of information, that kind of activity can also help us with the sustainability at the range.  As you know, there are other species out there that depend on this same forage, and it is a great example again of the challenge of trying to balance those multiple uses, the forage floor, it is raising the forage for wild horses and burros and for wildlife, all of whom are sharing this range. We are looking as part of the administration's priorities and focus on climate change as well as our America the Beautiful initiative, we are looking at ways to also focus on restoration so that these rangelands can thrive when they are impacted by fire or drought or other conditions, and BLM is in particular supporting efforts it like the National Seed Strategy so that we can ensure that what restoration does happen is going to be resilient, so it would be great if there was one quick answer, but I think we all know there isn't, but I do want to the assure you we are well aware of the many competing priorities and looking at all the options we have and monitoring the herds, as you know, both the condition of the animals themselves and the range.

Dr. Bleich:  There we go.  Thank you for appearing before the board and introducing yourself.  I did a little bit of background reading, and one of your colleagues, Brian Rutledge spoke very highly of you and the quote that I would like to call attention to is your statement that the needs of the land must always survive.  Having something worthwhile at the end is the driving force. And I think that's a very, very appropriate statement, and I think that that is the goal of everyone on this board and everyone that cares about Western rangelands and Western ecosystems, but I would offer the caution and following up on what Dr. Perryman and Mr. Yardley said, that at the pace things are proceeding and oftentimes things are going backwards, not forwards in terms of horse and burro issues and the health of public lands.  We aren't going to get there unless the pace picks up towards doing the right thing. And your comments are very, very well taken.  I represent wildlife management issues on this board, and I heard wildlife mentioned one time during your statements and responses to questions and thriving populations of wild horses and burros are great, they need management, but wildlife is what really is suffering in terms of impacts from horses and burros. And it needs to be elevated to a level of concern. Ecosystem health is what we're all concerned with on this board, and I would hope that most Americans are.  And again,

BLM_004031

the needs of the land must always survive, and I thank you for that quote, and I hope that that will be the direction in which you will lead the Bureau or help lead the Bureau.  Thank you.

Ms. Culver: Thank you for those comments.  And yes, we are really aware of the challenge here for wildlife in particular in this season.  So, I appreciate you raising it and glad to know the board is considering that as well.  I'm going to have to run in a minute, so I'll maybe take one more question.  I'm sorry I can't spend more time with you all because just really the questions, I really want to listen to more of this conversation, so I'll look forward it to the report and being able to follow up that way.

Ms. McAlpine: I also want to say thank you for meeting with us, Ms. Culver.  I live in Arizona, and I can tell you even the cactus is dying here.  So, this management situation is dire.  This is an emergency situation; we're all being impacted.  Dr. Perryman wrote an excellent article titled It's Five Minutes to Midnight, and he is absolutely correct when he says we are well beyond midnight now.  Arizona has the largest population of wild burros in the country, and there is nothing left to the environment.  And it's not your burros' fault, obviously, it is an ecological situation, and as I think Dr. Bleich said, this is an emergency and needs to be done as quickly as possible.

Mr. French: Thank you, Ms. Culver.  I had myself muted.  I'm not going to ask you my original question with respect to your crunch time, but I would like to speak. I think the message you've gotten from most of the board members right now is the dire nature of what we're facing right now.  I just would say also from the standpoint of from a manager protocol within the states, I come from Nevada, talking with Nevada wildlife officials right now, they are actually reducing numbers of euthanizing and reducing numbers of big game species in particular, Bighorn Sheep, because of this, trying to reduce the numbers to carrying capacity. So, as you might gather, there is efforts afoot right now with trying to manage the other ungulates on the public land anticipating what's coming at us right now and I can't overstate the fact that we are not only facing the loss of wildlife and horse numbers, but we are seeing changes to be the landscape right now which are generational. And this is something that we just can't over say as a board, and I think we're one voice along that line. But once again, thank you, thank you for stepping up and with your leadership.

Ms. Culver: Thanks.  It is really helpful to hear all the perspectives and history with this.

Dr. Lenz: Thank you.  Ms. Culver, I want to thank you for taking the time to speak with us.  I have no doubt from my observation point, and I've been involved with this for many, many years before joining the board, that the Wild Horse and Burro folks know how to manage the situation.  I think the problem we get into is the public relying on misinformation and emotion, having a lot of influence on how things are done.  And unfortunately, what's happened is we've kind of kicked the can down the road for many, many years and gotten into the situation right now that's life-threatening for not only horses but the entire ecosystem and other species. So I would just encourage you, I know there are really hard decisions that have to be made up to, in my opinion, including euthanasia for some of these horses in order to prevent pain and suffering and starvation and dehydration, and I would encourage you to rely on the folks in the Wild Horse & Burro Program, to rely on science and fact and hopefully we can muster the forces to resolve this problem in the not-so-distant future.  Thank you.

Ms. Culver: Thanks, Dr. Lenz, we do have an incredible team at both the Headquarters level and every state in the West that are dealing with this.  I agree you.  And I'm hopeful that our combined expertise will help us make progress with some support from Congress as well.  Thank you so much.

[Deputy Director Culver left the meeting.]

BLM_004032

## Introductions

Ms. Celeste Carlisle introduced the members of the board (see Table 1).

| TABLE 1 - NATIONAL WILD HORSE & BURRO ADVISORY BOARD MEMBERS | |
|---|---|
| **Board Member** | **Representing** |
| **Ms. Tammy Pearson** | Public Interest (Equine Behavior) |
| **Dr. Tom Lenz, DVM** | Veterinary Medicine |
| **Ms. Celeste Carlisle** | Wild Horse & Burro Advocacy |
| **Dr. Barry Perryman** | Public Interest (NRM/Special Knowledge) |
| **Mr. James French** | Natural Resource Management |
| **Dr. Ursula Bechert** | Wild Horse & Burro Research |
| **Ms. Susan McAlpine** | Humane Advocacy |
| **Mr. Steven Yardley** | Livestock Management |
| **Dr. Vernon Bleich** | Wildlife Management |

Ms. Holle Waddell, Acting Division Chief of the BLM Wild Horse and Burro Program, introduced the members of BLM in attendance.

## BLM Director Remarks, Continued
### Dr. David Jenkins, Assistant Director for Resources and Planning, BLM

Mr. Jenkins:  Good morning, everybody. I'm the Assistant Director for Resources and Planning, and I'm also the designated federal official for this meeting, charged with keeping us within the Federal Advisory Committee Act arena, but first I want to thank the board.  What I find so fascinated about working with you is the expertise that you bring, the range of information that you have at your fingertips.  Your expert citizen advice is welcome, is needed, and it's valuable. And I am just delighted that we have such a diverse and knowledgeable board.  So, I wanted to thank you all as a group and individually too for your efforts and your interest.

As you know, land management agencies don't have all the answers, and we need advice from citizen experts like yourself.  So again, thank you. I also want to just simply mention that we've got 75 slots for the public to address the board over the next two days, and I would like to thank public involvement.  I think not only do we need citizen experts in the form of a board, but we need to listen carefully to the public.  So, we do have 75 slots available for public input, and we've already received over 500 written comments on the Wild Horse & Burro Program for this year.  So, thank you for everybody who is livestreaming and is interested in this topic.  We deeply appreciate all of your efforts.

Let me just make a couple of other comments, and I'll dispense with my prepared remarks.  I would like to just recognize Commissioner French for being reappointed.  Thank you, Jim.  We appreciate your efforts, your continued efforts. Ursula, Dr. Bechert, newly appointed to represent the Wild Horse and Burro research part, thank you for coming on with us.  And of course, Tammy Pearson, Commissioner Pearson, we appreciate you on the board as well.  So, thank you all. You're representing the public interest equine behavior on the board.  Ms. Carlisle, thank you for being the chair, Commissioner French the vice-chair, and I can't not just pause for a moment and recognize Ms. Waddell, who is just this force in the Wild Horse & Burro Program.  She is fantastic.  I know you all think that is correct but I'm just going to call her out and thank her and her team.  They do a tremendous amount of work and a tremendous service both for the ecosystem and for the Wild Horses and Burros that we are charged with trying to manage.

So, I think I'm just going to stop there rather than going through all of my prepared comments, and then I'm going to say again what you've all said is that we recognize that we are in a severe drought situation right now, and we are thinking hard about how best to proceed under these circumstances, and we look forward to all of your advice.  So, with that, Ms. Carlisle, I'm just turn it back to you, and I won't go on with any other prepared comments.  I look forward to the board's advice.  Thank you.

Ms. Carlisle: [Introduced the members of the Forest Service in attendance.]

BLM_004033

## Agenda & Rules of the Zoom (Virtual / Online Platform)

*Bryant Kuechle, Facilitator, The Langdon Group*

Mr. Kuechle reviewed the procedural elements for public participation, stating that the BLM recognizes the value of public input and appreciates public interest in expressing themselves regarding matters of concern. He explained the process for registering to provide public comment, noting that there would be three designated opportunities to do so. Mr. Kuechle reviewed the day's agenda.

## Approval of September 2020 Meeting Minutes

Mr. French moved to accept the minutes as presented. Ms. McAlpine seconded. All approve? [AYES] Any opposed? The minutes were approved.

## September 2020 Advisory Board Recommendations and BLM Responses

1.  The Board recommends that BLM immediately begin to integrate wildlife management plan concepts (template developed by wildlife management agencies) on an HMA-by-HMA basis into a comprehensive, range wide WH&B management plan that includes contingencies for stochastic events and rangeland integrity, including riparian habitats.

    *Bureau of Land Management – The BLM does and will continue to analyze site-specific plans on an HMA and/or complex basis. In NEPA analyses for each HMA (or complex), the BLM analyzes impacts to wild horse and burro herds, wildlife including T&E species, resources, and resource values, including a review of impacts to soils, vegetation management practices, rangeland management practices, water resources, air resources, wetland and riparian areas, cultural resources, and mineral resources.*

    *The BLM will continue to follow all of the NEPA guidelines that require the agency to analyze the effects of proposed wild horse and burro management actions in the context of the agency's multi-use mandate. In the case of stochastic events, such as wildland fire or severe drought, BLM specialists will continue to monitor and assess the health of the animals and natural resources, and to take emergency management actions if needed. BLM tries to make such assessments in an interdisciplinary manner, communicating and collaborating with state and local agencies, where possible, to ensure the overall health of the land and animals.*

2.  The Board recommends that future research include development and implementation of predictive models for animal movements that will likely expand resource degradation areas; and development and application of new tools (e.g., terrestrial laser scanners, drones, GPS collars) to measure concurrent forage use among large herbivores.

    *Bureau of Land Management - The BLM appreciates this suggestion to improve understandings about the interactions between wild horse and burro populations of various sizes, their habitat selection and resource utilization, and the resulting effects on resources. The BLM is increasing its use of GPS telemetry to record the movements of wild horses and burros. This includes recently started monitoring of fertility-control treated mares at Swasey HMA, Sulphur HMA (Utah) and Eagle HMA (Nevada), and work begun in 2019 examining habitat use of wild horses, livestock, and sage-grouse at Desatoya HMA (Nevada).*

    *The BLM WHB Program is preparing an update to the 2005 WHB Research Strategy. This recommendation from the board will be considered as the program continues to develop the updated WHB research strategy. The board's new member for Research has been contributing to review early drafts of the new WHB research strategy, as did the previous member for Research (Dr. McDonnell). Because of the current on-range population size and high growth rates, developing and testing long-term, single application fertility control methods is likely to remain the highest research priority.*

    *Any specific funding decision about the types of proposed research projects or new tools mentioned in the board's recommendation would be subject to the same decision-making process behind other BLM-funded WHB research. That is to say, decisions about specific proposals would be contingent upon, among other considerations, the*

*quality of proposals received, the feasibility of the work, the perceived benefit to BLM's management program, and funding availability.*

3.  The Board recommends that the agency expand fertility control implementation and develop measurable objectives outlining a targeted reproductive growth rate reduction and multi-year plans, on an HMA-by-HMA basis. The effort should include fertility control treatments combined with gather operations, including HMAs where AML will not immediately be achieved. The Board recognizes that reproductive growth rates on the range must be reduced immediately so that overall numbers of horses or burros, as well as overall numbers of gathers, begins downward trending.

    *Bureau of Land Management - As noted in the BLM's 2020 report to Congress, the agency intends to expand its use of fertility control as part of its overall strategy to achieve and maintain herds at AML. The strategy will use a combination of removals and fertility control measures. In recent years, the majority of environmental assessments for herd management are analyses of multi-year plans that include fertility control. The BLM's final decisions have generally selected multi-year action alternatives with fertility control in addition to removals. The BLM recognizes the desirability of reducing herd growth rates immediately, but current herd sizes and finite funding limit the practicality of applying fertility control and returning animals to the range, until herds are closer to AML.*

4.  The Board recommends BLM compile and furnish to the Board an inventory of HMAs that have current, approved National Environmental Policy Act (NEPA) decision documents, that contain fertility control components, as well as the type of fertility control(s) acceptable within the limits of that document.

    *Bureau of Land Management – The BLM will work, within its current staffing and workload priorities, to provide such an inventory to the Advisory Board. Compiling some of the information will require correspondence with, and searches by, district and field offices, in cases where older records of decisions or herd management area plans are not available in digital formats. Until this is complete, all recent planning documents are available to the public on the BLM National NEPA e-planning site located at: https://www.blm.gov/programs/planning-and-nepa/eplanning.*

5.  The Board recommends that the BLM continue research into long term fertility control options, but that shorter-term, currently available safe and humane methods be utilized immediately. As longer-term fertility control modalities become available, the Board recommends that they be implemented, especially in more challenging HMAs, in order to increase management options.

    *Bureau of Land Management – The BLM thanks the Board for this recommendation. BLM's 2020 "Report to Congress: An Analysis of Achieving a Sustainable Wild Horse and Burro Program" makes clear that BLM intends to follow the actions in this recommendation. The full report can be found at: https://www.blm.gov/sites/blm.gov/files/WHB-Report-2020-NewCover-051920-508.pdf*

6.  The Board recommends that BLM identify the behavioral, physiological, and social differences between wild horses and burros. BLM should expand the program's capabilities to manage burro populations humanely and appropriately based on those differences and burro interactions (neutral, negative, and facilitative) with other wildlife.

    *Bureau of Land Management - In its analyses of management decisions, the BLM already draws on available scientific literature about wild burros. The BLM has begun to arrange for webinars in which managers speak with researchers who shares results of recent studies into burro ecology, behavior, physiology, and interactions with native wildlife species such as mountain lions, and endangered tortoises. Some of those research projects have been funded by the BLM, and some by other sources. The webinars are made available to BLM WHB staff and advisory board members. The resulting information may be included in analyses of future BLM decisions that could affect wild burros.*

7.  In order to improve the BLM's WH&B program decision efficiency and identify areas in need of improvement,

the Board recommends an external audit of systemic internal organizational strategy and structure, capabilities and protocols. The Board recommends that BLM work collaboratively with diverse stakeholder groups. The transparent audit should be performed by a neutral, third party with capabilities in organizational structure and set up. The Board should have an active, robust, and positive role.

*Bureau of Land Management – Over the past few years, the BLM has been audited by the Government Accountability Office and the Department of the Interior's Office of the Inspector General related to Program operations. The WHB Program embraced the recommendations of these external agencies and implemented changes, as appropriate (i.e., https://www.doioig.gov/reports or https://www.gao.gov/index.html). The agency maintained organizational effectiveness during the 'move west' reorganization and streamlined some of its business practices. The program continues to work collaboratively with leadership in the states in managing daily Program operations. The latest Table of Organization is posted on the BLM website at https://www.blm.gov/about/organization-chart/. The Board received a handout at the September 2020 meeting with the WHB program roles and responsibilities.*

**Discussion**

Regarding recommendation number 1:

Dr. Bleich: Yes, Ms. Chairman.  Dr. Bleich here.  For Ms. Waddell, the Bureau will continue to monitor and assess the health of the animals and Natural Resources and to take emergency management actions if needed.  Are the resources there right now to take advantage or to implement those emergency actions, as I think we all recognize are, in fact, needed?

Ms. Waddell: So, the question of resources I guess would depend on what you're referring to.  We do have staff that continues to monitor HMAs and make decisions as to the areas in which we would need to conduct gathers in, and then also assessing the environmental impacts as well as the additional wildlife and multiple use mandate and I think if you're asking about logistics regarding funding and staffing -- is that what you're asking about, Mr. Bleich?

Dr. Bleich: Well, I recognize that you have a very, very dedicated staff, a very skilled staff, but yes, what it boils down to is logistics and the budget to implement these emergency actions that I think are absolutely necessary at this point and I suspect that much of your staff, if not all of them, agree with that.  And I'm just curious about the backing that your agency or your program has in terms of the need or those monetary and logistical needs.

Ms. Waddell: So, you know, I said several years ago that funding, continued increases in funding, isn't necessarily the only solution to this program.  And so, in this instance where you're talking resources, this isn't necessarily just a budgetary challenge, it's not just a staffing challenge.  We're talking about space availability for housing of animals that are removed.  And then we're talking about, we're discussing range degradation, what would it take to restore that range, what are those resources as well.  Those are things that are outlined somewhat in the report to Congress that we've updated actions and funding needs in that particular document, but we're talking about a multiple-year plan to address the overpopulation on the range. So, to answer your question, whether or not we have the resources, I would say somewhat, we have the resources to address some of those issues, but obviously not all 177 HMAs at one time.

Mr. French:  Thank you.  It goes along with that question having to do with whether or not -- where the Bureau sits with regard to emergency management, so to speak.  I know obviously we've got contractors that we use for captures, emergency captures, we have transport contractors, we have processing and long-term holding contracts out there on the ground, but that is assuming that we had, you know, when we came up with this recommendation last time, we weren't looking at the same kind of situation we're looking at right now.  We were seeing the beginnings of the stress in the system.  But if you look at what is being reported to me coming out of between Utah and Nevada right now, this year, we're looking at if we're going to avert a catastrophe with horses alone, we'll need to move 10,416 out of Nevada and 20,000 out of southern Utah right now, and so that begs the question as to how do we sit with regard to those challenges because that's just immense, and secondly, what I'm guessing maybe we need assistance and help from Congress with

regard to that because we're not dealing with regular management at this stage.  This is the Exxon Valdez all over again, and I just, I am just wondering, just based on that data that I'm receiving right now from my neck of the woods, where we sit with that.  Thank you.

Ms. Waddell: Thank you, Commissioner French, and all great points. What we're doing is we've identified a 2021 data schedule and that's based on surveys and monitoring data from previous years to help determine where it is that we are going to be planning to gather and remove animals and then also administer fertility control. But you're right, we're in the time right now where there are states and HMAs that are being impacted by drought, by wildfire, and they're creating either escalating conditions or are right now emergencies.  So we're having to try and balance what was already planned to address the overpopulation in some HMAs and then we are now having to focus our attention on those emergencies, and how do we address those emergencies as well as continue to address the overpopulation, having space availability, having funding availability and the logistics in helicopter contractors, whether or not to bait and trap contract, any of those things, they are, you know, competing right now. So, Scott is doing a great job with his team in staying coordinated with the state leads and we are basically taking the issues that are most dire and kind of making some recommendations to leadership as to what we think we should do and how we should address it and we are looking at some different approaches.  What other agencies can we engage that could assist us in accomplishing some of these goals.  So, it is quite the balance, I'll tell you that, Commissioner French.

Dr. Jenkins: Thank you, Holle', for that comment.  We are very aware of the emergency situation right now and Ms. Waddell referenced the report to Congress, which was our best guess, our best estimates about what sort of resources we would need, but those estimates are really sort of responsive to our current situation, our current environmental crisis that we're in.  I've asked Holle' and her team to think about developing a different sort of long-term gather plan based on this long-term drought.  So, we are thinking through what the budget implications are, what are the holding implications, what are the fertility control implications, and what is it that we can do given this emergency that we're in. So, we are really paying attention, and we are coming up with different approaches that we're analyzing at the moment to see what we can do. So, part of what I'm interested in, because you've all referenced and understand the drought, is what your advice would be as we move through this meeting.  But I just wanted to let you know that we are thinking through as carefully as we can how to make sure that we are attuned to this environmental crisis that we're in at the moment with this extensive and it looks like this drought is not going on end in the near term.  It's going to go on for some period of time. Celeste, thanks.  I just wanted to jump in with that.

Ms. McAlpine: I just wanted to bring up the point, after looking all through the public comments, there are humane organizations, rescues for mostly horses but hopefully some burros, and I'm hoping that with the millions of dollars that these organizations raise that we can find a way to work together between BLM and these organizations to place and care for some of these, I mean, multitude of animals, you're talking 30,000 horses in two states, 1,000 burros in Arizona, this is a crisis and this is the time for all of us to work together to solve this crisis as quickly as we can. So, I am imploring BLM to reach out to these organizations and I'm imploring these organizations to start reaching out to BLM and helping us solve this situation quickly.

Mr. Yardley: I've been on this board now for five years, and we've been talking about the day that this would come, that a lot of the catastrophic effects we're now experiencing on the range, that they've just been compounded and stood up a lot because of the drought that we are facing and to me it feels like we're sitting on the front lines, seeing the devastation, and reporting what's happening, what's happening, we're having a problem, we're losing ground, we're losing ground, we're losing habitat and the message continues to be the same with regards to us losing ground, needing to do something about it, nothing is getting done about it and things continue to fall backwards and now it's just expedited all the more. We know it says the BLM does and will continue to analyze site-specific plans on an HMA and/or complex basis, a NEPA analysis for each HMA, the BLM analyzes impacts to Wild Horse and Burro herds, wildlife including threatened and endangered species, resources and resource values including a review of impacts to soil, vegetation management practice, rangeland management practices, water resources et cetera.  We know what's happening.  It's happening throughout all of the southwest United States in this dire circumstance we're faced with, with the overgrazing, with the overpopulations.  Like yesterday was too late to do something about it.  Now we're faced with even worse circumstances, and I think that the voice that's being echoed from everyone spoken on the board again repeatedly is we need to do something and do something now because even now is too late, but if we wait, like we're losing thousands of acres of ecosystem on a daily

basis and that's having a dire impact on both wild horses and all of the other animals and species that utilize that ecosystem.

Ms. Carlisle: I'll go ahead and get through these other questions. Dr. Bechert?

Dr. Bechert: I wanted to say I was encouraged by what Dr. Jenkins said, really forward looking, and I think along with that, what I'm seeing at the bottom of the BLM response is communicating and collaborating. I think that this goal is huge, and so for one agency to do all of that isn't realistic and I would propose that collaboration even goes beyond other agencies because information is power so explore the possibility of collaborating with other public institutions, universities, others that have other types of expertise and resources to address what we all agree is an emergency situation. So, kind of build on some of these key things that have already been shared.

Dr. Perryman: Yes, thank you, Madam Chairman. I'll try and be really brief here. I appreciate, Holle', what you guys have done. These have been some pretty good responses given what we've seen at times in the past, I think. But I'm a little concerned about statements, and I know that they need to be in there. They have their place. But statements like we will continue to do this and that, that's absolutely appropriate, but I want to make sure that the folks watching, and the folks involved on the board, I think we're all sort of on the same page, but I want to reemphasize it. Where we're at right now is we have an Apollo 13 mission going on right before our very eyes, and this drought has stirred those oxygen tanks and they've blown up and that's the kind of crisis mode we are in right now. Commissioner French was talking a while ago about the possibility of 30,000 animals or more needing to come off of two states, two states. We've never gathered 30,000 animals before. It seems like about ten or 13,000 or so is the maximum amount we've ever taken off at one time a few years ago, so my concern, and I think I don't want to put words in the rest of the board's mouth, they can speak for themselves, I guess, but my concern is really the readiness and the capability that we have at our disposal right now. 30,000 animals, and they're not going to have to come off for a few months. This drought may lose two, three, four or ten years, and the recovery of these areas that have been devastated are certainly going to take longer than that in some cases, so I think we're down to where I don't know whether FEMA is a possibility or not, but I think that phone call needs to be made. That's why we're here. Where are we going to put 30,000 animals in the next three or four months for some sort of intermediate holding period of time, we don't know what that's going to be. We know our capability, we can water trap right now, the drought makes that a little easier, but we only have so many people right now within the Bureau, the human capital is limited, and it needs to be expanded, so I think we need to work this problem just like NASA worked Apollo 13. It's that bad in, in Nevada and Utah and Arizona in some places, the southwest, it's that bad and animals are beginning to drop, even as I speak, even last week I got reports of it. So, when the horses are dropping, that you know the wildlife has already been impacted and the ecosystem is being impacted, that potential that was there is not there anymore. So, I want to bring that to the forefront that business as usual right now is not going on work. So, we are in a crisis mode, and we need to work this problem, maybe FEMA can help, but I think that's where we're at. I think we have to start looking at those kinds of phone calls to see what we can do. Madam Chairman, I yield back my time.

Ms. McAlpine: I hate following Dr. Perryman because he has such great analogies. Anyhow, one of the things that as we were discussing came up in my mind and I think is really important and I do like that FEMA idea because we do have to think out of the box but what about the rules and regulations that BLM needs to follow? I understand there was some draft regulations that had been started in order to facilitate the ease of managing these horses that would update regulations, facilitate management strategies and help with things like fertility control, managing nonproducing herds, feeding and care for unsold and unadopted animals at off-range corrals, so hopefully staff can revisit these rules and regulations and if it means contacting our legislators, then let us help you and let volunteers in the community, the public help you with something that is fully documented and not just misinformation, that they can go to their legislators with and say this is something that really needs to be done and that will really be valuable. Thank you.

Ms. Carlisle: All right. Let's move on. I have an Apollo 13 comment and some generalizations about that. My dad actually worked on the contingency planning for if there was navigational system failure, and here is the commonality between that and this. The space program has all kind of redundancies built into it and all sorts of plans B, C, D, E, G, all the way through. The Wild Horse & Burro Program does not. It has one set of options, gather, removal, handful of helicopter contractors, limited amount of space. And, you know, 2020 hindsight, it would be nice to have redundancies built into this program, but some of that needs to start happening now, we need to expand options and alternatives,

BLM_004038

obviously, we need to be thinking ahead, obviously. But the other thing about the Apollo project suspect that it was a nationwide common push toward one goal.  We don't have that in the Wild Horse and Burro program, and part of that is going to be reliability upon a lot of trust building and a lot of transparency and a lot of getting all of these different and divergent stakeholder groups pushing in a similar direction.  One of our colleagues talks about these unintended consequences we have when we think we're working in the same direction, but we end up stepping on each other.  I think those are also things that will be brought into the conversations in the working groups later on.  I always appreciate a good space program reference.

Regarding recommendation number 2:

Ms. Waddell:  Yes.  BLM did, it has increased use of GPS to record the movement of animals.  You're probably going to hear a lot of an update on this information in Dr. Griffin's presentation, but there was an increase of the GPS, I have to look at the recommendations, there were several HMAs involved in that use.  There was a part of that that talked about how to accept additional research projects.  So, all of those really would go through the same vetting system where any kind of research proposals or projects are submitted to the research team, which Dr. Griffin leads, and Dr. Kane sits on as well.  And they really do review the proposals and provide a recommendation.  To me, they even work with the people who have submitted the proposals and projects about potentially refining the project so it could have a better outcome and those are submitted to me, we have conversations, the research team met several times this year already so any decisions about specific proposals would be based on, you know, several considerations as well as funding availability, obviously.

Ms. McAlpine:  One of the things that we talked about I believe at the last meeting were measurable objectives and documentable or measurable responses.  So this is the second response to our recommendations that, you know, is really nice but does not other than in Swansea, Sulphi and Eagle, really have documentable and specific answer to say measurable objectives and in the future I would really appreciate if we could see a little more of that in the responses to our recommendations and we're trying to draft our recommendations so that it will become easier to provide measurable responses.  Thanks.

Regarding recommendation number 3:

Ms. Waddell: I didn't read through all of BLM's response, but it is a plan, we're continued, so let me start with the Report to Congress.  We have made some judgments in the Report to Congress, obviously.  It was submitted in May of 2020, and last year, fiscal year 2020, we gathered and removed a larger number of animals due to some emergencies that occurred than we had planned.  And so, I think it was somewhere in the neighborhood of 3,500 additional animals.  That of course meant that we needed to make plans to care for those 3,500 animals that were additional.  Which then impacted our funding availability to do more of the fertility control than we had planned to do. But I'll be honest, there are some challenges with identifying HMAs that are at or near AML because we don't have as many as we would like, high percentage of them, so we're really talking about treating animals that are in heavily overpopulated areas, and that's a concern to us, that's a concern to us, so we are working with the states and communicating with them regarding conducting gathers and catch, what we call catch, treat and release.  And so those may be options and they are options, this fiscal year in 2021, we do have some gathers that are planning to treat animals with the darting program, we recently did a notice of funding opportunity to award partnerships to organizations that would do several different operations, and one of those operations is supporting us with fertility control, assisting us in administering fertility control in heavily populated areas or those HMAs that are at or near AML. I'll be honest, you know, sometimes their recommendations are -- it's not necessarily a question, I guess.  I think we agree that yes, we want to find ways to slow the population growth in the HMAs, and we will continue doing that. The NEPA right now, many of the management considerations when our staff is fully together, their NEPA document is fertility control and different methods of population/growth suppression are management considerations, so they are very thoughtfully considered, and there are several states that have attempted to move forward with nonsurgical, more permanent fertility control measures, and sometimes they are litigated against, and sometimes we provide additional information, you know to the states about how to be more supported in those gathers that may not be as effective in administering fertility control, if they're heavily overpopulated.

BLM_004039

Dr. Lenz: Yes, Holle'.  So, are all the gathers today that are going on right now, the last few months, have they all been emergency gathers?

Ms. Waddell: No, they have not.

Dr. Lenz: They have not.  So, the ones that are not emergency, are any of those, are you returning any of those horses to the range after they've been gathered?

Ms. Waddell: Very few.

Dr. Lenz: So, are they putting some type of fertility control on those horses that are being returned to the range?

Ms. Waddell: That's correct.

Dr. Lenz: So, all of the horses that are going back on range have had fertility injections, correct?

Ms. Waddell: Yes, with GonaCon or PZP22.

Dr. Lenz: Okay, good, thanks.

Regarding recommendation number 4:

Ms. Waddell: We have compiled some of that information. This is Kirsten Lindgren who I didn't introduce, I don't think she's on camera, also presenting at this, but she's done a great job, she's new to our staff as a Wild Horse Specialist, and she's done a wonderful job pulling together the gather schedule and working with the states and identifying proposed gathers that have NEPA documents ready and available.  I think we talked at the last meeting about a NEPA system that was publicly accessible, and we did find that it doesn't have all of the information in it.  So, we do have some, we have our gather schedule and many of the proposed gather schedules do have NEPA documents, so I think it's just a matter of providing that information to you all, if you all were interested.  Or directing you because they're also available on BLM.gov.

Regarding recommendation number 5:

Ms. Waddell:  Yes, we agree with that.  Celeste, before I respond on number 5, I wanted to point out that I believe the website, the link to the e-planning, the NEPA public website, that can be researched for some of those documents, is also in that BLM response… So, number 5, yes, the BLM will continue to follow actions regarding that recommendation.  It that's to continue to look into research.  In fact, we've funded.  We identified a line item for next year to award some potential additional research into fertility control options, and we have started using IUD's as well.  So, I think we're following that pretty clearly and I know you guys are familiar with the report in that section that talks about the different types of growth suppression methods.

Ms. McAlpine:  I just want to state that we're kind of stuck between a rock and a hard place.  Yes, fertility control is probably the most submitted comment that we receive from the public so far, that they are really for fertility control versus the use of gathers.  But then again, we are now in a dire emergency situation, and the BLM is going to have to make some really difficult choices in order to get this under control and look at some really different and unique processes that can be quickly implemented, not next year or the year after, but as soon as possible, wish it was yesterday, in dealing with this crisis.

Regarding recommendation number 6:

Ms. Waddell: Yeah.  So, we do look at, you know, different scientific literature regarding wild horses and burros, and I think I would say -- I don't want to say, I think.  I would say that Dr. Griffin does a great job at working with the research team and finding unique proposals and bringing them to the forefront, things that maybe we haven't -- research studies that haven't funded and ones that would yield results that would be uncommon, I guess, I don't know the word, so he does do that and provide information and then conducts different webinars that are available to the Wild Horse and Burro staff. It will we recently had one and the board members were also invited to that.  So, all of that information could be information that's used in management considerations in the future.

Ms. Carlisle: Thank you, I appreciate that.  And just a comment.  I've participated in some of these webinars.  They're extraordinarily eye opening and helpful.  And I know that -- I believe that BLM happens the intention of eventually putting them onto some sort of public platform, and I would just highly encourage that.  They're very good.

<u>Regarding recommendation number 7:</u>

Ms. Waddell: So as the response kind of alludes to is that BLM has -- and also that OIG and we have made consideration of those recommendations and definitely made changes within our program operations. As far as the organizational structure, you know, we talked a lot about the change that was happening, we talked about this at the last meeting, but what was a concern -- or not a concern, but I think one thing that did happen very well is that as there were leadership changes and lots of moves that were happening, there was a core team for Wild Horse and Burro leadership that maintained in place.  So, because that happened, we were able to continue to work with the states, continue focusing on our challenges that we had, our gather and removals, fertility control and all of our operations that are within the Wild Horse and Burro program. It did, you know, take some additional coordination, but because our structure in the Headquarters Wild Horse and Burro office has been that we have not always been in the same office, I won't say always, but we have not, we've had a Reno office, Northern Office and then the office in DC so when those employees in DC were moved to the Reno office, you know, there was some time tine reassess and reevaluate how we were going on stay connected but then we were able to just really step into gear. If you're talking about, I think this particular one talked about a neutral third party with capabilities, and I'm not really sure with how that works within the government.  I remember the previous Division Chief did quite a bit of research to -- or Acting Division Chief did quite a bit of research to figure out how to address this or how this would work and much of it was, I don't remember that there was a response or any directions as to how we could accomplish that.  I don't know if Dr. Jenkins, if you could help me explain maybe some of that organizational structure.

Dr. Jenkins:  Thanks.  As I understand this question, right, the board's concern from last year, the board, and tell me if I get this right, the board has thought that the organizational structure of the Wild Horse & Burro Program was a little mysterious to the board, that they didn't understand the relationship between the National Office and the states and how information flowed between them, how decisions were made, how local - at different field levels and state levels - how the Wild Horse & Burro Program staff made local decisions based on HMAs and how that information was relayed to the National program.  So that was my understanding of the board's interest in this topic because it was a little opaque to the board how the entirety of the program operates.  And I think that's a good point because when you have an organization that is like BLM is, decentralized, with each state having some relative autonomy, it's an interesting question about how we organize as a larger National program.  That said, that's just stating that problem in a little built different format.  And if the board is still interested in that, I'm interested in helping the board understand that structure and how the National program and the decentralized state by state structure, how we operate, how we integrate, how we communicate.  So, I'll just leave it at that, Holle', at this point, and Chair Carlisle.

Ms. McAlpine:  I just wanted to respond that it was also and remains a little unclear to the public, and I think what I remember from the discussions from last year is we had talked about a completely new set of eyes looking at BLM processes and procedure, hoping to streamline them so somebody outside of the government taking a look at it, saying, you know, you really could do things a little more easily, inexpensively, efficiently, by making these changes.

Ms. Waddell: If it's okay, Celeste, I would like to respond. So, I think that was part of the response that BLM provided, that we have been audited by both GAO and OIG, and OIG operates a little bit differently, that can be internal or external

BLM_004041

concerns or complaints that are submitted, and an investigation occurs.  And GAO kind of does an audit.  Are you operating as efficiently as you should be?  And those are external to BLM.  So, I don't know if that's helpful.  And out of the GAO, there were several inefficiencies that were found.  There was a report that was submitted.  We provided a lot of -- we provided some information, and then pulled together teams to begin addressing those recommendations and making changes within the program. And one specifically that I can talk about is that our original facilities or our programs, our training programs, were operating under one particular tool, procurement tool or acquisition tool, and we had to make changes so that we were consistent with the contracting guidelines, and it rules as well as the grants and agreements rule, so those were changes that we made there.  And those was inefficiencies, and we were able to create cost savings and training programs which increased the number of trained animals that were going to be available for adoption and sale and that were eventually placed into private care.  So that's an example. We could probably send you that link to that report, to the GAO report.  It has been a couple of years now.  I don't exactly remember.  Maybe like I think 2018.  I don't know if anybody remembers.  Okay. So, we can totally provide that link, Celeste, if that's something that the board would like.

[BREAK]

## Agency Presentations to the Board

Presentations were given to the board via PowerPoint as follows [see Table 2]. See appendices for full presentation documents.

| TABLE 2 - PRESENTATIONS TO ADVISORY BOARD | |
| --- | --- |
| Presentation | Presenter |
| U.S. Forest Service Program Overview | Ms. Teresa Drotar, USFS |
| BLM Wild Horse and Burro Program Update | Ms. Holle' Waddell, BLM |
| BLM Comprehensive Animal Welfare Program Update | Ms. Jerrie Bertola, BLM |
| BLM Gather Planning and Scheduling | Mr. Scott Fleur, BLM |
| BLM Research Projects Update | Dr. Paul Griffin, BLM |
| BLM Population Surveys Update | Michelle Crabb, BLM |

**Discussion**

*Regarding US Forest Service Program Overview:*

Ms. Carlisle: In terms of funding, just to clarify, the Forest Service does not have a dedicated line item for the Wild Horse & Burro Program within Forest Service?

Dr. Drotar: That is correct.  That is something that we have proposed to request from Congress, but at this time, we do not.

Ms. Carlisle: And just a brief comment, setting aside the contention that was around the Heber wild horse territories it environmental assessment, I would like to say that the tone and the progressiveness of that environmental assessment was a high bar to set that I think a lot of field offices could look at and utilize as a template because it included adaptive management, and it included the sociology of the divergent stakeholder groups around that particular area, and that's incredibly important for trying to bring public into the fold in a way that feels meaningful.  So just really kudos to the Forest Service for the different vibe and tone in that environmental assessment.  I think that is the right direction.

Dr. Bleich: I think, Dr. Drotar, you responded to Miss Carlisle's question very clearly.  You do not have, Forest Service does not have a line item for feral horse management or horse management, equine management, and the funding that is used, what is the source or the line item from which those funds come from?

Dr. Drotar: Eric, would you like to answer that please?

---

Mr. Davis: Vegetation and wildlife.

Dr. Bleich:  I figured that was the case.  And secondly, just a very positive comment, I saw a presentation recently out of the Modoc National Forest on Devil's Garden removal, gather and removal recently, and it was exceedingly well done.  Very, very professional.  And I think the Forest Service and your program can be very proud of the information that was contained in that presentation.  Good job.

Dr. Drotar: Thank you.  We have some really good people and I appreciate Celeste's comments as well.  My colleague Dr. Francisco, who is the Wild Horse and Burro coordinator down by Heber did a wonderful job.  We do have great people at the Modoc.

Dr. Perryman:  Thank you, Ms. Drotar, we appreciate you being here with us today.  My question is centered around each population management plan for individual HMAs that you have animals on. Do you have individual management plans that are based on population models that include different levels of contraception and gather?  What models are you using to work off of to achieve AML?  What is the Forest Service currently using?

Dr. Drotar: I am not sure quite how to answer that, but many of our, we are three to five times, three to ten times, depending on where it is, over AML.  So, the use of contraceptives is a secondary issue, and we realize that we need to do more removals before that's even effective.

Dr. Perryman: Yes, and we all understand that, once we get down to lower levels of current populations and all the tools make a whole lot more sense and become easier, but there has to be some kind of a basic model that says we're going to get to such and such level by such and such a time.  And that has to be, I'm of the persuasion that you can't talk about gathers without talking about contraception.  They have to be hand-in-hand.  We can't turn animals back out.  We can't leave animals out there that don't have some kind of contraception plan associated with those groups of animals.  So, I guess, I don't know, encouragement at this point is to make sure that those population models, those plans are there to get to AML or whatever level you want to get to by a certain amount of time rather than just oh, we'll gather when we have to, or we'll gather when we get the money. And I know it's beyond that, that's not how you do things, but sometimes that's sort of how it seems anyway.  We wait and we wait to do this and do that, and in the meantime, the habitat, you know, these animals have to eat, right?  They've got to make a living out there.  And so individual population management plans for each one of those herd groups is imperative, and those plans have to include a combination of all the tools that we have available.  Okay.  I yield my time back.

Dr. Lenz: Every mare that's captured that's turned back should have some type of fertility control administered.  I don't think we should wait until we get them down a management level, a lower management level, because every foal we prevent being born aids us in our cause here to manage these horses. But I'm curious, your horses that are not adopted or sold, that are long-term holding, are they all in dry lots?  Or are they in pastures like some of the BLM horses?

Dr. Drotar: We have partnered, BLM has taken those horses, so they are in BLM facilities.  Some of them are in corrals, but the long-term ones are mixed in with BLM horses on the pastures.


### _Regarding BLM Wild Horse and Burro Program Update:_

Dr. Perryman: Yes.  Thank you, Holle'.  You answered quite a number of questions that I had, but I do have a couple.  I just saw that last slide too, and am I mistaken that I saw the number for contraception doses administered at 700 or so?  Was that correct?

Ms. Waddell: That was in fiscal year 2020, yeah, there was about 758.  And I'll tell you -- oh, go ahead.

Dr. Perryman: No, and do you expect to have more than that this year?

Ms. Waddell: Yes, we do. I mentioned earlier that we did lose some of that funding we had identified for population/growth suppression, fertility control in 2021 based on those additional removals in '20 that we have to pay for holding now but we do still plan to increase that number to well over 1,000 or more in 2021.

Dr. Perryman: Thank you. That was sort of my first question was how many doses are you going to administer, and then I have to start thinking about, well, how many are you going to administer over how many HMAs is that going to be, so when you start diluting it down, really, I wonder about the efficacy of a program like that with those low numbers. So, the next question in my mind then is what do your population models show as far as the need for product over the next five years? I mean, I'm assuming there's going to be a tremendous increase in the need for product, and have you had any conversations with the product providers so that they will be in place and be ready to go to provide these escalating numbers of product that -- I mean, obviously we all know that 1,000 doses of product that's not going to have a measurable effect over the total program period. It's just not. Now, to a single HMA it might, you know, but over the entire program, 1,000 is not going to -- I mean, you might as well do something else, put it mildly. So that's the question is what the escalation of product will look like in your models, and have you contacted the provider so that they can be ready to provide the product as this increases, because I'm assuming there's going to be, you know, there's going to be a need for 10,000 doses of product in a couple of years, and I don't think anybody is ready for that. So, what kind of conversations have you had in preparation and readiness? It all comes back to that readiness and preparation.

Ms. Waddell: Yeah. So, the readiness is a challenge, and not so much specifically with your comment here, but the readiness is a challenge in a lot of other ways. There's quite a bit of support, administrative support, contracting and HR and staffing and coordination, so there's lot of other readiness that would need to be put in place before we even, you know, got to anything else. But to your question on whether or not the providers would be able to supply the needed fertility control is that yes, Dr. Griffin has been in conversations with them, and more specifically, GonaCon and PZP, ZonaStat has told us that they can supply whatever needs and requests we have and these increased needs of treating animals.

Dr. Perryman: So, in your best guess, what are we going to need over the next year, over the next three years, in your best guess, what are your models telling you we're going to get to?

Ms. Waddell: So, I would actually ask Dr. Griffin to come on because I know he said that BLM has modeled fertility control needs under several scenarios and I think Dr. Griffin, are you there?

Dr. Green: Yes. Hello. So, it's hard to answer your question, Dr. Perryman, completely because a lot of those are local decisions and they're contingent on NEPA, they're contingent on funding, emergency situations for gathering are going to, you know, take precedent in many cases, but if the concern is, you know, whether we would be able to have contractors supply enough fertility control product, that that's not a major concern. That's one we've addressed and that given enough lead time, which is on the order of a few months, that can be supplied. And then in terms of how much, how many actual doses are needed, that is outlined in the 2020 report to Congress and what was forecast at that time, and I don't think I have anything more intelligent about the projected number of doses per year other than what was presented there. It's going to vary depending on the actual -- on the budget that we receive from Congress and the actual gathers that we can conduct every year. This was a topic of conversation during the last board meeting, and I know that for you and for the public, it's very frustrating to see a relatively small number of fertility control doses applied compared to the number of animals gathered, but it is kind of prompted by your question about population models, you know, if you imagine a Herd Management Area that is starting at, say, four or five times over the AML and you want to bring it to AML, you have to remove a very large number of animals, and even if you do turn back some, you know, a fraction of the mares that you have captured and they're treated, the ratio of animals treated with fertility control to the total number of animals that are gathered and removed is going to be small. So, we would like to see more fertility control application on the range as appropriate, but we're also recognizing that in situations like this with conditions on the range as they are, there is still, you know, in many places an imperative to reduce the number of animals on the range at the same time. So, the number of animals it turned back, that is, mares turnback that is treated is quite often going to be small and it's kind of a frustrating reality right now.

BLM_004044

Dr. Lenz: Thanks.  So Holle', is the BLM going, like the Forest Service, are they moving from freeze branding to microchips?

Ms. Waddell: So, we will continue to do both.  As freeze marks are pretty important in the way of identifying an animal, the microchipping is helpful for us in the corrals and pastures, but, you know, if animals are adopted, in order for us to identify them, or adopted or sold or transferred, we still want that ability to be able to read that freeze mark and associate it with the animal identification in our Wild Horse & Burro Program system.

Dr. Lenz: But you know, there's a lot of technology in the domestic sector around microchips, not so much the microchip, but the readers.  They have four foot long readers where you don't have to stand next to the horse.  There's also plenty of software available where you can Bluetooth you're reading from your reader to an iPad, iPhone or computer and track where the horses are.  You know, the California Horse Racing Board has mandated that every racehorse in California be microchipped, and they in real time know exactly where every racehorse in the state of California is.  And I wonder if that wouldn't be a program to initiate.  You can certainly continue freeze branding, but once that horse is microchipped, it's there for their life and it cannot be changed.  So, you could track horses from the range to holding to working facilities to adoption.  Most of the veterinary health certificates today are based on a microchip number, and so as those horses would move under private ownership, they would still have somewhat -- they would be somewhat tracked by their health certificates. But I think that might be a pretty good thing to start locking at and start thinking about because that's where, you know, it's so much easier to do that than to try to flip the mane up and read through a freeze brand.

Ms. Waddell: Yeah, Dr. Lenz, and not to cut you off, but maybe you missed me saying yes, every animal that we gather and remove now is microchipped, but we will continue to freeze mark as well.

Dr. Lenz: Right.  Right.  But you have the capability to track those horses with their microchip number?

Ms. Waddell: Yes.

Dr. Lenz: You do, okay.

Ms. Waddell: I don't think it's as fancy as the Bluetoothing, but what we do, we have that ability.

Dr. Lenz: All right.  Okay.

Ms. Waddell: And I think we did a presentation on the microchip.  It's been several Advisory Board meetings ago, but there was a presentation about them, and if Bryant won't yell at me, I'm happy to have Dr. Kane come on, he also was a part of that microchipping team.  And I don't believe we issued that policy, but we definitely have an actual instruction memorandum, I know it's drafted and it's probably in the hopper somewhere, but we have provided that process and procedure to the field, and that's been since maybe 2018, Dr. Kane, do you want to hop on?

Dr. Kane: You're correct.  Currently all animals that will are removed, all animals that are shipped, all animals that are prepped for private care placement are microchipped.  So basically, any animal in a BLM facility is currently microchipped.  They've kind of caught up doing whatever backlog there was from when the policy started back in around 2018.  Those microchip numbers are linked in BLM's database to the freeze mark number.  I think what Holle' was referring to with the freeze mark was the advantages of the visibility of the freeze mark as identifying a wild horse or burro prior to individual identifications, and I would say the facilities   right now are split about 50/50 in which ones we're relying mostly on the microchip and which ones are still reading freeze marks, it just depends on their, you know, software capabilities and setup and shoot site capabilities.  But it's been particularly helpful with the burros because as you know, most burros or a lot of burros look very much alike, and sometimes their freeze marks are hard to read with the wrinkles and whatnot.  So, it's speeded up their process.  We actually have chute readers in the facility down in Arizona that can read a chip as the animal moves through the chute.  One thing I would say it's not so simple as chipping them and tracking them absolutely everywhere, there's no satellite tracking, that's not technologically possible.

BLM_004045

Dr. Lenz: No, that's not what I'm talking about.

Dr. Kane: Right. But everybody has scanners, and everybody has the ability to scan a horse and if you note its location when you scan it, then you know where it is. And it's in the database as such.

Dr. Lenz: And each time they're moved, they're scanned, right, so you follow a horse?

Dr. Kane: Right. They're entered into the shipping records and entered into a record as sent and entered into a shipping record as received and the database is updated, and I realize you don't think there's satellite tracking, but some people in the public still sort of think that.

Dr. Lenz: I know, yeah.

Dr. Kane: That's not technologically possible.

Dr. Lenz: Right.

Dr. Bleich: Holle', just for information sake, what proportion of the 7500 animals that were processed through the AIP recently were horses and what proportion were burros?

Ms. Waddell: That's a great question. And thank you for that. I will have to ask the woman that I talked about who knows where all 50,000 animals are, we can ask her and get that number to you shortly. She's watching, yeah.

Dr. Bleich: Okay. Thank you. And then just for Dr. Griffin, it's hard for me to fathom why an animal in hand would be returned to the range unless it is in the context of a research program. Can you --

Dr. Griffin: I can understand that point of view. The BLM receives a number of comments from the public and has received comments from this board encouraging us to incorporate fertility control even prior to the achievement of AML, and local offices balance the decisions and Resource Management decisions that they have to at their own discretion, and in some cases, that has included turning back some treated mares, in some -- maybe it might help to put it in the context that because we know that a lot of these fertility control vaccines, GonaCon and PZP vaccines are more effective after a booster dose is given, sometimes you have to give them an initial dose and turn them back on the range under the expectation that the benefits of major reductions in fertility control will come later when they're captured a second time and treated a second time.

Dr. Bleich: Major reductions in fertility control --

Dr. Griffin: Long lasting effects of fertility control.

Dr. Bleich: Efficacy.

Dr. Griffin: Yeah, the entire efficacy of GonaCon after a booster dose.

Dr. Bleich: Increased efficacy.

Dr. Griffin: Correct. Especially in terms of longevity and longevity of effect and the higher rate of mares that would be contracepted. But certainly, we understand it's a frustrating situation to see a range that is degraded already and where the population size is higher than AML and then be turning horses back, it's complicated.

Dr. Bleich: I'm sure it is. I'm sure it is. Thank you.

BLM_004046

Dr. Griffin: I know that's not going to be satisfactory to everyone.

Ms. Pearson: Yes. So, the last two of you basically answered my questions but I do have to make a statement. I know it seems like 700 doses of contraceptive seems very small, but I have been on several of these gathers in Utah and in Nevada, and I've seen the amount of acreage covered in a gather and the amount of horses brought in, and we're not even close to appropriate management level on any of these gathers. So, I'm with you, Dr. Bleich, the thought of gathering these horses and then releasing them again when you're not even close to upper AML seems to me like, you know, a very good reason not to be doing contraceptive during that time period. And I wish we could have been doing this years and years ago before the appropriate management levels, you know, were beyond our control. One of the questions that I would like to ask, Holle', you know, and I basically already know the answer, but just so that the public is know this, but given the contractors that we have available right now and the capabilities of gathering, just simple math, we're not even capable of gathering this year's birthrate from what is on range, if you're just saying 20 percent. I don't think we're even -- I don't think we have that capability right now, unless we're utilizing water trap, you know, water baiting and all those different things. Am I wrong there?

Ms. Waddell: So yes, for the most part, you know, because it's not just -- so we have the logistical challenge with the contractors, but then we also have space availability as well. And as I mentioned, I think our planned gather, and Scott, please correct me if I'm wrong, but I thought it was near a little over 11,000 animals that were planned to be gathered this year. Scott, are you there?

Mr. Fleur: Yeah, so that's correct.

Ms. Waddell: Okay. Bryant will yell at you, okay, because we're on a time crunch. But Commissioner Pearson, so that approximately 11,000 number is based on several factors, and that's the thing about this program is that it's so interconnected with each one of its components and operations that you really can't just say we're only going to do this because it impacts so many other pieces of the program. So if we decided that you know what, let's max out our contractors and, you know, what is the maximum number of animals that we could gather and remove, we've already identified that we have this need, we've deemed these animals excess, so how many could we push through, and if that number was 30,000, this is just totally, I'm just throwing this out there, but if the number was 30,000, well, we know that we don't have the space availability to house, feed and care for 30,000 animals in this fiscal year between our corrals and our pastures, and then let's just even say that we had the space. Then Michael would be yelling at me right now to say Holle', we don't have the budget for the gathering or the holding in out years for those 30,000 animals. So that's what I mean when I say it's interconnected. There's all these pieces that have to really work together. And when you throw in adoptions and sales and transfers, those are numbers, but you can see, I guess we didn't have an adoption trend slide, but I bet it's in your off-range materials. I have not looked through the entire binder, I will be honest. But in that binder, you know, when you're looking at those adoption sales, they're not 15,000 numbers. We're still really talking about under 10,000, and we were shocked last year when we placed 6100 animals. There was a lot of effort from everybody in the Wild Horse and Burro program. However, the pandemic, there were lots of things that were happening that could have impacted that number. So, I'm saying all that to say, Commissioner Pearson, that you're right, there are several factors that would play into the fact on whether or not we could maximize the contractors and logistically, space availability and budget included be able to maximize the use of those contractors to remove animals.

Ms. Carlisle: I'm going to save my first part of my question because we're going to be talking about this in our working group, but it has to do with modeling and really being able to get past what essentially feels like stabs in the dark over how and why and where different management levers are operating. Holle', you're nodding, because I know you're like, yes. But a simple and fast question, what is the 2021 population count for wild horses and burros on our rangelands?

Ms. Waddell: Okay. Okay. So those numbers, you know, the states have done the work and pulled together their information. We have been working on finalizing those tables and those numbers. So, we hope that we'll be providing them to leadership and hope that they'll get out here pretty soon, but yeah, we know, there's a lot going on, you know. We're only so many people. So hopefully that number will be out soon. Was I on mute? Okay.

BLM_004047

Mr. French: I'll try to keep this brief; I know we're running tight on time of the I just wanted to ask this question to get us to actually thinking about this down the road.  But given the certainty of resource damage that we're going to see this year, over and above the identified planned gathers, has the BLM adopted emergency gather and contraception plans for this year?

Ms. Waddell: Yes, the short answer is yes, Commissioner French, and Scott is going to go a little bit more into detail it about kind of what this is looking like.  I think he was probably not expecting the planned schedule to then become as tentative as it now is based on some of these emergencies, and those emergencies may be occurring in places where all the documentation isn't quite ready, so there are several steps that Scott is working with the states on to make sure that they have everything they need for those emergencies.  I'll be honest, we're facing -- summer is always kind of a challenge because you know there are going to be some emergencies, but we've already seen an increased number of states identifying places to have emergencies be willing to do some intervening potentially with water hauling efforts and such, so I'm going to say a soft yes to your question.

Mr. French: I guess where I was going with that is if we're not going to move animals under these conditions, we're going to haul water, that begs the question as to what we're going to do with the resource, coming out of summer and into late winter without the forage availability.  We're just pushing the catastrophe down the road from dying of thirst to dying of starvation.  It, which is going to have significant impacts on wildlife species as well in most of those areas. And then, you know, I bring that up just for us to think about it.  Secondly, I pondered for a while now, that based on the conditions we have and have identified on the ground by HMA, because the AML number is such a pivotal number we use for management and for triggering management, what are the plans on the part of the Bureau to reassess AML?  Because AML, as you pointed out, Holle', AML, there is absolutely no comparison between AML now and AML50 years ago in those HMAs.  In many cases, or in some cases at least, it goes up.  In many cases it's completely shifted and changed because of landscape changes for those ranges in the last 50 years.

Ms. Waddell: Yeah.  And that's a good point, Commissioner French.  You know, those drought maps that I had in that presentation that showed 50 years, what would be very amazing is to overlay it with other resource conditions 50 years ago and then today so that it could be very clear that there's a distinct difference of the land and just the overall habitat 50 years ago to today. And so, we've been having conversations, our leadership and Dr. Jenkins, feel free to jump in, but we definitely have had some conversations with leadership, Scott has posed a couple of other approaches looking at, you know, AML and make adjustments to Resource Management plans, yeah, they definitely are conversations that we're having.

Mr. Yardley: Really quick, Holle', you've talked a lot about emergency gathers and the necessity for those and also the hauling of water, and Commissioner French kind of touched on this, but one of the big concerns that I have, and it does affect AML is when there is an emergency gather, the rangeland has already been pretty much stripped of any digestible plants.  It's kind of bankrupted the ecosystem at that point in time.  What efforts and what has the BLM done kind of taking into consideration what they're going to do for that rangeland restoration thereafter the imagine gatherings occurred and how can they, like, prevent the rangeland degradation from occurring prior to it being strictly an emergency gather rather than an emergency rangeland situation because of the downward trending that's occurring?

Ms. Waddell:  So I think the short answer to that is that BLM has identified that there's an interdisciplinary challenge here and some collaboration that's going to have to take place, and, you know, that's one of the things that Dr. Jenkins has stepped up as Assistant Director, has really encouraged and he as Lawrence St. George as our Deputy Assistant Director, really encouraged that the programs build - an interdisciplinary network, verge takes, wildlife should be at the table along with Wild Horse and Burro having discussions as we move forward with making decisions on removing animals in emergency situations or whether it's fire or whatever it may be, but that is an option to -- that is it an option to place seeds down, is it an option once animals are removed, is it an option and how do we restore it and how do we create an environment that wildlife and Wild Horse and Burros and all the multiple uses can come back to. And so those discussions have started as well.  I mean, I don't want to act like we're just starting because these are some conversations, but, you know, the agency focused on sage grouse habitat at one point, Congress appropriated money for sage grouse restoration efforts, and we were able to utilize some of those funds and some of those emergency conditions in previous years to address sage grouse habitat removed animals and then the other programs were able to also utilize some of those

BLM_004048

funds.  So, I think it would be very similar to that effort, but right now if you're asking if there are plans and a process, there's not.  There's conversations that are happening about it.

### *Regarding BLM Comprehensive Animal Welfare Program Update:*
[No questions.]

### *Regarding BLM Gather Planning and Scheduling:*

Ms. McAlpine: I just have a question, you treated in this hypothetical situation, you treated 100 mares and released them, and you released 100 stallions, each of which can impregnate many of the nontreated mares.  Is there any discussion or plans to sterilize or geld these stallions, particularly those with conformational abnormalities or serious issues before releasing them back?

Mr. Fleur: Well, of course in our example we like to -- and when we go back to the range with animals, we like to go with a 50/50 ratio.  But typically, in most gather situations, the stallions are not treated or gelded.  I mean, that is something we are looking at, and we are looking to implement down the road.  But the focus right now is on the mares and getting our products of, you know, GonaCon or PZP-22 into the animals and getting them back out onto the range.

Dr. Bleich: Just for clarification, Scott, you mentioned the assessment of body condition, ocular assessment of body condition by BLM staff, and Jerrie had mentioned an on range component to CAWP, animal welfare considerations.  Are they intertwined with each other or is the field assessment of body condition separate from CAWP program that Jerrie outlined, do they work together or how does that work?

Mr. Fleur: Well, we all use the Henneke method of body condition scoring, we have quite a few Field Specialists at the Bureau at the field level and their assessment is based on that Henneke score chart and Jerrie's team as well, although her team may be a little bit more refined in their situation, but yes, they should be the same.

Dr. Bleich: But body condition of horses on the range is a part of the CAWP.

Mr. Fleur: Jerrie, can you answer that one?

Ms. Bertola: As we develop those standards, yes, body condition is part of that that is in there currently, but those standards have not been -- they're not --

Mr. Fleur: Your assessment at this stage is just tied to the gather operations instead of visually on the range --

Ms. Bertola: Yes, correct.

Dr. Perryman: Yes, I will try and be brief.  I just want to make sure for the board's benefit and for those that are watching that when Scott was talking about if you take animals -- if you gather some excess but you still put, turn an excess back out onto a range, even though it's a lower number of animals that are being returned to the range, the intensity of the grazing process has not changed.  They are still going to eat anything immediately when a plant down in a riparian zone turns green, something is going to eat it.  So, you're not reducing the rate of the damage.  You might be reducing the scope or the horizontal scope of it, but you're not reducing the damage that's going on because those animals are going to continue to eat and continue to forage on those plants that are already stretched. You can put one antelope in a 10,000 acre pasture, just one pronghorn antelope, and you're going to find areas that are going to be used harder than others simply because they prefer those areas for whatever reasons.  So even though we're taking, you know, taking 1,000 animals off and we're still putting another, returning another 400 animals out there over AML, I forget what the numbers you actually used, Scott.

Mr. Fleur: A bunch.

Dr. Perryman: Even though we're returning them, we're still over AML, the intensity of the grazing that's going to take place in some of these key habitats is not going to decrease. They're still going to eat the same plants, the moment that they put up some kind of photosynthetic tissue, they're going to be eaten. So that doesn't do anything for us.

Mr. Fleur: Well, and I pointed out the degradation would continue to occur, and hopefully we would treat, all those animals going back would have been treated, we could capture again and booster and retreat and remove some more. So, it's a slow process and it's incremental.

### *Regarding Research Projects Update:*

Ms. Carlisle: I just have a quick one and maybe we can get more into this later. You've stated in the past, Dr. Griffin, that sometimes the good work of the research that happens doesn't, BLM isn't necessarily capable or able to implement things that maybe the research has pointed towards being effective. Does your department, the research department, have any, I don't know, power isn't quite the right word, but what sort of pushing can you all do to help Congress to understand and those upper levels of BLM management to understand that implementation of these already available types of fertility control should be scaling up consistently at all times?

Dr. Griffin: Yeah, I'm not sure what previous comments I made that you're referring to. I would like to think that we do a good job at the research team of trying to distribute the information that we get from research with staff in the field for them to help make decisions about whether and when it would be appropriate to use, and I can't think of a lot of fertility control methods for which there's been research where we have felt, where the agency has held back on applying that at a management level after appropriate analysis. But to answer your question about the application of research and pressing for the further use of fertility control, you know, I contribute to discussions whenever asked. You know, my role is to be responsive to Field Offices and staff that come to me with questions. I work with Headquarters office staff. We do have -- we have developed internal population modeling to project fertility control needs into the future. Try to help with population modeling questions that arise before Michelle Crabb came on as our population biologist, so, you know, we try to bring what information we have to bear. As you are probably aware, the agency is limited in terms of how much lobbying it is legal for us to do directly to Congress, but I think that the program as a whole is very much aware of the potential for fertility control to reduce growth rates in the future, but it's the same kind of thing that we've discussed earlier, you know, investment in fertility control in a given herd is kind of reducing future growth rates and if the present growth rate is causing severe degradation of the resources, you know, mixing in fertility control along with removals is a balance that is hard to achieve and we're trying to achieve that balance everywhere it possible.

Ms. Carlisle: Yeah, and apologies if I made it sound like you were --

Dr. Griffin: Oh, no, I don't doubt it. I had the same experience as you in re-reading the transcript from the previous board meetings and have to be careful about everything I say because -- no, not in a negative way.

(laughter).

Ms. Carlisle: Yeah, I take your point. I think what I'm trying to get at here is this -- I mean, this is just what happens in bureaucracy. There are amazing, compartmentalized bits of information all over this agency, and I think the board is interested in making sure that we are really pulling that together and then figuring out how to model outcomes that are actually feasible.

Dr. Griffin: I think if you could conduct a survey of the state leads and Wild Horse and Burro Specialists that do the majority of the hands on herd management work and monitoring work in the program, you would find that a lot of them are very aware or at least I would like to think that they are very aware of the fertility control options that are available, and as Scott has, you know, as Mr. Fluer was talking about, there's kind of a time lag in NEPA process and gather planning. You know, IUDs are a great example of this. We are pretty confident that based on available information and literature review, that they are an appropriate, safe and effective means of fertility control for nonpregnant animals, but it's

---

a very limited number of herd management areas that have the NEPA in place for those to be used.  That number will increase over time, but we won't be able to -- we just can't turn on a dime because of the appropriate laws that we follow.

Mr. Yardley: Hi, Paul.  This question is kind of for you and maybe for Scott Fluer as well.  In terms of fertility control they've taken into consideration -- have they taken into consideration just turning out strictly, like in those gathers that they do when they are going to have to turn some animals back out, only turning out the stallions, keeping all the mares so that -- essentially if you're not going to geld them, but if you can reduce the number of mares, you're going to reduce the number of foals.  I just wondered how much research has been done on that and what the potential is for that moving forward.

Dr. Griffin: I think you're talking about, we would call that kind of fertility control method sex ratio manipulation, and there are a lot of herd management areas where the actual goal of the -- the stated objective is to have 60 percent males and 40 percent females, and what that does is that effectively reduces, just like you were saying, the number of potential foals, at least for a few years, until that sex ratio balance kind of naturally comes back in balance just from the foals growing up. I think, you know, you're talking about if you're -- Scott can comment about this, you know.  I think his example of the turning back 50/50 exact same number of mares and stallions after the mares have been treated, that would depend on the local decision-making in the NEPA that they have ahead of time.

Mr. Fleur: To add to a little bit of that, once you start getting above that 60 percent studs or even higher, what you find, the field has found is horses are out seeking other horses.  There's bigger impacts from stallions trying to find females, a little more fighting.  That's from the field observation, from what we're hearing.  So, keeping it closer to a 50/50 is a better balance.

Mr. Yardley: With fertility control, has there been any research of ways of gelding those stallions without having to physically do it, like through some kind of vaccine or something so that essentially you have geldings, and you wouldn't have that type of fighting that occurs?

Dr. Griffin: There has, so what you're talking about is kind of generally reducing male fertility.  That hasn't really been a big focus for BLM because of early modeling work in the '80s and '90s that suggested that the number of stallions that you would have to treat in order to have a major reduction in the actual fertility rate for the mares, you would have to treat a very high fraction of those studs.  Upwards of 80 percent to start to have an impact in the reducing the number of foals. So, it hasn't been a big focus, but GonaCon can be used on male mammals to reduce their fertility, but in horses, I would have to get back to you, but I believe that early studies in horses found that it was not super-effective, you would have to have a lot of treatment, you know, multiple boosters.  Certainly, one dose of GonaCon is not going on reduce the sperm production for stallions.  In the Sheldon National Wildlife Refuge, they tested a chemical castration method where an agent was injected into the testicles for the stallions rather than -- for gelding, that was not very effective, and those stallions still had viable sperm as well. So, I'm not aware of a method where, you know, you would go out and dart stallions with a vaccine or something like GonaCon, where it would cause a major reduction in the number of foals, unless you had, you know, approximately more than 80 percent of the stallions treated at any given time probably with multiple booster doses.  So, it would require a level of effort that is probably not as straightforward as either reducing the number of mares with the sex ratio change or treating the number of mares with fertility control.  So that's kind of a long story of, you know, why stallions just haven't been the major focus on fertility control methods.

Mr. Yardley: I just wondered about the potential of even turning out like trying to get some of those down even closer to around ten percent mares or as few mares as possible and keep all the stallions out on the range because no mares, no babies, essentially.

Dr. Griffin: Sure, that would be effective from a population growth point of view but as Mr. Fluer mentioned, behaviorally we have anecdotal evidence that if you did get the ratio of stallions to mares more along the 70 to 30 line, you can have just a lot of stallions beating up on each other to compete for the small number of mares that are still out there.  And to date, that's not a decision that BLM has chosen to make.

Dr. Bleich: Just for the sake of information, let me preface this, I'm assuming that there's a differential in survival rates between males and females at least to some degree, and in an unmanipulated population, what would the natural sex ratio be to be expected males per females?

Dr. Griffin: Off the top of my head, I'm not sure. It would vary by age. I think that it is pretty close to 50/50 at birth. As stallions have a little bit lower survival rate as they get into, you know, competing for mares and then if it's an untreated population, then the older mares have a lower survival rate, I think just from the effects of having offspring.

Dr. Bleich: But it would probably be close to 50/50?

Dr. Griffin: It approximates 50/50 I think over --

Dr. Bleich: Overall?

Dr. Griffin: It would be close, yeah. Having said that, we know that mares that are treated with vaccines do have higher survival rates, so in populations that have high numbers of mares that are repeatedly treated with vaccine, then you can have a sex ratio skewing that skews more heavily to mares with more mares than stallions because of their -- especially at older age classes because the stallions are dying due to those interactions and the mares are not having foals.

Dr. Bleich: I was just looking for a relative comparison of the -- of the 70/30 or 60/40 that had been mentioned, in your Honor manipulated population.

Dr. Griffin: Right. Right. You know, it's hard to get a measure of the sex ratio of adults from aerial surveys because in horses they're just difficult to distinguish from the air. But there are a smaller number of demographic studies that have been longitudinal and have that kind of information, like from the Pryor Mountain herd and a couple others so I can try to get that for you.

Dr. Bleich: Just looking for the relative relationship between 60 and 30 or 60 and 40 or --

Dr. Griffin: I don't think there's anything magical about 60/40, but as Mr. Fluer mentioned, that it's up around that 70/30 level, there's anecdotal information about behavioral interactions that were not desirable.

Dr. Bleich: Okay, thanks.

Dr. Lenz: It's pretty common knowledge that if you geld an aged stallion, say six, seven, eight or above aged stallions that's bred mares before, that they will continue to cover mares after they're gelded even though they won't get them pregnant, they'll continue to cover them. So, I wonder, if you turned aged, castrated stallions back out and kept the younger stallions, those aged stallions would probably develop a band of mares, I would think, and defend that band. Would that have any effect? I know the key is to control the mare's fertility, but I'm wondering if aged, castrated stallions turned back out on the range that would be infertile would not decrease --

Dr. Griffin: We're looking forward to results from the U.S. Geological Survey which completed their study of gelded -- there was a population at the Kiger Herd Management Area where a number of geldings were turned back as part of a herd that also included fertile stallions, they completed their fieldwork last year, so we're looking forward to those results being published preliminarily what we were told was generally that there was, it looked like there was kind of a decrease over time and so that those older stallions, like you said, did retain it the mares that they were breeding with initially, but that over time, it appeared that they became less competitive.

Dr. Bechert: Yeah, mine is a real quick question. So, we're putting different fertility treatments out there, and I was wondering about tracking. And we had talked about microchipping earlier. So, I was wondering if the mares that are treated are microchipped. It seems like that's really important, especially as you're considering boosters.

BLM_004052

Dr. Griffin: Right. I think that there's some variety in terms of local offices and whether they do chip or don't chip animals that are turned back to the range is certainly increasing in prevalence and even five years ago nobody was doing that, now it's more and more common. I don't think that this is universally happening. Similarly, in some of those, in some HMAs but not others, those mares that are receiving fertility control are marked with unique numbered hip brands, freeze marks on a hip so that they can be monitored more easily, you know, just to say oh, that's mare 36, but that's not possible in every state. We certainly are moving in the direction of using microchips, trying to get it in the direction of all mares that are treated and turned back to the range getting microchipped for tracking. You wouldn't be able to determine that until you recaptured them, but that would be a more reliable way of tracking the previous treatment history for any mare that you recapture, and that information is being input into our Wild Horse & Burro Program system, the database that we use to track pretty much every time we handle a wild horse.

Dr. Bechert: Yeah, that's good to hear because, you know, a mare that has an IUD, assuming they last for multiple years, still to be determined, you wouldn't necessarily have to vaccinate her. But it's also really good for long-term research just to see how these different treatments are actually functioning in the field.

Dr. Griffin: Yeah, that's the kind of monitoring data that will become more and more useful over time and having it in the WIBUS database system will presumably allow us to do that kind of data mining exercise in the future.

Ms. Carlisle: Thank you. As you all are looking at sort of idealized times for maybe holding captured horses and applying a primer and a booster of whichever selected fertility vaccine may be utilized, are there any studies lined up through BLM or is BLM doing anything to look at idealizing that holding time so that it's as short as possible? In other words, what can we get away with in terms of it getting a horse, giving them a primer, holding them, giving them a booster so that when they are turned out, they have longer efficacy and higher, both longer and higher efficacy?

Dr. Griffin: Thank you so much for the opportunity to again plug the possibility of our request for proposal for fertility control research coming up that we expect to distribute later this fiscal year. That kind of question would be very appropriate for researchers to address, flashing lights to potential researchers.

**[BREAK]**

## Public Comment Period (1)

**Scott Beckstead**
Okay. Thank you. For the record, my name is Scott Beckstead, director for animal campaigns for the Center for Wellness Action, adjunct professor of law at Wilhelm University where I teach animal policy, Endangered Species Act. I was born and raised on a small farm in southern Idaho, raised beef cattle, spent my youth on horseback in Idaho. I earned my bachelor's degree at Utah State University and law degree at the University of Utah and now I now live and work in rural Douglas County, Oregon. Thank you for the opportunity to testify and a special thank you to BLM staff for allowing me to speak early in the meeting as you can probably hear I am at the Eugene airport waiting to catch a flight to Salt Lake City where I will be preparing for a rally on Friday morning with actress Katherine Heigl on behalf Horses of West Desert facing helicopter roundup beginning July 12. The American public is growing increasingly frustrated and unhappy with the BLM's management approach that favors not the horses, not the American taxpayer, but first and foremost the commercial livestock industry. The Humane Society of the United States ASPCA and Return to Freedom have been coopted by corporate grazing interests to support the path forward which establishes helicopter roundups - the primary management tool for wild equine populations. This puts them in the role of outliers among wild horse advocates who were specifically excluded from the discussions that produced the path forward. The BLM commercial livestock industry and groups behind the path forward are spreading a false narrative about wild horse populations. It's a clever ploy. By steering the conversation away from cattle and sheep, the issue is presented as a crisis with wild horses posing an imaginary existential threat to our public lands to justify mass removals. Meanwhile, beef, cattle, and sheep, which vastly outnumber wild horses, are given a free pass. It's time to stop talking about some embellished overpopulation of wild horses and instead start talking about the very real overpopulation of cattle and sheep. The BLM should take the following steps to return to Congress' original intent in the 1971 Wild Horse Free-Roaming Horses and Burro Act: number one, stop the helicopter roundups. They are cruel and a blatant violation of the act. By chasing wild horses with helicopters,

BLM_004053

incarcerating them in feedlots and allowing them to end up in the slaughter pipeline, the BLM is engaging in the very kind of cruelty the Act was intended to stop. Two, end the Adoption Incentive Program. Unscrupulous adopters are being paid by the BLM to take wild horses with the intent of selling them for slaughter and that needs to stop immediately. Note that this issue may become moot. My group Animal Wellness Action has created and led the effort to include in the INVEST Act, a bipartisan amendment that would ban the transport of American equines for slaughter.

**Heather Hellier**
Okay. Thank you for the time today. What President Nixon said when he signed the Wild Free-Roaming Horse and Burro Act of 1971, was that BLM was tasked with protecting our horses and land they occupy. 1971, 355 Wild Horse and Burro HMAs on over 53 million public land acres, today there are less than 177 HMAs and only 26.9 million acres. Of those 177 HMAs, seven still listed on the BLM website have already been zeroed out and 50 have AMLs of less than 50 animals, times three are below what's needed for diversity. The HMAs with HMAPS have suitable water sources for water and wildlife, far more forage available, since little to no sheep grazing, and BLMs failure to create plans for each Herd Management Area alienating science and solutions in solving issues. Formation of plans allow professionals in the field opportunity to help find solutions for wildlife. I am astonished that the BLM continues to request millions of taxpayers from Congress to round up and house our wild horses and burros, put up suitable perimeter fencing and providing water resources when needed. This would not only save the American taxpayers millions of dollars but would provide us with locations where we can go to see wildlife, wild horses and burros roaming wild and free for generations to come. I have personally visited over 27 HMAs throughout the West in the last 14 months and I am shocked at the things I have seen. Of those 27 HMAs, 24 do not have it H maps and the damage from cattle tromping on and eating the native grasses down to the dirt is glaringly evident. BLM and ranchers deliberately and with malice are fencing off water sources and turning off water troughs that fill only when cattle or sheep are present, stallions dying when trying to cross cattle guards or break through fencing to get their family bands to water. Wildlife suffers as well when the cattle drain the ponds. In many HMAs, BLM is cutting down millions of native junipers and pinyons, mowing down thousands of acres of our public land. I have seen devastation firsthand and know the land will never be the same for native wildlife. This does not even mention the grazing it permits on 75 percent and damage to forage and water sources within HMAs. I do not understand how that is not part of the conversation. It will suggest removing all of the mares from these HMAs and only these stallions are infuriating, but from what I've been told it's already done in the King Top HMA in Utah. Not acceptable. Disappointed in how much time. Instead of helping our horses and burros excel on the range, with the removal of excessive cattle and sheep raising permits. To close, last year, Claire Stables brought up faulty AIP programs and a member of this board shook his head explaining he could not understand why someone would take $1,000 for a horse and not take care of it.

**Rick Karcich**
I'm Rick Karcich from Sentinel, Colorado. Regarding wild horses and burros, the question is not can they reason, nor can they talk but can they suffer? Why should the law refuse protection to any intelligent being? BLM's mismanagement, illegitimate suffering of these horses by helicopter gathers, cruelly depriving them of water and forage on public lands mandated for their protection, by cruel transportation to subsidized slaughters through Adoption Incentive Program and by cruel warehousing and feedlot like settings ripe for disease and death. And all this is performed at taxpayer expense without regulatory oversight while falsely blaming wild horses and burros for the destruction of public lands. There are documented issues of discrepancies in the BLM's numbers of animals moving through the Wild Horse & Burro Program and many situations in which per BLM's own statistics the BLM growth rates, and corollary population estimates are scientifically and biologically impossible, discussing the basis for the removal of wild equines from the range and jeopardizing the program at multiple levels. The BLM's justification for Wild Horse and Burro gathers has ignored the very real threat to herd population dynamics and genetic diversity - two features that are vital components of any wild animal conservation and population management program. The BLM's adoption of strategies that threaten to eliminate the functioning and self-perpetuating herds as healthy entities are part of the BLM's path to extinction for wild horses and burros. Truthfully, there is no Wild Horse and Burro population problem on federal lands. The issue is the breed of National Cattleman's Beef Association and other livestock interests who want no competitors for the grass that grows on our public lands. There are now more than 4.3 million cattle and sheep on our Western lands, 30 of these domesticated ruminants for every wild horse. These ranchers have long wanted to exterminate the wild equines who eons ago occupied a central role in the North American ecosystem. Or these ranchers want to reduce them to remnant populations equivalent of functional extinction. For its part, the U.S. Forest Service operating under the Department of Agriculture has taken a similarly untenable approach to wild herds on wild horse territories managed by the Forest Service. I and millions like the

BLM_004054

are asking for immediate moratorium on further nonemergency gathers and removals of wild horses and burros until the BLM conducts a comprehensive science-based review of its Wild Horse & Burro Program and the impacts of private livestock grazing. We also seek to permanently bar the BLM and Forest Service from conducting any permanent sterilization procedures on wild equines. We believe that BLM has largely abandoned its statutory mandate to cherish these icons in a manner ecologically balanced and humane. Instead, BLM continues to weave a false narrative that blames wild horses and burros for degrading rangelands ignoring private impacts of millions of privately owned cattle and sheep.

**Mary Debonus**

Hi. Thank you for allowing me to speak. My name is Mary Debonus, I am actually an accountant, so I come to this both as an animal rights person but also with a financial head. I do have a horse sanctuary in Upstate New York called Mustang Valley Sanctuary, I have pulled ten horses from the kill pen, mustangs from the kill pen in the last year. One of them the BLM thinks is in long-term holding and it's not, is on my property. Looking at the way that the BLM is managing this, it is costing the taxpayers millions and millions and millions of dollars to fund 15,000 ranchers who have 18,000 grazing permits and only produce two percent of the livestock that's used for feeding the U.S. I'm a vegetarian, I'm against it, but if they're going to graze their horses on our lands and the taxpayer is going to pay for it, there should be an effect on the economy. They should be feeding the poor. It should somehow help. It's costing the taxpayers millions and millions and millions of dollars to help out just a few ranchers. That's the first problem. The second problem is from what I see, there's nine million EU's that are allowed on the land and that does not include the babies of the cows. Cows consume 50 gallons of water per day. You take that nine million and times it by 50 gallons of water per day, that's surface water, the effect on the environment is tremendous. If you took the cows off of our public lands, the amount of water that you save is enough to keep Arizona in water. That covers Arizona's entire usage for their entire population for the year would be saved by removing those 9 million welfare ranchers, welfare cows off of our public lands. So, I look at it from an accounting standpoint, I do look at it and say these horses should not be allowed to go over the border. I have a mare who came to me, she was pregnant, she was six months pregnant, she was going over the border of Mexico to be slaughtered, her baby is now on my property. I am a TIP trainer, I've done extreme Mustang Makeover, my girl came to me with a broken hip. The way you are rounding up these horses is barbaric. If you need to cull the herd, it needs to be done in a systematic way where those horses are vetted out because some horses are not gentle-able, they just don't have the ability to be gentle. They end up going for slaughter. If you hire, instead of spending all of this money and rounding up the horses, you can have equine specialists vet the herd, figure out which ones could be gentled, then pull them out in a humane fashion, and all of the money that is saved from rounding up the horses, not paying the ranchers to hold the horses, not paying for the helicopter roundups $800 a head and transport for those horses and paying for horses not even in holding anymore that money could go to subsidize all the ranchers in the United States.

**Linda Kemp**

Thank you. My name is Linda Kemp. I serve as a volunteer working for Master Wildlife Fund for Preserving American Wildlife. Of all the issues negatively impacting our horses, the loss of habitat, herd management in the forefront. Horses continue with no herd management area plan for a decade. The American people are being ignored and the law is broken. It is mandated wild horses to be considered first in HMAs, yet over 50 percent of the herd areas have been cancelled out and livestock numbers are far out of proportion to wild horses. Some counts show a ratio of 36 animals to one wild horse. Science points to the invasive livestock as culprit for the desertification of our public lands. And the rest of the world roadways the same. Sadly, BLM claims horses are doing damage. Barbaric treatment permitted by BLM is best expressed by Laura Leigh, founder of Wild Horse Education. I have witnessed stallions desperately trying to push against barbwire so their families can drink. Yet behind a closed gate on public lands inside the designated HMA area, cows lounge at a water source during the hottest months of the year because BLM does not consider the needs of wild horses when they approve the livestock permit. The number of livestock in the HMAs must be lowered. Abuse must be met with cancellation of permits; gates must be left open for access to the water and the removal of trespass livestock with termination of grazing permits. Our Wild Horse and Burros must be considered first, as mandated, with access to water, grazing, and other necessities over livestock at all times. There's a problem. Remove the livestock. The formation of plans will allow professionals in the field the opportunity to help find solutions. The process of Herd Management Area plans is a path to success. The planning should be an ongoing process with transparency and open invitation for professional volunteers working in teams. All HMAs must have a plan as established by law. Plans will create a working blueprint that would address all issues, including reproductive. If you fail to plan, you plan to fail. It's the first principle

BLM_004055

taught in every business arena. The management of our wild horses is failing because there is no HMA plans. Just a different negative motive against our wild horses and burros.

### Kerry O'Brien

Thank you. My name is Kerry O'Brien, I want to thank the board for their time and significant expertise. I've been documenting wild horses and range conditions since 2014, and I'm often confronted with how can you call yourself a wild horse advocate? I can't be an advocate for wild horses without being an advocate for the environment that they live in, including wildlife. When I look out my window, I see five wild horses and burros in my yard. I also see southern Utah. Here in the four corners of Colorado, we are literally dying of drought. BLM wild horses live in the Great Basin not in Appalachia or Missouri, I understand it's hard for people who live where there are arboreal forests and 50 inches of rain to comprehend what it's like where there's five. As Dr. Bleich said, emotional arguments should not be driving management. All over the West reservoirs are at 30 percent capacity, hay prices have soared, and good managers are liquidating their stock as they won't be able to feed through the winter. We'll be seeing more emergency gathers. This is a direct result of unrealistic expectations on the part of the public and poor management on the part of BLM. Dr. Perryman I think it was in the last meeting who kept referring to a stochastic event. Ben Masters asked if there's an emergency contingency plan for wild horses and the answer was no. We are now in that event, that emergency situation, it was predictable, predicted and now it's here. Ten and twenty-year-old resource management plans no longer suffice as climate is changing faster than that. Large ranches like the Gamble Winnecup Ranch do sophisticated carrying capacity and climate models for use with remote satellite technology for monitoring ranch conditions, I would petition BLM to adjust times leases for the betterment of range while BLM technology is stuck in the 20th century, many of whom of the managers I know, phrases like BLM will continue to monitor and assess is not proactive management. I understand decentralized management, clearly, it's failing. Additionally environmental specialists are harassed and fired when they don't go along to get along. A phrase I have never heard which should be at the top of the pyramid is carrying capacity. It's the only thing that matters above and beyond any and all special interests is how many wildlife, horses and livestock can this land feed and water. So, I am begging BLM to institute complete carrying capacity analyses on all HMAs and leased lands using current technology and counting for climate change on these very brittle environments. Even if that means going with outside consultants and issuing a top-down directive. Along with NMACO, I support the path forward, I am a wild horse advocate, and I don't want to see horses die. Thank you for your time.

### William E. Simpson, II

My name is William E. Simpson, II, and good afternoon, chair, and board members. Some of you may know about me. My writing. I'm arguably the only person in America today living among and studying free-roaming wild horses in the Soda Mountain Wilderness area. The BLM, I'm not going to belabor you with platitudes and lectures you've already heard 100 times. I am going to simply say that right now we have a '71 act that has a paradigm that just doesn't work because of the consumerism we're seeing in America for the demand for livestock products. It is what it is, and we have to come to its grips with it. Co-mingled cattle and wild horses in the same areas just doesn't work because the cascades are collapsed, in other words, the wild horses no longer have their co-evolved predators which is essential for the vigor of any genetic vigor of any wildlife as you know. We need to look at a paradigm, for BLM to relocate and it relocated wild horses into areas where they won't be co-mingled, there are a lot of critical wilderness areas with special designation of wilderness that are manifestly unsuited to livestock grazing. Wild horses in these specific areas where there is a lot of forage and water and mostly in the Western states would provide wildfire reduction from fuel reduction as well as a place for the wild horses to truly be wild and free. We were already engaging in selective breeding of wild horses when you use PZP, PZP as you all know works best on mares with the best immune systems, so they reacted best, the mares that have poor immune systems are able to still conceive, so you end up with it will progeny weaker genetically. It's a failed paradigm. We have to move forward given what's happening in America today. Laws become obsolete. It's time we have to amend the law and start doing what's right for the horses and for what American consumers want. We can't, it's not one or the other. It's not one of those kinds of deals. We have to all work together to use these public lands better, and there's a way to do it and we have places for horses again than are manifestly unsuited for livestock production. We need to look at that and solve this problem instead of continuing to labor all the lectures, all the hardship and angst, it's totally unnecessary. I appreciate the time today. Thanks for listening to me. My website is www.whfb.us. That's www.whfb.us, a documentary video showing what wild horses do on natural wilderness areas. Thank you.

### Dr. Claire Staples

BLM_004056

Good afternoon.  Class Claire staples speaking from Sky Dog Sanctuary. Nearly one year ago, I was the first person to raise the alarm about the Adoption Incentive Program and how people were abusing this to take $1,000 per horse taxpayer money only to then dump them in livestock auctions and kill pens.  I tried in every way I knew how to alert the BLM even speaking at this meeting to let you all know from a boot on the ground perspective that we were seeing dozens of babies in kill pens wild and unhandled in numbers we had never seen before.  The fact that they were babies, two and three-year-old horses that were being adopted and then dumped in groups of eight, twelve and sixteen was so alarming as we had never seen young horses like this still wild landing in kill pens.  We could see they had been adopted out in sets of four to different people in the same family with the same address, so it was obvious to us that the AIP was being abused and people were making sometimes $20,000 for the year of having these horses plus the meat price of selling them to a horse-trader.  Fred Woehl actually said at that meeting he didn't know this was happening and if it there was evidence of this to send that to the BLM.  I did.  I e-mailed everybody I could including Casey Hammond and Holle' Waddell and nobody addressed me.  Evidence given to The New York Times and Dave Phillips who did an amazing job of contacting some of the adopters and proved beyond doubt that this was happening.  I would like to know if you still do not believe your program is resulting in slaughter of young mustangs after The New York Times piece, FOX News picking this up, 25 Congress people writing to Deb Haaland asking her to suspend this program.  Does anyone here care that right now we're rescuing four babies who were branded in 2020 by the BLM and are sitting in a kill pen waiting to ship to slaughter? I've seen it used as an argument that these horses didn't ship to slaughter and were saved by rescues as if this means you don't have to do anything to help them.  I want you to understand that every sanctuary place we go with an AIP baby is a place we cannot afford or spare with the huge numbers of wild horses we have to take who are at risk of death or being abused, we cannot possibly keep saving them at the rate we did last year with over 100 mustangs pulled from kill pens by Skydog Sanctuary alone.  Rescues and sanctuaries saving these babies cannot be a tool that the BLM uses to solve this problem you have created.  At what point and with what amount of evidence do you need to actually take action?  Don't you think that the outcry about this program is enough for you to spend it and you yourselves do an investigation?  Now there are lawsuits being prepared to stop the AIP which is such a waste of time and money.  Why should it come down to having to sue you to stop this when we're all telling you this is happening?  I also want to understand what the point of making public comments is when they're not acted upon.  Thank you.

**Brieanah Schwartz**
Fantastic.  Good afternoon, everyone, my name is Brieanah Schwartz, Director of Policy and Litigation for the American Wild Horse Campaign, the nation's leading wild horse advocacy organization.  With the new administration and Wild Horse and Burro champion in Deb Haaland for Secretary of Interior, AWHC had high hopes for the future of BLM's Wild Horse & Burro Program. It was encouraging to hear that this administration wanted to follow the science and let it guide them in their management decisions.  However, that hasn't been the case thus far.  I will give credit where credit is due and thank the BLM for dropping its plan to surgically sterilize wild mares in the Confusion HMA when faced with litigation.  But it is time for these same strong principles to seep into other areas of the management program as well.  For example, new research has found that wild burros are a key beneficial component of their environment.  Yet the BLM has decided to eradicate them from the Mohave Desert without considering the science or what impacts they will cause with their elimination.  Wild horses and burros must be retained.  Further, every year since I started with AWHC, I have sat here and pleaded to the board to recommend that the BLM listen to the science and implement more on-range fertility control in place of horrific helicopter roundup and removal operations.  Now that we have an administration supposedly committed to science, I'll ask again, the BLM has a very timely opportunity to change the tide on how things are always done and instead seek a more humane and sustainable future for the wild horses.  In the Onaqui HMA in Utah there's already a PZP program in place and AWHC and Western Watershed Project have delivered BLM a proposal on how to implement a program that will allow the current population to stay for generations to come and avoid being stampeded by helicopters.  More than most HMAs, this herd has the eyes of the world on it.  BLM must think about the message it wants to send to the public.  I ask that the board express to BLM that the agency should embrace partnerships from the public and their creative solutions to these often complex questions.  Finally, AWHC remains ready and willing to share success in the Virginia range with BLM and Forest Service.  In our second year our volunteer-run PZP program exceeded the initial program goal of vaccinating 80 percent of the estimated breeding age population, benchmark of effective population control and treated 1290 mares last year alone.  As we noted in our proposal for Onaqui, success proves that AWHC can help current PZP program achieve goals.  I want to emphasize there's increasing interest in action from Congress to direct BLM to more broadly implement PZP including in this current appropriations cycle for the next fiscal year.  So today I call on the Advisory Board to formally endorse efforts made in Congress to use more PZP in the next year.  Thank you for the time.  I appreciate it.

**Craig Downer**

Yes, my name is Craig Downer, I have a nonprofit organization called Andean Tapir Fund dedicated to all the perissodactyls of the world, including horses and rhinos. I'm a wildlife biologist from Nevada and my website the wildhorseconspiracy.org which is the title for my book also, on my website. Overly simplistic thinking about the wild horse issue produces terrible injustice. They, the wild, naturally living horses possess a beautiful wisdom about how to survive and live in balance, but it is people who are failing to respect this. They are also capable of self-limitations of their numbers, once their ecological niche is filled. The wild horses have many beneficial effects upon the Western ecosystem. The chief problem lies with people who are so narrow and closed minded that they fail to see this. This is it on account of their greedy, power-mad agendas, that blinds them to the greater truth concerning the wild horses and their place in many Western ecosystems. The correct approach, the enlightened way to treat the wild horses, is reserve design, not vaccines, drugs, castrations, oophorectomies, all this to counteract the wild horse's natural wisdom to fill their niches to adapt harmoniously to the ecosystems they inhabit, mature systems, and naturally stabilize their population numbers. It is a real horror story how the pure and benign intent of the wild free-roaming horses and burros acted has been tediously and so hypocritically subverted since its inception a half century ago. Its jubilee year must be one where the true intent is restored, meaning the herds themselves and their habitats at truly viable levels, not the very outrageous low managed levels that BLM or Forest Service have assigned as well as woefully low forage allocations in animal unit amounts. Please check out my reserved design proposal. It is very much the same as rewilding and shows how we Americans can get this wonderful program back on track. And you can go to my GoFundMe for Mustang reserve design. Let's see. I just have done a few, I will be attending that rally on Friday, and I want to work together. I think so many. The public in America are adamant that we need change, and we need restoration of the herds in their habitats.

**Karen Betton**

Thank you. My name is Karen Betton, I'm a resident of Tulen, Utah and I visit the Onaqui herd at least once a week, I'm speaking as a member of the public on behalf of the Onaqui herd. I want the proposed budget allocated for the herd management spent on humane equine fertility treatment such as PZP that will actually help manage populations instead of relying on inhumane long-term government holding pens. I want the roundups stopped until an unbiased and scientific assessment and evaluation of the recommended AML could be carried out. I want a moratorium on barbaric helicopter roundups happening all over the country and proposed to happen for the Onaqui. I want to say that the Onaqui, they're a very unique herd of wild horses with the ease of accessibility being so close to Salt Lake Valley and their tolerance of people. They are a perfect HMA that we could partner easily with the BLM to conduct wild horse training, education studies and partnerships with local organizations in general and individuals to help actually manage PZP darting or other you're main on the range type -- other humane on the range type of treatments. Onaquis live in two different herds which do not commingle amongst themselves and the plan to remove all those horses releasing only 100 back in total over the range will compromise the genetic diversity of the Onaqui, it will destroy their families and their relationships and all things that make the Onaqui special today are going to be just torn to bits. I want to say that the Onaqui, like this is a herd of horses that are known and followed worldwide. They bring a countless number of tourists to the area and revenue for the local business. Every time I go out there, when I meet people, I talk to them, I find out where they're from, and most of the time probably 80 percent of the time they're not local, they're coming in from somewhere outside of Utah to see these horses because they're such a special herd and because they're so tolerant of people in general. The wild horses all over the country being used as scapegoats but they're not the root issue here and if you follow the money trail, it becomes clear that the special interests of the corporations and cattlemen ask livestock organizations, they are at the heart of the problem, and BLM is listening more in needs of those people than they are to the herds they're supposed to be managing. I want to say that it's an absurd management that claims the Onaqui range is in poor shape and cannot sustain the wild horses who reside there and yet allow thousands and thousands of sheep and cattle to graze that land eating the vegetation that would sustain those horses who live there and should be getting the primary consideration for the grazing and not the livestock. And I want to thank you for your time for the public to speak on this, and I hope that the comments that we're making will really be considered and make a difference. Thank you.

**Anthony Marr**

In 2019 BLM kept 45,000 horses in captivity for $56 million, $1,200 per horse per year. Ten years, 50,000 new captives per year and $20 million more in cost, year after year. In 2025, $125K horses in captivity costing $150 million that year. 2030 there will be 200,000, costing $250 million a year. Shell out that kind of money year after year? If not, BLM's new official policy could well be not worth it, ten years is a debt spiral -- ten years AML is a debt spiral in which wild horses

BLM_004058

and BLM itself, I'm speaking today to also weigh in on this tragedy appears the plan, five steps. Step one, create AML from 26 to 160,000, by reducing cattle populations by approximately 12 percent and allotment to the horse, with no net increase in water or feed demand. Step two. Leave 100,000 on horses alone and release all current 50,000 captive back to the wild. The new total population will be $150K, which would be about $10K below the $150K new AML. Step three, end roundup and close the holding facilities, saving $18 million per year for fieldwork, retraining staff and hiring new field personnel. Step four, apply wild maintenance construction to keep the population under $150K at all times. Plus create 177 new -- one for each HMA. Less than $4 million saved $80 million. Rather than fighting over water rights, the wildland will create new water. Step five. Transfer displaced cattle into the holding pastures. It will switch places with wild horses on the land and domestic cattle in the pens. In which the old rules may not necessarily apply, but to which the BLM can and should play an important part. Have a good day.

**Cambria Smith**
Hello. I didn't even realize that I was on speaker. I thought I was just watching. But although I'm camera-shy, I'm glad there's no camera. Aside from these conflicts of interest potential that seem to be evident, there is a right way and a wrong way to manage, and I think that Wild Horse Annie's bill in the early '70s, she would be rolling over in her grave if she saw what has been being done with helicopters, horses breaking their necks and stuff. And also, the majority of Americans are against these roundups. And the majority of people in the world. We have this incredible opportunity to do things the right way once and for all for these horses that are part of our American heritage, you know, that have been there for us, through wars and such. So, the inhumanity and the unnecessary torture in these holding pens getting to the exorbitant cost I completely agree with Anthony and I'm sure many people would, that like the economist woman earlier, that it goes into the billions, you know, when you times it by each horse and the cost. We don't have the money for it, it doesn't seem to be a common sense way of managing it, and it's not putting the horses and burros first, and now there's scientific evidence about horses helping with fire management, but they're being seen in this argument as scapegoated for destroying the ecosystem. I don't believe these horses are destroying ecosystems and neither do the leading world scientists. So, we need to base everything on science here and not just conjecture our opinions. Also, some of these horses are genetically linked to famous Native American chiefs that were promised their horses back that didn't get them back and all that's proven. These genetics are really special. Such as the National Roosevelt Park and all that. So yeah, there's a way to manage with birth control, sure, we need to manage the amounts of horses, but we don't really know that there's 90,000, but aside from numbers, let's not play a numbers game of the you know, I heard that there was some use of chemicals in subduing wild horses to capture them and I believe that's a new low, I think that's at Roosevelt Park. But there should never be any use of chemicals. I think that's a great idea to the horses that are good at being gentled, I think that what the prisoners have done with some of these horses that were just adopted, 14 of them last Saturday at Carson City Prison. So, what about all the several hundred, over 1,000 wild horses that are being held there in the back of the prison in the hot sun, are they better off there than where they were before? I feel that this must have to do with the demand for consumption of beef. A lot of people are turning vegetarian, and this would be a good reason to do so because of the amount of resources that cows take and the damage they do to the land.

**Mary Truello**
Hi. My name is Mary Truello, and I am just an ordinary citizen, a United States citizen, and I live in Chicago, so I don't really see what's going on with the wild horses and the cattle and the burros. I just see what I see and read what I read. I guess what I would like to just say is that if there was any way that there could be some kind of compromise with the cattle and the wild horses so that we can, as I agree with most of the speakers, that we can, you know, work this out together in harmony and balance and maybe like put our money in that place rather than like fighting each other, to me that makes a lot more sense than spending a bunch of money holding animals and rounding them up and splitting them away from their families. I feel like the emotional side of the animal has not been addressed at all. Maybe some of us do, some of us don't have either dogs or cats or animals, that they actually do have feelings, and, you know, they do deserve the right to be treated with humane -- humanely. So, I just wanted to thank you, and I hope that some of these comments will be considered and have a great day. Thank you.

**Erin Phillips**
Hi. My name is Erin Phillips, and I am a volunteer for the Cloud Foundation and also founder of Mustang Mission which is a new organization focused on rescuing Mustang and burros. I want to thank you to the Advisory Board and BLM for allowing this public comment. First, I want to say that I do not support helicopter roundups. The Adoption Incentive Program, which is sending hundreds of horses to slaughter, sterilizing wild mares, or adjusting the ratio of stallions and

BLM_004059

mares in the wild.  Not only are these management tools unnatural, but they are also flawed and inhumane.  My comment is not specifically on how you manage our wild horses and burros but a reason why you remove them from their ranges.  My recent research has led me to hold a strong position against livestock ranching, the welfare ranching program that you support.  Ranching on public lands is detrimental to the ranges since the West is very arid.  In areas where the cattle have overgrazed and bare soil is exposed, there's stronger likelihood for severe dust storms to occur, overgrazing also leads to invasion of exotic weeds and grasses that barely benefit wildlife on the land.  Additionally, ranching uses up much of our water sources, degrades rivers, streams several aquatic species on the endangered and threatened list because of stream destruction.  Thousands of wildlife suffer because of lack of water and vegetation yet ranching on our public lands is allowed to continue even though it does not contribute to the American people.  Only one of the ten states that mustangs occupy is listed as the top ten states that produce the most beef.  Livestock is the cause of severe drought, overgrazing, wildlife endangerment and more in the West.  Every wild animal has a purpose.  The government has allowed and assisted in the killing of predators to protect cattle.  This removes natural predation from wild horse herds which affects herd mortality rate.  Predation is very important as we've seen in the past.  We the taxpayers have seen our tax dollars be used to supported livestock ranchers, research at Western land grant universities, relief programs for ranchers and even many fences crisscrossing the West are paid by us, yet none of this benefits the American people and continues against our will.  In order to protect our wildlife and be able to use our Natural Resources in the future, we must not allow any private interests on public lands.  Public lands ranching must be stopped.  I cannot and will not stand by while the Bureau of Land Management allows privately owned livestock to completely destroy and decimate our public lands.  It will not continue.  Thank you.

**Anne Phillips**
Hello, my name is Anne Phillips and I actually live in Georgia, and I wanted to thank all of you for allowing me the privilege of commenting during this meeting. I have two points to make that will kind of have questions, yet I know you cannot answer the questions, but number one, public lands are owned by U.S. citizens and managed by government.  I just can never understand why my tax dollars that should be going to protect our public lands and the wildlife that inhabit it are actually paying private citizens to have their livestock and private livestock businesses.  Why is the BLM protecting these private citizens and their cattle instead of protecting the public lands and the wildlife that live there? My second point is that eagles and Mustangs and burros are the only federally protected wildlife.  Why are private citizens' cattle being protected but not the Mustang and the burro?  Why are my tax dollars being used to remove a federally protected Mustang or burro to be put in holding pens on private citizens' property?  Why don't the cattle just stay on their owners' land and the Mustangs and burros be allowed to stay in the wild?  All this is occurring with my tax dollars, especially when I want to protect the Mustang like the government should be doing. Not to mention how inhumane and horrific it is to use helicopters to chase down these protected mustangs, separate their families and put them in small holding pens for years, all on my tax dollar and for someone else's cattle.  It just doesn't make sense for the taxpayer or for the government who is given the responsibility of protecting the wild Mustang and burro.  It seems the only ones benefiting from this situation, which seemed unlawful to me are the cattle ranchers, and they shouldn't be benefiting from the BLM's management of public lands and wildlife. As I mentioned, I live in Georgia, and I have visited Cumberland Island's wild horses that are not managed at all, and these horses look great and are doing great and it's not overpopulated.  I have also visited the Pryor Mountains and see thousands of acres of land that the mustangs should be free to roam.  Finally, and most importantly, over all of this, I am a Christian, and the Bible says that the earth is the Lord's and that a wise man cares for the life of his animals.  We need to use wisdom and take better care of the land and Mustang by leaving them in the wild.  Again, thank you so much for your time, and we'll be praying for all of you to make the right decision.  Thank you.

**Grace Kuhn**
Great.  My name is Grace Kuhn with the American Wild Horse Campaign, here to talk to you today about the existential threat to not only wild horses and burros but to Western public lands as a whole, the livestock industry, and more specifically the taxpayer subsidized public lands ranching program.  I've been told by BLM officials that livestock and wild horses are separate, they like to say that one program has nothing to do with the other.  The truth is they are so intertwined, we'll not be able to solve the wild horse issue without addressing livestock grazing.  When Congress unanimously passed Wild Free-Roaming Horses and Burros Act it did so because wild horses were considered fast disappearing, why?  Mustangers, ranchers and cowboys in the area would take it upon themselves to brutally round up horses from lands and send them off to be killed.  2021 mustanging only looks slightly different, cowboys in low-flying helicopters brought in to remove horses, livestock, you get the idea, they all contract with the BLM and Forest Service to continue this modern day form of mustanging, facilities horses stored by the thousands operated by ranchers.  The land

BLM_004060

where wild horses ran.  Arbitrary population limits BLM sets for wild horses' appropriate management level is rigged to prioritize livestock. The National Academy of Sciences conducted review of Wild Horse & Burro Program, BLM looked at existing habitat and grazing and subtracted that with forage available.  Look at this board.  Hand-selected by the BLM to help it make decisions about how wild horses and burros are managed.  Tammy Pearson, a recent appointment, is sitting on this board to represent public interest, she is a 40 year public lands rancher whose allotments lie within wild horse habitat, lobbied, and testified for wild horse roundups and is in favor of horse slaughter.  As stated in 2017 testimony before the Utah legislature she discounts overwhelming opinion of the American public who oppose the slaughter of wild horses as, quote, romanticizing an animal that the whole rest of the world considers a protein source. As a member of the Beaver County Board of Commissioners, Pearson joined in a lawsuit against the BLM seeking removal of most of the wild horses in the Sulfur HMA, again nominated to this board to represent the position of public interest. Public interest of whom?  Ranchers?  Certainly not that of the 80 percent of Americans who want wild horses protected from wild horse slaughter.  I've been working on this issue for nine years, attended most of these Advisory Board meetings who produce nothing but the status quo of scapegoating wild horses and remain silent about millions of livestock grazing on public lands specifically on these conversations surrounding drought. Start talking about it, take allocating of resources into consideration, make recommendations to reduce livestock grazing on its habitat, protecting apex predators, advocating for fertility control and public opinion and sentiment, petition to have Tammy Pearson removed from this board as her position clearly violates Federal Committee Advisory Act.  I am almost out of time so thank you for hearing my comments.

**Jillian Loffer**
Thank you for listening to our voices and our opinions.  I'm just a normal person, I live in Los Angeles, California.  I don't have any affiliations with any wild horse anything, so I just want you to know that personally what I think you're doing is wrong, sorry to tell you that, but that's truly how it I honestly feel from the bottom of my heart and I am voicing my vehement opposition to the wild horse roundups, the helicopters, I mean, the insanity of what is happening is just shocking to the American people. Most American people don't want you to be doing this. We really don't.  We want you to stop these roundups.  We want it to end, and the fact that you're removing these wild horses to make room for private cattle ranchers to graze their cattle on our public lands and then this is all being funded by my taxpayer dollar and our taxpayer dollars combined?  It is just, you have to realize what the optics of this are.  I mean, it just really looks so awful, from anyone looking at this, from a purely logical perspective. I'm calling on the BLM to stop wasting millions of our tax dollars on these unnecessary wild horse roundups, especially given the fact that the BLM allows a disproportionate number of sheep and cattle to graze on our public lands, and you are supposed to be protecting these public lands.  You are not.  You are not.  You are beholden to the cattle ranchers who benefited from removing these wild horses, who are really not doing anything to anyone.  They're not.  They should be allowed to live their lives in peace.  I like that idea that the gentleman who spoke earlier said why don't you just take all the horses that are in the holding facilities and just reverse them with the cows.  I think that's a damn good idea.  I really do.  I mean, what you're doing is wrong, and it's unethical, and I have to call you on it.  And I want these roundups to stop.  You use costly and cruel practices to eliminate these poor horses and burros from our public lands.  They're not doing any damage.  They ecologically are there for a reason, and I agree with the woman that said God put them there for a reason, and they should be allowed to live their lives in peace.  This 1971 Wild Free-Roaming Horses and Burros Act, it's a federal law, and it was designed to protect wild horses and burros from quote, unquote, capture, branding, harassment, and death.  This is not happening.  The opposite is what's happening.  And it's just so upsetting.

**Terry Messmer**
My name is Terry Messmer, representing Free-roaming Equid and Equid Sustainability network, FREES. FREES is a grassroots effort to open dialogue and building positive relationships that engage all in actions to ensure the health and management of free-roaming wild horses and burros, Western range ecosystems and principles of multiple use.  FREES works to achieve the desired goal of healthy horses on healthy rangelands by promoting opportunities to engage others who may have different perspectives.  We have conducted national summits in Salt Lake City, Reno, and Cody to bring together stakeholders in open dialogue to seek consensus on management's approaches.  FREES conducts its work through working groups.  FREES committed to better understanding and respect being individual opinions while striving to develop meaningful actionable objectives to be implemented judiciously, compassionately, humanely, and expeditiously.  We also recognize that there's not one single solution, as such, we strive to identify innovative and practical strategies that are within the purview of the Bureau of Land Management, Forest Service, Native American tribes, and the states.  To fund these strategies, FREES recognizes that the U.S. Congress and executive branches, state

BLM_004061

legislators, nongovernmental organizations and private individuals must be fully engaged.  FREES recognizes that the unprecedented drought in the West is currently experiencing exacerbated the situation to create an ecological catastrophe that is an indictment on both personal collective and governmental failures to act to produce overabundant free-roaming Wild Horse and Burros. The consequences for free-roaming wild horses and burros rangeland and rangeland ecosystems they inhabit is further compounded by drought and ongoing climate change will be realized for many years to come.  We realize that there are a lot of organizations out there and consensus may not be achievable but FREES participants subscribe the following tenets.  Free-roaming horses and burros must be managed in a manner that is respectful to animal welfare and other multiple uses on public lands with the recognition of rangeland health must be contained.  Each area inhabited by free-roaming horses and burros is unique and should be managed to being in progress for action based on ecological conditions, current population status and the desired health of the land. Most herd units inhabited by Wild Horse and Burros have exceeded ecological carrying capacities.  We believe that unified messaging to Congress and the American public is essential to better inform them about free-roaming horse and burro management needs and concerns and the universal ecological impacts to the ecosystems of overabundant populations that we'll need to do to gain support for long-term funding.

**Skip Miller**
Thank you for the opportunity to be an advocate for wild horses that live in the real world.  I was raised on a ranch in the Great Basin where most of today's wild horses are.  We had cattle, sheep, horses, and a string, we ran cattle and sheep on what is now Palomino HMA and looked across Warm Springs HMA, Beatty Butte HMA and Heart Mountain Refuge also had wild horses.  I grew up right in the middle.  My great grandfather came to Harding County in the 1807s, and almost 150 years later, the fifth generation is still managing free-roaming horses.  But today they are on deeded land.  After the Wild Horse and Burro acted of 1971 became law, dad claimed the wild horses between Beatty Butte HMA and Warm Springs HMA removing close to 1,000 head.  He knew wild horses did not need to be saved but needed to be managed. 100 plus thousand wild horses on the range, and 50,000 in storage today proves him right.  The act of 1971 in the so-called wild horse and the so-called wild horse advocates have replaced the true history of wild horses with misinformation and emotion and are managing real wild horses in a make-believe world.  It does not work. Today's Wild Horse & Burro Program managers know how to manage free-roaming horses.  The Wild Horse and Burro Act is not allowing them to do it.  I have saw plan after plan thwarted by advocates and nothing is going to change until Congress changes the Wild Horse and Burro act it - through a management plan - removes all mention of saving wild horses and burros. This board needs to advise Congress to change the Wild Horse and Burro act of 1971 to a Wild Horse and Burro management plan of 2021.  50 years of failure is enough.  Our wild horses and public lands deserve better it.  I would like to see all public, all wild horses removed from public lands and have a wild horse program set up in the Flint Hills where more of the American population could come to see them, they could it be an end destination, a vacation destination, who knows, the wild horses might even go pay for themselves with the revenue.  Thank you and have a good day.

**Stacy Heatherly**
Hello, my name is Stacy Heatherly, I'm the eastern Nebraska it film Commissioner. The nonprofit organizations Blue River Forest Experience the dig sight productions in eastern Nebraska film office have partnered to create horse camps located on specific tribal lands.  We will offer summer camps, weekend camps, after school programs and adult career programs.  These camps will teach participants Lakota way of training, riding, and healing with the horse.  The goal of this effort is to create educational programs for young people with Native American heritage, both on and off the reservation.  To help them connect to their culture, the healing power of the horse, and in time to provide employment opportunities for families. Our goal will be to identify how many horses are needed for the various (Speaking language other than English) educational programs across the nation.  The founding team is interested in mutually beneficial solution with the BLM.  Our educational team would like to propose a federal contract with the BLM supporting the operation of our educational programs.  This would clutch the cost of care and training of wild horses involved as a program rather than paid for horses' individual sales.  Formation of a contract agreement will help create awareness within the BLM organization about education related and film related wild horse management opportunities on tribal lands.  We will be submitting our proposal at the earliest proposal acceptance date on the BLM website.  I thank you for your time today.

**Christina Paxton**
I want to thank you for the time to speak.  My name is Christina Paxton.  I am an American citizen taxpayer.  I live in Arizona.  I've been around cattle and sheep all of my life.  I want to state that I am opposed to the helicopter motorized

BLM_004062

roundups of our wild horses.  I am severely disappointed because the BLM continues to waste taxpayer dollars to manage the horses, well, actually they're not being managed, they're being rounded up, they're being sent to slaughter, there are better ways to do this.  Instead of wasting millions of taxpayer dollars.  Birth control methods, eliminating the domestic livestock and the law states specifically that the wild horses have priority over domestic livestock, special interest groups such as mining, oil, logging, et cetera.  They are to be it eliminated if they're causing problems for the horses.
Now, the American public and the numbers are growing, have had enough of this, they've had enough of their taxpayer dollars being wasted.  They want these horses managed out on the range.  They want these wild horses to be left where they're supposed to be and the cattle to be taken off because this is how it should be.  The cattle, the domestic livestock, are causing the problems.  The overgrazing, et cetera, destroying the water it sources for the wild horses and other wildlife that's out there.  And the American people, I being one of them, and I've done a lot of research on this, and we want this done better because not only are these roundups brutal, they're inhumane.  I've seen pictures, videos after video, I've seen pregnant mares aborting because the helicopters won't stop and let these animals alone.  How would you feel if your, let's say you're married, and your wife is pregnant, and someone comes, and they keep going after your wife until she can't physically stand it?  How would you feel if your family was attacked like that?  These families, these horse families need to be managed correctly, and the American people are demanding it because we've seen enough of this.  And we want our wild horses to be there for our children and grandchildren so we can go out to the Sand Wash basin, the Onaqui herd and see these wild horses, not in pens, and just being held there.  I mean, please, listen to the American public.  And thank you for your time.

**Kathryn Kopanke**
Good afternoon.  Thank you for this opportunity to speak today.  I'm Kathryn Kopanke senior Manager of legislative engagement for the American Society for the prevention of cruelty to animals, an organization borne out of a concern for equine welfare in 1866.  The ASPCA has supported recent efforts to find humane, nonlethal solutions to Wild Horse and Burro management because of the intensifying threats these herds face.  Unprecedented heat, drought and fires are now a fixture of the West and threaten states where 88 percent of BLM's wild horses and burros reside.  Meanwhile, BLM's failure to genuinely use fertility control has allowed populations to grow to levels that are realistically impossible to manage exclusively on the range.  In response, many stakeholders have come together to endorse a nonlethal strategy focused on shifting management away from the never-ending cycle of removals towards reliance on a fertility control to establish sustainable free-roaming herds.  Recognized this groundbreaking moment and recently increased the program's budget by 44 percent instructing the BLM to shift to humane fertility control, President's FY22 budget requested $35 million increase and this week the U.S. House Interior Appropriations Committee allocated additional $46 million for next year.  Externally the pieces are coming together for the BLM to bring this program back from the brink.
This opportunity and the slow progress being made towards achieving it really should be the focus of my comments today.  I wish we could be talking about an actual increase in fertility control for 2021 or the moves BLM is making to scale up capacity for holistic program that allows fertility control to take effect.  Unfortunately, though, we are not.  The ASPCA wholeheartedly supports adoptions of BLM horses and burros, in fact, adoptions are at the core of our equine welfare program, however, recently learned adoptions offered with uncontrolled cash incentives have led horses being funneled into slaughter pipeline.  It is the agency's duty to protect these animals.  It erodes public and legislative trust this Wild Horse & Burro Program.  Instead, we endorse training and investments that offer positive futures for these horses.  When done correctly, adoptions are a critical component of successful management.  But we cannot condone continuing the Adoption Incentive Program without serious re-evaluation and corrective management. We strongly urge that the BLM act quickly and suspend the program while investigating and rectifying these failures.  We are only a few steps down a long road to a humane and sustainable wild horse program but without adequate protections for the animals off-range, support for on Range Management will suffer.  This program is at a tipping point, we therefore urge the BLM to take steps to ensure that all wild horses and burros are protected both on and off the range.  Thank you for your time.

**Bonnie Culertare**
As an 80-year-old former social worker and science teacher, I speak.  History repeats itself.  They ignore what is rightfully theirs, government and the white men Europeans profess liberty, justice, equality, but in action, they usurp and deny them their rightful resources for survival.  Killing, lynching, shooting, done by our cavalry, our sheriff's, our police, BLM, and contractors, they marginalize them, commit them to baron reservations, corrals, feedlots top them off by verbally degrading and devaluing them, calling them dirty, mangy, sound familiar - done to blacks, Native Americans, wild horses, and burros. The 1971 law says the DOI Secretary is to manage wild horses and burros, section three, where found, section one, resources where found are to be used principally but not exclusively for wild horses and burros, section two, in order

BLM_004063

to have a thriving natural ecological balance section three reality over the past 50 years herds have been used from BLM 339 to 162 and Forest Service from 54 to 35 and it continues, areas where found have been reduced from 60 million acres to 29 acres, 83 percent where forage ground goes principally to livestock but not to wild horses and burros and if round ups and rules are accomplished 82 percent of the allowed numbers in herds will be below genetically viable, genetic viability. The law has been repeatedly violated.  Herds are not thriving, and they are not ecologically balanced.  Reality over this past 50 years, public citizens have been cut out and cut off from meaningful participation, environmental assessment comments made by public citizens to determine roundups and removals are blown off.  Advisory horse board advocates are denied a place, yet Tammy, a recently appointed member representing public interest, a livestock rancher proceed-horse slaughter, though 80 percent of us Americans oppose slaughter.  She does not represent public interest but special interest namely those of the ranchers.  Transparency is, oh, we won't tell you, wait six months for some shoddy answers if you're lucky, independent oversight and accountability is nowhere the to be seen, it's wrong, wrong, wrong, and outrage, outrage, outrage exists but the government responds oh they're just emotional public citizens.  So I'm asking our Congress and President Biden and Secretary pleading you to listen to Wild Horse and Burro advocates, it's time to address the oppressed, it is time to increase allowable numbers to sustain healthy herds and redirect resources to the wild horses and burros for survival on the range to stop the roundups and removals and to invest on the range fertility control to deal with population and retain Wild Horse and Burro government employees researchers advisors who have the best interests of wild horses and burros not livestock.

**Dave Duquette**

Hi.  Thanks for having me on.  My name is Dave Duquette. I represent an organization called Western Justice.  One thing, I'm not going to lecture you guys.  I appreciate all that you guys have to put up with and deal with here.  And I also want to clarify a couple things that I don't have a set speech for you to listen to, to go through at 90 miles an hour. So, one of the things I want to clarify that these activists have been talking about is I know almost every rancher with an HMA or horses on them and not one of them has ever told me that they want -- and I would be the person they would say something like this, but not one of them has ever said they want all the horses removed off the range.  They want them at AML and that is it.  And one of the things that has come up through this series of comments is that I don't think these commentators understand or these people that are commenting understand, the BLM doesn't own most of the water, especially in Nevada, on these HMAs, prime example is Laura Leigh's poster herd, the Fish Creek allotment.  That group, that whole area, all of that water is owned by the ranchers. It's all deeded water.  And they vilify these ranchers, and I know several of them, Bob Red down although sea punch, he spends $75,000 a year to haul water to horses, and these people are out here pushing these myths that these ranchers are bad.  They don't realize the infrastructure for water isn't there without the ranchers doing it.  And the other thing as far as grazing allotments, anybody that works for the BLM understands that almost all these ranches that have HMAs on them aren't turning out to full capacity, none of them.  And some of them aren't even turning out at all because there is no forage.  So, to sit here and say that the cows that go out for a certain amount of time for the year are causing all the problems, it's totally inaccurate. Holle', I had a plan that the past two secretaries that we put together and I would like to get it to you and have a conversation over the plan.  It comes from a lot of history and a lot of work and knowledge, so I would love to be able to get that to you at some point. And that's all. I mean, the myths and the problems, the things that ASPCA said, they said they've already identified 2.3 million people who are going on adopt horses.  They've got every chance in the world to do that.  Do they do that?  No, they don't.  So, let's talk about real solutions.  Thank you very much.

**Deniz Bolbol**

My name is Deniz Bolbol, I'm with the Cloud Foundation, we're a national organization dedicated to protecting wild horses and burros on public lands.  Bureau of Land Management has created a big lie that wild horses and burros are, quote, overpopulated.  AML is the foundation of this big lie.  This quote overpopulation lie is not based on science, and it must be reformed if the Wild Horse & Burro Program is ever to be on a sustainable and fair path.  BLM paid $1.4 million to the National Academy of Sciences for the scientific review of the program, yet you all on this committee ignore what they told you about your fraudulent AML system.  Here are some quotes. How AML is established is not supported by scientific information.  Here is another NAS quote.  Changes in social values and the discovery of new information require that AMLs be adaptable.  Here is another one.  AMLs are a focal point of controversy between the BLM and the public.  It is therefore necessary to develop and maintain equity in AML establishment and adjustment.  Yeah.  So, the NAS got it right, but the BLM chose to ignore it and you all, every one of you on this committee, every one of you ignores this fact.  Today more than 53,000 wild horses and burros are warehoused in government holding and you all plan to add another 100,000 to that number, anyone with common sense understands this is not sustainable. Roundups are cruel

BLM_004064

and are not sustainable, and as you've heard, the American public opposes them.  AML is based on giving commercial livestock 80 percent of the forage and herd management areas giving only 20 percent to wild horses and then you turn around and when the wild horses and burros go over this minuscule 20 percent you all claim quote, unquote, overpopulation.  This is the foundation of the big lie for wild horses and burros.  If the range is suffering, commercial livestock need to go.  If the water is limited, commercial livestock need to go.  Yet you all instead will continue the big lie and falsely claim there's a wild horse overpopulation, while adding commercial livestock to graze on supposedly depleted public lands.  The Onaqui wild horses is the poster child for this big lie, a roundup that is planned in just a few weeks yet just months ago BLM had thousands of livestock added to graze out in the same area.  Now BLM continues the big lies that the wild horses need to be removed.  The wild horse program will continue to rot until AML is fixed.  There are win-win solutions that can benefited all including ranchers and give wild horses their fair share but not one of you on this committee will talk about that, not one of you on this committee will address the big lie because each of you is promoting the big lie.

## Joan Wager

Great.  So, I'm Joan Wager from northern California, and I'm here today to demand that all impending roundups be halted.  Removal and fertile control are not management.  Management, as I understand it, in the form of herd management areas the required and legal tool with which to assess and plan for the herds on their designated areas.  The first step in all but a few HMAs is skirted by the BLM.  Instead, the BLM conducts environmental assessments for only the purpose of roundups.  This allows profit-driven animals, decimates public lands and wildlife habitats, leading to shrinking water tables, it allows trespass livestock, recreation, and it must be stopped.  The BLM Wild Horse & Burro Program as practiced is a horrific abuse, a disaster, and illegal.  It is a path to callous destruction for this iconic American keystone species.  It ignores the Wild Horse and Burro Act of 1971, mandating that the BLM offer humane management on public lands. I want to next say a few words about the ecological role wild horses and burros as keystone species play in their public land environment.  They're adapted to their range and its often harsh conditions making ecosystems sustainable, resilient, maintaining habitat for other species, i.e., the sage grouse, their unique digestive systems allow moisture content and nature plant seeds to pass in their excrement to create healthy soils and sequestered carbons, foster biodiversity and are able to eat coarse dry vegetation that reduces fuel load and fire risk.  Because they're highly mobile, they do not degrade water sources or overgraze.  That the BLM and Forest Service would reduce these animals to nonreproducing few, depriving them of their family groups, freedom and imprisoning them on baron feedlots, and slaughter by stampeding them in 100 degree-plus weather, running foals and older horses to their death, causing pregnant mares to abort is sadistic horrific abuse and must be stopped. The American public is against the brutal and unnecessary roundups, desires a humane management plan, and I implore you on this board, despite your entrenched economic interests, to listen to your sense of ethics and humanity and stop these roundups.  Thank you.

## RA Mazzola

Excellent.  Thank you.  I just want to say good afternoon.  I wanted to start by thanking all the board members, BLM and Forest Service staff and the countless members of the public for this meeting and those here in heart. Your commitment and passion trying to do what is best for our beloved wild horses and burros is commendable and appreciated.  I want to acknowledge a few things presented today.  I'm thrilled the BLM is creating educational materials about wild horses as well as providing information for future owners and adopters.  It however, I'm a bit alarmed by a comment made earlier that they're getting adopters that don't know how to feed horses.  So, if I misheard, I apologize, but if I do not mishear then I think we need to really look amount how adopters are getting approved because that's a little scary if a potential adopter can't even feed a horse.  The neat things I've been hearing today that I'm excited with, advances being made to advance meteorology for microchips for tracking animals and assuring consistency in the policy and management of horses between all the states, that's been really neat to see.  I must say that my main experience with BLM has been with Rob Sharp and crew down at the corrals in Burns, Oregon, and I've been pretty spoiled because they do a fantastic job down there.  I understand the situation now we're facing is incredibly dire and numerous complicated layers that must be navigated, a lot of this is being talked about today and being brought up by the public.  There are so many important topics to discuss.  Today I would like to bring up a smaller topic that I think has been overlooked.  It could help animal placement, program success, new partnerships, or ideas, as well as improved public opinion. I request attention to be given to communication channels being used by both BLM and Forest Service regarding public notices.  Currently people have to check multiple areas including BLM website, sand.gov, Federal Register, Wild Horse and Burro blog, think it bug and BLM press page in order to get information.  The option to sign up for BLM press releases is currently not working.  And it hasn't been reliable in the past.  So, offering a mailing list option that people can sign up for or just a central streamline

BLM_004065

location for the public to get information could greatly improve public involvement as well as potentially adoption and success of programs. I would like to consider myself a pretty active mustang supporter and I'm actually looking for ways I can help with wild horses, descriptions on Federal Register and Facebook pages, and even I've missed some of the recent things like funding opportunity that was published in April as well as current off-range pastures. I also would ask, I have short time here, I would ask that the public be more respectful of our BLM folks and our Advisory Board members. Please remember they're volunteers and they're people. So cut them a break.

[BREAK]

## Agency Presentations to the Board, Continued

**Discussion**

### _Regarding BLM Population Surveys Update_

Dr. Bleich: Thank you very much. Very interesting. Can you make available the website where the R package is available or where the statistical package is available that you are using?

Ms. Crabb: Yes, Mm-hmm.

Dr. Bleich: And that you made reference to? And then secondly, you mentioned, or you described this as a double observer method. I assume it has its foundation in the original work that Graham and Bell did decades ago; is that correct?

Ms. Crabb: Yeah. Another way that people sometimes describe it like a double observer with covariants.

Dr. Bleich: Okay. So, you are using the double survey -- the double observer method plus these covariants that modify the front and rear and left and right observers. So, it's really a hybrid type of thing?

Ms. Crabb: Yeah. It just wasn't developed with telemetry collars.

Ms. Pearson: Yes, I was going to say, I have been on several of these flights with these guys and if you can keep your equilibrium -- they fly through some pretty rough country, but it's super interesting -- and from everything that I viewed in person is very accurate. There's a slight percentage, like you said that maybe they can't see in that more rugged country. In Utah, they do a lot of that with snow on the ground and the conditions are right and it seems to be a fairly accurate assessment on the head counts on that. So, we appreciate that it's -- it's really good information.

Ms. Crabb: Yeah, I don't think BLM actually takes volunteers on flights any more these days.

Mr. French: Here I am. Thank you. Interesting. It's going to be interesting to see what these trends do as you start to repeat these flights over and over. I guess that's the crux of my first question is, do you -- what is your intent on these HMAs and HAs? Are you -- is it your intent to fly them every year, every other year? Obviously, it's -- the more data, the better in terms of the statistical analysis. I'm just wondering, you know what your budgets can support.

Ms. Crabb: Typically, we do a survey of a third of the HMAs. That decision is done at the state level and they we help them.

Mr. French: Do you try to use the same observers. You showed the flight lines with your GPS coordinates downloaded. I'm wondering, do you have seasonal shifts that you try to -- you change that up? Obviously, those -- the horses are going to be present -- depending on what temperature it is, depending on whether you snow on the ground, the horses will be in different locations. So, you know, ultimately, from a wildlife perspective, we pretty much had to scale those flights with,

you know, the conditions on the ground initially that would give us the indication on how those flights would run that particular time. Do you have those variations already logged in or is that something you are learning on the fly?

Ms. Crabb: Generally, we try to fly them at the same time for each HMAs and snow covering that's one of the variables, the snow cover in relation to the groups that we are observing.

Mr. French: You are obviously flying during the heat of summer, correct?

Ms. Crabb: Yes.

Mr. French: In some of those areas that have limited riparian stands of vegetation, we found when we were flying and looking for horses and whatnot, they were looking for the shade. So, you pretty much had to -- you pretty much had to tailor your flights based on, you know, the conditions on the ground because the horses weren't standing in the open area or the shade. So, I just -- I wonder -- in working with the BLM staff in northern Nevada and whatnot, we ran into a lot of those issues and questions along the line. I worked with the department of wildlife. We did air surveys for a lot of big games species and conducted horse surveys for the Bureau while we were in the air. I was wondering how that protocol was going to run.

Ms. Crabb: Yes, like them being in more vegetated areas since we're collecting that data I can like, obviously, you will see less groups when they are in the dense vegetation. The models actually help to account for that, since you are collecting that information. If they are in tree or if they are in brush, and the amount of vegetation. So that gets fed into the models that help to come up with the sighting probability. So, there will be a bigger correction factor on those groups that are in that vegetation.

## Comprehensive Ecosystem Approach to Management Work Group Discussion

Mr. French gave an update on the Comprehensive Ecosystem Approach work group, then opened the floor for discussion.

Mr. Yardley: Really quick, Jim, would you explain -- I think the general public, it would be good for them to hear the science behind the AML. It wasn't just a number that was drawn out of thin air, and I don't think that a lot of people understand that. You were heavily involved in that process. And I think it would be good for the other members of the board and also the general public to kind of hear.

Mr. French: That's a great question, Steve. The -- at least in my case, and as a biologist for the wildlife, AML was established, that number was established by a function of a lot of the user groups, and I'm not talking about livestock operators. I'm talking about the other members, agencies which had responsibility for wildlife-related management protocol, and in our case, to establish the AML, it was a function of terming, you know, what carrying capacity existed on that piece of real estate at that mole of time -- at that moment of time, what the species were out there on the ground, which included AUMs if there happened to be any AUMs on the HMAs but it also included -- we had a lot -- at the time, of course, that was before the days of GIS layers. So, we actually had Mylar overlays on the maps. And we laid -- we laid winter range, summer range by species out on top of those areas trying to get an idea of where the conflicts would occur, where the pinch points would be, so to speak, with regard to populations, whether they be -- usually in our part of the country, it's usually winter months is when we started seeing the pinch points, but we -- in some cases, and in those areas that were real arid and that we were responsible for managing, we actually identified the spring sources, the intermittent or the perennial flowing streams, and -- and tried to get an idea as to where we would expect to see uses, whether it be wildlife uses by species or whether it was uses of -- wild horse uses that we had observed or what we could expect to occur given an expansion of -- or a pioneering population of horses.

With regard to, that the first item was always determining what our carrying capacity was, vegetation-wise, density, production, pounds per acre, production, that data was out there. And that AML number was a number that was negotiated based on those conflicts, so to speak, between all species trying to make a living on the same piece of real estate. It was never driven by AUMs if it was -- AUMs, actually, in my part of the country, AUMs were cut by the time

we started seeing major shifts and changes, AUMs were cut by 50% in my part of the country and those were permanent suspensions.

So, we -- it was the outcome of determining what AML was, at least where I'm at, was an understanding of given the population of horses that was agreed to, we could expect X, Y and Z populations of big game or nongame, neotropical birds, sensitive species, riparian obligate species. We could estimate that those animals could coexist successfully, those species being okay on the ground. When that changed and those populations started to climb and occupy more and more of that habitat and they started heavily impacting things like winter ranges prior to the winter months occurring we started seeing downturned in big game -- generally big game populations, large ungulate populations. A good example of how that occurred in my lifetime and my career, we did -- we conducted aerial surveys as well for big game species on an annual basis. And we generally came up with trend information that showed fawn production of about 85 fawns per 100 does. That was the number we were looking for.

We watched the population of horses crash number-wise in the north end of my county in '92-93 and that population of mule deer went from about 84 fawns per 100 does in four months down to 4 fawns per 100 does and that population has never really recovered well, it still hovers in the teens. So it -- it was -- statistically and through observation, it was pretty easy to see that impact happen. It was also heart breaking to watch literally dozens of horses in the last throws of dying of starvation. From the air, you get to see all of that. So anyway, answer to your question, Steve.

Mr. Yardley: What caused that, Jim?

Mr. French: Well, it was a long-term downturn in condition. We had just come out of seven years of drought. That time -- if you looked at the latter part of the 1980s into the -- about 1993, there was a pretty severe drought, at least in northern Nevada at that time and we saw what we are seeing right now, except I think it's worse -- no question it's worse than it was then. We are seeing a -- the production of annual grasses and forbs almost nonexistent. We saw that over the course of three years and the body condition of everything, including the mule deer, the reproductive capacity, all of that was starting to show until we had the winter of '92/93, and there -- and everything had to move to the northwest part of my county to find what was remaining in terms of vegetation. They ended up trying to make a living in an area now that is called the Hot Springs herd area, HA out there. That is -- and that population of horses had been trying to make a living in that little corner for some time. That was -- that was their last stand, so to speak. And the mule deer and pronghorn all showed up about the same time, in late November, early December. No vegetation for anybody and they all sat or stood there side-by-side and their numbers dwindled, including horses.

Dr. Perryman: Carrying capacity, AML, all of those related things, the calculation of it is complex. It's complex. And there's a lot of people out there that are looking for soft answers to hard questions. And so, I will give you an example of the -- I know most of you no know this but just to frame -- frame it in the direction a little bit more in the direction of what Jim was talking about. It's not just how much forage is there. It's when is the forage there and what is the quality of that forage.

So, we have seasonal habitats. You know, seasonal habitats. There are certain places on the landscape that different critters prefer at different times of year. And that they require at different times of the year. And so, one of the -- this is -- I will bring this all back to our first bullet here, at least I think I will anyway. Let's take a -- let's take a pronghorn doe. Gestation for a pronghorn doe, if memory serves me correct is 250 days, so eight months and change. Okay? So, once she drops fawn or fawns, she has about four months basically -- three to four months to take care nutrition-wise to take care of any kind of uterine dystocia or any type of problem during the birth process. She has to turn that around and lactate and feed fawn or fawns and she also has to get the reproductive fitness to the point where she can breed up again. So, she's got to have body condition. And so here we are in the summertime, during that green period when forage is available, and they require not just pronghorn antelope but other critters as well. Our limiting factor in habitat throughout most of the Great Basin is that late summer season, early fall habitat when these animals are putting on weight. They are getting reproductively fit to go into winter. They are putting on weight so that they can survive the winter. And so, they move around on the landscape, and they use certain habitat areas, certain seasonal habitats more than others.

BLM_004068

Typically, they use areas where they can find green feeds and that along riparian feeds and wet meadows.  They may have to go up in elevation in some cases to find it.  They are all competing for that small limiting bottleneck of habitat during that period of time during the year.  And so, you compound that competition with drought and excessive number of horses or burros in some cases, most of the cattle have gone home by that time of year in lots of that area of the Great Basin and they are not out there competing that time of year.  You have all of these competing, all of these different critters competing for the late summer season habitat so they can really get ready for winter.  And if it's not there, they are compromised going into winter.  They are compromised going into breeding season and during the winter.  All you need is some kind of winter.  There are all kinds of winter conditions that can come into play.  But as Jim was talking about, if there's nothing -- if their body score conditions are low, it's not going to be good in the wintertime.

And so, what we had while we were thinking about with this first bullet is to make sure that the Bureau is taking into consideration the importance of those late summer season habitats when they are trying to develop gather criteria.  All of the other suites of animals out there, it doesn't matter if it's neotropical migrants or big game species or squeaky dogs.  It doesn't matter.  They all need those habitats.  They all depend on those habitats and in the habitats are over utilized by runaway populations of horses during that period or burros during that period of year -- of the year, then that's a problem.

It doesn't have to do with what the total amount of forage might be, standing forage out there.  It's the type and the nutritional quality and the amount, and the type of nutritional quality of that seasonal habitat that's important. And that's the bottleneck seasonal habitat, the amount of it that we have in the Great Basin and most of the intermountain west for that matter.  And so that has to be taken into consideration, it seems to me, when we are talking about prioritizing gathers. If you wait to look at body condition on the horses, it's too late.  We have to look at those seasonal habitats.  Right now, we are in June, and we will get into July and August, and that September, and we've got to be paying attention to what's going to be available.  What can we predict to be available at that time of the year?

And that's the one that will tip us if we don't take care of the bottleneck seasonal habitats.  It is part of some of the gather criteria.  I saw a list a couple of years ago.  I asked for a list a couple of years ago, what is the criteria for gathering and there's -- you know, there's 15, 16, 17, 18 things on the list, but there's really not a lot of emphasis on that late summer season habitat. And so, I think we really need to start paying attention to that.  So, I said enough for now.

Mr. French: Celeste, if I could, this is Commissioner French, before you chime in, I wanted to add one more thing to Dr. Perryman talking about that seasonal habitat.  One thing -- and we will see that happen this year because of the drought is the riparian habitat.  The animals will go where they are comfortable, and that's in the shade and where there's any green up.  That's in the 4 or 5% habitat, and that's the little screen strips called riparian habitat. Unfortunately, in the case of northern Nevada and much of the Great Basin, those habitats are critical habitat for threatened species.  In northern Nevada, for instance, and where my area that I live in right now, the cutthroat trout is a threatened species and it's proposed as an endangered species at least twice.  It's been reduced to less than 8 viable populations left in northern Nevada, about 5 million acres of ground. And so, it is an animal of intense management and concern.

And what we will see this year -- the livestock has been pulled off of anything that has anything to do with riparian habitat at the beginning of grazing cycle, knowing that that was going to be a problem.  And requiring landowners to develop additional water off site, away from the riparian area. The horses -- there is no management or herding or moving of horses off that riparian habitat.  They will keg up on those areas and they will utilize them just because that's where they are comfortable.  The problem with that, obviously not only is the riparian habitat affected but the aquatic, in terms of the drainage and the perennial waters.  It has placed significant pressure on survival of the cutthroat trout, just for example. But it is -- you know, we talk about the late season -- I call them ice cream species, those plant species that most the wildlife and animals that utilize them look for, because they prefer them. Unfortunately, not a lot of the riparian species or ice cream species as well and we are seeing the management or the challenges of the management of horses on public land is actually in conflict with the Endangered Species Act right now.  We wouldn't allow any use on public land that would dramatically impact critical habitat for a threatened species, yet it happens every year at least in northern Nevada with horses. And this year as dry as it is, and as hot it is, I bet you -- that's why I was asking if they are looking for the horses in the shade.  If I was looking for horses, they are standing in the trees right now.  Thanks.  Celeste, I will yield back to you.

BLM_004069

Ms. Carlisle: Thanks. Just a couple of thoughts that are swirling around. I'm not sure what to do with them. But drought begets drought. So, you know, we know that a majority of the herd management areas are located within what is termed exceptional drought. And it's important to understand what that means. That doesn't mean a bad year. That means we are trending towards longer and drier conditions. And so, I -- though there's problems with people looking at systems that look okay. But they are not okay, and they are not going to be okay tomorrow. On a dry landscape and very dry air, even if you do get precipitation, it's going to evaporate much more quickly. So, a water hole at whatever level it's at right now today, is not going to stay at that level for as long as it may have done five years ago. That's a huge concern of mine.

Sitting in the advocacy chair and it is deeply important that we protect and have these animals on our landscape. The American people want them as part of their -- part of the American West. And like a lot of other things, are a part of our American West. And coming with various different backgrounds about where they came from and what they are being used for or not. Lots of round pegs in square holes, basically. But under the conditions that we have now, the whole game has changed. And so, I think if we are able to focus on the habitat as opposed to pitting any uses, one against the other, none of those uses will be on our public lands here, if we don't focus on habitat. It's the one thing that matters. And from the context of the advocacy chair, it's what matters for the horses.

I got -- I got to say how they may be using their tools to assess this from a non-biased and very ecologically based perspective and the assessment inventory and monitoring that the BLM does, I'm not certain and I'm going to need some BLM help here, how does that apply to the Wild Horse and Burro Program? Because that is a way of standardizing how monitoring and inventory assessment, which are all different things are done on public lands. And then how and is that part of the wild horse and burro handbook that is sort of the step-by-step playbook for wild horse and burro specialists at their field offices. So, if there is not a BLM person or a board member that's familiar with that aim system and -- how it might be part of this.

Mr. French: Celeste, I will chime in a little bit on it. Going back to other droughts that I was -- was here for, there was a collaborative, between the Forest Service and the Bureau of Land Management and entities on the ground that were managing wildlife and we shared resources. We shared knowledge. We shared a lot of -- with a common interest in habitat -- and we all recognize that it doesn't matter if it's cow, horses, big horn sheep or pygmy rabbits. They all depend on the little green things that sprout out of the ground every spring. So, with regard to that, though, we -- for instance, our stream survey crews with the Department of Wildlife, we did all of the riparian/aquatic habitat inventories and provided that data to the Bureau of Land Management or the Forest Service personnel, so they could understand the challenges that we were observing on the ground at the moment. The intent of that, and the hope was that that information would be taken to heart and result in some changes in terms of the management that particular cycle or the cycle coming.

I know many, many times we literally pulled all the uses that we could control. And by the way, the cows are the only thing that you really have control of. But many, many times just the over utilization of riparian habitat, less than 7% of the total vegetation that was available to those cows, we sent those cows home. because of that over utilization.

A good example of having to do with management on the ground and the disconnect between the horse program and the other users on the ground, has to do with what happens following a major fire event. Several occasions in my area, we had major fires that burned an entire deer winter range on the north end of a mountain, went initiate -- we initiated deprivation big game tags and we managed by bullet the number of big game animals that winter on that piece of habitat that was lost in that fire. We suspended the AUMs for the livestock operation in there for at least two years and we walked away from a population of horses that were two and a half over AML. And that was because there was not any mechanism in place at that moment in time to handle that and I guess that comes down to that question about the comprehensive ecosystem management.

And somebody mentioned a while ago, talking about plan A, plan B. Do we have a strategic plan by HMA or HA by county or by, you know, pick a geographic area? I know if you talk to wildlife agencies in Nevada or Arizona or Colorado, herd-by-herd, they have a strategic plan in how they will manage those animals, and what they will do, whether it's some type of other stochastic everybody or what have you. I guess I would say, I'm wondering if we don't have that. If we don't have a -- a strategic plan which outlined what our response is going to be or needs to be given a set of

BLM_004070

circumstances, then we will sit back and repeat history.  I guess I would have been a little bit more comfortable with the management if we would have been able to sit down and actually talk about, for instance, when I had the Little Owyhee. How do we prevent the horses from showing up on that winter range in December and January this year? And at least how to we keep that number of horses from showing up there?  If we had that information and we could -- and the Bureau could have been able to pull the trigger on it in a timely manner we probably would have averted some of the catastrophe that happened on the north end of that mountain.

I guess where you are going with this Celeste is, I'm -- what are we doing when things are humming along predictably, and nobody is complaining about we're at AML or they are close to it and the range is respond well.  You know, what are we doing about preparing for the next event? And I guess that would be any takeaway from it.

Ms. Waddell: I was going to jump in and Celeste, I think I'm tracking what you are asking.  There's quite a bit in your statement/question.  So, I want to see if I -- if I understood it.  I think you were asking whether or not there was a comprehensive or standardized process on how AIM is connected and to HMA planning; is that correct?

Mr. French: AML?

Ms. Carlisle: Yes, basically.  I know that BLM has this system-wide assessment tool and monitoring tool, whereby -- well, maybe I don't understand it, but my understanding had been that, you know, this field office over here can put their data into it and this field office over here or the national office is able to reprieve it as well. So, it's a place where all of the data sets are coming to go and it's hard to do and it's even harder to do if you are trying to do it backwards and you all of a sudden wish you had done it.  So, I'm just trying to wrap my head around what the AIM system is and if it's a useful portal for capturing comprehensive ecosystem analyses over and across all of these ranges.

Because the next part is prioritizing who goes first and who gets what funding and I know that there's a process for that. Obviously.  But it's at a level now that is so complicated that just sort of sitting around and talking about it and state leads and DC and their field offices is inadequate.  I'm not faulting any of those people or offices at all. I'm saying they need a specialized and complex analytical tool, and we have some of that coming down the pipeline, with the updated Pop Equus but it has to be bigger than that.

Ms. Waddell: Right now, let me start off by saying this: we had conversations and we have support from Dr. Jenkins on identifying the Wild Horse and Burro Program and addressing the challenges on a holistic, programmatic level.  And that's a little bit different than we have had in previous years. So, as we start slowly taking that approach, he mentioned earlier, that we are starting to look at gather planning in a different way.  Instead of potentially state by state, what are the drought and the environmental impacts?  And that may not be on a state-by-state basis but on an HMA-by-HMA basis. We don't plan gathers of all 177 HMAs in any one year.  So, we are addressing a third of the HMAs in a rotation based on the previous and the pre-gather and the post-gather surveys that's happening.  So, there's a lot of pieces to that.

I wanted to start off by saying our goal is to move forward in looking at this program holistically.  And in doing so, we are starting to look at what are the other resources that we have to be consistent throughout the program as far as how we are analyzing and collecting the data.  And then the implementing of whatever the management action is going to be based on that programmatic data set.  I hope this is making sentence because right now, there's not necessarily a standardizing method across all of BLM and how we manage the HMA status.  There's some guidance.  There's lots of things that it's based on that is not consistently done throughout all of BLM.

And so, some of that comes with policy updates and communications and training.  And so those are things, I think we're headed towards.  But not quite there yet.  The AIM point of contact, which I have no idea what it is now, it was an individual -- I'm sure they are still sitting within our directorate and that's part of the collaboration conversations we were talking about earlier.  We're looking at these programs that have the cross-initiatives and cross benefits and see how we can improve the work we are doing and moving as one unit.

BLM_004071

Dr. Lenz: Well, just a short comment.  One of the difficulties with these Zoom meetings is conversation takes off and by the time you have a point, and you begin to make it, the conversation has moved along a long ways. I wanted to comment on the complicating factor when you look at the horses, the average horse drinks about 10 to 12 gallons of water a day. And that they are unique in that they cool themselves by sweating.  So as the temperature goes up, their water consumption goes up dramatically and it's not uncommon for them to drink 15 to 20 gallons of water when it's hot. So that complicated things.  The water consumption goes down and it goes up when the temperatures go up.  When the horses get down to a body condition score of two to three, they can be retrieved.  You can bring them back up, but you have to dramatically increase their food consumption.  The average horse eats about 1.8% of their body weight in dry matter.  And so, they will have to eat much more than that going into the winter.  If they go into the winter with a body condition score of two or three, the odds of them surviving is pretty slim. So, I don't know -- you know, we have moved along in the conversation here, beyond that point, I guess.  But it strikes me that this is a serious crisis.  And I know there's procedures in place, but I wonder if there's way to prevent what looks to be a potential disaster coming down the pipeline pretty soon.

Dr. Bleich: Jim, I would like to go back to your mention of that large fire the elimination of grazing privileges for at least two years, the bullet solution to reducing big game populations, and the subsequent movement of these horses as a result of the fire.  And just for clarification, and perhaps to elucidate the way things work a little more clearly, the question I have is -- or I'm going to make this prediction that that horse population continued to grow during that period.  As a result of decreased competition, if you will, native species, and with raising livestock; is that correct?

Mr. French: It is correct, yes.

Dr. Bleich: I think that's a point that we really, really need to emphasize and to help the public understand that with respect to nutrient availability and the way it affects body condition and the way body condition affects reproduction, and the way it affects recruitment rates and that some animals that are not considered in the equation as we're raising livestock and native species here take advantage of well-intentioned efforts and things get work as they try to do things for the ecosystem, or the habitat, that's the key to wildlife survival, as I friend used to say. In the absence of working everything together in the comprehensive manner like this group is advocating, we're going nowhere fast.  Just a comment but I did expect that you would confirm my suspicion with respect to the status of that horse population. Thank you.

Ms. McAlpine: I know BLM staff is really between a rock and a hard place.  You know, we're asking you to think forward, but we also need action now. This is a really dire situation, and from a humane standpoint, we need to take action.  Yes, we need to talk.  We need to plan for the future, but we need as Celeste said, plan, A, B, C, D and E, but we also need action now.  And if process changes, rule changes, legislative changes, will help accommodate that action, we need to make that happen. I mean, I can see what's happening to the Colorado River, which impacts Nevada.  It impacts Arizona.  It impacts Southern California, but it also impacts all of those feeder states that are having water and drought issues that feed the Colorado River. So, this is not just horses and burros and wildlife.  This is eventually, if it continues, impacting humans and millions of humans. So, we need to do something, and it needs to involve some really quick action, some really hard decisions and a lot of support from all of us to do that.

Mr. Yardley: Going along with a lot of the comments that Dr. Perryman and Dr. French were talking about with these extremely fragile, delicate riparians and the small sub irrigated meadows along stream banks, they are extremely susceptible to erosion and to overgrazing in the first place and when they are impacted and when they are gone, they don't come back.  Not in our lifetime, they don't come back. And even these regions where you get a severe drought and a severe amount of overgrazing, it's like -- it's 500 to 1,000 years.  The whole ecological balance is always talked about but rarely considered or anything done about when it comes to Wild Horse and Burro Program, unfortunately, like Dr. Bleich was talking about, managers with the best of intentions such as hauling water, which I agree is the humane thing to be done, but unfortunately, it's making it possible for horses to cause -- not just horses but all species to cause more degradation to the rangeland resource because there's water availability whereas before that was a factor.  And now feed becomes the main factor and then feed is gone and stripped down and we have the emergency gathers and something that's really bothered me, and we talked about.  There needs to be will emergency gathers by all means.  I'm saying, yes, we need to do them, but you remove the horses or the burros, but the damage is already done.  At that point in time, you are pulling bodies out of a building that is already burnt down.

---

BLM_004072

The amount and the cost of the range receding and rehabilitation that's got to take place.  Plus, you have to remove those animals for two to three years to remove the grazing pressure that goes with them, in order to get an established grazing conditions in the conditions are right. We are dealing with a catastrophic event and a size and scope -- the size and scope, which is almost unheard of. We see it with wildfires but this is unfortunately, going to affect the very animals that we are trying to help and trying to save and the land and the range resource that not only they but a myriad of other upland game and people utilize for their livelihoods and we need to do something to protect not just the emergency gathers but to prevent emergency gathers from happening and the amount of range degradation that happens before an emergency gather happens.  Or else it's all in vain. Somehow or some way in these recommendations we need to have some verbiage in there that talks about preserving the necessary of emergency gathers in the future, and otherwise, we are just taking a squirt gun into a cease-fire.

Ms. Carlisle: We are chasing our tail with the number of emergency gathers now exceeding basically the gather budget.  So again, this goes back to the planning for all eventualities and having a comprehensive approach so that what we are doing over here is not having some deleterious effect that we weren't able to capture or think about over here. If we are only able to because of circumstance and budget, only hit these areas that are very, very heavily impacted, then we're not ever able to show some success, somewhere in really showing how management can be done comprehensively, and successfully, and offer people hope, quite frankly, which is something that is needed from every end of this discussion, from advocacy to ranching to local towns around these areas to every other critters that live out and the agencies around it.

If we don't have good projects happening where we are showing how fertility control, alongside gathers gets to a point where you are able to reduce the number of horses gathered and times you are gathering.  If we don't have places where that's working and all we're doing is going out and gathering from areas because the animals are dying, then over here we have that same thing ramping up.  And so, we go over there and grab those animals that are distressed and then as all we'll be able to do.  And I'm not sure how to figure out -- how we prioritize these places when we are in such an extreme situation.  So, I'm throwing that out there.  Dr. Perryman had some thoughts on this the other day, I think as we were talking through some of this.  So, I will be quiet now.

Dr. Perryman: Two things.  Thanks, Celeste.  Two things to move the conversation along because we do need to move it along.  One, I want to go back to the Apollo 13 metaphor this morning.  We have got a disaster on our hands.  I mean, it is a mess!  Here in Nevada and Utah and places.  And so, I want to know what we can do -- number one, what can we do to help the Bureau -- what can we recommend to the Bureau that will help them deal with it this immediate mitigating what is going to happen in the next 90 days.  It's -- we may need the capacity to put 30,000 animals somewhere.  And so, somebody needs to be making a phone call to FEMA or somebody.  There's got to be - maybe ASPCA, maybe some of the other groups.  Maybe we can come to some kind of an emergency situation where we can buy time, buy space, buy something, buy feed.  That needs to be going on right now in my estimation because in 90 days we have 30,000 horses that we need to pull off one way or another, in water traps or any other kind of roundup we can come up with. I don't want to have to go out there and start doing head counts of animals that are laying on the ground, but I'm afraid that's what we are going to end up doing. That's number one.

Number two, with respect to Celeste's comment on success.  There are some areas that are pretty good, we are not in a drought.  We are over AMLs, but things are still okay.  We can still do some things.  And I would suggest that the Bureau pick two HMAs, just two HMAs and consent on gathering and contraception.  I mean, get after it!  Go for it!  So that we can show Congress and the people that are -- that are approaching Congress about new funding additional funding, because if they don't have something that they can point to that is a success that shows the Bureau can do this given the right set of circumstances.  If we can get everything ready to go, and if the Bureau can show success, then they can go back to Congress and say, hey.  Things are going well here.  This is a way out of this.  Is a way forward. And we have shown it in these two HMAs and wherever they should be. I would make that suggestion to the board -- that the board recommend something like that.  A comprehensive, pick a couple of HMAs, really concentrate.  Take those 2,000 doses of contraception that's going to be spent this year and divide it up in two HMAs. And just so that we can show some kind of an effect there, rather than gathering it over, you know, ten HMAs or however many that are going to be applied to.  So that would be a suggestion that I think we could do a recommendation on.

BLM_004073

And then the first one a recommendation on -- I don't know how to word it yet.  But there has to be something we can do to mitigate -- maybe not even mitigate is the word, but to contend with this population of horses in the Great Basin, and burros in some places in the Great Basin.  It may be even in Arizona as well.  What are we going to do when we start to see tens of thousands of horses choke down and starve?  What are we going to do when that starts happening?  Because between now and December, if they are in bad shape going into winter, it's not going to get any better.  So that's what I had on my mind.  I yield back.  Thank you.

Dr. Bechert: I thought it was interesting listening to all the conversations.  I appreciated Steven's comments.  It seems that there are maybe two ways forward.  One is emergency reactions where horses are pulled off lands, livestock raising is minimized and we provide food and water for animals to save them, but I also realize that that can often make the whole situation horse because then we're artificially supporting animals on lands that can't sustain them.  It's just pushing the problem further down the road and potentially making it worse.  But I realize we can't do nothing.  And so that's one option, but I think it needs to be really carefully considered.

The other is the changes we are seeing are beyond our control.  We cannot control climate change, clearly.  It's a thing that's happening.  And so, we need to be a little more flexible in terms of some other species that we read about that adopting to the change that's happening.  They migrate north.  They adapt to new environments.  We can land future actions acknowledging what the new reality might be on some of these lands. I know people have been -- I'm not one of them.  It's out of my field -- but projecting future climate scenarios on these different lands.  I think that very much needs to be a part of the conversation to inform our actions now but also in the future so that we can kind of preemptively prepare for possible disaster -- well, probable disasters coming up, but also to do whatever we can to mitigate that.

Mr. French: Thank you.  I think we are all dancing around the same thing here.  In my mind, I wrote a number of notes for myself here because one of the things that I think is a weak place, and it's not -- it certainly isn't offered as any kind of criticism.  One the things that is a weak place in the system right now, has to do with how BLM is authorized to react to stochastic events, anything like we are dealing with.  If the report to Congress included a -- set of action plans, hypothetical action plans which would occur, and would include support from Congress if certain things occurred.  You can spell them out.  We can take a look at of the things that occurred and are occurring on the public lands and talk about what would have been helpful if we had it in a timely manner.  So, if we could include a strategic plan which included a hypothetical or strategic plans having to deal with potential issues down the road, I think it certainly wouldn't catch Congress by surprise if the BLM showed up later and said, hey the fire season that we were hoping wouldn't happen did.  Or the drought that is exceptional is.  So, start with that.  The other thing has to do on a -- the reaction of -- all the way down to the district offices of the BLM, having to do with the planning effort and the management changes that occur based on events such as fire or drought or, you name it.

And I want to mention -- the example I used on the Little Owyhee having to do with a major fire event and the need for taking extraordinary management actions in order to manage big game population numbers, as well as livestock operations, I think it -- it should be -- it's important that any event that triggers extraordinary management changes should apply across the board to all species.  There shouldn't be an exception to that.  So if we're talking about -- if we're talking about removing AUMs for four years or three years on a -- or indefinitely on some sensitive habitat or following a major flood event, and we lose all of riparian areas in a -- a -- which happened north of here on the national forest, we removed -- you remove all of the -- all of the livestock off of that allotment trying to protect the riparian habitats, yet we didn't do anything for the horses that were camping on that water when the livestock wasn't there. I think it's important to say that management across the board, if they live on that piece of land and they depend on that piece of land, then the management applies to everything.  Just a couple of suggestions.  Thanks.

Mr. Yardley: I agree wholehearted with that, Jim.

Ms. Carlisle: Well, basically, I was just going to say what you were saying there, Bryant, that I'm sort of trying to take notes.  I don't know that we'll have time to really -- we may -- we may be able to sort of combine, I think, if we can scroll up the -- scroll down a little bit.  I want to see, one two, and three.  I mean, I think one, two, three --

BLM_004074

(Laughter)

-- I will wait until it stops moving. One, two, three and four are very related to each other. And these are just so folks know, these are sort of our stream of consciousness thoughts from putting together meeting -- our meeting notes over the past couple months of things we know we need to sort of hone in on. But there's a relationship here between this sort of -- our Apollo 13 level planning, which could have, should have, would have, years ago but we need to do it now. So, we are looking at every eventuality that. Also includes planning for fertility control being a part of that. If we done -- and I'm not saying that the BLM is not planning for this, but I'm trying to show as we are responding to these emergencies, we also need to be figuring out how we do that and begin implementing fertility control, because if all we do is respond to the emergencies and the -- with changing conditions and so everything is an emergency, then we never get to using fertility control and that means we never make a difference to the population growth rate. And if we don't do that then all of this is for not. Eventually, populations will just crash. And that's not okay. That's not natural. That is not how nature, quote, you know, takes care of itself. That means that something is wrong with the system. So, I don't know. I'm -- I'm losing my thought streams here. These things are all related, and I think it can be encapsulated in one or two well-written recommendations that are aiming at habitat and are aiming at somehow through these emergencies beginning to reduce the population growth rate as we respond to these emergencies. That's all I have at the moment.

Mr. Yardley: Celeste, just to touch on what you were saying and maybe -- I do think in certain situations, population crashes are what happens through nature. If left alone or unabated, we can and should do better. We have to humanely take care of these animals and population crashes, there's nothing humane about a population crash because essentially what it means is starvation of the masses or dehydration of the masses. Neither one are outcomes that we want to see happen. And in the meantime, ecosystem destruction. It – it's not good or healthy for anything and like we talked about, multigenerational recovery after those things have happened. So we have just got -- we need to work on hard answers for hard questions and now like has been stated.

Ms. McAlpine: I really like the idea that Barry and Celeste kind of pulled together for a recommendation. That the misinformation campaign is hugely successful. And I really think that BLM needs to have some real solid evidence of success. So, I liked Barry's idea of focusing on two HMAs to show that they have the tools and practices to successfully manage wild horse and burros. And then I agree with what Steven just said, is that we need BLM -- BLM needs a real-time plan to address the drought-impacted HMAs across the southwest. And then you skip back to the report to Congress and that includes a new reality that we need to react to. And action plans that will -- hypothetical action plans that submitted to Congress and get their support and backing so that Congress is also not just reacting to emotional misinformation but have some really solid information to help delegate funds and help BLM make some very difficult decisions. And then, of course they go back to changes in rules and legislation and all of that, that's going to help them in an emergency situation. And like Celeste said, fertility control is essential, and I'm of the belief that fertility control does not only include the mares, but we should also be talking about young stallions, stallions with conformational issues and when we're past this crisis, making sure that we manage our herds so that they are the most viable, the strongest and are desirable for adopters in the future.

Dr. Bleich: Yeah, I just wanted to come back to the points that Dr. Perryman and Jim made earlier in the context of Celeste's statement that we should take -- we need to take advantage of the current situation to reduce population growth rates, but I think we need to place an emphasis on reducing population growth rates right now will not pay off nearly as well as both actions. I think we need to make sure that reducing populations under the current conditions -- there's an opportunity to reduce populations through emergency work and also reduce growth rates. I didn't want to miss that point.

Mr. French: Thanks. I will keep this really brief. I think we're on to something here. I think ultimately if you go back to what Susan said of embracing the idea that Dr. Perryman had, I think it's list number five on our recommendations in terms of trying to get this message out on the ground because ultimately, that's one of the biggest problems we have right now, in my view, is not -- we don't -- we don't have a problem with the will to manage. We don't have a problem with the expertise to manage. We don't have the problem with -- with assembling the people with the subject matter expertise to matter. What we have -- we have a message and image problem.

BLM_004075

And basically, we have a population management dispute.  We've got groups of people who are in conflict in how they want to use these lands.  It's just basically that simple.  And I think being able -- if we selected -- strategically selected HMA, several HMAs which are nested in the middle of -- of others which are impacted in the same way with drought and we can demonstrate over time how management improved it, and used the tools in the tool box and actually -- so that we could actually describe what occurred there, and compare that -- that success with what occurred on the outside, you know, basically adhering to the requests that we heard today of leaving them alone.  Don't gather.  Don't -- don't do anything.  They are fine.  Leave them alone.

If we can compare that, with good robust management, I think it would be -- it would go a long way towards our ability to make our case, not only to the public but also make the case to Congress.  Because that's ultimately, the problem we are running into is Congress.  I do believe if we do decide to run down that road, if the BLM decides to put together a study along that line, those HMAs have got to be very strategic in terms of where we select them and -- so that we can compare them down the road.  Thanks.

Ms. Waddell: I wanted to offer this information.  Hannah, if you could scroll back up to two, the number two recommendation, and let you all know that we have had some discussions.  In fact, Scott has been working with a few states that have identified an emergency situation.  And spoken with them about considering fertility control on the animals and in conjunction with the emergency removal. So that's definitely something that we're putting on the table and having some discussions.  It's different than what we have done before.  And in past, normally we just go in and do an emergency removal.

The second piece I wanted to mention was about water hauling.  You know, there's not a -- there's verbiage that's in the handbook that does address water hauling in a sense and leaves it, you know, very kind of flexible depending on the situation. And so, the agency is has not taken a strong position that we will haul water everywhere or we won't haul water but each one of the HMAs is unique in its challenge, even though it says drought.  They have different numbers of animals that are there within that HMA.  They have different ranges of carrying capacity of AML.  It's difficult to treat all HMAs the same.  I think that's one of the things that Crystal Wengreen makes when she's talking with the states and identifying where the gathering, the tentative gather schedule, and she's talking to the specialists in the field and making those conditions about what is happening and how to best address them.  I wanted to offer that information.  I don't think it's your intention to say that BLM isn't doing anything.  This is terrible.  You guys have got to be better.

But it's very complex to try to relay all the work that's being done, considerations that are being made, the planning sessions and then this is being conveyed to leadership when there's a lot that BLM is taking on right now.  So, I'm not making excuses, but I wanted to lay that out to the board.  Scott is here.  Paula is here and I'm here.  I wanted to make sure that you guys -- feel free to ask those questions so that we can, you know, perhaps answer -- provide a response that we may not have covered in presentations. Scott just reminded me that he had created a drought map that had some overlays with the HMAs and a couple of other things that was very helpful.  So, we'll try to resurrect that and get that sent over to you guys for, you know, some of your continued conversations. So, thank you.

Ms. Carlisle: Holle', that map is in our packet.  We have that.

Ms. Waddell: Okay.  Perfect.  Thank you.

Dr. Lenz: Just a short comment.  I think the entire board agrees that in the gathers, as well as removal of animals we need to provide them with fertility control. I think in these crisis areas where there's a serious drought and you have emergency measures in place, that the focus should be removing as many animals as possible, because when those mares start to lose body weight, you can't gathering all of them but the remaining mares may lose body weight and body fat, they are not going to be very reproductive efficient and a lot of those mares will not get pregnant until they are in a situation where they can gain weight. I agree with the comment earlier that we need to in those areas focus primarily on taking as many animals off the range as we possibly can.

BLM_004076

Ms. Carlisle: Well, we do have that really tricky occurrence that can happen when you do remove animals from the range, and you open up resources for those left behind and then they can, in fact -- they get more nutritional -- gosh, it is the end of the day. Can you tell? We have to be careful with we look at the removal areas that we may be leaving behind animals that are compromised in some fashion and may not get pregnant, but we may also open up habitat and forage that then allows them to actually bump their reproductive growth rate up. So obviously in conditions where the range is so -- is in such bad shape and there's not forage available, that's -- that's not going to be happening.

Dr. Lenz: Yeah, I'm aware of that, when you cut them down then the animals that are left, they have more forage and then get pregnant. But it sounds like the situation is bad enough.

Ms. Carlisle: I do think we are in a much different situation right now. But what I wanted to throw out there was maybe for Holle' or Dr. Griffin, there's some new modeling programs that will be used for these situations like you are describing. I feel your pain in trying to figure out where one management action should occur and where another can't occur and how and why and I -- I understand it's an incredibly complicated process and it's beyond, you know, everyone sort of sitting around in a room and figure out what is the best thing to do.

There's a lot of analysis that our program -- a grad student in North Carolina is utilizing this and it's a well utilized program it systems analysis, but it's really useful for looking at incredibly complicated issues like this one, where we can take a look at what happens if we apply fertility control over here and gather this many over here but there's an emergency over here and we need to gather but we don't have the fertility control for it and how many need to go into holding and what's in holding, and can -- you know, and all the other layers including you can feed in economic equations into that as well. And I'm not saying that it is some miracle by any stretch, but I'm saying it's a rally powerful tool that I think the BLM could find very useful for removing some of the human error and biases is just natural in anything that any of us do, and really seeing what the consequences down the line might be, and it's also a powerful tool for -- for utilizing to educate stakeholders about how these management actions might have an effect over here that we had not anticipated. So, I will get that information to you all, but I'm wondering if BLM has anything at that level or is Pop Equus all there is in terms of just modeling fertility control and what happens in one specific HMA?

Dr. Griffin: I'm not aware of the program that you are alluding to from North Carolina. I don't think we are aware of it, and in theory the Pop Equus program that USGS is developing it could be a single HMA level, but it doesn't do the algorithm for optimization that you seem to be talking about.

Dr. Jenkins: Thank you for these suggestions. I wanted to expand on what Holle' was mentioning to you. A couple of months ago -- the BLM developed a five-year gather plan for all of -- across all of the HMAs and a couple of months ago when the drought really looked apparent and was not going to away, I asked Holle' and her staff to develop a five-year gather plan based on environmental conditions, based on drought conditions. And take a look at that. See and have that as, you -- somebody was talking about plan A, plan B, plan C, well, this is a plan B because we wanted to understand what a gather plan over five years would look like if we were paying attention, not to states, not to HMAs but to environmental drought conditions. So, they have done that, and we started looking at that and at the same time, I asked them -- and this is relevant to what Dr. Perryman was talking about. I said, let's start thinking about at two extremes here. We are vastly overpopulated with horses. We need to gather and remove them because there's just too many.

And then where we're close to an appropriate level, whatever that is, whether it's the old level, the old AML or something else. And at those, let's increase our fertility control. We are working at these two extremes. I like these suggestions let's say two HMAs and do aggressive fertility control. That's what I was trying to get at when I asked my staff to think about gathers at the high end and fertility control where we were really close to an appropriate level. Because it doesn't stay there. How do we keep them at that level and thus show some really good management results from that effort? So, I will let you know that that's -- we have been talking about that. Those two things.

And Holle' also mentioned -- that was just based on drought maps. It wasn't based on sensitive species that Jim brought up. It wasn't based on vegetation maps at the end of the growing season. It was a pretty crude look at drought maps and gathers. So, we can refine that by looking at some of these other elements that you brought up today, which I think are

useful refinements. And then in terms of hauling water, I have talked to the state directors who are talking to me about water hauling and I have said to them, if you are going to haul water, you need to figure out if you can increase fertility control when you get them close to water? Are you dart them? Are there other methods you can do? If it's NEPA available and the fertility controls are possible for the herd management areas, then that's what I'm encouraging the state directors to do with their staff so we don't just haul water and send them back out, but we send them back out with some level of fertility control that we can manage.

I wanted to just let you know that we are thinking about those sorts of things and that your advice and recommendations are helpful for us to -- oh, to make more sophisticated, I guess, our efforts.

Ms. Pearson: If I can find the mute button. I think that this goes back to some of my earlier comments and obviously we're all on the same page. All of this that we're talking about today needed to happen two or three years ago. And we're so far beyond that we can't even get -- like I said -- and I'm not trying to point fingers. It's just that the wheels of justice move slow, I guess and so does this kind of management. And everything and anything that has to be done has to come under EIS, has to come under your NEPA rules and the public comment periods and all of the planning and all of that. And yet, on the ground, we're looking at a total ecosystem crash and how do we avoid that?

So, Dr. Jenkins we have spoken to you several times. You saw that coming. You asked them to do that, but how do we implement that as soon as possible? How do we implement those gathers and how do we do that last month?
So -- because I can tell you I'm one of those people I'm on the ground. I see this every day. I know Barry does. I know Jim does. You know, we're here. We're right here in the middle of this, and we talk to the range specialists. The range cons, you know, our HMAs and our friends and neighbors and we are seeing this. We're talking the dust bowl era. We are talking thousands. I can't even imagine that it is not going to end up being thousands of dead animals by the end of the summer if not this winter. Because when you have no growth, no -- nothing growing this summer, they are talking about no domestic animals going out for winter range and this is just Utah. And I know Nevada is as bad or worse. You have any kind of a snow event that's going to cover what's left of that feed that didn't grow to begin with, we're talking massive die offs. Massive.

So, the activist groups that don't want us to gather, don't want us to touch them, they are going to get what they asked for, unfortunately, and it's going to be the most obvious, painful thing that we've ever seen. And it's -- you know, you hate to say the -- you know blunt truth, but I have always been a straight shooter for the most part, and that's going to be the cold, hard truth this winter. And it's not smoke and mirrors. This is -- that's the thing. This is not -- this is not smoke and mirrors. And I would love -- I have told many of you guys if you want to come down and I will show you, I will drive you out. I will show you.

Ms. Carlisle: I think this kind of segues into something we're going to be covering tomorrow, with the sort of internal organizational structure group which is also talking about really good communication between the public and the stakeholders and the advisory board and how we do that better. And one of the recommendations that we were sort of thinking about in terms of -- of education for the stakeholders that are interested in this and for the public that can sort of also begin to develop trust that is really necessary between the different interested parties and the wild horse issue and between the public and the Bureau of Land Management and ranchers and advocates and whatever other types of relationships you want to throw in there. We can see from the public comments that people are upset. It's a complicated issue and it's hard to understand, but I don't know that an agency that's not tasked with education as a mandate stands in a really difficult place.

Now whenever you all say something, I know that it's not completely accepted by some groups. And that's not really fair and that's not really your fault. And so, I think we're going to be looking at how we can do that better and Holle', I take your point too, that some of the things we have been talking about today, you guys have already been talking about. But we didn't know that, and so we are looking at how we can be more organically involved. And we can come in deeply knowledgeable about what's happening now and what we can do to provide you with the resources and the support that you need and not micromanage you. That's the last thing you need.

BLM_004078

So, I just wanted to offer that and offer that some of the stuff that we talk about tomorrow, is also a part of this conversation as well. The other thing is that that recommendation that we have at the bottom of the page. We don't need to pull it back up. I don't think we have time. That talks about an example and some of the education that might be really helpful would be I think more appropriate than the internal structure and communication around and among BLM and other education for the public and better and really meaningful involvement of the public. I hear the frustration of people showing up and making the comment -- and believing that it's not considered at all. And I don't think that's true. But I think it's very difficult to prove that that's not true. So anyway, I'm segueing a little bit. That our recommendation or the general recommendation at the end of that page is probably more appropriate around tomorrow's discussions. That's all.

**[Adjourn]**



BLM_004079



**Wild Horse and Burro Program**

**U.S. Department of the Interior
Bureau of Land Management**

# NATIONAL WILD HORSE & BURRO ADVISORY BOARD

June 30 - July 1, 2021

Volume 2

Day 2 Meeting Minutes

U. S. Department of the Interior
Bureau of Land Management

# Contents

**THURSDAY, JULY 1, 2021** ........................................................................................................ 2

Welcome ...................................................................................................................................... 2
Call to Order and Introductions ................................................................................................ 2
Welfare Work Group Discussion ............................................................................................... 2
Public Comment Session (2) ..................................................................................................... 17
BLM Internal Organizational Structure Work Group Discussion .......................................... 23
Public Comment Session (3) ..................................................................................................... 35
Advisory Board Discussion and Draft Recommendations ....................................................... 40
July 2021 National Wild Horse and Burro Advisory Board Recommendations ..................... 68



BLM_004081

# Thursday, July 1, 2021

## Welcome

***Bryant Kuechle, Facilitator, The Langdon Group***
Mr. Kuechle welcomed attendees to the Wild Horse and Burro Advisory Board meeting and introduced himself and his role as a neutral third-party facilitator. Mr. Kuechle reviewed the procedural elements for public participation, stating that the BLM recognizes the value of public input and appreciates public interest in expressing themselves regarding matters of concern. He explained the process for registering to provide public comment, noting that there would be two remaining designated opportunities to do so.

## Call to Order and Introductions

***Ms. Celeste Carlisle, Wild Horse and Burro Advisory Board Chair***
Ms. Carlisle welcomed the Advisory Board members, Staff, and all attending by live stream. She called the meeting to order. Ms. Carlisle introduced Dr. David Jenkins as the BLM designated federal officer, staff from the U.S. Forest Service, and the members of the board (see Table 1).

| TABLE 1 - NATIONAL WILD HORSE & BURRO ADVISORY BOARD MEMBERS ||
|---|---|
| **Board Member** | **Representing** |
| **Ms. Tammy Pearson** | Public Interest (Equine Behavior) |
| **Dr. Tom Lenz, DVM** | Veterinary Medicine |
| **Ms. Celeste Carlisle** | Wild Horse & Burro Advocacy |
| **Dr. Barry Perryman** | Public Interest (NRM/Special Knowledge) |
| **Mr. James French** | Natural Resource Management |
| **Dr. Ursula Bechert** | Wild Horse & Burro Research |
| **Ms. Susan McAlpine** | Humane Advocacy |
| **Mr. Steven Yardley** | Livestock Management |
| **Dr. Vernon Bleich** | Wildlife Management |

Ms. Holle Waddell, Acting Division Chief of the BLM Wild Horse and Burro Program, introduced the members of BLM that were in attendance.

## Welfare Work Group Discussion

Ms. McAlpine gave a brief update of the welfare work group sub-committee discussions. She then led the discussion on board recommendations to BLM as follows:

Ms. Carlisle: I understand the adoption program in general, the BLM has done a remarkable job.  Highlighting the value and versatility of these horses, really giving them a story, says their adoption events over the past couple years, they've been working to make sure that the events are cohesive, that there's branding throughout the entire process, so it's, so I can understand how frustrating and hurtful it is to the people who are actually on the ground and doing this work with the intention it that horses do find good homes. This is not anybody doing this on purpose is what I'm trying to say.  And I think that there is a distinct feeling in some organizations and stakeholder groups that this was done it on purpose as some way of hiding horses down a pipeline potentially towards slaughter, and I just do not think that is the case, and I think that's very important.

But I also think that this is definitely a hole in the system, and I also know that BLM has been well aware that they would go through this Adoption Incentive Program for a year and then analyze it and look for where improvements needed to happen, and that that has been happening.  So it's really unfortunate the tone of the article because I think that it put -- it vilified BLM yet again, but it is also pointing out something that does obviously need a reset and to be investigated.  So I

BLM_004082

feel like I'm swirling around here, but what I'm trying to say is this wasn't some purposeful nefarious, you know, plan, but this is an incredibly huge problem and the public is incredibly worried and concerned about it, as they should be.

I think the confusion that has happened around how to get really good solid information to the BLM Wild Horse & Burro Program, who the person is that responds, and what the protocol is for response is not clear to the public, if it exists, and that we need to make certain that the public completely understands what the BLM's reaction to this is and response to it and what they're doing about it, and that the public was very concerned, many news stories happened after that New York Times story came out, and then there was absolute silence from the agency, which does not mean that they're not doing anything, but the -- but the appearance to the public is not good and that can't happen it again. I think a lot of us kneel way, but again, it's not to blame this entire agency, it's to say we have got to fix this. We've got to always hold these horses in this place of value and care. And to the public right now, it looks like that was not happening. Those are just some of my flowing thoughts right now. But I'm going to stop for the moment.

D. Lenz: A couple of comments. I think I agree completely, this needs to be investigated, because right now we're dealing with a lot of theories that may not be true. I haven't seen the e-mail that Ms. McAlpine received. I would like to see that and see how they documented what's happened to these horses. But we have to keep in mind that this program has been dramatically effective. They've put well over 7,000 horses into individuals' hands over the last year or so, and I think they need to be commended for that.

I also think that the fact that a horse goes to a public sale barn doesn't mean that that horse is going to end up going to Mexico or Canada to be processed for human consumption. I would like to see some hard evidence that those horses that were bought at the sale barn actually ended up in that pipeline, and to date, I haven't seen that evidence. So I think people should be aware that whenever there's a program, there are always going to be unscrupulous people that take advantage of it, and what's going on right now, not just in the wild horses, but primarily in the domestic horse arena, is that the order buyers have learned they can make much more money by selling it to naive people or inhumane -- humane groups than shipping to Mexico or Canada. A horse is worth about 400 or $500 across the border, and they've found that I can put on the internet I have a BLM horse or I have a regular horse of some breed and it's going to go to a processing plant, but to buy it or if you provide funding for me to care for it the rest of its life, I'll ensure that doesn't happen.

And so there are folks that are paying 1,000, 2,000, 3,000 or $4,000 for these horses, and so the order buyers have learned that that's much more profitable than sending though the processing plants, so I guess I would like to see the hard evidence. I have no doubt that some have gone on sale barns, I'm sure through the last 50 years that these horses, once they're signed over to individuals, some of them end up at a sale barns, but it's illegal to sell a BLM horse to be processed for human consumption. So if we can investigate that and find those individuals, you can props cute them -- you can prosecute them. But again I would like to see some hard evidence that they're being shipped to Canada or Mexico. I talked to one of the U.S. veterinarians -- USDA veterinarians at the border, they used to inspect all the horses going across the border, they no longer do that, but if that's something that's called to their attention, then they'll certainly look into it. Thank you.

Ms. McAlpine: I do have to agree with Dr. Lenz. The information that was forwarded does make the huge leap that truckloads of wild horses and/or burros are being shipped to Mexico, and so that part of the, what, ten or eleven pages in the report makes that leap, and I'm with Dr. Lenz in that I don't believe that that has really been documented. I am concerned, obviously, that so many horses that went through the Adoption Incentive Program changed hands so quickly, which leads to another conversation that was started yesterday about whether or not people who are adopting or buying horses or involved in the Adoption Incentive Program have the actual skills to deal with a wild horse. Somebody who has trained horses for, oh, lots and lots and lots and lots of years, because that would give away my age if I told you, you take a domestic horse, you send it to a really good trainer, the horse comes back, and it is great, for 30 days. And then with an unknowledgeable rider, handler, groom, staff, whoever you happen to have, you know, all of a sudden the it horseback slides. So consistency is extremely important ask it certainly is ten times more important when you're handling and dealing with a wild horse or burro who is not domesticated it so I think that's a component that needs to be looked at too, how do we prepare these individuals so that they can succeed with these animals and that the animal doesn't end up going through a chain of hands, whether it's a pipeline or from one individual to another individual. So I think that is really important too.

BLM_004083

Dr. Bleich: As an individual who has worked with both state and federal wildlife Law Enforcement officers for my entire career, I'm a little bit familiar with the way has investigations proceed.  And the tone yesterday among many of the concerned public was one of, as Celeste indicated, you folks at BLM are not doing anything, and you contrived this AIP program so you could send horses off to -- so people can make money off of them and, you know, help reduce the burden of having these federal horses to care for.  And one of the first and most logical things involved in Law Enforcement is you really don't tell people what you're doing if you're trying to figure out what's going on.  And you will see that constantly from people involved in Law Enforcement.  We are not able to comment on that or we're not going to announce what we're doing to investigate this.  And I think it's horribly unfair to assume that the Bureau has not been on top of this, and that is the assumption that is out there and running rampant, that's what people are writing their Congress people about.  It reflects emotion, and certainly there are people that are emotionally involved with this issue, but it is not right for the assumption to be made that the Bureau is ignoring this or they invented this AIP program to lessen the burden of dealing with these horses. So that's all I have to say right now.

Mr. Yardley: Yeah, a couple different comments.  The first is, I was on the board when we as a board made the recommendation to put forth $1,000 in the AIP program.  Mr. Fred Woehl, the former chairman was kind of the brainchild, and we all thought it was a good idea to give those people who wanted to adopt a Mustang the opportunity to have a cash incentive, to have both for training and for caretaking purposes, and there was never even the wildest feeling that any of this would be misused or manipulated to get animals into the slaughter, into slaughterhouses, which it sounds like a very, very small amount have gotten in of the 7,000 that have been adopted, 81 went to the sale barn, and of those -- and of the 81, like Dr. Lenz talked about, just because they went a sale barn doesn't mean they went directly to a slaughterhouse.  It's not profitable, and doesn't make sense.

The other thing, the overarching problem that we've been talking about, like there are literally thousands of horses that are facing a much worse fate than a slaughterhouse, that of starvation that, of dying of dehydration, and these aren't something that some New York Times article writes up and talks about.  These are things that are happening on the ground as we speak.  Literally thousands of horses. So I guess I'm really frustrated because I feel like there's so much emphasis being put on this, and yet all these other horses that face much more dire circumstances -- that face a much more dire circumstance than what we're talking about are literally being overlooked by the majority of the public.  So if our New York Times journalist friend is listening, I would hope he would come out to the West and see the dire circumstances that are faced with these horses and write an article about that because that's really what needs to be addressed right now in this board meeting and right now with BLM, a lot more so than a handful of horses that have went to slaughter facilities, if they have went there at all.  Thank you.

Dr. Bechert: I have to agree with Steven, I think it's human nature to highlight problems that we can maybe tackle or we're familiar with, and you just look at some social media and you see that out there.  But otherwise, I totally agree that the ecological problems are much bigger.  However, this is the discussion right now, and I just wanted to point out that one of the public comments yesterday by Mr. Mazzola, he was commenting on Miss Waddell's note about the horse adoption guidebook, which sounds like a great idea, but he was concerned about the need for a book that talks about how to feed your horse and how to do basic care of horses and was wondering about the vetting process for the adoption program, and I confess I don't know what the vetting process is for that. But I think that it's heartening to know that we now have a CAWP permanent coordinator and I'm hopeful that the guidelines and assessment tools they come up with will be can helpful and I am hoping the board can work with them to put safeguards in place to really proactively prevent programs with this problem in the future, because I generally agree too, it's a good program, but we just need to tighten up problems like this.

Mr. French: Thanks a lot.  I tell you what, I feel exactly the same way my colleagues do on this board.  I don't think any of us -- I was sitting on the board as well when we made the recommendation for the AIP program.  I still think it's a great idea.  I still think it's getting -- increasing the number of horses made available to the public by putting an incentive out there, I think it's a great idea, it serves many purposes, and it's not trying to get animals into a slaughter barn.  The idea wasn't about that at all.  It was about getting horses to people who couldn't afford to get horses ultimately or to give them the incentive to do that and put those horses in -- titles those animals, get them out off the government inventory, and off the taxpayer role, and get them out there to where there can be, the animal can actually be enjoyed and the animal can actually function as a lot of these horses can.

I absolutely agree with Dr. Bechert and Steven Yardley with regard to the ecological issues.  You know, it's just -- I'll just say it, it's hypocritical.  We're sitting here talking about the possibility that animals that showed up at the sale barn may have made it across the border illegally for the purposes of human consumption.  That's what this is about.  And at the same time, we're literally, we're digging holes right now in the West burying horses that are dying of dehydration, and that is a fact. And that is the ultimate frustration on the part of somebody who has that responsibility.

But having said all that, I think also this is an opportunity for the Bureau and for this board.  We're having the conversation right now.  A lot of folks in social media are talking about this, and my phone is ringing off the hook here as well. So I think we need -- and I think the Bureau has been analyzing, one, the AIP program to see where the holes are and how the opportunity for somebody to break the law occurred.  That was the same analysis that occurred during the initial adoption program.  There was the same arguments made, that when somebody adopts a horse, somebody takes title to that horse later on down the road that allows them to ship that horse to sale barn or to sell it to somebody else as their own property, and as such, opens the door for illegal sale for human consumption.  That existed before the AIP program. So there were protocols put in place by the Bureau to try to minimize that prospect that those horses would make it into a pipeline for slaughter.  That included adoption compliance inspections.  That included compliance inspections at the beginning when the horse, when they took, people took possession of the horse initially and then later on down the road the adoption compliance inspections in terms of how the animal is being cared for and whether or not the animal was eligible for titling.

I would remind everybody that in 2020 when this thing first hit the ground, we were right in the middle of a pandemic. And the compliance inspection protocols were pretty hard to follow by the book because of that extraordinary situation that we were all dealing with, and that included the AIP program.  I'm not making excuses, I'm just stating a fact that the compliance inspection scheduling was impacted by COVID-19. That means that we can take a look at how titling occurred or didn't occur, whether compliance inspections happened or didn't happen.  We can start talking about how we can close those loopholes and those holes based on that, and then to go to Dr. Bleich's comment, yes, there is a very robust inspection and investigation underway right now by Interior toward the illegal activity of those horses potentially being shipped top slaughter -- with regard to the illegal activity of those horses potentially being shipped to slaughter.  And generally Law Enforcement doesn't announce what their intent is or what their investigations involve and what they intend to do with those investigations until the investigation pretty much reaches completion, for obvious reasons.

So I would say that putting a hold on this to the point to where we're taking a look at what the holes were and whether or not we had willful violation of the law as a function of the AIP program I think is a robust and appropriate investigation to do and make at this point, and I would be in support of that, but I also believe all of us, anybody who has an interest and has a concern for horses in general need to keep our eye on the ball with regard to what is actually happening out there on the ground and the reasons for that as well.  Thank you.  I'll yield back.

Dr. Perryman: I would just say, you know, things happen in life, and to expect someone to make a commitment to a horse who has never had a horse in some cases, a commitment of, you know, 20 years to maintain that horse, I mean, we all know people that get married every day that don't make 20-year commitments to people.  And so that's a big -- I mean, that's a big pull for a lot of folks, and I don't think a lot of them really understand that, is my guess.

But things are going to happen in life, and there's going to be reasons for people to give up ownership.  And we have to expect that.  And as long as we do the best that we can to close the loopholes that when they do have to give up those ownerships, that these animals are guided and -- I hesitate to use the word protected, but I guess that's probably the most appropriate word, that their welfare is ensured for the rest of their life.  We have to make sure that those loopholes are closed so that we can maintain that, and we have to close the illegal loopholes as well if those are happening, and I don't know what they are, in either category I don't know what those are.  I think the Bureau can -- they can figure that out, and if we give them that charge, they can figure that out on their own and report back. But I do think an investigation is in order and that it would be unwise to cancel out the AIP program because there are some small glitches here and there in the program that can be fixed. I know in 2019, I think the program placed about 7100 animals.  I don't know what the number -- I thought I saw Holle' throw the numbers up yesterday, but I was distracted with something else, I think, and I want to say it was 6,000 and some odd in 2020.  And into 2021.

BLM_004085

So I mean, that is an incredible number of animals that we've put into homes, and so to just throw the baby out with the bath water doesn't make much sense to me.  So I think this can be fixed, but I think it needs to be -- it's a very public-facing issue, and so it's going to receive a lot of scrutiny of one kind or another.  But I think the program is a major success story overall, but it's a new program, you know, it's only just a few years old, so there's going to be some growing pains, that may be too mild of a it term for some of the public, there are going to be some problems with it, some glitches that are going to have to be fixed, and that's what the Bureau needs to do is identify what has happened and try and anticipate what could happen and close those loopholes and continue the Adoption Incentive Program it, and not just continue it, but try to grow.  It's done a lot of very good things for a lot of people and a lot of horses.  There have been some good relationships that have been built as a result of it, and I think that needs to continue.  So I yield back.

Ms. Pearson: Yeah, I want to pick up where Dr. Perryman left off.  I agree, the adoption program in general over the years, I think we've taught, you know, it's been 270,000 or above over the course of the adoption program itself.  But the last few years had been waning, and I think before the incentive program we were down to 2,000 possibly a year or something if I remember right, 2,500 maybe, and I totally agree that that there's a lot of people who would love to adopt a horse, you know, want to be part of the solution on the range with the overpopulation and that and don't have the money or whatever.  So I think the incentive program was extremely successful, and the majority, obviously, of people that took the incentive, took the animals, have taken good care of that, I'm pretty sure.  And I do know, and maybe this is a time for a question and maybe some clarification from our BLM partners, from what I understand, the requirements of the program itself are pretty -- they're pretty strict, and the corrals, the things that you have to have in place to adopt a horse to begin with are pretty, you know, restrictive.  So Holle', I don't know who wants to answer that.  Maybe we ought to outline just a little bit, or Dr. Jenkins, I see his hand up, maybe clarification on what those requirements are, you know, to be in that.  And I'll yield my time back.

Dr. Jenkins: Thank you for this discussion and Holle' can fill in some of the details.  I'll give you a real quick overview of the program, you've talked about some of it here, and Commissioner Pearson just mentioned since the Wild Free-roaming Horses and Burro Act of 1971, 270,000 animals have been placed into private care.  So that's a large number of animals that have come off the range and placed into private care. And then as you've mentioned, with advice from this board being the Adoption Incentive Program was launched in March of -- 20719.  The it AIP program resulted inspect 90 percent increase in adoptions, resulted in first time and private adopters.  Since March of 2019, 7,800 plus animals have been placed through the Adoption Incentive Program into private care, as Holle' just put into the chat. Over this time, only 18 animals have been repossessed because an adopter had illegally sold an untitled animal to a sale barn.  The sale barns all have notification from the BLM about wild horses and burros and the process, and we're alerted to them when will they show up in these sale barns.  We want to ensure that a properly titled animal is sold and not an improperly titled animal or an untitled animal, rather.

Holle' can give some of the details for this, but each adopter signs an adoption agreement which includes an agreement not to sell or attempt to sell an untitled adopted wild horse or burro, and it also includes an agreement that they don't intend to adopt a horse, then to sell it later that, the intention is to adopt the horse and they don't have the intention to sell it at some later point.  The animal is subject to mandatory compliance check after a horse is adopted. Gosh, I think there's been some 5,300 or more compliance checks for these animals that have gone into the Adoption Incentive Program since the beginning, so the BLM is pretty, even with the pandemic, we were working hard to figure out how to perform these compliance checks. At the end of a year period after the adoption, the horse moves from federal ownership to private ownership.  It's called the title.  And at that point Congress has decided that the Wild Horse & Burro Program horse free roaming and burro act that the animals are transferred to a private party, so they're no longer considered under the act as wild free-roaming horses and burros, and that's what Congress has decided, that's a transfer that the jurisdiction over titled animals is no longer federal jurisdiction.

So this is the sort of world that this program operates in.  At the same time, the BLM as Deputy Director Culver said yesterday is very concerned about these reports that we've got from the New York Times and from other sources about some possible abuses of this system, and we are figuring out ways to refine and improve our practices. So we are working very hard at that, and as she mentioned, she hopes in the near future we can share with you what those refinements and improvements are, but at this point, I think you've all said you assume that the BLM is working hard to figure out how to change anything that may result in animals going to potential, you know, into Mexico or Canada or elsewhere for

BLM_004086

slaughter because that's not something the BLM wants either.  We are insistent upon and interested in the care of these animals, and we're going to do what we can to ensure that, and the Adoption Incentive Program has been really pretty widely and wildly successful so far, even though there are some refinements and improvements that need to be made, and we're looking at those. Anyway, I wanted to give you just sort of that background from my perspective and then maybe Holle' can fill in some details because she knows all the details.  It thanks, everybody.

Ms. Waddell: Thanks, Dr. Jenkins, and you covered quite a bit. Paul as the Acting Off-Range Branch Chief dropped links, one of them Commissioner Pearson, the adoption requirements, so that's available on our website, it's also information that we provide at events and also on our online corral, whether it's an in-person corral or if it's an adoption or event happening in our online corral or even at our satellite events, that there's a list of what those adoptions requirements are that the Wild Horse and Burro Specialist and personnel that are administering the events, they do go over with the adopters.

And if you have attended an event or adopted previously or purchased an animal, the it Wild Horse and Burro Specialist for the most part will sit down with you or talk through this with you over the phone. There are the requirements of an actual corral and depending on where you live in your area, the shelter requirements, there's fence height requirements, there's feed and watering sources that are questions that have to be completed, and then there's also diagrams that are drawn up, right?  There's a diagram on how to get to your place because the expectation is that we would be conducting a compliance inspection, but then also a layout of what those corrals and barns look like.  And I remember being in the field as a Wild Horse and Burro Specialist, I would sit down with the adopters, and if I didn't understand, you know, what they were doing, I would tell them, you know, think about talking to, explaining to a ten-year-old, right?  If you had to explain this layout of your facility to a ten-year-old, what would that look like?  And so people would, you know, think about that, and they would add circles and squares and triangles and try and give a good idea on what that layout looked like and where the feed and water were going to be associated.

And I think what I stated yesterday may have been misinterpreted when I was talking about the feed and care guide. It's a resource for people, not that people are coming in that have no absolutely -- don't know that horses and burros need to eat, right?  I'm pretty sure that our adopters do know that. But oftentimes, we don't, you know, our adopters are not people who are in the livestock arena.  A lot of our adopters are, you know, people who maybe have a couple of acres and are interested in getting a horse and maybe don't have a lot of equine knowledge.  So it's not a requirement to have a lot of equine knowledge or even be a trainer to adopt a horse or burro.  And I don't think that was the intention of the Wild Horse and Burro program.  I think the idea was to provide what we treasure as symbols of the American West and America's animal, I guess in a sense, that we can make that available for people to have in their own backyards, you know, have this piece of heritage in their own backyards. And if that requires everyone to be a trainer based on I'm not sure of whose standard, then that would be a little challenging.  I'm not discouraging that if that's one of the considerations on the recommendations, but I don't believe that that's the intent of the Wild Horse and Burro adoption program.

I went off on this little tangent, so I kind of forgot what the other point was I was going to make.  There was another point that I was going to make.  Oh, Paul is also going to drop in a sale barn notice that Dr. Jenkins referenced, and that's a barn notice notifying not only the sale barns but also people attending, we have requested, we've done two different efforts in sending out posters to sale barns and letters to inform them that, hey, it's illegal for the sale of an untitled animal to be sold, and it goes through all of the Code of Federal Regulations, it talks about criminal penalties, and it's just a notice that says, hey, warning, just check and make sure that the animal that is being sold at the sale barn has the required documentation.  And that obviously is a title or a bill of sale. We also send examples of that title and bill of sale so that the sale barn operators know what they would look like, and if animals arrive that have freeze marks without the required documentation, it we do receive phone calls at our National Information Center or e-mails, and we identify those animals, and if those animals are titled or have been purchased, then we inform whomever it is calling the sale barn operator and if they are untitled, we immediately take appropriate action.  And that will be contacting the office of jurisdiction and then coordinating the pickup of those animals.  So I just wanted to clarify some of those points, and I'm happy to answer any questions, but before I do that, Bryant, I hope it's okay, I would like to go to Paul, Paul McGuire, if you have anything to add there.

BLM_004087

Mr. McGuire: Thanks, Holle'. No, really, I think you covered it. I think the key point is that the safeguards that are in place for the AIP are identical to the regulatory safeguards that are in place under the - what you might call the traditional adoption program, and those safeguards are pretty rigorous, an adopter has to be able to demonstrate they have the capacity to be able to care for an animal through the application process that you outlined. And something else I would note, and I think you might have touched on this, Holle', is that Specialists in the field working with adopters at adoption events, they're working in person with that person in many cases, and they get a good feel for someone that knows what they're getting into when they're adopting a wild animal. And one thing I can tell you, our personnel are not out there pushing animals on people who don't quite feel quite know what they're getting into. They want it to be a good match. The whole objective is for the animal to go to a good home, so there will be that interpersonal engagement that happens. I've seen it, I've been involved with it. We like to place horses, obviously we like to report big numbers, but that's not the be all and this program and the folks who work for it, we want to make sure the animals are going to a good home. For every staff member, I can tell you if you've ever visited an event and interacted with the BLM folks, that's what you're going to sense and come away with, I would just make that point and I'm happy to answer any other questions. It.

Ms. Carlisle: Thank you. Let me look at what I was going to say. I think there's two things here that are important to make sure that we do, and one is some sort of response from the BLM for the public. And I know that we keep hearing there's going to be more information, but it is really important that the public hear what we've heard today, and there's not a heck of a lot of people watching, at least not on my coast right now, it's still pretty early, so I want to make sure that there's some sort of effort for BLM to be able to express their concern with this, even if that's the only thing that can be announced.

And as far as investigations go and what you can and cannot say, when those burros were shot I think kind of close to your neck of the woods, Ms. McAlpine, the BLM immediately began doing a lot of outreach and publicity about how this occurrence was absolutely, you know, abhorrent and that they were investigating and rewards were offered, all kinds of stuff. There was a lot of outreach that the BLM did, which then showed their care and concern. So I'm not certain as to why there hasn't been a sort of similar response to the AIP accusations, even if, especially relative to all of the other things that are happening in the adoption program and all of the other, frankly, much more existential issues we have in front of us with climate change and how do we care for animals on those ranges and wildlife on those ranges. I just drive myself down a path that I can't remember what I was trying to say. But anyway, I'm not certain as to why there hasn't been a response at least to the magnitude that there was for the burro incidences. So the BLM needs to say something.

And then when we're looking at incentivizing adoptions, which I don't think is a bad idea, but the reason that welfare organizations, they were very cautious and concerned about $1,000 cash incentive being what the incentive was from the get-go because those welfare organizations are the ones that catch animals that are falling through the cracks. So they had some sort of background knowledge and industry knowledge in knowing the types of things that people will do to try to get away with things. So their care and concern should not have been dismissed early on in this process. They do know from experience what can happen. Again, that's not to say that this program should not be happening. It's just to say that we have welfare organizations who have been doing this a long time, that can assist with the BLM knowing what these holes might be ahead of time. But we are where we are, and I'm also wondering if the board might want to consider some suggestions along the lines of other ways of incentivizing an adoption instead of handing somebody $1,000 cash. Does that $1,000 instead turn into a voucher for veterinary care or training or all of the things that $1,000 is supposed to be used for? And I also want to say, just so that it's on the public record, that there are a lot of people in BLM thinking along those same lines as well, starting to brainstorm about other ideas. So it's not that people's concerns are going into a vacuum. It may seem that way, but there is a lot of thought going on behind this. But again, just to reiterate, a cash incentive may not be the way to go, but that I think other ways of incentivizing would be pretty remarkable and could also go towards beefing up some of the already existing programs. You know, does that $1,000 get shunted over to the TIP trainers so that a person receives a trained animal, or something. I'm not saying that's what to do, but I think we can incentivize these adoptions in a way that really does provide resources for a new owner and their animal.

Mr. Yardley: I do agree with Celeste as far as maybe considering some other incentives rather than just $1,000 and maybe vouchers for veterinary care or feed or whatever be made available, but then you have to make more bureaucracy in order to carry those out. I think that's one thing that is easier with the cash is simply they get the cash and then use it according to their own needs and there's going to be it varying needs, and having had a lot of horses and taking care of a lot of horses

BLM_004088

and trained a lot of horses and sent horses to be trained by other people, $1,000 doesn't go a long way in caring for a horse.  And Dr. Lenz, I see him shaking his head no, he knows better than anyone, being a vet, a lot of the care cost goes to those veterinarians out there as well as the other expenses.  Owning a horse is an expensive endeavor.

However, after hearing what Ms. Waddell and Dr. Jenkins had to say about what the BLM is doing and trying to do to alleviate this problem, and Paul as well, I think it would be a knee-jerk reaction on the part of the board to recommend that they stop the AIP program because of what's happened, but I do think it would be wise for the BLM to have a better statement on what they're doing and be more forward and upfront with the public about it to alleviate a lot of concerns that are out there and fight false with fact. And unfortunately, a lot of times these knee-jerk reactions that occur because of something that a journalist wrote in a newspaper said that aren't solely based on fact or are very -- take a one-side approach to a situation, it can have drastic unwanted consequences of its own when a knee-jerk reaction occurs, and haste makes waste.  So I for one won't vote in favor of shutting down the program, but I am open for other ideas.  Thank you.

Dr. Lenz: All right.  I think, I mean a voucher program would work, that would be great.  But you know, the devil is in the details.  We know that half the people in the country don't use a veterinarian at all except for emergencies, so maybe it would stimulate people to use veterinarians, I don't know, but I doubt it, knowing human nature. For a trainer, $1,000 would go about a month or maybe a month and a half for a good trainer.  So that's not going on get too far.  And I suspect a deal could be worked out with Purina or Nutrena or one of the major feed companies to provide feed through a voucher, but I think a lot of research would have to be made into how a voucher would work and where it would work and where it would be effective. So we know that BLM is investigating this.  They've put almost 8,000 horses into homes.  I think the program should continue while the investigation takes place and then if someone can come up with a good idea with a voucher versus cash, if they can come up to a way that this doesn't happen again, then the program could be adjusted at that time.  But I agree with Steve, I don't see any reason to pause or stop this program in the short term.

Dr. Bleich: We're dealing with people that have broken the law.  The activity that was described in the newspaper article clearly is inappropriate, but more importantly, it's illegal.  There will always be individuals that will try to exploit anything that they can make a dollar at. It's illegal to murder people.  Look at Chicago last weekend.  I broke the speed limit driving the 25 miles up to this facility today to participate in this meeting.  I got away with it.  People in Chicago got away with what they perpetrated this weekend too, or at least are trying on get away with it.  Folks will continually try to exploit any way of taking advantage of existing regulations or laws, regardless of what the Bureau is able to do in terms of the AIP, and I think it's a fact of life.  There are bad people out there that we aren't going to be able to take corrective action for or prevent anything like this from happening in the future, no matter what the Bureau does in terms of regulatory actions or whatever legislation might be passed.  Just a comment, and maybe it was more appropriate to say that for a little bit later in this discussion, but I think it's an important fact, an important point that we all need to recognize.  We aren't going to eliminate illegal activity as long as there are people willing to break the law.

Ms. McAlpine: The only thing that they didn't talk about and I think we can do it at a later date is a lot of discussion came up yesterday about helicopter roundups and birth control, and I just want to make people aware, because I don't think we have the time for the discussion right now, that right now, darting birth control is not always possible and always an option with some of these herds, so that people need to understand that accommodations need to be made that this board fully supports and BLM is being encouraged to administer birth control as often as possible, but they also need to be able to use all of the tools currently available.

So with that, let's go to our draft recommendations. So the first one that we came up with in the humane handling group, and let me jump away from that for a second because one of the big discussions we had was that we would like to see the name of that working group changed, and I think the preference was for humane -- I have to find it again. Ursula, can you help me?

Ms. Carlisle: I'll look for it while you guide us through the rest of things.

Dr. Bechert: There?  Humane Handling Group?

BLM_004089

Ms. McAlpine: Yes, but we had a name that we wanted to propose for that.  It was something with communication.  It was humane –

Dr. Bechert: Comprehensive.  We add - we added to vote on adding comprehensive to the title.

Ms. McAlpine: Well, anyhow, the other thing we talked about is that Advisory Board members should be included in and educated about gathers, veterinary treatment, holding, transportation, training, and all aspects of the care and management of BLM horses and burros so that everybody who serves on the board comes from at least a baseline with regard to many of the issues that the public does bring up. So whether we use that as a recommendation or we simply state that to staff at BLM is a decision that the rest of my colleagues need to make, whether they think that should stand as a recommendation or just be something that we forwarded in communication.

Ms. Carlisle: I think because in the organizational structure group the infrastructure group that is meeting later in the day, I'm wondering if this -- we're sort of looking at a more holistic approach for involving the board generally with BLM business so that we're really tied in and understanding deeply what's going on so that our recommendations can be a lot tighter.  And this could be part of that.  So we could just kick it over to that other place and move on, because I think number 2 is going to require quite a bit of discussion.

Ms. McAlpine: So if there's no objection, that's what we'll do, other than Bryant said there was another hand.

Mr. Yardley: I just wanted to touch in on this really quick. Before all this COVID and everything happened, and earlier on in other boards and my first term as a board member, we would always have field trips prior to the meetings and go around and see some of the things that were happening on the range, in the veterinarian facilities. I for one found it very educational and informative and helpful to attend those, and I would just like to see the BLM, you know, with the COVID pandemic kind of coming to an end, reinstate those and have those field trips in conjunction with these meetings.

Ms. McAlpine: And that is part of what is indicated in our board charter also, that in order to be making these recommendations, we need to have eyes-on experience.  So thanks, Steven.  So for the second one, which we had actually started way before the discussion yesterday, is that we believe a comprehensive and standardized gather preparation and evaluation protocol should be developed by BLM, should include the public in its development and any reports or critical incident reviews made available to the public.  The process would include but not be limited to what is normal behavior for horses or burros, what happens during a gather, what the end result could be or should be, and then a post-gather debriefing and review.  Something similar to a critical incident stress debriefing for all involved including staff, contractors, board members or public that are there should a critical incident occur.  And obviously we're defining broken legs, miscarriages, anything like that as a critical incident, an individual is injured during the gather.  And this debriefing should be based on incident response to briefings, common in emergency response, wildfire, floods, and involving first responders, community response teams, counties, cities, and federal agencies, and it's not to be punitive but aimed to continually improve and update gathers and horse and burro handling throughout the BLM Wild Horse and Burro program.  It the CAWP coordinator, program chiefs, BLM staff as appropriate and appropriate board members and/or a highly experienced facilitator/emergency response Specialist should design this protocol.  Comments.

Ms. Carlisle: I know this is a lot of sort of bureaucracy speak that's thrown up here, but what we were trying to do, and all of this obviously once again, these are sort of just to get us going, they may be nowhere near final, but what we're aiming at is that the public's perceptions of gathers is that they are brutal, and they can be.  When you run big animals, it's, you know, they're big animals running.  I don't know what more you can say about that.  There can be chaos for sure.  And they're extremely stressful on the public to witness these gathers. And the gathers have a protocol in place, and I would say when that protocol is followed 100 percent, they have a pretty good system, but there are things that happen, and the public feels no recourse.  They see an incident, they report it, nothing more.

If we indeed want to say that the Comprehensive Animal Welfare Protocol in general is something that is continually improved and refined, because we learn things continually, and we learn things, you know, from the contractors doing this, from the public that's there, from people who have worked often with big animals on the range, and we also adapt

BLM_004090

and change as we learn better approaches, there's people that are starting to look at actually getting ways for horses to follow into a trap as opposed to pushing them into a trap.  So I'm saying these are available now and can be used everywhere, but these are things that need to be used as part of the conversation about how we gather horses, and I think the public also feels as if when there is an incident and they report it and nothing happens, these contractors that are doing this work, there's no consequence of any kind.

If the animals are never supposed to be run above a trot but they are galloped for several miles and you only have a handful of contractors to choose from, what do you do?  And we need to figure out how to do it better.  Again, these are highly qualified folks that are involved in these gathers, and I know this work is hard.  I've worked with large groups of wild horses in chutes and alleyways, it and it is an art as well as a science and we've got to have oversight over that in which the public can feel involved and that their voices are heard and valued when they notice that something is amiss. We can't just back into our corners and say, well, we're really good at this and we've been doing it a long time.  We should be saying, you know, okay, how do we adapt this situation?  And again I will throw the caveat out that I'm not saying that the BLM doesn't do things well, but I'm saying especially with high-intensity events with the potential for incredibly brutal things to happen, we've got to be better always.  We should always be refining things.  We should always be demanding that anyone along the chain handling these horses, whether it's in a gather or through processing and through transportation and all the rest, that standard has to be incredibly high, and I think it is, but it can be higher if we are continually refining our practices.  So that's what this is meant to do is set up a protocol for this, whether it's meaningful public involvement through this process, and I don't think the BLM is capable of all of that.  I mean, this requires a different skill set in terms of how you work with stakeholders and how you have these sort of critical incident stress debriefings which are heavily utilized in the emergency services sort of realm, and I think could be applicable to this as well. So that's where this all came from.

Mr. Yardley: I just wanted to ask a question to the BLM officers to respond to this, what is, I guess, essentially the gather, transportation, and evaluation protocol they have.  I know you're making this robust, but I know there's already a pretty stringent protocol that is in place and when followed properly has worked pretty good. But if there is a comment on that from the BLM I would sure like to know.

Ms. McAlpine: I need to jump in on this because I want everybody to understand that the intent of this was that this protocol and preparation would be for anybody who is observing the gather, to start with, and then any of the critical incident stress debriefing is for all of the individuals mentioned in the event of a critical incident.

Mr. Yardley: And I would just like to know from the BLM kind of what their stance is with that, kind of a baseline of where we're at with the BLM to kind of know where we need to go if we need to change some things.

Mr. Fleur: Yeah, I can go ahead and address this.  I think Holle' had to take a break real quick.  So yes, typically there's an operations and communication plan that is put together for each upcoming gather.  Those are up to the incident command team and the contract office or representative to put those plans it place.  And then on gather operations, there's daily reports, gather reports followed up with daily phoning meetings and discussions at the end of every day so those notable incidents are documented and we're constantly trying to fine-tune and make sure that the operations and the communication plans are followed.  So hopefully that addresses your question, Mr. Yardley.

Ms. Pearson: So that will clarify that this is specific to a gather and on the ground for those kinds of incidents, I know we keep coming back to the drought, but maybe that's because I can only see number two, I'm just wondering if we do those same, if we have those same kind of reporting on the death losses and those kinds of incidents due to the drought and that kind of stuff, because, you know, this is during the gather itself, I've been on several gathers and kind of like Celeste said, you've got large animals moving, there's a lot of that kind of stuff going on, and I've been at several that there's never been any kind of incident, not critical or otherwise, and, you know, these guys take their time, they do a lot of good things, and regardless of what kind of management we're looking at, there's always going to be gathers involved in that. So I'm just wondering if part of our humane treatment, are we also, as part of the -- and maybe I'm jumping the gun on this, is there also an assessment and a comprehensive standard reporting on drought incidents or whatever else we want to call it? I don't know who should answer that? I'm just wondering if that's something that was discussed during the humane group or

BLM_004091

if BLM already has some sort of answer to that because I don't get that kind of information in any way, shape, or form, in the kind of side conversations.  I'm just wondering if there's reporting on that.

Mr. Fleur: I'm not completely clear on your question, Commissioner.  You're kind of breaking up a little bit.

Ms. Pearson: I don't have the best service out in Timbuktu, Utah.  I guess what a lot of my questions, and we've been doing this -- talking over the years talking to range cons and whatever is, there is also reporting going on due to drought mortalities and stuff due to drought conditions and that sort of stuff, if we're talking about humane -- it's not really that you guys handle that one way or the other, but is there going to be reporting on that kind of stuff looking at the drought that's coming up?  Is there going to be that kind of reporting on death loss or anything?

Mr. Fleur: Okay.  Good question.  We have monthly State Lead calls and state leads in the various states bring to our attention through various meetings what's occurring in their respective states, maybe in their offices.  And as conditions escalate, we're having dialogue all the time about what's happening, you know, for instance using the drought monitor, keeping the lines of discussion open and discussing those matters, sometimes an alert comes up maybe giving you a heads-up that water conditions, you know, stock water availability is limited and just of those incidents, and part of that could be mortality as well.  You know, we're starting to notice situations out on the ground.  So that tends to be how we handle that.  If that helps answer your question?

D. Lenz: Let me provide some clarification.  This number two is primarily aimed at observers at gathers, and what we've learned, the domestic horse side s that when people are observing some type of activity with horses, we've learned it in the Triple Crown races, in rodeo, and a lot of other arenas, when they're observing something and they don't know a lot about horses and they don't know what's going to happen, when something catastrophic happens like a horse breaks its leg during a televised event, if there's a veterinarian or an expert on hand that can prepare them to say, look, this is what horses can do, this is what nature made them able to do, sometimes this happens, when this happens, this is what's going on happen, this horse is going to be examined by a veterinarian or whatever, in the case of these horses here, Dr. Kane or somebody is going to evaluate the horse, and this is what's probably going on happen, the horse is going to be euthanized or the horse is going to be treated or something, and when you do that, it alleviates a lot of concern and allows them to rely on somebody that knows something about horses.

We do the same thing when we euthanize a horse.  When we euthanize a horse, they don't lie down on the ground and go to sleep.  They crash to the ground, and they often nicker or there will be some movement or there will be some apparent breathing, but the horse is already unconscious before it leaves its feet.  So if you explain that to people, then they're okay. But if you just walk up there and euthanize a horse and it falls down and things start happening, then get really excited because they don't -- then they got really excited because they don't know.

So what we're recommending here is that someone from BLM be at the gather and gather up all the people that are observers and say, look, here is how horses are designed.  Horses are designed, they have a much larger heart and a much larger lung field than other animals their size.  They're designed to run.  And they can run a long ways, especially at a trot, and that's okay.  That's how nature made them.  It's not as stressful as it might appear to some people that don't know anything. Then when something bad happens, okay, this is what happened, this is why it happened, this is what we've tried to do to prevent it, unfortunately this happens, and then this is what we're going to do about it.  And I think so the recommendation is that in the debriefing, it's not only to internal BLM people, here is what went right and here is what went wrong and here is what we're going to change, it's also for the public because if they don't understand horses, and most of them don't, they jump to their own conclusion, which is often wrong.  And so that's what this recommendation is all about.

Dr. Bechert: That was perfect.  That was actually the point I was going to make and that's actually why we changed the name of our group to the Humane Treatment and Communication Work Group, and I remember now in our conversation Dr. Lenz had shared that, and we all thought that he would be good serving in this role. (laughter).  And I think it's especially important now as the drought is happening, horses' health might be compromised, so having somebody explain that and maybe even appears Scott was just talking about the death loss on the range, there's ways to share that

information to inform the public, because I think a lot of the misinformation that's out there comes from a lack of information, so then people make things up. So I think that was the crux of this recommendation was I wouldn't put the word protocol in there because that sounds more like what is already in existence, but it's actually somebody serving as a PR person to translate this kind of information.

Mr. French: Thank you. Pretty much Dr. Lenz and Dr. Bechert pretty much robbed most of the thunder out of my comments, but there were a couple of things remaining on here that I thought might be interesting to add to this discussion. First off, I support the recommendation. I think it's an important step forward, but I do recognize from a historical perspective, having been on numerous gathers in my career, that some of the observers that show up to these gathers are there for one reason, and that is to hinder the gather. They have no interest in learning what is happening or why it's happening or what we're doing to prevent it. They have one mix to be there, and that is to keep the gather from being successful. I just want to state that for the record.

Also, I think it's important for us to recognize that all gathers aren't created equal. It even helicopter gathers or horseback gathers or gathers which are a result of food trapping or water trapping. All of them can be violent. All of them can have unintended consequences. I've watched horses injured in horseback gathers on the Sheldon Refuge. I've observed -- obviously injuries occur with regard to helicopter gathers, but you have to remember, and I think it's important for us to consider that the reason helicopter gathers are the preferred method is because we've gotten to the point to where we're not gathering a small number of animals over AML. We're gathering four and five times over AML, which is requiring us to gather huge numbers of horses in a small or short period of time. In the worst case scenarios, we're gathering horses under emergency circumstances, as we are this year. The animals are in poor condition coming off winter range or trying to make a living with regard to limited water and forage, they're weak, they're in trouble to start with, and moving those animals at all is a risky operation. That's important to note. But we wouldn't be there, we wouldn't be making those decisions to gather those large numbers of animals if it wasn't for the notion that we were doing it for the best interests of the horses themselves and the range. So I would just say, and I'm somewhere in the verbiage I think for the folks that have problems with helicopter gathers is that the alternative to those helicopter gathers or lack thereof is not very pretty either. So with that, I'm just going to yield back. Thank you.

Dr. Bleich: I appreciate Ursula's comments, Tom's comments, and Jim's comments. I have been involved over the years in the capture of several thousand big animals, as described by Celeste, and I really do appreciate her reference to the fact that, yeah, things can go wrong when you're catching large animals. Overall, we've learned. And I've been involved in this capture business for a long time. We've progressed from chemical immobilization to corral trapping to the use of drive nets to the use of helicopter net guns, and those methods have been, the efficacy and safety records of those different methods have been developed or have been analyzed and compiled. We anticipate roughly a 4 percent problem rate, if using the helicopter net gun, and that has proven to be the safest method available to us right now for mountain sheep and mule deer, which is the majority of my capture experience, although we have also net-gunned donkeys successfully.

 I'm curious or I would suggest that as part of the public preparation for preparing folks for what they might see during a gather or what things can go wrong, that that be explained very carefully, and that the morbidity and mortality rate just be right upfront. You know, we can anticipate that there will be -- there's a great potential for a problem, maybe it's 4 percent, maybe it's 10 percent, maybe it's 1 percent based on the thousands of animals that have been handled, and they need to understand that right upfront. It's not like we're trying to information. It is just reality, things are going to go wrong. Nobody wants it to go wrong, but it does go wrong. And I think it's also important to note that in the case that I just described, overall 4 percent problem rate, we might do 1,000 animals in a row and kill the next 40, and that looks really, really, really bad, but things do go wrong. It still equals 4 percent over the long term, but stuff can go wrong, and we need to be -- and I think that being upfront about that and explaining that is also very important.

And then the final point that I would like to make is that those who are objecting to the use of aircraft to remove these horses are doing so right now because, well, that's in vogue. We can argue that this is a horrible experience for these animals to go through, and it probably is, it's pretty scary, I can assure that. But they are the same folks that are going to be objecting to the use of water traps to remove donkeys in the desert or the use of chemical immobilization if that's an appropriate technique in a small area, they are opposed to the removal of horses for any reason, helicopters right now are

BLM_004093

just in vogue in terms of being a very unpopular way of doing it and it gets a lot of attention.  End of statement.  Thank you.

Ms. Carlisle: Yeah, a few things.  I want to clarify that just because I sit here and say, you know, stuff happens and bad stuff happens sometimes doesn't mean that I don't think that we should be trying to change that.  And this is what this is trying to get at, this particular recommendation is sort of twofold.  It's to help the BLM to develop -- protocol might not be the right word, but a process that meaningfully involves the public in the actual when there's an actual operation.  I'm not saying when you can go to one of the hearings online and make comments with it.  I'm talking about being a part of the back and forth that can happen to refine our techniques, and maybe it's an inappropriate back and forth.  Maybe it is someone who is, you know, going to misrepresent what happened, but maybe it's not.  I've heard of a few incidences where there have been some really bad situations between the public that comes to a gather and some of the personnel surrounding the gather, of all different kinds.  I'm not blaming BLM, but there has to be a method for handling that, where the public can feel safe in reporting those incidences and is like they're part of the response.  So again, it's not to get someone who may not understand the entire process and the entire complexity of the entire Wild Horse & Burro Program, but there are folks that can help to refine these processes and can help to refine the interrelationships that need to develop and the trust that needs to be built up around this agency that is entrusted with so much care of our public lands.  And we need to have a better relationship with the public in regards to the things that happen out there that look chaotic.  So I just wanted to clarify that.

And then I also want to make sure that we're, when we're talking about things like, well, people don't really know, and if we're there to explain it, I know it is not the intention of anyone on this board to say that divisively at all.  What we're meaning is that there can -- this is how we can have really meaningful dialogue, if we have some people, and I know that BLM has communications people that are at these gathers.  We're talking about something different.  We certainly don't want to be perceived as sort of whitewashing something that is only going to need to increase, unfortunately, and again, I need to clarify, this doesn't mean that anybody it or I am excited about this or wants this, yahoo, let's go around and chase horses with helicopters, but we have limited options, and these options over and over again, me sitting here and being a realist, I don't really want this to happen, I don't like horses being shoved around, I don't like them being separated from their family bands, I don't really have control over that, but I can maybe have some assistance in the process to make sure that it is done with a high degree of humane consideration, as high as we can do and to continue to improve that as much as we can because of the situation that we are in it.

And again, I don't like it, but I don't see another way to handle it right now.  So I just wanted to clarify, and this is another reason I'm really excited that Jerrie Bertola is sitting in the Comprehensive Animal Welfare Protocol position because these are the types of things that we can make a general recommendation towards and then can assist Ms. Bertola in figuring out how to make these things work and how to work well and again I'll say it again for the 100th time, meaningful involvement from the public is different than public involvement.  We have to do better in that regard as well, and saying that we have to do better doesn't mean that we're all horrible at it and we've done a terrible job.  It means that we're learning that there are different ways that we need to be doing these things, human dimensions and Natural Resource management is now becoming part of how we look at things.  This is incredibly exciting because we've got to understand where different stakeholders are coming from, why they care about the matters that they do, and then we have to actually, this is the hard part, Dr. Perryman will appreciate this because he reminds me of this, we have to listen to each other. And listening to each other actually means attempting to step into their shoes as much as we can because the vitriolic diatribe that goes on and I think goes on pretty hot and heavy at a gather and around a gather, we've got to pull back from that if we actually want change to happen I'll step off my soapbox.  We need to be nicer, we understood to do better.

Ms. McAlpine: Okay.  What I want to do is jump right into this number 2 because I'm looking at the draft recommendations, and somewhere in the wordsmithing process, I think the context of the recommendation has changed. We originally had it as a comprehensive and standardized gather preparation and evaluation process should be developed by BLM and made available to the public, not should involve the public in its development.  We don't need the public developing this kind of guide for BLM staff.  And I think that is what led to some of the confusion.  It started to think -- it started to look like we were asking BLM to develop something for BLM it.  We're not.  We're asking BLM, as we've repeated, something for the public, you know, a guidebook, an experience, a discussion, a lesson plan, anything that you

BLM_004094

want to call it, and it's our attempt at education so that people understand, as in education, you tell them what you're going to tell them, you tell them, and then you tell them what you told them, and this is basically the same thing, what's normal behavior, what's going to happen, what happens during a routine gather, what the end result could be and then the post gather review and debriefing also helps dispel some of this information that Celeste is talking about and other members of the board that happens with individuals it whose intent is not the best intent of the horses and/or the gather.  I haven't come up with any wordsmithing, but I did cut out a whole lot of words.  This debriefing should be based on incident response debriefings common in emergency response.

And I would just end it there.  I mean, if you don't know it an emergency responder is fire, police, community response team, city, county, federal, county agencies, we don't need it, and also take out and is not punitive, so you would take out anything after emergency response and then with the aim to continually educate the public and improve and update gathers in horse and burro handling throughout, and that all can stay.  So that's where I am with this, and I didn't know, I thought the discussion of morbidity and mortality rate is a good piece to put in there.  So maybe we should make that E and a critical stress debriefing F.

Ms. Carlisle: I think this recommendation does cover both sides of the story, where we are asking for this educational piece for the public in the first part of our recommendation, but we are asking for a BLM -- it's not a policy, I don't know what to call it - it is asking for a new BLM process.  I don't know what's the right word in terms of what that breaks down for BLM.  So I'm trying to add more bureaucratic layers, but I hear repeatedly that there is an official sort of check-in that occurs after these gathers, but that is not transparent to the public. And with these critical incident stress debriefing that is sort of a model for this, that does it involve all involved, obviously driven by the agencies controlling the action, but if they involve communities. Our community is involved in a huge response to wildfire preparation and loss in this area that has involved, you know, the first responders who are supposed to do a debriefing, and then it kicks off to the county, and then the county invites in the community to be involved in that debriefing, but it is very structured.  It's not just phone calls back and forth to each other.

There needs to be an additional level here, and I'm sorry I don't have better words for that.  And maybe we make the recommendation if it's still a little confusing, to sort of begin, and we can work with Ms. Bertola on this, to begin utilizing some of these types of debriefings that are already put into place for emergency first response and incidences and beginning to research how that might apply to the Wild Horse and Burro CAWP program.  So maybe we're instead of throwing out this big recommendation that sounds like oh, my gosh, we have to have so much ready by the next Advisory Board meeting, we're saying we're going to begin moving in that direction and the first step is sort of figuring out how we very clearly state what the objectives of a critical incident stress debriefing would be and what the outcome is that we're looking for. So maybe we sort of step it back a piece so that doesn't seem like we're throwing out this like BLM please have this ready in a month, because that's not possible.

Ms. McAlpine: Yes, and I'm shaking my head, as I'm getting some corrections submitted, and I'm shaking my head at the words.  Asking for a new public facing BLM process.  How might existing BLM debriefing processes apply to the Wild Horse and Burro program?  That's not what we're going for exactly.  I mean, we're going for, you know, in my life, I would call it an outline, a lesson plan, a standard procedure, anything like that, but we're asking BLM to put something together, as I think Tom said earlier, which actually educates the public and prepares them for what they're going to see and experience, and that should we have an incident or should we have individuals who have tried to disrupt that, to actually debrief people to let them know what happened, what the actions will be.  Do I see Tom's hand?  Is it just up, or is it waving?  So that's what we're getting at.  So I think a lot of the words could go away, as we just took them away, I see typing going back on my right-hand side.  It. So let's go forward to any further discussion about it, whether or not the board wants us to continue wordsmithing, or if we've missed a piece and we got a little bit longer break.

Dr. Lenz: There we go.  I think we're putting too much verbiage here and we're expanding this beyond what the intent was.  I would, after D, delta, I would cut the rest of that and get rid of it because what you're looking for is preparation evaluation process, someone there to tell them what's going to happen, what horses it, their physiology, anatomy and so forth, allows them to do, what we expect to happen, then when something happens, we want to be able to address it immediately there and then a post-gather debriefing, okay, here is what happened, here is why we think it happened, here is what's going to take place.  If someone is worried about a foal being separated, at least the gathers I've been to, a

BLM_004095

cowboy is going to go out and find that foal, he knows where he is and we're going to bring him in here, he's not left out. So the rest of that, morbidity, stress debriefing, all of that, in my opinion, ought to be cut off of that and make this pretty straightforward and simple.

Dr. Bechert: I agree with Dr. Lenz' comment to shorten it, and listening to the conversations that we just had, it seems to me that there are three action items really that have percolated to the top.  One is some kind of written document, and that would be the comprehensive standardized gather preparation and evaluation process, maybe something that works for the public that explains these are the ways that gathers are conducted, but not get every gather is the same.  So having that live person there to be public facing and talking to people who are observing the gather to address the unique features and what is going on and do a debriefing and a review, that is another component, and then the third component is addressing what Celeste had brought up, and that's a way to engage the public in the process of continually improving this.  And maybe that could be something that is available online to just the people that were there because otherwise it could be abused, whereby they provide comments and feedback maybe after some reflection, and have it be positive, you know, recommendations actually.  That might be a way to engage the public in that process.  So those are the three things, written live and online feedback.

Mr. Yardley: The only thing I was going to say is in order to add a little bit of clarity for the BLM in this recommendation, on the second line down in the wordsmithing, so I'll just read, a comprehensive incentivized gather, preparation, evaluation process should be developed by the BLM and be made available to the public, right after available, put:  To educate, comma, prepare, comma, and inform the public, just include that in it so that it kind of helps BLM to kind of see what we're after with the recommendation.  And that's all.  Thank you.

Ms. Carlisle: I do know that the BLM does have on site a PR person at every -- or communications person, sorry, at every gather, and so we're not saying that that's not happening, that, you know, no one is standing there minding the store, so to speak, and it's not like we can keep making recommendation that is are like oh, BLM just hire in this person to come and do that, because we don't have limitless budget here either.  But that communications person, you know, are they provided with the proper training to facilitate something like this?  I mean, I'm sure Mr. Kuechle can tell us about how this is incredibly specialized.  We're asking, you know, someone to leave their office and then go wade into what essentially can be a very tense situation, and they need to have the training necessary for dealing with things like conflict management and validating, really validating concerns that people have, and then they need to come with the proper support behind them to be able to follow up on things when and if necessary.  So again, just to say that BLM does have somebody there, that does talk to people, they don't just have it happen and nothing is going on, but what I would like to think we are looking for is support towards that with the proper training and conditioning that's necessary for that because that is incredibly specialized.

And the other thing I wanted to stay is that we could just break this into two recommendations so that part F basically is a separate recommendation and we back it off like I was talking about before to just be sort of step 1 of investigating this road in looking into the potential of utilizing critical incident stress debriefing as a template for developing a more robust response process.

And my third and final thing is that could also, we could also utilize that F as a separate recommendation that just sort of gets the humane working group beginning to sort of come up alongside Ms. Bertola, which I know Ms. McAlpine you're already involved in that, but this could sort of help to solidify that, and we can then begin defining what a critical incident is.  And I don't think we're going to have time to get into that today, but that could be part of a recommendation.

Ms. Pearson: Okay.  So just for not necessarily clarification, but the gathers and everything that I've been on, I know this is done.  They have a person there if not more than one that are there to explain what's going on and, you know, answer any questions and that, and I know that's standard procedure in all gathers, specifically Utah, but the people that I know that are tied into this, and kind of like what I think it was Jim that said a lot of people that are there to view the gathers are there to either interrupt or, you know, cause some grief, or they're there to cherry pick photo shots. But I know that the BLM have people on hand at every gather to do the interpretation, do the education, do the explanation.  So I think they are doing this part.

BLM_004096

Dr. Lenz: All right.  Now, this is aimed at being proactive rather than reactive.  So rather than standing there and answering questions, this is aimed at that person taking the lead and starting to discuss how horses it are made, you know, what physiology and anatomy, why they can do certain things and then here is what's going on and then here is what happened.  I've been on several gathers, and there's somebody standing there that I can ask questions, but I think you have to be proactive. We've learned in horse racing and professional rodeo and a lot of other it venues that a lot of people won't ask the question.  They'll just come to a conclusion that's wrong, and so you have to proactively start the conversation and provide information along the way and then they can ask questions if they would like.

[BREAK]

## Public Comment Session (2)

### Conny Ahrend

Good morning.  Thank you for the opportunity provide my public comment.  I am Conny Ahrend, spelled C-O-N-N-Y A-H-R-E-N-D.  I'm speaking on behalf of the Wind Catcher Sanctuary, a privately owned Mustang sanctuary in the southern USA.  All I hear is a management plan for wild horses and burros but nothing about a management plan for livestock.  How come?  Talking about management.  No business leader would follow BLM's grazing policies, the grazing program is a big loss for the public lands and the American taxpayers.  According to a study of the center of biological diversity, it costs about half a billion dollars per year to maintain the livestock grazing program and the revenue of the grazing fee is a tiny fraction compared to that amount.  If a business is running a brand with such a deficit it would immediately be cancelled so this is an absolute financial disaster for the American taxpayer, and by the way, it is distortion of competition when ranchers in the West get to use public lands for grazing while the ranchers in the other states have to buy or lease and use their own property.  It would be more efficient to remove the cattle and leave the horses on the range and invest the approximately 60 million which BLM spends for long-term holding in re-seeding areas, putting the horses back out on the range and buying back water rights from the ranchers.  With no cattle out there the lands could recover from the destruction the livestock has caused.  If BLM doubts this would work, I suggest to try this out on all HMAs and ask ecologists to accompany these trials with scientific methods.  To my knowledge, the BLM still doesn't apply more than modern scientific methods to do proper counting of herd populations.  I mentioned last September that there are applicable solutions, for example the one developed by the federal Institute of Technology in Switzerland which is successfully used in a wildlife conservation program, so as long as there are no valid numbers, roundups have to be stopped immediately, especially helicopter roundups.  These are not in compliance with animal welfare.  Without such numbers, management plans for horses are useful and presumably unnecessary.  I suggest to stop the AIP and keep the horses and burros federally protected even after titles have been issued.  Some people mentioned that climate change and drought.  First of all, cattle are a big contributor to climate change, and second, there is this wild horse herd that -- to the media.  The ancestors of these horses have been set free over 100 years ago, these horses adapted and survived until today in the desert.  Last but not least, positions on the board, with all respect, should be filled only with people who have no personal conflict of interest.  Thank you.

### Linda Greaves

I'm Linda Greaves, and I work with preserving American wildlife and help organizing, I'm a citizen stakeholder though and that's where I'm speaking from today.  I want to touch on great points from yesterday and feel many facts have been covered today.  We need listen to new science and based on it, we can keep learning more. No changes are being made. We now know horses evolve and are keystone species, so reintroduce species at a minimum if they were all gone at one point, Native Americans dispute this fact.  Horses help repair the range and are being used around the world to regenerate land.  We need to look at locations where we could add land for wild horses.  BLM has removed half the original land that was dedicated for the horses.  Horses can be relocated from holding or when needed from the range where they can live free or help in countless ways, there needs to be a freeze on all roundups until there are management plans for each HMA, HMAs vary greatly and will need to be addressed as such.  AMLs also.  If we all heard early on that you cool your horse down, you never run them and put them up and you don't use them in extreme temperatures, doing so can cause organ damage, colic, and death.  So the deaths we see on roundup day are the tip of the iceberg.  Old and young are run to death. I would love to see a report on those left to die.  I want an audit on all horses in holding, horses being paid to be kept in holding are being sold, livestock needs to be removed from public lands unless carrying capacity to allow them with wild horses being the primary consideration as written in the law.  Livestock needs to be subsidized off-range if needed instead of horses being rounded up and Warehoused and predators being killed.  We are in environmental crisis and need to

BLM_004097

address this now, livestock and special interests are destroying these ecosystems from the top to the bottom. Recommendations I want are, plans to repair and improve management areas. Old fencing and garbage to be removed. All gates to be left open when cattle are not on there. Trespass livestock needs to be addressed and owners need to lose all rights to permits. Water projects need to be put in. We are in a crisis. There isn't an end in sight. These impacts are -- these impacts affect every animal out there. Instead of spending millions to roundups, let's spend some money ask get ahead of this issue and put some wells in and find other solutions to this crisis. BLM has done some big water projects for game animals, we can do the same for our horses. The board is supposed to be made up of a diverse stakeholders but everyone there is working from special interests. So we the people want wildlife experts, environmentalists and pro wild horse people appointed this next go round. Thank you for those listening.

**Tim McGaffic**
Hi. I'm Tim McGaffic and I've been a ranch manager and consultant for over 30 years. Currently I'm a volunteer consultant for the National Mustang Association in Mesa Verde National Park. In that time I've seen many approaches to management both good and bad. The best were and all are based on biological health, measured on total carrying capacity analysis, essentially productivity as stated in BLM's mission. This approach has sadly been missing from the BLM's approach to management. Understanding from a scientific, measured and data-producing methodology what the land will support is instrumental to knowing what actions will be taken on to enhance, to preserve the ecosystems under management, a stated mission of the BLM. The process that the BLM has used to produce accepted management levels for horses and burros and AUM's for livestock is not backed by an accepted scientific process that involves the calculation of total carrying capacity for a designated area. This is backed by the National Resource Council's publication using science to improve BLM Wild Horse & Burro Program. Current proposals by many groups do not consider what the actual carrying capacity is and assume that AML and AUM numbers are accurate or even based on current data that has been analyzed and managed and developed a management plan from that data. This is not the case. The following is -- is the listed mission statement of the BLM. BLM is to sustain the health, diversity, and productivity of public lands, for the use and enjoyment of present and future generations. The stated mission of the BLM is not being met. Health diversity and productivity are essentially the components of carrying capacity. Productivity, the ability of the ecosystem to produce forage, water, shelter, can be measured by total carrying capacity analysis. The BLM, Forest Service, and National Parks all have the personnel and ability to do this analysis in detail as other successful managers have. But to do that, it will take a management structure that coordinates wildlife, predator control, range analysis, horse management, livestock allocations, and water under one authority. The holistic approach would be able to ground any proposals from advocacy groups and the solid data that could be used to determine what process moving forward would be and how to achieve the mission of sustaining health, diversity, productivity of public lands for the use and enjoyment of our present and future generations. Thank you.

**Lynda Larsen**
Hello, and thank you for this opportunity. I'm from the National Mustang Association in Colorado. The following is adapted from our recent letter to Secretary Debra Haaland. Clearly our public land is drastically deteriorating in biological health and the future of our public lands is seriously in jeopardy as a result of overuse and mismanagement, now compounded by climate change. This is contrary to the mission of BLM to preserve our public lands for present and future generations. This administration needs to address the issue in new and innovative ways. Most of the blame for range degradation seems to be directed at wild horses and burros focusing on controlling populations and achieving the AML established in 1972 after passage of the Wild and Free-Roaming Horse and Burro Act. Achieving AMLs for wild horses and burros is always cited as the baseline goal. According to the report of the National Academy of Science, however, BLMs unscientific AMLs are not transparent to stakeholders, are not supported by scientific information and are not amenable to adaptation with new information and environmental and social change. Wild horses and burros live on roughly 17 percent of all public lands while livestock grazing is permitted on almost 90 percent of public land. Horses alone thus cannot account for the extent of range degradation and no amount of wild horse removals will restore degraded public lands. We maintain that a comprehensive range analysis is required on all public lands to determine the realistic carrying capacity based on actual scientific research and data. The many passionate arguments for what should be there, how many and in what priority are secondary to understanding what the land will support from solid scientific data. BLM and government agencies already have the resources and capabilities to conduct this research, but it will not happen without a universal mandate from top administration. Appropriate criteria for data gathering, research and application of scientific principles will enable the administration to determine the actual numbers of wildlife, wild horses and burros and livestock each area of public land is capable of supporting. Such a program could also produce southbound scientific data

that would support the government in legal actions that might be raised by various dissatisfied stakeholders. The current situation of overstock and go range degradation is a crisis that will defeat BLM's mission of preserving public land, a concerted effort to determine the carrying capacity and manage the lands accordingly is essential, given long recovery times that will be needed. This will take a coordinated national effort to achieve, and without a central project management plan, it will not it be accomplished and our land may very well not survive. Thank you.

**Mary Koncel**
Hello, I'm Mary Koncel, I represent the American Wild Horse Campaign. I direct my comments at the Forest Service's inhumane and fiscally irresponsible management of our wild herds and specifically the Devil's Garden horses on the Modoc National Forest. Besides allowing up to 24 horses or burros to be sold a day to an individual, the Forest Service has no agency-wide system to vet adopters or buyers and no means to track these animals once they've been placed. Further, the Forest Service won't implement fertility control on the Modoc forest. Instead, it continues to conduct massive roundups, then systematically dump the captured horses, all to appease local ranchers. This fall, it removed up to 1,000 as part of a multi-year plan to reach an unscientific AML of just over 200 horses. In the past four years, it removed 2100 horses, costing at least $5 million. But the population has only been reduced by 320 horses. Fertility control is still absent from this plan, so taxpayers will continue to pay for roundups of horses the agency could have prevented from being born. After the roundups, devil's garden horses suffer from the questionable care at the Modoc forest holding corrals. For example, during sorting, horses routinely crash into panels, breaking their next. In 2018, seven horses were euthanized after contracting pigeon fever, a treatable condition. Last year nine newly gelded horses died from hemorrhaging. To facilitate the large scale dumping of horses, the Modoc forest fast tracks them to become three strike horses in order to sell them for a dollar with no adequate screening of buyers. Free transportation is provided for truckloads of horses that include heavily pregnant mares and fragile mare-foal pairs. As a result, horses continue to die and potentially enter the slaughter pipeline. To rectify this management, we ask the Advisory Board to support these recommendations. Agency-wide Forest Service must follow BLM's lead and restrict the sale of animals to an individual to just four every year. Develop a Comprehensive Animal Welfare Program and tracking system to vet adopters and buyers and conduct compliance checks before titling adopted animals. Regarding the devil's garden horses, it must stop any future roundups until a PZP fertility plan is implemented and prohibit the sale of horses for a dollar and free transportation. Thank you for this time.

**Valerie Henry**
Okay. Thank God. So good morning and thank you for giving me the opportunity on speak. My name is Valerie Henry. I am a professional photographer, and let me just get right to it. So I called to stop all helicopter roundups. Instead of wasting taxpayer money on inhumane helicopter roundups in holding facilities invest time and effort in the PZP program which works. I have visited McCollough Peaks and islands and foals is not 24 percent, it's more in the two percent, to say roundups are for the horses own good is ludicrous. Hiding under the pretense that they have no water or forage yet taking them off their ranges shows absolutely no improvement in range conditions. I'm calling also to end the adoptive incentive program, unscrupulous adopters are being paid by the BLM to take wild horses with the intent of sending them to slaughterhouses. This needs to stop immediately and they need to be held accountable. Eliminate the AMLs, the numbers set by the BLM is unscientific and lacks transparency. Remove commercial livestock from Wild Horse and Burro HMAs, identify ranges as the best of its kind in states suitable for wild horses but not livestock and rewild the horses in holding to these ranges. Wild horses are vastly outnumbered on rangelands by livestock and what's concerning to me is that the BLM's close partnership with livestock operators which leases public lands that are being overgrazed not by the horses but by livestock. Stop catering to the corporate grazing organization and listen to what the public wants. It is outrageous that 80 percent of the forage to HMAs are dedicated to livestock, they should be for the wild horses, burros, and wildlife, and stop treating the wild horses as trespassers, they are protected by the federal law and what BLM is doing is a direct violation of the 1971 act, they're capturing, branding, harassing, and causing death. They violently rip apart families, they incarcerate them, and the ones that do get released are too few in numbers for genetic viability. I'm also calling to stop misleading the public about the wild horse contrived overpopulation number and be honest about the real overpopulation of commercial livestock on our public lands. So stop misleading the public in also thinking that this is a crisis and that the wild horses are the threat to our public lands to justify mass removals when livestock is given a free pass. I also would ask to appoint someone to this board from an advocacy group that is not involved, there has to be a change, BLM has to stand up for what is right and what is right is to protect our wild mustangs, they are a living link through the times of Western pioneers and Indians to public date, preservation of ecological right because without them we have no heritage. They don't belong to the BLM, they belong to the Americans. Thank you.

BLM_004099

**Ginger Fedak**

Okay. Thank you. My name is Ginger Fedak I am the wild horse and burro campaign conduct in defense of animals. You have heard a number of comments, angry and emotional, I ask that you do not discount comments with emotion and put them in an irrational bucket. Many of those commenters have extensive Wild Horse and Burro knowledge and boots on the ground experience within our wild herds, the comments from those experienced and knowledgeable people are science based and must be considered as such. Personally, I am a rancher, and I have worked on cattle and sheep ranches in the West. I am also a scientist with a degree in range animal science and Range Management from a Western State University. I have years of experience in scientific research. I also have a lot of boots on the ground experience in wild horse herds. Today, I will comment with my scientist hat on, taught to leave out emotion. I can tell you my Range Management professors would be scratching their heads listening to some of what members of this board say. These professors taught us that when it comes to range damage, sheep do the most damage in the way they graze and cows follow close behind with their grazing habits and wallowing by water sources. Range damage by wild horses is negligible due to their nature of constant moving while grazing. They travel to water sources in their family bands, drink, cool off, and then leave to graze or rest elsewhere. Wild horses travel 20 miles a day or more. I live in Colorado, so I'm well aware of the dire drought conditions. Wildfires last year were rampant in Colorado and the West, and two in Colorado were the largest in our state's history. But blaming a partial cause of the climate crisis on wild horses is ludicrous. Blaming the poor range conditions on our public lands on wild horses is equally inaccurate. Recent scientific peer reviewed studies -- peer reviewed studies showed that livestock cause a large percentage of global warming, of that figure, cows are responsible for 41 percent, wild horses are -- percent, again, wild horses are negligible. Please become familiar with the work done by the Western Watersheds Project which show the damage done by livestock is more than alarming and also shows that wild horses are not to blame. With the time constraints here there is no time to make my other points, but I have sent them in my written comments. I would end with our scientific analysis that WHB's actually improve range and water conditions in airplane rid areas as recent studies show. The climate crisis is real, lands degradation is real. The contribution WHB's make to these issues is minuscule compared to that of livestock. You must stop scapegoating WHB's for dire range conditions, removing thousands of wild horses and burros from public lands.

**Diane Tutas**

Thank you. Hello. My name is Diane Tutas from Indiana. I am not with any organization, just a private citizen. I have worked at some race tracks along with veterinarians and also at horse shows. I have the greatest respect for veterinarians. I am just starting to learn about wild horses and my interest has been greatly intensified lately. I am trying hard to learn so that I can be a good advocate, which has included talking to BLM specialists, advocates, rescues, listening to board meetings, I figured the best way I could do this was to actually make a trip, so in May and June I took a 5,000 mile journey and I intend to make another one. I also would like to witness a horse gather. I know the more you learn, the more acknowledged you are. What really bothers me is I believe since the roundups started in 1967 -- or 1976, they have been the main method of management for population growth, and I know that we are starting to use population control, but it is amazingly so underused and can be done so much more. Nothing is easy. I know that it's a hard thing, but nothing is easy. Also, climate control has been long ignored and is still denied by many. We need real solutions. The public trust is broken, and many have [inaudible] which makes working together worse. You have so many volunteers and advocates with extensive knowledge which is wasted. I am amazed at the people in talking with them and what they knew, and the public is very important. Yes, we are in a bad drought. I am aware of this. I was surprised, being from the heartland, to learn of the water rights issues and was disgusted to see how much water is actually wasted by humans. That was the most disheartening thing. But yet I think we need to share more of that water with the horses. Horses are not to blame, but the victim of many issues. If the land is so deprecated, which it is in some areas, every use needs to be addressed on public lands. With myself and the public, we know that when horses are being removed -- once horses are being removed, they are never returned. Now I'm starting to hear the euthanizing word more which upsets me. We must do more for creatures, long overdue, it's 2021, we have the capability, we need to work together for lasting change with all hands on deck. Thank you so much for your time.

**Kelly Gray Merritt**

My name is Kelly Gray Merritt, K-E-L-L-Y, G-R-A-Y, M-E-R-R-I-T-T. I am calling from North Carolina, and while I am not a scientist and while I don't have to rehash all the amazing evidence that's been presented to you all I am a travel writer and have been for 22 years and I am a huge fan of these horses and a supporter of these horses and a lifelong animal rescuer. I think my biggest point that I would make is there's no way anyone could look at these wild horse roundups and

BLM_004100

think they are anything but a horrific, horrific way to deal with this problem.  You cannot look at these helicopters chasing these horses into these pens and then the journey these horses endure as any reasonable or viable option to solve any of this problem. It is barbaric, it is cruel, it is archaic, it is ignorant.  And I don't know who makes the ultimate decision about this, but today and I think there are many thousands of us who feel this way, we are very, very concerned about the roundup that is coming up in Utah and especially the beloved horses we have all been following for decades, including the Gandalf of that range known as Old Man.  These horses are icons of American spirit.  They are beautiful.  They are majestic.  They are intelligent.  They have incredible family structures.  They have an amazing language that they speak to each other.  None of this is their fault.  We all know whose fault these problems are, and it is not the horses', and the way BLM and even the people involved in these roundups conduct themselves with regard to these horses is both shameful, inhumane, and completely unacceptable. Regardless of the solution, I don't care how many scientists are involved, I don't care how many politicians, how many private money managers, funds, politicians, who then pint people to do what they want them to do, I don't care about any of that, all I care about is that these roundups need to stop until other solutions are found. And if that includes birth control for horses on the range, whatever, but no more roundups.  Enough.  Enough. Enough.  Enough.  This has to stop.  And this Utah roundup you all have planned should not go forward. And as a travel writer for 22 years with some of the world's largest publications, I am so thankful that finally, finally, people are learning about this horrible practice and people are standing up and saying this – do not continue with these roundups, especially this one in Utah coming up.  Thank you.

**Redge Johnson**

Thank you very much.  Redge Johnson with Utah's public lands office, and I appreciate a few moments to share some of the State of Utah's thoughts on this issue and I would like to start off with that we fully support the wild horses and burros on our landscape, they're part of the tapestry of the multiple use aspect of BLM's landscapes and Forest Service that we all enjoy.  These are public lands and we support having these horses on the lands. We're also very supportive, though, of healthy landscapes, and those two things need to go hand-in-hand.  We need to have healthy horses and healthy landscapes in order to have these horses go on and continue with such a great historic perspective that they have it.  So I would like to get into a little personal sharing, I guess, if I could.  Our family grew up with these horses -- not with these horses, owning horses and managing horses, so I have a deep love for the horses and I really appreciate what the BLM does to try to manage them. The producers that everybody keeps talking about, they really do a lot of things for these horses, they're hauling water out there, they actually do have some very extensive plans that they go by.  We have great timing intensity and time that they rotate their animals in and out, and the wild horses don't have that.  And so I hope that the advocacy groups will recognize that the ranchers do a lot of good for these horses.  They're hauling water out there right now.  We're in a terrible drought here, and the ranchers are out there hauling water, and there's not this terrible need to get -- or desire to get rid of the horses.  In fact, a lot of the ranchers really enjoy the horses out there, and what we really need are the balanced aspect of the horses on the range, and what we don't have is that balance right now.  If a producer were able to run two or 300 percent of their allotted numbers, then the advocacy groups would have some serious concerns, and it's the same that the ranchers have.  A lot of these herds are two or 300 percent over their AML, and that's not what -- that's not fair to the ranchers and it's not fair to the landscape.  So we hope that the BLM will continue with the gathers.  There's been 150 years of gather history out there from when these horses were first brought onto the landscape, we've been gathering them ever since.  So we hope and we're asking for a continuation of the gathers.  We had an increase in the fertility control on the landscape, and again as Mr. McGaffic called for we hope there will be an increase in the monitoring of the HMAs.

**Barbara Flores**

Yay!  Okay.  My name is Barbara Flores.  I live in Colorado and I've been an advocate for wild horses since the mid 1980s.  Over 30 years.  And I've spent many hours on wild horse areas.  I have attended several roundups when the public was allowed close enough to be able to see what was actually happening on those.  As part of the BLM budget, we the taxpayers and owners of the land managed by this agency request a moratorium on all Wild Horse and Burro removals at this time and the funds that have been allocated to those removals used to fund PZP and other forms of humane fertility control.  When it comes to tools for managing Wild Horse and Burro populations, we have an effective tool and biological birth control such as PZP.  At the spring 2019 Advisory Board meeting, it was stated that just over 400 mares were given PZP in 2018.  We saw yesterday that the number administered in 2020 was only double that, at approximately 857 doses.  This number needs to be increased considerably to be effective.  The first step in accurate management of wild horses and burros is to scientifically and lawfully determine the real AML and the actual current population.  The national wild horse AML of 26,715 is based on an agreement with the National Cattleman's Beef Association - NCBA, not on science

BLM_004101

monitoring or the law. That number, accord to Gary Zegotnic, a former National Advisory Board member is a number that NCBA could live with. The elephant in the room is the extreme impact that private livestock are having on our public lands. Public lands ranchers who produce less than 2 percent of the beef in this country are spreading misinformation about the impact of wild horses and burros on the, while down playing and even ignoring the impact of their livestock. The emergency actions BLM refers to are only removing of wild horses and burros and not the necessary and critical removal of the large number of private cattle and sheep from our land. There will never be a thriving natural ecological balance until there is a significant reduction of private livestock numbers on our public land. Yesterday, I heard BLM characterize the American public as emotional and misinformed. I have learned the hard way that it is the BLM that is misinforming the public, trying to convince us that the removal of wild horses and burros support only solution to achieve a healthy range. Do not believe it. Thank you.

**Jean Pulieer,**

Okay. The composition of the board must include some more animal advocates. I would like to see the -- I would like to see, you know, the board composed of mostly animal advocates. I think that's what it should be. I also believe that the cattle should be taken off the land entirely. I don't believe they should be on the land at all. I think they are the destroyers of the land, and I think they should lose leases they have and they should be off the land and that if the horses need water and forage, then I think that the BLM has a responsibility to provide some of that. And I think that if the cattle are off the land, there will be more forage and water for the horses to sustain themselves, so that the cattle are the problem and the cattle ranchers are the problem. I don't think the horses are overpopulated at all. I think what's overpopulated are the cattle ranchers, and we need them off the land. This gathering with helicopters is just, it's just horrible. No one who sees that can stand that kind of abuse and cruelty, and those people who have been in that business, I mean, that is just horrible. Those who participate in those helicopter roundups are just -- you can't understand what kind of people they are to not recognize the cruelty of that kind of forcing those horses to gather, to run like that in that kind of heat, they do it in the summer heat as well, when we know the temperatures are up there. I mean, that is just the worst part of the year, and it's the worst kind of thing to do to the horses. That should not be tolerated at all. Also, you know, that's just absolute cruelty, and it just needs to stop right now. And the grazing needs to stop. I also find it very difficult for the public to be heard by this agency. First of all, trying to even get in, I had to wait two days to try to be heard. The telephone arrangements are not good, and if you don't have the present Zoom thing, I mean, you should be able to call in by telephone without any problem. So I don't understand why that is so difficult sometimes. So the BLM is not listening to the public. Clearly we have endless people from the public calling in, and the government of the people, by the people. Yeah. The government by the people, for the people, is what we all have been led to believe we have, and when you set up a membership group that doesn't include the majority of the people who want animals preserved and – [timer ran out]

**Lyn McCormick**

Thanks, you guys. I'm in Colorado, my husband and I are former bison producers, we live on a ranch in northwest Colorado just five miles from the Sand Wash basin. My husband is a fourth generation cattle rancher, cattle ranching family, sheep, the ranch we live on now, we run eleven head of horses on 2,000 deeded acres, and the ranch operates I think a 350 cow-calf operation. I'm here to talk about the budget, but first of all, I wanted to support Tim McGaffic on his proposal to do some meaningful on the range management through something along the lines of a linear programming model because I think that's the only way to achieve, you know, thriving ecological balance for all concerned, all species concerned and all stakeholders concerned out there. I've been doing some numbers on the budget, and it looks to me like first of all, I don't see why you don't pay the stakeholders to do on the range management. There's enough room in the budget, $101 million I think is what I see for fiscal year 2020, because if it costs me $2 and 20 cents per head per day to run horses and that includes hay, on this ranch, I don't see why you couldn't pay the stakeholders to manage the horses at a dollar to two dollars a day per head on the open range. The only cost, you know, they would have is the cost of day trap gather or however the Field Office would suggest to gather to get the PZP work done, and then of course you could call occupant for the adoption program. But according to my figures, the total on the range now at 95,114 at a dollar a day per head comes to $34 million plus or minus and totals on or off the range is 136,000 a day at a dollar a day per head, $53 million, $2 a head, $106 million, which is $5 million more than the BLM has already got budgeted. So then if you leave the desired AML of 26,770 head on the range, at a dollar a day per head, that's $9,000,771, at two dollars a day per head it's 19 million, so where is the rest of the budget going to go? The other issue with the budget is, if 19 percent of the budgeting goes to monitoring and other costs, well, those kinds of things could be kicked back into providing enough of a budget for on the range management contracts to the stakeholders. I'm not here to demonize any of the stakeholder groups because we've been in the production end of things, and we're also, my husband and I both are career horse people, but it

BLM_004102

just doesn't make any sense, to me it's a no-brainer, why aren't we paying the people who can manage the horses on the range to do that? Instead of paying people to manage them off the range? It's just -- I don't understand that rationale at all.

**Doug Busselman**
Great. Thank you. I'm Doug Busselman, I'm the Executive Vice President of Nevada Farm Bureau. We greatly appreciate the work that this Advisory Board is doing and the contributions that you are making for the improvements in the operations and policy considerations for improving the management of wild horses and burros. Having watched and listened to nearly all of the livestream that has been provided for this meeting, I understand that you are dealing with very contentious and challenging circumstances. I also know that you are aware of the extremely dire circumstances facing horses and burros as well as the resources, land, and water, in wildlife in Nevada. Hopefully your recommendations will advance actions to address this situation. Landscapes are being devastated by populations that are over the carrying capacity of the lands. This has been an ongoing situation, further made worse by the lengthening drought conditions of the past two years here in Nevada. Dealing with this crisis is not going to be easy or capable of quick solutions. We understand that the best that can be accomplished will be the emergency gathers and other actions and that could be the best that we will be able to accomplish. We do hope that the current examples of suffering animals and devastation to resources will be documented and considered as lessons learned for helping to burn into the public consciousness and understanding of what follows from not properly managing population of any animals within the carrying capacity of what the land can provide. Thank you very much for this opportunity to speak.

**Joanna Grossman**
Thank you for the opportunity to provide comments today. My name is Dr. Joanna Grossman and I'm the equine Program Manager and Senior Advisor for the Animal Welfare Institute. We look forward to continuing to work with the new administration and BLM staff to see meaningful change with the Wild Horse and Burro program. Secretary Haaland has been a strong advocate for the humane treatment of wild horses and we hope that in the coming months and years BLM will prioritize the on range management of herds through widely supported fertility control options such as PZP. Such a paradigm shift would allow the agency to break free of the costly cycle of helicopter roundups and shifting horses into long-term holdings facilities that's defined the program for far too long. We are gratified to see the BLM walk back plans during roundups to conduct ovarectomies. Lawmakers on both sides of the aisle have consistently spoken out against the BLM events to utilize a procedure that the National Academy of Sciences explicitly advised against due to the risks of trauma and infection. We remain concerned, however, about the scope of roundups the BLM is proposing to take in Checkerboard, Utah, over 3,000 horses, one of the largest in history. This roundup, BLM violates FLPMA and the Wild Horse Act in removing from checkerboard areas. The sweeping scope of roundups seems consistent with the pending draft of EIS which would eliminate millions of acres of horse habitat as a result of the upcoming Onaqui roundup, which would drastically reduce an iconic herd that attracts visitors from across the country. A strategy premised on mass removals is counter-productive since it spurs compensatory reproduction. Simply put, the BLM must move away from the trajectory outlined in its 2020 report to Congress which calls for accelerated and costly removals for many years to come. Finally, like many others, I want to turn briefly to the Adoption Incentive Program scandal. Numerous lawmakers have called for a formal OIG investigation after the Times expose revealed horses are being flipped for profit. This is not simply a matter of the welfare of these federally protected animals although obviously that's pair mounted, this is an issue abiding by statutory prohibitions on the slaughter of wild horses and ensuring that federal funds are not being used for the opposite of their intended purpose. And in this case paying so-called adopters to funnel wild horses into the horse slaughter market from a broader perspective the BLM is not going on adopt its way out of the problem of how to curve population growth, a proactive approach to implementing safe and proven fertility control is key to keeping horses on the range in their natural habitats and minimizing the exorbitant costs associated with roundups in holding. Thank you again for the opportunity provide comment on behalf of the Animal Welfare Institute today.

## BLM Internal Organizational Structure Work Group Discussion

Dr. Lenz: All right. So the first is organizational structure. So currently, the BLM, the way they do business is they allow local state or program leaders to decide how closely they're going to follow the national plan, and oftentimes they only select portions of that plan to execute. We understand why they do that. It's the closest to the action, they know what's going on specifically in their area and they know what needs to be done about it. But the problem with that is that it is very challenging to develop meaningful and shareable data archives or databases that aid in creating plans for the future or

BLM_004103

for the folks at the national level to report how they've done for the year and so forth, so we've recommended that the Wild Horse and Burro leadership reach agreement with specific management goals with database methods.  For example, require that all horses gathered be microchipped across all of the states and areas so that they are entered into a uniform database so that those horses could be tracked, information could be provided when they're captured and when they're treated with PZP or GonaCon or whatever method of fertility control, when they're removed to other areas, when they're removed to long-term holding pasture and so forth. Or another use, if we had a uniform system and everybody is following the same plan would be that you require that every horse, every mare captured and released be given PZP or GonaCon, that there wouldn't be -- it wouldn't be up to the local or state leader to decide whether or not they do that. Rather, they all do it, and that leadership at both the state and national level come to some agreement about that.

Bord engagement, all the folks on this Advisory Board have significant experience and expertise in areas that are vital to that program.  We have a lot of experiences with similar issues and similar problems outside of this program that we could bring to the table.  So the board believes that these assets are not being utilized fully.  A good example would be the Wild Horse and Burro program report to Congress, which was not provided to the board or the board was not asked to review it prior to it being sent forward.  And so our recommendation is that board members be embedded in the Wild Horse and Burro day-to-day activities in order to gain an understanding how all portions of the program are implemented.  Some of us have been deeply involved with roundups and working horses and Mustang Makeover and adoptions and so forth, while others have not been on a roundup or gather at all. Well, this would provide familiarization where the board might suggest improvements or new approaches or different approaches based on their experience, and it could also develop meaningful connections based on individual expertise from the board.  For example, it Wild Horse and Burro public affairs division could benefit from interactions with board members with expertise in advocacy and public interest because many of us it have dealt with welfare issues and issues like this that are confrontational, and we have some experience on how those should probably be handled or areas where we think there could be some improvement.

Interaction with outside stakeholders, I think education is one of the most critical factors in determining it the perceived success of the Wild Horse and Burro program by the public. Unfortunately, the spread of misinformation about BLM policies and activities by social media is rampant and resulted in the BLM's interaction with many of the outside stakeholders being adversarial rather than educational and cooperative.  Many of the board members have significant expertise in working with animal activists or Congress or environmental groups or ranchers or wildlife advocates or other interested parties, so we could bring that experience to the table.  So recommendation 3 is that the board members be routinely utilized by the Wild Horse and Burro program leadership to educate and communicate with outside stakeholders in an effort to find common ground.  And I think a good place we've talked about this earlier is the discussion about is grazing leases by ranchers.  I think the public, someone from BLM could explain that,  I'm not sure many folks in the public sector would believe them.  I think ranchers could explain it, and I think the same thing, that an independent person on the board perhaps that is not involved in that could sit down and go through how that's done and how it's managed and when the animals are allowed on and off the range and so forth, and there might be some benefit.  Of course, there's going to be some folks that you will never change their mind or educate, but I think the general public is always open to education and oftentimes you can change their mind on something because they don't know what they don't know.

The Population Biologists recommend that a Population Biologist be hired as soon as possible because that job plays an integral role in developing management plans and actions and is critical to the success of the program, so we recommend that they be hired as soon as possible.

And then updating the handbook, and I think I've heard that from a couple of the other subgroups, we believe that we're managing a 2021 problem with 1971 model, and that management handbook needs to be updated to take into account the changes in current range conditions, fire risk, droughts, degradation and so forth, so we recommend that a task force be appointed to update the management handbook, and that task force should include a few members from the Advisory Board, Wild Horse and Burro staff, and research personnel.

And then sixth, I didn't initially include this, is the BLM should strongly consider evaluating, most effectively using an outside entity, the organizational structure of the Wild Horse & Burro Program to determine if changes should be made.

So Celeste, those are the -- oh, we have another one.  Okay. I haven't seen that one, so Celeste, you may have to help me on that.

Ms. Carlisle: Let me just clarify because Dr. Lenz and I had a couple of documents going back and forth, and I think I got things crossed in the mail. But I think that this recommendation 7 really can be incorporated into that earlier recommendation where we're sort of looking at that holistic embedding of the board.  So I don't know that it needs to be separate. And then I took out the Population Biologist recommendation because they did just hire a Population Biologist, so unless you meant perhaps as a board position or something, I just removed that. So just to clarify.  That's all.

Dr. Lenz: Okay.  All right.  So how do you want to proceed?  Do you want to go back and work through these from the beginning, I guess?

Dr. Perryman: Yes, just a quick sort of note here.  First of all, there's too many of these, and I think there's some redundancy in there between the two documents that's going on.  We've had this discussion before.  We can't hand the Bureau, you know, fifteen recommendations.  That's just -- we can't do that, for all kind of reasons. I didn't see the last one until, this sounds kind of moronic, I didn't see the last one until the end.  When we were talking about from our previous meeting where we were talking about an outside evaluation of the program, and I know there was some talk about it the other day about GAO and Interior, DOI might have done a little bit of it as well, the board's concept of that from the last meeting was an outside entity, somebody from private sector that knows how to find and seek out redundancies and communication gaps within the structure, particularly as we're talking about decision-making tree and who gets to make decisions and who doesn't get to make decisions and how they have the input into the decision-making process overall. So I just want to make sure that that one, we bring it up again because I did think the response that Holle' gave us the other day was a good response, but I think we need to be more specific as a board in what we want, and what we wanted the last time, and I think it should carry over now, is something from, you know, there's all kind of firms out there that do these kinds of things, and it's going to cost a little bit of money.  But I think it would be well worth it in the long run that, we got a private entity to come in and take a look at it and not because we're being critical of the BLM, but because we're trying to find ways that we can make the decision-making process and implementation better, so we can have more efficacy after the decisions have been made. So I yield back.

Mr. Yardley: All right.  I don't know why my video won't pop up, but anyhow, the recommendation that the BLM should strongly consider evaluating the organizational structure of the Wild Horse and Burro program, when I was on my first term within the Wild Horse and Burro Advisory Board, they had that, and they had some recommendations made to them. I don't know what all was done with those thereafter, but there was a considerable amount of money that was spent in the not so distant past that was done from an outside source to try and address some of those issues.  Maybe Holle' can touch in on that or Paul or someone what was done with that, but I know especially when it came to kind of focusing the public's awareness it to wild horse and the wild horse program, there was a pretty significant study that was taken on by a third party.

Ms. Waddell: Hey, Steven, Holle' here.  Are you referring to the National Academy of Sciences?

Mr. Yardley: No it wasn't the National Academy of Sciences.  It was a third party, and a lot of their work involved like, I guess, kind of helping the public to be aware of the issues with the Wild Horse and Burros on the ranges, and then I just remember they said it's really contradictory because on one hand we're trying to press forward like this living legend, and on the other hand and to market them, and on the other hand, we're saying we need to get horses off of the ranges because of the range degradation that's occurring because of overpopulations. But they've done a lot of other extensive studies into the BLM along those lines, and I think this would have been about five, four or five years ago.  So it was just shortly after I was on the board.  It.

Ms. Waddell: Okay, I can think of a couple of things.  We did have a Fleischman Hilliard study but I think more than five years ago.  Most recently we had the Great Lakes marketing firm.  Does that sound familiar?

Mr. Yardley: I think the Great Lakes marketing firm was there.

Ms. Waddell: They presented twice to the board, once to talk about their study they would be doing and focus about rebranding the entire program so that we had consistent messaging both on and off-range and kind of as a whole, and then focus some attention on the interest, you know, where did the interest lie in private care placement and how we could market and rebrand. That was an external study that was done.  It didn't necessarily address the organizational structure, but it did talk a lot about the importance of consistency throughout the program, so in all the states, that, you know, whatever the requirements and process and expectations was of the public from BLM in California should match if someone was in Mississippi, there shouldn't be different communications regarding that.

And out of the Great Lakes marketing firm, a lot of great work came from there.  We had several studies that were done, we also hired our current marketing firm that has done a rebranding of kind of all of our communication pieces and outreach efforts, there's much more of a scheme when you look at social media posts and will our fliers and press releases and just kind of whatever it is that we're communicate to go the spun pretty consistent. I'm not sure if that's what you were addressing, Dr. Perryman, but Steve, I think that's the one you're talking about is the Great Lakes marketing.

Mr. Yardley: I think so too.  And maybe that's not inclusive enough and kind of the focus of what is being recommended here, but I do think that it touched in on a lot of kind of the concerns the board is expressing right now, so maybe some of that information that it they came up with could be looked back into and utilized, along with, if necessary, evaluation.

Dr. Bechert: Thank you.  I'll just comment on a few of the things that were listed there.  I know that Steven said that the field trips to observe gathers and some of the processes that BLM was involved in used to be part of an onboarding process is what it sounds like, and I definitely am in favor of that. And regarding organizational structure, this to me came up in Scott's presentation where he talked about the process for planning a gather and the myriad of documents that need to be pulled together, but also the communication and approval between the state level and the federal level for the budget and that you can go all the way through the process, but then there's an [inaudible] and you don't get what you wanted. So it seems like one piece that could maybe be, you know, discussed internally without even an external audit suspect the possibility of having states have more control over their budget and that when there's an emergency, it comes from a separate fund, because it's an emergency.  I'm not involved in the budget, but it just seems like something like that could be discussed.

And then the other part of the organizational structure that the group had talked about which kind of overlaps, I agree with Dr. Perryman, we should condense some of this, is the expertise that different people have, to embed them in BLM processes. And I can use myself as an example.  I feel that Dr. Griffin has done an excellent job embedding me in that process.  I've had to participate in lots of meetings and do a lot of work with the research group, and I think everyone else on this Advisory Board has different areas of expertise that should be able to plug in in different parts of the horse and burro program.  For example, Susan is a liaison with CAWP and that's where her expertise lies. Raised during the last public comment session by two individuals, is coordinating it acquisition of datasets, large datasets, to look at climate change, wildlife populations, rangeland health, because again, information is power, and that kind of information could be used in planning processes. But that kind of data compilation requires partnerships and collaborations with other agencies, also maybe academic institutions, and other organizations, preferably on a regional basis because they might have an interest in sharing data. I know my expertise is reproductive endocrinology, but when I'm looking at an animal or groups of animals, in addition to that information, it helps me to evaluate the situation if I know about the nutritional health and, you know, the environment that the animal is in because then I can lock at it holistically.  So similarly for solving these kinds of big problems, I think partnerships are necessary. So those are the three points that I would, you know, offer up for the organizational structure discussion.

Dr. Lenz: Okay.  In response to Dr. Perryman, these are too many, yeah, we know that.  I don't suspect that when we get done here at the end of the day that we should have more than five or six or seven for the whole board recommendations, but I think a lot of these will blend into some of the others. Regarding the audit of the organization, yes, we're looking at recommending an outside organization outside the government to do this.  This is commonly done in the private sector where they bring in outside experts to evaluate how your business is running and where there are areas for improvement, and I'm not just -- we're not just talking about the Wild Horse & Burro Program, we're talking about going above that to the BLM level is, how it manages the Wild Horse and Burro and what the decision tree is and who is in charge, oversees them as well. I mean, a good example to me, this might be unpopular, is that I don't understand why the U.S. Forest

BLM_004106

Service, they manage the forest, but why they're managing the wild horses when one, they don't have a budget, and two, a lot of their efforts are in concert with the Bureau of Land Management and Wild Horse and Burro program and a lot of the horses end up in their long-term holding.  So perhaps that would be something an outside audit would recommend if the BLM take -- I'm sure the BLM have plenty to do, but if they take over the management of those horses. I don't know if that clarifies things or not, but that's kind of the way we're thinking.  Anybody else on the committee that wants to jump in, please do.

Dr. Bleich: Yeah, this is with respect to the suggestion of updating the 1971 model that current management is based on, and I wonder about the reality of that.  I think updating is one thing, but implementing any update is another. And my concern lies in the fact that the 1971 model, if you will, the direction provided by Congress is in legislation, it's founded in legislation, and developing a better, more appropriate, or more appropriate or perhaps more realistic model is very, very desirable, but if it requires legislation to implement that model, I don't see much happening. Stuff seems to go through Congress at the rate that horse biscuits might go through a funnel, and I can also see problems arising in the absence of opening up a lot of other issues like regulatory reform, and the need for regulatory reform would be reflected in increased opportunities to enhance or facilitate emergency responses to current situations. So I really think it's a great idea, but in terms of realistically expecting something positive to occur if legislation is needed and more than one type of change or several changes are necessary, I just don't see it happening.  I'm just not optimistic that it would happen.

Ms. McAlpine: I was part of the discussion about hiring the outside agency, and part of what I just experienced with a community college, and I sit on their board of governors, and we allocated the funds to hire an outside agency with expertise in educational programs, and the end result is we spent a lot of money and every penny was worth it.  It has motivated staff and faculty and administration to work together, to build plans.  We have a five-year plan that we're working on in sections, and the community is involved, and obviously staff and administration is involved, and it really has made a huge difference.  And that's what we were looking for BLM.  So that was all I have to say.

Dr. Lenz: Do we want to go back to the top and start through these one at a time, and if we see an area where we can merge that into another recommendation or strengthen that recommendation or omit the recommendation, why don't we do that. The first recommendation is that we recommend that the Wild Horse and Burro reach agreement with local and state program leads on specific management goals and uniform data collection methods. What does everyone think?

Ms. Carlisle: Well, two things.  I'm wondering if this is -- what the BLM thinks of this and how they may be able to implement it, and my second thing is in a perfect world if the outside auditing entity for the structural organization would sort of work hand-in-hand with this or be part of this recommendation as a two-step, that first one happens and then the other, or if we keep them separate.  Just throwing out more to think about.  It I don't have an answer.

Ms. McAlpine: Based on the conversation over the last two days, I think this was a really good recommendation, and as we go through things, I think we also need to remember that we had a very vigorous conversation about the environment, and so we need to make sure that we get sufficient recommendations from that group to lead the way and then pick some of these that would really relate to that.  That's it.

Ms. Pearson: I know one of the reasons why we went with this recommendation is there seems to be a disconnect with what's happened, you know, maybe the requests on the local level, by the time it gets to the federal level or, you know, even beyond the state, the State Lead.  And, you know, this is just conversations that I've had on the side, you know. Everything on the ground seems to be an emergency situation, and yet some of those things get caught up in the cluster of the red tape and bureaucracy on the national level. So I think that's where this recommendation was coming from was that there needs to be more either communication or coordination or whatever with that between the local management, the people on the ground and what happens, and basically it comes down to basically permissions and funding, whether that's Congress or whatever, because I know for years, there has not been even a request in the national budget to increase, you know, budgeting on some of these things and that's why there was so much a lobbying effort to increase that founding a national level.

Mr. French: This is more a clarification based on the language. I'm seeing on this, I'm trying to remember the conversation, we're basically requesting that local management leads maybe from the state level or maybe even below that, maybe down to the District level would negotiate -- would negotiate and capture any of the recognized differences in management based on topography or weather conditions or fire cycles or what have you and possibly modify the handbook with regard to standardizing data collection methods.  Is that kind of where we're going with this?  I see us doing that kind of right now, but I'm just wondering, am I wrong?

Dr. Lenz: I think this is more of a day-to-day operational recommendation.  I mean, to me, an obvious thing to me is that, you know, we recommended several times that every mare that's released receive GonaCon or PZP or some type of fertility control, and then in our discussions yesterday and also we were only putting it in 700 horses, and I know, and that hasn't come up much over the last few years, in fact, it's about the same, and it's a critical part of managing the herds.  And so yesterday in one of the discussions, some of the state and regional managers are doing that and some of them aren't doing that.  And to me, that's a really important thing and perhaps there should some agreement or mandate or however we want to state it that that be done, and that information and data collected.  I also heard yesterday we have 700 mares last year that were given PZP, and I heard one of the folks that called in said that they had put 1400 doses in mares.  Well, obviously there was a local or state person, I would think, involved with those herds where that was done.  But it doesn't appear to me that that came up the food chain.  So I think something as simple as that.  And I also think it's important that if you can't collect consistent data or you don't have a common base, it's really difficult to plan what you're going to do if you don't know what you did.  So I think this is more of an operational recommendation.

Mr. French: Yeah, I agree.  Thanks.

Ms. McAlpine: I'm just reacting to a comment I heard a little bit earlier, and when you have your examples down in the bottom, what I think we're also getting to, you know, horses that have been captured before, treated with PZP, we want to facilitate BLM, I use the word reaction when I scribbled it down, but I mean more action to facilitate action by BLM to emergency situations.  Does that fit under there?

Dr. Lenz: Well, I think emergency action is more of a local issue, isn't it?  Of course, the whole program is involved with emergency action, but that seems almost like a local.  I guess we're trying to centralize this more.

Dr. Jenkins: Just -- in some ways I'm reluctant to move out of my DFO responsibilities and sort of brainstorm with you all, but let me make a couple of comments anyway.  Here is an analogy.  The National Academy of Sciences right now is studying how the BLM makes its decisions about buying seeds to restore disturbed or degraded or fired environments.  And we just recently put together a list of 220 people at various levels of the organization who actually make those decisions because the National Academy of Sciences didn't understand how those decisions were made and who made them and based on what criteria. I hear the board asking the same question in organizational structure about the BLM.  In the horse program, who is making the on the ground decisions about putting together gather plans, about putting together budgets and so on.  And what I'm hearing the board say is that we don't understand that, that's opaque to us how the organizational -- how the organization functions across all of the different decision-makings, and that's what I'm hearing you say.  And if I'm wrong about that, please let me know.  But the analogy that I hear is to this National Academy of Sciences trying to figure out how the BLM makes seed purchases.

And then the other thing I just wanted to mention, I'm going on put my anthropologist hat on just really quickly here, it's really pretty clear that organizations have a way of representing themselves to themselves and then to the public, which is not apples to apples in the way in which those organizations function, and anthropologists, among others, have a way of coming in and looking at organizations and saying, well, that's great how you represent yourself to yourself and to the wider world, but the functioning actually happens in other kinds of ways, informal methods and so on.  So I think I'm also hearing you ask that question.  You represent, you know, we understand organizational charts, we understand hierarchies, we understand decision-makings and flows of decisions.  Is that really how this organizational functions, is part of the question I hear you asking.  I'm not sure I'm right about either of those two points, but I wanted to throw them out, because I'm trying to understand what it is you're asking the BLM to do so that I can adequately respond to that, those questions. Thanks, everybody.

BLM_004108

Ms. Pearson: A fair analogy, to my point of what I was trying to make, I think that's a fair analogy.  I think that there is maybe not only we don't understand that, but I'm not sure that some of the local people that are making these decisions, you know, there just seems to be some sort of a disconnect in the communication, so I appreciate that.

Ms. Waddell: So Dr. Jenkins, thank you for that because I think that was helpful.  That's where I was - was maybe we can make some clarifications on some things, and then some things are based on organizational structure and probably something that we can go over with you all at a later date.

But I did want to say that based on kind of, I think it's somewhere above that recommendation, can you scroll up a little bit? One of the things that's talked about is there's a sentence that it said something like, hey, states kind of decide what part of the national policy they're going on administer, and I was going to tell you that much of the direction comes through budget directives, right?  We make a plan as to the goals that we plan to accomplish, what operations we're going to be doing within the entire program as a whole on the programmatic holistic approach that I was talking about yesterday.  And that's negotiated and communicated with the state leads that is supported by their State Directors. And so that direction comes through our budget directives, which are, you know, something that our public, those are all public documents, and they come through the plan target allocations segment and then also an annual work plan.  And we could probably dig up some of those links and provide them, drop them in there, but they are on BLM.gov, but that is one thing, there is a strategic planning exercise and once budget is allocated there's even a time where we go back to the table and say okay, the budget funding level may be above or less than we had anticipated, and so because of that there may be adjustments that need to be made.

The other thing that I wanted to mention is once those planned targets and accomplishments are identified and work begins to be conducted throughout the year, we do have an official reporting system that collects data.  And that is the performance management database or data system, and our Wild Horse & Burro Program system, it -- those are all 50,000 animals at one time, she was administering that system, and she did a presentation at the last board meeting, kind of walked you all through those steps in phases of that system, it, so I mentioned yesterday that we do have the policy that all animals are microchipped, so those microchips and when animals are freeze marked they are fed into this Wild Horse & Burro Program system and anything related to that particular animal or even herd management area and HMA in that system that is where that data is collected, so when we need to run reports or provide information, whatever that information may be, it is pulled from those systems.

So I just wanted to create those clarifying, make those clarifying points that, you know, that there is a data collection that we do require microchipping of all animals that are gathered and that are even in facilities, and I think Dr. Kane yesterday had explained that there had been a backlog that was caught up so that the animals currently in the corrals are all microchipped as well and that there is the direction through the budget information that is provided out to the field.  For work.  So I'm happy to clarify or answer any more specific questions to that.  Thanks.

Dr. Perryman: Yes, I appreciate that Holle', and I do understand that there are things that once they're set into motion, there are protocols, national protocols that get done, that filter all the way down to the field.  So related to that, before that, I guess, in terms of the decision-making process, let me just strip it down, because this is one of the things, this thing, at least in part came from me at our last meeting and the reason why we're talking about it again today, I guess.  I'll just be blunt.  It appears at times that once a plan at the national level or some aspect of a plan, some action, is planned at the national level, once it gets down the state level, and not the State Lead, but once it gets down to the State Director level, it appears that they can just ignore it.

And so that, there's a breakdown there.  And Dr. Jenkins was talking about, well, talked a little bit earlier here in our conversation about an organizational tree, and, you know, you've got a box and you've got a line, you've got a box and you've got a line.  Well, there's a whole lot that happens between those two boxes sometimes and a whole lot doesn't happen it between those boxes and that line, so that's the concern is that when there is a national priority of some action, once it gets down the State Director level, it certainly appears as though they can just ignore it, and if they just ignore it, there's no recourse, there's no way to stop that other than you might get on the phone and go, hey, look, can we do something different here?  And that's no assurance that that national priority is going to take place or going on get

BLM_004109

implemented.  So that's the reason behind this initial discussion. So the board was wondering, in our confusion, if someone could clear that and we thought a way to initiate that discussion would be to get someone from outside the Bureau to take a look at it and say look, this is where the communication breakdowns are, this is where the decision tree breakdowns are, or the decision implementation breakdowns are, and then we could have a discussion about how to rectify that. So I yield back.

Mr. Yardley: Yeah, I just kind of wanted to echo, I guess, what Dr. Perryman said and going on with what Dr. Jenkins said, talked about the seed acquisition stuff.  I think the desire of the board isn't just to know like all the people that make the decisions and where the decisions are made and how the decisions are made, but also a unity of, okay, we have this problem, there's too many mares, we need all of the mares, anytime a mare is gathered, she needs to be getting some contraceptive drug put in her, instead of, well, in Utah they're doing this, in Nevada they're doing this, or in northern Nevada they're doing this, in southern Nevada Nevada they're doing that.  Just a unity and a clarity of XYZ happens, therefore, we have a national standard that X, Y, Z is going to happen too.  Like at least from what I understand and the way I take it, the board would really like to know or kind of have an understanding that when something happens it, that it happens a little more across the board in the same set of given circumstances rather than just a kind of whoever the State Lead is at the time and whatever they're feeling like. Correct me if I'm wrong, anyone.  Thanks.

Ms. Carlisle: No, Mr. Yardley, I think you are exactly right.  Another example, and also an example of how the desires of the board again are not to be punitive.  The desires are to shore up the program so that it is both top-down and bottom-up strengthened. And so we have situations like, you know, the majority of horses are in Nevada.  And there are other states that are Bureau of Land Management, you know, manages lands in those states and they have zero interest in doing anything to help with adoptions for Nevada horses.  Well, the horses are the horses.  They go into a national adoption program.  If we continue to it compartmentalize and silo our operations, and this also goes back and forth between the flow between BLM and Forest Service as well.  We can't silo these things.  We need all hands on deck working together, and so that's the impetus for this recommendation, that we eliminate dysfunction, and again, I'm not saying that as an attack on the BLM.  We all work in our dysfunctional office and university and nonprofit settings.  It is the way we are.  But we're also getting better at repairing that and making systems stronger and stronger.  Again, I'm going to hearken back to that Dr. Jenkins' anthropology sort of bent towards everything.  We're learning how to implement those angles a little better.  So that's the reason for the ask.  Again, not to say that the board wants to have any hand in nitpicking who should be getting what at all.  We just want to make sure that the BLM Wild Horse and Burro program has incredibly strong leadership and that has an incredibly strong organization beneath them to manage this together.

Dr. Lenz: I wonder if we shouldn't table that recommendation for the day and move on to the second recommendation. What does everybody think? I think the second recommendation, it's my understanding from Holle' and a few other folks that perhaps this is going take place in the future, COVID kind of put a damper on this activity for the last year or two, so perhaps 2 is not required, although we could still make the recommendation to support them and embedding board members in the day-to-day activities of the Wild Horse & Burro Program, and I wonder if 2 and 3 couldn't be merged up, but once they're embedded, that we can be an asset in educating and communicating with outside stakeholders.  What does everybody think about that?

Ms. Carlisle: I agree with that.  I wonder if this is something that -- well, if it would be helpful, we can make it and if the BLM is like we've got this, then perhaps we hold off, though I do like the idea of asking for a specific -- I don't know how to do this.  I don't know if it's really a recommendation.  Maybe it's just a request.  That wild horse walkabout that one BLM Field Office does is a really incredible model for how real comprehensive experiential education can be occurring at these field offices. I know that specialists don't need another box to check on all of the things they need to do, but there's other ways to accomplish, you know, education on our public lands, and this is just a really good model, and I would like for others to be able to see it and experience it because I think it would be a good guide.  So perhaps that could just become a request that the board participate in one of those so we can use it to begin developing on how it could become something sustainable and could become something throughout the Wild Horse & Burro Program.

Ms. Waddell: Yes.  Celeste, I was just going to say Amanda Gearhart that was something amazing that she was doing and that was amazing and she's no longer here, so I think those walkabouts are postponed for right now.  But there is one thing that Scott and myself and Paul were chatting about as we were listening to some of the conversations yesterday and today.

BLM_004110

We were talking about how we really need to figure out and talk about a way to educate you all on some of the operations and how they -- how they come about, and we've even been talking about it for parts of our program, our Eastern States, that really focus on the private care placement side of the horses and getting them over to the West so that they can see the animals and how some of those decisions are made, gather operations and corrals on a different scale that aren't just private care placement but also deal with the preparation side of it.  And I think we're talking about a little bit of the same thing, finding ways to provide information to the board so that you are better informed about what is existing, and I think you can have a better conversation, you know, at the board meetings, and I'm sure how to do that, but I would like to consider, you know, how we can, is it a brown bag special, is it some type of workshop, you know, how is it that we can provide you all with some of that information.

Ms. Pearson: So three or four different things, I should say.  I don't have a problem combining 2 and 3.  I think that they are similar, so if we're going to try and shorten our recommendations then that's something we can do.  I 100 percent agree with what Celeste also said.  There's nothing better than getting people boots on the ground to educate them and just like Holle' said, it's a good thing for the board.  We all have our own expertise or our own knowledge.  It's a good thing for us to be able to do these kind of things as well.  The other thing, and I don't know how this works.  I know that BLM is not supposed to lobby Congress, but we've actually done this on a state level, regional level in Utah where we're bringing congressional folks out of DC and bringing them down and, you know, giving them an education on public lands, on not only BLM but Forest Service and different issues that we have with shared stewardship and different things like that, and I know that some of our congressional folks, specifically Utah and then also the people that I work with on National Association of Counties public lands is huge area in the West, but you get past the Mississippi or anywhere east of that, there's many people that don't have any idea what public lands even means because the majority of that back there is also private property.   So I think that when we talk about public lands, we talk about Wild Horse and Burro, there's a lot of information and education that can go out to groups that, you know, they're just not aware of this at all.  So when we were there, it's been two years ago now, and they had the trailer, the traveling trailer, informational trailer, I'm not sure what it's called, Holle', and it was on the mall in DC, and that was great.  That was awesome.  And I don't know if they've got that up and running again, but that thing should be on the road all the time because that's a really good informational tool.  You have the virtual tour on there and things like at that, and I think it all comes down to education and information on these kind of things.

Ms. McAlpine: I just listened to the discussion in combined recommendation 2 with recommendation 3, and did it by saying understanding of how all portions of the program are implemented to facilitate communication with outside stakeholders to find common ground - All portions are implemented to facilitate communication with outside stakeholders to find common ground.

Dr. Lenz: We want to insert board members somewhere in there were because what 3 is recommending is that the board members be utilized to educate and communicate outside.

Ms. McAlpine: Okay.  To --

Dr. Lenz: Stakeholders.

Ms. McAlpine: Implement to facilitate board members' communication with outside stakeholders to find common ground?  Is that what you want?

Dr. Lenz: It's not what I want, but what I would recommend --

Ms. McAlpine: I see what you mean, though.  Utilized by --

Dr. Lenz: If you just stick recommendation 2 and after implemented, okay, so you would say recommend that board members be embedded in day-to-day activities in order to gain understanding on how all portions of the program are implement and had that board members be routinely utilized by the leadership to educate and communicate with outside stakeholders, right?

BLM_004111

Ms. McAlpine: Yeah.  Good.

Mr. Yardley: Can you scroll up to recommendation number 2 so I can kind of look?  Maybe this goes along with what was just said.  What I was going to say, just recommend that board members be embedded in the Wild Horse and Burro day-to-day activities in order to gain an understanding, just keep all of recommendation number 2, and then scroll down to number 3.  Thereafter, board members be it routinely utilized by the wild horse board leadership to educate and communicate with outside stakeholders, period. So basically, thereafter -- and I think that --

Ms. McAlpine: Yeah.

Mr. Yardley: Okay.  Yeah.

Dr. Lenz: Well, I would just say, like I did a minute ago, when you got done with the first recommendation 2, say and that, instead of therefore, board members --

Mr. Yardley: Thereafter.

Dr. Lenz: Yeah.

Mr. Yardley: But we can change that, that's fine.  It.

Dr. Lenz: Rather than hereafter, just say and implemented, and that.  There we go.

Mr. Yardley: Yeah, that looks good.

Dr. Lenz: Do you want go 4?  It's my understanding by the subcommittee that there is a Population Biologist headcount approved by hiring for the Wild Horse and Burro program but that hasn't been done.  Holle', were we correct in that or is that not true?

Ms. Waddell: Yes, the Population Biologist position has been hired.

Dr. Lenz: Okay.  That solved that one.

Ms. Waddell: Yes, Michelle Crabb, she presented yesterday.

Dr. Lenz:  Good.  Okay.  Recommendation 5 that the task force be appointed to update the management book and should include two to three members of the board Wild Horse and Burro staff and research personnel. So didn't I see that from someone else from another subgroup that they had recommended something with regard to the handbook, or did I imagine that?

Ms. Carlisle: We touched on it a little bit in our comprehensive ecosystem approach to management group, and I think we're still sort of having a discussion of the right order of operations here and as Dr. Bleich pointed out making certain that we don't just bog ourselves down with a process that might get us too in the weeds right now.

Dr. Lenz: What do we think we should do about that right about that?

Mr. Yardley: I think we should scratch that for now going back to what Mr. Bleich said, or Dr. Bleich.

BLM_004112

Dr. Lenz: Okay. So scratch 5. So we're down to 6, which is recommending that an outside agency or organization audit the organizational structure of the Wild Horse & Burro Program. I know we know from Holle' that internal audits take place, but this recommendation is that an outside nongovernmental audit be conducted. I guess one question would be whether there would be a budget for that next year. But what does everyone think about that recommendation?

Ms. Carlisle: I'm just going to unmute myself a minute I think this is the recommendation that allows us to even be able to facilitate any of the recommendations well, and I don't know that we've completely used the proper language for these sorts of evaluations, and at lunchtime I'll try to do a little digging, but I think that it allows the best functioning of the program that we can get to, and this is a really complicated program, and it needs outside auditing and internal auditing, and we haven't done the outside auditing portion yet.

Ms. McAlpine: Weren't we talking about something similar to this in recommendation number 1 or 2 in the beginning? And if it was up to me, rather than saying what changes, I would like to see best practices that would be recommended, rather than just saying make changes. I mean, what is the best that we could possibly do?

Dr. Bleich: I think, Susan, you hit on what I was going to comment on, and what we really want to emphasize is how to make this better, not just changes that are needed. So increasing the efficacy, the efficiency, the reliability, enhancing the decisions making process or making it more practical and more meaningful in terms of expediency. So yeah, I think best practices to enhance efficiency and efficacy is good, and you I think have conveyed that, and that's just what I wanted to emphasize. End.

Mr. French: I have to agree with Dr. Bleich. He pretty much summed up what I was thinking. And I would just say as far as looking at organizational efficiencies from an outside set of eyes will probably go a long way to answer many of the recommendations that we've already fleshed out ahead of this. So I think that's kind of the -- that should put us in a position for some recommendations that could solve some of those communication issues that we've been referring to in the last couple hours. Thank you.

Dr. Lenz: I'm having trouble following, what I'm hearing is that number 5, they want to bleed a little of that into number 1. But number 1 from my perspective, we're looking at a leadership reaching agreement with local and state program leads rather than -- where is 6 again? Run that back down to 6 because I don't have that on my list. Rather than -- asking an outside source to evaluate the program. So I missed a couple of comments, I guess, how we would merge those together. Maybe Commissioner French could enlighten me a little bit on that. Maybe he has a better grip.

Mr. French: Yeah, Tom, this is Commissioner French. My thinking was that one of the things that was stuck in the back of my mind was we were going through number 1 there having to do with that coordination, consultation with local entities to try to basically establish in my mind efficiencies in how we're going to go about implementing the program in that particular locality. And when I was -- what crossed my mind as we were going through recommendation 6 was that that's essentially a -- following an efficiency study from a third party, that would essentially could conceivably give ups the road map we would need to make that connection. That's what I'm thinking.

Dr. Lenz: So we're still in support right now until we get to the final discussion of a third party audit, right?

Mr. French: Agreed.

Dr. Perryman: Yes.

Ms. McAlpine: And following that conversation, perhaps we should move recommendation 6 up to recommendation 1 or 2 so that it sort of has an orderly fallout, I guess.

Dr. Jenkins: Yeah, it would be helpful, let me preface this helpful comment. You know, if we hire somebody to do an external look at this program, any organization is going to come in with their own perspective and their own biases. If

BLM_004113

you hire somebody from a business perspective, they're going to come in and look at this as business. If you hire somebody who does governmental audits, they're going to have a series of assumptions. If you hire economists, they're going to look at it a little differently. It would be I think helpful for me to understand and I think Ms. Carlisle said she's going to take a look at what you mean by an audit versus a study versus some other way of looking at an organization because, you know, I have a certain view of what an audit is, and you all may too, but it would be good if you could specify from what, you know, sort of theoretical vantage you would like to have this. If it's just simply an organizational look, how is the BLM's horse program organized, and we could just do the box thing, or if it's something even deeper than that, as Dr. Perryman was saying, a lot happens between the boxes. If you're interested in how a shift in administration affects the program, that's a very different kind of question, and a shift in administration does in fact affect all functionings of the BLM. Anyway, there's a variety of ways that you can approach such a study, and it's not yet clear to me what it is that you all are thinking about. And that would help me to take action on a request or recommendation such as this one. Thanks.

Dr. Bleich: This suggestion will flow down the local and state administrators, but every organization has a boss, somebody makes decisions, and working towards an agreement, to me, could be rephrased more directly and say provide direction to lower level or outlying, to those in charge of the state to comply with this, rather than just say work towards an agreement of just have somebody make the decision, this is how it's going to be. Again, local managers won't like that, but it's the most efficient way to get anything done.

Ms. McAlpine: I think Dr. Jenkins hit it right on the nail for recommendation 6 when he said study because I think what we're really getting at is to study how BLM addresses all of the situations that they face, and that's why I'm saying, you know, help define best practices. You know, we may do it one way one state and another way another state based on what's on the ground, and that should be the way it is, but if we can do things better, that needs that outside look, I think Celeste keeps using a term like that, you know, just new eyes on the situation so we see it in a different way and get some very different suggestions.

Mr. French: This is how I envision it. We've gone through gosh going all the way back through to the first set of recommendations earlier this morning and we've talked about everything from the question was asked, for instance, how come mares haven't been given the fertility control when we've been handling them that Dr. Lenz was asking that question, which came out of recommendations earlier in the previous year. Utilization of outreach and we tried to flesh out a number of ways of utilizing outreach assets and resources, then I wrote down a number of them talking about creating emergency gather budgets and emergency budgets of any kind really starting with District and all the way up through the state leads. And then talked about recognizing local offices for capture management and how we go about trying to coordinate how captures are standardized. And then standardizing the decision tree process. You remember the conversation talking about that Dr. Perryman came up with where we come up with a recommendation it's adopted by from a national perspective or from this level and the level where Holle' is at, and you get this trickle down effect all the way to the State Offices, and it's in many cases ignored.

At any rate, that, to me, if we're looking for maybe the word audit isn't the right word for what we're asking for. Maybe it needs to be used, Susan's words talk become a study, but that study would start with a set of questions and asking, and trying to answer those questions, and how can we best define the weaknesses and what brought us to that pointed and what is best practices for consistency down the road. That's how I saw it. And I think basically many of these items have been discussed and hashed over, over three years ago. And there were some -- you folks probably remember the frustration on the part of the board the last official meeting we had before we had COVID-19 shut us down, but talking about, you know, having a lot of the recommendations that seemingly kind of went on deaf ears and for one reason or another, it wasn't that they were ignored, but was unable to comply with or to implement. So it created a lot of that frustration. But I think this is an opportunity try to standardize using those questions as a premise to standardize why some of these, many of these recommendations showed up again this year. Thanks. I'll yield back.

Dr. Bechert: Thank you. I agree with the term "study," as probably better than "audit" and part of that I think should be a comparison with other existing emergency response organizations. Maybe the wildfire program. Because BLM will be increasingly responding to emergencies. And so what changes could be made to streamline and increase those efficiencies? So looking internally but also externally for other successful models would be helpful.

Dr. Perryman: Yes. Let me sort of use another blunter tool to try and explain sort of where I think we were coming from and certainly where I think I'm coming from anyway with this is, you know, let's be honest, within federal agencies, there's no incentive for risk taking, absolutely no incentive for risk taking. There is an incentive for not taking a risk, and if a directive comes down from the Division Chief to do something with respect to the horse program f a State Director, for instance, as an example, decides in their own mind that that is not worth taking, that whatever that decision is, is taking a risk for them or their state or their programs or whatever they think is might affect, if they think that there is a risk associated with it, they have the option to not do it or to stonewall it or to go slow or whatever they can come up with to do that, and there has to be a way, and maybe we go through the rulemaking process, I don't know, what CFR number that is these days, but there has to be a way that when a decision is made at the national level in the division, that that decision works its way all the way and gets implemented into the field. Okay? That's the example. Because we've all seen examples of that happening, and we cannot afford that given the crises that we have before us.

We have to make sure that the efficacy of those decisions, the efficacy of the implementation of those decisions get done, and that was part of our frustration that Commissioner French was talking about from previous meetings is the board makes decisions, we pass them along, and then they seemingly get ignored, and it's not the division that's ignoring it, it's something downstream that has ignored those things or made it impossible or made it difficult for them to be implemented. So I don't know how to get any blunter than that with this. But that's what I had in my mind and I think that's what some of the other board members had in their mind based on our discussions at the last meeting that we had. So with that, I'll yield back.

Dr. Lenz: One question I have is it's great to recommend this, but who do we recommend does it? Do we want to get into that detail?

Ms. Carlisle: I don't think we want to detail that. I think we want to provide some parameters for our expectations, but the BLM would, I would assume, would they have to go to bid for something like this? I mean, we don't want to make specific direction except beyond maybe private entity or, you know, something to show, it's an internal assessment, could be done by some fresh eyes, but we have to define fresh eyes.

Mr. Yardley: I really like that word you used, Celeste, of internal assessment, maybe some people feel differently, but I wonder if instead of internal study, we put internal assessment, really that's what we're after, and really just going back to what Dr. Lenz was talking about and you mentioned this, I don't think we should recommend who does the study because that's going to have some bias and the potential for someone to say, oh, they were just trying to get business drummed up for XYZ, but we're not, we just wanted to get that information out there and get that figured out. That's all. Thanks.


**[BREAK]**

## Public Comment Session (3)

**Marie Milliman**
Marie Milliman, speaking on behalf of Wild Horse Education as a field representative. Thank you for the opportunity to speak to me. I have extensively observed and documented the range and the wild horses on range and during gather operations. Reminder, while horses and burros are a value public resource and not a use. I would like to have confidence that the board is capable of recognizing the value of public input as more than just an emotional response. Valuable, factual information is being provided and should be considered and applied. I will first address the most prominent suggestion, drought water access. This water emergency situation is self-created. As migration was mentioned as a coping mechanism for other wildlife, horses are prohibited to migrate due to fences that fragment our publicly owned and public perceived wide open lands. It restricts to alternative available or seasonal water sources and forage. Remove the fences. While the board has clearly stated that the BLM is hauling water, Wild Horse Education is only aware of two BLM active water hauls and has remotely contacted every district in the west in the last 30 days requesting that we be notified of drought monitoring, a list of water hauls, any water improvements and drought reports within HMAs with zero response. I have a question which is why has the agency taken no action on the active EAs that would allow them to close

BLM_004115

livestock grazing and prepare water hauls and use funders to repair wildlife.  BLM is choosing not to use the fullest extent of the law to restrict livestock and mining.  BLM puts in wildlife sources that are outside of the HMA boundaries.  Over the last ten years, Wild Horse Education has water shut off by permittees, inseparable wells and springs trampled by livestock.  If there was a true responsibility, the BLM would be preserving their habitat by restricting the uses.  We have been in a drought for six years now and necessary water improvements should have already been implemented.  It's not just the livestock that are decimating our public lands.  It's mining approving, installation, that has actually escalated resulting in further lowering the water tables, habitat loss and fragmentation.  What we have identified is the BLM failure to actually manage the HMAs.  BLM is searching for solutions when the information to actually manage is already established in the BLM handbook, Chapter 6, herd management area planning. The BLM is being grossly negligent in not completing the HMA piece as required.  This is a base for actual management of which an equitable wild horse allocation should be a priority as stated by law.  Not remove, sprinkle in some fertility control, and profess unavoidable overwhelming emergencies each and every year. CAWP needs revision.  Observers in the field should have an opportunity to observe the animals at the time of capture, and have access to report reports, et cetera.

**Keisha Sedlacek**

Hello, my name is Keisha Sedlacek, and on behalf of the Humane Society Legislative Fund, I appreciate the opportunity to address the board today.  We were pleased to the the FY '22 and the plan to vaccinate 3100 animals.  This is a substantial increase but it's still not enough.  More worrying is BLM's justification to continue its boring surgical sterilization of mares as a medical technique after recently announcing it would not be using ovariectomy via colpotomy.  To say it plainly this techniques not safe or humane for the animals. It's important to us that the agency develops management techniques that are safe, and we ask them to affirm the same.  The disingenuous understanding of what it takes to administer fertility vaccines have produced suspicion and confusion of helicopter gathers.  While bait trappings are improving, the helicopter drive gathers will likely deliver fertility control vaccines for the foreseeable future in order to reach a high enough proportion of the animals to stabilize and reduce their populations.  BLM has a high obligation to conduct them in a way.  To do so, the BLM has strictly implemented its CAWP and conducts periodic review to ensure that the most humane techniques to administer fertility control agents to these animals.  Having to work so long for enhanced protection - domestic and wild - and make sure that they do not go to slaughter, we were appalled by the allegations in the "New York Times" expose.  With other organizations and at least 32 members of Congress, we called upon the agency to suspend the program while investigating these alleged abuses, pursue available penalties for any violations discovered and take steps to ensure future abuses are prevented.  We were disappointed yesterday to hear the agency does not intend to suspend the program while it investigates these abuses.  We urge the board to continue to press the agency to take action on this.  Lastly, we note that while the western landscape is no stranger to severe drought, the added impact of climate change makes the BLM's multiuse mission much harder to fill.  Tough decisions loom ahead if the BLM cannot successfully create a sustainable and resilient program based upon nonlethal management strategies.  We urge the board to do its utmost to guide the agency, and a full-scale commitment to the development of just such a program. Thank you.

**Colette Kaluza**

Okay.  I'm speaking to you today as an independent member of the public.  I do not accept donations, nor do I receive any financial funds or favors from any organization or group. May I draw your attention to what I think and believe you will agree is most foundational and important, yet vastly overlooked.  Component of wild horse and burro management on public lands planning.  Planning is missing from the BLM Wild Horse and Burro Program.  Yet the means for planning is right in front of you.  The foundational document is herd management area plans for all 177 herd management areas. Herd management area shall be prepared.  Pursuant to the wild, free roaming horses and burros act of 1971, Section 43 CFR, 471.03-1, herd management area, I will quote you one part of that.  The authorized officers shall prepare a herd management area plan which may cover one or more herd management area areas.  Of course, the board knows that is shall, that it is not may. The BLM wild horse and burro management handbook, Chapter 6, page 36 talks a lot about herd management area planning.  I won't quote all of it, just a little bit for you to look up yourselves.  General herd management area, for wild horse burros and herds, it's through a sign specific environmental analysis and decision analysis, NEPA.  During the NEPA process, the environmental impacts associated with a range of alternative management strategies for the wild horse and burro herd and its habitat is analyzed and then I will drop down to another document, BLM report to Congress May 2020. It says page 21, herd management area plan development, every major management activity that occurs on HMAP, and I will tell you going back to the management handbook, I looked -- it's so important to have HMAPs, it's mentioned in the handbook over 100 times.  I will go on and say, I have researched all 177 HMAs.  I

BLM_004116

know what HMAs have, HMAPs, there are less than 10 and the vast majority are way out of date, 30 years old. They are too stale to be useful. They are historic underlying documents, but are essentially missing without HMAPs, our public lands are vulnerable to manipulation and corruption of and the use of our public lands that is not in the best interest of the wild horse and burro. One great example is Fish Creek in Nevada.

**Tristan Nielsen**

Okay. Great. Thank you for the opportunity to comment today. My name is Tristan. I'm the district manager for the White River Douglas, where we support the use of public lands. I'm calling in to north Colorado home to most of the wild horses in Colorado. I'm here to share a few facts that reflect the situation that our rangelands and economy are in and to support you in the tough decisions that you are going to have to make to effectively manage excess wild horses. Our appropriate management level within the county is 135 to 235 horses. BLM completed a census this March and have estimated that we have about 1600 horses, including this year's foals. That is 1,365 more horses on the ground than the BLM originally deemed our rangelands to sustainably support. To add, there are cattle per mitts who chose not to turn out on to certain pastures due to overgrazed areas due to excess horse numbers and the horses continue to push on to private property. That situation is bad enough, but we cannot forget about the D4 exceptional drought designation western Colorado has. Our rural communities rely heavily on our public lands that make up about 75% of the county, and the livestock permittees and hunting and fishing outfitters are important economic contributors to our county. Our community and economy suffer without healthy, public rangelands and all its multiple uses. There's no doubt emergency gathers are imminent due to the lack of feed and water available. We have a situation that will soon lead to many horses suffering. The current BLM's national horse and burro program is unsustainable under the current management strategies. Without access to all the tools provided through the wild Free Roaming Horse and Burro Act, the program will cause ecosystems in many areas to crash, horses and wildlife will starve or die of thirst and rural communities will be devastated. We respectfully request the board continue to support the hard decisions in utilizing all the tools to find solutions that will truly address the current and worsening crisis across the western landscapes. We need immediate action to remove excess horses from the range to protect the health of the horses and the rangelands. Please, stay focused on solution-oriented actions and do not get side tracks by feel-good distractions. Thank you very much.

**Carol Walker**

Wonderful. Thank you for allowing me to speak today. My name is Carol Walker. I am a wild horse photographer, artist, author, and advocate. And I have been following, documenting, and observing and photographing wild horses in Wyoming and other states since 2004. And right now, there is an environmental assessment that was drawn up for five of the largest herds in Wyoming. 3555 wild horses to be removed this year. I have, this week, been out on several of these HMAs, and there is plenty of water and feed. These actually, HMAs are in better shape than just about any, and there is no need for a removal this year. It is the Rock Springs grazing association driving this decision. I believe firmly that what needs to be done is the roundups need to be stopped right now. And a humane plan for management of wild horses and burros on the range needs to be implemented and using birth control where needed to control populations, humane birth control, proven birth control, not sterilization, not dangerous experiments on wild mares. So that needs to be the goal, to keep wild horses on the range where they belong. Adoption incentive program is an abomination. Wild horses are being sent after people get their $1,000, being sent to slaughter. This needs to be stopped immediately. And adoption program, the money needs to be put into education and support of adopters, not into giving them money and incentivizing greed and against the welfare of the wild horses. The commercial livestock needs to be removed from these herd management areas, especially the ones in the midst of the worst throes of the drought. There is no reason that there needs to be grazing, livestock grazing on herd management area areas. Wild horses are on 27 million-acreage and 75% of the forage is allocated to the livestock and not to the wild horses. And the horses in holding, it doesn't make sense to continue to build more holding facilities, more feed lots for these wild horses when they are out there on the range not costing the taxpayer millions. And they need to be kept free, wild, with their families, and they need to be managed where they belong on the range. Thank you very much.

**Morgan Phillips**

Hello. My name is Morgan Phillips. And I live on a farm in southeastern Georgia. I am very grateful for the opportunity to comment this afternoon. My family and I visited the mustangs in the Pryor Mountain Range last year and I would like to address the fact that the Bureau of Land Management continues to work towards the capture and sterilization than release of wild mustang. This plan, of ovariectomy via colpotomy is obviously not supported by the public. After multiple lawsuits, it just doesn't make sense why the BLM is determined to continue this plan. The majority of Americans

BLM_004117

obviously do not support this barbaric way of spaying a mare.  Hundreds of veterinarians have voiced their opposition as well.  And how can we expect wild animals to be able to successfully function in the wild when their natural hormonal behaviors have been taken away. There are other options for population control of wild mustangs and burros PZP darting is safe.  There's effective darting for herds all across the west.  However, the best option for population control is the natural one, leaving the wild mustangs and burros predators. It seems rather ridiculous to agonize over their population which nature's checks and balances are no longer present.  The mass killing of wolves and mountain lions is cruel and has given us more problems. These predators keep deer, elk, coyote, and other animal populations in check as well.  It is best if we allow nature to take care of itself.  I understand that these predators are a risk to ranchers, but I don't understand why the ranchers don't use livestock guardian dogs to protect their livestock.  Ranchers and farmers all over the world have used livestock guardian dogs for hundreds of years to protect their animals from lions and wolves. We need to be good stewards of this land that God has given us.  We need to have humane and biologically sound management plans.  Thank you very much for your time.

## Pamela True

Okay.  My name is Pamela True from Colorado, where a few wild horses still roam.  The BLM has decided to wipe them all out 2021 for special interests, ranchers and oil and gas corporations.  I'm founder of Stop Wild Horse Roundups Coalition and co-administrator of protecting America's wild horses.  A wild horse advocate for 17 years.

Year after year, we make our voices heard here at these meetings on cookie cutter, fake EAs and basically wipe out plans based out plans on conjecture, conspiracy, and lacking in any science or truth. All is then thrown in the trash.  We the people are fed up with being ignored.  I used to love this country and now I feel nothing but shame because of the actions of the Department of Interior, the Bureau of Land Management, which is a partnership that ignores the people and are destroying not only our federally protected wild horse and burros against every law on the books and degrading and poisoning our lands turning our precious water into toxic wastewater and depleting our river and streams and all water sources.  Deforestation and native fauna that provide, shade, shelter, food, nesting and habitat all for the wholly non-native cow that ultimately is slaughtered.  With public ranch land, all roads lead to slaughter.  They are not feeding this nation.  They are robbing us blind.  We heard BLM called wild horse and burro advocates ecoterrorists when we peacefully show up to oversee the barbaric roundups. But BLM is at the top of the heap of the ecoterrorism.  And the greedy ones want all of that too.  Sharing is not in your vocabulary.  The greed in this nation will be the end of this nation. Do any of you ever think about what you are teaching your children and grandchildren?  Total disrespect for nature and animals, the environment, selfish me-centered agendas, animal abuse, total lack of compassion and stewardship and little sense of morality.  We have stated to you all for decades the issues with this evil Wild Horse and Burro Program.  Every time we are ignored. This is a war being raged by the BLM, USFS, and USDA, while the wild horse and burro, our planet and you are making us pay for it all.  It's criminal, it's nothing but falsehoods, misinformation, propaganda, dishonestly and animal abuse of highest order.  Ashaming of America.  As always the horses that do no harm in nature and have been willing to serve man, always contributing to the evolution of man are trying to show us the way home, to a moral nation, one of compassion, kindness, community, appreciation of vast wildlands and wildlife, while working together towards stewardship.

## Charleen Flanagan

Hey, can you hear me?  Thank goodness!  First, I would like to thank y'all for giving me the opportunity to make a public comment. I have worked with domestic and wild troubled horses my entire life.  And the last couple of years, it's been really elating and heart wrenching, but I want to start helping all the mustangs that are in long-term holding.  And some of them have been made available to the public because the pandemic, or just because they don't have the means to get them out there and get them viewed. Over the last three years, I worked for the Mustang Heritage Foundation.  I trained and placed about 60 horses.  I have been in the barrel racing industry for approximately 20 years, starting with an Arab and a bare back pad. Utilizing the microchips that go in their checks.  Start transferring and tracking owner transfers. The vaccination castrations and Coggins are all positive aspects that get them home.  You guarantee you will bring them back. These horses have clean health certificates and that needs to be highlighted when you are trying to adopt them.

Open some more adoption centers that can be there seven days a week, available to the public so they can see them, and put them in front of them.  Have the BLM or the Mustang Heritage Foundation do a web page that has the horses on there, with general information, assessment disposition, and it can be updated as they are adopted.  Ability to complete the paperwork and adopt them online. People want to adopt them online, they want to be out of state, they have seven days to pick them up or they go back into the cycle.  Make them have a chance besides just an unfortunate fate of just being in holding. The pastures are great, but it's still not a permanent place for them. Horses that have been captured for longer

BLM_004118

periods of time and have been in pasture settings are a little less reactive and easier to work with.  Partnering with different groups after they are adopted.  AQHA and APHA, they all have different competitions.  I do barrels.  So we have jackpots.  We have side pots for incentives.  It might be $57,000 if you are running a paint.  It might be $10,000 in you are running a quarter horse.  BLM doesn't have anything to push them in different aspects, barrel racing, team roping, cutting, reining, dressage. It's really been a struggle trying to find people that aren't scared to handle them - they have a bad image and they shouldn't.  I think the AIP program is excellent.  They should not be able to adopt again if they are abusing it.  Right now, they are in holding.  We need to get people interested in them.  We need to place them, and we need to save the government money -- I mean, who knows what is going to happen to them ten years from now.  If you start an adoption center, they can get the horses going.  I mean, the BLM can hire a wrangler that can pull them from long-term care.  You want to focus on the mares since there's so many in captivity. I have your email address.  I have more ideas and I will send it to you.

**Amelia Perrin**
Good afternoon.  My name is Amelia Perrin and I'm with the American Wild Horse Campaign.  The last time I spoke to this board, I was 12 years old and now I'm almost 24 and things are even worse for our wild horses.  The BLM is in the middle of yet another slaughter scandal. I have poured through thousands of pages of records and documented hundreds of BLM branded animals at slaughter auctions.  So I'm here today to address the Adoption Incentive Program.  AWHC's investigative report which led to the "New York Times" story, is available to any members of the board.  AIP is a subsidized slaughter pipeline.  I highly suggest you read it.  Roughly 15 months after the AIP was implemented, rescue groups saw a dramatic increase in unhandled BLM horses and burros in kill pens.  Our investigation shows clearly what's happening.  People are adopting horses and burros through the AIP and sending them to pasture for a year and the second AIP payment and then immediately sending the animals to slaughter auctions.  Families are adopting the maximum number of animals each and flipping them to kill pens netting upwards of up to $16,000 in funds.  We have identified and rescued at BLM horses at auction last fall.  We confirmed nearly 80 as AIP.  We confirm the AIP in kill pens as we get Freedom of Information Act requests.  We documented more than 130 more BLM branded animals at kill pens, whose current status is unknown.  Kill buyers also direct ship wild horses and particularly burros across the border without ever advertising them.  So the true number of AIP animals sent across the border for slaughter is likely much larger than what we uncovered.  FOIA records show that the AIP has led to neglect and abuse, including a horse suffering with a broken neck, a horse reportedly living in a dog pen, malnourished and starving horses and horses covered in sores.  It's obvious the AIP is incentivizing those who lack the ability or the intent to care for wild, unhandled animals.  I listened to the board's comments earlier, and I'm saddened but not surprised that you are making excuses for this program. Compliance inspections are not adequate.  The vast majority are virtual.  Auctions where AIP animals are sold clearly identify themselves as kill pens.  Adopters are violating contracts signed under penalty of prosecution prohibiting the sale of slaughter.  The BLM needs to prosecute, not punt its responsible for these animals.  80% of Americans want wild horses protected from slaughter, Congress banned the cruel practice and the BLM's lack of meaningful response to the "New York Times" report, our findings to members of Congress, has been totally inadequate and absolutely unacceptable.  Use common sense.  There's no world in which paying people $1,000 to adopt an untamed wild horse is a good idea.  End the AIP and simply do better.  Thank you.

**Hannah Downey**
Wonderful.  Thank you. Excellent.  Hello.  Thanks for the opportunity to share public comment today.  My name is Hannah Downey and I'm the policy director at the Property and Environment Research Center, PERC, a conservation research institute, dedicated to improving environmental quality through incentive-based approaches located in Bozeman, Montana.  I'm joining you to address the Adoption Incentive Program. Recent lawsuits have questioned the impacts of the program on the well-being and the potential slaughter of wild horse and burro.  I would like to encourage the BLM and this board to focus on the enforcement of slaughter protection rather than disbanding the program all together.  Someone concerned about the ecosystem management and the balance of forage and water needs, there's too many horses on too little land.  The reality is that for every iconic image we get of a wild horse galloping across the range, there's another heartbreaking image of a foal with ribs jutting out and starving.  They are competing with at-risk species like sage-grouse.  It's not as simple as removing them off the range.  The off-range horses cost nearly $50 million a year.  AIP program will not solve anything, but it can help to move horses into homes alleviate pressures on public lands and save taxpayers significant dollars.  Back in 2016, before the program was started, PERC academic researchers found that an incentive payment approach would significantly reduce environmental and economic costs of overabundant wild horse populations.  The program contributed to a 91% increase in wild horse and burro adoptions placing animals into private care and saving

BLM_004119

taxpayers approximately $24,000 in lifetime off-range holding costs per animal. I understand that much of the current controversy over the program surrounding the study that found some animals adopted through this program ended up at slaughter auctions and I share those concerns about ensuring adopted animals are well-cared for. Adopters, however, do sign an agreement pledging to not sell animal nor slaughter. So my concern is with the enforcement of that contract rather than the program as a whole. I know people who have adopted wild horses through this program, and have used the incentive payment to provide a loving, quality home for the horses and want to see those efforts continue. So I would like to encourage the BLM and the Wild Horse and Burro Program to focus their efforts on assuring and enhancing the AIP program through enforcement, rather than heeding calls to dismantle the program as a whole. Thanks for all the work you are doing to listen to the make stakeholders and thank you for the opportunity to share my comment.

**Elyse Gardner Walsh**
Thank you. Okay. You know my name. I'm Elyse Gardner Walsh. I'm a retired court reporter. I'm a certified horse instructor. I have documented roundups in BLM programs since 2009. And I have done a lot of projects and volunteer work for Wild Horse Education. Commissioner Perryman said AML and a number of things and it truly is -- I want to talk about what Colette Kaluza already talked about, the key -- the key to the paradigm shift in wild horse and burro management which is the herd management area plan. And I want to thank them for opening my eyes to this all-important paradigm shift and protocol. You know, the rushed way that Colette -- (Audio fading out) kind of marginalized the facts that it's critically and amazing important. Herd management area is, in fact, mandated in the horse and burro handbook, page 4700. It would -- they set out a plan, set and identifies the herd, markers for the herd, acknowledges trades, topography, identifies objectives for that herd, and identified management tools and identifies triggers for gathers, emergency measures would be planned. This wouldn't all come at us like this terrible broad-brush panic everyone is having. BLM has district offices. It has district managers. It has staff. I'm mystified that at the amount of shirking of the law that's taking place. In the 2020 report that BLM produced, it tries to cover their dereliction by calling the updating age maps, talking about updating age maps, because the numbers reveal what Colette said. 7 to 10 out of the 177 HMAs have existing age maps. Dodging the handbook and the law in this stupendous way has marginalized these horses and set them up for disenfranchising and complete -- they have become a -- kind of a tool for making deals because nobody is making money from them. I'm mystified that it's okay to shirk a mandate like this. If this was done in mining, mining would sue BLM and stop it in its tracks. So I'm asking -- and you guys you sound kind of like a BLM advocate here. Can you please do your jobs and be the board and not the – [timer ran out]

## Advisory Board Discussion and Draft Recommendations

Ms. McAlpine: I looked at the second one and I think we got a comment in the chat from Forest Service, saying that they wanted to be part of that too. That's the way I understood it when I read it. So it would be, 'BLM identified two HMAs and forest service identified two or three.' And that was back in the chat yesterday.

Mr. French: Susan, for item two are you saying -- that was us trying to select several HMAs that could implement the whole cadre of management guidelines, and show a difference?

Ms. McAlpine: But I think Forest Service in the chat message seemed to say that they wanted to do a couple of them too. They also wanted to do that.

Mr. French: That is correct, Susan. Yes.

Ms. Drotar: Yes, this is Teresa. And Eric did put that in the chat and put territories instead of HMAs.

Ms. McAlpine: Okay. And –

Mr. French: Yeah, I certainly see no reason not to do that. I think that's -- you know, if the capacity exists for both of those agencies to put them into two selected HMAs and each agency, I think it just strengthens the case across the board. How does everybody else feel about that? We will stay on number two, until we complete that. So how does everybody else feel about that?

BLM_004120

Ms. Carlisle: Let's move the parenthesis from forest service and no longer consider them an afterthought but part of this comprehensive approach to managing horses on our public lands.

Mr. French:. So are we comfortable with this language or do we want to clean this language up at all?

Ms. Carlisle: I want to ask –

Dr. Perryman: I think it should be to demonstrate a population models rather than modes.

Mr. French: Oh, yeah, models.

Dr. Perryman: Yeah.

Ms. McAlpine: I'm good with it.

Mr. French: I like the way it reads right now.  How about you guys?

Ms. McAlpine: Mm-hmm.

Mr. French: So let's move off of two and up to one.

Dr. Perryman: Jim, can I say a couple of words about -- it's changed since you guys saw it last.  I put in an additional sentence predicated -- I put an additional sentence at the beginning to predicate, that talks about an unprecedented drought that is going on in the intermountain west and we might want to include the desert southwest there.

Mr. French: Okay.

Dr. Perryman: And the -- and took out the actual number.  The number 30,000 was in there before, and I don't know that we need to limit up or down what size that we're talking about in specific numbers.  But I think it captures it when we talk about gathering an unprecedented number of animals. So the language was not really smooths over, but it's it was taken out any kind of benchmark that could be conceived as being too high or too low or arguable.

Mr. French: Agreed.

Dr. Perryman: Whatever the case may be.  So those were the changes that were made.  So now I will be quiet.

Mr. French: Agreed.  Agreed.  I like that. So my understanding then that we're talking about a comprehensive drought management plan dealing specifically with horses in the intermountain west, or are we talking about identifying specific or maybe within the context of that plan, specific HMAs and -- or should we -- I'm thinking just inclusive of the HMAs but possibly -- because we do have -- there are drought contingency plans, EAs out there on the ground right now that they are hauling water under right now. Dr. Bleich, what do you hear?

Dr. Bleich: There is a need for a viable plan.  The board recommends that BLM immediately develop and implement, I think is needed. That includes the capacity to gather and house an unprecedented number of animals.  If you don't put implement in there, well, we planned but we didn't do it.

Mr. French: Okay.  That really drills -- Dr. Bleich, that really drills down a little bit better than the EAs that they are operating under right now in Nevada, for instance, the drought EAs because they are more open ended in terms of authorization for hauling water, and horses are part of that authorization.  But this -- this is specific to horses.  I like that language.  Celeste, how about you.

Dr. Bleich: Just trying to be helpful, but I think it was you, Jim, that mentioned earlier, risk aversion on the part of bureaucrats, decision makers and this -- if you give them a choice, well, yeah, we can develop it, but not implement it and

then there's no risk involved.  And we suggest that they develop it and implement it.  They don't have a choice if the Bureau elects to comply with that recommendation.

Mr. French: Yeah, agreed.  Agreed. I think Celeste was next.  Do you have anything else to add to that number one?

Ms. Carlisle: No.  I just want to make sure that the intent is really clear.  Especially from seat that I sit in.  You know, I think this can be interpreted as here's yet another plan to get rid of horses on public lands.  And this is a plan that will make certain that we have to -- we have to remove animals because they won't have anything to eat.  When that happens we need to be prepared to do it so it happens in a methodical way that makes sense.  The prioritization of this is going to be exceedingly tricky, and if there's no place for the animals to go, that's where our risk is, and so, I just want to make it really clear that I'm concerned about how this may be reflected, but if we don't do it, my concern for what will happen to those animals and longer term, what happens to the Act?  If we're no longer able to manage, because there has been an ecological crash and there has been a crash of the population, and it's determined that we can't have them out there anymore?  My concern is that for the long-term viability of a federally protected wild horse and burro, we better be thinking about this and acting on them.  Even though it's completely painful, and even though I know the optics.  It is looking like none of us care and I just -- I got to get past that because I care more for that habitat to support these horses into perpetuity and right now, it's not going to. I don't care what anecdotal evidence there is.  You better understand your soil science and your hydrology and your productivity and how that entire system is playing on all the other diversity that is absolutely essential for those wild horse and burro to remain out there.  So I'm making an impassioned plea to my compatriots out there that this is make or break right now.

Mr. French: I think you are absolutely right, Celeste.  I'm going to state for the record, we have -- this is -- we are going to remove horses from the range, either whether they are alive or after they perished.  It's that simple this year. And I share your concern that allowing this to degrade past the point it stands right now is really going to cast doubt as to what the carrying capacity, a word that's been thrown around quite a bit today, as far as establishing carrying capacity for many -- for generations to come.  Because this is not going to bounce back overnight.  It is not going to bounce back after the rain starts again.  We lost soil.  We lost plant communities, native plant communities and we have got plant conversion to nocuous weeds in many, many of these environments.  And this is our choice at this point.  We have to -- we have to do this. So I guess -- I state that for the record because I know we are being heard by a lot of folks out there on the ground and this has nothing to do with whether we like horses or don't like horses and whether we are saving forage for some other animal on the ground.  It's gotten past that point because that ship has sailed a while ago.

Ms. McAlpine: Well, my comment was, I'm thinking about Celeste and what she just said, but, my original comment was yes to add desert southwest and do not assume this is only focused towards horses because Southern California and Arizona have a burro issue more than they have a horse issue.  So I wanted to make that perfectly clear that I see this in being utilized in the southwest, in Southern California, for burros in addition to horses.  And I think I looked at the plan and there were about, I think 1,000 to 1500 burros they are projecting to remove from Arizona in the next year. So that's that.  I will think about if -- if Celeste can rephrase it.  She said it and then it's gone, but there was a way to add in the consideration of and then what Celeste said, and then you can go to the current and the likely continuation of the unprecedented drought situation. But something about that, just putting in a short sentence before that, then I think everything looks fabulous.

Mr. French: So Celeste, do you remember that language that Susan refers to?

Ms. Carlisle: Stuff comes out of my mouth and then I have to say it again?  That's the hard part!  I just want to make it really clear that in a nutshell, in making sure that we are thinking about the next generation of wild horses and burros to exist on our public lands.

Mr. French: There it is, future generations of wild horses and burros.

Ms. McAlpine: In consideration of the long-term success of wild horses and burros' sustainability on public lands.

Mr. French: Yep.  That's what is up there now.

BLM_004122

Ms. McAlpine: Yep.  That's good for me.

Dr. Bleich:  Actually, might it be helpful to consider using wording from the public law that speaks to healthy, sustainable ecosystems.  I can't remember the exact quote, but -- this is all this keeping with that notion.
That was included in the original legislation.

Mr. French: Where would you insert that, Vern?

Dr. Bleich: I'm not really sure.  Maybe as specified by the wild horse and --

Mr. Yardley: Deriving an ecological balance.

Dr. Bleich: Yes.  That's what Celeste is arguing for is the future and we want to ensure that those resources are not irreparably damaged or damaged for hundreds of years before they recover. And if we can make reference back to the original legislation in some way, it might hold some weight.  It's nothing that we came up with.  It's Congress people came up with this 50 years ago.

(Overlapping speakers).

Mr. French: If we look at the language that is up there right now, we included surviving ecological balance per legislation and it should be thriving ecological balance.

Dr. Bleich: Right.

Dr. Bechert: Thanks.  I think number one is getting too long and maybe number two is too short.  And something that is bothering me about point number two there, and it took me some time to figure out, maybe I just need more clarification. In general, I think it's a good idea, but I'm wondering what the goal is.  Of number two.  And then maybe some more specific language around comprehensive gather, contraception program, like how long?  Is this just to do it once and then we see, or is it, you know, a seven-year program?  And then demonstrate a successful planning outcome.  Is planning needed there?  Is that the goal of this is or is it the all outcome itself.  Especially the goal.

Mr. French: Management -- management outcome as opposed to planning outcome. I think the idea for this number two came from Dr. Perryman, and I think -- I embrace it.  Barry, I see you out there. Could I get you to chime in on that?  You are muted now.

Dr. Perryman: Sure.  And then I want to go back to number one here for just a minute.

Mr. French: Sure.

Dr. Perryman: The intent -- and I want to talk about intent on this one and the intent in number one as well.  The intent here is to -- to get the Bureau to focus their efforts on one or two -- a couple of HMAs by implementing these population models that have been developed, that Celeste has been a big part of that. We have population models that show reductions in horse populations over time, when we use a combination of gather and contraception. So I don't want to tell which line for the Bureau to use, which timeline or which method.  That will have to be worked out, but they have to start somewhere so that we're actually using contraception on a herd.  We're using gather and contraception in combination on a herd where we actually can show and demonstrate that the population levels are going to go down over time, until we reach a viable population level for that particular herd. So that's the point of it, is there has to be somewhere -- there has to be a unit of success that the Bureau can point to and say, look what we have done.  We managed this population with the best science available, using the best population models, using the appropriate contraception and gather tools, and we have this under -- we had this under control.  We have it in balance. And we're going to move forward and now we can go from there and we can start spreading that out into other HMAs.  So that was the idea that they need to be able to show that they can do it.

Dr. Bechert: I think it's a good goal and I can point to Assateague Island, but each HMA is so different, with different population of horses and all of that.  It's hard to -- I mean what if you do this and it's not successful for whatever reason?

Dr. Perryman: You tweak it until it is.  Rather than trying to figure it out on 177 HMAs, let's figure it out until we get some idea of what we are doing on two HMAs, and then we can go to Congress then.  Somebody can go to Congress and say, look.  This is working.

Dr. Bechert: Okay.  I see focus on specific areas and keep working on them.  But you don't want to neglect the other HMAs either, right?

Dr. Perryman: No, but if the Bureau is only going to -- going to use 2,000 units of product, I want it on two HMAs.  I don't want it spread out over 177 HMAs.

Dr. Bechert: Thank you.

Ms. McAlpine: Can I jump in with then some wordsmithing?  Because to catch all of that, demonstrate a successful planning management, genetically healthy population reduction outcome.

Dr. Lenz: I have to jump in here really quickly.  I would not mention the word "genetics" in any of this.

>> Agreed.

Ms. McAlpine: Okay.

Mr. French: How about the word "stabilize" populations and demonstrate a successful planning management protocol --

Dr. Bleich: Outcome.

Ms. McAlpine: Yeah, okay.  Demonstrate a successful planning/management protocol outcome.

Mr. Yardley: If you are 1,000% over HMA, and you are looking for stabilization, that's not what we want.

Mr. French: But what you are missing on it, Steve, we are not just not talking about contraception here.  We are talking about a combination of contraception and gathers, and utilizing the tools in the toolbox that we have, and quite frankly, I think it's important for us to pick an HMA that is well over AML so that we can demonstrate, we can take a population which is in peril and actually stabilize a population based on the tools we have available to us.  I think that's exactly what Dr. Perryman was going with it. Okay. So we're at the -- I think we jumped down to two for wordsmithing.  I'm -- can I go back up to Tammy.  She's got her hand up.  Tammy, go ahead and tell us what you think.

Ms. Pearson: Well, I hate jumping back and forth.  So if we want to get two nailed down and finished, let's finish it.

Mr. French: I thought we did.

Ms. Pearson: Jumping one to the other is hard to keep up and I know Hannah is doing a wonderful job, but just trying to keep up with us jumping back and forth is confusing to me and I'm sure her.

Mr. French: Okay.  Let's finish two then.  And then let's go back and finish the wordsmithing on one.

Ms. McAlpine: If she has got in the reach a viable herd level because we are talking away a couple.  Take away stabilize populations and go right to and demonstrate a successful planning/management outcome and take away the brackets.  Yeah.  To reach viable herd levels.  You can take out the "a."

Mr. French: And protocol.

Dr. Perryman: We have this thing called AML.

Mr. French: Yep.

Ms. Pearson: I agree with you Barry.  The one thing that we need to stay consistent and that was basically my comment anyway, we need to stay consistent with the Act, right?  We need to use the same verbiage.  We need to use the same acronyms, whatever else with AML. So right now, you know, whether you believe one way or another, whether AML is right or wrong, that's what we got.  That's the tools we have to use.  And so our verbiage and this kind of stuff needs to stay consistent with the Act.

Ms. McAlpine: So you want to change "herd levels" to reach viable AMLs.

Dr. Bleich: Established or recognized AMLs. I heard today there's 177 HMAs, but only 20 plans or something have been written. But there have got to be objectives for all of these areas and if they are established, we should strive to meet those that are established, using successful planning and management options.

Mr. French: Vern, I think ultimately, that's another recommendation.  I actually made that yesterday, talking about reevaluation of the AMLs and strategic plans for each of the HMAs that are timely and accurate, based on conditions on the ground as they exist today.  But I think that's separate from what we are trying to do here.  I think -- am I wrong? What we are trying to do here is apply the tools that the BLM has been given to two HMAs which need -- which need some assistance and see if we can't use those as a test or a model to determine whether or not we can take something that's dramatically over AML and actually start to turn those populations around.  And the habitat following those populations returning to AML. Am I wrong?

Dr. Bleich: No, I think that's it's very important to be able to demonstrate that if it can be demonstrated but I think the objective really should be to meet the AMLs that exist right now. If you have a place that has a proposed population of 100 horses and you have 800 horses there and you bring it down to 500, well, yeah, it kind of worked but it didn't get where we needed to be. And I'm just suggesting that if you have an objective of meeting existing objectives based on existing plans and current plans and you can do that, it will be more meaningful than just say, well, we heard the growth rate or we reduced it by -- the population by 50%, but we never got to where we need to be and everybody here has, I think, pretty much accepted the premise that the AMLs need to be revised based on the conditions that lasted over 50 years. Some would go up and most probably would go down.  But if we have something on paper that is an objective.  We should use these methods to reach our objective.  It may be a fine point that's not worth arguing.  That's the way I would approach it, but I'm certainly not the only voice here.

Mr. French: I think ultimately -- I think that's kind of what's in the back of our minds.  I'm putting words in people's mouths and that's dangerous.  The back of my mind, we couldn't evaluate success on those HMAs until we do achieve AML that exists on record right now. And then you can evaluate what the effect that is having on the environment. And so I think ultimately, that's where we want to go with it.  Having said that, I would like to go to Dr. Lenz right now. He's been waiting out there for a bit.

Dr. Lenz: I would say, I would edit that.  I want to talk about two and then I want to talk about one. After "to", I would say to meet established AMLs and then be done with it.

Mr. French: Yeah.

Ms. McAlpine: Or updated AMLs.

Dr. Lenz: Well, they are not updated yet.

Dr. Bleich: That's an objective that you shoot for.  Tom, that's what I was trying to say.  Thank you.

Dr. Lenz: Yeah.  That's it.

Ms. McAlpine: Don't take the rest of it out.  We need the rest of it.

Dr. Lenz: The rest of it is fine.

Ms. McAlpine: Leave that alone.

Dr. Perryman: Let me interject here, to update an AML, you are talking about a multi-year process and in the meantime, animals have to eat during that intervening period of time.  So there has to be a benchmark and the only thing we have are right now the established AMLs for a particular HMA.

Dr. Lenz: Back up on number one.  I think number one is really lengthy and wordy.  And I think -- and you all can disagree.  I think it ought to go back to the way Barry wrote it.  And if we are concerned about the term donkey or burro or horse, then down here where it says house unprecedented numbers of Equidae, because that covers horses and burros. Now it seems we keep expanding it and expanding it. If you handed me that objective, you know, they need to be measurable.  That would be difficult to work through.  So I would go back over what Barry had and then -- but Equidae rather than animals.

Mr. French: So Barry, what would you strike from that to take some of the wording out.

Dr. Perryman: If we have the original version, that would be a good place to start.

Mr. French: Someday it will show up on my phone, I'm sure.

Dr. Perryman: My main concern with number one other than being too long -- and I was hoping somebody else would catch -- is intent, what is the board's intent.  And what we are trying to do is include intent in the recommendation.  You can't always include intent the way that you would like to do it.  But you can make statements and have some additional verbiage that is aside from the -- from the recommendation that -- so that people can understand what the intent the board was. And -- and I want to go on the record here explaining the intent here and we danced around it a while ago, but I don't think we really nailed it down.  So I'm going to -- I want to try and do that.

This effort -- and I realize -- I absolutely realize that there's going to be entities and individuals out there that are going to see this as a blatant attempt to try and just remove animals and using drought as an excuse to do it.  That's not the intent of board.  Think I can put those words in the board's mouth.  That's not the intent of this board. The intent of this board -- and I will put it rather bluntly is we want to make sure that the Bureau has a plan in place ahead of time, to deal with extreme circumstances into the future, because if they don't, it becomes not only a humane issue, but it becomes an ecosystem, morality issue as well.

And if they don't have a plan like this in place, somebody is going to -- you know, I want some people to be out there -- we're going to be out this dragging dead bodies off the range! If something like this is not put in place.  This is simply to intervene so that we're not starving and choking down tens of thousands of horses and burros and pronghorn antelope and squeaky dogs and neotropical migrant birds and all the other critters that share those ecosystems out there. This is -- this is something that -- this is a plan to deal with unprecedented conditions.  And so that means that we would have to pull off unprecedented numbers of animals. I have a video -- I have an official video of the disaster that happened in the late 1980s down on Nellis Air Force Base, where thousands of horses starved and choked down.  And I for one did not want to be out there dragging dead bodies off the range into a pit because -- because we did not have a plan in place to deal with these unprecedented conditions that we are likely to have sometime in the future.

Mr. French: That was my intention.  Dr. Perryman, this is Jim again.  So let's try to consolidate that language, I would like to -- I want to make sure that we keep that message the same.  Because this is about as -- as much about the message as it is about the request or the take home.  And I think based -- based on -- oh, man!  I'm just trying to think about -- I'm trying to pick up on your -- your last -- okay, version two -- okay version one is above us there.  It says board recommends BLM immediately develop an emergency action plan that includes the capacity to gather and house up to 30,000 animals in 180

days, coinciding -- coincidentally contacting FEMA and Interior regarding possible funding and issue of an emergency declaration. Well, that pretty much sums up what we're looking at.

Dr. Perryman: Jim, I would just pull version one.  Version two is my refined version.  I would just go with version two.  I don't -- I don't know.  Everybody is getting rummy.

(Laughter).

Mr. French: I know.

Mr. French: Can everybody see version two right now?  It's above the --

Ms. Carlisle: Hannah, can you highlight it?  Thank you.

Mr. French: Yeah, there it is. I have four hands up now.  So let us -- I will run from -- I will start out with Susan.  What are your thoughts on that highlighted version?

Ms. McAlpine: That's great.  Just add "desert southwest" intermountain west and desert southwest.  And then I am good with that.  Thank you.

Mr. French: Okay.  Steve, what about you?

Mr. Yardley: Yeah, I think that looks good.  I was just -- my hand had been up from when -- kind along with what Tom was saying.  It was getting pretty lengthy.  The only thing I was wondering is if somewhere we ought to have in there to restore, like a thriving natural ecological balance.  Or something that ties it to the original Act. And the need -- I don't know if we are going to be able to restore thriving natural ecological balances in the areas that are emergency gathers off of.

Mr. French: So the sentence on the tail end of it, to finish it off, basically to -- the intent of the board is to restore a thriving ecological balance.

Mr. Yardley: Yes. And -- issuing an emergency declaration to restore a thriving ecological balance.  And prevent further range degradation maybe.

Mr. French: Well, that's both the same thing.

Mr. Yardley: Well, one is bringing back --

Mr. French: Steve, I'm going to leave it there right now and say it to Celeste.  And see what Celeste thinks and then Dr. Lenz -- or excuse me, Dr. Bleich and then Dr. Lenz.  Celeste, what do you think?

Ms. Carlisle: I would just -- our emphasis is the horses in regards to this discussion and how we talk about use of public lands.  This is all coming back to the horses and so our intent is so that we provide for range in the future that wild horses can still be protected on -- I think we need to make that somehow obviously very connected to everything else. But I want people to really understand that we're going to lose the opportunity to have them there at all, and this is what some of that is aiming at making sure we don't lose that opportunity.

Mr. French: So have you got any language you might think that we could -- we could get that thought included in this or --

Ms. Carlisle: I was adding it to the end prevent range degradation and provide for future wild horse and burro habitat.

Mr. Yardley: Celeste, would it put further range degradation open HMAs because essentially that's the ground that we are dealing with but --

Ms. Carlisle: Yeah.  I mean that's the only things we can make suggestions about. Wait, wait, but we lost the horse thing. Yeah. Future range degradation on HMAs and provide for future wild horse and burro habitat.

Mr. Yardley: Well, the HMAs, that's where their habitat is, but I don't know if that covers what you want to cover.

Mr. French: I'm cautioning we are getting long again on this --

Ms. Carlisle: We are getting wordy.  I'm trying to make it really clear that this is what we -- we care about a lot of things. We also care about the horses.  They might not be there if we don't think about this within context. And within -- and in a comprehensive fashion with all the other uses, blah, blah, blah.  We all know the routine.

Mr. French: So Celeste, are you comfortable with what you are seeing there right now?

Ms. Carlisle: I am.  I know it's wordy.

Mr. French: I'm okay with it, as long as we have all the points.  Dr. Lenz and then Dr. Bleich.  I guess Dr. Lenz may have stepped away for a second.  Dr. Bleich, what are your thoughts?  You are -- you are muted Dr. Bleich.

Dr. Bleich: Thank you.  BLM immediately develop an emergency action plan and implement as necessary in the words implement as necessary, or implement to ensure a healthy thriving environment is necessary.  I shouldn't say is necessary. Exists and persists in the future, in the HMAs are important points to make, but it's really, really, really hard to work on a document like this for me.  It's very hard for me to try to edit and make suggestions when it's constantly changing. So I'm going to bow out for right now, but I do think we need to talk about the need not only to have it, but to implement as needed or as necessary which is the case right now.  And I would urge my colleagues to try to insert that phrase similar to that into this, but I'm -- it's beyond me to be able to come up with the wording when things keep changing.

Mr. French: I think we are all struggling with that right now.  It's been a long day and a long couple of days.  I think where a lot of us are getting punchy.  But -- and this is a hard process when you are fresh in the morning, let alone now. So I want to make sure that we capture everybody's thoughts on this thing.  I don't want to -- I certainly don't want to -- it's a great idea.  I think we all get the idea of what we are trying to do with Dr. Perryman's language.  I want to make sure we capture, as we did with Celeste's comments, we capture those ideas for those people who will be reading these recommendations. So we have a version --

Ms. McAlpine: Can I jump in? So we get down to the board recommends BLM immediately develop and implement as necessary emergency action plans, including -- where did I go?  The capacity to gather and house an unprecedented number of animals, coincidentally contacting FEMA and Interior regarding possible funding and issuing an emergency declaration, period.  The intent --

Dr. Lenz: Do you still want to replace animals with Equidae, or animals?

Ms. McAlpine: It includes livestock, cows, sheep, wildlife.  So just leave that there.  And the intent of which is to restore a thriving -- do we need ecological -- natural ecological balance.  Can't we just have thriving ecological balance and prevent further range degradation on HMAs and.  HMAs provide the habitat.

Mr. Yardley: That's what I thought.  The only reason I was saying to restore thriving natural ecological balance, that's like verbatim out of the Wild Horse and Burro Act.

Ms. McAlpine: Okay.  Then leave it there.

Mr. Yardley: The wild horse and burro habitat is provided within the HMAs.  So I wonder if we can delete the last degradation on HMAs.  And end right there.

Dr. Bleich: And the business of natural thriving ecological systems, et cetera, could be as per public law 192-195.

Ms. McAlpine: We get too wordy then.  And --

Dr. Bleich: For one thing, I don't believe it's -- never mind.  I was just trying to simplify.  Again, I will bow out.  I apologize, Susan.

Ms. McAlpine: Is only the first two.  We have another ten to go through.  We gotta move here.

Mr. French: I'm working on it!

Ms. Carlisle: I was just going to say in that last sentence, the intent of which is to restore a thriving natural ecological balance, prevent further range degrade and provide for habitat that persists and exists in the future. And I'm fine with removing the specifics on the end.  Hopefully people infer that.  If they don't, they don't.  I think BLM will.

Mr. French: Okay. Susan, what do you think?

Ms. McAlpine: Go for it.  It's good.

Mr. French: Dr. Lenz, you had your hand up there for a while.  Are you okay now?

Dr. Lenz: No, I think it's good.  It's fine.

Dr. Perryman: Yes, two quick things.  I do agree that when we talk about unprecedented number of animals, I think we need to put Equidaes in there.  Because BLM doesn't have --

Ms. McAlpine: Cows.  Don't they have cows?

Dr. Perryman: Equids instead of animals.  And let's flip persists and exists.  So we get exists and persists. Okay.  I'm good.  I'm 10/10 on the side.

(Laughter).

Mr. French: Okay.  Everybody likes that version?  Thumbs up? Okay. All right. Let's move down to number two.  Are we squared away with that now?

Mr. Yardley: I think number two looks good.  Let's go with it.

Ms. McAlpine: Wait.  We have an issue.

Mr. French: We have a couple more issues.

Ms. McAlpine: Successful -- successful planning/management outcomes. You got rid of the a, you are talking about, two, three, four, five.  So it can't be "a successful." Thank you.

Mr. French: Celeste, your hand is up.

Ms. Carlisle: I think we need to make sure -- we ask the BLM to identify two very different HMAs and very different situations.  One that may be very, very, very many animals over their AML and maybe one that is closer to it and so we are learning about this management and if we can achieve the higher numbers as successfully as we can at those lower numbers.  And the timing that that takes.

Mr. French: So from the standpoint of language, should we say select two representatives HMAs --

Ms. Carlisle: Select an HMA near AML and select an HMA not near AML.

Mr. French: That's easy enough to do.

Ms. McAlpine: You can't do that. You are talking about one horse and one burro.  And you are talking about two different things and now you want four.  So you have to figure out --

Mr. French: Theoretically.

Dr. Perryman: How about in consultation with the board?

Mr. Yardley: The only HMA that's close to AML, I think is on the Pryors, and they are already kind of there.  So if you pick one other one -- I don't know of a whole lot of others that are near AML.

Mr. French: So I'm not seeing changes just yet on recommendation number two.  Dr. Bechert, your land is up.

Dr. Bechert: I was going to say if you start putting criteria on here, you need to go all the way to the weeds because HMAs differ, you know with their geography, and all of that.  So I -- I don't think we really want to go there.

Mr. French: No, I think certainly the Bureau understands what our intent is after this conversation today.  So I think we should probably leave it alone.

Mr. Yardley: I would agree with what she said.

Mr. French: I do too. Okay.  Steve, you had more comments you wanted to make?  Your hand is up. Anybody else have changes they want to make on recommendation number two, the wording as it exists now.  Thumbs up? Okay.  Can we move on then?

Ms. McAlpine: Are we ready to run with this one? Hopefully it was all straightened out.  We have just a couple of little things.  Just before we came back, we were floating around with a comprehensive and standardized gather and evaluation, whether it's a presentation or a brochure.  I'm not big on the brochure half of it.  Should be developed by BLM to be shared with the public observing gathers.  This presentation would include but not be limited to what is normal behavior for zoology for horses and burros what is going to happen and when during the gather, when the end result could be, and then Dr. Lenz had brought up mortality and morbidity statistics and so that's up for discussion.  And then Ursula added members the public who observed a gather should have an opportunity to submit constructive feedback to the BLM via an online form within a week of the event as a pay of engaging the public more and I'm not into that.  If they can't say something the day they are there, they will go home and have 40,000 people flood BLM with complaints. So that's it.

Mr. Yardley: Yeah, I would strike out mortality, and morbidity statistics.  That can kind of be included in -- in D, what the end result could be, and maybe you could – i.e.. mortality and morbidity statistics. Also, Susan, I do like the idea of a brochure in conjunction with the presentation so that if people are there, they can hand out the brochure so they have something to review and go over, along with -- I don't think the brochure, on a standalone basis is a good idea but I think it's a good idea to have in conjunction with the presentation.  And then I would strike out that last sentence, personally, but that's up to the rest of the board.

Ms. Carlisle: I think that we have to have a way for the public to be involved in this process.  And we're not going to figure that out in the next two hours, but I think that we need to begin to think about how members of the public submit their experiences or if they -- you know they witnessed an incident and they wanted to report it, there should be some method of them hearing back.  They should be hearing about what has been done about it if anything.  What the BLM in that debriefing reached as a part of that process.  Did they determine that something had gone wrong or did they determine, you know -- I don't know.  There has to be some back and forth.  You obviously don't want to add some layer that nobody can do, because there aren't personnel to do so, but there's got to be some sort of -- this isn't going to happen overnight and yet another fantastic reason that the CAWP coordinator is in place.  These are the type of things that can happen over time, but I think we need to start agitating for these sorts of things to be occurring in a much more procedural way so that the public can count on a response to their concerns:

BLM_004130

Ms. McAlpine: I need to respond to that, because we have a minimum of two -- (No audio)

Mr. Ferraro: I think Susan froze up.  Let's see. Did everybody else see that too.

Mr. Kuechle: She appears to be, yeah. Maybe -- somebody else might jump in. Ursula, do you want to share your thoughts?  We will relay them back to Susan.

Dr. Bechert: Sure.  My effort to add that about the members of the public at the end was in response to Celeste's earlier suggestion about including the public.  And I should be more specific there.  It's not who observed a gather but that particular gather.  And so you know, the brochure is an attempt to have something written.  It's part of the education process, and then there's the presentation Q&A.  And then members of the public who observed that, sometimes you need a little bit of time to digest.  Just giving feedback to the person there doesn't ensure that that information gets relayed in an effective way.  But if there's some kind of online form with some maybe open-ended questions even, that gets emailed to the people would are interested in submitting something, and it's not to be shared so there's not 40,000 people providing feedback, but just the people that were there at that gather.  And have it be constructive and that might be a good way to engage the public.  It was just an idea.

Mr. Yardley: If you leave that, members of the public who -- just delete, who.  I can see some value in being able -- for those people to reach out to BLM if they do have a concern or frustration, because sometimes they can have an opportunity to mill about in their mind over a week or so, rather than right when it happens.

Ms. Pearson: Okay.  So I said this 100 times.  I have been on these gathers a lot and I have seen the things that happen there.  So in Utah, and I don't know what everybody else does.  But in Utah, before the gathers start, there's a one-on-one with the state lead and the PR people that are there in person.  There's an educational thing up front and then after the fact, there's like a -- if there's an incident or whatever, they do in-person kind of a debriefing, if you want to call it.  And kind of allows that back and forth and an explanation of situation.  So I know that's happening already.  I don't know that it's -- you know, it's something that can be emailed or whatever, but I know that's how they are handling things here.

Dr. Perryman: Yes, I -- I'm following along the lines of Tammy.  I'm not sure that we're not giving them something that's already happening.  It could be something that is refined or standardized.  Chanced are it's not being conducted the same way for each gather across different states.  So maybe it would be better to -- I don't want to the blow the whole thing up. It seems like we are recommending something that is happening in most places.  Maybe the standardization should be -- the recommendation, that the Bureau standardize how it's done for each and every gather.  And I'm not sure that that's not true either.  So I'm willing to be -- I don't want to spend a lot of time debating it.  But are we recommending something that we are already doing?

Mr. Kuechle: That's how the recommendation begins is a comprehensive and standardized gather preparation and evaluation procedure and presentation should be developed by BLM to be shared with the public observing gathers.  We are putting this all together in standardized process.  Celeste, go ahead.

Ms. Pearson: I want to jump back in.  It's more important that the people on the ground can have the conversation if and when an incident happen rather than it be an open ended email that you can put whatever you want.  And maybe that's still another -- that's another option on top of that, but I think a face-to-fate interaction with the lead and the people -- and the BLM that are on the ground at the time, is a better way of handling things in my mind.

Ms. Carlisle: Well, why don't we ask for, assess -- assess gather protocol -- I know protocol is not the right word, but whatever the right word is for BLM, assess the public outreach and protocol at field offices and begin an analysis of whether they need to be standardized across the field offices.  That's not super grammatically awesome, but I'm trying to get these words out.

And then I think it's important and I don't think we come up with this or develop it right here on the spot, but I think for -- to -- part of our recommendation is to request that some sort of meaningful engagement and survey of the public that observes these gathers should be incorporated into whatever.  If that's already happening, great.

---

BLM_004131

I mean, I -- not everybody reacts the same.  Some people think it's not sufficient.  Some people think it is sufficient, and so that would be part of the assessment.  I don't think we can make that sweeping claim.  Some of us have gone where things go swimmingly and it's all good and people do a great job and it seems to run okay. And some have gone to, you know, that support structure isn't set up, and it seems a little chaotic.  So I think we need to first get a good idea of whether it's -- you know, it requires additional standardization or another player of public involvement that is different than it is now.

Mr. Kuechle: So Celeste is offering instead of -- that the existing system be assessed.

Mr. French: Yes, I would support that.  I think maybe starting with that, just assessing that, and then throwing out some of the ideas that we had, like the brochure and the presentation and the debriefing.  And then the post online follow-up. Because what I have heard from public comments is that they don't feel included in anyway.  They feel excluded and this would be a controlled way to give people who come to a gather an opportunity to provide some feedback.  And it seems like this information might best go to someone in the CAWP program, but also public affairs, in case, you know, something was upsetting to continually improve this whole process.  But something is missing from the way it's happening now.  And I think if a person is at a gather, and they are upset by what they see, they won't share it right there. And if they do I imagine the BLM person would just, you know, explain it away, but it's -- it's not quite enough.

Ms. McAlpine: We have taken a huge jump from what we our original thought was.  We should either strike it and go back to the original, because we cannot have everybody's concerns or anybody who is upset about anything, contacting BLM because they feel included.  This is to make sure that everybody who observes a gather has an opportunity to deal with a representative and go over what is supposed to happen, evaluate it at the end with them and ask if there's any problems and address them, or the staff member or whoever is conducting this observes something and processes it with the people observing the gather.  I mean, they are not running around 400 acres all separated.  So it shouldn't be that difficult.  We just jumped way too far away from the original intent.

Mr. Kuechle: So Susan, you want -- your recommendation is to end this at C?  A, B, C, and that's the conclusion?

Ms. McAlpine: Yes.  If you want to evaluate with individuals that's fine.  Other than that, that's fine.  Other than, that it's way overkill from where we started.

Dr. Bleich: Susan, I'm with you on that, although I was not involved in the development of this.  But the way it started and the way I perceived it initially when we talked about it at first, was to provide information to an attending member the public, a participating member of the public, how horses and burros are preadapted or well suited to -- physiologically to some of the things that you will witness.  How this will proceed what could go wrong and what you might expect to happen. So it was prepare them for what they might see and if you want to provide a process for further criticism, I would not use the word evaluate.  I would use criticism.  Because that's all you will get.

Ms. McAlpine: Evaluation is not the right word.

Dr. Bleich: Debriefing.

Dr. Lenz: Around our post-gather.  But I think up on the original recommendation, we're talking about two things. We are talking about a brochure and we're talking about an on-site presentation. Right? So maybe the word "on site" should be put or at bather.  I don't know how you want to word it.

Ms. McAlpine: Yes.

Dr. Lenz: There needs to be something.

Ms. McAlpine: On-site presentation.  Up in the second line.

Dr. Lenz: Yeah, on the second line. That was the whole point.  If you explain to people what might happen, and why it happened, they are much more respective than if just let them jumping to their own conclusions.

BLM_004132

Ms. McAlpine: And then D needs to be process for debriefing, participating members post gather. Or participating public post-gather.  Jim?

Mr. French: I came on some language that might work for this.  In lieu of the language starting with below D, how about provide -- BLM provide community -- a communication portal for debriefing gather participants following events?

Ms. McAlpine: So to me, that's just a duplication.  We are doing the debriefing, asking them to do the debriefing post-gather, meaning there.  That day.  Not six months.  So we might need the word immediately.

Dr. Lenz: Process for immediate debriefing.

Ms. McAlpine: And then we go back to opening everything back up again.  I saw Celeste's hand go through the air.

Ms. Carlisle: Well, I think we're getting a little hung up.  There are two different thought processes.  This could be two different recommendations, but I think for the sake of -- I'm, and another thing I will get to.  There are two different things here.  There's having really well designed, excellent education for members of the public that show up that is not just saying hey, guys, everything will be okay.  It's a really thoughtful deep dive into the process that's going to happen.  And we don't need to design that.  Again, this is for BLM to design I know that they have a process in place.  Maybe it's the same, maybe we are adding a little bit to it.  But the second part is meaningful public participation.  I don't think it matters whether it's the day of or online.  I think the board needs to recognize that there has been a miss somewhere along the line and we would like the CAWP coordinator, perhaps to begin digging into that a little bit more. I don't think the board needs to get into the particulars of this.  I think we need to say that we like for this process to begin and be helpful along the way.

Ms. McAlpine: So you are adding an additional recommendation.

Ms. Carlisle: I don't think it needs to be.  I think in D, we say the board recognizes that BLM should begin the development of -- I don't know how to say it -- a better public participation method.  Now we can wordsmith it.

Ms. McAlpine: To me, that's different than where we were going.  If you want a different recommendation regarding communication lines.  That's something else.  We are not talking about communication after an event.  We are talking about specifically at a gather. And so anything beyond that becomes its own recommendation.

Mr. Kuechle: Do you have a second recommendation?

Ms. McAlpine: We have the Adoption Incentive Program.  I thought we were done with the hard one.

Mr. Kuechle: I wasn't sure --

Ms. McAlpine: We thought we were going to the easy one. (Chuckles) So can we agree -- because I see recommendation number three.  Up there and then I see a recommendation three down below. So that comprehensive was one.  That must have been when I was offline.  So that's another recommendation.  Or is that gone now?  That's my question.  And then we need to move on to the Adoption Incentive Program.

Mr. Kuechle: So Susan, what you would like to propose is recommendation number three above, that we have been working ends after D, and I guess that's what -- we need to identify if anybody feels strongly that it -- that this other piece is relevant to this and stay in.  Does anybody feel strongly about that, I suppose?

Dr. Lenz: No.  No.

Mr. Kuechle: I think we are in a good place then where we can conclude recommendation three.

BLM_004133

Ms. McAlpine: Okay. Good. Now we need to go to the Adoption Incentive Program. And I changed it a little bit because of comments that have been made today, and information that we received. So I changed it to say, the Adoption Incentive Program, (AIP) is in the process of investigating issues related to the welfare -- oh, I'm sorry. I'm hearing feedback. Welfare of horses and burros adopted through this program, and possible misuse. Once analysis has been achieved, the program must be updated accordingly. BLM must enforce rules and --

Mr. Yardley: Susan, will you slow down a little bit. They are having trouble keeping up.

Ms. McAlpine: Do you want me to start over again? The Adoption Incentive Program, AIP is in the process of investigating issues related to the welfare of horses and burros adopted through this program, and possible misuse.

Mr. Kuechle: Pause there for a moment. Let her catch up.

Ms. McAlpine: Tell me when, Steve.

Mr. Kuechle: I will let you know. She's catching up. Good ahead. After misuse.

Ms. McAlpine: Misuse. Once analysis has been achieved, the program must be updated accordingly. The BLM must enforce rules and prosecute when appropriate.

Mr. Kuechle: Pause there for a second.

Ms. McAlpine: The board recommends noncash incentives in parenthesis, training or veterinary costs, end parenthesis, and implementation of refinements to ensure a high standard of welfare for adopted wild horses and burros.

Mr. Kuechle: Okay. Hold there. Okay. Implementation and refinements.

Ms. McAlpine: Implementation and refinements to ensure a high standard of welfare for adopted wild horses and burros.

And the last line, a suggestion would be longer periods until titling. And then rest of that was added since I have seen it. So that would be the part under discussion. A statement and response to the "New York Times" article. That's a duplicate. It says a statement in response to the "New York Times" article and social news media should be made as soon as possible. That's the piece that I'm saying was not in the recommendation I saw last time and passed by me, but we only had ten minutes. So we were doing our best to get everything to Celeste. That would be the piece that would be under discussion.

Dr. Lenz: I would replace food with feed.

Ms. McAlpine: Okay.

Mr. Yardley: Yeah, I would -- in an effort to keep it concise and to the point, and I would just end it at the BLM must enforce rules and prosecute when appropriate. Keep the recommendation to that point. You are opening a whole other can of worms with the noncash incentives. I can see benefits to having noncash incentives. You have to have a whole other bureaucracy, essentially, to carry out those things. For the simplicity of the program, I -- personally, it's a tradeoff. I don't know if the tradeoff is worth it. And -- and maybe you could include a statement in response to "The New York Times" article and social media news should be made as soon as possible if that hasn't already been done. But I don't know -- I personally would probably strike everything else after "appropriate" in the first second, third, fifth line.

Ms. McAlpine: And, you know, I kind of agree with you, Steven. I think that makes it a stronger statement, and I think it shows to the listening public that we heard what they had to say, that we're responding to what they had to say. And I would be more than happy to leave the statement in response to "The New York Times" article and social media news should be made as soon as possible.

Dr. Bleich: I agree with Steven and Susan on this.

BLM_004134

Ms. Carlisle: I know and I hear the problems with taking a pause. I think the public is demanding and I'm not just saying from comments we have gotten at this advisory board meeting. But I think that a pause through the investigation does not stop the program, but it shows that there has been a high enough level of intensity around this issue and I truly believe if we do not pause it, the level of intensity will be higher. So I would strongly recommend that the board support a pause. A pause is not an end to a program. But it can show that because this was a pretty hard shake to this program. This wasn't just a sort of bumps in the road that we need to even out and make better that that would be appropriate. And I also think that, again, we don't need to define what the -- you know, what the incentives would be, but I think we should strongly encourage the pursuit of noncash incentives as an alternative, and we don't have to list what that might be or a voucher program or whatever. I think the optics of handing cash to people with a horse and the potentials that that sets up.

Again, remember, I'm coming from the angle of the organizations that catch these horses that fall through the cracks. Obviously, horses are going to fall through the cracks. We all know people are going to take advantage of the system. We know these things. But weak show a really good faith effort that we care about them and we want to do our darndest to make sure that we patched up what we can and we are not going to get them all. I really think that that could help to calm this. It doesn't end the program. It gives it a little bit of a step back. All right. Let's make sure we understand what happened and maybe it is not significant. But if we don't really understand that before moving forward with the program, we have sort of missed an opportunity.

Ms. McAlpine: Have we got any hands.

Mr. Kuechle: I wanted to catch, Celeste -- the cash, noncash incentive. Does that capture the additional sentence you were proposing? What Hannah just wrote?

Ms. Carlisle: I think just saying -- we're just suggesting that they think outside of the box. We want to provide support for that. We don't have to say what that is. We can just recommend that they continue pursuing these additional incentives. Different incentives other than cash, whatever.

Mr. Kuechle: Alternative noncash incentive?

Ms. Carlisle: Yeah.

Ms. Pearson: You just derailed my train, Celeste. It's not that I disagree. And I guess that we do need to do a deep dive early and an investigation. I totally agree with that. The part that I worry about is that investigations can go on for years. I'm not sure if we pause that, that we will ever get it back on board. The one thing I do have to say is I know there's already incentives -- noncash incentives through the AIP program and things like that. There are those kinds of things in place. I don't have a problem with pursuing alternative noncash incentives. We all know the price of feed right now, and there should be a way of maybe reimbursing people for the hay that they buy or something to that effect. And I think changing payment process after titlement or something to do with that effect -- you know, there's a lot of -- there's a lot of things that we can change here, but I like the wording the way it is. And I 100% agree with the statement in response to the "New York Times."

Mr. French: Yeah, thanks. You know, I think we're all fairly close on this. I for one -- I will just say it, I for one have a difficult time taking a very dramatic stand on a policy that we proposed a year ago based on an article that describes approximately 80 horses that were in sale barns with no data to determine where those horses went. Just selling a horse after it's titled is not illegal. And -- and if those horses were sold as -- conventionally they are sold after titling, they are -- it's legal for the -- you know, those horses, as was pointed out are no longer covered under the wild horse and burro protection. And so therefore, they become somebody's property and I have a problem with the horses -- anybody who willfully got into the system, accepted the cash payment and then -- and then tried process gaining the system, processing the animals into slaughter. I don't think any of us embraced that. But we're taking some pretty serious -- I've got somebody over the top of me. [background noise] We're taking -- can you guys hear that?

Mr. Kuechle: Yes, I just muted it. Well, trying.

BLM_004135

Mr. French: You know, we're taking some pretty serious action here, based on an assumption that -- and without any data to support it. At least for -- from the standpoint --

[background noise]

Mr. French: Actually going through slaughter or going to slaughter.  I mean, those animals go into the sale barn and being sold as titled animals is -- is -- I think is what the article centered around. If I'm wrong, then I think -- then I will backtrack here.  I have complete confidence that the BLM will ferret out those individuals who took advantage of the AIP and broke the law.  I'm sure they are in the process of that right now.  There has -- you know, the rules pertaining to sale before titling is in place for conventional adoption as well. And so I'm -- I'm thinking that we're taking a shot he had incentive program because of some allegations that have -- that we have no data to support yet.

The other thing that bothers me is that if we decide to go this direction with it, we have to think about that 7800 horses that most of them went into homes and went adoption and off the -- and off the inventory that the Bureau of Land Management was faced with maintaining.  And looking at what we have in front of us in terms of challenges this next four months, taking -- adding 7800 horses, assuming this year is the same as last year in terms of adoptions. If we added another 7,000 horses, so to speak that the BLM would have to put into their inventory because we paused the program, I -- I worry about that. I worry about the capacity.  I know we are all worried about that.  I guess I'm playing a little bit of a devil's advocate here.  I think it's repugnant that anybody who would take advantage of the program and is sell these animals illegally into slaughter. These are just my comments and I'm certainly open for something to bend my elbow.

Dr. Perryman: The -- in the first place here, the statements involved here, they are in no way a recommendation.  It's just some statements. Secondly, the Bureau, Ms. Culver addressed the investigation yesterday in the national press.  And so -- and an investigation is ongoing now.  So the -- the response to "The New York Times" article or whoever broke the story, that's been taken care of.  At least at this point.  We may have liked to see something happen sooner, but regardless of that, that's been taken care of, a national statement has been made and shared with the national media on it.
So that part of it is sort of a moot point at this point in time.  And so we are back to the AIP program and whether or not it should be paused or not.  And I -- I can see both sides of the issue.  The -- the adoptions went down during COVID.  I mean, we did 7100, I think in 2019, and since 2019, we're at about 7800, 77, 7800.  So it's slowed down significantly.  If there was a time -- if there was an appropriate time to pause it, now would be it, probably.  Because it's slow for a couple of reasons that have already been mentioned.  And if you do pause it, you always run the risk of, you know, not being able to open up shop again.  I mean something could happen that could slow that process down.  So that's what we are down to, is whether -- I think that's what we are down to, is whether or not we want to recommend that the AIP program is paused, and if we do I would -- I would put -- I would put a time limit on it.  I would say, 30 days. Or you know, 60 days.  I don't know.  But I would limit the window of time associated with it, if we think that pausing it during an investigation would be a good idea or not.  And if we decide that it's not a good idea, then we can -- we can move on, I guess to the next one. So that -- in my mind, that's what the question is, is now given everything else that we know.  And you saw Arthur McGuire put a bunch of stuff up.  A lot of what we have been talking about is a moot point.  Now do we want to pause the incentive program or not?

Mr. Kuechle: "The New York Times" article that Paul McGuire provided the response that the BLM has provided.  Does anyone have discussion as far as removing that portion? This doesn't read necessarily like a recommendation as it is now.  And what's on the table, so to speak, from what he's offered is if we want to provide a recommendation to pause and if so, do we want to attach a time limit to that?  So Dr. Lenz, your thoughts?

Dr. Lenz: Well, to me, there are two recommendations.  One that would come out of this, one is to pause it.  The other is to consider vouchers instead of cash payments for people who are adopting these horses. I have dealt with a lot of vouchers.  It's not uncommon for organizations to provide vouchers for feed or farriers or trainers or veterinarians.  I can tell you from a veterinarian perspective, they are kind of a pain in the neck, because the client doesn't pay you.  They hand you something and then you have to contact whoever is providing the voucher and go through the process of getting your money.  So I'm not a big fan of them, but we certainly recognize them, and accept them.

BLM_004136

As far as pausing, I -- you know, this is a good, successful program, and we have no credible information that these horses have been sent across the border to a processing plant. We know they have gone to a sale barn. That's the legal right of the people once they own them. There's no information that they -- that they have gone anywhere other than to another owner. Until that's proven, I think we need to not pause this program. It's a good program. It's worked well, and I -- I just don't see the logic in stopping over something that we have no information that's happening. It just doesn't seem logical to me. And I understand people are all worked up about this. But it just doesn't seem logical to me.

Mr. Yardley: After thinking about everything that was said by everyone, my personal recommendation would be this, strike recommendation four all together, and let's move on with the rest of the recommendations. But I would need a second on that.

Ms. McAlpine: Well, I have been all over the board. First, I didn't want to stop the Adoption Incentive Program. Then when I saw the lists of 81 horses with their brand numbers and everything, I was like, well, you know, something is going on, maybe we should. And yet based on the conversations that we have had today and the information that we received, that the program is, in fact, being investigated. That I think the end of Recommendation 4 is simply really express to the community that the board has had serious discussion about this and that it is being analyzed and that we feel that BLM must enforce rules and prosecute when appropriate. And so if people don't feel that's an important thing, let's ditch it. Otherwise, let's end at appropriate and go on to something else.

Ms. Carlisle: I don't think we need this statement to "The New York Times" -- the response -- I don't think we need to ask for a statement. It's long past. They put out what they put out at this point. I don't think we should throw it out. I think we need to show that the board is concerned and BLM is concerned. I think we should keep it as it is. Yes, some of it is already happening but the board is also enforcing that we think if someone has broken the rules, they should be prosecuted. And sometimes the BLM doesn't have the teeth, and that goes back it revising regulations, which we don't have time to hit at this meeting but maybe the next. And it would be really lovely -- because otherwise, I would probably just have to abstain from this and it's I think it's heading in a really good direction, especially asking -- recommending pursuing alternative noncash incentives. If we said a short pause, a 30-day pause, I think that would help tremendously for all the reasons I already said. If we don't put that in there, I think we should leave it as is and have a second recommendation in relation to this, that says the board recommends pursuing alternative noncash incentives before continuing with the program or whatever.

Ms. McAlpine: Yeah.

Ms. Carlisle: So Recommendation 4.5, the board recommends -- yeah. Pursuing alternatives. We had it below. The board recommends pursuing alternative noncash incentives. And do --

Mr. Kuechle: Do you want to have those suggestions or just leave it noncash incentive?

Ms. Carlisle: No, that's not our purview. We can assist along the way if that's determined, but we're just stating that.

Ms. McAlpine: Okay. So because there's two pieces of this and we want to move on, I like the 4.5, but how many of the board members by a raise of hands that we can see visually, feel that we should be pausing the Adoption Incentive Program?

Dr. Bechert: I would say it's a pause, but with a timeline. Not just pausing it. I totally agree with Dr. Perryman. You have to put some parameters on there.

Ms. McAlpine: So we have a pause. A pause with the timeline. Any other -- we've got one, two, three.

Mr. Kuechle: I think that's what you were supporting too, Celeste. You are not saying -- you are saying a pause of the timeline as well?

Ms. Carlisle: Timeline?

Mr. Kuechle: Like 30 days.  So there's no straight pause on the table.  It's a 30-day pause or nothing.

Ms. McAlpine: Okay.  So we have three 30-day pauses and how many non-pause?  Although Barry wants to say something.  Oh, okay.  He doesn't need to say.

Dr. Perryman: I will go for a 30-day pause.

Ms. Pearson: I would support a 30-day.

Mr. French: I'm sorry, I was muted, but I'm sorry, I have -- I have some concern about any pause at all right now.  And it's mainly because I don't want to see this whole thing get the -- the baby get thrown out with the bath water as a result of this recommendation.  Just in light of the action that happened in the -- the House of Representatives following this article, and the letter back to Interior to try to end AIP completely, I worry about the action that we are taking, even at 30 days and what that message says to Congress. So I will be happy to support this program, when the data comes back that says that there was a breach in this program that caused animals to go to slaughter illegally and I will be happy to vote against it at this point, but at this stage, I can't.

Ms. Waddell: Sorry about that.  And it -- it's related to AIP and I think it's part of the language.  In about the third sentence down, that says the BLM must enforce rules and prosecute when appropriate.  I would encourage you guys to reconsider the language, and mainly because that is the job of BLM.  We have authorized officers that are operating daily based on regulations, based on legislative authority, and enforcing the Act.  And when there are violations of the prohibited acts or terms of adoption, that's absolutely a BLM official's duty to contact law enforcement, and go through those proper channels.  So I just wanted to offer that.

Mr. French: Agreed.

Ms. McAlpine: Can I suggest, Holle', that in order to really let the public know that we are listening to what they had to say, can we change it to the BLM will enforce rules and prosecute when appropriate?

Ms. Waddell: I mean as a recommendation, it just -- you guys are the board.  I just wanted to offer you that information.

Mr. Yardley: I think we need -- we need to reword Recommendation 4, because it's falling back on what Dr. Perryman was saying.  It's -- as it it's stated right now, it's really not a recommendation per se.  It's just a statement.

Ms. McAlpine: So let's go back to -- before we discuss this anymore.

Mr. Yardley: Oh, Dr. Bleich had something to say quick.

Dr. Bleich: This is very much in you know with what Holle' is pointing out.  And I don't think we need to make a recommendation here.  I think simply a statement that the board is aware of the public's concerns and appreciates the aggressive and thorough handling of this situation or investigation and subsequent outcome, whatever is decided on behalf of the BLM and its efforts to properly ensure the well-being of adopted horses.  We get into all kinds of things.  Just that the board is aware of the public's concern and we are convinced the Bureau is doing the right thing in investigating this.  This is their job.  They have the professionals to do so.  They will carry it out to the best of their ability or to closure.  And this was made very clear in the press release that ball just distributed to us again and what the lady said yesterday, the new incoming BLM chief. I don't think we want to criticize them.  I don't think we want to end any AIP.  It's worked.  I have real problems with the voucher idea.  Even if there's a 30-day window on this, you know, suspended it for 30 days, nothing gets done in 30 days.  This wouldn't be a memo from the top to the field in 30 days, and get anything accomplished.  I don't mean that in a demeaning way, but it's just that democracies work or don't work.

Dr. Perryman: That's why I suggested 30 days.

Dr. Bleich: Pardon?

Dr. Perryman: That's why I suggested 30 days.

(Laughter).

Ms. McAlpine: So it looks like we have a split board with regard to the idea of pausing Adoption Incentive Program.

Ms. Carlisle: I think we get rid of four and go to our 4.5, we want them to pursue looking into and we may have to do additional actions at the next board meeting. We don't have to write that down. It gets us to step one. We have 32 minutes to finish our three or four other recommendations. We may have to table some of it this conversation. I won't say it's over and done with. At that point -- heck, it would be wonderful if at that point we didn't have to revisit it. I'm saying we are making this statement close and around our Recommendation 4.5 and leave it at that.

Ms. McAlpine: And 4.5 becomes 4 and you delete before continuing with the program.

Mr. Yardley: Can we include the statement on Recommendation 4 the board is aware of the focused concern and appreciates the thorough investigation and then the board recommends pursuing noncash incentives and just put a period at the end of burros and leave it at that? Because I think that's -- I think that's as far as you will get. I think that's as comfortable like Jim was talking about. We worked really hard and we're really excited to get this program underway and I do feel like it's been a success and a darn good success. Has there been -- if there has been a problem, it's been a relatively very small problem. And a knee jerk reaction by us or the BLM that entirely shuts down this Adoption Incentive Program is as a step in the wrong direction, especially considering what we are facing ranges with the habitats and everything else coming on, we're -- we're making more tools and opening the tool box, we are closing it down, we are throwing tools out the back window.

Mr. Kuechle: I think -- I think we're on the same page there at this stage. we have three recommendations. And I'm judging that you would like to keep these separate? Does anyone have a concern with keeping this a statement and keeping recommendation as four and --

[edits to the recommendation verbiage are made on the shared screen]

Mr. Kuechle: Yeah. All right. Are we go moving to the next work group?

Ms. McAlpine: Mm-hmm. Please.

Dr. Lenz: I have pretty short statements. We cut down the three statements, the three recommendations, the first is recommend that the board members be embedded in the wild horse and burro day-to-day activities in order to gain better understanding of how all portions of program are implemented and to enable wild horse and burro leadership to utilize them to educate and communicate with outside stakeholders. This we combined two of them that we discussed last time. So I'm open to any discussion or recommendation to change.

Dr. Perryman: There may be some FACA issues here with the board and I would like to hear from BLM what their thoughts are about that, because I can see some real FACA potential issues.

[referring to Recommendation 5, where the board is embedded]

Dr. Lenz: I don't see the FACA, the board gathers itself together and brings it back and talks about what it knows and what it's discovered. So just in -- just really quickly, I don't see it as an issue for the boo at this point. I can consult with the FACA committee experts on that, but that's my preliminary read on that Recommendation 5.

Dr. Perryman: Thank you.

Dr. Lenz: Anybody else?

Dr. Bechert:  Yes, the day-to-day activities in order to gain better understanding, I think that's part of it, but I was also thinking in our initial conversation that we get, you know, embedded based on our areas of expertise.  And that we actually contribute to the process so it's not just to learn about how it works.  The examples I put forward was I'm surveilling the research place.  I'm working with the research team.  And Susan is the liaison to CAWP.  So, you know, mapping the different board positions to the most logical place within BLM.

Dr. Lenz: You would comma, based on their individual expertise, be embedded.  Is that what you are talking about?

Dr. Bechert: Yeah, I think that would work.  Thank you.

Dr. Lenz: Although, when they are processing horses, and castrating and so forth, I think it would be good for members of the committee to be present and go look at that, even though they may not know much about veterinary medicine or vaccines.  I agree generally that would be fine, but I think we can all learn something from the other activities that we're not necessarily experts in.

Dr. Bechert: I agree and it can be separate and to me, wasn't there some place -- I don't know if it's still standing or maybe it was part of something that already existed because I think Steven said part of the onboarding process was having board members go out in the field and experience all of that.

Dr. Perryman: Tom, let me back up a minute here and let me give you a what if scenario, back to this FACA thing.  Embedded may not be the best word.  Maybe attend would work.  I mean, let's say Steven was embedded in a gather.  Whatever embedded might mean, I could see that the public -- I could see a problem there.  He's somehow a part of planning or being involved in the implementation of a gather, that could be problematic. Maybe it doesn't violate FACA, I don't know, I have to trust Dr. Jenkins and the FACA experts there, but boy, that's something that I would not want the board it associated with.

Dr. Perryman: Attend, something that's more benign than this term embedded.

Ms. Waddell: So I guess I was going to say two things.  I don't know, Steven, you might remember this, Bruce took a stab a couple of years ago to get you guys out to attend a gather, and at the time, the FACA committee person was against that.  And I think there was some type of concern and I can't remember exactly what it was.  Dorothea, you might chime if you recall. It's something that we would definitely double check and see about that attendance.  I can't remember if it was a travel issue or if it was participating or something, but I know that we also have in the past done field trips, you know where we have taken you guys to a certain area, to see a certain operation.  That may be something that, you know, we could -- we could definitely ask that question back around, and there's positions that change often.  That may be something that's back on the table.

One other thing that I guess I would encourage, I mentioned some type of work jobs and Scott was going a little bit further.  We were chatting back and forth how it is we could assist in you all having a good understanding of the program and the different operations.  We talk about them but we don't really talk about any type of -- I don't know what to call them.  I keep calling them a workshop, I don't think it's a brown bag but some type of orientation of the program itself, and the specific operations that we conduct on a day-to-day basis.  And I'm not sure if that's where you guys are headed in trying to see. Those other field trips were always in conjunction with the board meetings because, you know, it was based on FACA guidelines, it was required to be a meeting in a public setting.  That's the other piece. So if we are really talking about your working groups that are possibly, you know, traveling somewhere, or an operation that's related to the working group that you are working in or something like that, that might be -- that's something we could consider.  I think this recommendation is a good one so you can be oriented with some information and you will have more information as you deliberate and have discussions.

Mr. Yardley: Yes, touching both on what Holle' and Barry, Dr. Perryman talked about.  I could see a lot of problems if I was to be embedded in a gather.  I don't think that would go so well. But I did really enjoy -- and I have missed having the field trips in conjunction with the meetings that we have, because I do feel like it opens up the eyes of a lot of the participants and it helps us get another perspective, more information and more embedded information leads to more and better recommendations. So a really good doctor -- kind of one of my heroes from college, Dr. Jim Bounds -- and

Dr. Perryman will know him -- he's a range expert and an instructor there.  He said you can learn more a day in the field than you can make up for in a semester worth of school and I think there's a lot of truth to that.

Ms. McAlpine: I liked Holle's word.  Rather than be embedded and rather than day-to-day, I find that a little scary.  I don't want to be looking over Dorothea's shoulder every day. How about based on their expertise receive orientation in wild horse and burro whatever you want to call them, projects, programs, events, whatever in order to have a better understanding and to enable wild horse and burro leadership to utilize the board.

Dr. Lenz: Don't you think we are talking about more than orientation.  I'm talking about -- I don't want someone to stand there and tell me how they are doing the process.  I want to walk up there and watch it, to see it.

Ms. McAlpine: Do you like onboarding better?  I mean that's a ter.

Dr. Lenz: I think like Ursula was talking about where she works with the research folks frequently, not just, okay, here's our research.  I think participate in or attend.  Either one of those will be fine.  I guess I envision this as a little closer contact than just an orientation or an onboarding, you know, a light touch.

Ms. McAlpine: Okay.  I would go for that.

Dr. Perryman: I have a little bit of an issue with the expertise.  I'm not an adoption expert.  I would like to know that -- I don't know that that's the direction we really want to go either.  I'm not really sure where I'm at.  I'm waiting for someone to fix it so I can make a decision.

(Laughter)

Mr. Yardley: Well, I agree wholeheartedly on that.  I was thinking the same thing about expertise.  Like, I'm representing the livestock industry.  I feel like I'm already -- I deal with the BLM:  We're not on an HMA, but I have an expertise already in that part of what I'm doing, but learning all of the different things, that maybe I don't have an expertise in would probably be more beneficial to me than learning more about what I do have the expertise in.

Mr. Kuechle: I wonder if you strip -- it sounds like BLM and the board is on the same page.  Celeste -- strip it of the details and I think it comes to good.

Ms. Carlisle: I'm helping with wordsmithing.  I'm trying to.  I think we want to make sure that -- I mean the reason we are chosen to be on the board is because of our areas of expertise.  We want to take advantage of that and interacting with those portions of BLM that have to deal with our backgrounds.  But we should also be, you know -- that sometimes applies to other things.  And that -- and sometimes if we learn something about something else, it -- it helps us in our area of expertise.  So I think something as simple as based on their individual expertise and/or interests.  And then continue the sentence, be involved, participate in, attend in, blah, blah, blah.

Mr. Yardley: Can we leave that out and recommend that the board members be involved.  I think we are making too much verbiage.

Dr. Lenz: I do too.  I would say recommend the board members attend day-to-day -- if you don't like attend Wild Horse and Burro activities and cut out that other.

Dr. Bechert: I think we are talking about two different things and that's why it's becoming -- one thing we were talking about is we do have different areas of expertise and so we want to utilize that in participating, attending, not in day-to-day activities but maybe in, you know, regular activities.  Again, mapping our expertise to some place in BLM.  That's one thing. The other thing is based on our interests, or our need-to-know as board members, we need to have that onboarding or orientation or whatever you want to call it.  They are two separate things.  That's my point.

Dr. Lenz: Yes.  I agree.  So this -- the point of this one, to my understanding, is to educate the board members on the activities of the Wild Horse and Burro Program from gathers to processing horses to adoptions to the Mustang Makeover

to all the different things that go on. So maybe we should stick with that, and how about we recommend that the board members attend Wild Horse and Burro activities in order to gain better understanding and go with that? If we want to add an additional one, we can do that.

Ms. McAlpine: Paul just suggested engage with wild horse and burro staff to gain a better understanding.

Mr. Yardley: I like how it's written right now with everything striked out that's struck out. I think it's concise and to the point. I think if we leave it like that -- if we want to make another recommendation to accomplish what Dr. Bechert was talking about, I think that's fine, but I think recommendation five with what's struck out in it reads good and it's concise and to the point.

Dr. Bechert: I think the reason that we were initially recommending that we include something about our individual areas of expertise and being mapped into BLM is to increase the meaningful engagement that we have with BLM. And this came out of my initial meeting listening first because I'm the new one, where were complaining about not being really engaged. Not being listened to. And I said, whoa, my experience is very different, let me share. And I can see that Susan served as liaison with CAWP, and, you know, that's a meaningful engagement. So the purpose of mapping area of expertise to BLM is to provide that meaningful engagement on an ongoing basis, based on our expertise.

I totally like the other stuff that you are talking about too, which is onboarding, orientation, learning more based on interests, all of that, to better understand how all of the portions of the program are implemented. I think that's great, but that's -- that, to me, sounds like something that already existed. I don't know. I never participated in, it but if not, I think it should be, you know, a second statement in this recommendation, because it's all about improving the engagement with BLM. I don't want us to lose that, because I thought that was really meaningful in our discussion.

Mr. Kuechle: So what would be your specific recommendation as a second statement? What would we do to this?

Dr. Bechert: Well, I would recommend taking out the strikeout and leaving that, but then adding some of the stuff you have below, like orientation for board members, better understanding of how all the portions of program or implemented. So one is more participatory where there's more of the back and forth, and the other is more directional board members being educated. So they are in my mind very different thanks.

Mr. Yardley: Can we leave Recommendation 5 as it stands Dr. Bechert and make another recommendation that covers the things that you are talking about? I agree that there are two different things going on, but I feel like for one of those things, as written with the strikeout, recommendation number 5 cover it's well, but I don't feel like it covers what you are talking about at all, really.

Dr. Bechert: Yeah.

Mr. Yardley: Another recommendation would be better and just leave that recommendation number five on the standalone basis and then make recommendation number 6 on another standalone basis to covers the basis of what you are talking about. I do see there's two different things at play, but I feel like one of those is covered well in Recommendation 5 as it stands with the strikeout.

Dr. Bechert: I think that could be with the possible exception of and to enable leadership to utilize them to educate. Because I don't feel like if I'm learning about something, then I'm going to turn around and educate somebody. So I think the latter half of that sentence should go with the other.

Mr. Yardley: That's fine.

Dr. Lenz: Well, the way I looked at the last part of that is once we have been well-educated on all phases of Wild Horse and Burro Program, we're able to educate other people that we run into or contacted by about the program. So I guess I thought it was better like it was originally. I don't think we are talking about educating them in great detail. We run into this all the time, or I run into people on a plane, and they start up a discussion about something in the horse industry, and you don't dive into deep science, right? So I would leave it up there and then I would start a second one that just says

recommend that the board utilize the expertise of individual -- recommend to the BLM, utilize the individual expertise of the board members.  And what do you think?

Dr. Bechert: The first part that individual board members be involve and participate in WHB activities.

Dr. Lenz: Okay.  That's fine.

Dr. Lenz: I would put a period after basis, rather than repeat what we said in the first one.  Would that be okay with you? It strikes me that the reason you are utilizing our expertise is not to help us educate other people, and it's to utilize our expertise.  Is it okay to say basis period?  Not your heads, put your thumb up?  Okay.  Let's move on.

Dr. Perryman: No.  I have two quick questions.  When we talk about recommend board members attend WHB activities, et cetera, are we talking about taking Celeste and sending her to an adoption event in Missouri? Some place?  I mean, what are we talking about specifically?  Do we have anything really in mind that the -- that could fulfill this -- this recommendation? That's my first question.  The second thing is not a question, but I guess just a point.  Let's make sure that we're thinking into the future that we're not just thinking about this current board.  Okay?  And I will leave that at that.  So just make sure that we are thinking about it in a future perspective on both of these and then I will -- I will go away here for a bit.  So can somebody tell me what specifically you had in mind first of all?  That was my first question. What are we talking about?

Dr. Lenz: We're talking about taking people on gathers and taking people to different areas where our work is going on with the Wild Horse and Burro Program to show them what's going on.  Because right now -- I and I understand that we are in a unique situation because of COVID.  What normally takes place is not taking place because we are doing everything remotely.

Dr. Perryman: So we are talking about sending Steven to an adoption event in Colorado or some place or wherever, and I mean -- is that really -- I mean that costs money and time.  Is that what we're really talking about doing?

Ms. McAlpine: But that's what we had done previously, although I only attended Washington and then everything kind of fell apart.  But that's what we did.  We often took the board on field trips to pastures, to holding areas, to a gather, if it was happening or to a --

Dr. Lenz: I think it's difficult.

Dr. Perryman: But that was in conjunction with a board meeting.

Ms. McAlpine: Yeah.  Yeah.  It could be that.

Dr. Perryman: Are we talking about individual -- as I said, are we going to send Steven to Minnesota?  Or are we going to -- are awe talking about this was a board function.  That's two different things.

Dr. Lenz: My understanding in the past, it hasn't been that way since I have been on the board, all little field trips we took was in conjunction with a board meeting.  But in talking to Fred in the past, they have done that where they have taken two or three members and taken them to a gather or taken them somewhere for a specific reason.  I don't think we need to drill down to where they go.  I think it's hard to defend a program or talk to individuals who don't know much about it if you haven't stood there and watched it or at least followed it in some way. I think this is to remind the Wild Horse and Burro Program that the board members need to attend these activities in person in order to provide good feedback and input and help defend and educate people on the program.

Dr. Perryman: Okay.  That's great.  Now we have intent.

Ms. Carlisle: I need to do some chairing.  We don't have very much more time.  Our captioner has a dead stop sooner than we think. So let's give ten more minutes to these recommendations and then we need to vote on them. And the BLM does have some parameters or used to have some parameters to get the board involved in different things and those have kind

BLM_004143

of gone away based on various reasons but they have some stuff that I think is a good starting point and so perhaps this will just lead to ongoing conversation with BLM to figure out how we help and assist for this to get going again.

Dr. Lenz: Okay.  If I was a betting man, I would not bet we get through these in what did you say, five or ten minutes?  But let's take a run at it. So number six, in order to improve Wild Horse and Burro Program's efficiencies and coordination, the board recommends that an outside third party be retained to study, identify, and make best practices, recommendations on improvements.

Ms. McAlpine: I'm good with this.  I don't have any wordsmithing or any comments.

Dr. Bechert: I was wondering.  There seems to be some things maybe missing and I'm not for adding a whole bunch of verbiage, but something about the ability to respond to emergency situations more nimbly.  I think that was part of the whole process, remembering Scott's presentation of the process for requesting a gather.  You know, that to me might be valuable to highlight in here as a goal.

Dr. Lenz: Well, tell me how you would do that.  What would you change to do that?  You know, I think these ought to be relatively simple, but give us some verbiage.

Dr. Bechert: You are asking me not to solve the problem but to wordsmith it?

Ms. Pearson: It kind of goes back to Barry's suggestion on the FEMA things.  I know, you know as a county commissioner and working with USDA and Forest Service or BLM, either way, when there's an emergency, a fire or something to that effect, all of the red tape goes out the window.  And there's emergency funding available, at a moment's notice, and that emergency situation, there's already a plan in place, and there's already funding there.  And everything is an all hands on deck type of thing and it just gets done. So I don't -- I don't know if this kind of thing can be tied to like the fire funding or FEMA funding.  When Dr. Perryman said that at first, it struck a chord with me, because we deal with that on a -- you know, an annual basis with fire.  And to me, this is no different with the drought, than a fire.  And fire rehab.  I'm not sure if Dr. Jenkins or Holle' can speak to that if it's even remotely the same sort of scenario.

Dr. Lenz: As you recall, this is a distilled version of what we were talking about initially, but we needed an outside third party to look at how BLM conducts business, how they operate to see if there's any areas where they involve their efficiencies and effectiveness and we distilled it down to this.

Dr. Bechert: Might right after the word coordination, could be a comma and especially ability to respond to emergency situations or something like that.

Dr. Lenz: Sure.  I think that would be good. What do you think about that?  I don't see any hands up.

Ms. Carlisle: I just -- I mean we keep trying to make this recommendation and we keep -- it's hard to completely communicate to the BLM what we're asking for.  And, you know, it's not just an understanding of -- and, you know, hey, let's make this more efficient in the way -- that whole system needs analysis.  I just want to make sure that we don't get back, you know, just because the BLM doesn't really understand what we're asking for, response that we didn't really kind of know what you were asking for.

Ms. McAlpine: Do you want to just add the word "recommendations on systemic improvement."

Ms. Carlisle: Systemic improvement in the Wild Horse and Burro Program, obviously. The structure is so complicated it's hard to put into words the things that -- I mean, this is why we need a -- you know, we need to look at the things we do need to analyze.  I don't know that we have the language to really put it into, you know, what the proposal would be exactly.  We know there's a breakdown in the system, and when there's big national policy, it doesn't necessarily trickle down.  What is happening and does it need to change?  I guess if there's still confusion by the next board meeting, we will have to beat the streets and figure out exactly what we need to ask for.

BLM_004144

Dr. Lenz: Well, remember we had a long, long, long discussion that currently there are government agencies that do audit BLM.

Ms. Carlisle: Mm-hmm.

Dr. Lenz: But we felt that there needed to be an outside agency that has a fresh set of eyes involved and looking at the situation. Right?

Dr. Perryman: Yes.  I think it needs to be specifically outside government.  Not outside BLM and another -- not another government entity like GAO or something like that.

Dr. Lenz: Right.  Right.

Dr. Perryman: But something outside nongovernment -- yeah.

Dr. Lenz: Yeah.

Dr. Perryman: And we were talking about identify specifically the decision tree authority chain.

Ms. Pearson: The one thing that does concern me on the last audit or the assessment that came from what was the -- the institute of sciences or whatever they were.

Dr. Lenz: Right.

Ms. Pearson: A lot of what they audited, in my perception, had nothing to do with -- I mean it just -- it was like somebody that didn't know what they were talking about auditing, and like Dr. Jenkins said, you know, serve going to have -- you know, what are we asking them to audit specifically?  Financially?  The processes, you know, of the -- of the adoption system, you know, the gathers, what? You know, is it a whole picture?  I'm not sure how that audit is going to come out if it's even what we are asking for.

Ms. McAlpine: That's why we changed the word "audit" to "study" and identify.  And in my mind this gives BLM the opportunity to say, okay, there's -- we have this outside agency that said we could improve A, B, C, and D in year one, we'll improve A.  In year two, we improve B.  And then year three, C, and year 4D.  So they don't have to do everything at once but they build a plan for systemic improvement. Do you want to change recommendations and say make best practice plans?  Strategies?  For systemic improvement?

Dr. Lenz: I wouldn't use -- I think recommendations is fine. Once they make the recommendation, then it's up to BLM or Wild Horse and Burro Program to develop the strategy. To meet the recommendations.

Ms. Carlisle: I think we all know what we -- we want in this sort of decision-tree authority and the power that BLM has to -- to bring their practices to actuality and if there are issues within the system that are blocking that from happening, that we just don't understand because it is so complicated. And there is a subcommittee that, you know, is tasked with sort of herding the cat on this particular issue.  So, we may need some BLM direction on this, but we don't -- you know, we can make the recommendation and then there may not have to be a little bit of back and forth to figure out exactly what is the best language to use for this?  What are the best outcomes we can get from this?

Dr. Lenz: Mm-hmm.

Ms. Carlisle: And if it's determined that we can't have these conversations out of a meeting we can get the research we need before the next meeting so we come with -- you know, third time is a charm.  Maybe that will be the time we get it if it's still unclear. In other words, I think we can leave it as is.  We've had a lot of discussion.  We can -- we'll probably grapple with it a little bit back and forth with BLM and maybe even grapple with it into the next meeting, but we're getting closer to figuring it out.

Dr. Lenz: Well, they can respond.  They will respond to the recommendation and then we can go from there.

Ms. Carlisle: And ideally we have some in between time where we can maybe make sure we are solid and ready if we need to.

Dr. Lenz: Okay.  The last one.  The board recommends wild horse and burro leader direct local/state program leads to comply with national strategic plans and data collections methods, except in the case of extreme local emergency. And I'm not sure about that last part.

Mr. Yardley: I would probably just strike that last part too.  I was wondering about that.  And then also, just really quick jumping back to recommendation number 6, that you -- on the last line to third-party will be retain to study, identify and make best practices -- make and implement, but I guess it's the third party it's referring to.  Never mind.

Dr. Bleich: If they can't do it, they can't do it, but they should try to do it.  If you strike that, the implication is they should try to do it even in emergencies.

Dr. Jenkins: Yes, for number seven, the wild horse and burro leadership, if you are referring to Holle' and her team, cannot direct local and state program leads who are in the hierarchy of the state programs.  So if you are -- if you are intending to recommend that the BLM leadership directs, you know, state -- or rather state directors, then that's a chain of authority, but there's no direct chain of authority in which Holle' can direct program leads.  We can make recommendations to states and we can have policy -- for example, information memorandum that goes to states.  Those come with my signature and not the wild horse and burro.  So this is getting to what Celeste was asking earlier, how is this organization structured? So right here, you are suggesting something that's not going to happen.

Dr. Lenz: Can't be do done.  Okay.

Dr. Jenkins: But you can change it so it would happen.

Dr. Lenz: How would we do it?

Dr. Jenkins: You would have to recommend that the BLM leadership.  Not the wild horse and burro leadership but the BLM leadership directs state -- states -- BLM state leadership to comply with national and strategic plans and data collection methods. That's how you would have to -- that's how you would have to do that.

Dr. Lenz: All right.  Let's do that then. We need to vote on them.

Dr. Jenkins: I won't say state program leads but the state directors.  The program leads -- you know, they -- the state directors who run their shows in the states, in the decentralized structure.

Ms. Carlisle: I think we need to work with - comply with national strategic Wild Horse and Burro Program plans, blah, blah, blah.

Ms. Pearson: That's way was going to say.

Dr. Bechert: I think with data collection, wasn't the point that it was standardized so the data can be shared across units?

Dr. Lenz: Celeste are we ready to vote on all of these?

Ms. Carlisle: Yes.  I was going to suggest that we scroll up to the top.

Mr. Yardley: I was just recommending to vote.

Ms. Carlisle: Are we ready?  Can you guys hear me.  I will read them out and then I will go -- we'll embrace Fred's style and I will call on each board member for a vote.  And someone is capturing that, correct? All right.  I shall read the first

BLM_004146

recommendation.  The current and likely continuance of the unprecedented drought situation in much of the intermountain west and desert southwest has revealed the need for a viable, catastrophic wild horse and burro contingency plan for this and future protracted drought scenarios.  Board recommends BLM immediately develop and implement as necessary an emergency action plan including the capacity to gather and house an unprecedented number of equids coincidentally -- do we want coincidentally --

Dr. Lenz: Coincidentally.

Ms. Carlisle: Coincidentally contacting FEMA and interior regarding possible funding and issuing an emergency declaration.  The intent of which is to restore a thriving natural ecological balance, prevent future range degradation and provide for habitat that exists and persists into future.  Does anyone want to make a motion -- oh, no we don't make a motion to vote on it.  We just vote on it, correct?

Dr. Bleich: One minor suggestion.  The intent of which is to -- the intent of this is to restore, I think is more appropriate wording, Celeste.

Ms. Carlisle: Anybody have a problem with that? All right.  We will go ahead and vote.

## July 2021 National Wild Horse and Burro Advisory Board Recommendations

Present: Ms. Susan McAlpine, Dr. Sue McDonnell, Dr. Barry Perryman, Ms. Celeste Carlisle, Mr. Fred Woehl, Jr., Dr. Tom Lenz, Mr. Jim French, Mr. Steven Yardley, Dr. Vernon Bleich

1. The current and likely continuance of the unprecedented drought situation in much of the Intermountain West and Desert Southwest, has revealed the need for a viable, catastrophic WH&B contingency plan for this and future protracted drought scenarios. Board recommends BLM immediately develop and implement as necessary an emergency action plan including the capacity to gather and house an unprecedented number of equids, coincidentally contacting FEMA and Interior regarding possible funding, and issuing an emergency declaration. The intent of this is to restore a thriving natural ecological balance, prevent further range degradation, and provide for habitat that exists and persists in the future.

   Approved. Vote was unanimous.

2. Board recommends BLM identify two (2) HMAs, one horse and one burro, and Forest Service identifies 2-3 territories, to implement a comprehensive gather-contraception program based on the best population models, to meet established AMLs and demonstrate successful planning/ management outcomes.

   Approved. Vote was unanimous.

3. A comprehensive and standardized "gather preparation and evaluation" brochure and on-site presentation should be developed by BLM to be shared with the public observing gathers.  This presentation would include but not be limited to:
   a. What is normal behavior/physiology for horses and burros
   b. What is going to happen and when during the gather
   c. What the end result could be (ie. Mortality and morbidity statistics)
   d. Process for immediate debriefing participating public post-gather

   Approved. Vote was unanimous.

3.5 Alternate Statement: The Board is aware of the public's concerns and appreciates the thorough investigation and subsequent outcome of BLM's efforts to properly ensure the welfare of adopted horses and burros to the best of their ability/to closure.

   Approved. Vote was unanimous.

4. The Board recommends pursuing alternative, non-cash incentives to ensure a high standard of welfare for adopted wild horses and burros.

   Approved. 8 in favor, 1 against, Dr. Bleich.

5. Recommended that Board members attend WHB activities in order to gain a better understanding of how all portions of the program are implemented to utilize them to educate and communicate with outside stakeholders.

   Approved. Vote was unanimous.

5.5. Recommended that BLM utilize and involve Board members based on their individual expertise on an ongoing basis.

   Approved. Vote was unanimous.

6. In order to improve the WHB program's efficiencies and coordination, especially the ability to respond to emergency situations, the Board recommends that an outside (non-government) third party be retained to study,

identify and make best practice recommendations for systemic improvements in the WHB program.

Approved. Vote was unanimous.

7.   The Board recommends that BLM leadership direct BLM state directors to comply with national strategic WHB program plans and standardized data collections methods.

Approved. Vote was unanimous.

Ms. Carlisle: I would definitely like to thank everybody for a long two days.  Thank you very much to BLM.  Thank you very much to forest service.  Dr. Jenkins, would you like to say any closing remarks before I adjourn the meeting?

Dr. Jenkins: Well, a successful meeting, I think for two days.  Once more, I appreciate your expertise and your willingness to work with the BLM and the Forest Service on this really problematic issue.  So just thank you, everybody, and I look forward to working with you all in future -- in the future.

**[Adjourn]**

BLM_004149

Wild Horse and Burro Advisory Board Meeting
Recommendations to Bureau of Land Management
July 1st, 2021

**Comprehensive Ecosystem**

*Recommendation 1:* The current and likely continuance of the unprecedented drought situation in much of the Intermountain West and Desert Southwest, has revealed the need for a viable, catastrophic WH&B contingency plan for this and future protracted drought scenarios. Board recommends BLM immediately develop and implement as necessary an emergency action plan including the capacity to gather and house an unprecedented number of equids, coincidentally contacting FEMA and Interior regarding possible funding, and issuing an emergency declaration. The intent of this is to restore a thriving natural ecological balance, prevent further range degradation, and provide for habitat that exists and persists in the future.

   Vote: Unanimous

*Recommendation 2:* Board recommends BLM identify two (2) HMAs, one horse and one burro, and Forest Service identifies 2-3 territories, to implement a comprehensive gather-contraception program based on the best population models, to meet established AMLs and demonstrate successful planning/ management outcomes.

   Vote: Unanimous

**Humane Handling and Communication**

<mark>*Recommendation 3:*</mark> A comprehensive and standardized "gather preparation and evaluation" brochure and on-site presentation should be developed by BLM to be shared with the public observing gathers.  This presentation would include but not be limited to:

    A.  What is normal behavior/physiology for horses and burros
    B.  What is going to happen and when during the gather
    C.  What the end result could be (ie. Mortality and morbidity statistics)
    D.  Process for immediate debriefing participating public post-gather

    Vote: Unanimous

<mark>Alternate Statement:</mark> The Board is aware of the public's concerns and appreciates the thorough investigation and subsequent outcome of BLM's efforts to properly ensure the welfare of adopted horses and burros to the best of their ability/to closure.

    Vote: Unanimous

<mark>*Recommendation 4:*</mark> The Board recommends pursuing alternative, non-cash incentives to ensure a high standard of welfare for adopted wild horses and burros.

    Vote: 8-1

BLM_004151

**Organizational Structure, Advisory Board Interaction, Collaboration**

*Recommendation 5:* Recommended that Board members attend WHB activities in order to gain a better understanding of how all portions of the program are implemented to utilize them to educate and communicate with outside stakeholders.

      Vote: Unanimous

*Recommendation 5.5:* Recommended that BLM utilize and involve Board members based on their individual expertise on an ongoing basis.

      Vote: Unanimous

*Recommendation 6:* In order to improve the WHB program's efficiencies and coordination, especially the ability to respond to emergency situations, the Board recommends that an outside (non-government) third party be retained to study, identify and make best practice recommendations for systemic improvements in the WHB program.

      Vote: Unanimous

*Recommendation 7:* The Board recommends that BLM leadership direct BLM state directors to comply with national strategic WHB program plans and standardized data collections methods.

      Vote: Unanimous



U.S. Department of the Interior
Bureau of Land Management

**Off-Range Highlights**
for
**Wild Horse and Burro (WHB) Advisory Board Meeting, June 30 - July 1, 2021**

**FY 2021 Private Placement Results** – The WHB Program has placed more than 4,125 animals into private care so far this fiscal year. The BLM credits the Adoption Incentive Program with reinvigorating interest in the adoptions, increasing placement figures dramatically, and thereby supporting on-range management efforts by reducing BLM's reliance on off-range holding facilities. There are thousands of adoption success stories between a wild horse or burro and an adopter, ranging from beloved backyard companions to champion performance partnerships. Since its launch in 2019, more than 7,500 wild horses and burros have been adopted through the incentive program. By increasing adoptions, the BLM is better able to reduce widespread overpopulation of wild horse and burro herds, which has reached historic levels and continues to threaten the health and well-being of the animals, other wildlife and the land on which they all depend.

**Off-Range Pasture Tour** – The WHB Program is proposing to conduct a virtual tour of a wild horse off-range pasture in September 2021. The purpose of the tour will be to offer members of the public the opportunity to learn more about BLM's WHB management mission, including the agency's responsibility for providing humane care for thousands of animals held in off-range facilities. The precise location of the tour is yet to be determined, but the Program is considering one of the newest off-range pastures in Maxwell, NE. The virtual format was chosen as a way to reach more public than via in-person tour.  BLM staff specialists along with the ranch owners will walk the public through the pasture on camera to see the horses and discuss details about how and why the agency manages this resource. Virtual attendees will be able to ask questions.

**WHB Educational Activity Book** – The Wild Horse and Burro Program was pleased to unveil a new educational activity book for all ages interested in the history of wild horses and burros and why the BLM manages herds on public lands.  Printed copies of the activity books are available at BLM facilities and events around the country and can also be accessed via our website at: www.blm.gov/whb/education.

**50th Anniversary Commemoration of the Wild Free-Roaming Horses and Burros Act** – The Wild Horse and Burro Program unveiled a new logo for 2021 to mark the 50th anniversary of the Wild Free-Roaming Horses and Burros Act of 1971. The logo and accompanying tag line – *A Milestone for America's Living Legends* – support a year-long messaging campaign aimed at highlighting the goals of the Act and promoting the value of wild horses and burros. The logo and tagline will appear on various informational/educational products and marketing/promotional items for the program throughout the year. The campaign is supported by a dedicated website with many contemporary and historical resources to advance the educational objectives, including a 24-month calendar with images, information and trivia about the Act and BLM's mission to manage wild horses and burros.



**UPDATE Compliance Handbook** – The newly published WHB Compliance Handbook was released the week of June 4.  The handbook made modifications by removing/updating outdated material and includes guidance related to virtual compliance.

1

BLM_004153



**UPDATE Off-Range Corral Acquisition –** The WHB Program posted a Request for Proposals for off-range corral holding in Idaho, Nevada, and Utah that can accommodate 500—10,000 wild horses and burros in safe, humane conditions in accordance with the Comprehensive Animals Welfare Program (RFP 140L0120R0008) which closed November 30, 2020. A competitive range of proposals were received and were evaluated by the contracting staff in May 2021. A Technical Proposal Evaluation Committee (TPEC) made up of subject matter experts was appointed and is currently evaluating the proposals. It is expected that the TPEC evaluation process will be completed within 60 days. Once the evaluation process is complete, successful proposals will begin going through the National Environmental Policy Act (NEPA) process before final contract award.

**Off-Range Pasture solicitation –** As part of its mission to sustainably manage wild horses and burros on public lands, the BLM announced on May 18 that it is seeking proposals for off-range pastures to provide a free-roaming environment and quality care for excess wild horses removed from Western public rangelands. The solicitation is open to proposals for facilities in Colorado, Idaho, Kansas, Montana, Nebraska, Nevada, North Dakota, Oklahoma, Oregon, South Dakota, Utah, Washington and Wyoming. The BLM may award multiple contracts that can accommodate 200 – 10,000 wild horses, with a four-year or nine-year renewal option.  The solicitation will close on July 19.

**UPDATE Online Corral –** The WHB Program continues to expand its use of the Online Corral platform to present more animals for placement and to reach a broader market. FY21-to-date, a total of four OLC events have been held with 943 animals being offered. Of these, 651 were adopted or sold, representing nearly a 70 percent placement rate. The average online bid for animals online has risen to approximately $455, yielding just over $394,000 in all. Nearly 2,000 applications have been submitted by individuals interested in adopting or purchasing a wild horse or burro.

**Mustang Heritage Foundation -** The Mustang Heritage Foundation (MHF) partnership continues to support the Program through its many successful efforts to place animals into private care. In March the Program was pleased to announce an additional $1,204,000 in funding for Fiscal Year 2021 to support the MHF and allow it to remain on track to exceed its private placement goals for the year. By the end of May, MHF had placed 1,776 animals, representing 43% of BLM's overall placements.

BLM_004154

| 117TH CONGRESS | | REPORT |
|---|---|---|
| 1st Session | HOUSE OF REPRESENTATIVES | 117–83 |

# DEPARTMENT OF THE INTERIOR, ENVIRONMENT, AND RELATED AGENCIES APPROPRIATIONS BILL, 2022

———————

JULY 6, 2021.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

———————

Ms. PINGREE, from the Committee on Appropriations, submitted the following

# R E P O R T

together with

## MINORITY VIEWS

[To accompany H.R. 4372]

The Committee on Appropriations submits the following report in explanation of the accompanying bill making appropriations for the Department of the Interior, the Environmental Protection Agency, and Related Agencies for the fiscal year ending September 30, 2022. The bill provides regular annual appropriations for the Department of the Interior (except the Bureau of Reclamation and the Central Utah Project), the Environmental Protection Agency, and for other related agencies, including the Forest Service, the Indian Health Service, the Smithsonian Institution, and the National Foundation on the Arts and the Humanities.

CONTENTS

| | Page number | |
|---|---|---|
| | *Bill* | *Report* |
| Title I—Department of the Interior: | 2 | 11 |
| Bureau of Land Management | 2 | 11 |
| United States Fish and Wildlife Service | 7 | 16 |
| National Park Service | 13 | 31 |
| United States Geological Survey | 19 | 38 |
| Bureau of Ocean Energy Management | 21 | 46 |
| Bureau of Safety and Environmental Enforcement | 22 | 47 |
| Office of Surface Mining Reclamation and Enforcement | 24 | 48 |
| Bureau of Indian Affairs | 27 | 49 |
| Bureau of Indian Education | 32 | 61 |
| Office of the Special Trustee for American Indians | 38 | 65 |

45–015

2

| | Page number | |
|---|---|---|
| | Bill | Report |
| Office of the Secretary | 41 | 67 |
| Insular Affairs | 43 | 68 |
| Office of the Solicitor | 46 | 70 |
| Office of Inspector General | 46 | 70 |
| Department-wide Programs: | 46 | 70 |
| Wildland Fire Management, Interior Department | 46 | 70 |
| Central Hazardous Materials Fund | 51 | 72 |
| Energy Community Revitalization Program | 52 | 72 |
| Natural Resource Damage Assessment and Restoration | 53 | 72 |
| Working Capital Fund | 54 | 73 |
| Office of Natural Resources Revenue | 55 | 73 |
| General Provisions, Department of the Interior | 56 | 73 |
| Title II—Environmental Protection Agency: | 79 | 74 |
| Science and Technology | 79 | 79 |
| Environmental Programs and Management | 79 | 85 |
| Office of Inspector General | 80 | 94 |
| Buildings and Facilities | 81 | 94 |
| Hazardous Substance Superfund | 81 | 95 |
| Leaking Underground Storage Tank Trust Fund Program | 82 | 97 |
| Inland Oil Spill Programs | 82 | 98 |
| State and Tribal Assistance Grants | 83 | 99 |
| Water Infrastructure Finance and Innovation Program Account | 95 | 105 |
| Administrative Provisions | 98 | 105 |
| Title III—Related Agencies: | 102 | 106 |
| Office of the Under Secretary for Natural Resources and Environment | 102 | 106 |
| Forest Service, U.S. Department of Agriculture | 103 | 106 |
| Wildland Fire Management, Forest Service | 109 | 120 |
| Indian Health Service, U.S. Department of Health and Human Services | 120 | 122 |
| National Institute of Environmental Health Sciences | 129 | 132 |
| Agency for Toxic Substances and Disease Registry | 130 | 133 |
| Other Related Agencies: | 131 | 134 |
| Council on Environmental Quality and Office of Environmental Quality | 131 | 134 |
| Chemical Safety and Hazard Investigation Board | 131 | 134 |
| Office of Navajo and Hopi Indian Relocation | 132 | 135 |
| Institute of American Indian and Alaska Native Culture and Arts Development | 133 | 135 |
| Smithsonian Institution | 134 | 135 |
| National Gallery of Art | 136 | 139 |
| John F. Kennedy Center for the Performing Arts | 138 | 140 |
| Woodrow Wilson International Center for Scholars | 139 | 140 |
| National Endowment for the Arts | 139 | 141 |
| National Endowment for the Humanities | 139 | 142 |
| Commission of Fine Arts | 141 | 143 |
| National Capital Arts and Cultural Affairs | 142 | 144 |
| Advisory Council on Historic Preservation | 142 | 144 |
| National Capital Planning Commission | 142 | 145 |
| United States Holocaust Memorial Museum | 142 | 145 |
| Presidio Trust | 143 | 146 |
| World War I Centennial Commission | 143 | 146 |
| Title IV—General Provisions | 144 | 147 |
| Minority Views | ....... | 312 |

## INTRODUCTION

The Department of the Interior, Environment, and Related Agencies Appropriations bill for fiscal year 2022 totals $45,850,000,000,

3

$7,393,000,000 above the fiscal year 2021 enacted level and $252,809,000 below the fiscal year 2022 budget request.

References throughout this report to the enacted bill and the budget request refer to the fiscal year 2021 enacted level and the fiscal year 2022 budget request unless otherwise stated.

COMMITTEE OVERSIGHT

Members of Congress have provided considerable input in fashioning this bill. In total, 359 Members submitted 7,840 programmatic and community project requests relating to multiple agencies and programs.

The Interior, Environment, and Related Agencies Subcommittee conducted six oversight hearings this year to carefully review the programs and budgets under its jurisdiction. The Subcommittee held the following oversight hearings:

Efforts to Address Marine Plastic Pollution Through Recycling—March 18, 2021

Wood Innovation: Sustainable Forest Products to Reinvigorate Rural Economies—March 23, 2021

The Effects of COVID–19 on Arts and Humanities Organizations—March 25, 2021

Forest Service Fiscal Year 2022 Budget Oversight Hearing—April 15, 2021

Department of the Interior Fiscal Year 2022 Budget Oversight Hearing—April 20, 2021

Environmental Protection Agency Fiscal Year 2022 Budget Oversight Hearing—April 21, 2021

In total, 17 individuals representing the Executive Branch, Congress, State, Tribal, and local governments, and the general public testified before the Subcommittee. In addition to those who testified in person, another 169 organizations, or coalitions provided written testimony for the hearing record which is publicly available online.

AERIAL FIREFIGHTER CERTIFICATION

The Committee is concerned that, in some cases, aerial fire-fighting companies put forward by states for inclusion in Cooperator Letters, and that are certified by states as meeting the equivalent of either Forest Service or Department of Interior standards, are not receiving timely approval or are receiving conditional approvals that limit states from fully utilizing their resources to fight wildfires. Given the patchwork of state and federal lands and the scale of wildfires, the Committee urges timely and transparent Cooperator Letter decisions to allow states to adequately respond to regional wildfires, including providing feedback to state wildfire agencies with detailed rationale for denials of requests. The Forest Service is directed to brief the Committee within 180 days of enactment of this Act on actions that can be taken to improve this process to include the feasibility of federal carding outside the federal contracting process.

BIGHORN SHEEP

The Committee is aware that the Forest Service and Bureau of Land Management (BLM) use the Western Association of Fish and

4

Wildlife Agencies' occupied bighorn habitat maps, telemetry data, and recent bighorn observations in conducting Risk of Contact analysis and that risk of contact models are currently being run on a State-wide basis where sufficient data exists. The Committee expects the agencies to continue to share findings transparently and promptly with other Federal land management agencies, State and local governments, State wildlife agencies, and State and Federal animal health professionals, including the Agricultural Research Service, permittees, and stakeholders. This will ensure the inclusion of the most directly affected interests in a common understanding of the Risk of Contact analysis, the search for suitable alternative allotments, and the development of options for wild and domestic sheep. The Forest Service and BLM are further directed to continue to engage the Agricultural Research Service, research institutions, state wildlife agencies, and other scientific entities to ensure the best professional scientific understanding of the risk of disease transmission between domestic and bighorn sheep is known before making management decisions that impact permittees.

BIRD COLLISIONS ON FEDERAL PROPERTY

Birds play an important role in ecosystems and a recent study suggests that nearly 3 billion birds have been lost since 1970. This is a staggering loss in every biome because birds play important roles such as being pollinators or in controlling pests. Collisions with glass kill up to 1 billion birds per year in the United States. All agencies under the jurisdiction of this Act are directed to monitor visitor and nature centers and office buildings for bird collisions with glass during spring migration (April 1—June 1) and fall migration (September 1—November 1); determine the scale of collisions; and assess whether retrofits to windows will reduce collisions. At a minimum, all agencies are directed to take low cost or no cost action, such as turning off interior lights at night or applying films or other adhesives to glass windows to reduce bird collisions. The Committee also supports efforts by the U.S. Fish and Wildlife Service to encourage communication tower owners to use avian friendly flashing lights which can save 4 million birds per year.

CARBON STORAGE ON FEDERAL LANDS

The Committee notes that geologic storage of carbon dioxide provides an opportunity for carbon capture and removal projects that could reduce emissions and mitigate climate change, and encourages land management agencies, including the Bureau of Land Management and Forest Service, to evaluate carbon storage as a potential activity on public lands. Within 180 days of enactment of this Act, the Bureau of Land Management and the Forest Service are to meet with the U.S. Geological Survey and discuss the potential to collaborate on efforts to better understand the potential carbon capture and geological storage on Federal lands and the efficacy of including this evaluation in resource management and forest plan revisions. Within 270 days of enactment of this Act, the Bureau of Land Management and the Forest Service are to brief the Committee on the outcome of this discussion and any related decisions.

5

### CIVILIAN CLIMATE CORPS

The Committee supports the proposed Civilian Climate Corps (CCC). Funding provided in this recommendation will leverage work occurring in a variety of different agencies and maximize efforts to engage and mobilize a new generation of climate focused conservation work. The Committee notes the critical importance of the urban interface for CCC to inspire and engage communities and residents traditionally unconnected to the core rural conservation missions of the partner agencies. The disperse locations of potential CCC sites will provide the opportunity to provide a physical and psychological imprint in the history of our nation during evolving times. The Departments of Interior and Agriculture are directed to provide a written plan, within 90 days of enactment of this Act, for how CCC funding will be used, along with a breakdown of funding and a list of existing programs or partners. The report should also include an analysis of the impacts of creating a dedicated budget line for the CCC.

### COLLABORATION ON WILDFIRE PREVENTION

The Committee recognizes the important work in wildfire prevention for which the Forest Service and Bureau of Land Management are responsible. The Committee encourages the Forest Service and Bureau of Land Management to conduct more frequent fuel content and soil moisture testing in consultation with the National Oceanic and Atmospheric Administration to ensure the government's ability to develop more accurate wildfire modeling and artificial intelligence solutions.

### CORAL REEF HEALTH

The Committee remains concerned that an unprecedented coral disease outbreak especially along the Florida Reef Tract, has left America's Great Barrier Reef on the brink of functional extinction, posing a significant obstacle to coral reef restoration efforts. Coral reef tracts serve as a major economic driver for the State of Florida and the U.S. territories, and are the most biologically diverse ecosystems in the ocean. The Committee recognizes the restoration work of the Department of the Interior and the National Oceanic and Atmospheric Administration, as well as state and territorial government partners, to support coral monitoring, research, and restoration efforts in highly impacted and high priority coral reef habitats in U.S. waters, including in Biscayne National Park and Dry Tortugas National Park, and further recommends the diversion of additional resources to support the state and local partners conducting this work on a daily basis.

### CUSTOMER SERVICE

The Committee directs all agencies funded by this Act to comply with title 31 of the United States Code, including the development of their organizational priority goals and outcomes such as performance outcome measures, output measures, efficiency measures, and customer service measures, as well as developing standards to improve customer service and incorporation of the standards into the performance plans.

6

### EDUCATIONAL AND OUTREACH PROGRAMS

The Committee strongly supports academic internships, partnerships, and educational and outreach programs of the agencies funded through this bill and encourages them to ensure that their efforts reach the widest possible audience including, but not limited to, Hispanic-Serving Institutions, Historically Black Colleges and Universities, and Tribal Colleges and Universities, as appropriate.

### ENVIRONMENTAL EDUCATION

The Committee recognizes the importance of environmental education and nature-based learning as a means of building healthy communities and neighborhoods, particularly in urban settings and economically disadvantaged communities. The Committee urges Department of the Interior agencies (including the National Park Service, United States Fish and Wildlife Service, United States Geological Service and the Bureau of Land Management), EPA, and the Forest Service to continue to develop partnerships with environmental educational organizations that increase access to outdoor focused learning year round in under resourced urban communities, including those organizations that target programming to children and K–12 schools. The Committee expects these agencies to delineate, in fiscal year 2023 budget justifications, efforts undertaken to support environmental education in urban settings and to partner with non-profit organizations that contribute to the underlying mission of these agencies.

### FEDERAL LAW ENFORCEMENT

The Committee notes that the Commerce, Justice, Science, and Related Agencies Appropriations Act, 2022 directs the Attorney General to continue efforts to implement training programs to cover the use of force and de-escalation, racial profiling, implicit bias, and procedural justice, to include training on the duty of Federal law enforcement officers to intervene in cases where another law enforcement officer is using excessive force, and make such training a requirement for Federal law enforcement officers. The Committee further notes that several Departments and agencies funded by this Act employ Federal law enforcement officers and are Federal Law Enforcement Training Centers partner organizations. The Committee directs such Departments and agencies to adopt and follow the training programs implemented by the Attorney General, and to make such training a requirement for its Federal law enforcement officers. The Committee further directs such Departments and agencies to brief the House and Senate Committees on Appropriations on their efforts relating to training no later than 90 days after the date of enactment of this Act.

In addition, the Committee directs such Departments and agencies, to the extent that such Departments and agencies have not already done so, to submit their use of force data to the Federal Bureau of Investigation (FBI)'s National Use of Force Data Collection database. The Committee further directs such Departments and agencies to brief the House and Senate Committees on Appropriations no later than 90 days after the date of enactment of this Act on their current efforts to tabulate and submit their use of force data to the FBI.

7

### FIRE RESILIENT COMMUNITIES

The Committee supports public-private partnerships that support and promote fire resilient communities including efforts to encourage the design, construction, and retrofitting of fire resilient residential homes and commercial buildings. Collaborative efforts between private industry, university-based wildfire researchers, community-based organizations and local communities are making notable progress in developing construction techniques and identifying building materials to actively mitigate fire risk in areas susceptible to catastrophic wildland fire, including the wildland urban interface. The Committee strongly encourages efforts at the state and local level, particularly within high-risk fire areas, to support the use of non-combustible American made construction materials to support and promote fire hardened and resilient communities.

### FIREFIGHTING AVIATION CONTRACTS

The Committee reiterates that it is important the Forest Service and Department of the Interior analyze current aviation contracting capabilities for wildland fire suppression activities to determine whether changes to existing practices may better support the strategic plan for aerial firefighting assets. The Committee notes that it has yet to receive the report outlined in House Report 116–448 and the explanatory statement accompanying the Consolidated Appropriations Act, 2021 (Public Law 116–260) regarding aviation contracts, current impediments to the use of longer-term contracts, and whether modifying cancellation ceilings for longer-term aviation contracts consistent with practices used for longer-term stewardship contracts, as provided by Division O of Public Law 115–141, could assist the agencies in having long-term certainty and affordability for modern aviation assets. The Committee expects the Forest Service and the Department to finalize the report expeditiously.

### FORMERLY INCARCERATED FIREFIGHTER

The Committee directs the Department of the Interior and the Forest Service to explore the possibility of allowing formerly incarcerated individuals to qualify for Federal wildland firefighting positions. Within 180 days of enactment of this Act, the Committee further directs the Department of the Interior and the Forest Service to provide a joint briefing to the Committee on the viability of a pilot program for allowing formerly incarcerated individuals to qualify for Federal wildland firefighting positions and the resources necessary to enact such a program.

### GREAT AMERICAN OUTDOORS ACT

At the end of this explanatory statement, the Committees have included allocation of projects pursuant to the Great American Outdoors Act (Public Law 116–152).

### LAND AND WATER CONSERVATION FUND

With the August 4, 2020, enactment of the Great American Outdoors Act (Public Law 116–152), Congress provided a permanent appropriation of $900,000,000 per year from the Land and Water Conservation Fund (LWCF). The Act also mandated that account

8

allocations and detailed project information be proposed by the administration each year through the president's annual budget submission, and that such allocations, following review by the Committee, may be modified through an alternate allocation. A detailed table showing the LWCF allocation by agency, account, activity, and project, with lists of specific federal land acquisition projects (including Community Project Funding acquisitions) and Forest Legacy Program projects, included at the end of this report.

The Committee encourages the National Park Service to prioritize funding under State and Local Assistance Programs to support the establishment of greenways, parks, trails and other outdoor recreation facilities in honor of America's veterans.

### LAND GRANTS, ACEQUIAS AND COMMUNITY DITCHES

The Secretaries of the Department of the Interior and the Department of Agriculture are urged to recognize the traditional use of State-recognized community land grants, acequias, and community ditches in the American Southwest during the land use planning process and in accordance with applicable law, shall consider and, as appropriate, provide for traditional-historic uses by these entities within land management plans.

### MARIJUANA ON PUBLIC LANDS

The Committee is aware that trespassers illegally grow marijuana on public lands in California. These unlawful activities harmfully impact the public, water, soil, and wildlife. The Committee supports Forest Service efforts to develop tools to detect and eradicate grow sites. The Committee directs the Forest Service and the Bureau of Land Management to continue to cooperate with state, local, and tribal governments on survey, reclamation, and prevention efforts to the maximum extent possible. The Committee also supports the Department of the Interior's use of drones to conduct statewide remote-sensing surveys of federal public lands to identify grow sites and allow for the development of cost estimates for reclamation after concerns about cybersecurity, technology, and domestic production have been addressed.

### MISSISSIPPI RIVER RESTORATION AND RESILIENCY STRATEGY

The Committee recognizes that the Mississippi River basin from Minnesota to Louisiana is a vital American waterway. Therefore, the Committee urges the Department of Interior, including the National Park Service, United States Fish and Wildlife Service, and the Bureau of Indian Affairs to participate and coordinate as an essential federal stakeholder with the Environmental Protection Agency as it leads efforts to develop a federal government-wide Mississippi River restoration and resiliency strategy focused on improving water quality, restoring habitat and natural systems, improved navigation, eliminating aquatic invasive species, and building local resilience to natural disasters. Additional direction is provided for the Environmental Protection Agency.

### MITIGATION ACTIVITIES FOR BORDER BARRIER CONSTRUCTION

The Committee is concerned that construction of a border barrier on sensitive lands along the southwest border, including national

9

wildlife refuges, national forests, national monuments, and wilderness areas has adversely impacted wildlife and the survival of imperiled species. The Committee directs the Department of the Interior to report back within 180 days of enactment of this Act on impacts to habitat and species from border barrier construction and what is needed to mitigate these impacts. Bill language has been included which authorizes the Bureau of Land Management, the United States Fish and Wildlife Service, and the National Park Service to accept transfers of funds from U.S. Customs and Border Protection for mitigation activities, including land acquisition, related to construction of border barriers on Federal lands.

### MONARCH BUTTERFLY POPULATIONS

The Committee is aware the United States Fish and Wildlife Service determined that listing the monarch as endangered or threatened is warranted but precluded by higher priority listing actions. The monarch is now a candidate under the Endangered Species Act and the Service will review its status annually until a listing decision is made. The Committee supports the historic Candidate Conservation Agreement with Assurances recently forged to create and maintain habitat for monarch butterflies and other pollinators on energy and transportation lands. The Committee has provided funding within the Department of the Interior to assist with monarch recovery.

### PAYMENTS IN LIEU OF TAXES (PILT)

The Payments in Lieu of Taxes (PILT) program provides compensation to local governments for the loss of tax revenue resulting from the presence of Federal land in their county or State. The recommendation includes full funding for PILT for fiscal year 2022 in Section 114 of Title I General Provisions.

### PRESCRIBED BURNS

The Committee encourages the Department of the Interior and the Forest Service to continue utilizing prescribed burns as a forest management tool in the western United States. Within 180 days of enactment of this Act, the Committee directs the Department of the Interior and the Forest Service to submit a report detailing the barriers to implementing prescribed burns in the western United States, possible solutions, and an estimate of fire damage in 2020 that could have potentially been avoided had the agencies implemented a more robust prescribed burn regime.

### PUBLIC ACCESS

The Department of the Interior and the U.S. Forest Service are directed to notify the House and Senate Committees on Appropriations in advance of any proposed project specifically intending to close an area to recreational shooting, hunting, or fishing on a nonemergency basis of more than 30 days.

### REPROGRAMMING GUIDELINES

Reprogramming guidelines were codified in Division D of P.L. 116–94 and outlined in the accompanying explanatory statement.

10

Bill language and direction is maintained to protect the integrity of this Committee.

TRIBAL CONSULTATION

The Committee notes with concern the frustrations heard from Tribes about agency failures to conduct "true" and "meaningful" government-to-government consultation. Although the level of frustration varies by agency and event, the common theme is that while most consultations solicit input and feedback from Tribes, the communication is one way and fails to return feedback to Tribes. Tribes often report that they don't know whether and how their input is considered. On decisions made in consultation with Tribes, the Committee expects agencies funded in this bill to publish decision rationale in the context of and in reasonable detail to the Tribal input received during consultation.

CONTRACT SUPPORT COSTS AND TRIBAL LEASE PAYMENTS

Payments for 105(l) Tribal lease costs directly resulting from decisions in the case of *Maniilaq Ass'n* v. *Burwell* in both 2014 (72 F. Supp. 3d 227 (D.D.C. 2014)) and 2016 (70 F. Supp. 3d 243 (D.D.C. 2016)) appear to create an entitlement to compensation that is typically not funded through discretionary appropriations. Instead, obligations of this nature are typically addressed through mandatory spending. Estimates for contract support costs and payments for section 105(l) Tribal lease costs continue to increase and have the potential to increase even further. Uncertainty surrounding estimates has inserted a high level of unpredictability into the budget process placing the Committee in the difficult position where rapidly escalating requirements are negatively impacting the ability to use discretionary appropriations to support core Tribal programs, including health, education and construction programs, or provide essential fixed cost requirements. In addition, because contract support costs and payments for Tribal leases are addressed through discretionary spending, all other programs funded under the Interior, Environment, and Related Agencies appropriations bill are impacted. The costs are growing exponentially, necessitating a long-term funding strategy to address them. The Committee notes the Administration's proposal to reclassify these costs as an appropriated entitlement in fiscal year 2023. The Department of the Interior and the Department of Health and Human Services are directed to continue working with the House and Senate committees of jurisdiction, the Office of Management and Budget, and the Committees on Appropriations to formulate long-term accounting, budget, and legislative strategies to address this situation, including discussions reclassifying these funds as an appropriated entitlement.

11

# TITLE I—DEPARTMENT OF THE INTERIOR

## BUREAU OF LAND MANAGEMENT

### MANAGEMENT OF LANDS AND RESOURCES

#### (INCLUDING TRANSFER OF FUNDS)

| | |
|---|---:|
| Appropriation enacted, 2021 ........................................................... | $1,220,555,000 |
| Budget estimate, 2022 ..................................................................... | 1,480,334,000 |
| Recommended, 2022 ........................................................................ | 1,458,414,000 |
| Comparison: | |
|    Appropriation, 2021 ..................................................................... | +237,859,000 |
|    Budget estimate, 2022 ................................................................. | −21,920,000 |

The Bureau of Land Management (Bureau) was created in 1946, 75 years ago, to steward the nation's public lands for the benefit of all Americans. Today the Bureau manages approximately 245 million surface acres or one-tenth of America's land base and 700 million acres of the subsurface mineral estate (30% of the United States). The Bureau manages a wide range of uses while conserving natural, historical, and cultural resources for present and future generations.

The Committee is aware of the Bureau's loss of staff and institutional knowledge under the previous Administration and that the Bureau is in the process of building back capacity. That does not excuse the Bureau from providing accurate and complete programmatic information to Congress in a timely fashion. The Committee directs Bureau leadership to examine this problem and take immediate actions to resolve it. The Bureau is to provide monthly briefings to the Committee on its progress in rebuilding staff capacity including its staffing plans, location of employees and the location of the headquarters, number of staff they have onboarded, hiring timeline from advertising to filling positions, with a particular emphasis on the Bureau's budget office.

The Committee recommends $1,458,414,000 in new budget authority for the Management of Lands and Resources appropriation. This amount is $237,859,000 above the enacted level and $21,920,000 below the budget request. The recommendation assumes the enacted level of funding for all programs and accepts the program changes in the budget request unless differences are specified. Program changes, instructions and details follow below and in the table at the end of this report. Additional instructions are included in the front of this report.

*Land Resources.*—The Committee recommends $314,971,000 for Land Resources, $63,539,000 above the enacted level and $1,668,000 above the budget request.

*Rangeland Management.*—The Committee recommends $118,335,000 which includes $1,950,000 for the Civilian Climate Corps; $2,051,000 for restoring landscape connectivity and function; $1,242,000 for conserving and restoring lands to combat climate change; $1,147,000 for improving water resources; $1,675,000 for restoring legacy disturbances; $1,147,000 for decision support for adaptive management; and $458,000 to transition to a zero emission fleet. The recommendation also provides $457,000 for National Wild and Scenic Rivers and $68,000 for National Scenic and Historic Trails. Within available funds, the Bureau is to work with a land grant university to conduct a study on public land manage-

BLM_004165

12

ment policies. This study will assist Western urban and rural communities, policy makers, resource managers, resource users, and others to understand, analyze, and engage effectively in the public land policy process.

*Forestry Management.*—The Committee recommends $12,948,000 which includes $1,256,000 for restoring landscape connectivity and function; $700,000 for conserving and restoring lands to combat climate change; and $68,000 to transition to a zero emission fleet. The recommendation also provides $118,000 for National Wild and Scenic Rivers.

*Cultural Resource Management.*—The Committee recommends $21,595,000 which includes $450,000 for the Civilian Climate Corps and $92,000 to transition to a zero emission fleet. The recommendation also provides $820,000 for National Wild and Scenic Rivers and $1,057,000 for National Scenic and Historic Trails.

*Wild Horse and Burro Management.*—The Committee recommends $162,093,000 which supports implementation of the May 2020 plan and includes $11,000,000 for administration of and research on reversible immunocontraceptive fertility control; and $504,000 to transition to a zero emission fleet. The Committee is making a large Federal investment in the wild horse and burro program and wants to ensure that these resources protect the welfare of the wild horses and burros and conserve the range for the habitat it provides to other species and the ecosystem services that are essential to protect human and species health and well-being in the face of climate change. The Committee directs the Secretary to establish a task force to bring experts from all Interior bureaus together to address the challenge of wild horses and burros. The Bureau of Land Management is directed to use $11,000,000 of the funds appropriated for this program to enter cooperative efforts with other Federal partners to significantly progress the administration of and research on reversible immunocontraceptive fertility control. This should include public-private partnerships and simultaneous evaluation of multiple fertility control alternatives at a meaningful scale. To tackle this challenge, the Bureau needs to focus on achieving a sustainable Appropriate Management Level while ensuring that all removals are conducted in strict compliance with the Bureau's Comprehensive Animal Welfare Program and any population growth suppression strategies must be proven, safe, and humane. The strategy will not include any sale or actions that result in the destruction of healthy animals, which continues to be prohibited by this bill. The Bureau is also directed to protect against any violation of the law. Specifically, the Bureau is to review its Adoption Incentive program and work with the Office of the Solicitor to strengthen contractual language and address any weakness in the program that would jeopardize the welfare of these animals. The Bureau is directed to provide quarterly updates to the Committee on the allocation of resources, achievement of performance metrics, input from the Departmental task force, efficacy of identifying and relocating horses to different Herd Management Areas, and to discuss any proposed changes to the current course of action. The recommendation provides $504,000 for the transition to a zero emission fleet.

*Wildlife and Aquatic Habitat Management.*—The Committee recommends $232,674,000 for Wildlife and Aquatic Habitat Manage-

13

ment, $44,170,000 above the enacted level and $4,298,000 below the budget request.

*Wildlife Habitat Management.*—The Committee recommends $158,972,000 which includes $70,000,000 for sage grouse conservation activities, $31,000,000 for threatened and endangered species, $19,667,000 for plant conservation and restoration, and $595,000 to transition to a zero emission fleet. The Committee also provides $427,000 for National Wild and Scenic Rivers and $192,000 for National Scenic and Historic Trails.

*Aquatic Habitat Management.*—The Committee recommends $73,702,000 which includes $3,188,000 for restoring landscape connectivity and function; $3,475,000 for conserving and restoring lands to combat climate change; $5,895,000 for improving water resources; $2,383,000 for decision support for adaptive management; and $229,000 to transition to a zero emission fleet. The recommendation also provides $952,000 for National Wild and Scenic Rivers and $132,000 for National Scenic and Historic Trails.

*Recreation Management.*—The Committee recommends $95,136,000 for Recreation Management, $18,407,000 above the enacted level and $3,635,000 above the budget request. The recommendation includes a total of $367,000 to transition to a zero emission fleet, $3,947,000 for National Wild and Scenic Rivers and $9,397,000 for National Scenic and Historic Trails. The increase of $3,000,000 for National Scenic and Historic Trails may be used for interpretive centers and to support iconic trails such as the Pacific Crest Trail.

The Bureau is directed to prioritize the use of funding for Travel and Transportation planning for special management areas to minimize the impact of motorized vehicles and recreation on threatened and endangered species. The Bureau is also encouraged to ensure that the public is adequately informed regarding the protection of lands, as well as open and closed routes for trails and recreational activities, for the areas protected by Public Law 116–9. To help inform the public, the Department should properly post signage and conduct regular reviews to ensure that signage is maintained, in good readable condition, and to replace any damaged or unreadable signs in a timely manner.

*Energy and Minerals.*—The Committee recommends $241,226,000 for Energy and Minerals, $42,622,000 above the enacted level and $7,655,000 below the budget request. The bill provides $15,000,000 for Alaska legacy wells; $8,000,000 for orphan wells; $2,000,000 for restoring legacy disturbances; $12,000,000 for promoting renewable energy development; and a total of $1,191,000 to transition to a zero emission fleet.

*Realty and Ownership Management.*—The Committee recommends $85,345,000 for Realty and Ownership Management, $5,220,000 above the enacted level and $2,401,000 below the budget request. The recommendation includes $3,000,000 for restoring landscape connectivity and function and a total of $321,000 to transition to a zero emission fleet. The recommendation also provides a total of $163,000 for National Wild and Scenic Rivers.

*Resource Protection and Maintenance.*—The Committee recommends $177,781,000 for Resource Protection and Maintenance, $44,540,000 above the enacted level and $11,594,000 below the budget request. The recommendation provides $8,000,000 for as-