83

search and Development. Additionally, to ensure a neutral, systematic, and independent evaluation of the science underlying its decisions, the Agency is directed to utilize the Office of Research and Development to develop the hazard identification and dose-response portions of all Agency risk assessments.

*Pathways for Renewable Fuel.*—The Committee notes the Agency received a petition to include pathways for renewable diesel produced from canola oil as advanced biofuel. Within 90 days of enactment of this Act, the Committee directs the Agency to report on the status of the petition. As part of this report to the Committee, the Agency is expected to report on the status of and actions to process existing corn kernel fiber pathway applications.

*Public Access to Agency Research.*—The Committee commends the Agency on issuing its "Plan to Increase Access to Results of EPA-Funded Scientific Research" on November 29, 2016. The Committee urges the Agency to continue its efforts towards full implementation of the plan and encourages the Agency to include updates on progress in future budget requests.

*Slash and Precommercial Thinnings.*—The Committee remains interested in understanding opportunities to use low-grade and low-value forest biomass as a feedstock for development of alternative fuels. The Committee looks forward to receiving the briefing directed in the explanatory statement accompanying P.L. 116–260, on the progress made to engage with other Federal agencies, states, private landowners, and stakeholders on efforts to create markets for low-grade and low-value wood.

*Slurry Injection of Complex Waste Pilot Projects.*—The Committee recognizes the potential of new, technological innovations to lower costs and environmental impacts of complex waste management, including biosolids, per-and- polyfluoroalkyl substances (PFAS) remediation sites, and superfund sites. The Committee directs the Agency, through the challenge and prize program or the Small Business Innovation Research (SBIR) program, to consider supporting pilot projects to test and evaluate the feasibility of safely and permanently disposing of complex waste materials using slurry injection technology. Within 90 days of enactment of this Act, the Agency is directed to report to the Committee on plans and associated costs to support such pilot technologies and how these technologies may reduce greenhouse gas emissions.

*STAR Grants.*—The Committee provides funds to continue the Science to Achieve Results (STAR) program and directs that not less than $30,000,000 be allocated for this program, a $1,400,000 increase above the fiscal year 2021 enacted level of $28,600,000. The Committee remains interested in the feasibility of reestablishing the Graduate Fellowship program and of implementing a mechanism to allow for submission of unsolicited, principal investigator-initiated proposals to STAR in order to capture innovative research ideas that may exist outside of the Agency and that advance its mission. The Committee looks forward to receiving the briefing directed in the explanatory statement accompanying P.L. 116–260.

The Committee encourages the STAR program to continue research on how green stormwater infrastructure can be used to reduce water-borne pollution entering large estuaries in which stormwater is a large source of pollution.

BLM_004237

84

*Testing Alternatives.*—The Committee notes that the Frank R. Lautenberg Chemical Safety for the 21st Century Act (P.L. 114–182) directed the Agency to report to Congress on efforts to advance non-animal testing and goals for future alternative test methods and strategies implementation. Once finalized, the Agency is directed to brief the Committee on the findings of this report, as well as the Agency's efforts to assist submitters as they develop information by means of an alternative test method or strategy before conducting new vertebrate animal testing, consistent with Section 4(h)(3)(A) of the Act. The Committee also notes that new approach methodologies (NAMs), including in vitro tests, in chemico assays and in silico models, represent the cutting edge of toxicity testing that can be prioritized for use in testing the safety of pesticides and chemicals instead of the use of animals in testing. The Committee encourages the Agency to continue supporting and performing research on the development and evaluation of NAMs through the Chemical Safety for Sustainability National Research Program, and is urged to consider expediting its timeline to end the use of mammals in testing.

*Vehicle Emissions Lifecycle Analysis.*—The Committee believes it is essential that when setting future standards for reducing greenhouse gas emissions, the Agency fully evaluate emission impacts of vehicle technologies and transportation fuels (including electricity used as a fuel) from well to wheel, and the vehicle cycle through material recovery and vehicle disposal in order to capture the full impacts of greenhouse gas emissions as accurately as possible. The Committee encourages the Agency to develop standardized modeling to evaluate the full lifecycle of vehicle technologies and transportation fuels, as new standards to reduce pollutants are being developed, and to coordinate as necessary, with other federal agencies that are conducting similar models for vehicles in an effort to accurately determine the full impact of reducing greenhouse gas emissions when conducting cost-benefit analyses of regulatory and other actions.

*Water Distribution Systems.*—The Agency is encouraged to prioritize deployment of smart infrastructure solutions such as distribution network leak detection, pressure monitoring, and sanitary and combined sewer monitoring technologies during upgrades to water and wastewater systems to optimize water delivery performance, reduce energy usage, limit water waste in distribution systems, and enhance modeling of sewer collection networks. These solutions will help improve operations, maintenance, and capital expenditure in planning and budgeting, and increase spatial and temporal monitoring data available on U.S. water quality and quantity.

*Water Information Centers.*—The Committee notes the Agency's Water Infrastructure and Resiliency Finance Center works in coordination with Environmental Finance Centers across the country to provide information and assistance to communities as they make informed decisions for drinking water, wastewater, and stormwater infrastructure. To enhance these efforts and better understand the health effects related to water infrastructure, the Committee urges the Agency to consider partnering with research universities to establish and support water health infrastructure and policy centers. Within 180 days of enactment of this Act, the Committee encourages the Agency to provide a briefing outlining any gaps in the

85

Agency's existing research programs and how such center(s) may benefit the Agency, the estimated costs of such center(s), and how the center(s) might establish a capability to oversee water quality metrics, standards, and delivery.

*Water Security Test Bed.*—In fiscal year 2022, the Committee directs the Agency to include up to $1,000,000 for advancing full scale applied research and testing capabilities to address threats to drinking water and drinking water infrastructure, including weatherization equipment, SCADA control systems, and water tanks for full year operating capabilities at Water Security Test Bed facilities.

*Wildfire smoke health impacts research, outreach and education.*—The Committee strongly supports the Agency's ongoing research activities on wildfire's effects on air quality and associated health impacts. As part of those efforts, the Committee urges the Agency to systematically track public health impacts from wildfire smoke to understand the scale of public health exposure to wildfire smoke, focusing on cost-effective prevention, mitigation and resilience strategies to equitably reduce public health impacts.

ENVIRONMENTAL PROGRAMS AND MANAGEMENT

The Environmental Programs and Management (EPM) account encompasses a broad range of abatement, prevention, enforcement, and compliance activities, and personnel compensation, benefits, travel, and expenses for all programs of the Agency except Science and Technology, Hazardous Substance Superfund, Leaking Underground Storage Tank Trust Fund, Inland Oil Spill Programs, and the Office of Inspector General.

Abatement, prevention, and compliance activities include setting environmental standards, issuing permits, monitoring emissions and ambient conditions and providing technical and legal assistance toward enforcement, compliance, and oversight. For many environmental programs, States and Tribes are directly responsible for actual operation of the various environmental programs, and the Agency's activities include providing support and assistance and conducting oversight.

