Department of the Interior, Environment, and Related Agencies—Continued
[Community Project Funding Items]

| Agency | Account | Location | Project | House Amount | House Requestor(s) |
|---|---|---|---|---|---|
| Environmental Protection Agency ............................. | STAG—Clean Water SRF ............. | MI | The City of Midland for a storm and sanitary sewer improvement project. | 750,000 | Moolenaar |
| Environmental Protection Agency ............................. | STAG—Clean Water SRF ............. | MI | Tuscarora Township for a septic to sewer expansion and moderniza- tion project. | 3,500,000 | Bergman |
| Environmental Protection Agency ............................. | STAG—Clean Water SRF ............. | MI | St. Clair County for the Clay-Ira interceptor project ......................... | 1,000,000 | McClain |
| Environmental Protection Agency ............................. | STAG—Clean Water SRF ............. | MI | The Macomb Interceptor Drain Drainage District for a segment sewer rehabilitation project. | 1,000,000 | McClain |
| Environmental Protection Agency ............................. | STAG—Clean Water SRF ............. | MI | Harrison Township for a sanitary sewer project ................................ | 1,000,000 | McClain |
| Environmental Protection Agency ............................. | STAG—Clean Water SRF ............. | MI | The Village of Clinton for a septic waste treatment project .............. | 185,000 | Walberg |
| Environmental Protection Agency ............................. | STAG—Clean Water SRF ............. | MI | Leoni Township for a wastewater treatment plant improvement project. | 3,500,000 | Walberg |
| Environmental Protection Agency ............................. | STAG—Drinking Water SRF ......... | MI | Village of Milford for Water System Improvements Project ............... | 2,000,000 | Stevens |
| Environmental Protection Agency ............................. | STAG—Drinking Water SRF ......... | MI | City of Pleasant Ridge for Kensington Water Main and Lead Service Line Replacement Project. | 650,000 | Levin (MI) |
| Environmental Protection Agency ............................. | STAG—Drinking Water SRF ......... | MI | Oakland County for Pontiac Water System Improvements ................ | 800,000 | Lawrence |
| Environmental Protection Agency ............................. | STAG—Drinking Water SRF ......... | MI | Village of Fowlerville for Water Treatment Plant Improvements ......... | 3,500,000 | Slotkin |
| Environmental Protection Agency ............................. | STAG—Drinking Water SRF ......... | MI | Oakland County for Royal Oak Township Water System Improve- ments. | 800,000 | Lawrence |
| Environmental Protection Agency ............................. | STAG—Drinking Water SRF ......... | MI | The City of Croswell for a drinking water quality improvement project. | 1,000,000 | McClain |
| Environmental Protection Agency ............................. | STAG—Drinking Water SRF ......... | MI | Charter Township of Shelby for a water reservoir project ................ | 1,000,000 | McClain |
| Environmental Protection Agency ............................. | STAG—Drinking Water SRF ......... | MI | The City of Kalamazoo for a lead water service line replacement project. | 1,000,000 | Upton |
| Environmental Protection Agency ............................. | STAG—Drinking Water SRF ......... | MI | The City of Jackson for the Pearl Loop North Branch water trans- mission main project. | 1,760,000 | Walberg |
| Environmental Protection Agency ............................. | STAG—Drinking Water SRF; Clean Water SRF. | MI | St. Clair County for a drinking water ($200,000) and wastewater ($800,000) improvement project. | 1,000,000 | McClain |
| Environmental Protection Agency ............................. | STAG—Clean Water SRF ............. | MN | City of Shakopee for River Stabilization Project .............................. | 3,500,000 | Craig |
| Environmental Protection Agency ............................. | STAG—Clean Water SRF ............. | MN | City of Two Harbors for a wastewater treatment facility improve- ments project. | 3,500,000 | Stauber |
| Environmental Protection Agency ............................. | STAG—Drinking Water SRF ......... | MN | City of Zumbrota for Water Main Loop ........................................... | 448,000 | Craig |
| Environmental Protection Agency ............................. | STAG—Drinking Water SRF ......... | MO | City of Slater for Well Field Protection Project ................................ | 147,000 | Cleaver |
| Environmental Protection Agency ............................. | STAG—Drinking Water SRF ......... | MO | City Utilities of Springfield for a raw water main construction project. | 3,500,000 | Long |

190

| Agency | Account | State | Project | Amount | Member |
|---|---|---|---|---|---|
| Environmental Protection Agency | STAG—Drinking Water SRF | MS | The Mississippi Band of Choctaw Indians for the Bogue Homa water system project. | 2,000,000 | Palazzo |
| Environmental Protection Agency | STAG—Drinking Water SRF | MS | The City of Gautier for a water treatment project | 2,770,000 | Palazzo |
| Environmental Protection Agency | STAG—Clean Water SRF | NC | Town of Cary for Swift Creek Stormwater Management and Modeling Program. | 900,000 | Ross |
| Environmental Protection Agency | STAG—Clean Water SRF | NC | Town of Hookerton for Waste Water Treatment Plant Lagoon and Sewer Collection System Improvements. | 1,897,001 | Butterfield |
| Environmental Protection Agency | STAG—Clean Water SRF | NC | The Town of Benson for a sewer treatment capacity project | 1,000,000 | Rouzer |
| Environmental Protection Agency | STAG—Clean Water SRF | NC | The City of Clinton for a sewer line repair project | 68,000 | Rouzer |
| Environmental Protection Agency | STAG—Clean Water SRF | NC | The City of Dunn for the Black River Waste Water Plant improvement project. | 1,000,000 | Rouzer |
| Environmental Protection Agency | STAG—Drinking Water SRF | NC | City of Henderson for Kerr Lake Regional Water System Upgrade and Expansion Project. | 3,500,000 | Butterfield; Price (NC) |
| Environmental Protection Agency | STAG—Drinking Water SRF | NC | Martin County for Water Regionalization Project | 3,437,000 | Butterfield |
| Environmental Protection Agency | STAG—Drinking Water SRF | NC | Town of Pittsboro for Water Treatment Plant Infrastructure Upgrades. | 2,208,800 | Price (NC) |
| Environmental Protection Agency | STAG—Clean Water SRF | NE | The Sarpy County Wastewater Agency for the Springfield Creek sewer project. | 3,500,000 | Bacon |
| Environmental Protection Agency | STAG—Clean Water SRF | NH | Town of Exeter for Exeter Squamscott River Sewer Siphons | 600,000 | Pappas |
| Environmental Protection Agency | STAG—Drinking Water SRF | NH | City of Portsmouth for Little Bay Waterline Replacement | 600,000 | Pappas |
| Environmental Protection Agency | STAG—Drinking Water SRF | NH | The Village of Peterborough for Water Main Relocation | 277,804 | Kuster |
| Environmental Protection Agency | STAG—Clean Water SRF | NJ | Township of Saddle Brook for Sewage Rehabilitation and Improvements. | 1,393,682 | Pascrell |
| Environmental Protection Agency | STAG—Clean Water SRF | NJ | Township of Berkeley Heights for West Side Drainage Project | 250,000 | Malinowski |
| Environmental Protection Agency | STAG—Clean Water SRF | NJ | Borough of Paramus for Prospect Avenue Sewer Pump Station Project. | 250,000 | Gottheimer |
| Environmental Protection Agency | STAG—Clean Water SRF | NJ | Borough of Saddle River for Sewer Main Construction Project | 1,105,166 | Gottheimer |
| Environmental Protection Agency | STAG—Clean Water SRF | NJ | City of New Brunswick for Sewer Replacement Project | 760,000 | Pallone |
| Environmental Protection Agency | STAG—Drinking Water SRF | NJ | Borough of Stanhope for Water Main Replacements | 250,000 | Sherrill |
| Environmental Protection Agency | STAG—Drinking Water SRF | NJ | Township of Bloomfield for Lead Service Line Replacement Program | 255,000 | Sherrill |
| Environmental Protection Agency | STAG—Drinking Water SRF | NJ | Hopatcong Borough for PFAS-related Water System Upgrades | 800,000 | Sherrill |
| Environmental Protection Agency | STAG—Drinking Water SRF | NJ | Town of Clinton for the West Main Street Water Main Replacement | 898,257 | Malinowski |
| Environmental Protection Agency | STAG—Drinking Water SRF | NJ | Milford Borough for Water Main Improvements | 360,000 | Malinowski |
| Environmental Protection Agency | STAG—Drinking Water SRF | NJ | The Village of Ridgewood for Drinking Water Treatment Facilities Construction. | 2,800,000 | Gottheimer |
| Environmental Protection Agency | STAG—Drinking Water SRF | NJ | Borough of Sussex for Water Utility Improvement Project | 100,000 | Gottheimer |
| Environmental Protection Agency | STAG—Clean Water SRF | NV | Boulder City for Wastewater Treatment Plant Upgrade | 1,000,000 | Lee (NV) |
| Environmental Protection Agency | STAG—Clean Water SRF | NV | The City of Carson City for a sewer extension project | 1,000,000 | Amodei |
| Environmental Protection Agency | STAG—Clean Water SRF | NV | The City of Sparks for Truckee Meadows Water Reclamation Facility upgrades. | 1,960,000 | Amodei |

