# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-2146-REB

AMERICAN WILD HORSE CAMPAIGN *et al.*,

      Petitioners,

v.

HAALAND, *et al*.,

      Respondents.

---

## RESPONDENTS' RESPONSE TO PETITIONERS' OPENING MERITS BRIEF

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii
TABLE OF ABBREVIATIONS ................................................................................... viii
INTRODUCTION ......................................................................................................... 1
STATUTORY AND REGULATORY BACKGROUND ............................................... 2

   A.   The Administrative Procedure Act ................................................................... 2
   B.   The Wild Free-Roaming Horses and Burros Act ............................................. 2
   C.   The National Environmental Policy Act .......................................................... 4

FACTUAL BACKGROUND ......................................................................................... 6

   A.   Current Horse Population Numbers and Range Conditions ............................. 6
   B.   Challenges Facing Wild Horse Management ................................................... 7
   C.   Cash Incentives For Adoption Purposes ......................................................... 8

      1.   The use of cash incentives in 2001 ........................................................ 9
      2.   The 2009 modification and expansion of cash incentives ...................... 9
      3.   The 2019 modification and expansion of cash incentives .................... 10
      4.   The 2022 modification of cash incentives ............................................ 11

STANDARD OF REVIEW .......................................................................................... 13
ARGUMENT ............................................................................................................... 14

   A.   Petitioners Do Not Have Standing To Bring Their Claims. ........................... 14

      1.   Injury in fact ......................................................................................... 15
      2.   Causation and Redressability ............................................................... 18

   B.   The 2019 and 2022 Instruction Memoranda Are Not Final Agency Action. ... 18
   C.   The 2019 and 2022 Instruction Memoranda Are Not "Legislative Rules." ...... 20
   D.   The term "rule" in 5 U.S.C. § 553(b) does not encompass non-binding planning or policy
      documents. ..................................................................................................... 24
   E.   To the extent Petitioners challenge BLM's long-running incentive practice, the statute of
      limitation bars review of those claims. .......................................................... 27
   F.   The 2019 and 2022 IMs complied with NEPA .............................................. 29

      1.   Categorical Exclusion was properly applied ....................................... 30
      2.   There is no extraordinary circumstance undermining the CE's application ................ 35

         a.   The IMs do not involve unresolved conflicts concerning alternative uses of
            resources. ..................................................................................... 35
         b.   The IMs do not potentially violate federal law ............................. 36
         c.   The IMs do not have highly controversial effects. ....................... 38

   G.   BLM's IMs Are Lawful and Reasonable. ...................................................... 39
   H.   Petitioners' Requested Vacatur Remedy is Not Appropriate. ......................... 43

CONCLUSION ............................................................................................................ 45

# TABLE OF AUTHORITIES

**Cases**                                                   **Page**

*Alaska Ctr. for the Env't v. U.S. Forest Serv.*,
    189 F.3d 851 (9th Cir. 1999) ................................................................. 6

*Alexander v. Anheuser-Busch Cos., Inc.*,
    990 F.2d 536 (10th Cir. 1993) .............................................................. 14

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Com'n*,
    988 F.2d 146 (D.C. Cir. 1993) .............................................................. 43

*Am. Horse Prot. Ass'n, Inc. v. Watt*,
    694 F.2d 1310 (D.C. Cir. 1982) ............................................................. 3

*Amoco Prod. Co. v. Watson*,
    410 F.3d 722 (D.C. Cir. 2005) .............................................................. 24

*Anderson v. Evans*,
    371 F.3d 475 (9th Cir. 2004) ................................................................ 37

*Anderson v. McCarthy*,
    Civil Action No. 16-00068-WHA, 2016 WL 6834215 (N.D. Cal. Nov. 21, 2016) ................ 21

*Applegate Trails Ass'n, et al.*,
    196 IBLA 256 (2021) ......................................................................... 37

*Assoc. of Flight Attendants-CWA, AFL-CIO v. Huerta*,
    785 F.3d 710 (D.C. Cir. 2015) .............................................................. 21

*Atchison, Topeka & Sante Fe R.R. Co. v. Pena*,
    44 F.3d 437 (7th Cir. 1994) ................................................................ 24

*Back Country Horsemen of Am. v. Johanns*,
    424 F. Supp. 2d 89 (D.D.C. 2006) ........................................................... 6

*Ballesteros v. Ashcroft*,
    452 F.3d 1153 (10th Cir. 2006) ............................................................ 20

*Bennett v. Spear*,
    520 U.S. 154, (1997) .................................................................. 13, 19

*Bergman v. United States*,
    751 F.2d 314 (10th Cir. 1984) ............................................................. 28

*Bhd. of Locomotive Eng'rs v. Atchison, Topeka & Santa Fe R. Co.*,
   516 U.S. 152 (1996) ................................................................................................ 24

*Brady Campaign to Prevent Gun Violence v. Salazar*,
   612 F. Supp. 2d 1 (D.D.C. 2009) ............................................................................ 31

*California ex rel. Lockyer v. U.S. Dep't of Agric.*,
   575 F.3d 999 (9th Cir. 2009) ................................................................................... 31

*Catron Cnty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*,
   75 F.3d 1429 (10th Cir. 1996) ................................................................................. 13

*Center for Biological Diversity v. Hamilton*,
   453 F.3d 1331 (11th Cir. 2006) ............................................................................... 28

*Citizens for a Healthy Cmty. v. United States Bureau of Land Mgmt.*,
   No. 17-CV-02519-LTB-GPG, 2019 WL 13214042 (D. Colo. Dec. 10, 2019) ....... 43

*Citizens v. United States*,
   No. 1:20-CV-00658-CNS, 2022 WL 16792226, n.4 (D. Colo. Nov. 8, 2022) ........ 18

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) .................................................................................................. 15

*Colo. Wild Horse v. Jewell*,
   130 F. Supp. 3d 205 (D.D.C. 2015) ................................................................... 23, 24

*Colorado Envtl. Coal. v. Wenker*,
   353 F.3d 1221 (10th Cir. 2004) ............................................................................... 18

*Ctr. for Biological Diversity v. Salazar*,
   706 F.3d 1085 (9th Cir. 2013) ............................................................................ 5, 34

*Earthworks v. U.S. Dep't of the Interior*,
   496 F. Supp. 3d 472 (D.D.C. 2020) ........................................................................... 6

*Ecology Center v. Castaneda*,
   574 F.3d 652 (9th Cir. 2009) ................................................................................... 21

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) ................................................................................. 17

*Forest Guardians v. Animals & Plant Health Inspection Serv.*,
   309 F. 3d 1141 (9th Cir. 2002) ................................................................................ 23

*Friends of Animals v. Pendley*,
  523 F. Supp. 3d 39 (D.D.C. 2021) .......................................................................... 20, 21, 22, 23

*Friends of Earth, Inc. v. Laidlaw Envtl. Servs, Inc.*,
  528 U.S. 167 (2000) .......................................................................................................... 15, 18

*Fund for Animals v. Williams*,
  246 F. Supp. 2d 27 (D.D.C. 2003) .............................................................................................. 38

*Gordon v. Norton*,
  322 F.3d 1213 (10th Cir. 2003) .................................................................................................. 18

*High Sierra Hikers Ass'n v. Blackwell*,
  390 F.3d 630 (9th Cir. 2004) ...................................................................................................... 34

*Humane Soc'y of U.S. v. Locke*,
  626 F.3d 1040 (9th Cir. 2010) .............................................................................................. 37, 38

*In re Special Grand Jury 89-2*,
  450 F.3d 1159 (10th Cir. 2006) .................................................................................................. 15

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
  92 F.3d 1248 (D.C. Cir. 1996) .................................................................................................... 24

*Izaak Walton League v. Kimbell*,
  558 F.3d 751 (8th Cir. 2009) ...................................................................................................... 28

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .................................................................................................................... 15

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ...................................................................................................................... 4

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ...................................................................................................................... 13

*Nat'l Wildlife Fed'n v. Espy*,
  45 F.3d 1337 (9th Cir. 1995) ................................................................................................ 42, 43

*Norton v. Southern Utah Wilderness Alliance*,
  542 U.S. 55 (2004) ...................................................................................................................... 19

*Olenhouse v. Commodity Credit Corp.*,
  42 F.3d 1560 (10th Cir. 1994) ............................................................................................. 13, 14

*Pac. Gas & Elec. Co. v. Fed. Power Comm'n,*
  506 F.2d 33 (D.C. Cir. 1974) .................................................................................. 25

*Perez v. Mortg. Bankers Ass'n,*
  575 U.S. 92 (2015) .................................................................................................. 2

*Pike v. City of Mission, Kansas,*
  731 F.2d 655 (10th Cir. 1984) ................................................................................ 28

*Preminger v. Secretary of Veterans Affairs,*
  517 F.3d 1299 (Fed. Cir. 2008) .............................................................................. 28

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989) ................................................................................................ 4

*Safari Club Int'l v. Jewell,*
  960 F. Supp. 2d 17 (D.D.C. 2013) .......................................................................... 5

*Schlesinger v. Reservists Comm. to Stop the War,*
  418 U.S. 208 (1974) .............................................................................................. 15

*Schweiker v. Hansen,*
  450 U.S. 785 (1981) .............................................................................................. 24

*Shearwater v. Ashe,*
  No. 14-CV-02830, 2015 WL 4747881 (N.D. Cal. Aug. 11, 2015) ......................... 31

*Sierra Club v. U.S. Army Corps of Eng'rs,*
  803 F.3d 31 (D.C. Cir. 2015) .................................................................................. 6

*Spannaus v. United States Dept. of Justice,*
  824 F.2d 52 (D.C. Cir. 1987) ................................................................................. 27

*Sugar Cane Growers Co-op of Fla. v. Veneman,*
  289 F.3d 89 (D.C. Cir. 2002) ................................................................................. 25

*Summers v. Earth Island Inst.,*
  555 U.S. 488, 129 S. Ct. 1142 (2009) ................................................................... 15

*The Wilderness Society v. Norton,*
  434 F.3d 584 (D.C. Cir. 2006) ............................................................................... 22

*Utah v. Babbitt,*
  137 F.3d 1193 (10th Cir. 1998) ....................................................................... 13, 14

*Ute Distrib. Corp. v. Secretary of Interior*,
    584 F.3d 1275 (10th Cir. 2009) ....................................................... 27, 28

*Vanda Pharm., Inc. v. Food & Drug Admin.*,
    436 F. Supp. 3d 256 (D.D.C. 2020) ...................................................... 20

*W. Radio Servs. Co. v. Espy*,
    79 F. 3d 896 (9th Cir. 1996) ................................................................. 24

*W. Watersheds Project v. Zinke*,
    441 F. Supp. 3d 1042 (D. Idaho 2020) .............................................. 2, 25

*Warth v. Seldin*,
    422 U.S. 490 (1975) .............................................................................. 16

*West Virginia Highlands Conservancy v. Johnson*,
    540 F. Supp. 2d 125 (D.D.C. 2008) ...................................................... 28

