IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-2146-REB

AMERICAN WILD HORSE CAMPAIGN *et al*.,

    Petitioners,

v.

HAALAND, *et al.*,

    Respondents.

**[PROPOSED] AMICUS BRIEF OF PROPERTY AND ENVIRONMENT RESEARCH CENTER**

## TABLE OF CONTENTS

Statement of Interest ..................................................................................................... 1
Argument ...................................................................................................................... 2
    I.    Vacating the Adoption Incentive Program Would Set Back Wild Horse Protection and Rangeland Ecosystem Conservation ................................................................ 3
    II.    AWHC's Misguided Procedural Arguments Would Hamstring Agencies' Use of Markets and Incentives for Conservation ................................................................ 7
Conclusion ................................................................................................................. 12

## TABLE OF AUTHORITIES

### Cases

*Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024 (10th Cir.2001) ........................... 11
*Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658 (D.C. Cir. 1978) .................................................................................................................. 8
*New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683 (10th Cir. 2009) ........................................................................................................................ 9
*Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17 (D.D.C. 2013) ....................................... 12
*Shearwater v. Ashe*, No. 14-CV-02830, 2015 WL 4747881 (N.D. Cal. Aug. 11, 2015) ... 9
*Virgil v. Andrus*, 667 F.2d 931 (10th Cir.1982) ............................................................. 8

### Statutes

16 U.S.C. § 1333 ........................................................................................................... 2
16 U.S.C. § 1339 ........................................................................................................... 4
5 U.S.C. § 533(a)(2) ...................................................................................................... 8

### Other Authorities

43 C.F.R. § 46.210(i) ............................................................................................ 10, 12
Bethany A. Bradley, et al., *Disentangling the abundance–impact relationship for invasive species*, 116 Bio. Sci. 9919 (2019) ................................................................ 4
Bureau of Land Management, *New Estimates Affirm Continued Overpopulation of Wild Horses and Burros Roaming BLM-Managed Public Lands* (Apr. 12, 2022) .................. 7
C.S. Boyd, et al., *Impacts of Feral Horse Use on Herbaceous Riparian Vegetation Within a Sagebrush Steppe Ecosystem*, 70 Rangeland Ecology & Mgmt. 411 (2017) 5
Eric Edward & Sara Sutherland, *Does Environmental Review Worsen the Wildfire Crisis?*, PERC Policy Br. (2022) ................................................................................. 12

Jan G. Laitos & Christopher Ainscough, *The Paralysis Paradox and the Untapped Role of Science in Solving "Big" Environmental Problems*, 30 Geo. Envtl. L. Rev. 409 (2018) ................................................................................................................ 11

Kathryn A. Shoenecker, Sarah R. B. King, & Terry A. Messmer, *The Wildlife Profession's Duty in Achieving Science‐Based Sustainable Management of Free‐Roaming Equids*, 85 J. of Wildlife Mgmt. 1057 (2021) ................................................. 2

Lucas K. Hall, *Feral horses influence both spatial and temporal patterns of water use by native ungulates in a semi-arid environment*, 9 Ecosphere e02096 (2018) ................. 5

Peter S. Coates, et al., *Sage-Grouse Population Dynamics are Adversely Affected by Overabundant Feral Horses*, 85 Wildlife Mgmt. 1132 (2021) ....................................... 6

U.S. Fish and Wildlife Serv., *Recovery Plan for the Lahontan Cutthroat Trout* (1995).... 6

U.S. Forest Serv., *Nat'l Prescribed Fire Program Review* (2022)................................. 12

Vanessa Elizondo, Timothy Fitzgerald, & Randy Rucker, *You Can't Drag Them Away: An Economic Analysis of the Wild Horse and Burro Program*, 41 J. Ag. Res. Econ. 1 (2016) ............................................................................................................. 2, 6

The Property and Environment Research Center (PERC) respectfully submits this amicus brief in support of respondents, Secretary Haaland and the Bureau of Land Management (the BLM).

## Statement of Interest

PERC is the national leader in market solutions for conservation. A nonprofit, nonpartisan organization, PERC is dedicated to advancing conservation through markets, incentives, property rights, and partnerships. With research, law and policy engagement, and innovative field conservation programs, PERC explores how aligning incentives for environmental stewardship produces sustainable outcomes for land, water, and wildlife.

