## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-02146-REB

AMERICAN WILD HORSE CAMPAIGN, et al.

       Petitioners,

  v.

DEBRA HAALAND, et al.

       Respondents.

---

## PETITIONERS' REPLY BRIEF

### *Oral Argument Requested*[1]

---

[1] Merits briefing is now complete. Because the parties have an interest in timely resolution of this matter, Petitioners respectfully request that the Court terminate designation of this matter as an AP case and assign it under D.C.COLO.LCivR 40.1 for prompt resolution.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

GLOSSARY ..................................................................................................................... v

INTRODUCTION .............................................................................................................. 1

I.   BLM'S JURISDICTIONAL DEFENSES FAIL ................................................... 2

   A.   Petitioners' Challenge Is Not Time-Barred ........................................... 2

   B.   Petitioners Have Standing ......................................................................... 5

      1.   Injury-in-fact ....................................................................................... 5

      2.   Causation and Redressability ........................................................ 10

   C.   The AIP is Final Agency Action Subject to Judicial Review ............... 12

II.   THE AIP IS ARBITARY, CAPRICIOUS, AND CONTRARY TO LAW ............. 14

   A.   The AIP Violated the APA ...................................................................... 14

   B.   The AIP Violates NEPA .......................................................................... 19

      1.   The AIP Is a New Nationwide Program ........................................ 19

      2.   BLM Invoked a CE that Does Not Apply to the AIP ................... 20

      3.   Extraordinary Circumstances Preclude Use of a CE ................. 23

   C.   The AIP Is Arbitrary and Capricious ..................................................... 24

III.   VACATUR IS THE PROPER REMEDY ............................................................ 26

CONCLUSION .................................................................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Wild Horse Pres. Campaign v. Jewell*,
    847 F.3d 1174 (10th Cir. 2016) .......................................................................8

*Am. Wild Horse Pres. Campaign v. Perdue*,
    873 F.3d 914 (D.C. Cir. 2017)........................................................................24

*Andrus v. Sierra Club*,
    442 U.S. 347 (1979).......................................................................................23

*Appalachian Power Co. v. EPA*,
    208 F.3d 1015 (D.C. Cir. 2000) .....................................................................19

*Aransas Proj. v. Shaw*,
    775 F.3d 641 (5th Cir. 2014) ...........................................................................7

*Bennett v. Spear*,
    520 U.S. 154 (1997)...............................................................................12, 14

*Chiang v. Kempthorne*,
    503 F. Supp. 2d 343 (D.D.C. 2007) ...............................................................12

*Comm. to Save the Rio Hondo v. Lucero*,
    102 F.3d 445 (10th Cir. 1996) ..................................................................8, 11

*Common Cause of Colo. v. Buescher*,
    750 F. Supp. 2d 1259 (D. Colo. 2010)...........................................................10

*Cure Land, LLC v. U.S. Dep't of Agric.*,
    833 F.3d 1223 (10th Cir. 2016) .....................................................................14

*East v. Clayton Cnty.*,
    436 F. App'x 904 (11th Cir. 2011) ................................................................17

*Friedman Bros. Inv. Co. v. Lewis*,
    676 F.2d 1317 (9th Cir. 1982) .......................................................................14

*Friends of Animals v. Pendley*,
    523 F. Supp. 3d 39 (D.D.C. 2021)...............................................15, 16, 17, 18

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
    528 U.S. 167 (2000).........................................................................................8

*Fund for Animals v. Lujan,*
  962 F.2d 1391 (9th Cir. 1992) ........................................................................7

*Getty v. Fed. Sav. & Loan. Ins. Corp.,*
  805 F.2d 1050 (D.C. Cir. 1986) ....................................................................23

*High Cty. Conservation Advocs. v. U.S. Forest Serv.,*
  951 F.3d 1217 (10th Cir. 2020) ....................................................................26

*Initiative & Reform Inst. v. Walker,*
  450 F.3d 1082 (10th Cir. 2006) ......................................................................5

*Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.,*
  861 F.3d 944 (9th Cir. 2017) ..........................................................................4

*Kleppe v. Sierra Club,*
  427 U.S. 390 (1976) ......................................................................................22

*La. Crawfish Prods. Ass'n-W. v. Rowan,*
  463 F.3d 352 (5th Cir. 2006) .....................................................................4, 21

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ...................................................................................23, 26

*Olenhouse v. Commodity Credit Corp.,*
  42 F.3d 1560 (10th Cir. 1994) ........................................................................7

*Or.-Cal. Trails Ass'n v. Walsh,*
  467 F. Supp. 3d 1007 (D. Colo. 2020) .........................................................27

*PETA v. U.S. Department of Agriculture,*
  797 F.3d 1087 (D.C. Cir. 2015) ..................................................................9, 10

*Pub. Emps. for Envtl. Resp. v. Nat'l Park Serv.,*
  No. 19-cv-3629, 2022 WL 1657013 (D.D.C. May 24, 2022)...................21, 22

*Rocky Mountain Wild v. Dallas,*
  No. 19-cv-1512, 2022 WL 11733139 (D. Colo. Oct. 20, 2022)....................26

*S. Utah Wilderness All. v. BLM,*
  551 F. Supp. 3d 1226 (D. Utah 2021) .....................................................7, 14, 23

*Sierra Club v. U.S. Dep't of Energy,*
  287 F.3d 1256 (10th Cir. 2002) ....................................................................11

*Tozzi v. U.S. Dep't of Health & Human Servs.,*
  271 F.3d 301 (D.C. Cir. 2001) ......................................................................11

*Utah Envtl. Cong. v. Russell*,
    518 F.3d 817 (10th Cir. 2008) ............................................................21

*W. Watersheds Proj. v. Zinke*,
    441 F. Supp. 3d 1042 (D. Idaho 2020) ..................................12, 18, 19

*WildEarth Guardians v. BLM*,
    870 F.3d 1222 (10th Cir. 2014) ............................................................8

*Wilderness Soc'y v. Wisely*,
    524 F. Supp. 2d 1285 (D. Colo. 2007)................................................14

*Wilderness Watch v. Mainella*,
    375 F.3d 1075 (11th Cir. 2004) ..........................................................21

**Statutes**

5 U.S.C. § 706............................................................................................26

16 U.S.C. § 1333........................................................................................17

Pub. L. No. 116-94, 133 Stat. 2534 (2019)...............................................25

**Regulations**

43 C.F.R. § 4.410.......................................................................................18

43 C.F.R. § 46.210.....................................................................................21

43 C.F.R. § 4700.0-6..................................................................................16

**GLOSSARY**

| | |
|---|---|
| AIP | Adoption Incentive Program |
| APA | Administrative Procedure Act |
| BLM | Bureau of Land Management |
| CE | Categorical Exclusion |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FOIA | Freedom of Information Act |
| IM | Instruction Memorandum |
| NEPA | National Environmental Policy Act |

## INTRODUCTION

Petitioners previously explained the specific, concrete ways the Bureau of Land Management's ("BLM") Adoption Incentive Program ("AIP") has fundamentally altered wild horse management since 2019 by: (1) financially incentivizing their widespread adoption by adopters motivated by money; (2) exposing many wild horses to neglect, malnourishment, and inhumane treatment by adopters while they await title; (3) providing a means for adopters to obtain title and then sell horses into the slaughter pipeline; (4) forcing Petitioners to counteract these activities by rescuing as many horses as possible before their deaths; and (5) shifting BLM's newfound funds to remove many more horses from the wild. These foreseeable impacts have resulted in immense environmental consequences to federally protected wild horses and other users of the public range, and have severely injured Petitioners and impaired their interests in protecting these animals from inhumane treatment and slaughter as Congress intended.

