**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 21-cv-2146-WJM

AMERICAN WILD HORSE CAMPAIGN, *et al.*,

    Petitioners,

v.

DOUG BURGUM, *et al.*,[1]

    Respondents.

---

**ORDER VACATING AGENCY ACTION AND REMANDING WITH
DIRECTIONS TO CONDUCT APA AND NEPA PROCEDURES**

---

Petitioners American Wild Horse Campaign ("AWHC"), Skydog Ranch & Sanctuary, Clare Staples, Evanescent Mustang Rescue & Sanctuary, Inc., and Carol Walker (collectively, "Petitioners") sue Respondents Doug Burgum, the Secretary of the Department of the Interior, and the United States Bureau of Land Management ("the BLM") (collectively, "Respondents"),[2] seeking to vacate two BLM actions that result in the removal of wild horses and burros from public lands.  Specifically, Petitioners challenge Instruction Memorandum 2019-025 (the "2019 IM") and Instruction Memorandum 2022-014 (the "2022 IM") (jointly, "the IMs"), which outline policies and procedures for administering the Adoption Incentive Program ("AIP").  Pursuant to the

---

[1]  The Court substitutes Secretary of the Interior, Doug Burgum, for Debra Haaland pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2] The Property and Environment Research Center, a nonprofit organization "dedicated to advancing conservation through markets, incentives, property rights, and partnerships," submitted an amicus brief in support of Respondents.  (ECF No. 54 at 4.)

AIP, the BLM pays qualifying members of the public a cash incentive to adopt federally protected wild horses and burros.  Petitioners contend that the IMs violate the Wild Free-Roaming Horses and Burros Act ("the Act"), 16 U.S.C. §§ 1331–1340, because they result in the slaughter of these protected animals by third parties.  Petitioners further contend that the IMs violate the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*., and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4231 *et seq*.

The Court agrees with Petitioners that the 2022 IM violates the APA and NEPA.  Consequently, the Court vacates the 2022 IM[3] and remands to the BLM with directions to conduct APA notice and comment and NEPA procedures.

## I. BACKGROUND

## A.    STATUTORY BACKGROUND

The Court begins by laying out the pertinent portions of the Act, which serve as the statutory backdrop of this case.  The Tenth Circuit has described the genesis and purpose of the Act as follows:

> Wild horses and burros are the progeny of animals introduced to North America by early Spanish explorers. They once roamed the western rangelands in vast herds. But over time, desirable grazing land was fenced off for private use, while the animals were slaughtered for sport and profit.  The herds began to dwindle, and the remaining animals were driven to marginal, inhospitable grazing areas. Alarmed at the decline of these herds, Congress in 1971 enacted [the Act] to protect the wild horses and burros from 'capture, branding, harassment, or death.'  16 U.S.C. § 1331 (1982).  According to congressional findings, these 'living

---

[3] As explained below, the 2022 IM supersedes the 2019 IM, so the Court's remedy does not disturb the 2019 IM because it is already without legal effect.  To the extent vacatur of the 2022 IM would revive the 2019 IM, however, the Court makes clear that the 2019 is invalid for the same reasons as the 2022 IM.

> symbols of the historic and pioneer spirit of the West' had
> been cruelly slain, used for target practice, and harassed for
> sport.  S. Rep. No. 242, 92d Cong., 1st Sess., reprinted in
> 1971 U. S. Code Cong. & Ad. News 2149, 2149.  Congress
> also found that the wild horses and burros had been
> exploited by commercial hunters who sold them to
> slaughterhouses for the production of pet food and fertilizer.
> *Id*.; *see also Johnston, The Fight to Save a Memory*, 50
> Texas L. Rev. 1055, 1056–57 (1972).
>
> Established under authority granted Congress by the
> Property Clause of the Constitution, the Act declares wild
> horses and burros to be an 'integral part of the natural
> system of the public lands,' 16 U.S.C. § 1331 (1982), and
> mandates that the animals be managed 'as components of
> the public lands.'  16 U.S.C. § 1333(a).

*Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174, 1178 (10th Cir. 2016)

(quoting *Mountain States Legal Found. v. Hodel*, 799 F.2d 1423, 1425 (10th Cir. 1986)).

The Circuit has further described the Act as "nothing more than a land-use regulation

enacted by Congress to ensure the survival of a particular species of wildlife."  *Hodel*,

799 F.2d at 1428.

By 1978, however, wild horse populations had rebounded significantly, so "action

[was] needed to prevent a successful program from exceeding its goals and causing

animal habitat destruction."  *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1316

(D.C. Cir. 1982) (quoting H.R. Rep. No. 95-1122, 95th Cong., 2d Sess. 23 (1978)); *see

also Wyoming v. United States Dep't of Interior*, 839 F.3d 938, 940 (10th Cir. 2016)

("The Act proved to be effective at remedying the decline of wild horse herds.  Indeed,

the Act proved almost too effective, as excess numbers of wild horses began to pose a

threat to habitat conditions.").  To address these competing concerns, Congress

amended the Act and imbued the BLM with authority and discretion to manage

excessive wild horse and burro populations.  *See Wyoming*, 839 F.3d at 940 ("Congress

therefore found 'certain amendments are necessary [to the Wild Horse Act] to avoid excessive costs in the administration of the Act, and to facilitate the humane adoption or disposal of excess wild free-roaming horses . . . .'") (citation omitted); *see also Am. Wild Horse Campaign v. Stone-Manning*, 2024 WL 3872558, at *1 (D. Wyo. Aug. 14, 2024) ("[T]he [Act] provides BLM with a high degree of discretionary authority to manage horses.").

"The main thrust of the 1978 amendments is to cut back on the protection the Act affords wild horses, and to reemphasize other uses of the natural resources wild horses consume." *Id.* at 1317. The amendments declare that an "excess" of wild horses exists if the horses "must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." *Id.* The amendments also "made it clear that Congress expected prompt administrative action to deal with wild horse overpopulations that had developed in the period 1971–78." *Id.* Congress determined that "action is needed to prevent a successful program from exceeding its goals." H. R. Rep. No. 95–1122, 95th Cong., 2d Sess. 23 (1978). To that end, section 1333(b)(2) dictates that excess wild horses "shall" be removed "immediately." *Id.*

The Act designates the BLM to oversee the management of wild horses and burros on public lands. *Id.* The BLM manages wild horses on public lands within what it calls designated herd management areas. 43 C.F.R. § 4710.3-1. Such areas and their boundaries are established by the BLM in Resource Management Plans. *Id.* These plans are prepared through a land-use planning process conducted pursuant to the Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701–1787. To

comply with the Act's directive to manage wild horses "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands," 16 U.S.C. § 1333(a), the BLM maintains a current inventory of wild horses in each herd management area; determines the appropriate management level of wild horses that each herd management area can sustain; and determines the method of achieving the designated appropriate management level.  § 1333(b)(1); 43 C.F.R. §§ 4710.2, 4710.3-1.

Section 3 of the Act requires the BLM, in pertinent part, to "maintain a current inventory of wild free-roaming horses and burros on given areas of the public lands" in order to "make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals," as well as to "determine whether appropriate management levels should be achieved by the removal or destruction of excess animals."  § 1333(b)(1).  As mentioned, if the BLM "determines . . . that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals," it must "immediately remove excess animals from the range so as to achieve appropriate management levels."  § 1333(b)(2).

The Act requires the BLM to determine the "necessity" of a removal based on "current" information.  *Id.*  But, within this framework, "'the agency has wide discretion in how it addresses [an identified] overpopulation.'"  *Am. Wild Horse Campaign*, 442 F. Supp. 3d at 154 (quoting *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1282 (D. Utah 2017)).  For example, BLM may initiate a gather and removal of excess animals or employ other population control measures, such as fertility controls and sterilization.  *See Fund for Animals, Inc.*, 460 F.3d at 23.

Section 1333(b)(2)(B) expressly contemplates that the BLM shall facilitate the adoption of excess wild horses and burros after they have been humanely removed from the wild.  The statute requires adopters to be "qualified individuals" who can assure "humane treatment and care (including proper transportation, feeding, and handling)." *Id.*  The statute limits an individual to adopting "not more than four animals . . . per year . . . unless the Secretary determines in writing that such individual is capable of humanely caring for more than four animals."  *Id.*  After one year, if the "Secretary determines that such individual has provided humane conditions, treatment and care," an adopter becomes eligible to obtain title to the animal.  § 1333(c).  After the BLM transfers title to a qualified adopter, the wild animal "shall lose their status as wild free-roaming horses and burros and shall no longer be considered as falling within the purview of" the Act.  § 1333(d)(1).  But, for those excess animals that cannot be adopted due to insufficient demand, the BLM "shall cause" them "to be destroyed in the most humane and cost-efficient manner possible."  § 1333(b)(2)(C).

Notwithstanding subsection (b)(2)(C)'s grant of authority, Congress has since forbidden the BLM from using federal funds to facilitate the sale of a wild horse or burro if that transaction results in the animal's slaughter.  *See In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1059 (9th Cir. 2014) ("Congress has never appropriated funds for extermination, as opposed to ongoing maintenance, of excess horses even if not adopted."); *see, e.g.*, Pub. L. 111–88, 123 Stat. 2904, 2907 (2009) ("Appropriations herein made shall not be available for the destruction of healthy, unadopted, wild horses and burros in the care of the Bureau of Land Management or its contractors.").  In 2021, Congress reiterated that

federal funds "shall not be available for . . . the destruction of any healthy, unadopted, and wild horse or burro" or "the sale of a wild horse or burro that results in the destruction of the wild horse or burro for processing into a commercial product."  Further Consolidated Appropriations Act of 2020, Pub. L. No. 116–94, 133 Stat. 2534.  (*See also* ECF No. 47-4 at 123 (noting that "the destruction of healthy, unadopted free-ranging horses and burros has been restricted either by a moratorium instituted by the director of BLM or by the annual Congressional appropriations bill for the department of the Interior in most years").)