In addition to program costs, this account funds administrative costs associated with the Agency's operating programs, including support for executive direction, policy oversight, grants and resources management, general office and building services for program operations, and direct implementation of Agency environmental programs for headquarters, the ten EPA regional offices, and all non-research field operations.

| | |
|---|---|
| Appropriation enacted, 2021 ................................................................ | $2,761,550,000 |
| Budget estimate, 2022 ...................................................................... | 3,427,494,000 |
| Recommended, 2022 .......................................................................... | 3,364,206,000 |
| Comparison: | |
|     Appropriation, 2021 ................................................................... | +602,656,000 |
|     Budget estimate, 2022 ............................................................... | −63,288,000 |

The Committee recommends $3,364,206,000 for Environmental Programs and Management, $602,656,000 above the enacted level and $63,288,000 below the budget request.

A detailed table of funding recommendations below the account level is provided at the end of this report, and the Committee provides the following additional detail by program area:

86

*Clean Air.*—The Committee recommends $435,154,000, $152,904,000 above the enacted level and equal to the request. The recommendation includes $103,689,000 for the Atmospheric Protection program project and increases funding for Federal Stationary Source Regulation to $26,618,000. The Committee notes the new responsibilities required of the Agency to implement the recently enacted American Innovation and Manufacturing Act of 2020 (AIM Act), which phases out use of hydrofluorocarbons (HFCs). The recommendation includes the requested increases for both Stratospheric Ozone program projects to carry out this work. As the Agency works to implement the AIM Act, the Committee directs the Agency to make reasonable accommodations to mitigate economic impacts on affected stakeholders, including industrial manufacturers.

Despite continued progress under the Clean Air Act to improve air quality and curb the effects of acid rain, forests and watersheds throughout the Northeast are still experiencing long-term impacts from acid rain, smog, and mercury. To better protect these ecosystems, enhance data collection, and improve long-term monitoring of these threats on the Northwoods Region, the Committee provides increased funding, consistent with the request, within EPM and S&T for the Clean Air Allowance Trading Program to support such efforts. The Committee directs the Agency to provide a briefing on its critical loads approach for climate and acid rain damage documentation not later than 180 days of enactment of this Act. As part of this briefing, the Agency should discuss opportunities to partner with research institutions and scientists in the Region to improve its critical loads approach, to collaborate on water body and ecosystem restoration projects, and to advance acid rain mitigation and monitoring in the Northeast.

*Compliance.*—The Committee recommends $132,350,000 for compliance activities, $29,850,000 above the enacted level and equal to the request.

The Committee is aware of concerns from communities across the country about the potential health risks associated with prolonged exposure to ethylene oxide. The Committee has provided the Agency additional resources for monitoring and compliance activities, and urges the Agency to engage with communities concerned about ethylene oxide exposure in a manner that adequately addresses their concerns. The Committee further urges the Agency to incorporate validated monitoring data provided to the Agency into relevant rulemakings.

*Enforcement.*—The Committee recommends $272,710,000 for enforcement activities, $24,313,000 above the enacted level and $293,862,000 below the request. In prior years and in the budget request, the Environmental Justice program project was funded within the Enforcement program area. As noted above, in fiscal year 2022, the Committee recommends funding Environmental Justice as a separate program area. After accounting for these changes, the Committee recommendation increases Enforcement program area funding by $36,151,000 above the enacted level and is equal to the request.

*Environmental Justice.*—The Committee recommends $141,973,000 for a new Environmental Justice program area. Compared to the enacted level within EPM, the Committee rec-

87

ommendation for fiscal year 2022 is an increase of $130,135,000. Additional resources for Environmental Justice are also provided within the Hazardous Substance Superfund and State and Tribal Assistance Grants accounts, and include new grantmaking authorities and funds.

The Committee is aware there are front-line communities that are overly-burdened by corporate pollution and environmental degradation, leading to a disproportionate negative impact on the health of community members. The Committee directs the Agency to develop a definition for disproportionately exposed communities. The definition should include: communities in which climate change, pollution, or environmental destruction have exacerbated systemic racial, regional, social, environmental, and economic injustices by disproportionately affecting indigenous peoples, communities of color, migrant communities, deindustrialized communities, depopulated rural communities, the poor, low-income workers, women, the elderly, the unhoused, people with disabilities, or youth. The Agency is expected to incorporate this definition into its ongoing environmental justice work.

With these substantial increases in resources, the Committee expects the Agency to make significant progress implementing tasks outlined in the "EJ 2020 Action Agenda," including working in one hundred overburdened communities and on cumulative risk assessments. Within 60 days of enactment of this Act, the Committee expects the Agency to submit implementation plans with anticipated milestones that will be achieved over the course of the year, and provide periodic reports on progress achieved to date.

*Environmental Protection: National Priorities.*—The bill provides $23,700,000, $2,000,000 above the enacted level and $23,700,000 above the request. The Committee directs that funds be used for a competitive grant program for qualified non-profit organizations, to provide technical assistance for improved water quality or safe drinking water, adequate wastewater to small systems or individual private well owners. The Agency shall provide $20,700,000 for Grassroots Rural and Small Community Water Systems Assistance Act, for activities specified under Section 1442(e) of the Safe Drinking Water Act (42 U.S.C. 300j–1(e)(8)). The Agency is also directed to provide $2,000,000 for grants to qualified not-for-profit organizations for technical assistance for individual private well owners, with priority given to organizations that currently provide technical and educational assistance to individual private well owners. The Agency is directed to provide on a national and multi-State regional basis, $1,000,000 for grants to qualified organizations, for the sole purpose of providing on-site training and technical assistance for wastewater systems. The Agency shall require each grantee to provide a minimum 10 percent match, including in-kind contributions. The Agency is directed to allocate funds to grantees within 180 days of enactment of this Act.

*Geographic Programs.*—The bill provides $642,747,000, $100,775,000 above the enacted level and $64,411,000 above the request. The Committee believes that protecting these important water bodies is a national priority and provides funding for programs that support their restoration and protection. From within the amount provided, the Committee directs the following:

88

*Great Lakes Restoration Initiative.*—The Committee recommends $375,000,000 for the Great Lakes Restoration Initiative (GLRI), $45,000,000 above the enacted level and $35,000,000 above the budget request. The Committee directs the Agency and other federal partners to continue to work together in coordination with the Great Lakes States, Tribes, local authorities, and nonfederal stakeholders to prioritize action-oriented projects across the five focus areas in lieu of additional studies, monitoring, and evaluations. Such projects include, but are not limited to, remediating and delisting Areas of Concern, reducing nutrient runoff, preventing and controlling invasive species, improve water quality, and increase coastal resiliency through restoration and protection of streambanks, natural coastlines and shorelines. As the Agency distributes funds across the five focus areas, tribal related activities should be maintained at not less than $15,000,000.