Department of the Interior, Environment, and Related Agencies—Continued

[Community Project Funding Items]

| Agency | Account | Location | Project | House Amount | House Requestor(s) |
|---|---|---|---|---|---|
| Environmental Protection Agency ........................... | STAG—Clean Water SRF ............... | NV | The City of Reno for the McCloud Area sewer conversion project ..... | 1,000,000 | Amodei |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF ........... | NV | The City of Carson City for the Quill Water Treatment Plant filtration upgrade project. | 1,500,000 | Amodei |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF ............ | NV | Churchill County for a water treatment plant project ...................... | 300,000 | Amodei |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF ............... | NY | Save the Sound for Little Neck Bay Stormwater Management ........... | 600,000 | Suozzi |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF ............... | NY | Village of Kiryas Joel Wastewater Treatment Plant for Wastewater Treatment Plant Components Modernization Project. | 2,000,000 | Maloney, Sean |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF ............... | NY | City of Newburgh for North Interceptor Sewer Project ...................... | 3,120,000 | Maloney, Sean |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF ............... | NY | County of Putnam for Riparian and Watershed Ecological Restoration Project. | 3,500,000 | Maloney, Sean |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF ............... | NY | Incorporated Village of Hempstead for Sewage System Improvements. | 2,000,000 | Rice (NY) |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF ............... | NY | Village of Sea Cliff and Hempstead Harbor Protection Committee for North Shore Shellfish Seeding. | 300,000 | Suozzi |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF ............... | NY | Town of Clarkstown for Storm Water Management Improvements ..... | 1,000,000 | Jones |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF ............... | NY | Town of Yorktown for Hallocks Mill Sewer Extension Project ............ | 1,200,000 | Jones |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF ............... | NY | Town of Rotterdam for Wastewater Treatment Plant Improvements Project. | 960,000 | Tonko |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF ............... | NY | The Incorporated Village of Patchogue for a wastewater treatment facility expansion project. | 3,500,000 | Zeldin |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF ............... | NY | The Town of Cherry Creek wastewater collection project ................... | 2,000,000 | Reed |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF ............... | NY | The City of Corning for a wastewater treatment plant improvement project. | 480,000 | Reed |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF ............... | NY | The Village of Portville for a sanitary sewer improvements project .. | 3,500,000 | Reed |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF ............... | NY | The Town of Prattsburgh for a wastewater service project ............... | 398,700 | Reed |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF ............... | NY | The Town of Seneca Falls for a pump station and force main wastewater collection project. | 1,966,000 | Reed |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF ........... | NY | City of Middletown for Water System Improvements Project ............. | 3,500,000 | Maloney, Sean |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF ........... | NY | Town of Lewisboro for Oakridge Water District PFAS Mitigation ......... | 1,800,000 | Maloney, Sean |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF ........... | NY | City of Long Beach for Sand Filter Rehabilitation Project ................. | 1,000,000 | Rice (NY) |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF ........... | NY | City of Glen Cove for Rehabilitation of the Nancy Court Pump Station. | 1,000,000 | Suozzi |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF ........... | NY | City of Mechanicville for Water Reliability Project .......................... | 800,000 | Tonko |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF ........... | NY | The Town of Riverhead for a drinking water project .......................... | 3,500,000 | Zeldin |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF ........... | NY | Suffolk County Water Authority for a drinking water project ............. | 3,500,000 | Zeldin |

192

| Environmental Protection Agency | STAG—Drinking Water SRF | NY | The Town of Babylon for the Oak Beach Water System project | 1,000,000 | Garbarino |
|---|---|---|---|---|---|
| Environmental Protection Agency | STAG—Drinking Water SRF | NY | The Village of Dundee for the water tank replacement and control system enhancements project. | 640,000 | Reed |
| Environmental Protection Agency | STAG—Drinking Water SRF | NY | The Village of Mayville for a water well replacement project | 2,000,000 | Reed |
| Environmental Protection Agency | STAG—Drinking Water SRF | NY | The Village of Marathon for a water river crossing project | 600,000 | Tenney |
| Environmental Protection Agency | STAG—Drinking Water SRF | NY | Herkimer County for the Eastern Mohawk Valley Regional transmission main project. | 500,000 | Tenney |
| Environmental Protection Agency | STAG—Drinking Water SRF | NY | The Town of Vernon for the Vernon Central water project | 3,000,000 | Tenney |
| Environmental Protection Agency | STAG—Drinking Water SRF | NY | The Village of Frankfort for a water system improvements project | 3,000,000 | Tenney |
| Environmental Protection Agency | STAG—Drinking Water SRF | NY | The Village of Aurora for replacement of aging water infrastructure | 160,000 | Katko |
| Environmental Protection Agency | STAG—Clean Water SRF | OH | Village of Lowellville for Wastewater Improvements | 549,600 | Ryan |
| Environmental Protection Agency | STAG—Clean Water SRF | OH | The Village of Chagrin Falls for a wastewater treatment plant infrastructure rehabilitation project. | 3,500,000 | Joyce (OH) |
| Environmental Protection Agency | STAG—Clean Water SRF | OH | The City of Willoughby for the Willoughby-Eastlake Water Pollution Control Center Lakeshore East Equalization Basin project. | 3,500,000 | Joyce (OH) |
| Environmental Protection Agency | STAG—Clean Water SRF | OH | The Geauga County Board of Commissioners for McFarland Waste Water Treatment Plant renovation and upgrades. | 800,000 | Joyce (OH) |
| Environmental Protection Agency | STAG—Clean Water SRF | OH | The Village of Grover Hill for a wastewater collections system project. | 400,000 | Latta |
| Environmental Protection Agency | STAG—Clean Water SRF | OH | The City of Rocky River for the Buckingham Road, Argyle Oval, and Arundel Road sewer replacement project. | 2,520,000 | Gonzalez (OH) |
| Environmental Protection Agency | STAG—Clean Water SRF | OH | The City of Strongsville for the Prospect Road storm sewer project | 1,600,000 | Gonzalez (OH) |
| Environmental Protection Agency | STAG—Clean Water SRF | OH | The City of Chillicothe for a wastewater treatment plant project | 3,500,000 | Wenstrup |
| Environmental Protection Agency | STAG—Clean Water SRF | OH | The City of Parma for Valley Villas, York, and State Roads sewer improvements. | 1,968,000 | Gonzalez (OH) |
| Environmental Protection Agency | STAG—Clean Water SRF | OH | The City of Fairview Park for sewer remediation and environmental improvements. | 3,500,000 | Gonzalez (OH) |
| Environmental Protection Agency | STAG—Drinking Water SRF | OH | The City of Painesville for the Shamrock/Brookstone waterline extension and capacity project. | 570,000 | Joyce (OH) |
| Environmental Protection Agency | STAG—Drinking Water SRF | OH | The City of Munroe Falls for a waterline crossing project | 1,040,000 | Joyce (OH) |
| Environmental Protection Agency | STAG—Drinking Water SRF | OH | The City of Rittman for a water transmission line project | 2,628,000 | Gonzalez (OH) |
| Environmental Protection Agency | STAG—Drinking Water SRF | OH | The City of Portsmouth for water treatment plant repairs and updates. | 3,500,000 | Wenstrup |
| Environmental Protection Agency | STAG—Drinking Water SRF | OH | The Village of Georgetown for a water tower rehabilitation project | 450,000 | Wenstrup |
| Environmental Protection Agency | STAG—Drinking Water SRF | OR | Port of Brookings Harbor for Wastewater Treatment Plant | 3,500,000 | DeFazio |
| Environmental Protection Agency | STAG—Drinking Water SRF | OR | City of Hillsboro for Water Supply System Construction | 1,000,000 | Bonamici |
| Environmental Protection Agency | STAG—Clean Water SRF | PA | Wyoming Valley Sanitary Authority for Stream Restorations and Stormwater Basin Retrofit. | 3,500,000 | Cartwright |
| Environmental Protection Agency | STAG—Clean Water SRF | PA | Cranberry Township for a sanitary sewer system project | 960,000 | Kelly (PA) |
| Environmental Protection Agency | STAG—Clean Water SRF | PA | The City of Corry for a wastewater treatment plant project | 400,000 | Kelly (PA) |

BLM_004347

Department of the Interior, Environment, and Related Agencies—Continued

[Community Project Funding Items]

| Agency | Account | Location | Project | House Amount | House Requestor(s) |
|---|---|---|---|---|---|
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF .......... | PA | Creswell Heights Joint Authority for Filter Media Material Upgrades | 400,000 | Lamb |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF .......... | PA | Center Township Water Authority for Center Grange Road Waterline Replacement. | 999,999 | Lamb |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF .......... | PA | Municipal Authority Borough of Midland for Water Treatment Plant Improvements. | 80,000 | Lamb |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF .......... | PA | The Avella Area School District for a water line extension project .... | 500,000 | Reschenthaler |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF .......... | RI | City of Newport for Narragansett Avenue Water Main Rehabilitation | 1,520,000 | Cicilline |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF .......... | TN | Glen Hills Utility District for an updated drinking water infrastructure project in Greeneville. | 996,160 | Harshbarger |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF .......... | TN | The City of Oak Ridge for a water treatment plant project ............... | 3,500,000 | Fleischmann |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF .............. | TX | City of Austin for a Wastewater and Stormwater Infrastructure Project. | 1,000,000 | Doggett |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF .............. | TX | City of Buda for South Loop 4 Wastewater Extension Project ........... | 1,636,364 | Doggett |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF .............. | TX | City of Wilmer for Force Main Replacement Project ......................... | 2,226,000 | Johnson (TX) |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF .............. | TX | Harris County Flood Control District for the Kingwood Diversion Channel improvement project. | 1,600,000 | Crenshaw |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF .............. | TX | Harris County Flood Control District for the Taylor Gully stormwater channel improvement project. | 1,600,000 | Crenshaw |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF .............. | TX | Memorial City Redevelopment Authority for a detention basin improvement project. | 3,394,000 | Crenshaw |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF .............. | TX | Harris County for the Forest Manor drainage improvement project ... | 1,673,600 | Crenshaw |
| Environmental Protection Agency ........................... | STAG—Clean Water SRF .............. | TX | The City of Waco for the Flat Creek water reuse project .................. | 1,700,000 | Sessions |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF .......... | TX | San Antonio Water System for Generators for Critical Infrastructure Protection. | 500,000 | Castro (TX) |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF .......... | TX | City of Schertz for Corbett Water Ground Storage Tank Project ........ | 3,500,000 | Gonzalez, Vicente |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF .......... | TX | City of Bellaire for Bellaire Waterlines ............................................. | 782,000 | Fletcher |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF .......... | TX | City of Jersey Village for Seattle Street Waterlines Replacement ...... | 624,835 | Fletcher |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF .......... | TX | City of Alamo for Wate Treatment Plant Rehabilitation and Expansion. | 3,500,000 | Vela |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF .......... | TX | The Brownsville Public Utilities Board for Water Treatment Plant Pump Station Improvements. | 500,000 | Vela |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF .......... | TX | City of Glenn Heights for Elevated Water Storage Tank Project ........ | 2,800,000 | Johnson (TX) |
| Environmental Protection Agency ........................... | STAG—Drinking Water SRF .......... | TX | City of Jacinto City for Northeast Water Mains & Fire Hydrant Improvements. | 1,950,000 | Jackson Lee |