*Wild Fish Conservancy v. Salazar*,
    688 F. Supp. 2d 1225 (E.D. Wash. 2010) .......................................... 27, 28

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*,
    870 F.3d 1222 (10th Cir. 2017) ............................................................ 43

*Wyoming v. U.S. Dep't of Interior*,
    839 F.3d 938 (10th Cir. 2016) ................................................................ 3

**Statutes**

5 U.S.C. § 551(4) ....................................................................................... 2
5 U.S.C. § 551(5) ....................................................................................... 2
5 U.S.C. § 553(b) ................................................................................. 24, 26
5 U.S.C. § 553(b)(3)(A) ......................................................................... 2, 25
5 U.S.C. § 553(d) .................................................................................. 24, 25
5 U.S.C. § 700 ........................................................................................... 1
5 U.S.C. § 702 .......................................................................................... 42
5 U.S.C. § 704 .................................................................................... 13, 19
5 U.S.C. § 706(2)(A) ............................................................................ 13, 42

16 U.S.C. § 1331 .................................................................................... 1, 3
16 U.S.C. § 1332(c) .................................................................................... 3
16 U.S.C. § 1333(1) .................................................................................. 42
16 U.S.C. § 1333(a) .................................................................................... 3
16 U.S.C. § 1333(b)(1) ............................................................................... 3
16 U.S.C. § 1333(b)(2)(B) ................................................................. 4, 7, 39
16 U.S.C. § 1333(c) .................................................................................... 4
16 U.S.C. § 1333(d)(1) .......................................................................... 4, 37

16 U.S.C. § 1333(e) ................................................................................................... 7, 8
16 U.S.C. § 1334 ......................................................................................................... 32

28 U.S.C. § 2401(a) .................................................................................................... 27

42 U.S.C. § 4321 ........................................................................................................... 1

43 U.S.C. § 1701 ........................................................................................................... 2

**Regulations**

40 C.F.R. § 1501.4 ........................................................................................................ 5
40 C.F.R. § 1507.3(b)(2) ............................................................................................... 5
40 C.F.R. § 1508.4 ........................................................................................................ 5
40 C.F.R. § 1508.9 ........................................................................................................ 5

43 C.F.R. § 4.410(a) .................................................................................................... 23
43 C.F.R. § 46.210 ........................................................................................................ 5
43 C.F.R. § 46.210(i) ...................................................................................... 30, 31, 34
43 C.F.R. § 46.215 ........................................................................................................ 5
43 C.F.R. § 46.215(c) .................................................................................................. 35
43 C.F.R. § 46.215(i) .............................................................................................. 35, 37
43 C.F.R. § 46.300 ........................................................................................................ 5
43 C.F.R. § 4710.1 ........................................................................................................ 3
43 C.F.R. § 4710.3-1 ..................................................................................................... 3
43 C.F.R. § 4750.4-1 ..................................................................................................... 4
43 C.F.R. § 4750.4-1(e) ......................................................................................... 4, 22
43 C.F.R. § 4770.5 .................................................................................................. 39, 40

## TABLE OF ABBREVIATIONS

AIP        Adoption Incentive Program

APA        Administrative Procedure Act

BLM        Bureau of Land Management

CE        Categorical Exclusion

IM        Instruction Memorandum

NEPA      National Environmental Policy Act

## **INTRODUCTION**

Petitioners seek to halt the Bureau of Land Management's ("BLM") long-running practice of offering cash payments to incentivize the adoption of wild horses and burros, as implemented under the Wild Free-Roaming Horses and Burros Act of 1971, as amended ("Wild Horses Act" or "Act"), 16 U.S.C. §§ 1331 *et seq*. To achieve this goal, Petitioners set their sights on recent internal BLM guidance documents: Instruction Memorandum ("IM") 2019-025, *Adoption Incentive Program for Wild Horses and Burros*, BLM_003561-64 ("2019 IM"),[1] and a superseding guidance document, IM 2022-014, *Adoption Incentive Program for Wild Horses and Burros*, BLM_004919-21 ("2022 IM"). Petitioners claim that BLM's issuance of the 2019 and 2022 IMs violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 700, *et seq*., because BLM issued them without public notice and comment. Petitioners also assert that BLM's reliance on a categorical exclusion ("CE") when issuing the IMs violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq*.

Petitioners' contentions miss the mark. Petitioners obviously disapprove of BLM's practice of offering cash incentives for adoption purposes, the outlines of which are formalized in the IMs they challenge. But disapproval alone (purportedly based on Petitioners' speculative and unsubstantiated instances of adoption fraud) does not make Petitioners' APA and NEPA claims viable. The IMs at issue in this case did not establish the incentive practice that Petitioners disapprove of. Rather, primarily for consistency and uniformity across all of BLM, the IMs establish internal guidance and procedures while creating a pithy name—the Adoption Incentive Program ("AIP")—for a long-running practice of offering adoption cash incentives.

---

[1] References to "BLM_######" refer to the bates-stamp numbering in the lower-right corner of each page in BLM's administrative record.

For these reasons, Petitioners lack standing and fail to identify a final agency action associated with the 2019 and 2022 IMs as required by the APA. Moreover, to the extent that Petitioners challenge the cash incentive practice generally, and not just the 2019 and 2022 IMs, those claims are barred by the statute of limitations. Further, BLM appropriately relied on a CE to issue the IMs. And even if Petitioners were able to clear the jurisdictional hurdles in this case (they cannot), BLM's issuance of the IMs was lawful, reasonable, and supported by the administrative record. For all these reasons, the Court should deny Petitioners' claims and grant judgment for the Respondents.

## STATUTORY AND REGULATORY BACKGROUND

### A. The Administrative Procedure Act

Among other things, the APA "establishes the procedures federal administrative agencies use for 'rule making,' defined as 'the process of 'formulating, amending, or repealing a rule.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95 (2015) (quoting 5 U.S.C. § 551(5)). "'Rule,' in turn, is defined broadly to include 'statement[s] of general or particular applicability and future effect' that are designed to 'implement, interpret, or prescribe law or policy.'" *Id*. at 95-6 (quoting 5 U.S.C. § 551(4)). "As a general matter, the APA requires an agency to use notice-and-comment procedures to make any 'rule.'" *W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1067 (D. Idaho 2020). However, notice-and-comment procedures generally do not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(3)(A).

### B. The Wild Free-Roaming Horses and Burros Act

BLM's management of Federal public lands under the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701, *et seq.*, must account for BLM's responsibilities under

statutes like the Wild Horses Act. Congress enacted the Wild Horses Act in 1971 to address

concerns that wild horses were vanishing from the West and preserve them as "living symbols of

the historic and pioneer spirit of the West." 16 U.S.C. § 1331. But within a few years after the

Act's enactment, the situation had reversed itself "and action [was] needed to prevent a

successful program from exceeding its goals and causing animal habitat destruction." *Am. Horse

Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982) (quoting H.R. Rep. No. 95-1122,

95th Cong., 2d Sess. 23 (1978)). As a result, Congress later amended the Act to provide BLM

with greater authority and discretion when managing wild horses and burros. *Id*.

Section 3 of the Act authorizes BLM, acting on behalf of the Secretary of the Interior, to

manage and protect wild horses "as components of the public lands" and "in a manner that is

designed to achieve and maintain a thriving natural ecological balance" on those lands. 16 U.S.C.

§ 1333(a); *see generally Wyoming v. U.S. Dep't of Interior* ("*Wyoming*"), 839 F.3d 938, 940

(10th Cir. 2016). To implement this direction, BLM designates herd management areas and sets

appropriate management levels for the wild horse and burro populations within each area. 16

U.S.C. §§ 1332(c), 1333(b)(1); 43 C.F.R. §§ 4710.1, 4710.3-1; *see also Wyoming*, 839 F.3d at

940. BLM typically defines "appropriate management level" as a range—bounded by a "low

appropriate management level" and "high appropriate management level"—for each herd

management area. *Id*. In conjunction with a requirement that BLM maintain a current inventory

of wild horses, the Wild Horses Act authorizes BLM to use a variety of methods to achieve

appropriate management levels, including (but not limited to) the removal and destruction of

"excess animals." 16 U.S.C. § 1333(b)(1). As relevant, the Wild Horses Act defines "excess

animals" as those "wild free-roaming horses or burros . . . which must be removed from an area

in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." *Id*. § 1332(f).

After BLM has removed excess wild horses or burros from the public lands, the Wild Horses Act authorizes BLM to facilitate the adoption of these animals. 16 U.S.C. § 1333(b)(2)(B). BLM may place these excess animals "for private maintenance and care" if it identifies "qualified individuals . . . [who] can assure humane treatment and care (including proper transportation, feeding, and handling)." *Id.* BLM requires adopters of wild horses or burros to "execute a Private Maintenance and Care Agreement and agree to abide by its terms and conditions." 43 C.F.R. § 4750.4-1. "Adopters are financially responsible for the proper care and treatment of all wild horses and burros covered by the agreement." *Id*. § 4750.4-1(e). After one year, if the "Secretary determines that such individual has provided humane conditions, treatment and care," an adopter becomes eligible to obtain title to the animal. 16 U.S.C. § 1333(c). Upon passage of title, the animal loses its status as a wild horse or burro, *id*. § 1333(d)(1), and no longer falls under the jurisdiction of BLM.

### C.  The National Environmental Policy Act

NEPA serves the dual purposes of informing agency decision makers of the environmental effects of proposed federal actions and of ensuring that relevant information is made available to the public so that they "may also play a role in both the decision-making process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA, however, does not mandate particular results or impose substantive environmental obligations on federal agencies. *Id.* at 351–52; *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989). Instead, NEPA ensures that federal agencies take a "hard look" at the environmental consequences of their proposed actions before deciding to proceed.

*Robertson*, 490 U.S. at 350–51. To satisfy NEPA's procedural requirement, an agency may prepare an Environmental Assessment to determine if it will issue a Finding of No Significant Impact or prepare an Environmental Impact Statement. 40 C.F.R. §§ 1501.4, 1508.9; 43 C.F.R. § 46.300.

The Council on Environmental Quality's NEPA regulations also instruct agencies to identify classes of actions, referred to as "categorical exclusions" or "CEs", that normally "do not individually or cumulatively have a significant effect on the human environment" and are therefore excluded from the requirement of preparing an Environmental Analysis or an Environmental Impact Statement. *Id.* §§ 1508.4, 1507.3(b)(2); *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013) (explaining that a categorical exclusion is "a form of NEPA compliance" that "requires less than where an environmental impact statement or an environmental assessment is necessary" (citation omitted)). An agency's procedures for categorical exclusions must "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect," and therefore requires preparation of an Environmental Analysis or Environmental Impact Statement. *Id.* § 1508.4; *see also* 43 C.F.R. §§ 46.210, 46.215 (prohibiting BLM and other bureaus in the Department of the Interior from relying on a CE if any extraordinary circumstances exist for a proposed action).