This case is of keen interest to PERC because overpopulation has numerous consequences for wild horses, rangeland health, and the conservation of native wildlife and ecosystems.[1] PERC believes that market solutions are the best means to improve wild-horse management, to conserve rangeland ecosystems, and to place more removed horses in caring homes.[2] To that end, PERC scholars produced a study in 2016 showing how an incentive payment would boost adoptions and free up resources to protect horses and conserve the range. *See* Vanessa Elizondo, Timothy Fitzgerald, &

---

[1] *See* PERC, *Reining in the Wild Horse Crisis*, https://www.perc.org/about-us/what-we-do/current-initiatives/reining-in-the-wild-horse-crisis/.
[2] *See id.*

Randy Rucker, *You Can't Drag Them Away: An Economic Analysis of the Wild Horse and Burro Program*, 41 J. Ag. Res. Econ. 1, 18–20 (2016).[3]

## Argument

For decades, the Bureau of Land Management has been between the proverbial rock and a hard place. The Wild Free-Roaming Horses and Burros Act directs the agency to "protect" wild horses on the federal range *and* to "immediately remove" excess horses when they threaten rangeland ecosystems. 16 U.S.C. § 1333. But the agency's efforts to satisfy these competing objectives have been stymied by a lack of tools, limited resources, and recurring conflict and litigation. *See* BLM_000028, 31–32, 118, 401, 564. *See also* Kathryn A. Shoenecker, Sarah R. B. King, & Terry A. Messmer, *The Wildlife Profession's Duty in Achieving Science-Based Sustainable Management of Free-Roaming Equids*, 85 J. of Wildlife Mgmt. 1057, 1058–59 (2021)[4] (noting that scientifically responsible management is frequently impeded by litigation); Elizondo, Fitzgerald, & Rucker, *You Can't Drag Them Away*, *supra* at 18–20.

This situation has significant and negative environmental consequences. Wild horses have suffered on the arid range as they compete for too little forage and water. BLM_002232, 2716, 4010–13, 5166. The overcrowding has also depleted range health, degraded riparian areas and streams, and harmed native fish and wildlife. *See* BLM_000029, 101, 1168–69, 1204–05 4010–13, 4023, 5166. Although there is no

---

[3] bit.ly/3h5JyzJ.
[4] https://wildlife.onlinelibrary.wiley.com/doi/epdf/10.1002/jwmg.22091.

single or easy solution to this problem, adoption incentives are a critical tool for reducing long-term off-range holding costs and freeing up resources to protect wild horses and conserve rangeland ecosystems. ECF. No. 50, 9-13.

AWHC opposes adoption incentives based on unsubstantiated assertions that adopters may violate their contracts by selling horses to slaughter. ECF. No. 46, 1. While such misdeeds by bad actors would, if true, be cause for greater enforcement efforts, AWHC does not raise substantive claims or claims to compel enforcement. Instead, it principally raises procedural objections to the Adoption Incentive Program.

As the BLM explains, AWHC's procedural attacks are misdirected. PERC agrees with those points but will not repeat them here. Instead, this brief addresses the serious environmental consequences that have occurred due to wild horses growing too numerous for the range to support them, consequences that would only worsen if the Adoption Incentive Program were vacated. PERC's brief also addresses AWHC's argument that the National Environmental Policy Act requires agencies to speculate about hypothetical actions they may take with the resources saved by a decision. ECF No. 46, 33. This novel argument, if accepted, would hamstring agencies' ability to pursue conservation through markets and incentives.

## I. Vacating the Adoption Incentive Program Would Set Back Wild Horse Protection and Rangeland Ecosystem Conservation

The BLM's brief explains the history of the wild-horse program and how so many areas grew to be overpopulated. ECF 50, 6–13. But the environmental consequences of having 80,000+ horses on a range that can support a population only one-third that size

3

bears further elaboration, as these environmental harms would only worsen if the Adoption Incentive Program were vacated. *See* BLM_000029, 4010, 4023, 5166,

An introduced species, wild horses have no natural predators. BLM_000042. As a consequence, wild horse populations can double every four years unless the BLM intercedes. BLM_000200, 460, 4023. The only natural check on population growth is exhaustion of the ecosystem's ability to sustain wild horses.[5]

Wild horse populations are largely concentrated in arid areas. BLM_4011–13. When Congress enacted the Wild Free-Roaming Horses and Burros Act, many of these areas were experiencing unusually high levels of precipitation. BLM_4011.[6] Since then, however, these areas have experienced regular and prolonged droughts. BLM_4012–13. During such times, wild horses must compete for inadequate forage and drinking water, and those that lose out in this competition suffer malnourishment, thirst, and other adverse health consequences. BLM_2232, 2717 (image of malnourished wild horse).