In response, BLM engages in revisionist history and disregards key facts in downplaying the monumental effects of the AIP. For instance, BLM asserts that Petitioners' challenge is time-barred because the agency previously attempted to incentivize wild horse adoptions through time-limited, geographically restricted pilot programs. Likewise, BLM contends that Petitioners lack standing because they speculate about AIP-adopted horses entering the slaughter pipeline; however, the record is replete with documentation of this fact. Because these fatally flawed assumptions go to the core of BLM's jurisdictional and merits arguments, the agency has not remotely demonstrated that its creation and modification of the AIP are consistent with the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, or the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347. As a result, the Court should vacate the challenged Instruction Memoranda ("IMs") and remand them to BLM for further consideration.

I.      **BLM'S JURISDICTIONAL DEFENSES FAIL**

Evidently recognizing its vulnerability on the merits, BLM expends substantial effort on threshold matters to avoid the Court reaching the legality of the AIP. None of BLM's jurisdictional defenses withstands scrutiny.

A.      **Petitioners' Challenge Is Not Time-Barred**

Petitioners challenge the 2019 creation and 2022 modification of the nationwide AIP, which is the agency action that caused an exponential increase in wild horses entering the slaughter pipeline. *See* Declaration of Suzanne Roy ("Roy Decl."), ECF No. 46-1, ¶¶10, 19-27; Declaration of Clare Staples ("Staples Decl."), ECF No. 46-4, ¶¶18-20, 22-28; Declaration of Candace Ray ("Ray Decl."), ECF No. 46-5, ¶¶11-15. In addition to their declarations, Petitioners have prepared multiple reports documenting in extensive detail that BLM's creation of the nationwide AIP has, in fact, resulted in many wild horses entering the slaughter pipeline. *See* BLM_003751-59 (identifying "more than 90 wild horses and burros at eight different livestock auctions, across five different states, all known to sell horses to kill buyers for slaughter"); BLM_003912-3957 (substantiating the "[i]nflux" of dozens of wild horses in kill pens after the AIP); ECF No. 46-2 at 8 (updating investigatory report findings and "confirm[ing] 312 [wild horses in kill pens since September 2020] as adopted through the AIP").

Shifting the focus away from the AIP, BLM asserts that Petitioners' challenge is time-barred because BLM undertook pilot programs in 2001 and 2009 involving cash incentives for adoption, and thus the nationwide AIP is merely an expansion of those earlier efforts. *See* ECF No. 50 at 27-29. In turn, BLM asserts that Petitioners should have challenged BLM's adoption cash incentives years ago. This contention is unpersuasive for several reasons.

To begin with, the two prior pilot programs were not comparable to the AIP in duration or scope. The 2001 "Wyoming Wild Horse Pilot Project" was "limited to Wyoming" and "was hindered by a lack of upfront funding and a lack of interest." *Id.* at 9; *see also* BLM_00001. Hence, BLM never intended to implement that project permanently or nationwide, and the outcome of that project did not harm Petitioners' interests because there was "a lack of interest" and few adoptions (and thus even fewer, if any, horses entering the slaughter pipeline).

Similarly, BLM advertised the 2009 "pilot program" as limited to New Mexico for a duration of approximately "two years." BLM_000285-87. And BLM made clear that it would offer only $500 for adoption under that program (i.e., 50% of the AIP incentive). BLM_000307-12. Like the 2001 pilot project, the 2009 version was mostly unsuccessful in adopting horses and therefore did not result in many adoptions or a notable increase in horses entering the slaughter pipeline. *See* BLM_1480 (explaining in 2016 that "[o]ver the last 10 years, adoptions have steadily declined to a low of 2,135 animals in 2014 . . . . compared to 6,644 in FY 2004"). Accordingly, it would have been unreasonable for Petitioners to sue BLM in 2001 or 2009, at which point Petitioners neither knew that BLM would one day promulgate a nationwide AIP, nor yet understood the parameters of any such hypothetical program and how it might impair their interests in any concrete or specific way.[2]

Underscoring the fundamental differences between the time-limited, geographically restricted pilot projects and the permanent, nationwide AIP is the fact that BLM called the earlier actions *pilot* projects. *See, e.g.*, BLM_000007-16 (referring to the "Wyoming Wild Horse Pilot

---

[2] The extremely low rate of cash-incentivized adoptions prior to the 2019 AIP is highlighted by the fact that less than 200 horses annually were adopted through such means in FY2010-FY2017. *See* BLM_003971-72 (noting that only 1,575 horses "were incentivized" during this period). This slow trickle of incentivized horses was not enough for Petitioners to discern any meaningful increase in such horses entering the slaughter pipeline.

Project"); BLM_000285-87 (outlining the "Pilot Program Administered by the New Mexico State Office"). By definition, a "pilot" program serves as "a trial apparatus or operation." *Pilot*, MERRIAM-WEBSTER DICTIONARY (online ed. 2022). As merely "trial" projects, neither BLM nor the public knew, either in 2001 or in 2009, whether BLM would *ever* establish a permanent, let alone nationwide, cash incentive program for adoptions. Indeed, BLM itself clarified that it could undertake such action only *after* analyzing data from the pilot projects to determine whether and how to proceed. *See* BLM_000208 (noting that "[a] pilot project would enable us to generate hard data to gauge public support, identify kinks, [and] refine the concept"); BLM_000531 ("BLM plans to evaluate the analysis of the [2009 pilot] program . . . and determine whether or not . . . to continue it and whether or not it should be applied nationwide.").

Conspicuously, not only does BLM fail in its brief to accurately characterize the 2001 and 2009 efforts as pilot projects, but it also fails to cite a single case in which the APA's statute of limitations has barred a challenge to an agency-wide program due to the failure to challenge a prior small-scale pilot program. In fact, applicable precedent supports Petitioners' common-sense view that a pilot project is not the same as an agency's subsequent *discretionary* decision to create a nationwide program. For example, the Ninth Circuit dismissed a challenge to a pilot program report under the APA; although "it was the final step in completing the pilot program, clearing the way for [agency] permitting of Mexico-domiciled carriers," "the report did not change the legal situation, because the [agency] maintained discretion over whether or not to begin issuing permits to Mexico-domiciled carriers." *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 952 (9th Cir. 2017); *cf. La. Crawfish Prods. Ass'n-W. v. Rowan*, 463 F.3d 352, 355, 358 (5th Cir. 2006) (relieving an agency from NEPA analysis of future discretionary

projects because the lawsuit challenged only "a pilot project, and thus, future projects in the Atchafalaya Basin have yet to be developed").