In addition to complying with the requirements of the Act, the BLM must also comply with the requirements of NEPA in its efforts to address wild horse overpopulation.  *See* 42 U.S.C. § 4331.  NEPA requires federal agencies to "identify and assess in advance the likely environmental impact of [their] proposed actions, including its authorization or permitting of private actions."  *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 36 (D.C. Cir. 2015) (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004)).  NEPA "serves the twin purposes of ensuring that (1) agency decisions include informed and careful consideration of environmental impact, and (2) agencies inform the public of that impact and enable interested persons to participate in deciding what projects agencies should approve and under what terms."  *Sierra Club,* 803 F.3d at 36–37 (citing *Pub. Citizen*, 541 U.S. at 768).  NEPA accomplishes these goals by requiring agencies to take a "'hard look' at their proposed actions' environmental consequences in advance of deciding whether and how to proceed."  *Sierra Club,* 803 F.3d at 37 (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989)).

Importantly, however, "NEPA is essentially procedural," *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978), and "it is [ ] well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson*, 490 U.S. at 350 (citations omitted). In other words, NEPA is "not a suitable vehicle for airing grievances about the substantive policies adopted by an agency, as NEPA was not intended to resolve fundamental policy disputes." *Front Range Equine Rescue v. Vilsack*, 2024 WL 4474920, at *2 (D.D.C. Oct. 11, 2024) (citations omitted).

## B.    FACTUAL BACKGROUND[4]

Consistent with its authority under the Act, the BLM has long sought to remediate wild horse and burro overpopulations by offering the animals for public adoption and sale. The BLM relies heavily on the adoptions and sales of these animals because it otherwise would be financially responsible for boarding and caring for them at expensive, off-range facilities. (*See* ECF 47-4 at 123 ("BLM's effort to control horse and burro numbers by removing animals from the range has led to the stockpiling of "excess" horses and burros in holding facilities.").) In some fiscal years, "more than 45,000 animals were in holding facilities, and their maintenance consumed almost 60 percent of the Wild Horse and Burro Program's budget." (*Id.*; *see also* ECF No. 47-29 at 243 ("The cost of providing quality, humane care for these animals runs about $50 million annually.").) While adoption and sale programs help the BLM reduce these large costs, the number of excess wild horses still far exceeds the public's demand for adopting and buying these wild, untrained animals. (ECF No. 47-29 at 243.)

---

[4] These facts are derived from the Administrative Record and are not in dispute unless otherwise noted. (ECF No. 47.)

In 2001, the BLM launched an initiative called the "Wyoming Wild Horse Pilot Program." (ECF No. 47-2 at 1.) The program was geographically limited to Wyoming and offered a one-time lump sum $1,000 payment to incentivize the public to adopt older wild horses. (*Id.* at 10.) The purpose of the program was to "help defray the expense of long-term feed and care of the adopted horses." (*Id.*) But "[t]he pilot project ended because of a lack of up-front funds" and because "private ranchers had less interest in the project as the market for cattle grazing improved." (*Id.* at 88.)

Starting in 2009,[5] the BLM "modified and scaled up its practice of using cash incentives" by "offering members of the public in New Mexico, Oklahoma, Texas, and Kansas a cash incentive to adopt excess wild horses." (ECF No. 50 at 18; ECF No. 47-3 at 42.) The New Mexico program, for example, offered prospective adopters older wild horses and burros and "a first-year care and feeding allowance," in the amount of $250 or $500, "payable upon the issuance of title after one year." (*Id.*) To receive the incentive payment, the adopter's title application form had to be signed by a veterinarian or BLM official. (ECF No. 47-3 at 205.) The BLM was required, "[a]t some point prior to titling," to "personally verify that the animals are fit and are being properly cared for." (*Id.*)

This litigation centers around the BLM's nationwide expansion of these pilot programs, promulgated by the two previously-referenced Instruction Memoranda issued in 2019 and 2022. The 2019 IM declared that its purpose was to "outline[] policies and procedures for administering the [AIP] for untrained wild horses and burros." (ECF No.

---

[5] The Court assumes that the New Mexico AIP started in 2009 because the parties repeatedly say so, although the Court notes that the instruction memorandum is dated in May 2008 and states that the program starts in "October 2008." (ECF No. 47-3 at 42.)

47-12 at 92.)   The 2019 IM elaborated:

> The BLM has developed the AIP to increase the number of adoptions of untrained wild horses and burros placed into private care through offering financial incentives to defray associated initial costs, such as veterinary care, feed, and training.  The AIP encourages new individuals and organizations to adopt a wild horse or burro, and motivates previous adopters to re-engage with the program and adopt additional animals.  All untrained animals are eligible for adoption in the AOP regardless of species, age, sex, color, herd management area or the number of times the animal has been offered for adoption.  The minimum adoption fee is $25 for untrained animals and may be competitive or non-competitive.  The AIP offers a financial incentive in the amount of $500 within 60 days from the adoption date and an additional $500 within 60 days from the title date, if completed within 60 days of title eligibility.  Increasing the placement of animals into private care is a critical priority of the WHB program and of utmost interest to the BLM due to the costs associated with caring for unadopted animals in BLM managed or contracted corrals and pastures.  Cost savings may be utilized for other management operations.

(*Id.*)

The 2019 IM set forth some of the same requirements as the 2001 and 2009 pilot programs.  For example, it continued to require applications to be signed by a veterinarian and for the BLM to conduct mandatory compliance checks on all animals participating in the program.  (ECF No. 47-12 at 92–95.)  But, as Respondents acknowledge, the 2019 IM differed in several respects from its prototypes: "the 2019 IM . . . expanded the geographic scope to apply nationally (all 10 Western states), changed the age of the qualifying horses, changed the amount of the incentive payment, gave the long-standing practice of cash incentives an official title ("Adoption Incentive Program")[,] . . . and amended its Adoption of Wild Horses and Burros Handbook, H 4750-2, Chapter 2 – General Adoption Requirements and Procedures."  (ECF No. 50 at

11.)  Further, the 2019 IM increased the monetary incentive payment amount from $250 or $500 to $1,000, half of which was to be tendered "within 60 days from the adoption date," and the other half to be tendered "within 60 days from the title date."  (ECF No. 47-12 at 92.)  It lowered the application fee from $125 to $25.  (*Id.*)  And the 2019 IM required adopters to sign an agreement that they "will not sell or transfer ownership of [adopted animals] to any person or organization that intends to resell, trade, or give away such animals for slaughter or processing into commercial products."  (ECF No. 47-8 at 215.)

After the BLM issued the 2019 IM, Petitioners "advised BLM and the public that the AIP 'was a terrible idea from an animal welfare perspective' because 'it will result in more federally-protected wild horses and burros entering the slaughter pipeline by incentivizing people without the necessary skills and resources to adopt wild horses." (ECF No. 46 at 23) (internal quotation marks omitted).  Specifically, Petitioners notified the BLM that, "one year after BLM established the AIP—as adopters received title to the first AIP—wild horses and burros began appearing at slaughter auctions in far greater numbers."  (*Id.*)

Following Petitioner's advocacy efforts, the *New York Times* published an article—titled "Wild Horses Adopted Under a Federal Program Are Going to Slaughter"—which reported that some AIP participants had sold their wild horses to "livestock auctions frequented by slaughterhouse brokers known as kill buyers," receiving "at least $20,000" in exchange.  (ECF No. 47-15 at 41; *see also id.* ("[R]ecords show that instead of going to good homes, truckloads of horses were dumped at slaughter auction as soon as their adopters got the federal money.  A program intended

to protect wild horses was instead subsidizing their path to destruction.").)

The article prompted the late Senator Diane Feinstein to write a letter to former Secretary Haaland, "strongly urg[ing] BLM to immediately suspend [the AIP] program and conduct a thorough investigation to ensure federal funds are used to protect wild horses and burros against abuse, neglect, or slaughter, as intended by Congress." (*Id.* at 39.) Senator Feinstein continued, "Subsidizing the slaughter of wild horses and burros with taxpayer dollars violates Congressional intent outlined in the Fiscal Year 2021 Consolidated Appropriations Act (Public Law 116-260), which prohibits the use of funds for the destruction of wild horses and burros and directs BLM to adopt a robust expansion of proven, safe, effective, and humane fertility control methods to manage these herds." (*Id.*) Shortly thereafter, 31 members of congress wrote a letter to the BLM urging the AIP's "immediate suspension." (*Id.* at 131.)

In seeming response to these concerns, the BLM issued the 2022 IM, which supersedes the 2019 IM and includes certain revisions. (ECF No. 47-28 at 86.) One revision changes the timing of when an adopter receives the $1,000 incentive payment; instead of receiving it in phases, the adopter receives a lump sum "within 60 days after the adoption title date." (*Id.*) Another revision readjusts the application fee from $25 back to $125. (*Id.*) The 2022 IM requires that all wild animals adopted through the AIP be inspected by a BLM official within six months of the adoption date, not 12 months. (*Id.*) And the 2022 IM requires adopters to sign an agreement "that they will not *knowingly* sell or transfer ownership of an adopted animal to any person or organization that intends to resell, trade, or give away the animals for slaughter or processing into commercial products." (ECF No. 50 at 12) (emphasis added). In other words, unlike

the 2019 IM, which required adopters not to transfer ownership of a wild horse to an organization that intends to give the animal away for slaughter, the 2022 IM merely requires adopters to agree not to *knowingly* engage in such conduct.

In July 2021, Petitioners sued Respondents, seeking to vacate the 2019 and 2022 IMs. (ECF No. 1.) Specifically, Petitioners contend that the IMs violate the Act, the APA, and NEPA. (*Id.* at 50.) Petitioners principally argue that Respondents violated the APA and NEPA by failing to subject the IMs to appropriate notice and comment procedures and environmental impact analysis. (*Id.* at 50–53; *see generally* ECF No. 46.) Respondents filed a response, to which Petitioners filed a reply. (ECF Nos. 50, 58.) The Administrative Record has been filed with the Court. (ECF No. 47.) Hence, this matter is fully ripe for the Court's review and decision.