The Committee remains concerned by the rise in harmful algal blooms (HABs) due to an increase in extreme weather events and climate variability throughout the Great Lakes, and believes that investing GLRI funding in innovative projects including wetland and other natural infrastructure project designs, technologies, or approaches), both nutrient and HAB reduction benefits can be achieved at landscape scales. The Agency is directed to brief the Committee on its current and historical allocation of funds among the five focus areas, with a focus on Area 3 (nutrients) and Area 4 (habitat) in fiscal year 2021 level. Additionally, the Committee urges the Agency to focus on HAB reduction efforts in Great Lakes regions where nutrient loading contributes the most to HABs. The Committee strongly supports projects that have cross-cutting benefits across focus areas and directs the Agency to use GLRI funding to support efforts that yield benefits to more than one focus area by combining resources from multiple focus areas and to develop a more flexible and responsive allocation process which ensures that States and local communities have the capacity and tools to respond to the growing threat that HABs and other environmental challenges pose to the Great Lakes. The Committee also encourages Agency funds to be made available to expand breakwaters and advance local shoreline mitigation measures that protect water quality and provide much needed protection for Great Lakes shorelines threatened by rising lake levels. The Committee directs the Agency, within 180 days of enactment of this Act, to submit a report outlining the funding that has been provided for these purposes over the last five fiscal years. The Committee also recognizes that environment-based mitigation measures such as the creation of wetlands, conservation easements, and natural flood plains to slow the flow rate of rivers, creeks, and streams, are innovative tools to mitigate the severity of future floods in the Great Lakes Bay region. The Committee urges the Agency to work in coordination with the U.S. Department of Agriculture, Federal Emergency Management Agency, National Oceanic and Atmospheric Administration, and U.S. Army Corps of Engineers, as well as state, local, and tribal governments, and business and non-profit stakeholders, on developing conservation and environment-based flood mitigation measures to reduce the impact of floods on communities within the Great Lakes Bay region, including the Tittabawassee River Watershed.

89

The Committee is aware of interest in utilizing GLRI funds in the Chicago River Watershed and encourages the Agency to brief the Committee on any benefits that might accrue to the Great Lakes from restoration work in the Chicago River.

*Chesapeake Bay.*—The Committee recommends $90,500,000 for the Chesapeake Bay program, $3,000,000 above the enacted level and equal to the request. From within the amount provided, $10,375,000 is for nutrient and sediment removal grants and $10,375,000 is for small watershed grants to control polluted runoff from urban, suburban and agricultural lands, and $8,750,000 is for state-based implementation in the most effective basins.

*San Francisco Bay.*—The Committee recommends $25,000,000 for the San Francisco Bay program, $16,078,000 above the enacted level and $13,000,000 above the request. The Committee directs the Agency to undertake priority activities within the San Francisco Bay estuary Comprehensive Conservation and Management Plan approved under section 320 of the Clean Water Act (CWA).

*Puget Sound.*—The Committee recommends $50,000,000 for Puget Sound, $16,250,000 above the enacted level and $15,000,000 above the budget request. Funds shall be allocated in the same manner as directed in House Report 112–331. The Committee directs the Agency to expeditiously obligate funds, in a manner consistent with the authority and responsibilities under section 320 of the CWA and the National Estuary Program.

*Long Island Sound.*—The Committee recommends $40,000,000 for the Long Island Sound program, $9,600,000 above the enacted level and equal to the budget request. The Agency shall operate the program as specified in section 119 of the CWA.

*Lake Champlain.*—The Committee recommends $20,000,000 for the Lake Champlain program, $5,000,000 above the enacted level and equal to the request. To restore and protect Lake Champlain and its surrounding watershed, funds should be allocated through the Lake Champlain Basin Program Process to support implementation of section 120 of the CWA, and by partnering with states, local organizations, and other stakeholders working to address challenges in the area, including phosphorous pollution, toxic substances, biodiversity, aquatic invasive species, and to make the lake and surrounding communities and ecosystems more resilient to climate change.

*Southern New England Estuaries.*—The bill provides $7,500,000, $2,000,000 above the enacted level and $1,248,000 above the request. The Committee directs the Agency to use the increase to spur investments in regionally significant and landscape-scale restoration projects through technical assistance, grants, and contracts.

*Great Lakes and Lake Champlain Invasive Species Program.*— The Committee notes that it has yet to receive the plans directed in P.L. 116–94 and P.L. 116–260 on the Agency's previous and planned actions to implement the Great Lakes and Lake Champlain Invasive Species Program as authorized by the Vessel Incident Discharge Act (P.L. 115–282). In fiscal year 2022, the Committee expects the Agency to finalize its plan expeditiously, and directs the Agency to use not less than the fiscal year 2021 level of funds from the appropriate Geographic Programs to use sound science and technological advancements to monitor for the intro-

BLM_004243

90

duction and spread of aquatic nuisance species into or within the Great Lakes and Lake Champlain systems. The Agency is directed to include details of these relevant funding levels as part of the Agency's operating plan.

*Indoor Air and Radiation.*—The Committee recommends $30,254,000, $5,303,000 above the enacted level and equal to the request. The Agency is directed to continue to operate the Radon program as in fiscal year 2021. Additionally, the Committee notes the need to maintain the U.S. source standard for radon gas for use by states and industry as the national benchmark for radon measurement devices, and encourages the Agency to collect available radon test data to update the national U.S. EPA Radon Map and develop locality-specific classifications of radon risks.

*Information Exchange/Outreach.*—The Committee recommends $131,117,000, $12,142,000 above the enacted level and equal to the request. This includes a $3,069,000 increase for Tribal Capacity Building to $15,971,000, an additional $1,027,000 to support implementation of the Evidence-Based Policymaking Act of 2018, and the requested $5,376,000 increase to support engagement with state and local partners, reduce children's exposure to lead, and strengthen the Agency's ability to carry out effective risk communication.

*IT/Data Management/Security.*—The Committee recommends $100,860,000, $9,860,000 above the enacted level and equal to the request. The Committee applauds the Agency for its efforts to support teleworking during the ongoing coronavirus pandemic, and where appropriate, is supportive of continuing flexibility for the Agency's workforce.

*Pesticide Licensing.*—The Committee recommends $110,219,000, $1,219,000 above the enacted level and equal to the request.

The Committee is aware of proposals to establish a Vector Expedited Review Voucher (VERV) program within the Office of Pesticides, modeled after a similar expedited review program at the U.S. Food and Drug Administration, to incentivize the development of disease vector control agents to control insecticide resistant mosquitos or other disease vectors. The Agency is directed to brief the Committee on the merits of establishing a VERV pilot program.

*Resource Conservation and Recovery Act (RCRA).*—The Committee recommends $123,120,000, $4,220,000 above the enacted level and $3,000,000 above the request.

Of the funds provided under this program area, $9,000,000 is for implementation of a federal permit program for coal combustion residuals in non-participating states, as authorized under section 4005(d)(2)(B) of the Solid Waste Disposal Act (42 U.S.C. 6945(d)(2)(B)), or to provide technical assistance to states establishing their own permitting program under section 4005(d) of the Solid Waste Disposal Act (42 U.S.C. 6945(d)).

Recycling provides significant contributions to American prosperity and protection of the environment, and the Committee supports efforts to strengthen the U.S. recycling system and increase outreach, awareness, and education on recycling. The Committee provides $13,202,000 for Waste Minimization and Recycling, $3,220,000 above the enacted level. The Committee notes that the recently enacted Save Our Seas 2.0 Act (P.L. 116–224) includes new authorities and responsibilities for the Agency. The Committee

BLM_004244

91

urges the Agency to utilize these authorities to improve domestic waste management and bolster U.S. recycling rates. Within funding provided for Waste Minimization and Recycling, the Committee includes no less than $1,000,000 for the Agency to work with states, local governments, nonprofits, and public-private partnerships to educate and inform consumers and households about their residential and community recycling programs. The Committee also provides an additional $1,000,000 for the Agency to assist local communities in studying, designing, and constructing recycling infrastructure in order to recapture valuable materials for the U.S. economy and divert biodegradable materials from landfilling to reduce the generation of methane gas. In addition to resources provided here, the Committee provides new funding for recycling infrastructure grants within STAG.