194

| | | | | | |
|---|---|---|---|---|---|
| Environmental Protection Agency | STAG—Drinking Water SRF; Clean Water SRF. | TX | County of El Paso for First-Time Water ($314,000) and Wastewater ($791,000) Connection Projects. | 1,105,000 | Escobar |
| Environmental Protection Agency | STAG—Clean Water SRF | UT | The Town of Manila for a sewage system project | 3,500,000 | Moore (UT) |
| Environmental Protection Agency | STAG—Drinking Water SRF | UT | The City of Centerville for the Green Steel Tank replacement project | 1,500,000 | Stewart |
| Environmental Protection Agency | STAG—Drinking Water SRF | UT | The City of Ephraim for a drinking water resiliency project | 3,000,000 | Stewart |
| Environmental Protection Agency | STAG—Drinking Water SRF | VA | City Williamsburg for Walnut Hills Stormwater Abatement and Streambank Stabilization project. | 336,600 | Luria |
| Environmental Protection Agency | STAG—Clean Water SRF | VA | City of Petersburg for Sewer Service Area Infrastructure Upgrades | 2,432,000 | McEachin |
| Environmental Protection Agency | STAG—Clean Water SRF | VA | City of Falls Church for Lincoln Avenue Stormwater Project | 400,000 | Beyer |
| Environmental Protection Agency | STAG—Drinking Water SRF | VA | Frederick County Sanitation Authority for Diehl Water Treatment Plant Improvement Project. | 3,000,000 | Wexton |
| Environmental Protection Agency | STAG—Drinking Water SRF | VA | City of Manassas for Transmission Main Replacement | 2,400,000 | Wexton |
| Environmental Protection Agency | STAG—Drinking Water SRF | VA | City of Portsmouth for Water Service Line Inventory | 500,000 | Scott (VA) |
| Environmental Protection Agency | STAG—Drinking Water SRF | VA | Surry County for Water System Upgrades | 3,200,000 | McEachin |
| Environmental Protection Agency | STAG—Drinking Water SRF | VA | Prince George County for Central Water System Extension Project | 3,200,000 | McEachin |
| Environmental Protection Agency | STAG—Drinking Water SRF | VA | Spotsylvania County for Motts Run Water Treatment Plant Expansion Project. | 1,840,000 | Spanberger |
| Environmental Protection Agency | STAG—Clean Water SRF | VI | Virgin Islands Waste Management Authority for Residential Collection Sewers Replacement. | 960,000 | Plaskett |
| Environmental Protection Agency | STAG—Clean Water SRF | VI | Virgin Islands Waste Management Authority for Wastewater Treatment Facilities Upgrade. | 1,120,000 | Plaskett |
| Environmental Protection Agency | STAG—Clean Water SRF | VI | Virgin Islands Waste Management Authority for Water Security Infrastructure Upgrades. | 1,200,000 | Plaskett |
| Environmental Protection Agency | STAG—Clean Water SRF | WA | City of Ellensburg for Renewable Natural Gas Conversion and Methane Gas Recovery at the Wastewater Treatment Facility. | 840,000 | Schrier |
| Environmental Protection Agency | STAG—Clean Water SRF | WA | City of North Bend for Snoqualmie Valley Trail Channel Widening and Wetland Creation/Enhancement. | 225,000 | Schrier |
| Environmental Protection Agency | STAG—Clean Water SRF | WA | The Town of Malden for a sewer system project | 3,500,000 | Rodgers (WA) |
| Environmental Protection Agency | STAG—Clean Water SRF | WA | The City of College Place for a wastewater treatment project | 3,500,000 | Rodgers (WA) |
| Environmental Protection Agency | STAG—Clean Water SRF | WA | The Stevens Public Utility District #1 for a septage reuse project | 1,680,000 | Rodgers (WA) |
| Environmental Protection Agency | STAG—Drinking Water SRF | WA | Quileute Nation for Quileute Move to Higher Ground Water System Improvement. | 1,479,355 | Kilmer |
| Environmental Protection Agency | STAG—Drinking Water SRF | WA | Sammamish Plateau Water and Sewer District for Sammamish Plateau Water PFAS Treatment Plant upgrades. | 1,585,000 | Schrier |
| Environmental Protection Agency | STAG—Drinking Water SRF | WA | Port of Coupeville for Wharf Rehabilitation Project | 136,000 | Larsen (WA) |
| Environmental Protection Agency | STAG—Drinking Water SRF | WA | MacKaye Harbor Water District for Agate Beach Lane Source Water and Transmission Improvements. | 694,480 | Larsen (WA) |
| Environmental Protection Agency | STAG—Drinking Water SRF | WA | The City of Airway Heights for a water replacement project | 3,500,000 | Rodgers (WA) |
| Environmental Protection Agency | STAG—Drinking Water SRF | WA | The Town of Cusick for a water treatment facility project | 3,500,000 | Rodgers (WA) |

BLM_004349

Department of the Interior, Environment, and Related Agencies—Continued

[Community Project Funding Items]

| Agency | Account | Location | Project | House Amount | House Requestor(s) |
|---|---|---|---|---|---|
| Environmental Protection Agency | STAG—Clean Water SRF | WI | City of River Falls for West Central Wisconsin Biosolids Facility Improvements. | 1,600,000 | Kind |
| Environmental Protection Agency | STAG—Drinking Water SRF | WI | Waukesha Water Utility for an elevated storage tank project | 530,000 | Fitzgerald |
| Environmental Protection Agency | STAG—Clean Water SRF | WV | DigDeep Right to Water Project for a sanitary septic and sewerage service project. | 459,840 | Miller (WV) |
| Environmental Protection Agency | STAG—Clean Water SRF | WV | The City of Moundsville for a main sewer line evaluation project | 100,000 | McKinley |
| Environmental Protection Agency | STAG—Drinking Water SRF | WV | The Marshall County Commission for a water meter project | 230,400 | McKinley |
| Environmental Protection Agency | STAG—Drinking Water SRF | WV | The Bel-O–Mar Regional Council for a water system improvements project. | 1,120,000 | McKinley |
| Environmental Protection Agency | STAG—Drinking Water SRF | WV | The Ohio County Commission for the Town of Triadelphia water storage tank project. | 600,000 | McKinley |
| National Park Service | Land Acquisition | AZ | Saguaro National Park—Rincon Creek Valley | 4,124,500 | Kirkpatrick |
| U.S. Fish and Wildlife Service | Land Acquisition | NH | Silvio O. Conte National Fish and Wildlife Refuge—Mascoma River Unit. | 3,700,000 | Kuster |
| U.S. Forest Service | State and Private Forestry | AZ | Arizona-Sonora Desert Museum for an Invasive Plant Treatment and Hazardous Fuels Reduction Project. | 50,000 | Grijalva |
| U.S. Forest Service | State and Private Forestry | CA | TreePeople Inc. for a Park Restoration Project | 750,000 | Sherman |
| U.S. Forest Service | State and Private Forestry | CA | Cal Poly Corporation for a Fire Break Project | 500,000 | Eshoo |
| U.S. Forest Service | State and Private Forestry | CA | Town of Los Gatos for a Fuels Reduction Project | 750,000 | Eshoo |
| U.S. Forest Service | State and Private Forestry | CA | City of Burbank for a Water Tender Project | 225,000 | Schiff |
| U.S. Forest Service | State and Private Forestry | CA | County of Nevada for the Ponderosa West Grass Valley Defense Zone fuels reduction treatment project. | 750,000 | LaMalfa |
| U.S. Forest Service | State and Private Forestry | CA | Yorba Linda Water District wildfire protection and firefighting support project. | 500,000 | Kim (CA) |
| U.S. Forest Service | State and Private Forestry | CO | Jefferson County for a Fuels Reduction Project | 358,000 | Neguse |
| U.S. Forest Service | State and Private Forestry | HI | City and County of Honolulu for an Urban Forest Inventory Project | 300,000 | Case |
| U.S. Forest Service | State and Private Forestry | IL | Morton Arboretum for an Urban Forestry Project | 750,000 | Casten |
| U.S. Forest Service | State and Private Forestry | MD | Alliance for the Chesapeake Bay for an Urban Forestry Project | 120,000 | Sarbanes |
| U.S. Forest Service | State and Private Forestry | MI | Royal Oak for an Urban Forestry Project | 93,500 | Levin (MI) |
| U.S. Forest Service | State and Private Forestry | NE | National Arbor Day Foundation for an urban forestry project | 750,000 | Fortenberry |
| U.S. Forest Service | State and Private Forestry | NJ | Mercer County for an Emerald Ash Borer Management and Ash Tree Restoration Project. | 625,000 | Watson Coleman |
| U.S. Forest Service | State and Private Forestry | OR | Willamalane Parks and Recreation District for a Fuels Reduction Project. | 200,000 | DeFazio |
| U.S. Forest Service | State and Private Forestry | OR | McKenzie River Trust for a Floodplain Restoration Project | 125,000 | DeFazio |

| U.S. Forest Service | State and Private Forestry | TX | Texas A&M University System for an Urban Forestry Project | 630,000 | Johnson (TX) |
| U.S. Forest Service | State and Private Forestry | WA | City of Roslyn for a Fuels Reduction Project | 750,000 | Schrier |

197

BLM_004351

198

COMPLIANCE WITH RULE XIII, CLAUSE 3(e) (RAMSEYER RULE)

In compliance with clause 3(e) of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, and existing law in which no change is proposed is shown in roman):

COMPLIANCE WITH RULE XIII, CL. 3(e) (RAMSEYER RULE)

In compliance with clause 3(e) of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italics, existing law in which no change is proposed is shown in roman):

## 400 YEARS OF AFRICAN-AMERICAN HISTORY COMMISSION ACT

*       *       *       *       *       *       *

**SEC. 7. PLANS; REPORTS.**

(a) STRATEGIC PLAN.—The Commission shall prepare a strategic plan for the activities of the Commission carried out under this Act.