Federal agencies are not required to provide an elaborate explanation of the reasons for applying a categorical exclusion. *Safari Club Int'l v. Jewell,* 960 F. Supp. 2d 17, 81–82 (D.D.C. 2013). The documentation of an agency's "reliance on a categorical exclusion need only be long enough to indicate to a reviewing court that the agency indeed considered whether or not a categorical exclusion applied and concluded that it did." *Id*. Indeed, "in most instances, a short statement that a categorical exclusion has been invoked will suffice to assure a reviewing court

that environmental effects have been considered," unless the record contains "substantial evidence… that an extraordinary circumstance might apply." *Id*. at 82 (internal alteration and citations omitted). Finally, an "agency's interpretation of the scope of one of its own [categorical exclusions] is 'given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation.'" *Earthworks v. U.S. Dep't of the Interior*, 496 F. Supp. 3d 472, 493 (D.D.C. 2020) (quoting *Back Country Horsemen of Am. v. Johanns*, 424 F. Supp. 2d 89, 99 (D.D.C. 2006)); *Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 857 (9th Cir. 1999); *see also Sierra Club v. U.S. Army Corps of Eng'rs,* 803 F.3d 31, 52 (D.C. Cir. 2015) ("We owe deference to the Corps's interpretation of its own NEPA regulations").

## FACTUAL BACKGROUND

### A.  Current Horse Population Numbers and Range Conditions

BLM's obligation to protect wild horses while managing and controlling them in a manner to achieve a thriving natural ecological balance within the Federal Land Policy and Management Act's overarching multiple-use framework has challenged the agency since the Wild Horse Act's enactment in 1971. BLM_000563. Despite Congress's attempts to provide BLM with statutory tools, the animals' reproductive capacity (their populations double approximately every four years, *see* BLM_000200; BLM_000460; BLM_004023) and lack of natural predators, BLM_000117-18; BLM_000564, has resulted in a chronic and severe overpopulation of wild horses on BLM-managed public lands. As of 2019, there was an estimated population of 88,000 wild horses and burros on Federal public, State, and private lands spread throughout 10 western states. BLM_005166. This total is triple the combined appropriate management levels for BLM's herd management areas. *Id*.; BLM_004010, BLM_004023. Overpopulation and worsening drought conditions throughout the West represent an existential

threat to the wild horses, health of the landscape, and other wildlife species that also depend on healthy rangeland. BLM_000001; BLM_004010-13. Wild horses regularly face starvation and death from lack of water and these conditions can force animals off public land and onto private property and public highways in search of food and water. BLM_004010-13; BLM_005166. With respect to the impacts of horse overpopulation on the landscape and habitat, "[in] many places, the range will take decades to recover – and in some cases, it's unlikely that it ever will[.]" BLM_005166.

### B. Challenges Facing Wild Horse Management

While BLM utilizes fertility control and other actions to manage the population of wild horses, *see* BLM_00401, it largely responds to the chronic and severe overpopulation of wild horses on public lands by gathering and removing them from the range. BLM_000118. The agency then makes the animals available for sale, 16 U.S.C. § 1333(e), or adoption, *id.* § 1333(b)(2)(B), among other things. For decades, however, BLM's need to remove wild horses from public lands has far outpaced the public's demand for these animals (either by sale or adoption). BLM _000564. As a result, BLM has long been forced to house and care for excess animals that have not been sold or adopted in off-range facilities. *Id.*

Over the past decades, BLM has removed hundreds of thousands of wild horses from the open range and now pays to board over 50,000 of these animals at off-range facilities. BLM_005166. BLM must pay the boarding expenses over the entire lifetime of the vast majority of these animals, at a staggering and escalating cost. *See* BLM_000204; BLM_005166 ("The cost of providing quality, humane care for these animals runs about $50 million annually."); BLM_004024 (demonstrating approximately 66% of BLM's horse management budget

dedicated to off-range boarding). As a result, much of BLM's wild horse-management budget is now fixed and committed to off-range boarding costs. *See, e.g.*, BLM_004024.

Few options exist for BLM to address these problems. Due to minimal market demand for wild horses in general, BLM is increasingly unable to find suitable homes for healthy excess wild horses through sales or its adoption program. BLM_000473. Further, Congress provided an additional sideboard on BLM's management options – the Wild Horses Act's provision that allows the agency to humanely destroy healthy, unadopted horses or conduct any sale that results in their destruction, is not an option. *See* 16 U.S.C. §1333(e) (providing for the sale of unadoptable excess without limitation under certain circumstances); Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. 113-235, 128 Stat. 2130, 2399 (Dec. 16, 2014) ("Appropriations herein made shall not be available for the destruction of healthy, unadopted, wild horses and burros in the care of BLM or its contractors or for the sale of wild horses and burros that results in their destruction for processing into commercial products."); *see also* Continuing Appropriations and Ukraine Supplemental Appropriations Act, Pub. L. 117-180, 136 Stat. 2114 (Sept. 30, 2022).

### C.  Cash Incentives For Adoption Purposes

Because of the long-running challenges – overpopulation of wild horses on public lands, the exorbitant costs of housing them at off-range facilities, and the wild horse-management restrictions imposed by Congress – BLM's ability to effectively implement its adoption program is critical to BLM's overall goal of bringing its wild horse management program onto a sustainable path. For decades, increasing adoptions has been critical to the health of the horses, the open range, and other native wildlife populations. To that end, BLM has long sought ways to

improve its adoption program. One such way includes the agency's long-standing practice of offering cash incentives as part of its adoption efforts.

### 1.   The use of cash incentives in 2001

BLM first began using cash payments to incentivize the adoption of excess wild horses in in 2001. At that time, the cash offerings were limited to Wyoming, BLM_000001-06; BLM_000007 (financial assistance agreement related to the Wyoming incentive program); BLM_000008 ("[This] agreement will assist and provide a sensible approach to deal with the problem of adopting these older horses."), and incentivized adoptions by issuing ranchers a one-time lump sum ($1000) to care for unadoptable excess horses. BLM_000088; BLM_000010. The goal of the cash incentives was to augment and enhance BLM's adoption program, which was being underutilized by the public, to curtail the number of horses entering long-term holding, and save the taxpayer approximately $3,448 per horse in 2001. BLM_000008-09. The effort, however, was hindered by a lack of upfront funding and a lack of interest – at that time, it was more profitable for private ranchers to use their land for cattle grazing than housing wild horses. BLM_000088. Nevertheless, BLM continued to explore ways to use cash payments to incentivize the adoption of excess wild horses.

### 2.   The 2009 modification and expansion of cash incentives

BLM modified and scaled up its practice of using cash incentives in 2009 when, in a continued effort to deal with the challenges of effectively managing wild horse populations, the agency began offering members of the public in New Mexico, Oklahoma, Texas, and Kansas, a cash incentive to adopt excess wild horses. The offered incentive helped defray costs associated with "first-year care and feeding" with the same end goal – prevent death of wild horses on the open range due to starvation and lack of water, protect rangeland, curtail the number of horses

entering long-term holding, and save the taxpayer in lifetime off-range boarding costs. BLM_000204-06. To receive the incentive payment, an adoption title application had to be signed by a veterinarian or BLM official. BLM_000205. While a potential adopter could obtain title if the title application was signed by other acceptable individuals under 43 C.F.R. § 4750.5(b), that adopter would not be eligible to receive an incentive payment. BLM_000205.

Additionally, BLM had to conduct mandatory compliance checks on all animals participating in the program. BLM_000205. BLM extensively implemented this iteration of its cash incentives practice and did so until 2019 – well beyond the originally-contemplated, two-year duration. BLM_001937 (indicating that the program was still operational in 2016); BLM_003971 (outlining adoption incentives in FY2017); BLM_003971-72 (indicating that from FY2010-2017, a total of 3,942 untrained horses were adopted in the region, 1,575 were incentivized adoptions). Additionally, as early as 2011, BLM expected to expand its use of cash incentives nationwide – *i.e.*, to all 10 Western states dealing with wild horse overpopulation issues. BLM_000531.

### 3.   The 2019 modification and expansion of cash incentives

In 2019, BLM did just that through the issuance of IM 2019-025 and the "creation" of the "Adoption Incentive Program" or "AIP." While the 2019 IM created a new title for marketing purposes and gave the program greater exposure and publicity, this IM was effectively a continuation of most aspects of the cash incentive practice that BLM initiated in 2009. For example, like the incentive that had been offered in New Mexico, Oklahoma, Texas, and Kansas, the incentive outlined in the 2019 IM was intended to help defray costs associated with first-year care and feeding. BLM_003561-63. To receive the cash incentive, an adoption title application had to be signed by a veterinarian or BLM official. *Id*. BLM still had to conduct mandatory

compliance checks on all animals participating in the program. *Id*. Furthermore, the overall goal of incentive payments remained the same – prevent the death of wild horses on the open range due to starvation and lack of water, protect rangeland, curtail the number of horses entering long-term holding, and save the taxpayer in lifetime off-range boarding costs. *Id.* While leaving the basic structure of the cash incentive practice in place, the 2019 IM then expanded the geographic scope to apply nationally (all 10 Western states), changed the age of the qualifying horses, changed the amount of the incentive payment, gave the long-standing practice of cash incentives an official title ("Adoption Incentive Program") for marketing purposes, and amended its Adoption of Wild Horses and Burros Handbook, H 4750-2, Chapter 2 – General Adoption Requirements and Procedures. *Id*.

The issuance of the 2019 IM, and the modification and expansion of the agency's cash incentive practice, "which began mid-way through Fiscal Year 2019, helped the agency to achieve a 15-year record for total placements that year of 7,104 animals. Total placements include animals adopted, sold or transferred to another public agency. Each animal successfully placed into private care is estimated to save taxpayers approximately $24,000 in lifetime off-range holding costs. That amounts to over $170 million in lifetime savings generated during Fiscal Year 2019 alone, in large measure due to the AIP." BLM_005165; BLM_004018.

### 4.  The 2022 modification of cash incentives

In 2022, BLM modified the 2019 IM and once again amended Chapter 2 of its Adoption of Wild Horses and Burros Handbook. *See* BLM_004919-21. Since the issuance of the 2019 IM, Petitioners, among others, notified BLM of the potential for adoption fraud and abuse. BLM_003826-88. After considering Petitioners' information and concerns, BLM decided that the potential for fraud and abuse was relatively low. BLM_004564 ("The BLM believes that the

required investment to feed and care for a horse or burro for 12 months also serves as a strong disincentive to adopt animals with an eye toward turning them for profit, even with the $1,000 incentive payment. Though it varies by state, it can typically cost several thousand dollars per year to provide good feed and care for a horse.").

Nevertheless, in an effort to address Petitioners' concerns and further reduce the potential for fraud and abuse, BLM added the following protections to its incentive practice, *see* BLM_004912-21:

- Continue to work with partners and other stakeholders to evaluate potential improvements to the AIP, consistent with relevant laws and regulations.