Letting nature take its course is not a socially or politically viable option. So, to prevent the death of horses from thirst and starvation, the BLM annually performs emergency gathers to save suffering horses. BLM_2716. *See* BLM_001169 (observing that some gathered horses must be euthanized because their condition has deteriorated too much). Because BLM cannot keep up with the explosive population growth, many

---

[5] Of course, serious, adverse environmental consequences can occur before an invasive species population reaches the limit that the ecosystem can support. *See* Bethany A. Bradley, et al., *Disentangling the abundance–impact relationship for invasive species*, 116 Bio. Sci. 9919 (2019).
[6] Congress has limited wild horse populations to the areas inhabited when the Wild Free-Roaming Horses and Burros Act was enacted. *See* 16 U.S.C. § 1339.

horses flee the range in search of greener, nonfederal pastures only to face other dangers such as car collisions while trying to cross busy highways. BLM_004010–13, 5166.

The wild horse crisis also harms rangelands. A GAO survey found increasingly negative effects of wild horses on their ecosystems as they exceeded appropriate management levels by less than 25%, 25–50%, and 51–100%. BLM_000101. Today, the wild horse population is over 300% capacity across the West—and in some areas far higher. BLM_000029, 4010, 4023, 5166. Overgrazing harms native vegetation, leading to the spread of invasive grasses that reduce plant diversity and increase fire risks. BLM_001168, 1204–1205. As horses compete for limited water sources, they can also degrade riparian vegetation and damage sensitive perennial springs. BLM_001169, 1204–1205. *See* C.S. Boyd, et al., *Impacts of Feral Horse Use on Herbaceous Riparian Vegetation Within a Sagebrush Steppe Ecosystem*, 70 Rangeland Ecology & Mgmt. 411 (2017). Even if overpopulation could be solved immediately, the range would "take decades to recover" from the damage that has already been done "and, in some cases, it's unlikely that it ever [would]." BLM_005166.

This overpopulation also has negative consequences on native wildlife. In times of drought, wild horses compete not only amongst themselves for food and water but also with native pronghorn, elk, and other ungulates. BLM_002213. *See* Lucas K. Hall, *Feral horses influence both spatial and temporal patterns of water use by native ungulates in a semi-arid environment*, 9 Ecosphere e02096 (2018) (finding that some ungulates avoid water sources where there are conflicts with wild horses). Wild horses can also degrade sagebrush habitat required by the greater sage-grouse. BLM_001045, 1097, 1168, 1174–

75, 2213, 4010-13. Wild horses' year-round grazing stresses sagebrush ecosystems, reducing grouse habitat. BLM_001168. And a third of sage-grouse populations overlap with wild horse management areas. BLM_002213. Therefore, wild horse overpopulation undermines greater sage-grouse conservation and could drive the species to the point of being endangered or threatened. BLM_001174–75. *See* Peter S. Coates, et al., *Sage-Grouse Population Dynamics are Adversely Affected by Overabundant Feral Horses*, 85 Wildlife Mgmt. 1132 (2021).[7] Indeed, the Fish and Wildlife Service has already identified overpopulation of wild horses as a factor in the decline of listed species. *See* U.S. Fish and Wildlife Serv., *Recovery Plan for the Lahontan Cutthroat Trout* 15, 25, 27, 64 (1995).[8]

For decades, the BLM has tried to address these impacts. As its brief explains, the limited tools and resources at its disposal have been a serious constraint. ECF No. 50, 6–7. But the explosive growth in the cost of keeping horses in off-range holding facilities threatens to overwhelm the wild horse program. BLM_000023. The Adoption Incentive Program is a critical market solution to close the gap between the supply of horses and demand to adopt them. Elizondo, Fitzgerald, & Rucker, *You Can't Drag Them Away*, *supra* at 18–20. And, in the short time that it has been in place, it is already proving effective. BLM_004018, 5165. In the program's first year, adoptions increased 91% compared to the prior year. BLM_005165. As of mid-2021, the program had saved the BLM approximately $185 million in avoided holding costs. BLM_004018.

---

[7] https://wildlife.onlinelibrary.wiley.com/doi/10.1002/jwmg.22089.
[8] https://ecos.fws.gov/docs/recovery_plan/950130.pdf.