The same is true here—nothing in the 2001 or 2009 pilots required BLM to establish a permanent, nationwide AIP. In 2019, BLM opted to create the AIP, but it could have declined to do so as well. Thus, had Petitioners sued in 2001 or 2009, their challenges could not have encompassed yet-to-be-taken actions within the agency's future discretion (e.g., the AIP).

### B.  Petitioners Have Standing

BLM also asserts that Petitioners cannot establish any of the elements of Article III standing to pursue this challenge. *See* ECF No. 50 at 14-18. These assertions are groundless.

### 1.  *Injury-in-fact*

In their declarations, Petitioners—nationally recognized wild horse advocacy organizations and individuals whose interests have been directly and adversely impaired by the AIP—set forth aesthetic, procedural, and organizational harms the AIP has caused them since 2019. Each type of injury independently establishes standing here.

As a threshold matter, BLM ignores the well-settled principle that "in reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, *and must therefore assume that on the merits the plaintiffs would be successful in their claims*." *Initiative & Reform Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006) (emphasis added) (quotation marks and citation omitted). Thus, the Court must assume for standing that BLM could not create or modify the AIP without notice-and-comment rulemaking or preparing an Environmental Impact Statement ("EIS") or Environmental Assessment ("EA"). Set in this proper context, it is clear that Petitioners have asserted cognizable injuries.

First, Petitioners have represented—subject to penalty of perjury—that the AIP resulted in a sharp increase of BLM-branded wild horses being subjected to neglect, abuse, and inhumane treatment by adopters prior to title transfer, and then being sold into the slaughter pipeline by adopters after title transfer. *See* Roy Decl. ¶¶10, 19-27; Staples Decl. ¶¶18-20, 22-28; Ray Decl. ¶¶11-15. Petitioners' (and the New York Times') detailed investigative efforts then confirmed that many of these BLM-branded horses were AIP horses. *See* BLM_003751-59; BLM_003800-03; BLM_003912-57; ECF No. 46-2. These facts were verified through BLM's *own* records obtained through the Freedom of Information Act ("FOIA") and Petitioners' first-hand observations of malnourished, injured animals in kill pens—horrific observations that inflicted severe psychological and emotional trauma to Petitioners and their members. *See* Roy Decl. ¶¶23 ("[S]taff and volunteers have suffered immense psychological stress, anxiety, and nightmares from having to observe these inhumanely treated, malnourished, and sick wild animals at slaughter auctions, kill pens, and after rescue."); Staples Decl. ¶20 (same); Ray Decl. ¶12 (same).

In a single paragraph, BLM dismisses these injuries as speculative because there are no "baseline numbers of titled horses" sold by adopters between the 2009 pilot "and the issuance of the 2019 IM," and because there is "no support whatsoever" that "these numbers are a significant increase from pre-2019 levels." ECF No. 50 at 17. But BLM ignores Petitioners' extensive first-hand observations verifying an exponential increase in wild horses entering the slaughter pipeline after BLM created the AIP, which tracks with the fact that the pre-2019 pilot programs did not significantly increase adoptions (and had little effect on the number of horses going to slaughter). *See supra* at 3. Put simply, the AIP changed the legal and practical regime governing wild horse adoptions (and entry into the slaughter pipeline) and injured Petitioners by paving the way for inhumanely treated animals to end up in kill pens requiring immediate (yet distressing)

rescue efforts by Petitioners to save them from certain death. *See Fund for Animals v. Lujan*, 962 F.2d 1391, 1396-97 (9th Cir. 1992) (finding that an organization's "members had standing to sue because of the psychological injury they suffered from viewing the killing of the bison" due to "[t]he distress experienced by [its] members viewing bison being killed is distinct from that suffered by the public at large"); *Aransas Proj. v. Shaw*, 775 F.3d 641, 648 (5th Cir. 2014) (expressing "little doubt" that an organization suffered cognizable injury by alleging deaths to birds and aesthetic injury to its members who observe and "enjoy them").[3]

Second, Petitioners have interests in BLM using "more humane means of managing these animals" in lieu of mass removals from the range, or at least taking steps to reduce the likelihood of "serious injuries and deaths associated with the use of helicopters to round up horses for removal from the range." Roy Decl. ¶7. But the logical outgrowth of the AIP—indeed its stated purpose—is to free up agency funding to remove *more* wild horses. *See* BLM_004921 (stating that the AIP will facilitate larger, more frequent removals by redirecting AIP savings to "on-range operations"). And, in fact, the AIP is doing just that. *See* BLM_005165 ("The AIP . . . helped [BLM] achieve a 15-year record for total placements [in 2019] of 7,104 animals. . . . That

---

[3] BLM's brief repeatedly characterizes Petitioners' verified claims of rampant AIP fraud and abuse leading to wild horses in the slaughter pipeline as "unsubstantiated." ECF No. 50 at 1; *see also id.* at 17. However, *all* of the information in the record on this point—including extensive investigatory reports from Petitioners, a detailed New York Times expose, and demands from Congress—unequivocally points to AIP horses repeatedly entering the slaughter pipeline. While BLM may prefer to wear blinders to inconvenient facts, the agency has neither conducted its own formal investigation, nor supplied any other record evidence proving that AIP horses are not, in fact, entering the slaughter pipeline. In the absence of any record evidence to the contrary, the Court must credit Petitioners' declarations—submitted under penalty of perjury—and their detailed investigatory report in the record verifying that AIP horses *are* entering the slaughter pipeline. *See, e.g.*, *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994) (noting that "the 'arbitrary or capricious' standard requires an agency's action to be supported by the facts in the record"; "[a]fter-the-fact rationalization by counsel in briefs or argument will not cure noncompliance by the agency with these principles").

amounts to over $170 million in lifetime savings generated during Fiscal Year 2019 alone, in large measure due to the AIP."). Indeed, BLM's website states that from FY2012-FY2019, the agency annually removed an average of 5,635 wild horses; after the AIP that number nearly *tripled* to 14,894 horses annually from FY2020-FY2022. *See* BLM, *Program Data: Removals*, https://www.blm.gov/programs/wild-horse-and-burro/about-the-program/program-data. Assuming, as the Court must for standing, that this major increase in wild horse removals required NEPA review, Petitioners plainly have standing for this reason too. *See, e.g.*, *Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174, (10th Cir. 2016) (holding that the American Wild Horse Campaign—a Petitioner here—may challenge a proposed BLM wild horse removal that would harm its interests under NEPA and the APA).