## II. JURISDICTION

### A.    STANDING

Before the Court can reach the merits of Petitioners' claims, it must first address Respondents' contention that Petitioners lack standing. *See Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 840 (10th Cir. 2019) ("Because standing is jurisdictional, [the court] must first determine whether [Petitioners] have standing to bring their claims."). A plaintiff has standing if they can show that (1) they have "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990); *San Luis Valley Ecosystem Council v. Dallas*, 2024 WL 5241385, at *6 (D. Colo. Dec. 13, 2024) (quoting *Hunt v. Wash. State Apple Advert.*

*Comm'n*, 432 U.S. 333, 343 (1977)).  In addition, "[a]n organization has standing if it can show at least one of its members meets the requirements for Article III standing." *Rocky Mountain Wild v. Dallas*, 98 F.4th 1263, 1286 (10th Cir. 2024).

Respondents contend that Petitioners cannot satisfy any of the three standing elements.  (ECF No. 50 at 14–18.)  Petitioners counter that they have suffered (1) procedural injury as a result of the BLM denying them the opportunity to oppose the AIP through a formal notice and comment process; (2) "organizational injury from the immense drain on resources and the impairment of core aspects of Petitioners' missions due to being forced to shift significant staff time and resources to counteract the AIP's unlawful outcomes"; and (3) "grave aesthetic injuries" by being forced to witness "malnourished, injured animals in kill pens."  (ECF No. 46 at 21; ECF No. 58 at 12.)

Initially, the Court observes that Respondents address only Petitioners' procedural and organizational standing theories.  (*See* ECF No. 50 at 14–18.)  As to Petitioners' procedural injury, Respondents argue that Petitioners were not harmed by being denied an opportunity to oppose the AIP during a formal notice and comment period because Petitioners "already provided BLM with this information and notified BLM that the incentive structure could lead to a sale of titled horses for slaughter."  (*Id.* at 25.)  Respondents suggest that this feedback—whether offered before or after the BLM issued the 2019 and 2022 IMs—would not have made a difference because the AIP is "essential to its horse management goals."  (*Id.*)  As to Petitioners' organizational injury, Respondents argue that "Petitioners' alleged economic injuries as an organization—*i.e.*, spending budget money to monitor, identify, and purchase titled

horses at auctions because of the IMs—is not a basis for injury in fact." (*Id.*)  In support, Respondents cite caselaw providing that an "organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury."  (*Id.* (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919–20 (D.C. Cir. 2015)).)

Neither of these arguments,[6] however, rebut Petitioners' position that they suffered aesthetic injuries by "observing first-hand the inhumane treatment these federally protected animals must endure as a direct result of the AIP."  (ECF No. 46 at 29.)  This omission, alone, is fatal to Respondents' standing challenge.  *See JME Investments, LLC, v. Westfield Ins. Co.*, 2025 WL 345754, at *10 (D. Colo. Jan. 30, 2025) (noting that a "failure to respond to an argument in a response brief results in waiver") (citation omitted).  Indeed, the Tenth Circuit has recognized that aesthetic injuries can establish standing.  *See Sierra Club v. United States Env't Prot. Agency*,

---

[6] The Court need not address the merits of Respondents' arguments as to Petitioners' procedural and organizational injuries given Respondents' failure to rebut Petitioners' aesthetic injury theory, but even if it did, the Court would reject them.  Respondents cite no authority supporting their argument that opposing the IMs in a general sense is the same (legally or otherwise) as opposing the IMs during formal notice and comment procedures.  If only some form of generalized opposition were sufficient for these purposes, the necessity of the APA's notice and comment requirements would be very much diminished and beside the point.

Respondents' reliance on the *Food & Water Watch* decision is also afield.  Petitioners do not argue that they spent money investigating the animal abuses allegedly caused by the AIP in anticipation of litigation; instead, Petitioners claim that they did so in an effort to save the horses and seek policy change.  *See Common Cause of Colo. v. Buescher*, 750 F. Supp. 2d 1259, 1269 (D. Colo. 2010) ("An organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." (quotation marks and citations omitted)).  (*See* ECF No. 58 at 15 ("BLM can point to nothing in Petitioners' declarations or the record indicating that Petitioners spent large portions (or any) of their organizational budgets prior to 2019 on adoption-related slaughter issues, nor is there any evidence that Petitioners engaged in investigatory activities merely to support litigation.").)

964 F.3d 882, 888 (10th Cir. 2020) ("In environmental suits, an injury-in-fact exists when the petitioner 'use[s] the affected area' and is a person 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity.") (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 181 (2000))).

Construing their brief liberally, the only argument Respondents assert that could conceivably undermine Petitioners' aesthetic injury theory is that Petitioners fail to substantiate their "claim that the IMs significantly increased the number of titled horses, originally adopted with cash incentives, now at risk for slaughter." (*Id.* at 26.) But even this argument misses the mark. For one, "in reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *Initiative & Reform Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006) (citation omitted). Put differently, the Court must assume in its standing analysis that the 2019 and 2022 IMs heightened the risk that more federally protected wild horses would be sold for slaughter in violation of federal law and that the animals were *actually* slaughtered.

At any rate, the record adequately substantiates this claim. Petitioners submit declarations documenting its members' firsthand experiences witnessing wild horse and burro abuse after the IMs went into effect and the publication of the *New York Times* article detailing the stories of two adopters who sold their wild horses for slaughter after pocketing the $1,000 incentive, which prompted members of Congress to sound the alarms. *See WildEarth Guardians v. BLM*, 870 F.3d 1222, 1231 (10th Cir. 2014) (holding that organizations established injury-in-fact based on "declarations from

individual members establishing harms to their personal aesthetic and recreational interests"); *Rocky Mountain Wild*, 98 F.4th at 1287 (looking to plaintiff's affidavits in discerning whether there was standing based on aesthetic injuries). (*See generally* ECF No. 58 at 6.)  Hence, Petitioners have shown that they have, in fact, suffered aesthetic injuries as a result of the 2019 and 2022 IMs.

Petitioners have likewise satisfied the relaxed causation and redressability elements of the standing analysis in this environmental case.  *See Comm. To Save the Rio Hondo v. Lucero*, 102 F.3d 445, 452 (10th Cir. 1996) (noting that "the normal standards for redressability" are relaxed in NEPA and APA cases); *see also Producers of Renewables United for Integrity Truth & Transparency v. Env't Prot. Agency*, 2022 WL 538185, at *9 (10th Cir. Feb. 23, 2022) ("An alleged procedural injury is subject to a somewhat relaxed, or at least conceptually expanded, standard of standing.") (internal quotation marks omitted).  Respondents argue that "the IMs at issue did not establish (or cause) BLM's long-standing practice of offering cash incentives for adoptions." (ECF No. 50 at 27.)  As a result, Respondents continue, "a judicial decision invalidating the IMs would not force a notice-and-comment period on BLM's overall incentive practice," nor "prevent the continued sale of titled animals (adopted with cash incentives)."  (*Id.*)  Respondents also argue that the IMs did not cause Petitioners' injuries because adoption fraud constitutes "illegal acts of third parties not before this Court."  (*Id.*)  Respondents insist that Petitioners' chain of causation theory "is pure speculation."  (*Id.*)

Contrary to Respondents' assertion, however, Petitioners' ability to prevail in this case does not depend on whether it can stop the BLM from incentivizing adoptions of

wild horses in all instances.  Rather, to establish standing, Petitioners' need only show that the 2019 and 2022 IMs increased the likelihood that more horses would be slaughtered by expanding the AIP on a nationwide basis.  (ECF No. 58 at 14.)  It appears from the record and Respondents' brief that, even if the Court were to vacate the 2019 and 2022 IMs, Respondents would still be able to continue to incentivize adoptions with cash payments in certain states, perhaps pursuant to the 2009 pilot program.  (*See* ECF No. 50 at 27 (asserting that "a judicial decision invalidating the IMs" would not affect the "BLM's overall incentive practice").)  Even so, that does not change the fact that Petitioners' injuries (aesthetic or otherwise), caused by the 2019 and 2022 IMs, can be redressed by vacating the nationwide AIP so that wild horses are not more likely to be slaughtered in the states not already covered by the 2009 pilot program.[7] And, as discussed, the Court must assume in its standing analysis that vacatur would remedy Petitioners' claimed injuries.  *Initiative & Reform Inst.*, 450 F.3d at 1093.

Nor is the Court moved by Respondents' argument that Petitioners' injuries are speculative and caused only by third parties.  Where an "alleged injury flows not directly from the challenged agency action, but rather from independent actions of third parties, [courts] have required only a showing that 'the agency action is at least a substantial factor motivating the third parties' actions.'"  *Tozzi v. US Dep't of Health & Human Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001) (quoting *Cmty. for Creative Non–Violence v. Pierce*, 814 F.2d 663, 669 (D.C. Cir.1987)).

---

[7] While the Court understands that the Wyoming pilot program ended decades ago (and therefore has no binding effect), it is unclear from the record and the parties' arguments whether the 2009 pilot program, which created adoption rights in New Mexico, Oklahoma, Texas, and Kansas, remains active.

Petitioners have made this showing.  It is not hard to imagine—nor is it speculative for Petitioners to assert, based on the record evidence—that the slaughter of wild horses by third parties would be "fairly traceable" to agency action that invites members of the public to obtain title to these untrained animals for a $1,000 cash incentive after only a year of care and supervision.  *See United States v. King Cnty., Washington*, 122 F.4th 740, 751 (9th Cir. 2024) ("Traceability may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the defendant's conduct comprise the last link in the chain.") (citation and internal quotation marks omitted).  Even BLM officials have acknowledged that the risk of these alleged abuses is possible as a result of the AIP.  (*See, e.g.*, ECF No. 47-9 at 18 (acknowledging that "[t]he easy money aspect [of the AIP] may bring out potential for fraud, abuse, and neglect"); *see also* ECF No. 47-7 at 59 ("Gentling and training mustangs and burros adds monetary value to the animals *and reduces the risk that they would be sold for slaughter*." (emphasis added)).)

For all these reasons, the Court concludes that Petitioners have standing to pursue their claims in this action.

## B.    FINAL AGENCY ACTION

Respondents next contend that Petitioners' claims are not justiciable because the 2019 and 2022 IMs are not final agency actions.  *See Sinclair Wyoming Ref. Co., LLC v. United States Env't Prot. Agency*, 72 F.4th 1137, 1143 (10th Cir. 2023) (confirming that a failure to challenge final agency action is a jurisdictional issue).  (ECF No. 50 at 18.)  The Court disagrees.