The Committee looks forward to receiving the Recycling Needs Survey and Assessment report described in House Report 116–448.

*Reducing Plastic Waste in Commerce.*—The Committee believes that efforts to reduce production and use of virgin plastics, especially single-use plastics, must be part of any overall strategy to reduce the landfilling of waste materials and a transition to a circular economy. The Committee directs the Agency to contract with the National Academy of Sciences to prepare a report on single use plastics. The report should analyze plastics by plastic type, and should evaluate the recyclability of each type of plastic, the average recycled content of each type of plastic, and national and regional estimates for the rates at which each plastic type is generated and recycled. To the extent such information is available, the report should include estimates for the contribution of state and local policies intended to reduce the use of single-use plastics (including bans, fees, and other mandatory and voluntary policies designed to reduce or discourage the use of single-use plastics) in any observed regional variability seen in rates of plastic waste generation or recycling. The Agency shall submit this report to the Committee within one year of enactment of this Act.

*Water: Ecosystems.*—The Committee recommends $59,899,000, $8,777,000 above the enacted level and $3,037,000 above the request. From within the amount provided, the Committee provides $750,000 per estuary for National Estuary Program (NEP) grants funded under Section 320 of the CWA, an increase of $50,000 per estuary above the enacted level. An additional $2,000,000 is provided for competitive grants. The Committee encourages the Agency to work in consultation with the NEP directors to identify worthy projects and activities.

The Committee recognizes the value of leveraging existing Agency programs and expertise to improve water quality in the Mississippi River Basin and to mitigate and control hypoxia in the Gulf of Mexico. The Committee expects the Agency, through the Hypoxia Task Force, to provide executive level direction and assistance to state and tribal partners as they implement comprehensive water quality solutions designed to reduce nutrient loads in waterways throughout the greater Mississippi River Basin, consistent with the Gulf Hypoxia Action Plan. The Committee directs the Agency to utilize available funding from the Gulf of Mexico Geographic Program, National Estuary Program/Coastal Waterways, and Sec. 319 Non-point Source grants, as appropriate, to support

BLM_004245

92

the implementation of State Nutrient Reduction Strategies and to develop modeling tools to understand the collaborative effects and impacts of these strategies on mitigating hypoxia. Not later than 90 days after enactment of this Act, the Committee directs the Agency to provide a spend plan to support these efforts and a report noting any additional authorities the Agency needs to carry out this work. Of the increase provided to the National Estuary Program/Coastal Waterways program project, $1,000,000 shall be used to support the Task Force's work.

*Water: Human Health Protection.*—The Committee recommends $118,804,000, $10,317,000 above the enacted level and $1,265,000 below the request. The Committee commends the decision to review and, as necessary, to revise the Lead and Copper Rule, to better protect children and communities from the risks of lead exposure through drinking water, including in schools and childcare facilities.

The Committee understands there is strong interest in carbon capture and storage projects that permanently sequester carbon dioxide in geologic formations instead of releasing this pollutant into the air. The Committee provides not less than $4,000,000 for the Agency's work within the Underground Injection Control program related to Class VI wells for geologic sequestration to help develop expertise and capacity at the Agency. These funds should be used by the Agency to expeditiously review and process Class VI primacy applications from States and Tribes and to directly implement the regulation as quickly as possible, where States have not yet obtained primacy by working directly with permit applicants. The Committee also directs the Agency, in consultation with the Bureau of Ocean Energy Management, to provide an assessment within 180 days of enactment of this Act of Class VI program's relevance to Outer Continental Shelf (OCS) carbon capture projects.

The Agency is encouraged to continue coordinating with the Food and Drug Administration in light of the directive included in Section 773 of Division B of the Consolidated Appropriations Act, 2019 (P.L. 116–6).

*Water   Quality   Protection.*—The   Committee   recommends $228,072,000, $11,722,000 above the enacted level and $2,582,000 below the request. The Committee supports the WaterSENSE, Urban Waters, and Trash Free Waters programs at the proposed levels. The Committee urges the Agency to develop Effluent Limit Guidelines (ELGs) and biosolids regulations with respect to PFAS chemicals.

The Committee supports the Agency's ongoing activities related to integrated planning, which will be increasingly necessary as States and communities work to meet their myriad clean water obligations while keeping rates affordable for water ratepayers. The Committee directs that funding for the Office of Municipal Ombudsman, as authorized by Congress, be funded at not less than the enacted level.

The Agency is directed to continue and expand its work coordinating with Federal, State, local, and Tribal agencies to monitor and reduce transboundary hazardous contaminants in U.S.-British Columbia transboundary watersheds, including the Kootenai watershed. These efforts should be funded at no less than the enacted level.

93

*Per- and Polyfluoroalkyl Substances (PFAS).*—Of the funds provided under this account, no less than $10,500,000 shall be for priority actions under the PFAS Action Plan, an increase of $4,989,000. Of such funds, the Committee directs that not less than $800,000 shall be from the Toxics Release Inventory program project, not less than $1,100,000 shall be from Toxics Review and Risk Prevention, not less than $4,000,000 shall be from Water: Human Health, and not less than $4,400,000 shall be from Water Quality Protection.

*Additional Guidance.*—The Committee includes the following additional guidance with respect to funding provided under this account:

*Administrator Priorities.*—The Agency is directed to submit a report within 90 days of enactment of this Act that identifies how any fiscal year 2020 and 2021 funding was used, by account, program area, and program project. Each activity funded should include a justification for the effort and any anticipated results.

*Asbestos.*—The Committee supports Agency action to eliminate the future use of asbestos in a variety of applications. The Agency is directed to periodically report to the Committee on its efforts to monitor, remove, and eliminate the use of asbestos.

*Buy Clean Procurement Pilot.*—The Committee urges the Agency to develop policies that can leverage the federal government's purchasing power to help reduce carbon pollution and other forms of pollution. The Administrator is encouraged to development a Buy Clean procurement preference pilot program, working in collaboration with the Secretary of the Department of Energy, and in consultation with the Administrators of the General Services Administration and the Office of Federal Procurement Policy, that places preference on the purchase or acquisition of goods, products, or materials that help reduce pollution, especially carbon pollution.

*Chlorpyrifos.*—The Committee notes the recent 9th Circuit decision directing the Agency to reevaluate existing and future registrations of chlorpyrifos in light of the risks that residual residues on food can pose. The Committee accepts the findings from numerous studies establishing the link between the use of chlorpyrifos and brain damage in children. The Agency is expected to meet its obligations to protect human health and the environment.

*Great Lakes Algal Blooms.*—The Committee recognizes that efforts to control runoff, manage Harmful Algal Blooms (HABs) and better manage nutrient flows into the Great Lakes in general, and Lake Erie in particular, require a shared interagency agenda. The Agency is directed to brief the Committee on its efforts to collaborate with federal partners, including the Natural Resources Conservation Service, in this region, and to include as part of the briefing how funds made available to the Agency are being utilized to build new habitat and natural infrastructure to decrease nutrient outflows and reduce HABs.