(b) FINAL REPORT.—Not later than [July 1, 2022] *July 1, 2023*, the Commission shall complete and submit to Congress a final report that contains—

(1) a summary of the activities of the Commission;

(2) a final accounting of funds received and expended by the Commission; and

(3) the findings and recommendations of the Commission.

**SEC. 8. TERMINATION OF COMMISSION.**

(a) DATE OF TERMINATION.—The Commission shall terminate on [July 1, 2022] *July 1, 2023*.

(b) TRANSFER OF DOCUMENTS AND MATERIALS.—Before the date of termination specified in subsection (a), the Commission shall transfer all documents and materials of the Commission to the National Archives or another appropriate Federal entity.

*       *       *       *       *       *       *

_____

## ALYCE SPOTTED BEAR AND WALTER SOBOLEFF COMMISSION ON NATIVE CHILDREN ACT

(Public Law 114–244)

*       *       *       *       *       *       *

**SEC. 3. COMMISSION ON NATIVE CHILDREN.**

(a) IN GENERAL.—There is established a commission, to be known as the "Alyce Spotted Bear and Walter Soboleff Commission on Native Children".

(b) MEMBERSHIP.—

(1) IN GENERAL.—The Commission shall be composed of 11 members, of whom—

199

(A) 3 shall be appointed by the President, in consultation with—

    (i) the Attorney General;

    (ii) the Secretary;

    (iii) the Secretary of Education; and

    (iv) the Secretary of Health and Human Services;

(B) 3 shall be appointed by the Majority Leader of the Senate, in consultation with the Chairperson of the Committee on Indian Affairs of the Senate;

(C) 1 shall be appointed by the Minority Leader of the Senate, in consultation with the Vice Chairperson of the Committee on Indian Affairs of the Senate;

(D) 3 shall be appointed by the Speaker of the House of Representatives, in consultation with the Chairperson of the Committee on Natural Resources of the House of Representatives; and

(E) 1 shall be appointed by the Minority Leader of the House of Representatives, in consultation with the Ranking Member of the Committee on Natural Resources of the House of Representatives.

(2) REQUIREMENTS FOR ELIGIBILITY.—

(A) IN GENERAL.—Subject to subparagraph (B), each member of the Commission shall have significant experience and expertise in—

    (i) Indian affairs; and

    (ii) matters to be studied by the Commission, including—

        (I) health care issues facing Native children, including mental health, physical health, and nutrition;

        (II) Indian education, including experience with Bureau of Indian Education schools and public schools, tribally operated schools, tribal colleges or universities, early childhood education programs, and the development of extracurricular programs;

        (III) juvenile justice programs relating to prevention and reducing incarceration and rates of recidivism; and

        (IV) social service programs that are used by Native children and designed to address basic needs, such as food, shelter, and safety, including child protective services, group homes, and shelters.

(B) EXPERTS.—

    (i) NATIVE CHILDREN.—1 member of the Commission shall—

        (I) meet the requirements of subparagraph (A); and

        (II) be responsible for providing the Commission with insight into and input from Native children on the matters studied by the Commission.

    (ii) RESEARCH.—1 member of the Commission shall—

        (I) meet the requirements of subparagraph (A); and

BLM_004353

200

(II) have extensive experience in statistics or social science research.

(3) TERMS.—

(A) IN GENERAL.—Each member of the Commission shall be appointed for the life of the Commission.

(B) VACANCIES.—A vacancy in the Commission shall be filled in the manner in which the original appointment was made.

(c) OPERATION.—

(1) CHAIRPERSON.—Not later than 15 days after the date on which all members of the Commission have been appointed, the Commission shall select 1 member to serve as Chairperson of the Commission.

(2) MEETINGS.—

(A) IN GENERAL.—The Commission shall meet at the call of the Chairperson.

(B) INITIAL MEETING.—The initial meeting of the Commission shall take place not later than 30 days after the date described in paragraph (1).

(3) QUORUM.—A majority of the members of the Commission shall constitute a quorum, but a lesser number of members may hold hearings.

(4) RULES.—The Commission may establish, by majority vote, any rules for the conduct of Commission business, in accordance with this Act and other applicable law.

(d) NATIVE ADVISORY COMMITTEE.—

(1) ESTABLISHMENT.—The Commission shall establish a committee, to be known as the "Native Advisory Committee".

(2) MEMBERSHIP.—

(A) COMPOSITION.—The Native Advisory Committee shall consist of—

(i) 1 representative of Indian tribes from each region of the Bureau of Indian Affairs who is 25 years of age or older; and

(ii) 1 Native Hawaiian who is 25 years of age or older.

(B) QUALIFICATIONS.—Each member of the Native Advisory Committee shall have experience relating to matters to be studied by the Commission.

(3) DUTIES.—The Native Advisory Committee shall—

(A) serve as an advisory body to the Commission; and

(B) provide to the Commission advice and recommendations, submit materials, documents, testimony, and such other information as the Commission determines to be necessary to carry out the duties of the Commission under this section.

(4) NATIVE CHILDREN SUBCOMMITTEE.—The Native Advisory Committee shall establish a subcommittee that shall consist of at least 1 member from each region of the Bureau of Indian Affairs and 1 Native Hawaiian, each of whom shall be a Native child, and have experience serving on the council of a tribal, regional, or national youth organization.

(e) COMPREHENSIVE STUDY OF NATIVE CHILDREN ISSUES.—

201

(1) IN GENERAL.—The Commission shall conduct a comprehensive study of Federal, State, local, and tribal programs that serve Native children, including an evaluation of—

(A) the impact of concurrent jurisdiction on child welfare systems;

(B) the barriers Indian tribes and Native Hawaiians face in applying, reporting on, and using existing public and private grant resources, including identification of any Federal cost-sharing requirements;

(C) the obstacles to nongovernmental financial support, such as from private foundations and corporate charities, for programs benefitting Native children;

(D) the issues relating to data collection, such as small sample sizes, large margins of error, or other issues related to the validity and statistical significance of data on Native children;

(E) the barriers to the development of sustainable, multidisciplinary programs designed to assist high-risk Native children and families of those high-risk Native children;

(F) cultural or socioeconomic challenges in communities of Native children;

(G) any examples of successful program models and use of best practices in programs that serve children and families;

(H) the barriers to interagency coordination on programs benefitting Native children; and

(I) the use of memoranda of agreement or interagency agreements to facilitate or improve agency coordination, including the effects of existing memoranda or interagency agreements on program service delivery and efficiency.

(2) COORDINATION.—In conducting the study under paragraph (1), the Commission shall, to the maximum extent practicable—

(A) to avoid duplication of efforts, collaborate with other workgroups focused on similar issues, such as the Task Force on American Indian/Alaska Native Children Exposed to Violence of the Attorney General; and

(B) to improve coordination and reduce travel costs, use available technology.

(3) RECOMMENDATIONS.—Taking into consideration the results of the study under paragraph (1) and the analysis of any existing data relating to Native children received from Federal agencies, the Commission shall—

(A) develop recommendations for goals, and plans for achieving those goals, for Federal policy relating to Native children in the short-, mid-, and long-term, which shall be informed by the development of accurate child well-being measures, except that the Commission shall not consider or recommend the recognition or the establishment of a government-to-government relationship with—

(i) any entity not recognized on or before the date of enactment of this Act by the Federal Government through an Act of Congress, Executive action, judicial decree, or any other action; or

202

(ii) any entity not included in the list authorized pursuant to the Federally Recognized Indian Tribe List Act of 1994 (25 U.S.C. 479a et seq.);

(B) make recommendations on necessary modifications and improvements to programs that serve Native children at the Federal, State, and tribal levels, on the condition that the recommendations recognize the diversity in cultural values, integrate the cultural strengths of the communities of the Native children, and will result in—

(i) improvements to the child welfare system that—

(I) reduce the disproportionate rate at which Native children enter child protective services and the period of time spent in the foster system;

(II) increase coordination among social workers, police, and foster families assisting Native children while in the foster system to result in the increased safety of Native children while in the foster system;

(III) encourage the hiring and retention of licensed social workers in Native communities;

(IV) address the lack of available foster homes in Native communities; and

(V) reduce truancy and improve the academic proficiency and graduation rates of Native children in the foster system;

(ii) improvements to the mental and physical health of Native children, taking into consideration the rates of suicide, substance abuse, and access to nutrition and health care, including—

(I) an analysis of the increased access of Native children to Medicaid under the Patient Protection and Affordable Care Act (Public Law 111-148) and the effect of that increase on the ability of Indian tribes and Native Hawaiians to develop sustainable health programs; and