- Ensure all adoption applications and agreements clearly and consistently state that the adopter must provide humane care and require the adopter to certify that they will not knowingly sell or transfer ownership of an adopted animal to any person or organization that intends to resell, trade, or give away the animals for slaughter or processing into commercial products.

- Improve the screening of adoption applicants to better ensure that ineligible individuals are identified and excluded from participating in the adoption program, consistent with relevant laws and regulations.

- Conduct an inspection of wild horses and burros adopted through the AIP within six months of adoption date, rather than twelve months.

- Have a veterinarian certify all title applications for wild horses and burros adopted through the AIP to ensure proper care.

- Increase posting of warning notices at livestock sale facilities, highlighting criminal penalties for illegally selling untitled wild horses and burros.

- Continue to refer cases to relevant U.S. Attorneys for potential violations under 18 U.S.C. § 1001 for making false or misleading statements on adoption and title applications and agreements.

- Evaluate changes to federal regulations that strengthen protections for adopted wild horses and burros.

## STANDARD OF REVIEW

Where statutes like the Wild Horses Act and NEPA do not provide for a private right of action, the APA provides for judicial review for challenges to final agency actions. *See, e.g., Utah v. Babbitt,* 137 F.3d 1193, 1203 (10th Cir. 1998); 5 U.S.C. § 704. Consequently, in addition to the Article III standing requirements, Plaintiffs must also meet the statutory standing requirements of the APA: Plaintiffs must show there has been some final agency action and must "demonstrate that [their] claims fall within the zone of interests protected by the statute forming the basis of [their] claims." *Catron Cnty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1434 (10th Cir. 1996). For agency action to be "final," it: (1) "must mark the consummation of the agency's decision making process"; and (2) "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78, (1997) (internal quotation marks omitted and citation omitted).

If there is a final agency action to review, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle*

*Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (internal quotation marks omitted and citation omitted). Pursuant to *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994), "[r]eviews of agency action in the district courts [under the APA] must be processed as appeals.  In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure." *Id.* at 1580.

## ARGUMENT

The IMs at issue in this case did not establish the AIP in anything more than name only. Rather, as envisioned by BLM as early as 2011, the IMs simply carried forward a long-running practice of cash incentives for adoptions (started in 2009), established internal guidance and procedures for consistency and uniformity purposes across all of BLM, and expanded the practice to apply nationally. The IMs created no new rights or obligations with respect to BLM's horse adoption efforts. For these reasons, Petitioners lack standing and fail to identify a final agency action as required by the APA. Moreover, to the extent that Petitioners challenge the cash-incentive practice generally, and not just the 2019 and 2022 IMs, those claims are barred by the statute of limitations. And BLM appropriately relied on a CE to issue the IMs. As discussed in detail below, all of Petitioners' claims fail.

**A.  Petitioners Do Not Have Standing To Bring Their Claims.**

Standing is "jurisdictional in nature," and the Court is obligated to satisfy itself that it has jurisdiction to hear the matter. *Alexander v. Anheuser-Busch Cos., Inc.*, 990 F.2d 536, 538 (10th Cir. 1993). Here, Petitioners fail to meet their burden of demonstrating that they satisfy the constitutional elements of standing—injury in fact, causation, and redressability. Without these

elements, Petitioners do not have standing to pursue their claims, regardless of their dedication to wild horse issues. "Standing is not measured by the intensity of a party's commitment, fervor, or aggression in pursuit of its alleged right and remedy . . . Nor is the perceived importance of the asserted right a substitute for constitutional standing." *Babbitt*, 137 F.3d at 1202 (citations omitted). In the absence of standing, any decision from the Court on this matter would be an improper advisory opinion. *In re Special Grand Jury 89-2*, 450 F.3d 1159, 1171 (10th Cir. 2006) (the proscription against advisory opinions is closely related to standing).

In limiting the judicial power to "Cases" and "Controversies," Article III of the Constitution restricts the role of the courts to redressing or preventing actual or imminently threatened injury to persons caused by private or official violation of law. *Summers v. Earth Island Inst.*, 555 U.S. 488, 129 S. Ct. 1142, 1146 (2009). The doctrine of standing is one of several doctrines that reflect this fundamental limitation. *Id.* at 1149. A petitioner must show that he is suffering a concrete and particularized "injury in fact"; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury. *Friends of Earth, Inc. v. Laidlaw Envtl. Servs, Inc.*, 528 U.S. 167, 180-181 (2000); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). This requirement assures that "there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party[.]" *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974). Here, Petitioners do not (and cannot) establish the required elements necessary for standing. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983).

**1. Injury in fact**

In challenging the IMs, Petitioners first assert a procedural APA injury from a lack of opportunity to comment. *See* ECF No. 46 at 20-21 ("Pets.' Br.") (asserting that "[h]ad BLM at the outset sought public comment as the APA requires, Petitioners would have both explained how the AIP is vulnerable to abuse and proposed alternative incentive structures that would better vindicate Congress's intent to protect wild horses and burros." *Id.* at 28). But Petitioners also acknowledge that they already provided BLM with this information and notified BLM that the incentive structure could lead to a sale of titled horses for slaughter. BLM_003751-59; BLM_003895-3957. Further, Petitioners already recommended to BLM alternative incentives that could be provided instead of cash. BLM_003751-59; BLM_003895-3957. BLM considered Petitioners' information and suggestions. As a result, while BLM decided that its long-standing incentive practice was essential to its horse management goals and should continue, the agency made additional adjustments to its incentive practice to further minimize the potential for fraud and abuse. BLM_004912-21; BLM_004564 ("The BLM believes that the required investment to feed and care for a horse or burro for 12 months also serves as a strong disincentive to adopt animals with an eye toward turning them for profit, even with the $1,000 incentive payment. Though it varies by state, it can typically cost several thousand dollars per year to provide good feed and care for a horse."). Petitioners' allegations of injury due to the lack of opportunity to provide information on "how the AIP is vulnerable to abuse and proposed alternative incentive structures that would better vindicate Congress's intent to protect wild horses and burros," is simply not true. *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (for purposes of standing a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

Next, Petitioners claim that the IMs significantly increased the number of titled horses, originally adopted with cash incentives, now at risk for slaughter. Pets.' Br. at 20. But Petitioners fail to substantiate this claim. Petitioners provide no baseline numbers of titled horses, adopted with cash incentives, sold in the timeframe between 2009 and the issuance of the 2019 IM. Petitioners point only to a relatively small number of post-2020 sales of titled animals that they claim were adopted with cash incentives and assert, with no support whatsoever, that these numbers are a significant increase from pre-2019-IM levels. Petitioners' claim is pure speculation. And the fear that these adopted, and now titled, animals *might* then be slaughtered amounts to speculation upon speculation, especially when there is minimal incentive for profit. *See* BLM_004564. This speculative injury concerning the increase of titled (originally adopted with cash incentives) animals being sold for slaughter, does not meet the "actual and imminent, not conjectural or hypothetical" standard for injury in fact necessary for standing.

Finally, Petitioners' alleged economic injuries as an organization – *i.e.*, spending budget money to monitor, identify, and purchase titled horses at auctions because of the IMs – is not a basis for injury in fact. Pets.' Br. at 21. "[An] organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919-20 (D.C. Cir. 2015). Moreover, "an organization does not suffer an injury in fact where it 'expend[s] resources to educate its members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended.'" *Id*. at 920 (citation omitted). Petitioners have not demonstrated how the IMs – documents that only provide guidance on uniformly administering BLM's adoption incentives – have perceptibly impaired their ability to provide services core to their organizational mission or increased their burden to monitor the sale of titled horses. This is

especially so due to the fact that the IMs merely carried forward an adoption incentive practice already in place since at least 2009. As a result, none of Petitioners' claimed injuries are sufficient to meet the requirement to establish a concrete and imminent injury in fact.

### 2.   Causation and Redressability

Even if Petitioners were able to establish an immediate and concrete injury (they cannot), they fail to demonstrate how their alleged injuries are caused by the IMs and, in turn, how a favorable court order would redress their alleged injuries. *Friends of Earth,* 528 U.S. at 180-81. First, the IMs at issue did not establish (or cause) BLM's long-standing practice of offering cash incentives for adoptions. In other words, the challenged IMs are not prerequisites for or essential to BLM's practice of incentivizing adoption. Second, to the extent Petitioners' injuries are caused by adoption fraud (*i.e.*, adopters violating signed adoption agreements), these are illegal acts of third parties not before this Court. And finally, Petitioners' chain of causation is pure speculation – *e.g.*, that adopters might sell horses after obtaining title to them, adopters might violate the terms of their adoption agreements and sell their titled horse to slaughter houses, the IMs increased or are the cause of adoption abuse and fraud, etc. The lack of causation then affects this Court's ability to remedy Petitioners' alleged injuries—a judicial decision invalidating the IMs would not force a notice-and-comment period on BLM's overall incentive practice, would not prevent the continued sale of titled animals (adopted with cash incentives), and would not eliminate the need for Petitioners to expend time and resources monitoring the sale of titled animals.

For all these reasons, Petitioners cannot demonstrate any of the necessary standing elements. Therefore, the Court does not have jurisdiction to review Petitioners' claims.

### B.  The 2019 and 2022 Instruction Memoranda Are Not Final Agency Action.

Petitioners fail to identify a specific final agency action as the basis of their claims. The APA requirements of a final agency action are jurisdictional. *Colorado Envtl. Coal. v. Wenker*, 353 F.3d 1221, 1235 (10th Cir. 2004); *Gordon v. Norton* , 322 F.3d 1213, 1219 (10th Cir. 2003).[2] Perhaps realizing that they cannot challenge the general long-standing practice of incentivizing adoptions for lack of a discrete agency action, *see, e.g. Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64-67 (2004), Petitioners instead focus on recent affirmative action taken by BLM – the issuance of the 2019 and 2022 IMs. Pets.' Br. at 22. But the challenged IMs are not final agency action and cannot serve as a basis for an APA claim because BLM did not establish or change any rights or obligations.

The APA authorizes review of "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. Action is "final" where: (1) it "mark[s] the consummation of the agency's decision-making process," and is not "merely tentative or interlocutory [in] nature"; and (2) "the action [is] one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (internal quotation marks omitted and citations omitted). Both conditions must be satisfied for an agency action to be final. *Id.* at 178.