The Adoption Incentive Program cannot solve all the challenges associated with wild horse management, of course. But, by reducing the number of horses for which the BLM must pay for off-range holding facilities, it frees up resources the agency can use to increase fertility treatments, gathers, and other methods to protect wild horses and conserve the federal range. In the mere three years since the Adoption Incentive Program was established, an increase in removals and other factors has caused the on-range population to decrease in consecutive years for the first time since 2007. *See* Bureau of Land Management, *New Estimates Affirm Continued Overpopulation of Wild Horses and Burros Roaming BLM-Managed Public Lands* (Apr. 12, 2022).[9] Considering how far wild horse populations exceed management objective and the consequences of overpopulation on other environmental resources, the breathing room provided by the Adoption Incentive Program is essential.

## II.  AWHC's Misguided Procedural Arguments Would Hamstring Agencies' Use of Markets and Incentives for Conservation

As the BLM's brief explains, AWHC's procedural objections to the Adoption Incentive Program miss their mark. ECF No. 50, 18–43. But some of AWHC's arguments are more concerning than others. Some would, if accepted, have repercussions far beyond this case, especially for agencies using markets and incentives to advance conservation.

---

[9] https://www.blm.gov/blog/2022-04-12/new-estimates-affirm-continued-overpopulation-wild-horses-and-burros-roaming-blm

AWHC asserts, for instance, that the BLM could not expand the geographic reach of adoption incentives or increase the amount of the incentive without first going through slow notice-and-comment rulemaking procedures. ECF No. 46, 24–29. But Congress excluded from these procedures a wide range of non-binding and non-regulatory actions, including any "matter relating to . . . contracts." 5 U.S.C. § 533(a)(2).[10] *See* ECF No. 50, 18–27. While the 2019 and 2022 instruction memoranda establishing the Adoption Incentive Program are not themselves contracts, they outline policies that BLM uses to establish the terms and price of a contract—namely, the Adoption Incentive Agreement that adopters enter with BLM. BLM_003561-64, BLM_004919-21. Therefore, the instruction memoranda involve a matter relating to agency contracts and are covered by this exclusion.[11]

While regulation requires stability and careful deliberation, markets require flexibility and adaptability. As economic and other conditions change, the amount of the adoption incentive may prove too large or too small. But if the agency must go through the gauntlet of an elaborate rulemaking process to change this price, conditions may change yet again in the intervening months or years. This would seriously hamper agencies' use of markets to further conservation.

---

[10] Despite its notice-and-comment claim turning entirely on the scope of 5 U.S.C. § 533, AWHC's brief contains no discussion of § 533(a)—the provision that defines that scope.

[11] This is not a case where a contract essentially functions as a binding rule or regulation and, thus, may fall outside the exception. *See* ECF No. 50, 18–27. *See also Virgil v. Andrus*, 667 F.2d 931, 936 (10th Cir.1982); *Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 664 (D.C. Cir. 1978) (exception does not apply where an agency imposes terms on a contract that a regulated entity is compelled to enter into).

More concerning, however, is AWHC's assertion that agency decisions resulting in substantial cost-savings violate NEPA unless the agency engages in a speculative analysis of the environmental impacts of hypothetical actions the agency might take with the saved resources. *See* ECF No. 46, 33. *See also* ECF No. 50, 32–34 (describing these as the "upstream" impacts of an adoption). Because one of the chief benefits of market solutions is that they can deliver better conservation outcomes at lower cost, this argument would seriously undermine these solutions.

In support of its theory, AWHC cites only a nonbinding decision from the Northern District of California. *Shearwater v. Ashe*, No. 14-CV-02830, 2015 WL 4747881, *17 (N.D. Cal. Aug. 11, 2015). But that case stands for the noncontroversial proposition that when issuing a rule changing the terms of eagle-take permits an agency must analyze how the change will affect the number of eagles taken under those permits. *See id.* Analyzing such direct and predictable consequences of an agency decision is a routine application of NEPA.

AWHC offers a fundamentally different sort of argument here. Money is fungible. Therefore, the future impacts of hypothetical actions an agency might take with resources saved by a challenged decision are inherently indirect and speculative—even more so than the BLM's brief indicates. Ultimately, requiring agencies to engage in the sort of speculation AWHC demands would undermine NEPA's purposes by producing uninformative and possibly meaningless analyses. *See New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 707 (10th Cir. 2009) (describing NEPA's "'twin aims' of informed agency decisionmaking and public access to information").

The BLM argues, correctly, that these impacts are too speculative to require NEPA analysis even if it's assumed the savings will be used exclusively to gather and remove horses from overpopulated areas. ECF No. 50, 32–33. These impacts can vary greatly based on location, how large the local horse population is, how many horses are removed, the health of the range, the environmental characteristics of the area, and many other factors. In other words, these are precisely the sort of impacts best analyzed in the context of a later, specific action. *See id. See also* 43 C.F.R. § 46.210(i) (categorically excluding from NEPA actions "whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process").