Third, it is beyond legitimate dispute that the procedural harms asserted by Petitioners— i.e., BLM's failure to engage in informed decisionmaking with notice and comment or subject to an EIS or EA—have increased the risk of wild horses entering the slaughter pipeline and induced larger wild horse removals, both implicating concerns "germane to [Petitioners'] interests." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 169 (2000). In addition, Petitioners' members submitted declarations documenting the harms to their aesthetic interests in observing wild horses free from inhumane treatment, neglect, malnourishment, or slaughter. The Tenth Circuit has held these harms sufficient to establish injury-in-fact in NEPA and APA cases. *See WildEarth Guardians v. BLM*, 870 F.3d 1222, 1231 (10th Cir. 2014) (holding that organizations had injury-in-fact to bring NEPA claims based on "declarations from individual members establishing harms to their personal aesthetic and recreational interests"); *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 451-52 (10th Cir. 1996) (affirming injury-in-fact in

NEPA case based on affidavits showing that an agency's "alleged uninformed decisionmaking" "has exposed [the plaintiffs'] interests to an increased risk of environmental harm").

Fourth, Petitioners have amply demonstrated another injury-in-fact by attesting that the AIP frustrates Petitioners' core missions, drains their resources through efforts to counteract the AIP's outcomes, and impairs their longstanding organizational priorities. *See* Roy Decl. ¶¶27-34; Staples Decl. ¶¶27-36; Ray Decl. ¶¶13-15. Importantly, BLM does *not* deny that Petitioners have spent hundreds of thousands of dollars beyond Petitioners' normal budgeting outlays to counteract the harms of the AIP since 2019, including through rescuing from slaughter, healing, training, feeding, finding homes, and transporting AIP horses; obtaining and compiling records from BLM through FOIA to better understand the AIP's outcomes; investigating the fate of AIP horses; and educating the public, Congress, and the media about the AIP and its outcomes.

The cursory defense set forth by BLM is that "'an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury.'" ECF No. 50 at 17 (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919-20 (D.C. Cir. 2015). But that is not what occurred here. BLM can point to *nothing* in Petitioners' declarations or the record indicating that Petitioners spent large portions (or any) of their organizational budgets prior to 2019 on adoption-related slaughter issues, nor is there any evidence that Petitioners engaged in investigatory activities merely to support litigation. Rather, this situation is functionally indistinguishable from another D.C. Circuit case—*PETA v. U.S. Department of Agriculture*, 797 F.3d 1087 (D.C. Cir. 2015). There, the court held that an animal welfare organization had standing where "the USDA's allegedly unlawful conduct *does* hamper and directly conflicts with PETA's stated mission of preventing cruelty and inhumane treatment of animals through, *inter alia,* public education and cruelty investigations," which forced the

organization to previously expend $10,000 in staff time and then $3,000 each year pending court relief. *Id.* at 1095-96.

If anything, organizational standing here is much clearer. Petitioners have expended *hundreds of thousands of dollars* specifically counteracting the AIP's harms through investigatory, public education, and outreach work—money that Petitioners diverted from other organizational priorities to the severe detriment of their core missions. "[P]recedent makes plain that, if an organization expends resources in response to, and to counteract, the effects of the defendants' alleged [unlawful conduct] rather than in anticipation of litigation, it has suffered a concrete and demonstrable injury that suffices for purposes of standing." *Id.* at 1097 (internal quotation marks and citations omitted); *see also Common Cause of Colo. v. Buescher*, 750 F. Supp. 2d 1259, 1269 (D. Colo. 2010) ("An organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." (quotation marks and citations omitted)).

Accordingly, Petitioners have established injury-in-fact to challenge the AIP.

### 2.      Causation and Redressability

The Court can easily dispense with BLM's single paragraph contesting Petitioners' establishment of causation and redressability. *See* ECF No. 50 at 18.

BLM asserts that the IMs creating and modifying the AIP are not essential for adoption cash incentives because BLM could incentivize adoption in the absence of the IMs. *Id.* But for standing purposes, the Court must assume that Petitioners will prevail on the merits—i.e., that the IMs required notice-and-comment procedures under the APA and an EIS or EA under NEPA. Likewise, despite BLM's attempt to recast Petitioners' injuries as caused by third parties (i.e., fraudulent adopters), *id.*, it is clear that the agency's uninformed creation of the AIP in

2019, which may well have taken a different course of action if subjected to the necessary legal procedures, increased the risk of more adoptions, a massive influx of wild horses in the slaughter pipeline, and substantially larger wild horse removals that all injure Petitioners' interests. *See Comm. to Save the Rio Hondo*, 102 F.3d at 452 (explaining that "to establish causation" under NEPA, "the plaintiff need only trace the risk of harm to the agency's alleged failure to follow [NEPA's] procedures"). Finally, BLM's contention that Petitioners' redressability is based on pure speculation of horses entering the slaughter pipeline once again overlooks the fact that all record evidence establishes that AIP horses *are* entering the slaughter pipeline in large numbers.[4]

In any event, in NEPA and APA cases, "'the normal standards for redressability' are relaxed; a plaintiff need not establish that the ultimate agency decision would change upon [NEPA] compliance." *Id.*, 102 F.3d at 452 (quoting *Defs. of Wildlife v. Lujan*, 504 U.S. 555, 572 n.7 (1992)). Because Petitioners represent that their injuries would be redressed by a court order vacating the AIP and requiring BLM to comply with the procedures set forth in NEPA and the APA, *see* Roy Decl. ¶35; Staples Decl. ¶¶31, 36; Ray Decl. ¶16, Circuit precedent compels the conclusion that Petitioners have standing. *See, e.g.*, *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1265-66 (10th Cir. 2002) ("The alleged injury is the potential environmental impact of an uninformed decision to" proceed with an action. "This injury is redressable by a court order requiring the [agency] to undertake an NEPA . . . analysis in order to better inform itself of the consequences of its decision.").

---

[4] Where a plaintiff's "alleged injury flows not directly from the challenged agency action, but rather from independent actions of third parties," a plaintiff need establish "only a showing that the agency action is at least a substantial factor motivating the third parties' actions." *Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001). Obviously, for an adopter that is motivated to adopt a wild horse solely for financial gain, "the agency action" of offering a cash incentive for adoption "is at least a substantial factor motivating the third parties' actions" of adopting and later disposing of that horse in a completely foreseeable manner.

### C.     The AIP is Final Agency Action Subject to Judicial Review

BLM also asserts that the AIP is not final agency action. *See* ECF No. 50 at 19-20. This fares no better than its other contentions.

There are several reasons why BLM's creation and modification of the AIP constitute final agency action. First, the IMs, which "outline[] policies and procedures for administering the [AIP]," BLM_004919, "mark[] the consummation of [BLM's] decision-making process" with regard to the first-ever permanent, nationwide AIP and are not "merely tentative or interlocutory." *Bennett v. Spear*, 520 U.S. 154, 177 (1997). Under comparable facts where BLM has issued IMs stating that they are "effective *immediately*" and directing them to "*[a]ll* [BLM] Field Office Officials," BLM_004921 (emphases added), courts have found that those IMs are not "provisional guidance" and instead are final agency actions. *See W. Watersheds Proj.*, 441 F. Supp. 3d 1042, 1062 (D. Idaho 2020); *see also Chiang v. Kempthorne*, 503 F. Supp. 2d 343, 350 (D.D.C. 2007) (finding that an action "easily satisfy[ied] the first prong of the final action test" because it was "*effective immediately*"). Importantly, BLM does *not* contest this prong of the final agency action test under *Bennett*. *See* ECF No. 50 at 19-20.