The APA constrains courts to review only "final agency action."  5 U.S.C. § 704.3.  "[A]gency action includes the whole or a part of an agency rule, order, license, sanction,

relief, or the equivalent or denial thereof, or failure to act."  *Id.* § 551(13).  "An agency action is final if it meets two conditions."  *Sinclair Wyoming Ref. Co., LLC v. United States Env't Prot. Agency*, 72 F.4th 1137, 1143 (10th Cir. 2023).  "First, the action must mark the consummation of the agency's decision making process—it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations and quotations omitted).

To be final, an agency action must "itself [be] the source of the parties' obligations, modifying the applicable legal landscape by interpreting the scope" of their statutory rights or duties.  *Kansas ex rel. Schmidt v. Zinke*, 861 F.3d 1024, 1034 (10th Cir. 2017) (quotations and alterations omitted).  Finality therefore attaches when an agency "has rendered its last word on the matter in question."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001) (quotations omitted).

Petitioners have met both elements.  Initially, the Court observes that Respondents do not address the first *Bennett* factor—that is, they do not contest that the 2019 and 2022 IMs "mark the consummation of the agency's decision-making process."  520 U.S. at 177–78.  (*See* ECF No. 50 at 28–29.)  Even had Respondents contested this factor, however, the Court would find that Petitioners easily meet it because both IMs clearly state that they are "effective immediately."  *See, e.g., Chiang v. Kempthorne*, 503 F. Supp. 2d 343, 350 (D.D.C. 2007) (finding that an action "easily satisf[ied] the first prong of the final action test" because it was "effective immediately"). (ECF No. 47-12 at 94; ECF No. 47-28 at 88.)

As to the second *Bennet* factor, Respondents argue that "the IMs did not

establish any new rights or obligations concerning the adoption of wild horses." (ECF No. 50 at 19–20.) They explain that, "because the practice of offering cash incentives had been in place since at least 2009, the issuance of the IMs created neither a new right for individuals to obtain federal funding associated with the adoption of a wild horse or burro, nor a new obligation for BLM to issue payments of federal funding to adopters of wild horses." (*Id.* at 20) (internal quotation marks omitted).)

In the Court's view, however, Respondents understate the substantive changes ushered in by the 2019 and 2022 IMs. To begin, the 2001 and 2009 pilot programs on which Respondents rely were just that: *pilot programs.* In other words, those programs were, by definition, not designed to be final agency actions because they "did not mark the consummation of the agency's decision-making process." *Bennett*, 520 U.S. at 177–78; *see also Int'l Bhd. of Teamsters v. U.S. Dep't of Transportation*, 861 F.3d 944, 952 (9th Cir. 2017) (discerning no final agency action where petitioner challenged a pilot program). On the contrary, those initiatives were both intended to last for only two years—and indeed, the 2001 Wyoming project ended within that timeframe because it was unsuccessful. By contrast, the 2019 and 2022 IMs do not have express expiration dates; instead, they appear to remain in effect indefinitely. (*See generally* ECF Nos. 47-12 at 92–95, 47-28 at 86–90.)

Furthermore, the 2019 and 2022 IMs afford rights to far more people than did their prototypes. As Respondents acknowledge, the 2019 and 2022 IMs "expanded the geographic scope to apply nationally (all 10 Western states)." (ECF No. 50 at 11.) Given this, it cannot be reasonably disputed that these agency actions are the source "by which rights or obligations have been determined, or from which legal

consequences will flow." *Bennett*, 520 U.S. at 177–78.  The 2019 and 2022 IMs appear to at least double[8] the number of states in which members of the public can participate in the AIP.

The Court is not persuaded otherwise by Respondents' argument that the 2009 IM "created the practice of offering cash incentives" and is therefore the source of the adoption incentive right.  (ECF No. 50 at 29.)  This argument has some superficial appeal—the 2009 Instruction Memorandum did create adoption incentive opportunities in New Mexico, Oklahoma, Texas, and Kansas and was more successful than the 2001 Wyoming pilot program.  But Respondents' argument paints an incomplete picture because it does not account for what agency action is responsible for conferring adoption incentive opportunities in the other six Western states.  The record reveals only one answer: the 2019 and 2022 IMs.

Moreover, while sufficient on its own to establish final agency action, the 2019 and 2022 IMs did more than just implement an indefinite nationwide AIP in at least six new states.  The IMs substantially increased the incentive payment amount from $250 or $500 to $1,000; changed the age of the qualifying horses offered for adoption; lowered and then raised the application fee amount; adjusted the terms of the agreements adopters had to sign regarding subsequent sales of the horses to which they obtained title; and amended the Adoption of Wild Horses and Burros Handbook, H-

---

[8] Respondents suggest that the 2019 and 2022 IMs provided rights in the 10 Western States, whereas Petitioners describe the program as providing rights nationwide (*i.e.*, in all 50 states).  The Court takes Respondents' word that the IMs only confer rights to the Western States; even so, the 2009 IMs only confer rights to only four of these states.  Hence, the 2019 and 2022 IMs expanded adoption incentive rights in at least six other states—including Wyoming, since its 2001 pilot program lapsed decades ago.

4750-2, Chapter 2—General Adoption Requirements and Procedures. (ECF No. 50 at 20.)

In sum, the Court concludes that the 2019 and 2022 IMs constitute final agency action. As a result, it has subject matter jurisdiction to review them.

### III. ANALYSIS

### A.    APA VIOLATIONS

Petitioners contend that the 2019 and 2022 IMs violate the APA's procedural and substantive requirements because the BLM issued them without conducting the necessary notice and comment procedures and because they are otherwise arbitrary and capricious. (ECF No. 46 at 24.) The Court agrees with both points.

### 1.    PERTINENT PRINCIPLES

In resolving APA claims, district courts apply a "deferential standard toward the agency's decisions." *Rocky Mountain Wild*, 98 F.4th at 1290 (citing *Biodiversity Conserv. All. v. Jiron*, 762 F.3d 1036, 1059 (10th Cir. 2014). That standard restricts courts from "overturn[ing] an agency's decision 'unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)). "Additionally, an agency's violation of the APA 'does not require reversal unless the appellant demonstrates prejudice resulting from the error.'" *Id.* (citation omitted). The Court "may set aside agency action only for substantial procedural or substantive reasons." *Id.* (quoting *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 779 (10th Cir. 2006) (internal quotation marks omitted)).

"[T]he burden is on the petitioner to demonstrate that the action is arbitrary and capricious." *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1227 (10th Cir. 2011) (quotation marks omitted). To avoid a finding that an agency action is arbitrary and

capricious, "the agency cannot (1) rely on factors deemed irrelevant by Congress; (2)

fail to consider important aspects of [the] problem; (3) present an explanation that is

either implausible or contrary to the evidence or (4) reach a decision that is not

supported by substantial evidence in the [administrative] record." *Am. Petroleum Inst. v.

U.S. Dep't of Interior*, 81 F.4th 1048, 1058 (10th Cir. 2023) (internal quotation marks

omitted) (alterations in original).  Courts "do not 'substitute [their] judgment for that of

the agency,' and [they] do not 'supply a reasoned basis for the agency's action that the

agency itself has not given.'" *Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 793–94 (10th

Cir. 2010) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.

Co.*, 463 U.S. 29, 43 (1983)) (alteration in original).

     "Judicial review of agency action in district courts must be processed as an

appeal." *Nat'l Ski Areas Ass'n, Inc. v. U.S. Forest Serv.*, 910 F. Supp. 2d 1269, 1279

(D. Colo. 2012) (citing *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th

Cir.1994)).  As such, "district court[s] should govern [themselves] by referring to the

Federal Rules of Appellate Procedure."  *Id.*

## 2.    PROCEDURAL APA VIOLATION

     Petitioners contend that the 2019 and 2022 IMs are legislative rules and that the

BLM therefore "violated the APA by establishing the AIP without notice and comment

rulemaking."  (ECF No. 46 at 32.)  Respondents counter that, "[b]ecause the IMs are

non-binding internal guidance, which merely continued and clarified an existing practice,

and did not create individual rights and obligations, they are not legislative rules subject

to the APA's notice-and-comment requirement."  (ECF No. 50 at 29.)  While this issue is

close in some respects, the Court ultimately sides with Petitioners.

     Under 5 U.S.C. § 551(4), a rule

> means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefore or of valuations, costs, or accounting, or practices bearing on any of the foregoing . . . .

Notwithstanding this broad definition of the term "rule," the APA requires only that legislative rules follow notice and comment procedures. *Sorenson Commc'ns, Inc. v. F.C.C.*, 567 F.3d 1215, 1222 (10th Cir. 2009) ("Under the APA, legislative rules can be issued only following notice and comment procedures.") (citation omitted). "A rule is legislative when it 'has the force of law and creates new law or imposes new rights or duties.'" *Id.* (quoting *FDIC v. Schuchmann*, 235 F.3d 1217, 1222 (10th Cir. 2000)) (quotation omitted). "Interpretative rules, by contrast, 'advise the public of the agency's construction of the statutes and rules which it administers.'" *Id.* at 1223 (quoting *Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 99 (1995)) (quotation omitted). "The agency's own label for its action is not dispositive." *Id.* (citing *Truckers United for Safety v. Fed. Highway Admin.*, 139 F.3d 934, 939 (D.C. Cir. 1998)).

"The hallmark of a substantive agency rule is that it carries the force and effect of law via the creation of new rights or duties." *Western Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1067 (D. Idaho 2020). "By contrast, a general statement of policy 'advis[es] the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'" *Id.* (quoting *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1012–13 (9th Cir. 1987)). Such policies "serve to educate and provide direction to the agency's personnel in the field, who are required to implement its policies and exercise

its discretionary power in specific cases." *Id.* at 1013 (quotation marks and citations omitted). "The critical factor" in determining whether a directive constitutes a general statement of policy is "the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case." *Id.* "Thus, to qualify as an exempted statement of policy, two requirements must be satisfied: (1) the policy operates only prospectively; and (2) the policy does 'not establish a binding norm,' and is not 'finally determinative of the issues or rights to which [it] address[es],' but instead leaves officials 'free to consider the individual facts in the various cases that arise.'" *Id.* at 1014 (quotation marks and citations omitted).