*Lead and Copper Rule.*—The Committee directs the Agency to study the merits of issuing a separate national drinking water regulation for schools that establishes a lead action level not more than the current federal action level to ensure children, who are at greatest risk from lead poisoning, are protected from contaminants in their water. The Committee urges the Administrator to publish a report following completion of the study with findings and conclu-

94

sions related towards the feasibility and potential life-saving impacts of establishing a separate lead action level for schools.

*Mississippi River Restoration and Resiliency Strategy.*—The Committee continues to recognize the need for the Agency to establish a Mississippi River Restoration and Resiliency Strategy, as described by House Report 116–448 and in coordination with identified stakeholders. The Committee directs the Agency to report the findings, strategy, and recommendations not later than 90 days after enactment of this Act. The Agency is also directed to engage with the U.S. Geological Survey as they host the Mississippi River Science Forum and to contribute to the proceedings as a federal agency with relevant scientific expertise.

*Outreach to Farm Workers.*—The Committee directs the Agency to extend its Spanish-language outreach program educating farmworkers and pesticide handlers about improving worker safety when applying pesticides in agriculture operations through radio and other media. The Committee notes support from outside parties of the radio outreach effort as having materially improved farm workers' knowledge and ability to reduce exposure risks for themselves and their families, and that research indicates the importance of message repetition over an extended period. The Committee urges the Agency to continue this Spanish-language radio outreach program beyond the final year of the current effort.

*Restrictions on Certain Communications.*—The Committee reminds EPA that funding may not be used in a manner contrary to Section 401 of this bill.

OFFICE OF INSPECTOR GENERAL

The Office of Inspector General (OIG) provides audit, evaluation, and investigation products and advisory services to improve the performance and integrity of EPA programs and operations. The Inspector General (IG) will continue to perform the function of IG for the Chemical Safety and Hazard Investigation Board. This account funds personnel compensation and benefits, travel, and expenses (excluding rent, utilities, and security costs) for the OIG. In addition to the funds provided under this heading, this account receives funds from the Hazardous Substance Superfund account.

| | |
|---|---|
| Appropriation enacted, 2021 ............................................................. | $43,500,000 |
| Budget estimate, 2022 ...................................................................... | 54,347,000 |
| Recommended, 2022 .......................................................................... | 54,347,000 |
| Comparison: | |
| Appropriation, 2021 ...................................................................... | +10,847,000 |
| Budget estimate, 2022 .................................................................. | 0 |

The Committee recommends $54,347,000 for the Office of Inspector General, $10,847,000 above the enacted level and equal to the budget request. In addition, the Committee recommends $11,800,000 as a payment to this account from the Hazardous Substance Superfund account.

BUILDINGS AND FACILITIES

The Buildings and Facilities account provides for the design and construction of EPA-owned facilities as well as for the repair, extension, alteration, and improvement of facilities used by the Agency. The funds are used to correct unsafe conditions, protect health

95

and safety of employees and Agency visitors, and prevent deterioration of structures and equipment.

| | |
|---|---|
| Appropriation enacted, 2021 ........................................................... | $33,752,000 |
| Budget estimate, 2022 ................................................................... | 62,752,000 |
| Recommended, 2022 ...................................................................... | 62,752,000 |
| Comparison: | |
| Appropriation, 2021 ................................................................. | +29,000,000 |
| Budget estimate, 2022 .............................................................. | 0 |

The Committee recommends $62,752,000 for Buildings and Facilities, $29,000,000 above the enacted level and equal to the request.

The Committee continues to have reservations about laboratory and office relocations and closures initiated outside of the Committee's reprogramming requirements in the previous four years. The Committee expects the Agency to immediately seek approval before undertaking any additional actions to effect such moves.

### HAZARDOUS SUBSTANCE SUPERFUND

#### (INCLUDING TRANSFERS OF FUNDS)

The Hazardous Substance Superfund (Superfund) program was established in 1980 by the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) to clean up hazardous materials, spills, and dangerous, uncontrolled, and/or abandoned hazardous waste sites. The Superfund Amendments and Reauthorization Act (SARA) expanded the program substantially in 1986, authorizing approximately $8,500,000,000 in revenues over five years. In 1990, the Omnibus Budget Reconciliation Act extended the program's authorization through 1994 for $5,100,000,000 with taxing authority through calendar year 1995.

The Superfund program is operated by EPA subject to annual appropriations from a dedicated trust fund and from general revenues. Enforcement activities are used to identify and induce parties responsible for hazardous waste problems to undertake cleanup actions and pay for EPA oversight of those actions. These enforcement actions are an essential element to the success of the program. In addition, responsible parties have been required to cover the cost of fund-financed removal and remedial actions undertaken at spills and waste sites by Federal and State agencies. At sites where no viable responsible party can be identified, EPA may use monies from the Trust Fund to remediate contaminated sites. Funds are transferred from this account to the Office of Inspector General and Science and Technology accounts for Superfund related activities.

| | |
|---|---|
| Appropriation enacted, 2021 ........................................................... | $1,205,811,000 |
| Budget estimate, 2022 ................................................................... | 1,533,814,000 |
| Recommended, 2022 ...................................................................... | 1,536,308,000 |
| Comparison: | |
| Appropriation, 2021 ................................................................. | +330,497,000 |
| Budget estimate, 2022 .............................................................. | +2,494,000 |

The Committee recommends $1,536,308,000 for the Hazardous Substance Superfund program, $330,497,000 above the enacted level and $2,494,000 above the request. The Committee recommends that $11,800,000 be transferred to the Office of Inspector

General, and $32,985,000 be transferred to the Science and Technology account.

*Enforcement.*—The Committee recommends $176,066,000, $2,251,000 above the enacted level and $5,841,000 below the request. In prior years and in the budget request, the Enforcement program area included funding for the Environmental Justice program project. Consistent with Enforcement funding within EPM, in fiscal year 2022, the Committee recommends funding Environmental Justice as a separate program area. After accounting for these changes, the Committee recommendation increases Enforcement program area funding by $8,092,000 above the enacted level for enforcement activities and is equal to the request.

*Environmental Justice.*—The Committee recommends $5,841,000 for a new Environmental Justice program area. Compared to the enacted level within HSS, the Committee recommendation for fiscal year 2022 is an increase of $5,015,000.

*Homeland Security.*—The Committee recommends $34,294,000, $244,000 above the enacted level and equal to the request. Of the funds provided, $1,475,000 should be included as part of the transfer to the Science and Technology account.

*Research: Chemical Safety and Sustainability.*—The Committee recommends $13,576,000, $752,000 above the enacted level and $700,000 above the request. There remain significant research needs with respect to the human health and ecological impacts of PFAS exposure, and methods for treatment and remediation. The Committee continues its support for research in support of designating PFAS chemicals as hazardous substances under Section 102 of CERCLA. Additionally, the Committee provides an increase of $700,000 to develop new and more cost-effective methods for remediating lead contamination in soils. The Agency is directed to include these funds as part of the transfer to the Science and Technology account.