(II) an evaluation of the effects of a lack of public sanitation infrastructure, including in-home sewer and water, on the health status of Native children;

(iii) improvements to educational and vocational opportunities for Native children that will lead to—

(I) increased school attendance, performance, and graduation rates for Native children across all educational levels, including early education, post-secondary, and graduate school;

(II) localized strategies developed by educators, tribal and community leaders, and law enforcement to prevent and reduce truancy among Native children;

(III) scholarship opportunities at a Tribal College or University and other public and private postsecondary institutions;

(IV) increased participation of the immediate families of Native children;

203

(V) coordination among schools and Indian tribes that serve Native children, including in the areas of data sharing and student tracking;

(VI) accurate identification of students as Native children; and

(VII) increased school counseling services, improved access to quality nutrition at school, and safe student transportation;

(iv) improved policies and practices by local school districts that would result in improved academic proficiency for Native children;

(v) increased access to extracurricular activities for Native children that are designed to increase self-esteem, promote community engagement, and support academic excellence while also serving to prevent unplanned pregnancy, membership in gangs, drug and alcohol abuse, and suicide, including activities that incorporate traditional language and cultural practices of Indians and Native Hawaiians;

(vi) taking into consideration the report of the Indian Law and Order Commission issued pursuant to section 15(f) of the Indian Law Enforcement Reform Act (25 U.S.C. 2812(f)), improvements to Federal, State, and tribal juvenile justice systems and detention programs—

(I) to provide greater access to educational opportunities and social services for incarcerated Native children;

(II) to promote prevention and reduce incarceration and recidivism rates among Native children;

(III) to identify intervention approaches and alternatives to incarceration of Native children;

(IV) to incorporate families and the traditional cultures of Indians and Native Hawaiians in the juvenile justice process, including through the development of a family court for juvenile offenses; and

(V) to prevent unnecessary detentions and identify successful reentry programs;

(vii) expanded access to a continuum of early development and learning services for Native children from prenatal to age 5 that are culturally competent, support Native language preservation, and comprehensively promote the health, well-being, learning, and development of Native children, such as—

(I) high quality early care and learning programs for children starting from birth, including Early Head Start, Head Start, child care, and preschool programs;

(II) programs, including home visiting and family resource and support programs, that increase the capacity of parents to support the learning and development of the children of the parents, beginning prenatally, and connect the parents with necessary resources;

204

(III) early intervention and preschool services for infants, toddlers, and preschool-aged children with developmental delays or disabilities; and

(IV) professional development opportunities for Native providers of early development and learning services;

(viii) the development of a system that delivers wrap-around services to Native children in a way that is comprehensive and sustainable, including through increased coordination among Indian tribes, schools, law enforcement, health care providers, social workers, and families;

(ix) more flexible use of existing Federal programs, such as by—

(I) providing Indians and Native Hawaiians with more flexibility to carry out programs, while maintaining accountability, minimizing administrative time, cost, and expense and reducing the burden of Federal paperwork requirements; and

(II) allowing unexpended Federal funds to be used flexibly to support programs benefitting Native children, while taking into account—

(aa) the Indian Employment, Training and Related Services Demonstration Act of 1992 (25 U.S.C. 3401 note; 106 Stat. 2302);

(bb) the Coordinated Tribal Assistance Solicitation program of the Department of Justice;

(cc) the Federal policy of self-determination; and

(dd) any consolidated grant programs; and

(x) solutions to other issues that, as determined by the Commission, would improve the health, safety, and well-being of Native children;

(C) make recommendations for improving data collection methods that consider—

(i) the adoption of standard definitions and compatible systems platforms to allow for greater linkage of data sets across Federal agencies;

(ii) the appropriateness of existing data categories for comparative purposes;

(iii) the development of quality data and measures, such as by ensuring sufficient sample sizes and frequency of sampling, for Federal, State, and tribal programs that serve Native children;

(iv) the collection and measurement of data that are useful to Indian tribes and Native Hawaiians;

(v) the inclusion of Native children in longitudinal studies; and

(vi) tribal access to data gathered by Federal, State, and local governmental agencies; and

(D) identify models of successful Federal, State, and tribal programs in the areas studied by the Commission.

(f) REPORT.—Not later than ⟦3 years⟧ *5 years* after the date on which all members of the Commission are appointed and amounts

205

are made available to carry out this Act, the Commission shall submit to the President, the Committee on Natural Resources of the House of Representatives, the Committee on Indian Affairs of the Senate, and the Committees on Appropriations of the House of Representatives and the Senate, a report that contains—

    (1) a detailed statement of the findings and conclusions of the Commission; and

    (2) the recommendations of the Commission for such legislative and administrative actions as the Commission considers to be appropriate.

(g) POWERS.—

    (1) HEARINGS.—

        (A) IN GENERAL.—The Commission may hold such hearings, meet and act at such times and places, take such testimony, and receive such evidence as the Commission considers to be advisable to carry out the duties of the Commission under this section, except that the Commission shall hold not less than 5 hearings in Native communities.

        (B) PUBLIC REQUIREMENT.—The hearings of the Commission under this paragraph shall be open to the public.

    (2) WITNESS EXPENSES.—

        (A) IN GENERAL.—A witness requested to appear before the Commission shall be paid the same fees and allowances as are paid to witnesses under section 1821 of title 28, United States Code.

        (B) PER DIEM AND MILEAGE.—The fees and allowances for a witness shall be paid from funds made available to the Commission.

    (3) INFORMATION FROM FEDERAL, TRIBAL, AND STATE AGENCIES.—

        (A) IN GENERAL.—The Commission may secure directly from a Federal agency such information as the Commission considers to be necessary to carry out this section.

        (B) TRIBAL AND STATE AGENCIES.—The Commission may request the head of any tribal or State agency to provide to the Commission such information as the Commission considers to be necessary to carry out this Act.

    (4) POSTAL SERVICES.—The Commission may use the United States mails in the same manner and under the same conditions as other agencies of the Federal Government.

    (5) GIFTS.—The Commission may accept, use, and dispose of gifts or donations of services or property related to the purpose of the Commission.

(h) COMMISSION PERSONNEL MATTERS.—

    (1) TRAVEL EXPENSES.—A member of the Commission shall be allowed travel expenses, including per diem in lieu of subsistence, at rates authorized for an employee of an agency under subchapter I of chapter 57 of title 5, United States Code, while away from the home or regular place of business of the member in the performance of the duties of the Commission.

    (2) DETAIL OF FEDERAL EMPLOYEES.—

        (A) IN GENERAL.—On the affirmative vote of ⅔ of the members of the Commission—

            (i) the Attorney General, the Secretary, the Secretary of Education, and the Secretary of the Health

206

and Human Services shall each detail, without reimbursement, 1 or more employees of the Department of Justice, the Department of the Interior, the Department of Education, and the Department of Health and Human Services; and

(ii) with the approval of the appropriate Federal agency head, an employee of any other Federal agency may be, without reimbursement, detailed to the Commission.

(B) EFFECT ON DETAILEES.—Detail under this paragraph shall be without interruption or loss of civil service status, benefits, or privileges.

(3) PROCUREMENT OF TEMPORARY AND INTERMITTENT SERVICES.—

(A) IN GENERAL.—On request of the Commission, the Attorney General shall provide to the Commission, on a reimbursable basis, reasonable and appropriate office space, supplies, and administrative assistance.

(B) NO REQUIREMENT FOR PHYSICAL FACILITIES.—The Administrator of General Services shall not be required to locate a permanent, physical office space for the operation of the Commission.

(4) MEMBERS NOT FEDERAL EMPLOYEES.—No member of the Commission, the Native Advisory Committee, or the Native Children Subcommittee shall be considered to be a Federal employee.

(i) TERMINATION OF COMMISSION.—The Commission shall terminate 90 days after the date on which the Commission submits the report under subsection (f).

(j) NONAPPLICABILITY OF FACA.—The Federal Advisory Committee Act (5 U.S.C. App.) shall not apply to the Commission, the Native Advisory Committee, or the Native Children Subcommittee.

(k) EFFECT.—This Act shall not be construed to recognize or establish a government-to-government relationship with—

(1) any entity not recognized on or before the date of enactment of this Act by the Federal Government through an Act of Congress, Executive action, judicial decree, or any other action; or

(2) any entity not included in the list authorized pursuant to the Federally Recognized Indian Tribe List Act of 1994 (25 U.S.C. 479a et seq.).

————

## YSLETA DEL SUR PUEBLO AND ALABAMA AND COUSHATTA INDIAN TRIBES OF TEXAS RESTORATION ACT

\*    \*    \*    \*    \*    \*    \*

### SEC. 301. RULE OF CONSTRUCTION.

Nothing in this Act shall be construed to preclude or limit the applicability of the Indian Gaming Regulatory Act (25 U.S.C. 2701 et seq.).

————

207

## SECTION 4 OF THE DELAWARE WATER GAP NATIONAL RECREATION AREA IMPROVEMENT ACT

**SEC. 4. USE OF CERTAIN ROADS WITHIN THE RECREATION AREA.**

(a) IN GENERAL.—Except as otherwise provided in this section, Highway 209, a federally owned road within the boundaries of the Recreation Area, shall be closed to all commercial vehicles.

(b) EXCEPTION FOR LOCAL BUSINESS USE.—Until September 30, 【2021】 *2022*, subsection (a) shall not apply with respect to the use of commercial vehicles that have four or fewer axles and are—

(1) owned and operated by a business physically located in—

(A) the Recreation Area; or

(B) one or more adjacent municipalities; or

(2) necessary to provide services to businesses or persons located in—

(A) the Recreation Area; or

(B) one of more adjacent municipalities.