Here, as explained above, since at least 2009 (and similarly in 2001), BLM has offered cash incentives to help defray the cost of caring for a wild horse and incentivize adoptions. *See, e.g.*, BLM_000001; BLM_000007-08. While the IMs formalized, expanded the geographic scope of, and added additional protective measures to the long-running practice, the IMs did not

---

[2] Respondents recognize the uncertainty pertaining to the jurisdictional nature of the APA's "final agency action" requirement. *See Citizens v. United States*, No. 1:20-CV-00658-CNS, 2022 WL 16792226, at *2, n.4 (D. Colo. Nov. 8, 2022). Regardless, whether it is jurisdictional or not, identifying a final agency action is a required element of a valid APA claim and Petitioners fail to identify one here.

establish any new rights or obligations concerning the adoption of wild horses. Stated differently, because the practice of offering cash incentives had been in place since at least 2009, the issuance of the IMs created neither "a new right for individuals to obtain federal funding associated with the adoption of a wild horse or burro," nor a new obligation for "BLM to issue payments of federal funding to adopters of wild horses." BLM_003832-33. While the IMs do mention the "creation" of the "Adoption Incentive Program" or "AIP," that reference merely pertains to the establishment of a pithy title as part of a marketing effort to increase exposure and publicity, not the creation of a cash incentive, which was a long-running practice that had been created at least a decade earlier. *See supra* "Factual Background" Section C. As a result, the IMs cannot serve as the final agency action that is necessary to support the Court's jurisdiction to review these claims. The conclusion that the IMs are not final agency action is further bolstered by the fact that, as explained below, the IMs are not legislative rules from which rights and obligations flow. Therefore, due to the lack of a final agency action, this Court has no jurisdiction to review Petitioners' claims.

### C. The 2019 and 2022 Instruction Memoranda Are Not Legislative Rules.

Legislative rules must be issued in accordance with notice-and-comment processes. *See Ballesteros v. Ashcroft*, 452 F.3d 1153, 1158 (10th Cir. 2006) (explaining that only legislative rules (*i.e.*, those rules that create individual rights and obligations) require compliance with the APA's notice-and-comment processes). Because the IMs are non-binding internal guidance, which merely continued and clarified an existing practice, and did not create individual rights and obligations, they are not legislative rules subject to the APA's notice-and-comment requirement.

Notably absent from the 2019 and 2022 IMs is the "hallmark" of a legislative rule: language that "commands, . . . requires, . . . orders, . . . [or] dictates." *Vanda Pharm., Inc. v. Food & Drug Admin.*, 436 F. Supp. 3d 256, 270 (D.D.C. 2020). Instead, the IMs provide guidance that outlines the management of cash incentive payments if the authorized officer chooses to provide one as part of the adoption process. In *Friends of Animals v. Pendley* ("*Pendley*"), the District Court for the District of Columbia concluded that a BLM IM concerning the management of wild horses and burros did not constitute a legislative rule because it did not command, require, or dictate a particular action, but instead couched its more specific directives in "advisory language." *See Pendley*, 523 F. Supp. 3d 39 (D.D.C. 2021). The *Pendley* court was particularly influenced by the fact that BLM's IM generally directed what BLM *should* do, not what it *must* do. *Id*. at 53-54; *see also Anderson v. McCarthy*, Civil Action No. 16-00068-WHA, 2016 WL 6834215, at *8 (N.D. Cal. Nov. 21, 2016) (concluding that an agency guidance document did not implement law or policy and was not a "'rule'—or 'rule equivalent'" because "it comprised of recommendations with which compliance is permissive, not mandatory."). This is equally true here. The 2019 and 2022 IMs use similar precatory language to that found in *Pendley*. *See, e.g.*, BLM_004920 (explaining that "BLM authorized officers *should generally* provide an adopter with an incentive valued at $1,000"; "BLM authorized officers *should* remove eligibility to participate in the AIP from any adopter that relinquishes two or more animals within a 12-month period").

While the IMs contain a few isolated instances of more mandatory language – *e.g.*, stating that authorized officers "should generally" provide cash incentives and that a decision not to do so would require higher-level approval – that does not transform an otherwise suggestive set of guidelines into binding agency rule. *See Assoc. of Flight Attendants-CWA, AFL-CIO v.*

21

*Huerta*, 785 F.3d 710, 719 (D.C. Cir. 2015) (explaining that a document that "inclines" authorized officers to take certain actions can still be a mere guidance document so long as "it does not constrain their discretion enough to create a binding norm."); *Ecology Center v. Castaneda*, 574 F.3d 652, 660 (9th Cir. 2009). In short, the IMs do not compel particular outcomes. They merely formalize internal processes for BLM to follow should an authorized officer decide to provide an incentive to an eligible adopter.

Additionally, BLM itself clearly states that the IMs are not binding or mandatory, containing a straightforward disclaimer explaining that they are not intended to "create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States." *See* BLM_004921 (footnote #1). When determining whether an agency pronouncement constitutes a legislative rule, expressions of agency intent are given considerable weight. *See The Wilderness Society v. Norton*, 434 F.3d 584, 595 (D.C. Cir. 2006) (explaining that when considering policy documents have the force and effect of law, courts are to consider the agency's own characterization of the document). For example, in *Pendley*, the court noted that the IM at issue "establishe[d] policy and guidance for the issuance of [wild horse and burro] gather decisions and NEPA compliance," based, in part, on an identical disclaimer to the one included in the IMs being challenged here. *Pendley*, 523 F. Supp. 3d at 54. Petitioners mischaracterize the import of the 2019 and 2022 IMs when they state the IMs are written as binding and mandatory policy. Pets.' Br. at 22. The simple fact that the IMs state that they are "effective immediately" does not mean that its guidance should be read as an order or mandate. What matters is the nature of the IMs' instruction, and like the IM in *Pendley*, the 2019 and 2022 IMs impose no mandatory actions or obligations on the agency and serve only as guidance for incentivizing adoptions if and when BLM deems it necessary.

Petitioners' argument that the IMs are legislative rules because they altered the requirement in 43 C.F.R. § 4750.4-1(e) to include a provision stating that "adopters are financially responsible for the proper care and treatment of all wild horses and burros covered by the agreement," Pets.' Br. at 22-24, is also without merit. First, BLM's incentive practice did not alter the adopter's ultimate financial responsibility. The cost of care for these animals far exceeds BLM's incentive payment and the adopter still has the responsibility to cover those costs. BLM's adoption incentive augments the adopter's responsibility; it is not a substitute for it. Second, as explained above, the IMs merely formalized and expanded a long-running practice of providing adoption incentives that were intended to help defray costs associated with first-year care and feeding. *Id*. So, to the extent that Petitioners allege that BLM changed Section 4750.4-1(c), such changes were made in 2009 and, as explained in more detail below, any challenge to that change is well outside the applicable six-year statute of limitation.

Finally, Petitioners' argument that the IMs altered established regulations to provide a new guarantee of due process, Pets.' Br. at 24-25, fares no better. The IMs (and the long-standing incentive practice in general) do not provide a new guarantee of due process, but instead simply recognize that the existing right of due process, already provided by Interior Board of Land Appeals regulations, may be triggered by denying someone the opportunity to participate in the program. *See* 43 C.F.R. § 4.410(a) (providing that "[a]ny party to a case who is adversely affected by a decision of the [BLM] has the right to appeal" that decision to the Interior Board of Land Appeals).[3] Notably, this would have been the case had BLM declined someone participation in the cash incentive program prior to the issuance of the IMs.

---

[3] Also, the only explicit amendment outlined in the IMs – *i.e.,* the amendment to BLM's Adoption of Wild Horses and Burros Handbook – demonstrates the IMs to be non-binding

In sum, the IMs are not legislative rules that require notice and comment.

**D.  The term "rule" in 5 U.S.C. § 553(b) does not encompass non-binding planning or policy documents.**

An alternative way to determine whether the IMs constitute a "legislative rule" requiring notice-and-comment is to compare them to the types of actions that are rules under the APA. The APA discusses various actions, such as substantive rules, interpretative rules, procedural rules, and general statements of policy, without delineating which fall under the definition of a "rule." *See* 5 U.S.C. § 553(b), (d). The most reasonable reading of the term "rule" in Section 553(b) is a legislative or substantive rule, one with binding legal effect. *See Atchison, Topeka & Sante Fe R.R. Co. v. Pena*, 44 F.3d 437, 442 (7th Cir. 1994) ("[I]nterested parties do not have the right to petition the agency for review of its interpretive rulings as they do with respect to agency rules."), aff'd sub nom. *Bhd. of Locomotive Eng'rs v. Atchison, Topeka & Santa Fe R. Co.*, 516 U.S. 152 (1996).

---

guidance – not a legislative rule. In *Pendley,* the court found that the IM simply revised internal administrative processes concerning the issuance of wild horse and burro gather decisions. *Pendley*, 523 F. Supp. 3d at 54-55. The *Pendley* court also noted that the APA exempts rules of agency organization, procedure, or practice from notice-and-comment requirements. Here, the IMs serve to amend the Adoption of Wild Horses and Burros Handbook, H 4750-2, Chapter 2 – General Adoption Requirements and Procedures. BLM_004921. As a legal matter, BLM's Adoption Handbook does not have the force and effect of law for two reasons. *See Forest Guardians v. Animals & Plant Health Inspection Serv.*, 309 F. 3d 1141, 1143 (9th Cir. 2002) (per curiam) (holding that an agency manual "does not have the force of law and does not bind the agency"); *Colo. Wild Horse v. Jewell*, 130 F. Supp. 3d 205, 214 (D.D.C. 2015) (holding that provision of BLM's wild horse Handbook requiring population inventories every two years did not create "a legal duty" for BLM). First, it merely establishes guidelines for BLM's adoption of wild horses and burros. And second, it was not published in the Federal Register and made subject to public notice and comment, nor was it promulgated under independent congressional authority. *See W. Radio Servs. Co. v. Espy*, 79 F. 3d 896, 901-02 (9th Cir. 1996) (the Adoption Handbook is not binding, and the Court does "not need to review [Plaintiff's] contention that [BLM] failed to comply with [its] guidelines."); *see also Schweiker v. Hansen*, 450 U.S. 785, 789 (1981).

But even if the term "rule" in Section 553(b) refers to more than just legislative rules, it would not encompass a non-binding policy or guidance documents like the IMs. The IMs provide general guidance specifically for incentivized wild horse and burro adoption efforts that, by its express terms, does not bind BLM. Guidance that "does not purport to, nor is it capable of, binding the agency" is "not an agency rule at all, legislative *or* interpretative." *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1257 (D.C. Cir. 1996); *see also Amoco Prod. Co. v. Watson*, 410 F.3d 722, 732 (D.C. Cir. 2005); *Sugar Cane Growers Co-op of Fla. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002) ("We have recognized that notwithstanding the breadth of the APA's definition [of a rule] an agency pronouncement that lacks the firmness of a proscribed standard—particularly certain policy statements—is not a rule"); *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974) ("A general statement of policy is the outcome of neither a rulemaking nor an adjudication; it is neither a rule nor a precedent but is merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications."). The APA refers to "substantive rule[s]," "interpretive rules," and "rules of agency organization, procedure, or practice," but never uses the term "rule" in its description of a "general statement of policy." *See* 5 U.S.C. § 553(b)(3)(A), (d). Therefore, even if the Court were to consider the IMs a "general statement of policy," it would not be a rule under the meaning of Section 553(b).