But it's not clear that AWHC's theory can be so limited. The BLM also might choose to increase fertility treatments, expand forage or water resources available to wild horses, improve conditions in off-range holding facilities, or pursue any other activity related to wild horses. And its choices may change over the life of the Adoption Incentive Program. Because such future decisions have not been made and cannot be reliably predicted, their potential impacts are necessarily conjectural and can only be reliably analyzed in the context of future decisions.

AWHC's suggestion to the contrary threatens to open a Pandora's box of conflict and litigation. If agencies engaged in the kind of speculative analysis AWHC demands, future litigants could claim the cost-savings would fund different, more destructive activities than what the agency chose to analyze. Because of money's fungibility, there's no objective way to determine whether the savings from a decision, rather than some

other source, will fund a later action. Thus, unless the agency analyzed every potential activity it might choose to fund, it would be open to such attacks.

This theory would also upend settled NEPA practices. Consider, for instance, NEPA's requirement to analyze a "no action" alternative to a proposed action. This alternative serves as an environmental baseline by requiring the agency to consider a world in which it decided not to move forward with a proposed action. *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1040 (10th Cir.2001). Such decision necessarily saves the agency any money it would have spent on the proposed action. But NEPA has never been understood to require agencies to speculate about how they might use these savings and count those hypothetical actions against the "no action" alternative. If it did, agencies could downplay the impacts of their proposed actions by, essentially, crediting them with the foregone impacts of an unrelated, more destructive, and purely hypothetical use of funds.

These concerns might seem modest if evermore NEPA analysis were an unalloyed good. But it isn't. Speculative NEPA analyses and the litigation they invite come at serious cost to agency resources and time, thereby hindering environmentally beneficial agency actions. *See* Jan G. Laitos & Christopher Ainscough, *The Paralysis Paradox and the Untapped Role of Science in Solving "Big" Environmental Problems*, 30 Geo. Envtl. L. Rev. 409, 412, 427–30 (2018). The Forest Service, for instance, has identified NEPA's strictures as an obstacle to restoring unhealthy forests and tackling the wildfire crisis. *See* U.S. Forest Serv., *Nat'l Prescribed Fire Program Review* App. A-

21 (2022).[12] The concern is well-founded. PERC's research has found that NEPA holds up forest restoration projects for years. *See* Eric Edward & Sara Sutherland, *Does Environmental Review Worsen the Wildfire Crisis?*, PERC Policy Br. (2022) (finding that it takes 5.3 and 7.2 years on average for the Forest Service to begin implementing thinning and prescribed fire projects, respectively, that require an environmental impact statement).[13] Such analysis paralysis serves neither the environment nor the public well. *See* Laitos & Ainscough, *The Paralysis Paradox*, *supra* at 412, 427–30. And a judicial expansion of NEPA to require analysis of hypothetical actions potentially funded by a challenged decision's cost-savings is a recipe for even more conflict and gridlock.

The undesirability of such delay is precisely why Congress and federal agencies have developed categorical exclusions, like the one relied on by the BLM in this case. *See* 43 C.F.R. § 46.210(i); BLM_004914-004916. It is also why, in reviewing an agency's reliance on a categorical exclusion, courts do not insist on an exhaustive showing. *Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 81–82 (D.D.C. 2013) ("[I]n most instances, a short statement that a categorical exclusion has been invoked will suffice"). To hold otherwise would undermine the very purpose of a categorical exclusion.

## Conclusion

One of the chief benefits of markets and incentives is that they can deliver better conservation outcomes at lower cost. Requiring a conjectural NEPA analysis of

---

[12] bit.ly/3BaT77g.
[13] https://www.perc.org/wp-content/uploads/2022/06/PERC-PolicyBrief-NEPA-Web.pdf.

hypothetical actions an agency might take with the cost-savings would be a significant hindrance to these solutions and to conservation generally. Indeed, in this very case, vacating the agency's decision would worsen the already serious environmental consequences of wild horse populations greatly exceeding what rangeland ecosystems can support. AWHC's request to vacate the Adoption Incentive Program should be denied.

Respectfully submitted December 5, 2022.

*/s/ Jonathan Wood*
Jonathan Wood
Property and Environment Research Center
2408 Analysis Dr. Ste. A
Bozeman, MT 59718
Ph: 406-587-9591
jonathan@perc.org

*Counsel for proposed amicus curiae*