Second, by establishing the first-ever permanent, nationwide cash incentive adoption program, these IMs determined "rights or obligations," and had "legal consequences." *See Bennett*, 520 U.S. at 177–78. *See* ECF No. 46 at 23-24. In contrast to the first *Bennett* prong, BLM contests the second prong on the basis that "because the practice of offering cash incentives had been in place since at least 2009," the agency's "issuance of the IMs created neither a new right for individuals to obtain federal funding associated with the adoption of a wild horse or burro, nor a new obligation for BLM to issue payments of federal funding to adopters of wild horses." ECF No. 50 at 20 (citation omitted).

12

However, as explained, *see supra* at 2-5, BLM conflates the time-limited pilot projects in Wyoming and New Mexico with the subsequent, entirely separate action challenged here—i.e., BLM's decision, for the first time ever, to create a permanent, nationwide AIP through IM 2019-025. In that light, there can be no dispute that the IMs satisfy *Bennett's* second prong. Before the IMs, there was no nationwide program conferring any right to federal cash incentives for adoptions of wild horses; after the IMs, *every* eligible adopter has the right to obtain a $1000 cash incentive (of which BLM must notify the adopter at the time of adoption). *See* BLM_004920-21 (stating that "[a]t the time of adoption, authorized BLM personnel should ask the adopter if they intend to participate in the AIP"; if so, the agency "should issue incentive payments via electronic funds transfer (EFT) within 60 days of receipt of all completed paperwork"). And under the IMs, the determination of an adopter's ineligibility affords the adopter due process rights that have no purpose or legal import aside from the AIP. *See* BLM_004927 (conferring due process rights when BLM determines "[y]ou are no longer eligible to participate in the AIP," but limiting those rights to the adopter's "ineligibility to participate *in the AIP*" rather than wild horse adoptions or cash incentives writ large (emphasis added)).[5]

BLM's brief also highlights yet another reason that legal consequences flow from the IMs. As it acknowledges, BLM concluded that IM 2022-14 triggered NEPA review, although in the agency's view BLM complied with NEPA by invoking a categorical exclusion ("CE") and determining that BLM need not prepare an EIS or EA. *See* ECF No. 50 at 34 (defending BLM's reliance on a CE and stating that "CEs are a form of NEPA compliance" (citation omitted)). That BLM itself affirmed the applicability of NEPA to IM 2022-014 demonstrates, under *Bennett*, that

---

[5] Whether or not the 2001 pilot project in Wyoming and the 2009 pilot program in New Mexico were reviewable final agency actions in their own right is legally irrelevant and practically distinct from the separate final action BLM took in issuing IM 2019-025.

the IMs have legal consequences. *See S. Utah Wilderness All. v. BLM*, 551 F. Supp. 3d 1226, 1229 (D. Utah 2021) (holding that "[l]egal consequences of a[] . . . decision also appear to flow to BLM *because it triggers BLM's duties to prepare NEPA . . . analyses*" (emphasis added)).

Even if the IMs were not final agency action—and they plainly are—BLM's decision *not* to prepare an EIS or EA, and instead to invoke a CE for IM 2022-14, is indisputably final agency action. *See Cure Land, LLC v. U.S. Dep't of Agric.*, 833 F.3d 1223, 1230-32 (10th Cir. 2016) (holding that the decision not to prepare an EIS satisfies the *Bennett* test because it "determines the parties' respective 'rights and obligations,' and is an action from which legal consequences flow"); *Wilderness Soc'y v. Wisely*, 524 F. Supp. 2d 1285, 1299 (D. Colo. 2007) (Krieger, J.) (finding decision not to prepare EIS both final and of legal consequence); *Friedman Bros. Inv. Co. v. Lewis*, 676 F.2d 1317, 1319-20 (9th Cir. 1982) (concluding that CE is reviewable final action even though the agency had not yet "made a final commitment to fund construction," because in the CE "the agency has spoken its last word on the project's environmental impact").

Accordingly, the IMs and their accompanying CE constitute final agency actions subject to judicial review.

## II.     THE AIP IS ARBITARY, CAPRICIOUS, AND CONTRARY TO LAW

Stripped of its jurisdictional arguments, BLM is left with little of substance to defend the merits of BLM's IMs and CE.

### A.     The AIP Violated the APA

Petitioners previously explained that BLM's creation of a permanent, nationwide program governing cash-incentivized adoptions of federally protected wild horses violated the APA by failing the requirement to subject agency programs and policies to notice-and-comment procedures. *See* ECF No. 46 at 24-28. Petitioners pointed to analogous examples in which court

have found IMs or similar decisions "legislative rules" subject to the APA's requirements. *Id.* In response, BLM acknowledges that it did not conduct any public APA process in issuing these IMs, but asserts that the APA does not apply because the IMs are not legislative rules and are instead non-binding policy. *See* ECF No. 50 at 20-27. This assertion does not pass muster.

At the outset, much of BLM's argument rehashes its unpersuasive contention that the IMs are not final agency action because they do not create any rights or obligations. *See id.* Because Petitioners have already rebutted BLM's erroneous position regarding rights and obligations in the final agency action context, we do not repeat that discussion here. *See supra* at 12-14.

Moreover, it is instructive that the only case cited by BLM that is remotely similar to this matter is *Friends of Animals v. Pendley*, 523 F. Supp. 3d 39 (D.D.C. 2021). There, the court found that a BLM-issued IM was not a legislative rule. *Id.* However, there are multiple facts that easily distinguish that case from the AIP. For instance, unlike BLM's creation of a permanent, nationwide self-titled "*program*" that BLM created through IM 2019-025 establishing the AIP, the IM in *Pendley* merely updated agency guidance outlining the minimum amount of time BLM field offices should consider allowing between wild horse removal decisions and the start of removals (reducing its recommendation from 31 days to 14 days). *Id.* at 49. But as the court correctly explained, that IM did not (and could not) create any new rights or obligations, because the statute and BLM's implementing regulations already authorized BLM to remove horses without *any* pre-removal period—i.e., immediately after a decision. *See id.* at 54 (explaining that the Wild Horse Act requires BLM to "immediately" remove excess horses from the range, and BLM's regulations state that "decisions to remove wild horses . . . shall be effective upon issuance"). Thus, the court found that the challenged IM "does not alter an existing legal right or obligation flowing from a statute or regulation." *Id.* at 55.