The 2019 and 2022 IMs undisputedly operate only prospectively, so that requirement is not at issue here. Respondents instead focus on the second requirement, arguing that the 2019 and 2022 IMs are not legislative rules because they largely "use precatory language" like "should" and "may." (ECF No. 50 at 30.) According to Respondents, the IMs "merely formalize internal processes for BLM to follow should an authorized officer decide to provide an incentive to an eligible adopter." (*Id.* at 31.) They primarily rely on *Friends of Animals v. Pendley*, 523 F.Supp.3d 39 (D.D.C. 2021), in support of this argument. (*Id.*)

*Pendley* involved a challenge to a BLM IM that "provide[d] BLM field officers with guidance on making wild horse and burro gather decisions." *Id.* at 49. Specifically, the IM provided that "gather decisions should be issued at least 14 days prior to the proposed gather start date" and that the "BLM should issue decisions authorizing gathers, removals, or population control actions through *a phased approach or over a*

*multi-year period* when it determines that such an approach would help it achieve its management objectives."  *Id.* (emphasis in original).  The IM continued, "[i]f the BLM issues a multi-year or open-ended decision to gather and manage [wild horses and burros] on the public lands, then no further decision is required to continue implementing the action unless the BLM determines that a change in conditions or objectives requires a new NEPA analysis and decision."  *Id.*  And the IM "supersede[d] a 2010 BLM instruction memorandum and amend[ed] Chapter 7 of the 4700-1, Wild Horse and Burro Management Handbook, which directed that [wild horse and burro] gather decisions be issued 31 to 76 days prior to initiation of gather activities."  *Id.* (internal quotation marks omitted).

For three reasons, the *Pendley* court rejected the petitioner's argument that the IM was a legislative rule subject to notice and comment procedures.  *Id.* at 53.  First, the court observed that the IM was replete with advisory and precatory language.  For instance, the court observed that the IM

- "expressly qualifies its scope by directing BLM field officials to adhere to its guidance 'when feasible.'"

- "couches its more specific directives in advisory language.  For example, with regards to the pre-gather 'protest period,' the 2019 Instruction Memorandum states that '*[u]nless* an emergency situation or other relevant management considerations exist, gather decisions *should* be issued *at least* 14 days prior to the proposed gather start date.'"

- recommends that the "BLM should issue decisions authorizing gathers, removals, or population control actions through a phased approach or

over a multi-year period *when it determines that such an approach would help it achieve its management objectives*."

*Id.* at 53–54 (emphases in original).

Second, the court noted that the IM "straightforwardly states that the 2019 Instruction Memorandum 'is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person.'" *Id.* at 54 (internal quotation marks omitted). The court recognized that, "[w]hile this description alone is not wholly dispositive, it comports with the non-binding and precatory nature of the 2019 Instruction Memorandum discussed above." *Id.*

Third, the court concluded that "the 2019 Instruction Memorandum does not alter any legal rights or obligations." *Id.* The court explained that, while the IM shortened the "time that parties can protest or seek review [of a gather decision] by more than half," that was not dispositive because "neither the WHBA, NEPA, nor any of their implementing regulations, require any protest period at all before the issuance of a BLM gather decision." *Id.* "To the contrary," the court added, "the WHBA states that BLM must 'immediately remove excess animals from the range,' 16 U.S.C. § 1333(b)(2)." *Id.* (emphasis in original). For these reasons, the court declared that the IM was "a non-binding guidance document," and that "[a]gencies like BLM are free to amend their own internal deadlines without undergoing notice and comment." *Id.* at 53, 55.

The Court begins by acknowledging that several factors undoubtedly support Respondents' position that the 2019 and 2022 IMs are procedural rules. To start, the

2019 and 2022 IMs share some of the same salient attributes as the IM reviewed in *Pendley*. Like the IM in *Pendley*, the 2019 and 2022 IMs repeatedly—and almost exclusively—use precatory language like "should" and "may." By the Court's count, these words appear approximately 30 times throughout the 2022 IM. (*See generally* ECF No. 47-12 at 86–90.) Hence, the 2019 and 2022 IMs plainly lack the "hallmark of a binding rule," which is that they command, require, order, or dictate. *Id.* at 53 (quoting *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014)).

The 2019 and 2022 IMs also include the same disclaimer used in *Pendley*: "This IM is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person." (*See, e.g.*, id. at 88 n.1.) This, too, supports Respondents' position that the IMs operate to merely "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power"—not create binding rights and duties. *Id.* at 1067; *see also Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) (describing a "general statement of policy" as "[a]n agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule").

On this last point, it appears that the 2019 and 2022 IMs are borne out of the broad discretionary authority with which Congress imbued the BLM more than 50 years ago. As mentioned, the Act expressly commands the BLM to offer adoptions to address wild horse overpopulations. *See* § 1333(b)(2)(B) ("The Secretary *shall* cause such

number of additional excess wild free-roaming horses and burros to be humanely captured and removed for private maintenance and care for which he determines *an adoption* demand exists by qualified individuals . . . .") (emphases added).  Contrary to Petitioners' assertion that the 2019 and 2022 IMs "lack a clear statutory basis," the IMs expressly cite the Act at least twice: "Since 1971, the BLM has removed animals from the range and made them available *in accordance with the Wild Free-Roaming Horses and Burros Act*."  (ECF No. 46 at 35; ECF Nos. 47-12 at 92–95, 47-28 at 86–90) (emphasis added).)  The IMs further explain: "Placing animals into private care *is a tenet of the Act* and a vital component of the WHB program."  *See Calif. Communities Against Toxics v. E.P.A.*, 934 F.3d 627, 632 (D.C. Cir. 2019) ("[T]o ascertain the nature of an agency action, courts should ground the analysis in the idiosyncratic regime of statutes and regulations that govern it."); *cf. Tennessee Hosp. Ass'n*, 908 F.3d at 1044 (discerning a legislative rule where the agency action lacked the "textual hooks" necessary to reach a contrary conclusion).  (*Id.* (emphasis added).)

The Court likewise rejects Petitioners' argument that the 2019 and 2022 IMs are legislative rules because they conflict with the BLM's preexisting regulations.  *Sacora v. Thomas*, 628 F.3d 1059, 1070 (9th Cir. 2010) (interpretive rules cannot be "inconsistent with" existing laws or "impose new rights or obligations"); *see also Air Transp. Ass'n of Am. v. Fed. Aviation Admin.*, 291 F.3d 49, 55 (D.C. Cir. 2002) ("Because interpretive rules cannot effec[t] a substantive change in the regulations, a rule that adopt[s] a new position inconsistent with any of the Secretary's existing regulations is necessarily legislative.").  (ECF No. 46 at 26.)  Petitioners support this argument by pointing out that the BLM's preexisting regulations instruct that *adopters* should fund the AIP, not the

other way around.  (*Id.*)

Petitioners are correct that the BLM's preexisting regulations contemplate that adopters should fund the AIP by paying fees.  *See* 43 C.F.R. § 4700.0-6(f) ("Fees shall normally be required *from qualified individuals* adopting excess wild horses and burros to defray part of the costs of the adoption program.") (emphasis added).  But the 2019 and 2022 IMs do not depart from this established practice—rather, they continue to require applicants to pay adoption fees, presumably to fund the AIP.  (*See, e.g.*, ECF No. 47-28 at 3 (stating that "[t]he minimum adoption fee for animals offered under the AIP is $125").)  The fact that the 2019 and 2022 IMs additionally offer a cash incentive to adopters "to help defray costs [incurred by adopters] associated with first-year care and feeding" is not inconsistent with the BLM's extant regulations that require adopters to pay adoption fees.  (ECF No. 50 at 23.)  Nothing in the Act or the BLM's preexisting regulations restrict the BLM from offering cash incentives to increase the frequency of adoptions.  Those authorities are simply silent on the topic of cash incentives.

All this to say, the Court recognizes that the 2019 and 2022 IMs contain many essential ingredients of a procedural rule and that some of Petitioners' arguments miss the mark.  The Court particularly appreciates that the IMs' plain language suggests that they are merely advisory.  But the plain language of an agency's IM is not solely dispositive in all cases—indeed, there are some situations in which an agency imbues its personnel with discretion but nonetheless (unwittingly) creates a legislative rule, such as by creating "a binding norm."  *Western Watersheds Project*, 441 F.Supp.3d at 1014.  The Court concludes that this is one of those cases.  Here is why.

Unlike *Pendley*, which reviewed an IM concerned with the mere timing of when a

gathering decision should begin, the 2019 and 2022 IMs introduce a new, substantive policy—*i.e.*, the nationwide AIP—that was not expressly contemplated by the Act or the BLM's preexisting regulations. In clear contrast to the agency action reviewed in *Pendley*, the IMs here create a public right to adopt a wild horse or burro and to receive $1,000 for doing so—not merely a right to advance notice of when some BLM action will occur. By comparison, then, the initiation of the nationwide AIP program, promulgated by the 2019 and 2022 IMs, is quite dissimilar to the BLM "amend[ing] [its] own internal deadlines." *Pendley*, 523 F.Supp.3d at 55.

Moreover, there is no record evidence evincing a belief by the BLM or its officials that the IMs were anything but mandatory in practice—assuming an applicant satisfied the eligibility criteria listed in the 2022 IM. The Court sees no record evidence indicating that a BLM official ever exercised their apparent discretion to deny an otherwise qualified applicant from adopting a wild horse or burro.[9] Notably, the 2019 IM was in effect for two years prior to Petitioners initiating this action. Despite this, Respondents have produced no evidence suggesting that the IMs were discretionary as implemented in practice, which the parties confirmed to be the case in their supplemental briefing. *See Western Watersheds Project*, 441 F.Supp.3d at 1067 n.9 ("[N]othing in the record reveals that anyone within BLM exercised any discretion in applying something other

---

[9] The Court ordered supplemental briefing on (1) "Whether record evidence supports the notion that BLM officials treated Instruction Memorandum 2019-025 and Instruction Memorandum 2022-014 as mandatory and binding, notwithstanding the repeated use of the words "should" and "may" throughout the Instruction Memorand[a]" and (2) "Whether record evidence indicates that BLM ever exercised discretion in denying a qualified individual, pursuant to the terms outlined in Instruction Memorandum 2019-025 and Instruction Memorandum 2022-014, from adopting a wild horse or burro." (ECF No. 62 at 1–2.) The parties confirmed that no such evidence exists. (*See generally* ECF Nos. 63, 64.)

than the procedures outlined within IM 2018-034.  This helps buttress the notion that IM

2018-034 was indeed binding and consistently used in the field and, thus, indicative of a

substantive rule rather than an interpretive policy."); *see also Chiang*, 503 F. Supp. 2d

at 350 (observing that "the agency is applying the Guidelines in a binding fashion").