*Research: Sustainable and Healthy Communities.*—The Committee recommends $17,934,000, $1,471,000 above the enacted level and $1,300,000 above the request. The Committee continues its support for research in support of designating PFAS chemicals as hazardous substances under Section 102 of CERCLA. Additionally, the Committee provides an increase of $1,300,000 to develop new and more cost-effective methods for remediating lead contamination in soils. The Agency is directed to include these funds as part of the transfer to the Science and Technology account.

*Superfund Cleanup.*—The Committee recommends $1,107,917,000, $299,417,000 above the enacted level and equal to the request. The Committee urges the Agency to prioritize work at sites where activities will result in reduced human exposure to toxic substances. The Committee provides an additional $2,500,000 within the Superfund: Remedial program, to support regulatory work needed to designate PFAS chemicals as hazardous substances under section 102 of CERCLA.

The Committee also directs the Agency, within 180 days of enactment of this Act, to submit a report on the status of each time-critical removal action for which Federal funds greater than $1,000,000 have been expended since January 1, 2017, along with the Federal cost of clean-up efforts, whether responsible parties

97

have faced criminal charges, and the amount of recovered Federal dollars.

*Per- and Polyfluoroalkyl Substances (PFAS).*—Of the funds provided under this account, not less than $24,000,000 shall be for priority actions under the PFAS Action Plan, an increase of not less than $3,800,000. Of such funds, not less than $10,000,000 shall be from Research: Chemical Safety, not less than $5,000,000 shall be from Research: Sustainable Communities, not less than $5,500,000 shall be for overseeing cleanups at federal facilities, and not less than $2,500,000 shall be for designating PFAS chemicals as hazardous substances under CERCLA. The amounts provided for research purposes should be included in the transfer to the Science and Technology account.

*Additional Guidance.*—The Committee includes the following additional guidance with respect to funding provided under this account:

*New and Emerging Technologies.*—To increase the rate of cleanups of Superfund sites around the country, the Agency is encouraged to collaborate with the private sector to utilize the best available technologies and in situ remediation products to restore these sites as expeditiously as possible to return them to productive use.

*Lead Contamination at Superfund Sites.*—The Committee notes that lead contamination is pervasive at Superfund sites, and that remediation efforts are hampered by the high costs of current removal options. The Committee has provided additional funds for research to help address this challenge. The Agency is urged to brief the Committee on additional research or remediation needs to address this problem.

### LEAKING UNDERGROUND STORAGE TANK TRUST FUND PROGRAM

Subtitle I of the Solid Waste Disposal Act, as amended by the Superfund Amendments and Reauthorization Act (SARA), authorized the establishment of a response program for cleanup of releases from leaking underground storage tanks. Owners and operators of facilities with underground tanks must demonstrate financial responsibility and bear initial responsibility for cleanup. The Federal trust fund is funded through the imposition of a motor fuel tax of one-tenth of a cent per gallon.

In addition to State resources, the Leaking Underground Storage Tank (LUST) Trust Fund provides funding to clean up sites, enforces necessary corrective actions, and recovers costs expended from the Fund for cleanup activities. The underground storage tank response program is designed to operate primarily through cooperative agreements with States. Funds are also used for grants to non-State entities, including Indian Tribes, under Section 8001 of the Resource Conservation and Recovery Act. The Energy Policy Act of 2005 expanded the authorized activities of the Fund to include the underground storage tank program. In 2006, Congress amended section 9508 of the Internal Revenue Code to authorize expenditures from the trust fund for prevention and inspection activities.

98

| | |
|---|---|
| Appropriation enacted, 2021 ................................................................ | $92,203,000 |
| Budget estimate, 2022 ..................................................................... | 92,376,000 |
| Recommended, 2022 ......................................................................... | 92,376,000 |
| Comparison: | |
|     Appropriation, 2021 ..................................................................... | +173,000 |
|     Budget estimate, 2022 ................................................................. | 0 |

The Committee recommends $92,376,000 for the Leaking Underground Storage Tank (LUST) Trust Fund Program, $173,000 above the enacted level and equal to the budget request.

Regular inspections of Underground Storage Tanks (USTs) are a key part of an overall strategy to prevent and minimize impacts of releases of fuels or other hazardous substances from USTs. The Committee provides $25,369,000 to support state inspection programs.

The Committee supports the Agency's ongoing efforts to study and mitigate corrosion issues at USTs as the nation employs increasing quantities of emerging fuels.

INLAND OIL SPILL PROGRAMS

This appropriation, authorized by the Federal Water Pollution Control Act, as amended by the Oil Pollution Act of 1990, provides funds to prepare for and prevent releases of oil and other petroleum products in navigable waterways. In addition, EPA is reimbursed for incident specific response costs through the Oil Spill Liability Trust Fund managed by the United States Coast Guard.

EPA is responsible for directing all cleanup and removal activities posing a threat to public health and the environment; conducting site inspections; providing a means to achieve cleanup activities by private parties; reviewing containment plans at facilities; reviewing area contingency plans; pursuing cost recovery of fund-financed cleanups; and conducting research of oil cleanup techniques. Funds for this appropriation are provided through the Oil Spill Liability Trust Fund which is composed of fees and collections made through provisions of the Oil Pollution Act of 1990, the Comprehensive Oil Pollution Liability and Compensation Act, the Deepwater Port Act of 1974, the Outer Continental Shelf Lands Act Amendments of 1978, and the Federal Water Pollution Control Act, as amended.

| | |
|---|---|
| Appropriation enacted, 2021 ................................................................ | $20,098,000 |
| Budget estimate, 2022 ..................................................................... | 22,409,000 |
| Recommended, 2022 ......................................................................... | 22,409,000 |
| Comparison: | |
|     Appropriation, 2021 ..................................................................... | +2,311,000 |
|     Budget estimate, 2022 ................................................................. | 0 |

The Committee recommends $22,409,000 for the Inland Oil Spill program, $2,311,000 above the enacted level and equal to the budget request.

*Preventing Oil Spills.*—The Committee is aware of the high noncompliance rate among facilities that are required to submit Spill Prevention Control and Countermeasures Plans or Facility Response Plans, and provides the requested increase to facilitate compliance assurance efforts.

*Research on Dispersants.*—The Committee expects the agency to continue its work studying the performance and behavior of oil dispersants in deep water and arctic spills, as well as developing protocols for testing oil spill control agents.

99

STATE AND TRIBAL ASSISTANCE GRANTS

The State and Tribal Assistance Grants (STAG) account provides grant funds for programs operated primarily by State, Tribal, local, and other governmental partners. The account includes three broad types of funds: (1) Infrastructure Assistance, which is used primarily by state, local, and tribal partners for projects that directly improve air quality, water quality, or clean up contaminated sites; supporting environmental protection; (2) Categorical Grants, which assist State and Tribal governments and other environmental partners with the operation of environmental programs, and (3) environmental justice implementation grants for state, local, and tribal governments and community stakeholders.

In the STAG account, the agency provides funding for infrastructure projects through two State Revolving Funds (Clean Water and Drinking Water), geographic specific projects in Alaska Native Villages and on the United States-Mexico Border, Brownfields revitalization projects, diesel emission reduction grants, and other targeted infrastructure projects. Additionally, the Water Infrastructure Improvements for the Nation Act (P.L. 114–322)(WIIN Act) and America's Water Infrastructure Act of 2018 (P.L. 115–270)(AWIA) authorized a number of clean water and drinking water grant programs designed to address specific water-related health and environmental concerns in communities.