(c) FEE.—The Secretary shall establish a fee and permit program for the use by commercial vehicles of Highway 209 under subsection (b). The program shall include an annual fee not to exceed $200 per vehicle. All fees received under the program shall be set aside in a special account and be available, without further appropriation, to the Secretary for the administration and enforcement of the program, including registering vehicles, issuing permits and vehicle identification stickers, and personnel costs.

(d) EXCEPTIONS.—The following vehicles may use Highway 209 and shall not be subject to a fee or permit requirement under subsection (c):

(1) Local school buses.

(2) Fire, ambulance, and other safety and emergency vehicles.

(3) Commercial vehicles using Federal Road Route 209, from—

(A) Milford to the Delaware River Bridge leading to U.S. Route 206 in New Jersey; and

(B) mile 0 of Federal Road Route 209 to Pennsylvania State Route 2001.

————

## SECTION 126 OF THE ILLINOIS AND MICHIGAN CANAL HERITAGE CORRIDOR ACT OF 1984

(Public Law 98–398)

**SEC. 126. SUNSET.**

The authority of the Secretary to provide assistance under this title terminates on 【the date that is 15 years after the date of enactment of this section】 *September 30, 2023*.

————

## SECTION 10 OF PUBLIC LAW 99–647

AUTHORIZATION OF APPROPRIATIONS

SEC. 10. (a) There is authorized to be appropriated annually to the Commission $1,000,000 for each year until September 30, 【2021】 *2023* to carry out the purposes of this Act; except that the

208

Federal contribution to the Commission shall not exceed 50 percent of the annual operating costs of the Commission.

(b) DEMONSTRATION FUNDS.—There is authorized to be appropriated to carry out section 8(c) not more than $10,000,000 for the period of fiscal years 2006 through 2016, to remain available until expended.

————————

## SECTION 12 OF THE DELAWARE AND LEHIGH NAVIGATION CANAL NATIONAL HERITAGE CORRIDOR

(Public Law 100-692)

SEC. 12. AUTHORIZATION OF APPROPRIATIONS.

(a) COMMISSION.—There is authorized to be appropriated annually to the Corporation to carry out its duties under this Act $1,000,000, except that the Federal contribution to the Corporation shall not exceed 50 percent of the annual costs to the Corporation in carrying out those duties.

(b) SECRETARY.—There are authorized to be appropriated annually to the Secretary such sums as may be necessary to carry out his duties under this Act.

(c) MANAGEMENT ACTION PLAN.—

(1) IN GENERAL.—To implement the management action plan created by the Commission, there is authorized to be appropriated $1,000,000 for each of fiscal years 2000 through 【2021】 *2023*.

(2) LIMITATION ON EXPENDITURES.—Amounts made available under paragraph (1) shall not exceed 50 percent of the costs of implementing the management action plan.

(d) TERMINATION OF ASSISTANCE.—The authority of the Secretary to provide financial assistance under this Act terminates on September 30, 【2021】 *2023*.

————————

## SECTION 106 OF THE QUINEBAUG AND SHETUCKET RIVERS VALLEY NATIONAL HERITAGE CORRIDOR ACT OF 1994

(Public Law 103-449)

SEC. 106. DUTIES OF THE SECRETARY.

(a) ASSISTANCE.—The Secretary and the heads of other Federal agencies shall, upon request of the management entity assist the management entity in the implementation of the plan. Such assistance shall include providing funds authorized under section 109 and technical assistance necessary to carry out this Act.

(b) TERMINATION OF AUTHORITY.— The Secretary may not make any grants or provide any assistance under this Act after September 30, 【2021】 *2023*.

(c) EVALUATION; REPORT.—

(1) IN GENERAL.—Not later than 3 years before the date on which authority for Federal funding terminates for the Corridor, the Secretary shall—

(A) conduct an evaluation of the accomplishments of the Corridor; and

(B) prepare a report in accordance with paragraph (3).

209

(2) EVALUATION.—An evaluation conducted under paragraph (1)(A) shall—
    (A) assess the progress of the management entity with respect to—
        (i) accomplishing the purposes of this title for the Corridor; and
        (ii) achieving the goals and objectives of the management plan for the Corridor;
    (B) analyze the Federal, State, local, and private investments in the Corridor to determine the leverage and impact of the investments; and
    (C) review the management structure, partnership relationships, and funding of the Corridor for purposes of identifying the critical components for sustainability of the Corridor.
(3) REPORT.—
    (A) IN GENERAL.—Based on the evaluation conducted under paragraph (1)(A), the Secretary shall prepare a report that includes recommendations for the future role of the National Park Service, if any, with respect to the Corridor.
    (B) REQUIRED ANALYSIS.—If the report prepared under subparagraph (A) recommends that Federal funding for the Corridor be reauthorized, the report shall include an analysis of—
        (i) ways in which Federal funding for the Corridor may be reduced or eliminated; and
        (ii) the appropriate time period necessary to achieve the recommended reduction or elimination.
    (C) SUBMISSION TO CONGRESS.—On completion of the report, the Secretary shall submit the report to—
        (i) the Committee on Energy and Natural Resources of the Senate; and
        (ii) the Committee on Natural Resources of the House of Representatives.

---

## ACT OF NOVEMBER 12, 1996

(Public Law 104-333)

AN ACT To provide for the administration of certain Presidio properties at minimal cost to the Federal taxpayer, and for other purposes.

# DIVISION I

\*    \*    \*    \*    \*    \*    \*

# DIVISION II

# TITLE I—NATIONAL COAL HERITAGE AREA

\*    \*    \*    \*    \*    \*    \*

210

**SEC. 107. SUNSET.**

The Secretary may not make any grant or provide any assistance under this title after September 30, 【2021】 *2023*.

\*　　\*　　\*　　\*　　\*　　\*　　\*

# TITLE II—TENNESSEE CIVIL WAR HERITAGE AREA

\*　　\*　　\*　　\*　　\*　　\*　　\*

**SEC. 208. SUNSET.**

The Secretary may not make any grant or provide any assistance under this title after September 30, 【2021】 *2023*.

# TITLE III—AUGUSTA CANAL NATIONAL HERITAGE AREA

\*　　\*　　\*　　\*　　\*　　\*　　\*

**SEC. 310. SUNSET.**

The Secretary may not make any grant or provide any assistance under this title after September 30, 【2021】 *2023*.

\*　　\*　　\*　　\*　　\*　　\*　　\*

# TITLE IV—STEEL INDUSTRY HERITAGE PROJECT

\*　　\*　　\*　　\*　　\*　　\*　　\*

**SEC. 408. SUNSET.**

The Secretary may not make any grant or provide any assistance under this title after September 30, 【2021】 *2023*.

\*　　\*　　\*　　\*　　\*　　\*　　\*

# TITLE V—ESSEX NATIONAL HERITAGE AREA

\*　　\*　　\*　　\*　　\*　　\*　　\*

**SEC. 507. SUNSET.**

The Secretary may not make any grant or provide any assistance under this title after September 30, 【2021】 *2023*.

\*　　\*　　\*　　\*　　\*　　\*　　\*

# TITLE VI—SOUTH CAROLINA NATIONAL HERITAGE CORRIDOR

\*　　\*　　\*　　\*　　\*　　\*　　\*

211

**SEC. 607. SUNSET.**

The Secretary may not make any grant or provide any assistance under this title after September 30, 〖2021〗 *2023*.

\*     \*     \*     \*     \*     \*     \*

# TITLE VII—AMERICA'S AGRICULTURAL HERITAGE PARTNERSHIP

\*     \*     \*     \*     \*     \*     \*

**SEC. 707. SUNSET.**

The Secretary may not make any grant or provide any assistance under this title after September 30, 〖2021〗 *2023*.

\*     \*     \*     \*     \*     \*     \*

# TITLE VIII—OHIO & ERIE NATIONAL HERITAGE CANALWAY

\*     \*     \*     \*     \*     \*     \*

**SEC. 809. SUNSET.**

The Secretary may not make any grant or provide any financial assistance under this title after September 30, 〖2021〗 *2023*.

\*     \*     \*     \*     \*     \*     \*

# TITLE IX—HUDSON RIVER VALLEY NATIONAL HERITAGE AREA

\*     \*     \*     \*     \*     \*     \*

**SEC. 910. SUNSET.**

The Secretary may not make any grant or provide any assistance under this title after September 30, 〖2021〗 *2023*.

\*     \*     \*     \*     \*     \*     \*

————

### SECTION 109 OF PUBLIC LAW 105–355

**SEC. 109. SUNSET.**

The Secretary may not make any grant or provide any assistance under this title after September 30, 〖2021〗 *2023*.

————

BLM_004365

212

## ACT OF OCTOBER 6, 2000

(Public Law 106-278)

AN ACT To designate the Lackawanna Valley and the Schuylkill River National Heritage Areas, and for other purposes.

# TITLE I—LACKAWANNA VALLEY NATIONAL HERITAGE AREA

\*     \*     \*     \*     \*     \*     \*

**SEC. 108. SUNSET PROVISION.**

The Secretary shall not provide any grant or other assistance under this title after September 30, 【2021】 *2023*.

\*     \*     \*     \*     \*     \*     \*

# TITLE II—SCHUYLKILL RIVER VALLEY NATIONAL HERITAGE AREA

\*     \*     \*     \*     \*     \*     \*

**SEC. 209. SUNSET.**

The Secretary may not make any grant or provide any assistance under this title after September 30, 【2021】 *2023*.

**SEC. 210. AUTHORIZATION OF APPROPRIATIONS.**

(a) IN GENERAL.—There are authorized to be appropriated to carry out this title not more than 【$10,000,000】 *$12,000,000*, of which not more than $1,000,000 is authorized to be appropriated for any 1 fiscal year.