Petitioners rely on *W. Watersheds Project v. Zinke* ("*Western Watersheds*"), 441 F. Supp. 3d 1042, 1067 (D. Idaho 2020), a district court opinion where the court found that a BLM land management IM (not a wild horse IM) was a legislative rule subject to notice-and-comment rulemaking. Pets.' Br. at 22, 24. But Petitioners' reliance on this case is misplaced. The IM at issue there is far different from the IMs at issue here. To begin, the court in *Western Watersheds*

found that the new IM created "an unmistakably different regulatory framework" than what was in place previously. *Id*. at 1064. These modifications affected the substantive and procedural rights and abilities of the public to participate in the process. The district court also determined that "legal consequences necessarily flow from the changes" in the new IM. *Id*. at 1066. Those legal consequences included: (1) the transition from mandatory public participation in parcel reviews under the former IM to more discretionary participation under the new IM; (2) elimination of some comment periods; and (3) shortening of protest periods. The court concluded that these alterations had "an immediate and practical impact" on the public and interested parties. The court therefore found that the IM constituted a rule and thus constituted "final agency action."

By contrast, the IMs here do not create a new regulatory framework or change the substantive or procedural rights and ability of the public to participate in the adoption process. Instead, the IMs exist within the regulatory framework at 43 C.F.R. subpart 4750 that governs the adoption of wild horses and burros. For example, the IMs do not change the eligibility standards for who can adopt a wild horse or burro, nor do they impact the procedural rights of those who meet these standards and participate in the adoption program. Unlike the mandatory IM at issue in *Western Watersheds*, the IMs here merely provide guidance on implementing the same general framework, from at least 2009, through which the BLM can provide a cash incentive to adoption participants as part of its overall adoption process, assuming that the authorized officer exercises his or her discretion to do so. *See, e.g.*, BLM_004920 (explaining that "BLM authorized officers *should generally* provide an adopter with an incentive valued at $1,000"; "BLM authorized officers *should* remove eligibility to participate in the AIP from any adopter that relinquishes two or more animals within a 12-month period"). Thus, because the

IMs are not legislative rules within the meaning of 5 U.S.C. § 553(b), BLM was not required to engage in notice and comment rulemaking before their issuance.

### E. To the extent Petitioners challenge BLM's long-running incentive practice, the statute of limitation bars review of those claims.

Contrary to Petitioners' characterization, the IMs did not "create" or "establish" the program through which BLM uses cash payments to incentivize the adoption of wild horses. BLM's practice of offering adoption incentives started long ago; the IMs merely named it, formalized it, and expanded its geographic scope. Accordingly, Petitioners' claims with respect to the specific IMs fail. However, to the extent that Petitioner's complaint can be construed to challenge the agency's long-running incentive practice generally, as compared to the 2019 and 2022 IMs specifically, Petitioners' challenge is time-barred.

A cause of action against an administrative agency accrues, within the meaning of 28 U.S.C. § 2401(a), as soon as a person challenging the agency action can institute and maintain a suit in court. *Spannaus v. United States Dept. of Justice*, 824 F.2d 52, 56 (D.C. Cir. 1987)); *see* 28 U.S.C. § 2401(a) (all civil actions against the United States must be filed within six years after the right of action first accrues). "A claim against [the] United States first accrues on the date when all events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Ute Distrib. Corp. v. Secretary of Interior*, 584 F.3d 1275, 1282 (10th Cir. 2009) (citation omitted). To the extent that Petitioners are arguing that BLM failed to comply with the APA's notice-and-comment requirement and NEPA's environmental review obligations when it started its practice of offering cash incentives, that claim accrued no later than 2009, when BLM first initiated the practice. *See* BLM_000204-06. Petitioners, who are engaged and savvy wild horse advocacy groups, had years to challenge BLM's cash incentive practice after its inception in 2009. They did not and are now well beyond the statute of

limitations for doing so. The Court should reject Petitioners' apparent attempt to end-run-around the relevant statute of limitations by purporting to focus solely on the IMs.

Nor does the continuing violation doctrine save Petitioners' tardy (and time-barred) claims. The "continuing violations doctrine permits a plaintiff to sue on a claim that would be time-barred if considered in isolation, but where subsequent violations act to prevent accrual or otherwise toll the limitations period." *Wild Fish Conservancy v. Salazar*, 688 F. Supp. 2d 1225, 1234-37 (E.D. Wash. 2010). As noted by the *Wild Fish* court, the origins of this theory are not clear and the caselaw is inconsistent and confusing. *Id*. However, it is clear that "the continuing wrong doctrine cannot be employed where the plaintiff's injury is definite and discoverable and nothing prevented plaintiff from coming forward to seek redress." *Ute Distrib. Corp.,* 584 F.3d at 1283. A "plaintiff may not use the continuing violation theory to challenge discrete actions that occurred outside the limitations period even though the impact of the acts continues to be felt." *Pike v. City of Mission, Kansas*, 731 F.2d 655, 660 (10th Cir. 1984) (en banc); *see also Bergman v. United States*, 751 F.2d 314, 317 (10th Cir. 1984) ("A continuing violation is occasioned by continual unlawful acts, not by continual ill effects from the original violation." (citation and quotation omitted)). *See also Center for Biological Diversity v. Hamilton*, 453 F.3d 1331 (11th Cir. 2006); *Preminger v. Secretary of Veterans Affairs*, 517 F.3d 1299, 1307 (Fed. Cir. 2008) (rejecting continuing violation theory to extend six-year statute of limitations); *Izaak Walton League v. Kimbell*, 558 F.3d 751, 761-62 (8th Cir. 2009) (refusing to apply theory against U.S. Forest Service when plaintiffs had been on notice of Forest Service position for at least 26 years before filing suit); *see also West Virginia Highlands Conservancy v. Johnson*, 540 F. Supp. 2d 125 (D.D.C. 2008).

Petitioners had years to challenge BLM's cash incentive practice since its inception in 2009. They did not and are now well beyond the statute of limitations for doing so. Thus, to the extent that Petitioners' complaint can be construed as asserting a claim against the agency's long-running incentive practice and the Court is inclined to find the practice to be final agency action, the Court should decline to apply the continuing violation theory here and find Petitioners' claims to be time-barred.

### F.   The 2019 and 2022 IMs complied with NEPA

Petitioners argue that BLM's issuance of the 2019 and 2022 IMs violated the procedural requirements of NEPA for two reasons: first, because BLM relied on a categorical exclusion and did not complete any NEPA analysis, *see* Compl., ¶ 115, ECF No. 1, and second, because BLM issued the IMs without considering reasonable alternatives. *Id.* ¶ 116. When properly contextualized, however, these IMs were merely modifications to an existing practice that offered cash incentives for adoption of excess wild horses and, therefore, were properly subject to a CE.

As an initial matter, the 2019 and 2022 IMs cannot be understood in a vacuum. As explained above, BLM did not establish a new cash incentive practice with IM 2019-025, which simply rebranded, expanded, and formalized the cash incentive program that BLM had been utilizing since 2009. *See* BLM_000204-06; BLM_000326; BLM_003971-72 (indicating that from FY2010-2017, a total of 3,942 untrained horses were adopted in the region, 1,575 were incentivized adoptions through the AIP). Instead, the IM modified the existing incentive structure by raising the amount of the incentive to $1,000 for each adopted animal, expanded the program's geographic footprint by applying it nationally, and made several procedural changes, including expanded the program to apply to younger wild horses and created a new form, titled

"Required Inspections for Incentive Animals," which permits BLM to track the adopted animals and their compliance inspections. BLM_003561-63. The 2019 IM also took steps to limit potential conflicts of interest and ethical concerns regarding the program (*e.g.*, no relatives of any BLM employee are eligible). *Id.*

The changes effectuated by the 2022 IM were similarly procedural and administrative in nature. For example, the 2022 IM modified the timing of the $1,000 incentive payment, required title application to be signed by a veterinarian or BLM-authorized officer, and increased the minimum adoption fee for animals participating in the incentive program. BLM_004919-21. These changes "enhance[d] existing protections for adopted wild horses and burros," BLM_004917, but did not change the substance of the program (seeking to use cash to incentivize adoption of wild untrained horses and burros), which had been in place for more than a decade.

Thus, the 2019 and 2022 IMs did not amount to a sea-change or even a new policy. Rather, it was the fine-tuning and formalization of a long-running, existing adoption incentive practice that had been modified and expanded since its initiation in 2009. As a result, the question before this Court is whether BLM violated NEPA by relying on a CE to issue IMs that *modified* BLM's existing cash incentive program, not, as Petitioners urge this Court to decide, whether the initial creation of the program—which occurred a decade prior—complied with NEPA. Indeed, judicial review of the practice's initial creation would by now be time-barred.

**1. Categorical Exclusion was properly applied**

BLM relied on the CE set forth in 43 C.F.R. § 46.210(i) when issuing the 2019 and 2022 IMs. BLM_004914-004916. 43 C.F.R. § 46.210(i) sets forth two CEs absent extraordinary circumstances. The first CE applies to "[p]olicies, directives, regulations, and guidelines: that are

of an administrative, financial, legal, technical, or procedural nature;" and second applies to

actions "whose environmental effects are too broad, speculative, or conjectural to lend

themselves to meaningful analysis and will later be subject to the NEPA process, either

collectively or case-by-case." As demonstrated below, issuance of the two IMs satisfies both

CEs.

To begin with, BLM properly relied on the first CE set forth in Section 46.210(i) because

the modifications effectuated to the agency's cash incentive program by the IMs are

administrative and procedural in nature. As noted above, the IMs did not *create* BLM's cash

incentive practice, which existed since at least 2009. Rather, the IM's made administrative and

procedural changes to that practice, including, but not limited to, changing and adding applicable

forms, changing the timing and amount of incentive payments, and addressing potential conflicts

of interest that could be presented by allowing BLM employees and their family members to

receive incentives. Notably, the changes effectuated by the 2019 and 2022 IMs: (a) did not

increase barriers to or reduce opportunities for public involvement in agency decision making,

*see Shearwater v. Ashe,* No. 14-CV-02830, 2015 WL 4747881, at *16-17 (N.D. Cal. Aug. 11,

2015), (b) did not shift burdens from the public to the BLM, *see id*. at *17, (c) did not remove

substantive environmental protections, *see California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575

F.3d 999, 1013-18 (9th Cir. 2009), and (d) did not effectuate regulatory changes that could

impact public safety, *see Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d

1, 15-18 (D.D.C. 2009), *judgement entered,* Nos. 08-2243 (CKK), 09-013 (CKK), 2009 WL

8161704 (D.D.C. Jul 30, 2009), *and case dismissed,* Nos. 09-5093, 09-5096, 2009 WL 2915013

(D.C. Cir. Sept. 8, 2009). As applicable case law demonstrates, the changes produced by the IMs

clearly amount to the types of "[p]olicies, directives, regulations, and guidelines: that are of an

administrative, financial, legal, technical, or procedural nature" that are properly the subject of the first CE set forth in 43 C.F.R. § 46.210(i).