In sharp contrast, the AIP both created rights and obligations that did not exist prior to IM 2019-025 under statute or regulation, *see supra* at 12-14, *and* effectively amended BLM's regulations by reversing the wild horse adoption payment structure from adopters paying BLM to directly fund BLM's activities, to the opposite approach of BLM paying adopters to indirectly fund BLM's activities. *Compare* 43 C.F.R. § 4700.0-6(f) ("Fees shall normally be required from qualified individuals adopting excess wild horses and burros to defray part of the costs of the adoption program."), *with* ECF No. 50 at 23 (conceding that AIP cash incentives are "intended to help defray costs [incurred *by adopters*] associated with first-year care and feeding"). In these ways, the IMs establishing the AIP are the *mirror image* of the IM that the *Pendley* court concluded is not a legislative rule subject to notice-and-comment procedures under the APA.

Likewise, in contrast to the AIP, the IM in *Pendley* did not require anything at all of BLM employees with respect to the duration of time required between a removal decision and the removal itself. Indeed, while stating that BLM would "strive" to allow "a minimum of 14 days" between a decision and removing horses, the IM supplied unbridled discretion to BLM field offices to deviate from the 14-day-minimum guidance, including where there are "emergency situation[s] or other relevant management considerations." *Id.* at 53; *See also* BLM, Permanent IM 2019-004 (Mar. 15, 2019) ("PIM 2019-004"), https://www.blm.gov/policy/pim-2019-004. Highlighting BLM's nearly limitless discretion to rely on *any* "relevant management considerations" to depart from the IM's timing recommendation, the IM created a wholesale exception to the recommendation by stating that field offices "should issue removal decision effective upon issuance" where the removal is necessary "to preserve or maintain a thriving natural ecological balance." *Id.* This, of course, encompasses nearly *every* wild horse removal authorized by the Wild Horse Act and undertaken by BLM. *See* 16 U.S.C. § 1333(b)(2). Thus,

unlike the AIP that compels BLM officials for the first time ever to notify adopters at the time of adoption of their unqualified right to participate in the AIP if they meet the program's eligibility criteria, *see* BLM_004920-21, the *Pendley* IM did not do anything but parrot the existing statutory framework and state BLM's intention to "strive" to provide 14 days between decisions and removals, while giving field offices abundant latitude to deviate from that timeline.

Finally, the *Pendley* IM did not confer any appeal rights if a BLM field office deviates from the 14-day recommendation. *See* PIM 2019-004. Here, however, BLM expressly afforded AIP-specific appeal rights to contest *any* determination that an adopter does not satisfy the agency's eligibility criteria set forth in the AIP. *See* BLM_004927. Of course, there can only be due process if an entity has a legal right in the first instance. *Cf. East v. Clayton Cnty.*, 436 F. App'x 904, 913 (11th Cir. 2011) (noting that if a party "did not have a legal right to these procedures . . . he had no due process rights to those procedures in the first place"). Although BLM attempts to cast this new appeal right as merely an existing due process framework, *see* ECF No. 50 at 23, the problem is that, for the first time, IM 2019-025 expressly applied the agency's appeal framework *to BLM's nationwide AIP* and such a right, by definition, could not and did not exist before the IM. Indeed, BLM's regulations makes clear that the AIP appeal right conferred in the IMs, *see* BLM_004927, safeguards an adopter's "legally cognizable interest" in AIP eligibility and payment—i.e., this is a required element for *every* BLM due process claim, including those determinations the AIP subjects to due process. 43 C.F.R. § 4.410(d).[6]

---

[6] In *Pendley*, the plaintiffs also challenged a different aspect of PIM 2019-004, which recommended that BLM field offices consider multi-year gather plans for wild horses to reduce administrative burdens. Although the plaintiffs feared this could lead to future removals without site-specific NEPA review, the court correctly noted that the IM "does not directly address, let alone alter, BLM's continuing obligations to complete the relevant NEPA documents before a gather decision and to submit them for public comment." *Pendley*, 523 F. Supp. 3d at 55.

In sum, the court correctly ruled that the IM in *Pendley* is not a legislative rule, and its reasoning also emphasizes precisely why the IMs here *are* legislative rules. *See* ECF No. 46 at 24-28. Moreover, *Pendley* provides the perfect contrast to a different BLM IM that a court held to be a legislative rule, which is indistinguishable in relevant ways from the AIP IMs. *See W. Watersheds Proj. v. Zinke*, 441 F. Supp. 3d 1042 (D. Idaho 2020).

The IM in *Zinke* was "effective immediately"; "had an immediate and practical impact" on members of the public; conferred "a right to appeal" any protest denied by BLM pursuant to the IM; and "does not clarify existing policy as much as it creates it." *Id.* at 1067-68; *see also* BLM, IM 2018-034, https://www.blm.gov/policy/im-2018-034 (conferring a "right to appeal to the Interior Board of Land Appeals" any "decision to deny or dismiss a protest"). The AIP IMs have these same hallmarks. Specifically, the AIP IMs were "effective immediately"; had an immediate and practical impact that conferred a federal benefit on the public and saw a dramatic increase in wild horse adoptions; provided appeal rights for adverse determinations under the IM; and established a permanent, nationwide cash incentive adoption program and thus created a new agency-wide policy rather than clarifying it. In every pertinent respect, the challenged IMs are indistinguishable from the IM deemed a legislative rule in *Zinke*.[7]

---

[7] BLM highlights the IMs' use of "should" rather than "shall" in certain instances, implying that BLM staff retains the "discretion" to "provide a cash incentive to adoption participants." ECF No. 50 at 26. But the IMs themselves contain no such latitude. Rather, adopters must be notified of the ability to participate in the AIP "at the time of adoption," and the IMs suggest that the *only* basis for withholding cash incentives is if an adopter is determined ineligible for failing to satisfy the criteria set forth in the AIP. BLM_004919-21; BLM_004927. Thus, despite artful drafting of the IMs, the practical effect makes clear that BLM staff may not withhold AIP payments from *eligible* adopters who meet all the criteria. *See, e.g.*, *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) ("If an agency acts as if a document issued at headquarters is controlling in the field . . . then [it] is for all practical purposes 'binding'").

Accordingly, for the rationales set forth in *Zinke*, IM 2019-025 and IM 2022-014 are legislative rules subject to the APA's requirements. Hence, because "the APA requires an agency to use notice-and-comment procedures to make any 'rule,'" *Zinke*, 441 F. Supp. 3d at 1067 (quoting 5 U.S.C. § 553(b)-(c)), the challenged IMs should have been issued only after formal "notice-and-comment procedures" under the APA. *Id.* Because they were not, the Court should vacate the IMs pending legal compliance through notice-and-comment rulemaking.

### B.    The AIP Violates NEPA

Petitioners previously explained why the first-ever permanent, nationwide cash incentive program for adoption of federally protected wild horses not only triggered NEPA review, but required an EIS or an EA due to the highly significant impacts of this new program, including the entry of many protected animals into the slaughter pipeline and the consequent removals of wild horses of increasing frequency and size (with myriad effects to wild horses and other range resources). *See* ECF No.  46 at 29-41. In response, BLM makes two unavailing arguments: (1) the AIP was not a new policy or program and thus was not subject to NEPA, and (2) if NEPA applies, BLM properly applied a CE and determined there are no extraordinary circumstances warranting preparation of an EIS or EA. *See* ECF No. 50 at 29-36.