(*See generally* ECF Nos. 63, 64.)[10]

This highlights another important difference from the interpretive rule found in

*Pendley*.  The 2019 and 2022 IMs do not elucidate as to when a BLM official should

ever exercise their ostensibly boundless discretion.  By contrast, the precatory language

in the *Pendley* IM was often accompanied by other language informing when a BLM

official should deviate from the general procedures prescribed therein, such as "when

feasible"; in "an emergency situation or" where "other relevant management

considerations exist"; and when the BLM "determines that such an approach would help

it achieve its management objectives."  *Id.* at 53–54.  While this language is capacious

and could arguably apply in most circumstances, it at least gave BLM officials some

idea of when discretion should be used.  Not so here.  Instead, the 2019 and 2022 IMs

suggest that a BLM official "should" or "may" reject an applicant only if the applicant

does not satisfy the criteria outlined therein.

---

[10] Respondents assert that these "inquir[ies] essentially request[] information about the availability of implementation documents," which would necessarily be outside the administrative record.  (ECF No. 64 at 2.)  The Court recognizes that its review "is to be based on the full administrative record that was before the Secretary at the time he made his decision." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 420 (1971).  But evidence showing whether BLM officials exercised discretion to deny otherwise qualified applicants pursuant to the 2019 IM would presumably be in the Administrative Record that the Secretary considered when issuing the 2022 IM.  The lack of such evidence between 2019 and 2021 is therefore relevant and fair game for the Court to consider.

Respondents' argument that the 2019 and 2022 IMs are purely advisory, and thus not enforceable, is also strongly belied by the fact that the AIP guarantees a prospective adopter a right to due process if their application is denied.  The AIP application form expressly states: "Within 30 days from receipt of this decision, *you have the right of appeal* to the Board of Land Appeals, Office of Hearings and Appeals, . . . in accordance with the regulations at 43 CFR, Part 4, if you disagree with this decision."  (ECF No. 47-29 at 4) (emphasis added).)  This begs the question: What standards does the Board of Land Appeals apply if a BLM official's discretion to reject an application is boundless and not tethered to whether the applicant met the criteria prescribed by the 2022 IM?  This purported appeal right would seem utterly meaningless if a BLM official has unbridled discretion to reject an application for any reason.  *See East v. Clayton Cnty.*, 436 F. App'x 904, 913 (11th Cir. 2011) ("[I]f East did not have a legal right to these procedures, . . . he had no due process rights to those procedures in the first place.").  A more sensible squaring of this provision is that an applicant's right to appeal, guaranteed by the 2019 and 2022 IMs, presupposes an applicant's right—or as the BLM's preexisting regulations put it, an applicant's "legally cognizable interest," 43 C.F.R. § 4.410(d)—to participate in the AIP in the first place.  *See Sorenson Commc'ns, Inc.*, 567 F.3d at 1222 ("A rule is legislative when it 'has the force of law and creates new law or *imposes new rights* or duties.'") (citation omitted) (emphasis added.  This is yet further evidence that the 2019 and 2022 IMs created new rights and obligations, consistent with the core feature of a legislative rule.

Respondents' only retort to the existence of the appeal provision is that the right to appeal adverse BLM decisions is nothing new.  (ECF No. 50 at 23.)  Citing section

4.410, Respondents remark that members of the public already had a preexisting right to an appeal "had BLM declined someone participation in the cash incentive program prior to the issuance of the IMs."  (*Id.*)

But this retort does not help Respondents.  On the contrary, Respondents implicitly *confirm* that the 2019 and 2022 IMs guarantee members of the public a right to appeal adverse BLM decisions.  They just maintain that this right is not groundbreaking because the appeal right guaranteed by the 2019 and 2022 IMs echoes the appeal right guaranteed by a preexisting regulation.  But this argument is simply a repackaging of Respondents' steadfast refrain that the 2019 and 2022 IMs are not legislative rules because they "merely continued and clarified an existing practice."  (ECF No. 50 at 29.)  As explained, the 2019 and 2022 IMs do much more than that: they create incentivized adoption opportunities in several new states and alter the terms of the 2001 and 2009 pilot programs in several substantive respects.[11]  (*See generally* ECF Nos. 47-12 at 92–95, 47-28 at 86–90.)  The appeal right established in the AIP application form creates a right to due process—for the first time—for those who are rejected from participating in the nationwide AIP.  (ECF No. 58 at 17.)

The Court's conclusion that the 2019 and 2022 IMs are legislative rules is further bolstered by the *Western Watersheds Project* decision, on which Petitioners rely.  There, the court discerned a legislative rule where the BLM's IM allowed for some "discretion . . . in limited degree on some details"; stated that "[i]t is effective immediately"; "outline[d] the leasing procedures for all current and future parcels under

---

[11] For this reason, the Court rejects Respondents' argument that Petitioners' APA claim is time-barred because it merely challenges the "BLM's long-running incentive practice."  (ECF No. 50 at 36.)

review by BLM field offices and correspondingly creates binding legal obligations";

conferred a right to appeal an adverse decision; and "d[id] not clarify existing policy as

much as it create[d] it."  *Id.* at 1067.

Similarly, here, the 2019 and 2022 IMs state that they are effective immediately;

outline current and prospective procedures for implementing the nationwide AIP;

guarantee "adversely affected" applicants a right to appeal; and create, for the first time,

substantive policy in at least six new Western States.  *See id.* at 1062 (observing that

the use of the words "effective immediately" "lets the air out of any argument that IM

2018-034 operates only as provisional guidance").  (*See generally* ECF Nos. 47-12 at

92–95, 47-28 at 86–90.)  And while the Court recognizes that the IM in *Western*

*Watersheds Project* included more mandatory language than is present in the 2019 and

2022 IMs, nevertheless, as explained, the record suggests that the only relevant criteria

BLM officials consider when rendering a decision on an AIP application is whether the

applicant satisfied the eligibility criteria outlined therein.  Put another way, it is evident to

the Court that, although the BLM was careful to use the word "should" throughout the

2019 and 2022 IMs, the agency really meant "shall."  *See Columbia Riverkeeper v. U.S.*

*Coast Guard*, 761 F.3d 1084, 1094–95 (9th Cir. 2014) (agency action is final if

"immediate compliance with its terms is expected"); *see also Appalachian Power Co. v.*

*EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) ("If an agency acts as if a document issued

at headquarters is controlling in the field, . . . then [it] is for all practical purposes

'binding.'") (citation omitted).

In reaching this conclusion, the Court appreciates that the line distinguishing

legislative and interpretive rules is often a "blurry" one.  *Pendley*, 523 F.Supp.3d at 53;

*see also Tennessee Hosp. Ass'n*, 908 F.3d at 1042 ("The distinction between a legislative rule and an interpretive rule can be difficult to discern.").  That is especially so here, where the BLM was careful to draft the 2019 and 2022 IMs without using binding language.  Yet an agency cannot avoid its notice and comment obligations by simply clothing instruction memoranda in permissive language, only to then treat them in practice as mandatory.  *See Air Transp. Ass'n of Am. v. Fed. Aviation Admin.*, 291 F.3d 49, 55 (D.C. Cir. 2002) (it is "well-established that an agency may not label a substantive change to a rule an interpretation simply to avoid the notice and comment requirements"); *see also Chiang*, 503 F. Supp. 2d at 350 ("Thus, although defendants now self-servingly assert that the Guidelines do not bind MMS, the record clearly indicates otherwise.").

On this record, the Court concludes that the legal effects of the 2019 and 2022 IMs render them legislative rules.  *See Pendley*, 523 F.Supp.3d at 53 (advising courts to focus on *both* the legal effects of an agency's action and the agency's characterization of its action).  As such, the Court holds that the BLM violated the procedural requirements of the APA by issuing them without conducting the necessary notice and comment procedures.  *See Tennessee Hosp. Ass'n*, 908 F.3d at 1042 ("If an agency attempts to issue a legislative rule without abiding by the APA's procedural requirements, the rule is invalid.").

### 3.   SUBSTANTIVE APA VIOLATION

The Court also agrees with Petitioners that the 2019 and 2022 IMs "run[] afoul of the APA's" substantive requirements.  (ECF No. 46 at 50.)

Recall that courts review APA challenges under the arbitrary and capricious standard.  *Rocky Mountain Wild*, 98 F.4th at 1290.  When "review[ing] an agency action

for arbitrariness," the Court's "'inquiry under the APA must be thorough, but the standard of review is very deferential to the agency.'"  *Fabrizius v. Dep't of Agric.*, 2025 WL 582723, at *5 (10th Cir. Feb. 24, 2025) (quoting *OXY USA Inc. v. U.S. Dep't of the Interior*, 32 F.4th 1032, 1044 (10th Cir. 2022)).  The Court may "'not substitute [its] judgment for that of the agency.  Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of the U.S.*, 463 U.S. at 43).  "[T]he grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record"; "[a]fter-the-fact rationalization by counsel in briefs or argument will not cure noncompliance by the agency with these principles."  *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1192 (10th Cir. 2023) (Rossman, J., concurring in part) (quoting *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994)).

Petitioners contend that the 2019 and 2022 IMs "disregard[] the clear congressional intent that wild horses and burros must be treated humanely and must not be slaughtered."  (ECF No. 46 at 42–43.)  Petitioners focus in part on Congress's 2021 appropriations bill, wherein it prohibited the BLM from using federal funds that result in "(1) the destruction of any healthy, unadopted, and wild horse or burro under the jurisdiction of the Secretary concerned (including a contractor); or (2) the sale of a wild horse or burro that results in the destruction of the wild horse or burro for processing into a commercial product."  Pub. L. No. 116–94, 133 Stat. 2534.  (ECF No. 58 at 24.)