The State Revolving Funds (SRFs) provide Federal financial assistance to protect the Nation's water resources. The Clean Water SRF helps eliminate municipal discharge of untreated or inadequately treated pollutants and thereby helps maintain or restore the country's water to a swimmable and/or fishable quality. The Clean Water SRF provides resources for municipal, inter-municipal, State, and interstate agencies and Tribal governments to plan, design, and construct wastewater facilities and other projects, including non-point source, estuary, stormwater, and sewer overflow projects. The Safe Drinking Water SRF finances improvements to community water systems so that they can achieve compliance with the mandates of the Safe Drinking Water Act and continue to protect public health.

Many Federal environmental statutes include provisions allowing delegation of day-to-day management of environmental programs to approved State and Tribal environmental programs. The Federal statutes were designed to recognize States and Tribes as partners and co-regulators, allowing States and Tribes to assist with the execution and implementation of environmental safeguards. For delegated environmental programs, State and Tribal governments issue and enforce permits, carry out inspections and monitoring, and collect data. To assist States and Tribes in this task, the statutes also authorized the agency to provide funding to States and Tribes. These grants, which cover every major aspect of environmental protection, include those programs authorized by sections 319 and 106 of the Clean Water Act (Federal Water Pollution Control Act, as amended, for non-point source pollution and water quality permits programs), sections 103 and 105 of the Clean Air Act (for State and Local air quality management programs), section 128 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (for State and Tribal response

BLM_004253

100

programs), section 1443(a) of the Safe Drinking Water Act (for public water system supervision), and section 3011 of the Resource Conservation and Recovery Act (for the implementation of State hazardous waste programs).

| | |
|---|---|
| Appropriation enacted, 2021 ................................................................ | $4,313,901,000 |
| Budget estimate, 2022 ........................................................................ | 5,130,007,000 |
| Recommended, 2022 ............................................................................ | 5,324,303,000 |
| Comparison: | |
|     Appropriation, 2021 ........................................................................ | +1,010,402,000 |
|     Budget estimate, 2022 .................................................................... | +194,296,000 |

The Committee recommends $5,324,303,000 for the State and Tribal Assistance Grants account, $1,010,402,000 above the enacted level and $194,296,000 above the budget request. The Committee provides the following additional detail by program area:

*Infrastructure Assistance.*—The Committee recommends $3,961,797,000 for infrastructure assistance.

*Community Project Funding Grants.*—From within funds provided for capitalization grants for the Drinking Water State Revolving Fund and the Clean Water State Revolving Fund, the Committee recommends $222,431,651 from the Clean Water SRF and $206,146,044 from the Drinking Water SRF be for Community Project Funding (CPF) grants for the construction of drinking water, waste water, and storm water infrastructure and for water quality protection. Each project shall provide not less than 20 percent matching funds from non-federal sources, unless approved for a waiver. Applicable federal requirements that would apply to a Clean Water State Revolving Fund or Drinking Water State Revolving Fund project grant recipient shall apply to a grantee receiving a CPF grant under this section. The Committee notes that the following funding sources are to be treated as non-federal funds and can be used to meet the non-federal matching fund requirement: U.S. Department of Housing and Urban Development, Community Development Block Grant program; U.S. Department of Agriculture, Rural Development Program; and Appalachian Regional Commission grants. As per U.S. Department of the Treasury guidance, funding made available to jurisdictions through the American Rescue Plan Act of 2021 (P.L. 117–2) are considered federal funds and may not be applied towards the non-federal cost share requirement. A detailed list of projects is located in the table titled "Incorporation of Community Project Funding" located at the end of this report.

*Clean Water State Revolving Fund (CWSRF).*—The Committee recommends $1,870,680,000 for the Clean Water SRF, requires at least 10 percent of funds to be used for green infrastructure or energy efficiency projects, reserves $2,000,000 for technical assistance and training grants, and requires that 10 percent of grant funds be used for additional subsidization. The Committee urges the Agency to utilize funding for the Clean Water SRF to protect freshwater sources. Additionally, to the extent there are sufficient eligible project applications, up to 20 percent of the funds made available through the CWSRF to each state may be used for projects that seek to minimize the impacts of nonpoint source pollution and stormwater runoff through the use of nature-based and other low impact development techniques.

BLM_004254

101

The Committee notes that wastewater treatment facilities are some of the largest industrial users of electricity in the nation and provides Green Project Reserve (GPR) funds as part of the CWSRF to encourage states to improve energy and water efficiency at treatment facilities. The Committee reminds the Agency of prior directives to develop a uniform reporting framework which states may use to report their GPR spending, and directs the Agency to develop and make available to states tools and metrics that allow states to quantify estimated energy and water savings benefits of these investments. The Agency is also reminded of the prior requirement to provide entities that provide technical assistance to wastewater and drinking water treatment facilities clear guidance on metrics for how to utilize GPR set asides. Finally, the Agency is directed to increase its cooperation on GPR technical assistance with the Department of Energy's Advanced Manufacturing Office and the U.S. Department of Agriculture's Rural Development Program.

The Committee is aware that in many parts of the country, untreated wastewater from failing septic systems contaminates surface waters and ground water. Section 4107 of AWIA authorizes use of Clean Water SRF funds to address septic systems. The Committee encourages the Agency to avail itself of all tools and authorities to address sources of water contamination. The Committee looks forward to receiving the report on the prevalence of low- and moderate-income households without access to wastewater treatment works described in House Report 116–448.

*Drinking Water State Revolving Fund.*—The Committee recommends $1,357,934,000 for the Drinking Water SRF, allows funds to be used to finance green infrastructure or energy efficiency projects, and requires that 14 percent be used for additional subsidization.

*US-Mexico Border Water Infrastructure Grant Program.*—The Committee recommends $35,000,000 for drinking water and wastewater infrastructure projects along the US-Mexico border that benefit U.S. citizens by reducing the flow of transnational pollution flows into the United States.

*Alaska Native Villages.*—The Committee recommends $36,186,000 in drinking water and wastewater infrastructure projects in Alaska Native Villages and other rural communities that face significant health challenges due to lack of adequate sanitation.

*Brownfields Program.*—The Committee recommends $130,982,000 for brownfields grants and directs that at least 10 percent of such grants be provided to areas in which at least 20 percent of the population has lived under the poverty level over the past 30 years as determined by censuses and the most recent Small Area Income and Poverty Estimates.

The Committee notes the value of multipurpose Brownfields grant awards, especially in communities that have clusters of Brownfield sites distributed over a larger geographic area. Many communities find that these larger awards allow for more rapid, cost-effective remediation and redevelopment planning, which in turn produce greater leveraging of Brownfields funding and offer more substantial returns on federal investment. The Committee urges the Agency to tailor the size and frequency of multi-purpose

BLM_004255

102

awards to the needs of each region, in order to make grant funding consistently available to communities with Brownfields sites.

*Diesel Emissions Reductions Grants (DERA).*—The Committee recommends $150,000,000 for DERA grants. The Committee notes that the DERA program was recently reauthorized through 2024. The Committee strongly supports the use of DERA funding in transportation electrification projects.