(b) FEDERAL SHARE.—Federal funding provided under this title may not exceed 50 percent of the total cost of any project or activity funded under this title.

\*     \*     \*     \*     \*     \*     \*

————————

## WHEELING NATIONAL HERITAGE AREA ACT OF 2000

(Public Law 106-291)

AN ACT Making appropriations for the Department of the Interior and related agencies for the fiscal year ending September 30, 2001, and for other purposes.

SEC. 157. (a) SHORT TITLE.—This section may be cited as the "Wheeling National Heritage Area Act of 2000".

(b) FINDINGS AND PURPOSES.—

(1) FINDINGS.—The Congress finds that—

(A) the area in an around Wheeling, West Virginia, possesses important historical, cultural, and natural resources, representing major heritage themes of transportation, commerce and industry, and Victorian culture in the United States;

(B) the City of Wheeling has played an important part in the settlement of this country by serving as—

BLM_004366

213

(i) the western terminus of the National Road of the early 1800's;

(ii) the "Crossroads of America" throughout the nineteenth century;

(iii) one of the few major inland ports in the nineteenth century; and

(iv) the site for the establishment of the Restored State of Virginia, and later the State of West Virginia, during the Civil War and as the first capital of the new State of West Virginia;

(C) the City of Wheeling has also played an important role in the industrial and commercial heritage of the United States, through the development and maintenance of many industries crucial to the Nation's expansion, including iron and steel, textile manufacturing, boat building, glass manufacturing, and stogie and chewing tobacco manufacturing facilities, many of which are industries that continue to play an important role in the national economy;

(D) the city of Wheeling has retained its national heritage themes with the designations of the old custom house (now Independence Hall) and the historic suspension bridge as National Historic Landmarks; with five historic districts; and many individual properties in the Wheeling area listed or eligible for nomination to the National Register of Historic Places;

(E) the heritage themes and number and diversity of Wheeling's remaining resources should be appropriately retained, enhanced, and interpreted for the education, benefit, and inspiration of the people of the United States; and

(F) in 1992 a comprehensive plan for the development and administration of the Wheeling National Heritage Area was completed for the National Park Service, the City of Wheeling, and the Wheeling National Task Force, including—

(i) an inventory of the national and cultural resources in the City of Wheeling;

(ii) criteria for preserving and interpreting significant natural and historic resources;

(iii) a strategy for the conservation, preservation, and reuse of the historical and cultural resources in the City of Wheeling and the surrounding region; and

(iv) an implementation agenda by which the State of West Virginia and local governments can coordinate their resources as well as a complete description of the management entity responsible for implementing the comprehensive plan.

(2) PURPOSES.—The purposes of this section are—

(A) to recognize the special importance of the history and development of the Wheeling area in the cultural heritage of the Nation;

(B) to provide a framework to assist the City of Wheeling and other public and private entities and individuals in the appropriate preservation, enhancement, and interpretation of significant resources in the Wheeling area em-

214

blematic of Wheeling's contributions to the Nation's cultural heritage;

(C) to allow for limited Federal, State and local capital contributions for planning and infrastructure investments to complete the Wheeling National Heritage Area, in partnership with the State of West Virginia, the City of Wheeling, and other appropriate public and private entities; and

(D) to provide for an economically self-sustaining National Heritage Area not dependent on Federal financial assistance beyond the initial years necessary to establish the heritage area.

(c) DEFINITIONS.—As used in this section—

(1) the term "city" means the City of Wheeling;

(2) the term "heritage area" means the Wheeling National Heritage Area established in subsection (d);

(3) the term "plan" means the "Plan for the Wheeling National Heritage Area" dated August, 1992;

(4) the term "Secretary" means the Secretary of the Interior; and

(5) the term "State" means the State of West Virginia.

(d) WHEELING NATIONAL HERITAGE AREA.—

(1) ESTABLISHMENT.—In furtherance of the purposes of this section, there is established in the State of West Virginia the Wheeling National Heritage Area, as generally depicted on the map entitled "Boundary Map, Wheeling National Heritage Area, Wheeling, West Virginia" and dated March, 1994. The map shall be on file and available for public inspection in the appropriate offices of the National Park Service.

(2) MANAGEMENT ENTITY.—

(A) The management entity for the heritage area shall be the Wheeling National Heritage Corporation, a nonprofit corporation chartered in the State of West Virginia.

(B) To the extent consistent with this section, the management entity shall manage the heritage area in accordance with the plan.

(e) DUTIES OF THE MANAGEMENT ENTITY.—

(1) MISSION.—

(A) The primary mission of the management entity shall be—

(i) to implement and coordinate the recommendations contained in the plan;

(ii) ensure integrated operation of the heritage area; and

(iii) conserve and interpret the historic and cultural resources of the heritage area.

(B) The management entity shall also direct and coordinate the diverse conservation, development, programming, educational, and interpretive activities within the heritage area.

(2) RECOGNITION OF PLAN.—The management entity shall work with the State of West Virginia and local governments to ensure that the plan is formally adopted by the City and recognized by the State.

(3) IMPLEMENTATION.—To the extent practicable, the management entity shall—

215

(A) implement the recommendations contained in the plan in a timely manner pursuant to the schedule identified in the plan;

(B) coordinate its activities with the City, the State, and the Secretary;

(C) ensure the conservation and interpretation of the heritage area's historical, cultural, and natural resources, including—

(i) assisting the City and the State in the preservation of sites, buildings, and objects within the heritage area which are listed or eligible for listing on the National Register of Historic Places;

(ii) assisting the City, the State, or a nonprofit organization in the restoration of any historic building in the heritage area;

(iii) increasing public awareness of and appreciation for the natural, cultural, and historic resources of the heritage area;

(iv) assisting the State or City in designing, establishing, and maintaining appropriate interpretive facilities and exhibits in the heritage area;

(v) assisting in the enhancement of public awareness and appreciation for the historical, archaeological, and geologic resources and sites in the heritage area; and

(vi) encouraging the City and other local governments to adopt land use policies consistent with the goals of the plan, and to take actions to implement those policies;

(D) encourage intergovernmental cooperation in the achievement of these objectives;

(E) develop recommendations for design standards within the heritage area; and

(F) seek to create public-private partnerships to finance projects and initiatives within the heritage area.

(4) AUTHORITIES.—The management entity may, for the purposes of implementing the plan, use Federal funds made available by this section to—

(A) make grants to the State, City, or other appropriate public or private organizations, entities, or persons;

(B) enter into cooperative agreements with, or provide technical assistance to Federal agencies, the State, City or other appropriate public or private organizations, entities, or persons;

(C) hire and compensate such staff as the management entity deems necessary;

(D) obtain money from any source under any program or law requiring the recipient of such money to make a contribution in order to receive such money;

(E) spend funds on promotion and marketing consistent with the resources and associated values of the heritage area in order to promote increased visitation; and

(F) contract for goods and services.

(5) ACQUISITION OF REAL PROPERTY.—

(A) Except as provided in paragraph (B), the management entity may not acquire any real property or interest

216

therein within the heritage area, other than the leasing of facilities.

(B)(i) Subject to subparagraph (ii), the management entity may acquire real property, or an interest therein, within the heritage area by gift or devise, or by purchase from a willing seller with money which was donated, bequeathed, appropriated, or otherwise made available to the management entity on the condition that such money be used to purchase real property, or interest therein, within the heritage area.

(ii) Any real property or interest therein acquired by the management entity pursuant to this paragraph shall be conveyed in perpetuity by the management entity to an appropriate public or private entity, as determined by the management entity. Any such conveyance shall be made as soon as practicable after acquisition, without consideration, and on the condition that the real property or interest therein so conveyed shall be used for public purposes.

(6) REVISION OF PLAN.—Within 18 months after the date of enactment, the management entity shall submit to the Secretary a revised plan. Such revision shall include, but not be limited to—

(A) a review of the implementation agenda for the heritage area;

(B) projected capital costs; and

(C) plans for partnership initiatives and expansion of community support.

(f) DUTIES OF THE SECRETARY.—

(1) INTERPRETIVE SUPPORT.—The Secretary may, upon request of the management entity, provide appropriate interpretive, planning, educational, staffing, exhibits, and other material or support for the heritage area, consistent with the plan and as appropriate to the resources and associated values of the heritage area.

(2) TECHNICAL ASSISTANCE.—The Secretary may upon request of the management entity and consistent with the plan, provide technical assistance to the management entity.

(3) COOPERATIVE AGREEMENTS AND GRANTS.—The Secretary may, in consultation with the management entity and consistent with the management plan, make grants to, and enter into cooperative agreements with the management entity, the State, City, non-profit organization or any person.

(3) PLAN AMENDMENTS.—No amendments to the plan may be made unless approved by the Secretary. The Secretary shall consult with the management entity in reviewing any proposed amendments.

(g) DUTIES OF OTHER FEDERAL AGENCIES.—Any Federal department, agency, or other entity conducting or supporting activities directly affecting the heritage area shall—

(1) consult with the Secretary and the management entity with respect to such activities.

(2) cooperate with the Secretary and the management entity in carrying out their duties under this Act, and to the extent practicable, coordinate such activities directly with the duties of the Secretary and the management entity.

BLM_004370

217

(3) to the extent practicable, conduct or support such activities in a manner which the management entity determines will not have an adverse effect on the heritage area.

(h) AUTHORIZATION OF APPROPRIATIONS.—

(1) IN GENERAL.—There is authorized to be appropriated to carry out this section $10,000,000, except that not more than $1,000,000 may be appropriated to carry out this section for any fiscal year.

(2) MATCHING FUNDS.—Federal funding provided under this section shall be matched at least 25 percent by other funds or in-kind services.

(i) SUNSET.—The Secretary may not make any grant or provide any assistance under this section after September 30, 【2021】 *2023*.