If Petitioners' NEPA arguments were to succeed, and the Court invalidated the 2019 and 2022 IMs, this Court would be penalizing the BLM for relying on a CE to attach formalities and process to an important practice that it had already been implementing for more than a decade. In essence, the Court would be saying that it is the documents outlining policies and procedures, not the long-running programs themselves, that violate NEPA. That would be an absurd outcome that helps highlight the administrative and procedural nature of the IMs and demonstrates BLM's justified reliance on the categorical exclusion set forth in 43 C.F.R. § 46.210(i) when issuing them.

BLM also properly relied on the second CE set forth in Section 46.210(i) when issuing the IMs. Both the upstream (the predominantly on-range impacts that could occur prior to a wild horse or burro entering BLM's adoption program) and downstream (the off-range impacts that could occur after an animal has entered the adoption incentive program) environmental effects of the changes that were made to BLM's cash incentive program in the 2019 and 2022 IMs were too speculative to lend themselves to meaningful analysis and actions occurring before and after wild horses and burros find themselves in the AIP will be subject to the NEPA process.

The environmental effects upstream and downstream of the 2019 and 2022 IMs are indeed highly speculative. For example, with respect to upstream effects, the number of wild horses and burros that BLM removes from public lands, and the location that those animals are removed from, depends on population numbers within individual herd management areas, land

health, budgetary commitments, available appropriations, and other factors.[4] As a result, even if it was arguably foreseeable that the IMs, and the cash incentive practice generally, would lead to more adoptions and, therefore, additional off-range holding space, whether and how the IMs would impact wild horses and burros on the range remained entirely conjectural.

The IMs' downstream effects were similarly broad and speculative. Although BLM had been using cash payments to incentivize wild horse adoptions since at least 2009, at the time the 2019 IM issued, the impacts associated with the actual changes effectuated by the IM (increasing the payment to $1,000, expanding the program to apply nationwide, *etc.*) were unknown and did not lend themselves to ready analysis. The same holds true for BLM's issuance of the 2022 IM. While BLM had experience applying the cash incentive program nationwide since 2019, if and how the administrative and procedural changes in the 2022 IM, which were designed to further protect wild horses from being mistreated or processed into commercial products, would impact the human environment were conjectural at best. Foreseeing the predicted outcomes in light of a larger program with additional safeguards based on the outcomes for a smaller program with fewer safeguards was simply not feasible.

Petitioners' contention that the IMs result in a foreseeable outcome, which undermines the CE, is inapposite and misses the point. Petitioners argue that the AIP as embodied in the 2019 and 2022 IMs would result in increased fraud, abuse, and/or neglect of wild horses and burros. *See* Pets.' Br. at 32-33. The theoretical risk of illegal action is no doubt greater for any program that provides any benefit with monetary value when compared to the same program lacking the monetary benefit. However, Petitioners do not focus on the expansion and

---

[4] On private lands, the time, location, and extent of removals of wild horses and burros is generally dictated by the desires of private landowners. 16 U.S.C. § 1334.

formalization of the AIP (changes that the IMs effectuated), but instead argue this point regarding the initiation of the cash incentives practice. In the course of focusing their arguments on changes that the IMs did *not* effectuate, Petitioners have failed to identify any outcomes of the 2019 and 2022 IMs that were foreseeable and lent themselves to ready analysis at the time of the IMs' issuance.

Finally, and significantly, in both the upstream and downstream context, effects of the 2019 and 2022 IMs will be (and are) subject to subsequent NEPA processes. The future on-range, upstream effects of the IMs will either be analyzed in environmental assessments that disclose the impacts of removing wild horses and burros from public lands, *see* BLM IM 2019-004, *Issuance of Wild Horse and Burro Gather Decisions* (March 15, 2019) (explaining that it is BLM policy to analyze the impacts of wild horse and burro removals in an environmental assessment), or subject to a CE that applies to the removal of wild horses and burros from private lands. Similarly, the downstream effects, such as the titling of horses, that may result from the IMs will also be subject to subsequent NEPA processes, typically via CE. However, because CEs are a form of NEPA compliance, the mere fact that subsequent events may also be subject to CE does not negate that such events will be subject to and compliant with NEPA. *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013) (explaining that a categorical exclusion is "a form of NEPA compliance" (citation omitted)).

Because the impact of the IMs on the human environment is highly speculative, BLM properly applied the second CE set out in 43 C.F.R. § 46.210(i), which exempts from further NEPA analysis actions "whose environmental effects are too broad, speculative, or conjectural to

lend themselves to meaningful analysis and will later be subject to the NEPA process, either
collectively or case-by-case." 43 C.F.R. § 46.210(i).[5]

## 2. There are no extraordinary circumstances preventing the CE's application.

Petitioners additionally argue that the 2019 and 2022 IMs were not properly subject to a
CE because of the presence of three extraordinary circumstances. First, Petitioners argue that the
IMs involve "unresolved conflicts concerning alternative uses of resources"; second, that the IMs
may "violate a federal law … or requirement imposed for the protection of the environment";
and third, that the IMs had "highly controversial environmental effects." Pets.' Br. § IV.A.4, at
34-37 (alteration in original) (quoting 43 C.F.R. § 46.215(c), (i)). The Court should reject all
three arguments.

### a. The IMs do not involve unresolved conflicts concerning alternative uses of resources.

Petitioners' argument that the IMs involve unresolved conflicts concerning alternative
uses of resources, if adopted by this Court, would have the effect of invalidating the application
of any and all CEs. This interpretation of 43 C.F.R. § 46.215(c) is not in line with the plain text
or the regulation as applied and should be rejected.

Once again, Petitioners' argument conflates the impacts of the recent IMs with those
associated with BLM's long-running cash incentive practice, which has been in existence since

---

[5] Petitioners argue the failure of BLM to state explicitly that it intended to rely on both prongs of
the CE invalidates the IMs themselves. Pets.' Br. at 32. This is incorrect, and would lead to the
absurd outcome of this Court potentially invalidating the IMs and remanding to BLM,
exclusively so that BLM can include one extra sentence quoting the relevant sections of each
prong of the CE in the AR. Indeed, because Petitioners cannot argue that citation to the CE,
generally, without specifying that BLM intended to rely on both prongs, is the type of arbitrary
and capricious action that undermines an agency's invocation of a CE, this argument is properly
rejected. *E.g.*, *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 638 (9th Cir. 2004)
(declining to return to the *status quo ante* in the face of a purely procedural NEPA violations).

at least 2009. In particular, Petitioners assert that easy money, *i.e.,* the incentive for adoption of wild horses, may invite fraud and that BLM should spend its funds training horses so that they may participate in a market for sale with active demand. Pets.' Br. at 35-36. This, however, is an alternative to the initial creation of the cash incentive program, which occurred no later than 2009, not an alternative to the 2019 and 2022 IMs, which are the subject of Petitioners' challenge. As such, Petitioners have not demonstrated that the IMs—which, as noted above, carry forward and modify an existing cash incentive program—involve unresolved conflicts concerning alternative uses.

Moreover, even if using agency appropriations differently is an alternative to the 2019 and 2022 IMs, it is not the type of alternative that amounts to an extraordinary circumstance that negates application of the CE. Simply put, Petitioners' argument is that BLM could have used its funding in a different manner. That may be true, but unless directed to take a specific action by statute, federal agencies generally have some discretion in how they spend appropriated funds. This is axiomatic of any federal decision or program, nearly all of which involve some number of alternatives if its implementation is viewed in sufficient detail. The mere fact that BLM could have spent appropriated funds in a different manner does not amount to an *extraordinary circumstance* warranting the study of alternatives here.

### b. The IMs do not potentially violate federal law.

Petitioners next argue that the 2019 and 2022 IMs violate federal law in that BLM's incentive program may be leading to the slaughter of wild horses or burros, in violation of federal law. *See* Pets.' Br. at 5-6. Petitioners' argument fails on numerous levels. First, Petitioners cite to no examples of federal funds that were used to transport wild horses or burros to slaughter, nor any used to fund the slaughter of any wild horse or burro. Moreover, neither the

letter from Senator Feinstein nor the House Appropriations Committee report that Petitioners cite in their brief conclude that BLM has used any such federal funds for that purpose. These documents merely ask BLM to take steps to ensure that federal funds are not used by BLM to conduct sales that result in wild horses going to slaughter.

Second, Petitioners misconstrue the nature of the prohibition in BLM's appropriations. As Petitioners note, that provision prohibits BLM from spending appropriated funds on "the destruction of any healthy, unadopted, and wild horse or burro" or "the sale of a wild horse or burro that results in the destruction of the wild horse or burro for processing into a commercial product." Pets.' Br. at 6. Notably, the 2022 IM pertains only to adopted wild horses, and it does not affect how BLM conducts any *sales* of wild horses or burros. Instead, it provides direction only for BLM's adoption of animals and includes specific measures to promote animal welfare. The IM, among other changes, requires compliance inspections of participating animals within six months of adoption and delays the incentive payment until after an animal has been titled. BLM_004921. In short, the prohibition that Petitioners are citing is not implicated by the activities addressed in the IMs.

Petitioners' argument that the AIP may result in a violation of federal law is largely predicated on allegations concerning *titled* animals—*i.e.*, those that have become privately owned—ending up in what Petitioners label the "slaughter pipeline." As an initial matter, adopters in the AIP are required to certify that they will not slaughter these horses and burros or sell these horses and burros for slaughter. BLM_004912-21. However, even if Petitioners could support these allegations—to date, they have not—it still would not constitute a violation of federal law. Under the Wild Horses Act, titled animals lose their status as wild horses or burros and, therefore, fall outside BLM's jurisdiction. 16 U.S.C. § 1333(d)(1). As a result, Petitioners'

assertion that titled, privately owned horses are being sold in auction and that that some of these former wild horses and burros are then sent to slaughter, not only rests on assumptions and speculation, but also focuses on animals that are no longer protected by federal law and which are outside of BLM's jurisdiction. Thus, there is simply no evidence on which to conclude that the AIP amounts to BLM funding the slaughter of wild horses or burros or engaging in any action that amounts to a violation of federal law.

In sum, Petitioners have failed to show that the AIP violates a federal law and that the extraordinary circumstance at 43 C.F.R. § 46.215(i) is present.

### c. The IMs do not have highly controversial effects.

"A proposal is highly controversial when there is a substantial dispute about the size, nature, or effect of the major Federal action rather than the existence of opposition to a use." *Anderson v. Evans*, 371 F.3d 475, 489 (9th Cir. 2004) (alteration, citation, and quotation marks omitted); *see also Applegate Trails Ass'n., et al.*, 196 IBLA 256, 281-82 (2021) ("[T]here must exist a substantial dispute as to the size, nature or effect of the action, rather than merely opposition to the action as a policy matter" (alterations, citations and quotation marks omitted)); *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1057 (9th Cir. 2010) ("A substantial dispute exists when evidence casts serious doubt upon the reasonableness of an agency's conclusions." (emphasis, alterations, and citation omitted)).