#### 1.    *The AIP Is a New Nationwide Program*

With respect to the former contention, BLM's position is puzzling because it *did* invoke and rely upon a CE when issuing IM 2022-014, albeit only after Petitioners sued the agency for not conducting *any* NEPA review in connection with its creation of the AIP with IM 2019-025. On the one hand, BLM implies that the AIP was not "sea-change or even a new policy" so NEPA does not apply, *id.* at 30; on the other, BLM makes clear its view that its reliance on a CE

satisfied the agency's NEPA obligations. *See id.* at 34 (defending BLM's reliance on a CE and stating that "CEs are a form of NEPA compliance" (citation omitted)).

In any event, BLM's position that the AIP was not a new program for NEPA purposes— and is part of a long-running cash-incentivized adoption program—is based on a fundamental misunderstanding of the differences between pilot projects and the permanent, nationwide AIP. *See supra* at 2-5. Regardless, because BLM subjected the AIP to NEPA review, the *only* question the Court must decide is whether BLM complied with NEPA by invoking a CE.

### 2.    *BLM Invoked a CE that Does Not Apply to the AIP*

As to BLM's other argument, the agency is severely mistaken that it can avoid an EIS or EA here. The specific CE applied to the AIP is inapplicable to the facts; there is nothing "purely administrative" about the creation of a major new nationwide program that foreseeably results in many federally protected animals entering the slaughter pipeline *and* in nearly tripling the number of wild horses removed from the range. *See supra* at 7-8. Yet, once again, BLM refuses to come to grips with the fact the AIP is a completely different regulatory regime—applied for the first time ever on a permanent, nationwide basis—that is distinct from prior pilot projects. *See* ECF No. 50 at 31 (asserting the AIP was purely administrative because cash incentives "existed since at least 2009"). Agencies may not conflate these types of distinct actions under NEPA. *See Rowan*, 463 F.3d at 355, 358 (distinguishing for NEPA purposes pilot projects and subsequent, discretionary actions).

The notion that the AIP is "purely administrative" is even more irrational because BLM applied this CE *after* receiving three years of data proving that AIP horses routinely enter the slaughter pipeline and that the AIP facilitates more frequent and larger wild horse removals. Although the use of this CE would have been highly suspect in 2019 given the AIP's foreseeable

outcomes, it was especially flagrant in 2022 when BLM knew the AIP was causing significant effects to wild horses and range resources. Thus, BLM's application of the CE fails on its face. *See Pub. Emps. for Envtl. Resp. v. Nat'l Park Serv.* ("*PEER*"), No. 19-cv-3629, 2022 WL 1657013, at *19 (D.D.C. May 24, 2022) (rejecting CE because "any characterization of the Directive as purely 'administrative, financial, legal, technical, or procedural' strains credulity"); *Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 825 (10th Cir. 2008) (rejecting CE for road repair and maintenance where agency proposed adding chemical road salt to roads); *Wilderness Watch v. Mainella*, 375 F.3d 1075, 1095 (11th Cir. 2004) (rejecting CE for "routine and continuing government business" because "[o]btaining a large van to accommodate fifteen tourists hardly appears to be a 'routine and continuing' form of administration").

BLM also has no persuasive response to the second essential element of the CE, which requires that it can be applied only where "environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case." 43 C.F.R. § 46.210(i). BLM does not (and cannot) explain why, in 2022, it was conjectural that AIP-adopted horses would enter the slaughter pipeline, when BLM had detailed investigatory reports and other evidence demonstrating that fact since 2019. Nor does BLM justify why—at a programmatic, nationwide level—the agency could not, in 2022, analyze the impacts that would result from wild horse removals of greater frequency and scope facilitated by AIP funding, as had occurred for several successive years.

Rather than conducting that *broader* analysis of this new nationwide program as required by NEPA, BLM instead focuses on the logistics related to single removals from "individual herd management areas," ECF No. 50 at 32-33. This apples-to-oranges comparison of programmatic NEPA review and site-specific NEPA review undermines BLM's application of this CE. *See*

21

*PEER*, 2022 WL 1657013, at *20 (rejecting assertion that "[a]ddressing potential environmental and social impacts are most meaningful at the park level" because it "mistakenly treats park-level analysis and national-level analysis as an either/or proposition"); *id.* ("[T]he entire purpose of tiering in NEPA analysis is to make *both* levels of review meaningful by 'incorporat[ing] by reference the general discussions of prior, broader [EISs]' on 'site-specific environmental analyses.'" (quoting *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 512 (D.C. Cir. 2010)); *cf. Kleppe v. Sierra Club*, 427 U.S. 390, 400-01 (1976) (contrasting a "new national coal-leasing program" requiring a programmatic EIS due to "significant environmental consequences" with smaller regional proposals). Thus, the CE doubly fails.[8]

Moreover, the amicus brief's view that "the future impacts of hypothetical actions an agency might take with resources saved by a challenged decision are inherently indirect and speculative" because they could be used on any number of agency efforts, ECF No. 54 at 9, is undercut by the brief's concession that, in fact, "an increase in removals [since 2019] . . . has caused the on-range population to decrease in consecutive years for the first time since 2007." *Id.* at 7. The fact that there might be better, horse-protective alternative uses of these funds also highlights why BLM must subject to NEPA review *all* available options for using the newly available AIP funds. Indeed, the Supreme Court already concluded that budgetary decisions with environmental impacts require preparation of an EIS. *See Andrus v. Sierra Club*, 442 U.S. 347 (1979) (holding that an "EIS must be prepared if any of the revisions the [agency] proposes in its ongoing programs in response to OMB's budget cuts would significantly affect the quality of the

---

[8] For this reason, BLM's assertion that there will be later *site-specific* NEPA review—even if true—does not cure the agency's failure to conduct a *programmatic* EIS or EA for the nationwide AIP now. *See* ECF No. 50 at 34.

human environment," but noting that requiring the agency "include a[] [separate] EIS with its revised appropriation request would merely be redundant").

### 3. *Extraordinary Circumstances Preclude Use of a CE*

The Court need not even consider government counsel's post hoc rationalizations in invalidating BLM's failure to analyze the existence of extraordinary circumstances, *see* ECF No. 50 at 35-36, because the agency failed to document that evaluation in the record. BLM_004916 (asserting only that "[t]he proposed action has been reviewed with the list of extraordinary circumstances" and "none of these circumstances apply"). "Stating that a factor was considered, however, is not a substitute for considering it." *Getty v. Fed. Sav. & Loan. Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). Accordingly, because "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself," there is no basis here for upholding BLM's determination regarding extraordinary circumstances. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983).