The Court does not understand Petitioners to allege that the 2019 and 2022 IMs

result in harm to wild horses still "under the jurisdiction of the Secretary," so the first prohibition listed in the appropriations bill is not applicable here.  Petitioners instead complain of harm suffered by horses *after* the BLM transfers title to the adopter pursuant to the 2022 IM.  (*Id.*)  Petitioners contend that the second prohibition forbids the BLM from adopting wild horses to the public if that adoption "results in the destruction of the wild horse or burro for processing into a commercial product."  *Id.*

As Respondents point out, however, Petitioners' arguments conflate adoptions with sales.  (ECF No. 50 at 48.)  As its name suggests, the nationwide AIP, promulgated by the 2019 and 2022 IMs, does not involve sales—only adoptions.  Hence, based on the plain text of Congress's 2021 appropriations bill, Respondents did not act arbitrarily or capriciously by initiating the 2019 and 2022 IMs.  Petitioners' interpretation of Congress's 2021 appropriations bill stretches its plain language too far.  They posit that the "BLM necessarily is foreclosed under federal law from spending any appropriated funds (through the AIP or otherwise) that foreseeably leads to anyone engaging in the sale of a wild horse or burro that results in the destruction of the wild horse or burro for processing into a commercial product."  (ECF No. 58 at 25 (cleaned up).)  But this reading cannot be reasonably squared with the Act, which divests a wild horse of its protected federal status—and the BLM of its jurisdiction over the horse—once the BLM transfers title to a qualified adopter after one year of care.  *See* § 1333(d)(1) (explaining that a wild horse "shall lose their status as wild free-roaming horses and burros and shall no longer be considered as falling within the purview of" the Act after one year of care).  Petitioners' reliance on Congress's appropriations bill is therefore misplaced.

Petitioners' reliance on the Act's other mandates, however, fares much better.

According to Petitioners, the 2019 and 2022 IMs contravene the Act's requirements that the BLM (1) protect wild horses and burros from "capture, branding, harassment, or death," § 1331, and (2) only offer wild horses for adoption after determining that the adopter "can assure humane treatment and cure (including proper transportation, feeding, and handling)," § 1333(b)(2)(B).  (ECF No. 46 at 42.)  Petitioners also argue that Respondents failed to consider "whether limiting the AIP to untrained horses increases the likelihood of horses being slaughtered."  (ECF No. 58 at 24.)

Respondents counter that the 2019 and 2022 IMs include several "safeguards" for ensuring that wild horses are protected and humanely cared for.  (ECF No. 50 at 42.)  For instance, Respondents explain, the IMs

- limit adopters to obtaining title to a maximum of four animals within a 12-month period;

- require BLM officials to conduct compliance checks within six months of the adoption date on untitled animals while in private care; and

- require adopters to affirm in writing, subject to perjury, that they do not intend to sell or transfer an adopted wild horse or burro for slaughter or processing into commercial products.

(*Id.* at 40–42.)

Moreover, Respondents continue, the BLM notifies the Department of Justice when false and misleading statements are made by adopters.  (*Id.* at 40.)  Respondents reason that these measures are sufficient to lessen the chance of later animal abuse because "the required investment to feed and care for a horse or burro for 12 months also serves as a strong disincentive to adopt animals with an eye toward turning them

for profit, even with the $1,000 incentive payment.  Though it varies by state, it can typically cost several thousand dollars per year to provide good feed and care for a horse."  (*Id.* at 41.)

The problem with some of Respondents' arguments, however, is that they stand on very little record evidence.  Respondents hardly respond to Petitioners' contention that they failed to consider whether offering *trained* wild horses, as opposed to *untrained* wild horses, would decrease the chances that the horse would be slaughtered, *i.e.*, be treated inhumanely and protected from, among other things, death.  *See* § 1333(b)(2)(B).  Instead, Respondents merely state that Petitioners' "disagreement with BLM's adoption incentive practice does not invalidate the IMs."  (*Id.* at 42.)  In this way, Respondents fail to point to record evidence showing that they "consider[ed] important aspects of [the] problem."  *Am. Petroleum Inst.*, 81 F.4th at 1058 (internal quotation marks omitted).

Respondents other explanations similarly fall short.  Although they reason that the upfront costs of caring for a wild horse often outpace the $1,000 incentive payment, Respondents' citation to supporting record evidence is to a response to Senator Feinstein's letter urging the BLM to immediately suspend the AIP.  (ECF No. 47-27 at 56.)  But this response post-dated the initiation of the 2019 IM by two years.  Thus, it is not evidence that the BLM considered this alternative when it created the nationwide AIP in 2019.  Respondents' claim that they protect wild horses by "inform[ing] sale facilities across the country that selling or attempting to sell wild horses and burros . . . is illegal" is also unsubstantiated.  (ECF No. 50 at 40.)  The Court has reviewed the portions of the record cited by Respondents in support of this claim—nothing therein

aligns with this assertion.   (*See generally* ECF No 47-28 at 79–88.)

Nor does the record suggest that Respondents considered an important aspect of the problem when it revised the 2022 IM to require adopters to sign an agreement "that they will not *knowingly* sell or transfer ownership of an adopted animal to any person or organization that intends to resell, trade, or give away the animals for slaughter or processing into commercial products." (ECF No. 50 at 12) (emphasis added).  This constitutes a change from the practice established by the 2019 IM, which required adopters not to transfer ownership of a wild horse to an organization that intends to give the animal away for slaughter, regardless of the adopter's mental state. Respondents cite no record evidence explaining why the BLM made this change.  In fact, Respondents ignore this point altogether in their response brief.  (*See generally* ECF No. 50.)

This relative paucity of record evidence explaining Respondents' rationales for issuing the 2022 IM is not surprising, of course, because the BLM did not subject the 2019 and 2022 IMs to notice and comment procedures, nor perform a robust, substantive NEPA analysis, as the Court will next explain.  But it is not incumbent on the Court to scour the record for evidence supporting Respondents' claim that they "consider[ed] important aspects of [the] problem."  *Id.*  Nor can the Court "supply a reasoned basis for the agency's action that the agency itself has not given."  *Copar Pumice Co.*, 603 F.3d at 794 (internal quotation marks omitted).

For all these reasons, the Court holds that the 2022 IM violates the substantive requirements of the APA, and consequently constitute arbitrary and capricious agency action.

**B.    NEPA VIOLATION**

Petitioners contend that Respondents violated NEPA by failing to conduct a meaningful analysis as to the potential environmental impacts of the 2019 and 2022 IMs.  (ECF No. 46 at 37.)  Again, the Court agrees.

Because NEPA does not "provide for a private right of action, [courts] review" such challenges "under the APA."  *Wild Watershed v. Hurlocker*, 961 F.3d 1119, 1126 (10th Cir. 2020); *see also Rocky Mountain Peace & Just. Ctr. v. United States Fish & Wildlife Serv.*, 40 F.4th 1133, 1142 (10th Cir. 2022) ("The APA provides a private right of action to challenge agency actions that violate NEPA.").  As before, the Court "will only overturn agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Wild Watershed*, 961 F.3d at 1126 (quoting 5 U.S.C. § 706(2)(A)).

"A federal agency must prepare an environmental impact statement ('EIS') before it takes a 'major Federal action[ ] significantly affecting the quality of the human environment.'"  *Rocky Mountain Peace & Just. Ctr.*, 40 F.4th at 1143 (quoting 42 U.S.C. § 4332(C)).  "The EIS must provide a detailed statement on (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided," (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and . . .  enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action."  *Id.* (internal quotation marks omitted).

"The Council on Environmental Quality ("CEQ") has promulgated regulations governing the preparation of an EIS."  *Id.* (citing 40 C.F.R. §§ 1500-1508.28.4).  "The agency preparing the EIS must [r]igorously explore and objectively evaluate all

reasonable alternatives, [i]nclude the alternative of no action, and if one or more exists, [i]dentify the agency's preferred alternative." *Id.* § 1502.14(a), (d), (e).

"Once the agency has completed its EIS, . . . it must wait a prescribed period of time before it may make a decision on the proposed action." *Id.* § 1506.10.  When the agency makes a decision, it "shall prepare a concise public record of decision," which must (1) "[s]tate what the decision was," (2) "[i]dentify all alternatives considered by the agency in reaching its decision," and (3) "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted." *Id.* § 1505.2.

"When an agency is uncertain as to whether a new project warrants an EIS," however, "it may identify categorical exclusions of actions that do not require preparation of either an EA or an EIS." *Rocky Mountain Peace & Just. Ctr.*, 40 F.4th at 1143.  A categorical exclusion ("CE") "means a category of actions which do not individually or cumulatively have a significant effect on the human environment." *Id.* § 1508.4.  To establish these CEs, the agency must determine that such projects have no major environmental effects. *Id.*  But the agency must also allow "for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." *Id.*  In such extraordinary circumstances, an agency cannot rely on a CE to avoid preparing an EA or an EIS. *Id.*; *see also* 43 C.F.R. § 46.215(a), (c) (agencies cannot rely on categorical exclusions if certain extraordinary circumstances apply, including when the proposed action may have (1) "significant impacts on public health or safety," or (2) "highly controversial environmental effects").[12]

---

[12] But, "[i]f an agency is uncertain whether the proposed action will significantly affect the environment, it may prepare a considerably less detailed environmental assessment" ("EA") to

Here, the BLM undisputedly elected not to prepare an EIS or EA before issuing the 2019 and 2022 IMs.  (ECF No. 47-28 at 82.)  Instead, it invoked a CE under 43 C.F.R. § 46.210(i), which exempts "policies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environment effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case."  (*Id.*)  The BLM's explanation for invoking this CE reads, in part, as follows: "Issuing a revised IM is a purely administrative function and the contents of the revised IM are of an administrative and procedural nature."  (*Id.* at 82–83.)

Petitioners argue that, contrary to the BLM's assertion, the 2019 and 2022 IMs are not administrative in nature because they aim "to significantly increase private ownership of federally protected wildlife, not purely to reduce administrative burdens." (ECF No. 46 at 39.)  Moreover, Petitioners add, the BLM "failed to justify another central premise of this CE"—namely, that the IMs' environmental impacts were too broad, speculative, or conjectural.  (*Id.* at 40.)