*Targeted Airshed Grants.*—The Committee recommends $70,000,000, and these grants shall be distributed on a competitive basis to non-attainment areas that EPA determines are ranked as the top five most polluted areas relative to annual ozone or particulate matter 2.5 standards, as well as the top five areas based on the 24-hour particulate matter 2.5 standard where the design values exceed the 35 mg/m3 standard. To determine these areas, the Agency shall use the most recent design values calculated from validated air quality data. The Committee notes that these funds are available for emission reduction activities deemed necessary for compliance with national ambient air quality standards and included in a State Implementation Plan submitted to EPA.

The Committee urges the Agency to pursue projects near port facilities and that advance the deployment of electrification technologies within the transportation sector.

*Water Quality Monitoring Grants.*—The Committee recommends $4,000,000 for water monitoring authorized under section 5004 of the WIIN Act (P.L. 114–322).

*Small and Disadvantaged Communities Grants.*—The Committee recommends $40,000,000 for grants to assist small and disadvantaged communities meet Safe Drinking Water Act requirements, authorized in section 2104 of the WIIN Act and section 2005 of AWIA.

*Lead Testing in Schools Grants.*—The Committee recommends $36,500,000 for voluntary testing of drinking water for lead contamination at schools and childcare facilities, as authorized in section 2107 of the WIIN Act and section 2006 of AWIA.

*Reducing Lead in Drinking Water Grants.*—The Committee recommends $81,515,000 for grants to reduce the concentration of lead in drinking water, as authorized in section 2105 of the WIIN Act.

*Drinking Water Infrastructure Resilience and Sustainability Program Grants.*—The Committee recommends $9,000,000 for grants to increase resilience of drinking water infrastructure to natural hazards, as authorized in section 2005 of AWIA.

*Technical Assistance for Treatment Works Grants.*—The Committee recommends $20,000,000 for grants to provide technical assistance to small, rural, and disadvantaged communities for the planning, design, financing, operation, and maintenance of water treatment infrastructure, as authorized by section 4103 as AWIA.

*Sewer Overflow Control Grants.*—The Committee recommends $60,000,000 for grants to control and treat sewer overflows, as authorized in section 4106 of AWIA. The Committee directs the Agency to award no less than 20 percent of grants for green infrastructure projects.

*Water Infrastructure Workforce Development.*—The Committee recommends $5,000,000 for grants to support workforce development for drinking water and wastewater system workers, as authorized by section 4304 of AWIA.

BLM_004256

103

*Recycling Infrastructure.*—The Committee recommends $55,000,000 for recycling infrastructure grants as authorized under section 302(a) of the Save Our Seas 2.0 Act.

*Categorical Grants.*—For categorical grants to States and other environmental partners for the implementation of delegated programs, the bill provides $1,262,506,000, an increase of $163,106,000 above the enacted level and $20,709,000 above the request. Funding levels for each grant program within the Categorical Grants program are specified in the table at the end of this report.

The Committee notes that states are essential partners that work to support the Agency's mission to protect public health and the environment. Ensuring that state agencies have sufficient capacity and expertise to effectively implement their delegated responsibilities is essential to ensuring that every community equitably benefits from our environmental laws.

*Categorical Grant: Beaches Protection.*—The Committee provides $11,500,000, $1,881,000 above enacted level and $1,689,000 above the request. These grants should be used to assist eligible states, territories, and Tribes as they implement programs to monitor their beaches and notify the public when they are unsafe to use. The Committee notes that beaches are used year-round in communities across the country, and that BEACH Act grants are especially critical in these states and communities that must continuously track bacteria levels to protect public health.

*Categorical Grant: Hazardous Waste Financial Assistance.*—The Committee recommends $111,500,000. The bill includes a provision to spend categorical grant funds for the purpose of providing grants to assist States in the development and implementation of state programs for the control of coal combustion residuals under section 2301 of the Water and Waste Act of 2016 (Public Law 114—322), and the Agency is directed to allocate $4,500,000 from the Hazardous Waste Financial Assistance categorical grants program project for this purpose. The Committees note that funds awarded under the authority provided by this Act are not subject to section 3011 of the Solid Waste Disposal Act (Public Law 89—272).

*Categorical Grant: Nonpoint Source (Sec. 319).*—The Committee recommends $180,000,000. The Committee notes that anthropogenic sources of nutrients, including non-point sources, are a primary factor in the occurrence and prevalence of Harmful Algal Blooms (HABs), and that reducing non-point pollution should significantly reduce both the frequency and severity of HABs. Therefore, the Committee directs the Agency to work with recipients to utilize these additional resources to prioritize these efforts. The Committee also supports ongoing efforts through non-point source programs and other mechanisms to reduce the amounts of plastic and other trash from entering waterways.

*Categorical Grant: Radon.*—The Committee continues to support state radon program efforts that raise awareness about the associated risks of radon exposure. The Committee recommends $11,000,000 and the Agency shall prioritize radon grants to states that have adopted or are seeking to adopt statewide radon building codes, conduct awareness and education programs for homebuyers and renters, and that have in place adequate certification or

BLM_004257

104

credentialing requirements for radon measurement and mitigation workers.

*Categorical Grant: State and Local Air Quality Management.*—The Committee recommends $320,000,000, an increase of $90,500,000 above the enacted level. The Committee is providing substantial increases of resources to accelerate the deployment of air monitoring equipment, especially in overburdened communities, and to enhance ongoing efforts at the state level to address emissions of carbon pollution.

*Environmental Justice Program Implementation Grants.*—The Committee recommends $100,000,000 for six new grant programs to assist communities members, states, Tribes, local governments, and community organizations by building capacity at all levels of civil society to assess environmental justice needs and implement solutions tailored to individual communities.

The Committee intends these grants to complement the Agency's existing small grants and cooperative agreement work, and to focus on implementing solutions that have been identified through collaborative engagement among all affected stakeholders. The Committee recognizes the need for flexibility in tailoring solutions to the individualized needs of environmental justice communities. Where appropriate, the Committee encourages the Agency to solicit consolidated community grant applications for grants that combine these new grant authorities to deliver solutions tailored to the specific needs of the applicant communities.

The Committee notes that there are wide disparities between states in their capacities to implement environmental justice practices, and the Agency is directed to prioritize resources to reduce those disparities.

*Additional Guidance.*—The Committee includes the following additional guidance with respect to funding provided under this account:

*National Water System Consolidation Assessment.*—The Committee recognizes the importance of water systems around the country being able to meet federal water quality standards while also being affordable for consumers. Many small urban and rural water systems struggle with the financial and technical capacity to meet these standards while providing affordable water and may need to consolidate or be absorbed by larger water systems. The Committee directs the Agency, as part of its Drinking Water Needs Survey, to assess water systems' capability of meeting water quality and affordability standards, their debt levels, and to develop guidance that provides recommendations to state and local governments to facilitate consolidations of small, urban, and disadvantaged water systems when they struggle to meet water quality and affordability standards.

*Use of Iron and Steel.*—The bill includes language in title IV general provisions that stipulates requirements for the use of iron and steel in State Revolving Fund projects. The Committee acknowledges that the Agency may issue a waiver of said requirements for de minimis amounts of iron and steel building materials. The Committees emphasize that any coating processes that are applied to the external surface of iron and steel components that otherwise qualify under the procurement preference shall not render such products ineligible for the procurement preference regardless of