————————

### SECTION 7 OF THE YUMA CROSSING NATIONAL HERITAGE AREA ACT OF 2000

(Public Law 106-319)

AN ACT To establish the Yuma Crossing National Heritage Area.

\*       \*       \*       \*       \*       \*       \*

**SEC. 7. SUNSET.**

The Secretary may not make any grant or provide any assistance under this Act after September 30, 【2021】 *2023*.

\*       \*       \*       \*       \*       \*       \*

————————

### ERIE CANALWAY NATIONAL HERITAGE CORRIDOR ACT

(Public Law 106-554)

# TITLE VIII—ERIE CANALWAY NATIONAL HERITAGE CORRIDOR

\*       \*       \*       \*       \*       \*       \*

**SEC. 810. AUTHORIZATION OF APPROPRIATIONS.**

(a) IN GENERAL.—

(1) CORRIDOR.—There is authorized to be appropriated for the Corridor not more than $1,000,000 for any fiscal year, to remain available until expended. Not more than a total of 【$14,000,000】 *$16,000,000* may be appropriated for the Corridor under this title.

(2) MATCHING REQUIREMENT.—Federal funding provided under this paragraph may not exceed 50 percent of the total cost of any activity carried out with such funds. The non-Federal share of such support may be in the form of cash, services, or in-kind contributions, fairly valued.

(b) OTHER FUNDING.—In addition to the sums authorized in subsection (a), there are authorized to be appropriated to the Secretary of the Interior such sums as are necessary for the Secretary for planning and technical assistance.

218

**SEC. 811. TERMINATION OF ASSISTANCE.**

The authority of the Secretary to provide financial assistanceunder this title shall terminate on September 30, 【2021】 *2023*.

————

**BLUE RIDGE NATIONAL HERITAGE AREA ACT OF 2003**

(Public Law 108–108)

AN ACT Making appropriations for the Department of the Interior and related agencies for the fiscal year ending September 30, 2004, and for other purposes.

SEC. 140. (a) SHORT TITLE.—This section may be cited as the "Blue Ridge National Heritage Area Act of 2003".

(b) FINDINGS AND PURPOSE.—

(1) FINDINGS.—Congress finds that:

(A) The Blue Ridge Mountains and the extensive cultural and natural resources of the Blue Ridge Mountains have played a significant role in the history of the United States and the State of North Carolina.

(B) Archaeological evidence indicates that the Blue Ridge Mountains have been inhabited by humans since the last retreat of the glaciers, with the Native Americans living in the area at the time of European discovery being primarily of Cherokee descent.

(C) The Blue Ridge Mountains of western North Carolina, including the Great Smoky Mountains, played a unique and significant role in the establishment and development of the culture of the United States through several distinct legacies, including—

(i) the craft heritage that—

(I) was first influenced by the Cherokee Indians;

(II) was the origin of the traditional craft movement starting in 1900 and the contemporary craft movement starting in the 1940's; and

(III) is carried out by over 4,000 craftspeople in the Blue Ridge Mountains of western North Carolina, the third largest concentration of such people in the United States;

(ii) a musical heritage comprised of distinctive instrumental and vocal traditions that—

(I) includes stringband music, bluegrass, ballad singing, blues, and sacred music;

(II) has received national recognition; and

(III) has made the region one of the richest repositories of traditional music and folklife in the United States;

(iii) the Cherokee heritage—

(I) dating back thousands of years; and

(II) offering—

(aa) nationally significant cultural traditions practiced by the Eastern Band of Cherokee Indians;

(bb) authentic tradition bearers; and

(cc) historic sites; and

(dd) historically important collections of Cherokee artifacts; and

(iv) the agricultural heritage established by the Cherokee Indians, including medicinal and ceremonial food crops, combined with the historic European patterns of raising livestock, culminating in the largest number of specialty crop farms in North Carolina.

(D) The artifacts and structures associated with those legacies are unusually well-preserved.

(E) The Blue Ridge Mountains are recognized as having one of the richest collections of historical resources in North America.

(F) The history and cultural heritage of the Blue Ridge Mountains are shared with the States of Virginia, Tennessee, and Georgia.

(G) there are significant cultural, economic, and educational benefits in celebrating and promoting this mutual heritage.

(H) according to the 2002 reports entitled "The Blue Ridge Heritage and Cultural Partnership" and "Western North Carolina National Heritage Area Feasibility Study and Plan", the Blue Ridge Mountains contain numerous resources that are of outstanding importance to the history of the United States.

(I) it is in the interest of the United States to preserve and interpret the cultural and historical resources of the Blue Ridge Mountains for the education and benefit of present and future generations.

(2) PURPOSE.—The purpose of this section is to foster a close working relationship with, and to assist, all levels of government, the private sector, and local communities in the State in managing, preserving, protecting, and interpreting the cultural, historical, and natural resources of the Heritage Area while continuing to develop economic opportunities.

(c) DEFINITIONS.—

(1) In this section:

(A) HERITAGE AREA.—The term "Heritage Area" means the Blue Ridge National Heritage Area established by subsection (d).

(B) MANAGEMENT ENTITY.—The term "management entity" means the management entity for the Heritage Area designated by subsection (d)(3).

(C) MANAGEMENT PLAN.—The term "management plan" means the management plan for the Heritage Area approved under subsection (e).

(D) SECRETARY.—The term "Secretary" means the Secretary of the Interior.

(E) STATE.—The term "State" means the State of North Carolina.

(d) BLUE RIDGE NATIONAL HERITAGE AREA.—

(1) ESTABLISHMENT.—There is established the Blue Ridge National Heritage Area in the State.

(2) BOUNDARIES.—The Heritage Area shall consist of the counties of Alleghany, Ashe, Avery, Buncombe, Burke, Caldwell, Cherokee, Clay, Graham, Haywood, Henderson,

BLM_004373

220

Jackson, McDowell, Macon, Madison, Mitchell, Polk, Rutherford, Surry, Swain, Transylvania, Watauga, Wilkes, Yadkin, and Yancey in the State.

(3) MANAGEMENT ENTITY.—

(A) IN GENERAL.—As a condition of the receipt of funds made available under subsection (i), the Blue Ridge National Heritage Area Partnership shall be the management entity for the Heritage Area.

(B) BOARD OF DIRECTORS.—

(i) COMPOSITION.—The management entity shall be governed by a board of directors composed of nine members, of whom—

(I) two members shall be appointed by AdvantageWest;

(II) two members shall be appointed by HandMade In America, Inc.;

(III) one member shall be appointed by the Education Research Consortium of Western North Carolina;

(IV) one member shall be appointed by the Eastern Band of the Cherokee Indians; and

(V) three members shall be appointed by the Governor of North Carolina and shall—

(aa) reside in geographically diverse regions of the Heritage Area;

(bb) be a representative of State or local governments or the private sector; and

(cc) have knowledge of tourism, economic and community development, regional planning, historic preservation, cultural or natural resources development, regional planning, conservation, recreational services, education, or museum services.

(e) MANAGEMENT PLAN.—

(1) IN GENERAL.—Not later than 3 years after the date of enactment of this section, the management entity shall submit to the Secretary for approval a management plan for the Heritage Area.

(2) CONSIDERATION OF OTHER PLANS AND ACTIONS.—In developing the management plan, the management entity shall—

(A) for the purpose of presenting a unified preservation and interpretation plan, take into consideration Federal, State, and local plans; and

(B) provide for the participation of residents, public agencies, and private organizations in the Heritage Area.

(3) CONTENTS.—The management plan shall—

(A) present comprehensive recommendations and strategies for the conservation, funding, management, and development of the Heritage Area;

(B) identify existing and potential sources of Federal and non-Federal funding for the conservation, management, and development of the Heritage Area; and

(C) include—

221

(i) an inventory of the cultural, historical, natural, and recreational resources of the Heritage Area, including a list of property that—

(I) relates to the purposes of the Heritage Area; and

(II) should be conserved, restored, managed, developed, or maintained because of the significance of the property;

(ii) a program of strategies and actions for the implementation of the management plan that identifies the roles of agencies and organizations that are involved in the implementation of the management plan;

(iii) an interpretive and educational plan for the Heritage Area;

(iv) a recommendation of policies for resource management and protection that develop intergovernmental cooperative agreements to manage and protect the cultural, historical, natural, and recreational resources of the Heritage Area; and

(v) an analysis of ways in which Federal, State, and local programs may best be coordinated to promote the purposes of this section.

(4) EFFECT OF FAILURE TO SUBMIT.—If a management plan is not submitted to the Secretary by the date described in paragraph (1), the Secretary shall not provide any additional funding under this section until a management plan is submitted to the Secretary.

(5) APPROVAL OR DISAPPROVAL OF MANAGEMENT PLAN.—

(A) IN GENERAL.—Not later than 90 days after receiving the management plan submitted under paragraph (1), the Secretary shall approve or disapprove the management plan.

(B) CRITERIA.—In determining whether to approve the management plan, the Secretary shall consider whether the management plan—

(i) has strong local support from landowners, business interests, nonprofit organizations, and governments in the Heritage Area; and

(ii) has a high potential for effective partnership mechanisms.

(C) ACTION FOLLOWING DISAPPROVAL.—If the Secretary disapproves a management plan under subparagraph (A), the Secretary shall—

(i) advise the management entity in writing of the reasons for the disapproval;

(ii) make recommendations for revisions to the management plan; and

(iii) allow the management entity to submit to the Secretary revisions to the management plan.

(D) DEADLINE FOR APPROVAL OF REVISION.—Not later than 60 days after the date on which a revision is submitted under subparagraph (C)(iii), the Secretary shall approve or disapprove the proposed revision.

(6) AMENDMENT OF APPROVED MANAGEMENT PLAN.—