Although Petitioners plainly disagree with BLM's cash incentive practice and the expansion and formalization of the program in the 2019 IM, they have not adduced any evidence to suggest that there is disagreement in the scientific community regarding the size, nature, or effects of the program. Accordingly, Petitioners cannot show that this extraordinary circumstance is present. *See Fund for Animals v. Williams*, 246 F. Supp. 2d 27, 45 (D.D.C. 2003)

(finding that the effects of a proposed action were not highly controversial for purposes of NEPA despite disagreement between U.S. Fish and Wildlife Service experts and outside entities over the action's effects), *amended,* 311 F. Supp. 2d 1 (D.C. Cir. 2004), *and order vacated as moot*, 428 F.3d 1059 (D.C. Cir. 2005).

As a result of the foregoing, Petitioners' NEPA claims fail, and judgment is properly entered for Respondents. As a result of the foregoing, Petitioners' NEPA claims fail, and judgment is properly entered for Respondents.

### G.  BLM's IMs Are Lawful and Reasonable.

Even if the Court found Petitioners' challenge to the IMs to be justiciable, BLM's IMs are lawful, reasonable, supported by the record, and should be upheld. Petitioners' core argument on this issue – BLM's issuance of the IMs violates the Wild Horses Act (and Congress's prohibition on using appropriated funds for the sale of a horse that results in its being processed into a commercial product) because it *might* result in a third party selling a horse to slaughter after the horse is titled into private ownership – *see* Pets.' Br. at 42-45, is misplaced. As explained, the IMs did not "create" or "establish" BLM's cash incentive practice; BLM started that practice years earlier. The IMs merely formalized the procedural aspects of the practice and expanded its geographic scope. Petitioners' argument fails for that reason alone.

Further, Petitioners' argument fails because it conflates *adoptions* with *sales*. Under the Wild Horses Act, the Secretary is authorized to *adopt* excess animals to private parties. The Act does, however, place certain limitations on adoption to ensure that wild horses and burros are likely adopted into good homes and will receive humane treatment and care. 16 U.S.C. § 1333(b)(2)(B). For example, the statute limits adopters to titling a maximum of four animals within a 12-month period and prohibits the conveyance of title to the animal for at least 12

months from the adoption date. *Id*. Further, under its wild horse and burro regulations and depending on the circumstances, BLM may conduct compliance inspections on untitled animals while in private care. BLM_004912-21. Additionally, BLM requires all adopters to affirm in writing that they do not intend to sell or transfer an adopted wild horse or burro for slaughter or processing into commercial products. *Id*. This affirmation is enforceable under 18 U.S.C. § 1001, which makes it a federal crime to make false statements to any agency of the United States. BLM alerts the Department of Justice ("DOJ") of false or misleading statements for DOJ to investigate and prosecute in its discretion. *See, e.g.*, BLM_004483; BLM_004516; BLM_003962.

As another safeguard, BLM has informed livestock sale facilities across the country that selling or attempting to sell wild horses and burros (*i.e.*, animals for which title has not passed to a private individual) is illegal and, under 43 C.F.R. § 4770.5, can result in criminal penalties and fines up to $2,000 or imprisonment up to one year, or both. BLM_004912-21. BLM has also taken steps to inform sale barns how to potentially identify animals that may be wild horses or burros and has encouraged sale barns to require paperwork demonstrating that title to the animal up for sale has in fact passed to an individual. *Id*.

Also, in the 2022 IM, BLM provided additional protections designed to ensure that wild horses (*i.e.*, those animals under BLM's jurisdiction) are adopted into good homes, BLM_004912-21:

- Continue to work with partners and other stakeholders to evaluate potential improvements to the Adoption Incentive Program, consistent with relevant laws and regulations.

- Ensure all adoption applications and agreements clearly and consistently state that the adopter must provide humane care and require the adopter to certify that they will not knowingly sell or transfer ownership of an adopted animal to any person or organization that

intends to resell, trade or give away the animals for slaughter or processing into commercial products.

- Improve the screening of adoption applicants to better ensure that ineligible individuals are identified and excluded from participating in the adoption program, consistent with relevant laws and regulations.

- Conduct an inspection of wild horses and burros adopted through the Adoption Incentive Program within six months of adoption date, rather than twelve months.

- Have a veterinarian certify all title applications for wild horses and burros adopted through the Adoption Incentive Program in order to receive the incentive payment.

- Increase posting of warning notices at livestock sale facilities, highlighting criminal penalties for illegally selling un-titled wild horses and burros.

- Continue to refer cases to U.S. Attorneys for potential violations under 18 U.S.C. § 1001 for making false or misleading statements on adoption and title applications and agreements.

- Evaluate changes to federal regulations that strengthen protections for adopted wild horses and burros.

Finally, BLM reviewed whether the adoption incentive would motivate adopters to adopt animals and then sell them for profit and found "that the required investment to feed and care for a horse or burro for 12 months also serves as a strong disincentive to adopt animals with an eye toward turning them for profit, even with the $1,000 incentive payment. Though it varies by state, it can typically cost several thousand dollars per year to provide good feed and care for a horse." BLM_004564.  Given the multitude of protections that the Wild Horses Act, BLM's regulations at 43 C.F.R. subpart 4750, and the IMs provide before and during the adoption process, BLM reasonably concluded that issuance of the IMs (and the provision of cash

payments to incentivize adoptions, generally) conforms with its legal obligations pertaining to untitled *wild* horses and burros.

To get around that fact, Petitioners instead focus on speculative outcomes that do not concern BLM's sale of wild animals. Instead, Petitioners focus on the sale by third parties of *titled* animals that, under the terms of the Wild Horses Act, are no longer protected by the statute or under BLM's jurisdiction. Pets.' Br. at 42-45. In particular, Petitioners appear to claim that the IMs violate the provision in BLM's appropriations that prohibits the agency from spending appropriated funds on "the sale of a wild horse or burro that results in the destruction of the wild horse or burro for processing into a commercial product." That restriction, by its terms, applies to BLM sales, not BLM adoptions. And even if that restriction applied to adoptions (it does not), BLM has taken multiple steps within its authority to prevent animals from being sold by third parties to slaughter. To the extent Petitioners argue that, despite all those steps, a third party might, in the future, sell a horse to slaughter once it its titled to a private party, the Wild Horses Act is clear: BLM's jurisdiction is limited to untitled wild horses and does not extend to animals for which title has passed to other entities. 16 U.S.C. § 1333(1). There is simply no legal basis to assert that BLM has an ongoing obligation – or, indeed, even the authority – to take action once the horse has been titled. Given the limits of its authority, BLMs decision to issue the IMs, which contain several safeguards to ensure that untitled wild horses are adopted into good homes, was lawful and reasonable.

Petitioners obviously disagree with BLM's adoption incentive practice as formalized and expanded through the IMs. But mere disagreement with BLM's adoption incentive practice does not invalidate the IMs. Nor would their disagreement invalidate BLM's adoption incentive practice. With exploding horse populations and Congressional limitations on available horse-

management tools, BLM's adoption incentives practice is crucial to its overall goal: reduce the death of wild horses on the open range due to starvation and lack of water, protect rangeland, curtail the number of horses entering long-term holding, and save the taxpayer in lifetime off-range boarding costs. BLM's IMs formalizing and expanding its adoption incentive practice are lawful, reasonable, supported by the record, and should be upheld.

### H.  Petitioners' Requested Vacatur Remedy is Not Appropriate.

Petitioners have not established any violation pertaining to the IMs and the CE, the subject of their challenge. But, in the unlikely event that the Court identifies any legal shortcomings, Respondents request the opportunity to brief the issue of remedy in more detail. For now, however, Respondents briefly explain how Petitioners fail to demonstrate an entitlement to the remedy requested of a remand with vacatur of the 2019 and 2022 IMs and the 2022 CE. Pets.' Br. at 21, 45. The appropriate remedy here is a remand *without* vacatur.

While the APA provides that a reviewing court "shall . . . hold unlawful and set aside agency action . . . found to be arbitrary [or] capricious," 5 U.S.C. § 706(2)(A), it also makes clear that "[n]othing herein . . . affects . . . the power or duty of the court to . . . deny relief on any . . . appropriate . . . equitable ground," *id*. § 702. *See Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (noting that "[a]lthough the . . . court has power to do so, it is not required to set aside every unlawful agency action. The court's decision to grant or deny injunctive or declaratory relief under APA is controlled by principles of equity."). Though the Tenth Circuit has declined to vacate agency action in some cases, *see e.g., WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1239-40 (10th Cir. 2017), it has not established a specific test for determining when remedies other than vacatur are warranted. *Citizens for a Healthy Cmty. v. United States Bureau of Land Mgmt*., No. 17-CV-02519-LTB-GPG, 2019 WL

13214042, at *1 (D. Colo. Dec. 10, 2019). Other courts have employed a two-step test that weighs "the seriousness of the [agency action's] deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Com'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).

To the extent that the court does identify legal infirmities associated with the IMs, remand without vacatur of the IMs would be the appropriate remedy. First, BLM can cure any defect on remand. At best, Petitioners' challenges consist of an alleged failure to provide notice-and-comment and an alleged failure to fully evaluate the environmental effects of the policy and guidance included in the IMs. BLM, if required, can both open a notice-and-comment period and complete the necessary environmental analysis. Thus, BLM can fulfill any remaining APA and NEPA requirements identified by the Court. Second, vacatur of BLM's IMs would result in disruptive and unintended consequences. For example, if the IMs were vacated, BLM officials would lack consistent guidance on how to uniformly apply adoption incentives nationally. Also, while the underlying authority to provide adoption incentives would remain,[6] consistent application of the benefits and protections for the animals that ensure the likelihood of good adoptive homes (especially the protections added in the 2022 IM) would be jeopardized by vacatur.

Taken together and individually, both prongs of the *Allied-Signal* test weigh strongly in favor of remand without vacatur.

---

[6] Because Petitioners have challenged only the issuance of the 2019 and 2022 IMs, neither of which created or authorized the provision of cash payments to incentivize adoptions, the Court is without jurisdiction to enjoin the practice generally. The Court's jurisdiction is limited to enjoining the application of the IMs.

## CONCLUSION

For the reasons details above, the Court should reject Petitioners' claims and grant

judgment in favor of Respondents.


Respectfully submitted this 1st day of December, 2022

/s/ Rickey D. Turner, Jr.
RICKEY D TURNER, JR.
Senior Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife and Marine Resources Section
999 18th St., South Terrace, Suite 370
Denver, CO 80202
Ph: 303-844-1373
Fax: 303-844-1350
rickey.turner@usdoj.gov

Peter W. Brocker
Peter W. Brocker
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
150 M Street NE, Rm. 3.1609
Washington, DC 20002
Ph: (202) 305-8636
(202) 305-0506 (facsimile)
peter.brocker@usdoj.gov

*Attorneys for Respondents*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed with the

Court's CM/ECF system, which will electronically serve all counsel of record.

/s/ Rickey D. Turner, Jr.
Rickey D. Turner Jr.