If the Court considers counsel's assertions, they do not cure BLM's NEPA failures. Yet again, counsel conflates the prior pilot projects resulting in nominal effects with the new permanent, nationwide AIP resulting in major, widescale effects. *See* ECF No. 50 at 36. By "not only fail[ing] to address" the relevant effects of the action but "den[ying] its very existence," BLM took a "head-in-the-sand approach . . . [that] is the antithesis of NEPA's requirement that an agency's environmental analysis candidly confront the relevant environmental concerns." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 931 (D.C. Cir. 2017).

Accordingly, BLM's creation of a new nationwide program with highly significant effects on wild horses and range resources required an EIS or at least an EA.

### C.      The AIP Is Arbitrary and Capricious

Compounding its notice-and-comment and NEPA violations, BLM created and modified the AIP without considering relevant factors including: (1) whether the AIP would violate the Congressional prohibition against BLM funds being used in a manner that results in slaughter of wild horses; (2) whether cash-incentivized adopters will treat horses humanely as required by the Wild Horse Act; and (3) and whether limiting the AIP to untrained horses increases the likelihood of horses being slaughtered. *See* ECF No. 46 at 42-45. BLM's responses—which failed even to address the second and third relevant factors—cannot pass muster.

BLM insists the AIP does not violate the Congressional prohibition against BLM selling wild horses for slaughter because the agency washes its hands of this problem once it transfers title to adopters; in other words, BLM *adopts* these horses that enter the slaughter pipeline, but BLM does not itself *sell* them. *See* ECF No. 50 at 36-38, 42. Although a clever attempt to bypass Congress's intent, this is plainly not consistent with federal law. By creating a program that foreseeably (and, in 2022, knowingly) results in adopters obtaining wild horses from BLM and selling them for slaughter in a manner BLM itself cannot lawfully do, BLM acted arbitrarily and capriciously and failed to consider relevant factors before issuing the challenged IMs.

Likewise, BLM ignores the salient fact that Congress limited the agency's use of appropriated funds for two separate actions: (1) "the destruction of any healthy, unadopted, and wild horse or burro under the jurisdiction of the Secretary" (i.e., BLM); and (2) "the sale of a wild horse or burro that results in the destruction of the wild horse or burro for processing into a commercial product." Pub. L. No. 116-94, 133 Stat. 2534, 2747 (2019). Whereas Congress expressly restricted the first limitation to wild horses still "under the jurisdiction of the Secretary"—i.e., horses that BLM has yet to title to third parties—Congress did *not* similarly

restrict the second limitation to those horses that remain in BLM's care. *Id.* This is an important

distinction; because Congress did not restrict the second limitation on BLM's use of appropriated

funds to pre-titled wild horses, BLM necessarily is foreclosed under federal law from spending

*any* appropriated funds (through the AIP or otherwise) that foreseeably leads to *anyone* engaging

in "the sale of a wild horse or burro that results in the destruction of the wild horse or burro for

processing into a commercial product." *Id.* Because that is precisely the outcome of the AIP,

BLM acted arbitrarily and capriciously in creating this program without considering its

conformance with the statutory prohibitions Congress has placed on BLM's use of funds.

BLM also mistakenly points to a "decision" or "finding" the agency made in purportedly

considering "whether the adoption incentive would motivate adopters to adopt animals and then

sell them for profit." ECF No. 50 at 41; *see also id. at* 12, 16. But this fails for several reasons.

First, this was not a formal decision; it was a self-serving letter responding to Senator Feinstein's

grave concerns about the AIP. *See* BLM_004563-64. Second, BLM sent this letter *in 2021*, post-

dating BLM's decision to create the AIP by more than two years, highlighting that BLM did not

meet its legal obligation to consider relevant factors in 2019 when creating the AIP. Third, when

given the chance in 2022—at the time BLM modified the AIP through IM 2022-014—BLM

neither made any formal decision, let alone conducted any underlying analysis in the record,

concluding that "the required investment to feed and care for a horse or burro for 12 months []

serves as a strong disincentive to adopt animals with an eye toward turning them for profit, even

with the $1,000 incentive payment" because "it can typically cost several thousand dollars per

year to provide good feed and care for a horse." BLM_004564. Indeed, as explained herein,

BLM *knew* in 2022, on the basis of extensive record evidence, that adopters were, in fact,

adopting horses for profit, failing to adequately feed and care for them, and then selling them

into the slaughter pipeline. In short, BLM neither made any formal finding that adopters would not utilize the AIP solely for profit nor supported (or could support) that proposition.

Accordingly, for this reason and those previously explained, BLM failed to consider relevant factors in creating and modifying the AIP, and thus violated the APA. *See State Farm*, 463 U.S. at 43 ("Normally, an agency [action] would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider.")

## III.    VACATUR IS THE PROPER REMEDY

Petitioners requested that the Court apply the APA's statutory mandate to "set aside" arbitrary, capricious, and unlawful agency action by vacating the IMs and CE. 5 U.S.C. § 706(2). BLM insists that the Court should instead remand those decisions without vacatur. *See* ECF No. 50 at 43-44. However, its one-paragraph justification, *id.* at 44, does not remotely satisfy its formidable burden to obtain this extraordinary equitable remedy. *See, e.g.*, *Rocky Mountain Wild v. Dallas*, No. 19-cv-1512, 2022 WL 11733139 (D. Colo. Oct. 20, 2022) (Arguello, J.) ("[T]he party seeking to avoid vacatur of agency action bears the burden of showing entitlement to such extraordinary relief by presenting extraordinary facts that would support an exception.").

BLM contends that it can attempt to cure its errors on remand by subjecting the AIP to notice-and-comment procedures and NEPA review, and thus vacatur is not warranted. *See* ECF No. 50 at 44. But that is true *every* NEPA case; yet, "[t]he typical remedy for . . . [a] violation of NEPA is remand to the district court with instructions to vacate the agency action." *High Cty. Conservation Advocs. v. U.S. Forest Serv.*, 951 F.3d 1217, 1228 (10th Cir. 2020).

BLM also asserts that vacatur would be "disruptive" because "BLM officials would lack consistent guidance on how to uniformly apply adoption incentives nationally." ECF No. 50 at 44. This assertion is overblown; there was no nationwide program governing cash-based

adoptions from 1971 to 2019 and BLM managed without major disruption. *See Or.-Cal. Trails Ass'n v. Walsh*, 467 F. Supp. 3d 1007, 1074 (D. Colo. 2020) (Martinez, J.) (vacating action where entities "have thus far managed to continue their operations without serious disruption").

Further, any nominal disruption to the agency's adoption program while it comes into legal compliance cannot outweigh the fact that remand without vacatur will send many more federally protected horses to horrific death by slaughter while BLM conducts its APA and NEPA processes. Accordingly, vacatur is the appropriate outcome.

## CONCLUSION

Petitioners respectfully request that the Court vacate the IMs and CE, and remand those decisions to BLM for further consideration.

Respectfully submitted,

*/s/ William S. Eubanks II*
William S. Eubanks II
bill@eubankslegal.com

Elizabeth L. Lewis
lizzie@eubankslegal.com

EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(970) 703-6060

*Counsel for Petitioners*