Petitioners' arguments are well-taken.  First, for the reasons already discussed, the 2019 and 2022 IMs are substantive, and not merely administrative, because they expand the public's right to apply for the AIP on a nationwide basis and guarantee an appeal of a denial of that right.  Notably, the IMs themselves dispel any contrary conclusion.  The IMs plainly disclaim having an administrative purpose, instead declaring that they are "related" to the BLM's "Mission" "to increase the number of

---

determine whether an EIS is necessary. *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 736 (10th Cir. 2006) (citing 40 C.F.R. § 1508.9).

adoptions of untrained wild horses and burros placed into private care through offering financial incentives to defray associated initial costs, such as veterinary care, feed, and training."  *See Shearwater v. Ashe*, 2015 WL 4747881, at *17 (N.D. Cal. 2015) ("In addition, the primary purpose of the Final 30–Year Rule, *according to the regulation itself*, was not to reduce FWS's administrative burden.  Rather, the primary purpose was to "facilitate the responsible development of renewable energy and other projects designed to operate for decades.") (emphasis added).  (ECF No. 47-12 at 92.)

Second, Petitioners correctly point out that the BLM failed to support its claim that the IMs' "environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis."  43 C.F.R. § 46.210(i).  Respondents offered no explanation whatsoever in its CE on this topic.  The BLM instead attempted only to substantiate its CE by claiming that "subsequent adoptions and titling events will later be subject to the NEPA process, either collectively or on a case-by-case basis."  (*Id.* at 40.)  But, as another court explained on nearly identical facts, agencies "must establish both prongs of the second portion of the CE" to prevail.  *See Shearwater*, 2015 WL 4747881, at *21.  Because the BLM "has failed to 'adequately explain its decision' to rely on the 'too broad, speculative, or conjectural to lend themselves to meaningful analysis' prong of the second portion of the CE,'" the Court concludes that this, too, renders the BLM's reliance on the CE infirm.  *See id.* at *20 (quoting *Sierra Club v. Bosworth*, 510 F.3d 1016, 1026 (9th Cir.2007)).

Third, and finally, even had the BLM properly invoked a CE (which it did not), it still had to adequately "determine whether [the action] meets any of the extraordinary circumstances."  43 C.F.R. § 46.205(c)(1).  On this point, the BLM simply listed the

various criteria included in 43 C.F.R. § 46.215 and stated as follows: "The proposed action has been reviewed with the list of extraordinary circumstances (43 CFR 46.215) described below; none of these circumstances apply to the proposed action."  (ECF No. 47-28 at 83.)

The Court is not convinced by this conclusory statement that extraordinary circumstances may not apply.  Petitioners aver that extraordinary circumstances may apply because the IMs: (1) involve "unresolved conflicts concerning alternative uses of resources," 43 C.F.R. § 46.215(c); (2) "[v]iolate a Federal law . . . or requirement imposed for the protection of the environment," 43 C.F.R. § 46.215(i); and (3) have "highly controversial environmental effects," 43 C.F.R. § 46.215(e).  (ECF No. 46 at 35–37.)  Petitioners advance plausible arguments in support of each of these averments. For example, Petitioners cite record evidence suggesting that expending resources towards adopting trained wild horses, instead of untrained horses, could be a better use of resources.  (ECF No. 46 at 36.)  They also point to record evidence suggesting that the 2019 and 2022 IMs may violate federal law, reiterating that over 30 members of Congress wrote to the BLM opining that this was the case.  (*Id.*)

To their credit, Respondents thoroughly respond to each of these points in their brief.  (*See* ECF No. 50 at 44–48.)  But these belated explanations should have been offered when the BLM invoked the CE.  The Court cannot consider them this late in the game to conclude that no extraordinary circumstances may apply.  *See Rocky Mountain Wild*, 98 F.4th at 1294 ("When 'considering whether the agency took a 'hard look,' we consider only the agency's reasoning at the time of decisionmaking, *excluding post-hoc rationalization concocted by counsel in briefs or argument*.") (quoting *New Mexico ex*

*rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009)) (emphasis added).  While an agency's "reliance on a categorical exclusion need only be long enough to indicate to a reviewing court that the agency indeed considered whether or not a categorical exclusion applied," the conclusory statement supplied by the BLM on this score did not.  *Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 81–82 (D.D.C. 2013).

In sum, the Court concludes that the BLM failed to show an adequate basis in the record for electing not to prepare an EIS—much less for not preparing even a concise EA review document—prior to issuing the 2019 and 2022 IMs.  *See Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006) ("[N]ot only did [the agency] fail to conduct an EIS . . ., it did not even conduct an EA."); *see also Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 995 (9th Cir. 2023) ("[W]hen an agency is uncertain about the possible environmental effects of a proposed action, the proper course is to prepare an EA to the best of the agency's ability, not to avoid environmental analysis altogether.").  Putting aside the importance of the AIP in advancing the BLM's "worthy goal[s], it is no substitute for the [agency's] obligations to comply with NEPA and to conduct a studied review and response to concerns about the environmental implications of major agency action."  *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 492 (9th Cir. 2011).  Consequently, the Court holds that the BLM violated NEPA's procedural requirements when it promulgated the 2022 IM.

## C.    REMEDY

For the foregoing reasons, the Court discerns both an APA and NEPA violation. The Court must now fashion a remedy.

Petitioners ask the Court to vacate the 2019 and 2022 IMs and require the BLM

to conduct the proper APA and NEPA procedures on remand.  (ECF No. 46 at 45.)

Respondents maintain that, "[t]o the extent the Court does identify infirmities associated

with the IMs, remand without vacatur of the IMs would be the appropriate remedy."

(ECF No. 50 at 44.)  Respondents offer two reasons for why this is the case: (1) "BLM

can cure any defect on remand"; and (2) vacatur "would result in disruptive and

unintended consequences," *i.e.*, "BLM officials would lack consistent guidance on how

to uniformly apply adoption incentives nationally," which could jeopardize the likelihood

of wild horses and burros reaching "good adoptive homes" in a consistent manner.  (*Id.*)

"Under the APA, courts 'shall' 'hold unlawful and set aside agency action' that is

found to be arbitrary or capricious.  Vacatur of agency action is a common, and often

appropriate form of injunctive relief granted by district courts."  *WildEarth Guardians*,

870 F.3d at 1239 (quoting 5 U.S.C. § 706(2)(A)).  Still, district courts have discretion to

fashion relief other than vacatur.  *See Oregon-California Trails Ass'n v. Walsh*, 467

F.Supp.3d 1007, 1074 (D. Colo. 2020) ("The Court will grant for purposes of argument

that 'shall' in 'shall hold unlawful and set aside,' 5 U.S.C. § 706(2)(A), sometimes does

not mean 'shall.'"); *see also Diné Citizens Against Ruining Our Env't v. U.S. Office of

Surface Mining Reclamation & Enf't*, 2015 WL 1593995, at *1 (D. Colo. Apr. 6, 2015)

(interpreting 5 U.S.C. § 702 as "preserving the power of courts to apply equitable factors

in the [APA § 706] remedies analysis").  "[T]he party seeking to avoid vacatur of agency

action bears the burden of showing entitlement to such extraordinary relief by

presenting extraordinary facts that would support an exception."  *Rocky Mountain Wild

v. Dallas*, 636 F. Supp. 3d 1289, 1307 (D. Colo. 2022) (citing *Nat'l Parks Conservation

Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019)), *vacated on other grounds*, 98

F.4th 1263 (10th Cir. 2024).

In the Court's view, both sides present compelling arguments.  On the one hand, Petitioners argue that "remand without vacatur will send many more federally protected horses to horrific death by slaughter while BLM conducts its APA and NEPA processes."  (ECF No. 58 at 27.)  On the other hand, Respondents and Amicus, The Property and Environment Research Center, argue that the AIP is critical to ensuring that wild horses and burros are not forced to compete for diminishing forage and water sources, while harming the environment in the process.  (*See, e.g.*, ECF No. 54 at 5 ("This overpopulation also has negative consequences on native wildlife.  In times of drought, wild horses compete not only amongst themselves for food and water but also with native pronghorn, elk, and other ungulates.").)  The Court therefore cannot fashion a remedy based only on these sympathetic policy concerns.  *Cf. Citizens for a Healthy Cmty. v. United States Bureau of Land Mgmt.*, 2019 WL 13214042, at *2 (D. Colo. Dec. 10, 2019) (declining to vacate agency action based in part on the consequences of doing so).

What's left, then, are the arguments raised by Respondents in their brief.  (ECF No. 50 at 44.)  Simply put, these reasons do not constitute extraordinary circumstances. Respondents' argument that the "BLM can cure any defect on remand" is unpersuasive because that is true in most, if not all, APA and NEPA cases.  (*Id.*)  And their argument that "BLM officials would lack consistent guidance on how to uniformly apply adoption incentives nationally" fares no better, as the BLM managed to implement the 2001 and 2009 pilot programs well before the 2019 and 2022 IMs were promulgated.  *See Oregon-California Trails Ass'n*, 467 F.Supp.3d at 1074 (vacating agency action where

the record revealed that the respondents had previously "managed to continue their operations without serious disruption"). (ECF No. 50 at 44.) If anything, Respondents have insisted that vacatur of the 2022 IM would not disturb the BLM's efforts adopting wild horses and burros in certain states pursuant to its other adoption incentive programs. (*See* ECF No. 50 at 27 (asserting that "a judicial decision invalidating the IMs" would not affect "BLM's overall incentive practice").)

Thus, the Court remains unconvinced that Respondents have met their heavy burden of showing that the Court should deviate from 5 U.S.C. § 706(2)(A)'s direction that courts are to "set aside" procedurally deficient agency actions.

## IV. CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1. Instruction Memorandum 2022-014 is hereby VACATED;

2. This matter is REMANDED to the BLM for further proceedings consistent with this Order;

3. The Clerk shall enter judgment in favor of Petitioners and against Respondents, and terminate this action; and

4. Petitioners shall have their costs upon compliance with D.C.COLO.LCivR 54.1.

Dated this 3rd day of March, 2025.

BY THE COURT:

William J. Martínez
Senior United States District Judge